

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | : | **CASE NO. C-1-02-107** |
| | : | |
| Plaintiffs, | : | |
| | : | Judge S. Arthur Spiegel |
| SIERRA CLUB, ET AL., | : | Magistrate Judge Timothy S. Hogan |
| | : | |
| Intervenors, | : | |
| | : | |
| v. | : | |
| | : | |
| BOARD OF COUNTY COMMISSIONERS | : | |
| OF HAMILTON COUNTY, OHIO, ET AL. | : | |
| | : | |
| Defendants. | : | |

**SIERRA CLUB AND MARILYN WALL'S MEMORANDUM IN OPPOSITION TO THE**
**UNITED STATES' MOTION FOR ENTRY OF CONSENT DECREE**

60

## I. INTRODUCTION AND EXECUTIVE SUMMARY

> *... I have only had forty-eight hours, as a Commissioner, to consult people who I respect and who I trust and whose opinions I think are valuable and important. I have only had forty-eight hours in which to try to get some modicum of information to help me make a policy decision that is going to impact this County for twenty-five years or more. That is not enough. That is not enough.*

> Hamilton County Commissioner Todd Portune,
> February 13, 2002[1]

On February 13, 2002, two lawyers for the Citizen-Plaintiffs in this case appeared before the Hamilton County Commissioners to offer a "stand-still" agreement and to plead with the elected officials for a short period of time to see whether the citizens and the county officials could resolve citizen's concerns about the obvious flaws that were already apparent in the Interim Partial Consent Decree ("IPCD" or "Partial Decree"). The Sierra Club and Marilyn Wall[2], and other members of the public, were allowed to see the proposed Decree for the first time less than forty-eight earlier.

The official videotape of the February 13th Commissioners' meeting clearly shows both confusion and sharp differences among County officials on the justification for the prior secrecy of the proposed IPCD and the need to give the public and the Commissioners sufficient time to analyze the Partial Decree so that everyone could understand its full implications.[3] One Commissioner said that he understood that the ***Department of Justice*** said the decree had to be signed by the Commissioners before February 15, 2002 (the date that the Citizen-Plaintiffs became entitled to file a citizen suit pursuant to the Clean Water Act). Another Commissioner admitted that the attempt to gain a tactical advantage over the Citizen-Plaintiffs had turned the County's public comment period into a "farce." Commissioners were also advised that the U.S. EPA's public comment period would only allow the

---

[1] Speaking at a regular meeting of the Hamilton County Commissioners.

[2] The Sierra Club and Marilyn Wall are the Plaintiffs in *Sierra Club et al. v. Hamilton County et al.* (case no. C-1-02-135) that has been consolidated with the twin cases *U.S. v. Hamilton County* No. C-1-02-107 and *Ohio v. Hamilton County* No. C-1-02-108. Pleadings in all three cases now bear the number C-1-02-107. Additionally, the Sierra Club and Marilyn Wall have been recently granted Intervention in the consolidated *United States v. Hamilton County*, No. C-1-02-107.

[3] Memorandum in Opposition to Defendants' Motion to Dismiss Under Rule 12(b)(1), at 32 and Exhibit "E" attached thereto. Intervenors incorporate by reference herein their Memorandum in Opposition to Defendants' Motion to Dismiss and attached Exhibits.

1

federal government, not the Commissioners, the opportunity to change the terms of the Partial Decree. The transcript of a relevant colloquy from the hearing is attached as Exhibit 1.

The videotape clearly shows that Commissioner Dowlin entered the Commissioner's meeting with the belief that February 13, 2002 was a "magic date" to the MSD and its lawyers for the Commissioners' approval of the IPCD. It was magic because fifty-eight days earlier the Citizen-Plaintiffs had, after years of active concern and months of research and review of the records, sent the County, the City, the MSD, the U.S. EPA, the Ohio EPA and the Department of Justice a Citizen-Suit Notice Letter specifically outlining the MSD's violations of federal and state environmental laws. Instead of inviting the Citizen-Plaintiffs to join the government-to-government negotiations during the sixty-day notice period (pre-litigation dispute resolution is one of the reasons for the statutorily mandated 60-day waiting period)[4], the MSD urged that the citizens not be included and the other governmental entities agreed. The end result was a highly unusual and suspect product called an "Interim Partial Consent Decree," designed more to prevent citizen input and enforcement than to promptly stop violations of federal law.

In addition to being alarmed by the Partial Decree's lack of compliance requirements, its illegal remedies (*see* discussion of SSO 700 below), and the absence of any civil penalties for past and ongoing violations, the Citizen-Plaintiffs were concerned from the outset that the health, safety, and property rights of Hamilton County residents would be profoundly impaired by the Partial Decree. The raw sewage dumped by the Defendants into the various waterways transversing through Hamilton County carries with it bacteria, viruses, and toxic chemicals from industrial sources.[5] The Partial Decree, if approved, will be immediately used as a shield against abatement actions and allow these conditions to persist at some locations for up to twenty years, and at other locations indefinitely. As a

---

[4] Under the Clean Water Act, Citizen-Plaintiffs are able to, but not required to, file a lawsuit immediately after the expiration of 60 days; rather, federal courts obtain *jurisdiction* over the controversy after the 60-day period has expired.
[5] Like the residents of Hamilton County, industrial users of the sewer system pay the County for treating *all* of their wastes, but, in fact, only get part of the waste treated. The rest is expelled from the system (usually during rainfall events) before it ever reaches the wastewater treatment plant and is rendered safe for discharge.

result of the IPCD, many residents would also be doomed to another twenty years of sewage in their basements (which have been appropriated by the MSD as periodic *de facto* storage tanks) under the terms of the Decree that was before the Commissioners on February 13 and is before the Court in the case at bar.

