UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Case No. 1:02cv00107** |
| ) | (Consol. with C-1-02-108 and |
| ) | C-1-02-135) |
| The Board of County Commissioners, ) | |
| Hamilton County, Ohio ) | Judge Arthur J. Spiegel |
| ) | Magistrate Judge Timothy S. Hogan |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF-INTERVENORS' MOTION FOR STATUS CONFERENCE

The Sierra Club and Marilyn Wall ("Plaintiff-Intervenors") have moved this Court for a status conference, ostensibly "for the purposes of evaluating the 60-day public comment period and scheduling appropriate hearings on the pending decrees." Plaintiff-Intervenors' Motion for Status Conference at 1, Docket #99. What Plaintiff-Intervenors neglect to mention in their papers is that this Court ***has already set a status conference for February, 12, 2004—after the completion of the federal comment period on the Global Decree.*** Order, Docket #95 ("September 4 Order"). Plaintiff-Intervenors' apparent rationale for departing from the schedule established in the September 4 Order is their charge that there has been "very little in the way of citizen involvement" in the City and County's approval process, implying that Defendants did not follow through on their commitment to conduct public review and comment on the Global Consent Decree. Memorandum in Support of Motion for Status Conference ("Memorandum") at

1-2, Docket #99. Their insinuation on this point flies in the face of Defendants' vigorous and exhaustive public outreach program that included:

- **3** community meetings hosted by the Metropolitan Sewer District ("MSD");
- **3** City Council public hearings;
- **2** County Commission public hearings;
- **4** *Cincinnati Enquirer* newspaper articles;
- **3** radio interviews;
- **7** local television news reports;
- **21** rebroadcast meetings on local cable channels;
- **375** letters sent to local public officials and community council members; and
- **3** websites with links to MSD's dedicated comment e-mail address.

This coordinated public outreach program was designed to educate the public on the Global Decree's terms, and to provide information on the various avenues open to the public to offer their opinions or submit questions. Plaintiff-Intervenors had – and took advantage of – the ample opportunities available to the public-at-large to submit comments on the Decree, and their protestations to the contrary ring hollow when compared to the litany of Defendants' public outreach efforts.

The Court should not countenance Plaintiff-Intervenors' tactics. Defendants, and the United States and the State of Ohio ("Government-Plaintiffs"), have faithfully adhered to the requirements set forth in the September 4 Order, and Plaintiff-Intervenors' unverified, misleading, and irrelevant arguments relating to the public process—a public process which far exceeds any requirement of the law or any order of this Court—do not provide any reason for the Court to reconsider its September 4 Order and depart from the carefully considered schedule set forth therein.

I. **THE SEPTEMBER 4 ORDER ALREADY ESTABLISHES THE SCHEDULE FOR CONSIDERING THE CONSENT DECREES AND REMAINS APPROPRIATE FOR THE TIMELY RESOLUTION OF THIS MATTER**

Plaintiff-Intervenors' Motion seeking a status conference entirely ignores the fact that this Court has already selected the appropriate procedure and schedule for consideration of the consent decree addressing Defendants' Sanitary Sewer Overflows (the "SSO Decree") and the Global Decree (the "Consent Decrees"), including scheduling a status conference for February 12, 2004—after the close of the federal public comment period. *See* September 4 Order at 1-3.

To recap, the Court's September 4 Order established a schedule for completing the negotiations and commencing the judicial consideration of the Consent Decrees. First, the parties would submit to the Court a draft of the proposed Global Decree by October 7, 2003. September 4 Order at 1-2. Then, after Defendants had two months to consider and sign the Global Decree, it would be formally lodged with the Court by December 4, 2003. September 4 Order at 2. Next, *after* the required federal public comment period which would be completed by February 6, 2004, the Court would hold a status conference at 3:00 P.M. on February 12, 2004 (presumably to set a schedule for judicial consideration of the two decrees). Finally, the Government-Plaintiffs would respond to the public comments and move for entry of the Global Decree. September 4 Order at 2-3.

