IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| and ) | |
| STATE OF OHIO ) | |
| Plaintiffs, ) | |
| v. ) | |
| THE BOARD OF COUNTY ) | Civil Action Nos. C-1-02-107 |
| COMMISSIONERS, HAMILTON ) | |
| COUNTY, OHIO, ) | Judge S. Arthur Spiegel |
| and ) | |
| THE CITY OF CINCINNATI, OHIO, ) | |
| Defendants. ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
INTERVENORS' MOTION FOR STATUS CONFERENCE**

Plaintiffs United States, State of Ohio, and ORSANCO (plaintiffs) oppose Intervenors' Sierra Club's and Marilyn Wall's (Sierra Club) request for a status conference to inform the Court about the extent of the opportunity for public input on the proposed Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants and Implementation of Capacity Assurance Program Plan ("final decree"), which was lodged on December 3, 2003, and to reassert their request for an evidentiary hearing for the final decree and the Interim Partial Consent Decree on Sanitary Sewer Overflows ("IPCD"), which was lodged on February 15, 2002. As discussed below, this Court has previously established the appropriate schedule for public review of the final consent decree and has already scheduled a status conference for

February 12, 2004 at 3 p.m., to discuss the scope of the comments received, whether the United States intends to move for entry of the two lodged decrees, and if so, a briefing schedule, and a date for the hearing. Furthermore, this Court has also previously ruled, consistent with the vast majority of cases, that the consent decrees do not require an evidentiary hearing, but rather a "fairness hearing" based on the briefs submitted and arguments of the attorneys for the parties. There is no reason to have another status conference at this juncture or to otherwise depart from the Court's prior correct rulings on the procedures for review of the consent decrees.

    A.    <u>A Status Conference is Not Necessary at this Juncture to Discuss the Public Process on the Consent Decrees, Which Has Been, and Will Be, Adequate.</u>

Sierra Club has requested a status conference (in advance of the one currently scheduled on February 12, 2004) to inform the Court of its views that the public process on the final decree has been inadequate. This request is, at a minimum, premature because the primary public comment process on the final decree has not yet even begun. As this Court and Sierra Club are aware, Department of Justice regulations require that consent decrees such as the ones before this Court receive a public notice and comment period. Notice of the proposed IPCD was previously published in the Federal Register, and nine sets of public comments (one from Sierra Club and eight from individual citizens) were received on the IPCD during its 30-day public comment period. The mandated public review and comment period has not yet begun for the final decree, but will as soon as the Federal Register notice has been published, which is expected to occur some time during the week of December 7th. Although a comment period was previously held for the IPCD, the United States will republish notice of the IPCD along with the final decree, since the two decrees can now be viewed together as the regulators' comprehensive proposed solution to defendants' sewer system ills. Given the history of comments received on

the IPCD, the involvement of Sierra Club and its members, the significant local media attention, and the numerous public meetings and other avenues for public awareness provided by MSD and defendants, plaintiffs have no doubt that the federal public comment period will provide a sufficient forum for Sierra Club and private citizens to make their views known on the proposed decree.

Pursuant to its order of September 4, 2003 (doc. 95), at the request of attorneys for defendants, this Court allowed a 60-day review period to allow the Board and City Council adequate time to hold some public meetings on the decree and to review the decree prior to their signatures. The vast majority of consent decrees, including Clean Water Act sewer system decrees signed by municipalities, do not receive this additional pre-signing public review process. The federal public comment period provides adequate opportunity for the public to provide the United States (and courts, since the comments received are filed with any motion for entry) the public's views on proposed settlements. In this case, the additional public process provided on the final decree extends beyond that provided for most settlements.

Since the additional 60-day review period was requested by the defendant governmental bodies that would actually sign the decree (the County Board and the City Council) to provide them sufficient time to review the decree and any public views on it prior to signature, it is not up to plaintiffs (or the Sierra Club and Marilyn Wall) to judge the adequacy of this additional public comment period. If citizens feel they have not yet had enough opportunity to provide their views, they may do so during the federal public comment period.

