# EXHIBIT 14
# 1 of 4

NEW ISSUE

RATINGS: Moody's Investors Service    A
Standard & Poor's Corporation    AAA

MBIA Insured

Assuming compliance with certain covenants, in the opinion of Peck, Shaffer & Williams LLP, Bond Counsel, for purposes of federal income taxation, interest on the 2003 Bonds is excludible from gross income, and is exempt from certain Ohio taxes, as described in greater detail, and subject to the exceptions noted, in "TAX EXEMPTION" herein.

# $215,575,000

# HAMILTON COUNTY, OHIO
# SEWER SYSTEM IMPROVEMENT AND REFUNDING REVENUE BONDS
# 2003 SERIES

## (The Metropolitan Sewer District of Greater Cincinnati)

**DATED: June 1, 2003 (Series A)**
**September 1, 2003 (Series B)**

**DUE: December 1, as shown below**

The 2003 Series A Bonds and 2003 Series B Bonds (the "2003 Bonds") will be only issued as fully registered bonds in the denomination of $5,000 or any integral multiple thereof. The 2003 Bonds mature on December 1 of the years noted below and will bear interest, payable June 1 and December 1, commencing December 1, 2003. The 2003 Bonds will be prepared as fully registered on a combined basis for the two separate issues and as shown on the inside cover page for each of the two series broken out separately, and when delivered, all 2003 Bonds will be registered in the name of CEDE & Co., as nominee of Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the 2003 Bonds. Purchases will be made only in book-entry form through DTC Participants and no physical delivery of the 2003 Bonds will be made to Beneficial Owners except as described herein. The principal of and premium, if any, and interest on the 2003 Bonds will be paid by the Trustee, as trustee for the 2003 Bonds, to CEDE & Co., so long as CEDE & Co. is the registered owner of the 2003 Bonds. Payment of principal, premium, if any, and interest will be made to Beneficial Owners by DTC through its DTC Participants. The 2003 Bonds are subject to redemption as set forth herein.

Payment of the principal and interest on the Series 2003 Bonds when due will be guaranteed by a financial guaranty insurance policy to be issued simultaneously with the delivery of the Series 2003 Bonds by

## MBIA

The 2003 Bonds are being issued by the County of Hamilton, Ohio to provide funds for the following: (i) refunding of a portion of the 1993 and 1995 Bonds previously issued to fund capital improvement projects of The Metropolitan Sewer District of Greater Cincinnati ("MSD"); (ii) capital improvement projects of MSD; (iii) a portion of the Bond Reserve Requirement; and (iv) costs of issuance. The 2003 Bonds will be secured by a Trust Agreement dated as of October 1, 1985 between the County, U.S. Bank N.A., the Trustee, and for certain limited purposes, the City of Cincinnati Ohio, as supplemented by several Supplemental Trust Agreements. The 2003 Bonds, the 2001 Bonds, the 2000 Bonds, the 1997 Bonds, the 1995 Bonds, the 1993 Bonds (other than the Refunded Bonds) and any future Additional Bonds are parity Bonds equally and ratably secured by a pledge of the Net Revenues of the Sewer System of MSD.

U.S. Bank National Association will act as the initial Disclosure Agent for the 2003 Bonds. All capitalized terms used, but not defined, on this cover page or elsewhere in this Official Statement are used as defined in this Official Statement (See "DEFINITIONS") or in the Trust Agreement.

**THE 2003 BONDS ARE NOT GENERAL OBLIGATIONS, BUT ARE SPECIAL OBLIGATIONS OF THE COUNTY, PAYABLE SOLELY FROM THE NET REVENUES OF THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI, AND THE REVENUE FUND CREATED UNDER THE TRUST AGREEMENT, AND NEITHER THE GENERAL CREDIT NOR TAXING POWER OF THE COUNTY, THE CITY, OR OF THE STATE OF OHIO OR ANY POLITICAL SUBDIVISION THEREOF, IS PLEDGED TO PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, NOR INTEREST ON THE 2003 BONDS.**

The combined principal for the two separate series is shown below with each series broken out separately on the inside cover page.

## $182,435,000 Serial Bonds

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 2004 | $   495,000 | 2015 | $21,510,000 |
| 2005 | 2,305,000 | 2016 | 19,100,000 |
| 2006 | 1,420,000 | 2017 | 1,620,000 |
| 2007 | 1,340,000 | 2018 | 4,050,000 |
| 2008 | 1,475,000 | 2019 | 4,250,000 |
| 2009 | 1,500,000 | 2020 | 4,460,000 |
| 2010 | 16,910,000 | 2021 | 4,680,000 |
| 2011 | 17,690,000 | 2022 | 4,900,000 |
| 2012 | 18,585,000 | 2023 | 5,135,000 |
| 2013 | 19,510,000 | 2024 | 5,375,000 |
| 2014 | 20,495,000 | 2025 | 5,630,000 |

**$3,840,000 Term Bonds due December 1, 2005**
**$750,000 Term Bonds due December 1, 2028**
**$28,550,000 Term Bonds due December 1, 2028**

The 2003 Bonds are offered when, as and if issued and received by the Underwriters, subject to the approval of legality by Peck, Shaffer & Williams LLP, Bond Counsel. Certain legal matters will be passed upon for the Underwriters by their counsel, Baker & Hostetler LLP, Cincinnati, Ohio, for the County by their special counsel, Peck, Shaffer & Williams LLP and by the Hamilton County Prosecutor, and for MSD and the City of Cincinnati, by the City Solicitor. Public Financial Management, Inc., Cleveland, Ohio has acted as financial advisor to the County in connection with the offering of the Series 2003 Bonds. It is expected that the 2003 Series A Bonds will be available for delivery on or about July 9, 2003, and the 2003 Series B Bonds will be available for delivery on or about September 4, 2003. Both deliveries will be in New York, New York through DTC.

## SEASONGOOD & MAYER

**CITIGROUP**                    **CONNERS & CO., INC.**                    **LOOP CAPITAL MARKETS, LLC**

The date of this Official Statement is June 25, 2003, and the information contained herein speaks only as of that date.

## 2003 SERIES A BONDS

### $130,765,000 SERIAL BONDS

| Maturity (December 1) | Amount | Interest Rate | Price or Yield | Maturity (December 1) | Amount | Interest Rate | Price or Yield |
|---|---|---|---|---|---|---|---|
| 2004 | $   495,000 | 2.00% | 1.02% | 2015 | $   275,000 | 3.45% | 3.47% |
| 2005 | 2,305,000 | 1.50% | 1.23% | 2015 | 21,235,000 | 5.00% | 3.47% |
| 2006 | 1,420,000 | 1.50% | 1.46% | 2016 | 19,100,000 | 5.00% | 3.64% |
| 2007 | 1,340,000 | 1.80% | 100 | 2017 | 1,620,000 | 5.00% | 3.76% |
| 2008 | 1,475,000 | 2.10% | 2.12% | 2018 | 4,050,000 | 5.00% | 3.82% |
| 2009 | 1,500,000 | 2.35% | 2.38% | 2019 | 4,250,000 | 5.00% | 3.92% |
| 2010 | 985,000 | 2.65% | 2.69% | 2020 | 475,000 | 4.00% | 4.01% |
| 2010 | 3,945,000 | 4.00% | 2.69% | 2020 | 3,985,000 | 5.00% | 4.01% |
| 2011 | 90,000 | 2.90% | 2.95% | 2021 | 4,680,000 | 4.75% | 4.23% |
| 2011 | 5,000,000 | 5.25% | 2.95% | 2022 | 4,900,000 | 4.75% | 4.31% |
| 2012 | 800,000 | 3.00% | 3.09% | 2023 | 1,520,000 | 4.35% | 4.36% |
| 2012 | 4,575,000 | 5.25% | 3.09% | 2023 | 3,615,000 | 4.75% | 4.36% |
| 2013 | 480,000 | 3.15% | 3.22% | 2024 | 5,375,000 | 4.75% | 4.39% |
| 2013 | 5,150,000 | 5.25% | 3.22% | 2025 | 5,630,000 | 4.75% | 4.41% |
| 2014 | 100,000 | 3.30% | 3.34% | | | | |
| 2014 | 20,395,000 | 5.00% | 3.34% | | | | |

$750,000 4.30% Term Bonds due December 1, 2028, Price 100

$28,550,000 5.00% Term Bonds due December 1, 2028, Yield 4.30%
(Plus accrued interest from June 1, 2003)

## 2003 SERIES B BONDS

### $51,670,000 SERIAL BONDS

| Maturity (December 1) | Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| 2010 | $11,980,000 | 5.00% | 2.90% |
| 2011 | 12,600,000 | 5.00% | 3.10% |
| 2012 | 13,210,000 | 5.00% | 3.22% |
| 2013 | 13,880,000 | 5.00% | 3.34% |

$3,840,000 5.00% Term Bonds due December 1, 2005, Yield 1.45%
(Plus accrued interest from September 1, 2003)

## REGARDING USE OF THIS OFFICIAL STATEMENT

This Official Statement does not constitute an offering of any security other than the original offering of the 2003 Bonds of the County of Hamilton, Ohio, identified on the cover hereof. No person has been authorized by the County of Hamilton or the Underwriters to give any information or to make any representation, other than that contained in this Official Statement, and if given or made, such other information or representation not so authorized must not be relied upon as having been given or authorized by the County or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, and there shall not be any sale of the 2003 Bonds by any person, in any jurisdiction in which it is unlawful to make such offer, solicitation or sale.

