# EXHIBIT 14
# 3 of 4

hereunder shall be abated, until such time as the amount of payments otherwise required hereunder equals the amount prepaid:

(3)    Third, upon written notice by the Trustee to the City and provided there is no Reserve Account Guaranty in effect, the City shall transmit for deposit into the Reserve Account, with respect to each draw on the Reserve Account, 1/24 of the amount drawn on the Reserve Account until the balance in the Reserve Account equals the Bond Reserve Requirement;

(4)    Fourth, upon written notice by the Trustee to the City, the City shall transmit such sum in addition to any of the foregoing allocations as may be necessary and available, after meeting the requirements of the preceding paragraphs to make up any previous deficiency in any such monthly allocation;

(5)    Fifth, upon written notice by the Trustee to the City, the City shall transmit and pay when due, the administrative costs of carrying or redeeming the Bonds;

(6)    Sixth, as and when required, the City shall transmit to the County such sums as are required to pay principal of and interest on any General Obligation Bonds, General Obligation Notes or other Obligations of the County incurred for Sewer System purposes, as certified by the County to the City; and

(7)    Seventh, upon written notice by the Trustee to the City, the City shall transmit, whenever the balance in the Replacement and Improvement Account is less than the Required Replacement and Improvement Account Balance, for deposit into the Replacement and Improvement Account the sum of $83,000 monthly until the amount on deposit therein reaches the Required Replacement and Improvement Account Balance.

On or before December 31 of each year the City shall transfer all Pledged Revenues in its possession to the Trustee for deposit into the Surplus Account after reserving two month's Operating and Maintenance Expenses, annualized based on the current Fiscal Year budget plus any encumbrances applicable to the year then ending. Within 30 days after receipt of the audited financial statements for such Fiscal Year, any Pledged Revenues in excess of two month's Operating and Maintenance Expenses, annualized based on the audited financial statements for such Fiscal Year and reserved by the City pursuant to this paragraph, (the "Transfer Amount") shall be transferred to the Trustee for deposit into the Surplus Account; provided, however, that the City may treat as a credit against such transfer to the Surplus Account (i) operating encumbrances which existed on December 31 of the prior Fiscal Year and were paid between the first day of the ensuing Fiscal Year and the date of transfer and (ii) long term operating encumbrances incurred prior to the beginning of the current Fiscal Year for obligations which are to be paid in the current or later Fiscal Years. Such long term operating encumbrances are to be evidenced by a certificate of the City Finance Director listing each long term operating encumbrance and its purpose, which certificate is filed with the Trustee and the County at the time Pledged Revenues are transferred to the Surplus Account.

## Additional Bonds

If no Event of Default under the Trust Agreement has occurred and is continuing, the County may, to the extent permitted by law in effect at the time thereof, and without jeopardy to the tax exempt status of the 2003 or Prior Bonds, issue Additional Bonds from time to time for any lawful purpose including, but not limited to, (i) completing the 1985 Project, the 1986 Project, the 1991 Project, the 1993 Project, the 1995 Project, the 1997 Project, the 2000 Project, the 2001 Project, or the 2003 Project, (ii) refunding any one or more series of Bonds, (iii) funding any claims settlement, and (iv) making

Improvements to the Sewer System. The 2003 Bonds constitute Additional Bonds. Additional Bonds of any series, including the 2003 Bonds, shall be equally and ratably secured by the Pledged Revenues and the Revenue Fund with the Prior Bonds (other than the Refunded Bonds) and each other series Additional Bonds.

Prior to the issuance of any Additional Bonds and after the adoption of Bond Legislation for said Additional Bonds there shall be filed with the Trustee the items required by the Trust Agreement, including, but not limited to, the following:

(a)    if for Improvements, a statement, signed by the Director of MSD or the Independent Engineer, giving (i) an estimate of the cost of the Improvements, including an amount for contingencies but excluding financing charges, reserves and interest during construction, and (ii) an estimate of the completion date for said improvements;

(b)    if for claims settlement, an opinion of the Legal Officer to the effect that the use of the proceeds of the Additional Bonds, together with other funds, if any, of MSD or the County, for such purpose will result in the satisfaction and release of the claim underlying such claims settlement, and such opinion shall state the estimated date of such satisfaction and release;

(c)    a certificate, signed by an Authorized Officer, setting forth:

(i)    the Net Income Available for Debt Service for the most recent Fiscal Year for which audited financial statements are available, adjusted to reflect on an annualized basis any increase or decrease in rates, charges and rentals of the Sewer System which became effective during that period or prior to the date of issuance of the Additional Bonds, and

(ii)    the amount of the maximum annual Principal and Interest Requirement Bonds for any Fiscal Year thereafter, including the Principal and Interest Requirements on such Additional Bonds for the purposes of subparagraphs (II) and (III) below.

The Trustee shall not authenticate and deliver such Additional Bonds unless:

(I)    the proceeds (excluding accrued interest but including any premium) of such Additional Bonds shall be not less than the additional costs of the 1985 Project or the cost of the Improvements or claims settlement, less any other funds available or to be made available to pay the additional costs of the 1985 Project or the costs of the Improvements or claims settlement; and

(II)    the Net Income Available for Debt Service for the prior Fiscal Year as set forth in the certificate required under paragraph (c)(i) above, is at least equal to (a) 125% of the maximum annual Principal and Interest Requirements as set forth in the certificate required under paragraph (c)(ii) above including the Principal and Interest Requirements on all Bonds and the proposed Additional Bonds and (b) 100% of the maximum aggregate annual Principal and Interest Requirements on all Bonds and the proposed Additional Bonds as set forth in the certificate required under paragraph (c)(ii) above and on General Obligation Bonds, General Obligation Notes and other Obligations in any subsequent Fiscal Year; or

(III)    the forecasted Net Income Available for Debt Service of the first two full Fiscal Years of the Sewer System shown in the statement, study or report described in the next paragraph are at least equal to (1) 130% of the maximum Principal and Interest Requirements shown in paragraph (c)(ii) above and (2) 105% of the maximum aggregate annual Principal and Interest Requirements on all Bonds and

proposed Additional Bonds as set forth in the certificate required under paragraph (c)(III) above and on General Obligation Bonds, General Obligation Notes and other Obligations in any subsequent Fiscal Year.

The statement, study or report referred to in subparagraph (III) above shall be signed by a Consultant, retained by the County and as to whom the Trustee does not make an objection, giving a forecast for the first two Fiscal Years immediately following the Fiscal Year in which the completion date of said Improvements is to occur.

Before any Additional Bonds for the purpose of refunding or advance refunding all or a portion of the Bonds outstanding shall be delivered:

(a)     the proceeds (excluding accrued interest but including any premium) of such refunding Additional Bonds plus any moneys to be withdrawn from the Revenue Fund by the Trustee for such purpose, as hereinafter provided, together with any other funds available to the County for such purpose, together with the interest that shall accrue (without further investment or reinvestment of either the principal amount of such Defeasance Obligations or the interest earnings therefrom) upon any Defeasance Obligations acquired, shall be not less than an amount sufficient to pay the principal of and the redemption premium, if any, on the Bonds to be refunded and the interest which will accrue thereon to the redemption date or maturity dates, as the case may be, and the expenses incident to such financing to the extent not paid from other sources, as required to cause such Bonds to be paid and discharged in accordance with the Trust Agreement, and

(b)     either (i) the maximum annual Principal and Interest Requirements for any Fiscal Year thereafter giving effect to the issuance of such refunding Additional Bonds shall, for any Fiscal Year during which all Bonds not being refunded are outstanding, be not greater than 105% of the maximum annual Principal and Interest Requirements on account of all Bonds outstanding immediately prior to the issuance of such refunding Bonds, including the Bonds to be refunded or (ii) the conditions set forth in subparagraphs (II) or (III) above are met with respect to such refunding Additional Bonds.

## General Covenants of the County

The following is a summary of certain covenants the County has made in the Trust Agreement with the Trustee and Holders of the Bonds and which the County has reaffirmed in the Supplemental Trust Agreements and extended to the 2003 Bonds:

(a)     The County will, solely from the sources provided in the Bond Legislation, pay the principal of and premium, if any, and interest on the Bonds on the dates and at the places and in the manner mentioned in the Bonds.

(b)     The County will faithfully observe and perform at all times all agreements, covenants, undertakings, stipulations and provisions contained in the Bond Legislation, the Trust Agreement and the Bonds, and in all proceedings pertaining to the Bonds or the Sewer System.

(c)     The County represents and warrants that it is, or will be upon delivery of the Bonds, the owner of title to the Sewer System, or licenses from the City to operate portions of the Sewer System, sufficient to operate the Sewer System, and upon delivery of the Bonds will have good right, full power, and lawful authority to pledge the Pledged Revenues and Revenue Fund as herein and in the Trust Agreement provided.

(d)    The County has not heretofore made or suffered to exist any pledges of or liens on the Pledged Revenues. The County will not make any pledge or assignment of or create any lien or encumbrance upon the Pledged Revenues or the Revenue Fund having a pr higher than or equal to that of the Bonds except as provided in the Bond Legislatio regard to the issuance of Additional Bonds.

(e)    The Sewer System and all books and documents in the County's possession or control relating to the Sewer System. the Revenue Fund and the Pledged Revenues. shall at all times be open to inspection by such accountants or other agents as the Trustee. the Underwriters or the Holder or Holders of 25% or more in principal amount of Bonds then outstanding may from time to time designate.

