

January 5, 2004


Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, D.C. 20044-7611


RE: United States and State of Ohio v. Board of County Commissioners of Hamilton
County and the City of Cincinnati, D.J. Ref. 90-5-1-6-341A.


## SIERRA CLUB AND MARILYN WALL'S PARAGRAPH-BY-PARAGRAPH COMMENTS ON SECOND DECREE

The Sierra Club also submitted narrative comments on November 18, 2003 on the
proposed Consent Decree (second Consent Decree) which was dated October 7, 2003.
Those comments, which are organized by topic and not by paragraph, are attached hereto
and incorporated herein as Exhibit A.


I.     SUMMARY

The second Decree authorizes illegal CSO, SSO and Wastewater Treatment Plant
violations for another twenty years. This is despite the fact that CSO compliance has been
required under the Long Term Control Plan for over six years, SSO's have been illegal
for thirty years, and OEPA Findings and Orders to correct illegalities were issued over
eleven years ago.

The combination of the IPCD and the Second Decree, taken together, do not create a path
that will result in cessation of the MSD's violations of the Clean Water Act by a date
certain.  The date certain is needed when you have long term noncompliance.  There has
been a 1985 federal Consent Decree regarding Mill Creek violations, a 1992 OEPA Order
on SSOs, a 1996 Long Term CSO Control Plan, legally-enforceable NPDES permits,
reported negotiations over an extended period of time --- none of which have led MSD to

voluntary compliance with the federal Clean Water Act. This is why the Sierra Club calls for a more definitive timeframe and the supervision of a Special Master.

The Consent Decree should recognize the extensive history of violations and delays and adopt a "time is of the essence" standard for all MSD corrections. "As expeditious as practicable", the term used in the decree, fails to establish the appropriate guiding principle for bringing the agency into compliance, as it is undefined and presumes a history of good faith compliance.

There is a clear record of inadequate state and federal enforcement and, as a result the environment has been unnecessarily degraded, even if this was due to other priorities or to budgetary constraints and limitations of time and personnel. For the reasons set forth below and in the Sierra Club's November 18, 2003 and other documents (supplied with these comments and elsewhere), the combination of the IPCD and the Second Decree is inadequate to bring MSD into compliance with the law because:

- The Consent Decrees contain  significant loopholes and indefinite time extensions thereby making it impossible to ascertain a date certain by which MSD's violations of law will cease;  without the changes suggested herein, the management and oversight of MSD progress or lack of progress will be highly complex, if not impossible; Oversight by a Special Master is needed to bring about compliance.

- The Consent Decrees do not contain interim deadlines, benchmarks or measurements of success by which the performance of MSD can be determined and evaluated over time; "Time is of the essence" must become the new operating paradigm.

- The Consent Decrees do not contain or require MSD to submit a financial plan as to how it will fund the various parts of the remedial program and, there is no commitment on the part of the Defendants to fund the entire program or any part of the program; the MSD should have developed a construction and financing schedule for implementation of the remedial program, but it is not included in the Decree.  A committed, financial plan is necessary.

- The MSD and the County have in the past manipulated the estimated cost of the remedial program in order to sway public opinion by projecting inflated and unrealistic rate increases. MSD and the County can also manipulate the $1.5 billion CIP cap loophole in the second Decree, unless there is oversight by a Special Master.  Oversight by a Special Master should specifically be included in the Consent Decree.

- The Sewage-in-Basement Program outlined in the second Decree fails to include funding commitments for each part of the program: prevention, emergency response, and claims.  Without definite funding commitments for each part of the program, it is unlikely that they will continue to be properly funded and

administered over time. A guaranteed fund of at least $37-40 million (and committed to in the Consent Decree) is required for the prevention program alone. This figure was stated by the MSD Director to the County Commissioners as the five-year cost of the sewage-in-basement prevention program.

- The CD should require a moratorium on new connections and tap-ins and extensions, unless there is proven adequate capacity at the treatment plants and in the sewer lines to which the new connection is flowing.  Allowing additional connections without adequate capacity is illegal and will simply exacerbate illegal overflows, backups of raw sewage into basements and CSO/SSO activations.

- Lowering water quality and allowing less than the legally required full secondary treatment violates the Clean Water Act.

- In order for the Court and the public to see and understand what progress, if any, has been made by MSD going forward the Consent Decree should contain clear and simple interim deadlines and benchmarks of success, such as:

  o The net (exclusive of new SSOs) SSOs have been eliminated each year
  o Reductions in the total overflows per 100 miles sewer/year
  o Reductions in SSOs activations
  o Reductions in CSO activations
  o Number of wet-weather, remedial CIP construction projects completed on time and on budget
  o Reductions in WWTP bypassing
  o Reductions in SIB backups
  o Number of SIB prevention systems installed
  o Number of SIB emergency cleanups performed vs. requested
  o SIB claims paid vs. claims made
  o Percentage completion of the overall CAPP and LTCPU each year
  (See Affidavits of Dr. Bruce Bell, previously submitted in this case, Exhibit B and Exhibit C.

## II.    PARAGRAPH-BY-PARAGRAPH COMMENTS ON THE SECOND CONSENT DECREE

**Last "WHEREAS" Clause, p. 6:**

Entry of this Consent Decree is not fair, reasonable, and in the public interest for the reasons set forth in this document and in the other Sierra Club Comments attached hereto and incorporated herein.

**PARA. II. D., pp. 7-8:**

The second Consent Decree claims that the County is responsible for operating the wastewater treatment plants and sewer system. The Consent Decree asserts "prior court decisions in Ohio hold that MSD cannot be sued in its own name, and thus, <u>MSD is not a party to this action</u>." This is an incorrect and outdated statement of the law of Ohio. See *Bibbs v. Cinergy, et al.*, 2002 Ohio 1851; 2002 Ohio App. LEXIS 1629 (1st App. Dist. 2002) ("First, we conclude that MSD is a political subdivision as defined under R.C. 2744.01(F). It admitted in its answer that it was a division of the city of Cincinnati, and it pleaded governmental immunity and limited damages under R.C. Chapter 2744. Further, this issue was implicitly determined in *H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist.* (1997), 118 Ohio App. 3d 792, 694 N.E.2d 111. Accord *Nice v. Marysville* (1992), 82 Ohio App. 3d 109, 611 N.E.2d 468; *Best v. Findlay* (Dec. 5, 1997), 1997 Ohio App. LEXIS 5479, Hancock App. No. 5-97-22, unreported; *Kendle v. Summit Cty.* (Apr. 15, 1992), 1992 Ohio App. LEXIS 2005, Summit App. No. 15268, unreported."). The Government plaintiffs and the Defendants should not include outdated and incorrect statements of legal authority in pleadings filed with the Court.

MSD has been held by the Ohio courts to have the capacity to sue and be sued in its own name. MSD should not only be a party to the Decree, it should specifically be subjected to the Court's injunctive relief powers. The MSD Director and others in top management should also be signatories to the Decree, so that if it is determined that MSD has not complied with any of the Decree's mandatory requirements, they can be directly and personally subject to the injunctive powers of the federal court, including the power of contempt.

