Also, there is no SEP for Little Miami or Great Miami or Ohio River. MSD's failure to agree with EPA on an acceptable SEP from the 1985 CD is another example of why a Special Master is required in this case.

**XV, Reporting Requirements, p. 50:**

The reporting requirements are quarterly and, according to this provision, should contain a good amount of information. However, the problem with the amount of information being developed is that the EPA (and certainly the OEPA) does not have the staff (dedicated to this project) to promptly analyze the information. Furthermore, to the extent that EPA has hired outside contractors to evaluate MSD compliance, it has used that situation to shield from disclosure its consultants' evaluations of MSD non-compliance with the CWA. Sierra Club has repeatedly asked EPA to provide it with its evaluation of MSDs violations of the law in the CSO and WWTP areas. EPA has repeatedly refused to provide Sierra Club with this information.

This is also why the public needs independent, citizen oversight and a Special Master involved. EPA has no enforcement presence here in Cincinnati and very little credibility. The Consent Decree appears mostly to be an elaborate mechanism for planning and to assist MSD in putting off implementation and avoiding consequences. It contains too many loopholes.

**XVII.E.1, Stipulated Penalties for Bypasses, CSOs, Unpermitted Overflows, and SSDs:**

The Consent Decree makes Defendants liable for civil penalties of $1000/day for each day of bypass, CSO or unpermitted overflow that was caused by Defendants' failure to comply with their O&M program (SSO Decree, Ex. 7) or other specified O&M obligations. This is, of course, virtually unenforceable. Proving that a particular bypass, CSO, or unpermitted overflow is due to a specific violation of an O&M plan is almost impossible. But, of course, this appears to be what EPA and the MSD want from the Consent Decree – virtual immunity from penalties for the next 20 years.

Also, this provision may actually limit the enforceability of MSD's NPDES permits for its WWTPs bypassing. MSD could argue that all future plant bypassing is covered by this provision. Unless a by-pass is caused by an O&M violation, MSD could argue, it would not be enforceable. The fact that the EPA has refused to reveal the extent of the bypassing problems at the WWTPs makes this particularly problematical for public oversight.

Para. E.2. provides that Defendants shall be subjected to a stipulated penalty of $3000/day for each CSO or unpermitted overflows that occurs "after the later of 1) the date for completion of all remedial measures specified in the Long Term Control Plan Update, the Addendum to the Long Term Control Plan Update, or the Revised Long Term Control Plan Update, as applicable, or 2) any schedule of completion date

extensions or revisions that are made pursuant to Para. VII.C of this Consent Decree." That is at least 2022 or later. Plus, the Consent Decree goes on to state that EPA: "will not demand payment for stipulated penalties…until after the two-year evaluation period. Further, Defendants are not liable for stipulated penalties during a six-month shake down period following the date for completion of all remedial measures. **Thus, EPA must wait until 2022 or later to collect any stipulated penalties for illegal discharges that are capacity related.** This is a very weak incentive for compliance. Stringent benchmarks, interim deadlines and penalties for capacity-related overflows are the only way to protect the public interest during the remediation of a sewer system that is so grossly out of compliance with the law.

Para. E.3 – SSD's Following Completion of Capacity Assurance Program Plan – this provision deals with stipulated penalties for sanitary sewer discharges (SSDs) (from SSOs). Stipulated penalties for SSDs in a particular "sub-basin" kick in only after the date for completion of all remedial measures for that particular sub-basin, plus any extensions or revisions granted by EPA. Also, EPA will not demand payment until after the two-year evaluation period. Defendants also have a 6-month shake down period following the completion of all remedial measures for each particular sub-basin.

Of course, MSD can simply set 2022 as the end date for all SSO remediation work in all sub-basins and then, there would be virtually no stipulated penalty liability whatsoever. The structure of the Consent Decree leaves too much discretion in the hands of the EPA and OEPA. The public needs interim benchmarks of success for the entire system and in each watershed and sub-basin. Also, the question arises as to why the same kind of sub-basin approach to stipulated penalties was not applied to CSOs, in the Consent Decree.

