# EXHIBIT 1-ATTACHMENT A

## SIERRA CLUB COMMENTS ON CONSENT DECREES, ATT. A: NOVEMBER 18, 2003; MARCH 27, 2003; NOVEMBER 2003, REVISED 11/17/03; JULY 22, 2003; UNDATED COMMENTS RE SYCAMORE WWTP PERMIT RENEWAL



SIERRA
CLUB
FOUNDED 1892

**November 18, 2003** (corrected)

# SIERRA CLUB'S COMMENTS ON THE PROPOSED MSD/EPA/OEPA CONSENT DECREE

## INTRODUCTION

Under the proposed MSD Consent Decree, Hamilton County ratepayers will pay $1.5 billion *to consultants and contractors* over a 19-year-period to *study, plan,* provide some *temporary* fixes, while *committing to fixing a mere 15%* of the decades-old sewer overflows. If water quality standards aren't met, government officials and the MSD can *lower the standards* thereby redefining the violations out of existence. These are not the only problems with the proposed Consent Decree, but, if the recommendations proposed by the Sierra Club below are accepted, the Consent Decree can be fixed and, at the same time, the environment *and the economy* can be improved.

The purpose of the federal Clean Water Act is to restore and maintain the quality of our country's waters. That goal was to have been met in the mid-1980's. And, in place after place across the country, these goals have been achieved. Clean water has been shown to be directly tied to regional economic health, as well as environmental and public health.

1

Here in Hamilton County, however, our MSD has not only failed to achieve these

goals but continues to have hundreds of violations of the Clean Water Act and has failed

to plan to prevent future violations

Nowhere is this more obvious than the stories of thousands of Hamilton County

residents who suffer from sewage backing up into their homes due to our inadequate,

failing sewer system. They have lost property and lost property value. They have had

their health threatened and their quality of life lowered. These sewage backups into

homes are part of the same failing system that also allows raw sewage to spill into our

streams.

We can do better. We can make better progress than what is outlined in the

Interim Partial Consent Decree and the "Global" Consent Decree. We must do better

because the Decrees seek to make legal that which is illegal under the Clean Water Act.

More than that, these two Consent Decrees threaten the future economic, health and

environmental well being of the entire region. There is a right way to do this that is both

affordable and practical. Unfortunately, the MSD with the "assistance" of the EPA and

the OEPA, has gotten it wrong.

## I.    MSD IS CURRENTLY VIOLATING THE LAW, HAS VIOLATED THE LAW FOR DECADES AND WILL CONTINUE TO DO SO FOR THE NEXT 19 YEARS, OR LONGER IF THESE DECREES ARE APPROVED. FURTHERMORE, NONE OF THE FLAWS IN THE INTERIM PARTIAL CONSENT DECREE HAVE BEEN CORRECTED.

In the decades since the Clean Water Act was passed, MSD has continued to have

hundreds of violations, has failed to eliminate illegal sanitary sewer overflows (illegal

since 1972), including those going into people's homes, yards and nearby parks and

streams, failed to eliminate wastewater plant violations and illegal bypasses, failed to implement Orders of the Ohio Environmental Protection Agency issued in 1992 (to address many of these past failures), failed to implement the 1996 Long Term Control Plan, failed to plan for and construct additional capacity at treatment plants and in sewer lines (while at the same time adding more sewage to the system) and failed to protect property values and the regional infrastructure investment. MSD has engaged in protracted negotiations, commissioned many studies, but failed overall in implementing permanent, cost-effective solutions to correct ongoing violations. MSD has excluded the public, including the Sierra Club from negotiations – despite our willingness to defer legal action in favor of negotiations and despite our subsequent intervention in the government case against it.

There has been an enforcement structure at the EPA and the Ohio EPA (and Ohio Attorney General's Office) for thirty-years, but these agencies have failed to enforce the law and to protect the residents of Hamilton County from abuse. MSD has spent millions of dollars of the residents' money during this time period, but much of it was spent for sewer expansion into new areas of the County, instead of fixing what it knew was broken and in need of replacement. Millions have been spent on studies that have not been implemented.

