IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
|       v. ) | Civil No. C-1-02-107 |
| ) | |
| THE BOARD OF COUNTY ) | Judge S. Arthur Spiegel |
| COMMISSIONERS, HAMILTON ) | |
| COUNTY, OHIO, et al., ) | |
| ) | |
|    Defendants. ) | |
| ———————————————— ) | |
| ) | |
| STATE OF OHIO, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
|       v. ) | |
| ) | |
| THE BOARD OF COUNTY ) | |
| COMMISSIONERS OF HAMILTON ) | |
| COUNTY, OHIO and THE CITY OF ) | |
| CINCINNATI, ) | |
|    Defendants. ) | |
| ———————————————— ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT
OF MOTION FOR ENTRY OF CONSENT DECREES**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(a)(3). . . .  . . . . . . . . . . . . . . . . . - i -

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

    A.  The Defendants' Sewer System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -
    B.  What are CSOs and SSOs? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -
    C.  The Clean Water Act's Regulatory Scheme and
        Plaintiffs' Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

        1.  The General Regulatory Scheme. . . . . . . .  . . . . . . . . . . . . . . . . - 6 -
        2.  The Wet Weather Water Quality Act of 2000 and U.S.
           EPA's 1994 CSO Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -
        3.  Plaintiffs' Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

           a.  WWTPs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -
           b.  SSOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 13 -
           c.  CSOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -
           d.  United States' Claim Concerning Basement Backups . . . - 15 -

    D.  The Lodged Consent Decrees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

        1.  Development of Long Term Remedial Plans. . . . . . . . . . . . . . . - 16 -
        2.  Implementation of Long Term Remedial Plans . . . . . . . . . . . . . - 18 -
        3.  Interim Measures During Development and Implementation
           of Long Term Remedial Plans . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -

           a.  Construction Projects . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
           b.  Water-in-Basement Programs . . . . . . . . . . . . . . . . . . . . - 20 -
           c.  Operation, Maintenance, and Response Requirements . . - 22 -
           d.  Short-term Adequate Capacity Program . . . . . . . . . . . . . - 22 -

        4.  Civil Penalty and Supplemental Environmental Projects . . . . . . - 23 -
        5.  How The Decrees Ensure Accountability and Full Disclosure
           to the Regulators and Sierra Club . . . . . . . . . . . . . . . . . . . . . . . . - 24 -

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -
    B.  The Decrees Are Fair, Reasonable and Consistent with the

Clean Water Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -

1.     The Consent Decrees are Fair. . . . . . . . . . . . . . . . . . . . . . . . . . . . - 29 -
2.     The Consent Decrees are Reasonable. . . . . . . . . . . . . . . . . . . . . . - 33 -
3.     The Consent Decrees are Consistent with the Clean Water Act.   - 34 -

C.     The Comments Do Not Provide Any Basis to Disapprove
       the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 36 -

1.     The Regulators Are Capable of Properly Overseeing
       Implementation of the Decrees;  A Special Master is
       Unnecessary and Inappropriate.  . . . . . . . . . . . . . . . . . . . . . . . . . . - 37 -

       a.     The United States is Capable of and Committed to
              Overseeing These Decrees. . . . . . . . . . . . . . . . . . . . . . . . . . - 38 -
       b.     Sierra Club Will Be Kept Fully Informed Concerning
              the Implementation of the Decree and Can Itself Raise
              Issues of  Lack of Diligent Enforcement. . . . . . . . . . . . . . . - 43 -
       c.     A Special Master Is Unprecedented and Inappropriate. .  - 44 -
       d.     The United States Would Not Object to an Ombudsman
              for the WIB Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 45 -

2.     The United States has Sued the Appropriate Entities, and
       This Court Has Plenary Authority to Enforce its Orders
       Against these Defendants, their Employees, or Others if
       Necessary.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 48 -
3.     The Schedule Approach Used by the Decrees Is Reasonable
       and Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 52 -

       a.     The Clean Water Act Does Not Preclude a Phased
              Compliance Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 52 -
       b.     The Schedule Approach is Reasonable and Appropriate.   - 54 -

4.     The Decree Appropriately Uses the Clean Water Act's
       Statutory and Regulatory Requirements as Goals and
       Endpoints For the LTCP Update.  . . . . . . . . . . . . . . . . . . . . . . . . - 59 -
5.     The Decree Appropriately Accounts for the Possibility of
       Future Revisions to Water Quality Standards. . . . . . . . . . . . . . . - 61 -
6.     The Decrees Appropriately Include Requirements For
       Defendants to Build Now Only Those Remedial Measures
       That Will Not Be Rendered Obsolete By the Long
       Term Remedial Measure Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . - 64 -
7.     The Decrees Themselves Appropriately Do Not Contain A
       Financial Plan, But Such a Plan is Required as Part of
       the LTCPU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 66 -

8.    The Decrees Do Not Contain "Loopholes;" the Limited
      Opportunities for Extensions of Deadlines are Reasonable
      and Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 69 -

      a.    Insufficient Rainfall Potential Schedule Extension:  . . . . - 70 -
      b.    $1.5 Billion Potential Schedule Extension . . . . . . . . . . . . . - 71 -
      c.    "Evaluate and Correct" Potential Schedule Extension . . - 74 -
      d.    Potential Deadline Extension for Revised LTCPU.  . . . . . - 76 -

9.    The IPCD's Short Term Adequate Capacity Plan Provides an
      Appropriate Approach for Ensuring That New Growth Does
      Not Adversely Affect SSOs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 78 -

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 79 -

## EXHIBITS

**Exhibit 1**    **Responsiveness Summary**

**Exhibit 2**    **Declaration of Mark J. Klingenstein**

**Exhibit 3**    **Affidavit of Patrick T. Karney**

**Exhibit 4**    **April 12, 1968 Agreement**

**Exhibit 5**    **Affidavit of James Simpson**

**Exhibit 6**    **Affidavit of Lisa Morris**

**Exhibit 7**    **Affidavit of George Elmaraghy**

**Exhibit 8**    **Declaration of Barry J. Schueler**

**Exhibit 9**    **Declaration of Patrick T. Karney**

**Appendix A - Reference Materials**

**Appendix B - Unreported Cases**

## SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(a)(3)

I.    **INTRODUCTION** ................................................... **p. 1**
This United States, with the consent of co-plaintiffs, the State of Ohio and the Ohio River

Valley Water Sanitation Commission ("ORSANCO"), respectfully requests this Court to enter

the lodged Interim Partial Consent Decree for Sanitary Sewer Overflows ("IPCD") and Consent

Decree on Combined Sewer Overflows, Wastewater Treatment Plants and Implementation of

Capacity Assurance Program Plan ("Final Decree"), collectively, "decrees." As required by 28

C.F.R. § 50.7, the United States solicited public comment on both decrees and has received

exceptionally voluminous comments from Intervenor Sierra Club (and a few comments from

others). The United States has carefully examined all of the comments and believes that, despite

the number of points raised and the heat of Sierra Club's rhetoric, the decrees are fair,

reasonable, and consistent with applicable law and therefore satisfy the standards for entry.

II.    **BACKGROUND** ................................................... **p. 3**
Section II describes defendants' sewer system, the plaintiffs' amended complaint, and the

decrees. The complaint and the decrees address four inter-related problems: sewage overflows

from defendants' sanitary sewers ("SSOs"), overflows from combined storm water and sanitary

sewer lines ("CSOs"), deficiencies at wastewater treatment plants ("WWTPs"), and backups of

sewage into people's basements. This section also discusses the Clean Water Act's regulatory

scheme, its process for changes to water quality standards and EPA's "CSO Policy."

III.    **ARGUMENT** ................................................... **p.26**
Section III.A (pp. 26-28) describes the standard this court should employ in reviewing the

decrees. This court should review the decrees under a deferential standard and enter them if it

finds that the settlements are fair, reasonable and consistent with the statute. E.g., United States

v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991). The decrees easily

meet this test. See § III.B, pp. 29-35; § II.D, pp. 16-26. The comprehensive settlement embodied

in the decrees, will bring defendants' SSOs, CSOs, and WWTPs into compliance with the Clean

Water Act as expeditiously as is practicable. In accordance with the CSO Policy and EPA's

approach in other CSO and SSO cases, defendants must perform specified monitoring, modeling,

and analysis and to develop two major remedial plans. The plans must contain schedules that are

"as expeditious as practicable" and, subject to a few narrow potential extensions, must achieve

completion of construction no later than 2022, and sooner if practicable. The plans are both due

June 30, 2006 and are subject to approval by EPA, the State and ORSANCO.

