including technical experts hired by EPA, have engaged in vigorous and extensive negotiations with attorneys and technical representatives from the City and County focused on remediating defendants' sewer system. In February 2002, these negotiators were joined by a lawyer and technical experts representing ORSANCO, which brought to the table additional experience focused on the Ohio River. Although ORSANCO joined the negotiations after the SSO decree negotiations had concluded, it participated fully in negotiating the Final Decree. These robust (often contentious) negotiations, combined with the "manifested willingness of EPA to thoroughly consider all . . . comments made with regard to the proposed decree[s]," Akzo, 949 F.2d at 1435, provide ample support for the good faith efforts of the parties.

Although Sierra Club was not a party to these negotiations, the regulators seriously considered the organization's views, including incorporating certain of Sierra Club's proposed concepts in the WIB Programs and making certain changes to the IPCD after lodging and to the second comprehensive decree after its initial submittal to the Court in September 2003 in response to specific issues raised by Sierra Club. In addition, as requested by this Court, the plaintiffs kept Sierra Club apprised of the status of the negotiations and met with them in person or by telephone several times. See, e.g., Klingenstein Dec. ¶¶ 86-87, 146. By its orders instructing Sierra Club not to "interfere" with the negotiations,[34] this Court has recognized that the United States is free to negotiate with whom it chooses. As long as the parties acted in good faith (and there are no allegations to the contrary), the fact that Sierra Club was not included as

---

[34] Doc. 78, Order, Dec. 2, 2002, pp. 2-3 (Court "orders Intervenors to do nothing to interfere with the progress of such negotiations between the parties."); Doc. 90, Order, Jan. 28, 2003, p.2 (Court reiterates Dec. 2, 2002 Order "directing Intervenors to do nothing to interfere with the progress of the negotiations between the Parties").

an active participant at the table does not render the decrees procedurally unfair.[35]

Further, the decree reflects the parties' careful and informed assessment of the merits of the governments' claims, the costs, risks, and delays that litigation would entail, and the benefits that will accrue from an immediate start of the injunctive measures contained in the decree. As to litigation risk if the consent decrees are not entered, although the United States believes it would ultimately prevail on the claims alleged in the Complaint,[36] it would likely take years to litigate over the highly complex scope and schedule of the necessary injunctive relief, with no guaranty that the result would be more expeditious or better than that embodied in the decrees. Further, litigation over the appropriate injunctive relief would consume a tremendous amount of the parties' and the Court's limited resources -- resources that would be better devoted toward remedying the environmental problems at issue here. As the Sixth Circuit commented, in approving a hazardous waste cleanup decree,

> Weighing strongly in favor of approval is the fact that the plan can be implemented immediately. Rejection of the plan would result in the expenditure of considerable time, money, and effort in litigation. In the meantime, chemicals from the Site would continue to leach out and further contaminate the surrounding area.

---

[35] See, e.g., Cannons Eng'g Corp., 899 F.2d at 93 ("So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses."); United States v. District of Columbia, 933 F. Supp. 42, 48, n.6 (D.D.C. 1996) (failure to include Virginia in negotiations did not render agreement procedurally unfair); Comunidades Unidas Contra La Contaminacion, 204 F.3d at 277 (court rejected objections to a settlement based upon lack of participation by intervener in negotiations).

[36] Defendants' liability for certain claims would be particularly easy to prove, such as liability for SSOs or for violations of effluent limits in WWTPs, as these would be proved by reports or other documents submitted by, and sworn to by, defendants. However, liability for other violations, such as the plaintiffs' claims that defendants CSOs' have violated narrative water quality standards in their permit could require considerable expert opinion and be quite time-consuming.

Akzo, 949 F.2d at 1436.  Pursuant to Paragraph XVIII.L of the IPCD and Paragraph XVII.M of the Final Decree, the defendants are already implementing the decrees' requirements, subject to stipulated penalties that can be assessed after the decrees are entered.  Entry of the decrees would ensure that this work continues on time under this Court's order.

Finally, in evaluating a settlement under environmental statutes, fairness should also be considered in light of the effect of the decree on non-signatories – in this case, the public.  Id. The citizens of Hamilton County and Cincinnati will benefit from this settlement because it will get their basements quickly and safely cleaned up when sewage backups occur; it will get them reimbursed for losses caused by defendants' wastewater more quickly and reliably than in the past or pursuant to an independent state law tort claim; it requires defendants to install devices or other measures to prevent sewage backups where possible in the interim while defendants are working to expand system capacity; and it requires defendants to eliminate SSOs and to expand system capacity and take other measures so that their CSOs and WWTPs fully comply with the law.  The schedules specified in and required by the decree are expeditious and reasonable,[37] and as noted, work is already underway.  If the parties instead litigated this case, it could be years before an order for injunctive relief is obtained, and there is certainly no assurance that such an order wold provide for more complete or more expeditious relief.

Nothing in the decrees precludes the rights of citizens, including Sierra Club, from bringing an action for other environmental violations or if defendants fail to comply with the decrees, in the unlikely event that the plaintiffs fail to "diligently prosecute" these violations themselves.  In fact, because Sierra Club will be receiving all quarterly compliance reports,

---

[37] See infra §§ III.C.3, .8; Responsiveness Summary ¶ 35, 37-38.

technical plans, and other submittals under the decrees, it will be kept well informed and will be able to bring any compliance issues or questions to the governments or directly to this Court if warranted.

In short, for all of these reasons, this Court should find that the Decree is fair to the public and the parties.

