Klingenstein Dec. ¶ 30-31.[65] Similarly, in February, 2004, defendants submitted the Capacity

Assessment Plan to the regulators for approval. Klingenstein Dec. ¶ 125. This plan guides the

development of, and sets the schedule for, the capacity assessment and the Capacity Assessment

Program Plan, the major remedial plan for SSOs. IPCD ¶ VII.C. After their review, the

regulators again insisted that the defendants' proposed schedule for the submission of the CAPP

was too long, and more importantly, was not coordinated with the submission of the LTCPU.

This coordination is essential so that the regulators can review the plans together and assess the

various aspects of the remedial program as a whole. As finally approved, the Capacity

Assessment Plan adequately addressed all of the regulators' concerns, and most importantly, the

date for submission of the CAPP was June 30, 2006 – eight months earlier than initially proposed

and the same day as the LTCPU is due. Klingenstein Dec. ¶ 125.

    In sum, Sierra Club's concern over the "as expeditious as practicable" standard is

unfounded, especially given the concrete dates that provide backstop deadlines for the decrees'

major remedial components and this Court's ability to hear the evidence and apply the standard if

necessary. Nor do Sierra Club's other schedule-related comments warrant this Court's concern.[66]

---

or in obtaining authorizing legislation. Klingenstein Dec. ¶ 31.

[65] After discussions among the parties, defendants proposed and the regulators recently approved further revisions to the SSO 700 IRM Plan under which defendants will increase the storage capacity of the treatment facility so that untreated discharges from SSO 700 will be reduced from the current average of approximately 44 down to perhaps one every several years. See Klingenstein Dec. ¶¶ 26, 33; Responsiveness Summary ¶ 37.

[66] Sierra Club also raises the concern that having one "substantial completion of construction" deadline (2022) for all of the CAPP and LTCPU projects means that the final schedule could allow the deadlines for all of the projects to be 2022. SC, pp.6, 7, 17. This schedule would be inconsistent with the decree and would never be approved by the regulators. First, it would simply not be practicable from a project management perspective, and would not meet the "as

4.    The Decree Appropriately Uses the Clean Water Act's Statutory and
Regulatory Requirements as Goals and Endpoints For the LTCP Update.

Sierra Club criticizes the Final Decree for establishing three allegedly undefined goals for

the Long Term Control Plan Update.  SC, pp. 6-7.  However, these goals carefully track the

Clean Water Act statutory and regulatory requirements at issue.   Specifically, the first goal for

the LTCPU is that "Defendants construct and implement all feasible alternatives to eliminate

bypasses at Defendants' WWTPs or, if defendants demonstrate during the course of developing

the Long Term Control Plan Update that elimination of bypassing is not feasible, to reduce

bypasses at the WWTPs to the maximum extent feasible and to provide maximum feasible

treatment for any remaining bypasses."  Final Decree ¶¶ VII.A, D.2.  This goal tracks the

regulatory language at 40 C.F.R. § 122.41(m)(4), and Section III.11 of defendants' NPDES

permits, which both prohibit "bypass" unless, inter alia, "there were no feasible alternatives to

the bypass."[67]

---

expeditious as practicable" standard.  Klingenstein Dec. ¶¶ 127-28.  Further, as noted above,
there must be interim deadlines to ensure that the work proceeds in an orderly and appropriate
manner.  Finally, Sierra Club will be receiving a copy of the proposed CAPP and LTCPU, and if
defendants propose such a ridiculous schedule and plaintiffs do not disapprove it, Sierra Club is
free to raise the matter with the regulators or to inform this Court.

[67] Sierra Club laments that there is no "definition of feasible or non-feasible."  SC, p. 7.
However, the term "feasible" is a commonly used term in environmental law, establishing an
extremely stringent standard, that the regulators and this Court are well equipped to enforce.
Specifically, as the Supreme Court has recognized, the plain meaning of the term "feasible" is
"'capable of being done, executed, or effected,'" American Textile Manufacturers Institute, Inc.
v. Donovan, 452 U.S. 490, 508-09 (1981) (quoting Webster's Third New International
Dictionary of the English Language 831 (1976)).  However, the term encompasses both
"technical" feasibility and "economic" feasibility.  See American Textile, 452 U.S. at 530 n.55.
Cf. United States v. City of Toledo, Ohio, 63 F. Supp. 2d 834 (N.D. Ohio 1999)("feasible
alternatives" under bypass regulation include added plant capacity requiring planning and
construction).  Sierra Club's suggestion that the decree should place some sort of parameters
around the term "feasible," especially at this point in advance of the LTPU process, would only

The second and third goals are that "Defendants' CSOs comply with the requirements of the Clean Water Act, U.S. EPA's CSO Policy, Chapter 6111 of the Ohio Revised Code and the rules promulgated thereunder, the Compact and the pollution control standards promulgated thereunder, and the Defendants' Current Permits," and that "Defendants shall not have Unpermitted Overflows." Final Decree ¶¶ VII.A, D.2. These goals also track the Clean Water Act's statutory requirements prohibiting discharges of pollutants "except as in compliance with" NPDES permits. 33 U.S.C. § 1311(a).

