# EXHIBIT 1

# <u>RESPONSIVENESS SUMMARY</u>

<u>Note:</u>  **This "Responsiveness Summary" contains the United States' responses to comments raised that were not previously addressed in the United States' Memorandum in Support. The comments and responses thereto roughly follow the order in which they were raised in Sierra Club's letter of January 5, 2004.  <u>See</u> Doc. 114, Notice of Filing of Comments, Exhibit 1.  Comments from additional sources are also addressed.[1/]**

## <u>COMMENTS THAT PERTAIN TO BOTH DECREES</u>

1.    **Comment: MSD has the capacity to be sued and should be separately named as a party.**

Sierra Club asserts that the decrees' recitation that "MSD cannot be sued in its own

name," is an "incorrect and outdated statement of the law," and that MSD should be made a

party to this action.  SC, p.4.

> **Response: MSD cannot be sued in its own name, and even if it could, the fact that it is not a party is not relevant to the decrees' enforceability or Sierra Club's ability to attempt to sue MSD in the future.**

A.  <u>MSD Cannot Be Sued In its Own Name</u>.

The United States disagrees with Sierra Club's analysis of the law on this issue.  First,

---

[1/] All of Sierra Club's comments are attached as Exhibit 1 (and attachments A-M) to the Notice. These comments include a letter dated January 5, 2004, which includes paragraph-by-paragraph comments on the Final Decree and reiterates most comments they have previously submitted on both decrees.  The January 5, 2004 Sierra Club letter will hereafter be referred to as "SC," with a page cite.  Cites to Sierra Club's attachments will be referred to, for example, as Comments, Ex. 1-A.  Exhibit 2 to the Notice includes the two sets of comments on the Final Decree from other people, and these will be referred to as Comments, Ex. 2-A and B.   Exhibit 3 includes the eight sets of comments on the IPCD received from others, and these will be referred to as Comments, Ex. 3-A-H.

statutory construction clearly implies that MSD may not sue or be sued.  The statute under which

MSD was formed, Ohio Rev. Code Chapter 6117, does not directly address whether it is subject

to suit.  However, under Ohio law there are two types of sewer districts:  regional sewer districts

and county sewer districts.  Regional sewer districts are formed pursuant to Ohio Rev. Code

Chapter 6119, and county sewer districts are formed pursuant to Ohio Rev. Code Chapter 6117.

Chapter 6119 clearly states that regional sewer districts can sue and be sued.  Ohio Rev. Code §

6119.06(D).  However, Chapter 6117 makes no mention of whether county sewer districts can

sue or be sued.  Thus, by negative implication, the statute forecloses a county sewer district such

as MSD from suing or being sued in its own name – separate and distinct from the county that

created it.

Second, two cases specifically support this analysis.  In Safeco Insurance Co. v. Colerain

Township Trustees, No. C-800050, 1981 WL 9657 (Ohio App. 1 Dist. Mar. 4, 1981), plaintiffs

sued MSD for negligence.[2]  MSD argued that it was not a legal entity and could not be sued, but

rather that the sewers were under control of the County.  The Ohio Court of Appeals found it

"clear from R.C. 6117.01 et seq. that the authority for the sewer districts created [ ] is placed in

the Board of County Commissioners and the sewer [sic] themselves do not have any independent

existence."  Id. at *2.  In Verbag v. Hamilton County Board of County Commissioners, No. C-

970593, 1998 WL 241788 (Ohio App. 1 Dist. May 15, 1998), plaintiffs sued the County, the

City, and MSD (as Sierra Club did) concerning a sanitary sewer project.  The court stated that

"[t]he Metropolitan Sewer District is also named as a defendant; however the city of Cincinnati

and the board of county commissioners are the only properly named defendants.  Hamilton

---

[2] The unreported decisions discussed herein are provided in Appendix B.

County owns the Metropolitan Sewer District, which is operated by the city of Cincinnati." <u>Id</u>. at *1.

Sierra Club cites several cases for its proposition that the United States' position is "outdated" and that the law has changed.[3] All of these cases were brought under Ohio Rev. Code Chapter 2744, which addresses sovereign immunity for local and state governments within Ohio as specifically related to tort liability.  Pursuant to that Chapter, any "political subdivision" that is engaged in a "proprietary function" may, in certain circumstances, be "liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to" that function.  Ohio Rev. Code § 2744.02(B)(2).  Proprietary functions include the "maintenance, destruction, operation, and upkeep of a sewer system." Ohio Rev. Code § 2744.01(G)(2)(d).

Sierra Club first cites <u>Bibbs v. Cinergy Corp.</u>, No.-C-010390, 2002 WL 537628 (Ohio App. 1 Dist. Apr. 12, 2002).  In that case, plaintiffs sought to recover damages related to a sewer backup.  The <u>Bibbs</u> court held that MSD was a "political subdivision" as defined under Ohio Rev. Code § 2744.01(F) and thus that there was no sovereign immunity for its negligent actions. <u>Id</u>. at *3. ("These provisions clearly remove the shield of immunity from MSD.")  However, <u>Bibbs</u> did not address whether MSD is a legal entity distinct from the County Board of Commissioners.  The United States does not dispute that MSD, as an organization under the control and management of the County Board, is a "political subdivision."  However, in order to recover based on the actions of MSD, one must sue the County Board, which is a political subdivision subject to suit and is the legal entity responsible for MSD.

---

[3] Only one of Sierra Club's five cited cases post-dates <u>Verbag</u>.

The <u>Bibbs</u> court stated, and Sierra Club copied verbatim, that "this issue was implicitly determined" in <u>H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist.</u>, 118 Ohio App. 3d 792, 795 (Ohio App. 1 Dist. Mar. 19, 1997). The issue that the <u>Bibbs</u> court was referring to, however, was whether political subdivisions could be liable for proprietary functions related to the sewer, which the <u>Hafner</u> court does implicitly address, because it did not question the issue. However, as with <u>Bibbs</u>, <u>Hafner</u> in no way addresses whether MSD can be sued in its own right. In fact, the <u>Hafner</u> court repeatedly referred to the <u>county</u> as the defendant. <u>See, e.g.</u>, <u>id</u>. at 794 ("trial court entered summary judgment for the county"); 795 ("the question of whether the county may be liable turns on . . . .").

The other cases cited by Sierra Club are <u>wholly</u> irrelevant to the issue of whether MSD is subject to suit and appear merely to have been copied from the cites in <u>Bibbs</u> without further research. <u>See</u> <u>Nice v. City of Marysville</u>, 82 Ohio App. 3d 109, 611 N.E.2d 468 (1992) (plaintiff sued city for damage relating to flooded storm sewer; issues were whether Ohio Rev. Code Chapter 2744 applied since it was not enacted in 1946, when the sewer was constructed, and whether the damage resulted from a governmental or proprietary function); <u>Best v. City of Findlay</u>, Hancock App. No. 5-97-22, 1997 Ohio App. LEXIS 5479, (Dec. 5, 1997) (plaintiff sued city to recover expenses related to sewer repair; issue related to whether damage resulted from a governmental or proprietary function); <u>Kendle v. Summit Cty.</u>, Summit App. No. 15268, 1992 Ohio App. LEXIS 2005 (Apr. 15, 1992) (plaintiff sued county for damages related to sewer backup; issues included whether failure to inspect sewer was a proprietary or governmental function and whether county was negligent).

In summary, the United States stands by the decrees' recitation that "MSD cannot be

sued in its own name" separate and apart from the County.

    B.  The Named Defendants are Sufficient to Obtain the Injunctive Relief under the Consent Decree, and the Court Should Defer to the United States' Prosecutorial Discretion.

    Even if MSD is subject to suit, the United States has determined that the City of Cincinnati and Hamilton County are the proper defendants in this case.  Further, as discussed in the United States Memorandum in Support of Motion for Entry of Consent Decrees ("United States' Memorandum"), § III.C.2,  the officers and employees of MSD are bound by the consent decrees, and this Court has ample power to obtain adherence to its terms by the named defendants and by others if necessary.

    The law is well established that prosecutors have broad discretion in deciding whom to prosecute.  Wayte v. United States, 470 U.S. 598, 607 (1985).  The Supreme Court has explicitly stated that prosecutorial discretion extends not only to the issue of *whether* to prosecute, but also to the issue of *whom* to prosecute.  "Our decisions . . . uniformly have recognized that courts normally must defer to prosecutorial decisions as to whom to prosecute."  Town of Newton v. Rumery, 480 U.S. 386, 396 (1987).  The exercise of this discretion is normally immune from judicial scrutiny.  Moog Industr., Inc. v. FTC, 355 U.S. 411 (1958).

    Additionally, the Sierra Club is not in a position to challenge the United States' prosecutorial discretion in this matter.  "[T]he exercise of prosecutorial discretion cannot be challenged by one who is himself neither prosecuted nor threatened with prosecution." Simon v. E. Ky. Welfare Rights Organization, 426 U.S. 26, 37 (1976).  Therefore, even if MSD were subject to suit, the Sierra Club must accept, and this Court should defer to, the United States' determination of whom it chose to sue in this action.

C.  <u>Issue Preclusion Does Not Bar the Sierra Club from Future Actions</u>

Finally, Sierra Club is in no way bound by the statement in the decrees that MSD is not subject to suit, and it is free to attempt to sue MSD itself in the future for violations that are not addressed by the decrees.  "Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim."  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 748-49 (2001). The doctrine reflects the longstanding policy that one full opportunity to litigate an issue is sufficient. <u>See</u> <u>Hickman v. Comm'r of Internal Revenue</u>,  183 F.3d 535, 537 (6th Cir. 1999).

Although the requirements for issue preclusion are enumerated differently in different opinions, the Sixth Circuit has recently stated that the doctrine applies only when (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue.  <u>See</u> <u>United States v. Real Property Known & Numbered as 415 E. Mitchell Ave.</u>, 149 F.3d 472, 476 (6th Cir. 1998); <u>Bills v. Aseltine</u>, 52 F.3d 596, 604 (6th Cir. 1995).  Without reaching the other requirements, the present case was clearly not litigated; thus, Sierra Club is not precluded from litigating the issue of MSD's capacity to be sued in the future.

Furthermore, the Supreme Court has specifically declared the preclusive effect of a settlement.  "[S]ettlements ordinarily occasion no issue preclusion . . . unless it is clear . . . that

the parties intend their agreement to have such an effect." <u>Arizona v. California</u>, 530 U.S. 392,

414 (2000).  Therefore, the consent decrees would have no preclusive effect against Sierra Club

on this issue should its members wish to litigate it in the future.

**2.      Comment:  All illegal discharges should be eliminated within five years.**

Mr. Poffenberger, representing Save the Lake Association, asserted:  "At a minimum, all

illegal discharges should be eliminated within five years, preferably within one year."

Comments, Ex.2-B.

**Response: As explained in the Klingenstein Declaration, ¶ 129, this is impossible.**

**3.      Comment:  The decrees do not contain benchmarks or measurements of success.**

Sierra Club states that the decrees have no "interim deadlines, benchmarks, or

measurements of success" by which performance can be measured, and Sierra Club lists 11

"clear and simple" benchmarks that the decree should contain.  SC, pp. 2, 3.

**Response: Sierra Club is wrong, and the suggested additional "benchmarks" are either already required or unworkable.**

Sierra Club is flat wrong when it suggests there are no interim deadlines.  As discussed in

the United States' Memorandum, § III.C.3.b, the decrees explicitly require a minimum of three

major construction milestones, or interim deadlines, for each construction project built pursuant

to the plans to be submitted under the decrees.  Further, through the extensive reporting

requirements in the decrees and the various requirements of the approved plans, there <u>are</u> ample

ways to chart defendants' progress.  Defendants are required to report quarterly, <u>inter alia</u>, on the

status and progress made of each major remedial measure and the SEPs (including whether they

are being constructed on schedule and whether design and performance criteria are met), and

must make considerably more extensive reports concerning implementation of the WIB

programs, including:

> 1) as to the Water-in-Basement Prevention Program (Exhibit 6), the date and address of any requests for installation of devices, the date and disposition of any such requests (including what type of device, if any, was installed), the address, date, and disposition of any other investigations or installations that defendants initiate under the program; 2) as to the Water-in-Basement Customer Service Program (Exhibit 7), the address of each customer that has requested customer service under the program, the date of the request, the disposition of the request (e.g., service request denied, initial investigation completed, cleanup completed) and the date of the disposition; 3) as to the Water-in-Basement Claims Program (Exhibit 8), the address of the claimant, the date the claim was made, the amount of the claim, the disposition of the claim (including the amount paid if any), the date of the disposition, or whether the claim is still pending.  In addition, defendants shall report annually, beginning with the quarterly report submitted after the first anniversary of the Date of Lodging of this Decree, the amount Defendants spent in the previous year on remedial measures under the WIB Prevention Program (Exhibit 6).

Final Decree ¶ XV.C.  Further, under the IPCD, defendants must report, among other things, monthly summaries of significant amounts of SSO information as required by SSO Monitoring and Reporting Plan.  IPCD, Exhibit 5.  This information will be ample to allow the governments and the Sierra Club to follow the progress of the decrees, including whether defendants are appropriately implementing the approved plans on schedule, whether the WIB program is being appropriately implemented, and the number of SSOs that have been eliminated.

Sierra Club suggests numerous specific "benchmarks" that the decree should include.  To the extent Sierra Club is suggesting that this information should be <u>reported</u> under the decree so progress can be assessed, most of these are already required to be reported (<u>e.g.</u>, SSOs eliminated, number of claims paid vs. claims made, number of SIB prevention systems installed), or can be fairly easily deduced from the information reported (<u>e.g.</u>, reductions in SSO activations can be made by comparing the annual total from one year against the annual total from the year before).  To the extent Sierra Club is suggesting the listed items have specific enforceable limits

or other "benchmarks" set in the decrees, this would be impossible, since most of the listed items depend on the amount of rain or other items, which are out of defendants' control. See Klingenstein Dec. ¶¶ 136-138. For example, it would be impossible for the decree to mandate a specified number of reductions in SSO activations or WIB cleanups performed, because there will be more SSOs and more cleanups needed in a wet year. In short, the decrees and their various approved plans contain ample enforceable interim and final deadlines, performance measures, design criteria, and other benchmarks that the governments and Sierra Club can assess and track through the quarterly and annual reports required by the decree. Together, these provisions easily exceed the "fair, reasonable, and in the public interest" threshold for approval of the decrees.

**4.    Comment:  Post-Construction monitoring does not begin until 2011.**

Sierra Club complains that post-construction monitoring under Section X will not begin until 2011 when it should be on-going from Day 1. SC, pp. 12-13.

**Response: The post-construction monitoring provisions are appropriate when understood in conjunction with the decrees' other compliance reporting requirements.**

The CSO Policy requires that the selected CSO controls be subjected to a "post-construction water quality monitoring program adequate to verify compliance with water quality standards and protection of designated uses as well as to ascertain the effectiveness of CSO controls." 59 Fed. Reg. at 18,694, col. 2. The monitoring program should be detailed in a plan, subject to the regulators' approval, which includes specifics on the monitoring protocols to be followed, including for effluent and ambient monitoring, and other appropriate protocols. Id. The main point of this effort, then, is assessing how well the CSO controls are actually working

in the environment.

