EXHIBIT 5

AFFIDAVIT OF JAMES SIMPSON

## AFFIDAVIT OF JAMES SIMPSON

**STATE OF OHIO**            )
                             ) s.s.
**COUNTY OF MONTGOMERY**)

    I, James Simpson being of sound mind, age of majority, and being duly cautioned and sworn in accordance with law, makes the following statement based upon personal knowledge:

1.     I am currently employed by the Ohio Environmental Protection Agency, ("Ohio EPA"), in the Southwest District Office ("District") in the Division of Surface Water, ("Division"), as a manager. I have held my current position in the District since 1981 with the Division or its predecessor the Division of Water Pollution Control. In my current position I supervise all of the Division's personnel in the Southwest District Office; this number has typically fluctuated between 16 and 28 employees. The District serves a sixteen county area of southwest Ohio including Hamilton County.

2.     I hold a Bachelor of Science in Civil and Environmental Engineering, from the University of Cincinnati, (1975) and a Master of Science in Water Resources Management (Civil Engineering Department), from the University of Colorado, (1980). I am a licensed Professional Engineer in the State of Ohio.

3.     In my position, I oversee work of the staff and participate in program activities that include the review and evaluation of proposed wastewater treatment and sewer systems, the regulation and oversight of existing wastewater and sewer systems and discharges of sewage, industrial waste and other wastes to waters of the State; and the monitoring of various streams to evaluate their quality in comparison to State and federal standards/requirements. My work also includes: reviewing permits to install and NPDES permits to ensure compliance with state law;

developing permit terms and condition; and evaluating and determining what are approvable technologies for use for collection, conveyance, holding and treatment of wastewater. I am also responsible for developing guidance for the Division related to PTIs, NPDES permits and management of wastewater, sewage, sludge, industrial waste, and other wastes associated with municipal facilities and industrial facilities. I also keep current with the various technologies available for or in use in wastewater management operations in Ohio and elsewhere. In my current position I also supervise and conduct field activities associated with stream monitoring and sampling of wastewater and other substances, compliance inspections, respond to complaints and participate in documentation and prosecution of enforcement actions. My other duties include providing technical assistance and other information to the public, developing budgets and work plans, and various personnel actions in addition to supervising the work of the unit,

4. I have over the period of time from at least 1992 to the present had some involvement in discussions and negotiations between the State of Ohio or Ohio EPA and the Metropolitan Sewer District of Greater Cincinnati, ("MSD"), related to Sanitary Sewer Overflows ("SSOs"), in the MSD system. After the Ohio EPA Director's 1992 Findings of Fact and Orders, ("DFFOs"), were issued and MSD submitted its initial general plan related to SSO control, I was directly involved in negotiations with MSD. These negotiations in 1997 and 1998 were aimed at the development of a draft Ohio EPA DFFO that established an approach for addressing the SSOs in MSD's system.

5. In 1999 because US EPA and the Department of Justice were also engaged in discussions with MSD which included addressing the same issues about the SSOs in MSD's sewer system, Ohio EPA decided not to proceed with issuance administrative orders but to participate in the

negotiations with US EPA and MSD. As those negotiations proceeded, given that resolution of all enforcement issues related to MSD's sewer system and wastewater treatment plants would take considerable time and that Ohio EPA was concerned to have a court enforceable order in place that established a framework for remedying the SSO problems in MSD's system that had been the focus of the 1992 DFFOs, the parties agreed to divide the negotiations and first complete negotiations on a judicial consent decree addressing the SSOs.

6.      These negotiations led to an agreement in principal between the negotiators on behalf of MSD, Hamilton County, the City of Cincinnati, US EPA, DOJ, Ohio EPA and the State of Ohio that was reached in late summer/early fall 2001 and finalized in all material respects by November 8, 2001.

7.      On December 19, 2001 I received a copy of a December 18, 2001 letter from representatives of the Sierra Club indicating their intent to file a citizen suit related to SSOs in MSD's system. On December 20, 2001 I faxed a copy of the letter from the Sierra Club to Leslie Allen, counsel for the United States in this matter. Prior to the time that I received that December 18, 2001 letter I had not received any expression of interest by the Sierra Club related to MSD. I have reviewed information in the files maintained by the Division related to MSD. Those files also reflect that while negotiations were ongoing with MSD in 1998, 1999, 2000 and 2001 no other Division personnel in the District received any expression of interest from the Sierra Club related to SSO issues in MSD's system or the ongoing negotiations related to the SSOs.

