EXHIBIT 7

AFFIDAVIT OF GEORGE ELMARAGHY

## AFFIDAVIT OF GEORGE ELMARAGHY

STATE OF OHIO         )
                      ) s.s.
COUNTY OF FRANKLIN    )

I, George Elmaraghy being of sound mind, age of majority, and being duly cautioned and sworn in accordance with law, make the following statement based upon personal knowledge:

1. I am currently employed by the Ohio Environmental Protection Agency, ("Ohio EPA"), as the Assistant Chief of the Division of Surface Water, ("Division"). I have held this position with this Division since its inception in September 1994. Prior to that time I held the position of Assistant Chief of the Division of Water Pollution Control. I have been employed by Ohio EPA since 1974 and have worked primarily in the area of wastewater and water pollution control.

2. I hold a Bachelor of Science in Chemical Engineering from Cairo University, (1972) and a Master of Science in Environmental Engineering from the Ohio State University, (1974). I am also a licensed Professional Engineer in the State of Ohio.

3. In my current position I am responsible for: supervision of Section Managers, resolution of programmatic and technical issues, determination of priorities for the Division, addressing budget issues, interacting with US EPA & other state agencies, and handling general management issues in the Division. In my position, I oversee work of the staff and participate in program activities that include: the review and evaluation of proposed wastewater treatment and sewer systems; the regulation and oversight of

existing wastewater and sewer systems; the regulation and oversight of discharges of sewage, industrial waste and other wastes to waters of the State; and the monitoring of various streams to evaluate their quality in comparison to State and federal standards/requirements. My work also includes reviewing various permits to install and NPDES permits to ensure compliance with state law. This also includes developing permit terms and conditions and evaluating and determining what are approvable technologies for use for collection, conveyance, holding and treatment of wastewater. I am also responsible for reviewing and developing rules and guidance for the Division related to: water quality and antidegradation, permits to install wastewater treatment and sewer systems, NPDES permits, and the management of wastewater, sewage, sludge, industrial waste, and other wastes associated with municipal facilities and industrial facilities. I also keep current with the various technologies available for or in use in wastewater management operations in Ohio and elsewhere. In my current position I have oversight related to the Division's field activities associated with stream monitoring and sampling of wastewater and other substances, compliance inspections, and complaint responses. I also participate in the negotiation and prosecution of enforcement actions.

4. I participated in the negotiations that culminated in the 1992 issuance by the Ohio EPA Director of Findings of Fact and Orders, ("DFFOs") related to Sanitary Sewer Overflows ("SSOs") in the sewer system operated by the Metropolitan Sewer District of Greater Cincinnati, ("MSD"). From 1992 to the present I have had involvement in discussions and negotiations between the State of Ohio and/or Ohio EPA and MSD related to SSOs, in the MSD system. After the Ohio EPA Director's 1992 DFFOs were

issued and MSD submitted its initial general plan related to SSO control, I was directly involved in negotiations with MSD. In 1997 and 1998 these negotiations were aimed at the development of a draft Ohio EPA DFFO that established an approach for addressing SSOs in MSD's system.

5. In 1999 because US EPA and the Department of Justice were engaged in global discussions with MSD, which also addressed the same SSO issues, Ohio EPA decided not to proceed with issuance of administrative orders but to participate in the negotiations with US EPA and MSD. As those negotiations proceeded, given that resolution of all enforcement issues related to MSD's sewer system and wastewater treatment plants would take considerable time and that Ohio EPA was concerned to have a court enforceable order that established a framework for remedying the SSO problems in MSD's system that had been the focus of the 1992 DFFOs, the parties agreed to divide the negotiations and complete negotiations first on a judicial consent decree addressing the SSOs.

6. These negotiations led to an agreement in principal between the negotiators on behalf of MSD, Hamilton County, the City of Cincinnati, US EPA, DOJ, Ohio EPA and the State of Ohio that was reached in late summer/early fall and finalized in all material respects by November 8, 2001.

7. Under Ohio's water quality standards Ohio has separately established water quality requirements related to antidegradation in OAC 3745-1-05. Any application for a permit for construction of treatment for the ultimate long term solution for SSO 700 will

need to be evaluated in light of the antidegradation rule, in addition to other water quality requirements. When these provisions apply, they impose a separately enforceable requirement that the technology proposed be "best available demonstrated control technology", ("BADCT"). For discharges of sanitary wastewater, typically the BADCT provisions actually require a higher level of treatment that achieves removal of more pollutants than that achieved by the conventional secondary treatment technology contained in federal regulations. This BADCT level of treatment is typically described as tertiary treatment. In addition, other applicable water quality requirements may also require that the ultimate long term solution for SSO 700 will be required to meet discharge limits associated with tertiary treatment.

8. Installing a conventional secondary biological treatment system for the discharge at SSO 700 is also not currently a practical option. The typical biological treatment system is designed for and suitable for treating constant or steady streams of wastewater but they do not perform well in cases where the flow is intermittent as is the case at SSO 700. While a typical conventional biological system would receive a certain constant minimum flow of pollutants that would maintain the bio-mass that actually acts to treat the wastewater, the SSO 700 discharge is intermittent and occurs only in some wet weather conditions. At SSO 700 there is no constant base flow of pollutants to maintain the treatment bio mass. Conventional biological systems need an extended period of time over several days to develop bio-mass which is an essential element for the treatment process to function. The chemically enhanced high rate treatment system, CEHRS, that the Decree requires MSD to implement as an interim treatment system for the discharge from SSO 700 is particularly well suited to the type of flow at SSO 700. The CEHRS

treatment can be rapidly brought on line to respond to a wet weather event and treat the wastewater at SSO 700. Because CEHRS does not use biological treatment there is no bio mass that must be developed before any wastewater can be treated.

Further Affiant sayeth naught.

_____
GEORGE ELMARAGHY

Sworn to before me and subscribed in my presence this 13th day of August, 2002.

_____
NOTARY PUBLIC

LAUREN C. ANGELL, Attorney At Law
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.