EXHIBIT 9

DECLARATION OF PATRICK T. KARNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Sierra Club and Marilyn Wall )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>The Board of County Commissioners )<br>of Hamilton County, The City of Cincinnati, )<br>and The Metropolitan Sewer District of Greater )<br>Cincinnati )<br>)<br>Defendants. )<br>)<br>_____)  | Case No. 1:02cv00135<br>Judge Sandra S. Beckwith<br>Magistrate Judge Jack Sherman |

### DECLARATION OF PATRICK T. KARNEY, P.E., DEE

I, Patrick T. Karney, state and declare as follows:

1. I am over 18 years of age and am competent to testify regarding the following:

2. I am currently a Professional Engineer (P.E.) and a Diplomate Environmental Engineer (DEE), an internationally recognized credential that is accepted in the engineering profession as the hallmark of premier environmental engineers.

3. I am the current director of the Metropolitan Sewer District of Greater Cincinnati in Cincinnati, Ohio ("MSD").

4. Cincinnati's collection system dates back to 1828 when Cincinnati started the construction of its storm sewer system. Cincinnati then began to convert these storm sewers into combined sewers in the 1860s, expanding the combined sewer and beginning the construction of separate sanitary sewers in 1895.

5.  After 1930, the emphasis shifted to the construction of separate sanitary sewers matched with storm water networks to try to prevent the commingling of sanitary waste and storm water. As urban development progressed in Cincinnati, plumbing practice allowed foundation stormwater drains to be connected to the sanitary sewer system, eventually resulting in an overwhelmed sewer system and basement flooding. The local topography of Cincinnati, which includes steep hills, also made it difficult to keep storm water from entering the sanitary sewers, aggravating the overflow problem.

6.  To address these problems, local engineers in the first half of the twentieth century constructed a number of sewer lines that intercepted localized sewer discharges along local tributaries and carried them to single downstream discharge points – now known as SSOs – located on the larger streams where the effect on the local community was believed to be less. One example is the Mill Creek Interceptor which was constructed in the early 1930s. To put this decision into context, the first regional wastewater treatment plant did not go on line in Cincinnati until 1953. Before then, the sewer lines ran directly to the Ohio River and its tributaries.

7.  In 1992, MSD formulated a SSO elimination plan formulated under the Ohio Environmental Protection Agency ("OEPA") Director's Final Findings and Orders issued on September 22, 1992 ("1992 DFFO"). The 1992 DFFO required MSD to report to OEPA all SSOs and to present a general plan for disposal system improvements to eliminate all unpermitted discharges of sewage. MSD submitted its "General Compliance Plan to Eliminate Sanitary Sewer Overflows" on June 21, 1993. The elimination program implemented under the 1992 DFFO has cost MSD approximately $174 million and has eliminated approximately 63 SSOs from the system. Elements of this program included rehabilitation under MSD's Capital

Investment Program ("CIP") of existing sewers, upgrades to pumping stations, improvements to treatment plants, and the construction of new relief or interceptor sewers. MSD also instituted an inflow and infiltration ("I&I") program to eliminate excess infiltration of storm water into the sanitary sewers. This program eliminated approximately 15,000 unauthorized storm water connections to the sanitary sewer system.

8. In 1998, OEPA proposed a new DFFO to replace the 1992 DFFO, but because of the overlap of SSO enforcement between the two agencies, OEPA decided in 1999 to join with the United States Environmental Protection Agency ("USEPA") to negotiate with the City and County a comprehensive solution to issues associated with SSOs, combined sewer overflows ("CSOs"), and certain of MSD's water treatment plants. During the next few years, the parties met frequently to discuss the proper solution to the issues raised by USEPA and OEPA as well as the terms of settlement.

9. Given that resolution of all of the SSO, CSO and treatment plant issues faced by MSD would take considerable time, and given that OEPA, the City and the County had been poised to enter into an SSO-only DFFO in 1998, the parties agreed to divide the negotiations into two consecutive phases: 1) a first phase resulting in a judicial consent decree addressing SSOs; and 2) a second phase addressing treatment plant and CSO issues.

10. As a result of these negotiations, the parties achieved agreement in principle in late summer 2001, with the details of the Consent Decree finalized in all material respects by November 8, 2001.

11. The Board of County Commissioners for Hamilton County held a public meeting on February 13, 2002, to air public comments on a proposed settlement offered by the United

3

States and OEPA. Four speakers from the Sierra Club presented in detail their opposition to the Consent Decree before the Board voted on it.

12. On February 15, 2002, the United States of America, acting on request and behalf of the Administrator of EPA, filed suit against Hamilton County and the City of Cincinnati, alleging that SSOs violate the Clean Water Act and seeking an injunction from any further discharges and an order that Defendant expeditiously complete all actions necessary to ensure further discharges cease.

13. On February 15, 2002, a proposed "Interim Partial Consent Decree on Sanitary Sewer Overflows"("Consent Decree") was also filed in the United States enforcement action.

14. Under Section VI.2 of the Consent Decree, the City and County will take immediate action to remedy the most serious of the SSOs in their system at a cost of $48 million. Exhibit III to the Consent Decree requires implementation of remedial measures to address the 17 "most highly active" SSOs, which are the SSOs which discharge most often each year. Section VII of the Consent Decree requires the City and County to undertake a comprehensive study of the capacity of their sanitary sewer system, including creation of a state-of-the-art computer model of the system, which will cost approximately $15.5 million.

15. The Consent Decree also requires MSD to develop a comprehensive plan for remedying all SSOs under its jurisdiction. This will cost approximately $9 million.

16. SSO 700 is the SSO that discharges the most effluent of any in the system.

I swear under the penalty of perjury that the foregoing is true and to the best of my knowledge and belief.

Executed on this day the 3rd of April, 2002.

Patrick T. Karney, P.E., DEE

On this 3rd day of April, 2002, before me, the undersigned officer, personally appeared Patrick T. Karney known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

Notary Public

My Commission expires:



NEE FONG CHIN Attorney at Law
NOTARY PUBLIC   STATE OF OHIO
My Commission has no expiration
date. Section 147.03 O.R.C.