# EPA'S COMBINED SEWER OVERFLOWS

# GUIDANCE FOR FINANCIAL

# CAPABILITY ASSESSMENT AND

# SCHEDULE DEVELOPMENT

## MARCH 1997

## (EXCERPTS)

United States
Environmental Protection
Agency

Office Of Water
(4204)

EPA 832-B-97-004
March 1997

# ♦EPA    Combined Sewer Overflows

## Guidance For Financial Capability Assessment And Schedule Development

LESLIE ALLEN

SENIOR ATTORNEY
DEPARTMENT OF JUSTICE
(202) 514-4114



## SECONDARY FINANCIAL CONSIDERATIONS

The three financial considerations--grant and loan availability, sewer user fees, and other viable funding mechanisms--are normally investigated early in the process of establishing CSO controls. They are described in more detail in the EPA document *Combined Sewer Overflows—Guidance for Funding Options* (EPA-832-B-95-007). They are typically addressed and resolved in the development of the financial schedule for the LTCP prior to design and construction. Therefore, these considerations normally do not have a significant impact on the length of time needed to implement CSO controls. An exception could occur in a case where a permittee's CSO controls can be constructed quickly but where the only available CSO funding source takes an inordinately long time to implement.

### Grant and Loan Availability

During the long-term planning process, the permittee should develop a financing plan that identifies sources of capital funds. Generally, these will include some form of loan or grant. Typically, availability of grants and loans will not have a significant impact on the implementation schedule. In evaluating the effect of grant and loan availability on the permittee's schedule, the following funding sources would be considered:

- State wastewater treatment grant programs

- SRF Program

- State loan program (other than SRF program)

- Rural Utility Services Program (formerly: Rural Development Administration loan program)

- CoBank loan program

- Commercial loans

- Local revenue bonds

- Local general obligation bonds

## Sewer User Fees

As part of the long-term planning process, the permittee should identify existing user fees and rate structures for wastewater treatment and then develop a new rate structure that includes recovery of the costs for CSO controls. Depending upon how CSO user fees are apportioned among residential, commercial, and industrial users, implementation of the LTCP may cause fees to increase significantly. In most cases, construction of the CSO controls occurs over an extended period allowing time for an orderly increase in the user fees. Thus, user fees typically are unlikely to have a significant impact on the implementation schedule. Combining increases in user fees with an ongoing public education program can help ease the effects of "rate shock" related to the higher user fees. The EPA document "Building Support for Increasing User Fees," (EPA 430/09-89-006) provides specific details on creating a public education program to successfully raise user fees.

## Other Viable Funding Mechanisms and Sources of Funding

The permittee may have to consider alternate sources of funding if loans and grants are not available or if a need exists to reduce the financial impact of CSO controls on the users. In some cases, alternative funding mechanisms or financing sources may require additional time to set up. To evaluate the scheduling impacts of other viable funding mechanisms and sources of financing, the permittee's ability to accomplish the following actions would be assessed:

- Establish special assessment districts

- Increase user fees

- Impose/increase taxes (such as income taxes, sales taxes, or property taxes)

- Privatize wastewater treatment.

Most permittees would be expected to have several of these options available; therefore other viable funding mechanisms and sources of funding typically are not likely to have a significant impact on the implementation schedule.

## SCHEDULING CONSIDERATIONS

Establishing an implementation schedule for the CSO controls is a negotiating process involving the permittee and EPA and state NPDES authorities. Normally, the time period for the CSO control implementation schedule is defined by the time required for normal engineering and construction practices. However, environmental and financial considerations can influence the time allowed to complete the CSO controls. The implementation schedule would always give high priority to addressing the environmental considerations involving discharges to sensitive areas and use-impaired water bodies. The CSO controls for these discharges would be constructed as expeditiously as possible. The implementation schedule can lengthen by phasing construction of the CSO controls when financial considerations create a financial burden. The primary financial

# INTERIM CLEAN WATER ACT

# SETTLEMENT PENALTY POLICY

## MARCH 1, 1995

## (EXCERPTS)

# INTERIM CLEAN WATER ACT SETTLEMENT PENALTY POLICY

March 1, 1995

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.     PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.    APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

