**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., | : | **CASE NO. C-1-02-107** |
| | : | |
| Plaintiffs, | : | |
| | : | Judge S. Arthur Spiegel |
| and | : | |
| | : | |
| SIERRA CLUB, ET AL., | : | |
| | : | |
| Intervenors, | : | |
| | : | |
| v. | : | |
| | : | |
| BOARD OF COUNTY COMMISSIONERS | : | |
| OF HAMILTON COUNTY, OHIO, ET AL. | : | |
| | : | |
| Defendants. | : | |

**INTERVENOR SIERRA CLUB'S MEMORANDUM**
**IN OPPOSITION TO ENTRY OF THE CONSENT DECREES**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………..i

SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(a)(3)……………iv

I.  INTRODUCTION……………………………………………………..1

II.  ARGUMENT……………………………………………………………4

    A.  The Decrees fail to meet the standard of approvability…...……..4

        1. Unless modified, the Decrees are not diligent prosecution and do not moot the pending citizen suit…….7

        2.  CERCLA in contrast to CWA…………………………..10

    B.  The Decrees have no final, non-extendable end dates for bringing all violations into compliance…………..……………11

        1.  The Consent Decrees' flexible deadlines for SSOs and sewage treatment plant violations are inconsistent with law………………………………………………………..15

        2.  The Agencies have imposed non-extendable compliance deadlines for municipalities' SSOs violations of the Clean Water Act in other cases………………………………….

        3.  The 1.5 billion dollar extension of time violates EPA's own CSO policy…………………………………………………17

        4.  Requiring MSD to end its violations "as expeditiously as practicable" is unenforceable and violates the law and EPA policy…………………………………………………...20

    C.  The consent decree is inconsistent with law and the public interest because it proposes illegal primary treatment at SSO 700 and at the Sycamore Wastewater Treatment plant……………………..22

        1. The Interim Remedial Measure for SSO 700 is Illegal and not in the public interest………………………………….22

        2.  Use of a "Primary Treatment" Add-on at the Sycamore Wastewater Plant is Illegal and Inappropriate…………..….25

D.   The Sewage-in-Basement Program is Unfunded and Unfair…..27

1. There is adequate data to estimate funding for the SIB program……………………………………………….29

2. The SIB program contains numerous other flaws precluding a finding that it is in the public interest……………………………………………...…..31

E.   The MSD Refuses to Implement a Long Term Control Plan That Meets Decades-Old Water Quality Standards…………………....32

F.   The Court Should Appoint a Special Master………………..…37

III.  CONCLUSION……………………………………...…………………43

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Atlantic States Legal Foundation v.*
*Eastman Kodak Company*, 933 F.2d 124 (2d Cir. 1991)..............................10, 13

*Cronin v. Browner*, 90 F.Supp. 2d 364 (S.D. N.Y. 2000)............................38, 39

*Dague v. City of Burlington*,
935 F.2d 1343, 1352 (2d Cir.1991), *rev'd on other grounds*,
505 U.S. 557, *on remand*, 976 F.2d 801 (2d Cir. 1992)...............................14

*Frilling v. Village of Anna*, 924 F. Supp. 821 (S.D. Ohio 1996).................13

*Hawaii's Thousand Friends and Sierra Club v.*
 *City and County of Honolulu*, 821 F. Supp. 1368 (D. Hawaii 1993) ...........24

*Jarrett v. Water Works and Sanitary Sewer Board of Montgomery*,
2001 U.S. Dist. LEXIS 522 (M.D. Ala. 2001) ...............................................13

*Jones v. City of Lakeland, TN*, 224 F.3d 518 (6th Cir. 2000) ......................8, 9, 11, 12

*Kelley ex rel. Michigan DEQ  v. A.T. Wagner*,
930 F.Supp. 293, 298 (E.D. Mich. 1996) .....................................................5

*Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 515 (W.D. Mich. 1989)....5

*Long Island Soundkeeper Fund, Inc. v.*
*New York City Department Of Environmental Protection*,
27 F. Supp. 2d 380 (E.D. NY 1998) .............................................................14

*Modern Sys. Tech. v. United States*, 979 F.2d 200, 204 (Fed. Cir. 1992) .....35

*New York Coastal Fishermen's Association v. New York City Department of Sanitation et al.*, 772 F. Supp. 162, (S.D. NY 1991) ........................................................10, 13

*New York State Association for Retarded Children, Inc. v. Carey*, 551 F.Supp. 1165 (E.D. NY 1982) ......................................................................................37, 39, 40, 41, 42

*Ohio Valley Envtl. Coalition v. Horinko*, 279 F. Supp. 2d 732 (S.D.WV. 2003)......33, 34

*Orange Env't v. County of Orange,* 860 F. Supp. 1003  (S.D.NY 1994) ...... 13

*Reed v. Cleveland Board of Education*, 607 F.2d 737, 740 (6th Cir. 1979) ... 39

*Save Our Bays & Beaches v. City & County Honolulu,*
 904 F. Supp. 1098  (D. Hawaii 1994) .......................................................... 24

*Torncello v. United States,* 231 Ct. Cl. 20, 42, 681 F.2d 756, 769 (1982) .... 35

*United States v. Akzo Coatings, Inc*., 949 F.2d 1409 (6th Cir. 1991 ) ............ 5, 6

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ....... 6, 12

*United States v. City of Bedford, OH*, 1989 WL 158020 (N.D. Ohio) .......... 17

*United States v. City of Toledo*, 63 F.Supp.2d 834 (N.D. Ohio 1999) .......... 26

*U.S. v. District of Columbia*, 933 F.Supp. 42 (D.D.C. 1996)…………………

*United States v. Hoboken*, 675 F. Supp. 189 (D. NJ 1987) ........................... 16

*United States v. Hooker Chemicals and Plastics Corp.*,
540 F.Supp. 1067 (W.D. NY 1982) ............................................................... 5, 6

*U.S. v. Pesses, et. al*, 1994 U.S. Dist. LEXIS 18684, at *22
(W.D. Penn. 1994) .......................................................................................... 5, 6

*United States v. Telluride*, 849 F.Supp. 1400 (D. Colo. 1994) *rev'd on other grounds*, 146
F.3d 1241 (10th Cir. Colo. 1998) ................................................................... 5, 6, 12, 28

*Woll v. United States*, 45 Fed. Cl. 475  (U.S. Ct. Claims 1999 .................... 35

*Wuori v. Concannon*, 551 F.Supp. 185, 189 (D. Maine 1982) ...................... 39

## II.    <u>Statutes</u>

Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 to 1387
("Clean Water Act") ..............2, 4, 7, 8, 9, 10, 11, 12, 14, 16, 17, 23, 24, 25, 26, 33, 39,42

33 U.S.C § ..................................................................................................... 36

33 U.S.C. §1364(a) ........................................................................................ 27

33 U.S.C. §1365(b) ............................................................................................12

Comprehensive Environmental Response Compensation and Liability
Act, 42 U.S.C. §§9601 to 9675 .....................................................................7, 10, 11

III.    Regulations

40 CFR 133.102 ...............................................................................................23

40 C.F.R. 131.10(g), (h), and (j) ....................................................................33

40 C.F.R. Sec. 131.3(e) ..................................................................................33

OAC §3745-1-32, Table 32-1 ........................................................................32


IV.    Rules

Rule 53, Fed. R. Civ. P. .............................................................................37, 38


V.    Other

EPA's Combined Sewer Overflow (CSO) Control Policy,
59 Fed. Reg. 18688-18698, April 19, 1994 ....................................................20

59 Fed. Reg. 18688 ........................................................................................20

59 Fed. Reg. 18690 ........................................................................................21

59 Fed. Reg. 18694 ........................................................................................33


EPA's Combined Sewer Overflows – Final Guidance for Financial Capability
Assessment and Schedule Development, February 1997. EPA 832-B-97-004.............21

EPA's Proposed Blending Policy, 68 FR 63042, November 7, 2003 ...........26

Memorandum from Robert Perciasepe, Assistant Administrator,
Office of Water, Re: Implementation of the CSO Control Policy, May 19, 1998 ...............21

**SUMMARY OF ARGUMENT PER LOCAL RULE 7.2 (a)(3)**

I.    INTRODUCTION ............................................................................1

The Hamilton County MSD ("MSD") presents a special case study of decades of continuing violations of the Clean Water Act ("CWA"). If approved by the Court, the two decrees: prolong CWA violations for needless years; provide "re-openers" to already vague and distant deadlines that are almost certain to extend "end dates," rendering them not end dates at all; grant an inference of economic hardship to the MSD without any demonstration of hardship; commit to a $1.5 billion re-opener that will extend the 2022 deadline; prolong continuation of absolutely illegal SSOs by applying the inapplicable CSO policy to SSOs.

There is competent and unrebutted evidence before this Court that SSOs are patently illegal, that the SSOs can be fixed on an accelerated schedule (as few as 10 years, not 20 years), that Hamilton County can pay for the necessary remediation of its sewer system (CSOs, SSOs, treatment plant violations and by-passes) without "economic hardship," that fixing the SSOs at the earliest possible date will actually enhance the CSO long-term plan, that if the SSOs are not fixed at the earliest possible date, Hamilton County families will be exposed to an imminent hazard for 10 or more years beyond what is necessary.

II.    ARGUMENT………………………………………………………………………4

Section II explains that a reviewing court has a duty to conduct an independent evaluation of the evidence relied upon both in support and opposition to decrees between

government entities and environmental polluters in order to determine whether they are fair, reasonable, in the public interest and consistent with statute.  In general, courts will approve such consent decrees only if they meet this standard. The Consent Decrees in this case do not meet this standard.

First, in determining whether a decree is reasonable, a court will typically examine whether the: (1) decree is an efficient vehicle for cleansing the environment; (2) decree has adequately compensated the public for past harms; and, (3) the government has driven a hard enough bargain under the circumstances.  The Court needs to consider the intertwining of the diligent prosecution issue when evaluating the Decrees.  *See* Section II.A.1.  In this case, there is a pending citizen suit relating to the SSO violations and sewage-basement backups In this case, it would not be in the public interest to enter a consent decree that does not, as a matter of law, constitute "diligent prosecution" by the agencies. To enter a consent decree that does not constitute "diligent prosecution" would allow the citizen suit to go forward, which could lead to inconsistent judgments and not provide for judicial economy

Second, the failure of the Decrees to set final, non-extendable compliance dates for all violations is inconsistent with both the law and the public interest. *See* Section II.B.  One of the factors that courts have repeatedly cited in finding a lack of "diligent prosecution" is a lack of a final, non-extendable compliance dates.

In the Decrees, the Agencies wrap up the violating wastewater treatment plants and pump stations into the LTCP update process and improperly apply the CSO Policy to aspects of the Defendants sewer system to which the policy is not applicable.  *See* Section II.B.3.  The Decrees also apply the time extension cap of $1.5 billion to non-CSO

violations.  In the Motion, the Agencies give this Court the misleading impression that Congress requires the Court to apply CSO Policy to all aspects of the MSD's violating sewer system and the proffered remediation plan.  This is false.  This Court has the authority to apply injunctive relief in this case differently to the MSD's SSOs, wastewater treatment plants, by-passes, and pump stations and sewage backups than it does to CSOs.

