Rachel Carson State Office Building
P. O. Box 2063
Harrisburg, PA 17105-2063

**Office of Water Management**                                            717-783-4693

Water Docket
Environmental Protection Agency
Mail Code 4101T
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460
Attention Docket ID No. OW-2003-0025

Docket Clerk:

   The Pennsylvania Department of Environmental Protection (DEP) is providing comments on the U. S. Environmental Protection Agency (EPA) proposed policy "National Pollutant Discharge Elimination System (NPDES) Permit Requirements for Municipal Wastewater Treatment Discharges During Wet Weather Conditions" as published in the November 7, 2003 Federal Register (Volume 68, Number 216).

   The proposed policy is an interpretation and apparent expansion of existing federal regulations governing sewage bypasses around treatment units within a Publicly Owned Treatment Works (POTW), the recombining of the bypassed sewage flow with the fully treated sewage flow, and discharge of the blended effluent during wet weather conditions. The final blended effluent would be required to meet secondary treatment standards or more stringent water quality based discharge limitations

   EPA solicits comments on specific issues identified within the proposed policy. DEP's response to those specific issues are presented in the attachment to this letter entitled:

**Pennsylvania Department of Environmental Protection Comments on the "National Pollutant Discharge Elimination System (NPDES) Permit Requirements For Municipal Wastewater Treatment Discharges During Wet Weather Conditions" published in the November 7, 2003 Federal Register (Volume 68, Number 216).**

   The attachment also presents additional comments and concerns on the broader proposed policy statement.

   DEP believes that guidance from EPA headquarters must be based firmly on supporting statute and regulation. The goal of such guidance should be to level the playing field across jurisdictional lines so that all permitting authorities are meeting statutes and regulations consistently, and to establish clear responsibility for local government to adequately maintain its wastewater infrastructure.

Water Docket             -2-

A policy which provides disincentives for responsible municipal management of wastewater infrastructure does not further the Clean Water Act mandate of restoring and maintaining water quality in our nation's waters. In the interest of reducing municipal sewage management costs, the proposed policy would backslide on existing environmental and public health protections that have served the public interest for years. The proposed policy would also institutionalize disincentives for the necessary investment in the nation's wastewater collection and treatment infrastructure, and result in continued deterioration of the infrastructure and a concomitant increase in the frequency of blending events.

The apparent backsliding in the environmental and public health protection that would occur under this proposed policy is in direct conflict with the additional protections being put in place by EPA for CAFOs, CSOs, MS4s and the LT2 under the Safe Drinking Water Act. Further, CSOs are already adequately addressed under EPA rules, policy and guidance and should not be included in this proposed policy for separate sanitary sewer systems.

DEP administers a strong Municipal Wasteload Management program (established in 1979) and a very effective Sewage Facilities Planning Program established in 1966). Together these programs provide a five-year early warning of projected wet weather problems in wastewater collection, conveyance and treatment facilities; require proactive response by local governments to these warnings via corrective action plans, improved operation, maintenance, connection prohibitions (capacity management) and provide long-term solutions through sewage facilities alternative analysis and mandatory implementation schedules. DEP has effectively managed these programs in concert with local governments to resolve numerous wet weather problems in the past resulting in the maintenance of adequate treatment levels at POTWs, elimination of SSOs and provision of capacity for reasonable and well planned growth.

Further support of increased emphasis on local responsibility to resolve such problems through ongoing maintenance programs is included in a recent report by the Pennsylvania Joint Legislative Air and Water Pollution Control and Conservation Committee titled "Report of the Infiltration Task Force". This report presents the results of a two-year effort by a broad based membership of the wastewater industry, regulated community and state legislators. The findings include the need for wastewater utilities to develop a comprehensive local strategy that includes asset management, regionalization to establish economies of scale, public outreach and education and rates that reflect the full cost of service, including capital asset maintenance and replacement. Local governments are charged with the responsibility for using existing regulatory authority to require house lateral repair/replacement, improved inspection of new construction and resale inspection and local financial assistance programs to support lateral maintenance and repair. The need for federal and state financial assistance to protect the integrity of the initial capital investment in wastewater infrastructure is also identified.

