**EXHIBIT 7**

ADDITIONAL RESPONSES OF THE SIERRA CLUB TO THE UNITED STATES'
MEMORANDUM IN SUPPORT OF ENTRY OF THE CONSENT DECREES
AND THE UNITED STATES' REPONSIVENESS SUMMARY
TO THE SIERRA CLUB'S COMMENTS[1]

Responsiveness Summary, #3, page 3 – As the Sierra Club has pointed out in argument and in the Declarations of Dr. Bruce Bell, interim benchmarks of success are necessary, reasonable and, are workable. Benchmarks in the Decree will ensure that the Plans are not used to delay and extend the already unreasonably long compliance schedule. Those benchmarks, as previously pointed out to the Court, include, e.g.: (1) number of SSOs eliminated each year until all are eliminated; (2) number of treatment plant by-passes that are eliminated each year until the EPA by-pass regulations are being met; (3) number of sewage-in-basement homes provided with prevention devices each year until all homes with MSD-caused SIB are so provided; (4) number of SIB victims provided with emergency cleanup services compared with the number who experience backups and call MSD's complaint line; (5) number of MSD-caused SIB victims paid per year compared with the number who file complaints; and, (6) total amount of MSD-caused SIB damage claims paid as compared with the amounts claimed by the victims.

Responsiveness Summary, #13, page 18 – Sierra Club commented that the Consent Decrees failed to provide it with specific and defined monitoring and intervention rights.[2] The United States responds that it will voluntarily supply Sierra Club with data and, because Sierra Club is not a signatory to the Decrees, it may not participate in the Dispute Resolution Process.

While, the United States has graciously agreed to send Sierra Club all monitoring and other reports, it is not required to do so in the Decree. Should United States change its mind about this in the future, Sierra Club would have no enforceable rights under the Decree to receive the reports. Thus, the Decree should not be approved without requiring

---

[1] If Sierra Club has not responded to part of the United States' Responsiveness Summary in Attachment "A", it should not be inferred or implied that it either agrees with the United States' position or that it has abandoned its comment. Rather, if it has not responded to a specific paragraph in the United States Responsiveness Summary, then the Club may have covered it in its main brief or it believes that its comments are clear enough already and need no further explanation or supporting argument.

[2] Sierra Club's comments read as follows: "XXI. Dispute Resolution. Sierra Club and the public should have specific and defined monitoring and intervention rights for both Consent Decree enforcement and Dispute Resolution. The Dispute Resolution process will be overused because of the loopholes, indefinite time extensions and the over-reliance on such vague terms as "expeditiously as practicable." In any case, the Special Master appointed by the Court should be in charge of the Dispute Resolution process. The costs of Dispute Resolution should be born by the MSD."

1

the parties to supply Sierra Club with all monitoring, quarterly and other required reports and the government responses.

Secondly, Sierra Club should be made a party to the Dispute Resolution process. Although Dispute Resolution is part of the Decree (and, as United States repeatedly points out, Sierra Club is not a signatory), it is also part of a judicial procedure that directly derives from the authority and continuing jurisdiction of the federal District Court. This Court can fashion whatever protections of its authority and jurisdiction that it deems necessary. It need not accept a consent decree that impinges on its judicial authority in a manner that is not reasonable or efficient. If the Court determines that the presence of the Sierra Club in the Dispute Resolution process is in the public interest and will assist the Court in better understanding the issues before it, then it can order it, even if it is not provided for in the Decrees.


Responsiveness Summary #17 and 18, pages 26 – 31 – The Sierra Club has commented that the United States in its Joint Amended Complaint or otherwise has not specifically disclosed to the public or the Court the true extent of the MSD's violations that the Decrees purport address. The United States claims that its consultant, Mark Klingenstein, has prepared tables to this effect and that those are being provided to the Sierra Club. Sierra Club did not received those until April 27, 2004.

