Case 1:02-cv-00107-SAS    Document 118-8    Filed 05/03/2004    Page 1 of 14

Page 1
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

LEXSEE 1994 US DIST LEXIS 18684

**UNITED STATES OF AMERICA, Plaintiff, v. MARVIN PESSES, ET. AL., Defendants.**

Civil Action No. 90-654

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

*1994 U.S. Dist. LEXIS 18684; 39 ERC (BNA) 1951*

**November 7, 1994, Decided**

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**JUDGES:** [*1] Gustave Diamond, United States District Judge

**OPINIONBY:** Gustave Diamond

**OPINION:**

OPINION

DIAMOND, D.J.

Presently before the court is the United States' motion to enter a consent decree. For the reasons discussed below, the motion will be denied.

Background

Plaintiff commenced this action against twenty-six defendants pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), *42 U.S.C. § 9601,* et seq., to recover costs it incurred in response to an alleged release or threatened release of hazardous substances at the Metcoa Radiation site located in Pulaski, Pennsylvania ("Site"). The site was used by Metcoa between 1975 and 1983 to process, inter alia, scrap metal, waste sludge, radioactive materials and spent nickel cadmium batteries in order to recover the various metals contained within the wastes. In 1986, the Environmental Protection Agency ("EPA") commenced an investigation of the site which revealed the presence of 3,000 55 gallon drums containing hazardous substances, including, inter alia, cadmium, chromium, copper, lead, magnesium, mercury, nickel, radionuclides (thorium), selenium and zinc. "The investigation [*2] also determined that portions of the site were contaminated with elevated levels of radiation." Complaint at P33. Investigations by the EPA and the Commonwealth of Pennsylvania established that hazardous substances had been released or there was a threat of their release into the air, soil and water. At the time the complaint was filed, the United States had incurred response costs in excess of $ 600,000.00. Complaint at P36. The complaint seeks joint and several liability for all costs incurred for response activities related to the site, a declaratory judgment on liability for response costs that would be binding on any subsequent action to recover further response costs expended by the United States and an award of the costs of enforcement, including the costs of suit. Complaint at Prayer for Relief. n1

> n1 Response costs under CERCLA encompass expenses generated from "removal" actions and "remedial" actions and "include enforcement activities related thereto." *42 U.S.C. § 9601*(25); see also footnotes 8 and 9, infra.

[*3]

Pursuant to the Magistrates Act, *28 U.S.C. § 636*(b)(1)(A) and (B), and the Local Rules for Magistrates, this case was referred to United States Chief Magistrate Judge Robert C. Mitchell for pretrial proceedings. The court entered a case management order on September 17, 1990, which divided the litigation into three phases:

> Phase One shall determine whether defendants are liable to plaintiff under Section 107 of CERCLA, *42 U.S.C. § 9607;* provided that all issues as to

Case 1:02-cv-00107-SAS    Document 118-8    Filed 05/03/2004    Page 2 of 14

Page 2
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

response costs incurred by the United States shall be litigated in Phase Two. Phase Two shall determine appropriate relief, including the amount of recovery by the United States from defendants. Phase Three shall determine all crossclaims and third-party claims among defendants and third-party defendants, and thereby establish an allocation of liability among those parties if such allocation is appropriate.

Case Management Order at p. 4. The parties have not engaged in discovery regarding Phase Two and Phase Three issues. Discovery by the third-party defendants was stayed by an order dated September 17, 1990, and these parties have not [*4] had the opportunity to engage in any discovery.

The instant litigation has been protracted and has consumed considerable resources. The various defendants are comprised of three groups: the "Scraper/Dealer Defendants" who sent scrap material to the site for treatment and processing; the "Generator Defendants" who arranged for the disposal or treatment of hazardous wastes at the site; and the "Owners/Operators" of the site, Marvin Pesses and the Lawrence County Industrial Development Authority. On March 30, 1992, the Honorable Timothy K. Lewis (then a United States District Court judge for this district, now a judge on the United States Court of Appeals for the Third Circuit) affirmed a report recommending that plaintiff's motion for partial summary judgment be granted. Judge Lewis determined that plaintiff had established that the Scraper/Dealer Defendants were "responsible persons" within the meaning of *42 U.S.C. § 9607*(a). See *United States v. Pesses, 794 F. Supp. 151, 153 (W.D.Pa. 1992)*. The order affirming the report specifically noted that a determination regarding joint and several liability as to the defendants [*5] had not been made and the granting of plaintiff's motion only established that the Scraper/Dealer defendants were responsible persons within the meaning of *42 U.S.C. § 9707*(a).

On December 21, 1993, an order was entered affirming a report which recommended that plaintiff's motion for summary judgment under § 107 against all defendants except Molycorp and Marvin Pesses be granted "with respect to liability but not as to the joint and several nature of their liability." n2 The court also affirmed the section of the report recommending that partial summary judgment be granted against plaintiff on the basis that it "is a responsible party within the meaning of CERCLA and is also liable under § 107." Certain defendants had filed a motion for partial summary judgment as to their counterclaims against the United States. These counterclaims allege that the EPA, the Nuclear Regulatory Commission, the Air Force, the National Aeronautics and Space Administration ("NASA") and other agents and employees of the plaintiff contributed to the release or threatened release of hazardous substances at the site. n3 The magistrate judge's report noted that obsolete [*6] materials and industrial by-products from the Air Force which contained nickel and cadmium were sent to the site and processed there. The magistrate judge further found that the NASA sent scrap to the site which contained nickel, chromium and radioactive thorium, and that the General Services Administration ("GSA") also initiated shipments of hazardous substances to the site. While noting that the existence and extent of the EPA and NRC's liability must be evaluated by the factfinder in light of the allegations against those departments, the court concluded that plaintiff is a responsible person under § 9607(a)(3) of CERCLA because of the uncontroverted actions of the Air Force, NASA and GSA.

> n2 Prior to the entry of this order, the government dismissed its claims against Molycorp, Inc. and Marvin Pesses.
>
> n3 The plaintiff had previously moved for judgment on the pleadings on behalf of the Nuclear Regulatory Commission and the EPA in response to these counterclaims. That motion was denied by the court's adoption of a report and recommendation dated May 1, 1991.

