UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

MAY 19 1998

**MEMORANDUM**

SUBJECT:  Implementation of the CSO Control Policy

FROM:   Robert Perciasepe
        Assistant Administrator
        Office of Water

        Steven A. Herman
        Assistant Administrator
        Office of Enforcement and Compliance Assurance

TO:     Water Management Division Directors, Regions 1-10
        Regional Counsels, Regions 1-10
        State Directors

The purpose of this memorandum is to discuss implementation of the Combined Sewer Overflow Control Policy (CSO Policy) and identify areas where heightened efforts are necessary.

The Environmental Protection Agency (EPA) published the CSO Policy on April 19, 1994 (59 FR 18688), following a negotiated policy dialogue among representatives from States, environmental groups, municipal organizations, and EPA. The CSO Policy provides for a phased process to bring communities with combined sewer systems into compliance with the technology-based and water quality-based requirements of the Clean Water Act. To date, EPA has released six guidance documents and continues to work with stakeholders to foster implementation of the Policy.

The CSO Policy is now four years old and continues to be recognized as an example of innovation and good government. In principle, EPA and its stakeholders continue to affirm the Policy's key themes, such as permitting flexibility, stakeholder coordination and public participation, financial capability as a factor affecting implementation schedules, and examination of water quality standards as appropriate. In practice, however, many challenges remain, and implementation of the Policy has not met some initial expectations.

<u>Nine Minimum Controls.</u> The CSO Policy's first key milestone was implementation of the nine minimum controls by January 1, 1997. The nine minimum controls are measures that can reduce CSOs and their effects on receiving water quality without requiring significant engineering studies, construction activity, or financial investment. In a November 18, 1996, memorandum to the Regional and State Directors, we communicated the importance of meeting this deadline.


Recycled/Recyclable
Printed with Soy/Canola ink on paper that contains at least 50% recycled fiber

2

Under the CSO Policy, implementation of the nine minimum controls should become an enforceable obligation through inclusion in an appropriate enforceable mechanism. The Policy describes how the nine minimum controls and other CSO requirements are to be included in National Pollutant Discharge Elimination System (NPDES) permits (renewed permits or reopened and reissued permits) or administrative orders. The November 18, 1996, memorandum reminded NPDES authorities that the approach identified in the CSO Policy — not to seek civil penalties for past CSO violations — would not apply unless the permittee has no discharges during dry weather and meets the objectives and schedules of the CSO Policy, including the January 1, 1997, deadline for implementing the nine minimum controls. By now, every CSO community should be implementing the nine minimum controls, and most NPDES permits should contain measurable, enforceable, and specific conditions requiring implementation of the nine minimum controls, including submittal of appropriate documentation.

Although the January 1, 1997, implementation deadline has passed, our best information from EPA Regions and States indicates that only about 52 percent of CSO communities are currently implementing the nine minimum controls. Approximately another 25 percent have not yet implemented the nine minimum controls but are under an enforceable requirement to do so in the future.

There are several reasons for this. Many communities' permits have not yet been reissued to include the nine minimum controls, and permittees are reluctant to implement the nine minimum controls in the absence of an enforceable requirement. Some States have focused their efforts on requiring long-term control plans or have resisted using enforcement mechanisms as implementation tools. We believe, however, that the nine minimum controls are an essential element of any community's CSO program and that full implementation of the nine minimum controls is crucial to the success of the CSO Policy. The goal of 100 percent implementation remains a high Agency priority. We will continue to track implementation of the nine minimum controls and coordinate with EPA and State enforcement authorities as necessary to foster compliance.

We also stress the need for communities to provide appropriate documentation that they have implemented the nine minimum controls and for NPDES authorities to review this information thoughtfully. To date, although 52 percent of CSO communities have implemented the nine minimum controls, approximately 42 percent have submitted documentation. The Agency does not believe documentation is simply a "paperwork" exercise. Rather, documentation describes the community's comprehensive effort to use the nine minimum controls to reduce the frequency, volume, and impacts of CSOs. Without strong documentation, a CSO community and its permitting authority cannot meaningfully assess the effectiveness of the nine minimum controls and the extent to which additional controls, if any, may be needed.

Long-Term Control Plans. The CSO Policy calls for initial ("Phase I") NPDES permits to require development of a long-term CSO control plan as soon as practicable, but generally within two years after issuance of the permit, Section 308 information request, or enforcement action requiring a plan. The long-term control plan should include measures that provide for compliance with the technology-based and water quality-based requirements of the Clean Water Act, including attainment of water quality standards under either the "presumption approach" or the "demonstration approach." The subsequent ("Phase II") permit should require immediate implementation of the control measures in the long-term control plan. The long-term control plan should include a fixed-date implementation schedule. Requirements for expeditious

3

implementation of the long-term control plan should be placed in an appropriate enforceable mechanism.

Regions and States indicate that approximately 33 percent of CSO communities are moving ahead to implement long-term CSO controls. Approximately another 28 percent are subject to an enforceable requirement to develop a long-term CSO control plan. We do not have adequate information to determine how much of the current CSO planning and control activity is being undertaken consistent with the CSO Policy.