On February 15, 2002, two days after the Commissioners' public "hearing," the Department of Justice and the State of Ohio coordinated the filing of separate but similar complaints in federal court. The Partial Decree was filed, *with these complaints*, on the same day. The two cases were promptly consolidated under the heading *United States, et al v. Hamilton County, et al.*, were assigned to Judge Weber and later transferred to Judge Beckwith.

On February 27, 2002, the Citizen-Plaintiffs filed a broader and more comprehensive Complaint, styled *Sierra Club, et al. v. Hamilton County, et al.* ("Sierra Club case"), which included a preliminary list of deficiencies that had already been found in the Partial Decree and that sought further relief not obtained by the Partial Decree. The Citizen-Plaintiffs filed a Motion for Consolidation of the Sierra Club case with the consolidated U.S. and Ohio cases because of overlapping issues and discovery needs in the two cases. The motion was unopposed and the other parties did not quarrel with the basis for the motion, which was granted by Judge Beckwith. She ordered that subsequent pleadings should be filed under the *United States v. Hamilton County, et al.* caption. *See* Sierra Club's Motion to Consolidate, filed April 1, 2002, Doc. No. 5, 02-CV-107.

Even after all three cases were consolidated, the Citizen-Plaintiffs continued to be left out of ongoing discussions among the other parties. As a result, the very members of the public who have a multi-year history of research and concern for Hamilton County's sewer problems have systematically been shut out of the process, at every step, even though they and many of their members are directly affected by the MSD's illegal discharges, even though the Citizen-Plaintiffs are clearly able to understand the technical issues, even though Sierra Club has been allowed to correct similar problems in other communities in the country, and even though some of the best sewer experts in the United

States are ready, willing, and able to assist the parties and the Court in resolving the issues in contention.

Once the details of the decree were known, the first opportunity for the Citizen-Plaintiffs to seek correction of the problems was before the Commissioners in February 2002. Unfortunately, the County Commissioners were rushed into rubber-stamping the document that they themselves did not have adequate time to evaluate—without hearing evidence of the Partial Decree's impact on the lives and legal rights of thousands of Hamilton County residents. The Sierra Club case and the intervention granted by this Court offer the second opportunity for the Citizen-Plaintiffs to seek correction of the problems. Yet, this Court is now being told that the issues are "too technical" for the Court to allow even minimal discovery and an evidentiary hearing before this Court decides whether it can and should approve the Decree.

Further, despite the Partial Decree's illegal provisions, its deferral of compliance until some yet undetermined future date, and its lack of a monetary penalty, the MSD is attempting to use the Partial Decree as a shield to stall all discovery related to the broader Sierra Club case and, worse yet, as a shield to immediate abatement of sewer overflows and related health threats. The MSD even seeks dismissal of some or all of the Sierra Club case based on the filing of the Partial Decree. Initial discovery in both cases will reveal why approval of the current Partial Decree must be denied, and why the Sierra Club case must go forward.

Hence, while the present record, including the expert affidavits attached to this pleading, justifies this Court's immediate rejection of the Partial Decree, at the very least, the Court should open the process to the Citizen-Plaintiffs by allowing discovery on the "diligent prosecution" and "adequacy of the decree" issues, and by holding an evidentiary hearing to build a record to assist the Court in its

4

evaluation of the Partial Decree.[6]

**II.     TWO OF THE FEDERAL GOVERNMENT'S LEADING ENVIRONMENTAL EXPERTS AND A REVIEW OF THE PARTIAL DECREE'S ILLEGAL, INADEQUATE, AND UNENFORCEABLE TERMS CONFIRM THAT THE DOCUMENT BEFORE THE COURT DOES NOT MEET THE REQUIREMENTS OF THE CLEAN WATER ACT AND CANNOT BE APPROVED.**

As if the U.S. EPA and Ohio's history of lax enforcement and the MSD's rush to have an

admittedly incomplete, illusory document approved were not enough to cause concern, two of the

federal government's most prominent experts have found the Partial Decree in the case at bar to be a

*wholly ineffective* vehicle for eliminating illegal Sanitary Sewer Overflows (SSOs) in Hamilton

County.

- Dr. Bruce Bell, an expert who has thirty-plus years of engineering practice in sewage treatment matters (many of those assisting the U.S. EPA and the DOJ including in the development of consent decrees to resolve Clean Water Act violations), has never seen a consent decree before this one that requires *only planning, not compliance*, for the vast majority of violations and that allows the use of an *illegal remedy* for any period of time, let alone 20 years.[7]

- Dr. Michael Kavanaugh, who was at one time the Justice Department's expert on economic feasibility and civil penalties, also states, "I have never been involved in an enforcement action that was settled *without the payment of civil penalties*."[8]

The proponents of the Partial Decree (the government Plaintiffs and the Defendants) have the

burden of producing evidence that enables this Court to determine independently whether the Partial

Decree is lawful, fair, reasonable and consistent with the Clean Water Act.[9] *Gautreaux v. Pierce*, 690

F.2d 616, 630-31 (7th Cir. 1982). "Approval of a consent decree is a judicial act, committed to the

informed discretion of the trial court, which must satisfy itself that the agreement 'is fair, adequate, and

reasonable' and 'is not illegal. . .or against the public interest.'" *Bragg v. Robertson*, 83 F.Supp. 2d 713

---

[6] *See generally, Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 (1986). The type of fairness hearing that this Court should hold is best exemplified by the hearings held in *United States v. Hooker Chemicals and Plastics Corp.*, 540 F. Supp. 1067 (W.D.N.Y. 1982).
[7] Bell Declaration, Ex. "A" to Sierra Club's Memorandum in Opposition to Defendants' Motion to Dismiss (First Bell Declaration), attached hereto as Exhibit 2; Second Bell Declaration, attached hereto as Exhibit 3, at para. 11.
[8] Ex. "B" to Sierra Club's Memorandum in Opposition to Defendants' Motion to Dismiss (Kavanaugh Declaration), attached hereto as Exhibit 4, at para. 6.
[9] A district court's "authority to adopt a consent decree comes only from the statute which the decree is intended to enforce." *System Federation No. 91, Railway Employees' Department, AFL-CIO v. Wright*, 364 U.S. 642, 651 (1961).