The Government-Plaintiffs and Defendants have met the deadlines in the September 4 Order. A draft of the proposed Global Decree was submitted on October 7, 2003. Notice of Proposed Decree, Docket #96. Defendants reviewed and signed the Global Decree, and it was formally lodged with this Court on December 3, 2003. Notice of Lodging of Final Consent Decree, Docket #101. Notice of the Global Decree will be published in the Federal Register, and Defendants understand that the comment period is scheduled to conclude well before the Court's

deadline.  In sum, at this time, **_all obligations the Court set out in its September 4 Order have been met_**.  Until the Global Decree undergoes public comment and consideration by the United States as required by federal law, *see* 28 C.F.R. § 50.7, there can be no further action on the Global Decree because it is not yet final, and the Government-Plaintiffs have not yet moved for its entry.[1]

      The logic of the Court's September 4 Order is clear.  By scheduling a status conference shortly *after* the close of the public comment period mandated under federal law, the Court ensured that it would not hold unnecessary conferences at interim stages in the Global Decree's development.  Once the public comment process is complete, the Government-Plaintiffs will have the opportunity to assess the content and volume of public comments before holding a status conference, thus allowing the Government-Plaintiffs to update the Court meaningfully on the time they will need to review and respond to public comments in their expected Motion for Entry.  Therefore, the Court should maintain the schedule articulated in its September 4 Order,

---

[1] Although "Sierra Club *expects* that the Global Decree will be signed and accepted by EPA (as was the [SSO Decree]) without incorporating additional recommendations suggested by the Sierra Club in [its] comments," Memorandum at 3, Plaintiff-Intervenors' *expectations* as to whether the United States will incorporate any of Plaintiff-Intervenors' comments are irrelevant as to whether it is in the interest of judicial economy to wait until the completion of the public comment period.  Moreover, these expectations have no foundation; indeed, the SSO Decree was revised after receipt of public comment.  *See* United States' Memorandum in Support of Mot. for Entry at 22-29, Docket #56 (noting changes in proposed SSO Decree, some of which were made after issues were highlighted in public comments).  Most importantly, Plaintiff-Intervenors are not the entire public!  Remarkably, Plaintiff-Intervenors appear to be suggesting that delaying a status conference until after the close of the public comment period is a waste of time because the Sierra Club's comments may not have an effect on the Decree, while entirely ignoring the possibility that other public comments may cause the parties to amend the Decree.  At the very least, the Court should allow the public comment process to come to completion and require Sierra Club to take advantage of its right to public comment before prematurely resorting to judicial intervention.

and hold a status conference on February 12, 2004, at which time it can address the schedule and process for addressing the two decrees.

## II. PLAINTIFF-INTERVENORS DO NOT PROVIDE A RATIONALE FOR HOLDING A STATUS CONFERENCE PRIOR TO FEBRUARY 12, 2004

Plaintiff-Intervenors provide no compelling rationale for departing from the schedule set by the Court's September 4 Order. First, Plaintiff-Intervenors' insinuation that Defendants' public review process has been inadequate is manifestly false.[2] As summarized below, Defendants conducted an intense campaign designed to inform and involve the public in consideration of the Global Decree. Indeed, complain as they might about the adequacy of the public participation process, Plaintiff-Intervenors were active participants in this process! Second, Plaintiff-Intervenors do not provide any rationale for why the issues raised in their Motion cannot be raised during the process for consideration of the decrees that the Court has already established in its September 4 Order.

### A. Plaintiff-Intervenors' Accusations that the Public Was Not Afforded the Opportunity to Participate in Defendants' Deliberations on the Decree Are Manifestly False.

Plaintiff-Intervenors' ostensible rationale for departing from the schedule established in the Court's September 4 Order is their charge that there has been "very little in the way of citizen

---

[2] Ignoring the uncontested record and standard rules of judicial proof, Plaintiff-Intervenors continue to use their papers inappropriately as a mechanism for making unverified (and false) factual claims. For example, Plaintiff-Intervenors state in their Motion that the 60-day public comment period would allow Defendants to "hear from the citizens of Hamilton County about the Decree (which was not done before signing the [SSO Decree]). . . ." Memorandum at 1. But Defendants held public hearings before signing the originally lodged SSO Decree, as admitted by Plaintiff-Intervenors early in this litigation (*see* Plaintiff-Intervenors' Opp. To Defendants' Mot. to Dismiss for Lack of Jurisdiction at 31-32, Docket #9), and before signing the SSO Decree as revised after public comments. Defendants' Reply to Plaintiff-Intervenors' Opp. to Entry at 14 & attached Declaration of Peter P. Murphy at ¶ 4, Docket #62.

involvement" in the City and County's approval process, implying that Defendants did not follow through on their commitment to conduct public review and comment on the Global Consent Decree.[3]  Memorandum at 1-2.  This is simply false.  As more fully described in the attached Third Declaration of Patrick T. Karney ("Third Karney Decl."), which is attached hereto as Attachment #1, Defendants have conducted a vigorous public outreach and comment program designed to generate a broad base of public participation and interest in the Consent Decree and its approval process.