In summary, there has already been an open opportunity for public review and comment

on the decree. Regardless of the adequacy of the prior public process, the primary avenue for citizens to provide input to the United States and this Court on the adequacy of the decree is mandated by federal regulation and that process will soon be afforded. It also provides a fully sufficient procedure for citizens to make their views known in this matter. All comments received during this comment period will be reviewed and responded to by the United States and will be presented to this Court, assuming the United States moves forward with the entry of the decrees following public comment.[1]

  B. <u>Sierra Club Had Appropriate Involvement, and the Final Decree Addresses Some of Sierra Club's Comments.</u>

Sierra Club again sounds the refrain that it has been "systematically excluded" from the negotiations of the two proposed decrees. As plaintiffs have previously explained, although plaintiffs made considerable efforts to broker relations among the parties so that Sierra Club might have a more formal role at the table, it became clear fairly early on that this would not be possible. Moreover, as has been previously briefed, case law is clear that the United States is free to negotiate and settle with whom and under the terms it chooses, subject to the Court's finding that the ultimate settlement is fair, reasonable, and in the public interest.[2] Finally, and

---

[1] Sierra Club requests the status conference "to provide the Court with the Sierra Club's comments on the Second Decree." Memorandum in Support, p.1. Since three sets of comments were attached to its memorandum, they have already been provided to the Court. In addition, Sierra Club will have the opportunity to provide these comments and others, if it desires, to the United States (which will provide them to the Court) during the public comment period, and, as an Intervenor, will have the additional opportunity to further brief the Court on its views during the Motion for Entry proceedings, should the United States move this Court for entry of the decrees. Thus, it is not necessary for the Court to hold another status conference in addition to the one already scheduled in February.

[2] <u>See</u>, e.g., <u>United States v. Cannons Engineering Corp.</u>, 899 F.2d 79, 93 (1st Cir. 1990) ("[T]he government is under no obligation to telegraph its settlement offers, divulge its

most importantly, this Court recognized that three-way negotiations were not going to be fruitful in this case. In two orders, this Court directed Sierra Club to do nothing to interfere with the negotiations of the final decree. Order, Jan. 29, 2003 (Doc. 90), pp. 2, 3; Order, Dec. 3, 2002 (Doc. 78), p.3.

    The fact that Sierra Club was not at the table does not mean that its views have not been considered. Sierra Club has provided its views on the two decrees from time to time to the parties either in writing (see letters attached to Sierra Club's Motion for Status Conference), orally at meetings or conference calls among the parties (e.g., July 9 and July 21, 2003), or to individual counsel. Many of Sierra Club's comments indicate a fundamental disagreement with the approach the parties have taken in the two decrees. Assuming the United States moves for entry of the two decrees, the United States memorandum in support will explain how the two

---

negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes. . . . So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses." ); United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 277 (1st Cir. 2000) (court rejected objections to a settlement based upon lack of participation by intervener in negotiations); United States v. District of Columbia, 933 F. Supp. 42, 48 n.6 (D.D.C. 1996) ("[T]he mere failure to include the Commonwealth in these negotiations does not in and of itself render the Agreement procedurally unfair."); United States v. Glens Falls Newspapers, Inc., 160 F.3d 853, 858 (2d Cir. 1998) (court refused to permit disclosure of confidential settlement negotiations, noting that few cases would ever be settled if the press or public were in attendance at a settlement conference or privy to settlement proposals); City of Hartford v. Chase, 942 F.2d 130, 135 (2d Cir. 1991)("[A] federal judge has the power to prevent access to settlement negotiations when necessary to encourage the amicable resolution of disputes."); United States v. Town of Moreau, New York, 979 F. Supp. 129, 135-36 (N.D.N.Y. 1997)("it is doubtful that a public settlement conference would ever permit the type of give and take that would lead to an agreed resolution of the dispute."); Arizona v. Nucor Corp., 825 F. Supp. 1452, 1458 (D. Ariz.1992) (private negotiations are appropriate provided they are conducted in good faith); B.H. v. McDonald, 49 F.3d 294, 301 (7th Cir. 1995)(upholding secrecy of judicial settlement negotiations: "the public has no right to follow the negotiators into the negotiation room." ); United States v. Bliss, 133 F.R.D. 559, 568 (E.D. Mo. 1991)("[t]he confidentiality of the negotiations does not have any bearing on the candor, openness, and bargaining balance as between the parties to the negotiation . . . ").

settlements are consistent with EPA's Combined Sewer Overflow Policy, 59 Fed. Reg. 18688 (Apr. 19, 1994), and other relevant guidance documents, how they represent the United States' general approach in settling sewer system matters of this type, and how they are an appropriate solution in this case.

On some matters, however, the parties are basic in agreement with Sierra Club and have included provisions in the decree similar to those requested by Sierra Club. For example, the parties were well aware that this consent decree must adequately address the all-too-frequent occurrence of sewage backups in basements. Sierra Club and this Court have repeatedly raised concerns about this unacceptable situation. Sierra Club's comments of July 22, 2003, suggested, among other things, an administrative claims process to compensate people who have incurred cleanup expenses or had lost or damaged property due to a basement backup. Although the provisions are not identical to those requested by Sierra Club in its letter of July 22, 2003, Section XIII of the final decree, the Water-in-Basement (WIB) program, addresses this Court's and Sierra Club's concerns that basements be promptly cleaned up when spills occur and that redress for lost or damaged property be provided. In addition, the WIB program requires defendants to install preventative measures, such as backflow devices, to prevent the backups from occurring (in addition to the measures for the expansion and renovation of the system that will be required by the Long Term Control Plan Update).