The information and expressions of opinion herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the County since the date hereof.

Upon issuance, the 2003 Bonds will not be registered by the County under the Securities Act of 1933, as amended, or any state securities law, and will not be listed on any stock or other securities exchange. Neither the Securities and Exchange Commission nor any other federal, state or other governmental entity or agency will have, at the request of the County, passed upon the accuracy or adequacy of this Official Statement or approved the 2003 Bonds for sale.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE 2003 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

# TABLE OF CONTENTS

REGARDING USE OF THIS OFFICIAL STATEMENT ...................................................... i
INTRODUCTION ...................................................................................................... 1
DESCRIPTION OF THE 2003 BONDS ........................................................................ 3
    General Description ............................................................................................ 3
    Mandatory Redemption ...................................................................................... 3
    Optional Redemption ......................................................................................... 4
BOOK-ENTRY ONLY ............................................................................................... 4
BOND INSURANCE .................................................................................................. 6
    The MBIA Insurance Corporation Insurance Policy .............................................. 6
    MBIA ............................................................................................................... 6
    MBIA Information .............................................................................................. 7
    Financial Strength Ratings of MBIA .................................................................... 8
SOURCES OF PAYMENT AND SECURITY FOR THE 2003 BONDS ............................... 8
PLAN OF FINANCING .............................................................................................. 11
THE REFUNDING PROGRAM ................................................................................... 11
APPLICATION OF THE PROCEEDS OF THE 2003 BONDS .......................................... 12
DEBT SERVICE REQUIREMENTS ON THE 2003 BONDS AND CURRENT
    OUTSTANDING OBLIGATIONS ........................................................................... 13
THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI ........................... 14
    Formation and MSD Agreement ......................................................................... 14
    Management and Organization ........................................................................... 16
    Other Parties Working With MSD ....................................................................... 19
    Operations ........................................................................................................ 19
    Treatment Plants ............................................................................................... 23
    Plant Performance ............................................................................................. 25
    Collection System .............................................................................................. 26
    Environmental Compliance and Quality ............................................................... 26
        Overview ................................................................................................. 26
        Mill Creek Wastewater Treatment Plant and 1985 Consent Order ................. 27
        Background on MSD SSO Program ............................................................ 28
        Interim Partial Consent Decree on SSOs and Sierra Club Litigation ............... 29
        CSO Issues .............................................................................................. 30
        Current Discussions Concerning the Proposed "Global" Consent Decree ......... 32
        Other Environmental Regulatory Actions ................................................... 32
        Long Range Environmental Planning .......................................................... 33
        QUEST Plan ............................................................................................. 33
        Mill Creek Deep Tunnel ........................................................................... 34
    Capital Improvement Program ............................................................................ 34
        Procedure to Establish ............................................................................... 34
        Capital Improvement Program 2003-2007 ................................................... 35
        Future Financings ..................................................................................... 36
    Customers and Billing ........................................................................................ 36
    Employees and Payroll ....................................................................................... 37
    Insurance .......................................................................................................... 38
    Sewer Rates ...................................................................................................... 38
    Operating Budget .............................................................................................. 40
    Summary of Historical Financial Information ....................................................... 41

# TABLE OF CONTENTS
(continued)

Page

Management Discussion of Results of Operations ..................................................... 43
THE COUNTY ............................................................................................................ 45
SUMMARY OF CERTAIN PROVISIONS OF THE 2003 AND PRIOR BOND LEGISLATION
    AND THE TRUST AGREEMENT ......................................................................... 47
    Creation of Trust ................................................................................................... 47
    Establishment, Application and Investment of Funds and Accounts ........................... 48
    Deposit and Disposition of Pledged Revenues ....................................................... 49
    Additional Bonds ................................................................................................... 50
    General Covenants of the County ........................................................................... 52
    Rate Covenant ...................................................................................................... 53
    Events of Default ................................................................................................... 54
    Acceleration .......................................................................................................... 54
    Other Remedies: Rights of Holders ........................................................................ 55
    Waivers of Events of Default .................................................................................. 55
    Supplemental Trust Agreements ............................................................................ 56
    Release of Trust Agreement ................................................................................... 57
    Payment and Discharge of Bonds .......................................................................... 57
INVESTMENT CONSIDERATIONS ............................................................................. 58
    General ................................................................................................................. 58
    Limitation of Security to Revenues and Special Accounts ......................................... 58
    Governmental Regulation ...................................................................................... 58
    Future Financial Performance - Ability to Finance Future Projects ............................. 58
    Bankruptcy of County or City ................................................................................ 59
    Uncertainty of Consequences of Failure to Amend or Extend the MSD Agreement ..... 59
ELIGIBLE INVESTMENTS - INVESTMENT EARNINGS ................................................ 59
LITIGATION .............................................................................................................. 60
UNDERWRITING ....................................................................................................... 61
FINANCIAL ADVISOR ............................................................................................... 61
LEGAL MATTERS ...................................................................................................... 61
TAX EXEMPTION ...................................................................................................... 62
ORIGINAL ISSUE DISCOUNT ................................................................................... 63
PREMIUM ................................................................................................................. 63
FINANCIAL STATEMENTS ......................................................................................... 64
VERIFICATION OF MATHEMATICAL COMPUTATIONS ............................................... 64
RATINGS ................................................................................................................... 64
CONTINUING DISCLOSURE UNDERTAKING ............................................................. 65
MISCELLANEOUS ..................................................................................................... 65
DEFINITIONS ........................................................................................................... 67


APPENDICES

A - Financial Statements
B - Form of Approving Opinion of Bond Counsel
C - Specimen Bond Insurance Policy

[THIS PAGE INTENTIONALLY LEFT BLANK]

OFFICIAL STATEMENT

of the

COUNTY OF HAMILTON, OHIO

Relating to the Original Issuance of Its

$215,575,000

Hamilton County, Ohio
Sewer System Improvement and Refunding Revenue Bonds
2003 Series
(The Metropolitan Sewer District of Greater Cincinnati)

# INTRODUCTION

This Official Statement, including the cover page, the table of contents page, maps, and Appendices A through C, is furnished by Hamilton County, Ohio in connection with the offering of Hamilton County, Ohio Sewer System Refunding Revenue Bonds, 2003 Series A (The Metropolitan Sewer District of Greater Cincinnati), in the aggregate principal amount of $215,575,000. The 2003 Bonds consists of two series of bonds, the 2003 Series A in the aggregate principal amount of $160,065,000, dated June 1, 2003 to be delivered on or about July 9, 2003; and the 2003 Series B Bonds in the aggregate principal amount of $55,510,000, dated September 1, 2003 to be delivered on or about September 4, 2003. The 2003 Bonds are being issued pursuant to the general laws of the State of Ohio, specifically Section 133.08 of the Ohio Revised Code, a resolution of the Board of County Commissioners passed on June 4, 2003 and the Trust Agreement as supplemented by the Supplemental Trust Agreements under which U.S. Bank National Association, Cincinnati, Ohio (formerly The First National Bank of Cincinnati, then Star Bank, N.A., then Star Bank National Association and then Firstar Bank, National Association), is the Trustee. The Trustee also serves as registrar, transfer and paying agent on the 1993, 1995, 1997, 2000, 2001, and 2003 Bonds and disclosure agent for the 1995, 1997, 2000, 2001 and 2003 Bonds. The Trustee served as registrar, transfer and paying agent on the 1985, 1986, and 1991 Bonds, but those Bonds have been refunded or paid in full and are no longer outstanding.