(f)    The County will cause the Sewer System to be kept in good repair and good operating condition, and the County may. at its own expense. from time to time undertake additions, remodeling, modifications and improvements to the Sewer System under the terms and conditions set forth in the Trust Agreement and shall maintain fire and other extended coverage insurance. in amounts not less than the full insurable value of the Sewer System. as provided in the Trust Agreement.

**Rate Covenant**

The County will at all times prescribe and charge such rates for the services of the Sewer System, and will so restrict Operating and Maintenance Expenses. as shall result in Net Income Available for Debt Service at least adequate to provide for (i) the payments required by this Bond Legislation to be made into the Revenue Fund, (ii) sufficient funds to pay the Principal and Interest Requirements on any General Obligation Bonds, General Obligation Notes and all other Obligations of the County incurred for Sewer System purposes, (iii) sufficient earnings coverage to permit the issuance of the Additional B required for the construction of necessary or advisable extensions or improvements of the Sewer S) and (iv) to provide for the normal growth and sound operation of the Sewer System.

In no event shall the sum of Net Income Available for Debt Service with respect to each Fiscal Year be less than 125% of the aggregate amount of Principal and Interest Requirements on the Bonds payable during such Fiscal Year; provided, however, that if Additional Bonds are issued to pay the cost of Improvements, the portion of the Principal and Interest Requirements thereon that shall be included in the calculation in each Fiscal Year during the estimated construction period of the Improvements shall equal the portion of the interest on said Additional Bonds accruing during that Fiscal Year that has not been funded; provided further, if the amount on deposit in the Surplus Account at the end of such Fiscal Year is in excess of 10% of the aggregate principal amount outstanding on all Bonds, General Obligation Bonds, General Obligation Notes and all other Obligations and the Reserve Account is at the Bond Reserve Requirement and the Replacement and Improvement Account is at the Required Replacement and Improvement Account Balance. then for such Fiscal Year the percentage for the rate covenant set forth in the first clause of this paragraph shall be 110% rather than 125%; and provided further that the failure in any such 12-month period to meet such test shall not constitute an event of default under the Trust Agreement.

In the event of a failure to meet the rate covenant in the preceding paragraph, the County shall notify the Trustee and shall immediately employ a Consultant to prepare and submit a written report and recommendations with respect to the rates and charges of the Sewer System necessary to meet the above-stated rate requirements and with respect to improvements or changes in the operations of the Sewer System, stating the extent to which prior recommendations of consultants or engineers may not have been complied with by the County. The County shall, within 60 days of receipt of such re

revise its rates and charges in conformity with such recommendations and otherwise follow such recommendations.

## Events of Default

If any of the following events occur, it is hereby defined as and declared to be and to constitute an "event of default:"

(a)     failure to pay any interest on any Bond when and as the same shall have become due and payable;

(b)     failure to pay the principal of or any premium on any Bond when and as the same shall become due and payable, whether at stated maturity or by acceleration or by redemption:

(c)     failure by the County to perform or observe any other covenant, agreement or condition on the part of the County contained in the Trust Agreement or in the Bonds, which failure shall have continued for a period of 90 days after written notice, by registered or certified mail, to the County specifying the failure and requiring the same to be remedied, which notice may be given by the Trustee in its discretion and which notice shall be given by the Trustee at the written request of the Holders of not less than 25% in aggregate principal amount of Bonds then outstanding;

(d)     the abandonment of the Sewer System or any substantial portion thereof or the discontinuance of the operations therein, and the continuance thereof for ten days after receipt by the County of a written notice from the Trustee specifying such default and requesting that it be corrected; or

(e)     the County shall: (i) become insolvent or the subject of insolvency proceedings, (ii) be unable, or admit in writing its inability, to pay its debts as they mature; (iii) make a general assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its property; (iv) file a petition or other pleading seeking reorganization, composition, readjustment, or liquidation of assets, or requesting similar relief; (v) apply to a court for the appointment of a receiver for any of its assets; (vi) have a receiver or liquidator appointed for any of its assets (with or without the consent of the County) and such receiver shall not be discharged within 90 consecutive days after his appointment; (vii) become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code; or (viii) file an answer to a creditor's petition admitting the material allegations thereof for liquidation, reorganization, readjustment or composition or to effect a plan or other arrangement with creditors or fail to have such petition dismissed within 60 consecutive days after the same is filed against the County.

## Acceleration

Upon the occurrence of any event of default, the Trustee may, and upon written request of the Holders of not less than 25% in aggregate principal amount of Bonds then outstanding, shall by notice in writing delivered to the County, declare the principal of all Bonds then outstanding (if not then due and payable) and the interest accrued thereon to be due and payable immediately and, upon said declaration, such principal and any premium and interest shall become and be immediately due and payable, anything in the Bonds or in the Trust Agreement to the contrary notwithstanding, and thereupon all the Bonds then outstanding shall become and be immediately due and payable, anything in the Bonds or in the Trust Agreement contained to the contrary notwithstanding, and thereupon all the Bonds then outstanding shall be secured ratably by the Trust Agreement irrespective of their original maturity dates.  Provided, however, that nothing contained in the Trust Agreement shall in any way interfere with, but shall be in addition to the rights of the Holders of the Bonds then outstanding upon any default in the payment of the principal, interest, or premium, if any, on the Bonds, to have a receiver appointed by a court of competent

jurisdiction to operate the Sewer System and apply the income and revenues to the payment of the Bonds and the interest thereon.

If, at any time after such principal and any premium and interest shall have been so declare and payable and prior to (a) the entry of a judgment in a court of law or equity for enforcement of the Trust Agreement or (b) the appointment, and the confirmation thereof, of a receiver after an opportunity for hearing by the County, all sums payable hereunder on the Bonds which have not reached their stated maturity dates and which are due and payable solely by reason of said declaration shall have been duly paid or provided for by deposit with the Trustee and all existing defaults shall have been made good, including without limitation reasonable fees, charges and expenses of the Trustee and its counsel and of the Holders of the Bonds, including reasonable fees of counsel paid or incurred, then and in every such case such payment or provisions for payment shall ipso facto constitute a waiver of such default and its consequences and an automatic rescission and annulment of such declaration under the next preceding paragraph, but no such waiver or rescission shall extend to or affect any subsequent event of default or impair any rights consequent thereon.

### Other Remedies: Rights of Holders

Upon the happening and continuance of an event of default the Trustee may, with or without taking action with regard to acceleration, pursue any available remedy, including without limitation, action at law or in equity, to enforce the payment of the Bonds or to remedy any event of default.

Upon the happening and continuance of an event of default, and if requested so to do by the Holders of at least 25% in aggregate principal amount of Bonds then outstanding and indemnified at its option, the Trustee shall exercise such of its rights and powers as the Trustee, being advised by counsel, shall deem most effective to enforce and protect the interests of the Holders.

No remedy conferred upon or reserved to the Trustee (or to the Holders) is intended t exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Trustee or to the Holders under the Trust Agreement.

No delay or omission to exercise any right or power accruing upon any event of default shall impair any such right or power or shall be construed to be a waiver of any such event of default or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

No waiver of any event of default hereunder, whether by the Trustee or by the Holders, shall extend to or shall affect any subsequent event of default or shall impair any rights or remedies consequent thereon.

### Waivers of Events of Default

At any time, the Trustee may in its discretion waive any event of default hereunder and its consequences and rescind any declaration of maturity of principal, and shall do so upon the written request of the Holders of (1) at least one-half in aggregate principal amount of all the Bonds then outstanding in respect of which an event of default in the payment of principal, interest, or premium, if any, exists or (2) at least 25% in aggregate principal amount of all Bonds then outstanding in case of any other event of default; provided, however, that there shall not be waived any event of default described in paragraphs (a) or (b) of "Events of Default" herein or any such declaration in connection therewith rescinded, unless at the time of such waiver or rescission payment of the amounts provided for waiver and automatic rescission in connection with acceleration of maturity have been made or provided for. In

of any such waiver or rescission, or in case any proceeding taken by the Trustee on account of any such events of default shall have been discontinued or abandoned or determined adversely, then and in every such case the County, the Trustee and the Holders shall be restored to their former positions and rights under the Trust Agreement respectively, but no such waiver or rescission shall extend to any subsequent or other event of default, or impair any right consequent thereon.

## Supplemental Trust Agreements

The County and the Trustee may without the consent of, or notice to, any of the Holders, enter into trust agreements supplemental to the Trust Agreement and financing statements or other instruments evidencing the existence of a lien and/or security interests as shall not, in the opinion of the County and the Trustee, be inconsistent with the terms and provisions hereof for the following purposes:

(a)    To cure any ambiguity, inconsistency or formal defect or omission in the Trust Agreement;

(b)    To grant to or confer upon the Trustee for the benefit of the Holders any additional rights, remedies, powers, or authority that may lawfully be granted to or conferred upon the Holders or the Trustee;

(c)    To subject additional revenues to the liens and pledge of the Trust Agreement;

(d)    To add to the covenants and agreements of the County contained in the Trust Agreement other covenants and agreements thereafter to be observed for the protection of the Holders, or to surrender or limit any right, power or authority reserved to or conferred upon the County in the Trust Agreement, including the limitation of rights of redemption so that in certain instances Bonds of different series will be redeemed in some prescribed relationship to one another;

(e)    To evidence any succession to the County and the assumption by such successor of the covenants and agreements of the County contained in the Trust Agreement and the Bonds;

(f)    To modify, amend or supplement the Trust Agreement in such manner as to permit the qualification thereof under the Trust Indenture Act of 1939, as amended, or to comply with any similar requirements of any other law; and

(g)    In connection with the issuance of Additional Bonds.