**PARA. IV. OBJECTIVES, p. 11:**

In Para. IV, the Decree seeks to "to achieve expeditious implementation of the provisions…with the goals of eliminating all Sanitary Sewer Overflows and Unpermitted Overflows and coming into and remaining in full compliance with the requirements of the Clean Water Act, U.S. EPA's 1994 Combined Sewer Overflow (CSO) Policy, Chapter 61111 of the Ohio Revised Code and the rules promulgated thereunder, the Compact and the pollution control standards promulgated thereunder, and the Defendants' Current Permits." However, the Decree provides no standards as to what "expeditious implementation" would mean, outside of the actual terms of the Consent Decrees.

Also, given the problems that were uncovered by the Brown and Caldwell Report (copy attached as Exhibit D) , citing serious MSD management deficiencies, it is necessary that the Consent Decree have a Special Master to oversee engineering and financial implementation.

**PARA. V. DEFINITIONS, p. 14:**

The two Consent Decrees continue to refer to the "Mill Creek Deep Tunnel." This tunnel should not be referenced in the Decrees for several reasons. First, the US Army Corps of Engineers has now determined that the tunnel is not cost-beneficial (ACOE study attached as Exhibit E).   Secondly, the tunnel is a flood control project and should not be part of the $1.5 billion remedial program to stop the MSD's Clean Water Act violations. Third, the size of the tunnel, as determined in the Corps' study would not be sufficient to handle the overflows from the MSD's illegal SSOs and CSO discharges.  (The tunnel design is for a mere two-tear storm for CSO's.)   Thus, continuing to include reference to the tunnel in the Decree is inappropriate and also makes it more likely that the MSD will misuse the $1.5 billion extension of time loophole in the Decree.

Furthermore, as the Sierra Club stated previously, the MSD has proposed and the EPA has accepted an unreasonably long delay in the final remedy for SSO 700, the largest of MSD's illegal SSOs.  This delay was not based on what is feasible or appropriate at the current time.  Rather, it is based upon a delay to accommodate the potential, future approval and construction of the Mill Creek Deep Tunnel. Thus, the SSO 700 compliance delay offered by EPA should be removed from the Consent Decree and the illegal, interim control measure identified for SSO 700 should not be approved by the Court. A final remedy that complies with the secondary treatment requirements of the CWA should be implemented, now. A study done by MSD shows that a fully legal, secondary treatment plant can be built at the site of SSO 700 and will have numerous benefits to the MSD system (see MSD study attached as Exhibit F.)

**PARA. VI. CAPITAL IMPROVEMENT PROJECTS, p. 18-19:**

The number of CIP projects that are specifically required by the IPCD and the second Decree is woefully inadequate.  See Sierra Club Comments dated July 22, 2003 and the CIP tables prepared by the Sierra Club (attached as Exhibit G.   The only wastewater treatment plant (WWTP) capital project that is specifically mentioned in the second Decree (even though there are violations at other plants) is the Sycamore Plant. Apparently, all other WWTP problems will be dealt with in the LTCP Update.  This is inappropriate. There needs to be full public disclosure and accountability, now, regarding all of the MSD violations that are vaguely set forth in the Joint Amended Complaint.

The Consent Decree says that the remedial measure planned for the Sycamore WWTP in Ex. 1, which is an high-rate, primary treatment plant, is the "feasible alternative to by-passing" at the plant. The Consent Decree claims that this is the feasible alternative because of the high expense to MSD of all of the various other capital improvements needed in the future. Presumably, if those other improvements were not being done, however, under the CWA and regulations and the Sycamore NPDES permit, EPA would have required more to be done at the Sycamore plant, rather than to treat the wet weather sewage overflows with primary treatment and disinfection.

Installing a high-rate treatment unit at the Sycamore plant is not what is required to reduce by-passes to the maximum extent feasible and does not provide the public with the

maximum feasible treatment for remaining the by-passes. By endorsing high-rate, primary treatment units at publicly-owned treatment plants (which are required to meet "secondary treatment" standards, not the lower, "primary treatment") EPA is amending the Clean Water Act and its own regulations by the "back door". To the extent that EPA has authorized the use of high-rate, primary treatment systems at WWTPs elsewhere in the Consent Decrees, such as at SSO 700, they are also illegal and violate the CWA's secondary treatment requirements.

**Para. VII., Long Term Control Plan Update, p. 20:**

In sub-para. A.2, Defendants are required to submit the Long-Term Control Plan Update by June 30, 2006.  The Update will contain a schedule and is to be coordinated with the SSO CAPP (see below).  The date for "Substantial Completion of Construction" under the Update is February 28, 2022.  This means that, theoretically, all of the construction solutions could have an end date of 2022 and still be in compliance with the terms of the Decree.  Also, all of the problems with the MSD WWTPs (which have never been articulated) are folded into the LTCP Update and are also given until 2022 to come into compliance. Full public disclosure of the all WWTP violations needs to be made prior to submission of the Consent Decree to the Court. Otherwise, the Court will not be able to determine if the Decree adequately addresses the violations and is, therefore, fair, reasonable and in the public interest.

**Para. VII.A.1, p. 20 Public Participation Plan**.

The Public Participation Plan is totally inadequate. See comments on Consent Decree Exhibits below.

**Para. VII. "Long Term Control Plan Update"**

(Para. VII. A) provides for Defendants to undertake a comprehensive program to identify remedial measures and a schedule (the "Long Term Control Plan Update") with the goals of insuring that: (1) Defendants construct and implement all feasible alternatives to eliminate bypasses at Defendants' WWTPs or, if Defendants demonstrate during the course of developing the Long Term Control Plan Update that elimination of bypassing is not feasible, to reduce bypasses at the WWTPs to the maximum extent feasible and to provide maximum feasible treatment for any remaining bypasses (where appropriate, feasible alternatives to bypassing may include, without limitation, high rate physical-chemical treatment units and/or primary clarification and disinfection;[1]  Defendants' CSOs comply with the requirements of the Clean Water Act, the U.S. EPA's CSO policy, Chapter 6111 of the Ohio Revised Code and the rules promulgated thereunder, the

---

[1] Acceptance of high-rate treatment add-ons at WWTPs to handle wet weather flows violates the CWA's secondary treatment requirements.

Compact and the pollution control standards promulgated thereunder, and Defendants' Current Permits; and (3) Defendants eliminate Unpermitted Overflows.

Again, there are no standards written in the Decree to define or otherwise determine what these goals are. There is no definition of "all feasible alternatives to eliminate bypasses". There is no definition of the use of particular storm durations and frequencies. There is no definition of what is feasible or non-feasible. There is no methodology for making such a determination.

Also, the EPA has not disclosed to the Court the full scope and extent of the MSD's CWA violations.   This is very important because the Court needs to know if the Consent Decree is in the public interest. The court cannot know if the deal is in the public interest when the MSD's violations are hidden from public scrutiny.  Sierra Club has asked the EPA to disclose this information, but EPA hasn't. The allegations in EPA's Joint Amended complaint are so vague as to be meaningless from a res judicata, collateral estoppel or diligent prosecution standpoint.

**In Para. VII.A.2  "Long Term Control Plan Update"**

Defendants are to submit by June 30, 2006, a Long term Control Plan Update Report. That Report is to contain a schedule "as expeditious as practicable" for design, construction and utilization of the remedial measures specified in the Long Term Control Plan Update and shall contain a deadline for Substantial Completion of Construction of all remedial measures that is as expeditious as practicable. Except as provided in Section IX (Completion of Construction), the date for Substantial Completion of Construction of all construction under the Long Term Control Plan Update shall be no later than February 28, 2022.