**XVII.E.3, Stipulated Penalties for Violations of Effluent Limitations.**

This provision sets fairly low stipulated penalties for effluent limit violations ($1000 - $8000). The problem again is with the enforcement of these provisions. **There is no one designated to audit compliance and payment.** OEPA appears not to have the staff and resources to do this. OEPA claims that its computer database is corrupted and that it cannot be used to determine which NPDES permittees are in violation and which are not. OEPA claims that its database cannot determine which violations are real and which are artifacts of the problems in its software. This amount of penalty is not an incentive to comply; it appears to be more of a protection mechanism.

**XVIII.E, Force Majeure**

This provision includes the $1.5 billion cap on capital expenditures to remedy violation of the Clean Water Act. Changed financial circumstances or unanticipated or increased costs or expenses don't excuse violations or grant extensions, except if the "estimated" total cost exceeds $1.5 billion. The problem, of course, is that MSD will estimate (already

17

has estimated in BBS Study) that costs will exceed $1.5 billion. On closer examination, the BBS Study was shown to contain fluff, fat, double counting and projects that MSD has absolutely no intention of building. This is another clear reason why a Special Master is necessary to oversee the engineering and fiscal ends of this project.

### XXI. Dispute Resolution

Sierra Club and the public should have specific and defined monitoring and intervention rights for both Consent Decree enforcement and Dispute Resolution. The Dispute Resolution process will be overused because of the loopholes, indefinite time extensions and the over-reliance on such vague terms as "expeditiously as practicable." In any case, the Special Master appointed by the Court should be in charge of the Dispute Resolution process. The costs of Dispute Resolution should be born by the MSD.

### XXII. Civil Penalty

The civil penalty in this case is $1.2 million. The purpose of the $100,000 to ORSANCO is unclear. The EPA should reveal the legal basis for diverting $100,000 in civil penalties to ORSANCO, an interstate agency, because interested parties cannot be recipients of civil penalties. ORSANCO should also reveal the purpose to which the money would be put. Both the EPA and the Defendants have admitted in discovery in this case that, if the maximum civil penalties available under the CWA were be applied to the Defendants' violations, the civil penalty would be in excess of $25 million. That means that MSD has a lot of violations over a very long period of time. EPA has a Municipal Penalty Policy and a policy on Supplemental Environmental Projects. The Agency should explain to the Court and the public and the Court exactly how it determined the amount of the civil penalty and the SEPs in this case. See first Affidavit of Dr. Michael Kavanaugh, previously submitted in this case, Exhibit M.

### XXVI.B. Effect of Consent Decree and Non-Waiver Provisions:

This provision is problematical. It provides that the Consent Decree resolves all civil claims of the US and the State for injunctive relief and civil penalties for the CWA violations alleged in the Joint Amended Complaint filed through the date of lodging of the Decree (Dec. 4. 2003). The problem is that the Joint Amended Complaint is totally vague and cannot form the basis to determine what MSDs violations are. The Joint Amended Complaint does not specify the MSD violations that are being released and, therefore has no <u>res judicata, collateral estoppel</u> or diligent prosecution effect.

### XXX. Review of Submittals:

A Special Master can make sure the multiple party reviews take place in a timely manner. MSD submittals are reviewed by EPA, OEPA and ORSANCO, which in and of itself is very unwieldy. The agencies agree to use best efforts to review submittals expeditiously.

**If they cannot complete review within 60-days of receipt, then the Consent Decree deadlines are <u>automatically extended</u> for the number of days after 60-days that it takes the agencies to approve.** This is particularly problematical, given the relatively small level of resources that the agencies have devoted to the MSD case to date. There is a special review procedure for ORSANCO; if ORSANCO disagrees with EPA or OEPA, it can trigger the dispute resolution process and attempt to **delay compliance even further**. A Special Master can make sure the multiple party reviews take place in a timely manner, as these agencies have historically missed deadlines and now have even fewer resources.

**ADDITIONAL ISSUES:**

**Moratorium on new connections** – new connections to already overloaded sewers should not be permitted. The "credit program" that is provided for in the IPCD allows for new connections first and then verification later. It is not clear that the verification program is valid and, certainly has not been subject to any peer review. Mostly, this is just "eye-wash" to cover additional connections that will just make the overflow problems worse. There should be oversight of any sewer moratorium by a Special Master.

**Wastewater treatment plant bypasses:** Ohio EPA knows that the Sycamore and Polk Run wastewater treatment plants are not designed to handle their wet weather flows. These plants are sanitary only (not combined). Polk Run NPDES permit has a design flow specified of 8 MGD, but in actuality its design flow is only 6 MGD. Bypassing is illegal except in an Act of God event (and EPA is not enforcing this). Ohio EPA is allowing new connections to occur to an overloaded system.