None of the flaws in the Interim Partial Consent Decree have been addressed. Our comments on these flaws are attached at the end of this document.

## II.    THE CONSENT DECREES ARE MISSING DEADLINES, INTERIM DEADLINES, FINAL DEADLINES ARE TOO FAR INTO THE FUTURE,

**THERE ARE TOO FEW ACTUAL CONSTRUCTION PROJECTS AND
LOOPHOLES ALLOW EVEN FINAL DEADLINES OF 19 YEARS FROM NOW
TO GO UNMET**

The deadlines in the Consent Decree are too distant and could be further extended through numerous loopholes. There are no interim benchmarks of success to judge the success of the program and the performance of MSD. This will make tracking and enforcement of the Decree difficult or impossible for the Commissioners, the City and the public. Both CSO compliance and SSO elimination are not slated for completion under the Decree until 2022 or 19 years.

MSD can get the job done in 10 years. That would save big money. Interest rates are at historic lows today and major interest savings will occur if the construction schedule is shortened. It is not necessary for householders to put up with sewage in basements or for Hamilton County residents to put up with polluted waterways an extra nine years at an even higher investment.

The Decrees will continue to allow violations of the Clean Water Act. The Decrees lack firm deadlines for remediation, interim deadlines, complete and accurate costing and dedicated funding. The "Global" the Decree is without an adequate program to address sewage in basement overflows, without public participation or ongoing oversight, and, in fact, it seeks to avoid compliance by an intentional plan to lower water quality standards, instead of cleaning up the water.

The Consent Decree only provides for actual construction on 15 of 100 active sanitary sewer overflows (SSOs) (or 15%). Under the Decree, the other 85 SSOs may not be eliminated for another 20 years. These 85 illegal SSOs dumped raw sewage into Hamilton County rivers and streams over 1000 times in 2002, alone. The Consent

4

Decree proposes construction for 23 Combined Sewer Overflows (CSOs) out of a total of 256 (or 9%). 233 CSOs have no correction deadline. 56 of these CSOs, which are not required to be corrected until 2022, have overflowed 4,705 times in 2001 and 2002, alone. The residents of Hamilton County should not have to wait 19 or more years for the clean water that they should have had years ago

Of the SSOs that are not slated for actual construction, 35 of them were identified as illegal by MSD as far back as 1993, engineering solutions were developed (including pricing the projects), and they were previously scheduled for elimination. Of the 256 CSOs, MSD has previously prepared Capital Improvement Projects and cost estimates for 216 of them. Again and again, MSD is spending money on consultants and studies, but not on construction and compliance with the law.

The SWIM study, done in the early 1990's, gave MSD a "D" report card grade for its performance and recommended nearly $2 billion in projects to repair the sewer infrastructure and to provide more capacity. That study was never implemented. In 1996, as required by its federal clean water permit, MSD prepared yet another plan, the Long Term Control Plan. That plan called for $1.5 billion in sewer improvements and was not implemented. As part of the LTCP, remedial measures were developed for at least 214 of the 256 CSOs. Now, only 11% of those previously engineered projects for actual construction are in the Consent Decree. We have seen no reason why MSD cannot commit to deadlines to correct the SSOs and CSOs, which have already been engineered and costed out.

The Consent Decree calls for completing yet another Long Term Control Plan Update by 2006.    Again, more money spent on studies, rather than correcting sewer overflows.

Sierra Club seeks to have deadlines in the Consent Decree for all CSO remediation and SSO elimination, as well as deadlines for treatment plant upgrades.[1] Nineteen years is too long. There need to be interim deadlines, priorities for projects that will protect public health and the environment, including sewage in basement overflows. If deadlines are not met, there must be accountability to the court and the public. The oversight and compliance enforcement by the EPA/OEPA has failed to date and will fail again without tight interim standards and benchmarks and careful oversight and supervision by Special Masters appointed by the court to insure both financial and engineering performance and compliance.