In the meantime, defendants must construct various specific projects, including: projects

to address most of their worst SSOs (to be completed by mid-2006, with many finished sooner)

and numerous CSOs (to be completed by 2010, with many finished sooner); significant

improvements at the Sycamore WWTP (to be completed in 2006); and an interim and final

solution to SSO 700, their worst SSO. (The interim solution must be completed by mid-2006

and is designed to handle a ten year design storm, and thus will almost completely eliminate SSO

700's environmental impacts; the final solution is governed by a separate plan and must be

completed no later than 2022). In addition, plans attached to the decrees require improvements

in, inter alia, defendants' operation and maintenance of their sanitary sewer system, and response,

monitoring and reporting of SSOs. Further, defendants must pay a $1.2 million penalty and

spend at least $5.3 million on six "supplemental environmental projects," which will greatly

benefit degraded portions of the Mill Creek.

Finally, the Final Decree requires that defendants implement a three-pronged "Water-in-

Basement" ("WIB") Program, which requires defendants to install measures to help prevent sewage backups into homes and businesses; to clean up sewage backups when they do occur; and to compensate victims for property losses or expenses. (§ II.D.3.b, pp. 20-21) These programs, which began on January 1, 2004, are the first of their kind in a federal consent decree, and will provide long overdue relief for the beleaguered citizens who suffer basement backups while preventative measures are being installed and system capacity expanded. Preliminary information shows that Defendants have been aggressively implementing these programs.

The remainder of the brief (§§ III.C.1-9, pp. 37-79) and the attached Responsiveness Summary go through the scores of comments and demonstrate that they do not affect the ultimate approvability of the decrees. Many of Sierra Club's comments concern its belief that the government plaintiffs are either unable or unwilling to oversee the defendants' compliance with the decrees and that a special master should be appointed to perform that role. As discussed in § III.C.1, pp. 37-48, however, a special master would not add materially to the resources already engaged in bringing the defendants into compliance, and there is no justification for the additional layer of oversight that Sierra Club advocates. The oversight of a long-term, billion-plus-dollar program to upgrade a large municipal sewage system is quintessentially one for government agencies with technical and legal staff trained and experienced in such projects. Even assuming that plaintiffs were slower than they should have been to focus enforcement resources on the defendants in this case, there can be no doubt that they are focused there now, and it is hardly likely that, after investing thousands of staff hours in reviewing the defendants' sewer system and negotiating these decrees, plaintiffs would allow their efforts to be wasted. Moreover, because the United States and the State each has independent authority to enforce the

decrees, backed up by ORSANCO, a future flagging of attention by one of the plaintiffs should

not affect the quality of oversight. In short, it is baseless to suggest that the United States, with

the other regulators, will not appropriately oversee this settlement.

Further, the United States has pledged to (and has) forwarded all reports and submittals

received under the decrees to Sierra Club, as well as any formal responses to the submittals.

Sierra Club itself will have all the information necessary to monitor defendants' progress and the

regulators' oversight. It can bring any issues it has to the governments' attention, or if it believes

necessary, to the attention of this Court. In short, a special master to oversee the overseers is

unnecessary, would not be helpful, and would waste resources that would be better spent on the

defendants' sewer system.

Other comments raised, with a synopsis of our responses, include:

- The decrees are unenforceable because MSD is not itself a party. (§ III.C.2, pp. 48-52)
As a matter of Ohio law, MSD is not separate from the County, and is itself not separately
subject to suit. (Responsiveness Summary, ¶ 1, pp. 1-7) However, the plaintiffs named and
included in the decree the two entities that control the finances, operations and other aspects of
the sewer system. Neither defendant can avoid responsibility by finger-pointing because both
have signed the decrees and are subject to this Court's enforcement powers.

- The schedules are not aggressive enough, are too vague and do not have interim
deadlines. (§ III.C.3, pp. 52-58) The Court and the parties in settlement have equitable
discretion to craft a reasonable schedule to achieve compliance. Weinberger v. Romero-Barcelo,
456 U.S. 305 (1982). EPA's CSO Policy expressly recognizes the need to exercise such
discretion by allowing a phased approach for implementing CSO controls that considers the
community's financial capability. Further, the decrees' approach of setting "backstop" deadlines
combined with the requirements that the schedules in the plan be "as expeditious as practicable"
is reasonable and enforceable, as the regulators have already demonstrated.

- The compliance standards are too vague to be enforceable. (§ III.C.4, pp. 59-61) On
the contrary, the compliance goals and standards are enforceable and will result in compliance
with the law. Both the regulators, in reviewing and approving the remedial plans, and this Court,
in dispute resolution if necessary, are fully equipped to apply the standards.

• <u>The Final Decree will allow illegal changes to water quality standards.</u> (§ III.C.5, pp. 61-64)  Any changes to water quality standards are governed by applicable law and are subject to a separate regulatory process, which includes public input and the right to challenge decisions in court.  The decree does not allow or encourage any changes beyond those allowed by law.

• <u>The decrees should require more fixed date construction projects.</u> (§ III.C.6, pp. 64-66) The decrees appropriately follow the CSO Policy's approach, which requires adequate analysis before selecting particular remedial projects.  The regulators included in the decrees only those projects that they were confident will be consistent with the long-term plans.

• <u>The decrees do not contain financial plans.</u> (§ III.C.7, pp. 66-69)  The decrees themselves appropriately do not contain financial plans, but the CSO remedial plan, due in 2006, will and will show how defendants will finance the remedial efforts and the WIB Programs.

• <u>There are too many "loopholes" to ensure compliance.</u> (§ III.C.8, pp. 69-78)  Nothing in the decrees could allow defendants to avoid coming into full compliance.  There are a few prescribed situations in which defendants can <u>request</u> a schedule extension if the appropriate showing is made.  These few provisions provide appropriate flexibility to address significant uncertainties, but do not weaken defendants' obligations to comply.

• <u>There should be a sewer moratorium.</u> (§ III.C.9, pp. 78-79)  Complete sewer moratoriums are extremely rare in federal consent decrees of this sort, as the United States hesitates to impose such significant long-term development restraints on local communities and their economies.  The Short-Term Adequate Capacity Program, which requires defendants to demonstrate that they have removed more water from the sewer system before new hookups will be allowed, strikes the appropriate balance between allowing new economic development (and thus bringing funds into Hamilton County and to MSD, which will help pay for sewer remediation required by the decrees) and preventing any wastewater flows from this new development from aggravating or in any way adding to downstream SSOs.

In short, neither these comments nor any of the others received indicates that the decrees are inappropriate.  The Court's inquiry is not whether these are the <u>best</u> possible settlements the United States could have achieved or whether the settlements are ones the Court considers ideal, but rather, whether the proposed decrees are fair, reasonable, and consistent with the Act.  The decrees easily meet this test, and the United States respectfully requests this Court to enter them so that defendants can continue their important work subject to plaintiffs' oversight and this Court's enforcement authority.

## I.    INTRODUCTION

This memorandum is submitted in support of the motion by the United States of America,

on behalf of the United States Environmental Protection Agency (EPA), requesting that this

Court enter the proposed IPCD, as presented to the Court on August 20, 2002[1], Doc. 56, and the

Final Decree, as lodged on December 3, 2003.  The decrees resolve the claims in the Joint

Amended Complaint, Doc. 100 ("Complaint") filed by plaintiffs the United States, the State of

Ohio ("State"), and the Ohio River Valley Water Sanitation Commission ("ORSANCO") against

defendants for various violations of the Clean Water Act, and related Ohio and ORSANCO laws

and regulations.  The Complaint alleges, among other violations, unauthorized discharges of

sewage from their sanitary sewer collection system ("sanitary sewer overflows", or "SSOs"),

discharges from their combined sewer collection system ("combined sewer overflows," or

"CSOs") that were in violation of their CSO permit, and various violations of the permits

pertaining to defendants' wastewater treatment plants ("WWTPs").  See 33 U.S.C. §§ 1311,

1319(b), 1365(a); Ohio Rev. Code Chapter 6111.  The Complaint also states a federal claim

under Section 504 of the Clean Water Act, 33 U.S.C. § 1365(a).  This is the first time the United

States has exercised these Clean Water Act authorities to obtain cleanup and other relief in

basements.