### 2.    The Consent Decrees are Reasonable.

The most important criterion for the Court to consider in determining whether the decrees are reasonable is their "likely effectiveness as a vehicle for cleansing the [environment] . . . ." Akzo, 949 F.2d at 1437. The decrees will bring defendants' SSOs, CSOs, and WWTPs into compliance with the Clean Water Act in a manner that is consistent with EPA's CSO Policy, the Clean Water Act, and EPA's approach in numerous other CSO and SSO settlements. The decrees contain schedules that are "as expeditious as practicable" and subject to "backstop" dates that are appropriately stringent. See infra § III.C.3. Further, the Final Decree provides limited potential flexibility, subject to the regulators' approval and dispute resolution before this Court, for the final construction deadline if capital costs are expected to exceed $1.5 billion. See infra § III.C.8. This approach strikes a reasonable balance between a fixed construction end-date and the possibility of potential financial distress to the ratepayers if the costs of compliance end up being very high. Further, this Final Decree includes a basement backup program to provide cleanup, damages, and prevention options to residents whose basements have been flooded with sewage. In part because the primary focus of the Clean Water Act is the nation's waters, and sewage in basements does not always reach waters of the United States, this is the first federal Clean Water Act settlement to include such provisions. Finally, the decree obtains a $1.2 million

-33-

penalty and $5.3 million in valuable SEPs to benefit the Mill Creek and the predominantly low-income communities in the vicinity of these projects.

Sierra Club has raised many issues concerning the consent decrees. Each of these is discussed either below in Section III.C or in the attached Responsiveness Summary, and none of the comments, either alone or in combination, casts serious doubt on the adequacy or reasonableness of this settlement as a means to correct the defendants' violations. To be sure, it might in theory have been possible for the governments to have negotiated a slightly tighter deadline for certain projects or a higher stipulated penalty here or there. As discussed above, however, the issue for this Court is not whether these are the best possible settlements the governments could have negotiated, but whether the settlements provide a reasonable approach to obtaining Clean Water Act compliance in this matter.[38] Where the costs of the necessary remedial work will be truly enormous, as here, reasonableness (as well as the CSO Policy) certainly allows consideration not only of how fast it would be physically possible to complete that work, but also of the impact the required costs will have on the community and other important public needs. Whether or not this settlement struck the perfect balance between expeditious, compliance and economic burden, it struck one that is reasonable and likely to succeed.

3.     The Consent Decrees are Consistent with the Clean Water Act.

Finally, the decrees are consistent with the Act and comport with the specific statutory

---

[38] See, e.g., Bragg v. Robertson , 83 F. Supp. 2d 713, 717 (S.D. W. Va. 2000) (as a negotiated agreement, consent decree embodies a compromise; parties each give up something they might have won in litigation); United States v. District of Columbia, 933 F. Supp. 42, 51 (D.D.C. 1996) (same).

policies that underlie this case. The overarching goal of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). This decree furthers those goals, as discussed above, by obtaining defendants' compliance with the Act in a manner that is "as expeditious as practicable." As discussed further, infra at note74, the regulators did not accept a LTCP proposed by defendants in 1996 because they did not believe it was stringent enough and would not result in ultimate compliance with the Act. These decrees require defendants to perform adequate modeling, monitoring, and analysis so that the regulators can ensure that they are approving plans that achieve compliance with the Clean Water Act.

The Sixth Circuit has sometimes articulated this third prong as "consistent with the public interest." See United States v. County of Muskegon, 298 F.3d 569, 580-81 (6th Cir. 2002). In assessing whether a proposed settlement is in the public interest:

> [t]he court should . . . bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities "is the one that will best serve society," but only to confirm that the resulting settlement is "'within the reaches of the public interest.'"

United States v. Microsoft Corp., 56 F.3d 1448, 1462 (D.C. Cir. 1995) (emphasis in original; citations omitted). The decree serves the public interest in the many ways discussed above, by bringing defendants into compliance in the manner required by the Act and by providing appropriate redress to the public for the terrible problems they have endured as a result of sewage in their homes. The decree more than meets the requirement that it be "within the reaches of the public interest." Id.

C.    **The Comments Do Not Provide Any Basis to Disapprove the Agreement.**[39]

The United States received comments from 11 people or entities on the two decrees, including voluminous comments from Sierra Club. See Doc. 113, Notice and attached comments. Unfortunately, Sierra Club appears not to have heeded this Court's warning that Sierra Club desist from "derisive rhetoric of counsel" and "scurrilous" arguments. Order, Jan. 29, 2003, Doc. 90, p.2. For example, Sierra Club asserts that "Hamilton County ratepayers will pay $1.5 billion to *consultants and contractors* over a 19-year period to *study, plan,* provide some *temporary* fixes, while *committing to fix a mere 15%* of the decades-old overflows." Comments, Ex. 1-A, p. 1 (emphasis in original). As discussed above, defendants must pay what it takes (even if it exceeds $1.5 billion) to bring their system into full compliance – the fact that compliance is brought about by enforceable plans submitted under the decrees does not make the

---

[39] In this memorandum, the United States responds to what appear to be the most significant public comments raised during the two public comment periods. Attached to this memorandum as Exhibit 1 is a Responsiveness Summary, which responds to the additional comments received. Further, the United States believes that most if not all of the issues on the settlements that have been raised in Sierra Club's many prior filings with this Court are being addressed herein. Recognizing that this memorandum and its attachments would already be very long given the number of comments raised, the United States has focused on the comments Sierra Club submitted during the comment periods. Finally, a number of the comments initially received on the IPCD appear to be moot given the lodging of the Final Decree and will not be addressed. These include comments that the IPCD is partial and only addresses SSOs; does not require implementation of the CAPP; does not require defendants to pay a civil penalty; and does not represent diligent prosecution because of its partial nature and phased approach. In addition, Sierra Club criticized the fact that it was unable to participate in the negotiation of the IPCD and that it was "shut out" of the process. The United States assumes that this comment is also moot given the Court's orders that Sierra Club not interfere with the plaintiffs' and defendants' decree negotiations. See supra note 34.

    As an intervenor, however, Sierra Club may raise in its anticipated opposition brief any important points that it believes warrant further discussion.

compliance less of a commitment.[40]  Similarly, Sierra Club sarcastically sums up its view of the

Final Decree as "mostly an elaborate mechanism for planning and to assist MSD in putting off

implementation and avoiding consequences" SC, p.16.  Comments of this sort neither illuminate

the issues nor help the regulators or the Court evaluate whether there is merit to any of Sierra

Club's concerns.  Having done its best to wade through the quagmire, the United States submits

that nothing in Sierra Club's comments (or any of the others received ) provides a reason to

withdraw from or reject the proffered settlements.