Clearly, in this Clean Water Act lawsuit seeking injunctive relief requiring defendants to take measures to comply with the statutory and regulatory requirements applicable to their bypassing and CSOs, it is appropriate for the goals of the long term remedial measures planning process, and the compliance endpoints, to track the language of the requirements being enforced.

Despite the fact that these compliance requirements are derived from statute, regulations, and permit language, Sierra Club insists that there should be "standards" to "further define" what these compliance goals are. SC, pp. 7, 15. In particular, Sierra Club suggests that the final consent decree should include the concept of "design storms" to further define the regulatory term "feasible" in the bypass prohibition and to mandate in the decree the ultimate design capacity of the sewer system.[68] The United States disagrees.

Sierra Club repeatedly refuses to accept the fundamental premise of the LTCP process as

---

serve to reduce the stringency of the standard.

[68] SC, pp. 7, 15. As Sierra Club sarcastically puts it: "The planning of the LTCPU does not appear to be tied into a specific system capacity. So, after years and years of negotiations and "hard bargaining" with the MSD, the EPA/OEPA still don't know what size sewer system they want to get from the defendants when the planning and construction is all done." SC, p. 15.

set forth in the CSO Policy and mandated by Congress. A municipality cannot appropriately propose a final remedial approach until it has performed the required analysis, and similarly, the regulators cannot endorse or disagree with a proposed approach without that analysis. There is no "one size fits all" sewer pipe that should be installed. In some areas, designing for a 10-year storm or a particular percentage "capture" might be sufficient. In other areas, it might not be. It is only after defendants, and the regulators, have analyzed an array of various potential alternatives (including for their expected cost, performance, and impact on the receiving stream) that they can determine the appropriate mix of remedial solutions that provide the "most cost-effective means of reducing pollutants and meeting CWA objectives and requirements." 59 Fed. Reg. 18,689, col. 3. Similarly, what is "feasible" at one WWTP may not be sufficient at another where, for example, there is more room to build a larger retention basin. In short, picking a design storm out of the air as the ultimate compliance criterion for either the sewer pipes or the WWTPs is wholly contrary to the CSO Policy and, thus, is inappropriate.[69]

     5.    The Decree Appropriately Accounts for the Possibility of Future Revisions to Water Quality Standards.

Sierra Club also argues that the Final Decree is "not in the public interest" and "violates the Clean Water Act" because the decree accounts for the possibility that water quality standards might eventually be revised based upon information generated in the course of developing the Long Term Control Plan Update. SC, pp. 2 , 8.[70] However, as noted above, U.S. EPA's 1994 CSO Policy specifically directs that "[d]evelopment of the long-term control plan should be

---

[69] Sierra Club's additional technical comments concerning bypass are addressed in the Responsiveness Summary at ¶¶ 19-20.

[70] See also Comments, Ex. 2-A, p. 1; Comments, Ex. 2-B.

coordinated with the review and appropriate revision of [water quality standards] and implementation procedures on CSO-impacted waters to ensure that the long-term controls will be sufficient to meet water quality standards." 59 Fed. Reg. 18,694. Moreover, Congress endorsed this approach by amending Section 402(q)(2) of the Clean Water Act to specifically require that U.S. EPA issue guidance to facilitate this process; and Congress also required in Section 402(q)(1) of the Clean Water Act that all CSO consent decrees such as the Final Decree in this case "shall conform to" that policy. 33 U.S.C. § 1342(q)(1).

Sierra Club insinuates that the regulatory authorities may have "already approved" revisions to water quality standards, are "working 'behind the scenes' with MSD to make them happen," and will flout the law by allowing revisions to water quality standards to occur that will violate Clean Water Act requirements pertaining to "anti-backsliding" and "existing uses." SC, pp. 8, 21. According to Sierra Club, "[i]t is obvious that the entire focus of MSD's effort will be to petition OEPA and EPA to lower the present WQSs . . . and to propose a set of remedial alternatives in the LTCPU in 2006 that will be scaled back from what is currently required or was required in the 1996 LTCPU." SC, p.21 (emphasis in original).[7/] Sierra Club's overheated assertions are both unfounded and illogical. If that truly was the regulators' intent, then presumably U.S. EPA and Ohio EPA would have simply approved the Long Term Control Plan proposed by defendants in 1996. U.S. EPA refused to do so because that plan did not go far enough in controlling CSOs, which is one of the primary reasons the United States brought this

---

[7/] In a similar vein, it asserts that "[t]he whole thrust of the Decree (not hidden in any way) is for MSD to keep getting away with business as usual." Id. at 22.

judicial enforcement action.[72]