Because it will take some time for sufficient projects to be built to begin to see a substantial impact on the receiving streams, the final decree does not require defendants to develop a post-construction monitoring plan until five years after approval of the LTCPU.  ¶ X.A.  Klingenstein Dec. ¶¶ 94-95.  However, as Sierra Club suggests, it is appropriate for defendants to be charting their construction progress and for the regulators to be overseeing this progress from Day 1, and this sort of compliance monitoring, including reporting on whether design and performance criteria have been met, is accomplished under the reporting requirements.  Under Paragraph XV.A of the Final Decree, defendants must report on, among other things, the status of the construction projects and compliance or non-compliance with the requirements of the decrees (including their attachments).  Paragraph II.H.4(b) of the LTCPU Plan requires defendants, as part of their LTCPU, to provide for each remedial project "[c]riteria necessary to ensure that the remedial measures are properly designed ("design criteria") and to ensure that, once constructed, the remedial measures perform in the manner that they were expected to perform ("performance criteria")."  Because defendants must report on project status and compliance/non-compliance with the decree, they will necessarily also have to report whether the projects are meeting the design and performance criteria specified in the approved LTCPU.  Thus, defendants will be reporting this type of information from "Day 1" as Sierra Club suggests.

**5.     Comment: Defendants should report quarterly on WWTP permit compliance.**

Sierra Club suggests that MSD should issue a "quarterly public report" on the compliance status of each WWTP, including compliance with permit requirements for effluent

- 10 -

limits, bypassing, reporting and O&M.  SC, p.14.

   **Response: Defendants are required to report on all of these under the Final Decree.**

   Defendants <u>are</u> required to report quarterly on all of these aspects of WWTP compliance pursuant to Section XII of the Final Decree ("Defendants shall comply with the effluent limitations, monitoring, record-keeping and reporting requirements and operation and maintenance requirements" of their WWTP permits) and Paragraph XV.A (Defendants' quarterly report shall contain "a description of compliance or non-compliance with the requirements of this Consent Decree."), and Paragraph XV.B (quarterly reporting on bypass) of the Final Decree.  The United States is forwarding all of these quarterly reports to Sierra Club.

6.  **Comment: The decrees' reporting requirements will contain a lot of information, and EPA does not have the staff to promptly review it.**  SC, p.16.

   **Response:  False.**

   Sierra Club has no grounds for this baseless assertion.  As discussed in the United States' Memorandum at § III.C.1.a , EPA has retained Mark Klingenstein (who has additional staff at SAIC who haves assisted with this case in the past and can be called on again in the future), and has assigned a very experienced engineer and attorney from EPA Region 5 to oversee this case. Together they, with additional assistance, as necessary, from EPA Region 5, Headquarters, and the Department of Justice, will be able to review this information appropriately.  The United States has appropriately reviewed the reports received to date, including contacting defendants for additional information or clarification where necessary, and will continue to do so.  <u>E.g.</u>, Klingenstein Dec. ¶ 139.   Further, these reports will also be reviewed, as necessary, by personnel from OEPA and ORSANCO, the latter of which is based in Cincinnati and <u>does</u> have a local "enforcement presence" there.  A special master would not be helpful and is not necessary

- 11 -

for this purpose.

7.    **Comment:  The decrees' approach to stipulated penalties for capacity-related overflows does not provide a sufficient incentive for compliance.**  SC, p.17.

**Response: The decrees' approach, taken as a whole, is very reasonable.**

Capacity-related discharges are caused, essentially, by two things:  inadequate capacity and inadequate O&M.  As discussed, the decrees require defendants to implement long term measures to address their lack of capacity.  Defendants must also to implement O&M programs under the IPCD and follow the O&M requirements of the CSO and WWTP permits.  Final Decree ¶ XI.A, § XII; IPCD ¶¶ VII.H and J.

Plainly, some of defendants' SSOs discharge when it rains, and most if not all of defendants' CSOs do not currently comply with their permit when they discharge, and these non-compliant discharges will continue until the remedial measures to eliminate the SSOs and bring the CSOs into compliance are constructed.  The decrees do not require stipulated penalties for capacity-related discharges (unless they are caused by O&M violations – <u>see</u> Response to Comment 8, below).  Until the final remedy to eliminate the SSO or bring the CSO into compliance is constructed, there is nothing further defendants can do to avoid such discharges.  The decrees' stipulated penalties for failure to meet the various construction deadlines in the decrees and the approved SSO 700 Remedial Measures Plan, CAPP and LTCPU provide sufficient "sticks" to keep defendants on schedule for remediating their SSOs and CSOs without "piling on" additional stipulated penalties for capacity-related overflows prior to completion of the applicable final remedy.

The decrees' stipulated penalty provisions for capacity-related discharges <u>after</u> completion of construction of the remedy all work the same way.  Thus, "Sanitary Sewer

- 12 -

Discharges," or "SSDs, from SSO 700 or any other SSO, and CSOs all work in the same way.

The decree imposes stipulated penalties of $3000 per discharge per day for any for "Sanitary

Sewer Discharges," or "SSDs"[4] from SSO 700 or any other SSO, and non-compliant CSOs after

the applicable date for completion of construction, see IPCD ¶ XI.E.2(a); Final Decree ¶¶

XVII.E.2(a), .3(a), except as follows:  The decrees allow a six-month "shake down" period for

defendants to get any "bugs" out, i.e., to test the system make sure it is adjusted or otherwise

working properly, and there are no stipulated penalties for violations caused by a greater than

"ten year/24 hour" storm event.  Finally, the decrees incorporate an "Evaluate and Correct"

concept.[5]  This is discussed at length in the United States' Memorandum at § III.C.8.c.  Under

Paragraphs XVII.E.2(a) and .3(a) of the Final Decree and XI.E.2(b) of the IPCD, stipulated

penalties for non-compliant discharges will continue to accrue, after the "shake down" period,

and during the remainder of the two year "Evaluate and Correct" period, but the regulators will

not demand them until after this period.  Thus, if stipulated penalties accrue, and defendants do

nothing further to correct their system, they must pay the penalties.  However, if they determine

during the "evaluate and correct" period that, despite their previous work in accordance with an

---

[4] "Sanitary Sewer Discharge" is defined as a "discharge to waters of the State or United States
from Defendants' Sanitary Sewer System through a point source not specified in any NPDES
permit."  IPCD p.12.  The decree uses this term for stipulated penalties because the Clean Water
Act imposes liability for, among other things, any "discharge of a pollutant" except in
accordance with an appropriate permit.  33 U.S.C. §§ 1311(a); 1319(e); 1342.  "Discharge of a
pollutant" is defined as, in relevant part, to require an addition of a pollutant to a "waters of the
United States."  33 U.S.C. § 1362(12), (7).  Thus, it is appropriate to apply stipulated penalties
only to discharges to waters of the United States (or State, given a similar structure under Ohio
law).

[5] See IPCD ¶ VI.D ("Evaluation and Correction Period" for SSO 700 final remedy); Final
Decree ¶¶ VII.C ("Evaluate and Correction Period" for LTCPU), VIII.B ("Evaluate and
Correction Period" for SSO CAPP).

approved plan, major additional work is necessary, and they receive approval from the regulators

for an enforceable plan for this work,[6] their final compliance deadline for that SSO or CSO is

extended. This approach provides sufficient impetus for defendants to comply since they will

either be subject to stipulated penalties for non-compliant discharges or for violations of an

enforceable plan, or both, until they have fully come into compliance.

In short, this is a reasonable and sufficiently stringent approach to capacity-related

stipulated penalties. Could plaintiffs have negotiated a slightly different scheme that Sierra Club

would view as more "aggressive"? Perhaps, but this is not assured and is not the standard for

approval. The consent decree represents a reasonable compromise between the parties on this

issue.[7]

8.      **Comment:  Stipulated penalties for CSOs and other capacity-related violations that
        occur because of O&M violations are "virtually unenforceable."** SC, p.16.[8]

        **Response: The approach is appropriate.**

        As discussed immediately above, the United States does not believe it is appropriate to

_____

[6] Defendants must petition the agencies to submit a revised plan as soon as they discover the
problem.

[7] See, e.g., Bragg v. Robertson, 83 F. Supp. 2d 713, 717 (S.D. W. Va. 2000), aff'd sub nom.,
Bragg v. West Virginia Coal Assn., 248 F.3d 275 (4th Cir. 2001), cert. denied, 534 U.S. 1113
(2002) (as a negotiated agreement, consent decree embodies a compromise; parties each give up
something they might have won in litigation); United States v. District of Columbia, 933 F.
Supp. 42, 51 (D.D.C. 1996).

[8] Sierra Club concludes:  "But, of course, this appears to be what EPA and the MSD want from
the Consent Decree – virtual immunity from stipulated penalties for the next 20 years." Id.  This
is utterly untrue – especially given the many hefty stipulated penalty provisions for non-
compliance with plans (including their construction requirements), interim and final deadlines,
and other consent decree violations – and Sierra Club's aspersions (here and elsewhere) on the
good faith of the United States are not in keeping with this Court's admonition to avoid "derisive
rhetoric" and "scurrilous" arguments. Order, Jan. 29, 2003, Doc. 90, p.2.

"pile on" stipulated penalties for capacity related discharges that the defendants can do nothing about until the final remedies are complete. Thus, during the construction period, stipulated penalties apply for failure to comply with construction schedules and requirements, and also if the non-compliant discharge was caused by a violation of O&M requirements. (These penalties are in addition to stipulated penalties for violation of the O&M requirement itself. Final Decree ¶ XVII.F; IPCD ¶ XI.G.) Precisely because it would be difficult, as Sierra Club asserts, to prove that a particular CSO violation or bypass is due to an O&M violation, the decrees specifically require defendants to report in the quarterly reports, as to each SSO, CSO, or bypass, whether it was caused by an O&M violation or whether an O&M violation contributed to the volume or duration of the SSO, CSO or bypass. Final Decree ¶ XV.B, IPCD ¶ IX.B. Further, the quarterly reports (like all submissions under the decrees) are subject to significant penalties for the submission of false information, including the possibility of fines and imprisonment. Final Decree ¶ XVI.C, IPCD ¶ X.C. Given the decrees' general approach to stipulated penalties for capacity-related violations, these stipulated penalties provide sufficient further incentive to ensure that defendants follow their O&M requirements, especially where the failure to do so could result in a non-compliant discharge. Again, this is a reasonable approach to this issue.

9.     **Comment: Stipulated penalty provisions may limit enforceability of defendants' WWTP permits' bypass provisions.** SC, p. 16.

   **Response: Sierra Club's comment overlooks specific language in the Final Decree that reserves the regulators' enforcement rights.**

   The Final Decree's stipulated penalty provisions state:

   Payment of stipulated civil penalties as set forth above shall be in addition to any other rights or remedies that may be available to the United States, the State, ORSANCO, or their agencies by reason of the Defendants' failure to comply with requirements of this Consent Decree, and all applicable Federal, state or local

laws, regulations, the Compact and pollution control standards promulgated thereunder, NPDES permit(s) and all other applicable permits. The payment of such stipulated penalties shall not be construed to relieve Defendants from specific compliance with this Decree, applicable federal or State law, or the Compact and the pollution control standards promulgated thereunder, nor shall it limit the authority of U.S. EPA, Ohio EPA, or ORSANCO to require compliance with such laws.

Final Decree ¶ XVII.O. The Final Decree specifically reserves all rights against the defendants that the United States has, inter alia, for violations of the Clean Water Act that occur after the date of lodging. Id. ¶ XXVI.E. There is no way the requirement to pay a stipulated penalty for a bypass violation (or any other violation) limits the United States' future enforcement rights.[9]

**10.    Comment: Stipulated penalties for violations of effluent limits are too low.** SC, p.17.

   **Response: The amounts are reasonable.**

The amounts, which range from $1000 per violation per day to $8000 per violation, Final Decree ¶ XVII.G.1, are sufficiently stringent to deter non-compliance, particularly since they do not in any way prevent future additional enforcement actions by the United States for more penalties or injunctive relief.

**11.    Comment: "There is no one designated to audit compliance and payment"** of **stipulated penalties.** SC, p. 17 (bold type in original).

   **Response: False.**

As repeatedly discussed, this is not true. The United States alone has specifically designated two highly qualified technical people to monitor compliance, in addition to attorneys

---

[9] Sierra Club similarly asserts without further analysis that the stipulated penalties for violations of effluent limits are a "protection mechanism." SC, p.17. The United States has no idea what is meant by this, but assuming Sierra Club is asserting, as it appears to be asserting with regard to the bypass penalties, that the collection of a stipulated penalty has some negative effect on the United States' enforcement rights, this assertion is similarly false and groundless.

from EPA and DOJ as necessary. The United States, with the other regulators, will appropriately enforce the stipulated penalty provisions, just as it will all provisions of these decrees. Finally, of course, if the United States or Ohio or ORSANCO do not appropriately oversee the decrees, Sierra Club can bring it to the regulators' or this Court's attention, or if necessary.

12. **Comment: Why doesn't the same kind of sub-basin approach to stipulated penalties apply to CSOs as to SSOs?**

Sierra Club notes that, under the Final Decree, once defendants complete the long term remedial measures to eliminate SSOs in a particular sub-basin, they are liable for stipulated penalties for any SSO that occurs in that particular sub-basin. Final Decree ¶ XVII.E.3. However, the Final Decree does not take a similar sub-basin approach for CSOs. Instead, post-remedial measure stipulated penalties for CSOs do not apply until after completion of all of the long term remedial measures for CSOs. Id. ¶ XVII.E.2. Sierra Club questions why this is the case. SC, p. 17.

**Response: The different approaches are warranted due to the differences in compliance endpoints between the SSOs and CSOs.**

As explained in the United States' Memorandum at §§ II.B & II.C.3.b-c, SSOs are unpermitted discharges that must be eliminated, while CSOs can be permitted, subject to water quality based effluent limitations (and other requirements) that are developed to attain water quality standards in the receiving streams. Given the absoluteness of the compliance end point for SSOs, it will be a straightforward exercise to determine, on a sub-basin by sub-basin basis, whether compliance has been achieved: any SSO will constitute non-compliance. The compliance endpoint for CSOs may be less absolute. Moreover, the Final Decree requires all CSO improvements to comply with their design and performance criteria, upon completion of

- 17 -

construction, and the failure to do so will subject Defendants to stipulated penalties.  Final

Decree ¶ XVII.F.2, Exhibit 4, § II.H.4(b).  These "design and performance criteria" stipulated

penalty provisions serve the same function as the sub-basin stipulated penalty provisions for the

SSOs and are a reasonable approach.

13.     **Comment:  Sierra Club and the general public "should have specific and defined monitoring and intervention rights for both Consent Decree enforcement and Dispute Resolution.**  SC, p.18.

        **Response: Sierra Club is not a party to the decrees and has different, but appropriate, rights.**

        Congress provided specific rights for citizens (including, among others, Sierra Club and

"the public") in Section 505 of the Clean Water Act.  33 U.S.C. § 1365.  A citizen may bring an

action against any person who is alleged to be in violation of the Act, with proper notice and

unless the United States (or a State) has already "commenced and is diligently prosecuting a civil

or criminal action . . . to require compliance with the standard, limitation, or order . . . ."  33

U.S.C. § 1365(b)(1)(B); <u>see also</u> <u>id</u>. § 1365(a), (b)(1)(A).  If the United States (or a State) has

already commenced and is diligently prosecuting a compliance action, a citizen may intervene as

a matter of right in the action.  33 U.S.C. § 1365(b)(1)(B).[10]  As this Court is aware, Sierra Club

took advantage of this by filing a complaint in intervention concerning SSOs and thus becoming

a party to the governments' underlying lawsuit (at least as to the SSO claims).[11]

_____

[10] The United States does not know what is meant by Sierra Club's comment that the decrees should have "specific and defined" intervention rights for Sierra Club and the public.  These rights are specifically defined for any citizen pursuant to 33 U.S.C. § 1365(b)(1)(B).

[11]  If the Court enters the consent decrees, this separate citizen action should be dismissed.  <u>E.g.</u>, <u>United States EPA v. City of Green Forest</u>, 921 F.2d 1394, 1403-05 (8th Cir. 1990)(citizens' properly dismissed when government consent decree resolving same claims is entered).