8.      I have reviewed and am familiar with the Short Term Adequate Capacity Plan, Exhibit 10 to the Decree that was the subject of public comment, and also the amendments to that plan which were negotiated in response to one of the public comments received.

9.      There were commenters who expressed concern that the decree did not impose a moratorium banning any future sewer expansion until the existing SSO problems are fixed. However, from the standpoint of pollutants added to the environment, this Short-Term Adequate Capacity Plan in the decree (Section VIII and Exhibit 10) provides superior benefit to a moratorium. A sewer moratorium would ban new sewer construction or hookups, but would keep the amount of sewage entering the system at the status quo. The STACP in this decree requires defendants to eliminate five gallons of flow for every one new gallon of flow they propose to add, thus decreasing the amount of flow in the system and decreasing SSOs even while other solutions are being implemented and studied. The decree expressly requires through the STACP that flows from new development not aggravate or in any way add to the quantity discharged from any SSO downstream of the new flows.

10.     While the effect of the STACP at any one location may be that the amount of clean water "dilution" will be somewhat reduced, the actual impact on concentrations and volume of pollutants discharged at a particular SSO discharge will be beneficial. It is for this reason that the Decree and the STACP require a minimum credit trade ratio of more than 1 to 1. By using the requirement of the elimination of 5 gallons of flow for every gallon of new flow the STACP addresses the fact that the new flow may in some circumstances on a gallon for gallon basis be of a higher strength. Further, and more significant, even with a slight increase in concentration, the reduction in flow achieved by the program will decrease the volume discharged via the SSOs and thus will result in a net decrease in the quantity of pollutants that make their way into the

environment. The STACP strikes an appropriate balance, preventing any wastewater flows from new development from aggravating or in any way adding to the quantity of pollutants discharged from any downstream SSO.

11. Ohio EPA and MSD have had an informal credit program in use in various iterations since 1993 as part of ongoing efforts addressed at preventing increases in discharges from SSOs. The effective date for the credit program used in the STACP is January 1, 2000. This is approximately when the parties reached basic agreement on the concepts in the STACP attached to the Decree and as such is appropriate point from which to begin to implement the program. In addition, throughout the period of negotiations for the consent decree, defendants have been actively working to fix their system by constructing Capital Improvement Projects, developing their model, collecting data, and implementing programs to reduce I&I. This began with defendants smoke testing to identify downspout connections in the Muddy Creek service area, and was followed by a program to accomplish removal of downspouts. Both of these programs were later extended to the entire MSD area. In addition, several major sewers were replaced to reduce extraneous water. The defendants' efforts in sewer maintenance and inspection have also steadily increased in the period since 1999 in order to maximize carrying capacity and minimizing overflows due to blockages and constrictions

12. It is technically infeasible to require that credits in the STACP be based on demonstrated reductions of upstream hydraulic loading. It is very difficult to measure exactly the amount of I&I reduction that is achieved by each of the various sewer system fixes contemplated by the STACP and it would be impractical to measure the result of each and every rehabilitation

project. Under the best of circumstances, the technology available to measure flow would be unable to distinguish each of these relatively small changes in flow within the collection system. The credits provided in Paragraph 3.1 of Exhibit 10 for such things as downspout and driveway drain removal, rehabilitation of deteriorated mainline sewers, and manhole rehabilitation are reasonable estimates of expected flow reduction. In most cases, negotiation has reduced these values from those originally proposed by the defendants, in part recognizing an element of uncertainty in how effective these reductions will be and to maintain conservatism in the estimates. Moreover, the STACP requires defendants to perform studies to improve the accuracy of these estimates and requires improved or verified estimates to be used when developed. The amendments to the STACP that the parties have agreed to following review of the public comments also specifically make this verification process already contemplated by Section 4.0 of the STACP more rigorous. In addition to the existing testing program for downspouts and manholes outlined in Paragraph 4.1, the amended STACP now not only requires a verification program under Paragraph 4.2 for sewer line rehabilitation/replacement, it also sets a deadline for submission of the plan to Ohio EPA for review and approval. Finally the STACP now includes at Paragraph 4.3 a separate process for studying and verifying the result of an integrated program in an area that includes both mainline sewer rehabiltation/replacement as well as manhole rehabilitation.

_____
JAMES SIMPSON

Sworn to before me and subscribed in my presence this __13__ day of August, 2002.

_____
NOTARY PUBLIC
My Commission Expires 6/14/04