IV.     PENALTY CALCULATION METHODOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        A. Economic Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        B. Gravity Component . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        C.      Gravity Adjustment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
        D. Litigation Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        E. Ability to Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

V.      SUPPLEMENTAL ENVIRONMENTAL PROJECTS (SEPs) . . . . . . . . . . . . . . . . . .  22

VI.     OTHER TYPES OF PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

VII.    DOCUMENTATION, APPROVALS, AND CONFIDENTIALITY . . . . . . . . . . . . .  23


ATTACHMENT 1 -- Examples of How to Calculate Statutory Maximum Penalty

ATTACHMENT 2  -- Settlement Penalty Calculation Worksheet



# I.    INTRODUCTION

Section 309 of the Clean Water Act (CWA), (33 U.S.C. §1319) authorizes the Administrator of the U.S. Environmental Protection Agency ("EPA" or "Agency") to bring civil judicial and administrative actions against those who violate certain enumerated requirements of the CWA.  In such actions the Administrator may seek civil penalties.

EPA brings enforcement actions to require alleged violators to promptly correct the violations and remedy any harm caused by the violations.  As part of an enforcement action, EPA also seeks substantial monetary penalties which promote environmental compliance and help protect public health by deterring future violations by the same violator and deterring violations by other members of the regulated community.  Penalties help ensure a national level playing field by ensuring that violators do not obtain an unfair economic advantage over competitors who have done whatever was necessary to comply on time.  Penalties also encourage companies to adopt pollution prevention and recycling techniques, so that they minimize their pollutant discharges and reduce their potential liabilities.

This Policy implements the Agency's February 1984 general *Policy on Civil Penalties* (#GM-21) and the companion document, *A Framework for Statute Specific Approaches to Penalty Assessments* (#GM-22), both issued on February 16, 1984.  This Policy revises and hereby supersedes the *Clean Water Act Penalty Policy for Civil Settlement Negotiations* issued on February 11, 1986.[1]

This document sets forth the policy of the EPA for establishing appropriate penalties in settlement of civil judicial and administrative actions.  Subject to the circumstances of a particular case, this policy provides the lowest penalty figure which the Federal Government should accept in a settlement.  This Policy is drafted so that violators whose actions, or inactions, resulted in a significant economic benefit and/or harmed or threatened public health or the environment will pay the highest penalties.  Obviously, where settlement is not possible, the Government reserves the right to seek penalties up to the statutory maximum.

# II.    PURPOSE

---

[1] The guidances issued to interpret and supplement the 1986 Penalty Policy are also superseded.  These documents are the: Addendum to the Clean Water Act Civil Penalty Policy for Administrative Penalties, issued August 28, 1987; Guidance on Penalty Calculations for POTW Failure to Implement an Approved Pretreatment Program, issued December 22, 1988; Bottomline Penalties for Cases Involving More than Five Years of Non-Compliance, issued May 11, 1992; Gravity Penalty Pilot Policy for Clean Water Act Cases, issued November 12, 1992; and Final Interim Guidance on Use of Litigation Consideration Reductions in the Clean Water Act Penalty Policy, issued October 10, 1993 (which incorporated the November 1992 Gravity Penalty Pilot Policy).

The purpose of this Policy is to further four important environmental goals. First, penalties should be large enough to deter noncompliance. Second, penalties should help ensure a level playing field by ensuring that violators do not obtain an economic advantage over their competitors. These two goals generally require that penalties recover the economic benefit of noncompliance, plus an appropriate gravity amount. Third, CWA penalties should be generally consistent across the country. This is desirable as it not only prevents the creation of "pollution havens" in different parts of the nation, but also provides fair and equitable treatment to the regulated community wherever they may operate. Fourth, settlement penalties should be based on a logical calculation methodology to promote swift resolution of enforcement actions and the underlying violations.