Throughout the United States' presentations to this Court on the Decrees, it argues that, regardless of the multiple and overlapping time extension opportunities afforded to the MSD, the Decrees should be approved because MSD must, in any event, end its violations of the law "as expeditiously as practicable."  *See* Section II.B.4. However, a definite date must be required to bring the SSOs and wastewater treatment plant violations and bypasses, which are per se illegal, and sewage basement backups into compliance. To the extent that a narrative standard might be permissible under the CSO policy, which applies to CSO's only (as explained above), the Agencies have chosen a standard that violates the law and EPA's own policies.

Third, instead of requiring MSD to build a conventional, secondary treatment plant at the site of SSO 700, the United States suggests that this Court allow MSD to build a primary treatment plant that does not meet the requirements of the Clean Water Act. *See* Section II.C.  This illegal, "interim" measure, the EPA suggests, should be allowed to operate until 2016, if the Mill Creek Storm Water Tunnel is built and 2021, if the tunnel is not built.

Instead of enlarging the Sycamore Plant to treat all flows with the level of treatment required by the CWA, the Decrees approve a plan to add a "primary treatment" plant (the same type of unit as proposed for SSO 700) to Sycamore's existing, overloaded

secondary treatment plant, in order to treat the plant by-pass violations. *See* Section II.C.2. The use of primary treatment "add-ons" at sanitary-only, municipal sewage treatment plants is illegal.  The CWA requires that all municipal sewage coming to the plant be provided with secondary treatment.

Fourth, the United States asserts jurisdiction over the basement backups as an imminent and substantial endangerment to human health, 33 U.S.C. §1364(a), yet, the Agencies want the Court to approve a program with no teeth. *See* Section II.D. The SIB program suffers from the following flaws, further described below: The program is inadequately funded--only $ 1 million committed; There are no consequences in the Decrees if the program is carried through at a minimal level; no stipulated penalties would apply; There are no defined benchmarks of progress (e.g., number of homes provided with prevention devices per year, etc.); The citizen claimants are not afforded due process: the violator judges eligibility; The Decrees do not provide for a special master to oversee the process; The legal release required by MSD/Law Department is unfair; it requires claimants to waive personal injury claims in order to receive personal property reimbursement.

Fifth, in the Decrees, MSD is not really committing to any particular remediation plan. *See* Section II.E.  In fact, MSD tells us in the Decree that it is planning to submit **two** Long Term Control Plan Updates in 2006: one that meets presentWater Quality Standards and one that does not. Consent Decree, Ex. 4, page 6.  The Consent Decree suggests that it is permissible for the Defendants to refuse to develop a Long Term Control Plan that meets the Water Quality Criteria for "existing uses" on the rivers, creeks and streams in Hamilton County.  If this is, in fact, the interpretation of the federal

CSO Policy that the United States is suggesting to the Court, it is erroneous. A Long

Term Control Plan submitted under the Policy must conform to the Water Quality

Standards for all "existing uses" on the receiving stream.

Finally, it is clear from the scope of the work to be completed under the Decrees

and the vast amount of time that will be necessary to oversee compliance, that the SIB

victims' rights and health cannot be effectively protected in a timely manner without

appointment of a special master to oversee compliance with the Decrees. *See* Section II.F.

A special master is needed to help the Court fulfill its duty of ensuring compliance with

the Decrees, should they be entered, by providing technical support and continuity;

monitoring loopholes and potential for abuse in the Decrees; and monitoring difficult

financial and engineering issues. Further, because of the complexity of the Decrees and

remedial program, the Court can be easily misled or overwhelmed with technical issues.

By reporting directly to the Court, the special master can help keep the MSD focused on

the remedial obligations under the Decree and help restore credibility in MSD reporting

to the public.

III.     CONCLUSION…………………………………………………………………….43

Sierra Club has demonstrated that 1) the Decrees are not an efficient vehicle for cleansing

the environment; (2) the Decrees do not adequately compensate the public for past harms;

and, (3) the Agencies have failed to drive a hard enough bargain under the circumstances.

The lack of funding and critical benchmarks in the sewage-in-basement program also

underscore that the Decrees do not appropriately compensate the public for the years of

official neglect at the hands of the MSD. The Decrees are, therefore, not in the public's

interest.  Without repair of the major flaws pointed out by Sierra Club, above, the Court should reject the Decrees.

## I. INTRODUCTION

The Hamilton County MSD ("MSD") presents a special case study of decades of continuing violations of the Clean Water Act ("CWA"). [1]  Despite this, the MSD, since 1997, has driven a hard bargain in private negotiations with the Ohio and federal environmental agencies ("Agencies"), the plaintiffs that filed the Motion for Entry of the Decree and an 80-page Memorandum with attachments ("Motion").  The MSD "successfully" held out for two decrees that, if approved, will:

• prolong CWA violations for needless years;

• provide the de facto approval of the Agencies (and this Court) to unnecessarily continue many of the violations for years

• provide "re-openers" to already vague and distant deadlines that are almost certain to extend "end dates," rendering them not end dates at all;

• grant an inference of economic hardship to the MSD without any demonstration of hardship;

• commit to a $1.5 billion re-opener that will extend the 2022 deadline, even though the MSD has announced that it will cost "over $3.6 billion" to fix 100 SSOs, alone [2];

---

[1] The 1987 Smale Commission and the 1991 SWIM report identified and decried the very same sewer problems that are still, 17 years and 13 years later, unresolved.  According to Hamilton County Commissioner Todd Portune: "We've got a broken, dilapidated system that was allowed to get that way by a generation of Commissioner neglect." The Cincinnati Enquirer, February 22, 2004.
[2] "Plugging all of Cincinnati's estimated 100 SSOs could cost $3.6 billion," Karney says.  "Sewage Pouring Into Lakes, Streams," by Tom Vanden Brook, USAToday, August 20, 2002

- prolong continuation of absolutely illegal SSOs by applying the inapplicable CSO policy to SSOs, even though fixing the SSOs at the earliest possible date will enhance the future CSO long-term planning;

- require that the MSD complete planning and take steps years from now, when the MSD has a legal obligation to carry out these actions anyway under the "CSO Policy."

Even though the MSD held out for a way to prolong SSO violations based on the misapplication of the CSO policy, the Agencies' Motion leads one to believe that this outcome was the Agencies' idea. The Sierra Club presumes, but was not allowed to know, that the Agencies at least attempted to end the utterly illegal SSOs at the earliest possible date.[3]

Despite all of this, the Agencies argue that the risk of litigation outweighs the benefit of better protecting the public. Yet, there is competent and unrebutted evidence before this Court that SSOs are patently illegal, that the SSOs can be fixed on an accelerated schedule (as few as 10 years, not 20 years), that Hamilton County can pay for the necessary remediation of its sewer system (CSOs, SSOs, treatment plant violations and by-passes) without "economic hardship," that fixing the SSOs at the earliest possible date will actually enhance the CSO long-term plan, that if the SSOs are not fixed at the earliest possible date, Hamilton County families will be exposed to an imminent hazard for 10 or more years beyond what is necessary. Further, much of this evidence comes by way of admissions in the Motion; the rest has been supplied by the Sierra Club and is unrebutted by probative evidence.

---

[3] At the request of the Agencies and the Defendant, the Sierra Club was not allowed any discovery of the contrasting positions taken by the parties during the eight (8) years of negotiations, even though this is directly material to the "fairness" of the Decrees, see p. 6 infra.

To pull together information that has already been put before this Court in argument and pleadings, the Sierra Club is providing additional expert reports from Dr. Bruce Bell (attached as Exhibit 1) and Dr. Michael Kavenaugh (attached as Exhibit 2) in the form of sworn declarations and the affidavit of Ryan Lehan of Delhi, Ohio, an SIB victim (attached as Exhibit 3). Sierra Club is also providing a video tape of a backup in the Lehan home that occurred in May, 2003.[4]

To be approvable, the Consent Decrees ("Decrees") must, at least, be changed to impose firm SSO deadlines, to appoint a special master to oversee the Decrees, and to approve an SIB budget, along with other SIB program changes sufficient to abate, at the earliest possible date, the imminent hazard created by the SSOs for all SIB victims.[5] This Court should not approve the two Decrees unless and until they are fair to the public, otherwise in the public interest, and contain provisions that *legally and timely* achieve both the requirements and the goals of the CWA.

## II. ARGUMENT

### A. The Decrees fail to meet the standard of approvability.

---

[4] The Lehan affidavit and videotape (attached as Exhibit 3) demonstrate weaknesses in the Decrees regarding the SIB victim program, how MSD is not living up to its commitments for backups occurring after January 1, 2004, and why funding commitments and specific benchmarks of progress are required in the decree. The Lehan situation is also an exemplar of why the Court needs to appoint a special master under Rule 53 to assist it in this case

[5] The Sierra Club has suggested numerous times in its comments and court submissions in this case that an approvable decree should include at a minimum: (1) firm compliance end-dates by which violations will cease, subject to limited force majeure exceptions; (2) clear benchmarks of interim progress in the decree, itself, so that the public will know that progress is, in fact being made (e.g., X number of SSOs eliminated per year until all are eliminated; reduction of X% of treatment plant by-passes per year until compliance is achieved; specific benchmarks for judging progress in the sewage-in-basement program, etc.); (3) firm commitments in the Decree to get funding to accomplish its requirements, so that political issues do not throw the decree back into Court in media res; (4) a funded and fair program to promptly assist the victims of MSD-caused sewage basement backups; (5)appointment of a special master to assist the Court in fulfilling its obligations under the decree; and, (6) development of a CSO Long Term Control Plan Update will be complete by a date certain. The public interest requires nothing less.

In general, courts will approve consent decrees between government entities and environmental polluters only if they are fair, reasonable, in the public interest and consistent with statute. *United States v. Telluride*, 849 F.Supp. 1400 (D. Colo. 1994) A reviewing court has a duty to conduct an independent evaluation of the evidence relied upon both in support and opposition to the agreements in order to determine whether the decree meets this standard. See *Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 515 (W.D. Mich. 1989)

A consent decree is more than a simple contract. *U.S. v. Pesses, et. al*, 1994 U.S. Dist. LEXIS 18684, at *22 (W.D. Penn. 1994) (attached as Exhibit 4), citing *Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 515 (W.D. Mich. 1989). "Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." *Id.* Thus, the proponents of a consent decree bear the burden of producing evidence that enables a court to ***independently*** determine whether to enter the decree. *Id.* at *17 (emphasis added). "In considering whether to approve a consent decree, the court must conduct an ***independent evaluation*** of the evidence relied upon in relation to the agreements reached and must eschew any rubber stamp approval of it." *Id.,* citing *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067 (W.D. NY 1982).

Approval of such settlements is not automatic and may be denied by the court, if the terms are not fair and reasonable. *Kelley v. A.T. Wagner*, 930 F.Supp. 293, 298 (E.D. Mich. 1996) (consent decree not approved); see also, *United States v. Akzo Coatings, Inc.*, 949 F.2d 1409 (6th Cir. 1991). As noted, federal courts do not "rubber stamp" such decrees. This is especially true, as in the case at bar, where there are substantial public

interests at stake.  See *United States v. Telluride*, 849 F.Supp. 1400 (D. Colo. 1994)
(approval of consent decree denied) ("This is not the typical litigation between private
parties.  Indeed, substantial public interests are at stake. In suits affecting the public
interest, my role is more searching…Contrary to what the parties' one-sided presentation
might suggest, I may not nor would I merely imprimit their decision as though possessed
of a clerical rubber stamp."). *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409,
1424 (6th Cir. 1991); *United States v. Cannons Eng. Corp.*, 899 F.2d 79, 84 (1st Cir.
1990))." See also, *United States v. Hooker Chemicals*, 540 F.Supp, 1067, 1072 (W.D.
N.Y. 1982).