Water Docket                  -3-                  February 2, 2004

In summary, DEP supports the development of clear national guidance that promotes increased emphasis on local government's responsibility to adequately maintain its wastewater infrastructure in accordance with federal and state statute and regulation. Should EPA pursue this proposed policy it must establish incentives for responsible system management and a legal basis must be clearly established for the policy through appropriate changes to federal regulations.

Thank you for the opportunity to comment on the policy in its proposed form. I anticipate that substantive changes will be made to the proposal to clarify and strengthen its provisions before being finalized. The substantive changes necessary to make this proposed policy contribute toward the progressive advancement of EPA's national environmental and public health protection mandate would dictate the necessity for a re-publication of a revised draft for further public review and comment.

Follow-up questions on the comments submitted herein and the positions represented on behalf of DEP can be directed to John Hines of my staff at the above number or by e-mail at johines@state.pa.us.

Sincerely,

Cathy Curran Myers
Deputy Secretary
for Water Management

Enclosure

**Pennsylvania Department of Environmental Protection Comments on the "National Pollutant Discharge Elimination System (NPDES) Permit Requirements For Municipal Wastewater Treatment Discharges During Wet Weather Conditions" Published in the November 7, 2003 Federal Register (Volume 68, Number 216).**

This proposed policy is an interpretation of existing regulations for allowing sewage to bypass treatment units within a POTW and then blending that sewage with treated effluent during wet weather conditions. The final blended effluent would need to meet secondary treatment standards or more stringent water quality limitations. Within the proposal, EPA asked for comments on specific issues.

A. **EPA requested comments on the following 4 issues:**

1. *Is the current interpretation of "excessive I/I" under 40 CFR 133.103(d) adequate? What challenges, if any, would facilities face in meeting the percent removal requirements or obtaining an adjustment to percent removal requirements under Sec. 133.103(d), including the excessive I/I provisions, as a pre-condition for authorization of blending in an NPDES permit?*

   - The *Sewer System Infrastructure Analysis and Rehabilitation* Guidance (EPA, 1991, EPA/6225/6/6-91/030) referenced in the proposed policy should be adequate to determine "excessive I/I" under 40 CFR 133.103 (d).

   - The proposed policy correctly states that the percent removal requirement may be waived or relaxed when it cannot be achieved because of dilute influent if, among other things, the dilute influent is not caused by excessive I/I. Excessive I/I is defined as the quantities of I/I that can be eliminated from a sewer system as determined by a cost-effectiveness analysis that compares the costs for correcting the I/I conditions to the total cost of transportation and treatment of the I/I at a treatment facility. However, to keep the waiver provision from rendering the percent removal requirement meaningless, the cost used in the comparison must be the cost of transportation to and providing treatment of all the wastewater at a secondary treatment facility. The cost of providing less than secondary treatment or only treating part of the wastewater will always be less than I/I removal, thereby encouraging dilution and discouraging municipalities from maintaining their collection system. This is exactly the opposite result of the one intended by adding the percent removal requirement to the regulations in the first place.

   - The proposed policy also correctly states that the percent removal waiver provision was added to the regulations, among other reasons, to avoid requiring municipalities to construct advanced treatment just in order to achieve 85% removal. It must be clear in the proposed policy that the waiver provision was never intended to provide a way for municipalities to avoid providing less than secondary treatment and use dilution to achieve the secondary treatment standards. A facility may be eligible for the waiver only

-2-

if it was designed to achieve 85% removal, but due to the less concentrated wastewater cannot achieve it. Any other interpretation discourages collection system maintenance and undermines the secondary treatment requirements.

2. *In principle 4, which would require that flow only be routed around the biological or advanced treatment unit when the capacity of treatment and storage units is being fully utilized, should EPA define the term "fully utilized?" Are there situations where system operators might need to keep some treatment or storage capacity in reserve, for example, to help prevent overflows or address other peak flow concerns where exceedences of treatment capacity is likely but has not yet occurred? If so, the commenter should describe the situations.*

- If this is truly a proposed policy to allow flow routing with respect to wet weather conditions there is no need to reserve capacity or to hold it back. Peak flow events that exceed treatment and storage capacity should be few in number.