In its Responsiveness Summary, the United States takes the position that: "The parties are <u>settling</u> this matter, and therefore are in effect agreeing <u>not to resolve</u> the question of which and how many violations have actually occurred." (Emphasis in original). "Further," the United States argues, it "has no obligation to create this information for the Sierra Club or the general public." The United States has forgotten one very important entity – this Court. Unlike a private dispute, where settlement agreements typically provide that there is no finding of fault, this is a public decree, where the parties are required to prove and the Court is required to determine that the deal is fair, reasonable, lawful and <u>in the public interest.</u> *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409 (6th Cir. 1991)(When reviewing CD, court must "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes" of the Act.) So, contrary to the United States' assertion, the public and the public's interest is a stakeholder. Without understanding the true extent of the violations in each of the various parts of the MSD's system, the Court and the public cannot possibly determine if the deal cut by the United States is fair and reasonable. In fact, the deal is not.

With respect to Responsiveness Summary #18, the United States' Joint Amended Complaint is not specific enough for this Court to determine for res judicata and collateral estoppel purposes whether the violations covered in it are coterminous or overlapping with the violations alleged in Sierra Club's Citizen Suit Complaint. Without such an understanding, the Court cannot determine, even if it should approve the Decree, whether the Sierra Club's Citizen Suit would progress in whole or in part.


Responsiveness Summary #19, page 31-33. The interim remedy at the Sycamore WWTP is inappropriate and illegal. See Bell Declaration, Ex. "___". Here, the United States

admits, "Defendants diverted millions of gallons of partially treated flow around a portion of the Sycamore WWTP approximately 114 times in 2002-2003." This clearly violates the federal by-pass regulation, 40 C.F.R. 122.41(m), and the NPDES permit for the Sycamore plant. The initial remedy in the Decree is the same sort of illegal remedy that the MSD is proposing at SSO 700. This treatment system, the United States' admits, will not meet the Clean Water Act's Secondary Treatment standards. 40 C.F.R. §133.102. The United States goes on to say that the final solution will be determined as part of the CSO Long Term Control Plan Update and will be subject to the $1.5 billion time extension clause and other re-openers related exclusively to the federal CSO Policy. This is also inappropriate and illegal. The United States is applying its CSO Policy to a sewage treatment plant and a sewer basin that is totally comprised of sanitary-only sewers and not any combined sewers. The federal CSO Policy is totally inapplicable to this situation. *United States v. City of Toledo*, 63 F.Supp.2d 834 (N.D. Ohio 1999) does not require or even suggest that a feasibility determination for remediation of illegal wastewater treatment plant by-passes await the years of planning that may be entailed in the CSO parts of the system, which are unrelated to it. The feasible alternatives that must be considered to illegal bypassing at the Sycamore Plant is whether the MSD can expand the existing plant to provide secondary treatment to all sewage flows that are reaching the plant. That is the teaching of *United States v. City of Toledo*. No determination has been made that it is not feasible at Sycamore to have a proper, secondary treatment plant treat all of the flows. Thus, the expenditure of funds for an interim measure that does not meet secondary treatment standards in unnecessary.

Responsiveness Summary #21, pp.35-37. The Sierra Club commented that the $1.5 billion deadline extension provision in Sec. IX of the Decree should not include money that MSD estimates it will spend on the Mill Creek Storm Water Tunnel. The United States indicates that it is appropriate for the MSD to not only include in its estimate the cost of hooking up CSOs and SSOs to the Mill Creek tunnel (which will likely cost nearly a billion dollars itself), but also to include in the "estimate" of total remediation costs the whole of Hamilton County's "35% community share" (roughly $350 million), which would be necessary to match the Corps of Engineers funding.[3]

It is important for the Court to understand that this is <u>not</u> the way the funding for the tunnel would work. The MSD is not responsible for stormwater issues in Hamilton County. Jurisdiction over stormwater is now vested in the Hamilton County Storm Water District, which was formed on March 10, 2003, pursuant to ORC §6117. The District was set up to administer the storm water programs in the County. Forty-five of the fifty jurisdictions in Hamilton County, including all 12 townships joined the District. (See http://www.hamilton-co.org/stormwater/).