[*7]

The government indicates that the entry of the proposed consent decree is the second step in a three step process to resolve entirely its claims "and potential liabilities in this case." The first step was taken when the United States' motion to dismiss without prejudice its claims against defendants Marvin Pesses and Molycorp, Inc. was granted. The second step is the entry of this decree, which resolves the claims to date of the United States by reimbursement of 100% of the United States' past response, oversight and enforcement costs. n4 The third step will be a motion for entry of a declaratory judgment as to the liability of the remaining defendants, which the government contends has already been established through the court's orders of March 30, 1992 and December 21, 1993. The government alleges that "at the end of these three phases, the United States will have recovered everything sought in the complaint, and the claims of the United States will be satisfied, leaving only the third phase of this litigation, in which the United

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

States is not involved: crossclaims and third-party claims of the defendants."

> n4 The government avers that its costs, including those incurred in the lodging of the instant consent decree, are now approximately $ 2,000,000.00.

[*8]

EPA's Prior Administrative Actions

The site was first brought to the attention of the EPA in the mid-1980's when elevated levels of nickel and other metals were detected at the site. The EPA has since been conducting and overseeing removal actions at the site through the use of superfund monies and the issuance of unilateral administrative orders ("UAO") pursuant to § 106 of CERCLA, *42 U.S.C. § 9606*. The first UAO was issued on August 17, 1990, and required its respondents to conduct specific removal actions, including determining the extent of contamination, disposing of hazardous non-radioactive waste and non-hazard radioactive waste offsite to a treatment, storage and disposal facility, conducting further sampling and analysis of the remaining materials and identifying and analyzing the various methods for treatment and disposal of the contamination remaining at the site. The 1990 UAO was issued to twenty-eight respondents: all twenty-six defendants as well as to Aerospace Metals, Inc. and Columbia Iron & Metal Company. Of the twenty-eight respondents, only seven defendants and Aerospace Metals, Inc. performed the work required. The costs [*9] incurred by these respondents were approximately $ 4,000,000.00. In addition to the physical removal of some materials from the site, the end product of the 1990 UAO was a "management options/analysis report" ("MOAR") which identified the various classifications of the remaining materials and analyzed the options for possible treatment and disposal of the wastes.

On June 20, 1993, the EPA issued a second UAO requiring additional removal action. The 1993 UAO was issued to all respondents who did not comply with the 1990 UAO, and to Aerospace Metals, Inc., and three more recently identified potentially responsible persons ("PRPs"). The government asserts that "upon completion of the Phase Three work, EPA does not foresee any other response action to be necessary at the site." The government further indicates that the non-settling defendants refused or failed to perform any work at the site pursuant to the 1990 UAO and are refusing to perform the work required by the 1993 UAO.

**The Terms of the Consent Decree**

At a status conference on October 13, 1992, the United States invited all parties in the litigation, including third-party defendants, to enter into a settlement. The United States explained [*10] that it sought to obtain 100% of its past costs and that it would not entertain "piecemeal" settlements with individual defendants. The United States further explained that it believed that this would be an amicable resolution of the instant dispute and that each party would only have to contribute a small amount if its past costs were covered on a per capita basis. The seven defendants who had completed the work under the 1990 UAO responded to the government's offer shortly before the issuance of the 1993 UAO. The United States then agreed not to include these seven defendants in the 1993 UAO. No other defendants were informed of the settling defendants' intentions to pay 100% of the government's past response costs nor apprised of the ongoing negotiations. On August 17, 1993, a consent decree between those seven defendants and the United States was lodged with this court. n5 Public notice of the proposed decree was published in the Federal Register on August 30, 1993. Pursuant to § 122(d)(2)(B) of CERCLA, *42 U.S.C. § 9622*(d)(2)(B) and *28 C.F.R. § 50.7*, the public was given a thirty day comment period. The Department of Justice received five sets [*11] of comments which are addressed in its brief in support of the instant motion.

> n5 Prior to the lodging of the instant decree, 21 of the 62 third-party defendants offered a sum certain to resolve de minimus claims at the site. The EPA has not responded to this offer.

The settlement scheme contemplated by the consent decree requires the seven settling defendants to cover the total liability of all responsible persons ("RPs") for past costs. Thus, it is best viewed as a "cash out" of the United States' past cost claims against all RPs, with the settling defendants advancing the settlement funds. The consent decree requires the settling defendants to reimburse, in two installments, the United States' past costs of approximately $ 2,000,000.00 at the site. These costs include oversight costs of UAOs issued pursuant to § 106 of CERCLA, *42 U.S.C. § 9606*. n6 In exchange for these payments, the United States covenants not to sue the settling defendants for past response costs and has [*12] granted the settling defendants a conditional covenant not to sue for any portion of the Phase Three work, unless the 1993 UAO is not satisfactorily performed by its respondents. The EPA reserves the right to issue a UAO to the settling defendants for Phase Three work and for any other future work at the sight (which is "not presently anticipated"), "thereby preserving its main interest in an expeditious cleanup of the site." The United

Case 1:02-cv-00107-SAS    Document 118-8    Filed 05/03/2004    Page 4 of 14

Page 4
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

States also reserves its rights and the covenants to sue given to the settling defendants do not apply to claims based upon the failure of the settling defendants to meet the requirements of the consent decree, claims for future damage to natural resources as defined in § 101(6) of CERCLA, *42 U.S.C. § 9601*(6), claims for costs incurred by any natural resources trustees, claims based upon criminal liability, claims for response costs incurred by any federal agencies other than the NRC, Air Force, GSA or NASA, claims for injunctive relief or administrative order enforcement under CERCLA with regard to Phase Three work if it is not otherwise satisfactorily performed by the respondents to the 1993 UAO and claims [*13] for future response costs. The settling defendants covenant not to sue the United States with respect to the site or the consent decree. They further covenant that they will not seek to challenge or otherwise contest an administrative order issued for the Phase Three work on any ground, unless the United States brings an enforcement action against the settling defendants for failure to comply with any future administrative order. The consent decree also provides that the settling defendants are entitled to the contribution protection which is afforded under § 113(f)(2) of CERCLA, *42 U.S.C. § 9613*(f)(2). n7

n6 The government has noted the inconsistency of the recovery of these oversight costs in light of *United States v. Rohm & Haas Co., 2 F.3d 1265 (3d Cir. 1993)*, which specifically held that such oversight costs are not recoverable under the plain language of CERCLA. The United States has provided no explanation for this apparent inconsistency and has not distinguished the recovery of these costs under the instant circumstances. [*14]

n7 The pertinent sections of § 9613(f) provide:

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607 (a) of this title. ... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. ...