Long-term planning consistent with the CSO Policy is key to the success of local CSO control efforts. We urge Regional and State authorities to work actively with permittees to ensure that long-term control plans address important elements of the CSO Policy such as characterization, monitoring, and modeling of the combined sewer system and receiving water; public participation; evaluation of the cost and performance of alternatives; and coordination with State water quality standards authorities and NPDES authorities. EPA Headquarters will continue to track progress in the development of long-term control plans consistent with the CSO Policy.

Water Quality Standards (WQS). Long-term CSO control plans must ensure that both the technology-based and water quality-based requirements of the CWA are met. With respect to water quality-based requirements, the CSO Policy provides that "[d]evelopment of the long-term plan should be coordinated with the review and appropriate revision of WQS and implementation procedures on CSO-impacted receiving waters to ensure that the long-term controls will be sufficient to meet water quality standards" (59 FR 18694). The CSO Policy places a high priority on eliminating or redirecting CSOs that discharge to sensitive areas such as beach areas and shellfish beds. Remaining overflows must neither cause nor contribute to a violation of WQS.

In locations where uses have been designated without consideration for the wet weather conditions of urban streams, it is appropriate to evaluate the attainability of WQS. The CSO Policy recognizes the States' flexibility to review their WQS and encourages them to define recreational and aquatic life uses more explicitly where appropriate. Such refinements could define, for example, seasonal conditions or a particular size storm event when primary contact recreation would not occur. In making such adjustments to uses, however, States must ensure that downstream uses are protected and that the use is fully protected during other seasons or after the storm event has passed. Furthermore, a use attainability analysis would be required in such cases, since use attainability analyses are required prior to the removal of a designated use or the modification of a use to one requiring less stringent criteria. Such a structured scientific analysis is an appropriate mechanism for determining the attainability of a use. In any case, if a State has a reasonable basis to determine that the current designated use could be attained after implementation of the technology-based controls of the CWA, then the use could not be removed.

We strongly encourage Regions and States to work with permittees to ensure that long-term plans are developed consistent with WQS. We also encourage greater coordination among EPA, States, and permittees in refining designated uses as appropriate in CSO-impacted receiving waters. In many cases the permittee's development of a long-term control plan, and the State's review and revision of WQS, will occur concurrently and interdependently. Site-specific data collected as part of the development of the long-term control plan and data from watershed analyses should assist States in evaluating the adequacy of the long-term control plan to

4

contribute to the attainment of WQS. Such data will also provide important information necessary for determining whether a use is attainable and, where the designated use is not attainable, the appropriateness of a variance or other revision to the applicable WQS. Variances may be appropriate, in limited circumstances on CSO-impacted waters, where the State is uncertain as to whether the WQS can be attained and time is needed for the State to conduct additional analyses on the attainability of the WQS.

<u>Measuring Program Performance.</u> The CSO Policy continues to have a high level of support within EPA and among stakeholder groups. With visibility, of course, comes scrutiny. Understandably, the Policy continues to provoke questions about how well a flexible approach can address a costly and complex environmental issue. In addition, implementation of the CSO Policy is occurring amid public demands that investments in pollution control yield tangible environmental benefits.

Under the Government Performance and Results Act (GPRA), EPA developed a pilot performance plan to track the implementation status of the CSO Policy. Program indicators developed under the performance plan include progress in implementation of the nine minimum controls, development of long-term plans, and reduction in the frequency, volume, and adverse water quality impacts of CSOs. The data base developed to implement the performance plan will continue to provide useful insights into the status of CSO Policy implementation and will be a useful program management tool.

Accountability for the CSO Program is also embodied in the Agency's Strategic Plan under GPRA for the water program. Objectives to be attained by 2005 currently include a 30 percent reduction from 1992 levels in annual point source loadings from CSOs, publicly owned treatment works, and industrial sources. EPA's FY 1998 goal is for 80 percent of CSO communities' permits to be issued consistent with the CSO Policy; for FY 1999, the goal is 100 percent consistency.

We also encourage you to support efforts by CSO communities to develop other, locally defined, indicators of progress in controlling CSOs. Locally defined measures of success can provide meaningful incentives to select and implement CSO controls that not only meet CWA requirements but are cost-effective, tailored to local water quality objectives, and likely to yield results that the public, and specifically rate-payers, will support.

In closing, we urge you to help make the CSO Policy a success. We remind you that implementation of the CSO Policy continues to be a high priority for the Water Program and is among the top program priorities for the Office of Regulatory Enforcement in FY 1998. It is essential that all CSO communities be moving aggressively toward two important goals: full implementation of the nine minimum controls and coordination with NPDES and WQS authorities in the development and implementation of long-term control plans. We welcome continued dialogue among EPA Headquarters, Regional, and State permitting and enforcement authorities on removing any identified impediments to achieving these goals.

If you have questions concerning this memorandum, please contact either Ross Brennan of the Office of Wastewater Management at (202) 260-6928, or John Lyon of the Office of Regulatory Enforcement at (202) 564-4051.