(S.D.W.V. 2000), *aff'd in part, rev'd in part on other grounds, rem. by,* 248 F.3d 275 2001 U.S. App. LEXIS 7412 (4th Cir. 2001). Since the IPCD has illegal, inadequate, and unreasonable terms, the Proponents have sustained that burden for this Partial Decree.

In exercising its authority, a district court should not blindly accept the terms of any proposed settlement. The hands-off approach urged by the proponents in an effort to have this Court "rubber stamp" their agreement should be rejected by this Court due to the past twenty years of lax enforcement that precedes the tendered order, as well as the illegal and suspect terms of this Partial Decree.[10] A searching judicial review is required in the case at bar because the "technical issues" have at their roots public health and environmental concerns that certainly are not beyond this Court's understanding. Substantial public interests are at stake, here, that will have far ranging environmental and health consequences for the citizens of Hamilton County.

One of the most important of all the approvability criteria is the "decree's likely effectiveness as a vehicle for cleansing the [environment]."[11] This Partial Decree is not only ineffective, but it will actually do more harm than good. As discussed below, the IPCD turns its head to thousands of violations of federal law, ignores the significant risks to human health and property, fails to make any progress toward remedying these concerns for at least a decade, and was born of a process that shut out the Citizen-Plaintiffs, County Commissioners and other elected officials, and other citizens from any meaningful review of the flawed agreement. As a result, the Court should reject the Partial Decree and require the parties to either craft an approvable decree or to litigate the merits of the Citizen-Plaintiffs' claims.

---

[10] Some of the sorry history of non-enforcement over the past ten years by OEPA has been previously described in the Sierra Club's Memorandum in Opposition to Defendants Motion to Dismiss and will not be repeated, here. Suffice it to say that, in 1992, the then Director of the OEPA issued a document called the Director's Final Findings and Orders (DFFO), which required the Defendants to submit a plan *and implement a plan with a "fixed-date compliance schedule" to eliminate discharges from the separate sanitary sewerage system overflows*. The Defendants never submitted a fixed-date compliance schedule to eliminate the SSOs and the state of Ohio never enforced its order. The 2002 IPCD is a giant leap backward for the citizens of Hamilton County—a leap backwards to a time before 1992, when the Defendants were purportedly required to actually implement a fixed-date, compliance schedule.

[11] United States Memorandum in Support of its Motion for Entry at 35 *citing United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409 (6th Cir. 1991).

**A.     The Remedies Proposed by the Interim Partial Decree are Unlawful**

One of the most important aspects of the Court's evaluation of a consent decree is whether or not it is lawful.  Among the numerous inadequate and unfair provisions in the Partial Decree, two nationally renowned experts have noted that the decree also contains several unlawful provisions.  The Partial Decree:

- *Improperly approves an interim discharge at SSO 700, which does not meet the Clean Water Act's secondary treatment standard. Second Bell Declaration at para. 24;*

- *Allows SSO 700 to discharge sewage without a permit until 2016 or 2022.  Id. at para. 25, 30.*

- *Does not require construction of remedies that will cease their unlawful discharges, even though remedies are technically feasible within 5 years.  Id. at paras. 5-7, 24.*

The Defendants' single most egregious discharge of raw sewage into the Mill Creek is an enormous outfall called SSO 700, located in Reading, Ohio, directly upstream from soccer fields and recreational areas.  According to the United States' current expert, Mark Klingenstein, P.E., SSO 700 overflows 75 million gallons per year of raw sewage, with a total of 44 overflow days per year (approximately one day in eight).[12]  As stated in the United States' complaint, this activity is plainly illegal.  *See* United States' Complaint, paras. 16-19. Under the Clean Water Act, all discharges must meet secondary treatment standards and must be governed by an enforceable permit.[13]  33 U.S.C. § 1311(a).

Instead of requiring actual compliance with the Clean Water Act at SSO 700—which is technically feasible within five years[14]— the Partial Decree provides for a device that will not meet secondary treatment standards[15] and allows the continuing pollution at SSO 700 for the next 20 years

---

[12] Klingenstein affidavit, para. 9, attached to the United States' Memorandum in Support of Entry of Consent Decree.

[13] Secondary treatment is defined by 40 C.F.R. §133.102 as a set of effluent performance criteria that must be met by all municipal sewer systems.

[14] Second Bell Declaration at para. 24.

[15] As Dr. Bruce Bell points out in his first and second declarations, the CEHRS cannot meet the requirements of secondary treatment from an engineering standpoint and thus, is not able to be permitted.  *See* First Bell Declaration, paras. 17-21; Second Bell Declaration, para. 24.

via the creation of a device that offers only the illusion of pollution control (despite the long-term operation and illusory control provided by it, the IPCD calls this device a Chemically Enhanced High Rate Settling and Storage Facility [CEHRS]. Nor are Defendants required to obtain a permit for this fourteen to twenty-year period. Rather, the Partial Decree is silent on this issue, because the U.S. EPA and the OEPA both know that this interim facility cannot meet the requirements for secondary treatment and cannot, therefore, be legally permitted. *See* Second Bell Declaration para. 24. This "negotiation victory" for the MSD is nothing but a transparent scheme to violate the federal Clean Water Act by allowing unpermitted sewage to flow directly into public waterways and onto public and private lands.