### 1. There Were Numerous Well-Publicized Public Meetings on the Global Decree.

Contrary to Plaintiff-Intervenor's suggestion that the public review process was comprised of a single meeting on November 19, 2003 (Memorandum at 2), Defendants collectively held ***eight public meetings*** in October and November 2003 to present the Global Decree to the community and to provide a forum for the public to present comments and ask questions about the Decree.[4]  Third Karney Decl. at ¶¶ 5, 6, 15, 16, 20.  To publicize these meetings, Defendants took the following actions:

---

[3]  It is important to note that Defendants' extensive public comment process on the Global Decree was voluntary:  neither the September 4 Order, the Clean Water Act nor any other provision of federal law requires the broad public outreach that Defendants undertook.  The mere fact that Defendants elected to involve the public in their consideration of the Global Decree, and the Court ordered a schedule that enabled Defendants to involve the public does not necessitate a hearing devoted to entertaining Plaintiff-Intervenors' observations on the process.  The only public comment process required by federal law is the process established under 28 C.F.R. § 50.7 that the United States is about to begin as contemplated by the September 4 Order.  To hold a status conference now to impose a new process for considering the Global Decree would short-circuit that mandated federal public comment process.

[4]  Two additional meetings were held for contractors and local officials.  *See* Third Karney Decl. at ¶ 6.

6

- MSD held a press briefing on Tuesday, October 7 at 2:30 p.m. to inform the media about the Global Decree, its purpose, and the review process, as well as to announce the planned community meetings. WKRC (Ch. 12), WCPO (Ch. 9), WLWT (Ch. 5), WLW-FM, WVXU-FM and the *Cincinnati Enquirer* attended this initial briefing.

- MSD continued to promote the community meetings through local television and radio, sending media alerts prior to each meeting to local media outlets. Three radio stations (WLW, WVXU and WNKU) aired interviews with Patrick Karney, Director of MSD, to publicize the community meetings.

- MSD promoted these community meetings in the print media, including an article on the front page of the Metro Section of the October 7, 2003, *Cincinnati Enquirer* that listed the dates and times of the community meetings. MSD also arranged to have meetings included in local newspapers' calendars of events.

- MSD sent informational letters to 131 public officials and 50 community council members of townships and municipalities located throughout Hamilton County. Focused on the Global Consent Decree, the letters also outlined the community-meeting schedule.

- MSD mailed invitations to the October 30 information meetings to 893 MSD contractors and stakeholders as well as to 194 public officials.

- MSD posted information about the Global Decree on its Web site. This information included a copy of the Decree, a fact sheet, a glossary of terms, the schedule of community meetings and an e-mail link through which questions and comments could be submitted directly to MSD.

- The City of Cincinnati and Hamilton County posted the schedule of community meetings on their Web sites. The link posted on Hamilton County's Web site connected visitors directly to the MSD site.

*See* Third Karney Decl. at ¶ 7. A video of the October 20 community meeting was aired on CitiCable 13 times. *See id.*

Three of the eight meetings were open community forums hosted by MSD on October 18, 20 and 27. These meetings were designed to accomplish three purposes: to educate the community about the terms of the Global Consent Decree; to provide a forum where the public could voice their questions or concerns about the Decree; and to provide information about the approval process and how citizens could submit additional comments. At each meeting, MSD gave a multi-media presentation about the Global Decree, and provided handouts and copies of the Decree itself. *See id*. at ¶¶ 8-9. After the presentation, attendees were invited to submit

7

written and oral questions that were answered by MSD Director Karney and other MSD staff.[5] MSD also distributed comment sheets at the community meetings and gave instructions on how to submit written comments on the Decree either at the meeting or afterwards. *See id* at ¶ 10. MSD publicized a mailing address, a dedicated e-mail address, and a telephone number for citizens to submit comments - at the community meetings, on its web site, and in various media announcements. *See id*. at ¶¶12-13.