Finally, as an example of a comment that has been specifically addressed as requested, on or about October 9th, counsel for the United States received a call from Albert Slap, counsel for Sierra Club. Mr. Slap raised the concern that the final consent decree contained an exception for stipulated penalties for CSOs caused by a "ten-year or greater storm event" but that it did not

contain a definition for "ten-year storm," rendering the concept meaningless. (This concern is reiterated in footnote 3, p.12 of Sierra Club's letter, dated November 18, 2003, which plaintiffs received via email at 9:47 p.m. on Sunday, November 23.) It was an omission of the parties not to include a definition for "Ten-Year Storm," as a definition for this term was included in the IPCD. In response to Mr. Slap's comment, the parties amended the final decree to add the same definition for Ten-Year Storm as is contained in the IPCD. (See Final Decree, § V (Definitions), p.17).

    C.    This Court Previously Ruled that an Evidentiary Hearing is Not Necessary.

This Court has already decided, consistent with the vast bulk of authority, that it does not need to hear from live witnesses or otherwise hold an evidentiary hearing in order for it to evaluate whether the decree should be approved. See Transcript of October 9, 2002 hearing (doc. 72) at, e.g., p. 51 ("I don't want to hear the witnesses. . . ."), 53 ("It's not going to be an evidentiary hearing, but I expect counsel to be thorough in their presentation."). See also Joint Motion by United States and State of Ohio for Case Management Order, July 11, 2002 (doc. 36), pp. 5-10, and Reply Memorandum, Aug. 12, 2002 (doc. 55), pp. 6-10. There is no reason for the Court to revisit this ruling.

Sierra Club argues that because it believes it did not have enough time to present information from sewage-in-basement victims to the City Council and County Commission and because not enough people showed up at the public forums on the decree that were held, this Court should change its mind and hold an evidentiary hearing on the decrees. Memorandum in Support, p.3. As discussed above, to the extent the Sierra Club or the general public has not already spoken adequately on the decree, there is ample opportunity to do so in the upcoming

federal public comment period.  Moreover, the Court is already well aware of the public concern over sewer issues and of the terrible situation caused by sewage in basements.  An evidentiary hearing in which members of the public could voice this well-established concern directly to the Court would not assist the Court in determining whether the decree should be entered.  Rather, the Court should continue in its course of holding a non-evidentiary fairness hearing, the date for which should be selected along with a briefing schedule for the motion for entry (assuming this is appropriate) at the February 12th status conference.

      D.     <u>A Special Master is Not Necessary to Oversee the Use of the 1985 Consent Decree Funds.</u>

Sierra Club raises several questions about the funds in the MSD Environmental Security Account established pursuant to a 1985 consent decree to address Mill Creek wastewater treatment plant violations.  Under the terms of that decree, the Board of Commissioners placed $750,000 into an interest-bearing security account.  The money was to be used for "environmentally beneficial project(s)" as approved by U.S. EPA.  Defendants were to propose a project(s) within 90 days, and upon approval by U.S. EPA, they were to implement the project(s).  However, to date, the money has never been spent and remains in the escrow account.  These funds have grown with interest to about $1.1 million.

The parties are not proud of the fact that defendants and the United States were not historically able to agree on an "environmentally beneficial" use of these funds.  Nevertheless, as the parties explained to this Court at the status conference on September 3, 2003, because these funds have not yet been spent, they could be used to "jump start" a basement cleanup program under the final decree.  This use would also be consistent with the terms of the 1985 decree and would put these funds toward an immediate and highly beneficial use.  Consistent with this

discussion, Paragraph XIII.B of the final consent decree provides that "Defendants shall initially fund the Water-in-Basement Customer Service Program [the basement cleanup program] from the monies currently accumulated in the Environmental Security Account established pursuant to Section XVIII of the Consent Order dated August 16, 1985 in Civil Action C-1-85-0693. When those funds are depleted, Defendants shall continue to implement the program in accordance with the requirements and schedules in Exhibit 7." This "seed money" will allow defendants to begin the basement cleanup program on January 1, 2004.