This Official Statement includes descriptions of, among other matters, the 2003 Bonds and the Prior Bonds, the Trust Agreement, the 2003 and Prior Bond Legislation, which descriptions are qualified by reference to the entire text of the related instruments, including the Trust Agreement, the Supplemental Trust Agreements and the form of the 2003 Bonds. Copies will be available for inspection at the principal corporate trust office of the Trustee after delivery of the 2003 Bonds.

References herein to provisions of Ohio law, whether codified in the Ohio Revised Code or uncodified, the Ohio Constitution, or the Internal Revenue Code of 1986, as amended, are references to such provisions as they presently exist. Any of those provisions may from time to time be amended, repealed, or supplemented.

As more fully described in other sections of this Official Statement (See "THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI"), MSD is a County sewer district operating pursuant to Chapter 6117 of the Ohio Revised Code. Its current name, size and scope of operations resulted from the 1968 consolidation of the sewer system of the City of Cincinnati with and into the sewer system of Hamilton County, Ohio. MSD currently operates the wastewater collection and treatment system (the "Sewer System") for substantially all the unincorporated areas of Hamilton County,

all of the City of Cincinnati, substantially all of the villages and cities within Hamilton County and small portions of Clermont and Warren Counties. As such, it is primarily responsible for treating the wastewater discharge of the area. The Sewer System contains both combined sewers, which convey sanitary wastewaters and stormwaters, and sanitary sewers which convey only sanitary wastewaters. The combined sewers are located primarily in the City of Cincinnati, while the sewers in the other areas are primarily sanitary sewers. The Sewer System services a residential population in excess of 800,000 and substantially all of the industry located in Hamilton County.

The County is situated in the extreme southwest corner of the State in the center of a thirteen county metropolitan area, including Hamilton, Butler, Warren, Clermont and Brown Counties in Ohio, Dearborn and Ohio Counties, Indiana, and Kenton, Campbell, Gallatin, Grant, Pendleton and Boone Counties in Northern Kentucky. The County includes the City of Cincinnati, the County seat, as well as 36 other municipalities. Hamilton County is the third most populous county in the State and, based on 2000 census data, the metropolitan area consists of approximately 1,979,000 residents. As of January 1, 2003, the total assessed valuation of property subject to ad valorem taxes levied by Hamilton County was approximately $18.886 billion.

MSD sewage treatment facilities are operated under the regulatory control of the U.S. EPA, the Ohio EPA and various other regulatory authorities. The discharge or effluents are subject to the controls established by the United States Clean Water Act and the NPDES Permits issued by the Ohio EPA pursuant thereto.

The proceeds of the 2003 Bonds, together with certain other available funds of the County, shall be used to (i) refund a portion of the 1993 and 1995 Bonds; (ii) reimburse the County for a portion of the cost of purchasing certain equipment, constructing certain improvements and making certain other capital expenditures, which funds the County has already expended; (iii) pay a portion of the cost of one ongoing capital improvement project which has not yet been completed; (iv) increase the balance in the Reserve Account for the Bonds; and (v) pay the costs of issuance of the 2003 Bonds. (See "APPLICATION OF THE PROCEEDS OF THE 2003 BONDS").

The 2003 Bonds will be special obligations of the County, payable solely from the Net Revenues of MSD and the other sources described herein. The 2003 Bonds are issued as parity bonds on a parity with the Prior Bonds (other than the Refunded Bonds) and any future Additional Bonds, all of which will be secured equally and ratably under the Trust Agreement. Neither the general credit nor taxing power of the County, the State of Ohio or any political subdivision thereof, is pledged to the payment of the 2003 Bonds. The Bonds are generally secured by a pledge of the Net Revenues of the Sewer System, together with the Bond Account, Reserve Account, Replacement and Improvement Account and Surplus Account of the Revenue Fund and the Expense Account. (See "SOURCES OF PAYMENT AND SECURITY FOR THE 2003 BONDS," and "SUMMARY OF CERTAIN PROVISIONS OF THE 2003 AND PRIOR BOND LEGISLATION AND TRUST AGREEMENT - Rate Covenant").

Payment of the principal and interest on the 2003 Bonds when due will be guaranteed by a financial guaranty insurance policy to be issued simultaneously with the delivery of the Series 2003 Bonds by MBIA Insurance Corporation ("Bond Insurer"). (See "BOND INSURANCE")

Pursuant to the Trust Agreement for the County to issue Additional Bonds on a parity with the Prior Bonds it must meet certain conditions including either a historical or forecasted debt service coverage ratio. The historical test requires that the Net Income Available for Debt Service for the last Fiscal Year for which audited financial statements are available, adjusted to reflect on an annualized basis any increase or decrease in rates, charges and rentals of the Sewer System which became effective during that period, must be at least equal to (a) 125% of the maximum annual Principal and Interest

Requirements on all Bonds including the proposed Additional Bonds; and (b) 100% of the maximum Aggregate Annual Principal and Interest Requirements on all Bonds, including the proposed Additional Bonds, all General Obligation Bonds and Notes and other Obligations in any subsequent Fiscal Year. (See "SUMMARY OF CERTAIN PROVISIONS OF THE 2003 AND PRIOR BOND LEGISLATION AND TRUST AGREEMENT - Additional Bonds").

In 2002, MSD had Net Income Available for Debt Service of approximately $58,747,000, or approximately 150% of the maximum annual Principal and Interest Requirements on all then outstanding Bonds and approximately 144% of the maximum annual Principal and Interest Requirements on all then outstanding Bonds, General Obligation Bonds and Notes and other Obligations. In 2001, MSD had Net Income Available for Debt Service of approximately $62,745,000, or approximately 181% of the maximum annual Principal and Interest Requirements on all then outstanding Bonds and approximately 170% of the maximum annual Principal and Interest Requirements on all then outstanding Bonds, General Obligation Bonds and Notes and other Obligations. (See "THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI - Summary of Historical Financial Information").

The 2003 Bonds are subject to certain risk factors some of which are typical of Ohio sewer revenue bonds generally and others of which are unique to the 2003 Bonds (See "INVESTMENT CONSIDERATIONS"), including uncertainties relating to future environmental compliance and costs associated therewith, the anticipated need for future financing, the amounts of which cannot be determined at this time, and uncertainty regarding the potential consequences of the scheduled termination of the MSD Agreement between the County and the City in 2018, prior to the scheduled final maturity of the 2003 Bonds.

## DESCRIPTION OF THE 2003 BONDS

### General Description

The 2003 Series A Bonds shall be dated June 1, 2003 and the 2003 Series B Bonds shall be dated September 1, 2003 and shall bear interest from such date at the rates set forth on the inside cover page of this Official Statement. The 2003 Bonds are being issued as fully registered bonds in the denomination of $5,000 or any integral multiple thereof. The 2003 Bonds will be issued originally solely in book entry form to The Depository Trust Company ("DTC"), New York, New York, in the name of its nominee, CEDE & Co., to be held in DTC's book entry only system. So long as the 2003 Bonds are held in the book entry only system, DTC (or a successor securities depository) or its nominee will be the registered owner or holder of the 2003 Bonds for all purposes of the Trust Agreement, the 2003 Bonds and this Official Statement, except for the purpose of giving certain consents. In the event that the 2003 Bonds are not held in a book entry only system, principal of and premium, if any, on the 2003 Bonds will be payable when due to the registered holders, upon presentation and surrender thereof, at the principal corporate trust office of the Trustee.

Interest on the 2003 Bonds will be payable semi-annually on June 1 and December 1, commencing December 1, 2003.

The 2003 Bonds are exchangeable as provided in the Trust Agreement. The Trustee may charge a bondholder an amount equal to any tax, fee or other governmental charge required to be paid in connection with any such exchange, and an amount sufficient to reimburse the Trustee for all costs and expenses incurred in connection with such exchange or transfer.