The County and the Trustee may also enter into a supplemental trust agreement without the consent of or notice to the Holders (i) to evidence or provide for any letter of credit or other credit enhancement for any series of Bonds which does not result in a downgrading of any credit rating on any series of Bonds; (ii) to permit the exchange of registered Bonds for coupon Bonds if, in the opinion of nationally recognized bond counsel selected by the County, that exchange would not result in the interest on any of the Bonds outstanding becoming subject to Federal income taxation; (iii) to permit the use of a book entry system to identify the registered holder of a Bond, (iv) to achieve compliance with any applicable securities or federal tax law; (v) to permit the Trustee to comply with any obligations imposed upon it by law; or (vi) to permit any amendment which, in the judgment of the Trustee is not to the prejudice of the Trustee or the Holders.

Additionally, the Holders of not less than a majority of the aggregate principal amount of the Bonds then outstanding (exclusive of Bonds held or owned by the County) have the right to consent to and approve the modification, alteration or rescission of any provision of the Trust Agreement deemed

necessary by the County and the Trustee, except that (i) an extension of the maturity of the principal of or interest on any Bond, or a reduction in the principal amount of any Bond or the rate of interest or redemption premium thereon, or a reduction in the amount or extension of the time of any payment required by any mandatory sinking fund requirement, requires the consent of the Holder of each Bond affected, (ii) the creation of a privilege or priority of any Bond over any other Bond and any reduction in the aggregate principal amount of the Bonds required for consent to any such supplemental trust agreement requires the consent of the Holders of all of the then outstanding Bonds, and (iii) the imposition upon the Pledged Revenues or the Revenue Fund of a lien ranking prior to the lien of the Trust Agreement requires the consent of the Holders of all of the then outstanding Bonds.

## Release of Trust Agreement

If the County shall pay or cause to be paid and discharged all the outstanding Bonds, or there shall otherwise be paid to the Holders of the outstanding Bonds all payments due or to become due thereon, and provision shall also be made for paying all other sums payable under the Trust Agreement by the County, then and in that event the Trust Agreement (except for certain limited sections thereof) shall cease, be determined and become null and void, and the covenants, agreements and other obligations of the County under the Trust Agreement shall be discharged and satisfied, and thereupon the Trustee shall release the Trust Agreement, including the cancellation and discharge of the pledge of and lien upon the Pledged Revenues and the Revenue Fund, and execute and deliver to the County such instruments in writing as shall be requisite to satisfy the pledge of and lien upon the Pledged Revenues and the Revenue Fund of the Trust Agreement and to enter on the records such satisfaction and discharge and such other instruments to evidence such release and discharge as may be reasonably required by the County; and the Trustee shall assign and deliver to the County any property at the time subject to the pledge of and lien upon the Pledged Revenues and the Revenue Fund of the Trust Agreement which may then be in its possession except amounts to be held by the Trustee for the payment of principal, interest or premium due on the Bonds.

## Payment and Discharge of Bonds

All the outstanding Bonds of one or more series or of one or more maturities within any series shall be deemed to have been paid and discharged within the meaning of the Trust Agreement, if:

(a)     the Trustee shall hold, in trust for and irrevocably committed to said payment and discharge, sufficient moneys, or

(b)     the Trustee shall hold, in trust for and irrevocably committed thereto, Defeasance Obligations certified by an independent accounting firm of national reputation to be of such maturities and interest payment dates and to bear such interest as will, without further investment or reinvestment of either the principal amount thereof or the interest earnings therefrom (likewise to be held in trust and committed, except as hereinafter provided), be sufficient together with moneys (if any referred to in (a), above), for the payment, at their maturities or redemption dates, of all principal, interest, and premium, if any, on the Bonds to the date of maturity or redemption, as the case may be, or if default in such payment shall have occurred on such date then to the date of the tender of such payment; provided, that if any of such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been duly given or an irrevocable provision satisfactory to the Trustee shall have been duly made for the giving of such notice.

# INVESTMENT CONSIDERATIONS

## General

The 2003 Bonds, like all securities issued by state and local governments, are subject to fluctuations in value due to fluctuations in the tax-exempt securities market, including changes caused by proposed and enacted Federal tax legislation and due to changes in the financial conditions of the Sewer System, and/or the County.

## Limitation of Security to Revenues and Special Accounts

The 2003 Bonds are not general obligations of the County but are payable from the Pledged Revenues derived by MSD from charges for use of the Sewer System after payment of Operating and Maintenance Expenses and certain accounts established pursuant to the Trust Agreement. Although the County has agreed to charge such rates as shall at all times produce Net Income Available for Debt Service necessary to meet the requirements of the funds and accounts created by the 2002 and Prior Bond Legislation, no representation or assurance can be made or given that Net Income Available for Debt Service, as presently collected, projected, or otherwise, will be realized by the County in amounts sufficient to pay maturing principal and interest on the Bonds. Neither the general credit and taxing power nor the ordinary funds of the County are pledged to the payment of the Bonds.

## Governmental Regulation

Although the operations of MSD and the rates established for MSD by the County Commissioners are not currently subject to direct regulation by the State of Ohio or the United States, such operations and rates can be adversely affected at any time by laws enacted by the Ohio General Assembly or Congress or by rules, regulations, orders, or determinations by state or federal agencies which have the effect of increasing the expenses of MSD and/or impairing or limiting the County's ability to increase rates. The 2003 and Prior Bond Legislation provides that Pledged Revenues shall first be applied to the reasonable cost of the operation and maintenance of the Sewer System before any such revenues may be used to pay debt service on the Bonds. Such Bond Legislation also provides that the authority to fix rates for MSD is within the discretion of the County Commissioners of the County which is not subject to the regulation of any other governmental body. As elected public officials, members of the County Commissioners are subject to political pressures from individuals or groups seeking to prevent rate increases. The County has agreed to charge such rates and charges for use of the Sewer System as shall at all times produce Pledged Revenues necessary to meet the rate covenants and other requirements of the applicable Bond Legislation, to review annually the rate structure, and if the rate structure is not adequate, to amend the structure based upon the recommendations of a Consultant. The sole authority to raise rates remains with the County Commissioners.

## Future Financial Performance - Ability to Finance Future Projects

All financial and other information presented herein has been provided by the County from its records, except for information expressly attributed to other sources. The presentation of information, including tables of receipts from rates, charges, taxes, and other sources, is intended to show recent historical information, and is not intended to indicate future or continuing trends in the financial position or other affairs of the County or its Sewer System except as otherwise specifically indicated herein. No representation is made that past experience, as might be shown by such financial and other information, will necessarily continue or be repeated. The ability to complete its Capital Improvements Program and comply with the applicable federal and state legal requirement depends, in part, on the ability of the County to finance such future construction either through external borrowings, funds on deposit, or funds

raised through future rate increases. No assurance can be given that due to unforeseen factors that such additional financings will be completed.

**Bankruptcy of County or City**

The Bankruptcy Code permits, in some circumstances, a state's political subdivisions, public agencies and instrumentalities such as the County and the City, to adjust their debts. Under the Bankruptcy Code and in certain circumstances described therein, an eligible entity may be authorized to initiate Chapter 9 proceedings without prior notice to or consent of its creditors, which proceedings may result in material and adverse modification or alteration of the rights of its secured and unsecured creditors, including holders of its bonds, notes and certificates of indebtedness.

A municipal corporation, such as the City, is eligible for relief thereunder only if generally authorized to be a debtor thereunder by State law, or by a governmental officer or organization empowered by State law to authorize such municipal corporation to be a debtor thereunder. In addition, the municipal corporation must be insolvent or unable to meet its debts as they mature, and must either obtain the agreement of or have negotiated with certain of its creditors before filing bankruptcy or demonstrate that such negotiation is impractical, or demonstrate its reasonable belief that a creditor may attempt to obtain a preferential transfer of the municipal corporation's property.

The Ohio Revised Code permits political subdivisions, such as the County or the City, to file bankruptcy only with the prior approval of the Bureau of Inspection and Supervision of Public Offices of the State Auditor. In 1979, Ohio enacted the Municipal Fiscal Emergency Act providing an alternative to bankruptcy for municipal corporations, but not counties, experiencing fiscal emergencies. It is possible that the State Auditor would require a municipal corporation to comply with the requirements of the Municipal Fiscal Emergency Act rather than permitting the municipal corporation to file for bankruptcy under the Bankruptcy Code. The Constitution of Ohio, however, permits a municipal corporation frame and adopt a charter for its government and Ohio Courts have held that a charter provision , certain governmental powers and functions prevails over inconsistent State statutes. Thus, an argument could be advanced that a municipal corporation could enact a charter provision permitting it to seek relief in the United States Bankruptcy Court without obtaining the consent of the State Auditor.

Assuming the City has satisfied the eligibility requirements for filing bankruptcy, a number of specific provisions of the Bankruptcy Code extending relief to debtors would be available to the City, including the right to reject executory contracts which it considers burdensome, possibly including the MSD Agreement. While the County would be an unsecured creditor of the City for damages for breach of the MSD Agreement, the County would not be entitled to specifically enforce the City's contractual obligations thereunder. Thus, the County would be required to replace the City as operator of MSD.

**Uncertainty of Consequences of Failure to Amend or Extend the MSD Agreement**

The current MSD Agreement expires on April 30, 2018. The Bonds have a final maturity of December 1, 2028. The financial and operating consequences to the Sewer System of not extending the MSD Agreement are uncertain. (See "THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI - Formation and MSD Agreement").