There is no definition or meaning for a schedule that is as "expeditious as practicable". This term is essential to the decree but implies a history of compliance and good faith. That is not the situation with MSD.  MSD's numerous and ongoing violations need to be corrected and "time is of the essence" must be the guiding principle of the decree. Because the LTCP Update and the Capacity Assurance Program Plan prepared under the SSO Decree do not have any interim deadlines, benchmarks or measures of success until the year 2022, the words "as expeditious as practicable" (which modify the word "schedule") have significance in controlling the unfettered discretion of the MSD to put off all deadlines until 2022.

In the IPCD, the counterpart to the LTCP Update is the Capacity Assessment Program Plan or CAPP. The CAPP submission has no specific date by which it is due.  Rather, the Hydraulic Model comes first, which was due on October 31, 2003. Once the Model is done, MSD must prepare a Capacity Assessment Plan within 120 days after October 31, 2003, and submit it to EPA. This would mean that the CAP is due at the end of January 2004.  Then, the plan goes to EPA for approval (no set time limit on them to respond). Then, MSD will submit a Capacity Assessment Report consistent with the schedule set

forth in the Capacity Assessment Plan – again, no deadline. After the Capacity Assessment Report is completed, MSD must develop a Capacity Assurance Program Plan. Again, there is no deadline for submission.  The CAPP is meant to provide a "schedule that is as expeditious as practicable for design and construction of all proposed measures." The problem with this is procedure is that it creates a   management and oversight nightmare. It is going to be difficult to track the progress under the CAPP because, among other things, it is unclear when it is going to be completed and approved. There is too much room for drift in this process and, there are no interim benchmarks or criteria for success of the SSO elimination program (e.g., 1/2 of all SSOs eliminated in 5-years; sharp reductions in the number of overflows per 100-miles of sewer per year, reductions in basement backups, etc.).


**Para. VII.B, p. 21 :**

In paragraph VII.B, "Modification of Long Term Control Plan Update if Anticipated Changes to Legal Requirements Do Not Occur", the parties admit that the LTCPU will be written by the MSD on the basis that there <u>will be fundamental changes</u> in the Clean Water Act, U.S. EPA's CSO Policy, Chapter 6111 of the Ohio Revised Code and/or the rules promulgated thereunder will be revised.  The second Decree places the burden on the Governments to notify Defendants in writing that the "expected revisions are not going to occur." However, there is no deadline by which governments have to provide this notice.  In para. VII. B.2, it states that within 180 days of Defendants' receipt of the written notice, they must submit for review and approval a "Revised Long Term Control Plan Update", but that completion of remedial measures may be later than Feb. 28, 2002, if it is not practicable to complete those measures by that date.  The CD does not set forth any permissible end date that would be either acceptable or unacceptable to EPA.  Those fundamental changes include lowering of Water Quality Standards.

**The decree invites lowering Water Quality Standards and any such attempt will run afoul of the Clean Water Act, including the anti-backsliding provision.    If MSD petitions for a lowering of the use classifications and, hence, the Water Quality Standards (allowing more fecal bacteria in the rivers and streams), then the public may end up spending $1.5 billion and end up with lower water quality than they have now.**  This whole aspect of the second Decree makes it against the public interest. Allowing MSD to adopt a remedial plan that <u>assumes</u> weakening changes in existing law and regulations will occur in the future is outrageous.  It signals to the public that EPA has either already approved these weakening changes in advance or is working "behind the scenes" with MSD to make them happen. Both are clearly not in the public interest.


**Para. VII.C, p.24:**

This section provides yet another extension-of-time loophole.  Here, Defendants can submit a petition to EPA for more time, if they do a post-completion evaluation of any construction measure in the LTCP.  In para. VII.C "Evaluation and Correction Period",

any remedial measure specified in the LTCP (and the final end date of 2/28/2022) is subject to an "evaluation and correction" extension of time.  While para. VII.C.1 provides that MSD may evaluate the effectiveness of <u>any</u> measures in the plan, para. VII.C.2 provides that MSD can petition EPA for an extension of the deadline for "<u>all of the measures specified in the LTCPU</u>…" The petition must be submitted no later than thirty days from the end of the two-year evaluation period.  Defendants "shall submit a petition as soon as practicable after they identify a problem(s) that they believe warrants correction, and may submit more than one petition if they identify multiple problems." Thus, for each and every element in the LTCPU, MSD can submit a petition for an extension of the final end date. There are multiple approval processes, including approval of the petition and approval of the LTCPU addendum, which can delay the ultimate correction of the problems.[2]

**Para. VII.D, p. 26, "Compliance after Implementation":**

After substantial completion of construction of all measures under the Long Term Control Plan Update or any extension of time, all of which add an indeterminate amount of time after 2022, then the "CSOs shall comply with the Clean Water Act, US EPA's CSO Policy, Chapter 6111… the Compact and … the Defendants' Current Permits, and Defendants shall not have Unpermitted Overflows."  The Court and the public simply do not know when the MSD's violations of law will cease.

**Para. VIII.A, Implementation of the Capacity Assurance Program Plan, p. 27:**

The CAPP as described in Subpara. VII.E.8 of the SSO Decree (IPCD) must be submitted. The date of submission is uncertain, however.  The date for substantial completion of all construction under the CAPP is Feb. 28, 2022. Upon final approval of the CAPP by EPA, it will become part of the second Consent Decree.  The Court and the public just don't know when that will be.  Thus, management oversight will be very difficult, if not impossible.

Section VIII.B also includes an "evaluation and correction period" loophole extension of time.  EPA and OEPA's oversight of the MSD has been very weak over the years. These government agencies have not protected the residents of Hamilton County from illegal pollution or from intolerable sewage backups, all of which have been well-known for the entire time that the governments and MSD have been "negotiating" the Decrees.

---

[2] Under the Second Decree, there is the Long Term Control Plan Update, which is supposed to be completed by 2/28/2022. The Second Decree also contemplates a Long Term Control Plan Update Revision, the end date of which is unknown and an Addendum to the Long Term Control Plan Update, the end date of which is also unknown. There could also be the Addendum to the Long Term Control Plan Update Revision, the end date of which is also unknown.

In para. VIII. "Implementation of the Capacity Assurance Program Plan", the second CD incorporates the CAPP in the SSO decree (subpara. VII.E.8 of that IPCD). Like the LTCPU, there are no interim deadlines or benchmarks or criteria for success of the CAPP in the IPCD or the second Decree.  Para. VIII.A of the second Decree provides that the schedule in the CAPP shall be as "expeditious as practicable", but shall be no later than 2/28/2022.   Again, there is no definition of as "expeditiously as practicable."  This vague and meaningless catchall phrase is likely to push much of the compliance issues into the Consent Decree's Dispute Resolution Process and place a continuing burden on the Court and judicial resources.