The Sycamore WWTP upgrades that are being proposed do not have loading limits for the sewage that is bypassed by secondary treatment and, above a certain flow amount, no limits at all. The high rate treatment facility that Ohio EPA is proposing to permit is illegal under the Clean Water Act. Almost all of Mill Creek and significant parts of the Little Miami are not attaining State Water Quality Standards.

**Illegal connections to the MS4s system:** In reviewing MSD employee Eric Saylor's deposition in this case, he states that the MSD's SSO's usually overflow to the storm water system (municipal separate storm water system or MS4) of other municipalities, townships, etc., within Hamilton County. These overflows are "illicit discharges" under the Phase II storm water regulations, which all small systems now have to comply with. These municipalities submitted their storm water Phase II permit applications to Ohio EPA in March 2003 and, one of the six minimum controls that have to be addressed is removing illicit discharges to storm water systems. Therefore, MSD now causes and will in the future be causing all these municipalities to be in violation of their storm water permits.

**Unresponsive FOIA appeal to USEPA:** Sierra Club member, Patricia Brechlin, submitted a FOIA appeal to USEPA in December 2002, regarding the 33 pages of

documents that USEPA is withholding. Some of those documents have Don Schregardus' name associated with them. The fact that USEPA withheld these documents appears to be purely political since many are official letters that were sent from the agencies. USEPA has still not responded to Sierra Club appeal other than to say that it was received in the Office of General Counsel in January 2003.

**Public Accounting of MSD Violations:**
Sierra Club has requested evaluative documents prepared by EPA and OEPA as to the state of compliance by MSD with its NPDES permits regarding CSOs and WWTPs. Sierra Club wanted to know in what respects the regulatory agencies had found the MSD in non-compliance with the Clean Water Act. These documents and opinions were withheld from Sierra Club under a claim of investigative privilege, inter alia. The citizens pay for EPA and OEPA to enforce the federal and state clean water laws against polluters. The citizens have a right to know in what respects their government agencies have found a polluter to be in violation of the Clean Water Act.

This information is important in enabling the Sierra Club to properly evaluate the proposed Consent Decree and to inform the Court as to the reasonableness of the Decree. Examples of the information that was withheld by EPA include: EPA staff/contractor assessment of MSD's compliance (since January 1, 1997) with the federal CSO Policy and CSO Permit; MSD's violations of NPDES permits for its major WWTPs; violations by MSD of the by-pass provisions of its NPDES permits for its major WWTPs. EPA should also disclose all of the MSD discharges through unpermitted CSOs.

**EXHIBIT 1. – CIP**

Exhibit 1 specifies only 23 CSO capital improvement projects and the high-rate treatment unit for the Sycamore plant. The CSO construction completion dates run from 2004 to 2010. The construction end date for the Sycamore HRTU is 2006. There are 256 CSOs with permits. 216 of the 256 CSOs, each have CIP numbers associated with them and even have remediation cost estimates. Of the 233 CSOs that are not scheduled for construction with set end dates, 56 of them (for which MSD has supplied overflow data) overflowed 4705 times in 2001 and 2002 combined. The CD must contain deadlines for all MSD CIP projects.

**EXHIBIT 2. – PUBLIC PARTICIPATION PLAN.**

This plan has two components. Neither is adequate or truly 'public'. The role, scope of work and membership in the Steering Committee is extremely limited. (MSD did agree to ask additional organizations to join when questioned by the County Commission.) It is problematic that this committee is hand-picked by MSD to oversee MSD. It represents government, industry and some academics, rather than members of the broader public. The scope of work is limited to "high-level" oversight and "big picture" issues. MSD prefers to use its own consultants for the "detail" work. Ironically, when picking up any

MSD issue, it is the details that matter, whether overpriced isolation grinder pumps, costs estimates for the Cranbrook drive sewer or the Wesselman Road sewer extension or the cost to purchase homes of Sewage-in-Basement victims or the conclusions of the Brown and Caldwell audit. Additionally, MSD will select the information to be presented to the Committee. What MSD needs here is a truly independent citizen oversight board with the engineering and accounting auditing capacity (i.e., funding) to examine the details of MSD's progress and to represent the public interest.