### III.    THE GLOBAL CONSENT DECREE CONSTITUTES AN ATTEMPT BY MSD TO LOWER WATER QUALITY STANDARDS IN THE OHIO RIVER AND ITS HAMILTON COUNTY TRIBUTARIES.

The Consent Decree states that MSD intends to petition EPA/OEPA to *lower* the Water Quality Standards for the rivers and streams in Hamilton County. Although the purported purpose of the Consent Decree is to clean up the Hamilton County rivers and streams and to eventually *meet* the Clean Water Act's goals of swimmable and fishable water, it is the stated intent of the MSD to seek *lower* Water Quality Standards.

If this occurs, it will continue to make boating, swimming, jet skiing, water skiing, canoeing, fishing, drinking water and kayaking as unsafe in the future as it is

---

[1] The Baton Rouge Consent Decree requires CIP milestones, such as 1/3 or 2/3 complete with all remedial projects by a date certain.

6

today. This cannot be what Hamilton County residents envision a $1.5 billion Consent Decree to accomplish.

Presently, the State of Ohio's Water Quality Standards for the Ohio River and tributaries are intended to protect existing uses, including "primary contact recreation." Overflows of raw sewage containing high levels of fecal bacteria from the Hamilton County/City of Cincinnati sewers cause violations of these and other water quality standards, which in turn violate the federal Clean Water Act and the Ohio Revised Code (6111). Every time it rains and even at times in dry weather, the MSD's overflowing sewers dump millions of gallons of raw sewage into Hamilton County waterways.

The Consent Decree states that MSD is "not proposing or agreeing to implement such measures…" as would meet the primary contact Water Quality Standards. Entrusting the sewer system to a MSD management that did not comply/has not complied with federal and state clean water laws in the past, is now costing Hamilton County ratepayers millions in fines and penalties.

The Consent Decree should not be used as a mechanism to justify lower water quality standards in the Ohio and its major tributaries and, MSD must change its intent and seek to meet the existing standards.

## IV.    THE PROPOSED SEWAGE-IN-BASEMENT PROGRAM DOES NOT PROTECT HAMILTON COUNTY RESIDENTS FROM OVERFLOWING, UNDERSIZED SEWERS.

The *basic* structure of the MSD program tracks a structure first suggested to the MSD, the EPA and OEPA by the Sierra Club in its July 22, 2003 comments to the EPA and elsewhere in the litigation. There are, however, many loopholes in the sewage-in-

7

basement program proposed by MSD in the Consent Decree, which would allow the MSD to continue to avoid meeting the needs of the victims of backups.

Authorizations of remedies without financial appropriations (legally binding commitments) are meaningless. There has been no money appropriated by the County to fund this program beyond the Supplemental Environmental Project funds from the prior consent decree. The MSD included in its rate calculations in this case approximately $250 million to purchase just some of the SIB victims' homes. This amount was on top of the multi-million dollar sewer remediation work that MSD claimed would help SIB victims **some day** in the future. After the Sierra Club and the local media made the plight of the SIB victims public, and after the federal court issued its Order in September, the MSD responded with a "prevention" program, which it claimed would cost only $37-40 million.[2] This figure did not include, however, the two other parts of the SIB program, the emergency response and cleanup (Customer Service), and the Claims program.