_____

[1] The IPCD was initially lodged with the Court on February 15, 2002, Doc. 2.  Following the
public comment period, the parties to the decree agreed to certain minor revisions, including
revisions to address certain comments Sierra Club had made on the decree.  The parties re-
executed the IPCD and filed it on August 20, 2002 as Attachment 1 to the United States' Motion
for Entry of the Consent Decree, Doc. 56.  Subsequently, this Court ordered the motion for entry
of the IPCD to be "[held] in abeyance . . . until such time as the second round of negotiations in
the Parties' two-phased remedial strategy is complete, after which time the Court shall consider
the two decrees together."  Doc. 90, Order, Jan. 28, 2003, at p.2.

Together, the two decrees will eliminate defendants' SSOs and will bring defendants into compliance with the terms of their CSO and WWTP permits. In addition, the "basement component" of the Final Decree, again a first for the United States, requires defendants to install measures to prevent basement backups, to clean up basement backups when they occur, and to reimburse residents and businesses for damages due to sewage in their basements.

Pursuant to 28 C.F.R. § 50.7, the Department of Justice solicited public comment on the proposed decrees.[2] Nine sets of public comments were received on the IPCD, including comments from Sierra Club. Three sets of comments were received on the Final Decree, including voluminous comments from Sierra Club. All of the comments were recently filed with the Court in a Notice of Filing of Consent Decree Comments, Doc. 113 ("Notice").[3] The major comments and the United States' responses thereto are discussed in depth in Section III.C, infra. Additional comments are discussed in a Responsiveness Summary attached as Exhibit 1.

After review and consideration of the comments received, the United States has determined that the comments do not provide a basis to conclude that the proposed settlements

---

[2] Notice of the proposed IPCD was initially published in the Federal Register at 67 Fed. Reg. 9320-03 (Feb. 28, 2002). Notice of the Final Decree (and an invitation to submit comments on it and any additional comments on the IPCD) was published at 68 Fed. Reg. 68651-01 (Dec. 9, 2003).

[3] Sierra Club's comments are attached as Exhibit 1 to the Notice. These comments include a letter dated January 5, 2004, which includes paragraph-by-paragraph comments on the Final Decree and reiterates most comments they have previously submitted on both decrees, and Attachments A-M. The January 5, 2004 Sierra Club letter will hereafter be referred to as "SC," with a page cite. Cites to Sierra Club's attachments will be referred to, for example, as Comments, Ex. 1-A. Exhibit 2 to the Notice includes the two sets of comments on the Final Decree from other people, and these will be referred to as Comments, Ex. 2-A and B. Exhibit 3 includes the eight sets of comments on the IPCD received from others, and these will be referred to as Comments, Ex. 3-A-H.

are "inappropriate, improper or inadequate." 28 C.F.R. § 50.7(b)(l). To the contrary, the consent decrees are fair, reasonable, and in the public interest.

Finally, it should be noted that defendants have been implementing the IPCD in accordance with its terms since it was lodged in February 2002, and have similarly been moving forward with the work required by the Final Decree. They are well along toward implementing many of the required interim construction projects, are working on the major plans that will dictate the final remedies for their system, and have been implementing all aspects of the basement backup programs since January 1, 2004. Under the terms of the decrees, defendants are subject to stipulated penalties from the date of their signing, which can be assessed retroactively after the decrees are entered. So far, defendants have not missed any deadlines and have made good efforts on the plans submitted to date. The United States, State, and ORSANCO have reviewed the proposed plans rigorously, tightened two schedules significantly, and made other technical comments, all of which were satisfactorily addressed prior to approval of the plans. In short, the process is working as envisioned. Rejection of the decrees could result in significant litigation particularly concerning the final remedies, could significantly delay defendants' compliance with the Act, and could disrupt implementation of the basement programs. In summary, the United States respectfully urges this Court to enter the IPCD and Final Decree, which will allow the defendants to continue their efforts pursuant to this Court's Order.

II.     **BACKGROUND**

A.     **The Defendants' Sewer System**

Defendants own and operate approximately 3000 miles of sewers that collect and

transport Hamilton County's sewage for treatment at one of seven large wastewater treatment plants prior to being discharged into area rivers and streams. There are two types of sewers that carry sewage effluent in Hamilton County: "combined sewers" and "sanitary sewers." Approximately 55% of defendants' sewers are combined sewers and the rest are sanitary sewers. The combined sewers are designed to collect and transport both sewage and storm water, while the sanitary sewers are supposed to collect and transport only sewage.[4] The combined sewer system is located primarily in the older, central portion of the County's system (including downtown Cincinnati), while newer and outlying areas are served by the separate sanitary sewer system and storm sewers. See Declaration of Mark Klingenstein, attached hereto as Exhibit 2 (hereafter, "Klingenstein Dec."), at ¶¶ 13-16.

B.     **What are CSOs and SSOs?**

As discussed further below, plaintiffs brought this case in large part because defendants have unauthorized discharges from both their combined and sanitary sewer systems. Discharges from sanitary sewer systems, known as "sanitary sewer overflows," or "SSOs,[5] are illegal. In this case, the primary cause of defendants' SSO problem is lack of system capacity. Klingenstein Dec. ¶ 68. A municipality can experience lack of system capacity when, as is the case with Hamilton County, the sewer system was laid decades ago and wastewater flows into the system have increased, e.g., because of growth in population and industry, without adequate system

_____

[4]  Storm water in the portions of Hamilton County served by the sanitary sewers is collected in and transported by storm sewers to points throughout Hamilton County that discharge into area rivers and streams.

[5] The term "SSO" can also refer to a sanitary sewer overflow structure or outfall, that is, the pipe from which the unauthorized sanitary sewer system discharge emanates.

expansion. Lack of capacity can also be caused by "infiltration and inflow" or "I&I." As noted, sanitary sewers are designed to transport only sewage. Unfortunately, "clean" water does in fact enter portions of defendants' sanitary sewer system through leaks in the system caused by deteriorating pipes and tree roots growing into the sewers ("infiltration"), as well as through roof drains, manhole covers and yard drains ("inflow"), thus exacerbating the lack of capacity. As a result, sewage frequently overflows from overflow structures into area rivers and streams. Defendants' system has approximately 100 such overflow points, which discharge sewage when the pipes become too full. These "SSO" structures were constructed many years ago, as the result of a no-longer acceptable approach for addressing overloaded sanitary sewer systems. In 2003, there were approximately 1000 overflows from these discharge points. Defendants' worst SSO, SSO 700, discharges approximately 44 times per year, with an annual discharge volume of about 75 million gallons. Klingenstein Dec. ¶¶ 9-16, 25, 141.

In contrast, a combined sewer system is designed to transport both sewage and storm water. These systems are largely an "artifact" of an earlier way of building sewers and have not been newly constructed in the United States for decades. Combined sewers are generally not designed to be big enough to carry sewage plus all of the rainfall from the area's larger storms. Thus, combined sewers are designed to discharge from combined sewer overflow points. Untreated discharges from these overflow points are known as "combined sewer overflows," or "CSOs." These discharges may be authorized during wet weather by specific provisions in NPDES permits. Defendants have a permit that governs their approximately 233 combined sewer overflow points, but, as discussed infra § III.C.3.c, defendants' CSOs violate this CSO permit in various respects. Defendants' CSO points discharge thousands of times each year for

an estimated annual volume in excess of 6 <u>billion</u> gallons of mixed sewage and rainwater.

Klingenstein Dec. ¶¶ 9-16, 142.