      1.    The Regulators Are Capable of Properly Overseeing Implementation of
            the Decrees;  A Special Master is Unnecessary and Inappropriate

Sierra Club argues throughout its comments that, for numerous reasons, the governments

are incapable of properly overseeing the implementation of the consent decrees and that the

Court should appoint a special master to fill that role.[41]  These assertions, in their numerous

guises, are groundless.

The United States agrees with Sierra Club's assertions that defendants have had many

violations of the Act in the past, that they did not fully comply with the State-issued DFFO to

eliminate SSOs, that their system does not have adequate capacity for its flows, and that

discharges of sewage and other wastewater into peoples' basements is disgusting and presents an

unacceptable health hazard.  However, the primary focus now should not be on the moral weight

of defendants' past transgressions, but rather on the fact that the governments have acted to

---

[40] Further, even the reference to the $1.5 billion is baseless.  The provisions concerning the $1.5 billion potential schedule extensions, discussed infra at § III.C.8.b., concern capital expenditures for projects that are proposed in the plans after the studies have been performed.  See Final Decree ¶ IX.B.

[41] See also Comments, Ex. 2-A, p. 2.

secure a comprehensive pair of consent decrees to bring defendants into compliance. Once

entered, these decrees will constitute an enforceable judicial order, and this Court has plenary

powers to ensure that defendants comply with its orders. The United States is fully capable of

and committed to overseeing and enforcing these decrees, as it has done in many comparable

cases. Moreover, the United States' vigilance is backed up by <u>both</u> the State of Ohio and

ORSANCO. Finally, Sierra Club can itself monitor implementation of the decree and bring any

issues to the attention of the regulators or this Court, if necessary. Injecting a special master into

this mix is not necessary and would add uncertainty and an extra layer of complexity and expense

to implementation of the decrees.

                a.      The United States is Capable of and Committed to Overseeing
                       These Decrees.

First, it is important to note that addressing SSOs and CSOs is of critical concern to

Congress and is one of EPA's current highest priorities. As discussed above, Congress

specifically endorsed EPA's CSO Policy's approach by enacting Section 402(q) of the Clean

Water Act, which mandates that all permits, orders and decrees concerning CSOs comply with

the CSO Policy. 33 U.S.C. § 1342(q)(1). Congress further required EPA to report back to it on

progress made in implementing and enforcing the CSO Policy. 33 U.S.C. § 1342(q)(3). In its

2001 report to Congress, EPA pledged as follows:

> With the codification of the CSO Control Policy in the 2000 amendments to the CWA,
> EPA will continue to work in partnership with the states to address remaining CSO
> issues. EPA will work aggressively with NPDES authorities, water quality standards
> authorities, and CSO communities to implement and enforce the CSO Control Policy.

Report to Congress, Implementation and Enforcement of the Combined Sewer Overflow Policy,

EPA 833-R-01-003, Dec. 2001, ES-14.[42] Toward that end, in December 2003, EPA designated

wet-weather enforcement, including "ensur[ing] compliance with CWA requirements addressing

. . . overflows from combined and sanitary sewers . . ." to be one of the Agency's top four

enforcement priorities.  68 Fed. Reg. 68,893 (Dec. 10, 2003).

DOJ and EPA have entered into over 50 municipal Clean Water Act judicial settlements

and well over 100 administrative settlements that contain significant injunctive relief to address

SSOs and/or CSOs.[43] These include major judicial settlements with Honolulu, Maui, Atlanta,

Boston, Miami, Baltimore, Puerto Rico, Toledo, Youngstown, New Orleans, Baton Rouge, San

Diego, and many other communities.  In general, these settlements are structured very similarly

to the decrees in this case.  That is, if defendants have not already done so, they are required to

study their system in detail and to develop a plan or plans to achieve compliance; plans and other

submittals under the decree are subject to review and approval by EPA (and often by the State

too); some deadlines and performance criteria are specified in the decree, and some are required

to be proposed in the plans; compliance is subject to stipulated penalties; and defendants must

report on their compliance by periodically submitting substantial reports to EPA.  Contrary to

Sierra Club's assertions, the decrees in this case also contain all of the necessary elements to

allow EPA, Ohio, and ORSANCO to follow defendants' progress and ensure that the decrees are

appropriately implemented, including appropriate and enforceable interim and final deadlines,

---

[42] Relevant pages of this report are included in Appendix A.  The full report is available at
http://cfpub1.epa.gov/npdes/cso/cpolicy_report.cfm?program_id=5.

[43] In addition, EPA has entered into well over 100 CSO and/or SSO administrative settlements.

performance criteria, compliance standards, detailed and sufficient reporting requirements,[44] and

no "loopholes."[45] In the other CSO/SSO matters (as in settlements under other provisions of the

Clean Water Act and other statutes), EPA, with DOJ's assistance if necessary, has been

committed to ensuring that settlements are implemented properly and enforced by the court if

necessary, and the United States is equally committed here.

     As with many complex sewer system cases, the United States has expended significant

resources to reach these settlements and in no way intends to waste those efforts by tolerating

non-compliance.[46] As part of EPA's congressional mandate to implement and enforce the Clean

Water Act, EPA retains, hires, and otherwise assigns competent personnel to ensure that

settlements are appropriately negotiated and overseen, and this case is no exception. By way of

example, EPA has retained Mark Klingenstein, the technical expert who assisted with the

negotiation of the settlements, and his firm, SAIC, to oversee their implementation. Mr.

Klingenstein is one of the country's leading experts on CSO and SSO matters, and EPA has

---

[44] Even Sierra Club agrees that these reports "should contain a good amount of information." SC, p.16.

[45] See, e.g., infra §§ III.C.3.b, .4, .8; Responsiveness Summary ¶¶ 3-4.