An additional problem with this aspect of Sierra Club's comments is that its concerns about potential revisions of water quality standards are being raised at the wrong time and in the wrong forum. As described above, Section 303(c) of the Clean Water Act, U.S. EPA's implementing regulations at 40 C.F.R. Part 131, and Ohio law establish a separate regulatory process and substantive criteria governing the review and possible revision to water quality standards.[73] That process includes providing the public ample opportunity to review and comment on any revisions to water quality standards that the State might be considering. To the extent Sierra Club takes issue with any revision to water quality standards that Ohio EPA might propose in the future, Sierra Club will be free to raise its arguments during the public comment period, including arguments based upon the Clean Water Act's "anti-backsliding" and "existing use" requirements. If Ohio EPA fails to adequately address Sierra Club's concerns, Sierra Club will have the right to challenge that future Ohio EPA action first administratively and then in an Ohio appellate court. In addition, Sierra Club would be able to petition U.S. EPA to disapprove the State's decision. If U.S. EPA fails to adequately address Sierra Club's concerns and approves this future Ohio EPA decision, Sierra Club can challenge U.S. EPA's decision in federal court. Sierra Club's speculative arguments that U.S. EPA and Ohio EPA will allow illegal revisions to water quality standards should not serve to hold up entry of these consent decrees.

---

[72] See infra § III.C.6.

[73] See § II.C.1 . Thus, the Final Decree specifically provides that disputes concerning, inter alia, the issuance, renewal, modification, denial or revocation of a permit and decisions with respect to new or revised water quality standards are not subject to dispute resolution under the decree but, rather must be addressed in the relevant administrative and/or judicial forum. Final Decree ¶¶ XXI.B, C.

Sierra Club makes one final comment in this regard that strains all credibility. Specifically, Sierra Club makes the unsubstantiated statement, in boldface type, that **"the public may end up spending \$1.5 billion and end up with lower water quality then they have now."** Id. at 8 (emphasis in original).  Clearly, \$1.5 billion spent on implementing the remedial measures required by these consent decrees, under the regulators' and this Court's oversight, will dramatically improve water quality by eliminating or significantly reducing untreated discharges and otherwise bringing defendants into compliance.  It is mystifying that Sierra Club would suggest that such an expenditure may actually result in lower water quality than currently exists.

6.    The Decrees Appropriately Include Requirements For Defendants to Build Now Only Those Remedial Measures That Will Not Be Rendered Obsolete By the Long Term Remedial Measure Plans.

Sierra Club argues that the number of Capital Improvement Projects ("CIPs") included in the IPCD and Final Decree is "woefully inadequate." SC, p. 5.  Sierra Club notes that defendants developed a proposed Long Term Control Plan for addressing CSOs in 1996 and that, as part of that plan, remedial measures were developed for at least 214 of the 256 CSOs.  Comments, Ex. 1-A, p. 5.  Sierra Club asserts that defendants should be required to implement all of those remedial measures that were developed as part of the 1996 LTCP, not just the 40 projects set forth in Exhibit 1 to the Final Decree.  Id.; SC, p. 20.

The United States disagrees because defendants' 1996 Long Term Control Plan was inadequate for several reasons, most importantly because it would continue to allow too much pollution from defendants' CSOs.[74]  Most of the remedial measures set forth in that plan are

---

[74] As described in Paragraphs 72-73 of Mark Klingenstein's Declaration, there are several fundamental problems with that plan.  First, the plan was premised on the improper presumption that reducing raw sewage discharges from CSOs from the current annual amount of

-64-

likely to be superceded by other, more stringent, measures that defendants will be required to

implement once the long term remedial plans are approved under the decrees in 2006. In light of

the massive amount of money that the citizens of Hamilton County are going to be required to

spend to address their sewer problems, and the fact that defendants will begin implementation of

the long term remedial measures plans in 2006 or early 2007, it would not be in the public

interest to require defendants to squander resources on projects that are likely to be superceded

once the long term remedial measures plans are approved. Instead, defendants should only

implement those CIPs from the 1996 LTCP or elsewhere that are likely to be included in or

compatible with any conceivable long term remedial measure plans developed under the decrees.

To this end, the United States carefully analyzed each of the 216 CSO projects on the CIP

list and determined which ones met the criterion of being likely to be included in or compatible

with the long term remedial measures plans. A description of the analysis that was performed for

each of the 216 CIP projects is included in the Declaration of Mark Klingenstein at ¶¶ 78-88.

The CIP list attached to the Final Decree as Exhibit 1 includes all projects that survived this

analysis.[75]

---

approximately 6 billion gallons down to an annual average of 2.5 billion gallons, occurring an
average of 12 occasions per year will be sufficient to comply with the Clean Water Act. Second,
a major component of the plan for reducing raw sewage discharges was to provide satellite
treatment to some of the sewage with relatively primitive primary treatment and disinfection
facilities to be constructed at various locations throughout Hamilton County. Since that time, a
more advanced high-rate treatment technology has been developed for treating CSOs that will do
a far better job removing pollutants and minimizing public health risks from CSOs than the
earlier technology. Third, the plan did not consider the possibility of construction of a deep
tunnel under the Mill Creek to store excess flow to permit its later treatment.