- 18 -

The Supreme Court has explained the complementary roles that Congress intended for United States and States, as primary enforcers of the Clean Water Act, and citizens as supplementary enforcers, as follows:

> The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the state," and that citizen suits are proper only "if the Federal, State and local agencies fail to exercise their enforcement responsibility."

Gwaltney of Smithfield, Ltd. V. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 60 (1987) (citations omitted). The Supreme Court concluded that to view it otherwise would "change the nature of the citizens' role from interstitial to potentially intrusive," a result Congress could not have intended. Id. at 61.

Courts have examined the role of an intervenor plaintiff with respect to a Clean Water Act consent decree between the government and a defendant, and they have held that a citizen intervenor cannot be allowed to dictate the terms of settlement, block the settlement process, or otherwise interfere with the government settlement. Sierra Club has only the right, through public comment and through the briefs this Court allows, to comment on the decree – a role which it has vigorously exercised. To allow otherwise would render the civil enforcement provisions of the Clean Water Act

> . . . impossible to administer. Those provisions allow any affected citizen to intervene in a government action as a matter of right. If such a citizen were allowed to block entry of a consent decree merely by objecting to its terms it would wreak havoc upon government enforcement actions. Accordingly the court holds that once intervenors have been given the opportunity to object to the decree they have had an appropriate day in court and a judgment on consent may be entered.

United States v. Ketchikan Pulp Co., 430 F. Supp. 83, 85 (D. Alaska 1977)(citations omitted).[12]

The role of an intervenor into a consent decree proceeding was also presented in United States E.P.A. v. City of Green Forest, 921 F.2d 1394 (8th Cir. 1990), where the Eighth Circuit Court of Appeals reversed the district court's refusal to allow a citizen group to intervene in a federal Clean Water Act consent decree proceeding, but found the court's denial of the motion to be largely "harmless error."  The court noted that, although the citizens had been denied intervention, they had, de facto, been permitted to participate because they had taken advantage of their right to object to the decree during the public comment period.  As the court observed, "[t]here is little else that they could have done had they formally intervened."  921 F.2d at 1402. The court then went on to uphold the district court's dismissal of the citizen group's separate citizen suit, which had been filed before EPA brought suit and negotiated its consent decree:

> In view of the preeminent role that must be afforded the EPA in enforcing CWA violations – a role contemplated by the legislative history and recognized by the Supreme Court in Gwaltney – we hold that it was proper for the district court to dismiss [the citizen group's] CWA claims against Green Forest after the latter had entered into a consent decree with the EPA.  The EPA is charged with enforcing the CWA on behalf of all citizens.  Since citizens suing under the CWA are cast in the role of private attorneys general, as a practical matter, there was little left to be done after the EPA stepped in and negotiated a consent decree.

Id. at 1404.

While these cases do not precisely address the rights of a non-settling intervenor concerning a consent decree once it is entered, they make clear that Congress intended citizens' rights to be "interstitial," that citizens have no rights to the terms of consent decrees to which

---

[12] See also Local Number 93, Int'l. Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 529 (1986) (intervenor does not have power to block decree merely by withholding its consent); Bragg v. Robertson, 83 F. Supp. 2d at 720 (same).

- 20 -

they are not parties beyond offering comments, and that there is "little left to be done" once a decree is entered. Only the parties to a decree are bound by, or can take advantage of, the terms of that decree, and only the government plaintiffs can enforce the terms of a consent decree they have entered into. Sierra Club is not a party to the decrees and, therefore, has no legal role in implementing or enforcing them.[13]

This does <u>not</u> mean, however, that Sierra Club lacks the practical ability to help ensure that the decrees are appropriately implemented, should it choose to. As discussed in the United States' Memorandum at § III.C.1.b, Sierra Club is receiving all formal proposed plans and government approvals/disapprovals/comments generated under the decree, as well as all quarterly reports on the decrees' implementation.[14] Although Sierra Club cannot itself enforce the decrees' terms, it can inform the regulatory agencies if, in its view, defendants are not appropriately complying or, if it believes that all three of the plaintiffs are failing to oversee or enforce properly, it can inform the Court of its views, as it has done throughout this process.[15] If the Court is interested or believes it necessary, it will no doubt call the parties before it to discuss the issues Sierra Club has raised.

---

[13] It is hornbook law that "[a] nonparty may not enforce an order that was not entered in its favor." 13 Moore's Federal Practice, § 71.03 (Matthew Bender 3d ed. 2004).

[14] In addition, as discussed in the United States' Memorandum at § III.C.1.b, in November, Sierra Club was asked to join the Steering Committee that will advise defendants on their development of the LTCPU. If Sierra Club takes advantage of this offer (and it has not as of yet), it would have direct input into the development of this critical remedial plan.

[15] In the unlikely event that Sierra Club believes the United States and State's efforts are so desultory as to amount to a lack of "diligent prosecution," Sierra Club may file and attempt to maintain a separate citizen suit.

Further, although Sierra Club, as a non-signatory, cannot avail itself of the decrees' dispute resolution provisions, it will have meaningful input in dispute resolution. First, the United States has committed to forward to Sierra Club any "notice of dispute" that invokes informal dispute resolution under the decrees. Since the United States is also providing Sierra Club with all the submittals, regulators' responses, quarterly reports, etc., Sierra Club will have all the information it needs to provide comments to the regulators during the informal dispute resolution period, which the regulators will consider in reaching their decision. If the dispute is not resolved informally and formal dispute resolution is invoked, the United States will also forward the "statement of position," which invokes formal dispute resolution, as well as the statement(s) of provision that provide(s) the regulators' response. If the dispute still is not resolved, the "petitioner" must file a petition with the Court to invoke judicial resolution, which will of course be served on Sierra Club. If the Court allows it, Sierra Club can presumably file its views with the Court on the dispute. Thus, Sierra Club will have an effective opportunity to provide input in both informal and, with the permission of the Court, formal judicial dispute resolution.

In short, this is an appropriate role for citizen intervenors like Sierra Club, given the Act's reliance on the Federal and State governments as primary enforcers and citizens as supplementary enforcers of the Act – especially here, where there are three congressionally-appointed primary regulators overseeing and enforcing the decrees. To allow Sierra Club, or other intervenors to a settled matter, any greater role in enforcing the entered decrees would "wreak havoc upon government enforcement actions" and render the enforcement provisions of the Act, as well as the decrees, "impossible to administer." Ketchikan Pulp, 430 F. Supp. at 85.

14.    **Comment:  Dispute resolution will be "overused" because of vague terms and "loopholes."**  SC, p.18; <u>see also</u> SC, p. 10.

**Response: The terms are appropriate, and this Court can apply them if necessary.**

As discussed in the United States' Memorandum at §§ III.C.8 and .4, the decrees contain no "loopholes," and the few carefully prescribed provisions for schedule extension and the use of terms such as "as expeditiously as practicable" and "no feasible alternatives" are all appropriate. These provisions or terms have been used precisely because it is inappropriate to prescribe the deadline or standard further at this point because of potential future uncertainties or because the requisite planning and analysis has not been completed.  The fact that the provisions or terms do not precisely define what happens in every possible circumstance does not render them inappropriate.

Further, as discussed in the United States' Memorandum, these concepts have recognized and enforceable meaning.  The regulators have proven that they are able to apply such terms (for example, by significantly tightening the schedule for constructing the Interim Remedial Measure–the CEHRS–and submission of the Capacity Assessment Program Plan).  The parties have worked out all issues to date, and there is no reason to think the parties cannot work these issues out in the future.  Further, it is unlikely that defendants will "overuse" dispute resolution, because there is a significant disincentive for them to dispute an issue because stipulated penalties continue to accrue during the dispute, and if they lose, they must pay all the stipulated penalties determined to be owing.  Final Decree ¶ XXI.K; IPCD ¶ XIV.I.  Ultimately, however, if the parties are unable to agree on a particular deadline or schedule extension issue in the future, this Court will have before it the information developed under the decrees that is necessary for an informed decision and will be able to apply the decrees' terms.

- 23 -

15.    **Comment:  The costs of dispute resolution should be borne by defendants.**  SC, p.18.

**Response: Pursuant to the terms of the decrees, the parties bear their own costs.**

Pursuant to Section XIX of the IPCD and Section XXVII of the Final Decree, "[e]ach Party shall bear its own costs and attorneys' fees with respect to matters related to this Consent Decree."

16.    **Comment:  The review of submittal provisions are problematic; a special master is needed.**

Sierra Club asserts that it is "very unwieldy" to have the decrees' submittals reviewed by all three regulators.  Further, the decrees' provisions that allow defendants' deadlines to be extended if the regulators take over 60 days to complete their review, are "particularly problematical given the relatively small level of resources that the agencies have devoted to the MSD case to date."  Further, dispute resolution on submittals could delay compliance even further.  Sierra Club's answer is a special master "to make sure the multiple party reviews take place in a timely manner."  SC, pp. 18-19.

**Response: The review of submittal provisions are appropriate, and the regulators will act appropriately in administering them.**

Congress chose to give the United States and Ohio essentially concurrent jurisdiction in a matter such as this one and further also provided ORSANCO with a meaningful regulatory role concerning discharges into the Ohio River.  All three entities joined this case as plaintiffs and are responsible for overseeing the settlements.  Defendants would have liked nothing better than to have only one regulatory agency "in charge."  They were particularly concerned about what would happen to their schedules if the agencies took longer than 60 days to review a submittal or had a dispute among themselves that took time to resolve.  Thus, as has been done in other cases,

- 24 -

the parties negotiated reasonable provisions to ameliorate this potential problem, including

providing defendants additional time if the regulators' review takes longer than 60 days, and

staying defendants' obligation to perform an action that is necessarily affected by "materially

different or irreconcilable" positions taken by the regulators.[16]  IPCD ¶ XIV.H, XXII.C; Final

Decree ¶¶ XXI.J, XXX.B-C.  These provisions provide an appropriate accommodation to

defendants' schedule concerns given the reality that there are three plaintiffs with independent

approval authority in this case.

        As to Sierra Club's concerns that the regulators will not timely and appropriately review

submittals, these have been answered before.[17]  The United States is very committed to this case

and has assigned sufficient personnel to oversee the decrees, including the submittals,

appropriately.  See United States' Memorandum, § III.C.1.a .

        Finally, it would be unhelpful and inappropriate to have a special master oversee the

review of submittals, because this review and approval process is particularly committed to the

regulatory agencies' discretion, based on their technical expertise.  For its part, EPA will apply

an appropriate level of effort to complete its review thoroughly and expeditiously.  However,

EPA will take as long as it needs to appropriately review the documents – especially the CAPP

and LTCPU that will select the final remedies for the sewer system.  This is exactly why the

United States could not commit to completing its review in 60 days, as defendants initially

---

[16] Further, in response to defendants' concerns about the multiple overseers, the Final Decree also contains provisions to help coordinate a consistent response among the regulators.  See Final Decree ¶ XXX.D.

[17]  Sierra Club's assertion that the agencies have devoted a "relatively small level of resources" to this matter is particularly droll, since the United States alone has spent well over ten thousand employee and expert hours on this matter.  See United States' Memorandum at § III.C.1.a.

requested.  Some reviews will take (and have taken) less time, and depending on the complexity

of the document and issues that arise, some may take more time.  It would be very inappropriate

and perhaps detrimental to the final outcome of the decrees to have a special master hurrying the

regulators along in their review and approval process for these critical plans.

17.    **Comment:  The complaint is too vague.  There needs to be full public disclosure of
all past violations in order to determine if the decrees adequately address the
violations.**

Sierra Club repeatedly asserts that the Joint Amended Complaint is too vague.  SC, p.5,

6, 7, 14.  They say that the Court "cannot know if the deal is in the public interest when the

MSD's violations are hidden from public scrutiny," SC, p.7, and that citizens have a "right to

know in what respects their government agencies have found a polluter to be in violation of the

CWA."  SC, p. 20.  Sierra Club further asserts that it asked EPA to disclose this information, but

EPA has used outside contractors to "shield from disclosure" information on violations.  SC,

pp.7, 14, 16.[18]

> **Response: The Joint Amended Complaint is adequate.  The United States is not
> required to prove all the violations it is settling, and there is sufficient information
> concerning the violations to allow assessment of the decrees.**

First, the Joint Amended Complaint fully complies with the requirements of Fed.R.Civ.P.

8(a) to set forth a "short and plain statement" of the claim showing that the pleader is entitled to

relief, giving the defendant fair notice of what plaintiff's claim is and the grounds upon which it

rests.  Conley v. Gibson, 355 U.S. 41, 47 (1957).  The Joint Amended Complaint describes

plaintiffs' Clean Water Act and other claims sufficiently to provide adequate notice to

---

[18] Sierra Club's similar comments, but that pertain specifically to its FOIA request, are addressed
below in Response to Comment 46.

- 26 -

defendants, as well as to Sierra Club and the Court, of claims the plaintiffs are alleging and settling pursuant to the decrees. There are no heightened pleading requirements under the Clean Water Act.[19] In fact, courts have explicitly approved a consent decree against a challenge that the complaint underlying it was insufficient, as long as the decree comes within the "general scope of the pleadings."[20] Clearly, these decrees do.

Sierra Club's assertion that it is entitled to know all of defendants' violations before the parties can settle the case turns the notion of settlement on its head. The parties are settling this matter, and therefore, are in effect agreeing not to resolve the question of which and how many violations have actually occurred. Thus, adding specificity to the Complaint would not accomplish Sierra Club's objective because assertion in a complaint does not equate to a finding of violations. Further, the United States has no obligation to create this information for Sierra Club or the general public. Finally, the United States' refusal to turn over in discovery draft, incomplete and potentially inaccurate tables of violations that it was in the process of developing was not improper. These tables, which the United States was developing primarily for use if the settlement negotiations fell through, clearly fall within the protections of the work product doctrine. Fed. R. Civ. Proc. 26(b)(3).[21] Nevertheless, the United States did make available to

---

[19] See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993) (heightened pleading requirements apply only in cases of fraud and mistake).

[20] United States v. BP Exploration Oil Co., 167 F.Supp.2d 1045, 1050 (N.D. Ind. 2001) (entering decree where the decree comes within general scope of the complaint), citing Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (2001) (consent decree must "come within the general scope of the case made by the pleadings").

[21] Contrary to Sierra Club's insinuations, the United States was not using its expert, Mark Klingenstein and his staff, to prepare the tables to "shield [this information] from disclosure," as Rule 26(b)(3) plainly applies to documents prepared "in anticipation of litigation," whether they

- 27 -

Sierra Club all non-privileged information that it had concerning defendants' violations,

including extensive documents prepared by defendants in response to requests for information

concerning their violations pursuant to Section 308 of the Act.  33 U.S.C. § 1308(a).

Despite the fact that the regulators did not create final documents listing each and every

violation that came within the ambit of the Joint Amended Complaint, the United States (and

other regulators) spent an enormous amount of time studying defendants' sewer system,

including the sanitary system, the combined system, and the WWTPs, their various violations,

and the reasons therefore.  The United States studied the system sufficiently to craft appropriate

injunctive relief for all of the violations alleged in the complaint.  Klingenstein Dec. ¶ 140.

For example, plaintiffs and defendants spent considerable time reviewing the WWTP

effluent limit violations to determine what injunctive relief, if any, was necessary.  The State's

computer system for determining WWTP permit effluent limit violations had certain problems

(which have since been fixed), and it had generated a list of thousands of WWTP violations.

Defendants and plaintiffs first separately, and then together, reviewed the list of violations and

determined in fact that there were far fewer than were on the State's initial list; that appropriate

steps had been taken at the WWTPs to address the effluent limit violations; and that, in the

regulators opinion, specific injunctive relief was not necessary for this claim beyond the

requirement in the Final Decree, subject to stipulated penalties, that defendants comply with the

effluent limits in their permits.  Moreover, plaintiffs and defendants met with Sierra Club and

went over the WWTP violations and  findings in details.  Klingenstein Dec. ¶¶ 146-50.