## III. APPLICABILITY

This Policy applies to all CWA civil judicial and administrative actions filed after the effective date of this Policy, and to all such pending cases in which the government has not yet transmitted to the defendant or respondent an oral or written proposed settlement penalty amount. This Policy also may be applied (instead of the 1986 version) in pending cases in which penalty negotiations have commenced if application of this Policy would not be disruptive to the negotiations. This Policy applies to civil judicial and administrative penalties sought under CWA §309, including: violations of NPDES permit limits and conditions; discharges without an NPDES permit; violations of pretreatment standards and requirements (including local limits and pretreatment programs); violations of §405 sludge use or disposal requirements; violations of §308 information requests; and violations of §309(a) compliance orders. This Policy does not apply to actions brought exclusively under CWA §311 (oil and hazardous substance spills) nor for violations of requirements in §404 ("wetlands" cases involving disposal of dredged or fill material). Separate penalty policies apply to these two types of cases.

This Policy sets forth how the Agency generally expects to exercise its enforcement discretion in deciding on an appropriate enforcement response and determining an appropriate settlement penalty. In some cases, the calculation methodology set forth here may not be appropriate, in whole or part; in such cases, with the advance approval of the Assistant Administrator, an alternative or modified approach may be used.

This Policy only establishes how the Agency expects to calculate the minimum penalty for which it would be willing to <u>settle</u> a case. The development of the penalty amount to plead in an administrative or judicial complaint is developed independent of this Policy, except that the Agency may not seek a settlement penalty in excess of the statutory maximum penalty for the violations alleged in the complaint. This Policy is not intended for use by EPA, violators, courts, or administrative judges in determining penalties at a hearing or trial. (Also see §VI below).

A settlement penalty calculation is generally required before the Agency files an administrative complaint or refers a civil action to the Department of Justice. The penalty

calculation should be revised as relevant new information is discovered during the course of the litigation. The penalty calculation should be reviewed periodically (e.g.,on the anniversary of when the complaint was filed) to determine if any revisions to the calculation are necessary.

## IV.  PENALTY CALCULATION METHODOLOGY

Before proceeding to calculate the settlement penalty, Agency staff should estimate the statutory maximum penalty in order to determine the potential maximum penalty liability of the discharger.[2] The penalty which the government seeks in settlement may not exceed this statutory maximum amount. Examples of how to calculate the statutory maximum are set forth in Attachment 1. In general, the statutory maximum penalty for violations of an effluent limit for a period longer than one day includes a separate penalty for each day in the time period (assuming there was a discharge on each day).

The settlement penalty is calculated based on this formula:

**Penalty = Economic Benefit + Gravity +/- Gravity Adjustment Factors - Litigation Considerations - Ability to Pay - Supplemental Environmental Projects.**

Each component of the penalty calculation is discussed below. A worksheet summarizing the penalty calculation is included as Attachment 2.

### A. Economic Benefit

Consistent with EPA's February 1984 *Policy on Civil Penalties,* every effort should be made to calculate and recover the economic benefit of noncompliance. The objective of the economic benefit calculation is to place violators in the same financial position as they would have been if they had complied on time. Persons that violate the CWA are likely to have obtained an economic benefit as a result of delayed or completely avoided pollution control expenditures during the period of noncompliance. Commonly delayed and avoided CWA pollution control expenditures, include, but are not limited to:

      o    Monitoring and Reporting (including costs of the sampling and proper laboratory analysis);

      o    Capital equipment improvements or repairs, including engineering design, purchase, installation, and replacement;

---

[2] This calculation of the statutory maximum penalty, done as part of the settlement penalty calculation, is a legal evaluation, subject to the attorney-work product privilege. This calculation is not intended for use in court.

6.  Approval of Litigation Considerations.  The Agency recognizes that the quantitative evaluation of litigation considerations often reflects subjective legal opinions.  Therefore, EPA Regions may reduce the preliminary penalty amount for litigation considerations for up to one-third of the net gravity amount (i.e., gravity as modified by the gravity adjustment factors) without Headquarters approval (where such approval would otherwise be required).  Of course, such a reduction must be fully explained and maintained in the case file.  This reduction is not applicable in municipal cases in which the tables in D.7 below are used.