        In determining whether a decree is reasonable, a court will typically examine
whether the: (1) decree is an efficient vehicle for cleansing the environment; (2) decree
has adequately compensated the public for past harms; and, (3) the government has
driven a hard enough bargain under the circumstances.  See *United States v. Cannons
Engineering, Corp.*, 899 F.2d 79 (1st Cir. 1990).  Taking these issues into account, the
Decrees, especially the IPCD covering SSOs, fail to meet the standard of reasonableness.

        Further, the Motion argues that a negotiation process failing to include all parties
and that cannot be objectively evaluated has resulted in "fair" consent decrees.  Yet, the
concept of what is "fair" necessarily means that the negotiation process was also fair.
The analysis of whether the terms of a consent decree are fair is both procedural and
substantive.  *Pesses*, 1994 U.S. Dist. LEXIS at *18-19.  "In evaluating procedural
fairness a court should ordinarily look to the negotiation process in an attempt to gauge
its candor, openness and bargaining balance."  *Id.* (internal quotations omitted).  The
negotiation process surrounding the Decrees was not fair to the one party that most

closely understands the needs of the members of the public most directly affected by the violations. Hence, the process was not fair to the public. At very least, the Court should give no weight to self-serving conclusory statements throughout the Motion that the negotiations were robust.

The Motion ignores two other issues that, in this case, should be given weight by the Court in evaluating the Decrees. First, the Sierra Club is the plaintiff in a pending, consolidated citizen suit. The Sierra Club is not "merely" an intervenor. Hence, it is improper to ignore the diligent prosecution standard when evaluating the decrees. Second, the Motion recites variations of the CERCLA consent decree approval standards that apply to some extent to this review, but does not point out that the structure of CERCLA is dramatically different from the structure of the CWA and therefore the policies underlying the evaluation of the consent decrees may need to be more stringent under the Clean Water Act than under CERCLA. This is especially true in the case at bar for the reasons set forth in this Memorandum.

       1.   *Unless modified, the Decrees are not diligent prosecution and do not moot the pending citizen suit.*

First, the Court needs to consider the intertwining of the diligent prosecution issue when evaluating the Decrees. In this case, there is a pending citizen suit relating to the SSO violations and sewage-basement backups In this case, it would not be in the public interest to enter a consent decree that does not, as a matter of law, constitute "diligent prosecution" by the agencies. To enter a consent decree that does not constitute "diligent prosecution" would allow the citizen suit to go forward, which could lead to inconsistent judgments and not provide for judicial economy. As is more fully set forth throughout

this memorandum, the Decrees, because they do not provide fixed dates by which all violations must cease, do not constitute "diligent prosecution" under the case law.

The Decrees in this case allow too many violations to continue, ***for too long***, to be in the public interest. Indeed, where, as here, citizens are being exposed to pathogens in raw sewage as a result of MSD's ongoing violations, anything less than diligent prosecution cannot be considered to be in the public interest. The pending citizen suit, if it has to go forward, will subject the defendant to a summary judgment on liability for the SSOs and seek an injunction to curtail the illegal discharges by the earliest possible date. Since the consent decree does not halt the ongoing violations, it would not bar the citizen suit from going forward. As a result, it would not be in the public interest to approve the decrees.

Under the case law, these Decrees do not amount to diligent prosecution. See e.g., *Jones v. City of Lakeland, TN*, 224 F.3d 518 (6th Cir. 2000). In *Jones*, a citizen suit sought enforcement of violations of the Clean Water Act by the city of Lakeland. The court held that the Tennessee Dept of Environmental Conservation (TDEC) had not diligently prosecuted the violations. *Id*. at 522-523. The Court held:

> this review concludes that TDEC's administrative enforcement action over a ten-year period was inadequate to address plaintiffs' concerns. During this inordinately long period of administrative enforcement, TDEC: (1) permitted the City to discharge impermissible volumes of contaminated raw human sewage, sludge, and other toxic, noxious substances into Oliver Creek on an ongoing basis thereby creating significant risks to human health and wildlife in, about, and along the water course; (2) permitted the City, by an Order dated August 21, 1996, to increase the impermissible volume of contaminated raw waste water discharging into the stabilizing lagoon that feeds Oliver Creek by allowing the City to continue to make connections and/or line extensions to its wastewater

> collection system; (3) waived countless NPDES violation notices; (4) extended and waived the compliance deadlines of three, possibly four, of its sweetheart consent orders with the City; n1 and (5) imposed nominal token penalties in lieu of punitive compliance incentive penalties of $ 10,000.00 per day authorized by the Clean Water Act, n2 all of which conduct contradicted a level of "diligent prosecution" demanded by 33 U.S.C. § 1365(b), especially in light of the City's ongoing impermissible pollution of Oliver Creek as late as September 30, 1996, the date this action was commenced. n3 The trial court's resolution to the contrary is not convincing and clearly erroneous, and is REVERSED

*Id.* Similarly, the Agencies have been negotiating this consent decree for eight years, during which time MSD has been permitted to continue to spew raw sewage into the Ohio River and citizens' basements.

Further, the Decrees allow most of these violations to continue for at least another 18 years or more. The Decrees have multiple loops of extensions built into it, for extending compliance beyond 2022. They waive penalties (and remedial measures during the period to come into compliance) for ongoing violations of the Clean Water Act at illegal SSO discharge points and treatment plant bypasses. The Decrees address two of the most frequent and largest illegal discharges (SSO 700 and the Sycamore Treatment Plant By-Pass and) for this long year "interim" period with illegal and substandard primary treatment that does not meet the requirements of the CWA.

Like the enforcement actions of the Tennessee Department of Environmental Conservation against Lakeland, the Decrees do not constitute diligent prosecution. In this case, nothing less is in the public interest.

A consent decree that is not diligent in terms of its prosecution and its provisions is <u>per force</u> not reasonable and, it is not in the public interest for the court to approve it.

8

See discussion, infra.  Moreover, since the Decrees would not put an end to the ongoing CWA violations, they would not bar the pending citizen suit from going forward. In the case of *Atlantic States Legal Foundation v. Eastman Kodak Company*, 933 F.2d 124 (2d Cir. 1991), defendant moved for summary judgment dismissing a citizen suit based on a settlement between it and the state. Defendant paid a fine totaling one million dollars, and on the same day entered into a criminal plea agreement, and as part of the civil settlement agreed to pay for the costs of on-site monitoring by state employees and submit to a comprehensive environmental audit, as well as other remedial measures. The court of appeals held that the issue of whether the citizen suit was barred from proceeding depended on whether the ongoing violations of the CWA would cease.  Id. at 128. See also *New York Coastal Fishermen's Assn v. New York City Dept of Sanitation*, 772, F.Supp. 162, 168-9 (1991). (refusing to accept previously entered settlements as diligent enforcement, where settlements allowed five years from 1990 to adopt a plan and construct a facility to cease a discharge of landfill leachate, where the problem was known about since 1983).

   *2.  CERCLA in contrast to CWA*

   At the heart of the CERCLA cases' standard for evaluation is the government working with a settling group of potentially responsible parties ("PRPs") that the government is attempting to lure into a final settlement via incentives.  While the cases guard against unfairly prejudicing non-settling parties, the legislative history of CERCLA and legion of cases interpreting it make clear that there needs to be some incentive to join settling group and not to "wait in the weeds" to see how the non-settling group's litigation turns out.

This is the context in which government choices are given deference by CERCLA courts. Non-settling parties stay outside the arrangement at their own peril. The government is situated **between** these two factions and the decisions interpreting CERCLA give the government substantial leeway in providing incentives to settle.

In this Clean Water Act case, the Agencies are dealing with one polluter and a flawed decree that prejudices the public, generally, and the thousands of victims of sewer-backup pollution, specifically. Non-settling private polluters are not at risk. Hence, the inclination of the Court to protect the public by closely scrutinizing these consent decrees is entirely proper and necessary. There is no non-settling group to litigate with to make up any shortfall. Unlike CERCLA, which is a remedial statute that does not involve violations of law by the PRP, (in fact, cleanup of contamination often resulting from lawful activities), the Clean Water Act, in cases like that at bar, involves ongoing violations of law that are endangering the public, and deserve judicial scrutiny to ensure a remedy that is indeed in the public interest. In the case at bar, the Agencies have sanctioned ongoing violations of the CWA too many years into the future.

**B. The Decrees have no final, non-extendable end dates for bringing all violations into compliance.**

The failure of the Decrees to set final, non-extendable compliance dates for all violations is inconsistent with both the law and the public interest. One of the factors that courts have repeatedly cited in finding a lack of "diligent prosecution" is a lack of final, non-extendable compliance dates. The Sixth Circuit in *Jones v. City of Lakeland, TN.*, 224 F.3d 518 (6th Cir. 2000) found that enforcement by the State of Tennessee: "has the indicia of pretextual enforcement calculated to perpetuate TDEC's ten-year oversight of the City's ongoing impermissible pollution of the watercourse, which has afforded the

parties, the City, and TDEC, protection from third-party citizen-initiated litigation, evidenced by the listed substantively similar unenforced consent orders between the parties extending compliance deadlines under the guise of "diligent prosecution." Id. at **12.[6] The Decrees likewise contain multiple loops of extensions of time for MSD to come into compliance with the Clean Water Act.

The Decrees are the culmination of the Agencies' enforcement effort against the MSD. As stated, the Decrees must be looked at through the lens of the case law requiring a fairness determination. *Telluride*, supra. The fairness determination requires that the Decrees be fair, reasonable, in the public interest and lawful. As noted, one important indicia of fairness is whether the Decrees are an efficient means of cleansing the environment. See *United States v. Cannons Engineering, Corp.*, 899 F.2d 79 (1st Cir. 1990). This "efficiency" analysis is almost identical to the analysis that the court's have undertaken in determining whether a government prosecution, order or consent decree is sufficiently diligent to block a citizen suit under 1365(b)(1)(B). In case after case, courts have ruled that government enforcement that extends the deadlines by which a polluter's violations will cease is non-diligent. If government enforcement, whether by administrative order, consent decree (state or federal), or settlement agreement, is not diligent (because of deadline extensions), then it is also not fair, reasonable or in the public interest and should not be approved by the federal court. See, *Frilling v. Village of Anna*, (state court consent decree was not diligent prosecution because it excused

---

[6] The Court in *Jones* further states: "Like its three predecessors, the fourth Order has incorporated the previously included escape clause permitting the City to seek extensions of the compliance deadline mandated by the Consent Decree, and partial or total abatement of any monetary assessments that may have accrued as a result of the City's non-compliance. Defendant counsel's representation that the August 26, 1996 Consent Order is a good faith indication of anticipated future "diligent prosecution" is less than persuasive in light of a demonstrated ten-year history of permitted ongoing violations." Id.