3. *Principle 5 of this draft policy is designed to ensure compliance with applicable water quality-based effluent limitations, including those based on water quality criteria for bacteria. Would this principle be sufficient to protect against discharges of pathogenic organisms or should principle 5 of this draft policy include an explicit requirement for disinfection of blended effluent prior to discharge, where appropriate?*

- In the absence of disinfection, meeting any permit limits for bacteria will be problematic. The proposed policy must require that the blended flow be effectively disinfected.

4. *In developing principle 6, what factors should be considered when evaluating if a permittee is properly operating and maintaining their collection system in a manner consistent with 40 CFR 122.41(e)?*

- In Pennsylvania, the Municipal Wasteload Management Regulations provide the mechanism for the permittee to identify any existing or potential problems at the treatment facility or within the sewer system. When problems are identified, the permittee must limit new connections to the system and develop a plan to eliminate the problem. The current bypass provision in the NPDES permit also requires the reporting of treatment facility bypasses. These requirements should be adequate.

- It is imperative that "proper I/I maintenance" be defined. It should include an ongoing monitoring program through metering and inspection (including TV inspections), repair program, inspection/repair of private laterals, insuring that

-3-

downspouts and sump pumps are not connected and a sound stormwater control program.

- The degree of control and predictability of flows within a sewer system needs to be defined and quantified. The structural integrity of a sewer system must be documented. The sewer system must be improving in performance before any amendments to permits for wet weather treatment considerations apply.

- "Properly operating and maintaining" should be defined. One possible definition is reducing the I/I in the system to below the definition of "excessive" in 40 CFR 133.103(d) using the cost of transportation to and of providing full treatment of all the wastewater at a secondary treatment facility in the cost comparison as suggested above.

- EPA's proposed policy in effect discourages POTW's from incorporating proper design modifications and operational procedures to enhance treatment of wet weather flows. It is imperative that the policy includes requirements to develop a long-term remediation plan for all appropriate collection and treatment facilities in order to reduce pathogen loading.

B. Specific Comments on the Six Blending Principles

- The First principle is that the blended flow must meet the permit effluent limitations. This gets "watered down" so to speak since a reduction in percent removal (which may be presently prohibited because of excessive I/I) will likely be affected because excessive I/I will also disappear through definition. Excessive I/I is that flow which is cheaper to remove than to treat. If treatment through blending reduces treatment costs drastically as one might expect, less I/I will be defined as excessive and therefore a percent removal reduction will be available. This effort is self-fulfilling. A municipality proposes to blend, that reduces the cost of treatment which reduces the "excessive" I/I and that allows a reduction in percent removal.

- Principle Three purports to requires primary treatment prior to blending. This requirement is anything but definite since the proposed policy uses the words "should provide." Primary treatment is not defined. EPA should define it in the same manner that secondary treatment is defined. Allowing the "equivalent of primary treatment" which is also undefined further confuses the primary treatment requirement. Many of the treatment facilities designed and constructed today do not include the traditional primary treatment units used in facilities built over the last 20 years. These newer facilities should not be allowed to blend by justifying an "equivalent of primary treatment".

- Principle Four expands the entire proposed policy from a bypass of flow to protect secondary and advanced secondary processes to situations where

-4-

storage basin capacity is exceeded. A POTW should not immediately qualify for blending because they have undersized equalization or storage basins. What is the "accepted good engineering practice" design for storage basins? What storm event or what conditions if any should a storage facility <u>not</u> be designed to handle as defined by a "good engineering practice?"

- Principle Four speaks about protecting the structural integrity of the treatment units. The proposed policy must insure maintenance of the structural integrity of the sewer system. Principle Six only mentions the need for an evaluation of the structural integrity of the system. These 2 principles may contradict each other.