The MSD and the MSD's ratepayers <u>qua</u> ratepayers are not going to be responsible for the 35% "community share" of the Mill Creek Stormwater Tunnel, if it is ever built. This flood control project benefits many municipalities and businesses in the Mill Creek Valley. Any community share for the Mill Creek Tunnel would likely be

---

[3] According to the Affidavit of Mark Klingenstein, "cost estimates for the tunnel...currently exceed one billion dollars. Defendants' share of this cost is not currently defined, but it is likely to approach $500 million." Klingenstein Affidavit, Para. 38.

3

funded through the Hamilton County Stormwater District. How it would be funded, whether by contributions from the member governments backed by taxes or levies to property owners, or by new, separate stormwater user fees, is completely speculative at this point in time. It would not, however, be funded exclusively by MSD ratepayers.

The United States' inclusion of a $350 to $500 million local share of the future, yet speculative, Mill Creek Stormwater Tunnel costs in MSD's estimate of total remedial costs of the LTCPU (against the $1.5 billion "re-opener") is without a rational basis. As stated in Dr. Kavanaugh's Affidavit, attached hereto as Ex. "__", keeping the MSD's capital cost estimates clear and not allowing the estimates to contain inappropriate charges is one of the most important reasons why a Special Master is necessary.

Responsiveness Summary #33, p.55: The United States claims that Marilyn Wall (as a representative of Sierra Club) was invited to participate on the Steering Committee for the Long Term Control Plan Update and, to date, has not accepted. The clear inference that the Court is being asked to draw from this argument and the Affidavit of MSD Director, Patrick Karney, is that somehow Ms. Wall and the Sierra Club are not serious about public participation or their role in this process. Nothing could be further from the truth. The facts of the "Karney invitation" to Ms. Wall are in dispute, as is much of everything related to the Decrees. See Affidavit of Marilyn Wall, attached hereto as Attachment A. As Ms. Wall states, no invitation was made, only a statement that, when the litigation was over, Mr. Karney would have discussions with her regarding public outreach.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America, et al., )
)
    Plaintiffs, )
)
v )   Case No. 1-02-107
)
The Board of County Commissioners )
of Hamilton County, Ohio and The City of )   Judge S. Arthur Spiegel
Cincinnati, )
)   Magistrate Judge Timothy S. Hogan
    Defendants. )
)

### DECLARATION
### Marilyn Wall

1. I, Marilyn Wall, live at 816 Van Nes Drive, Cincinnati, Ohio 45246.
2. I do volunteer work for environmental organizations and do this work primarily from 515 Wyoming Avenue, Cincinnati, Ohio 45215. I am the Ohio Chapter Sierra Club Conservation Chair.
3. I, along with Sierra Club, am an intervener in United States of America et al, Plantiffs v. Board of County Commissioners of Hamilton County et al, case no. 02-CV-00107.
4. During or immediately prior to one of the meetings of the Hamilton County Board of Commissioners in 2003, I was approached by Mr. Pat Karney, Director of the Greater Cincinnati Metropolitan Sewer District.
5. Mr. Karney indicated the possibility of including the Sierra Club in MSD's Public Outreach Component. However, he indicated that until the litigation was over, he would not be able to have discussions with Sierra Club. Respecting Mr. Karney's wish to avoid discussions with Sierra Club while the litigation was ongoing, we did not pursue direct discussion on the matter, but confined our comments to the formal process.
6. I, Marilyn Wall, am willing to serve as a volunteer on the Long Term Control Plan Steering Committee whether or not a consent decree is approved and regardless of the status of litigation.

_Marilyn Wall_                        *Marilyn Wall*
PRINT FULL NAME            SIGNATURE

Date: May 2, 2004

Attachment A