**(2) Settlement**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

Separate provisions apply to the settling federal agencies. n8 The United States resolves its liability to the settling defendants in responding to the 1990 UAO, as well as any potential [*15] future liability to the settling defendants, by reimbursing the settling defendants $ 200,000.00 of the $ 4,000,000.00 they incurred in past response costs. The EPA further covenants not to take administrative action against the settling federal agencies. The settling federal agencies are required to pay $ 91,153.00 to the superfund and receive an unconditional covenant not to sue as to all past and all future costs at the site. The settling federal agencies also receive contribution protection.

n8 The settling federal agencies are defined as "all agencies of the United States" and include the EPA, NRC, Air Force, GSA and NASA.

The Standard of Review

In passing the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress authorized various types of settlements which the EPA may utilize in CERCLA actions, including consent decrees which require RPs to contribute to cleanup costs and/or to undertake response activities themselves. See *42 U.S.C. § 9622* [*16] (1987); *United States v. Cannons Engineering Corp., 899 F.2d 79, 85 (1st Cir. 1990)*. SARA's legislative history makes clear that the trial court's review of such consent decrees is undertaken to "satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." H.R. Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S. Code Cong. & Admin. News 3038, 3042; *Cannons 899 F.2d at 85*.

Page 5

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

Accordingly, "reasonableness, fairness, and fidelity to the statute are, therefore, the horses which the district judges must ride." *Cannons, 899 F.2d at 85.* By necessity these factors are quite malleable and must be used by the district courts to evaluate a wide range of potential problems and creative solutions which arise from the complex litigation generated by CERCLA. Generally, these assessments are made in conjunction with the recognition that public policy strongly favors settlements of disputes and that parties to a lawsuit are generally free to compromise their positions in order to reach an amicable resolution. See *Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 80 (3d Cir. 1982)* [*17] (public policies strongly favor settlements); *United States v. Armour & Co., 402 U.S. 673, 681, 29 L. Ed. 2d 256, 91 S. Ct. 1752 (1971)* (parties to a lawsuit are generally free to compromise their disputes).

The proponents of a consent decree have the burden of producing evidence which enables the court to determine independently whether the proposed consent decree is fair, reasonable and consistent with the goals of CERCLA. *Gautreaux v. Pierce, 690 F.2d 616, 630-31 (7th Cir. 1982).* In considering whether to approve a consent decree, the court must conduct an independent evaluation of the evidence relied upon in relation to the agreements reached and must eschew any rubber stamp approval of it. *United States v. Hooker Chemicals and Plastics Corp., 540 F. Supp. 1067 (W.D.N.Y. 1982),* aff'd, *749 F.2d 968 (2d Cir. 1984).* In order for the proponents to meet their burden of proof, they must develop and present an adequate record which enables the court to evaluate the proposed decree in light of "the evidence relied upon and the evidence [*18] discarded; the questions addressed by the agency and those by-passed; the choices open to the agency and those made." *United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991);* see also *United States v. Seymour Recycling Corp., 554 F. Supp. 1334, 1337-38 (S.D.Ind. 1982)* (court is to "eschew any rubber stamp approval in favor of independent evaluation"). The court's function in determining whether a particular decree passes muster is not to determine whether the best possible settlement that could have been reached has been, but is limited to determining whether the agreement is fair, reasonable and consistent with the goals of CERCLA. *Akzo, 949 F.2d at 1436.*

The analysis of whether the terms of a consent decree are fair involves both procedural and substantive components. *Cannons, 899 F.2d at 86.* In evaluating procedural fairness "a court should ordinarily look to the negotiation process in an attempt to gauge its candor, openness and bargaining balance." Substantive fairness "introduces into the equation, concepts of corrective justice [*19] and accountability: a party should bear the cost of harm for which it is legally responsible." *Id. at 87.* The terms of the consent decree must be based upon a rational measure of apportioning liability and determining comparative fault. Id. (citing *United States v. Rohm & Haas, 721 F. Supp. 666, 685 (D.N.J. 1989); Kelley v. Thomas Solvent Co., 717 F. Supp. 507, 517-18 (W.D.Mich. 1989); United States v. Conservation Chemical Co., 628 F. Supp. 391, 401 (W.D.Mo. 1985)).*

Generally, the determination of comparative fault at a particular site is left largely to the informed judgment of the EPA. *Cannons, 899 F.2d at 87.* The means by which the EPA has apportioned liability is generally upheld whenever there is a reasonable and good faith basis for that apportionment. *Id. at 88; Akzo, 949 F.2d at 1436* (the presumption in favor of voluntary settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative [*20] agency like EPA which enjoys substantial expertise in the environmental field). However, "the true measure of the deference due [to a particular administrative agency's decisions] depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." *Cannons, 899 F.2d at 84* (quoting *F.T.C. v. Standard Financial Management Corp., 830 F.2d 404, 408 (1st Cir. 1987)).*

Examining the reasonableness of a decree is a multifaceted exercise. *Cannons, 899 F.2d at 89.* The most important facet is "the decree's likely efficaciousness as a vehicle for cleansing the environment." Id. Another important facet is whether "the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures." A third facet is whether the proposed settlement takes into account the foreseeable risks of loss, which includes an assessment of the strength of the parties' litigating positions. Id. Finally, the reasonableness of a decree must be assessed in light [*21] of the congressional goal of expediting effective remedial action and minimizing litigation. *United States v. Rohm & Haas Co., 721 F. Supp. 666, 680 (D.N.J. 1989).*

The Court of Appeals for the Third Circuit has consistently noted that "CERCLA is a remedial statute which should be construed liberally to effectuate its goals." *United States v. Alcan, 964 F.2d 252, 258 (3d Cir. 1992); FMC Corp. v. United States, 29 F.3d 833, 840 (3d Cir. 1994).* "CERCLA's primary purpose is remedial: to clean up hazardous waste sites." *United States v. Rohm & Haas, 2 F.3d 1265, 1270 (3d Cir. 1993); B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992)* (one of CERCLA's primary purposes is to provide for efficient and expeditious

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

remediation of the nation's toxic waste sites). CERCLA's other "essential purpose [is] making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *FMC, 29 F.3d at 840* (quoting *Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir. 1993));* [*22] *Alcan, 964 F.2d at 258* (one of statute's principal goals is "assuring that those who caused chemical harm bear the costs of that harm ....") (citation omitted)). By placing the burden of clean-up and remediation on responsible parties, the statute is designed to make the party benefiting from the commercial activities creating the waste internalize the subsequent health and environmental costs of its activity into the costs of doing business. *FMC, 29 F.2d at 840.*