The Klingenstein affidavit, paras. 10-11, does nothing to change the fact that the IPCD does not mandate compliance with the Clean Water Act for the new ICD discharge point. Klingenstein says that it is "possible" for the CEHRS to achieve removal rates of "over 65% and 90%" (85% is required by 40 C.F.R. Part 133). The mere possibility that in some undisclosed optimum conditions, 90% treatment may be achieved for some short period of time does not establish that the requirements of federal law will be met (this is an example where discovery and cross examination will reveal what is actually possible as well as the suspect basis and limiting nature of Klingenstein's vague assertions).[16]

What is worse, the facility can discharge an unlimited amount of partially treated sewage per year, on an unlimited number of days, without a permit and without any permit limitations—all in violation of 33 U.S.C. § 1311 and the requirement of secondary treatment. 40 C.F.R. Part 133. In fact, there is no requirement in the IPCD that Defendants actually operate the CEHRS at any particular level, on any particular number of days, or maintain it in any particular manner. There are simply no enforceable standards at all at SSO 700.

---

[16] Like the situation leading up to the rejection of the consent decree in *United States v. Telluride*, 849 F. Supp. 1400 (D. Colo. 1994) *rev'd on other grounds*, 146 F.3d 1241 (10th Cir. 1998) (discussed *infra*), the United States' expert in this case, Mark Klingenstein, P.E., relies for many of his assessments and conclusions on Defendants' evaluations, without making his own. *See* Second Bell Declaration, para. 29.

The proponents' attempt to foist the illegal CEHRS on this Court and the public, alone, demonstrates the compelling need for the Court to reject the IPCD.

**B.      The IPCD is Unreasonable and Inadequate to Bring Defendants into Compliance with the Clean Water Act.**

While the United States urges this Court to ministerially grant it deference in the "remedies" chosen in the IPCD, courts have clearly stated that: "...the true measure of the deference [given to a particular administrative agency's decisions] depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances."[17] Here, the MSD's negotiation "victories" render the Partial Decree both patently unreasonable, as demonstrated herein, and plainly inadequate to bring Defendants into compliance with the Clean Water Act. Without reciting the entire contents of the Bell and Kavanaugh declarations, Citizen-Plaintiffs stress a few key points, here. For example the Partial Decree:

- *Does not require elimination of the vast majority of the reported SSOs. Second Bell Declaration, para. 6;*

- *Does not require elimination of any of the unreported SSOs, including the discharges into area residents' basements. Id at para. 8;*

- *Fails to require fixed final construction dates for the few specific construction projects that are required by the Partial Decree—thereby making compliance a mere illusion. Id. at para. 5-6;*

- *Calls for an inadequate operation and maintenance program, which will be ineffective at securing compliance with the Clean Water Act both because of its inadequate terms and the fact that stipulated penalties cannot be collected unless the government-plaintiffs prove that the SSO resulted from the defendants' failure to implement the O&M program. Id. at para. 6;*

- *Does not impose penalties for failure of the Defendants to construct remedies that will cease their sanitary sewer overflows. Id. at para. 5; Kavanaugh Declaration at para. 6;*

- *Is void of deadlines and penalties for construction and elimination of unlawful sanitary sewer overflows and removes significant motivational influences, which are crucial to bringing a polluter into compliance with the law. Second Bell Declaration, para. 5-6;*

---

[17] *Cannons*, 899 F.2d at 84, (*quoting F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404, 408 (1st Cir. 1987)).

- *Is primarily a planning exercise, which does not require construction or implementation of the plan. Id. at para. 11;*

- *Aggravates existing SSO violations by authorizing Defendants to add new sewage flows into sewer pipes where there are active, illegal overflows, without first verifying that the pipes have available capacity—a verification that is technically feasible. Id. at para. 17; and,*

- *Ignores that there are technologically and economically feasible alternatives available to the Defendants to eliminate their illegal raw sewage discharges in a fixed time period. See First Bell Declaration at paras. 12, 14; Second Bell Declaration at para. 24.*

When courts look at the "reasonableness" and "adequacy" of consent decrees, they typically look at the specific relief employed in relation to the magnitude of the violations. If the relief chosen is insignificant or, worse, non-existent, as is the case at bar, a reviewing court is free to reject the decree. *See Telluride,* 849 F.Supp. 1400. Thus, this Court is not required to give **any** deference to a decree that is unreasonable and inadequate to remedy Clean Water Act violations of epidemic proportions.

Here, the Partial Decree requires specific relief for a very tiny fraction of the Defendants' total illegal SSOs, which, when sewage backups into basements are added in, number in the thousands. According to Dr. Bell, even the construction schedules for the very few SSOs covered in IPCD Exhibit 3 are subject to significant loopholes. *See* Second Bell Declaration, para. 7. Nor will the Partial Decree eliminate the Defendants' most highly active SSOs, as the U.S. claims. *Id.* at para. 9. Rather, three (3) of the top ten (10) and five (5) of the top seventeen (17) SSOs will not be eliminated.

The United States admits repeatedly in the pleadings submitted to this Court that "[T]he reason this decree is termed 'partial' and 'interim' is because it does not require implementation of the final SSO remedial plan. . .and thus does not completely resolve the plaintiffs' claims for injunctive relief set forth in the complaints." United States Memorandum in Support of Entry at 15. ***This is correct.*** This admission, along with the further failings of the Partial Decree as outlined above, and further explained by Dr. Bell in his two declarations clearly show that, the IPCD fails to bring Defendants into compliance, or even require significant progress towards compliance with the Clean Water Act. Consequently, this Court should not approve the Partial Decree.

10

### C.    The Partial Consent Decree is Unfair.

The analysis of whether the terms of a consent decree are "fair" involves both procedural and substantive components. *Cannons*, 899 F.2d at 86. "[W]here the protections of an adversary system are not present, [the Court should] undertake a more searching review of a consent decree's fairness." *Telluride*, 849 F. Supp. at 1403.[18]  Here, even a superficial review of the proponents' Partial Decree reveals that it is both procedurally and substantively unfair.  Taken together, Intervenors' pleadings, exhibits and expert affidavits demonstrate such deficiencies.