In addition to the MSD-sponsored open community meetings, the City of Cincinnati's Neighborhood and Public Services Committee held a public hearing on the Global Consent Decree on November 18, 2003. MSD answered several questions from community members who attended the meeting. The City recorded the meeting and aired the video on CitiCable five times. Moreover, the County Commission and the full City Council each conducted two public hearings regarding the Global Decree (November 19 and 26 for the City, and November 20 and 26 for the County). *See id.* at ¶¶14-20. These hearings were publicized by MSD during its community meetings, as well as by the City Council and the Board of County Commissioners. *See id*. at ¶ 12; Memorandum at 2.

Short of mailing a notice of the meetings to every affected citizen in the Greater Cincinnati area – which apparently is what Plaintiff-Intevenors demand and why they now demand a status conference – MSD took every reasonable step to alert the public about the Global Decree and the various opportunities available to the public for comment, including newspaper articles, radio spots, and television coverage as more fully detailed in the attached

---

[5] These questions and answers were submitted to both the County Commissioners and the City Council before they voted to approve the Global Consent Decree unanimously. *See* Third Karney Decl. at 11.

Third Karney Declaration. The mere fact that, in Plaintiff-Intervenors' view, only a "handful"[6] of citizens decided to take advantage of this process (Memorandum at 2), does not undercut the vigor with which Defendants sought public comment on the Global Decree and does not provide a rationale for abandoning the process for considering the two decrees established by the Court's September 4 Order.

    **2.    Plaintiff-Intervenors Misstate the Extent of Their Own Involvement in the Public Consideration of the Consent Decree.**

Plaintiff-Intervenors' suggestion that they were limited to only nine minutes of public dialogue with the County Commissioners at the November 19 public hearing also is demonstrably inaccurate. In truth, Plaintiff-Intervenors presented their comments on the Global Decree to Defendants at no fewer than ***five public meetings***: 1) at a City Council Committee meeting on November 18; 2) at the City Council's public hearing on the Decree on November 20; 3) at the City Council's November 26 public vote meeting; 4) at the public vote meeting held by the Board of County Commissioners on November 26, 2003; and 5) at the November 19 County Comissioners' public hearing that they cite in their Memorandum. *See id*. at ¶¶ 15-20. Moreover, as stated above, Sierra Club and the public in general had ample opportunity to present questions and comments at ***eight*** separate meetings about the Global Decree. All of these meetings were attended Sierra Club members and representatives - including at times Plaintiff-Intervenor Marilyn Wall and her counsel, Albert Slap. *See* Memorandum at 2-3.

With regard to Plaintiff-Intervenors' suggestion that they were afforded only nine minutes to speak, the Board of County Commissioners limits the amount of time that any one speaker can

---

[6] Plaintiff-Intervenors have a curious definition of "handful" as at least 53 citizens attended the three public meetings hosted by MSD, not including the five public meetings hosted by the City and County. Third Karney Decl. at ¶ 11.

9

consume at any public Board of County Commissioners meeting. This general rule applies at all such hearings,[7] and typically applies to all speakers. This is hardly an unusual practice for government public meetings. At the November 19 hearing on the Global Decree, however, Commissioner Dowlin actually offered Sierra Club members ***additional*** time to speak, but they did not take advantage of the opportunity. *See id*. at ¶17.

In addition, Plaintiff-Intervenors now claim that they have a video and the other "additional materials" described in their Memorandum that were never submitted to MSD, the City, or the County during the comment period because they were prevented from doing so at the November 19 meeting. Shockingly, Plaintiff-Intervenors also promise "additional paragraph-by-paragraph technical comments" that are still being prepared ***more than two months after the City and County released the Global Decree for public comment***. It is inconceivable that Plaintiff-Intervenors claim that the public deliberative process was inadequate when they decided not to submit these materials at any other point during the comment period. They were clearly on notice about how the public was to present comments to Defendants, and it was obvious that MSD – as the duly authorized representative of the County and City – was accepting comments throughout the process. Instead, Plaintiff-Intervenors waited until the eleventh hour to mail only their summary Comments – which are dated November 14, 2003,[8] and are attached to their

---

[7] In order to conduct business, the Board of County Commissioners enforces a rule at public hearings that individuals are allotted three minutes each to present information or ask questions. *See* Third Karney Decl. at ¶16.

[8] The Sierra Club submitted revised comments even later – on November 18.