      Sierra Club recommends that the accumulated money be turned over to an independent Special Master who would report directly to the Court as to its future use for environmentally beneficial projects. However, the use of the money is now specifically governed by the terms of this final decree. Further, detailed reporting requirements on implementation of the WIB Customer Service Program are required by Paragraph XV.C, and expenditures from the account remain subject to audit by EPA pursuant to Section XVIII of the 1985 Consent Decree as incorporated into the final decree in this matter by ¶ XXVI.C. In short, a Special Master is not necessary to oversee these expenditures.

      Sierra Club also complains that the Environmental Security Account could have been earning more interest in U.S. securities and has requested that MSD provide a financial accounting of what has happened to the money during the past years. The 1985 Consent Decree did not specify what sort of investments were required. However, given the parties intention in entering into the 1985 decree that the money be accessible to be spent relatively soon, the money would have to remain readily accessible. Typically, higher interest rates can be earned for less liquid funds. If the parties had known at the time the escrow account was established that the

funds would not be spent for eighteen years, it is possible that the decree would have dictated, or the parties would have reached an agreement on, a higher-yielding account or instrument than was evidently used in this case. However, hindsight is 20/20. If this Court is interested in receiving an accounting of the financial history of the Environmental Security Account, plaintiffs have no objection. However, given the specific use required under this decree for the money and the fact that the money must begin to be spent on January 1, 2004 and be accessible for use from then until it is depleted, plaintiffs do not believe the accounting would be particularly useful for the future use of the funds. In any event, this Court can rule on this request now without an additional status conference, or can discuss the issue at the already scheduled conference on February 12, 2004.

## CONCLUSION

In conclusion, none of the issues raised by Sierra Club merits an additional status conference in advance of February 12th. Of course, if this Court believes an earlier status conference would be useful to address these or any other issues, plaintiffs will gladly attend.

    Respectfully submitted,

    THOMAS L. SANSONETTI
    Assistant Attorney General
    Environment and Natural Resources Division
    United States Department of Justice
    Washington, D.C. 20530


    <u>S/Leslie Allen by D. Wiethe per telephone authorization</u>
    LESLIE ALLEN
    Senior Attorney
    Environmental Enforcement Section
    Environmental and Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7611

          Washington, D.C.  20044-7611
          (202) 514-4114


          GREGORY G. LOCKHART
          United States Attorney for the Southern District of Ohio


           S/Donetta D. Wiethe
By:  DONETTA D. WIETHE (0028212)
      Assistant United States Attorney
      221 E. 4th Street
      Atrium II, Suite 400
      Cincinnati, Ohio  45202
      (513) 684-3711


OF COUNSEL:

GARY PRICHARD
Associate Regional Counsel
U.S. Environmental Protection Agency, Region V

ANDREW R. STEWART
Attorney-Advisor
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

- 11 -

          FOR STATE OF OHIO:
          JIM PETRO
          Attorney General

          <u>S/Margaret A. Malone by D. Wiethe per telephone authorization</u>
By:  MARGARET A. MALONE (0021770)
       Assistant Attorney General
       Environmental Enforcement Section
       30 East Broad Street, 25th Floor
       Columbus, Ohio 43215-3400
       (614) 466-2766

          FOR THE OHIO RIVER VALLEY WATER
          SANITATION COMMISSION:

          <u>S/J. Steven Justice  by D. Wiethe per telephone authorization</u>
          J. STEVEN JUSTICE (0063719)
          Taft, Stettinius & Hollister LLP
          110 North Main St., Ste. 900
          Dayton, Ohio 45402-1786
          (937) 228-2838

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO INTERVENORS' MOTION FOR STATUS CONFERENCE** was served this 5th day of December, 2003:

electronically on:

> Margaret A. Malone; Christopher J. Buckley; Peter P. Murphy; Kevin M. St. John (c/o Peter P. Murphy); Michael K. Murphy (c/o Peter P. Murphy); J. Steven Justice; Gary Prichard; and Leslie Allen;

and by regular U.S. Mail on:

> D. David Altman, Lance D. Himes, and Amy Jo Leonard, at D. David Altman Co., LPA, 15 East Eighth Street, Suite 200W, Cincinnati, OH 45202; Nee Fong Chin, Hamilton County Prosecutor, Civil Unit, 230 E. Ninth Street, Suite 4000, Cincinnati, OH 45202-2151; J. Rita McNeil, Cincinnati City Solicitor, 801 Plum Street, Cincinnati, Ohio 45202; and Albert J. Slap, 20 Erie Avenue, Glendale, Ohio 45246.

                                              s/Donetta D. Wiethe
                                              DONETTA D. WIETHE (0028212)
                                              Assistant United States Attorney