**Mandatory Redemption**

Certain of the 2003 Bonds maturing on December 1, 2005 and the 2003 Bonds maturing December 2028 are subject to mandatory sinking fund redemption prior to maturity. This redemption may occur through the County depositing sufficient funds in the Bond Account to redeem the subject 2003 Bonds at par, plus accrued interest, or by the purchase of the 2003 Bonds by the County on the open market at a price not to exceed par plus accrued interest. The 2003 Bonds redeemed, rather than purchased on the open market, may be redeemed by lot by the Trustee without action by the County in the principal amounts on December 1 of each of the years listed below:

| $3,840,000 Series B Term Bonds Maturing in 2005 | | $28,550,000 Series A Term Bonds Maturing in 2028 | | $750,000 Series A Term Bonds Maturing in 2028 | |
|---|---|---|---|---|---|
| Year | Principal Amount Subject to Mandatory Redemption | Year | Principal Amount Subject to Mandatory Redemption | Year | Principal Amount Subject to Mandatory Redemption |
| 2004 | $1,875,000 | 2026 | $8,650,000 | 2026 | $250,000 |
| 2005* | 1,965,000 | 2027 | 9,700,000 | 2027 | 250,000 |
| | | 2028* | 10,200,000 | 2028* | 250,000 |

**Optional Redemption**

The 2003 Series A Bonds and 2003 Series B Bonds maturing on December 1, 2014 through 2028 are subject to optional redemption prior to maturity, at the option of the County, in whole or in part (and by lot within a maturity) on any date, on or after December 1, 2013 at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption, without premium.

The 2003 Bonds maturing December 1, 2004 through December 1, 2013 are not subject to optional redemption prior to maturity.

---

\* Final Maturity

4

BOOK-ENTRY ONLY

The 2003 Bonds will be issued in book-entry only form, as fully-registered securities registered in the name of CEDE & Co (DTC's partnership nominee). DTC will act as securities depository for the 2003 Bonds. One fully-registered bond certificate will be issued for each maturity of the 2003 Bonds, in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of 2003 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2003 Bonds on DTC's records. The ownership interest of each actual purchaser of each 2002 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2003 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 2003 Bonds, except in the event that use of the book-entry system for the 2003 Bonds is discontinued.

To facilitate subsequent transfers, all 2003 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, CEDE & Co. The deposit of 2003 Bonds with DTC and their registration in the name of CEDE & Co effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2003 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2003 Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor CEDE & Co will consent or vote with respect to 2003 Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the County as soon as possible after the record date. The Omnibus Proxy assigns CEDE & Co's consenting or voting rights to those Direct Participants to whose

accounts the 2003 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the 2003 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Agent, or the County, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the County or the Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 2003 Bonds at any time by giving reasonable notice to the County or the Agent. Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The County may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the County believes to be reliable, but the County takes no responsibility for the accuracy thereof.

## BOND INSURANCE

### The MBIA Insurance Corporation Insurance Policy

The following information has been furnished by MBIA Insurance Corporation ("MBIA") for use in this Official Statement. Reference is made to Appendix C for a specimen of MBIA's policy.

MBIA's policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the County to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment ) and interest on, the 2003 Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by MBIA's policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the 2003 Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

MBIA's policy does not insure against loss of any prepayment premium which may, at any time, be payable with respect to any 2003 Bonds. MBIA's policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of 2003 Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above

MBIA's policy also does not insure against nonpayment of principal of or interest on the 2003 Bonds resulting from the insolvency, negligence or any other act or omission of the Trustee or any other paying agent for the 2003 Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Trustee or any owner of 2003 Bonds the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice for such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such 2003 Bonds or presentment of such other proof of ownership of the 2003 Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the 2003 Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the 2003 Bonds in any legal proceeding related to payment of insured amounts on the 2003 Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the Trustee payment of the insured amounts due on such 2003 Bonds, less any amount held by the Trustee for the payment of such insured amounts and legally available therefor.

## MBIA

MBIA Insurance Corporation ("MBIA") is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by MBIA, changes in control and transactions among affiliates. Additionally, MBIA is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the policy and MBIA set forth under the heading "Bond Insurance". Additionally, MBIA makes no representation regarding the 2003 Bonds or the advisability of investing in the 2003 Bonds.

The Financial Guarantee Insurance Policies are not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

## MBIA Information

The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") are incorporated herein by reference:

(1)     The Company's Annual Report on Form 10-K for the year ended December 31, 2002; and

(2)    The Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2003.

Any documents filed by the Company pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act of 1934, as amended, after the date of this Official Statement and prior to the termination of the offering of the 2003 Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2002, and (2) the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at the Company's website at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

As of December 31, 2002, MBIA had admitted assets of $9.2 billion (audited), total liabilities of $6.0 billion (audited), and total capital and surplus of $3.2 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 2003, MBIA had admitted assets of $9.3 billion (unaudited), total liabilities of $6.1 billion (unaudited) and total capital and surplus of $3.2 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

**Financial Strength Ratings of MBIA**

Moody's Investors Service, Inc. rates the financial strength of MBIA "Aaa".

Standard & Poor's, a division of The McGraw-Hill Companies, Inc. rates the financial strength of MBIA "AAA".

Fitch, Inc. rates the financial strength of MBIA "AAA".

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significant of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the 2003 Bonds and such ratings shall be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the 2003 Bonds. MBIA does not guaranty the market price of the 2003 Bonds, nor does it guaranty that the ratings on the 2003 Bonds will not be revised or withdrawn.

## SOURCES OF PAYMENT AND SECURITY FOR THE 2003 BONDS

The 2003 Bonds are special obligations of the County issued on a parity with the Prior Bonds (other than the Refunded Bonds) payable solely from the sources described herein, subject to the provisions of federal bankruptcy law and other laws affecting creditors' rights.

Neither the general credit of the County, the City nor that of the State, or of any political subdivision thereof, is pledged to the payment of the principal of or interest on the 2003 Bonds and the Bondholders are given no right to have any excises or taxes levied by the General Assembly of the State of Ohio or the taxing authority of any political subdivision thereof, including the County and the City, for the payment of the principal or interest on the 2003 Bonds.

The 2003 Bonds, the Prior Bonds, and any Additional Bonds that may be issued under the Trust Agreement on a parity therewith, are payable equally and ratably from the Net Revenues of the Sewer System and moneys in the various accounts constituting the Revenue Fund. (See "SUMMARY OF CERTAIN PROVISIONS OF THE 2003 AND PRIOR BOND LEGISLATION AND THE TRUST AGREEMENT").

As described more fully herein (See "THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI - Formation and MSD Agreement") pursuant to the MSD Agreement, the City operates the Sewer System. The City collects all revenue of the Sewer System on behalf of the County. These funds are held by the City and invested with its other funds with MSD receiving a separate accounting of all receipts and its allocable portion of all interest earned. Pursuant to the Trust Agreement, on a monthly basis and upon written notice from the Trustee, after paying all Operating and Maintenance Expenses, the City pays to the Trustee, from the Pledged Revenues in its possession for deposit in the Bond Account of the Revenue Fund, the necessary amounts to pay the principal and interest on the Bonds. On this same monthly basis, the City is required to transfer to the Trustee (i) unless a Reserve Fund Guaranty is in effect, 1/24 of any draw on the Reserve Account until the Reserve Account reaches the Bond Reserve Requirement; and (ii) the amount necessary to make up any prior deficiencies in monthly payments to the Bond Account and unless a Reserve Fund Guaranty is in effect, the Reserve Account. Upon written request, the City is also required to pay from the Net Revenues the administrative costs of carrying or redeeming the Bonds; the principal and interest on any General Obligation Bonds, General Obligation Notes or other Obligations of the County incurred for Sewer System purposes, and on a monthly basis during any calendar year in which the balance in the Replacement and Improvement Account is less than the Required Replacement and Improvement Account Balance, $83,000, until the amount on deposit in such account reaches the Required Replacement and Improvement Account Balance.

Payment of the debt service on the 2003 Bonds, the Prior Bonds, and any Additional Bonds is secured by a pledge of and lien on (i) Net Revenues of MSD; and (ii) moneys in the Bond Account, Reserve Account, Replacement and Improvement Account, and Surplus Account of the Revenue Fund. All the accounts of the Revenue Fund are held in the custody of the Trustee. Construction accounts and the revenues of the Sewer System are held by the City. Any pledge or lien on any fund, account, revenues, money or other intangible property not in the custody of the Trustee is valid and enforceable only to the extent permitted by law.