## ELIGIBLE INVESTMENTS - INVESTMENT EARNINGS

Moneys in the Bond Account and Reserve Account must be invested in direct obligations of the United States of America, having a maturity date or dates not later than the date or dates on which the respective money shall be required for their proper use, and with respect to the Reserve Account, not l

than the final maturity of any outstanding Bonds. Moneys held by the City for the account of MSD prior to being transferred to the Revenue Fund shall be invested by the City in the Eligible Investments. Moneys in the Bond Account, Reserve Account, Replacement and Improvement Account, Surplus Account and 2001 Expense Account shall be invested by the Trustee at the direction of the County in Eligible Investments. Additionally, moneys in the Surplus Account may be invested in the Bonds.

In computing the amount of each of the said accounts, the investments therein shall be valued at cost or par value, whichever is lower. Earnings on any moneys or investments in the Construction Accounts shall be credited to the Bond Account. Earnings on any moneys or investments in the Surplus Account shall be credited to the Surplus Account. Earnings on any moneys or investments in the Reserve Account shall be credited to the Reserve Account unless the amount in such account is in excess of the Bond Reserve Requirement in which case all earnings shall be transferred to the credit of the Surplus Account. Earnings on any moneys or investments in the Replacement and Improvement Account shall be credited to the Replacement and Improvement Account unless the amount in such account is in excess of the Required Replacement and Improvement Account Balance, in which case all earnings shall be transferred to the credit of the Bond Account. Earnings on any moneys or investments in the Bond Account shall be credited to said Bond Account. All moneys in the Bond Account after an Interest Payment Date or a Principal Payment Date shall remain invested until checks for interest are presented for payment or until the Bonds have been paid, and all such investment income shall be credited to the Bond Account. Both the County and the City have historically followed and continued to maintain conservative investment policies, avoiding investment in repurchase agreements, derivatives and leveraged investments with a high-risk factor.

## LITIGATION

To the knowledge of the County no litigation or administrative action or proceeding is pending or threatened restraining or enjoining, or seeking to restrain or enjoin, the issuance and delivery of the 2003 Bonds or the execution and delivery of the Supplemental Trust Agreements, the use of the Pledged Revenues to pay the debt service on the 2003 Bonds, or contesting or questioning the proceedings and authority under which the 2003 Bonds, the Trust Agreement and the Supplemental Trust Agreements have been authorized and are to be issued, sold, executed or delivered, or the validity thereof. A certificate to such effect will be delivered by the County to the Underwriters as the original purchaser of the 2003 Bonds at the time of the original delivery of the 2003 Bonds to the Underwriters.

The City, in its capacity as the operator of MSD, and the County, as the owner of MSD, are parties to various legal proceedings generally incidental to MSD's operations, seeking damages in substantial amounts. No such pending legal proceedings relate directly to the 2003 or Prior Bonds, or the security therefor (other than the matters described under "THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI -Environmental Compliance and Quality"). In any such legal proceedings seeking damages, however, a judgment against the City or County may either directly or indirectly affect the Sewer System and the security for the Bonds, in that judgment creditors may sue to subject Pledged Revenues and MSD properties to a levy of execution to the extent that any such judgment is not or cannot be satisfied from other moneys of MSD, and, in that the losses caused by such judgments are not insured, and therefore increase the operation and maintenance costs of MSD.

The ultimate disposition of such pending legal proceedings cannot be predicted or determined at present. In the opinion of the Solicitor of the City, however, no such pending proceedings will have a material adverse effect on the Sewer System or its continued operations, the 2002 Project, the 2002 or Prior Bonds, or the security therefor.

## UNDERWRITING

The 2003 Bonds are being purchased by the Underwriters for whom Seasongood & Mayer, 1 1 Loop Capital Markets, LLC, Citigroup and Conners & Co., Inc., are acting as representatives. Underwriters have jointly and severally agreed to purchase the 2003 Bonds at a discount of $816.35 .50 for the Series A Bonds and $283,101.00 for the Series B Bonds from the initial offering prices set forth on the cover page, subject to the terms and provisions of the Bond Purchase Agreement. The obligation of the Underwriters to accept delivery of the 2003 Bonds is subject to various conditions set forth in the Bond Purchase Agreement, but all of the 2003 Bonds offered hereby must be purchased by the Underwriters if any are so purchased. It is intended that the 2003 Bonds will be offered to the public initially at the offering price set forth on the cover page of this Official Statement and that such offering price subsequently may change without requirement of prior notice. The Underwriters may offer the 2003 Bonds to other dealers at prices lower than those offered to the public. The Underwriters named on the cover page of this Official Statement expect to make a market in the 2003 Bonds.

## FINANCIAL ADVISOR

The County has retained Public Financial Management, Inc., Cleveland, Ohio (the "Financial Advisor") in connection with the preparation of certain matters relating to the County's issuance of the 2003 Bonds. The Financial Advisor is not obligated to undertake, and has not undertaken to make, an independent verification or to assume responsibility for the accuracy, completeness, or fairness of the information contained in the Official Statement. The Financial Advisor is an independent advisory firm and is not engaged in the business of underwriting, trading or distributing municipal securities or other public securities.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance and sale of the 2003 Bonds and are subj the approving opinion of Peck, Shaffer & Williams LLP, Bond Counsel. A signed copy of such opin....u dated and speaking as of the date of original delivery of the 2003 Bonds to the Underwriters, will be delivered to the Underwriters at the time of such original delivery and certified copies of such opinion will be printed on the back of the 2003 Bonds. The form of such opinion is included as Appendix B hereto ("TAX EXEMPTION").

In its capacity as Bond Counsel and special counsel to the County, Peck, Shaffer & Williams LLP has participated in the preparation of and has reviewed certain sections of the Official Statement. Said firm, as Bond Counsel and as special counsel to the County, has performed certain other functions to assist the County and MSD in the preparation by the County of this Official Statement. However, said firm has not been engaged to confirm, and assumes no responsibility for, and expresses no opinion as to the accuracy, completeness or fairness of any of the statements in this Official Statement or in any reports, financial information, offering or disclosure documents or other information relating to the County or the 2003 Bonds that may be prepared or made available by the County or others to the Holders of the 2003 Bonds or others.

The engagement of said firm as Bond Counsel is limited generally to the preparation of certain of the documents contained in the transcript of proceedings, an examination of such transcript of proceedings and the law incident to rendering the approving legal opinion referred to above, and the rendering of such approving legal opinion.

Certain legal matters will be passed upon for the Underwriters by their counsel. Baker & Hostetler, LLP. and for the County by the County Prosecutor. and for the County by Peck. Shaffer & Williams LLP as special counsel. and for the City and MSD by the City Solicitor.

## TAX EXEMPTION

In the opinion of Bond Counsel for the 2003 Bonds. based upon an analysis of existing laws. regulations, rulings and court decisions. interest on the 2003 Bonds is excludible from gross income for Federal income tax purposes. Bond Counsel for the 2003 Bonds is also of the opinion that interest on the 2003 Bonds is not a specific item of tax preference under Section 57 of the Internal Revenue Code of 1986 (the "Code") for purposes of the Federal individual or corporate alternative minimum taxes. Furthermore, Bond Counsel for the 2003 Bonds is of the opinion that interest on the 2003 Bonds is exempt from taxation, including personal income taxation, by the State of Ohio and its political subdivisions, and is excludible from the net income base used in calculating the Ohio corporate franchise tax.

A copy of the opinion of Bond Counsel for the 2003 Bonds is set forth in Appendix B. attached hereto.

The Code imposes various restrictions, conditions, and requirements relating to the exclusion from gross income for Federal income tax purposes of interest on obligations such as the 2003 Bonds. The County has covenanted to comply with certain restrictions designed to ensure that interest on the 2003 Bonds will not be includable in gross income for Federal income tax purposes. Failure to comply with these covenants could result in interest on the 2003 Bonds being includable in income for Federal income tax purposes and such inclusion could be required retroactively to the date of issuance of the 2003 Bonds. The opinion of Bond Counsel assumes compliance with these covenants. However, Bond Counsel has not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2003 Bonds may adversely affect the tax status of the interest on the 2003 Bonds.

Certain requirements and procedures contained or referred to in the Trust Agreement and other relevant documents may be changed and certain actions (including, without limitation, defeasance of the 2003 Bonds) may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. Bond Counsel expresses no opinion as to any 2003 Bonds or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other then Peck, Shaffer & Williams LLP.

Although Bond Counsel for the 2003 Bonds has rendered an opinion that interest on the 2003 Bonds is excludible from gross income for Federal and Ohio income tax purposes, the ownership or disposition of, or the accrual or receipt of interest on, the 2003 Bonds may otherwise affect a Bondholder's Federal, state or local tax liabilities. The nature and extent of these other tax consequences may depend upon the particular tax status of the Bondholder or the Bondholder's other items of income or deduction. Bond Counsel expresses no opinions regarding any tax consequences other than what is set forth in its opinion and each Bondholder or potential Bondholder is urged to consult with tax counsel with respect to the effects of purchasing, holding or disposing the 2003 Bonds on the tax liabilities of the individual or entity.