**Para. IX.A. Extension of Deadlines If There Are Not Adequate Precipitation Events to Allow for Collection of Monitoring Data, p. 30:**

Para. IX. "Completion of Construction Deadlines" provides in subpara. A that the deadlines for the LTCP Update Report and Substantial Completion of all remedial measures are premised on the assumption that there will be "sufficient precipitation" for Defendants to complete wet-weather sampling in accordance with Ex. 3 to the second Decree. It will not be known if this "sufficient precipitation" loophole exists until Oct. 15, 2005.  If there have not been sufficient precipitation events "the deadlines for submission of the Long Term Control Plan Update Report and Substantial Completion of Construction of all remedial measures specified in the LTCPU shall be extended by the number of days after October 15, 2005, that it takes for Defendants to complete the additional wet-weather sampling in accordance with the Monitoring and Modeling Work Plan."

**The second Decree does not define what is necessary for there to be "sufficient precipitation" to conduct the Monitoring and Modeling Work Plan.  This is an automatic extension of time loophole and does not require prior EPA approval. All that has to happen is for Defendants to claim that there has not been "sufficient precipitation" and they get an open-ended extension.**  Notwithstanding all of the data collection done by MSD to date and all of the monitoring that it has done to support the system-wide hydraulic model that was due at the end of October, 2003, the EPA has agreed to yet another sample-collection, monitoring period, ending October 15, 2005.

**Para. IX.B, Extension of Deadlines if Capital Costs Exceed $1.5 Billion –**

In para. IX.B of the second Decree, which is entitled "Extension of Deadline if Capital Costs Exceed $1.5 Billion" (at p. 32), Defendants may <u>unilaterally</u> extend the final compliance deadline of February 28, 2022, if they can demonstrate that the "expected capital costs (in 2006 dollars) of the remedial measures in the LTCP Update and the CAPP are expected to exceed $1.5 billion."  The new deadline (chosen by the Defendants) must still be as expeditious as practicable, but may be later than 2/28/2022. There is no specific EPA approval of this deadline extension and no specific end date beyond which the MSD violations of the CWA may no longer continue.

MSD has already shown that its inflated and unrealistic estimates of remediation costs can exceed $1.5 billion (as shown in the 2001 BBS Report), depending on what projects it chooses to include or not to include in the remediation program (e.g., purchase of SIB homes, Mill Creek tunnel, etc.) (see excerpt from BBS report and MSD's buy-out list of Sewage-in-Basement homes, attached as Exhibit. H. The BBS Report, an estimate of the costs of wet weather remedial measures need by MSD to comply with the CWA is replete with double counting and exaggerations that drive up the estimated costs of remediation beyond what is actually necessary and beyond which MSD has any realistic belief that it will either build or fund.

The Consent Decree exacts no penalty for MSD's overestimating, intentionally inflating the remedial costs, double-counting, including extraneous costs (such as the Mill Creek Flood Control Tunnel), or providing exaggerated solutions, which MSD never intends to implement. The Defendants' "demonstration" of estimated remedial costs does not even have to take place after the costs have been approved by the Commissioners and made part of the Capital Budget. The Consent Decree offers to MSD a clear incentive to exaggerate costs and to obtain a "self-reward" of an indefinite, final compliance deadline extension.

A financial auditor either appointed by a Special Master or a second Special Master is also required to determine if the sewer rates are being properly set going forward, in light of previous exaggerations by the MSD of the rate increases required to fund the Consent Decree's remedial measures. While the MSD's own rate consultants were preparing expert reports for use in this case, the MSD Director was spreading highly exaggerated and fear-inducing misinformation to "US Today" and other media outlets regarding the need for a 1500% rate increase to fund the CWA improvements. See "USA Today", August 20, 2002, attached hereto as Exhibit I). Neither of MSD's rate consultants supported such exaggerations.

According to Sierra Club's expert economist, Dr. Michael Kavanaugh, the average family in Hamilton County pays less than $1/day for sewage disposal today and, after all of the $1.5 billion CWA violation remediation program has been accomplished by 2022, rates should increase to somewhat less than $2/day per family. (see Affidavit of Dr. Michael Kavanaugh, dated April 8, 2003, previously submitted in this case, attached hereto and incorporated herein as Exhibit J).

As perhaps the most egregious example of its inflated remediation estimates, MSD included in its estimates until very recently and astounding $250 million to purchase the homes of some (not all) of the sewage-in-basement victims. See MSD's proposed buy-out list attached as Exhibit H. When confronted with the necessity of actually coming up with a Sewage-in-Basement program, the $250 million, MSD buy-out program became an estimated $37-40 million "prevention" program. Even with that rapid deceleration of costs, no dollars have been appropriated to even fund the prevention program.

MSD has also publicly said that their $35K to $40K/ isolation pump system estimate could be done for less than $10K, but, it has not proposed any budget change nor have the Commissioners adopted such changes. This is another example of MSD overpricing and possibly overpaying – showing how the cost may well exceed $1.5 billion without fixing the problem.

There was also significant testimony on December 17, 2003 at Hamilton County Commission about MSD's cost estimates for putting a sewer line on Cranbrook going way over original cost estimates. MSD is also undercharging for tap-ins to the Wesselman sewer line. This means that existing rate payers are subsidizing building the sprawl-inducing, Wesselman sewer line.

MSD Director Karney has stated that the MSD rate increase that goes into effect January 9, 2004, does not include anything in the consent decree. That is, rates are being increased but not for complying with the Consent Decree. No funding commitment exists.

Paras. IX.B.1 and 2 provide that sewer relining and manhole rehabilitation and water-in-basement capital expenditures may be included in determining whether the capital costs for the remedial measures are expected to exceed $1.5 billion. The MSD has normal sewer improvement capital expenditures each year. There is a historical record of how much money has been spent on these projects annually. The $1.5 billion cap should be reserved for wet-weather, remedial costs over and above normal sewer improvements capital expenditures. It should be focused on solving the wet-weather, lack of capacity problems in the MSD sewers and sewage treatment plants.

Subpara. 3 provides that if any new, more stringent requirements are imposed on Defendants due to regulatory changes, then these capital expenditures would also be added on to the total remedial measures to determine if the $1.5 billion cap is exceeded and, if the deadlines can be extended. Sierra Club opposes this provision.

**Para. X, Post-Construction Monitoring, p.34:**

This Para. is an example of just how difficult tracking and monitoring will be under the second Decree. The Post-Construction Monitoring program requires that a Work Plan be submitted 5-years after the approval of the Long-Term Control Plan Update in 2006 (2011). The purpose of the work plan is to "help determine" whether the remedial measures, when completed, meet all design criteria and performance criteria. One would expect that, within the first 5-years after 2006, many projects (1/2?) would have already been completed. Post-construction monitoring should be on-going from Day-1. It should be happening, now. Presumably, MSD is working on SSO removal projects, sewer separation, CSO dry-weather overflows and the like. The design criteria and performance criteria of those projects are already set and can certainly be the subject of post-construction monitoring. This is precisely why 3rd party, independent engineering and fiscal monitoring is necessary through a Special Master. **EPA is apparently**

**satisfied with waiting until 2011 to begin this process**. The Court and the ratepayers cannot be satisfied with this.

**Para. XI., Remedial Measures Addressing Nine Minimum Controls, Non-High Water Dry Weather Combined Sewer Overflows, p. 40:**

Para XI.B. CSO public notification program in Exhibit 5 is not adequate. See comments on Exhibit 5.