The public outreach program is not designed to interest the public or focus on their issues, but sounds much like the "Community Meetings" held on the Consent Decree. These meetings provided nothing in the way of actual feedback and public discussion. Some questions were not answered fully or at all. The questions were then "processed" by MSD and, a MSD version of the public input was written, which was not shared with attendees, giving them no opportunity to even know there was a public record that needed to be corrected.

Sierra Club, using a variety of techniques, obtained quite a different view of MSD and what needed to be done than what MSD obtained.


**EXHIBIT 3. – MONITORING AND MODELING WORK PLAN IN SUPPORT OF THE LTCP UPDATE.**

No rationale or justification is offered for this monitoring and modeling effort. There has already been extensive monitoring of the main stem of the Ohio and the main Ohio tributaries in Hamilton County. Sierra Club would like to see a review of existing data sets and reports both from MSD, as well as ORSANCO and OEPA. What monitoring and modeling efforts supported the 1996 LTCP or the 1991 SWIM Plan? The obvious purpose of this new effort is to support a lowering of Water Quality Standards and a reduction in the level of remediation efforts required to meet the new, lowered WQS.


**EXHIBIT 4. – LONG TERM CONTROL PLAN UPDATE WORK PLAN.**

It is obvious that the entire focus of MSD's effort will be to petition OEPA and EPA to lower the present Water Quality Standards between now and 2006 and to propose a set of remedial alternatives in the LTCPU in 2006 that will be <u>scaled back</u> from what is currently required or was required in the 1996 LTCP. It further appears that much of this (perhaps all of it) is just a rehash of what was already done in 1996. MSD will either use the additional time to attempt to set up its "non-affordability claim" under EPA's CSO guidance (using unreliable numbers) or will attempt to lower water quality standards even without the non-affordability criteria being met. It is likely that the actual work that must be done under the Long-Term Control Plan Update that comes out in 2006 will be <u>far less</u> than $1.5 billion, because MSD with the assistance of the State and the EPA will have

succeed in degrading the water quality standards applicable to the rivers and streams in Hamilton County.

The Decree shows no vision and no recognition that "primary contact recreation" in the metropolitan area is already taking place and will not stop just because the WQS are degraded. Jet skiers can be seen at the public landing in Cincinnati and around Newport and Covington. Inner-city kids swim in the Mill Creek and won't stop just because the WQS are degraded. The whole thrust of the Decree (not hidden in any way) is for MSD to keep getting away with business as usual.

The EPA CSO Policy states that: "a state may remove a designated use from its water quality standards only if the designated use is not an existing use. An existing use is a use actually attained in the water body on or after November 28, 1975. Furthermore, a State may not remove a designated use that will be attained by implementing technology-based effluent limits…and by implementing cost-effective and reasonable best management practices for nonpoint source controls…" Prior to removing a designated use, "States must conduct and submit to EPA a use attainability analysis…" 59 Fed. Reg. 18695 (April, 19, 1994).

Notwithstanding this clear policy against lowering the standards, MSD states in the Decree that it is not agreeing to implement a Long-Term Control Plan that is meant to meet the current Water Quality Standards, only lowered ones.

The MSD should have developed a construction and financing schedule for implementation of CSO controls, but it is not included in the Decree.

**EXHIBIT 5. PUBLIC NOTIFICATION PROGRAM**

In this program, people will have to call a number to find out if there is likely to be CSO overflows that day and the message on the other days will basically tell them that they should be avoiding urban streams at all other times, too. It is unlikely anyone would call a hot line to get this information. "Stream or River Closing" notices should be issued, just like beach closures. Information on actual overflows, where they are occurring, how far downstream the water quality is affected, and what areas should be avoided, levels of fecal coliform measured should be regularly reported, as well. MSD should also have the information easily downloadable on the web. MSD should pay to have the information put in the newspapers and on the local news where people will hear this information. Also, this should include SSOs as well as CSOs, since there is as much or more of a health hazard from SSOs.

**EXHIBIT 6. – WATER IN BASEMENT PREVENTION PROGRAM.**

This is the "prevention" part of the program, regarding "technological" fixes. First, the euphemism "water-in-basement" needs to be eliminated. Secondly, the MSD needs to

publish its shaded, GIS maps of the known sewage-in-basement areas. They should be published in the bills, the website, and in the newspapers. The MSD says that it is going to initiate contact with property owners from its database who have had multiple sewer backups of wastewater as a result of inadequate capacity and that property owners wishing to participate can call MSD to review their eligibility.