The Consent Decree does not specify if the program is retroactive or not. This is a very important issue for the SIB victims, some of whom have been living with this horrific problem for up to 20-years. MSD Director, Mr. Karney, said at the October 27th Lockland public meeting that "retroactivity" was up to the Commissioners. The Consent Decree does not specify how many homes would be subject to the prevention program each year. MSD Director Pat Karney cites the St. Louis "grinder pump" program as a "resounding success." St. Louis has installed 45 grinder pumps at residents' homes since 1999 or about 9 homes per year. Mr. Karney, by his own estimate, has 1000 homes that

---

[2] The speed with which MSD lowered its capital cost estimates of $250 million for SIB remediation (used in MSD's rate calculations) to a $37-40 million program also points out why the $1.5 billion cap and the multitude of deadline extensions in the Decree are meaningless. MSD cannot be trusted to provide accurate cost estimates. Outside financial oversight is needed to see that MSD spends funds appropriately. See discussion of the Special Master, infra.

will need the prevention program (these are only the homes where MSD admits that

sewage backups are its fault). If our MSD were to install grinder pumps in 9 homes per

year, it will take MSD over 100 years to provide grinder pumps or some other

comparable prevention fix for all of the Hamilton County homeowners where it admits

responsibility. If the number of homes is closer to Sierra Club's estimate of 5000 –

10,000, then the program will take 500 to 1000 years at that rate.

MSD has lacked investigative capacity to identify the cause of most SIB incidents

– in fact, they have only determined the cause in approximately 10% of the complaints.

The thousands of SIB victims in Hamilton County, Ohio have had enough bad

experiences with the MSD's lack of responsiveness and the "Act of God" denial letters

from the Cincinnati City Solicitor's office (denying payment of claims where MSD knew

it was at fault), that there is a **complete breakdown** in trust and good faith.

The SIB program in the Consent Decree gives the MSD unfettered discretion to

provide, or not provide, prevention devices to Hamilton County homeowners. The time

frame for providing these devices is totally up to MSD. MSD can justify continued

neglect by claiming lack of appropriation of funds, or any other reason or no reason at all.

There are no benchmark standards (e.g., number of prevention systems installed/year,

number/amount of claims paid/year, number of cleanups performed/ year, etc.); also,

there is no due process right of appeal set out in the SIB program.

The SIB emergency response program also gives MSD unfettered discretion to

provide cleanup and response services or not provide them. MSD claims that it will only

be able to visit 80 homes in the first 8-hours of a rain event, and then, just to make an

eligibility determination. There is no annual budget for this part of the program, either;

9

no goals as to the number of homes responded to each year; no adequately staffed and trained administrative personnel; no contractor certification program specified; no monitoring program to report on successes and failures (i.e., need for follow-up or return visits), nor is there a formal system for reporting to the Court, Commissioners and the public.

No due process for claimants is provided for in the Consent Decree. No administrative appeals process is provided for. If there is to be an Ombudsperson, he/she should not report to MSD, but to the Special Master and the Commissioners and the City.

Furthermore, the Consent Decree alludes to two jurisdictional pre-requisites that can be used (abused) to prevent an otherwise eligible homeowner from participating in the benefits, if any, of the SIB program. The first is a strict, 24-hr. notification requirement. If the homeowner with sewage in basement fails to notify MSD 24 hours after the incident, MSD can deny the claim. What if the backup occurs while the homeowner is away? The second requirement is that MSD may refuse to allow homeowners to participate in the program, if the homeowners refuse to "flood-proof" their home, as specified by the MSD. This creates numerous obstacles.

Also, the homeowner should not be responsible for maintenance and cost of operating the pumps when the overflows are caused by failures in the MSD system.

The proposed SIB solution has a number of flaws as outlined by SEEI , a firm with considerable experience in both storm and combined sewer technology, as well as specific experience in grinder pump technology. The principal of the firm directed USEPA'S Research and Development activities in these programs. At best, MSD's grinder pump concept is a temporary, partial solution. At worst it is excessively expensive, temporary and simply

moves the overflow to another location. These options are only a band-aid until system capacity is improved.