> C.     **The Clean Water Act's Regulatory Scheme and Plaintiffs' Complaint**

>> 1.     The General Regulatory Scheme

In Section 101(a) of the Clean Water Act ("Act"), 33 U.S.C. § 1251(a), Congress

declared that the objective of the Act "is to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters," and that "it is the national goal that, wherever

attainable, an interim goal of water quality which provides for the protection and propagation of

fish, shellfish, and wildlife and provides for recreation shall be achieved by July 1, 1983." 33

U.S.C. § 1251(a)(2).  To achieve these goals, Congress made it unlawful for any person to

discharge any pollutant from a point source into the waters of the United States, except in

compliance with a "National Pollutant Discharge Elimination System" (or "NPDES") permit

issued by EPA or an authorized State.  33 U.S.C. §§ 1311(a), 1342, 1362.  Pursuant to Section

309(b) and (d) of the Clean Water Act, 33 U.S.C. § 1319(b), (d), the United States may

commence a civil action for injunctive relief and civil penalties for violations of this requirement,

including, <u>inter alia</u>, discharges without a permit or discharges that do not comply with the terms

of an NPDES permit.

The NPDES permits contain requirements that govern the relevant discharges, such as the

amounts and types of pollutants that can be discharged, operation and maintenance ("O&M") of

wastewater treatment facilities, and monitoring and reporting of discharges.  EPA may object to

any State-issued NPDES permit that is not consistent with federal requirements, 33 U.S.C.

§ 1342(d), and members of the public have the right to challenge State permitting decisions in

State court. See Ohio Rev. Code §§ 3745.04 - 3745.07.[6]   The Clean Water Act also requires

that States adopt "water quality standards," subject to U.S. EPA review and approval.  33 U.S.C.

§ 1313(c).  A water quality standard consists of a "designated use," which is the State's goal for

how a water body should be used, and "criteria" necessary to protect that "designated use."  40

C.F.R. § 131.2.  "Criteria" are numeric or narrative descriptions of the pollutant concentrations

that must be met in a water body to protect the designated use.  See American Paper Institute,

Inc. v. U.S. EPA, 996 F.2d 346, 349 (D.C. Cir. 1993).  For example, Ohio's water quality

standards provide that the designated recreational use for the Ohio River is "bathing waters,"

which means, in relevant part, "that during the recreation season – May to October – [it should

be] suitable for swimming."  The criteria necessary to protect that use are set forth in Ohio

Administrative Code 3745-1-32, Table 32-1 and include specific fecal coliform[7] criteria.[8]  The

Ohio River is presumed to meet its designated recreational use (i.e., it is presumed to be safe for

swimming) when its fecal coliform levels are lower than the specified criteria.  Conversely, the

Ohio River does not meet its designated use (i.e., it is presumed that it cannot safely be used for

swimming) when its fecal coliform levels exceed those criteria.

---

[6]  An appellant would first appeal to the Environmental Review Appeals Commission ("ERAC"), followed by an appeal as of right, under Ohio Rev. Code § 3745.06 to an Ohio Court of Appeals, which is an appellate level court.

[7]  "Fecal coliform" is defined as "the portion of the coliform group of bacteria which is present in the intestinal tract of warm-blooded animals, and is evidence of the presence of human or animal wastes."  Ohio Admin. Code § 3745-1-02(B)(36).

[8]  During the months of May through October, "the maximum allowable level of fecal coliform bacteria shall not exceed two hundred ml as a monthly geometric mean based on not less than five samples per month; nor exceed four hundred per one hundred ml in more than ten per cent of all samples taken during the month.  Ohio Admin. Code § 3745-32, Table 32-1.

Consistent with the goal set forth in Section 101(a)(2) of the Act, U.S. EPA's regulations require that water bodies be designated for a fully "fishable/swimmable" use, unless it is demonstrated that attainment of a fishable/swimmable use is simply not feasible, in which case a lesser designated use can be established that reflects the highest level of water quality attainable. See Kansas Natural Resource Council, Inc. v. Whitman, 255 F. Supp.2d 1208, 1209, 1213 (D. Kan. 2003). Pursuant to EPA's regulations, a use is not attainable if, inter alia, the costs of controls necessary to attain the use "would result in substantial and widespread economic and social impact." 40 C.F.R. § 131.10(g)(6).

A State that is considering revising water quality standards must hold public hearings and provide the public a meaningful opportunity to comment before making any final decision. 40 C.F.R. § 131.20(b), Ohio Rev. Code § 6111.041. If, following the public comment period, a State decides that it is not feasible to attain a use, and thus that water quality standards should be revised to reflect the best water quality that is in fact attainable, the State must submit the proposed revision to U.S. EPA for review and approval before it can become effective. 33 U.S.C. § 1313(c)(3). U.S. EPA's approval/disapproval decision is based on whether or not the State has satisfied the federal requirements in 40 C.F.R. Part 131, including whether the State has in fact demonstrated that attainment of the use is not feasible. 40 C.F.R. § 131.21(b). The public has the right to challenge State decisions to revise water quality standards in State court, Ohio Rev. Code §§ 3745.04 - 3745.07,[9] and the right to challenge U.S. EPA decisions to approve or disapprove a State's proposed revisions in federal court, City of Albuquerque v. Browner, 865 F. Supp. 733, 737 (D.N.M. 1993).

---

[9] See supra note 6.

-8-

Water quality standards are not independently enforceable under the Act.  Instead, water quality standards are enforced through the NPDES permits described above.  See American Paper Institute, 996 F.2d at 350.  Specifically, NPDES permits must contain limitations on the amount of pollutants that can be discharged that reflect what can be achieved by technically practicable controls ("technology based effluent limitations"), plus any more stringent effluent limitations necessary to meet water quality standards ("water quality based effluent limitations").  Id. at 349; 33 U.S.C. §§ 1311(b)(1)(E), 1312(a).

> 2.     The Wet Weather Water Quality Act of 2000 and U.S. EPA's 1994 CSO Policy

Congress recently took an extraordinary step of adding a provision to the Clean Water Act governing how U.S. EPA should address CSOs in judicial consent decrees.  Specifically, on December 21, 2000, Congress enacted the "Wet Weather Water Quality Act of 2000,"creating a new section 402(q) of the Act, 33 U.S.C. § 1342(q),  Pub. L. 106-554 (Dec. 21, 2000), which requires that:

> Each permit, order, or decree issued pursuant to [the Clean Water Act] . . . for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy ["CSO Policy"] signed by the Administrator on April 11, 1994.

U.S. EPA issued the CSO Policy in 1994 to "establish a consistent national approach for controlling discharges from CSOs."  59 Fed. Reg. 18,688, col. 1 (Apr. 19, 1994).[10]  The Policy has four key principles:

> 1.  Providing clear levels of  [CSO] control that would be presumed to meet appropriate health and environmental objectives;

-----

[10] For the convenience of the Court, a copy of the CSO Policy is included in Appendix A.

2.  Providing sufficient flexibility to municipalities, especially financially disadvantaged communities, to consider the site-specific nature of CSOs and to determine the most cost-effective means of reducing pollutants and meeting CWA objectives and requirements;

3.  Allowing a phased approach to implementation of CSO controls considering a community's financial capability; and

4.  Review and revision, as appropriate, of water quality standards and their implementation procedures when developing CSO control plans to reflect the site-specific wet weather impacts of CSOs.

Id. at 18,689, col. 3.

The primary mechanism specified in the CSO Policy for implementing these principles is the multi-step process of developing and implementing a "Long Term Control Plan" ( "LTCP") to determine the long term remedial measures necessary for the municipality's CSOs to come into compliance with the Clean Water Act "as soon as practicable." See id. at 18,691-94.  The first step in this process is for the municipality to evaluate rainfall records and existing information regarding the municipality's sewer system, and perform monitoring of the municipality's CSOs and receiving streams, to allow for the development, calibration and validation of technically sound models of the municipality's sewer system and receiving streams. Id. at 18,691-92.  Next, the municipality should utilize the collected information and models to perform engineering analyses of the costs, effectiveness, feasibility, and water quality impacts of a wide range of alternatives for eliminating, or reducing and treating CSOs.  Id. at 18,692-93. The resulting information concerning the costs, effectiveness, feasibility and water quality impacts of the range of alternatives being considered should then be used by the municipality and the regulators to select a LTCP and implementation schedule that will result in the municipality's CSOs coming into compliance with the Clean Water Act "as soon as practicable."  See generally

-10-

Id. 18,692-94, and specifically, 18,688, col. 3; 18,691, col. 3.[11]

As noted above, the fourth "key principle" of the CSO Policy is the recognition that it may be necessary when developing LTCPs to "review and revis[e], as appropriate, water quality standards." Id. at 18,689, col. 3. To that end, the CSO Policy specifies that "[d]evelopment of the long-term control plan should be coordinated with the review and appropriate revision of [water quality standards] and implementation procedures on CSO-impacted waters to ensure that the long-term controls will be sufficient to meet water quality standards." Id. at 18,694, col. 2. This allows the State water quality standards authority to use the information generated in the course of developing the LTCP "to analyze the attainability of the [water quality standards] . . . [and assist] States in determining the need for revisions to [water quality standards] and implementation procedures to better reflect the site-specific wet-weather impacts of CSOs." Id. at 18,694, col. 3.