[46] The lead DOJ attorney alone has spent over 3300 hours on the matter from 1997 through the filing of this brief, both working on settlement negotiations and preparing the case for litigation when settlement appeared uncertain. Other attorneys and paralegals at DOJ have spent more than 600 additional hours. The lead attorney in EPA Region 5 has similarly spent thousands of hours, and management and staff attorneys and technical personnel from EPA headquarters have devoted close to or exceeding 1000 hours to this case. Further, in the past 8 years, EPA's expert, Mark Klingenstein, and others at Science Applied International Company ("SAIC"), have spent over 7,000 hours on this case. Klingenstein Dec. ¶ 8.

relied on him and SAIC for many complex CSO and SSO enforcement matters.[47]  In addition,

EPA Region 5 has dedicated an experienced technical staff engineer and a highly qualified

attorney to oversee the decrees.  These people and/or other competent technical and legal

personnel as necessary, will ensure that EPA performs a timely and in-depth technical review of

submittals, approves only appropriate plans, carefully tracks defendants' implementation of the

decrees, and takes action to enforce the decrees as appropriate.[48]

The regulators' track record under the decrees thus far shows that there will be no "rubber

stamping" of submittals and that implementation will be closely monitored.   For example, as

discussed further below, the regulators have had the opportunity to approve two substantial plans

under the IPCD to date.  The regulators carefully reviewed the plans and refused to approve

either one as submitted for various technical reasons, but most importantly because the schedules

were not "as expeditious as practicable."  When ultimately approved, the technical concerns were

addressed, and both plans contained considerably tightened schedules.  See infra § III.C.3.b;

Klingenstein Dec. ¶¶ 31-32, 125.[49]

---

[47]  To date, he has been the governments' technical expert in at least 17 collection system cases,
including, among others, Miami, Toledo, San Diego, Boston, Indianapolis, Youngstown,
Portland, Baltimore, and Washington, D.C.  See Klingenstein Dec. ¶ 5, and his Curriculum
Vitae, attached to his Declaration.

[48] If somehow there is a breakdown in personnel in the future or some other matter, such as a
decrease in funding, that negatively affects the governments' oversight of this case, as discussed
below, Sierra Club can bring it to the attention of the regulators or this Court if necessary and the
issue can be appropriately addressed in the future.  See § III.C.1.b.; Responsiveness Summary ¶
13.  At present, there is simply no basis to assert that a lack of government funding or staff makes
a special master necessary here.  pp. 2, 16.

[49] Moreover, the entire Final Settlement was the outgrowth of the regulators' refusal to accept the
defendants' 1996 Long Term Control Plan because it did not go far enough toward capturing or
controlling their CSO discharges.  See infra § III.C.6.  Similarly, while defendants began initial

In addition to reviewing and approving submittals received to date, EPA and its consultants have been carefully monitoring defendants' progress through review of the quarterly progress reports required by the decree. Klingenstein Dec. ¶ 139. Contrary to Sierra Club's baseless assertions, there are many enforceable interim and final deadlines, performance criteria, and benchmarks to mark progress under the decrees. Further, the voluminous quarterly reports provide more than adequate information for the regulators to assess this progress, compliance with the decrees' terms, and compliance with the Act. [50]

Additional provisions in the Final Decree help ensure close oversight of the defendants' progress. As envisioned by the CSO policy, see 59 Fed. Reg. 18,694 (cols. 2-3), the regulators plan to meet with defendants throughout the LTCP Update process to ensure that defendants are moving in the right direction, to review the results of the analyses performed to date, and to discuss any questions that the parties may have. The Final Decree requires the parties to meet at least twice in 2004 and 2005 and once in early 2006 prior to the submittal of the LTCP Update Report. Final Decree, Exhibit 4, LTCPU Work Plan, pp. 8-9. Finally, although the regulators will not be members of the steering committee of local environmental and other organizations that defendants have convened to provide oversight and guidance to them throughout the LTCP Update process, the regulators will be invited to attend all Steering Committee meetings, and they plan to attend regularly. Final Decree, Exhibit 2, Public Participation Plan, pp. 1-2.

In short, there is no record to support Sierra Club's assertion that the United States and

---

work on their SSOs under a state administrative order, the regulators ultimately insisted on a more comprehensive approach, subject to stipulated penalties and enforcement by the court. See Responsiveness Summary ¶ 53.

[50] See infra, e.g., §§ III.C.3.b., .4; Responsiveness Summary ¶¶ 3 - 5.

the other plaintiffs will fail to properly oversee this comprehensive pair of court orders. After

having devoted so many resources to this matter thus far, the United States and the other

regulators are in no way going to shirk their duty to ensure that defendants comply with the

decrees and ultimately with the Clean Water Act.

At bottom, Sierra Club's oft-repeated refrain seems to be that this Court should not trust

the United States and State to do their jobs. However, "[i]t is a basic presumption of our system

of government that public servants abide by the law and their sworn duty to uphold it." Bragg,

83 F. Supp.2d at 719. Congress has given EPA and Ohio EPA primary authority over Clean

Water Act enforcement in this State, and this Court should presume that EPA and Ohio EPA,

together with ORSANCO, will enforce this decree with diligence. Friends of the Earth, Inc. v.

Laidlaw Envtl. Servs. (TOC), Inc., 890 F. Supp. 470, 487 (D.S.C. 1995).

        b.    Sierra Club Will Be Kept Fully Informed Concerning the
              Implementation of the Decree and Can Itself Raise Issues of Lack
              of Diligent Enforcement.