[75] The parties met with Sierra Club on May 1, 2003 to discuss the CIPs that had been selected
for Exhibit 1. Sierra Club continued to assert that other projects should also be included and sent
the United States a list of 57 CSO CIPs that it asserted should be built now. Mr. Klingenstein

The regulators did not include more SSO CIPs in the IPCD for similar reasons. As is true of the remedial measures for CSOs, determining the SSO remedies this can only be accomplished after careful monitoring, modeling and engineering analysis of the sanitary sewer system, and this is the approach that EPA typically requires for addressing unpermitted discharges from large collection systems. Klingenstein Dec. ¶¶ 110-18. Before the parties began negotiating concerning the IPCD, defendants had developed certain CIP projects, but they had not performed the system-wide effort necessary to develop an appropriate system-wide solution. The regulators agreed to include certain CIPs in the IPCD, which would address most of defendants "highly active" SSOs because they would address some of defendants' worst SSOs and the projects seemed reasonably developed. Id. ¶18. Clearly, then, it is appropriate to require Defendants to move forward with these projects, while they are developing their comprehensive solution for the remaining SSOs, which is due in 2006.

       7.    The Decrees Themselves Appropriately Do Not Contain A Financial Plan, But Such a Plan is Required as Part of the LTCPU.

Sierra Club asserts that the consent decrees are deficient because they do not have an attached financial plan, do not require defendants to submit a financial plan, and contain no funding commitments. SC, pp. 2, 11-12. In particular, Sierra Club asserts that there needs to be a definite funding plan and multi-year commitment for the WIB Programs. SC, pp.14, 23, 24. These complaints are misplaced, however, because, consistent with the CSO Policy, a financial

---

carefully went through that list and developed a table with explanations to show why, in the United States' view, they should not be included. The parties held a teleconference with Sierra Club on July 21, 2003 and walked Sierra Club through the list and the analysis. Klingenstein Dec. ¶¶ 86-87. Sierra Club has simply continued its in assertion that "[w]e have seen no reason why MSD cannot commit to deadlines to correct the SSOs and CSOs, which have already been engineered and costed out." Comments, Exhibit 1-A, p. 5.

plan <u>will</u> be required as part of the LTCPU.

It is neither the United States' practice, nor is it necessary, for these types of decrees to include in the decree itself detailed funding commitments or a financial plan as to how defendants will fund their Court-ordered responsibilities. It is sufficient, from an enforcement perspective, that defendants are required to build the required remedial projects and implement the various programs on a schedule and subject to stipulated penalties and this Court's various enforcement powers. It is up to defendants to determine how they plan to finance all of the decrees' requirements.[76] Thus, the United States municipal sewer decrees do not typically mandate specific financial arrangements that will be used to pay for remedial measures at the outset. Klingenstein Dec. ¶¶ 102-03.[77]

However, financial analysis <u>is</u> an integral component of the CSO long term control planning process. The CSO Policy "recognizes that financial considerations are a major factor affecting the implementation of CSO controls. . . [and] . . . allows consideration of a permittee's financial capability in connection with the long-term CSO control planning effort, WQS review, and negotiation of enforceable schedules." 59 Fed. Reg. at 18,690, col. 3. The CSO Policy also

_____

[76] Further, defendants cannot avoid compliance because they are having difficulty financing the measures. The decrees specifically provide that (except for the potential deadline extension if costs exceed $1.5 billion), "changed financial circumstances or unanticipated or increased costs or expenses associated with implementation of this Consent Decree, shall not serve as a basis for excusing violations of or granting extensions of time under this Decree. <u>See</u>, Final Decree ¶ XVIII.E, IPCD ¶ XII.E.

[77] Further, it would be very difficult at this juncture to mandate a required spending level for the WIB programs, because by their very nature, the amount required to be spent annually will fluctuate based on storm events and other factors that are out of defendants' control, and it will take some time for defendants to develop enough experience to make reliable budget estimates. Klingenstein Dec. ¶¶ 103-04.

specifically states that the LTCP should "include both fixed date project implementation

schedules (which may be phased) and a financing plan to design and construct the project as soon

as practicable." Id. at 18,691, col. 3.

Following the CSO Policy, the Final Decree requires defendants as part of the LTCPU to

analyze their financial capability for purposes of schedule development and also if they intend to

seek any revisions to water quality standards based on a demonstration of "substantial and

widespread economic and social impact," 40 C.F.R. § 131.10(g)(6).[78] The Final Decree also

specifically requires that, among other things, the schedule be "based on consideration of "EPA's

CSO Guidance for Financial Capability Assessment and Schedule Development, EPA 832-B-97-

004, Mar. 1997 ("Financial Capability Guidance").[79] Final Decree, Exhibit 4, LTCPU Work

Plan, ¶ II.F.  The Financial Capability Guidance, in turn, provides that "the permittee should

develop a financing plan that identifies sources of capital funds." Id. at 47.  The guidance then

summarizes the range of funding sources that should be considered, including grants, bonds,

sewer user fees and other viable funding sources such as taxes. Id. at 47-48.  Finally, defendants

must present information demonstrating that the schedule for implementation of both the CAPP

_____

[78] See supra § II.C.1-2.  See Final Decree ¶ VII.A.2 and Exhibit 4, Long Term Control Plan Update Work Plan, ¶¶ II.C, II.E.1, II.F, II.H.4 and 7.
    The analysis required by the LTCPU Work Plan includes providing "[i]nformation on availability of grants and/or loans for funding the alternatives that have been evaluated; bond capacity for the next twenty years; current and projected residential, commercial and industrial user fees; and other viable funding mechanisms and/or sources of financing construction of the alternatives; and . . .[a]ny other information that Defendants believe is important in evaluating Defendants' financial capability to fund improvements to Defendants' Sewer System and WWTPs." Final Decree, Ex. 4, ¶¶ C.2-3.