The parties (and Sierra Club) well know, for example, where all of defendants' SSOs and

are prepared by the party itself, its attorneys, or its consultants.

CSOs are located; that some of defendants' CSOs and SSOs discharge nearly every time it rains and that others discharge periodically; that nearly every CSO discharge violates the narrative limit in defendants' CSO permit that CSOs not "impair designated uses;" and that bypass occurs frequently at some of defendants' WWTPs, including Mill Creek and Muddy Creek. See, e.g., Comments, Ex. 1-G. The main point of the two decrees is to require defendants to study their system sufficiently to craft appropriate injunctive relief to address all of these violations and to come into compliance with the law. Further, the decrees will not terminate until defendants have, inter alia, "maintained compliance with each and every provision of this Consent Decree for twelve consecutive months," which would include, for example, the requirements that defendants' CSOs comply with their applicable permit and defendants comply with their WWTP effluent limits. IPCD ¶ XXV.A.1, Final Decree ¶ XXXIII.A.1. Thus, the decrees' terms mandate compliance with the law, and it is not necessary at this juncture for the United States to provide information on every violation for Sierra Club and this Court to determine that the decrees presents a reasonable approach for achieving compliance or that the penalties imposed are appropriate. (See Response to Comment 28).

Although the United States does not believe it necessary, it has developed tables of SSOs (each SSO constitutes a Clean Water Act violation), CSOs (most, if not all, of which violate the narrative effluent limitations in defendants' NPDES permit), bypasses (all of which violate defendants' NPDES permits to the extent there were feasible alternatives to avoid bypass), and WWTP effluent limit violation for 2002-03, which it is providing to the parties and Sierra Club. See Klingenstein Dec. at ¶¶ 141-44. Given their volume, the United States is not filing those tables with the Court, although it will gladly do so should the Court desire. These tables provide

- 29 -

detailed information concerning defendants' current compliance status.

18.     **Comment:  Because the complaint does not specify the violations, the decrees are unclear what is being settled and they, therefore, have no <u>res judicata</u>, collateral estoppel, or diligent prosecution effect.**  SC, p. 18.

      **Response: The complaint and decrees are sufficiently clear to determine what is being settled.**

The United States takes great care in its decrees to be specific and appropriately narrow as to what is being settled, and these decrees are no exception.  Pursuant to Paragraph XXVI.B of the Final Decree, the Final Decree "resolves the civil claims of the United States and the State for injunctive relief and civil penalties for the Clean Water Act violations alleged in the Joint Amended Complaint filed herein through the Date of Lodging of this Decree, including any remaining claims for injunctive relief for the Clean Water Act violations alleged in the SSO Complaints through the Date of Lodging of this Consent Decree."[22]  (Similar language pertains to ORSANCO's claims.)  Thus, the Final Decree resolves all civil claims for the violations alleged in the complaint through December 3, 2003.  Because the decrees provide injunctive relief for all of the types of violations at all of the facilities alleged in the complaint and the civil penalty received is sufficient under EPA's penalty policy for all of the violations alleged in the complaint, <u>see</u> Response to Comment 28, it is appropriate that the Final Decree resolve all of these types violations through the date of lodging.  For example, because the Final Decree requires defendants to comply with its effluent limits and O&M requirements at all of its WWTPs, Final Decree § XII, the complaint need not specify precisely which WWTPs have violated which requirements on which dates.  Thus, it is sufficient to allege, in notice pleading

---

[22] The "effect of decree" provisions of the IPCD are, of course, much narrower reflecting the partial nature of the settlement.  IPCD ¶ XVIII.B.

fashion, that: "On various dates from March 1, 1994, Defendants discharged pollutants from some or all of Defendants' Seven Major WWTPs in excess of the effluent limitations for such discharges contained in the NPDES permits for those wastewater treatment plants . . . . ," Joint Amended Complaint ¶ 69; and "On various dates from March 1, 1994, Defendants violated the operation and maintenance requirements of some or all of the NPDES permits for Defendants' Seven Major WWTPs . . . ." Joint Amended Complaint ¶ 75. There is nothing unclear or inappropriate about the effect of the decrees on the claims alleged in the Joint Amended Complaint.

**COMMENTS SPECIFICALLY CONCERNING THE FINAL DECREE**

19.    **Comment: The interim remedy for the Sycamore WWTP is inappropriate and illegal.**

Sierra Club asserts that the Final Decree's requirements that defendants construct a high-rate ballasted flocculation treatment facility as an interim remedy to the bypassing problem at the Sycamore WWTP is inappropriate and illegal. SC, pp. 5-6. Sierra Club further asserts that the NPDES permit contemplated for the Sycamore WWTP violates the Clean Water Act because it does not include loading limits for bypassed flows and does not require the bypassed flows to meet secondary treatment requirements. SC, p. 19.

> **Response: The provisions of the final decree allowing for continued bypassing at the Sycamore WWTP if there are no feasible alternatives to the bypass, but requiring construction of high-rate ballasted flocculation and disinfection facilities that will come close to meeting secondary treatment requirements and protect public health to treat any bypasses that might occur, *are* consistent with U.S. EPA's bypass regulation that has been in effect since 1979.**

Defendants diverted millions of gallons of partially treated flow around a portion of the

- 31 -

Sycamore WWTP approximately 114 times in 2002-03.  See Klingenstein Dec. ¶ 143.  These diversions of flow are defined as "bypasses," which are prohibited under U.S. EPA's regulations at 40 C.F.R. § 122.41(m) and the NPDES permit for defendants' Sycamore WWTP unless, inter alia, there were no feasible alternatives to the bypass.  As an initial remedy, pursuant to Exhibit 1 of the Final Decree, defendants are required to construct a high-rate ballasted flocculation and disinfection facility at the Sycamore WWTP, to treat bypassed flows.  That facility is expected to be able to remove up to 90% of the suspended solids and 65% of the oxygen demanding materials from the bypassed flow,  plus achieve an extremely high level of disinfection to kill the harmful pathogens that would otherwise be discharged.  See Klingenstein Dec. ¶¶ 27-28, 151-57.  Construction must be completed by December 31, 2006.

The final solution to bypassing at the Sycamore WWTP, and at defendants' other WWTPs, will be determined under the Final Decree through development and implementation of the LTCPU, which has, as its first goal, ensuring that "Defendants construct and implement all feasible alternatives to eliminate bypasses at Defendants' WWTPs or, if defendants demonstrate during the course of developing the Long Term Control Plan Update that elimination of bypassing is not feasible, to reduce bypasses at the WWTPs to the maximum extent feasible and to provide maximum feasible treatment for any remaining bypasses."

As stated in the Final Decree, "in light of the substantial costs and magnitude of the remedial measures that will be required to be implemented [as part of the LTCPU and CAPP, and as Capital Improvement Projects], the Parties expect that proper construction and implementation of the remedial measures for the Sycamore WWTP . . . will be the feasible

alternatives to bypassing at the Sycamore WWTP."[23/]  Final Decree § VI.  However, it is possible (although unlikely) that the costs of the necessary remedial measures required by the LTCPU and CAPP will not be nearly as great as the parties expect, in which case the LTCPU will have to include additional measures for further reducing bypassing at the Sycamore WWTP, to the extent such additional measures are feasible.

Sierra Club's argument that the diverted flows at the Sycamore WWTP are required to meet the Clean Water Act's secondary treatment requirements ignores the fact that, since 1979, U.S. EPA's bypass regulation, 40 C.F.R. § 122.41(m), has allowed for the diversion of flows from portions of a treatment facility where, <u>inter alia</u>, there "were no feasible alternatives to the bypass," and that regulation was upheld by the D.C. Circuit Court of Appeals in 1987.[24/]  <u>See</u> <u>Natural Resources Defense Council v. U.S. EPA</u>, 822 F.2d 104, 122 (D.C. Cir. 1987).  The provisions of the Final Decree allowing for continued bypassing at the Sycamore WWTP if there are no feasible alternatives are clearly consistent with U.S. EPA's longstanding bypass regulation.

In addition to incorrectly arguing that bypassed flows must receive secondary treatment,

---

[23/]  The term "feasible" encompasses economic feasibility, as well as technical feasibility.  <u>See</u> <u>American Textile Manufacturers Institute, Inc. v. Donovan</u>, 452 U.S. 490, 508-09, 530 n.55 (1981); 40 C.F.R. § 131.10(g)(6) (attainment of water quality standards may not be "feasible" where the costs of controls necessary to attain standards "would result in substantial and widespread economic and social impact").

[24/]  Sierra Club asserts, utterly without support, that "[b]ypassing is illegal except in an Act of God event (and EPA is not enforcing this)."  SC, p.19.  There is no "Act of God" concept in 40 C.F.R. 122.41(m), and EPA <u>is</u>, in this case and others, enforcing the bypass regulation.  <u>See</u>, <u>e.g.</u>, <u>United States v. City of Toledo, Ohio</u>, 63 F. Supp. 2d 834 (N.D. Ohio 1999) (court agreed with United States' interpretation that "feasible alternatives" under bypass regulation included requiring an assessment of the feasibility of additional construction).

Sierra Club makes the corollary argument that it is somehow illegal for the Final Decree to require defendants to construct and operate high-rate ballasted flocculation and disinfection facilities to provide the maximum feasible treatment to any remaining bypasses, to the extent elimination of bypassing is not feasible.  SC,  pp. 5-6.  As described above, U.S. EPA's longstanding bypass regulation allows for flow to be bypassed from portions of a treatment facility (e.g., the secondary treatment portion of a municipal WWTP) where there are no feasible alternatives to the bypass.  It is absurd to suggest that the Clean Water Act would preclude U.S. EPA from requiring that any bypasses that do occur after implementation must be treated to the maximum extent feasible (in this case, by use of high-rate ballasted flocculation and disinfection facilities).

Sierra Club's final comment in this regard is that it believes future NPDES permits for the Sycamore WWTP will have to include "loading" and secondary effluent limitations for the diverted flows.  The United States notes that, although it does not necessarily agree with Sierra Club's assertions, this disagreement is beside the point, as questions concerning the conditions that will need to be included in future NPDES permits for the Sycamore WWTP are ones to be answered in the permitting context, not in the enforcement context (let alone this consent decree proceeding).  These questions will be answered by Ohio EPA, as the permitting authority, subject to review by U.S. EPA and subject also to the public's right to review and challenge in state court any permitting decision that is made.

**20.    Comment:  The Polk Run plant is not designed to handle its wet weather flows.**  SC,

Sierra Club states that "Ohio EPA knows that the . . . Polk Run wastewater treatment plant . . .  [is] not designed to handle [its] wet-weather flows.  Polk Run NPDES permit has a

- 34 -

design flow specified of 8 MGD, but in actuality its design flow is only 6 MGD.  Bypassing is

illegal except in an Act of God Event . . . ."  SC, p. 19.

> **Response: Any Capacity issues at the Polk Run WWTP will be addressed by the**
>
> **LTCPU.**

The United States is not aware of any bypassing that occurred at Polk Run in 2002 or

2003 because of inadequate capacity.  Klingenstein Dec. ¶¶ 143, 159.   Further, based on

information provided by Ohio EPA, Ohio EPA approved and defendants are well along toward

completing an expansion of the Polk Run WWTP to an 8 MGD facility.  As discussed above in

Response to Comment 19, however, if there is bypassing or other capacity-related problems at

the Polk Run WWTP, as defendants' other WWTPs, this will be remedied under the Final

Decree through development and implementation of the LTCPU.

21.     **Comment: When figuring the costs for the $1.5 billion potential schedule extension, defendants should not include the costs of the tunnel, sewer relining and manhole rehabilitation, or costs for new regulatory requirements.**  SC, pp. 5, 12.

> **Response: These costs are appropriately included, except for the Corps' tunnel costs, which are not included.**

Sierra Club asserts that the Mill Creek Tunnel ("tunnel") is a flood control project and

thus, that its costs should not count toward the $1.5 billion figure for the potential schedule

extension.  The very positive aspect of the tunnel, and the reason the IPCD was negotiated to

potentially allow for its use in remediating SSO 700, is that the tunnel would provide <u>both</u> flood

control and significant CSO/SSO benefits, with the Corps paying for the lion's share of the costs.

<u>See generally</u> Response to Comment 36 below.  <u>Of course</u> defendants cannot count the money

that the Corps spends on building the tunnel toward the $1.5 billion figure!  However, if the

tunnel is built and if it is the remedy that is proposed and approved in the SSO 700 Remedial

Plan, defendants will incur significant costs to hook the sewer system into the tunnel to achieve the related CSO/SSO benefits and will also likely need to pay a 35% "community share" of the cost of the tunnel.  These costs would count toward the $1.5 billion in "capital costs (in 2006 dollars) of the remedial measures in the Long Term Control Plan Update and the CAPP," Final Decree ¶ IX.B, assuming defendants also include the tunnel in the LTCPU as a component of their solution for addressing CSOs.  Klingenstein Dec. ¶¶ 38, 44.

Similarly, it is reasonable to include the capital costs of sewer relining and manhole rehabilitation as long as a Sewer Relining and Manhole Rehabilitation Program Plan is included as an element of their Long Term Control Plan Update.  Final Decree ¶ IX.C.  These projects, which will reduce infiltration and inflow, and thus remove storm water from defendants' system, are an aspect of ensuring that a system has sufficient capacity to handle its flows to result in compliance with the Act.  Further, there is only one "pot of money" for all of the sewer construction that needs to be done – the LTCPU, CAPP, and other major remedial projects, as well as more routine sewer relining and manhole work.  To the ratepayers, whether the construction work is routine or part of the remedial plans required by the decree, it still must be paid for from their same hard-earned money, and should be considered in the determination of whether the schedule is "practicable" or whether it exacts too great a toll on the ratepayers at that rate of construction.  Finally, while defendants are already performing this routine construction, including these construction projects in an enforceable plan under the Final Decree will ensure that appropriate sewer relining continues to occur as defendants must simultaneously implement the more major and costly projects required by the CAPP and LTCPU.

Including costs for "new regulatory requirements" in the $1.5 billion figure is based on

- 36 -

similar reasoning and is similarly appropriate.  This provision was requested by defendants based on their belief that EPA is considering requiring that WWTPs include significant and expensive phosphorous controls in the not-too-distant future.  (Phosphorous is a big contributor to water quality problems, and WWTPs are a significant source of phosphorous.)  The plaintiffs agreed, again based on the fact that there is one source of money for these related compliance efforts.  If defendants include such measures as part of their enforceable LTCPU, and if plaintiffs approve their inclusion, it is reasonable that these costs be taken into account in determining affordability for scheduling purposes.

In short, all of these components are reasonably included in the $1.5 billion figure, which merely allows defendants to <u>request</u> a schedule longer than 2022.  It must be stressed, of course, that the fact that defendants spend more than $1.5 billion does not guarantee a date past 2022, and that any approved schedule will be as expeditious as practicable.

**22.    Comment:  The decree's Dry Weather Overflow provisions are inappropriate.**

Sierra Club notes that "dry weather overflows" from defendants' CSOs are prohibited and argues that EPA is somehow attempting to "amend[] its policy by the back door" because Sierra Club believes that the Final Decree only requires that dry weather overflows be reduced to the maximum extent practicable.  SC, p. 13.  Sierra Club further asserts that the "as expeditious as practicable" standard governing the schedule for future improvement will allow defendants to establish a schedule under the consent decree that allows dry weather overflows to continue until 2022 or later.