7.  Municipal Cases.  In those cases against a municipality or other public entity (such as a sewer authority) in which the entity has failed to comply with the Clean Water Act but nevertheless did make good faith efforts to comply, the Agency may mitigate the preliminary penalty amount based on this national municipal litigation consideration.  The preliminary penalty amount (economic benefit + gravity $\pm$ gravity adjustments) may be mitigated to no less than the cash penalty determined by operation of the two tables set forth below.  In addition, the cash penalty established by the tables may be reduced based on compelling ability to pay considerations and by up to 40 percent for appropriate supplemental environmental projects. Reducing the cash penalty below the amount established by the national municipal litigation consideration (other than for ability to pay considerations or for 40 percent based on a SEP) requires compelling evidence of other considerations and the prior approval of Headquarters (even if Headquarters' approval of the settlement would otherwise not be required).

The national municipal litigation consideration is a discretionary factor and the Agency is under no obligation to use it in all municipal cases.[21]  It should only be used if there is some evidence that the municipality made a good faith effort to comply.   The national municipal litigation consideration is based on the economic benefit, environmental impact, duration and size of the facility, and is derived, in part, on the settlement penalties EPA has obtained from judicial municipal cases settled between October 1988 and December 1993.  There are three steps to calculate a penalty using the national municipal litigation consideration tables.

1. Using Table A determine the economic benefit environmental impact factor amount. This dollar amount is found by selecting an appropriate value from the range in the appropriate cell in Table A.  The economic benefit is the benefit previously calculated pursuant to section IV.A. above.  Impact of the violations is based on the actual or potential (risk) of harm caused, in whole or part, by the violations.

2. Using Table B determine the population months of violations factor amount.  This dollar amount is found by selecting an appropriate value from the range in the appropriate cell in Table B.  The service population is the total population served by the violating

---

[21]  The national municipal litigation consideration is primarily intended to apply in cases in which there has been a failure to timely construct treatment facilities  or other capital projects; it may not be appropriate in pretreatment failure to implement cases.

POTW(s) during the period. The months of violation are the total number of months calculated pursuant to section IV.B above. (If the service population exceeds 3 million, the Table B value is found by combining values from multiple rows. For example, if the service population was 4.5 million, the factor B penalty contribution would be the sum of a value selected from the appropriate cell in the 1,000,001 to 2,000,000 population row plus a value selected from the appropriate cell in the 2,000,001 to 3,000,000 population row.)

3. Sum the selected factor values from Tables A and B. Note that the factor values in Tables A and B are in thousands of dollars.

## NATIONAL MUNICIPAL LITIGATION CONSIDERATION -- TABLE A

### ECONOMIC BENEFIT ENVIRONMENTAL IMPACT FACTOR IN THOUSANDS OF DOLLARS

| IMPACT OF VIOLATIONS ON HUMAN HEALTH OR THE ENVIRONMENT | ECONOMIC BENEFIT RANGES IN THOUSANDS OF DOLLARS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | .001 to 50 | 50 to 100 | 100 to 250 | 250 to 1,000 | 1,000 to 2,000 | 2,000 to 5,000 | 5,000 to 10,000 | 10,000 to 25,000 | greater than 25,000 |
| No actual or potential harm. | 6 to 9 | 11 to 15 | 17 to 23 | 32 to 43 | 49 to 67 | 75 to 103 | 110 to 151 | 167 to 230 | 283 to 389 |
| Minor actual or potential harm (e.g., water quality-based effluent or whole effluent toxicity limit violated). | 9 to 11 | 16 to 19 | 25 to 29 | 47 to 55 | 73 to 86 | 112 to 131 | 164 to 192 | 251 to 293 | 424 to 495 |
| Moderate actual or potential harm (e.g., fish kill, beach closing, restrictions on use of water body, raw sewage discharges). | 13 to 14 | 22 to 25 | 33 to 38 | 63 to 71 | 98 to 110 | 150 to 168 | 219 to 246 | 335 to 376 | 566 to 636 |
| Severe actual or potential harm (e.g., repeated beach closings, interference with drinking water supplies). | 17 to 32 | 30 to 55 | 46 to 84 | 87 to 158 | 135 to 245 | 206 to 374 | 301 to 548 | 460 to 837 | 778 to 1,414 |