Defendant Village from complying with certain final effluent limitations for nearly four years, requiring instead that Defendant Village comply with two successive sets of interim limitations); *Orange Env't v. County of Orange, 860 F. Supp. 1003 (S.D.NY 1994)* (Consent order between the polluter and the State was not diligent and did not bar a citizen suit unless it was absolutely clear that future violations of the CWA could not reasonably be expected to occur. The court did not find that to be the case at that time); *Atlantic States Legal Found., Inc. v. Eastman Kodak Co*., 933 F.2d 124 (2d Cir. 1991) (Civil consent order and guilty plea in court, plus a $1 million civil fine and $1 million criminal fine. Court holds that a citizen may challenge the settlement between the polluter and the state, if there is a realistic prospect that the violations alleged in Atlantic States's complaint will continue notwithstanding the settlement); *Jarrett v. Water Works and Sanitary Sewer Board of Montgomery*, 2001 U.S. Dist. LEXIS 522 (M.D. Ala. 2001)(The Court found that a consent order between a state and a polluter was not diligent because, although it required the polluter to submit an engineering report, which investigates the need for changes and provides for time limits by which changes must be completed, the Consent Order leaves open the possibility that upon investigation, no changes will be required); *New York Coastal Fishermen's Association v. New York City Department Of Sanitation et al.*, 772 F. Supp. 162, (S.D. NY 1991) (Court holds that several state consent orders are not diligent because state was involved in the pollution situation since 1983 and its orders do not require compliance until 1995. According to the Court: "… this means that at least twelve years will run before the problem is rectified. This is not diligent prosecution."); *Long Island Soundkeeper Fund, Inc. V. New York City Department Of Environmental Protection*, 27 F. Supp. 2d 380 (E.D. NY 1998)(State

enforcement proceeding in state court held to be not diligent and no bar to citizen suit because it did not cause the violations alleged in the citizen suit to cease without any likelihood of recurrence); Dague v. City of Burlington, 935 F.2d 1343, 1352 (2d Cir. 1991) (no diligent prosecution under analogous provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, where state did not demand compliance with an Assurance of Discontinuance and granted respondent many extensions of time).

        In Section IX of the Consent Decree (and other sections as well) MSD is allowed to escape from a firm date to cease all CWA violations.[7] The United States allows MSD to avoid stopping violations by a date certain merely by providing its own estimate that capital expenditures will exceed $1.5 billion. MSD has already done this publicly many times over.[8] According to Sierra Club's experts, this provisions and others in the Decrees virtually guarantee significant delays in compliance. See Declarations of Drs. Bruce Bell and Michael Kavanaugh, Exhibits 1 and 2.

Applying such indefinite extensions of time for CSO violations is inconsistent with protection of human health and the environment, does not constitute diligent prosecution, and is inconsistent with the public interest. Applying such extensions to SSOs and sewage treatment plant bypasses and violations is, in addition, inconsistent with the statute.

---

[7] In addition to all of the time extension provisions in the Decree, the putative end-date of 2022 is too far out and too contingent. "Hamilton County Commissioner Todd Portune says the fixes could happen faster if projects he feels are unnecessary are delayed. He said he found more than $45 million in such projects during his review of the district's budget." By Dan Klepal, Sunday, February 22, 2004,The Cincinnati Enquirer. According to Sierra Club's engineering expert, Dr. Bruce Bell: "Other Cities, such as Atlanta, Jacksonville, and Vallejo have entered into Consent Decrees that address their SSO problems in significantly shorter time frames. Cincinnati could do so as well."

[8] "Plugging all of Cincinnati's estimated 100 SSOs could cost $3.6 billion," Karney says. See fn 2, supra. Of course, this statement was a gross exaggeration, which is not supported by MSD's rate expert, Clyde Wilber, who filed a declaration with this Court. Mr. Wilbur's estimate of future rates (at some unspecified date) is $937/yr. Dr. Kavanaugh has estimated that all of the remediation work can be done with sewer rates rising only to $692/year in 2022.

1.  *The Consent Decrees' flexible deadlines for SSOs and sewage treatment plant violations are inconsistent with law.*

The Sierra Club has provided this court with competent evidence that SSOs and sewage treatment plant violations can be ended by a date certain, and at least some of these (like SSO 700) can be ended within five years. Exhibit 1 at para. 28. Under the terms of the Decrees, these violations are not required to end until 2022, and that date is subject to the extensions discussed herein. The Section IX time extension loophole applies not just to deadlines for Defendants' Combined Sewer Overflows, but to all remedial actions under both Decrees: SSOs, CSOs, required wastewater treatment plant upgrades and expansions, correction of illegal by-passes of treatment plants, and pump station improvements. This is a crucial distinction.

A Long Term Control Plan is a "term of art" used in the federal CSO Policy. The federal CSO policy is not applicable to SSOs (sanitary sewer overflows), which are illegal, and unlike CSOs, cannot be permitted.[9] Wastewater treatment plants that are in violation of the CWA, illegal treatment plant by-passes, and overflowing pump stations, all of which are maintained by MSD, are also not part of the federal CSO Policy. Thus, any Long Term Control Plan balancing or flexibility that may arguably be present in the CSO Policy is not applicable to SSOs and wastewater treatment plants, which are violating the law, illegal by-passes, and pump station violations and sewage basement backups.[10] Applying a $1.5 billion compliance date extender (or opener) to these parts of

---

[9] As stated in the United States' Responsiveness Summary at 17: "…SSOs are unpermitted discharges that must be eliminated, while CSOs can be permitted, subject to water quality based effluent limitations (and other requirements)…Given the absoluteness of the compliance end point for SSOs, it will be a straightforward exercise to determine, on a sub-basin by sub-basin basis, whether compliance has been achieved: any SSO will constitute non-compliance."

[10] It is very clear that the United States has inappropriately applied the federal CSO Policy to SSO 700. In his Affidavit, United States consultant, Mark Klingenstein, rejects Sierra Club's comment that SSO 700 should be eliminated more quickly stating: "[S]election of a tighter backstop date might have limited

the sewer system is not authorized by either the CWA or its regulation and, in the

historical circumstances of this case, it is inappropriate, unreasonable and not in the

public's interest.

In the Decrees, the Agencies wrap up the violating wastewater treatment plants

and pump stations into the LTCP update process and improperly apply the CSO Policy to

aspects of the Defendants sewer system to which the policy is not applicable.  The

Decrees apply the time extension cap of $1.5 billion to non-CSO violations.  Section IX

of the Decree is, by its own terms, specifically applicable to <u>all</u> construction under the

LTCPU and the SSO CAPP (from the first or Interim Partial Consent Decree).  In the

Motion, the Agencies give this Court the misleading impression that Congress requires

the Court to apply CSO Policy to all aspects of the MSD's violating sewer system and the

proffered remediation plan.  This is false.  This Court has the authority to apply

injunctive relief in this case differently to the MSD's SSOs, wastewater treatment plants,

by-passes, and pump stations and sewage backups than it does to CSOs. *United States v.*

*Hoboken*, 675 F. Supp. 189 (D. NJ 1987) (rejected the Defendant's argument that

secondary treatment standards were not required if the Defendant could show an

impossibility defense).[11]

According to Sierra Club's engineering expert, Bruce Bell: "[T]he Consent

Decree also improperly applies regulatory flexibility allowed (to a certain extent) to

---

USEPA's and OEPA's ability to allow Defendants desirable flexibility in what will be concurrent efforts to
eliminate SSOs and bring their CSOs into compliance with the Clean Water Act."  Given decades of
flagrant abuse by the MSD, the Sierra Club respectfully suggests that the Defendants desires in the nature
of flexibility are not of paramount importance. The elimination of illegal SSOs ***at the earliest possible date***
is of paramount importance. Any regulatory flexibility that is due for CSOs under the CSO Policy is not
due or owing for MSD's illegal SSOs.

[11] If an impossibility defense is not implied or authorized by the CWA, then  the United States and the
Defendants should not be permitted to arrogate into the Decrees a "financial feasibility" defense as to the
SSOs, treatment plant violations, by-passes, sewage backups, etc. (and without any proof!).

CSOs under the federal CSO Policy to SSOs and to POTWs that consist of solely sanitary sewers. Under the CSO Policy, Long Term Control Plans are required for and apply to **only** combined sewer systems. Discharges through permitted CSO discharge points during wet weather are allowed, if they do not violate Water Quality Standards and apply the Nine Minimum Controls (technology-based standards). Violations of effluent limits at POTWs and SSOs and pump stations are simply not legal. These violations should be remedied **at the earliest possible date**, without applying regulatory flexibility allowed under the CSO Policy. Bell Declaration, Exhibit. 1.

>    2.    *The Agencies have imposed non-extendable compliance deadlines for municipalities' SSOs violations of the Clean Water Act in other cases.*

In 1989, some 15-years ago, the EPA and the city of Bedford, Ohio, negotiated a consent decree that was embodied in a court order and opinion. That order is published at *United States v. City of Bedford, OH*, 1989 WL 158020 (N.D. Ohio). The Bedford consent decree: (1) comprehensively dealt with treatment plant, SSOs, CSOs and pump station by-passes; (2) required elimination of SSOs and by-passes by a date certain; (3) set firm compliance dates and schedules; (4) required implementation of the EPA's minimum controls for CSOs; (5) imposed a limited sewer moratorium[12]; and, (6) and contained a provision: **"In no event shall the compliance dates regarding elimination of the Sanitary Sewer Overflows and By-Passes be extended."** In the Bedford, OH case, the decree clearly distinguished between compliance dates for CSOs, on the one

---

[12] Contrary to the Agencies' assertions, the Sierra Club is not against development or growth, but is against the extension of sewers in areas where there are already capacity-related overflows, without positive proof that capacity increases have <u>already been</u> achieved, prior to increasing upstream sewer connections. The system embodied in the Decrees is akin to playing sewage "Russian Roulette" with downstream residents' basements.

hand, and SSOs and treatment plant by-passes on the other.  The latter were permitted no extensions of the final compliance date.

> 3.   *The 1.5 billion dollar extension of time violates EPA's own CSO policy.*

While SSOs are per se illegal, CSOs may be permitted and are afforded a more flexible remedy under EPA's SSO policy. However, the Decrees violate this policy by failing to require an analysis of economic hardship.

According to Sierra Club's economic expert, Dr. Michael Kavanaugh, the $1.5 billion time opener in Section IX is not justified by any existing analysis of economic hardship on Hamilton County ratepayers.  Dr. Kavanaugh, who regularly consults for the United States Department of Justice on these cases and **was initially the Department's economic expert in this case**, has previously provided a declaration to this Court demonstrating that the CSO Policy's economic hardship evaluation has not been done by the EPA in this case and, in any event based on a study that he performed, the criteria for hardship would not been met by MSD's remediation plan. [13]

Rather than dealing directly with Dr. Kavanaugh's analysis, however, the Motion attempts to side-step this important issue. The Agencies have not performed an economic analysis of hardship pursuant to the EPA's "Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development" (1997). [14] Instead of

---

[13] See Second Declaration of Dr. Michael Kavanaugh, attached as an Exhibit to the Third Declaration of Dr. Kavanaugh, Ex. 2, hereto.  The financial capability assessment referred to herein is set forth in the "Combined Sewer Overflows – Final Guidance for Financial Capability Assessment and Schedule Development." February 1997. EPA 832-B-97-004.  Before taking financial capability into account, and certainly before agreeing to a set, dollar cap deadline extender, EPA is required to follow its own guidance and perform the analysis set forth in the above-referenced guidance.  If this has been done, it would have been provided to Sierra Club in discovery.  No such study has been produced by the EPA. An excerpt from this Guidance document is attached hereto as Exhibit 5.