- Principle Six - The proposed policy should not be extended to include combined sewer systems. CSO systems are already covered under the CSO Policy, which allows for primary treatment with related bypasses. By including CSO systems in this draft policy, it gives the appearance that separate sewer systems are similar to CSO systems.

- Principle Six appears to only apply to parts of the collection system where "the permittee has operational control". The NPDES permit is always issued to the operator of the treatment facility. In most cases, the operator of the treatment facility may not have control over the collection system, especially where the treatment facility serves a multi-municipal system. The proposed policy must require that the permittee have the authority to impose requirements back to the contributing municipalities or operators of the sewer systems. Without this requirement, the operator of the treatment facility has no operational control of a collector sewer system and would have no requirement to remove infiltration/inflow. In some cases, it has been demonstrated that a majority of the excessive I/I within sewer systems is behind the curb, which is generally not under controlled by the operator of the sewer system. Permittees need to be held accountable to all the flows entering their systems.

- Finally despite the six principles supposedly being requirements that must be met to blend, the proposed policy later states that: "EPA and State decision makers would retain the discretion to adopt approaches on a case-by-case basis that differ from the Policy." Since EPA and state regulations establish bypass authority, PA would be opposed to any provision in the proposed policy, which gives the appearance of circumventing the established regulatory requirements.

C. <u>General Comments:</u>

- The proposal to bypass peak wet weather flows at sewage plants gives the appearance of being contrary to EPA's requirements under the CAFO, CSO

-5-

and MS4 programs. While those programs attempt to improve wet weather discharges this proposed policy backs away from the treatment of wet weather sewage flows that otherwise could be eliminated from the sewer system or treated.

- The background discussion suggests this policy is needed to avoid significant monetary expenditure. For the last ten years, Pennsylvania and other states have required programs of initial I/I removal with follow-up wet weather retention tanks. This approach is both environmentally protective and relatively moderate in cost. Between 15 and 20 systems now have retention tanks and in many of these cases the tanks were built for about $1.50 per gallon stored. As a result, Pennsylvania does not believe there is a justifiable need for this proposed policy.

- Blending removes incentive to maintain sewer systems and to remove I/I at its source. It is cheaper and easier to convey it to the plant and blend it. Why does EPA want to provide a disincentive to sewer repair and maintenance as will occur under this proposed policy?

- EPA indicates blending should somehow be condoned because 48% of 129 municipalities polled apparently presently blend. If present practice were always the acceptable approach, we would still have a lot of facilities providing only primary treatment.

- The proposed policy seems to conflict with the Toledo Federal Court case decision, which dealt with the bypass regulations and determined that providing additional facilities to handle wet weather flows was, in fact, a feasible alternative to bypassing.

- While blending is one method of preventing the washout of biological solids it does nothing to help a biological system suffering upset from a dilute influent. In fact, blending will encourage less sewer maintenance because blending is cheap, and influent sewage will become more dilute. That will lead to the obvious need to route more flow around the secondary units to avoid further reduction in the food concentration of the already dilute influent.

- The proposed policy uses the terms "peak wet weather flow", "wet weather flow" or "wet weather" to describe the focus of the policy. However, these terms are not defined. Until they are, it will be extremely difficult to come to a national agreement on this issue.

- Some "wet weather" events, like Tropical Storm Agnes, will cause overflows from even appropriately maintained systems. Lesser events will probably cause overflows only from systems that have not been appropriately maintained. Temporary bypassing may be appropriate in the first case, but not in the second.

-6-

The policy needs to be specific about the magnitude of wet weather events it is addressing, because different requirements will be appropriate depending on the event. Temporary bypassing may be appropriate during an event that will cause bypassing regardless of a municipality's efforts to maintain its collection system or during a declared flooding emergency. However, if bypassing occurs in a system under other than a defined set of circumstances, the municipality should be under consent order and agreement to rehabilitate its collection system.

- The cost effectiveness analysis of a range of reasonable alternatives to bypassing should include collection system rehabilitation

- The proposed policy uses the term "blending", but really what the policy proposes to do is legalize bypassing. To legalize bypassing in situations other than those listed in 40 CFR 122.41(m) requires a regulation change.