A consent decree is more than a simple contract. *Kelley v. Thomas Solvent Co., 717 F. Supp. 507, 515 (W.D.Mich. 1989).* Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties. Id. A judicial order approving the decree transforms it into a continuing decree of equitable relief and its prospective provisions operate as an injunction. Id. (citing *Carson v. American Brands, 450 U.S. 79, 84, 67 L. Ed. 2d 59, 101 S. Ct. 993 (1981)).* While the court has the power to modify the decree should changed circumstances [*23] subvert its original purpose, *Brown v. Neeb, 644 F.2d 551, 563 (6th Cir. 1981),* a court may only approve or reject a consent decree as presented and may not modify or alter its provisions in the process of approving it. Id. (citing Officers for Justice v. Civil Service Commission), *688 F.2d 615, 625-26 (9th Cir. 1982)).* In other words, a court may not substitute its own judgment for that of the parties as reflected in the decree. *United States v. Jones & Laughlin Steel Corp., 804 F.2d 348 (6th Cir. 1986).*

Discussion

A. The Parties' Contention

In response to the motion to enter the consent decree, the non-settling defendants and the third-party defendants filed briefs in opposition. These parties contend that the government has entered into a "sweetheart" deal with itself and allege that the government's allocation of its own percentage of costs is without precedential support in the history of CERCLA, self-serving and lacking appropriate support in the record. They further argue that the extraordinary covenant not to sue for future liability granted to the settling federal agencies [*24] is contrary to the statutory intent reflected in § 122 and the EPA's own internal guidelines pertaining to releases from liability when less than a complete remedial action has been undertaken at a particular site. n9

n9 The term "remedial action" is specifically defined under CERCLA:

> The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. ...

*42 U.S.C. § 9601*(24) (emphasis added).

In its reply brief, the United States argues that 100% of its past costs are being recouped from the settling defendants. It reiterates that the instant litigation concerns only a removal action and not a remedial action. n10 It notes [*25] that in removal actions it is not required to perform a Remedial Investigation and Feasibility Study, risk assessment or Record of Decision. With regard to the contentions that the EPA failed to apply its own internal guidelines derived from the relevant statutory sections on CERCLA settlements in an even-handed manner to the federal agencies, the government asserts that it is entering "into this settlement pursuant to the inherent authority of the Attorney General." It further asserts that the congressional enactments regarding settlements under CERCLA do not specifically limit the authority of the Attorney General to compromise claims where the United States is a party and that its own interpretations of the statutory settlement provisions and its regulations promulgated thereunder do not pertain to the instant settlement. The government attempts to justify the settling federal agencies' covenant not to sue as to future liability by arguing that the federal agencies are essentially responsible parties whose contribution of hazardous wastes to the site were de minimus (1.5% of the estimated number of total shipments). It further avers that "In order to remove the United States [*26] from the case completely, the consent decree, in essence begins the allocation process that will be performed in Phase Three [of this litigation] by determining the United States' allocation of response costs."

Case 1:02-cv-00107-SAS    Document 118-8    Filed 05/03/2004    Page 7 of 14

Page 7

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

n10 A "removal" action is defined as follows:

> The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result form a release or threat of release.

*42 U.S.C. § 9601*(23). The Third Circuit has opined that "in general, removal actions are short term responses to a release or threat of release while remedial actions involve long term remedies." *Rohm & Haas, 2 F.3d at 1271.*

[*27]

B. The Relevant Statutory Provisions and the Decree's Furtherance of CERCLA's Goals

In passing the 1986 SARA amendments, Congress explicitly made clear that the various agencies of the federal government are to be treated no differently than any other person or entity with regard to CERCLA liability. Section 120 of the SARA amendments provides:

**(a) Application of Chapter to Federal Government**

**(1) In general**

> Each department, agency, and instrumentality of the United States (including the executive, legislative and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title. Nothing in this section shall be construed to affect the liability of any person or entity under sections 9606 and 9607 of this title.

*42 U.S.C. § 9620*(a)(1) (emphasis added). Congress intended that the federal government and its various agencies and branches be subject to the same treatment as any other person or entity found liable under CERCLA. See *FMC, 29 F.3d at 842* [*28] (§ 9620(a)(1) "imposes liability on the government to the same extent as liability is imposed on 'any nongovernmental entity'" and may even encompass liability for regulatory actions which only the government can undertake when such actions establish liability under CERCLA). Accordingly, where the government is a RP, "it should be held responsible for cleanup costs, just as any private business would be, so that it will internalize the full costs ... [that its hazardous] substances impose on society and on the environment." *Id. at 840.*

At the same time, Congress promulgated § 122 which sets forth various standards applicable to various types of settlements entered into under CERCLA. "The legislative history (of § 122) reveals that Congress was concerned about "sweetheart deals," and thus mandated that certain procedures be followed." *United States v. Moore, 703 F. Supp. 455, 459 (E.D.Va. 1988)* (citing 1986 U.S. Cong. & Admin. News 2835, 2957-57); see also 2 Susan M. Cooke, The Law of Hazardous Waste: Management, Cleanup, Liability and Litigation § § 12.04[2][d]; 13.01[5][d] (1994). Of particular concern here is subsection [*29] (f) which addresses various conditions regarding covenants not to sue. In general, subsection (f) provides that the president may provide any person with a covenant not to sue concerning future liability resulting from the release or threatened release of a hazardous substance which is "addressed by a remedial action" if the covenant not to sue is in the public interest, would expedite response action consistent with the national contingency plan, the person is in full compliance with the terms and conditions of the consent decree, and the response action has been approved by the EPA. *42 U.S.C. § 9622*(f)(1). Such covenants, when they concern future liability to the United States, shall not take effect until the EPA certifies that remedial action has been completed in accordance with the requirements of CERCLA at the facility in question. *42 U.S.C. § 9622*(f)(3).