### 1.    The IPCD is Procedurally Unfair

The Partial Decree is procedurally unfair because concerned citizens were repeatedly shut out of the negotiations[19] and the decree actually rewards the Defendants for their recalcitrance.  Moreover:

- *Its "partial" and "interim" nature fails to reflect the relative strength of the governments' case against the Defendants;*[20]

- *Modifications are, as the United States admits, "minor" and do not alter its fundamental inadequacy and unreasonableness.  Second Bell Declaration, para. 37;*[21]

- *Despite hundreds of undisputed violations of the Clean Water Act reported to the government plaintiffs by defendants themselves, the government plaintiffs failed to negotiate any civil penalty, elimination of all illegal discharges, or remediation of damage done by illegal discharges; and, despite the clear strength of the government plaintiff's case, they failed to obtain the same level of relief that the OEPA ordered, but did not obtain, 10 years ago!*[22]

---

[18] *Telluride* was a Clean Water Act case where a "suspect" decree was before the court.  The court rejected a Justice Department sponsored consent decree that was filed on the same day as the complaint, because it was not developed in a manner that was procedurally or substantively fair.

[19] Courts have also rejected consent decrees where the decree adversely affects the legal rights of intervenors or 3rd persons who are not party to the decree. *See, e.g., United States v. City of Hialeah*, 140 F.3d 968 (11th Cir. 1998).  The Partial Decree, if approved, will definitely have a dramatically adverse impact on the rights of Intervenors and their members to be free from pollution caused by Defendants' violations.  The Partial Decree will also remove significant incentives for prompt compliance. Second Bell Declaration at paras. 7 and 11.  In the *Hialeah* case, the Department of Justice and the City of Hialeah crafted a consent decree without the consent or input of unions or police or firefighters.  The DOJ refused, as here, to permit the intervenors to participate in negotiations. The trial court set aside the decree and the appeals court affirmed.

[20] It is difficult without discovery for a court to determine the truthfulness and validity of a party's claim of hard bargaining.  As the court stated in *Bragg v. Robertson*, 83 F.Supp.2d 713, 719: "Having observed the parties and heard their contentions throughout the extensive preliminary injunction hearings and briefing...the Court knows the process leading to this agreement was fair and full of adversarial vigor, revealing the strengths and weaknesses of each side's case."  This Court has not had the benefit of observation of the adversarial process between the United States and the Defendants, because there has been none.

[21] *See* United States Memorandum in Support of Entry at 1.

[22] *See First and Second Bell* Declarations (comparing other consent decrees); *See also* II. (C)(2), *infra*.

In evaluating procedural fairness, Courts will ordinarily look to the negotiation process in an attempt to gauge its candor, openness, and bargaining balance. *Id.* at 87. *See also, Akzo Coatings*, 949 F.2d at 1433("In determining whether a decree is 'fair,' courts have considered . . . 'the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved.'"). Given that the United States was presented with thousands of Defendants' admitted strict liability violations, millions upon millions in available maximum civil penalties, and technologically and financially feasible solutions to present to the Court, the Defendant should have been put on a firm and fixed date compliance program. Notwithstanding the magnitude of Defendants' admitted and longstanding violations, the IPCD neither mandates that the Defendants come into compliance with the Clean Water Act in a timely manner, or for most violations, at all, nor does it provide adequate incentives for complying with the law in the future. Given the strength of the Citizen-Plaintiffs' and government's cases at bar, the Partial Decree is not a reasonable bargain and, thus, is procedurally unfair.

Instead of insisting on a definite and fair agreement that would result in compliance with the law, the United States and the Defendants came up with the Interim Partial Consent Decree, *a decree unlike any ever seen before* by two nationally-recognized experts, who are regularly employed by the U.S. EPA and the DOJ.

### 2. *The Partial Consent Decree is Substantively Unfair.*

Substantive fairness "introduces into the equation, concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible." *Cannons.*, 899 F. 2d at 87. "Substantive fairness. . .mirrors the requirement that the decree be equitable." *Telluride*, 849 F. Supp. at 1402. The Partial Decree is substantively unfair because it:

- *Does nothing meaningful to eliminate or abate thousands of raw sewage backups into the homes of residents of Hamilton County, yet will be asserted as a bar to any action (e.g. the Sierra Club case) seeking abatement of these conditions. Second Bell Declaration, para. 6;*

- *It does not require significant operation and maintenance (O&M) improvements, as required by reasonable municipal sewer consent decrees with the United States. Id. at paras. 12-15;*

- *At its core, is an illegal agreement that does not result in compliance with the Clean Water Act despite the unenforceable assurance of the government's attorney that she would continue to negotiate for compliance and litigate if necessary;*

- *Does not provide for accountability where it fails to impose any civil penalty for past violations, allows the aggravation of the violations by authorizing new sewer connections into SSO sewer lines; and does not require cessation of the illegal conduct, yet will be used by Defendants as a shield against any abatement action by those most directly affected by the continuing illegal discharges; and,*

- *The Partial Decree does not offer corrective justice where it allows the defendants' to take 14 to 20 years to correct the single most egregious illegal discharge, where a technically feasible remedy is achievable in 5 years.*

In this case, the Partial Decree puts off until at least 2016, what can be done in five (5) years. Further, the Defendants are attempting to use the Partial Decree to bar the Citizen-Plaintiffs, as well as any other affected party from seeking relief in the interim. The Partial Decree is not equitable to the public or to the rights of the Sierra Club and its members. For example, an administrative order issued to San Diego in April 2002 requires that city to clean approximately 1,500 miles of its sewer system each year for the next two years (the entire system in two years). In sharp contrast, the IPCD in this case only requires Defendants to clean 185 miles of sewer each year (6.3% of its system).[23] The same order requires San Diego (whose sewer system is almost identical in size to Defendants' system and whose SSO rate is less than 20% of Defendants' SSO rate) to rehabilitate or replace 60 miles of sewer each year for the next 10 years. Here, the Defendants are only required, under the Partial Decree, to rehabilitate or replace 10 miles each year. *Id.* Further, the IPCD rewards the Defendants decades of recalcitrance—including a decade where the MSD simply refused to comply with OEPA Director's administrative orders, to the great frustration of OEPA staff. *See* Memorandum of Sierra Club in Opposition to Defendants' Motion to Dismiss, p. 17. The Partial Decree leaves thousands of residents of Hamilton County with raw sewage in their basements and millions of gallons of sewage flowing

---

[23] Second Bell Declaration at para. 14.