Memorandum – directly to the City Council and the Hamilton County Commissioners.[9]  *See* Memorandum at 1.  It is astonishing that Plaintiff-Intervenors would complain now about the lack of time allotted to them at a ***single*** County public hearing after failing to avail themselves of the many avenues for comment presented to them.[10]

      Lastly, it is clear that despite the allegedly inadequate nature of the public comment process, Defendants heard Plaintiff-Intervenors' objections to the Decree, and Plaintiff-Intervenors knew how to express their displeasure when they wanted.  As mentioned in their Memorandum, Commissioner Portune and City Council persons Cranley, Crowley, and Cole attended a Sierra Club-sponsored meeting held to highlight the water-in-basement issue.  Plaintiff-Intervenors had the opportunity, and obviously took that opportunity, to lobby both City and County decision makers about the Decree's terms.  *See* Patrick Karney Decl. at ¶ 18.  Plaintiff-Intervenors also knew how to contact the City and the County directly, evidenced by their faxing of comments directly to the City Council and the County Commissioners on November 14, 2003.  *See id.*  Simply, Plaintiff-Intervenors had nearly two months to present their views, and they did so when they wished.

---

[9] Although counsel to Sierra Club e-mailed these comments to counsel for the Government parties, he did not extend that courtesy to counsel for Defendants.  *See* Declaration of Peter P. Murphy in Support of Defendants' Opposition to Plaintiff-Intervenors' Motion for Status Conference at ¶ 3 (attaching e-mail forwarding Sierra Club comments to Government parties), which is attached hereto as Attachment #2.

[10] Amazingly, Sierra Club claims to have been wrongly "excluded" from negotiating the Global Decree despite the fact that this Court's Order instructed that Sierra Club was only to "be kept apprised" of the negotiations, and ordered Plaintiff-Intervenors not "to interfere with the progress of the negotiations."  Order Denying Mot. for Temp. Stay at 3, Docket #78; *see also* Order Granting Mot. to Clarify at 2-3, Docket #90.

B.  **Plaintiff-Intervenors' Request for an Evidentiary Hearing – Which the Court Has Already Rejected – Does Not Justify a Departure from the Process Established by the Court's September 4 Order.**

Plaintiff-Intervenors argue that their "lack of participation" in the construction of the Global Decree necessitates a "formal status conference to plan an ***evidentiary hearing*** on the [SSO Decree] and the Global Decree."  Memorandum at 3 [emphasis added].  This backhanded request for an evidentiary hearing must be rejected.  The parties have already covered this ground, and the Court has already determined that an evidentiary hearing is not required for it to assess the fairness, adequacy and reasonableness of the SSO Decree.  At the October 9, 2002, hearing the Court stated, "***I don't plan to have an evidentiary hearing***. . . . At [a fairness hearing] I expect counsel to be able to document what they have to say in their briefing . . . so I can . . . understand what is going on without having to hear from witnesses."  Transcript of Oct. 9 Hearing, Docket #72 at 55; *see also id.* at 35 (In response to Mr. Buckley's statement that Defendants are unaware of a case where discovery has been authorized and an evidentiary hearing held on the adequacy of a federal Clean Water Act consent decree, the Court replied "***I am not talking about an evidentiary hearing***.").  Even if this well-settled[11] issue were still open, there is no reason why it would need to be addressed before conclusion of the federal comment period about to be undertaken by the United States under 28 C.F.R. § 50.7.

---

[11]  As explained in detail in extensive briefing, the general rule is that "[r]equests for evidentiary hearings are, for the most part, routinely denied—and properly so—at the consent decree stage in environmental cases."  *United States v. Comunidades Unidas Conta La Contaminacion*, 204 F.3d 275, 278 (1st Cir. 2000) (quoting *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994)).  This rule denying evidentiary hearings is particularly appropriate in cases where environmental consent decrees are subject to public comment.  *See, e.g.,* Defendants' Reply to Plaintiff-Intervenors' Opp. to Mot. for Case Management Order at 8-14, Docket #51; Defendants' Reply to Plaintiff-Intervenors Opp. to Mot. for Entry at 16-18, Docket #62.  Both the SSO Decree and the Global Decree will have been subject to public comment before the Government-Plaintiffs move for entry.