The Reserve Account was initially funded upon the delivery of the 1985 Bonds from the proceeds of the 1985 Bonds. The balance in the Reserve Account has been increased from the proceeds of the 1986 Bonds, 1991 Bonds, 1993 Bonds, 1995 Bonds, 1997 Bonds, 2000 Bonds, the 2001 Bonds and will be further increased on issuance of the 2003 Bonds from the proceeds of the 2003 Bonds, in an amount sufficient to bring the Reserve Account balance up to an amount equal to the maximum amount of

9

Principal and Interest Requirements on the Bonds in any subsequent Bond Year. The Trust Agreement also allows the County to fund the Reserve Account through the issuance of a Reserve Account Guaranty in an amount equal to the Bond Reserve Requirement. The Replacement and Improvement Account m⸱ ⸱⸱ ⸀ be used for replacements of or improvements to the Sewer System as directed by the Director of M⸱ and to the extent funds are not available in the Bond Account and the Reserve Account, may be used to pay the principal of and interest on the Bonds.

The Surplus Account is an account held by the Trustee into which is deposited any Pledged Revenues of MSD after providing all required payments under the Trust Agreement. The Surplus Account shall, to the extent necessary, from time to time, be transferred to the Bond Account or the Reserve Account to permit the payment of all obligations payable from such accounts, and otherwise may be used for any other Sewer System purpose, upon requisition of the Finance Director of the City. On or before December 31 of each year, the City is obligated to transfer all Pledged Revenues in its possession to the Trustee for deposit into the Surplus Account after reserving two month's Operating and Maintenance Expenses on an annualized basis based on the current Fiscal Year budget plus any encumbrances applicable to the year then ending. Within 30 days after receipt of the audited financial statements for such Fiscal Year the City is obligated to transfer any Pledged Revenues in excess of two month's Operating and Maintenance Expenses on an annualized basis based on the audited financial statements for such Fiscal Year and reserved by the City to the Trustee for deposit into the Surplus Account; provided, however, that the City may treat as a credit against such transfer to the Surplus Account (i) operating encumbrances which existed on December 31 of the prior Fiscal Year and were paid between the first day of the ensuing Fiscal Year and the date of transfer and (ii) long term operating encumbrances incurred prior to the beginning of the current Fiscal Year for obligations which are to be paid in the current or later Fiscal Years. Such long term operating encumbrances are to be evidenced by a certificate of the City Finance Director listing each long term operating encumbrance and its purpose, which certificate is filed with the Trustee and the County at the time Pledged Revenues are transferred to the Surplus Account. The nature of MSD's operations and the cash basis encumbrance system used ⸱ the City in operating MSD generally have the combined effect of MSD having higher encumbrances the beginning of the year than at the end. During the year, portions of the commitments for which encumbrances are made are paid and the encumbrance reduced or eliminated. It is contemplated that from time to time the City Finance Director may requisition funds from the Surplus Account for deposit to the City's general operating account for MSD to reserve funds for such encumbrances. Thus, the balance on deposit in the Surplus Account at any given time may be substantially less than the balance at or as of the end of the year.

In addition, the County covenanted in the Trust Agreement that it will at all times prescribe and charge such rates for the services of the Sewer System, and will so restrict Operating and Maintenance Expenses, as shall result in Net Income Available for Debt Service at least adequate to provide for (i) all payments required by the Trust Agreement to be made into the Revenue Fund, (ii) sufficient funds to pay the debt service on any General Obligation Bonds, General Obligation Notes and all other Obligations (less the amount of interest which has been funded for such Fiscal Year) of the County incurred for Sewer System purposes, (iii) sufficient earnings coverage to permit the issuance of Additional Bonds required for the construction of necessary or advisable extensions or improvements of the Sewer System, and (iv) to provide for normal growth and sound operation of the Sewer System. The definition of Net Income Available For Debt Service includes one-half of the amount of Pledged Revenues transferred to the Surplus Account for such Fiscal Year (as determined under Section 7 of the 1985 Bond Legislation after receipt of the audit).

The County further covenants that in no event shall the Net Income Available for Debt Service with respect to each Fiscal Year be less than 125% of the aggregate amount of Principal and Interest Requirements on the Bonds payable during such Fiscal Year. If Additional Bonds are issued to pay t⸱

cost of Improvements. the portion of the Principal and Interest Requirements thereon that shall be included in the calculation in each Fiscal Year during the estimated construction period of the Improvements shall equal the portion of the interest on said Additional Bonds payable during that Fiscal Year that has not been funded.

If the amount on deposit in the Surplus Account at the end of the Fiscal Year is in excess of 10% of the aggregate principal amount outstanding on all Bonds. General Obligation Bonds. General Obligation Notes and all other Obligations. and the Reserve Account is at the Bond Reserve Requirement and the Replacement and Improvement Account is at the Required Replacement and Improvement Account Balance, then for such Fiscal Year the County is only required to have Net Income Available for Debt Service of 110% of the aggregate amount of Principal and Interest Requirements on the Bonds payable during such Fiscal Year.

In the event of a failure to have sufficient Net Income Available for Debt Service in any Fiscal Year the County shall notify the Trustee and shall immediately employ a Consultant to prepare and submit a written report and recommendations with respect to the rates and charges of the Sewer System necessary to generate sufficient Net Income Available for Debt Service and with respect to improvements or changes in the operations of the Sewer System. A copy of such report and recommendations shall be filed with the County, the Trustee. and any Bondholders of record requesting the same. The County shall, within sixty (60) days of receipt of such report, revise its rates and charges in conformity with such recommendations and otherwise follow such recommendations. If the Consultant's report is not provided within a reasonable time, the Trustee may require the County to employ a different Consultant. If such recommendations are followed, then a failure to meet the required rate covenant shall not constitute a default under the Trust Agreement so long as Net Income Available for Debt Service is adequate to provide sufficient funds to pay the Principal and Interest Requirements on any Bonds, General Obligation Bonds, General Obligation Notes and all other Obligations of the County incurred for Sewer System purposes.

## PLAN OF FINANCING

The proceeds of the 2003 Bonds, together with certain other available funds of the County, shall be used to (i) refund a portion of the 1993 Bonds and a portion of the 1995 Bonds; (ii) reimburse the County for a portion of the cost of purchasing certain equipment, constructing certain improvements and making certain other capital expenditures, which funds the County has already expended; (iii) pay a portion of the cost of one ongoing capital improvement project which has not yet been completed; (iv) increase the balance in the Reserve Account for the Bonds; and (v) pay the costs of issuance of the 2003 Bonds. The improvements being financed with a portion of the proceeds of the 2003 Bonds are all part of routine capital improvements included in the 2003 and prior Capital Improvement Programs. All of the capital improvements projects for which the 2003 Bonds proceeds will be applied are herein collectively referred to as the "2003 Project."

## THE REFUNDING PROGRAM

The County has determined that it is in its best interest to provide moneys to refund the outstanding 1993 Bonds stated to mature on December 1, 2004, 2005, 2010, 2011, 2014, and 2016, and the outstanding 1995 Bonds stated to mature on December 1, 2010, 2011, 2013, and 2015 (the "Refunded Bonds"), in order to achieve lower debt service and to lower the effective interest costs of the amounts financed. The moneys required to refund the Refunded Bonds will be obtained from a portion of the proceeds of the sale of the 2003 Bonds and from the monthly deposits of interest on the refunded 1993 and 1995 Bonds previously made into the Bond Account. Such moneys will be paid over and simultaneously therewith irrevocably deposited with the Trustee as the escrow agent for the Refunded

Bonds (the "Escrow Deposit Trustee") pursuant to the provisions of the Escrow Deposit Agreement entered into by the County and the Escrow Deposit Trustee for the Refunded Bonds. Such moneys will be applied by the Escrow Deposit Trustee to the redemption of the 1993 Refunded Bonds on or about December 1, 2003, at par for certain 1993 Bonds, and at par plus a premium of 2% for other 1993 Bonds as applicable, and the 1995 Refunded Bonds on or about December 1, 2005, at par plus a premium of 2%. Upon the establishment and funding of the irrevocable Escrow Deposit Agreement, the Refunded Bonds shall no longer be deemed to be outstanding under the Trust Agreement and payments by the County of the principal of and the interest on such Refunded Bonds shall cease.

In the Escrow Deposit Agreement, the Escrow Deposit Trustee has acknowledged that the County has deposited with it funds which are sufficient, together with interest and earnings thereon, to: (i) pay all principal and interest requirements when due on the Refunded Bonds through their respective redemption date, (ii) pay the redemption price of such Refunded Bonds upon redemption; and (iii) pay, when required, costs and expenses related to the foregoing, including certain fees and expenses of the Trustee, as Escrow Deposit Trustee.