For example, corporations are required to include all tax-exempt interest in determining "adjusted current earnings" under Section 56(c) of the Code, which may increase the amount of any alternative minimum tax owed. Similarly, tax-exempt interest may also increase the amount of any environmental tax owed under Section 59 of the Code, which is based on the alternative minimum taxable income of any

corporation subject to that tax. Receipt of tax-exempt interest, ownership or disposition of the 2003 Bonds may result in other collateral Federal, state or local tax consequence for certain taxpayers. Such effects include, without limitation, increasing the federal tax liability of certain foreign corporations subject to the branch profits tax imposed by Section 884 of the Code, increasing the federal tax liability and affecting the status of certain S Corporations subject to Sections 1362 and 1375 of the Code, increasing the federal tax liability of certain individual recipients of Social Security or Railroad Retirement benefits, under Section 86 of the Code and, for tax years beginning in 1996, limiting the use of the Earned Income Credit under Section 32 of the Code that might otherwise be available. Ownership of any 2003 Bonds may also result in the limitation of interest and certain other deductions for financial institutions and certain other taxpayers, pursuant to Section 265 of the Code. Finally, residence of the holder of 2003 Bonds in a state other than Ohio or being subject to tax in a state other than Ohio, may result in income or other tax liabilities being imposed by such states or their political subdivisions based on the interest or other income from the 2003 Bonds.

## ORIGINAL ISSUE DISCOUNT

Certain of the 2003 Bonds maturing December 1, 2008-2023 (the "Discount Bonds") are being offered and sold to the public at an original issue discount ("OID") from the amounts payable at maturity thereon. OID is the excess of the stated redemption price of a bond at maturity (the face amount) over the "issue price" of such bond. The issue price is the initial offering price to the public (other than to bond houses, brokers or similar persons acting in the capacity of underwriters or wholesalers) at which a substantial amount of bonds of the same maturity are sold pursuant to that initial offering. For federal income tax purposes, OID on each bond will accrue over the term of the bond, and for the Discount Bonds, the amount of accretion will be based on a single rate of interest, compounded semiannually (the "yield to maturity"). The amount of OID that accrues during each semi-annual period will do so ratably over that period on a daily basis. With respect to an initial purchaser of a Discount Bond at its issue price, the portion of OID that accrues during the period that such purchaser owns the Discount Bond is added such purchaser's tax basis for purposes of determining gain or loss at the maturity, redemption, sale other disposition of that Discount Bond and thus, in practical effect, is treated as stated interest, which is excludible from gross income for federal income tax purposes.

Holders of Discount Bonds should consult their own tax advisors as to the treatment of OID and the tax consequences of the purchase of such Discount Bonds other than at the issue price during the initial public offering and as to the treatment of OID for state tax purposes.

## PREMIUM

"Acquisition Premium" is the excess of the cost of a bond over the stated redemption price of such bond at maturity or, for bonds that have one or more earlier call dates, the amount payable at the next earliest call date. Certain of the 2003 Bonds that mature in 2004 to 2006 and 2010 to 2028, both inclusive (the "Premium Bonds") are being initially offered and sold to the public with Acquisition Premium. The Premium Bonds are callable with a redemption premium prior to their maturity date. For federal income tax purposes, the amount of Acquisition Premium on each bond, the interest on which is excludable from gross income for federal income tax purposes ('tax-exempt bonds") must be amortized and will reduce the bondholder's adjusted basis in that bond. The amount of any Acquisition Premium paid on the Premium Bonds that must be amortized during any period will be based on the "constant yield" method, using the original bondholder's basis in such bonds and compounding semiannually. This amount is amortized ratably over that semiannual period on a daily basis. However, no amount of amortized Acquisition Premium on tax-exempt bonds may be deducted in determining bondholder's taxable income for federal income tax purposes.

Please note that because the Premium Bonds are callable with redemption premiums, both the amount of, and the amortization period for, the Acquisition Premium will depend both upon when the Premium Bonds can be redeemed and if in fact they are redeemed. Holders of any Premium Bonds, both original purchasers and subsequent purchasers, should consult their own tax advisors as to the actual effect of such Acquisition Premium with respect to their own tax situation and as to the treatment of the Acquisition Premium for state tax purposes.

## FINANCIAL STATEMENTS

The financial statements of MSD for the years ended December 31, 2001 and 2002 included in this Official Statement have been audited by Foxx & Company, independent certified public accountants. The financial statements and independent auditors' report thereon are included as Appendix A to this Official Statement. The financial statements audited by Foxx & Company have been included in reliance on their reports given on their authority as experts in accounting and auditing.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Upon delivery of the 2003 Bonds, Causey, Demgen & Moore, Inc., independent accountants, will deliver a report on the mathematical accuracy of certain computations contained in schedules provided to them by the Underwriters relating to (a) the adequacy of the maturing principal amounts of the United States government obligations held in the escrow for the Refunded Bonds to be refunded, interest earned thereon and certain other moneys to pay all of the principal or redemption price of and the interest on such Refunded Bonds as such principal or redemption price and interest become due and payable and (b) the computations of yield used by Bond Counsel to support its opinion that the 2003 Bonds are not arbitrage bonds within the meaning of Section 148 of the Code.

The report of Causey, Demgen & Moore, Inc. will include the statement that the scope their engagement was limited to verifying the mathematical accuracy of the computations contained in such schedules provided to them and that they had no obligation to update their reports because of events occurring or data or information coming to their attention subsequent to the date of such report.

## RATINGS

As noted on the cover page, Moody's Investors Service and Standard & Poor's Corporation have assigned ratings of "Aaa" and "AAA", respectively, to the 2003 Bonds, with the understanding that upon the delivery of the 2003 Bonds, the Bond Insurance Policy will be issued to the Bond Insurer.

Moody's Investors Service and Standard & Poor's Corporation have assigned their underlying municipal bond rating "Aa3" and "AA" respectively to the 2003 Bonds.

Such ratings reflect only the views of such organizations and any desired explanation of the significance of such ratings should be obtained from the rating agency furnishing the same, at the following addresses: Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007; and Standard & Poor's Corporation, 25 Broadway, New York 10004. Generally, a rating agency bases its rating on the information and materials furnished to it and on investigations, studies and assumptions of its own. There is no assurance such ratings will continue for any given period of time or that such ratings will not be revised downward or withdrawn entirely by the rating agencies, if in the judgment of such rating agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the market price of the 2003 Bonds.

The County presently expects to furnish the rating agencies that have rated the 2003 Bonds with information and materials that they may request on future bond, note and certificate of indebtedness issues. However, the County assumes no obligation to furnish requested information and materials. may issue debt for which ratings are not requested. Failure to furnish requested information materials, or the issuance of debt for which a rating is not requested, may result in the suspension or withdrawal of a rating agency's ratings on the 2003 Bonds.

## CONTINUING DISCLOSURE UNDERTAKING

In accordance with the requirements of Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission and for the benefit of the Bondholders, the County and for certain limited purposes, the City (the "Obligated Persons"), have agreed to provide, or cause to be provided through a disclosure agent, certain information pursuant to a Continuing Disclosure Agreement. The following information will be provided:

(a)     to each nationally recognized municipal securities information repository ("NRMSIR") and to its state information depository ("SID"), if one is established for the State of Ohio, the Operating Data; such Operating Data shall be provided on or before August 15th of each year for the prior fiscal year;

(b)     in a timely manner, to each NRMSIR or to the Municipalities Securities Rule-making Board ("MSRB") and to the SID, if any, notice of the occurrence of any material events with respect to the Bonds.

(c)     in a timely manner, to each NRMSIR or to the MSRB and to the SID, if any, notice of a failure (of which the Obligated Person or disclosure agent has knowledge) of an Obligated Person to provide the required annual financial information on or before the date specified in its written continu' disclosure undertaking.

"Operating Data" shall mean the information (updated) contained in the (a) Audited Financial Information contained in Appendix A and (b) the Tables entitled (i) "Number of Accounts and Wastewater Flow" and "Ten Largest Customers", (ii) "Sewer Rates", and (iii) "Selected Historical Financial Information - Operations, Cash and Investments, and Debt Service Coverage", in the subsections entitled (x) "Customers and Billing", (y) "Sewer Rates" and (z) "Summary of Historical Financial Information", respectively.

The Continuing Disclosure Agreement contains provisions regarding amendment, default and remedies for failure to perform thereunder. Copies of the Continuing Disclosure Agreement are on file at the office of the Trustee.

## MISCELLANEOUS

The foregoing summaries or descriptions of the 2003 Bonds and the provisions in the Trust Agreement and all references to other materials not purporting to be quoted in full, are only brief summaries of certain provisions thereof and do not constitute complete statements of such documents or provisions. Reference is hereby made to the complete documents for further information.

The Clerk of the Board will certify that all formal actions relative to the passage of the Bond Legislation were taken in an open meeting of said Board and that all deliberations of said Board and its committees which resulted in formal action were taken in meetings open to the public, in full compliance

with applicable legal requirements, including Section 121.22 of the Ohio Revised Code commonly known as the "Sunshine Law."

To the extent that any statements made in this Official Statement involve matters of opinion or estimates, whether or not expressly stated to be such, such statements are made as such and not as representations of fact or certainty, and no representation is made that any of such statements will be realized. Information herein has been derived by the County from official and other sources and is believed by the County to be reliable, but such information other than that obtained from official records of the County has not been independently confirmed or verified by the County and its accuracy is not guaranteed.

Neither this Official Statement nor any statement which may have been made orally or in writing is to be construed as or as part of a contract with the Bondholders of the 2003 Bonds.

The Underwriters have furnished the information in this Official Statement with respect to the public offering prices of the 2003 Bonds and the information in "UNDERWRITING." Neither the County nor Bond Counsel can guarantee the accuracy or completeness of any such information.