The MSD's NPDES permits and EPA's CSO regulations prohibit dry weather CSO overflows. The second Decree requires MSD to do a study of dry weather overflows from CSOs that are not caused by an earlier, wet-weather inundation of the sewer system. The report is due by October 31, 2004. The report is to include a schedule of remedial measures to "prevent or reduce, to the maximum extent practicable, future discharges from occurring." There is no end date for the schedule or for the elimination of dry weather overflows.

There are two problems, here. First, the EPA CSO Policy and the MSD's CSO Permit requires that CSO dry weather overflows be eliminated. **EPA is saying in the Decree that dry weather CSOs need to be reduced to the maximum extent practicable, instead of eliminated. EPA appears to be amending its policy by the back door**. Secondly, MSD has been aware of this condition in its CSO permit and already knows where its dry-weather overflows. Without a firm schedule of compliance and a definite elimination deadline, tracking and accountability will be difficult or impossible. Under the Consent Decree, MSD could come in with a schedule in 2004 that allows dry weather overflows to continue until 2022 or later.

**Para. XI.E., Control of Solid and Floatable Materials in CSOs:**

Again, the Decree provides for yet another study to be performed by December 1, 2004. **Actually, the current CSO permits required MSD to control solid and floatable materials by 1997.** MSD knows which CSO outfalls do not have any or do not have effective control of solids and floatables. **There is no specific deadline by which the Consent Decree orders the MSD to comply with this permit provision**. The Consent Decree should include specific projects that are required to control solid and floatable materials and dates by which such projects must be completed, with appropriate stipulated penalties for non-compliance.

**Para. XII, Compliance with Effluent Limitations:**

This provision states that Defendants must comply with the effluent limitations, monitoring, record-keeping and reporting requirements, and operation and maintenance requirements of Defendants' NPDES permits. There is no purpose to this provision.

MSD, already, must comply with its permits, in all aspects now and in the future. This provision cannot be used as a backdoor way of not requiring compliance with any current or future permit terms or conditions. .

One of the important items that Sierra Club never got from MSD or EPA (despite repeated requests) was an accurate summary of the violations at each of MSD's wastewater treatment plants (WWTPs). This would have given Sierra Club and would given the Commissioners and Council an accurate picture of what the magnitude of the problems are at the WWTPs.

As part of the public participation and public reporting process, the MSD should issue a quarterly public report on the permit compliance status of each WWTP from the standpoint of effluent limit violations, by-passing, reporting, and O&M violations.


**Para. XIII, Water-in-Basement Program, p. 47:**

First, what comes out of a sewer pipe in Hamilton County residents' basements is sewage, not water. The stories that the sewage-in-basement victims told to the Sierra Club and the Sierra Club's public meeting underscore that **this is a sewage problem, not a water problem**. See Sierra Club videotapes of SIB victims and public meeting, attached hereto as Exhibit K and Exhibit L. While the Sewage-in-Basement program closely follows Sierra Club's previously-submitted suggestions, there are serious problems, however.

- The initial funding for the cleanup part of the program is coming from a "SEP" Environmental Security Account fund that was established pursuant to the 1985 Mill Creek WWTP Consent Decree between the EPA and the MSD. That account was funded at the level of $750,000.00 in 1985. At a reasonable rate of return, the account should now have close to two million dollars in it, but only has approximately $1.1 million.
- **There needs to be a definite funding plan and multi-year, funding commitments for the sewage-in-basement program: the prevention, emergency response, and claims program.**
- Claims processing – heretofore, the claims processing was handled by the Office of the Solicitor for the City of Cincinnati. The track record of that organization has been weak and has been so acknowledged by the MSD Director at several public meetings. Placing the claims process in the hands of the City Solicitor's office, without assurances of proper staffing, procedures, the training, etc., would not be a reliable solution. **The claims processing should be under the control of a neutral third-party, like an insurance company.** Again, supervision and oversight by the Special Master would be necessary under the circumstances.

**XIII.D, Adequate Capacity, p. 48:**

This general provision requires Defendants to implement remedial measures that ensure upon completion adequate capacity to meet the requirements of decree. This provision references the CAPP, the LTCPU, and WIB Prevention Plan, etc.  What this provision does not do is to provide any guidance that would be useful to an engineer.  For example, the design storm is not referenced in this provision.  There is a provision in Para. XVII.E.2, Stipulated Penalties, which states: "Defendants shall not be liable for stipulated penalties for CSOs or Unpermitted Overflows that are caused by a ten-year or greater storm event."

First, **this is an escape clause from stipulated penalties – a definition of a force majeure event – not a design criteria.**  In order for the remedial measures to be engineered, they need to be benchmarked to a particular storm event. When engineers talk about a storm event for the purpose of design, they use the National Weather Service, Rainfall Frequency Atlas Maps, http://www.srh.noaa.gov/lub/wx/precip_freq/precip_index.htm. If you look at those maps, you will not see anything that states what a "ten-year or greater storm" is. Every storm is designated with both a return frequency and duration. The durations are from 30-minutes to 24-hours. The combination of return frequency and duration yields a number of rainfall inches. The number of rainfall inches can then be used to design the size of sewers and appurtenant structures.

EPA (purportedly an agency with expertise in such matters) has used a "storm event" in the Consent Decree to exempt MSD from stipulated penalties but there is no definition of that "storm event".  Presumably, by leaving out the duration factor, EPA intended to allow MSD to argue at a stipulated penalty phase that the storm exceeded the 10 year-30 minute storm, which is quite a bit smaller than the 10-year – 24 hour storm.

After receiving an early Sierra Club comment on the second Decree, EPA did add to the Definition section of the Decree the definition of a ten-year storm event (to mean the 10-year, 24-hr. storm).  However, the use of this definition is apparently limited to stipulated penalty purposes.  The planning of the LTCPU does not appear to be tied into a specific system capacity.  So, after years and years of negotiations and "hard bargaining" with the MSD, the EPA/OEPA still don't know what size sewer system they want to get from the Defendants when the planning and construction is all done.   The Consent Decree misses the opportunity to settle and resolve vital issues and has missed the opportunity for clarification and left out the opportunity to compel compliance and avoid delays.

**XIV, Supplemental Environmental Projects, p. 48:**

 In this provision of the Consent Decree, the Defendants are agreeing to SEP projects in the amount of $5.3 million.  In Para. XXII, Defendants agree to pay a civil penalty of $1.2 million. There is no discussion about how the EPA's Municipal Penalty Policy was applied in this case and how the SEP Policy was applied. The SEPs are all Mill Creek stream restoration projects that apparently will be constructed by MSD. So, the money is still in MSD hands and not in the hands of any 3rd parties that are working to improve the environment.  **The money and the project must be put in the hands of a 3rd party.**

Also, there is no SEP for Little Miami or Great Miami or Ohio River. MSD's failure to agree with EPA on an acceptable SEP from the 1985 CD is another example of why a Special Master is required in this case.

**XV, Reporting Requirements, p. 50:**

The reporting requirements are quarterly and, according to this provision, should contain a good amount of information. However, the problem with the amount of information being developed is that the EPA (and certainly the OEPA) does not have the staff (dedicated to this project) to promptly analyze the information.  Furthermore, to the extent that EPA has hired outside contractors to evaluate MSD compliance, it has used that situation to shield from disclosure its consultants' evaluations of MSD non-compliance with the CWA. Sierra Club has repeatedly asked EPA to provide it with its evaluation of MSDs violations of the law in the CSO and WWTP areas. EPA has repeatedly refused to provide Sierra Club with this information.