There are serious flaws in this procedure. First, MSD's database is deficient in that there are properties with multiple backup complaints where MSD claims that there was no lack of main line capacity. This is because it takes too long for MSD to investigate the complaint and, by the time MSD gets to the site, the main line sewer levels have receded. Secondly, many, many homeowners have either not complained or stopped complaining because of widespread public perception (and reality) that MSD would do nothing to help.

Putting MSD in charge of eligibility determinations without any oversight or supervision is not in the public interest. Also, because there is no budget for this operation, MSD would likely make very stringent eligibility determinations and keep the number of prevention fixes at a very small number per year. MSD claimed to the Commissioners (reported in the news) that the prevention program alone would cost $37 million. In its 2001 BBS Study, MSD claimed that it was necessary to condemn and purchase over 250 sewage-in-basement homes at a cost of $250 million. This vast discrepancy in the MSD estimates of the cost of what is needed to deal with sewage-in-basement problems engenders a strong lack of confidence in its fiscal candor. In reality the cost of the SIB program are probably far less than 2.5% of the entire cost of the decree. The Court and the Commissioners and the public interest require:

- An annual budget for the prevention program;
- A firm commitment as to the number of homes to be retrofitted per quarter;
- An administrative program adequately staffed to handle the calls, intake, program administration, certification of contractors program, payments to contractors, monitoring of success or failure, need for follow-up or return visits, installation of additional equipment or alternative technologies, monitoring program and reporting to Court, Commissioners and the public.

**EXHIBIT 7, WATER IN BASEMENT CUSTOMER SERVICE PROGRAM PLAN.**

This is the plan for the emergency response and cleanup portion of the sewage-in-basement program. Again, the euphemism needs to go. The staff resources devoted to this program seems too low, based on the historical number of SIB complaints that come in during precipitation events. In the first 8-hours of a rainfall event that would cause backups, MSD would only be able to visit 80 homes in all of Hamilton County to conduct an assessment of eligibility for emergency services. Where there has been a backup due to inadequate capacity within the previous two years or where there is a main line

blockage, MSD will dispense with the eligibility assessment and will "engage a contractor to proceed with cleanup..."

If there are any problems with the emergency cleanup, questions or complaints will be fielded by the MSD WIB Program Complaint Ombudsman, under the direct supervision of the MSD Director. The Ombudsman should report to a Special Master, appointed by the Court.

Again, there is no annual budget for this, no estimate of the number of homes that will be eligible for this service, no list of certified contractors or a certification process, no administration program, and no reporting program to the Court, the Commissioners and the public.

**EXHIBIT 8 – WATER IN BASEMENT CLAIMS PROCESS PLAN.**

This has been touted in the press in recent days as a damage reimbursement program. The first problem is that this claims program does not appear to be retroactive, even for those properties where MSD admits that it is at fault. Secondly, there appears to be a "jurisdictional" requirement that the resident notify MSD within 24-hours of the time that the occupant discovers "WIB." This does not make any sense, in that many families may be out of town on vacation, etc., when their homes are flooded with sewage, and would not know about the problem until they return, which may be more than 24-hours after the backup.

The claims process has an assessment of eligibility, which seems to be exclusively with MSD with no appeal or discussion with the Ombudsman. There will be a presumption of MSD responsibility for those locations that have experienced a basement backup due to inadequate capacity within the previous two years and where MSD has not resolved the capacity issue and where the backups are due to blockages in the main line and MSD "had notice and opportunity to clear, but did not clear."

There are a number of problems, here. First, with regard to the previous basement backup experience, MSD will likely rely on its existing database of complainants and the "cause" determination that is set forth in the database. Those cause determinations are likely wrong in most cases, due to the time lapse of MSD inspection after a complaint is called in. Even in neighborhoods where MSD acknowledges that chronic sewage in basement problems exist, MSD has determined that the cause of backups is "unknown", if, when its inspectors got to the site, the level of sewage in the main line had receded. So, the presumption approach that the Sierra Club suggested in its earlier comments would be better. MSD would provide GIS maps of known sewage in basement areas. If a backup occurred in any of those areas, then the presumption would be that MSD is responsible. MSD could rebut the presumption by showing that the problem was caused by overland flooding or a lateral backup, etc. The homeowner, however, could submit evidence to counter that rebuttal. MSD should not have the final word on eligibility. There should be

some administrative due process other than a final decision by the Office of the Solicitor of the City of Cincinnati.