In short, like the rest of the Consent Decree, the public will find it next to impossible to know if the program is a success or failure. There are no set criteria under which the MSD has consented to be judged. Without standards, benchmarks, milestones, etc., it is impossible to develop a "report card" with which to grade the MSD's performance. A third-party, independent claims system with dedicated funding is essential, as is an appeals process.

The Consent Decrees should require MSD to implement those Capital Improvements as a priority that will stop SIBs.

## V.    THE DELAY IN FIXING SSO 700 IS BASED ON THE FICTION THAT THE MILL CREEK DEEP TUNNEL WILL BE FUNDED AND CONSTRUCTED, WHICH IS NOW EXTREMELY UNLIKELY

The Interim Partial Decree (or the first Decree), which is incorporated into the "Global" Decree, provides for an interim and illegal temporary fix for SSO 700. SSO 700 discharges over 40 days per year and dumps on average 75 million gallons per year of raw sewage into the Mill Creek. The EPA/OEPA apparently accepted an interim and illegal fix (one that does not meet the required "secondary treatment") because MSD convinced the EPA/OEPA that the Mill Creek Deep Tunnel would be built and that SSO 700 would spill its raw sewage into the tunnel for transmission to the Mill Creek Wastewater Treatment Plant for appropriate treatment. A recent study by the United States Army Corps of Engineers (ACOE), however, shows that the tunnel is not cost justified and is not likely to be built (its cost alone estimated at $1.23 billion). The

11

ACOE study showed that the Tunnel would cost $3.5 million more per year than its purported benefits (costs exceed benefits). Additionally, the tunnel is being designed to handle only a 2-year storm frequency. The Global Consent Decree, after all the purported effort by MSD and the EPA/OEPA, did not specify a storm frequency that will govern its provisions.[3]

The MSD has performed an internal study that shows that a full, secondary treatment plant (a legal solution) could be built at the location of SSO 700 in five years and that it would have many benefits. It would actually treat all of the raw sewage at SSO 700. It would reduce CSO discharges downstream in the CSO area of the Mill Creek and would reduce the loading to the Mill Creek plant, which cannot handle the sewage loads that it presently receives.

## VI.    THE CONSENT DECREE DOES NOT ADEQUATELY ADDRESS PROBLEMS AT THE MSD's WASTEWATER TREATMENT PLANTS, ILLEGAL CONNECTIONS, AND ILLEGAL BYPASSING.

Ohio EPA knows that the Sycamore and Polk Run wastewater treatment plants are not designed to handle their wet weather flows. These plants take sanitary sewage only (not stormwater). Polk Run NPDES permit specifies a design flow of 8 MGD (million gallons per day) but, in actuality, its design flow is only 6 MGD. Bypassing a wastewater treatment plant is illegal except in an Act of God event. Ohio EPA is allowing new connections in already overloaded sewer systems in Hamilton County. The Sycamore WWTP upgrades that are being proposed will not have loading limits for the sewage that is bypassed by secondary treatment and, above a certain flow amount, no limits at all. The high rate treatment facility that Ohio EPA is proposing to permit at

---

[3] In one of its provisions, the Global Decree mentions a 10-year storm, without specifying duration, such as 1-hour, 24-hour, etc. The mention of a 10-year storm is meaningless, without a duration factor.

Sycamore is illegal under the Clean Water Act for wastewater treatment plants handling sanitary waste..

MSD needs to enforce regulations regarding illegal connections to their system rather than merely allow them to continue to contribute to overflows.   Illegal SSO's, which overflow to municipal separate storm water sewers, also need to be addressed by MSD.

**VII.   PUBLIC PARTICIPATION**

Public participation and citizen oversight are needed to insure compliance with the Clean Water Act.  This includes easy access to the public information that MSD has.

The public participation proposed by MSD in the Consent Decree is very limited in both the scope of information to be provided to the Steering Committee, the issues the Steering Committee will address and the lack of representation from organizations.