Congress endorsed this particular aspect of the CSO Policy in the Wet Weather Water Quality Act of 2000 by requiring that U.S. EPA "issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters." 33 U.S.C. § 1342(q)(2). U.S. EPA issued the required guidance on July 31, 2001.[12]

The CSO Policy further provides that, once an appropriate LTCP and implementation schedule have been selected, they should be included in an appropriate enforceable mechanism

---

[11] As discussed further, infra § III.C.3.b, the CSO policy specifically includes consideration of both physical and financial feasibility in determining whether a schedule includes "the earliest practicable compliance date." See e.g., 59 Fed. Reg. at 18,690, col .3.

[12] This document, entitled "Guidance: Coordinating CSO Long-Term Planning With Water Quality Standards Reviews," can be found on U.S. EPA's website at http://cfpub1.epa.gov/npdes/cso/guidedocs.cfm.

(generally a judicial consent decree if the schedule is expected to take longer than five years to implement or the municipality is a major permittee). Id. at 18,696, col. 18,697, col. 2. Finally, the CSO Policy provides that the municipality should perform post-construction monitoring to evaluate the effectiveness of the controls specified in the LTCP and, if those controls have not resulted in compliance with the Clean Water Act, the municipality – upon notification from the permitting authority – should be required to develop a revised LTCP containing additional controls necessary for achieving compliance with the Clean Water Act. Id. at 18,694, col. 2; 18,696, col. 2.

    3.    Plaintiffs' Complaint

Plaintiffs' Joint Amended Complaint seeks injunctive relief and civil penalties for violations for discharges from three different components of defendants' sewer system: discharges from the WWTPs, CSOs and SSOs. In addition, the United States seeks additional injunctive relief for the significant "basement backups" that plague defendants' system:

    a.    WWTPs

The Clean Water Act requires that NPDES permits for municipal WWTPs contain numeric technology based effluent limitations established by U.S. EPA that reflect the level of treatment that can be achieved using a treatment technology called "secondary treatment." 33 U.S.C. § 1311(b)(1)(B). Secondary treatment "refers to a process of physical and biological treatment of wastewater to remove pollutants which deplete the water's oxygen content and increase its acidity." Maier v. U.S. EPA, 114 F.3d 1032, 1035 n.2 (10th Cir. 1997). The secondary effluent limits applicable to municipal WWTPs are set forth at 40 C.F.R. Part 133. They include numeric limits on suspended solids, oxygen demanding materials known as

-12-

"BOD$_5$" or "CBOD$_5$" and pH. The water quality based effluent limitations applicable to discharges from WWTPs are generally numeric limits on a wide number of pollutants including fecal coliform or E. coli bacteria, residual chlorine, and numerous metals.

In addition, NPDES permits for municipal WWTPs prohibit "bypass," which is defined as "the intentional diversion of waste streams from any portion of a treatment facility," unless, inter alia, "there were no feasible alternatives to the bypass." See 40 C.F.R. § 122.41(m). The "no feasible alternatives" prong of the bypass prohibition requires that permittees construct additional treatment or storage facilities to avoid the need for bypass, to the extent construction of such facilities is feasible. See United States v. City of Toledo, Ohio, 63 F. Supp. 2d 834 (N.D. Ohio 1999) . NPDES permits for municipal WWTPs also must contain provisions requiring that the WWTP be properly operated and maintained, see 40 C.F.R. § 122.41(e), and that the municipality monitor its discharges and report the results of that monitoring to the state permitting authority. See 40 C.F.R. §§ 122.41(j), (k); 122.44(i). NPDES permits issued by States such as Ohio must, pursuant to 40 C.F.R. § 123.25, also contain these same provisions.

Count III of the Complaint alleges that, at various times, defendants violated (and unless enjoined, will continue to violate) the effluent limitations, bypass prohibition, operation and maintenance requirements, and monitoring and reporting requirements of some or all of the NPDES permits for their seven major WWTPs.[13]

                        b.      SSOs

Defendants do not have NPDES permits authorizing discharges from any of the 100

---

[13] Defendants' current compliance status at their seven major WWTPs is summarized in the Declaration of Mark Klingenstein, at ¶¶ 143-50.

sanitary sewer overflow points that exist in their sanitary sewer system, and thus SSOs from these discharge points are illegal and must be eliminated. Count IV of the Complaint alleges that defendants' unpermitted SSOs violated (and unless enjoined, will continue to violate) Section 301(a) of the Act, 33 U.S.C. § 1311(a).[14]

        c.     CSOs

CSOs, unlike SSOs and discharges from municipal WWTPs, are not subject to the Clean Water Act's secondary treatment requirements. See Montgomery Environmental Coalition v. Costle, 646 F.2d 568, 592 (D.C. Cir. 1980). Instead, CSOs are subject to technology based requirements that reflect "best available technology," and any more stringent limitations necessary to attain water quality standards. Costle, 646 F.2d at 592. As described in Paragraphs 35 and 37 of the Joint Amended Complaint, the technology based requirements in defendants' current NPDES permit for their CSOs consist of "six minimum controls." The water quality based effluent limitations in the permit are general, narrative effluent limitations prohibiting, among other things, discharges containing pollutants "[i]n amounts that will impair designated instream or downstream water uses."

Count I of the Complaint alleges that defendants' CSOs violated (and unless enjoined, will continue to violate) these general, narrative effluent limitations, especially the prohibition on discharges containing pollutants "[i]n amounts that will impair designated instream or downstream water uses."[15] Count II of the Complaint alleges that defendants had unauthorized

---

[14] See Klingenstein Dec. ¶ 141 for a summary of information concerning defendants' SSOs for 2002 and 2003.

[15] See Klingenstein Dec. ¶ 142 for a summary of information concerning defendants' CSOs for 2002 and 2003.

-14-

"dry weather overflows" and failed to operate and maintain their system in a manner that would minimize impacts to the receiving streams resulting from CSOs, which violated (and unless enjoined will continue to violate) the technology-based, "six minimum control" requirements of their CSO Permit.

d.    United States' Claim Concerning Basement Backups

Finally, the Joint Amended Complaint includes a claim for relief under Section 504(a) of the Act, 33 U.S.C. § 1364(a), to address the widespread problems, of which this Court is well aware, caused by sewage from Hamilton County's combined and separate sewer systems backing up into houses, yards, and businesses. Despite the "relief valves" provided by defendants' CSOs and SSOs, many of the sewage backups are caused by inadequate capacity in defendants' system. Klingenstein Dec. ¶ 99.[16] Section 504(a) provides that "[n]otwithstanding any other provisions of this chapter," where a source of pollution "is presenting an imminent and substantial endangerment" to human health or "to the livelihood" of persons, the United States is authorized to seek injunctive relief to enjoin "any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary." 33 U.S.C. § 1364(a). The defendants' pollution is clearly presenting such an endangerment. Thus, the Complaint's Fifth Claim, asserted solely by the United States, seeks "an order requiring defendants 1) to take measures such as increasing sewer capacity, improving operation and maintenance, and installing backflow prevention devices to prevent or minimize to the greatest extent possible the release of sewage into buildings, yards,

---

[16]    However, some occur, through no fault of defendants, because of blockages or other problems in the private lateral lines. Klingenstein Dec. ¶ 99.

and other areas where persons may come into contact with it; 2) when releases do occur, to clean up and disinfect the affected property so as to remove any endangerment to health; and 3) to take such other action as may be necessary." Joint Amended Complaint ¶ 87.