Although Sierra Club is not a party to the decrees and thus cannot actually enforce their

provisions, Sierra Club will have all the information it needs to track implementation of the

decree and raise issues if it so chooses. The United States has pledged to provide Sierra Club

with all plans, quarterly progress reports, and other documents submitted by defendants pursuant

to the decrees' requirements, as well as all formal responses that plaintiffs send to defendants

under the consent decrees.[51] Thus, Sierra Club will be kept well informed and can raise any

---

[51] These include the regulators' formal approvals, disapprovals with comments, and the various
written documents provided for in dispute resolution (e.g., notice of dispute, statement of
position). See, e.g., Final Decree ¶ VII.A.3 ("U.S. EPA/Ohio EPA/ORSANCO may approve the
Long Term Control Plan Update Report or decline to approve it and provide written
comments."); § XXI (Dispute Resolution).

perceived shortcomings in defendants' implementation or the governments' oversight to the

parties' attention.  Undoubtedly, Sierra Club will also feel free to raise issues to this Court's

attention if it feels it necessary to do so.  Finally, Sierra Club is free to file a citizen suit against

defendants for other violations of the Act, or even for violations that are the subject of these

decrees, if it can show that the regulators' lack of oversight amounts to a lack of "diligent

prosecution" for such violations.  Thus, if Sierra Club chooses, it can continue to play the "watch

dog" role in the community that Congress envisioned for citizen groups under the Clean Water

Act.[52]

In addition, in November 2003, Patrick Karney, the Director of the Metropolitan Sewer

District ("MSD"), invited intervenor-plaintiff, Marilyn Wall, a representative of Sierra Club, to

be a member of the LTCPU Steering Committee, which will provide oversight and guidance to

defendants throughout the development of the LTCP.  As the Public Participation Plan explains,

"[a]lthough MSD hopes that the Steering Committee will work toward a consensus regarding the

appropriate approach for MSD to take in addressing various CSO issues, Steering Committee

members will be encouraged to offer their independent views on issues - even when those views

might diverge from those of the rest of the Committee."  See Final Decree, Exhibit 2, p.2.

Should Ms Wall choose to join the Committee (and Mr. Karney has still not had a definitive

response from her or Sierra Club), Sierra Club would be able to provide direct input on the

development of the LTCPU.  See Declaration of Patrick Karney, attached hereto as Exhibit 3.

        c.      A Special Master Is Unprecedented and Inappropriate.

Sierra Club's request for a special master in this case is, so far as we are aware, without

---

[52] Sierra Clubs role in future proceedings is further discussed at Responsiveness Summary, ¶ 13.

precedent.  The United States has entered into close to or over 200 consent decrees per year, in

each of the last four fiscal years, in environmental enforcement cases on behalf of EPA.  Many of

those settlements involve remedial work over substantial periods, and EPA and DOJ are

accustomed and institutionally well-equipped to monitor and enforce compliance.   While the

United States has occasionally requested the appointment of a special master or court monitor to

supervise certain aspects of the defendant's compliance work, such requests are rare and virtually

never made before the defendant has been given sufficient opportunity to perform after the

decree or order has taken effect and the defendant has demonstrated an inability or refusal to do

so.  In no such case, however, has the special master's role been to supervise or supplant the

government's primary role in overseeing consent decree implementation.

        Before taking the extraordinary step of ordering a special master to oversee

implementation of these decrees – a step that no other court has ordered in connection with

similar settlements, this Court ought to see evidence that a master is needed because the

governments' oversight is inadequate.  There is no such evidence.  At this juncture, where

implementation and oversight of the IPCD has been proceeding smoothly since its lodging in

February 2002, and defendants are moving forward to implement the Final Decree, appointment

of a special master would divert attention from the tasks at hand and would require (presumably)

the defendants to divert resources that would be better spent improving their sewer system.

> d.      The United States Would Not Object to an Ombudsman
>           for the WIB Programs.

        Although the United States strongly opposes the appointment of a special master or other

third-party to oversee implementation of this settlement, the United States would not object to

the appointment of a local "ombudsman" or monitor (hereafter, "ombudsman") to serve as an intermediary between the parties and individuals who have sought relief under the WIB Programs. The WIB programs differ from the other remedial programs under the decrees in that they are highly oriented toward MSD's individual customers. That is, they are intended to provide relief or damages to individual homeowners, and issues may arise that pertain to "customer satisfaction." Such issues might include, for example, a resident's belief that his basement was inadequately cleaned up, that his damage claim was inappropriately rejected, or that he did not receive as much in reimbursement as warranted. Such concerns will generally have more to do with State law, tort claims, and property valuation than with compliance with the Clean Water Act and, therefore, may not necessarily be in the realm of EPA's or the other regulators' specialized expertise. Thus, while we believe that the regulators are fully capable of overseeing the WIB Programs and that the Final Decree provides reporting and other mechanism that will help them do so, we can also foresee value in setting up a "neutral" office, such as a court-appointed ombudsman, to help ensure personal and individualized "customer service" attention to citizen claims.

Thus, if the Court believes it desirable, the United States would not object to an "ombudsman" being selected or appointed to assist the citizens with complaints they may have concerning the WIB Programs and/or to advise this Court as necessary concerning WIB program implementation. The United States envisions that this would be someone in the community whom residents could call or otherwise contact if they believe they have not received appropriate or adequate response from defendants' personnel on their basement issues. The United States envisions that the ombudsman would be able to investigate the allegations, determine whether

-46-

additional action is warranted, inform the defendants of what action is necessary, and convene

the parties if necessary to discuss issues or deficiencies.  ( If the ombudsman does not have

technical expertise sufficient to determine a particular matter, he or she could contact the

regulators for a technical opinion or could hire a consultant on an "as needed" basis.)  We

envision that the ombudsman would inform the regulatory agencies if defendants do not respond

appropriately, which would give the agencies an opportunity to impose the stipulated penalties

provided in the Final Decree or take any other action necessary to enforce the Final Decree's

WIB Program.  If there were a major breakdown in the process, however, the ombudsman could

report directly to this Court, which could convene the parties if necessary.  In addition, of course,

if this Court desires it, the ombudsman could report to the Court periodically, or upon request, on

the status of implementation of the basement programs.  Should the Court determine that such an

ombudsman is necessary or desirable, the United States believes that Ginny Whitman or Mike

Newman would be well qualified to fill this role.