[79] Relevant pages of this document are included in Appendix A.  The entire document may be obtained at: http://cfpub1.epa.gov/npdes/cso/guidedocs.cfm.

and the LTCP are "as expeditious as practicable," which will necessarily require that defendants

include a financing plan as part of that demonstration.  Exhibit 3, ¶ II.F.  Thus, Defendants will

indeed be submitting a financing plan as part of their LTCP and CAPP submissions.  Further, in

order for defendants to accurately plan and budget for the LTCP and CAPP remedies, their

financial plan will necessarily also have to finance and budget for the WIB Programs.  In

summary, the regulators do expect to receive, as part of the LTCPU and CAPP, an enforceable

financial plan, which will specify how defendants intend to fund the projects and programs

(including the WIB Programs) required by the decrees over the life of the decrees.

> 8.    The Decrees Do Not Contain "Loopholes;" the Limited Opportunities for
>        Extensions of Deadlines are Reasonable and Appropriate.

Sierra Club complains that the decrees contain "loopholes" and "indefinite time

extensions" in the schedules making a final compliance date uncertain.  SC pp. 2, 8-9, 10-11.

The short answer is that there are no "loopholes."  As discussed above, the decrees require

defendants to submit plans for the various remedial components.  Each plan must contain a

schedule with certain prescribed interim deadlines and a date for completion that is "as

expeditious as practicable" and no later than the specified backstop deadline.  However, the

decree also recognizes three narrow potential grounds for defendants to request extensions to

deadlines for specific reasons, and a fourth situation where the regulators can demand that

defendants submit a Revised LTCPU, which may potentially have a deadline later than 2022.

These are not "loopholes" under which defendants can avoid compliance.  Rather, they provide

the defendants with potential flexibility for "good cause shown" in certain prescribed situations.

The extensions are subject to the regulators' approval, will not be approved unless the requisite

-69-

showing has been made, and any disputes concerning the decision will be resolved by this Court in dispute resolution. Any request and the regulators' determination thereon will be in writing, and Sierra Club will be provided with these and any supporting documents associated with the schedule extension request. Thus, as discussed above, Sierra Club is free to raise issues if it disagrees with the regulators' decisions. Each of the provisions under which defendants may potentially receive an extension of time is discussed below and is a reasonable and appropriate approach to a specific situation that clearly merits the potential flexibility.

a.    Insufficient Rainfall Potential Schedule Extension

Paragraph IX.A acknowledges that certain deadlines in the Final Decree are premised on the assumption that there will be sufficient precipitation for defendants to complete wet-weather sampling in accordance with the Monitoring and Modeling Work Plan attached to the Final Decree as Exhibit 3. The Monitoring and Modeling Work Plan sets out certain rainfall criteria that the regulators felt were essential for appropriate modeling and monitoring. Without the right mix and size of storms, the model could have a "garbage in/garbage out" quality, which is in no one's interest. Thus, the decree allows defendants to notify the regulators if certain rainfall criteria have not been met and to continue wet-weather sampling as expeditiously as practicable until the requirements have been met.

Sierra Club's arguments that this is an "automatic extension of time loophole," that the decree does not define sufficient precipitation, and that the extension is "open-ended" are greatly exaggerated. SC, p.10. First, the Modeling and Monitoring Plan does indeed specify what

"sufficient precipitation" means.[80]  Second, although the notification is not subject to formal

approval, if the regulators believe there has in fact been enough rain, they can raise the issue in

dispute resolution and/or assess stipulated penalties for failure to comply with the Plan.  Finally,

the potential extension is open-ended, but it needs to be because no one can predict when the

necessary amount and patterns of rain will occur.  Further, defendants must complete their

monitoring "as expeditiously as practicable."  As discussed above, this standard has meaning and

can be applied by the regulators and the Court if necessary.  Finally, defendants are moving

forward to attempt to complete all monitoring this year, and it is very unlikely that this provision

will be triggered.  Klingenstein Dec. ¶¶ 90-93.  In sum, this potential extension wisely and

conservatively addresses the slight possibility that Mother Nature may not cooperate with the

timing required by the decree.[81]

b.     $1.5 Billion Potential Schedule Extension

Sierra Club also criticizes the Final Decree's provisions for a potential schedule extension

if the remedial program is expected to cost over $1.5 billion.[82]  SC, pp. 10-12.[83]  As discussed,

---

[80] In the case of wet-weather sampling of CSOs, SSOs and storm water discharges, it means a minimum of 3 wet weather events, Final Decree, Ex. 3, ¶ 2.4.2; for wet-weather sampling in receiving streams other than the Ohio River, it means 3 wet-weather events, Id. ¶ 2.3.2; and for wet-weather sampling in the Ohio River, it means one or two wet-weather events.  Id. ¶ 2.2.2. Defendants recently developed a Quality Assurance Project Plan ("QAPP") that further defines the nature of the storm events that are need.  See Klingenstein Dec. ¶ 92.