> **Response: The decree contains appropriate remedial measures to prevent dry weather overflows.**
>
> Defendants have a longstanding problem with "dry weather overflows" (<u>i.e.,</u> overflows

that are not caused by a lack of capacity during and immediately following precipitation)

resulting from historical changes in the Ohio River water level caused by dam construction and

changes in how existing dams are operated. These changes, which occurred after defendants'

CSO outfalls were constructed, resulted in many of those outfalls being submerged by the Ohio

River, which in turn results in large amounts of river intrusion into Hamilton County's sewer

system. This river water, in turn, uses up sewer capacity, resulting in CSOs occurring during dry

weather. Although defendants have been implementing measures over the years to address this

problem, there are approximately 27 CSO outfalls still experiencing these "High Water/Dry

Weather" ("HW/DW") overflows. A number of the Capital Improvement Projects in Exhibit 1

to the Final Decree are designed to address the HW/DW overflow problem, with the remainder

being addressed by the LTCPU. See Klingenstein Dec. ¶¶ 96-98.

It is virtually impossible for a combined sewer system the size of defendants' to avoid

having an occasional dry weather overflow. However, other than their significant HW/DW

overflow problem, defendants do not appear to have a significant weather overflow problem.

See Klingenstein Dec. ¶ 98. To ensure that this is indeed the case, the Final Decree requires that

defendants perform a study, the "Non-High Water Dry Weather Overflow Study," to determine

whether any of their CSO outfalls have had more than one discharge more than twenty-four

hours following a precipitation event, as a result of other than High Water Conditions or

continued runoff or infiltration and inflow from a precipitation event. If they do have CSO

outfalls that have experienced more than one such discharge, defendants must develop and

implement remedial measures to prevent or reduce, to the maximum extent practicable, these

discharges in the future, in accordance with a schedule that is as expeditious as practicable.

Final Decree § XI.D.  Contrary to Sierra Club's assertions, the "as expeditious as practicable" standard is a meaningful, enforceable standard.  <u>See</u> United States' Memorandum at Memorandum, § III.C.3.

Finally, defendants are required to comply with the operation and maintenance requirements in their permit applicable to their combined sewer system.  Final Decree § XI.A.  These requirements include the obligation to utilize technology to "prohibit dry weather overflows."  <u>See</u> Defendants' CSO Permit, Part II.M.  Consequently, if the situation with defendants' sewer system changes, and they begin having a dry weather overflow problem that is not the result of Ohio River intrusion (and so is not being remedied by the CIPs or LTCPU), the regulators can seek stipulated penalties and bring an action to enforce the Final Decree to require defendants to comply with the operation and maintenance provisions of their permit to address dry weather overflows.

In sum, the Final Decree contains an appropriate mix of specific remedial measures to address all known dry weather overflow problems – <u>i.e.</u>, their longstanding HW/DW overflow problem – and general operation and maintenance requirements necessary to address any future dry wether overflow problems that might arise that are not being addressed by the specific remedial measures.

**23.    Comment:  The decree does not contain a deadline by which defendants are required to comply with their permit requirements pertaining to controlling solid and floatable materials in CSOs.**

**Response: See Response to Comment 24, below.**

**24.    Comment:  The decree does not contain appropriate requirements pertaining to their permit requirements for controlling solid and floatable materials in CSOs.**

Sierra Club argues that the Final Decree contains no specific deadline by which defendants are required to comply with the requirements in their CSO permit pertaining to control of solid and floatable materials in their CSO discharges.  SC, p. 13.  Sierra Club further argues that the Final Decree should contain specific projects that are required to control solid and floatable materials.  Id.

> **Response: The United States is not aware of any problems defendants are having complying with their permit requirements pertaining to controlling solid and floatable materials in CSOs and so the Final Decree requires that Defendants immediately comply with those requirements.**

The United States is not aware of any evidence suggesting that defendants are not complying with the requirements in their permits pertaining to controlling solid and floatable materials in their CSOs, and so the Final Decree does not contain any specific remedial measures that need to be taken in this regard.  However, the Final Decree does require defendants to immediately comply with these requirements.  Final Decree ¶ XI.E.1.  Moreover, the Final Decree further requires defendants to perform an engineering study of what defendants have done in the past five years, and what more they could do in the future, to control those parameters.  Final Decree ¶ XI.E.2 - .4.  If the study shows that defendants are not complying with the requirements in their permits pertaining to controlling solid and floatables, defendants will be in violation of Paragraph XI.E.1 of the Final Decree, and therefore subject to stipulated penalties and potential enforcement action under the Final Decree to compel compliance.  These provisions appropriately address this issue.

25.    **Comment:  There is no purpose to the requirements that defendants comply with various permit requirements.**

Sierra Club believes there is "no purpose" to the requirement that defendants comply

with the effluent limitations, monitoring, record-keeping and reporting requirements, and operation and maintenance requirements of Defendants' NPDES permits, Final Decree § XII, because defendants must already comply with their permits: "This provision cannot be used as a backdoor way of not requiring compliance with any current or future permit terms or conditions." SC, p.13-14.

>   **Response: The provision makes defendants' violations subject to stipulated penalties.**

Of course defendants must comply with their permits. This provision makes any non-compliance with the listed requirements subject to significant stipulated penalties and a potential enforcement action under the Final Decree (rather than having to initiate a new lawsuit, although plaintiffs are not precluded in any way by the decrees from initiating such a new lawsuit)). Final Decree ¶¶ XVII.G, O.. Sierra Club's comment warning that the provision cannot be used as a "backdoor way of not requiring compliance" is incomprehensible, particularly given the language in ¶ XVII.O of the Final Decree, quoted above in Response to Comment 9.

26.    **Comment: The WIB Program should be called the SIB Program.** SC, p.14, 22, 23, 25.

>    **Response: This issue is semantical, and "WIB" is broader.**

The issue of what the WIB Program should be called is merely one of semantics. The decree defines WIB as follows: "'Water-in-Basement(s)' ('WIB(s)') shall mean any release of wastewater from Defendants' Sewer System to buildings that (i) is not the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by Defendants; and (ii) is not the result of overland, surface flooding not emanating from Defendants' Sewer System." Final Decree § V. Thus, the

WIB Program applies to "wastewater," a term that is broader than simply "sewage."[25]  Further, defendants have already begun to implement the Program with the name required by the Final Decree.  Any name change now could be confusing to the public and would cost money that is better put toward the actual programs.

27.    **Comment: The WIB Prevention Program (Exhibit 6) is inadequate in a number of aspects.**  SC, p.22-23.

**Response: The Program is reasonable and will be appropriately overseen.**

Sierra Club has a number of criticisms of the WIB Prevention Program.  First, it states that the Program needs to have an adequate administrative staff.  The United States agrees.  However, it is neither necessary, nor possible (at this time or while the decree was being negotiated), nor necessarily advisable to specify this level of detail in Exhibit 6, the WIB Prevention Program.  Defendants must staff the program appropriately to meet its goal, which is "to provide WIB Prevention services to eligible buildings in a manner that is as expeditious as practicable."  In doing so, MSD must "exercise its good faith reasonable engineering judgment" to determine whether a house is "eligible" to participate in the program, to prioritize candidate properties, and to determine the appropriate approach to sewage backup prevention at any particular property.  See Final Decree, Exhibit 6.  Further, the United States disagrees with Sierra Club that it is advisable at the outset of the program to require a firm commitment to the number of homes to be retrofitted each year.  It will take some time before defendants have gained sufficient experience with the program to develop an estimate of how long each property will

---

[25] Ohio Rev. Code § 6111.01 provides definitions for "sewage," "industrial waste," and "other waste."  § 6111.01(B), (C), and (D).  "Wastewater" is not defined but is regarded as encompassing all three of these.  See § 6111.01(A), 6111.04 (discharge of any of these requires NPDES permit.)

take and cost.  Klingenstein Dec.  ¶ 104.  The regulators do not believe this level of specificity is warranted up front in the decree.  However, defendants will quickly need to develop more accurate information and estimates to enable them to put together the financial plan required by the 2006 LTCPU, which as discussed will also pertain to the WIB Program.  See United States' Memorandum at  § III.C.7.

Sierra Club also complains that MSD's database does not include all houses that have experienced WIB because 1) it takes so long for MSD to get to a house that by the time MSD gets there, the sewer levels have receded; and 2) people have given up complaining because MSD would do nothing to help.  SC, p. 22-23.  The answer to this is two-fold: First, MSD's response track record will improve under this Court order, as will its database.  Second, eligibility for the program does not depend on being in the database.  Properties can be eligible for the program in two ways – either by being on MSD's database as experiencing capacity-related backups in the last five years, or by a homeowner calling to request an eligibility determination.

The United States (and the other regulators) will oversee the program, including eligibility determinations,[26] and if necessary will enforce the decree if the quarterly reports or other information shows that defendants are not moving quickly enough to install backflow prevention devices or if they are not otherwise appropriately implementing the program.  A special master is not necessary.  However, as discussed in the United States' Memorandum at  § III.C.1.d, if this Court determines that a WIB Program Ombudsman is appropriate, this person

---

[26] Sierra Club comments that "[p]utting MSD in charge of eligibility determinations without any oversight or supervision is not  the public interest."  SC, p. 23.

would also oversee implementation.  Finally, Sierra Club, and its members, will likely be keenly interested in defendants' track record in the WIB Programs generally, and if they see problems, they can alert the regulators or this Court, and adjustments to the program can be made, if necessary.[27]  While the WIB Programs may not be drawn up exactly how Sierra Club wanted them, the trio of WIB Programs, which are the first of their kind anywhere, far exceed the "reasonableness" standard applicable in reviewing a proposed consent decrees.  The United States strongly urges the Court to allow defendants an opportunity to make the WIB Programs work.

28.    **Comment: The WIB Customer Service Program (Exhibit 7) is flawed in a number of aspects.**  SC, pp. 23-24.

       **Response: The Program is reasonable and will be appropriately overseen.**

       Sierra Club makes a number of the same assertions about the WIB Customer Service Program Plan as it did about the WIB Prevention Program, including that there needs to be adequate staff, that the WIB Customer Service Program Plan Ombudsman should report to a special master; and that there is no estimate of the number of houses that will be eligible for this program.  The United States refers to its answer directly above in response to these comments.[28]

_____

[27] Sierra Club also suggests that "MSD should publish its shaded, GIS maps of the known sewage-in-basement areas."  SC, pp.22-23.  The United States is not aware of the particular maps that Sierra Club is referring to, and apparently, neither are defendants.  It is counsel for the United States' understanding that Mr. Murphy, counsel for the defendants, contacted Mr. Slap, counsel for Sierra Club, for further information on what he was referring to by email on February 24th, but there has been no response.

[28] As to the estimate of the number of eligible houses, while it would be impossible to require MSD to respond to a required number of houses per year, since the number will vary greatly depending on rainfall, MSD undoubtedly already has a rough idea of the eligible houses based on  its database (although this number may be low, as Sierra Club points out).  Defendants will need to develop more accurate information in this regard to enable it to put together the financial

In addition, Sierra Club asserts that there is "no reporting program to the Court, the Commissioners, or the public" for the WIB Cleanup Program. SC, p.24. Pursuant to ¶ XV.C of the Final Decree, defendants must report to the regulators: "as to the Water-in-Basement Customer Service Program (Exhibit 7), the address of each customer that has requested customer service under the program, the date of the request, the disposition of the request (e.g., service request denied, initial investigation completed, cleanup completed) and the date of the disposition." (See supra Response to Comment 3 for the information that must be reported on the other WIB programs.) This information will be sent to Sierra Club, which can disseminate it further if there is interest, and it is certainly available to the County Commissioners on request. Further, if the Court would like, the parties will forward any or all of the reported WIB information to it, or will submit status reports or appear for status conferences to report on defendants' progress in any manner requested.

Finally, Sierra Club notes that the Environmental Security Account, which was established under a 1985 consent decree but its funds were never fully spent, and which is providing initial funding for the WIB cleanup program, should have had more money in it. SC, p.14. This comment is unrelated to the reasonableness of the current decrees. Moreover, it is not necessarily correct.

Specifically, the 1985 Consent Decree did not specify what sort of investments were required. However, given the parties intention in entering into the 1985 decree that the money be accessible to be spent relatively soon, the money would have to remain readily accessible. Typically, higher interest rates can be earned for less liquid funds. If the parties had known at

_____

plan required by the LTCPU.

the time the escrow account was established that the funds would not be spent for eighteen years, it is possible that the decree would have dictated, or the parties would have reached an agreement on, a higher-yielding account or instrument than was evidently used in this case. However, hindsight is 20/20.

Ultimately, the question of whether or not the funds in the Security Account could have earned a higher return are unrelated to the reasonableness of the decrees, particularly since defendants are required to continue to implement the WIB Cleanup Program when the "seed money" runs out. Final Decree ¶ XIII.B.2.

**29.    Comment:  The WIB Claims Process Plan (Exhibit 8) is inadequate in a number of aspects.**  SC, pp. 24-25.

**Response: The Program is fair and reasonable.**

Sierra Club has a number of comments that are particular to the WIB Claims Program Plan, each of which will be addressed below.  First, Sierra Club asserts that the 24-hour notification requirement is unfair because "many families may be out of town on vacation, etc., when their homes are flooded with sewage, and would not know about the problem until they return, which may be more than 24-hours after the backup.  SC, p. 24.  However, the language of the plan was specifically drafted to avoid this unfair result.  In order to be eligible to submit a claim, a resident "must notify MSD within 24 hours of the time that the occupant discovers the WIB."  Final Decree, Exhibit 8, p.1 (emphasis added).  This approach reaches a reasonable accommodation between Sierra Club's concern and defendants' need to investigate the cause of the WIB while the incident is still "fresh."

Second, Sierra Club complains that the program would be "better" if it relied on the presumption approach that Sierra Club had suggested in earlier comments instead of the

presumption approach that the plan currently embodies.  See Comments, Exhibit 1-A, pp. 34-35. Under Sierra Club's proposal, defendants would develop and publicize a map of "chronic backup areas."  If a homeowner experienced a backup and was in the "chronic area," he or she would be entitled to a rebuttable presumption that the backup was the "fault of MSD."

Exhibit 8 uses a similar, but slightly different presumption approach.  The Claims Process will reimburse damages arising from basement backups caused by inadequate capacity in the Sewer System or that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System.  After receipt of a claim, MSD will perform an assessment, where it will exercise its "good faith reasonable engineering judgment" to determine the cause of a WIB, based on a consideration of a variety of factors.  However,

> at locations that have experienced a basement backup due to inadequate capacity within the previous two years and where MSD has not resolved the capacity issue, MSD will treat that backup as MSD's responsibility and dispense with the assessment phase of the Claims Process.  In such cases, MSD will pay appropriately documented claims without further investigation as to the cause of the WIB incident.  The same presumption and expedited process will apply to locations that experience basement backups caused by blockages in public sewer lines of which MSD had notice and opportunity to clear, but did not clear.

Exhibit 8, p. 2.  Thus, any home that has experienced a capacity-related backup in the last two years, which has not been addressed, is automatically entitled to payment for appropriately documented claims.

Is Sierra Club's proposal "better"?  Perhaps, but not necessarily.  For example, it is not entirely clear that homeowners would want the stigma or potential real estate consequences associated with a widely publicized map of "chronic backup areas," especially if their house did not experience WIBs.  At any rate, whether Sierra Club's proposal is "better" is not the legal standard for approval of the decrees.  The issue is not what Sierra Club might have ideally liked

- 47 -

to have seen – it is whether, taking everything into account, the decrees are fair, reasonable, and consistent with the Clean Water Act. The above approach is different from Sierra Club's, but could hardly be termed unreasonable. Its consistency with the Clean Water Act is irrelevant because the Act does not cover what is essentially a State of Ohio tort claim. This program goes far beyond anything required by the Clean Water Act and provides, in a federal consent decree subject to oversight and enforcement by EPA, DOJ, the State of Ohio, ORSANCO and this Court, an expedited administrative process for resolving State tort claims, short of litigation..