## NATIONAL MUNICIPAL LITIGATION CONSIDERATION -- TABLE B

| POPULATION MONTHS OF VIOLATION FACTOR IN THOUSANDS OF DOLLARS | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SERVICE POPULATION | MONTHS OF VIOLATION | | | | | | | | | | | |
|  | 1 to 6 | 7 to 12 | 13 to 18 | 19 to 24 | 25 to 30 | 31 to 36 | 37 to 42 | 43 to 48 | 49 to 54 | 55 to 60 | 61 to 66 | 66> |
| 100 to 5,000 | 0 to 0.6 | 0 to 1.8 | 0.1 to 3 | 0.1 to 4.2 | 0.1 to 5.4 | 0.1 to 6.6 | 0.2 to 7.8 | 0.2 to 9 | 0.2 to 10.2 | 0.2 to 11.4 | 0.3 to 12.6 | 0.3 to 14 |
| 5,001 to 25,000 | 0.6 to 3 | 1.8 to 9 | 3 to 15 | 4.2 to 21 | 5.4 to 27 | 6.6 to 33 | 7.8 to 39 | 9 to 45 | 10.2 to 51 | 11.4 to 57 | 12.6 to 63 | 14 to 70 |
| 25,001 to 50,000 | 3 to 6 | 9 to 18 | 15 to 30 | 21 to 42 | 27 to 54 | 33 to 66 | 39 to 78 | 45 to 90 | 51 to 102 | 57 to 114 | 63 to 126 | 70 to 140 |
| 50,001 to 100,000 | 6 to 12 | 18 to 36 | 30 to 60 | 42 to 84 | 54 to 108 | 66 to 132 | 78 to 156 | 90 to 180 | 102 to 204 | 114 to 228 | 126 to 252 | 140 to 280 |
| 100,001 to 250,000 | 12 to 30 | 36 to 90 | 60 to 150 | 84 to 210 | 108 to 270 | 132 to 330 | 156 to 390 | 180 to 450 | 204 to 510 | 228 to 570 | 252 to 630 | 280 to 700 |
| 250,001 to 500,000 | 30 to 60 | 90 to 180 | 150 to 300 | 210 to 420 | 270 to 540 | 330 to 660 | 390 to 780 | 450 to 900 | 510 to 1,020 | 570 to 1,140 | 630 to 1,260 | 700 to 1,400 |
| 500,001 to 1,000,000 | 60 to 120 | 180 to 360 | 300 to 600 | 420 to 840 | 540 to 1,080 | 660 to 1,320 | 780 to 1,560 | 900 to 1,800 | 1,020 to 2,040 | 1,140 to 2,280 | 1,260 to 2,520 | 1,400 to 2,800 |
| 1,000,001 to 2,000,000 | 120 to 240 | 360 to 720 | 600 to 1,200 | 840 to 1,680 | 1,080 to 2,160 | 1,320 to 2,640 | 1,560 to 3,120 | 1,800 to 3,600 | 2,040 to 4,080 | 2,280 to 4,560 | 2,520 to 5,040 | 2,800 to 5,600 |
| 2,000,001 to 3,000,000 | 240 to 360 | 720 to 1,080 | 1,200 to 1,800 | 1,680 to 2,520 | 2,160 to 3,240 | 2,640 to 3,960 | 3,120 to 4,680 | 3,600 to 5,400 | 4,080 to 6,120 | 4,560 to 6,840 | 5,040 to 7,560 | 5,600 to 8,400 |

# V.    SUPPLEMENTAL ENVIRONMENTAL PROJECTS (SEPs)

Supplemental Environmental Projects (SEPs) are defined by EPA as environmentally beneficial projects which a violator undertakes, but is not otherwise legally required to perform, in exchange for favorable penalty consideration in settlement of an enforcement action. In order for a violator to receive a settlement penalty reduction in exchange for performing such a project, the project must conform with the EPA's SEP Policy, or be approved in advance by the Assistant Administrator[23]. A SEP may be allowed in a municipal case, even if the cash penalty is less than economic benefit, provided the cash penalty is no less than 60 percent of the amount provided in section IV.D.7. Use of SEPs in a particular case is entirely within the discretion of EPA, and the Department of Justice in judicial cases.

# VI.    OTHER TYPES OF PENALTIES

This Policy only establishes how the Agency expects to calculate the minimum penalty for which it would be willing to settle a case. The development of the penalty amount to plead in an administrative or judicial complaint is developed independent of this Policy. This Policy is not intended and should not be used as the basis for a penalty demand in a complaint, an administrative hearing or, a civil judicial trial. The Agency will not use this Penalty Policy in arguing for a penalty at trial or in an administrative penalty hearing.[24] In those cases which proceed to trial or an administrative hearing, the Agency should seek a penalty higher than that for which it is willing to settle.