[14] An excerpt from this document was included with the United States' Reference Materials, attached to its Memorandum in Support of Entry.  Sierra Club has also included an excerpt from this document as Exhibit. 5.

complying with EPA policy and performing the economic analysis, the Agencies and the MSD have constructed a wholly new policy in this case, namely, if remedial program spending exceeds an arbitrary threshold (in this case $1.5 billion), then it is **per se** evidence of hardship and, they will reopen the deal, thereby delaying compliance deadlines for all projects, CSO and non-CSO, alike. See, Consent Decree, Section IX. Dr. Kavanaugh also states in his Third Declaration (Exhibit 2), that Section IX of the Consent Decree creates a "moral hazard" – namely, a perverse incentive for MSD to overestimate its capital expenditures.[15]  Furthermore, unlike other loopholes in the Decree, this deadline opener does not have to be pre-approved by EPA/OEPA and, it is not clearly covered by the Dispute Resolution process.  Compare, e.g., Consent Decree, "Evaluation and Correction Period", Para. VIII.B., with "Extension of Deadlines If Capital Costs Exceed $1.5 Billion", Para. IX.B.

> 4. *Requiring MSD to end its violations "as expeditiously as practicable" is unenforceable and violates the law and EPA policy.*

Although MSD has failed to comply with a 1992 state order to come into compliance, has been in an enforcement action since 1996, and still has not come up with a definite plan to end the hazard to citizens exposed to bacteria, viruses and other pathogens found in the raw sewage MSD spews into the Ohio River and into citizens' own basements, the Agencies insist that requiring that the violations cease "as expeditiously as practicable" is sufficiently enforceable to justify approval of the consent

---

[15] According to Dr. Kavanaugh: "The CDs create a 'moral hazard' for MSD by giving it a 'direct incentive' to overestimate capital costs.  Moreover, experience with MSD's spending estimates is troubling…MSD has proposed duplicative solutions in previous remediation estimates (BBS Study) that overstate costs by at least $500 million."  Kavanaugh Third Declaration, Exhibit 2. Part of this overstatement is putting Hamilton County's community share of the Mill Creek Stormwater Tunnel onto the MSD ratepayers. See discussion, infra, Attachment "A".

decree. [16] Throughout the United States' presentations to this Court on the Decrees, and in its Brief at 56, it argues that, regardless of the multiple and overlapping time extension opportunities afforded to the MSD, the Decrees should be approved because MSD must, in any event, end its violations of the law "as expeditiously as practicable."  However, the Sierra Club contends that a definite date must be required to bring the SSOs and wastewater treatment plant violations and bypasses, which are per se illegal, and sewage basement backups into compliance. To the extent that a narrative standard might be permissible under the CSO policy, which applies to CSO's only (as explained above), the Agencies have chosen a standard that violates the law and EPA's own policies.

The United States claims to find support for the "as expeditiously as practicable" language in the EPA's 1994 CSO Policy.  59 Fed. Reg. 18688, Col. 3. What the CSO Policy actually says is that the polluter must be "subject to <u>enforceable</u> schedules that require the <u>earliest practicable compliance date</u> considering physical and financial feasibility." [17] 59 Fed. Reg. 18690.

The schedule provided by the consent decree is neither enforceable  nor does it require the earliest practicable compliance date.   After the 1994 CSO Policy was published, EPA developed specific guidance on financial feasibility factors in 1997. The EPA's Combined Sewer Overflows -- Final Guidance for Financial Capability

---

[16] According to the United States in its Responsiveness Summary, #14, p. 23, the term "as expeditiously as practicable" has been used "precisely because it is inappropriate to prescribe the deadline or standard further at this point because of potential future uncertainties or because the requisite planning and analysis has not been completed."  This is evidence of lax enforcement, i.e. flagrant violator of federal clean water laws for decades (MSD) cannot be given a deadline for compliance, specifically because they are so far out of compliance.

[17] Furthermore, the Consent Decree fails to comport with the May 19, 1998, Memorandum from Robert Perciasepe, Assistant Administrator, Office of Water, Re: Implementation of the CSO Control Policy.  In that memorandum Mr. Perciasepe wrote: "The long-term control plan should include a <u>fixed-date implementation schedule</u>" (emphasis added).  The Consent Decree does not include a fixed-date implementation schedule for the vast majority of remedial measures, other than for the relatively few SSO and CSO projects specified in the Decree itself.  See Bell Declaration, Ex. 1, Para. 5.

Assessment and Schedule Development, February 1997, provides in pertinent part that: "In general, CSO controls should be implemented <u>as expeditiously as possible</u>."[18]  Thus, the 1994 CSO Policy requires compliance by the "earliest practicable compliance date" not as "expeditiously as practicable." The follow-on, 1997 EPA Financial Capability Guidance, which is relied upon by the EPA in this case, requires controls to be implemented "as expeditiously as possible."  EPA has combined the least stringent parts of the two standards, eliminating the requirement of a "compliance date" required by the first expression of the standard, and eliminating the requirement that the remedy be implemented as expeditiously as "possible" required by the second.

Even if this Court were to determine that having a narrative standard was appropriate to supplement firm compliance end-dates, the one chosen by the Agencies is inconsistent with EPA law and policy and not in the public interest, especially given the past history of MSD violations.[19]

**C. The consent decree is inconsistent with law and the public interest because it proposes illegal primary treatment at SSO 700 and at the Sycamore Wastewater Treatment Plant.**

*1. The Interim Remedial Measure for SSO 700 is Illegal and not in the public interest.*

One of the key elements in determining the approvability of a consent decree is the legality of the relief proposed in the consent decree.  See discussion, supra.  SSO 700, which is located in Evendale, behind the General Electric Aircraft Engines plant, is a

---

[18] The United States provides this Court with a few pages of the Guidance for Financial Capability Assessment and Schedule Development in its attached "Reference Materials".  The United States does not attach page 43, where the Guidance directs that CSO controls generally be "implemented as expeditiously as possible." See Ex. 5, hereto.
[19] As Sierra Club noted in its comments, a "time is of the essence" standard would be appropriate, given the decades of MSD violations and lax government enforcement.

huge, illegal[20] and environmentally destructive opening in the MSD's sewer system. It overflows approximately 44 times a year and discharges about 75 million gallons per year of raw sewage directly into Mill Creek.[21]  SSO 700 has been intentionally and illegally maintained by the MSD for many years.  Each day of discharge could subject the MSD to a maximum of $27,500 in civil penalties under the CWA.  Just for SSO 700, the maximum civil penalties that MSD would face, if this case went to trial would be over $8 million dollars.

| Year | Days of Discharge (SSO 700) |
| --- | --- |
| 2003 - | 56 |
| 2002 – | 68 |
| 2001 – | 51 |
| 2000 – | 30 |
| 1999 – | No data |
| 1998 – | 50 |
| 1997 - | 42 |

Instead of requiring MSD to build a conventional, secondary treatment plant at the site of SSO 700, the United States suggests that this Court allow MSD to build a primary treatment plant that does not meet the requirements of the Clean Water Act.[22] See Bell Declaration, Exhibit 1. This illegal, "interim" measure, the EPA suggests,

---

[20] "Unlike CSOs, these points are not permitted, and are therefore considered to be illegal." Affidavit of United States' consultant Mark Klingenstein, Para. 16.

[21] Klingenstein Affidavit, Para. 25, p. 6.

[22] "Secondary treatment" as required by the CWA for municipal sewage is defined in 40 CFR 133.102. It generally requires a biological process (bacteria & microorganisms consume organic material) and achieves 85% removal of 5-day biochemical oxygen demand ($BOD_5$) and total suspended solids (TSS) on 30-day average.  It also requires pH values to be maintained. Like the add-on, primary treatment system that is proposed for the Sycamore Treatment Plant in the Consent Decree, the interim treatment system proposed at SSO 700 will not meet 85% removal.

should be allowed to operate until 2016, if the Mill Creek Storm Water Tunnel is built and 2021, if the tunnel is not built.[23]

Thus, if the tunnel is not built, the Agencies are asking this Court to approve operation of an illegal, interim treatment system (without a lawful permit) for 15-years.[24] Accepting fifteen years of illegal treatment by MSD, without a CWA-compliant, NPDES permit containing enforceable conditions, is clearly unreasonable and should not be approved by the Court.[25]

As stated in the Motion, pp. 13-14: "Defendants do not have NPDES permits authorizing discharges from any of the 100 sanitary sewer overflow points that exist in their sanitary sewer system, and thus SSOs from these discharge points are illegal and must be eliminated."  SSOs do not have NPDES permits because the CWA does not allow them, unless the discharge from the SSO is treated to meet the Act's secondary treatment standards. See, *Save Our Bays & Beaches v. City & County Honolulu*, 904 F. Supp. 1098  (D. Hawaii 1994); *Hawaii's Thousand Friends and Sierra Club v. City and County of Honolulu*, 821 F. Supp. 1368 (D. Hawaii 1993)

Dr. Bell has opined that the interim treatment plant proposed by the MSD at SSO 700 will not meet the CWA's secondary treatment requirements. See Bell Declaration,

---

[23] "The Corps of Engineers reviewed the Mill Creek Storm Water Tunnel in March 2003 and found that it was "not the most cost effective solution to local flooding…" Klingenstein Affidavit, Para. 39, p. 9.  The cost estimates for the tunnel and associated piping to connect it to defendants' sewer system currently exceed a billion dollars." Klingenstein Dec. Para.38.

[24] The United States' consultant, Mark Klingenstein "acknowledges that violations (at SSO 700) will continue to occur until needed measures are implemented." Klingenstein Affidavit , Para. 34, p. 8.

[25] There is no legal means, other than this Consent Decree, by which the State of Ohio or the federal EPA could issue a permit for this illegal technology at a sanitary sewer overflow (SSO) under the Clean Water Act and its National Pollutant Discharge Elimination System.  SSOs must either be eliminated or provided with Secondary Treatment. See United States' Br. At 14.  Such deviation could only be accepted as a temporary artifact of settlement of a case, pending implementation of a final, lawful remedial solution. Fifteen years of operation of a "temporary artifact" without operating permit controls and enforceable standards is a step backwards from the lawful requirements of the Clean Water Act. It is not in the public interest.

Exhibit 1.  Furthermore, after studying the situation and even visiting the site of SSO 700,

Dr. Bell determined that a full secondary treatment plant could be built at the site in

approximately five-years.

A MSD study produced in discovery in this case (Doc. No.COL1009064) showed

that a full secondary treatment plant was feasible and carried with it significant benefits.

A "conventional treatment plant would be considered a permanent solution to discharges

from SSO 700.  Water quality of Mill Creek downstream of the discharge point would be

improved. Conventional treatment can be designed to produce an effluent containing

relatively low concentrations of contaminants. Construction of a conventional treatment

facility would likely result in a successful antidegradation review and issuance of a PTI

due to the following: elimination of SSO 700; improvement of existing water quality in

Mill Creek; and, reduction in pollutant loads entering Mill Creek WWTP." (See Exhibit

D to Bell Declaration, Exhibit 1).

The Klingenstein's affidavit disputes that the site at SSO 700 is suitable for the

construction of a full secondary treatment plant, but, without adequate foundation, this

testimony should be afforded little or no weight.[26]

This Court should not approve a decree that contains an obvious illegal provision.