In addressing the appropriateness of a covenant not to sue as to future liability under the above provisions, the EPA is to consider where the covenant is in the public interest based on an assessment of the effectiveness and reliability of the utilized [*30] remedial action (in light of other alternative remedies

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 8 of 14

Page 8

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

considered), the nature of the risks remaining at the facility, the extent to which various performance standards are incorporated into the decree, the extent to which the response action has provided a complete remedy for the facility, the extent to which the technology used in the response action is demonstrated to be effective, the additional sources of funding available for any additional remedial actions which might eventually become necessary and whether the proposed remedial action will be carried out by the RPs themselves." *42 U.S.C. § 9622*(f)(4). Congress likewise indicated that in addition to a remedial action being adequately developed and implemented before such covenants for future liability are given, that any such covenant be subject to a reopener clause which allows the United States "to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions which are unknown at the time the president certifies under paragraph (3) that remedial action has been completed at [*31] the facility concerned." *42 U.S.C. § 9622*(f)(6). Such a reopener may be omitted in "extraordinary circumstances" where, "after assessment of relevant factors referred to [above] and volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interests considerations, precedential value, and inequities and aggravating factors," the "terms, conditions, or requirements of the agreement containing the covenant not to sue are sufficient to provide all reasonable assurances that public health and the environment will be protected from any future releases at or from the facility." *42 U.S.C. § 9622*(f)(6)(B).

In addition to the above provisions regarding covenants not to sue, Congress promulgated guidelines for effectuating early cash-outs of RPs whose individual contributions of hazardous substances to a site are "de minimus." These settlements are final as to a party's liability. This subsection authorizes such cash-outs where the settlement concerns only a "minor portion of the response costs at a particular facility" and the party's contribution of hazardous wastes and their toxicity [*32] are minimal in comparison to other hazardous substances at the facility. *42 U.S.C. § 9622*(g)(1). A de minimus settlement may include a covenant not to sue as long as it is not inconsistent with the public interest as determined under subsection (f). *42 U.S.C. § 9622*(g)(2).

Subsection (h) of § 122 sets forth various provisions dealing with the authority to settle any claim pertaining to "costs incurred by the United States" in a response action and the settlement of response costs under § 9607. This subsection does not contain any provisions authorizing a covenant not to sue regarding future liability. As with other settlements entered into under § 122, subsection (h) provides contribution protection for "matters addressed in the settlement." *42 U.S.C. § 9622*(h)(4).

The EPA has promulgated various guidelines to assist it in entering into covenants not to sue in private party settlements. In 1985, the EPA promulgated an interim CERCLA settlement policy, set forth at *50 F.Reg. 5034 (1985),* which addresses settlement proposals to reimburse the government [*33] for response costs. The 1985 policy sets forth ten factors to be considered when the government is settling less than the total liability arising from the site. The most relevant factors include assessing the volume and the nature of the waste contributed by each RP, the strength of the evidence tracing the wastes at the site to each settling RP, the litigative risks in proceeding to trial, public interest considerations and the nature of the case that remains after settlement.

The EPA also has promulgated guidelines regarding covenants not to sue under § 122(f), which address the conditions which must be present to grant such covenants. The EPA has concluded that in passing § 122, Congress "established specific requirements governing the Agency's ability to issue such covenants." The 1987 guidelines indicate that the key consideration is the status and progress of the remedial action itself. Such covenants are only to be granted if there is sufficient information to demonstrate that the ultimate remediation of the site can and will be successfully completed. The EPA's regulations indicate that any such covenant must comply with the criteria set forth in § 122(f)(1) and the factors [*34] enumerated in § 122(f)(4). Furthermore, the EPA has interpreted the statute to require that any covenant not to sue regarding future liability cannot take effect until the EPA certifies that the remedial action has been completed. Accordingly, its regulations provide that "prior to certification, therefore, the settling party remains fully responsible for any future liability for future remedial action necessary at the site."

The EPA's interpretation of § 122 is consistent with the congressional intent reflected in that section. First, Congress expressed a clear intent that covenants as to future liability be granted only when a plan for permanent cleanup of the hazardous substances at a particular site has been delineated and it is clear that the remedial action itself will be completed by those parties entering into the consent decree. Otherwise, such covenants may be entered into with de minimus parties where the factors set forth in § 122(g) are met. The EPA has interpreted the key provisions of § 122(f), in relation to the other sections of SARA and the relevant legislative history, as serving several goals, including "codifying the principle that the more permanent the cleanup [*35] the

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 9 of 14

Page 9
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

more complete the release" and "protecting the public by ensuring that responsible parties remain liable for future releases requiring future remedial action."

The government asserts that § 122(f) and the EPA's regulations do not apply to the instant settlement and the covenant granted to the settling federal agencies because "the United States enters into this settlement pursuant to the inherent authority of the Attorney General" to compromise litigation and "section 122(f) applies only to settlements under section 122, which this is not" because the action is one for past costs regarding "a removal action (as opposed to a remedial action)." The government relies on *United States v. Hercules, 961 F.2d 796 (8th Cir. 1992),* to support its authority to enter into the instant settlement. That case, however, does not stand for the proposition that the principles codified in § 122 are to be ignored in assessing the propriety of a covenant which releases a party's future CERCLA liability.

In Hercules, the government entered into a consent decree with a number of entities which were successors to an entity which previously owned and operated a pesticide [*36] manufacturing plant (the Phoenix parties) but were essentially only one of three main RPs. See *United States v. Vertac Chemical Corp., 756 F. Supp. 1215, 1217 (E.D.Ark. 1991).* Another RP had settled with the United States in a previously approved consent decree. Prior to trial, the Phoenix parties and the government agreed to resolve the issue of liability under a number of applicable federal and state statutes "in return for their payment of $ 1.84 million for cleanup costs, $ 126,000 for natural resource damages caused by the continuation, and 33 percent of all future pre-tax profits earned over the next twelve years, or forty percent of the liquidation value, in the event Phoenix is liquidated before the termination date." *Id. at 1218.* The remaining RP objected to the proposed consent decree, contending that § 122 "prohibits a 'cash out' settlement with a non de minimis party where no remedy has been selected or completed; that the covenant not to sue is permitted only when remedial action has been completed; and that the settlement does not contain a reopener provision as required by section 122(f)(6)(A)." Id. [*37] The trial court concluded that § 122 was not to be "construed so narrowly" and that the "EPA must be granted some discretion in fashioning settlements which are fair and reasonable under the circumstances, while furthering the objectives of CERCLA." *Id. at 1219.* Drawing on § 122 to assure that a "sweetheart" deal was not being approved, the trial court approved the decree because (1) it was the result of good faith, arm's length negotiations, (2) the decree contained stringent restrictions that were imposed on the Phoenix parties to ensure that they would fully meet their obligations (including sever limitations on salaries, fringe benefits and borrowing money) and (3) that the settlement represented "the maximum possible amount of money obtainable from the Phoenix parties given their net worth and their limited ability to pay." Id. It concluded that "the finite resources of the Phoenix parties are better put to use in helping clean up the Jacksonville site than in litigation costs." Id.