13

into the Mill Creek—all while the problem is "studied" yet again.

Moreover, the IPCD does not introduce, let alone employ, concepts of "corrective justice" or "accountability" for Defendants' past illegal acts. It delays indefinitely the imposition of mandatory civil penalties. Yet, civil penalties in Clean Water Act cases are important for purposes of punishment, deterrence and removal of unearned economic benefits. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 120 S.Ct. 693 (2000).[24] Each day of violation at SSO 700 (and all of the hundreds/thousands of other SSOs) carries with it a maximum potential fine of at least $25,000/day of violation. Using Klingenstein's own numbers over a five-year period, for SSO 700 alone the Defendants face maximum civil penalties of $5,500,000.00, with penalties of over $1,000,000.00 per year for continuing violations, since the complaints were filed.

Nor does the IPCD hold Defendants accountable for their continued use of Hamilton County residents' basements as involuntary, raw sewage holding tanks during wet weather overflows —overflows that are caused by Defendants' failure to adequately expand the sewage carrying capacity of their system. *See* U.S. Memorandum in Support of Entry of Order at 8. Instead, Proponents ask the Court to shield the MSD from accountability for these discharges by urging approval of a Partial Decree that does not stop the discharges, but can be used as a bar against future abatement actions.

## III. GIVEN THE SCANT ENFORCEMENT PROVIDED BY THE IPCD, IT DOES NOT IN ANY WAY BLOCK THE CITIZEN-PLAINTIFF'S ENFORCMENT OF THE CWA.

Under the terms of the IPCD, the Defendants are not excused from compliance with the Clean Water Act, yet the Defendants seek to use the Partial Decree as a shield to protect them from citizen enforcement on "diligent prosecution" grounds. The United States and the Defendants attempt to set up a "Catch 22" scenario, whereby the citizens are forced to accede to a decree that does not bring the MSD into compliance with the law and is completely dependent upon unenforceable promises of

---

[24] As Judge Kane states in Telluride, *supra*: "Under these circumstances, the government's suggestion that I 'pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment' borders on the ludicrous. . .An agency's judgment is entitled to deference when it is based on reasoned decision making." *Id.* at 1404.

future governmental enforcement. However, when the citizens attempt to fill the enforcement void left by the defective IPCD through this or future citizen suits, then the Defendants have and will argue that the citizens' suit must be blocked by the governments' ongoing "diligent prosecution". The United States and the Defendants have chosen not to adequately enforce or comply with federal law, a fact that is abundantly clear from their transparent attempt to seek legal asylum through a hastily written and seriously deficient Partial Decree.

There have been a number of cases where federal courts were presented with "sweetheart deals" and inadequate remedies under the guise of consent decrees that where filed with complaints on the same day. In some of these cases, the decrees and complaints had been previously filed in state courts or before administrative boards. *See Jones v. City of Lakeland, Tenn.*, 224 F.3d 518 (6th Cir. 2000); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 890 F.Supp. 470 (D.S.C. 1995); *Frilling v. Village of Anna*, 924 F. Supp. 821 (S.D. Ohio 1996). In those cases, the federal courts did not have jurisdiction over the consent decrees, but they roundly criticized them and did not let them block proper, citizen enforcement of the federal Clean Water Act in federal court.[25]

For example, Judge Rice in *Frilling v. Village of Anna, supra*, 924 F. Supp. 821 (S.D. Ohio 1996) criticized the state consent order excusing the Village from complying with its permit limits while new facilities were being constructed. *Id.* at 829. To support his ruling that a consent order that fails to require compliance with the parameters in the NPDES Permit does not bar a citizen suit enforcement action, Judge Rice held :

> ... Therefore, although it could be argued that the State sought in its Complaint to require compliance with these four parameters, the State's act of simultaneously filing a Consent Order which expressly declined to require such compliance, and its failure to submit a copy of the NPDES permit until a week after this action was filed and resolved (Notice of Errata) indicates

---

[25] For example, in *Jones, supra,* the 6th Circuit wrote (en banc): "n1. The administrative jurisdiction of TDEC over the impermissible pollution of Oliver Creek by the City, in violation of the Clean Water Act and the Tennessee Water Control Act, has the indicia of *pretextual enforcement* calculated to perpetuate TDEC's ten-year oversight of the City's ongoing impermissible pollution of the watercourse, which has afforded the parties, the City, and TDEC, protection from third-party citizen-initiated litigation, evidenced by the listed substantively similar unenforced consent orders between the parties extending compliance deadlines under the guise of 'diligent prosecution'..." *Id.* at 523 (emphasis added).

15

that the *allegations in the Complaint were a mere formality*, and that the State did not, as a practical (as opposed to a technical) matter, bring this civil action for the purpose of requiring compliance with these four permit parameters.