     **C.**    **Plaintiff-Intervenors' Comments regarding the 1985 Escrow Account Do Not Provide a Rationale for Abandoning the Process Established by the Court's September 4 Order.**

Defendants also object to Plaintiff-Intervenors' "request" that "MSD promptly provide the Court a proper financial accounting of what happened to" the funds set aside in a Supplemental Environmental Escrow Account pursuant to a 1985 Consent Decree. Memorandum at 4-5. As a threshold matter, this "request" is out of place in a Memorandum supporting a Motion "to convene a status conference for the purposes of evaluating the 60-day public comment period and scheduling appropriate hearings on the pending decrees."[12]

Additionally, the disposition of the escrow account is addressed in the Global Decree, which requires Defendants to use this money to fund the initial stages of the MSD "Water-In-Basement Customer Service Program." *See* Global Decree, Section XIII.B. Because the use of these funds is addressed by the Global Decree, an assessment of the management of these funds since they were deposited should be dealt with in the context of the entire Decree, in accordance with the process established by the September 4 Order.

### III. CONCLUSION

For the reasons stated above, in the interests of judicial economy and the timely and orderly resolution of this matter, Defendants respectfully urge this Court to deny Plaintiff-Intervenors' Motion for Status Conference and adhere to the carefully planned schedule laid out in its September 4 Order, whereby the Court will hold a status conference on February 12, 2004,

---

[12] Another threshold issue is whether Plaintiff-Intervenors even have any standing or legal right to assert this request in this case, as the Defendants' historic management of an account established under a wholly separate consent decree is not relevant to the Clean Water Act allegations that are presently before this Court through either Plaintiff-Intervenors' citizen suit or intervention complaints.

which ultimately will be followed by the Government-Plaintiffs' Motion for Entry and the Court's consideration of the fairness, adequacy, and reasonableness of the Consent Decrees. Accordingly, Defendants respectfully request that this Court deny Plaintiff-Intervenors' Motion for Status Conference and proceed with the schedule laid out in its September 4 Order.

Dated this 5th day of December, 2003.

|  |  |
|---|---|
| \_\_\_\_\_s/Nee Fong Chin_____ | |
| Nee Fong Chin, Trial Attorney | Jennifer Langan, Of Counsel |
| Ohio Bar # 0038095 | Assistant City Solicitor |
| Assistant County Prosecutor | Room 214, City Hall |
| Hamilton County Prosecutor's Office | 801 Plum Street |
| 230 East 9th Street, Suite 4000 | Cincinnati, Ohio 45202 |
| Cincinnati, OH  45202 | |

Christopher H. Buckley, Jr., Of Counsel
Peter P. Murphy, Of Counsel
Michael K. Murphy, Of Counsel
Kevin St. John, Of Counsel
Gibson, Dunn and Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

For the Board of County Commissioners Of
Hamilton County, Ohio and the City of
Cincinnati

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true copy of the foregoing Defendants' Opposition to Plaintiff-Intervenors' Motion For Status Conference, the attached Third Declaration of Patrick T. Karney, the attached Declaration of Peter P. Murphy in Support of Defendants' Opposition to Plaintiff-Intervenors' Motion for Status Conference, and the Notice of Electronic Filing were served on this 5th day of December, 2003, via regular mail upon the following:

D. David Altman, Esq.  
Law Offices of D. David Altman, L.P.A.  
15 East Eighth Street, Suite 200W  
Cincinnati, OH 45202  

Albert J. Slap, Esq.  
Law Office of Albert J. Slap, Esq.  
20 Erie Ave.  
Glendale, OH 45246  

For Plaintiffs Sierra Club and Marilyn Wall

Margaret A. Malone  
Assistant Attorney General  
Attorney General, State of Ohio  
Environmental Enforcement Section  
30 East Broad Street  
Columbus, OH 43266-0410  

For the State of Ohio  

Leslie Allen  
Senior Attorney  
Environmental Enforcement Section  
Environmental and Natural Resources Division  
U.S. Department of Justice  
P.O. Box 7611  
Washington, DC 20044-7611  

Donetta D. Wiethe  
Assistant United States Attorney  
221 East Fourth Street  
Atrium II, Suite 400  
Cincinnati, OH, 45202  

Gary Pritchard  
Associate Regional Counsel  
U.S. EPA, Region 5  
77 West Jackson Blvd.  
Chicago, IL 60604-3590  

For the United States of America

                                                                                         s/Kevin St. John  
                                                                                         Kevin St. John