## APPLICATION OF THE PROCEEDS OF THE 2003 BONDS

The proceeds of the sale of the 2003 Bonds and the uses of such funds are shown below:

| Sources of Funds: | Amount |
|---|---|
| 2003 Bonds - Par Amount | $215.575.000.00 |
| Aggregate Premium (Net of Original Issue Discount) | 22.195.837.55 |
| Trustee held funds in the Bond Account | 1.101.587.51 |
| Accrued Interest | 824.688.77 |
| **Total Sources** | **$239.697.113.83** |

| Use of Funds: | Amount |
|---|---|
| Deposit to Escrow Fund to refund portions of the 1993 and 1995 Bonds | $134.111.259.75 |
| Reimbursement to the County for prior projects | 96.548.827.75 |
| Deposit to Construction Fund for uncompleted project | 3.451.172.25 |
| Deposit to Reserve Account | 2.424.683.40 |
| Deposit to Bond Account | 824.688.77 |
| Costs of Issuance (including bond insurance premium, underwriters' discount, financial advisor, legal, accounting and printing costs) | 2.336.481.91 |
| **Total Uses** | **$239.697.113.83** |

## DEBT SERVICE REQUIREMENTS ON THE 2003 BONDS
## AND CURRENT OUTSTANDING OBLIGATIONS

The following table sets forth. for each year the 2003 Bonds are outstanding. the amoun required in such year to be made available for the captioned purpose. and also the principal and interest on the current outstanding Obligations which will continue to be outstanding after the issuance of the 2003 Bonds.

| Year | Principal and Interest Requirements on the Prior Bonds[1] | 2003 Bonds — Principal Maturities or Mandatory Redemption | 2003 Bonds — Interest[2] | 2003 Bonds — Total Payments | Total Revenue Bond Principal and Interest | Total Principal and Interest on Other Outstanding Obligations[3] | Total Principal and Interest Requirements on All Obligations |
|---|---|---|---|---|---|---|---|
| 2003 | $35,448,305.00 | $0 | $4,490,736.25 | $4,490,736.25 | $39,939,041.25 | $1,871,153.59 | $41,810,19-- |
| 2004 | 29,340,412.50 | 2,370,000 | 10,369,222.50 | 12,739,222.50 | 42,079,635.00 | 1,806,935.19 | 44,886,57( |
| 2005 | 29,340,637.50 | 4,270,000 | 10,265,572.50 | 14,535,572.50 | 43,876,210.00 | 1,806,935.19 | 45,683,14! |
| 2006 | 32,315,318.76 | 1,420,000 | 10,132,747.50 | 11,552,747.50 | 43,868,066.26 | 1,806,935.19 | 45,675,00· |
| 2007 | 32,314,483.76 | 1,340,000 | 10,111,447.50 | 11,451,447.50 | 43,765,931.26 | 1,806,935.19 | 45,572,86( |
| 2008 | 32,317,076.26 | 1,475,000 | 10,087,327.50 | 11,562,327.50 | 43,879,403.76 | 1,806,935.87 | 45,686,33! |
| 2009 | 32,318,336.26 | 1,500,000 | 10,056,352.50 | 11,556,352.50 | 43,874,688.76 | 1,806,935.19 | 45,681,62: |
| 2010 | 16,941,263.76 | 16,910,000 | 10,021,102.50 | 26,931,102.50 | 43,872,366.26 | 1,806,935.19 | 45,679,30· |
| 2011 | 16,945,782.50 | 17,690,000 | 9,238,200.00 | 26,928,200.00 | 43,873,982.50 | 1,806,935.19 | 45,680,91· |
| 2012 | 16,947,262.50 | 18,585,000 | 8,343,090.00 | 26,928,090.00 | 43,875,352.50 | 1,801,786.69 | 45,677,13· |
| 2013 | 16,944,587.50 | 19,510,000 | 7,418,402.50 | 26,928,402.50 | 43,872,990.00 | 1,801,786.69 | 45,674,77· |
| 2014 | 16,942,838.76 | 20,495,000 | 6,438,907.50 | 26,933,907.50 | 43,876,746.26 | 1,490,656.52 | 45,367,40( |
| 2015 | 16,947,732.50 | 21,510,000 | 5,415,857.50 | 26,925,857.50 | 43,873,590.00 | 1,224,155.54 | 45,097,74: |
| 2016 | 20,428,120.00 | 19,100,000 | 4,344,620.00 | 23,444,620.00 | 43,872,740.00 | 1,092,998.09 | 44,965,73: |
| 2017 | 38,865,447.50 | 1,620,000 | 3,389,620.00 | 5,009,620.00 | 14,860,355.00 | 977,932.17 | 44,852,99· |
| 2018 | 7,501,735.00 | 4,050,000 | 3,308,620.00 | 7,358,620.00 | 14,858,340.00 | 546,774.50 | 15,--· ·-: |
| 2019 | 7,502,220.00 | 4,250,000 | 3,106,120.00 | 7,356,120.00 | 14,858,340.00 | 516,284.03 | 1! · |
| 2020 | 7,502,347.50 | 4,460,000 | 2,893,620.00 | 7,353,620.00 | 14,855,967.50 | 516,284.03 | 1! ·· |
| 2021 | 7,501,632.50 | 4,680,000 | 2,675,370.00 | 7,355,370.00 | 14,857,002.50 | 425,882.57 | 15... ··6! |
| 2022 | 7,503,450.00 | 4,900,000 | 2,453,070.00 | 7,353,070.00 | 14,856,520.00 | 50,140.65 | 14,906,66! |
| 2023 | 7,500,875.00 | 5,135,000 | 2,220,320.00 | 7,355,320.00 | 14,856,195.00 | 25,070.33 | 14,881,26: |
| 2024 | 7,502,412.50 | 5,375,000 | 1,982,487.50 | 7,357,487.50 | 14,859,900.00 | 0.00 | 14,859,90: |
| 2025 | 7,502,062.50 | 5,630,000 | 1,727,175.00 | 7,357,175.00 | 14,859,237.50 | 0.00 | 14,859,23· |
| 2026 | 4,499,012.50 | 8,900,000 | 1,459,750.00 | 10,359,750.00 | 14,858,762.50 | 0.00 | 14,858,76: |
| 2027 | 0.00 | 9,950,000 | 1,016,500.00 | 10,966,500.00 | 10,966,500.00 | 0.00 | 10,966,50: |
| 2028 | 0.00 | 10,450,000 | 520,750.00 | 10,970,750.00 | 10,970,750.00 | 0.00 | 10,970,7E |
| **Total** | $448,673,352.56 | $215,575,000 | $143,486,988.75 | $359,061,988.75 | $807,935,341.31 | $26,796,387.60 | $834,731,7: |

---

[1] Excluding the Refunded Bonds.
[2] Interest includes all interest from June 1, 2003, for the 2003 Series A Bonds, and September 1, 2003 for the 2003 Series B Bonds, part of which will be paid as accrued interest by the purchasers of the 2003 Bonds.
[3] Includes all County obligations for General Obligation Bonds, General Obligation Notes and other Obligations for borrowed money with respect to the Sewer System having a maturity of more than 365 days from incurrence, excluding the Bonds. The County has no General Obligation Bonds or Notes outstanding with regard to MSD.

## THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI

### Formation and MSD Agreement

MSD is a county sewer district established pursuant to Chapter 6117 of the Ohio Revised Code. MSD collects and treats wastewater through the operation of the Sewer System. The Sewer System is operated pursuant to the authority of the Revised Code. The Revised Code specifically authorizes the formation of joint sewer districts, agreements between counties and municipal corporations providing for sewage treatment, the establishment of sewage rates and assessments by the Board of County Commissioners, and the borrowing of money to pay the cost of constructing, maintaining, and repairing sewer systems.

Prior to 1968, the County and the City maintained separate sewage operations. MSD was formed on April 10, 1968, pursuant to resolutions of the Board of County Commissioners of Hamilton County and Ordinances of the City of Cincinnati, providing for a consolidation of the City Sewer Department and the County Sewer District. The entire transaction is recorded in Hamilton County Commissioner's Minute Book 152, pages 958 to 988. The steps leading to the consolidation were taken in the following order:

(1)     The City enacted Ordinance 144-1968 consenting to be consolidated into County Sewer District No. 1; conveying the sole and exclusive use of all of the sanitary sewage facilities to the Hamilton County Board of County Commissioners; and authorizing and consenting to construction, maintenance, repair and operation of sewer improvements for local service by the Board of County Commissioners.