This Official Statement has been duly prepared and delivered by the County, has been approved by the Director of MSD and has been executed for and on behalf of the County by the County Administrator.

COUNTY OF HAMILTON

By:   /s/ DAVID J. KRINGS
       David J. Krings
       County Administrator

APPROVED:

THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI

By:   /s/ PATRICK T. KARNEY
       Patrick T. Karney, Director

## DEFINITIONS

In addition to the words and terms elsewhere defined in this Official Statement, the follo... words and terms as used herein shall have the following meanings unless the context or use inc another or different meaning or intent:

"Additional Bonds" means Sewer System Revenue Bonds of the County which may be issued under Section 12 of the Bond Legislation.

"Authorized Officer" or "Authorized Officers" of the County means any person or persons specifically authorized by resolution to take the action intended, and, if there is no such specific authorization, shall mean the County Administrator or the President of the Legislative Authority or the Auditor or the County Treasurer.

"Bankruptcy Code" means the United States Bankruptcy Code.

"Board" means the Board of County Commissioners of Hamilton County, Ohio.

"Bond" or "Bonds" means the outstanding 1993 Bonds, 1995 Bonds, 1997 Bonds, 2000 Bonds, 2001 Bonds, 2003 Bonds and any Additional Bonds.

"Bondholder" or "Holder" means the person in whose name any Bond is registered.

"Bond Account" means the "MSD Sewer System Revenue Bond Account" created by Section 8 of the Bond Legislation.

"Bond Insurance Policy" means the financial guaranty insurance policy issued by the B. Insurer which guarantees the payment of the principal and interest on the 2003 Bonds.

"Bond Insurer" or "Insurer" means, with respect to the 2003 Bonds, MBIA Insurance Corporation, a stock insurance company incorporated under the laws of the State of New York, or any successor thereto and with respect to any series of Additional Bonds, the issuer of the credit support, if any, securing such Additional Bonds.

"Bond Legislation" means, when used in connection with the 1985 Bonds, the 1985 Bond Legislation, when used in connection with the 1986 Bonds, the 1986 Bond Legislation, when used in connection with the 1991 Bonds, the 1991 Bond Legislation, when used in connection with the 1993 Bonds, the 1993 Bond Legislation, when used in connection with the 1995 Bonds, the 1995 Bond Legislation, when used in connection with the 1997 Bonds, the 1997 Bond Legislation, when used in connection with the 2000 Bonds, the 2000 Bond Legislation, when used in connection with the 2001 Bonds, the 2001 Bond Legislation, and when used in connection with the 2003 Bonds, the 2003 Bond Legislation, and when used in connection with Additional Bonds or to relate to Bonds when subsequent Additional Bonds are outstanding, shall mean or include, as the case may be, such bond resolution or other legislation providing for the issuance of such Additional Bonds but only to the extent consistent with the 1985 Bond Legislation, the 1986 Bond Legislation, the 1991 Bond Legislation, the 1993 Bond Legislation, the 1995 Bond Legislation, the 1997 Bond Legislation, the 2000 Bond Legislation, the 2001 Bond Legislation, and the 2003 Bond Legislation all as the same may be amended, modified or supplemented by any amendments or modifications thereof and supplements thereto entered into in accordance with the provisions of the Trust Agreement, as supplemented.

"Bond Purchase Agreement" means the Bond Purchase Agreement dated June 25, 2003, between the County and the Underwriters and any associates thereof setting forth the terms and conditions of the sale of the 2003 Bonds including the purchase price thereof.

"Bond Reserve Requirement" means, as to the 2003 and Prior Bonds, the maximum amount of the aggregate Principal and Interest Requirements on the 2003 and Prior Bonds payable in any subsequent Bond Year. Upon the issuance of any subsequent Additional Bonds, the Bond Reserve Requirement shall mean the maximum amount of Principal and Interest Requirements on all Bonds outstanding after delivery of such Additional Bonds, subject to the provisions specified in Section 12 of the 1985 Bond Legislation, along with any further reserve requirements specified in the bond legislation authorizing the Additional Bonds.

"Bond Year" means a period of 12 consecutive months beginning on December 2 and ending on December 1.

"City" means the City of Cincinnati, Ohio, a municipal corporation existing under the Constitution and laws of the State of Ohio and its Charter.

"Clean Water Act" means the United States Clean Water Act.

"Consultant" means a nationally recognized firm of independent consultants knowledgeable in the operation and finances of municipal sewer systems, having favorable reputations for skill and experience in such work, designated by the Legislative Authority. The Consultant may be an Independent Engineer (as defined in the Trust Agreement) or, if otherwise qualified, the independent certified public accountant engaged to perform annual audits of MSD.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement relating to the Bonds among the County, the City and the Trustee, as initial Disclosure Agent.

"County" means the County of Hamilton, Ohio, a county and political subdivision in and of the State of Ohio, and its lawful successors.

"DTC" means the Depository Trust Company, New York, New York.

"Defeasance Obligations" means (i) Government Obligations; (ii) evidences of beneficial ownership of an interest in, or payments to be made on, identified Government Obligations, which Government Obligations are held by a bank or trust company, organized and existing under the laws of the United States of America or any state thereof, as representative for the beneficial owners; (iii) obligations issued by or on behalf of states or political subdivisions, (A) provision for the payment of the principal of, premium, if any, and interest on which shall have been made by irrevocable deposit with a bank or trust company in the capacity of trustee or escrow agent of cash and obligations described in (i) or (ii) above, the maturing principal of and interest on which, when due and payable (without further investment or reinvestment of either the principal amount thereof or the interest earnings therefrom), shall provide sufficient money to pay the principal of, any redemption premium and interest, if any, on such obligations issued by or on behalf of states or political subdivisions and (B) which obligations either are rated at the time of acquisition in the highest rating category by Moody's Investors Service or Standard & Poor's Corporation, or, if unrated, are determined by the Trustee to qualify under this clause (iii); and (iv) general obligations issued by or on behalf of states which are rated in either of the two highest rating categories (without regard to any gradation within such categories) by both Moody's Investors Service and Standard & Poor's Corporation, at the time of the acquisition of such obligations.

"Director of MSD" or "Director of Sewers" means the Director of The Metropolitan Sewer District of Greater Cincinnati or his authorized representative.

"Disclosure Agent" means U.S. Bank National Association, as initial disclosure agent and subsequent disclosure agent appointed pursuant to the Continuing Disclosure Agent.

"Eighth Supplemental Indenture" means the Eighth Supplemental Trust Agreement among the County, the Trustee and the City dated as of October 1, 2001.

"Eligible Investments" means:

(a)     Bonds, notes, debentures or other obligations or securities of the United States; or bonds, notes or other obligations guaranteed as to principal and interest by the United States or those for which the faith of the United States is pledged for the payment of principal and interest thereon, by language appearing in the instrument specifically providing such guarantee or pledge and not merely by interpretation or otherwise;

(b)     Bonds, notes, debentures, or other obligations or securities issued by any federal government agency; bonds, notes, or other obligations guaranteed as to principal and interest by the United States or those for which the faith of the United States is pledged for the payment of principal and interest thereon, by interpretation or otherwise and not by language appearing in the instrument specifically providing such guarantee or pledge;

(c)     Certificates of deposit or time deposits owned by the Trustee or any affiliate thereof, provided that such certificates of deposit or time deposits shall be fully collateralized, to the extent not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, by obligations described in clause (a) above; and

(d)     Any repurchase agreement (i) with any bank, trust company or savings and loan association, including, without limitation, the Trustee and (ii) which is secured by a perfected security interest in favor of the Trustee in obligations of the type specified in paragraph (a) above, which obligations are in the possession of the Trustee and are not subject to any third party claims.

With respect to the Construction Accounts, "Eligible Investments" means those investments permitted by Section 301-11 of the Cincinnati Municipal Code excepting section (3) thereof, as now constituted or with subsequent amendments, provided the Trustee approves the use of any new investments permitted by amendments to the Cincinnati Municipal Code. The investments currently described in such section (other than section (e) thereof) are as follows:

(a)     Bonds and other obligations of the City;

(b)     Bonds, notes, or other obligations of or guaranteed by the United States, or those for which the faith of the United States is pledged for the payment of principal and interest thereon;

(c)     Bonds, notes, debentures, or other obligations or securities issued by any federal government agency, or the export-import bank of Washington;

(d)     Bonds and other obligations of the State;

(e)     Time certificates of deposit of banks which have an office located within the boundaries of the County, the payment of the principal of the deposit and interest thereon for which eligible security

are pledged and deposited with the city treasurer or qualified trustee. Eligible securities and qualified trustee shall have the same meaning as eligible securities and qualified trustee for the purposes of Section 135.18 of the Revised Code:

(f)    Agreements with banks which have an office located within the boundaries of the County, offering to sell to the City securities eligible for investment under the provisions of Section 135.14(A) or (B) of the Revised Code, and offering to repurchase the same securities at a stated additional amount for a specified period of time. It shall also be permissible to enter into a repurchase agreement which is not for a specified period of time which is known as an "open end" or "good until canceled" repurchase agreement in the banking industry. The possession of the eligible securities shall be transferred to the City or qualified trustee as defined in paragraph (e) hereof. Such investments shall not be limited solely to those funds which will not be needed for a period of six months; and

(g)    Agreements with banks which have an office located within the boundaries of Hamilton County, Ohio, whereby the City would sell to the bank securities eligible for investment under the provisions of Section 135.14(A) or (B) of the Revised Code and offer to purchase the same securities from the bank at a stated additional amount for a specified period of time.