This is also why the public needs independent, citizen oversight and a Special Master involved. EPA has no enforcement presence here in Cincinnati and very little credibility. The Consent Decree appears mostly to be an elaborate mechanism for planning and to assist MSD in putting off implementation and avoiding consequences. It contains too many loopholes.

**XVII.E.1, Stipulated Penalties for Bypasses, CSOs, Unpermitted Overflows, and SSDs:**

The Consent Decree makes Defendants liable for civil penalties of $1000/day for each day of bypass, CSO or unpermitted overflow that was caused by Defendants' failure to comply with their O&M program (SSO Decree, Ex. 7) or other specified O&M obligations. This is, of course, virtually unenforceable.  Proving that a particular bypass, CSO, or unpermitted overflow is due to a specific violation of an O&M plan is almost impossible.  But, of course, this appears to be what EPA and the MSD want from the Consent Decree – virtual immunity from penalties for the next 20 years.

Also, this provision may actually limit the enforceability of MSD's NPDES permits for its WWTPs bypassing.  MSD could argue that all future plant bypassing is covered by this provision.  Unless a by-pass is caused by an O&M violation, MSD could argue, it would not be enforceable.  The fact that the EPA has refused to reveal the extent of the bypassing problems at the WWTPs makes this particularly problematical for public oversight.

Para. E.2. provides that Defendants shall be subjected to a stipulated penalty of $3000/day for each CSO or unpermitted overflows that occurs "after the later of 1) the date for completion of all remedial measures specified in the Long Term Control Plan Update, the Addendum to the Long Term Control Plan Update, or the Revised Long Term Control Plan Update, as applicable, or 2) any schedule of completion date

extensions or revisions that are made pursuant to Para. VII.C of this Consent Decree."
That is at least 2022 or later. Plus, the Consent Decree goes on to state that EPA: "will
not demand payment for stipulated penalties…until after the two-year evaluation period.
Further, Defendants are not liable for stipulated penalties during a six-month shake down
period following the date for completion of all remedial measures.  **Thus, EPA must
wait until 2022 or later to collect any stipulated penalties for illegal discharges that
are capacity related.** This is a very weak incentive for compliance.  Stringent
benchmarks, interim deadlines and penalties for capacity-related overflows are the only
way to protect the public interest during the remediation of a sewer system that is so
grossly out of compliance with the law.

Para. E.3 – SSD's Following Completion of Capacity Assurance Program Plan – this
provision deals with stipulated penalties for sanitary sewer discharges (SSDs) (from
SSOs). Stipulated penalties for SSDs in a particular "sub-basin" kick in only after the
date for completion of all remedial measures for that particular sub-basin, plus any
extensions or revisions granted by EPA.  Also, EPA will not demand payment until after
the two-year evaluation period.  Defendants also have a 6-month shake down period
following the completion of all remedial measures for each particular sub-basin.

Of course, MSD can simply set 2022 as the end date for all SSO remediation work in all
sub-basins and then, there would be virtually no stipulated penalty liability whatsoever.
The structure of the Consent Decree leaves too much discretion in the hands of the EPA
and OEPA. The public needs interim benchmarks of success for the entire system and in
each watershed and sub-basin.  Also, the question arises as to why the same kind of sub-
basin approach to stipulated penalties was not applied to CSOs, in the Consent Decree.

### XVII.E.3, Stipulated Penalties for Violations of Effluent Limitations.

This provision sets fairly low stipulated penalties for effluent limit violations ($1000 -
$8000).  The problem again is with the enforcement of these provisions.  **There is no one
designated to audit compliance and payment.**  OEPA appears not to have the staff and
resources to do this.  OEPA claims that its computer database is corrupted and that it
cannot be used to determine which NPDES permittees are in violation and which are not.
OEPA claims that its database cannot determine which violations are real and which are
artifacts of the problems in its software. This amount of penalty is not an incentive to
comply; it appears to be more of a protection mechanism.

### XVIII.E, Force Majeure

This provision includes the $1.5 billion cap on capital expenditures to remedy violation
of the Clean Water Act.  Changed financial circumstances or unanticipated or increased
costs or expenses don't excuse violations or grant extensions, except if the "estimated"
total cost exceeds $1.5 billion. The problem, of course, is that MSD will estimate (already

has estimated in BBS Study) that costs will exceed $1.5 billion. On closer examination, the BBS Study was shown to contain fluff, fat, double counting and projects that MSD has absolutely no intention of building.  This is another clear reason why a Special Master is necessary to oversee the engineering and fiscal ends of this project.

## XXI. Dispute Resolution

Sierra Club and the public should have specific and defined monitoring and intervention rights for both Consent Decree enforcement and Dispute Resolution.  The Dispute Resolution process will be overused because of the loopholes, indefinite time extensions and the over-reliance on such vague terms as "expeditiously as practicable."  In any case, the Special Master appointed by the Court should be in charge of the Dispute Resolution process.  The costs of Dispute Resolution should be born by the MSD.

## XXII. Civil Penalty

The civil penalty in this case is $1.2 million. The purpose of the $100,000 to ORSANCO is unclear. The EPA should reveal the legal basis for diverting $100,000 in civil penalties to ORSANCO, an interstate agency, because interested parties cannot be recipients of civil penalties.  ORSANCO should also reveal the purpose to which the money would be put.  Both the EPA and the Defendants have admitted in discovery in this case that, if the maximum civil penalties available under the CWA were be applied to the Defendants' violations, the civil penalty  would be in excess of $25 million. That means that MSD has a lot of violations over a very long period of time.  EPA has a Municipal Penalty Policy and a policy on Supplemental Environmental Projects.  The Agency should explain to the Court and the public and the Court exactly how it determined the amount of the civil penalty and the SEPs in this case. See first Affidavit of Dr. Michael Kavanaugh, previously submitted in this case, Exhibit M.

## XXVI.B. Effect of Consent Decree and Non-Waiver Provisions:

This provision is problematical. It provides that the Consent Decree resolves all civil claims of the US and the State for injunctive relief and civil penalties for the CWA violations alleged in the Joint Amended Complaint filed through the date of lodging of the Decree (Dec. 4. 2003). The problem is that the Joint Amended Complaint is totally vague and cannot form the basis to determine what MSDs violations are.  The Joint Amended Complaint does not specify the MSD violations that are being released and, therefore has no res judicata, collateral estoppel or diligent prosecution effect.

## XXX. Review of Submittals:

A Special Master can make sure the multiple party reviews take place in a timely manner. MSD submittals are reviewed by EPA, OEPA and ORSANCO, which in and of itself is very unwieldy.   The agencies agree to use best efforts to review submittals expeditiously.

**If they cannot complete review within 60-days of receipt, then the Consent Decree deadlines are <u>automatically extended</u> for the number of days after 60-days that it takes the agencies to approve.** This is particularly problematical, given the relatively small level of resources that the agencies have devoted to the MSD case to date. There is a special review procedure for ORSANCO; if ORSANCO disagrees with EPA or OEPA, it can trigger the dispute resolution process and attempt to **delay compliance even further**. A Special Master can make sure the multiple party reviews take place in a timely manner, as these agencies have historically missed deadlines and now have even fewer resources.