Finally, the problem is not the water component of the discharge – it is the sewage. The use of a euphemism to citizens is misleading and even dangerous because it will cause people to mis-respond to the hazard.

**EXHIBIT 9, SUPPLEMENTAL ENVIRONMENTAL PROJECTS PLAN -**

See discussion, above.

Comments submitted on behalf of Sierra Club and Marilyn Wall by

*/s/ Marilyn Wall*

Marilyn Wall
Ohio Chapter Sierra Club
Conservation Chair
515 Wyoming Avenue
Cincinnati, Ohio 45215
513-761-6140 ext 10

25

| | |
|---|---|
| Exhibit A | Sierra Club narrative comments and prior comments on draft Consent Decree and Interim Partial Consent Decree |
| Exhibit B | Affidavits of Dr. Bruce Bell, previously submitted in this case |
| Exhibit C | Affidavit of Dr. Bruce Bell, previously submitted in this case |
| Exhibit D | Brown and Caldwell Report |
| Exhibit E | ACOE Report March 2003 |
| Exhibit F | MSD study showing a fully legal, secondary treatment plant can be built at the site of SSO |
| Exhibit G | Sierra Club CIP Tables for SSOs and CSOs |
| Exhibit H | MSD / B&B Report on water in basement buyouts |
| Exhibit I | USA Today August 20, 2002 |
| Exhibit J | Affidavit of Dr. Michael Kavanaugh |
| Exhibit K | Sierra Club Sewage-in-Basement video |
| Exhibit L | Sierra Club public Meeting |
| Exhibit M | Affidavit of Dr. Michael Kavanaugh |



November 18, 2003 (corrected)

## SIERRA CLUB'S COMMENTS ON THE PROPOSED MSD/EPA/OEPA CONSENT DECREE

**INTRODUCTION**

Under the proposed MSD Consent Decree, Hamilton County ratepayers will pay $1.5 billion *to consultants and contractors* over a 19-year-period to *study, plan*, provide some *temporary* fixes, while *committing to fixing a mere 15%* of the decades-old sewer overflows. If water quality standards aren't met, government officials and the MSD can *lower the standards* thereby redefining the violations out of existence. These are not the only problems with the proposed Consent Decree, but, if the recommendations proposed by the Sierra Club below are accepted, the Consent Decree can be fixed and, at the same time, the environment *and the economy* can be improved.

The purpose of the federal Clean Water Act is to restore and maintain the quality of our country's waters. That goal was to have been met in the mid-1980's. And, in place after place across the country, these goals have been achieved. Clean water has been shown to be directly tied to regional economic health, as well as environmental and public health.

1

Here in Hamilton County, however, our MSD has not only failed to achieve these goals but continues to have hundreds of violations of the Clean Water Act and has failed to plan to prevent future violations

Nowhere is this more obvious than the stories of thousands of Hamilton County residents who suffer from sewage backing up into their homes due to our inadequate, failing sewer system. They have lost property and lost property value. They have had their health threatened and their quality of life lowered. These sewage backups into homes are part of the same failing system that also allows raw sewage to spill into our streams.

We can do better. We can make better progress than what is outlined in the Interim Partial Consent Decree and the "Global" Consent Decree. We must do better because the Decrees seek to make legal that which is illegal under the Clean Water Act. More than that, these two Consent Decrees threaten the future economic, health and environmental well being of the entire region. There is a right way to do this that is both affordable and practical. Unfortunately, the MSD with the "assistance" of the EPA and the OEPA, has gotten it wrong.