The public needs full oversight of all aspects of MSD, planning, scheduling of projects, engineering and fiscal accountability. This will not happen without a more robust public participation program that includes funds for citizen technical and financial review (see Section VIII, Supplemental Environmental Projects).

MSD's Public Outreach fails to meet public information needs and is unlikely to engage citizens with a strong interest in this issue, much less, the general public.

Public outreach would be better served by making MSD's information available on the web and in newspapers and other media.  Violations, warnings about SSO and CSO events, reporting on these events and levels of exceedances need to be made readily available to the public as the public uses these waterways, not to mention its own property.

13

## VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS (SEPs)

Supplemental environmental projects need to be managed by organizations other than MSD, but with reporting to the Court.  The proposed SEPs in the Consent Decree are outside the scope of MSD's mission and experience.

Sierra Club recommends SEPs which are administered by organizations outside MSD to do the following:  1)  provide funded citizen oversight over MSD engineering and financial performance and planning; 2) citizen water monitoring to educate citizens about Clean Water and compliance with the Consent Decree; 3) Resource Economic Studies to show the benefit of clean water to the community.

The SEP from the 1986 Consent Decree has not yet been spent as far as Sierra Club can determine.  We request an accounting of these SEP funds and the interest they would have accrued.

## IX.    THE CONSENT DECREE IS UNENFORCEABLE AS WRITTEN AND, THE COMMISSIONERS, THE COURT AND THE PUBLIC NEED A SPECIAL MASTER TO AUDIT MSD'S ENGINEERING AND FISCAL PERFORMANCE.

The Second Consent Decree is unenforceable as written because it is layered with contingencies, deadline extensions, loopholes and a complete absence of interim benchmarks of success along the nineteen-year life of the Decree. Put in more simple terms, this is like allowing our public schools to educate our children and have only one test at the end of the 12th grade.  The Consent Decree has numerous reporting requirements, but there are no intermediate standards that must be met along the way. Some clear examples of benchmark standards would be: (1) a certain number of SSOs

and SSDs eliminated each year[4]; (2) a certain number of CSOs remediated each year, reducing overflows to a small number, such as two per year; (3) separating so many miles of combined sewers each year; (4) expanding capacity at so many WWTPs each year (reducing or eliminating plant by-passing); (5) reducing the incidence of sewage backup complaints each year; (6) reducing the total number of sewer overflow events per 100-miles of sewer in the system each year from over 50 overflows/ 100-miles of sewers (now) to the industry benchmark of 5 overflows/ 100-miles of sewers in ten years.

Deadlines need to also reflect priorities such as the impact on human health and the environment, stopping overflows rather than simply moving the overflow threat to a new location, and no increases in the amounts of sewage going into pipes and wastewater treatment plants, until there is sufficient capacity to properly treat the sewage.

These are the kind of objective and visible standards by which MSD's performance can be graded in a **Public Accountability Report Card**. After purported years of negotiation between the MSD and the EPA/OEPA, these are precisely the kind of objective and visible standards that the public should expect to see, but are clearly missing from the Decree. MSD has a history of failure at accomplishing its long-term goals. If these objective standards are not met, residents, businesses and the environment will suffer the consequences. The concern for the public is that EPA/OEPA are not the "guarantors" of the success of this project. At this point in time, neither agency has the staff or resources to oversee a project of this scope and complexity. Also, compliance with the Consent Decree does not guarantee that, at the end, MSD will be in compliance with the Clean Water Act or its regulations. Hamilton County and the City of Cincinnati

---

[4] SSO is a sanitary sewer overflow (illegal); SSD is a sanitary sewer discharge from a SSO (illegal). A CSO is a combined sewer overflow (not illegal in wet weather; illegal in dry weather – not good in either case).

have the power and the obligation to make sure the money is spent wisely, the projects

are chosen on a worst-first basis, and the construction is completed in a timely manner.