D.    **The Lodged Consent Decrees**

The two consent decrees establish a judicially enforceable framework for ensuring that defendants develop (and implement) sophisticated, long-term plans for the massive infrastructure improvements that are needed to solve the problems resulting from their aging, undersized sewer system, and that defendants implement those improvements as expeditiously as practicable. The decrees also require defendants to implement hundreds of millions of dollars of interim measures to ameliorate these problems while they are developing and implementing the long term remedial measures. Further, the decrees require that defendants pay a civil penalty of $1,200,000 for their past violations of the Clean Water Act and State law, and spend at least $5,300,000 performing specified environmentally beneficial projects in Hamilton County.[17] Finally, the decrees include sufficient provisions to ensure that the regulators are kept well informed and can provide appropriate oversight and enforcement, if necessary, of defendants' work. As discussed further infra, there are also appropriate means, consistent with the Clean Water Act's citizen suit provisions, for Sierra Club to provide meaningful input concerning implementation of the decrees. The key components of the decrees are summarized below.

1.    Development of Long Term Remedial Plans

Consistent with Section 402(q) of the Act, 33 U.S.C. § 1342(q), and EPA's approach in

---

[17] Under EPA policy, amounts committed for such "supplemental environmental projects" ("SEPs") may partially mitigate the amount of civil penalty required. See Responsiveness Summary ¶ 30.

-16-

the CSO Policy, Section VII of the Final Decree and Exhibits 2 - 4 require defendants to perform

CSO and receiving stream monitoring necessary to develop, calibrate and validate models of

defendants' sewer system and receiving streams; utilize that information and the models to

generate information regarding the costs, effectiveness, feasibility and benefits of a wide range of

alternatives for eliminating, reducing and treating CSOs; and utilize that information in

developing and proposing infrastructure improvements to bring defendants CSOs  into

compliance with the Clean Water Act.  Defendants' long term plan for the CSOs, which must

also analyze and propose remedial measures to address basement backups and bypassing at the

wastewater treatment plants, is entitled the "Long Term Control Plan Update" (or "LTCPU") and

must be submitted to the regulatory agencies for their review and approval or disapproval by no

later than June 30, 2006.  ¶ VII.A.2.

     EPA has not yet issued regulations or a policy, like the CSO Policy, to govern procedures

for eliminating SSOs.  However, by practice, EPA's consent decrees have required a process for

SSOs that is similar to the LTCP process for CSOs.  Klingenstein Dec. ¶¶ 110-18.  Thus, Section

VII and Exhibit 4 of the IPCD also require defendants to collect data, perform system modeling,

perform an assessment of system capacity, analyze a wide range of solutions, and ultimately

propose a system-wide solution for elimination all capacity-related SSOs.[18]  Defendants' long

term plan for the remedial measures needed to address SSOs is entitled the "Capacity Assurance

Program Plan" or "CAPP" and also must be submitted to the regulatory agencies by June 30,

---

[18] This effort is well underway.  Defendants have completed the hydraulic model, including the
necessary data collection, and have submitted and received approval for the plan and schedule
that will govern the capacity assessment and other required analyses.  Klingenstein Dec. ¶¶ 124-
26.

2006. Klingenstein Dec. ¶ 125. The LTCPU and CAPP will contain design and performance

criteria, and schedules for completion of construction of the remedial measures that are as

expeditious as practicable, but in no event later than February 28, 2022,[19] unless one of a handful

of narrowly circumscribed circumstances occurs.[20] Final Decree ¶¶ VII.A.2, VIII.A. § IX.

###     2.    Implementation of Long Term Remedial Plans

The decrees require defendants to submit their long term remedial measure plans to the

regulators for their review and approval.[21] Upon approval of the plans, or upon resolution by this

Court of any disputes regarding the adequacy of those plans, defendants are required to construct

and operate the remedial measures in accordance with the approved plans, including meeting

design criteria, performance criteria, and interim and final construction schedule deadlines

contained in the plans. IPCD VII.E.8; Final Decree ¶¶ VII.A.3-4, VIII.A.

The consent decrees require that, upon completion of construction of the long term

remedial measures, defendants' sanitary sewer system shall have adequate capacity to ensure that

defendants do not have any capacity-related SSOs (including basement backups), defendants'

---

[19] As discussed in ¶ 38 of the Responsiveness Summary, the final remedy for defendants' largest SSO, SSO 700, is governed by a different plan, the SSO 700 Remedial Plan. The parties negotiated a different plan and schedule for this SSO to take advantage of the significant cost savings and environmental benefit that would occur if the Corps of Engineers builds a deep tunnel under Mill Creek. If the Corps does build the tunnel, the final remedy for SSO 700 must be completed no later than 2016. If not, the final remedy for SSO 700 has a "no later than" date of December 31, 2022. IPCD ¶ VI.C.

[20] These are described infra at § III.C.8. For a discussion of the decrees' schedules and design and performance criteria, see infra § III.C.3.b; Responsiveness Summary, ¶¶ 3-4.

[21] The United States and State have approval authority for the plans under both decrees. Because ORSANCO came to the table after the IPCD had already been negotiated, it only has approval rights for the plans submitted under the Final Decree, although it receives and has the right to submit comments on the submittals under the IPCD. See IPCD ¶ XXII.D.

combined sewer system shall have capacity or other measures consistent with appropriate design standards to prevent capacity-related basement backups, and defendants' remaining CSO discharges, if any, shall be in compliance with applicable federal, State and ORSANCO laws. Final Decree ¶¶ VII.D, XIII.D.

Further, consistent with the CSO Policy, the Final Decree requires defendants to perform post-construction monitoring to evaluate the effectiveness of the LTCP controls, especially those relating to water quality. Final Decree § X. Further, with certain minor exceptions, if SSOs have not been eliminated or CSOs do not comply with applicable laws by February 2022, defendants are subject to stipulated penalties of $3000 per day, unless they have submitted and received approval of a revised plan and schedule for further remedial work to achieve compliance. See Final Decree ¶¶ XVII.E.2 -.3. This "evaluate and correct" approach is also consistent with the CSO Policy. See infra § III.C.8.3.

> 3.    Interim Measures During Development and Implementation of Long Term
>        Remedial Plans

The consent decrees require defendants to implement a number of interim measures to ameliorate the problems caused by their inadequate sewer system while they are developing and implementing their long term remedial measures.

> a.    Construction Projects

The consent decrees require defendants to construct numerous specific remedial projects throughout Hamilton County over the next six years. The IPCD requires defendants to implement specific construction projects, known as "Capital Improvement Projects" (or "CIPs"), which will eliminate 16 "highly active" SSOs by specified dates ranging from September 30,

2002 to July 31, 2006. IPCD ¶ VI.A. The Final Decree requires 24 CIPs, which address approximately 40 CSOs and a WWTP, with completion dates that range from December 2004 to December 2010. Final Decree § VI, Exhibit 1. Together, these projects are expected to cost approximately $130 million. Klingenstein Dec. ¶ 78.

Finally, the IPCD requires defendants to develop and construct an interim remedy for its worst SSO, SSO 700. SSO 700 currently discharges on average 44 times/year with an average total of approximately 75 million gallons of sewage (generally diluted to some extent with storm water) discharged annually. Klingenstein Dec. ¶ 25. According to the approved SSO 700 Interim Remedial Measures Plan, defendants will spend approximately $15.6 million on an interim storage and treatment system that has been designed and planned to handle a 10-year design storm event, and will almost completely eliminate the environmental impact of this SSO, reducing untreated discharges from the current level of approximately 44 times/year down to perhaps one untreated discharge every several years. Klingenstein Dec. ¶ 32.