It must be stressed that the United States is not suggesting that the decrees need to be

modified or that the Court should hesitate to approve them as negotiated.  If the Court believes

such an ombudsman role is appropriate, the parties could meet among themselves, or with this

Court, to hammer out the role after entry of the decrees, and any resulting approach can be

embodied in a separate subsequent Court order.

Finally, it must also be stressed that, although the United States would not object to a

WIB ombudsman as described above, it continues to oppose any such additional oversight for the

CSO, SSO and WWTP compliance projects and programs required by the decrees.  Oversight of

these programs should remain with the "government actor[s] committed to the protection of the

-47-

public interest and specially trained and oriented in the field." <u>United States v. Comunidades</u>

<u>Unidas Contra La Contaminacion</u>, 204 F.3d 275, 280 (1st Cir. 2000).[53]

    2. <u>The United States has Sued the Appropriate Entities, and This Court Has</u>
<u>Plenary Authority to Enforce its Orders Against these Defendants, their</u>
<u>Employees, or Others if Necessary.</u>

  Sierra Club asserts that the United States should have sued MSD in its own name and

made MSD and its director signatories to the decree "so that they can be directly and personally

subject to the injunctive powers of the federal court, including the power of contempt." SC, p.4.

The Court has also voiced concerns about the relationship between the defendants and MSD,

including whether the County and City can adequately control MSD so that the decrees can be

properly implemented. While the relationship between the defendants and MSD, which is

governed by Ohio state law, is beyond the scope of the decrees, this arrangement will not hinder

the appropriate implementation of the decrees. On the contrary, it was appropriate and sufficient

to sue the Board of Commissioners of Hamilton County Board ("County"), which pursuant to

Ohio law has authority and control over the sewer system, including financial control, and the

City, which operates the sewer system under a contract with the County, and not to sue MSD as

well, because MSD is not itself separately subject to suit. <u>See</u> Responsiveness Summary ¶ 1.

Moreover, as explained below, MSD, its director, and its employees are already required to

comply with the consent decree pursuant to Federal Rule of Civil Procedure 65(d),[54] and this

---

[53] The Sixth Circuit has specifically commented on EPA's "substantial expertise in the environmental field." <u>Akzo</u>, 949 F.2d at 1436.

[54] This Rule provides that "every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees and attorneys and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. Proc. 65(d).

Court has plenary authority and multiple and sufficient means to enforce the entered consent decrees as lawful orders of this Court.

The Metropolitan Sewer District was established pursuant to Ohio Revised Code Chapter 6117. Under this law, the County is authorized to establish sewer districts, but the County itself retains authority and control of the sewer system and remains responsible for such things as the acquisition, construction, maintenance, and operation of the sewer system; acquiring real estate for the sewer system; adopting and enforcing rules and regulations for the construction, maintenance, and use of the sewer system; establishing rates and service charges; and issuing bonds. See Ohio Rev. Code §§ 6117.01 - 6117.04, 6117.39; 133.08. Thus, the County owns, controls, and holds the purse strings for the sewer system.

In 1968, pursuant to authority provided by ORC §307.15, the County contracted with the City to provide a "total and complete management service for the operation of the county Sewer System," and specifically, to "do all things necessary to manage and operate the Metropolitan Sewer District . . . ." See April 14, 1968 Agreement, attached hereto as Exhibit 4, at p.2 and p.4, § VIII. Pursuant to this contract, the City staffs and operates MSD, and employees of MSD are employees of the City. See Agreement p.4, § VII.

By suing the City and County and having both entities sign the decrees, the United States has joined to the decrees the authorities that own, control, fund, and operate the sewer system and MSD. There can be no finger pointing at each other because both the City and County are subject to the decrees and to the Court's powers to enforce it.

Further, it is not necessary for MSD, its director, Pat Karney, or any of its other employees to sign the decrees, because they are already bound to comply with them. Federal

-49-

Rule of Civil Procedure 65(d) states that an injunction is binding "upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Even if MSD could be considered a legal entity separate from Hamilton County, which the United States does not believe is the correct interpretation of Ohio law, see Responsiveness Summary ¶ 1, it would be bound by the terms of the consent decrees because it is "in active concert or participation with" the City and County and has actual notice of the consent decrees.[55] As the Supreme Court has explained, Rule 65(d) can be interpreted as derivative of common law doctrine that parties who are "identified with [the defendants] in interest, in 'privity' with them, represented by them or subject to their control," are bound by the injunction so that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14 (1945). Thus, even if it could be considered a separate legal entity not controlled by the County, MSD would also be considered bound so that defendants are not able to avoid complying with the decrees by blaming MSD for any noncompliance.[56]

---

[55] For example, the decrees are discussed on MSD's website: http://www.msdgc.org/consent_decree/.

[56] The Sixth Circuit has recently addressed the issue of who is bound by Rule 65(d) and found that to enjoin an administrative head, but interpret that injunction to exclude those who actually implement that which is enjoined, would serve no purpose. In Blackard v. Memphis Area Medical Center for Women, Inc., 262 F.3d 568 (6th Cir. 2001), cert. denied, 535 U.S. 1053 (2002). In Blackard, the Administrative Director of the Courts (ADC) was enjoined from enforcing an abortion-related parental consent notification provision of a Tennessee statute on the basis of potential unconstitutionality. The court found that though the ADC did not have a direct supervisory role over the juvenile courts, which were actually involved in the enforcement of the statute, "[t]o enjoin the ADC without having that injunction reach the judges of the various courts would be meaningless where the purpose of the injunction is to prevent the enforcement of

Similarly, Pat Karney, the Director of MSD, and other MSD officials and employees are also bound to comply with the decree by Rule 65(d) because they are employees of the City, a party to the decree.