[81] A similar provision was included in the IPCD ¶ VII.B.3, which allowed for a potential extension if there was inadequate rain to calibrate the hydraulic model.  However, defendants were able to complete calibration of the model on time, without any need for an extension. Klingenstein Dec. ¶¶ 91, 124.

[82] Sierra Club repeatedly and disingenuously refers to this potential extension as a "$1.5 billion cap," giving the absolutely false impression that defendants spending under the two decrees will capped at $1.5 billion.  E.g., SC pp. 2, 12, 17, Defendants will be required to spend as much

-71-

the proposed LTCPU must contain a schedule that is "as expeditious as practicable" and that

achieves substantial completion of construction by no later than February 28, 2022, except as

provided in Section IX. Under Paragraph IX.B of the Final Decree, defendants may submit as

part of the proposed LTCPU a schedule that exceeds 2022 if they:

> demonstrate that the expected capital costs (in 2006 dollars) of the remedial
> measures in the Long Term Control Plan Update and the CAPP are expected to
> exceed $1.5 billion. If such capital costs are expected to exceed $1.5 billion, then
> the deadline for completion of all remedial measures specified in the Long Term
> Control Plan Update and the CAPP must be specified in the Plan(s) and must still
> be as expeditious as practicable, but may be later than February 28, 2022, if it is
> not practicable to complete the CAPP and Long Term Control Plan Update
> remedial measures by that date.

The regulators agreed with this provision because it provides some potential flexibility in

schedule if compliance costs exceed $1.5 billion. The costs of compliance will be borne largely,

if not exclusively, by Cincinnati's and Hamilton County's ratepayers. U.S. EPA is sensitive to

concerns that improvements remain affordable for the ratepayers. As noted, the CSO Policy

stresses that costs and affordability should be taken into account in crafting a compliance

schedule, and that the LTCP must include a financing plan to design and construct the project as

soon as practicable.

As Sierra Club has noted, defendants are not coming into the LTCPU process with a

blank slate. They have looked at various approaches to solve their wet weather problems over

---

money as it takes to bring their system into compliance with the law.

[83] Certain additional issues Sierra Club has raised about this schedule extension provision are
addressed in the Responsiveness Summary ¶ 21.

time, and their estimates to achieve compliance vary widely.[84]  One cost study (the "BBS Study")

estimated that it will cost between $1.2 and $3.6 billion.  Klingenstein Dec. ¶ 75.  During the

negotiations, the parties were simply unable to reach agreement on an acceptable fixed end-date

given the wide variation in potential costs.  If the parties could have determined that costs would

be less than $1.5 billion, defendants could have agreed to a 2022 fixed date without the need for

any schedule flexibility, but this would impermissibly pre-judge the outcome of the LTCPU

process.  (In addition, plaintiffs might not have agreed that this date was soon enough.)  Given

defendants' estimate that compliance could cost more than twice this amount, depending upon

the selected remedial measures, the governments agreed to provide the defendants an opportunity

to prove that they could not meet 2022 because of the cost burden.  Ultimately, the parties were

able to agree on a strategy that provided a fixed backstop date, which could be adjusted (sooner if

practicable, and later only if costs exceed $1.5 billion and then, only if absolutely necessary) once

the LTCPU was submitted, which would contain the information necessary to analyze the costs

and schedule.

It should be stressed that, just because defendants estimate that costs will exceed $1.5

billion, defendants do not automatically or necessarily get an extension.  Contrary to Sierra

Club's utterly false statement that "Defendants may unilaterally extend" the 2022 deadline if they

estimate that costs will exceed $1.5 billion, SC, p. 10, defendants' cost estimates and proposed

schedule are to be submitted as part of the LTCPU, which requires the regulators' approval.  The

---

[84] Sierra Club repeatedly criticizes defendants' various past cost estimates as "highly inflated."
SC, pp. 2, 11-12, 17-18.  This is exactly the point of requiring defendants to estimate the costs of
the various remedial alternatives it is considering in documents that are subject to the regulators'
approval.  Until remedies have been costed out, proposed, submitted, and actually approved by
the regulators under this decree, they are merely background information.

regulators will scrutinize the cost estimates to ensure that they are reasonable and the schedule to ensure that is as expeditious as practicable.[85] Finally, even if the regulators agree that costs will exceed $1.5 billion, they will not approve a deadline later than 2022 unless defendants demonstrate that it is not "practicable to complete the CAPP and Long Term Control Plan Update remedial measures by that date." Final Decree ¶ IX.B.