Finally, even if the program does not operate exactly as Sierra Club would like, it is fair because it does not take away any additional remedies a homeowner might have or arguments it could make under State law. Unlike, for example the 9/11 Victim's Compensation Fund or the recent settlement fund established to compensate victims of abuse from priests by the Archdiocese of Cincinnati, the WIB Claims Program does not require claimants to waive their rights to sue in court.[29] In fact, any decision denying a claim in full or resulting in an offer of payment of an amount less than the full amount of the claim will include pertinent information regarding the process for pursuing the claim in Ohio State court. Final Decree, Exhibit 8, p.3. Thus, if a homeowner disagrees with its eligibility determination or the valuation of its claim, he or she can pursue a remedy against defendants in Ohio court by arguing, for example, as Sierra Club suggests, that the "storage" of sewage in a basement results in a "taking," or, if applicable, by asserting a claim under Ohio Rev. Code Chapter 744 for negligent performance of a

---

[29] See September 11th Victim Compensation Fund of 2001, Pub. L. 107-42 (2001), 49 U.S.C. § 40101, Historical Notes, Title IV, § 405(c)(3)(B)(i); Archdiocese of Cincinnati Settlement Fund, www.thesettlementfund.com.

proprietary function.[30]

What the WIB Claims Program does then is make it much easier for homeowners to collect money from defendants for WIB damage, without giving up any other rights. WIB victims do not have to hire lawyers or bring a lawsuit. Further, for claimants who meet the presumption, the Claims Program potentially broadens defendants' liability for damages beyond that provided in Ohio law by taking away the requirement that plaintiffs prove that the damage was the result of negligence or that the action in question was a proprietary function, both of which issues can contribute significant uncertainty in litigation. As long as a claimant meets the presumption described above, defendants pay (assuming appropriate documentation). And if a claimant does not meet the presumption, it may nonetheless be eligible for payment under the program if MSD performs a good faith investigation and finds that the damage resulted from inadequate capacity in the sewer system (again with no need to prove negligence or proprietary

_____

[30] Under Ohio Rev. Code § 2744.02(B)(2), defendants would be liable for property damages caused by the negligent performance of acts by their employees with respect to "proprietary functions." "Proprietary functions" include the "maintenance, destruction, operation, and upkeep of a sewer system." Ohio Rev. Code § 2744.01(G)(2)(d). Defendants are not be liable for negligence with respect to "governmental functions," which include the "provision or non-provision, planning or design, construction, or reconstruction of a . . . sewer." Id. § 2744.01(C)(2)(l). Usually, cases in this area turn on whether the negligent act in question is a proprietary or a governmental function. While it may seem that "capacity-related" issues are more likely to be considered to be "governmental functions," because they arguably relate to the planning and/or design of a sewer, some courts have found that failure to upgrade inadequate sewers is a maintenance failure, thus entitling plaintiffs to recovery. E.g., H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist., 118 Ohio App.3d 792, 694 N.E.2d 111 (1997).

    Counsel for Sierra Club has brought to counsel for the United States' attention that she may have asserted in the February 15th status conference that Ohio had changed its laws, making it easier for plaintiffs to recover for sewer-related damages. If so, she misspoke. What counsel intended to say was that the law may be changing. That is, cases may be becoming more favorable in this regard. Counsel for the United States apologizes for any misstatement or confusion on this issue.

function) or if the WIB was the result of MSD's negligent maintenance, destruction, operation or upkeep of the sewer system.  And as noted, if the claimant is turned down, there is no harm to his or her ability to sue defendants in court if the facts warrant it.  In short, this is eminently fair because it only helps claimants by making it easier to recover against defendants, without hurting any legal right to recovery they may have under State law.

Next Sierra Club asserts that there should be some administrative due process other than a final determination by the City Solicitor.  SC, pp. 24-25.  This Court in the February 15th status conference also noted some concerns about having the City Solicitor's office in charge of determining whether and how much should be paid, without some higher review authority, given that the City is a defendant and would be affected by the outcome.  This is no different from an insurance company deciding whether or how much to pay on a claim.  While it theoretically might be better to have the process administered by a neutral entity, this would likely be more expensive, and in any event is not the settlement approach that the parties have devised.  Given that, as discussed, a claimant is not required to give up any legal rights, the United States does not see a due process concern, as the claimant will receive ample due process in state court.  Finally, if the Court does determine that a WIB Ombudsman is necessary or desirable, this person could review the claim determinations and bring any issues of fairness in implementation of the Program or a particular claim to the attention of the Solicitor's office, the plaintiffs or this Court.

Finally, Sierra Club comments that the reimbursement program should be retroactive.  SC, p. 24.  The Program needs to start somewhere, and the parties negotiated  that it would apply to WIBs from January 1, 2004 onward, the earliest feasible date after the lodging of the Final

Decree on December 3, 2003.   Moreover, as has been discussed, the WIB Claims Program does

nothing to disturb the right any victim has to sue defendants in court under Ohio law for any

damage from WIBs occurring prior to the start of the Program.   Could the parties have

negotiated an earlier retroactive date?   Perhaps, but this is not the criterion for approvability.

      In summary, the WIB Claims program easily meets the test for approvability because it is

fair, reasonable, in the public interest, and  not inconsistent with the Clean Water Act.

**30.**    **Comment:  The decree contains no discussion about how the penalty was derived.**
    SC, p.15, 18.

    **Response: The civil penalty was derived in accordance with the U.S. EPA's**
    **nationally-applicable policy for calculating civil penalty settlement amounts in**
    **Clean Water Act enforcement actions.**

    U.S. EPA's "Interim Clean Water Act Settlement Penalty Policy" (March 1, 1995) "sets

forth the policy of the EPA for establishing appropriate penalties in <u>settlement</u> of civil judicial

and administrative actions."  <u>Id</u>. at 2.[31]   Pages 17-20 of that document sets forth a two-step

procedure for establishing settlement penalty amounts in Clean Water Act civil enforcement

actions against municipalities.   The first step is to calculate the "Table A" penalty range, by

determining the "economic benefit" of non-compliance and the "impact of violations on human

health or the environment."   For "economic benefit," the United States assumed that the

economic benefit of the violations in this case exceeded $25,000,000, the highest amount

specified in the table.   For "impact of violations," the United States placed the violations into the

---

[31] Relevant pages of the policy are attached in Appendix A.  The entire policy can be found at:
http://www.epa.gov/compliance/resources/policies/civil/cwa/cwapol.pdf.

"moderate actual or potential harm" "impact" category, because that category explicitly includes "raw sewage discharges." Using these two inputs, the penalty range provided for in Table A is $566,000-$636,000.

The second step is to determine the "Table B" penalty range, based on the municipality's service population (in this case, between 500,000 and 1,000,000) and the months of violation (in this case, greater than 66 months, the maximum period set forth in Table B). This produced a Table B penalty range of $1,400,000 - $2,800,000. Tables A and B are then added together to arrive at the appropriate penalty range which, in this case, was $1,966,000 - $3,436,000. The penalty amount for a municipality can then be reduced to reflect the defendant's performance of "Supplemental Environmental Projects" or "SEPs," provided the cash penalty is no less than 60% of the amount derived in accordance with Tables A and B. SEPs are defined as "environmentally beneficial projects which a violator undertakes, but is not otherwise legally required to perform, in exchange for favorable penalty consideration in settlement of an enforcement action." Id. at 22.

Defendants in this case offered to perform a number of substantial SEPs. Specifically, as discussed in the United States' Memorandum in Support § II.D.4 and Final Decree, Exhibit 9, the SEPs include three streambank stabilization and greenway creation projects, "the Caldwell-Seymour Greenway and Ecological Restoration SEPs," two in-stream habitat restoration SEPs, and a "brownfield" SEP at a municipal landfill owned by the City of Elmwood, located on the banks of the Mill Creek. Defendants are required to spend at least $5.3 million on these SEPs, and the SEPs will be performed in economically depressed areas bordering the Mill Creek and will bring additional green space and environmental benefits to these communities. Indeed, the

SEPs will advance particularly important environmental goals under the U.S. SEP Policy:

> [T]here is an acknowledged concern . . . that certain segments of the nation's population, i.e., low-income and/or minority populations, are disproportionately burdened by pollutant exposure.  Emphasizing SEPs in communities where environmental justice concerns are present helps ensure that persons who spend significant portions of their time in areas, or depend on food and water sources located near, where the violations occur would be protected. . . . EPA encourages SEPs in communities where environmental justice may be an issue.

U.S. EPA Supplemental Environmental Projects Policy, May 1, 1998, p.2.[32/]

As described above, the United States could settle this case consistent with the penalty policy with a cash penalty (without any SEPs) anywhere within the range of $1,966,000 to $3,436,000.  Given Defendants' willingness to perform SEPs whose costs will far exceed this range, the United States believes that a civil penalty near the lower end of that range–i.e., $1,200,000 (which equates to a $2,000,000 penalty before reductions to reflect the SEPs)--is appropriate.  It is important to note that Defendants are required to spend $5.3 million on SEPs, yet will only receive a penalty offset of $800,000 to $2.2 million.  Consequently, not only do the SEPs in this settlement advance important goals of the U.S. EPA SEP Policy in benefitting economically disadvantaged populations, but they constitute a substantially larger sum than defendants are required to spend to obtain the penalty mitigation they are receiving.

**31.    Comment:  The SEP money and projects should be in the hands of a third party, rather than controlled by defendants.  SC, p. 15.**

> **Response: This is not favored under EPA's SEP Policy.**

Page 17 of U.S. EPA's SEP Policy specifically provides that "Defendants . . . are

---

[32/] Relevant pages of the SEP Policy are attached in Appendix A.  The entire policy may be found at:  http://www.epa.gov/compliance/resources/policies/civil/seps/fnlsup-hermn-mem.pdf.

responsible and legally liable for ensuring that a SEP is completed satisfactorily.  A

defendant/respondent may not transfer this responsibility and liability to someone else,

commonly called a third party."  U.S. EPA is unwilling to act inconsistently with this nationally

applicable policy.  Often the best way (sometimes the only way) to ensure that funds are spent

and projects implemented in the manner required by a consent decree is to make the defendant

implement the SEP(s) itself.  In this case, the parties initially discussed the possibility of having

certain of the projects implemented by the a group called the Mill Creek Restoration Project,

which is working to restore the Mill Creek and its environs and create public greenways along its

banks.  However, given their legal responsibility, subject to stipulated penalties, for

implementing the SEPs correctly, defendants determined that they wanted to perform the

projects themselves, and the plaintiffs agreed.

32.    **Comment:  EPA should discuss the purpose of and describe the legal basis for
       diverting $100,000 in penalty money to ORSANCO.**  SC, p.18.

       **Response**: **The purpose of and legal basis for defendants paying $100,000 of the
       State's $600,000 share of the penalty money to ORSANCO is set forth in the
       Affidavit of Lisa Morris, Chief of the Division of Surface Water, Ohio EPA,
       attached hereto as Exhibit 6.**

33.    **Comment:  The Public Participation Plan is inadequate.**

       Sierra Club asserts that the Public Participation Plan attached to the Final Decree as

Exhibit 2 is inadequate because its membership is not broad enough and its scope of work is too

limited.  Sierra Club states that MSD needs "a truly independent citizen oversight board with the

engineering and accounting auditing capacity (i.e., funding) to examine the details of MSD's

progress and to represent the public interest."  Sierra Club further states that the public outreach

program is not designed to interest the public or focus on its issues, but sounds more like the

"community meetings" MSD held on the final decree.  SC, pp.21-22.

> **Response: The Public Participation Plan is consistent with U.S. EPA's 1994 CSO Policy.**

  U.S. EPA's 1994 CSO Policy encourages CSO communities to actively solicit public input throughout the long term control plan development process.  59 Fed. Reg. 18,692 (April 19, 1994).  Consistent with the Policy, the Public Participation Plan attached as Exhibit 2 to the Final Decree was developed to ensure that defendants make a meaningful effort to educate the public about long term control planning issues, solicit the public's input throughout the course of that process, and take public input into account as defendants develop the LTCPU.  The Plan is an extremely thorough, detailed plan that, when implemented, will certainly accomplish the public participation goals of the CSO Policy.  As has been stressed, defendants already have three competent regulatory agencies, as well as Sierra Club should it choose to, overseeing its efforts.  Defendants do not need, the CSO Policy does not require, and the Plan was not intended to create an "independent citizen oversight board."  It is worth noting that defendants have extended an invitation to Intervenor and Sierra Club representative, Marilyn Wall, to join the Steering Committee described in the Public Participation Plan.  To date, Ms. Wall has not responded to defendants' invitation.  See Affidavit of Patrick Karney, attached hereto as Exhibit 3.

**34.**    **Comment:  Exhibit 5: The Public Notification Program is inadequate.**  SC, p.22.

Sierra Club believes that the Public Notification Program attached as Exhibit 5 to the Final Decree is inadequate.  Sierra Club argues that people are unlikely to call a hot line to get information regarding whether it is safe to enter the waterways.  Sierra Club suggests that Defendants should issue "Stream or River Closing" notices, like beach closure notices; provide

specific information on which specific waters should be avoided due to CSOs; regularly report

on the specific fecal coliform levels and have the information easily downloadable; and pay to

have the information included in newspaper articles on the electronic media.  Finally, Sierra

Club states that there should be public notification of SSOs, as well as CSOs.

>    **Response**: **The Public Notification Program (Exhibit 5 to the Final Decree) and
>    Sewer Overflow Response Plan (Exhibit 6 to the IPCD) will ensure that the public is
>    adequately notified regarding the potential health impacts of CSOs and SSOs.**

There is no question that raw sewage is released from Defendants' sewer system into

Hamilton County's rivers, streams and creeks whenever there is more than a quarter-inch of rain

and, during dry weather, whenever the Ohio River is elevated.  Equally, there is no question that

those releases make the area waterways unsafe for recreational use, and that this problem can

only be addressed through massive and expensive improvements to defendants' infrastructure

that will take years to implement.  Finally, there can be little question that, as a result of this

lawsuit, and the lodged consent decrees, there has been heightened public and media attention

focused on these problems, and this heightened attention is likely to continue over the next few

years as Defendants' develop their LTCP Update in accordance with the Public Participation

Plan attached as Exhibit 2 to the Final Decree.

Defendants' CSO Public Notification Program attached as Exhibit 5 to the Final Decree

insures that any member of the public can find out at any time whether there has been or will

likely soon be CSO discharges into the area waterways.  Defendants' are also required to

publicize the program through press releases, water bill inserts and its website, and by contacting

the media and schools.  It also requires that Defendants publicize the program through signs

posted along waterways in CSO areas, and also to work with the Hamilton County Health

Department to ensure that there is adequate signage at public access points.  Defendants' Sewer

Overflow Response Plan attached as Exhibit 6 to the IPCD similarly requires that signs be

posted at SSO locations.

Sierra Club's suggestions would not likely improve the effectiveness of the notification

program. As noted, the waterways in Hamilton County are never safe for public use during and

following rain events, and when the Ohio River is at a high level, and the goal of the notification

program is to ensure that the public is made aware of that fact.  Providing information regarding

fecal coliform levels in the waterways in an easily downloadable format will not further that

goal.  Similarly, paying to include notices in the news and electronic media will likely be

extremely expensive and of limited utility as it will necessarily be after the fact notice.  The

United States believes that implementation of the program will ensure that the public is

adequately informed about the risks posed by CSOs and SSOs.