If the "bottom-line" settlement penalty calculated pursuant to this Policy exceeds the maximum penalty that can be obtained in an administrative penalty action pursuant to §309(g) of the CWA, the Agency should instead proceed judicially.[25] In rare circumstances, the statutory maximum penalty may be less than the "bottom-line" settlement penalty in civil judicial cases; in such circumstances, the statutory maximum penalty should serve as the new "bottom-line" penalty.

---

[23] See "EPA Policy on the Use of Supplemental Environmental Projects in Enforcement Settlements", transmitted on February 12, 1991 by the Assistant Administrator for Enforcement, or subsequent revisions.

[24] If that were to occur, then the defendant would have no incentive to settle with EPA. See *Guidance on the Distinctions Among Pleading, Negotiating, and Litigating Civil Penalties for Enforcement Cases Under the Clean Water Act,* OECM/OW, January 19, 1989.

[25] For further guidance on choosing between administrative and judicial enforcement options, see "Guidance on Choosing Among Clean Water Act Administrative, Civil and Criminal Enforcement Actions", which was Attachment 2 to the August 28, 1987 "Guidance Documents and Delegations for Implementation of Administrative Penalty Authorities Contained in 1987 Clean Water Act Amendments".

# EPA SUPPLEMENTAL ENVIRONMENTAL

# PROJECTS POLICY

## MAY 1, 1998

## (EXCERPTS)

# EPA SUPPLEMENTAL ENVIRONMENTAL PROJECTS POLICY

**Effective May 1, 1998**

## A.   INTRODUCTION

1.   Background

In settlements of environmental enforcement cases, the U.S. Environmental Protection Agency (EPA) requires the alleged violators to achieve and maintain compliance with Federal environmental laws and regulations and to pay a civil penalty. To further EPA's goals to protect and enhance public health and the environment, in certain instances environmentally beneficial projects, or Supplemental Environmental Projects (SEPs), may be part of the settlement. This Policy sets forth the types of projects that are permissible as SEPs, the penalty mitigation appropriate for a particular SEP, and the terms and conditions under which they may become part of a settlement. The primary purpose of this Policy is to encourage and obtain environmental and public health protection and improvements that may not otherwise have occurred without the settlement incentives provided by this Policy.

In settling enforcement actions, EPA requires alleged violators to promptly cease the violations and, to the extent feasible, remediate any harm caused by the violations. EPA also seeks substantial monetary penalties in order to deter noncompliance. Without penalties, regulated entities would have an incentive to delay compliance until they are caught and ordered to comply. Penalties promote environmental compliance and help protect public health by deterring future violations by the same violator and deterring violations by other members of the regulated community. Penalties help ensure a national level playing field by ensuring that violators do not obtain an unfair economic advantage over their competitors who made the necessary expenditures to comply on time. Penalties also encourage regulated entities to adopt pollution prevention and recycling techniques in order to minimize their pollutant discharges and reduce their potential liabilities.

Statutes administered by EPA generally contain penalty assessment criteria that a court or administrative law judge must consider in determining an appropriate penalty at trial or a hearing. In the settlement context, EPA generally follows these criteria in exercising its discretion to establish an appropriate settlement penalty. In establishing an appropriate penalty, EPA considers such factors as the economic benefit associated with the violations, the gravity or seriousness of the violations, and prior history of violations. Evidence of a violator's commitment and ability to perform a SEP is also a relevant factor for EPA to consider in establishing an appropriate settlement penalty. All else being equal, the final settlement penalty will be lower for a violator who agrees to perform an acceptable SEP compared to the violator who does not agree to perform a SEP.

The Agency encourages the use of SEPs that are consistent with this Policy. SEPs may not be appropriate in settlement of all cases, but they are an important part of EPA's enforcement program. While penalties play an important role in environmental protection by deterring violations and creating a level playing field, SEPs can play an additional role in securing significant environmental or public health protection and improvements. SEPs may be particularly appropriate to further the objectives in the statutes EPA administers and to achieve other policy goals, including promoting pollution prevention and environmental justice.