Waiting until 2021 for a final SSO 700 remedy to be completed (the non-tunnel,

deadline) is furthermore unreasonable, when credible expert testimony of Dr. Bell

---

[26] EPA's engineering consultant, Mark Klingenstein, submitted a Second Declaration to this Court, in which he doubted that the site of SSO 700 is sufficient for a full secondary treatment plant. He repeats this assertion in his current affidavit.  See Klingenstein Affidavit, Para.48, p.11. On 12/26/02, EPA stipulated that Mr. Klingenstein had not "undertaken any engineering or other study to determine if a site sufficient for a full secondary treatment plant is available for sewer flows at SSO 700." The fact that Mr. Klingenstein would provide an opinion to the Court regarding the lack of a suitable site for a full secondary treatment plant without undertaking any study seriously undercuts his credibility in this case.

indicates that a full secondary treatment plant can be built at the site of SSO 700 in five-years.

        2.   *Use of a "Primary Treatment" Add-on at the Sycamore Wastewater Plant is Illegal and Inappropriate.*

Instead of enlarging the Sycamore Plant to treat all flows with the level of treatment required by the CWA, the Consent Decree approves a plan to add a "primary treatment" plant (the same type of unit as proposed for SSO 700) to Sycamore's existing, overloaded secondary treatment plant, in order to treat the plant by-pass violations. See Klingenstein Affidavit, Paras. 151- 157. The Sycamore Creek wastewater treatment plant treats only wastewaters conveyed by sanitary sewers. There are no combined sewers leading to the Sycamore Wastewater Plant. Sycamore Creek Plant has violated effluent limitations numerous times during 2003. Sycamore Plant was in violation of its effluent limitations over 36% of the days in 2003. Wastewater at Sycamore bypassed secondary treatment almost 15% of the days in 2003 resulting in over 213 million gallons of sewage bypassing secondary treatment.

The use of primary treatment "add-ons" at sanitary-only, municipal sewage treatment plants is illegal. The CWA requires that all municipal sewage coming to the plant be provided with secondary treatment. CWA Section 1311. In extraordinary circumstances, by-passing is permitted to prevent serious loss of property or life. See Bell Declaration, Exhibit 1. But, where, as here, historical data shows that the flows in the sewer lines are typically far greater than the plant can handle, then the CWA requires that the sewer utility expand the plant to provide full secondary treatment to the flows.[27]

---

[27] In the case of the Sycamore Plant, the MSD has offered EPA to expand the plant to 18 MGD, when the flows exceed 50 MGD, and adding a primary treatment unit to treat the rest. Klingenstein Affidavit, Para. 152, p. 33.

Id.  The CWA does not permit the flows to be segregated, with some flows provided primary treatment and some provided with secondary treatment, as a cost-savings measure.[28]  Because there is no evidence that a full secondary treatment plant at Sycamore is infeasible, there is no justification for not requiring it. (Bell Declaration, Exhibit 1.)  See *United States v. City of Toledo*, 63 F.Supp.2d 834 (N.D. Ohio 1999).

The EPA's proposed blending "policy", which is published at 68 FR 63042, Friday, November 7, 2003, further underscores that the Sycamore Plant proposal in the Consent Decree is illegal.  ***This Court is being asked to approve of something that goes beyond what the current law allows and even preempts a change in federal regulatory guidance.***  The United States DOJ asks the Court to do this before EPA Headquarters has even had a chance to approve it – and before the public has had a chance to appeal it to the courts as a violation of the CWA. The Commonwealth of Pennsylvania has provided comments to the EPA strongly opposing this policy. Comments from the PA DEP (attached as Exhibit 6).[29]

**D.      The Sewage-in-Basement Program is Unfunded and Unfair**

The Sewage-in-Basement ("SIB") program that is provided for in the Decrees is inadequate, unfair, and not in the public interest, unless changes are made.  Sierra Club's

---

[28] According to the United States' consultant, Mark Klingenstein: "Defendants have estimated that the cost of the proposed upgrade to the Sycamore Plant will be about $22 million dollars.  The cost of providing full secondary treatment to a peak flow of 49 MGD would be significantly higher than the Defendants' estimated costs." Affidavit, Para. 156, p. 33.  While this is undoubtedly true, the EPA's discretion does not encompasses amending the Clean Water Act's requirements.

[29] Commonwealth of PA comments: "Principle six - The proposed policy should not be extended to include combined sewer systems.  CSO systems are already covered under the CSO Policy, which allows for primary treatment with related bypasses.  By including CSO systems in this draft policy, it gives the appearance that separate sewer systems are similar to CSO systems." Page 4. At page 5: ". EPA indicates blending should somehow be condoned because 48% of 129 municipalities polled apparently presently blend. If present practices were always the acceptable approach, we would still have a lot of facilities providing only primary treatment." See Exhibit 6.

has strongly advocated for a comprehensive remedial program for SIB victims; however, the program offered to the Court for approval in the Decrees is fundamentally flawed.[30] The United States asserts jurisdiction over the basement backups as an imminent and substantial endangerment to human health, 33 U.S.C. §1364(a), yet, the Agencies want the Court to approve a program with no teeth.

The SIB program suffers from the following flaws, further described below:

- The program is inadequately funded--only $ 1 million committed;

- There are no consequences in the Decrees if the program is carried through at a minimal level; no stipulated penalties would apply;

- There are no defined benchmarks of progress (e.g., number of homes provided with prevention devices per year, etc.)

- The citizen claimants are not afforded due process: the violator judges eligibility;

- The Decrees do not provide for a special master to oversee the process;

- The legal release required by MSD/Law Department is unfair; it requires claimants to waive personal injury claims in order to receive personal property reimbursement.

As stated in the Sierra Club's comments, an SIB program must be pre-funded to be meaningful.[31] The only funding committed in the Decrees is $1 million that was left

---

[30] Sierra Club appreciates that the Decrees contain a "first of its kind, basement sewage program, long advocated by the Sierra Club to remedy the hazardous conditions caused by MSD's system But Sierra Club contends that the Decrees, and the SIB program in particular, must contain funding commitments, now. The relief afforded to SIB victims could easily be illusory or evaporate quickly in the future, if funds for the program are reallocated in the political process to other projects, without any consequences under the Decree – thus, the benefit to the public would be ephemeral. See Sierra Club's Complaint, Paras. 43, 48, 49 and 74.

[31] According to the United States' consultant, Mark Klingenstein, funding the Consent Decree's sewage-in-basement program is inappropriate because: "In my experience, USEPA and the United States do not

over from an environmental fund created in the 1985, federal consent decree regarding

the Mill Creek Wastewater Plant.  This is a totally inadequate level of funding and, **there

is no commitment made in the Decrees to continue the sewage-in-basement

programs at any level of effort, whatsoever**.  Furthermore, there is no consequence in

the Decrees, if MSD were to reduce the program to a bare minimum.  The Stipulated

Penalty provisions of the Decrees, when paired with Exhibits 6, 7, and 8, provide no basis

for penalties against the Defendants, should they ratchet the program back to a minimal

level of effort.[32]

In response to Sierra Club's request for funding of the SIB program, the Agencies

tell the Court that the program cannot be funded, now.  The Motion argues that no

funding commitment can be made because none is possible –the amount of future

funding being speculative and contingent upon "future rainfall events."  Motion, at 67,

n.77.  This Court should not accept such an outcome.

*1. There is adequate data to estimate funding for the SIB program.*

MSD already has the data it would need to estimate the amount of funding

required for the SIB program. The MSD knows the address of those houses that have

historically suffered from sewer backups and which are MSD's fault.  MSD has provided

the Sierra Club with GIS maps showing houses with up to 5 repeat basement backups that

---

include such provisions in Clean Water Act consent decrees." Affidavit, Para. 102, p. 22.  This is not a
persuasive response in light of the public interest aspect of this Court's review.  A fair reading of Mr.
Klingenstein's views on the sewage-in-basement program (Affidavit, Paras. 99 – 106) demonstrate two
important points: (1) he bases his views on speculations and assumptions; and (2) he has done no
independent investigation of the program and relies totally on data and information provided by
Defendants. See *United States v. v. Telluride*, 849 F. Supp. 1400 (D. Colo. 1994)

[32] The United States tells the Court in its Responsiveness Summary, #27, pp.42-43, that the US and the
other regulators will "enforce the decree" if information shows that "Defendants are not moving quickly
enough to install backflow prevention devices or if they are not otherwise appropriately implementing the
program."  By what standards will MSD be judged by the regulators when the Decrees contain none?

are the fault of MSD.[33]  Furthermore, the MSD has submitted additional documentation

in discovery that lists 1179 homes where MSD has "determined that issues in the

Defendants' sewer system were a contributing factor." In addition to this the GIS system

and the list, MSD maintained a separate list of 199 homes, where it determined that sewer

backups  were its fault and were so severe that there was nothing short of property

purchase and moving the residents out that could be done to remediate the backups.

MSD estimated that the purchase cost per home for those 199 homes was

$225,000/home.  The total cost of this project was estimated by an MSD contractor

(BBS, Inc.) to be approximately $250 to $300 million.  The homeowners on this list were

never told that their properties were so designated by MSD.

   Contrary to Mark Klingenstein's unsubstantiated assertions, the costs of the

Decrees' SIB program can be accurately determined and are not future rainfall

dependent.  For the property damage claims and emergency cleanup part of the program,

there has been a fairly consistent pattern of complaints over the years:

Year Number of Sewer Backup Complaints[34]

| Year | Number of Sewer Backup Complaints |
|---|---|
| 1997 – | 2355 |
| 1998 – | 2856 |
| 1999 – | 1871 |
| 2000 – | 2990 |
| 2001 – | 2366 |
| 2002 – | 2206 |
| 2003 – | 2649 |

---

[33] This geographic information system (GIS) maps are from the MSD and were obtained by the Sierra Club
in discovery in this case.
[34] MSD has estimated that there are three sewage backups occurring for every one complaint system-wide.

28

7-year avg. = 2470 sewage basement backups/year

Given this quick review of the data, the Court can take judicial notice of the fact that it will not be difficult for the MSD to estimate for budgeting purposes (in fact, they may have already), , the dollar amount of claims (both damage and cleanup) that would be presented in a typical year.[35] Therefore, MSD can prepare a budget and commit to spend those funds in the Consent Decree on the behalf of victims of sewage backups caused by the MSD.

> 2. *The SIB program contains numerous other flaws precluding a finding that it is in the public interest.*

Other flaws in the sewage-in-basement program include, <u>inter alia</u>, the lack of due process protections for claimants, the lack of a special master to oversee the process, and the type of release that MSD and the City Law Department are requiring of claimants, which requires them to release all personal injury claims against the MSD and the City in order to get compensated for personal property damage caused by the MSD.[36]

Finally, the affidavit of Ryan Lehan and the videotape of a recent sewage backup in his basement demonstrate that the Agencies' assertions about the implementation of the SIB program since January 2004 are not accurate. Mr. Lehan has experienced sewage backups seven times, including one event (May 2003) on video. Contrary to the

---

[35] In response to Sierra Club's comment that putting the City Law Dept. in charge of claims eligibility s would not afford due process to the sewage victims, the United States responded that: (1) this model is like an insurance company, which makes its own coverage determinations; and, (2) that was the deal that "we" cut. First, the insurance company is generally not also the party causing the damage. But, if the Law Dept. is going to play the role of insurance company, then it can easily get typical claims experiences (average payouts, etc.) from those insurance companies that cover sewer basement backups. Second, the history of the Law Dept.'s refusal to pay claims even where the MSD admitted fault is troubling. Third, the deal that the Agencies' cut, is not in the public interest and should not be approved.