In affirming the trial court's entry of the decree, the Court of Appeals for the Eighth Circuit held that § 122 was not a clear and unambiguous limitation on [*38] the Attorney General's authority to compromise litigation. *Hercules, 961 F.2d at 799.* It further held that Congress' omission of authority to grant covenants for future liability in § 122(h) did not "clearly and unambiguously limit the Attorney General's inherent authority, derived from *28 U.S.C. § 516* ..., to make settlements of recovery cost litigation involving the United States." Id. Finally, it found no abuse of discretion by the trial court in entering the decree because the decree was consistent with the objections of CERCLA in that the settlement obtained the maximum amount of recovery obtainable from the settling parties and furthered the goal of expediting cleanup by using the parties' finite resources toward that end. *Id. at 800.*

While Hercules establishes that the provisions of § 122 are not an express limitation on the Attorney General's authority to compromise CERCLA claims in general, it does not establish that the provisions of § 122 are to be ignored in assessing whether a covenant not to sue for future liability given to a particular party is appropriate under [*39] the circumstances. The congressional concerns regarding "sweetheart" deals and the codified principle that complete releases are to be measured in relation to the permanency of the cleanup are heightened where the consent decree does not seek to establish who will be responsible for a significant amount of cleanup that remains at a site and seeks to release a party based upon an assessment of only that party's contributions of waste. Accordingly, the principles codified in § 122 provide general guidance for assessing whether the instant covenant given to the federal agencies is consistent with the goals of CERCLA and in the public interest.

In assessing the propriety of the covenant granted to the federal agencies, it is significant that the instant consent decree does not further CERCLA's goal of expediting the complete remediation of the site in question. No party to the decree is required under its terms to do anything to further the removal or remediation of the contamination remaining at the site. Instead, the settling parties are being rewarded with purported contribution protection for shouldering the costs of the 1990 UAO and buying out the government's investigative and oversight [*40] costs to date and the

Case 1:02-cv-00107-SAS    Document 118-8    Filed 05/03/2004    Page 10 of 14

Page 10
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

settling federal agencies are receiving a complete release for contributing a small percentage of the costs based upon a present estimate of the immediately foreseeable costs of completing the presently anticipated response actions. Thus, the CERCLA interest being served in the proposed decree is not the assured completion (or even partial completion) of the remediation of the site, but instead is only the apportionment interest of assuring that those who contributed to the site internalize the costs of the harm they caused to the environment. Accordingly, the concepts of corrective justice and accountability are at the forefront of the court's analysis. In addition, because five entities are being completely released from liability at the site, the public interest of assuring that adequate funds ultimately are available to pay for the entire costs of cleanup is brought into play.

### C. Public Interest Considerations

The present record does not establish that the public interest will be served by the total release of the federal agencies at this juncture in the cleanup and/or litigation. The record indicates that the site still presents a real danger to the [*41] public. The decree does not assure that any party will undertake any further response action at the site. Furthermore, without a determination on joint and several liability and an assessment of who will initially bear the costs of the remaining cleanup, it cannot be assumed that there will be adequate resources available to fund the permanent remediation of site. Accordingly, the total release of the federal agencies is premature.

Public policy considerations under the EPA's guidelines include consideration of the timing factors associated with any cleanup and the ability to complete all necessary response actions. These factors have been overlooked with regard to the settlement provisions offered to the federal agencies. The government's issuance of the 1993 UAO order to various noncomplying defendants establishes that there is presently an "imminent and substantial endangerment to the public health or welfare or the environment" and that this endangerment needs to be immediately addressed and eliminated. The non-settling defendants have been described as "recalcitrant" defendants who refused to perform any work required under the 1990 UAO and are refusing to perform any work required [*42] under the 1993 UAO. Progress at the site has been slow. Furthermore, the record supports the non-settling defendants' contention that permanent cleanup of the site will be complicated due to the dilemma created by the presence of radioactive materials and the limited means available to dispose of or remediate such wastes properly. See the MOAR set forth at Exhibit E to Scrapper/Dealer Defendants' Brief in Opposition. Thus, the record as a whole indicates that the removal actions undertaken at the site fall short of the permanency of the selection, certification and implementation of remedial action generally required for the total release of a party from liability. And, while the government has assured "its main interest in an expeditious cleanup" by demanding conditional covenants as to the settling defendants' future liability (and only settling with these defendants as to the actual past costs expended), these same considerations have been overlooked with regard to the federal agencies' obligations to the public.

Moreover, in adopting the report which granted the plaintiff's partial summary judgment motion for liability against the defendants under § 9707(a), the court specifically [*43] declined to grant plaintiff's request to include a determination of joint and several liability against each defendant because of the directives set forth in *United States v. Alcan Aluminum Corp., 964 F.2d 252 (3d Cir. 1992).* n11 There, the court noted that CERCLA does not specifically provide for joint and several liability in multiple defendant cases. While the court specifically stated that joint and several liability is generally appropriate in § 107 actions, it further held that apportionment may be warranted in certain circumstances. It determined that the burden of establishing a reasonable basis for apportionment rests with the defendant and noted that this burden is substantial. *Alcan, 964 F.2d at 267-71.* Accordingly, the court held that the determination of whether joint and several liability exists must be based on principles of federal common law and used the Restatement (Second) of Torts for guidance. After concluding that the government need not prove causation with regard to its initial burden of establishing liability, the court stated:

> Our conclusions on this point are completely consistent with our [*44] previous discussion on causation, as there we were concerned with the government's burden in demonstrating liability in the first instant. Here we are dealing with Alcan's effort to avoid liability otherwise established. We observe in this regard that Alcan's burden in attempting to prove the divisibility of harm to the Susquehanna River is substantial, and the analysis will be factually complex as it will require an assessment of the relative toxicity, migratory potential and synergistic capacity of the hazardous waste at issue... But Alcan should be permitted this opportunity to limit or avoid liability. If Alcan succeeds in this endeavor, it should only be liable for that portion of the harm fairly attributable to it.