* * *

The State has agreed not to enforce [the Defendant's] permit limitations until June, 1998, and the United States EPA reviewed this matter and declined to take any action. The government's failure to enforce specific final effluent limitations in the Defendant's NPDES permit does not prevent Plaintiffs from seeking to enforce them through a citizen suit, such as the instant action. Earlier in this opinion, this Court quoted the Supreme Court's observation that § 1365 has the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." Gwaltney v. Chesapeake Bay Found., 484 U.S. 49, 62, 98 L. Ed. 2d 306, 108 S. Ct. 376 (1987). At least in regard to the four parameters which the State has agreed not to enforce until June, 1998, this would appear to be just such a case. n18

n18 Because Plaintiffs in this action seek to require immediate compliance with these four parameters, whereas the State did not require such timely compliance, this Court notes that Defendant Village's reliance on Connecticut Fund for the Environ. v. Contract Plating Co., Inc., 631 F. Supp. 1291, 1293 (D. Conn. 1986) to argue that Plaintiffs' claims are barred because Congress intended "to bar citizens' suits whenever the same purpose could adequately be achieved by a prior pending state suit," is unavailing. Because the State did not achieve the same purpose which is here sought by the Plaintiffs--namely, *immediate compliance with all NPDES permit limitations*--the district court's reasoning in Contract Plating Co. is inapposite here. (Emphasis added).

The *Frilling* scenario is on all fours with the case at bar, though Judge Rice was powerless to directly reject the state court decree. In contrast, this Court has the power to reject the Partial Decree and allow the citizen enforcement action to go forward. The IPCD excuses Defendants from compliance with the CWA for hundreds of illegal SSOs. It excuses Defendants from taking any immediate action to prevent thousands of raw sewage backups annually into residents' basements. The Partial Decree excuses Defendants from obtaining a NPDES permit for SSO 700 for fourteen to twenty years.[26]

Unable to deny that the Partial Decree is full of holes, the federal government pledges that in the future it will seek a "holistic remedy," which it has not been able to achieve in its purported years

---

[26] The intent of the State of Ohio and the municipal polluter in *Frilling* was the same as the intent of the federal EPA and the State of Ohio, here; namely, an attempt to impose partial and greatly delayed enforcement of the law as a bar to a complete, immediate enforcement of the law by citizens. Judge Rice saw through this attempt and held that the partial compliance consent decree does not bar plaintiffs from seeking full compliance through the citizen suit mechanism.

of bargaining. *See, e.g.,* U.S. Memorandum, pp. 57-58. This clarifies the reason for the flaws, omissions, and illegal provisions in the IPCD, it is aimed at blocking comprehensive enforcement by the Citizen-Plaintiffs. Therefore, any benefits in the IPCD should be preserved in a legal, adequate, and fair final document resulting from an Order of this Court or from negotiations among *all* of the parties to this dispute.

## IV. WHERE A PROPOSED DECREE IS REPLETE WITH SERIOUS QUESTIONS ABOUT ITS FAIRNESS, ADEQUACY, AND ENFORCEABILITY, THE COURT HAS THE DISCRETION TO AUTHORIZE DISCOVERY AND AN EVIDENTIARY HEARING.

Given the serious shortcomings in the Partial Decree, the Court should not merely accept the conclusory representations made by the Government-Plaintiffs and Defendants to justify their admittedly partial product. If not convinced on the face of the Partial Decree and by the expert declarations offered by the Citizen-Plaintiffs that the Partial Decree is unfair, unreasonable and unlawful, then the Court should hold an evidentiary hearing after providing the opportunity for preliminary discovery. Even the Government-Plaintiffs themselves admit that nothing in the law *prohibits* the Court from holding an evidentiary hearing, as is clear by the very cases cited in their various memoranda of law.[27] Rather, the decision as to whether an evidentiary hearing is warranted turns on the specific circumstance of the case. *See U.S. v. Comunidades Unidas Contra La Contaminacion*, 204 F. 3d 275 (1st Cir. 2000); and *George Trucking, supra.*

Thus, if the Court has any questions concerning the existence of factual issues or the specific circumstances of the case at bar, discovery and an evidentiary hearing will shed light on the following deficiencies in the IPCD: 1) SSO 700's failure to comply with secondary treatment standards; 2) the Commissioner's hasty approval of the IPCD;[28] 3) the failure of the Partial Decree to address three of

---

[27] For example, the Eighth Circuit in *U.S. v. Metropolitan St. Louis Sewer District*, 952 F. 2d 1040 (8th Cir. 1992) acknowledged that it was within the trial court's sound discretion whether or not to conduct an evidentiary hearing. See also, *U.S. v. George Trucking, Inc.*, 34 F. 3d 1081 (1st Cir. 1994).

[28] To be considered "fair", a consent order must be negotiated as a result of arms-length, good-faith bargaining. *Comunidades Unidas*, 204 F. 3d at 281. In *Comunidades*, the First Circuit found the consent order to be fair where there

the top ten and five of the top seventeen highly active SSOs; 4) the fact that the IPCD requires

Defendants to replace only 10 miles of sewer line per year where other decrees require 60 miles of

sewer line to be replaced each year; and, 5) the fact that the IPCD's proposed offset system which

would add one gallon of waste for every 5 gallons of stormwater removed will not achieve compliance

with the Clean Water Act. Given the litany of substantive inadequacies in the Partial Decree and the

many factual disputes that exist between Plaintiffs-Intervenors and the remaining parties, the

circumstances of the case demonstrate the need for an evidentiary hearing.