(2)     The Board of County Commissioners by Resolution recorded in Commissioner's Minute Book 152, page 963, accepted the sewer district consolidation, conveyance and local service described in Ordinance 144-1968 by the City.

(3)     The City then enacted Ordinance 145-1968, which assigned its interest in 23 contracts for sewage treatment with other municipal corporations to the County.

(4)     The County by Resolution recorded in Commissioner's Minute Book 152, page 967, accepted assignment of the 23 municipal sewage treatment contracts from the City in Ordinance 145-1968 and assumed the City's contractual obligation to provide sewage treatment to the municipalities, including communities such as Indian Hill, Montgomery, Blue Ash, Wyoming and Reading.

(5)     The County by Resolution recorded in Commissioner's Minute Book 152, page 968, then changed the name of Hamilton County Sewer District No. 1 to The Metropolitan Sewer District of Greater Cincinnati.

(6)     Following the consolidation of City and County sewer systems into MSD the City adopted Ordinance 146-1968, which approved the MSD Agreement between the City and County.

(7)     Ordinance 147-1968 established the Department of Sewers in the City to manage and operate MSD.

(8)     After the City approved the MSD Agreement, the County by Resolution recorded in Commissioner's Minute Book 152, page 979, accepted and adopted it.

15

The MSD Agreement established the respective responsibilities and duties of the City and the County. Pursuant to the MSD Agreement, the County retained authority and control of the Sewer System including, but not limited to, the sole authority to establish sewer service charges, adopt rules and regulations and approve capital improvement programs. The County designated the City as its managing agent for the operation of the Sewer System, subject to the control and direction of the Board as provided in the MSD Agreement. Subject to the retained authority of the County, the City agreed to undertake the management and operation of MSD for and on behalf of the County for a period of 50 years commencing May 1, 1968 and expiring April 30, 2018. The County agreed to maintain Sewer System service charges and revenues at rates which would at all times be sufficient to pay the reasonable expenses of operation and maintenance of the Sewer System and the debt service charges on all then existing and future indebtedness of the City and County related to the Sewer System. The County also transferred all of its sewer system related personal property, equipment, and vehicles to the City so that the City could operate the Sewer System. The City agreed to plan, design and supervise the construction of all sewers and sewage treatment facilities, maintain and operate all sanitary and combined sewers and all sewage pumping and treatment facilities and generally operate the Sewer System. As part of the consolidation, and in connection with the execution of the MSD Agreement, the City granted the sole and exclusive use of all sanitary and combined sewers and sewage treatment facilities to the County. The City, however, retained legal title to all such facilities.

Substantially all of the unincorporated areas of the County, minor sections of Warren and Clermont Counties and all of the cities and villages within the County which have sanitary or combined sewers, except the Villages of Glendale and Terrace Park and the City of Harrison, are served by MSD. Pursuant to applicable law, all households which have sanitary sewers available to them must be connected to such sanitary sewers. Significant portions of the County, primarily in the western section, are not sewered. Many developed portions of the unsewered area utilize on-site treatment facilities, usually septic tanks or aerobic treatment systems. Large portions of this unsewered area are not highly developed. (See Map on page 22 hereof). MSD has proposed and presented to the County for consideration a comprehensive plan to provide sewer service to all of the unsewered portions of County in the QUEST Master Plan. (See "QUEST Program").

MSD has not engaged in the treatment or distribution of public water supply or the disposal of solid waste and currently has no plans to provide such services. MSD is providing management and administrative services to the City's Stormwater Utility Management Department for a fee, on an annual basis.

Periodically both the City and the County have reviewed the advisability of seeking revisions to the MSD Agreement. In 1997 the City and County entered into the 1997 MSD Supplemental Agreement. Pursuant to the 1997 MSD Supplemental Agreement, the City and County agreed to appoint a committee to explore the future borrowing capacity and other issues concerning the future of MSD.

The committee was appointed in 2000, and issued a report dated February 20, 2001. Among other things, the report indicated that there were two main issues which the City and the County needed to resolve in order to assure long term access to the capital markets in order to finance capital improvements: (i) the continued ability of MSD to use all combined and sanitary sewer system facilities to accomplish its mission; and (ii) management continuity of MSD beyond 2018. The report identified five options, but specifically did not recommend three of them. The two remaining options were: (i) extend the MSD Agreement without change until all Bonds are retired; or (ii) have the City enact an additional ordinance granting to MSD the exclusive use of City owned facilities and assignment of previous service contracts in perpetuity. These options have certain potential adverse consequences to either the County or the City. Currently, both the City and the County have the report under advisement.

16

The City and the County may agree to an extension of the term of the MSD Agreement; indeed, the MSD Agreement contemplates that they may do so. If the City and the County do not agree to an extension, and no other alternate action is taken by the City, the repercussions of failing to extend the MSD Agreement may adversely affect the operations and financial condition of the Sewer System after the MSD Agreement's termination. Any party that might seek to operate the Sewer System following a termination of the MSD Agreement and without the City's continued involvement might confront the following circumstances:

- Legal uncertainty regarding rights to the use of City-owned facilities;
- The need to replicate all or substantial portions of the MSD workforce;
- The need to provide, by alternative means, the financial, legal and other administrative services that the City currently provides for MSD; and
- The need to create a billing and collection system for MSD that does not utilize the data and services of the City's Water Works and its power to terminate water service as a collection tool.

Neither the County nor the City can predict the likelihood that any of these circumstances will materialize or the magnitude of the negative impact on the operations or financial condition of MSD if any of them does materialize.

**Management and Organization**

The Department of Sewers of the City is responsible for the performance of the City's responsibilities to manage and operate MSD. The head of the Department of Sewers is the Director of MSD and is primarily responsible for the administration of the entire Sewer System, including design, construction, repair, maintenance and operation of all sewers and sewage treatment facilities. The Department of Sewers administers MSD through the Office of the Director and five operating divisions: the Administration Division, the Engineering Division, the Wastewater Treatment Division, the Industrial Waste Division and the Wastewater Collection Division.

The Office of the Director is primarily responsible for coordinating the overall operation of MSD. The Administration Division is responsible for all personnel, accounting, budgeting, safety and training matters. The Engineering Division is responsible for the extension of service permits; the development of rules and regulations and legislation; maintaining all sewer records; planning, evaluating, and development of projects; development, management, and implementation of MSD's Capital Improvement Program; acquisition of easements and property; preparation and presentation of all legislation required to complete a project; and project management of individual projects from conception through design, construction, completion, and acceptance of the project with the goal of project completion on time and within budget. The Wastewater Treatment Division has the responsibility for operating and maintaining all wastewater treatment plants, package treatment plants and pumping stations and performing all actual treatment of sewage. The Industrial Waste Division is responsible for regulating industrial waste discharges, pretreatment and surcharge programs, sampling and analytical laboratory operations. The Wastewater Collection Division is responsible for inspection, maintenance, repair and rehabilitation of the wastewater collection system including all combined sewers, sanitary sewers, combined sewer outlets and appurtenances.

Because the City operates MSD and the Sewer System for the County, the Director of Sewers is appointed by the City Manager of the City of Cincinnati and all other supervisory personnel are either appointed by the City Manager or selected pursuant to the civil service rules applicable to City employees. MSD believes that there is adequate management available in the event of the unanticipated loss of principal supervisory personnel.

The following individuals. holding positions within the Department of Sewers. exercise principal supervisory authority over the Sewer System.

*Patrick T. Karney. P.E.. DEE. Director. Department of Sewers. City of Cincinnati.*

Mr. Karney has a Bachelors Degree in Mechanical Engineering and Masters of Science Degrees in Engineering Management and Civil Engineering. He is a Registered Professional Engineer in the States of Missouri, Florida and Ohio. Additionally. Mr. Karney is a licensed treatment plant operator.

Mr. Karney was appointed as the Director of The Metropolitan Sewer District of Greater Cincinnati in early 1999. His background consists of over sixteen years of experience managing municipal wastewater treatment systems which includes his work at the Metropolitan Sewer District of St. Louis, Mo., and the City of Jacksonville, Florida. Additionally. prior to his experiences with municipal wastewater, Mr. Karney worked for seven years in the private industrial sector with General Motors Corporation and Falcon Products, Inc. Mr. Karney's private sector experience also includes his service as a Deputy Executive Director of the Water Environment Federation and Southern Division President for a residuals recycling company. Mr. Karney also established his own environmental consulting firm and later left the firm to become the Southeast Regional Manager for Black & Veatch. Mr. Karney has presented and published over forty technical papers on environmental issues. five of which have been presented internationally to groups outside of the United States and nine of which have been presented at international meetings of the Water Environment Federation.