"Escrow Deposit Trustee" means U.S. Bank, National Association, Cincinnati, Ohio, Escrow Trustee under the Refunded Bonds Escrow Deposit Account.

"Fifth Supplemental Indenture" means the Fifth Supplemental Trust Agreement among the County, the Trustee and the City dated as of August 15, 1995.

"First Supplemental Indenture" means the First Supplemental Trust Agreement among the County, the Trustee and the City dated as of April 1, 1986.

"Fourth Supplemental Indenture" means the Fourth Supplemental Trust Agreement among the County, the Trustee and the City, dated as of April 15, 1993.

"GAAP" or "generally accepted accounting principles" means generally accepted accounting principles for local government units as prescribed by (i) the Governmental Accounting Standards Board or any successor thereto, and (ii) the pronouncements of the Financial Accounting Standards Board and the American Institute of Certified Public Accounts or any successor thereto.

"General Obligation Bonds" means the County's general obligation bonds issued by the County for the purpose of making improvements or enlargements to the Sewer System, excluding general obligation bonds issued in anticipation of the collection of special assessments.

"General Obligation Notes" or "Certificates of Indebtedness" means the County's notes and/or certificates of indebtedness (herein the "notes") issued from time to time in anticipation of the issuance of the County's General Obligation Bonds, and notes issued to refund such notes, for the purpose of making improvements or enlargements to the Sewer System, excluding notes issued in anticipation of General Obligation Bonds which are issued in anticipation of the collection of special assessments.

"Improvements" means any improvements, additions or extensions to the Sewer System, including real estate and interests in real estate, buildings, structures, fixtures and facilities and additions thereto, and machinery, equipment, furniture and other personal property.

"Independent Engineer" means any engineer or firm of engineers, independent of the County, experienced in the construction and operation of plants and systems such as the Sewer System,

71

knowledgeable with respect to rate studies applicable thereto, having a good repute for skill and experience in such work, selected by the County and satisfactory to the Trustee and the Underwriters.

"Interest Payment Date" means, with respect to the 2003 and Prior Bonds, June 1 and June 1. Interest Payment Date as to subsequent Additional Bonds shall mean the dates identified as such in the Bond Legislation for the Additional Bonds; provided, however, that Additional Bonds bearing a fixed rate of interest shall have interest payable on June 1 and December 1 of each year.

"Legal Officer" means the counsel to the operator of the Sewer System.

"Legislative Authority" means the Board and any officer, board, commission or other body which hereafter succeeds, by operation of law, to the powers and duties of such board.

"MSD" means The Metropolitan Sewer District of Greater Cincinnati.

"MSD Agreement" means the Agreement between the County and the City dated April 10, 196 as amended, with respect to the ownership and operation of MSD attached as an exhibit to the Trust Agreement.

"Mill Creek Consent Order", "Federal Consent Order" or "Order" means the Consent Order entered by the U.S. District Court, Southern District of Ohio, Western Division, on August 16, 198 resolving the complaint brought by the United States against the State of Ohio, the County and the City for violation by MSD of its NPDES Permit for the Mill Creek Wastewater Treatment Plant.

"Net Income Available for Debt Service" means Pledged Revenues, plus one-half of the amount of Pledged Revenues transferred to the Surplus Account (as determined under Section 7 of the 1985 Bond Legislation after receipt of the audit) excluding gains or losses on disposition of assets, just received, and excluding gains or losses arising from the early extinguishment of Bonds, Obligation Bonds and Notes and Obligations, minus Operating and Maintenance Expenses.

"Net Revenues" means Pledged Revenues minus Operating and Maintenance Expenses.

"1985 Bond Legislation" means the bond resolution authorizing the 1985 Bonds adopted by the County on October 23, 1985, as the same may be modified or supplemented by any amendments or modifications thereof.

"1985 Bonds" means the $63,800,000 Hamilton County, Ohio Sewer System Revenue Bonds 1985 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1985 Bond Legislation.

"1985 Project" means the improvements to the Sewer System described in the recitals to the 1985 Bond Legislation.

"1986 Bond Legislation" means the resolution authorizing the 1986 Bonds adopted by the County on April 23, 1986 as the same may be modified or supplemented by any amendments or modifications thereof.

"1986 Bonds" means the $85,020,000 Hamilton County, Ohio Sewer System Revenue Bonds 1986 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1986 Bond Legislation.

"1986 Project" means the improvements to the Sewer System described in the recitals to the 1986 Bond Legislation.

"1991 Bond Legislation" means the resolution authorizing the 1991 Bonds adopted by the County on February 6, 1991, as the same may be modified or supplemented by any amendments or modifications thereof.

"1991 Bonds" means the $90,000,000 Hamilton County, Ohio, Sewer System Improvement and Refunding Revenue Bonds, 1991 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1991 Bond Legislation.

"1991 Project" means the improvements to the Sewer System described in the recitals of the 1991 Bond Legislation.

"1993 Bond Legislation" means the resolution authorizing the 1993 Bonds adopted by the County on April 21, 1993, as the same may be modified or supplemented by any amendment or modification thereof.

"1993 Bonds" mean the $171,790,000, Hamilton County, Ohio Sewer System Improvement and Refunding Revenue Bonds, 1993 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1993 Bond Legislation.

"1993 Project" means the improvements to the Sewer System described in the 1993 Bond Legislation.

"1995 Bond Legislation" means the resolution authorizing the 1995 Bonds adopted by the County on August 16, 1995, as the same may be modified or supplemented by any amendment or modification thereof.

"1995 Bonds" mean the $85,800,000 Hamilton County, Ohio Sewer System Improvement and Refunding Revenue Bonds, 1995 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1995 Bond Legislation.

"1995 Project" means the improvements to the Sewer System described in the 1995 Bond Legislation.

"1997 Bond Legislation" means the resolution authorizing the 1997 Bonds adopted by the County on October 8, 1997, as the same may be modified or supplemented by an amendment or modification thereof.

"1997 Bonds" means the $105,245,000 Hamilton County, Ohio Sewer System Improvement Revenue Bonds, 1997 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 1997 Bond Legislation.

"1997 Project" means the improvements to the Sewer System described in the 1997 Bond Legislation.

"1997 MSD Supplemental Agreement" means the agreement between the City and the County approved by representatives of the City and County on July 14 and 15, 1997, approved by the County Commissioners on July 16, 1997 and approved by City Council on August 6, 1997.

"Ninth Supplemental Indenture" means the Ninth Supplement Trust Agreement among the County, the Trustee and the City, dated as of June 1, 2003.

"NPDES" means the system requiring a permit to discharge effluents known as the Nation. Pollutant Discharge Elimination System.

"NPDES Permits" means the permits issued by the U.S. EPA pursuant to controls established by the National Pollutant Discharge Elimination System.

"Obligations" means all obligations of the County for borrowed money with respect to the Sewer System (including capital leases, and Ohio Water Development Authority Cooperative Agreements) which mature, or shall be renewable by the County more than 365 days from incurrence thereof, excluding Bonds, General Obligation Bonds, General Obligation Notes, any Ohio Sewer and Water Rotary Commission advances and any Obligations issued in anticipation of the collection of special assessments.

"Ohio EPA" means the Ohio Environmental Protection Agency.

"Operating and Maintenance Expenses" shall have the meaning which would be given to it in accordance with GAAP consistently applied, but shall include only those expenses applicable to the Sewer System and all its appurtenances, and shall exclude expenses of any other utility of the County whether or not such other utility shall be operated as a single unit with the Sewer System. Notwithstanding the foregoing, interest expense, any expenses relating to credit enhancement of any Bonds, amortization and depreciation shall not be included in Operating and Maintenance Expenses.

"Operating Data" shall mean the information (updated) contained in the (a) Audited Financial Information contained in Appendix A and (b) the Tables entitled (i) "Number of Accounts and Wastewater Flow" and "Ten Largest Customers", (ii) "Sewer Rates", and (iii) "Selected Historical Financial Information - Operations, Cash and Investments, and Debt Service Coverage", in the subsections entitled (x) "Customers and Billing", (y) "Sewer Rates" and (z) "Summary of Historical Financial Information", respectively.

The term "outstanding Bonds" or "Bonds outstanding" means all Bonds which have been authenticated and delivered by the Trustee under the Trust Agreement except:

(a)    Bonds canceled or held in safekeeping by the Trustee on surrender, exchange or transfer or canceled because of payment at maturity or redemption;

(b)    Bonds which are deemed to have been paid and discharged pursuant to the provisions of the Trust Agreement;

(c)    Bonds in lieu of which others have been authenticated under Section 2.04 of the Trust Agreement.

"Pledged Revenues" means all Sewer System funds held by the City pursuant to the MSD Agreement immediately after delivery of the 1985 Bonds and all revenues and other income derived from all services, properties, and facilities of the Sewer System, including the revenues specified in the MSD Agreement, investment earnings, including interest on all accounts of the Revenue Fund and, income arising on sale or disposition of assets, judgments, and all other income arising out of the operation of the Sewer System, whether or not recurring, determined in accordance with GAAP, and excluding grants.

"Principal and Interest Requirements" means. except as provided below. for any period of time: as applied to the Bonds of any series. the principal payable (whether pursuant to stated maturity, mandatory sinking fund or other mandatory redemption requirement) and interest due and payable on the Bonds. less any capitalized interest and accrued interest on deposit in the Bond Account; and as applied to General Obligation Bonds and Notes and any other Obligations. the principal payable (whether pursuant to a stated maturity or a mandatory sinking fund or other mandatory redemption requirement). interest due and payable on and other amounts payable or accruing in that period. less any capitalized interest and accrued interest available in any fund or account designated for the payment of interest on said General Obligation Bonds and Notes and other Obligations. Principal and Interest Requirements:

(a)     on any Additional Bonds that are secured by a letter of credit or other credit facility shall be amortized as if the full amount available under the letter of credit or other credit facility is drawn on the earliest possible date and as if the Additional Bonds are then repayable to the bank or other credit institution under the terms of the related agreement with such bank or credit institution; and if the terms of any Additional Bonds or such commitments being considered are such that interest thereon for any future period of time is expressed to be calculated at a rate which is not then susceptible of precise determination. then interest on such Additional Bonds or commitments for such period shall be computed by assuming the rate of interest applicable to such period which might be borne by such Additional Bonds or commitments as determined by a qualified firm of investment bankers; and

(b)     on General Obligation Notes. shall be deemed to be the Principal and Interest Requirements on the General Obligation Bonds anticipated thereby, assuming that such Bonds were issued as of the date of issuance of the General Obligation Notes and the first payment of principal thereon is made on December 1 of the second year following the issuance of the General Obligation Notes; and

(c)     on Additional Bonds with a maturity of seven years or less. issued in anticipation of Additional Bonds with a longer maturity, shall be deemed to be the Principal and Interest Requirements on the Additional Bonds anticipated thereby, assuming that such Additional Bonds were issued as of the date of calculation with a maturity of 25 years bearing interest at a rate equal to the latest revenue bond index of The Bond Buyer or the latest rate borne by County revenue bonds; and

(d)     on Additional Bonds and General Obligation Bonds or Notes issued in anticipation of the receipt of grants previously awarded for Sewer System purposes, shall exclude the principal to the extent it is to be paid from the anticipated grant.

Notwithstanding the foregoing, with respect to determining the Principal and Interest Requirements to establish compliance with the rate covenant in Section 13 of the Bond Legislation, the Principal and Interest Requirements shall be the actual principal of and interest due on the Bonds described in paragraph (i) above during the Fiscal Year for which compliance with such Section 13 is to be determined.

"Principal Payment Date" means, as to the 2003 and Prior Bonds, December 1 of each year, and as to subsequent Additional Bonds, the date or dates identified as such in the Bond Legislation authorizing the issuance of such Additional Bonds; provided, however, that any Additional Bonds bearing a fixed rate of interest shall have principal, including mandatory sinking fund redemption, payable on December 1 of each year.

"Prior Bond Legislation" means the 1985 Bond Legislation, the 1986 Bond Legislation, the 1991 Bond Legislation, the 1993 Bond Legislation, the 1995 Bond Legislation, the 1997 Bond Legislation, the 2000 Bond Legislation, and the 2001 Bond Legislation.

"Prior Bonds" means the outstanding 1991 Bonds. the outstanding 1993 Bonds. the outstanding 1995 Bonds. the outstanding 1997 Bonds. the outstanding 2000 Bonds. and the outstanding 2001 Bonds. but not including any Refunded Bonds.

"Rebate Fund" means the MSD Revenue Bond Rebate Fund held by the Trustee pursuant to the Prior Bond Legislation and the 2003 Bond Legislation.

"Refunded Bonds" means any of the 1985 Bonds. 1986 Bonds and 1991 Bonds which have been refunded with proceeds from any of the Prior Bonds and the Bonds which have been selected to be refunded in part with proceeds from the 2003 Bonds. as described or identified in the 2003 Bond Legislation.

"Refunded Bonds Escrow Deposit Agreement" means each and every Escrow Deposit Agreement among the Escrow Deposit Trustee. the County and the City providing for the advance refunding of the Refunded Bonds.

"Regular Record Date" means, with respect to any Bond. the close of business on the fifteenth day of the calendar month next preceding an Interest Payment Date.

"Replacement and Improvement Account" means the "MSD Sewer System Replacement and Improvement Account" created by Section 8 of the 1985 Bond Legislation.

"Required Replacement and Improvement Account Balance" means the sum of $5,000,000.

"Reserve Account" means the "MSD Sewer System Revenue Bond Reserve Account" created by Section 8 of the 1985 Bond Legislation.

"Reserve Account Guarantor" means the issuer of Reserve Account Guaranty.

"Reserve Account Guaranty" means a letter of credit. surety bond insurance policy or similar arrangement representing the irrevocable obligation of the Reserve Account Guarantor to pay the Trustee upon request made by the Trustee up to an amount stated therein, satisfying the requirements of the Bond Legislation and the Trust Agreement.

"Reserve Account Guaranty Agreement" means the reimbursement agreement, loan agreement or similar agreement between the County and a Reserve Account Guarantor with respect to repayment of amounts advanced under the Reserve Account Guaranty.

"Reserve Account Guaranty Coverage" means the amount available at any particular time to be paid to the Trustee under the terms of the Reserve Account Guaranty.

"Revenue Fund" means the "MSD Sewer System Revenue Fund" created by Section 8 of the 1985 Bond Legislation.

"Revised Code" means the Ohio Revised Code, as amended.

"Second Supplemental Indenture" means the Second Supplemental Trust Agreement among the County, the Trustee and the City dated as of December 1, 1986.

"Seventh Supplemental Indenture" means the Seventh Supplemental Trust Agreement among the County, the Trustee and the City dated as of June 1, 2000.

"Sewer System" means the sewer system presently owned or operated by the County as a public utility in MSD, and includes any extensions, modifications, enlargements or additions thereto, including Improvements, if any.

"Sixth Supplemental Indenture" means the Sixth Supplemental Trust Agreement among the County, the Trustee and the City dated as of October 1, 1997.

"State" means the State of Ohio.

"Supplemental Trust Agreements" means the First Supplemental Indenture, the Second Supplemental Indenture, the Third Supplemental Indenture, the Fourth Supplemental Indenture, the Fifth Supplemental Indenture, the Sixth Supplemental Indenture, the Seventh Supplemental Indenture and the Eighth Supplemental Indenture.

"Surplus Account" means the "MSD Sewer System Revenue Surplus Account" created by Section 8 of the 1985 Bond Legislation.

"Third Supplemental Indenture" means the Third Supplemental Trust Agreement among the County, the Trustee and the City dated as of January 15, 1991.

"Trust Agreement" means the Trust Agreement dated as of October 1, 1985 among the County of Hamilton, Ohio and The First National Bank of Cincinnati, Cincinnati, Ohio, Trustee (now known as U.S. Bank National Association), and, for certain limited purposes, the City, securing the 1985 Bonds, as supplemented by the Supplemental Trust Agreements, to secure the Bonds under the terms of the Trust Agreement, as the same may be amended, modified or supplemented by any amendments or modification thereof and supplements thereto entered into in accordance with the provisions thereof.

"Trustee" means U.S. Bank National Association, Cincinnati, Ohio (formerly The First National Bank of Cincinnati and then Star Bank, N.A., Cincinnati, Ohio and then Star Bank, National Association and then Firstar Bank, National Association), and its successors and any corporation or associations resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee at the time serving as successor trustee under the Trust Agreement.

"2000 Bond Legislation" means the resolution authorizing the 2000 Bonds adopted by the County on June 7, 2000, as the same may be modified or supplemented by an amendment or modification thereof.

"2000 Bonds" means the $40,085,000 Hamilton County, Ohio Sewer System Improvement Revenue Bonds, 2000 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 2000 Bond Legislation.

"2001 Bond Legislation" means the resolution authorizing the 2001 Bonds adopted by the County on October 24, 2001, as the same may be modified or supplemented by an amendment or modification thereof.

"2001 Bonds" means the $76,000,000 Hamilton County, Ohio Sewer System Improvement and Refunding Revenue Bonds, 2001 Series A (The Metropolitan Sewer District of Greater Cincinnati), identified in Section 3 of the 2001 Bond Legislation.

"2001 Project" means the improvements to the Sewer System described in the 2001 Bond Legislation.

"2003 Bond Legislation" means the resolution authorizing the 2003 Bonds adopted by the County on June 4, 2003, as the same may be modified or supplemented by an amendment or modification thereof.

"2003 Expense Account" means the 2003 Expense Account held by the Trustee pursuant Section 6 of the 2003 Bond Legislation.

"2003 Project" means the improvements to the Sewer System described in the 2003 Bond Legislation.

"Underwriters" means Seasongood & Mayer, LLC, Cincinnati, Ohio, Loop Capital Markets, LLC, Chicago, Illinois, Citigroup, Chicago, Illinois and Conners & Co., Inc., Cincinnati, Ohio, together with the other underwriters listed in the Bond Purchase Agreement.

"U.S. EPA" means the United States Environmental Protection Agency.

# THE METROPOLITAN SEWER DISTRICT
## OF GREATER CINCINNATI

## FINANCIAL STATEMENTS

for the years ended December 31, 2002 and 2001

# THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI

## TABLE OF CONTENTS

PAGE

**Financial Statements**

Independent Auditors' Report ............................................... 1

Management's Discussion and Analysis ..................................... 3

Statements of Net Assets ..................................................... 8

Statements of Revenues, Expenses and Changes in Net Assets .................. 10

Statements of Cash Flows ..................................................... 11

Notes to the Financial Statements ........................................... 12