**ADDITIONAL ISSUES:**

**Moratorium on new connections –** new connections to already overloaded sewers should not be permitted. The "credit program" that is provided for in the IPCD allows for new connections first and then verification later. It is not clear that the verification program is valid and, certainly has not been subject to any peer review. Mostly, this is just "eye-wash" to cover additional connections that will just make the overflow problems worse. There should be oversight of any sewer moratorium by a Special Master.

**Wastewater treatment plant bypasses**: Ohio EPA knows that the Sycamore and Polk Run wastewater treatment plants are not designed to handle their wet weather flows. These plants are sanitary only (not combined). Polk Run NPDES permit has a design flow specified of 8 MGD, but in actuality its design flow is only 6 MGD. Bypassing is illegal except in an Act of God event (and EPA is not enforcing this). Ohio EPA is allowing new connections to occur to an overloaded system.

The Sycamore WWTP upgrades that are being proposed do not have loading limits for the sewage that is bypassed by secondary treatment and, above a certain flow amount, no limits at all. The high rate treatment facility that Ohio EPA is proposing to permit is illegal under the Clean Water Act. Almost all of Mill Creek and significant parts of the Little Miami are not attaining State Water Quality Standards.

**Illegal connections to the MS4s system**: In reviewing MSD employee Eric Saylor's deposition in this case, he states that the MSD's SSO's usually overflow to the storm water system (municipal separate storm water system or MS4) of other municipalities, townships, etc., within Hamilton County. These overflows are "illicit discharges" under the Phase II storm water regulations, which all small systems now have to comply with. These municipalities submitted their storm water Phase II permit applications to Ohio EPA in March 2003 and, one of the six minimum controls that have to be addressed is removing illicit discharges to storm water systems. Therefore, MSD now causes and will in the future be causing all these municipalities to be in violation of their storm water permits.

**Unresponsive FOIA appeal to USEPA**: Sierra Club member, Patricia Brechlin, submitted a FOIA appeal to USEPA in December 2002, regarding the 33 pages of

documents that USEPA is withholding.  Some of those documents have Don Schregardus' name associated with them.  The fact that USEPA withheld these documents appears to be purely political since many are official letters that were sent from the agencies.  USEPA has still not responded to Sierra Club appeal other than to say that it was received in the Office of General Counsel in January 2003.

**Public Accounting of MSD Violations:**

Sierra Club has requested evaluative documents prepared by EPA and OEPA as to the state of compliance by MSD with its NPDES permits regarding CSOs and WWTPs. Sierra Club wanted to know in what respects the regulatory agencies had found the MSD in non-compliance with the Clean Water Act.  These documents and opinions were withheld from Sierra Club under a claim of investigative privilege, inter alia.  The citizens pay for EPA and OEPA to enforce the federal and state clean water laws against polluters.  The citizens have a right to know in what respects their government agencies have found a polluter to be in violation of the Clean Water Act.

This information is important in enabling the Sierra Club to properly evaluate the proposed Consent Decree and to inform the Court as to the reasonableness of the Decree. Examples of the information that was withheld by EPA include: EPA staff/contractor assessment of MSD's compliance (since January 1, 1997) with the federal CSO Policy and CSO Permit; MSD's violations of NPDES permits for its major WWTPs; violations by MSD of the by-pass provisions of its NPDES permits for its major WWTPs.  EPA should also disclose all of the MSD discharges through unpermitted CSOs.


## EXHIBIT 1. – CIP

Exhibit 1 specifies only 23 CSO capital improvement projects and the high-rate treatment unit for the Sycamore plant.  The CSO construction completion dates run from 2004 to 2010. The construction end date for the Sycamore HRTU is 2006.  There are 256 CSOs with permits. 216 of the 256 CSOs, each have CIP numbers associated with them and even have remediation cost estimates.  Of the 233 CSOs that are not scheduled for construction with set end dates, 56 of them (for which MSD has supplied overflow data) overflowed 4705 times in 2001 and 2002 combined.  The CD must contain deadlines for all MSD CIP projects.


## EXHIBIT 2. – PUBLIC PARTICIPATION PLAN.

This plan has two components. Neither is adequate or truly 'public'.  The role, scope of work and membership in the Steering Committee is extremely limited.  (MSD did agree to ask additional organizations to join when questioned by the County Commission.)  It is problematic that this committee is hand-picked by MSD to oversee MSD. It represents government, industry and some academics, rather than members of the broader public. The scope of work is limited to "high-level" oversight and "big picture" issues.  MSD prefers to use its own consultants for the "detail" work.  Ironically, when picking up any

MSD issue, it is the details that matter, whether overpriced isolation grinder pumps, costs estimates for the Cranbrook drive sewer or the Wesselman Road sewer extension or the cost to purchase homes of Sewage-in-Basement victims or the conclusions of the Brown and Caldwell audit.  Additionally, MSD will select the information to be presented to the Committee.  What MSD needs here is a truly independent citizen oversight board with the engineering and accounting auditing capacity (i.e., funding) to examine the details of MSD's progress and to represent the public interest.

The public outreach program is not designed to interest the public or focus on their issues, but sounds much like the "Community Meetings" held on the Consent Decree. These meetings provided nothing in the way of actual feedback and public discussion. Some questions were not answered fully or at all. The questions were then "processed" by MSD and, a MSD version of the public input was written, which was not shared with attendees, giving them no opportunity to even know there was a public record that needed to be corrected.

Sierra Club, using a variety of techniques, obtained quite a different view of MSD and what needed to be done than what MSD obtained.

**EXHIBIT 3. – MONITORING AND MODELING WORK PLAN IN SUPPORT OF THE LTCP UPDATE**.

No rationale or justification is offered for this monitoring and modeling effort.  There has already been extensive monitoring of the main stem of the Ohio and the main Ohio tributaries in Hamilton County.  Sierra Club would like to see a review of existing data sets and reports both from MSD, as well as ORSANCO and OEPA.  What monitoring and modeling efforts supported the 1996 LTCP or the 1991 SWIM Plan?  The obvious purpose of this new effort is to support a lowering of Water Quality Standards and a reduction in the level of remediation efforts required to meet the new, lowered WQS.

**EXHIBIT 4. – LONG TERM CONTROL PLAN UPDATE WORK PLAN**.

It is obvious that the entire focus of MSD's effort will be to petition OEPA and EPA to lower the present Water Quality Standards between now and 2006 and to propose a set of remedial alternatives in the LTCPU in 2006 that will be scaled back from what is currently required or was required in the 1996 LTCP.  It further appears that much of this (perhaps all of it) is just a rehash of what was already done in 1996.  MSD will either use the additional time to attempt to set up its "non-affordability claim" under EPA's CSO guidance (using unreliable numbers) or will attempt to lower water quality standards even without the non-affordability criteria being met.  It is likely that the actual work that must be done under the Long-Term Control Plan Update that comes out in 2006 will be far less than $1.5 billion, because MSD with the assistance of the State and the EPA will have

succeed in degrading the water quality standards applicable to the rivers and streams in Hamilton County.

The Decree shows no vision and no recognition that "primary contact recreation" in the metropolitan area is already taking place and will not stop just because the WQS are degraded. Jet skiers can be seen at the public landing in Cincinnati and around Newport and Covington. Inner-city kids swim in the Mill Creek and won't stop just because the WQS are degraded. The whole thrust of the Decree (not hidden in any way) is for MSD to keep getting away with business as usual.

The EPA CSO Policy states that: "a state may remove a designated use from its water quality standards only if the designated use is not an existing use. An existing use is a use actually attained in the water body on or after November 28, 1975. Furthermore, a State may not remove a designated use that will be attained by implementing technology-based effluent limits…and by implementing cost-effective and reasonable best management practices for nonpoint source controls…" Prior to removing a designated use, "States must conduct and submit to EPA a use attainability analysis…" 59 Fed. Reg. 18695 (April, 19, 1994).

Notwithstanding this clear policy against lowering the standards, MSD states in the Decree that it is not agreeing to implement a Long-Term Control Plan that is meant to meet the current Water Quality Standards, only lowered ones.

The MSD should have developed a construction and financing schedule for implementation of CSO controls, but it is not included in the Decree.


## EXHIBIT 5. PUBLIC NOTIFICATION PROGRAM

In this program, people will have to call a number to find out if there is likely to be CSO overflows that day and the message on the other days will basically tell them that they should be avoiding urban streams at all other times, too. It is unlikely anyone would call a hot line to get this information. "Stream or River Closing" notices should be issued, just like beach closures. Information on actual overflows, where they are occurring, how far downstream the water quality is affected, and what areas should be avoided, levels of fecal coliform measured should be regularly reported, as well. MSD should also have the information easily downloadable on the web. MSD should pay to have the information put in the newspapers and on the local news where people will hear this information. Also, this should include SSOs as well as CSOs, since there is as much or more of a health hazard from SSOs.


## EXHIBIT 6. – WATER IN BASEMENT PREVENTION PROGRAM.

This is the "prevention" part of the program, regarding "technological" fixes. First, the euphemism "water-in-basement" needs to be eliminated. Secondly, the MSD needs to

publish its shaded, GIS maps of the known sewage-in-basement areas. They should be published in the bills, the website, and in the newspapers. The MSD says that it is going to initiate contact with property owners from its database who have had multiple sewer backups of wastewater as a result of inadequate capacity and that property owners wishing to participate can call MSD to review their eligibility.

There are serious flaws in this procedure. First, MSD's database is deficient in that there are properties with multiple backup complaints where MSD claims that there was no lack of main line capacity. This is because it takes too long for MSD to investigate the complaint and, by the time MSD gets to the site, the main line sewer levels have receded. Secondly, many, many, many homeowners have either not complained or stopped complaining because of widespread public perception (and reality) that MSD would do nothing to help.

Putting MSD in charge of eligibility determinations without any oversight or supervision is not in the public interest. Also, because there is no budget for this operation, MSD would likely make very stringent eligibility determinations and keep the number of prevention fixes at a very small number per year. MSD claimed to the Commissioners (reported in the news) that the prevention program alone would cost $37 million. In its 2001 BBS Study, MSD claimed that it was necessary to condemn and purchase over 250 sewage-in-basement homes at a cost of $250 million. This vast discrepancy in the MSD estimates of the cost of what is needed to deal with sewage-in-basement problems engenders a strong lack of confidence in its fiscal candor. In reality the cost of the SIB program are probably far less than 2.5% of the entire cost of the decree. The Court and the Commissioners and the public interest require:

- An annual budget for the prevention program;
- A firm commitment as to the number of homes to be retrofitted per quarter;
- An administrative program adequately staffed to handle the calls, intake, program administration, certification of contractors program, payments to contractors, monitoring of success or failure, need for follow-up or return visits, installation of additional equipment or alternative technologies, monitoring program and reporting to Court, Commissioners and the public.

**EXHIBIT 7, WATER IN BASEMENT CUSTOMER SERVICE PROGRAM PLAN.**

This is the plan for the emergency response and cleanup portion of the sewage-in-basement program. Again, the euphemism needs to go. The staff resources devoted to this program seems too low, based on the historical number of SIB complaints that come in during precipitation events. In the first 8-hours of a rainfall event that would cause backups, MSD would only be able to visit 80 homes in all of Hamilton County to conduct an assessment of eligibility for emergency services. Where there has been a backup due to inadequate capacity within the previous two years or where there is a main line

blockage, MSD will dispense with the eligibility assessment and will "engage a contractor to proceed with cleanup…"

If there are any problems with the emergency cleanup, questions or complaints will be fielded by the MSD WIB Program Complaint Ombudsman, under the direct supervision of the MSD Director.  The Ombudsman should report to a Special Master, appointed by the Court.

Again, there is no annual budget for this, no estimate of the number of homes that will be eligible for this service, no list of certified contractors or a certification process, no administration program, and no reporting program to the Court, the Commissioners and the public.


**EXHIBIT 8 – WATER IN BASEMENT CLAIMS PROCESS PLAN**.

This has been touted in the press in recent days as a damage reimbursement program. The first problem is that this claims program does not appear to be retroactive, even for those properties where MSD admits that it is at fault.  Secondly, there appears to be a "jurisdictional" requirement that the resident notify MSD within 24-hours of the time that the occupant discovers "WIB."  This does not make any sense, in that many families may be out of town on vacation, etc., when their homes are flooded with sewage, and would not know about the problem until they return, which may be more than 24-hours after the backup.

The claims process has an assessment of eligibility, which seems to be exclusively with MSD with no appeal or discussion with the Ombudsman.  There will be a presumption of MSD responsibility for those locations that have experienced a basement backup due to inadequate capacity within the previous two years and where MSD has not resolved the capacity issue and where the backups are due to blockages in the main line and MSD "had notice and opportunity to clear, but did not clear."

There are a number of problems, here. First, with regard to the previous basement backup experience, MSD will likely rely on its existing database of complainants and the "cause" determination that is set forth in the database.  Those cause determinations are likely wrong in most cases, due to the time lapse of MSD inspection after a complaint is called in. Even in neighborhoods where MSD acknowledges that chronic sewage in basement problems exist, MSD has determined that the cause of backups is "unknown", if, when its inspectors got to the site, the level of sewage in the main line had receded.  So, the presumption approach that the Sierra Club suggested in its earlier comments would be better. MSD would provide GIS maps of known sewage in basement areas.  If a backup occurred in any of those areas, then the presumption would be that MSD is responsible. MSD could rebut the presumption by showing that the problem was caused by overland flooding or a lateral backup, etc.  The homeowner, however, could submit evidence to counter that rebuttal. MSD should not have the final word on eligibility. There should be

some administrative due process other than a final decision by the Office of the Solicitor of the City of Cincinnati.

Finally, the problem is not the water component of the discharge – it is the sewage.  The use of a euphemism to citizens is misleading and even dangerous because it will cause people to mis-respond to the hazard.


**EXHIBIT 9, SUPPLEMENTAL ENVIRONMENTAL PROJECTS PLAN -**

See discussion, above.


Comments submitted on behalf of Sierra Club and Marilyn Wall by


Marilyn Wall
Ohio Chapter Sierra Club
Conservation Chair
515 Wyoming Avenue
Cincinnati, Ohio 45215
513-761-6140 ext 10