**I.   MSD IS CURRENTLY VIOLATING THE LAW, HAS VIOLATED THE LAW FOR DECADES AND WILL CONTINUE TO DO SO FOR THE NEXT 19 YEARS, OR LONGER IF THESE DECREES ARE APPROVED. FURTHERMORE, NONE OF THE FLAWS IN THE INTERIM PARTIAL CONSENT DECREE HAVE BEEN CORRECTED.**

In the decades since the Clean Water Act was passed, MSD has continued to have hundreds of violations, has failed to eliminate illegal sanitary sewer overflows (illegal since 1972), including those going into people's homes, yards and nearby parks and

streams, failed to eliminate wastewater plant violations and illegal bypasses, failed to implement Orders of the Ohio Environmental Protection Agency issued in 1992 (to address many of these past failures), failed to implement the 1996 Long Term Control Plan, failed to plan for and construct additional capacity at treatment plants and in sewer lines (while at the same time adding more sewage to the system) and failed to protect property values and the regional infrastructure investment. MSD has engaged in protracted negotiations, commissioned many studies, but failed overall in implementing permanent, cost-effective solutions to correct ongoing violations. MSD has excluded the public, including the Sierra Club from negotiations – despite our willingness to defer legal action in favor of negotiations and despite our subsequent intervention in the government case against it.

There has been an enforcement structure at the EPA and the Ohio EPA (and Ohio Attorney General's Office) for thirty-years, but these agencies have failed to enforce the law and to protect the residents of Hamilton County from abuse. MSD has spent millions of dollars of the residents' money during this time period, but much of it was spent for sewer expansion into new areas of the County, instead of fixing what it knew was broken and in need of replacement. Millions have been spent on studies that have not been implemented.

None of the flaws in the Interim Partial Consent Decree have been addressed. Our comments on these flaws are attached at the end of this document.

II.     **THE CONSENT DECREES ARE MISSING DEADLINES, INTERIM DEADLINES, FINAL DEADLINES ARE TOO FAR INTO THE FUTURE,**

3

**THERE ARE TOO FEW ACTUAL CONSTRUCTION PROJECTS AND LOOPHOLES ALLOW EVEN FINAL DEADLINES OF 19 YEARS FROM NOW TO GO UNMET**

The deadlines in the Consent Decree are too distant and could be further extended through numerous loopholes. There are no interim benchmarks of success to judge the success of the program and the performance of MSD. This will make tracking and enforcement of the Decree difficult or impossible for the Commissioners, the City and the public. Both CSO compliance and SSO elimination are not slated for completion under the Decree until 2022 or 19 years.

MSD can get the job done in 10 years. That would save big money. Interest rates are at historic lows today and major interest savings will occur if the construction schedule is shortened. It is not necessary for householders to put up with sewage in basements or for Hamilton County residents to put up with polluted waterways an extra nine years at an even higher investment.

The Decrees will continue to allow violations of the Clean Water Act. The Decrees lack firm deadlines for remediation, interim deadlines, complete and accurate costing and dedicated funding. The "Global" the Decree is without an adequate program to address sewage in basement overflows, without public participation or ongoing oversight, and, in fact, it seeks to avoid compliance by an intentional plan to lower water quality standards, instead of cleaning up the water.

The Consent Decree only provides for actual construction on 15 of 100 active sanitary sewer overflows (SSOs) (or 15%). Under the Decree, the other 85 SSOs may not be eliminated for another 20 years. These 85 illegal SSOs dumped raw sewage into Hamilton County rivers and streams over 1000 times in 2002, alone. The Consent

4

Decree proposes construction for 23 Combined Sewer Overflows (CSOs) out of a total of 256 (or 9%). 233 CSOs have no correction deadline. 56 of these CSOs, which are not required to be corrected until 2022, have overflowed 4,705 times in 2001 and 2002, alone. The residents of Hamilton County should not have to wait 19 or more years for the clean water that they should have had years ago

Of the SSOs that are not slated for actual construction, 35 of them were identified as illegal by MSD as far back as 1993, engineering solutions were developed (including pricing the projects), and they were previously scheduled for elimination. Of the 256 CSOs, MSD has previously prepared Capital Improvement Projects and cost estimates for 216 of them. Again and again, MSD is spending money on consultants and studies, but not on construction and compliance with the law.

The SWIM study, done in the early 1990's, gave MSD a "D" report card grade for its performance and recommended nearly $2 billion in projects to repair the sewer infrastructure and to provide more capacity. That study was never implemented. In 1996, as required by its federal clean water permit, MSD prepared yet another plan, the Long Term Control Plan. That plan called for $1.5 billion in sewer improvements and was not implemented. As part of the LTCP, remedial measures were developed for at least 214 of the 256 CSOs. Now, only 11% of those previously engineered projects for actual construction are in the Consent Decree. We have seen no reason why MSD cannot commit to deadlines to correct the SSOs and CSOs, which have already been engineered and costed out.

5