First, in the view of the Sierra Club, it is impossible for the County and the City to

oversee MSD and the Consent Decree under the structure of the 1968 Agreement. Under

that Agreement, MSD has become a "shadow organization" hiding behind the City and

the County. MSD told the federal judge in this case that it can raise millions of dollars in

sewer revenue bonds, but it cannot be sued in its own name. MSD must start taking

responsibility for its actions. Shared responsibility between the city and the county

means no one is responsible. There needs to be one responsible party. If the $1.5 billion

slated to be spent to correct the decades of neglect of the Hamilton County sewers is

wasted, then that taxpayer money is irretrievably gone. The County and City cannot

simply rely on the EPA/OEPA to supervise compliance.

The recent Brown and Caldwell report June 24, 2003, commissioned by MSD at a

cost of $700,000 identifies a "crisis in leadership at MSD", as well as a lack of planning

in wastewater engineering, including a longer term wastewater collection a treatment

facilities Master Plan. The report says that creating such a plan "will help MSD prioritize

projects, identify schedules and improve customer service. Individual planning efforts

related to CSO, SSO … and long-term replacement planning."

The Consent Decree must include the appointment and funding of a Special

Master[5], who will have adequate supervisory staff and expert monitors. The Special

Master would report to the Commissioners, the City, the Court and the public. A Special

Master is an expert who is skilled in a particular area, in this case execution and

---

[5] Federal Courts in the United States have the inherent authority to appoint a Special Master to assist the Court in monitoring compliance with its orders. Special Masters are also provided for under Rule 53 of the Federal Rules of Civil Procedure.

successful completion of major sewer improvement projects. The job of the Special

Master would have three components: (1) engineering oversight (Are the capital

improvement projects being completed? Are the benchmark environmental goals being

met?); (2) fiscal accountability (Are the projects being completed on time and on budget?

Is MSD being fair and honest in its use of bond proceeds and its rate setting?); and, (3)

handling the Consent Decree's complex Dispute Resolution Process. It is Sierra Club's

position that without a Special Master overseeing this project, the $1.5 billion in

ratepayer money will likely be frittered away by MSD. Since 1968, the MSD has failed

to follow the rule of law and the explicit orders of the State of Ohio. It has failed to

follow its federal discharge permits. It cannot now be trusted to properly execute this

huge construction project with the focus, vigor and respect for legal obligations that is

required.



**SIERRA CLUB**
FOUNDED 1892

March 27, 2002

<u>CERTIFIED MAIL: RETURN RECEIPT REQUESTED</u>

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Subject: United States and State of Ohio v. Board of County Commissioners of Hamilton
County and the City of Cincinnati, D.J. Ref. 90-5-1-6-341A

Dear Sir:

On February 28, 2002, a notice was published in the Federal Register, which solicited
comments from the public for a period of 30 days regarding the proposed Interim Partial
Consent Decree ("Consent Decree") between the United States and State of Ohio v.
Board of County Commissioners of Hamilton County and the City of Cincinnati, Civil
Action Nos. C-1-02-107 and C-1-02-108. The Sierra Club wishes to submit this letter
with attachments as comments on the above referenced Interim Partial Consent Decree.

As you are already aware, the problems relating to sanitary sewer overflows have
occurred in Hamilton County for over 20 years, and therefore, the ultimate remedy will
not be accomplished overnight. However, the Sierra Club and the residents of Hamilton
County must be assured that this problem is corrected in an expedited and protective
manner with the long-term best interests of the public in mind. The Interim Partial
Consent Decree as it is now structured does not accomplish these goals. The numerous
failings of the order include the following:

The Interim Partial Consent Decree as it is proposed is "partial" and therefore does not
address the full magnitude of the Sanitary Sewer Overflows (SSOs) problem in Hamilton
County. There are currently 101 numbered and identified (SSO) locations reported by
the Metropolitan Sewer District to the Ohio EPA every month. The Sierra Club is also
aware of other SSOs that are not reported. The proposed Interim Partial Consent Decree