### b.    Water-in-Basement Programs

For years, defendants steadfastly refused to take steps to clean up homes that were flooded by sewage backups from defendants' sewer system, and refused to compensate victims for damages caused by such backups. Given the enormity of this problem in Hamilton County, and defendants' previous unwillingness to do much of anything about it, the United States, State of Ohio and ORSANCO took the unprecedented step of negotiating and including in the Final Decree detailed provisions specifically addressing the basement backup problem. Specifically, Section XIII of the Final Decree requires that defendants implement a three-pronged "Water-in-Basement Program" to address and remedy sewage backups into homes and businesses cased by

problems with defendants' sewer system. The first prong of this program, the "Water-in-Basement Prevention Program," requires implementation of a variety of remedial measures such as installation of grinder pump systems to prevent sewage from backing up into homes and businesses. See Final Decree ¶ XIII.A, Exhibit 6. The second prong, the "Water-in-Basement Customer Service Program," requires that defendants promptly respond to and clean up sewage backups, and take other measures to minimize the public health risks resulting from such backups. Id. ¶ XIII.B, Exhibit 7. The third prong, the "Water-in-Basement Claims Program," establishes an expeditious, streamlined process for compensating sewage backup victims for their real or personal property losses or expenses. Id. ¶ XIII.C, Exhibit 8.[22] These provisions are the very first of their kind in a federal consent decree, and should serve as a model for future consent decrees in other communities facing similar sewer backup problems. According to preliminary information provided by defendants, they have spent over $1 million implementing these programs in the first quarter of 2004. They reported that 109 properties are currently in the investigation/design phase of the WIB Prevention Program and that, of the 90 claims received under the WIB Claims Program, 63 have been validated and had checks issued to homeowners, 20 are still being reviewed, and 7 were denied. Further, all have been (or are being) processed within the Final Decree's 60-day turnaround time. Klingenstein Dec. ¶ 105.

---

[22] The WIB Claims Program is not the only redress available to the citizens for damage to property or cleanup expenses they incur. They have remedies under State law against defendants, and they are not required to waive their right to file suit in State court to participate in the claims program. In fact, any decision denying a claim or resulting in an offer of payment of an amount less than the full amount claimed will include information regarding the process for pursuing the claim in Ohio State court. Final Decree, Exhibit 8, p. 3.

c.    Operation, Maintenance, and Response Requirements

The consent decrees also contain provisions requiring that defendants properly operate and maintain their wastewater treatment plants and sewer system, IPCD ¶¶ VII.H, J, Exhibits 7, 9; monitor, report and respond to SSOs, IPCD ¶¶ VII.F, G, Exhibits 5, 6; minimize and reduce industrial discharges during wet weather that might be discharged from CSOs and SSOs, IPCD ¶ VII.I, Exhibit 8; notify the public of CSOs, Final Decree, XI.B, Exhibit 5; and take measures to maximize flows to the wastewater treatment plants, ensure that dry weather overflows are eliminated, and control solids and floatable materials in CSOs.  Final Decree ¶¶ XI.C-E.

d.    Short-term Adequate Capacity Program

Section VIII of the IPCD and Exhibit 10 ("Short-Term Adequate Capacity Plan," or "STACP") are intended to "prevent wastewater flows from new development from aggravating or in any way adding to the quantity discharged from any downstream SSO."  IPCD ¶ VIII.C. That is, defendants must ensure that more flow (in the form of groundwater or rainwater, or I&I) is removed from the system than is added from a proposed new sewer or new flows from upstream development.  Specifically, defendants must remove a minimum of 5 gallons of flow from a downstream SSO for each gallon of new flow that is proposed to be added.  Id.; Exhibit 10 ¶ 3.1.  Defendants can remove excess flow by removing downspouts and driveway drains and rehabilitating deteriorated sewer lines and manholes.  The STACP lists allowable "credit" amounts that represent the estimated amount of water removed for a given activity.  Defendants track the credits and supplies Ohio EPA with a quarterly tracking report.  Credits "earned" from January 1, 2000 forward may be used to offset proposed new development.  The STACP also includes a field testing program designed to further quantify actual flow removal rates.  Id.

-22-

Exhibit 10 ¶¶ 4, 5; CD ¶ VIII.D.

### 4. Civil Penalty and Supplemental Environmental Projects

Finally, the final consent decree requires defendants to pay a civil penalty of $1.2 million and to spend a minimum of $5.3 million to implement six or more Supplemental Environmental Projects ("SEPs").[23]  Final Decree ¶ XXII.A and § XIV.  The SEPs, which are spelled out in detail in Exhibit 9 include:  three streambank stabilization and greenway creation SEPs (estimated to cost $4.75 million); two in-stream habitat restoration SEPs (for $250,000); and a "brownfield" SEP at a municipal landfill owned by the City of Elmwood, which is on the banks of the Mill Creek and is spilling garbage and leaking leachate into the Mill Creek.  Defendants are required to develop a plan to remediate the landfill to regulatory standards and to perform the portion of the plan that addresses bank stabilization (to prevent further garbage erosion into Mill Creek) and leachate control.  This SEP is estimated to cost $435,000.  Defendants are required to complete the SEPs in accordance with the SEP Plan (Exhibit 9) and ultimately to document the expenditure of at least $5.3 million.  If defendants spend less than $5.3 million implementing these SEPs, they must either pay the difference in a stipulated penalty to the State and the United States, or propose additional SEPs for approval and implementation.  Exhibit 9, § IV; Final Decree ¶ XVII.H.

The SEPs were selected in coordination with an environmental group, the Mill Creek Restoration Project, which is working to restore the tremendously degraded Mill Creek and environs.  These projects are being performed in economically depressed areas that border the

---

[23] Both the civil penalty and the SEPs fully comply with EPA's civil penalty and SEP policies. See Responsiveness Summary ¶¶ 30-31.

Mill Creek and will bring additional green space and environmental benefits to these communities.

       5.     How The Decrees Ensure Accountability and Full Disclosure to the Regulators and Sierra Club

As discussed in more detail infra, the consent decrees contain ample provisions to ensure that defendants comply with their terms, that the regulators are fully informed concerning their implementation, and that the regulators have all information and tools necessary for appropriate oversight and enforcement. First, the consent decrees have stringent stipulated penalty provisions for essentially any non-compliance with the terms of the decrees, their attachments, or any later approved plans.[24] Second, the consent decrees require defendants to submit comprehensive quarterly reports to Plaintiffs regarding the status of their compliance with all aspects of the consent decrees. The information that must be submitted includes information regarding CSOs, SSOs, bypassing, wastewater treatment plant discharges; progress being made with respect to the CIPs and the development and implementation of the remedial measures plans; and implementation of all three aspects of the Water-in-Basement Program.[25] The consent decrees also require that defendants provide plaintiffs with thorough information supporting any proposed remedial measure plans and schedules, and to revise and resubmit those plans and schedules to address any comments or questions that plaintiffs might have.[26] Plaintiffs, therefore, will have all of the information necessary to monitor defendants' compliance with the

---

[24] See IPCD § XI; Final Decree ¶ XVII; infra § III.C.1.a; Responsiveness Summary ¶¶ 7-12, 25.

[25] See IPCD § IX; Final Decree § XV; infra § III.C.1.a; Responsiveness Summary ¶¶ 3 - 6, 28.

[26] See, e.g., Final Decree ¶ VII.A.3; Exhibit 4, ¶ II.H.

decrees and to ensure the adequacy of defendants' proposed interim and long term remedial measures.

As further evidence of the adequacy of these provisions, defendants have been complying with the terms of the both decrees since they were each lodged, including, among other things, timely submitting their quarterly reports and the two remedial plans required to date, and calibrating the IPCD's hydraulic model.  E.g., Klingenstein Dec. ¶¶ 31-32, 124-125, 139.  As discussed infra, the regulators have been carefully overseeing this progress, including requiring changes to the submitted plans where necessary.[27]

Finally, there is ample and appropriate opportunity for Sierra Club to keep apprised of and involved in the implementation of the decrees, to the extent it wants to.  First, the United States has been providing copies of all documents it receives from defendants under the consent decrees to the Sierra Club, as well as copies of all formal responses that plaintiffs send to defendants under the consent decrees.  The United States commits to continue doing so for as long as Sierra Club wishes to receive those documents.  This will allow Sierra Club to monitor defendants' compliance with the decrees, monitor plaintiffs' efforts to enforce the decrees, provide input to the parties regarding the adequacy of the long term remedial measures plans and schedules proposed under the decrees, and raise any concerns it may have regarding progress being made under the decrees to the regulators or the attention of this Court.  In addition, intervenor-plaintiff, Marilyn Wall, a representative of Sierra Club, has been invited to be a member of the LTCPU Steering Committee, which will provide oversight and guidance to defendants throughout the development of the LTCP.  Thus, Ms Wall and Sierra Club, can

---

[27] See infra §§ III.C.1.a.; and III.C.3.b.

provide direct advice to defendants as they develop the LTCPU.[28]

III.   **ARGUMENT**

    A.   **Standard of Review**

       The "general test" applied by courts in the Sixth Circuit in determining whether to

approve a consent decree is one of "fairness, reasonableness and consistency with the statute."

United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991).[29]  This

limited standard of review reflects a public policy that strongly favors settlements of disputes

without litigation.  The Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir. 1976).

Settlements conserve the resources of the courts, the litigants, and the taxpayers and "should . . .

be upheld whenever equitable and policy considerations so permit."  Id. at 1372.  This is

particularly true in disputes involving environmental violations "where voluntary compliance by

the parties . . . will contribute significantly toward ultimate achievement of statutory goals."

Kelly v. Thomas Solvent Co., 717 F. Supp. 507, 516 (W.D. Mich. 1989) (citations omitted).[30]

------

[28] See also infra § III.C.1.b.; Responsiveness Summary ¶ 13.

[29] A similar formulation used by the Sixth Circuit is "fair, adequate, and reasonable, as well as consistent with the public interest."  United States v. County of Muskegon, 298 F.3d 569, 581-82 (6th Cir. 2002) (entering Clean Water Act municipal consent decree over objections of non-settling intervenors), quoting United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986).  This standard is consistent with that applied in other circuits.  See, e.g., United States v. Montrose Chemical Corp., 50 F.3d 741, 746-47 (9th Cir. 1995) (district court's function is to ensure decree is fair, reasonable, and consistent with statute's purposes); In re Cuyahoga Equipment Corp., 980 F.2d 110 (2d Cir. 1992); United States v. Metropolitan St. Louis Sewer District, 952 F.2d 1040, 1044 (8th Cir. 1992); United States v. Cannons Engineering Corp., 899 F.2d 79, 85 (1st Cir. 1990) ("[r]easonableness, fairness, and fidelity to the statute are, therefore, the horses which district judges must ride"); Citizens for a Better Environment v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

[30] See also, e.g., United States v. City of Jackson, Mississippi, 519 F.2d 1147, 1151 (5th Cir. 1975)(settlements "maximize[] the effectiveness of limited law enforcement resources" by

Approval of a settlement is committed to the informed discretion of the trial court. United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986); Donovan v. Robbins, 752 F.2d 1170, 1176-77 (7th Cir. 1985); Securities and Exchange Commission v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984). Courts, however, usually exercise this discretion in a limited and deferential manner. For example, the Court does not have the power to modify a settlement; it may only accept or reject the terms to which the parties have agreed. Jones & Laughlin Steel Corp., 804 F.2d at 351; Akzo Coatings of America, 949 F.2d at 1435; Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 630 (9th Cir. 1982). Further, in reviewing a consent decree, "the controlling criteria is not what might have been agreed upon . . . nor what the district court believes might have been the optimal settlement." United States v. Cannons Engineering Corp., 720 F. Supp. 1027, 1036 (D. Mass. 1989) (citations omitted), aff'd, 899 F.2d 79, 84 (1st Cir. 1990) (court determines "not whether the settlement is one which the Court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute"); see also Officers for Justice, 688 F.2d at 625, 630; Thomas Solvent Co., 717 F. Supp. at 515.

Finally, the balancing of competing interests affected by a proposed consent decree to which the United States is a party "must be left, in the first instance, to the discretion of the Attorney General." United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981). As the Sixth Circuit has noted, judicial deference to a settlement is "particularly strong" when that

---

permitting government to obtain compliance without lengthy litigation); In re Acushnet River and New Bedford Harbor, 712 F. Supp. 1019, 1029 (D. Mass. 1989) (environmental settlements "save the sovereigns, and subsequently the public, considerable time and money that would otherwise be expended at trial").

settlement "has been negotiated by the Department of Justice on behalf of a federal

administrative agency like EPA which enjoys substantial expertise in the environmental field."

Akzo Coatings Inc., 949 F.2d at 1436; see also id. pp. 1424, 1435.[31] Thus, where an agency

committed to the furtherance of the public interest has negotiated an agreement, there is a

presumption of validity.[32]

─────────────────────

[31] As the First Circuit Court of Appeals has recently explained, there are:

> two policies that heavily brigade the decree. The first is the strong public policy in favor
> of settlements particularly in very complex and technical regulatory contexts. Moreover,
> such a policy has added bite where the settlement has been advanced for entry as a decree
> by a government actor committed to the protection of the public interest and specially
> trained and oriented in the field.

United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir.
2000) (citations and quotations omitted). See also Cannons, 899 F.2d at 84 (deference toward
CERCLA settlements particularly compelling where a governmental agency with special
expertise that is "committed to the protection of the public interest has pulled the laboring oar in
constructing the proposed settlement"); Thomas Solvent, 717 F. Supp. at 516.

[32] Kelley v. Thomas Solvent Co., 790 F. Supp. 731, 735 (W.D. Mich. 1991); United States v.
Hooker Chemical and Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985); City of New York v.
Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988); United States v. Rohm and Haas Co., 721
F. Supp. 666, 681 (D.N.J. 1989). See also, e.g., SEC v. Randolph, 736 F.2d 525, 529 (9th Cir.
1984) (court should "pay deference to the judgment of the government agency which has
negotiated and submitted the proposed judgment").
    Sierra Club may argue, citing United States v. Telluride Co., 849 F. Supp. 1400 (D. Colo.
1994), that because this case was settled without active litigation it is suspect and does not
deserve judicial deference. However, by far the majority of EPA's cases brought by the
Department of Justice are settled without active litigation. Further, the parties' negotiations in
this case were long, hard-fought and complex, with all parties represented by competent counsel
and advised by competent technical employees and expert consultants. The robust negotiations
and adversarial nature of the parties' relationship significantly distinguishes this case from the
Telluride matter, where, apparently, the United States had no technical assistance of its own and
instead relied "heavily, if not exclusively" on defendant's expert. Id. at 1403-04. Moreover, the
Telluride court cited with approval the approach employed in this matter, saying:
> I do not hold that the government's practice of filing an enforcement action
> coupled with a consent decree is per se improper; indeed, it serves a laudable
> purpose when the negotiations leading to the decree are themselves adversarial.

B.    **The Decrees Are Fair, Reasonable and Consistent with the Clean Water Act.**

The lodged consent decrees easily meet the three-part test for district court approval of a settlement: The decree is fair, reasonable, and consistent with the Clean Water Act. Accordingly, the Court should enter the decrees.

1.    The Consent Decrees are Fair.

To determine whether a proposed settlement is procedurally and substantively fair, courts look to factors such as "the strength of the plaintiff's case, the good-faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved." Akzo, 949 F.2d at 1435 (citation omitted). Generally speaking, courts find procedural fairness where the settlement was negotiated at arm's length among experienced counsel.[33]

In this case, the settlements are the result of good faith and hard, arms-length bargaining between the plaintiffs and the defendants. Since 1998, attorneys and technical representatives from U.S. EPA, the Department of Justice, Ohio EPA and the Ohio Attorney General's office,

---

See Cannons Eng'g, 899 F.2d at 84 ("Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table.") Id. at 1403.

[33] See, e.g., Montrose, 50 F.3d at 746 (deference given to "affected parties . . . represented by experienced lawyers [who] have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree"); Cannons, 899 F.2d at 87 (fact decree negotiated at arm's length among experienced counsel, and that the agency operated in good faith supports finding of procedural fairness); Comerica Bank-Detroit v. Allen Industries, Inc., 769 F. Supp. 1408, 1412 (E.D. Mich. 1991) (arms length bargaining among parties provides presumptive favor for a settlement); City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988). See also Akzo, 949 F.2d at 1435 (good faith efforts of the parties indicated by arms-length negotiation process).