Equally as important as who is bound by the decrees is the fact that this Court has ample authority and power to ensure that the decrees are implemented. In the event that the decrees' substantial stipulated penalties are insufficient to ensure defendants' compliance, the United States would file a motion to enforce the decree, as it has against other municipal settlors when necessary. Generally, such a motion and any ensuing order has been sufficient to obtain compliance. However, in the unlikely event that it is not, this Court has the "inherent power to enforce compliance with . . . [its] lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). As the Supreme Court has explained, "federal courts are not reduced to issuing injunctions . . . and hoping for compliance. Once issued, an injunction may be enforced." Hutto v. Finney, 437 U.S. 678, 690-691 (1978). The Supreme Court has explicitly noted that a court may hold a city in contempt and fine it for failure to comply with a consent decree, and in egregious and appropriate circumstances, may even be able to hold individual city council members in contempt, even though they are not signatories to the decree. See Spallone v. United States, 493 U.S. 265, 278-80 (1990) (upholding contempt sanctions against city for violating consent decree, but overturning contempt sanctions against individual councilmen

---

a potentially unconstitutional statute." Id. at 576. Similarly, here, to the extent MSD is viewed as a separate entity that in fact is implementing the WIB program and other programs under the decrees, it would be meaningless to hold that MSD is not subject to the consent decrees and this Court's powers.

because contempt against city was likely sufficient to compel compliance with decree).[57]

        3.     The Schedule Approach Used by the Decrees Is Reasonable and Appropriate.

Several commenters have complained that even after entry of the decrees, defendants will still be in violation of the Clean Water Act. See Comments, Exhibits 3-E, 3-F, 3-H. In a related vein, commenters have complained that the schedules in the decrees are too long and thus that violations will continue for too long. See Comments, Exhibits 1-A, pp. 19-20; 3-A; 3-D; e.g., SC, p.1 ("The second Decree authorizes illegal CSO, SSO and Wastewater Treatment Plant violations for another twenty years."). Sierra Club has further asserted that the schedule approach contained in the decree is vague and unenforceable. SC, pp. 2, 4, 6-10. While criticisms of particular schedules in the decrees are addressed in the Responsiveness Summary, see ¶¶ 2, 37, 38, it is important to describe at this juncture the nature of the injunctive relief provided by Section 309(b), 33 U.S.C. 1319(b), of the Clean Water Act.[58]

        a.     The Clean Water Act Does Not Preclude a Phased Compliance Schedule

Section 309(b) of the Act authorizes EPA to "commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order," which would include the violations that are at issue in this case. 33 U.S.C. § 1319(b). In Weinberger v. Romero-Barcelo, 456 U.S. 305, 317-18 (1982),

---

[57] In extreme cases, courts have turned to receivership to achieve the necessary compliance. See, e.g., United States. v. City of Detroit, 476 F. Supp. 512 (D.Mich. 1979) (court found it necessary to implement Clean Water Act consent decree by putting authority to control the sewer system in the hands of one person).

[58] The other two commenters on the Final Decree raised various duplicative concerns. See Comments, Ex. 2-A, p. 1; Ex. 2-B.

the Supreme Court addressed the operation of Section 309(b) and stated that "[t]he provision

makes clear that Congress did not anticipate that all discharges would be immediately enjoined. .

. . [E]nforcement actions typically result, by consent or otherwise, in a remedial order setting out

a detailed schedule of compliance designed to cure the identified violation of the Act." Thus, the

fact that discharges will continue after the decrees are entered is not fatal to the decrees. On the

contrary, the projects contemplated under the two decrees will necessarily take considerable time

to plan and build, and for defendants to simply "turn the plumbing off" for its over 800,000

customers while construction occurs would not be in the public interest. If the parties were to

litigate concerning the appropriate remedial schedules, this Court would use its traditional

equitable discretion to balance the equities and determine a schedule that is appropriate. 456

U.S. at 316. As the Supreme Court explained, "'[t]he essence of equity jurisdiction has been the

power of the [court] to do equity and to mould each decree to the necessities of the particular

case. Flexibility rather than rigidity has distinguished it.'" 456 U.S. at 312, quoting Hecht Co. v.

Bowles, 321 U.S. 321, 329 (1944).

  The issue for this Court in reviewing the schedules under the decrees is similar, but is one

step removed because this Court is reviewing the negotiated settlement of the parties. As

discussed above, the issue is whether, in light of the massive resource and construction

commitments contained in the decrees, the schedules are reasonable. This determination

involves the exercise of the Court's equitable discretion, but the Court should not substitute its

judgment for the balance struck by the parties. E.g., Akzo, 949 F.2d at 1435. Moreover, this

Court should defer to the expertise of U.S. EPA and Ohio EPA, the agencies entrusted by

Congress with implementing the Clean Water Act. As the Sixth Circuit has noted, it is not this

Court's task to

> engag[e] in a de novo review of the scientific evidence pro and con on each
> proposed remedy . . . . The federal courts have neither the time nor the expertise
> to do so . . . . "When examining this kind of scientific determination . . . a
> reviewing court must generally be at its most deferential."

Akzo, 949 F.2d at 1424 (discussing deference due to EPA under a CERCLA settlement), quoting

Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103

(1983) (concerning judicial review of Nuclear Regulatory Commission's decisions on nuclear

power plant licensing). See also, e.g., District of Columbia, 933 F. Supp. at 47 (broad deference

should be afforded to EPA's expertise in determining an appropriate Clean Water Act

settlement). Under this deferential standard, this Court should find that the schedule approach

used by the decrees and discussed below, as well as the specific deadlines themselves, are

reasonable.

>        b.       The Schedule Approach is Reasonable and Appropriate.

The decrees require defendants to develop a plan and schedule for each of the major

remedial construction components of the decrees, e.g., the SSO 700 interim and final remedies,

the CAPP, and the LTCPU.[59] The decrees require that the schedule for each of these major

components must be "as expeditious as practicable," but must achieve completion of

construction no later than a specified "backstop" deadline. These backstop deadlines were

negotiated to be reasonably expeditious based on currently available information. See, e.g.,

Klingenstein Dec. ¶¶ 45-46. Once the data gathering, analyses, and planning required by the

---

[59] This approach of requiring schedules to be submitted as part of a plan that is subject to
governmental approval is a common and appropriate means for setting enforceable consent
decree schedules. Klingenstein Dec. ¶ 113.

-54-

decrees are performed, sufficient information will be available for defendants to propose more precise implementation schedules and for defendants (or the regulators) to tighten the backstop deadlines as necessary to meet the "as expeditious as practicable" standard. Thus, when construction can practicably be achieved earlier than the decrees' listed backstop deadlines, it must be. If disagreements about tightening deadlines arise in connection with the approval of plans, they will be resolved through the dispute resolution mechanisms of the decrees.

Further, the schedules are required to include "critical construction milestones", including, at a minimum, deadlines for submission of a Permit to Install; commencement of construction, and completion of construction.[60] These interim deadlines will help the regulators ensure that defendants remain on track to meet their final deadlines.

Sierra Club argues that the "as expeditious as practicable standard" is vague, undefined, and "presumes a history of good faith compliance;" that the regulators will not enforce this standard to ensure that remediation occurs expeditiously (and thus that a special master is necessary); and that the decree should adopt a"time is of the essence" standard. E.g., SC, pp. 2, 4, 6 - 10. Once again, Sierra Club's assertions lack merit.

First, the "as expeditious as practicable" standard is not only consistent with, but effectively mandated by, EPA's CSO Policy and the Act. As discussed above, the Clean Water Act requires that CSO consent decrees conform to the CSO Policy. 33 U.S.C. § 1342(q)(1). The CSO Policy uses the phrase "as soon as practicable" when referring to the time frame for coming

---

[60] See, e.g., Final Decree VII.A.2, Ex. 4, ¶ II.F; IPCD ¶ VII.E.5. Thus, Sierra Club's oft-repeated complaint that the decree contains "no interim deadlines" is simply false. See, e.g., SC, p.2, 3, 7. These milestones are interim construction deadlines, and failure to meet them subjects defendants to substantial stipulated penalties. See IPCD ¶ XI.C.1; Final Consent Decree ¶ XVII.C.2.

into compliance with CSO standards. <u>See</u>, <u>e.g.</u>, 59 Fed. Reg. 18,690 (col.3), 18,691 (col. 3), 18,696 (col. 1). This standard is essentially synonymous with "as expeditious as practicable."[61] at 18,688 (col . 3). As discussed further <u>infra</u> § , the CSO Policy provides further guidance on how this phrase should be interpreted and how schedules should be devised. Of particular note is the fact that the concept of "practicability" goes beyond mere engineering practicability. The CSO Policy specifically "recognizes that financial considerations are a major factor affecting the implementation of CSO controls. . . [and] . . . allows consideration of a permittee's financial capability in connection with the long-term CSO control planning effort . . . and negotiation of enforceable schedules." 59 Fed. Reg. at 18,690, col. 3. Thus, the CSO Policy stresses that LTCP schedules must "require the earliest practicable compliance date considering physical <u>and</u> <u>financial</u> capability. 59 Fed. Reg. at 18,689, col. 3 (emphases added).

Further, the "as expeditious as practicable standard" is neither vague nor unenforceable. Federal courts have been able to apply phrases like "as expeditiously as practicable" without any apparent trouble. As one court has noted, "[i]n ordinary usage...'as expeditiously as possible' [is] understood to mean 'as soon as reasonably possible under all the circumstances." <u>Thomas De La Rue v. U.S. Banknote Corp.</u>, 979 F. Supp. 968, 972 (S.D.N.Y. 1997). Thus, if the parties are unable to agree on a particular deadline in the future, it is completely reasonable to assume that

---

[61] The dictionary defines the term "expeditiously" as "possessed of, or characterized by, expedition, or efficiency and rapidity in action." "Soon" is defined as "quickly." "Expeditiously" is defined as "possessed of, or characterized by, expedition, or efficiency and rapidity in action," and "practicable" as "capable of being effected, done, or put into practice; feasible." <u>See</u> Webster's Revised Unabridged Dictionary, 1998. Thus, the phrase "as expeditiously as practicable" can be defined, "as rapidly as is capable of being done," and means the same as "as soon as practicable" or "as quickly as practicable."

-56-

this Court can effectively apply the standard used in these consent decrees and that the standard

is clear enough to be enforceable.  While it may be a factually intensive analysis, at least the

Court will have before it the information developed under the decrees that is necessary for an

informed decision.[62]

Finally, in reviewing and approving the two major plans received to date, the regulators

have already shown that the "as expeditious as practicable" standard in fact does have "teeth,"

and that if warranted, the regulators will demand a more expeditious schedule.  For example, the

IPCD requires that the SSO 700 Interim Remedial Measures Plan ("IRM Plan") include a

schedule that is "as expeditious as practicable and that achieves completion of construction by no

later than December 31, 2007."  IPCD ¶ VI.B.1.  As initially proposed, the IRM Plan contained a

"substantial completion of construction" deadline[63] of July 2007.  The regulators believed the

interim remedy for SSO 700 could be constructed more quickly.  Ultimately, the regulators

approved an SSO 700 IRM Plan that required substantial completion of construction, i.e.,

commencement of operation of the treatment system, to occur a year earlier, or by July 2006.[64]

─────────────────

[62] The decrees' approach of setting "backstop" deadlines, subject to further tightening when the relevant information becomes available, is preferable to spending perhaps years now litigating the deadline issues based on insufficient information.

[63] The Final Decree uses the term "Substantial Completion of Construction," which is defined to mean "completion of construction and installation of equipment such that the system may be placed in full operation, and will both function and perform as designed.  This specifically includes all control systems, instrumentation and all residual handling systems."  Final Decree ¶ V.B.  This definition ensures that the systems will be fully operational as expeditiously as practicable, but minor "finishing touches," such as landscaping or other non-functional components, may be completed later.

[64] The approved schedule allows for a maximum total 6 month extension, i.e., until no later than December 2006, if any of several prescribed "unavoidable contingencies" (essentially "force majeure" events) occurred, such as "unavoidable events" that cause delays in property acquisition