In summary, this potential schedule extension provision reasonably reflects the reality that, if the residents of Hamilton County are required to spend more than $1.5 billion on remedial measures, the date that is "as expeditious as practicable" for constructing and financing those measures might in fact be later than February 28, 2022.

   c. "Evaluate and Correct" Potential Schedule Extension

Sierra Club criticizes the "Evaluate and Correct" provisions of both the decrees because these could delay the ultimate correction of the problems and ultimate compliance date. SC, pp. 8-9. Under these provisions, which apply to the SSO 700 final remedy and the completion of remedial measures under the LTCPU or CAPP, after completion of such measure(s), defendants are provided a period of time to evaluate the remedy to ensure that it is performing as defendants (and the regulators, as evidenced by their approval of the plan) expected and that it is complying or helping to bring about compliance with the law as the parties anticipated. If not, as soon as they discover the problem, defendants may petition the regulators to allow them to submit a

---

[85] Thus, there is no merit to Sierra Club's repeated assertions that defendants will manipulate their cost estimates to take advantage of the potential schedule extension. SC, pp. 2, 11-12, 17-18. If the costs have been exaggerated, plaintiffs will not approve the LTCPU. Further, there is no merit to Sierra Club's statement that the Final Decree "exacts no penalty for MSD's . . . providing exaggerated solutions, which MSD never intends to implement." SC, p.11. If defendants propose an "exaggerated solution" in the CAPP or LTCPU, and plaintiffs approve it, defendants must implement it, subject to stipulated penalties, as part of this Court's order.

revised plan and schedule to correct the problems. If the regulators approve the petition, the

defendants submit a revised plan and schedule to fix the particular problem and come into

compliance concerning the discharges at issue (e.g., if post-construction monitoring shows that,

despite implementation of the LTCPU measures, water quality standards are still not being met).

If the regulators approve the revised plan, the defendants are required to implement the plan in

accordance with its schedule, subject to stipulated penalties, and the decree's prior deadline for

compliance for the discharges at issue will be extended.[86] If defendants do not submit a petition

and revised plan to correct the problem, their discharges violate the decree, and they are subject

to stipulated penalties of $3000 per discharge per day.[87] Thus, at all times, defendants will either

be subject to significant stipulated penalties (and potentially an enforcement action for

noncompliance with the decree) or be under an enforceable plan to fix the problem and come into

compliance.

This approach is not only reasonable, but it is envisioned by the CSO Policy. The CSO

Policy requires defendants to perform "post-construction compliance monitoring" to verify that

the remedial measures are achieving compliance with water quality standards and to otherwise

ascertain the effectiveness of the CSO controls. 59 Fed. Reg. 18,694, col.2; see also

Responsiveness Summary ¶ 4. The CSO compliance process by necessity requires somewhat of

a "trial and error" approach. Some CSO remedies, such as totally separating a combined sewer

---

[86]    See IPCD ¶ VI.D ("Evaluation and Correction Period" for SSO 700 final remedy); Final
Decree ¶¶ VII.C ("Evaluate and Correction Period" for LTCPU), VIII.B ("Evaluate and
Correction Period" for SSO CAPP).

[87]    See, e.g., Final Decree ¶ XVII.D.3. See also Responsiveness Summary ¶ 7 for additional
discussion of stipulated penalties and the "evaluate and correct" provisions.

pipe into separate sanitary sewer and storm water pipes, will achieve predictable results. Other projects can be designed for a particular result but may need post-construction adjustments to ensure that they operate as designed. Or, the improvements may not achieve the hoped-for water quality benefits. Despite good faith and best efforts by a municipality, and a corresponding careful review by the regulators, the selected remedial measures may not ultimately be sufficient to achieve the necessary water quality in the receiving streams. In that case, the municipality must go back to the "drawing board" to ratchet up their controls further or take some other measures until compliance is achieved. Thus, the CSO Policy provides that if the CSO controls fail to meet water quality standards, the permittee should be required to "develop, submit and implement, as soon as practicable, a revised CSO control plan which contains additional controls to meet WQS and designated uses." 59 Fed. Reg. at 18,696, cols. 2-3.

This is precisely the concept that is built into the decrees. In short, the decrees require the defendants constantly to be either working under an approved enforceable plan to come into compliance, or to be subject to substantial stipulated penalties for discharges that violate the decree. This is a reasonable and appropriate approach to address the reality that bringing a complex sewer system into compliance is an inexact science and may require adjustments after the remedial measures are built.

d.    Potential Deadline Extension for Revised LTCPU

The final provision for potential flexibility in schedule is under Paragraph VII.B of the Final Decree. As described above, the CSO Policy recognizes that information developed during the course of long term control planning may serve as a basis for a state to revise water quality standards or NPDES permit requirements if a demonstration is made that it will not be feasible to

-76-

attain particular water quality standards (e.g., because the costs necessary to attain the designated use would result in "widespread social and economic impact").  40 C.F.R. § 131.10(g)(6); see, supra, §§ II.C.1-2.  However, any changes to water quality standards or permitting requirements would occur in a separate regulatory setting and pursuant to a separate regulatory process from the submission and approval of the LTCPU under this consent decree.  Thus, it is possible that the defendants will develop sufficient information in the LTCPU process to demonstrate to the regulators that they would likely be able to meet the regulatory requirements for Ohio to revise water quality standards, and that the regulators would approve a LTCPU that contains remedial measures based on this assumption.  It is further possible that during the separate regulatory process for standards revision, which as noted is subject to public process and administrative and judicial review, water quality standards fail to get revised as assumed.  If that occurs, it would be senseless to require defendants to continue to implement expensive remedies that the regulators now know would likely not comply with water quality requirements.  Thus, Paragraph VII.B provides that, if the Long Term Control Plan Update is approved under the decree based upon the belief that water quality standards will be revised, but the water quality standards do not in fact get revised, defendants may need to develop and implement an additional set of remedial measures (the "Revised Long Term Control Plan Update") necessary to meet the more stringent existing water quality standards.[89]

---

[89] Sierra Club complains that the burden is on the governments to notify defendants that the change will not occur, and that there is no deadline for doing so.  SC, p. 8.  However, both of these provisions are sensible and reasonable.  First, the regulators will most likely obtain the most reliable information the soonest concerning the outcome of the standards process.  Second, the standards process is wholly separate from the consent decree and provides opportunity for public involvement and legal challenges.  Thus, it is uncertain when the final decision may be made.

Sierra Club complains that there is no complete construction date for any such Revised LTCPU and that the schedule could be later than 2022. Id. This is also reasonable and appropriate because it is highly uncertain when any as yet unrequested changes to water quality standards would be made (if ever), what the standards decision (if any) will be, and precisely how the approved LTCPU would have to change (if at all). The approved schedule is assured of being appropriate, however, because it must be "as expeditious as practicable," subject to the regulators' review and approval.

9.    The IPCD's Short Term Adequate Capacity Plan Provides an Appropriate Approach for Ensuring That New Growth Does Not Adversely Affect SSOs.

Numerous commenters complained that the decrees do not impose a moratorium to prevent any further sewer expansion until the existing capacity-related problems are fixed.[89] However, sewer moratoriums are rare in federal SSO or CSO consent decrees, because of their potential to damage the economies of the affected communities. Klingenstein Dec. ¶ 135. Further, from the standpoint of pollutants added to the environment, the Short-Term Adequate Capacity Program ("STACP") in the IPCD decree (IPCD § VIII, Attachment 10) provides superior benefit. A sewer moratorium would ban any new sewer construction or hookups, but would not necessarily reduce the amount of sewage entering the system. In contrast, the IPCD requires defendants to eliminate five gallons of flow for every one new gallon of new flow they propose to add, thus decreasing the amount of flow in the system and decreasing SSOs. Sierra Club argues that the removal of I&I required by the STACP will increase the concentration of the sewage in the pipes. Comments, Ex. 1-A, p. 20. This may be true, but the reduction in flow

_____

[89] See SC, pp. 3, 19; Comments, Ex. 2-B; Comments, Ex. 3-A, B, C, D, F, G, H.

-78-

achieved by the program will decrease the number of overflows and thus will decrease the

pollutants that make their way into the environment.[90]  See Affidavit of James Simpson, attached

hereto as Exhibit 5, at ¶¶ 9-10.[91]  Further, the governments believe the STACP strikes the

appropriate balance between allowing new economic development (and thus bringing funds into

Cincinnati and Hamilton County and also increasing funding to MSD, which will help pay for

the needed sewer remediation required by these decrees) and "prevent[ing] any wastewater flows

from this new development from aggravating or in any way adding to the quantity discharged

from any downstream SSO." IPCD ¶ VIII.C.[92]


## CONCLUSION

For the reasons set forth above, the United States respectfully asks this Court to find that

the IPCD and Final Decree, taken together, are fair, reasonable and consistent with the Clean

Water Act and to enter them as orders of this Court.

_____

[90] Sierra Club also notes that the STACP's approach "will allow the overflows to continue." SC
p.2. So would a sewer moratorium. Because defendants' overflows are largely caused by lack of
capacity, they will occur when the flow exceeds capacity until the appropriate remedial measures
are built to eliminate them. The STACP at least requires defendants to achieve a net reduction in
flow before new construction is allowed and thus should help to minimize SSOs in the
meantime.

[91] This affidavit was originally attached as Exhibit 6 to the United States' Motion for Entry of the
of the Consent Decree (Aug. 20, 2002), Doc. 56.

[92] Two additional technical comments concerning the STACP are addressed in the
Responsiveness Summary at ¶ 43.

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530

_Leslie Allen_

LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4114

GREGORY G. LOCKHART
United States Attorney
for the Southern District of Ohio

By:     _Donetta Wiethe_ ( p.t.a. , LA )

DONETTA D. WIETHE  (0028212)
Assistant United States Attorney
221 East Fourth Street
Atrium II, Suite 400
Cincinnati, Ohio  45202
513-684-3711

OF COUNSEL:

GARY PRICHARD
Associate Regional Counsel
U.S. EPA, Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, IL 60604-3590

ANDREW STEWART
Attorney-Advisor
U.S. EPA, Office of Enforcement and Compliance Assurance
Ariel Rios Building (2243A)
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

-80-