### COMMENTS SPECIFICALLY CONCERNING THE IPCD


**35.    Comment:  The deadlines for the Capacity Assessment Program are Indefinite.**

Sierra Club asserted that because various construction and other schedules in the IPCD

were to be submitted in the Capacity Assessment Plan, and this plan was due 120 days from

completion of model validation, this "sets up the model's completion and calibration as a major

loophole in enforcement of any and all compliance schedules."  Comments, Exhibit 1-A, pp.19-

20.  Sierra Club further asserted that because the IPCD itself contained no fixed deadlines for

submission of the Capacity Assessment Report or the Capacity Assessment Program Plan, but

rather that these would be included in the Capacity Assessment Plan, this procedure would lead to an "oversight nightmare." SC, pp. 7-8, 9.

     **Response: Sierra Club's comments are moot, and the process worked as expected.**

     The defendants completed validation of the model on time and submitted the Capacity Assessment Plan on time. The regulators approved the Capacity Assessment Plan on April 13, 2004, thus fixing dates for completing the capacity assessment and submitting the Capacity Assessment Report (June 30, 2004) and for submitting the Capacity Assurance Program Plan ("CAPP") (June 30, 2006, the same date the LTCPU is due). Klingenstein Dec. ¶ 125.[33]

**36.   Comment:  The interim remedy for SSO 700 is illegal.**

     Sierra Club asserts that the Chemically Enhanced High Rate Settling (CEHRS) and Storage Facility is illegal as an interim remedy because it does not meet secondary treatment standards and thus cannot be issued a permit. SC, p. 5, 6; Comments, Exhibit 1-A, p. 19.

     **Response: The CEHRS is highly appropriate as an interim remedy.**

     The IPCD proposes the CEHRS facility as an interim remedy to reduce the number of discharges from SSO 700 and improve the quality of the effluent that is discharged from SSO 700 until the final remedy is completed. IPCD ¶ VI.B. In fact, as discussed below in Response to Comment 37, defendants have recently agreed to major upgrades to the proposed facility, which virtually eliminate the environmental impacts from this major SSO. Klingenstein Dec. ¶¶

---

[33] As initially submitted, on February 26, 2004, the Capacity Assessment Plan proposed a date of February 28, 2007 for the CAPP. However, upon review, the regulators determined that this date was not sufficiently expeditious, and further that it would not allow sufficient coordination with the LTCPU and required the CAPP to be submitted at the same time as the LTPCU. Defendants made this change and all other technical changes requested by the regulators, resubmitted the plan, and it has since been approved. Klingenstein Dec. ¶ 125.

31-32.  As long as the schedule for final compliance is appropriate, plaintiffs would not

necessarily be obligated to require an interim remedy at all.  However, given the substantial

environmental and public health benefits that were expected from the CEHRS, plaintiffs insisted

on an interim remedy to better the environment in the meantime.

The question of whether defendants could ultimately obtain an NPDES permit

authorizing discharges from the facility as a final remedy is one to be answered in the permitting

context, not in the enforcement context (let alone this consent decree proceeding).  If defendants

ever seek to obtain an NPDES permit for the CEHRS facility as part of a final solution for SSO

700, the ultimate determination of whether the facility could be permitted would be made by

Ohio EPA, as the permitting authority, subject to review by U.S. EPA and subject also to the

public's right to review and challenge in state court any permitting decision that is made.  The

permitting decision would necessitate an evaluation by the permitting authority (and others) of

many issues, including whether discharges from the facility can meet secondary treatment

requirements and whether such a permit could be issued under the State's applicable water

quality requirements.   Affidavit of George Elmaraghy ("Elmaraghy Aff."), attached hereto as

Exhibit 7, ¶¶ 7-8;[34] Klingenstein Dec. ¶ 49.

**37.    Comment: Defendants are not spending enough on CEHRS; it will not be big
         enough; and it will not be built quickly enough.**  Comments, Exhibit 1-A, p. 19.

**Response: The schedule and size of the facility are appropriate, especially as
defendants have just agreed to substantially increase its size.**

Having criticized the CEHRS interim facility as "illegal," Sierra Club then argues

---

[34] This affidavit was originally attached as Exhibit 5 to United States' Motion for Entry of the
Consent Decree (Aug. 20, 2002), Doc. 56.

somewhat anomalously that the amount defendants are required to spend on it is not enough, that it may not be big enough to treat all the flow, and that the schedule to build it is not quick enough.[35]   The decree requires defendants to spend $10-15 million on the interim remedy, and to use their hydraulic model to assess whether marginal increases in system capacity and total project cost above $10 million (up to $15 million) are justified based on a "knee of the curve" analysis.  CD ¶ VI.B.1.  Although the regulators originally, and appropriately, approved an Interim Remedial Measures Plan ("IRM Plan") for a CEHRS facility that was estimated to cost $11.3 million and result in no discharges in a typical year, defendants have recently agreed to increase the storage capacity significantly and to spend $15.6 million.  The facility is now being "designed and planned to handle a ten year design storm event," and is expected to reduce discharges from over 40 per year to perhaps one every several years.  This substantial increase in capacity will almost completely eliminate SSO 700's impact.  Klingenstein Dec. ¶¶ 31-32.

As to the construction schedule, the decree required defendants to submit to plaintiffs for approval an IRM Plan that includes a schedule that is "as expeditious as practicable and that achieves completion of construction by no later than December 31, 2007."  CD ¶ VI.B.1, p.17.  As initially proposed, the IRM Plan contained a "substantial completion of construction" deadline[36] of July 2007.  The regulators believed the interim remedy for SSO 700 could be

---

[35] Sierra Club also asserts that it will operate for too long.  SC, Attachment 2-A, p.2.  This is essentially a reiteration of its comment that the schedule for the final SSO 700 remedy is too long, which is discussed below in Response to Comment 38.

[36] The Final Decree uses the term "Substantial Completion of Construction," which is defined to mean "completion of construction and installation of equipment such that the system may be placed in full operation, and will both function and perform as designed.  This specifically includes all control systems, instrumentation and all residual handling systems."  Final Decree, ¶ V.B.  This definition ensures that the systems will go on line and begin full operation as

constructed more quickly.  Ultimately, the regulators approved an SSO 700 IRM Plan that

required substantial completion of construction, i.e., commencement of operation of the

treatment system, to occur a year earlier, or by July 2006.  Klingenstein Dec. ¶ 31.[37]

**38.    Comment: The IPCD's approach to the final remedy at SSO 700 should not rely on the tunnel and is otherwise inappropriate for various reasons.**  SC, p. 5; Comments, Ex. 1-A, p. 19; Ex. 3-H.

**Response: The final remedy for SSO 700 reasonably accommodates the possibility that the tunnel will be built, which would provide significant environmental benefit and cost savings.**

Sierra Club and others criticize the final remedial approach to SSO 700 for several

reasons, none of which should induce this Court to disapprove the consent decrees.  First, Sierra

Club argues that the remedy relies too heavily on the Mill Creek Deep Tunnel.  Comments,

Exhibit 2-A, p. 19.[38]  The governments believe that the Mill Creek Tunnel would be an excellent

solution both to eliminate SSO 700 and to address defendants' CSOs in the Mill Creek drainage

area.  Cost estimates for the tunnel and associated piping to connect it to defendants' sewer

system currently exceed a billion dollars.  Klingenstein Dec. ¶ 38.  Defendants' share of this cost

is not currently defined, but it is likely to approach $ 500 million. Id.  While this is a significant

sum, if the Army Corps builds the tunnel, it will be paying for the bulk of the cost (likely 65%)

of the tunnel, and defendants would achieve this excellent but expensive remedy at greatly

expeditiously as practicable, but minor "finishing touches," such as landscaping or other non-functional components, may be completed later.

[37] The approved schedule allows for a maximum total 6 month extension, i.e., until no later than December 2006, if any of several prescribed "unavoidable contingencies" (essentially "force majeure" events) occurred, such as "unavoidable events" that cause delays in property acquisition or in obtaining authorizing legislation.  Klingenstein Dec. ¶ 31.

[38] See also Comments, Ex. 3-H.

reduced cost to them.  Cost savings from this project would allow defendants to spend the money elsewhere on their sewer system.  E.g., Klingenstein Dec. ¶¶ 38, 51, 53.  If the Corps does not move forward with the tunnel, the parties did not believe it was appropriate to dictate this particular very expensive remedy for SSO 700 where other more cost effective remedies may be available.  Thus, the IPCD does not "rely on" the Tunnel being built at all, but rather specifically recognizes that it may not be built and allows defendants to propose an alternative remedy if the Tunnel is not built.  CD ¶ VII.C.1-3.

In its recent comments, Sierra Club asserts that the IPCD should be revised to excise any reference to tunnel because the Corps "has now determined that the tunnel is not cost beneficial." SC, p. 5.  However, the fact that the Corps has made this determination does not mean that the tunnel will not be built.  The Corps is continuing to analyze the tunnel as one of three potential alternatives.  The tunnel is the "locally preferred plan" or "LPP," and it can be approved, even if it is more expensive than the most cost-beneficial plan, if the local "non-Federal sponsor" agrees to pay the difference in cost between the most cost-beneficial plan and the LPP, the tunnel.  See Exhibit 8, Declaration of Barry J. Schueler ¶¶ 3-10; see also Klingenstein Dec. ¶¶ 39-4o.  Thus, the Corps has in no way made the decision that the tunnel will not built, and it is indeed appropriate to continue to include it as an option for remediating SSO 700.

Next Sierra Club asserts that the tunnel is designed for a "mere" two-year storm for CSOs and thus it is too small to handle defendants' SSOs and CSOs.  SC, p. 5.  Contrary to Sierra Club's insinuation, the tunnel was never intended to handle all of defendants' SSOs and CSOs. Rather, the tunnel would be expected to eliminate SSO 700, and will also likely play a role in addressing other Mill Creek area SSOs, and would store defendants' combined flows up to a

two-year storm.  What this means is that it is expected that the CSOs would overflow less than once in a typical year.  This is a very high level of control for CSOs.  Klingenstein Dec. ¶ 37, 42-43.

Sierra Club states that defendants have performed a "study" that shows that a fully legal, secondary WWTP could be built in at the site of SSO 700, and thus that the IPCD's approach of allowing for the possibility of using the tunnel is inappropriate.  SC, p. 5.[39]  Further, Sierra Club offers the Declaration of Bruce Bell, who, without elaboration, opines that "[i]t is technically feasible to build a secondary treatment plant, which would comply with the secondary treatment requirements contained in the Clean Water Act and its implementing regulations to treat the discharges from SSO 700 within five years."  Comments, Ex. 1-B, ¶ 22.  While it may be technologically feasible to construct a secondary treatment plant in five years, it is unlikely that this could be achieved in this time frame at SSO 700 given probable Ohio EPA permitting issues, possible siting issues, defendants' contracting procedures and rules, and other hurdles that must be overcome to design, permit and construct such a plant.  Klingenstein Dec. ¶ 52.

More importantly, it is not clear that such a plant could ever be constructed at SSO 700.  First, there may not be adequate space for it, and a large WWTP at this site could run into significant community opposition.  Klingenstein Dec. ¶ ¶ 48, 55.  Second, a conventional secondary biological treatment system may not work at SSO 700.  Because the flows from SSO 700 are intermittent and vary so greatly, there is not a sufficiently consistent flow of pollutants to maintain the biomass that actually treats the sewage.  In other words, there is not a steady

_____

[39]  In support of this statement, Sierra Club attaches a two-page piece of paper, apparently from defendants, with what look like some fairly rudimentary "thoughts" on it.  See Comments, Ex. 1-F.

enough supply of food (i.e., sewage) to sustain the "bugs" that eat the sewage.  Elmaraghy Aff. at ¶ 8; Klingenstein Dec. ¶ 50.  Third, Ohio EPA might not be able to issue a permit to such a secondary treatment facility because the State's applicable water quality requirements may require a higher level of treatment for discharges into the Mill Creek at that location.  Elmaraghy Aff. ¶ 7; Klingenstein Dec. ¶ 49, 55.

Finally, even if it were technologically feasible and capable of being permitted, a secondary treatment facility for SSO 700 is not a preferable solution to the dual approach set forth in the IPCD of a high level of treatment from an interim facility and the ultimate elimination of SSO 700 through the Tunnel (or other means of compliance if the Tunnel is not built).  The type of secondary treatment facility apparently envisioned by Mr. Bell would be much more expensive to build and operate than the interim facility, may not achieve substantially greater pollutant loading reductions than the CEHRS facility, would only address SSO 700 and not also CSOs as the Tunnel will, and would not eliminate SSO 700 as the Tunnel will.  See generally Klingenstein Dec. ¶¶ 37-43, 47-55.  Further, given that all of defendants' money for wastewater control comes from one source – the ratepayers – additional resources spent at SSO 700 will diminish resources available for additional CSO control elsewhere.  Given the uncertainties associated with whether a secondary treatment facility could ever be permitted as a final remedy to the SSO 700 problem, the likelihood that discharges from SSO 700 will be entirely eliminated if the Tunnel is constructed, and the fact that the environmental benefits of such a secondary facility as an interim measure are not likely to be substantially greater than the CEHRS, it would not be in the public interest to require the MSD ratepayers to pay for construction of a secondary treatment facility at this time.

Sierra Club also argues that the schedule for eliminating SSO 700 is unreasonably long and was not based on what was "feasible," but rather was negotiated simply to allow for the possibility of defendants' using the tunnel as part of their CSO/SSO strategy.  SC, p.5; Comments, Ex. 1-A, p. 2.  Sierra Club is correct that the schedule was negotiated to allow for the possibility of incorporating the tunnel, and as discussed above, this approach was entirely appropriate.

The IPCD has a two-pronged approach to the schedule for SSO 700.  If the Tunnel is built, the schedule set forth in Paragraph VII.C.3 for eliminating SSO 700 must be "as expeditious as practicable" and must achieve construction of the Tunnel and any other proposed remedial measures by no later than 2016.  Like several of the other dates in the decree, the 2016 date is a "backstop."  The decree requires a more expeditious schedule than this if practicable. Further, the 2016 date fairly closely tracks the Corps' proposed schedule and is reasonable given the magnitude of this undertaking.  Klingenstein Dec. ¶ 46.  In its criticism of the schedule, Sierra Club also criticizes the fact that defendants have until December 2005 to submit the Tunnel Notice, which informs plaintiffs whether or not defendants intend to pursue the Tunnel, and an additional four years (until December 2009) to submit the final SSO 700 Remedial Plan. However, these dates also derive from Corps' schedule as it was known at the time of the negotiations, was reasonable then, and is still reasonable.  Klingenstein Dec. ¶ 45.

If the Tunnel is not built, the decree requires elimination of SSO 700 under a schedule that is "as expeditious as practicable" and that achieves completion of the remedial measures by December 2022.  This also is a reasonable date, given the likely relationship between the control of SSO 700 and downstream CSO control, and the fact that the backstop date for completion of

- 65 -

construction of all of the other long term remedial measures is also 2022 (albeit, February 2022). Klingenstein Dec. ¶ 46.[40/]

**39.    Comment:  The negotiation process for the IPCD was unfair.**

The United States received several comments criticizing the negotiating process that resulted in the IPCD.  These comments alleged that the parties "quickly prepared" the decree to "beat" the Sierra Club suit; that defendants rejected Sierra Club's offers concerning settlement in order to "beat" it to the courthouse; and that there was inadequate public involvement, including less than two days notice to comment at a daytime meeting.  See Comments, Exhibit 3-D, 3-G, 3-H.[41/]

**Response:  The negotiation process was fair.**

The assertion that the parties "quickly" prepared the decree to "beat" the Sierra Club's citizen suit to the courthouse is ludicrous.  The parties negotiated for several years to produce the IPCD.  In December 2001, as the parties were obtaining signatures for the IPCD, plaintiffs received, essentially "out of the blue," a letter from Sierra Club (dated December 18, 2001) providing 60 days advance notice of its intent to file suit for SSO violations.  Affidavit of James

---

[40/] Further, at the time the IPCD was negotiated, the arbitrary selection of a tighter backstop date would have limited plaintiffs' ability in the future CSO negotiations to allow defendants desirable flexibility in what will be their concurrent efforts to eliminate SSOs and to bring their CSOs into compliance with the Clean Water Act.  Id.

[41/] One commenter also noted:  "We need help and someone for us and not money people who some have relatives in the Hamilton County Commissioners, so I have heard."  Comments, Ex. 3-H.  However, the United States has no information that bribery or nepotism in any way influenced the negotiations process or the resulting decree.

Simpson ("Simpson Aff."), attached hereto as Exhibit 5, ¶ 7.[42] Because the parties had already concluded their negotiations on and were in the process of obtaining the necessary approvals for what they believed represented a fair, reasonable and appropriate response to the SSO violations at issue, they moved forward to sign and lodge the negotiated decree.

As to the comment that the public only had "two days notice" of a public meeting held by the Hamilton County Board of Commissioners, this meeting was held as part of the process for obtaining the County's approval of the consent decree, see Declaration of Patrick Karney ("Karney Dec."), attached hereto as Exhibit 9, ¶ 11.[43] Neither the Clean Water Act nor federal regulations require any sort of public meeting or hearing for these decrees. Rather, the appropriate mechanism for citizen input into an environmental settlement such as this one is the notice and comment period required by Department of Justice regulations. 28 C.F.R. § 50.7. The robust series of comments submitted by the public concerning the IPCD is ample evidence that the public has had its say. These comments submitted on the IPCD received scrutiny within the Department of Justice, prompted certain changes to the decree, and will now receive due consideration by this Court. This process, which was also followed for the Final Decree, adequately safeguards the right of the interested public.[44]

---

[42] This affidavit was originally attached as Exhibit 6 to United States' Motion for Entry of the Consent Decree (Aug. 20, 2002), Doc. 56.

[43] This declaration was previously attached as Exhibit 4 to Memorandum in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Civ. No. C-1-02-135 (Apr. 3, 2002), Doc. 09.

[44] As the Court is aware, the parties submitted a "final draft" of the Final Decree to the Court on October 7, 2003. Doc. 96. Defendants held an additional 60-day public process, including numerous meetings, before their approval of the Final Decree. Sierra Club submitted comments

40.    **Comment:  The Decree will Promote New Development and Urban Sprawl and Will Raise Rates.**

Several commenters voiced concerns about urban sprawl, including, for example:

--MSD's plans to lay sewers in undeveloped areas will lead to urban sprawl.  Comments, Ex. 3-A, B, D, F.

--Laying new sewers at public expense exempts developers from their fair share of costs and thus promotes urban sprawl.  Comments, Ex. 3-A; SC, p.12.

**Response: This issue is beyond the scope of the Clean Water Act and decrees.**

The objective of the decrees is to bring defendants into compliance with the Clean Water Act.  Controlling development (other than to ensure it does not have a negative effect on sewer capacity, which as discussed is ensured by the STACP) is beyond the scope of this decrees. Further, the United States has no regulatory jurisdiction over such local land-use matters.

41.    **The decrees will cause sewer rates to rise.**

One commenter noted that sewer rates are too high, and people may lose their houses "because they can't afford the cost of sewers that MSD and developers have forced on them." Comments, Ex. 3-H.

**The CSO Policy allows financial issues to be considered in the LTCP process, and the decrees appropriately follow this Policy.**

As discussed in the United States' Memorandum at § II.C.2, the CSO Policy recognizes that sewer remediation of the type contemplated in the Policy and required by these decrees is extremely expensive and that it is the community that bears these costs.  The CSO Policy allows a consideration of financial impacts on a community both in setting the schedule for

_____

during this process, and a change was made to the Final Decree based on one of these comments.

improvements and, in accordance with EPA's regulations, in acknowledging the potential for changes to water quality standards if the financial impact to achieve existing standards is would cause "widespread social and economic distress," and the decrees incorporate consideration of finances as envisioned by the Policy. Also, consistent with the Policy, these decrees require defendants to first implement an extensive  monitoring and modeling program before proposing specific solutions to remedy their sewer problems to ensure that the most cost-effective solutions are implemented and that those solutions will in fact work. Concerns about minimizing costs also factored heavily in the parties' decision to provide defendants with the flexibility to take advantage of the Mill Creek Tunnel as the remedy for SSO 700 if the Corps decides to build it.

It is just about a certainty that rates will need to be raised to finance the construction required by the decrees. However, it is up to defendants to determine exactly how rates should be raised, bonds issued, loans secured, etc., to finance the improvements required by the decrees. These financial planning aspects will be included as a component of the LTCPU, and will be subject to the regulators' approval.

In short, the regulators are sympathetic to the comment that rates may become higher, but many communities across the country are facing similar raises to achieve cleaner water.

**42.    Comment:  The IPCD Does Not Address All SSOs.**

 Sierra Club and others assert that the IPCD only pertains to the "101 numbered and identified SSO locations," and it only remediates 17 of them.  Id.  "Thus on its face, the scope of the order fails to protect public health, water quality and the environment by failing to eliminate

the remaining 84 SSOs" Id.[45]  Sierra Club also asserts that the decree does not address

overflows at pump stations.  Id.[46]

  These comments may be based on a misunderstanding of the IPCD because the IPCD,

which requires the development of the CAPP, and the Final Decree, which requires

implementation of the CAPP, do address all SSOs.[47]  The primary goal of the IPCD is

"eliminating all Sanitary Sewer Overflows."  CD § IV, p.10 (emphasis added).  The decree

defines "Sanitary Sewer Overflow" as "any discharge to waters of the State or United States

from Defendants' Sanitary Sewer System through point sources not specified in any NPDES

permit . . . ."[48]  CD pp.12-13 (emphasis added).  "Sewer System" means the "wastewater

collection and transmission system owned or operated by Defendants designed to collect and

convey municipal sewage (domestic, commercial and industrial) to the Defendants' Wastewater

Treatment Plants or overflow structures," and "Sanitary Sewer System" means "all portions of

the Defendants' Sewer System that are not a part of the Defendants' Combined Sewer System."

IPCD § V, p.13.  Taken together, then, SSOs include any unpermitted discharges from

---

[45] Similar comments were made by others.  See Neal, Attachment 2-B; Thompson, Attachment 2-C; Wolterman, Attachment 2-D; Weiner, Attachment 2-E; Crosby Township, Attachment 2-F; Rainey, Attachment 2-G; Johnson, Attachment 2-H; Flyer, Attachment 2-I; )

[46] See also Comments, Ex. 1-A, p. 19 (The Tunnel will not address SSOs in other sewer basins.)

[47]  To the extent these comments were based on the partial nature of the IPCD, which did not require implementation of the CAPP, these comments are, of course, now moot.

[48] The definition also includes "any release of wastewater from Defendants' Sanitary Sewer System to public or private property that does not reach waters of the United States or the State, such as a release to a land surface or structure that does not reach waters of the United States or the State . . . ."  Id.  Thus, defendants' CAPP must eliminate, and ensure enough capacity to prevent, basement backups as well as overflows to waters of the United States or State.

defendants' separate sanitary wastewater collection and transmission system. This would include discharges from SSOs other than just the "101 numbered and identified SSO locations" and also discharges from pump stations, which pump sewage in the pipes uphill (or against gravity) and thus are part of the "transmission system." Klingenstein Dec. ¶ 57.

While it is true that the IPCD contains specific projects to eliminate only 17 of the 101 enumerated SSOs, the Comprehensive SSO Remediation Program set forth in Section VII applies to all SSOs. For example, defendants are required to assess "all known overflow points" and evaluate the "causes of all known capacity-related SSOs," IPCD ¶ VII.C.1 (emphases added), in order to identify remedial measures "that have the goal of eliminating all capacity-related SSOs and/or that are necessary to insure that there is adequate capacity in the [Sanitary Sewer System] so that there will be no capacity-related SSOs under projected future conditions [through the year 2025]. . . ." CD ¶ VII.E.1 (emphasis added).[49] These remedial measures must be included in the CAPP, which is required to be submitted to the regulators and approved under Paragraph VII.E of the IPCD and must be implemented pursuant to Section VIII of the Final Decree.

As noted above, the IPCD also addresses SSOs that are not related to lack of capacity, but rather may be caused by pipe blockages, root intrusion, or other O&M problems by requiring defendants to follow attached O&M plans for their sanitary sewer system and pump stations

---

[49] Two commenters stated that the court should "order MSD to formulate a plan to fix all SSOs." Flyer, Attachment 2-I; see also Weiner, Attachment 2-E This is precisely what the CAPP is – a plan to fix all the SSOs.

(IPCD, Exhibits 7 and 9).[50]  In short, then, the IPCD (in conjunction with the implementation requirements of the Final Decree) does addresses <u>all</u> capacity and non-capacity related SSOs.

43.    **Comment:  The STACP credit program should not be retroactive and should require "demonstrated reductions."**  Comments, Ex. 1-A, p. 20.

**Response: The effective date of January 1, 2000 is reasonable, as is the methodology for determining credits.**

The effective date for the STACP credit program – which requires that Defendants remove five gallons of flow for every one gallon of new flow they intend to allow into their sewer system -- is January 1, 2000.  This is approximately when the parties reached basic agreement on the concepts in the STACP and is an appropriate a date from which to begin to implement the program.  Simpson Aff. ¶ 11.  It should be noted that throughout the lengthy negotiations for the consent decree (and before that under the 1992 DFFO), defendants have been actively working to fix their system by constructing Capital Improvement Projects, developing their model, collecting data, and implementing programs to reduce I&I.  Simpson Aff. ¶ 11; Karney Dec. ¶ 7; Klingenstein Dec. ¶¶ 17, 112.  Further, stipulated penalties for failure to implement the IPCD begin to accrue from the date defendants signed the decree -- even in advance of lodging.  Applying the credit program embodied in the STACP from January 1, 2000, when the parties reached agreement on the plan, is more appropriate than waiting for entry of the IPCD, given defendants' ongoing concerted efforts to reduce I&I and to address SSO violations.

Sierra Club further comments that the credits are not based on "demonstrated reductions of upstream hydraulic loading."  However, in practice, it is technically infeasible to achieve this.

---

[50]  Stipulated penalties of $2000/day apply to a failure to follow the O&M plans and $3000 per day of SSD if the SSD was caused in whole or in part by a failure to follow the O&M plans.

This is because it is very difficult to measure exactly the amount of I&I reduction that is achieved by various sewer system fixes, and it would be impractical to measure the result of each and every rehabilitation project.  Simpson Aff. ¶ 12.  The credits provided in Paragraph 3.1 of Exhibit 10 for such things as down spout and driveway drain removal, rehabilitation of deteriorated mainline sewers, and manhole rehabilitation are reasonable estimates of expected flow reduction.  Id.  Moreover, the STACP requires defendants to perform studies to improve the accuracy of these estimates, with any changes subject to Ohio EPA's approval.  Id.  In summary, the STACP embodies a reasonable method for estimating the amount of I&I removed for purposes of determining the credits.

## MISCELLANEOUS COMMENTS

**44.    Comment:  Save the Lakes Association wants to be a party and get all mailings.**

Mr. Poffenberger's letter states:  "Save the Lake Ass'n, by submitting this letter, would like to become a party to this matter" and asks to be put on all mailing lists.  Comments, Ex. 2-B.

**Response: The Association must intervene.**

Save the Lakes must formally intervene to become a party.  33 U.S.C. § 1365(b).  As has been noted, the United States is sending to Sierra Club all documents submitted by defendants or issued by plaintiffs pursuant to the consent decrees.  Perhaps Save the Lakes could visit the Sierra Club office to view these documents?

**45.    The regulators should enforce the 1992 SSO DFFO.**

One commenter noted that MSD has been "under court order to fix SSO problem since

- 73 -

1992," and that the regulators should enforce the "mandate of 1992." Comments, Ex. 3-A.

**Response: This is inappropriate.**

As an initial matter, it should be noted that the Ohio EPA Director's Final Finding and Order (DFFO) that was issued in 1992 is not a court order, but rather an administrative order. Further, it is not enforceable by the United States. Under the 1992 DFFO, defendants spent $174 million and made some progress toward eliminating SSOs. Karney Dec. ¶ 7. In 1998, Ohio EPA and the defendants were in the process of negotiating a new DFFO to replace the 1992 DFFO, when Ohio EPA decided instead to fold its SSO enforcement efforts into a consent decree with the United States, subject to stipulated penalties, court oversight, and enforcement by both regulators. Simpson Aff. ¶¶ 4-5; Elmaraghy Aff., ¶¶ 4-5; Karney Dec. ¶ 8. Plaintiffs believe the comprehensive SSO approach set forth in the IPCD and the Final Consent decree (including extensive modeling and alternatives analysis to ensure adequate system capacity) is the appropriate approach to eliminate defendants' SSOs.

**46.    Comment:  Defendants' SSOs cause municipalities to be in violation of their storm water permits.**

Sierra Club asserts that defendants' SSOs usually overflow to the storm water system (municipal separate storm water system or MS4) of other municipalities, townships, etc., within Hamilton County. These overflows are "illicit discharges" under the Phase II storm water regulations, which all small systems now have to comply with. These municipalities submitted their storm water Phase II permit applications to Ohio EPA in March 2003 and, one of the six minimum controls that have to be addressed is removing illicit discharges to storm water systems. Therefore, Sierra Club argues that defendants now cause and will in the future be causing all these municipalities to be in violation of their storm water permits. SC, p.19.

**Response: The CAPP required to be developed under the IPCD and implemented under the Final Decree will remedy this problem.**

The goal of the Capacity Assurance Program Plan ("CAPP") required to be developed under the IPCD is to identify "feasible remedial measures that have the goal of eliminating all capacity-related SSOs and/or that are necessary to insure that there is adequate capacity in the [sanitary sewer system] under current and projected future conditions so that there will be no capacity-related SSOs under projected future conditions." IPCD ¶ VII.E. The Final Decree requires implementation of the approved CAPP, and that upon completion of construction of the measures set forth in the approved CAPP, defendants' sanitary sewer system shall have adequate capacity to ensure that defendants do not have any capacity-related SSOs. Final Decree ¶¶ VIII, XIII.D. These provisions, in conjunction with the operation and maintenance requirements set forth in Exhibits 7 and 9 of the IPCD, which are designed to prevent non-capacity related SSOs, (Exhibits 7 and 9), will address all SSOs, including those which Sierra Club believes may be entering other municipalities' storm sewers.

**47.    Comment: U.S. EPA has not responded to Sierra Club's FOIA request**

Sierra Club expresses concern "regarding the 33 pages of documents that USEPA is withholding" from release under FOIA. SC, pp. 19-20.

**Response: Sierra Club's concerns regarding U.S. EPA's response to Sierra Club's FOIA request are irrelevant to questions concerning the appropriateness of the decrees. Sierra Club should address its concerns in accordance with U.S. EPA's FOIA regulations and FOIA itself.**

Sierra Club's concerns regarding U.S. EPA's response to its FOIA request are irrelevant to the issue of evaluating the adequacy of the decrees. U.S. EPA believes that all of the withheld documents were properly withheld in accordance with the Freedom of Information Act and U.S.

- 75 -

EPA's regulations implementing FOIA at 40 C.F.R. Part 2.  Sierra Club has appealed that

determination to U.S. EPA's Office of General Counsel, in accordance with 40 C.F.R. § 2.114,

and Sierra Club should contact the appropriate contact person(s) in that office, if Sierra Club is

not satisfied with how that office has responded to the appeal.