2.    <u>Pollution Prevention and Environmental Justice</u>

The Pollution Prevention Act of 1990 (42 U.S.C. § 13101 et seq., November 5, 1990) identifies an environmental management hierarchy in which pollution "should be prevented or reduced whenever feasible; pollution that cannot be prevented should be recycled in an environmentally safe manner whenever feasible; pollution that cannot be prevented or recycled should be treated in an environmentally safe manner whenever feasible; and disposal or other release into the environment should be employed only as a last resort ..." (42 U.S.C. §13103). Selection and evaluation of proposed SEPs should be conducted generally in accordance with this hierarchy of environmental management, i.e., SEPs involving pollution prevention techniques are preferred over other types of reduction or control strategies, and this can be reflected in the degree of consideration accorded to a defendant/respondent before calculation of the final monetary penalty.

Further, there is an acknowledged concern, expressed in Executive Order 12898 on environmental justice, that certain segments of the nation's population, <u>i.e.,</u> low-income and/or minority populations, are disproportionately burdened by pollutant exposure. Emphasizing SEPs in communities where environmental justice concerns are present helps ensure that persons who spend significant portions of their time in areas, or depend on food and water sources located near, where the violations occur would be protected. Because environmental justice is not a specific technique or process but an overarching goal, it is not listed as a particular SEP category; but EPA encourages SEPs in communities where environmental justice may be an issue.

3.    <u>Using this Policy</u>

In evaluating a proposed project to determine if it qualifies as a SEP and then determining how much penalty mitigation is appropriate, Agency enforcement and compliance personnel should use the following five-step process:

(1)    Ensure that the project meets the basic definition of a SEP. (Section B)
(2)    Ensure that all legal guidelines, including nexus, are satisfied. (Section C)
(3)    Ensure that the project fits within one (or more) of the designated categories of SEPs. (Section D)
(4)    Determine the appropriate amount of penalty mitigation. (Section E)
(5)    Ensure that the project satisfies all of the implementation and other criteria. (Sections F, G, H, I and J)

Step 5:   Final Settlement Penalty

     5.a.    The SEP mitigation amount (step 4.b) is then subtracted from the settlement amount without a SEP (step 1.c).

     5.b    The greater of step 2.d or step 5.a is the minimum final settlement penalty allowable based on the performance of the SEP.

## F.    LIABILITY FOR PERFORMANCE

Defendants/respondents (or their successors in interest) are responsible and legally liable for ensuring that a SEP is completed satisfactorily.  A defendant/respondent may not transfer this responsibility and liability to someone else, commonly called a third party.  Of course, a defendant/respondent may use contractors or consultants to assist it in implementing a SEP.[18]

## G.    OVERSIGHT AND DRAFTING ENFORCEABLE SEPS

The settlement agreement should accurately and completely describe the SEP. (See related legal guideline 4 in § C above.) It should describe the specific actions to be performed by the defendant/respondent and provide for a reliable and objective means to verify that the defendant/respondent has timely completed the project. This may require the defendant/respondent to submit periodic reports to EPA. The defendant/respondent may utilize an outside auditor to verify performance, and the defendant/respondent should be made responsible for the cost of any such activities. The defendant/respondent remains responsible for the quality and timeliness of any actions performed or any reports prepared or submitted by the auditor. A final report certified by an appropriate corporate official, acceptable to EPA, and evidencing completion of the SEP and documenting SEP expenditures, should be required.

To the extent feasible, defendant/respondents should be required to quantify the benefits associated with the project and provide EPA with a report setting forth how the benefits were measured or estimated. **The defendant/respondent should agree that whenever it publicizes a SEP or the results of a SEP, it will state in a prominent manner that the project is being undertaken as part of the settlement of an enforcement action.**

The drafting of a SEP will vary depending on whether the SEP is being performed as part of an administrative or judicial enforcement action. SEPs with long implementation schedules (e.g., 18 months or longer), SEPs which require EPA review and comment on interim milestone activities, and other complex SEPs may not be appropriate in administrative enforcement

---

[18] Non-profit organizations, such as universities and public interest groups, may function as contractors or consultants.