[36] The United States' rejection of the Sierra Club's comments on the sewage-in-basement program's lack of due process, the lack of a special master and the like is primarily that: "it isn't the deal that we cut" with the MSD. Given this Court's public interest review obligations, that response does not meet the objections.

Agencies' assertions, his claim for property damage (2004) has pending for more than 60 days without resolution. Also contrary to the Agencies' assertions, although he notified MSD, he was responsible for cleaning up the sewage. Finally, he has not been informed of any schedule for remediation of the problem. Evidence obtained from MSD conclusively proves that the Lehan backups are caused by a MSD pump station next to their house.   The evidence is that Lehan's experience is typical of sewage backups around the County. The videotape captures the emotional trauma associated with sewage backups.[37]

The Lehans suffered a backup of sewage into their basement after January 1, 2004, when the MSD has purportedly started implementing its sewage-in-basement program.   The United States tells the Court in the Responsiveness Summary, #29, p. 47, "any home that has experienced a capacity-related backup in the last two years, which has not been addressed, is <u>automatically</u> entitled to payment for appropriately documented claims." (Emphasis in original).   Again, the implication here is that being automatically entitled to payment means that the victims are being paid.  In the Lehans' case, that is not true. See Lehan Affidavit, Exhibit. 3.  The United States has no provision in the Decree that would permit it to apply sanctions or stipulated penalties against the MSD for failure to compensate the Lehans (for example) or even to force MSD to

---

[37] The Lehans have hired an expert in wastewater engineering whom, after reviewing boxes of documents from the MSD (obtained under the Ohio Open Records Law) determined that the MSD's sewage pump station, located next door to the Lehan's property, directly caused all of the basement backups. Documents discovered by the Lehans (which will presented to this Court in May along with the expert's report) show that the MSD admitted that its sewage pump station was at fault. The MSD even evaluated alternatives and determined that preventing the backups in the Lehan's basement (and two more neighbors) was feasible.  It just was not a high enough priority and it was never funded or implemented.  Even today, there is no plan to implement any alternative that would help the Lehan's plight.  The expert's report will also show that the MSD's operation and maintenance of the pump station over the years was woefully inadequate and was so acknowledged by the MSD.

compensate them in a timely manner. As it now stands, there is no special master for the

Lehans to appeal to for judicial oversight.

### E. The MSD Refuses to Implement a Long Term Control Plan That Meets Decades-Old Water Quality Standards

In the Decrees, MSD is not really committing to any particular remediation plan.

In fact, MSD tells us in the Decree that it is planning to submit **two** Long Term Control

Plan Updates in 2006: one that meets present[38] Water Quality Standards and one that

does not. Consent Decree, Ex. 4, page 6.[39]

The Consent Decree suggests that it is permissible for the Defendants to refuse to develop

a Long Term Control Plan that meets the Water Quality Criteria for "existing uses" on

the rivers, creeks and streams in Hamilton County.  If this is, in fact, the interpretation of

the federal CSO Policy that the United States is suggesting to the Court, it is erroneous.

A Long Term Control Plan submitted under the Policy must conform to the Water

Quality Standards for all "existing uses" on the receiving stream. 59 Fed. Reg. 18694,

Col. 3.[40]

The federal CSO Policy specifically references existing CWA regulations on this issue:

"In addition, the regulations at 40 C.F.R. 131.10(g), (h), and (j) specify when and how a

designated use may be modified.  A State may remove a designated use from its water

quality standards only if the designated use is not an existing use." (Emphasis supplied).

---

[38] Water Quality Standards for fecal coliform on the Ohio River have been in effect since 1985.  OAC §3745-1-32, Table 32-1.
[39] From a diligent prosecution standpoint, the United States concurrently admits that MSD's illegal discharges violate the Water Quality Standards of the Ohio River and the streams and creeks in Hamilton County, but refuses to adequately enforce current day Water Quality Standards.  The Decree does not require MSD to meet current WQS.  It can petition to lower WQS and, if the MSD is NOT successful in lowering present day WQS, then the MSD will release MSD from the 2022 compliance end-date. Consent Decree, Sec. VII.B; See Declaration of Dr. Bruce Bell, attached hereto as Ex. 1.
[40] 40 C.F.R. Sec. 131.3(e) provides that: "(e) Existing uses are those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards."

In the case of the Ohio River, the State Water Quality Standards provide at O.R.C. §3745-1-32 the following designated uses: "The Ohio river is designated warmwater habitat, public water supply, agricultural water supply, industrial water supply, and bathing waters…"

Courts have referred to an "existing use" as one that is **actually taking place in the stream**, like swimming or fishing.  See, *Ohio Valley Envtl. Coalition v. Horinko,* 279 F. Supp. 2d 732 (S.D.WV. 2003)  (**"**Even if the lowering of water quality does not affect **existing uses,** such as fishing or swimming, that lower **water quality** could still affect the plaintiffs' aesthetic and economic interests."). Id. at **28. Swimming and bathing have actually taken place on the Ohio River and in the rivers, creeks and streams in Hamilton County since 1975.

As referenced in the United States' Brief, stringent bacterial criteria are applicable to the Ohio River during the warm weather months, May through October.  Id. Table 32-1. United States Br., p. 7.  Contrary to any implication otherwise by the United States, the Long Term Control Plan Update must meet Ohio Water Quality Standards (WQS) and Water Quality Criteria (WQC) for existing uses, which MSD is currently violating.[41]

Not only does MSD make it abundantly clear that it will submit two Long Term Control Plan Updates by 2006 (Consent Decree, Exhibit 4, page 6), but it also announces that: "Defendants are not proposing or agreeing to implement such measures" as are required to meet the existing Water Quality Standards.

---

[41] The LTCPU must show how the WQS/WQC are going to me met by the remedial measures and, then, of course, the plan must be implemented in such a way as to actually meet the standards and criteria. While there may be some flexibility with regard to "designated uses" of a stream, where that particular use of the stream has not been attained since 1975, the CSO Plans must meet Water Quality Standards for all existing uses – there is no flexibility in this regard.

In fact, MSD states its belief that "those (water quality) requirements will be revised by the time Defendants complete implementation of the Long Term Control Plan Update…" Furthermore, the MSD states "Defendants, working in conjunction with Ohio EPA and ORSANCO, will evaluate how those legal requirements will change…"[42] The clear implication of the Consent Decree is that there are no substantive standards that the LTCPU must meet, and that all remedial actions to be proposed in the LTCPU (and even the State Water Quality Standards, themselves) are "up for grabs" in meetings between MSD, OEPA and ORSANCO, subsequent to the Decree.

If this is true, then the Consent Decree truly is an illusory contract – a placeholder for continuous rounds of negotiations.[43]   In this case, the deadline extenders and loopholes make MSD's promises illusory and, as to the LTCPU, MSD clearly says that it does not intend to be bound by or implement a Plan that meets current WQS for existing uses. Consent Decree, Ex. 4, page 6.

According to Sierra Club's engineering expert, Dr. Bruce Bell, "Allowing Defendants to spend significant money and time to develop a Long Term Control Plan update based on the speculative assumption that undefined changes to designated uses,

---

[42] OEPA official, Lisa Morris, announces to this Honorable Court in her Affidavit, that $100,000 of the MSD civil penalties paid to the State will be paid over to ORSANCO as a contract to assist ORSANCO to developing lower water quality standards, which would be applicable to MSD's violating discharges.

[43] See, *Woll v. United States*, 45 Fed. Cl. 475 (U.S. Ct. Claims 1999).  An illusory contract is one that does not actually bind one of the parties, such as an agreement to agree. Contract terms cannot be illusory. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992) (noting illusory contract**,** such as "agreement to agree" does not bind party to accept performance). An illusory contract is an agreement in which one party gives consideration that is so insignificant that an actual obligation cannot be imposed. See Torncello v. United States, 231 Ct. Cl. 20, 42, 681 F.2d 756, 769 (1982) (citing 1 Corbin, On Contracts § 145 (1963)) (rhapsodizing that an illusory promise is like the mirage of the desert with its vision of flowing water). The enforceability of the agreement is forfeited by the insignificant promise.

water quality standards, and regulations will occur and will be approved by the State and EPA and will likely result in unnecessary delays in compliance.[44]

Like the $1.5 billion time extension provision in Section IX, Section VII.B.2 of the Consent Decree provides that the MSD can extend the 2022 deadline for compliance, if it is unsuccessful in its attempt to get Water Quality Standards changed.    If the MSD cannot get the standards changed so as to validate the less stringent plan, then it is no longer bound by the 2022 end date. Clearly, this is not in the public interest.[45]

The significance of the Decree's lack of commitment to existing Water Quality Standards is perhaps amply illustrated by reference to ORSANCO's current "Ohio River Fact Sheet".   This document provides that: "For recreational contact, the Commission suggests the following: due to high bacteria counts within 48 hours after a measurable rainfall, there should be no contact with the River downstream of major urban areas." Based on rainfall data from the National Climatic Data Center and the ORSANCO warning, recreational contact should have been avoided on the Ohio River 75.6% of the year in 2003.   This dramatic statistic highlights the importance to the public of requiring a remedial programs that meet existing Water Quality Standards.[46]

---

[44] Furthermore, Section VII.B. of the Consent Decree rewards the MSD for submitting a LTCP Update that improperly presupposes that changes to Water Quality Standards for existing uses may occur. If MSD submits such a Plan and is proven wrong (those changes don't occur), Section VII.B.2 allows MSD to submit a revised Update, with a date for completion of all remedial measures that is later than February 28, 2022.

[45] According to Dr. Bell: "The Consent Decree provision allowing compliance to be delayed if changes to regulations, designated uses, and/or water quality changes do NOT occur, places the regulators in a position of having to make a Hobbsian choice.  EPA and the State would be required to make or approve such changes.  The regulators would then be placed in a position where approval of less stringent requirements would prevent delays in MSD compliance projects, but failure to approve such changes (lower Water Quality Standards) would result in delays in construction of remedial measures.  Regulators' placing themselves in such a conflict of interests is not in the public interest and should not be approved by the Court." Bell Declaration, Ex. 1.

[46] Thirty years ago, Congress set a reasonable goal: make all waters of the United States safe for swimming and fishing.  Those goals in 33 U.S.C. §1251(a) have not been repealed.

Given this obvious weakness in the Decree, this Honorable Court should determine that the Decree fails the test of reasonableness and is not in the public interest.

## F.  The Court Should Appoint a Special Master

The Motion argues that a special master is not needed to oversee compliance with the Decrees, should they be entered, because oversight and enforcement are the Agencies' jobs and they will not "shirk their duty" to ensure compliance.  Motion, at 43. This argument is flawed because it 1) fails to acknowledge the Court's broad authority to appoint a special master, notwithstanding the Agencies' intentions to do their jobs; 2) ignores the purposes of appointing a special master; 3) fails to consider the budgetary constraints on regulatory Agencies, and, indeed, all of government; and 4) sidesteps the Agencies' history of lax enforcement with respect to the sewage problems.  Analysis of these flaws reveals that appointment of a special master is the only way to ensure that the sewage problems will be corrected and that the health of the SIB victims will be protected.

First, the Agencies' responsibilities under any consent decree and the quality and extent of any enforcement efforts are immaterial to the Court's authority to appoint a special master. The Court's authority to appoint a special master in this case arises from Federal Rule of Civil Procedure 53 ("Rule 53") as well as from the Court's inherent authority to provide itself with the instruments required for the performance of its duties. *Carey*, 551 F.Supp. at 1179, citing *Ex Parte Peterson*, 253 U.S. 300, 312-13 (1920). Under Rule 53, a court may appoint a master to:

(A)  perform duties consented to by the parties;

(B)  hold trial proceedings and make or recommend findings of
fact, on issues to be decided by the court without a jury if
appointment is warranted by

(i)   some exceptional condition, or
(ii)  the need to perform an accounting or resolve a
difficult computation of damages; or

(C)  address pretrial and post-trial matters that cannot be addressed
effectively and timely by an available district judge or magistrate
judge of the district.

Fed. R. Civ. P. 53(a)(1).  Because the parties have not consented to appointment of a

special master (see Rule 53(A)) and since the master's role would not include holding

trial proceedings or recommending findings of fact (see Rule 53(B)), Rule 53(C) provides

the requisite authority in this case.  Indeed, as indicated in the Advisory Committee Notes

to Rule 53(C), "[c]ourts have come to rely on masters to assist in framing *and enforcing*

complex decrees."  Fed. R. Civ. P. 53, Advisory Committee Notes 2003 Amendment

(emphasis added).

Thus, the only limit to the Court's authority to appoint a master is that the matter

referred to the master "cannot be addressed effectively and timely by an available district

judge or magistrate judge of the district."  Rule 53(C). In fact, "there is considerable

room for appointing special masters when the purpose of the master is to enforce a

judicial decree." *Cronin v. Browner*, 90 F.Supp. 2d 364, 377 (S.D. NY 2000). [47] Here, a

special master is needed to enforce the proposed consent decrees because of:

1.      Ongoing court involvement for 20+ years – need for technical support and

continuity.

---

[47] The Agencies admit that "this Court has plenary powers to ensure that defendants comply with its
orders."  Motion, at 38.

2.      Complexity of the Decrees and remedial program – see Declarations of

        Drs. Bell and Kavanaugh, attached.

3.      Loopholes and potential for abuse in the Decrees – see Declarations of

        Drs. Bell and Kavanaugh attached.

4.      Difficult financial and engineering issues. Court can be easily misled or

        overwhelmed with technical issues.

5.      Crisis in management at MSD.[48]

6.      The 1968 County/City Agreement establishes a management structure that

        has failed in the past and will continue to do so in the future until fixed.

        By reporting directly to the Court, the special master can help keep the

        MSD focused on the remedial obligations under the Decree.[49]

7.      Help restore credibility in MSD reporting to the public.

Thus, it is clear from the scope of the work to be completed under the Decrees and the

vast amount of time that will be necessary to oversee compliance, that the SIB victims'

rights and health cannot be effectively protected in a timely manner without appointment

of a master to oversee compliance with the Decrees.

        Further, it is well settled that courts have the authority to appoint a special master

to assist it at the remedy stage of litigation, particularly in cases where the health or

welfare of the public or of a group of individuals is at stake.  See *Cronin*, 90 F.Supp. 2d,

at 377 (appointment of a special master is appropriate to monitor consent judgment

---

[48] According to the 2003 Brown and Caldwell Study, (commissioned by the MSD): "There is a crisis of leadership at MSD. 50% of employees who took the survey do not feel top management sets a good example. 40% of employees who took the survey doubt the truth of information received from top management.

[49] "[MSD] It's an organization that operates without complete, clear direction because of this hybrid arrangement that exists," Commissioner Todd Portune said. "I don't see the City undertaking the effort that needs to be done." The Cincinnati Enquirer, October 23, 2003  "County Wants to Run MSD."

requiring EPA to produce complex Clean Water Act regulation designed to protect human health and the environment); *Wuori v. Concannon*, 551 F.Supp. 185, 189 (D. Maine 1982) (appointment of special master to oversee implementation of consent decree setting forth comprehensive plan to upgrade and develop services for mentally retarded); *Reed v. Cleveland Board of Education*, 607 F.2d 737, 740 (6th Cir. 1979) (special master appointed in a school desegregation case to assist in devising a remedy). Appointment of a master is especially appropriate in these types of cases since monitoring of a consent decree expedites the progress made toward compliance with the terms and goals of consent decrees.  See *Carey*, 551 F.Supp. at 1178.

Second, the scope of the Agencies' responsibilities and commitment under the Decrees is immaterial to the purposes of appointing a special master.  The Agencies argument that, while "…plaintiffs were slower than they should have been to focus enforcement resources on the defendants in this case, there can be no doubt that they are focused there now…" misses the point.  The more pertinent question is how this Court will properly discharge its post-decretal obligations, without the continuity and technical support that can only be provided by a special master.

The need for a special master in this case arises primarily from the ***Court's*** obligations under the Decrees for continuing jurisdiction, monitoring, oversight, and dispute resolution.[50]  A district court has "not only the power *but the duty* to enforce a settlement agreement which it [has] approved…"  *New York State Association for Retarded Children, Inc. v. Carey*, 551 F.Supp. 1165 (E.D. NY 1982) (emphasis added),

---

[50] In lieu of a special master, the United States claims that it has no objection to this Court appointing an Ombudsman to "assist the citizens with complaints they may have…and/or to advise this Court as necessary concerning the WIB program implementation." United States' Br. At 46.  The Sierra Club is unclear where the United States finds authority for this Court to appoint an ombudsman, as opposed to a special master under Federal Rule 53.

citing *Meetings & Expositions, Inc. v. Tandy Corportation*, 490 F.2d 714, 717 (2nd Cir.

1974).  Vesting the power to oversee and enforce the Decrees solely with a party to those

agreements would undermine this Court's duty to perform its own oversight of the

compliance of ***all*** parties with the letter and spirit of any decree.

Further, the level of involvement of any special master is directly related to the

adequacy and effectiveness of the Agencies' enforcement.  If that enforcement is as

thorough and effective as the Agencies claim it will be, the special master's duties

"would go beyond those of the present monitoring Agencies." *Id.* at 1180.  That is, the

Court does not need someone to perform the Agencies' duties for them.  "What is needed

is an independent body for compliance purposes which can orient and coordinate the

reports and programs of the present Agencies." Thus, the special master would only act

as the "eyes and ears of the court." *Id.*  With such confidence in their future abilities, the

Agencies should not mind the oversight of a special master.

Third, the unpredictability of its own budget belies the Agencies' promises that

they intend to fully enforce the Decrees.  The fact that governmental budget limitations

negatively impact compliance with consent decrees has already been established.  In

*Carey*, the plaintiffs sued the state for constitutional and statutory violations related to

living conditions in a state school for the mentally retarded.  The judge signed a consent

judgment and, recognizing that monitoring of the state's obligations was necessary, the

parties agreed to appointment of a review panel funded by the state. *Id.*  Although the

state's progress after entry of the consent judgment "was in no small degree due to the

monitoring, reporting and recommendations" of the review panel, the panel was

effectively removed when the state legislature deleted the review panel's funding

provision from the budget. *Id.* ***"As might have been expected," after the panel's funding was removed, conditions at the school "materially deteriorated."*** *Id.* (emphasis added). To prevent further violations of the consent judgment and to protect the plaintiffs from harm, the court appointed a special master to oversee compliance with the consent judgment. *Id.* at 1178-79.

Like the review panel in *Carey*, the effectiveness of the Agencies' oversight of the proposed Consent decrees is contingent upon funding, the availability of which is beyond its control. The health of citizens who have spent years living with sewage in their basements should not be placed solely in the hands of an entity that cannot even guarantee that it will have the money to fully perform the enforcement it claims it will perform. This Court does not need to and should not wait – as the *Carey* court did, to the plaintiffs' detriment – to see if the Agencies will or can adequately enforce the Consent decrees. Rather, a special master needs to be appointed ***now***, to prevent any possible compliance failures. The Court needs to take judicial notice of funding cuts, deficits, and changes in focus of programs (e.g. Homeland Security responsibility), as well as the upcoming impact of Iraq'a current and future need for U.S. tax dollars.

Finally, the Agencies argue that it "would be very inappropriate and perhaps detrimental to the final outcome of the decrees to have a special master hurrying the regulators along in their review and approval process for these critical plans." Responsiveness Summary #16, page 26. Yet, their history of lax performance demonstrates that this is precisely the reason why a special master is needed.[51] The MSD

---

[51] When the United States entered into a consent decree with the MSD in 1985 over violations at the Mill Creek wastewater treatment plant, it established an environmental fund with a $750,000 payment by MSD. The funds were to be spent on environmentally beneficial projects in the County. According the United States, the money "would not be spent for eighteen years." Responsiveness Summary #28, p.46. This

prepared a Long Term Control Plan in 1996. The Agencies admit that they found that plan defective at that time and unapprovable.[52] However, neither agency took action to force MSD to submit an approvable plan until this case, which was triggered by the Sierra Club's 60-day Notice Letter on December 18, 2001. Thus, contrary to the Agencies' argument, the regulators do need to be hurried along.

## III. CONCLUSION

Sierra Club has demonstrated that 1) the Decrees are not an efficient vehicle for cleansing the environment; (2) the Decrees do not adequately compensate the public for past harms; and, (3) the Agencies have failed to drive a hard enough bargain under the circumstances. The lack of funding and critical benchmarks in the sewage-in-basement program also underscore that the Decrees do not appropriately compensate the public for the years of official neglect at the hands of the MSD. The Decrees are, therefore, not in the public's interest. Without repair of the major flaws pointed out by Sierra Club, above, this Honorable Court should reject the Decrees.

Respectfully submitted,

/s/ D. David Altman_____

D. David Altman, Esq.

---

example of lack of follow-through, EPA's failure to force MSD to immediately revise its unacceptable, 1996 Long Term Control Plan, its chronic lack of enforcement against MSD's thousands of other CWA violations, does not present a particularly encouraging or flattering picture of EPA's enforcement.

[52] It is important to note that the United States is now claiming that it rejected the MSD's 1996 LTCP because it only showed a CSO control rate of 85%. Mark Klingenstein states in his Affidavit that "given the bacterial standards that apply to Defendants' receiving waters, it is virtually impossible to comply with those standards at an 85% CSO control level." Affidavit, paras. 73-74, p. 17. Yet, the Decrees do not require that the LTCPU meet any particular level of CSO control. If Mr. Klingenstein knew in 1996 that it would be impossible for MSD to meet Water Quality Standards with 85% control, then, with all of the work that Mr. Klingenstein on this case since then, he should be able to tell the Court what level of control is necessary to meet current Water Quality Standards and, the Agencies should be willing to support having a definite control standard inserted in the Decrees.

(#0021457)
D. David Altman Co., L.P.A.
15 East 8th St., Suite 200W
Cincinnati, OH 45202
(513-721-2180)


/s/ Albert J. Slap_____
Albert J. Slap, Esq.
(#0074579)
Law Office of Albert J. Slap
20 Erie Ave.
Glendale, OH 45246
(513-771-7800)


## CERTIFICATE OF SERVICE

       I hereby certify that on May 3, 2004, a copy of the forgoing Intervenor Sierra Club's Memorandum in Opposition to Entry of the Consent Decrees was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


                    /s/ D. David Altman_____
                    D. David Altman (0021457)
                    D. DAVID ALTMAN CO., L.P.A.
                    15 East 8th Street, Suite 200W
                    Cincinnati, OH  45202
                    E-mail:  daltman@one.net