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 11 of 14

Page 11

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

Id. The court further rejected the government's argument that a hearing was unnecessary because the defendant had commingled its waste with other generators' waste. It opined:

> ... "Commingled" waste is not synonymous with "indivisible" harm. We observe that some courts have held that a generator may present evidence that it has paid more than its "fair share" in a contribution proceeding, expressly permitted under 42 U.S.C. § 9613 [*45] (f)(2). ... In a sense, the "contribution" inquiry involves an analysis similar to the "divisibility" inquiry, as both focus on what harm the defendant caused. However, we believe that this inquiry, to the extent that it is the same as that discussed in above-noted cases, is best resolved at the initial liability phase and not the contribution phase since it involves precisely relative degrees of liability. Thus, if the defendant can prove that the harm is divisible and that it only caused some portion of the injury, it should only be held liable for that amount. In our view, the logical consequence of delaying the apportionment determination may well be drastic, for it seems clear that a defendant would easily be strong-armed into settling where other defendants have settled in order to avoid being held liable for the remainder of the response costs.

*Id. at 270 n.29.*

n11 Because discovery in the instant action has not been completed with regard to the divisibility of harm and cost apportionment issues due to the fact that it has been postponed until Phase II of the action, the magistrate judge concluded that the question of the defendants' joint and several liability was premature.

[*46]

A close reading of Alcan indicates that the court cannot assume at this juncture of the litigation that the ultimate funds and resources necessary to completely remediate the site will continue to be available after the release of the federal agencies. The Alcan court held that a defendant may be able to avoid joint and several liability by showing that there is a "reasonable basis" for apportioning the contribution of each polluter to the single harm caused. n12 The court's opinion also indicates that the divisibility issue cannot be resolved in favor of the government at this juncture simply because it appears to be difficult. n13 Without a determination on the divisibility issue or a consent decree which obligates the defendants to complete the presently needed response actions, it cannot be assumed that the remaining private party defendants will be legally obligated to shoulder the entire costs of all further actions at the site in the end. Thus, without an affirmative basis from which to conclude that any permanent remedial action ultimately selected will be funded by those who legally bear the responsibility for such actions, the complete release of the federal agencies [*47] is premature and inconsistent with the congressional intent reflected in § 122 and the EPA's regulations thereunder.

n12 In Rohm and Haas, the Court further opined that "in order to warrant apportionment, a defendant cannot simply provide some basis on which damages may be divided up, but rather it must show that there is a reasonable basis for determining the contribution of each cause to a single harm." *Rohm and Haas, 2 F.3d at 1280.*

n13 The court noted that the joint pollution of water is typically considered to be subject to the divisibility rule. Alcan, 964 F.2d at n.27 ("there are other kinds of harm which, while not so clearly marked out as separable into distinct parts, are still capable of division upon a reasonable and rational basis and a fair apportionment among the causes responsible ... . Such apportionment is commonly made in cases of private nuisance where the pollution of a stream ... has interfered with the plaintiff's use and enjoyment of his land.") (quoting *Restatement (Second) of Torts § 433A*, comment d; (emphasis in opinion)).

[*48]

D. The Decree's Allocation of Comparative Fault

The proponents of the decree have failed to establish that the present allocation of the federal agencies' responsibility as to all past and future liability is reasonable and equitable under the circumstances. The court is unable to ascertain from the present record whether the share of apportionment costs assigned to the federal agencies is a fair approximation of comparative fault in relation to the other RPs.

In approving a decree, the district courts have an obligation to assure that the equitable contribution rights of the non-settling parties have been adequately considered in forging the compromise reached by the

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 12 of 14

Page 12
1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

settling parties. The provisions of CERCLA and its legislative history establish that the judiciary is "to apportion responsibility in a fair and equitable manner." *United States v. Conservation Chemical Co., 628 F. Supp. 391, 401 (W.D.Mo. 1985)*. The courts are to avoid creating a "windfall" or "wipeout" by approving a decree "which results in an apportionment of responsibility which arbitrarily or unreasonably ignores the comparative fault of the parties, where there is a reasonable [*49] basis for allowing that comparison to be made." *Id. at 402* (emphasis added). Furthermore, the court must be satisfied that the settlement "is not an opportunity to avoid any of the cleanup requirements or procedures of the act." *Akzo, 949 F.2d at 1436* (quoting 132 Cong.Rec. S 14, 918 (daily ed. Oct. 3, 1986) (Statement of Sen. Mitchell)).

The United States contends that the allocation of the federal agencies' contribution is justified on the basis of a log book which partially reflects the number of shipments sent to the site. It avers that it is "not presently aware" of additional materials which would assist in ascertaining volumetric contributions and therefore the log book was a neutral means by which to ascertain its share of the waste sent to the site. n14 The total shipments recorded in the receiving log were counted and then compared with the number of currently identifiable federal shipments. The government asserts that even when the shipments from the early operation of the site (which were not recorded in the log book) are included and one "makes the reasonable assumption that federal shipments to other Pesses' [*50] operations which ultimately reached the site were in about the same proportion as the shipments whose origins" are known, then the federal agencies are responsible for about one-half of one percent of the shipments. It asserts that the total of these shipments would make the United States responsible for 1.5% of the total shipments to the site. Under this total shipment analysis, it asserts that the federal agencies are paying ten times the government's share of shipments to the site. n15 The government's argument is that it should in essence receive de minimus party status because the other defendants' waste has been commingled with the radioactive waste and there is no basis to believe that the federal agencies who shipped radioactive wastes to the site are any more liable than any other defendant. The government admits that its proportional share of liability has been assessed in relation to the spent cadmium batteries sent to the site by the Air Force because it was willing to concede liability on this basis and argues that the counterclaims against the EPA and NRC are without merit because these types of claims generally have been unsuccessful in the past. No similar assessment [*51] has been made as to the 26 defendants' or the 62 third-parties' contributions to the site. The government's share of costs has not been compared to the share of costs attributable to any similarly situated defendants.

> n14 The government has not used the log book to ascertain any other RPs' proportional share of the wastes. The non-settling defendants note that there are over 90 boxes of related documents which supplement the log book.
>
> n15 The government attempts to bolster this analysis by submitting deposition testimony from Marvin Pesses who stated that all materials sent to the site by the United States came from the Air Force. It asserts that this error on Marvin Pesses' part demonstrates the relatively minor nature of the shipments of cobalt and thoriated nickel chrome from GSA and NASA.

The record is devoid of any attempt by the government to adequately evaluate the type of wastes sent by the various parties and the settling federal agencies. No attempt has been made to evaluate the relative toxicity, [*52] migratory potential and synergistic capacity of the wastes contributed by the various parties or the correlations between the various wastes and the costs of any viable permanent remedial action presently under consideration. n16 The federal agencies shipped some of the radioactive materials present at the site. The record demonstrates that 75% of the site includes waste which contains detectable levels of radioactive materials. To date, discovery has only revealed five defendants who have shipped radioactive wastes to the site: two of the settling defendants, one of the settling federal agencies and two non-settling defendants. The government implicitly suggests that any additional costs of removing and remediating the radioactive material cannot be distinguished from the costs that would ordinarily arise for treating the remaining hazardous wastes.

> n16 The EPA's own guidelines stress the following about the nature of the wastes contributed:
>
>> 2. Nature of the Wastes Contributed
>>
>> The human, animal and environmental toxicity of the hazardous substances contributed by the PRPs, its mobility, persistence and other properties are important factors to consider. As noted above, a small amount of

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 13 of 14

Page 13

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

wastes, or a highly mobile waste, may cost more to clean up, dispose, or treat than less toxic or relatively immobile wastes. In addition, any disproportionate adverse effects on the environment by the presence of wastes contributed by those PRPs should be considered.

If a waste contributed by one or more of the parties offering a settlement disproportionately increases the costs of cleanup at the site, it may be appropriate for parties contributing such waste to bear a larger percentage of cleanup costs than would be the case by using solely a volumetric basis.

[*53]

No defendant has had the benefit of discovery on the issues of divisibility or apportionment and thus the court is unable to ascertain whether, under the appropriate principles of corrective justice and accountability, contributions of radioactive waste should be factored into any party's proportional share of responsibility. As the Alcan court observed, commingled waste is not synonymous with indivisible harm. Furthermore, where the decree does not further the purpose of expediting the remediation of a site, and only attempts to allocate the response costs among the parties through a decree in equity, the basis for excluding the toxicity of the parties' wastes from the allocation of response costs should be firmly established so that there is a fair basis for uniformly applying that principle in all additional allocations among the remaining parties.

Moreover, what has been left out of the analysis concerning the justification for the total release of the federal agencies is a comparison of the relative responsibilities of the various defendants. A comparison of this nature is essential to an adequate determination of whether the decree has fairly allocated responsibility and [*54] accountability. While a de minimus settlement is based upon an assessment of total response costs and the minimal volume and toxicity of a party's contributions, such an assessment is inadequate where guidelines for de minimus treatment have not been uniformly established and even-handedly applied. Comparative fault and accountability cannot be assessed in a vacuum; such an analysis is dependent upon correlations between the various defendants' contributions and the overall costs of remediation. Accordingly, the "piecemeal" settlement used to assess the federal agencies' liability does not provide an adequate basis to assure that the five settling federal agencies have paid their fair share in relation to what other similarly situated defendants ultimately will be required to pay.

Finally, the government's contention that the consent decree's allocation of the federal agencies' proportional share of all costs should simply be viewed as the first step in "the allocation process that will be performed in phase three" likewise is misplaced. Even where a determination is made on legal principles that the harm at a particular site is not divisible, such a determination "will [*55] not negate a defendant's right to seek contribution from other non-settling defendants, as the contribution proceeding is an equitable one in which a court is permitted to allocate response costs based on factors it deems appropriate." *Alcan, 964 F.2d at 270 n.29*. The "equitable apportionment" established by treating the settling federal agencies as de minimus contributors but failing to establish similar criteria and applying it to all other similarly situated RPs is obscure. Furthermore, the logic and equity of stripping all non-settling defendants, third-party defendants and any PRP identified in the future of the right to seek contribution from the settling federal agencies through a decree in which those parties have not had the benefit of full discovery and have had no input or say is questionable where there has not been a determination as to joint and several liability and the government admits that it is not relying on CERCLA's settlement provisions to establish the authority for binding all such parties through the decree. See *United States v. Asarco, Inc., 814 F. Supp. 951, 956 n.4 (D.Col. 1993)* (without [*56] a determination on joint and several liability, a party may assert an independent cost recovery claim against any other party because there is no common liability and therefore no right of contribution); *Martin v. Wilks, 490 U.S. 755, 768, 104 L. Ed. 2d 835, 109 S. Ct. 2180 (1989)* (under the general rules of federal common law, "[a] voluntary settlement in the form of a consent decree between one group of [plaintiffs] and a [defendant] cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of [plaintiffs] who did not join in the agreement. This is true even if the second group of [plaintiffs] is a party to the litigation ....") (citing *Firefighters v. Cleveland, 478 U.S. 501, 529, 92 L. Ed. 2d 405, 106 S. Ct. 3063 (1986))*. The lack of a firm basis in the record from which to judge the comparative fault and responsibility of the federal agencies in relation to the other RPs' comparative responsibility, the lack of any guidelines from which to assess whether similarly situated parties will be treated similarly and the fact that [*57] the proponents do not rely on any statutory authority to effectuate the decree, provide colorable bases for subsequent challenges to the propriety of the decree which would prolong rather than minimize the instant litigation. Accordingly, because the

Case 1:02-cv-00107-SAS   Document 118-8   Filed 05/03/2004   Page 14 of 14

Page 14

1994 U.S. Dist. LEXIS 18684, *; 39 ERC (BNA) 1951

record fails to justify the proposed allocation of the federal agencies' total response costs in relation to the other RPs' proportional share of response costs, it cannot be said that the decree fairly allocates responsibility among the various RPs.

We recognize that the government should not be required to litigate this action in order to settle it, nor should it be required to settle with all RPs in order to resolve its liability in the instant litigation. But where the settlement negotiations were not openly extended to all RPs and the government chooses to treat itself differently than all others who are part of or directly impacted by the settlement agreement, the reasons for such preferential treatment must be adequately supported on the record and must be part of a fair and reasonable allocation of responsibility in relation to all who will be affected by it.

For those reasons noted above, the plaintiff's motion to enter consent [*58] decree will be denied. The Scrapper/Dealer defendants' motion for oral argument on the United States' motion to enter consent decree will be denied as moot.

An appropriate order will follow.

Gustave Diamond

United States District Judge

DATE: November 7, 1994

ORDER OF COURT

AND NOW, this 7th day of November, 1994, for the reasons stated in the opinion filed this day, IT IS ORDERED that plaintiff's motion to enter a consent decree (Document No. 1047) be, and the same hereby is, denied; and,

IT IS FURTHER ORDERED that defendants' motion for oral argument on the plaintiff's motion to enter consent decree (Document No. 1063) be, and the same hereby is, denied as moot.

Gustave Diamond

United States District Judge