The Government-Plaintiffs have erroneously cited cases that provide factors that have

persuaded some courts that an evidentiary hearing was not needed, yet none of these factors are present

in the case at bar. Unlike, in *Metropolitan St. Louis Sewer District*, here, the Plaintiff-Intervenors have

objected to substantive provisions of the Partial Decree, there are substantial factual disputes to be

addressed, and the Partial Decree is illegal on its face.[29]

Similarly, in *Comunidades Unidas*, none of the factors relied upon by the Court to justify the

trial court's failure to hold an evidentiary hearing are present in the case at bar. One major factor was

that substantive terms of the Consent Decree were re-negotiated based on the Intervenor's objections.[30]

Moreover, the Consent Order required a 1.5 million dollar penalty and contained "a plethora of

compliance requirements, qualitative standards and ongoing monitor reporting devices". *Id.*

---

was no support for the allegation that the Defendants were the "worse run utility" while the United States looked the other
way. In the case at bar, Plaintiff-Intervenors have already presented evidence that the Ohio EPA spent a decade "looking
the other way" over the strong objection of agency staff. *See* Exhibits to Memorandum of Plaintiffs' Sierra Club and
Marilyn Wall In Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. No. 9, filed April 23, 2002.
[29] In *George Trucking, supra* note 25, the Court upheld the trial court's decision not to hold an evidentiary hearing on a
CERCLA settlement because: 1) a special "settlement master" had been appointed by the court to oversee settlement
negotiations while they were ongoing; 2) the Defendant-Appellants claim for a hearing was presented in a "slipshod"
fashion; and 3) the factual record had been full developed and allowing evidentiary hearings would frustrate the policies
under CERCLA promoting "expedious settlements". Again, these factors are not present in the case at bar. A list of
pending motions is attached hereto as Exhibit 5.
[30] The Court noted that after the objections were made, there was an exchange of technical personnel, explanatory material,
and documents. The Intervenors were not only given the opportunity to actually meet and confer with the negotiating
parties, but numerous substantive provisions were corrected to satisfy the Intervenors. For example, of the 81 interim
effluent limits objected to , 18 were eliminated and 46 were made more stringent.

Significantly, the First Circuit reiterated the trial court's finding that the citizen's group "having been granted intervenor status, was more than a mere spectator and, if any of its concerns remained unanswered after conclusion of the public comment process, there would be an opportunity to raise its objections directly before the court at an evidentiary hearing to be scheduled, if and when the need arises". *Id.* at 277.[31] Thus, contrary to the Government-Plaintiffs' contentions, Citizen-Plaintiff Intervenors are not limited to the comments submitted during the public comment period to participate in an enforcement action. This can be seen by many of the cases cited by the Government-Plaintiffs when urging the court to deny intervention in the case at bar. For example, the Court in *Arizona v. Motorola*, 139 F.R.D. 141 (D.C. AZ 1991) denied intervention because to allow it would "render the negotiations between the original parties a waste of time . . ." and "impede or prevent entry of the state/city Consent Order…". *Id. See also*, *City of Bloomington v. Westinghouse Electric Corp.*, 824 F. 2d 531 (7th Cir. 1987) (In denying intervention, the court acknowledged that, if intervention had been granted, the negotiations would have to begin again). In fact, the Second Circuit specifically recognized the elevated role of intervenors beyond mere participation in the public comment period when it stated, in support of its decision, to deny intervention as untimely: "[I]f [proposed intervenors] interest was, as it now asserts, more than any other member of the public, it should have made its application to intervene as soon as it became aware of that interest, rather than relying on the process of public comments alone to protect that interest." *U.S. v. Pitney Bowes, et al.*, 25 F. 3d 66 (2nd Cir. 1994).

## V.    CONCLUSION

The Court should not give deference to a Partial Decree that has been deemed wholly ineffective by two leading federal environmental experts and that is replete with illegal, inadequate, and unenforceable terms. While these defects justify this Court's outright rejection of the Partial

---

[31] The First Circuit found that the trial court did not error in subsequently finding that the need for an evidentiary hearing never arose given the litany of factors described above.

Decree, at the very least, the Court should grant the Citizen-Plaintiffs discovery on the "diligent prosecution" and "adequacy of the decree" issues and hold an evidentiary hearing.[32]

Respectfully submitted,

D. David Altman, Esq.
(#0021457)
D. David Altman Co., L.P.A.
15 East 8th St., Suite 200W
Cincinnati, OH 45202
(513-721-2180)

Albert J. Slap, Esq.
(#0074579)
Law Office of Albert J. Slap
20 Erie Ave.
Glendale, OH 45246
(513-771-7800)

---

[32] At the status conference on August 28, 2002, Judge Spiegel asked Defendants' counsel, Chris Buckley, Esq. if the Defendants' Motion to Dismiss the Sierra Club's Complaint Under Rule 12(b)(1) relied on evidence outside of the Sierra Club's complaint, thereby converting it to a motion for summary judgment and requiring Sierra Club an opportunity for discovery. Mr. Buckley responded that the Defendants' Motion did not reference materials outside the Sierra Club's complaint. A review of the Defendants' Memorandum of Law, the *six inches of attached exhibits* and the Declaration of Patrick Karney, Director of MSD shows the Defendants are relying on extrinsic evidence, thereby entitling Plaintiff-Intervenors to discovery on the motion.

20

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a true copy of the foregoing Memorandum In Opposition to

the United States' Motion for Entry of Consent Decree was served on this 9th day of September, 2002,

via regular mail upon the following:

Nee Fong Chin
Assistant County Prosecutor
Hamilton County Prosecutor's Office
230 East 9th Street, Suite 4000
Cincinnati, Ohio 45202

W. Peter Heile, Of Counsel
Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, Ohio 45202

Christopher J. Buckley, Of Counsel
Peter P. Murphy, Of Counsel
Gibson, Dunn and Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

For the Board of County Commissioners Of
Hamilton County, Ohio and the City of
Cincinnati

Margaret A. Malone
Assistant Attorney General
Attorney General, State of Ohio
Environmental Enforcement Section
30 East Broad Street
Columbus, Ohio 43266-0410

For the State of Ohio

Leslie Allen
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources
  Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Donetta D. Wiethe
Assistant United States Attorney
221 East Fourth Street
Atrium II, Suite 400
Cincinnati, Ohio 45202

Gary Prichard
Associate Regional Counsel
U.S. EPA, Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, IL 60604-3590

For the United States

_____
Attorney for Plaintiffs

21