*Robert J. Campbell. Deputy Director, P.E., DEE. Department of Sewers, City of Cincinnati.*

Mr. Campbell received a Bachelor of Science in Civil Engineering 1971, and a Masters of Science in Civil Engineering in 1983, both degrees from the University of Missouri - Rolla, Rolla, Missouri. The American Academy of Environmental Engineers certified Mr. Campbell as a Diplom with a Wastewater Specialty in 1991. Mr. Campbell is a registered Professional Engineer in the State Iowa, Missouri, and Ohio. Additionally, Mr. Campbell is a Certified Wastewater Operator in the State of Missouri and Illinois.

Mr. Campbell was appointed Deputy Director on July 19, 1999, where his responsibilities include Treatment, Industrial Waste, Sewer Collection Systems. Engineering and Stormwater. From 1996 to his appointment as Deputy Director, Mr. Campbell was the Plant manager at the Sauget Development and Research Association, where he was responsible for the management of two wastewater treatment facilities. From 1995 to 1996, Mr. Campbell was the Office Manager for the St. Louis office of Consoer Townsend Evirodyne Engineers where he was responsible for all activities of the St. Louis region. From 1991 to 1995, Mr. Campbell was the Executive Director of the Little Blue Valley Sewer District, Kansas City, Missouri, where he was responsible for all activities associated with the administration of a regional sewer district. From 1990 to 1991, Mr. Campbell was the Municipal and Industrial Manager for Engineering Science, Inc., a national environmental consulting firm. From 1978 to 1990, Mr. Campbell was employed by the Metropolitan St. Louis Sewer District holding the positions of Assistant Director of Wastewater, Director of Planning, and Director of Stormwater. From 1971 to 1978, Mr. Campbell was employed by the City of Tulsa Water and Sewer Department in the Water and Wastewater Treatment Plants Division.

*Edward H. Kesterman, P.E., Sewers Chief Engineer, Department of Sewers, City of Cincinnati.*

Mr. Kesterman received his Bachelor of Science Degree in Civil Engineering from the University of Cincinnati in 1984 and is a Registered Professional Engineer in the State of Ohio. Mr. Kesterman began his career with the Metropolitan Sewer District in 1971 and has devoted his entire career to serv

in various progressive positions within the Engineering Division. Most recently, since being promoted from Principal Engineer to Sewers Chief Engineer in 2000, Mr. Kesterman participated in the specialized intensive professional training program at the Water and Wastewater Leadership Center held at the Kenan-Flagler Executive Education facilities of the University of North Carolina at Chapel Hill.

*Julia L. Johnson, Superintendent, Wastewater Administration Division, Department of Sewers, City of Cincinnati.*

Ms. Johnson received an MBA in Management in 1975 from the University of Cincinnati. She also has a Bachelor of Science Degree in Business Administration from Virginia State University, Petersburg, Virginia which she received in 1973. Ms. Johnson has served in her present position since September, 1986. She has extensive experience in public administration having held a number of positions in the personnel department of the City of Cincinnati. She also served as a field auditor in the Department of Finance, City of Cincinnati. Ms. Johnson holds memberships in the following professional associations: American Society for Training and Development, American Management Association, and American Society for Public Administration.

*William J. Winters, P.E., Treatment Superintendent (Acting), Wastewater Treatment Division, Department of Sewers, City of Cincinnati.*

Mr. Winters received his Bachelor of Science Degree in Civil/Environmental Engineering from the University of Cincinnati in 1980, and his Masters of Science in Environmental Engineering from the University of Cincinnati in 1983. Mr. Winters is a Professional Engineer in the State of Ohio, holds a Class IV Ohio Wastewater Operator Certificate, and is certified in Manufacturing Reliability from the University of Dayton.

Mr. Winters began his career with MSD in 1983 and has devoted his entire career to serving in various positions in the Wastewater Treatment Division and the Process Quality Improvement Division. Most recently he has been promoted to Principal Engineer responsible for supervising the Central Services Section, Wastewater Treatment Division. Currently he is acting as the Wastewater Treatment Division Treatment Superintendent until the position is filled permanently.

*G. Stephen Minges, P.E., Superintendent, Wastewater Collection Division, Department of Sewers, City of Cincinnati.*

Mr. Minges attended the University of Cincinnati, receiving his Bachelor of Science Degree in Civil Engineering in 1974. Prior to 1981, Mr. Minges was employed as a Project Engineer with Hamilton County Department of Public Works, an Assistant Bridge Engineer for Donald Schramm, then Hamilton County Engineer and a Structural Engineer for Curtis D. Summers P.E. Inc.

Mr. Minges was appointed as Superintendent of Wastewater Collection on February 28, 1993. Since 1981, Mr. Minges has worked for the Department of Sewers as an engineer in the Wastewater Collection Division. Mr. Minges is a Professional Engineer and a Professional Surveyor licensed in the state of Ohio, he also holds an Ohio EPA Class II Certificate in the operation of Wastewater Collection Systems. Mr. Minges is a member of the Water Environment Federation and a member of several state and local associations.

*Beverly B. Head, Superintendent, Industrial Waste Division, Department of Sewers, City of Cincinnati.*

Ms. Head received a Bachelor of Science Degree from Emory University, Atlanta, Georgia, in 1972. She holds a Class II Wastewater Operator's License from the State of Georgia.

Ms. Head was appointed as Superintendent of the Industrial Waste Division on October 4, 1992. From 1973 until her appointment Ms. Head worked for the Dekalb County, Georgia, Public Works - Water and Sewer Department. During her tenure there, she held positions ranging from Laborat: Technician to her last one as Supervisor of the Water Quality Control Laboratory and Monitoring Bra.

*Alan P. Landis, C.P.A., MSD Comptroller.*

Mr. Landis received a Bachelor of Science Degree in 1963 in Business Administration from Butler University, Indianapolis, Indiana.

Mr. Landis joined MSD in January, 1990 as an employee of the County, assigned full-time to the management of MSD. He is responsible for the financial aspects of the Sewer Department. The scope of his position also includes accounting, budget preparation and monitoring, auditing, annual fund statements, accounts payable and receivable, rate studies, and debt management. Prior to 1990, Mr. Landis worked with the following companies: Stockton West Burkhart, Inc., Breneman, Inc. and Deloitte, Haskins & Sells. His extensive experience has been as controller, treasurer, public accountant and in the area of administration and management. Mr. Landis is a member of American Institute of Certified Public Accountants. He received his CPA in 1966.

**Other Parties Working With MSD**

In addition to independent consultants routinely engaged to conduct various studies, MSD routinely employs an outside consulting firm to do revenue requirement and cost allocation studies. (See "Sewer Rates"). In administering its responsibilities under the MSD Agreement, the County has historically used a variety of advisory committees which were reorganized into a single committee, the Public Advisory Committee, in 2001. The Public Advisory Committee consists of a maximum of fifteen members, including the County Administrator, two members nominated by the Township Associatir two members appointed by the Hamilton County Municipal League, two members nominated by the C Manager, two members representing the Board, one nominated by the County General Health District and six other qualified individuals recommended by the Chair. The major function of the Public Advisory Committee is to assess technical and policy questions of concern or interest to the Board relating to the management and operation of MSD and to make recommendations to the Board.

**Operations**

The Sewer System covers approximately 400 square miles. It serves a residential population of approximately 800,000 and substantially all of the industry in Hamilton County through over 200,000 sewer connections and operates and maintains over 3,000 miles of sanitary and combined sewers, 7 major wastewater treatment plants, 6 package treatment plants, 133 package lift stations and 8 major pumping stations.

Since the 1968 consolidation, various small portions of Clermont and Warren Counties have been included within the Sewer System, as well as the municipalities of North Bend, Cleves and Loveland. With completion of the Taylor Creek treatment plant, it is possible that Miamitown, which lies within the County and is currently serviced only by private septic tanks, as well as many other areas in the Taylor Creek drainage basin could join the System in the future. The QUEST Plan anticipates inclusion of all areas of the County in the Sewer System, with the Taylor Creek treatment plant serving as an important element of the QUEST Plan.

MSD is nearing completion of a three year project to develop and calibrate a system-wide computer generated hydraulic model of the entire sewer system. When fully developed and implement: