### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Sierra Club, et al. | ) | **Case No. 1:02cv00107** |
| | ) | (Consol. with C-1-02-108 and |
| Intervenors, | ) | C-1-02-135) |
| | ) | |
| v. | ) | Judge S. Arthur Spiegel |
| | ) | |
| | ) | |
| The Board of County Commissioners, | ) | |
| Hamilton County, Ohio, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

### <u>REPLY OF DEFENDANTS BOARD OF COUNTY COMMISSIONERS, HAMILTON COUNTY, OHIO, AND THE CITY OF CINCINNATI TO INTERVENOR SIERRA CLUB'S MEMORANDUM IN OPPOSITION TO ENTRY OF THE CONSENT DECREES</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(A)(3)................................. vii

I.    INTRODUCTION ...........................................................................1

II.   THE DECREES ARE FAIR, ADEQUATE, REASONABLE AND
      CONSISTENT WITH THE CLEAN WATER ACT ............................................2

      A.    The Enforceable Deadlines Established by the Decrees are
            Reasonable and Consistent with the Clean Water Act................................4

            1.    Numerous Sewer System Decrees that Contain Extendable
                  Timelines Have Been Found Fair, Adequate and
                  Reasonable .......................................................................6

            2.    The "As Expeditious As Practicable" Scheduling Standard
                  Established by the Decrees Is Reasonable and Is Consistent
                  with the Objectives of the Clean Water Act ................................10

                  a.    Integration of SSO, CSO and wastewater treatment
                        plant remedial action is fair, adequate and
                        reasonable.......................................................................10

                  b.    Allowing Defendants an extension if costs exceed
                        $1.5 billion is a reasonable approach to a
                        compliance schedule ........................................................14

                  c.    Applying the "as expeditious as practicable"
                        standard to CSOs is reasonable and is consistent
                        with USEPA's CSO Policy .................................................16

      B.    The Fact that Clean Water Act Compliance Will Be Attained over
            Time as the Decrees Are Implemented Does Not Render the
            Decrees Unreasonable........................................................................18

            1.    The Interim Remedy at SSO 700 Promotes the Public
                  Interest by Dramatically Reducing Discharges in the Short-
                  Term..............................................................................19

            2.    The Sycamore Project Is Also Consistent with the Law,
                  which Authorizes Bypasses where Treatment Is Not
                  Feasible .........................................................................21

i

3.    The "Study, Design, Fix" Approach to Remedial Action
Established by the Decrees is Reasonable and Consistent
with the Clean Water Act ............................................................22

C.    Intervenors' Baseless Attacks on the WIB Program Ignore the Fact
that It Is the Most Ambitious Program of its Kind in the Nation .............23

1.    Far from Being Unfair, the WIB Program Represents a
Perfectly Suited Response to Capacity-Related WIBs .................24

2.    Intervenors' Objections to the WIB Program Do Not State
Any Legitimate Reason for this Court Not to Enter the
Decrees .......................................................................................26

a.    Defendants must meet the Decrees' enforceable
commitments no matter how they are funded ...................26

b.    The WIB Program is in the public interest, and
Intervenors' "numerous other flaws" do not alter
that conclusion ................................................................29

D.    The Water Quality Standards Compliance Program Established by
the Global Decree Strictly Adheres to USEPA's CSO Policy ..................32

1.    USEPA's CSO Policy Explicitly Allows Consideration of
Water Quality Standards Revisions in LTCP Development..........33

2.    Consideration of Water Quality Standards Revisions with
Regard to the Waters of Hamilton County Is Not Precluded........35

3.    Allowing the Defendants the Opportunity and Time to
Analyze Multiple Alternatives Is Consistent with USEPA
Guidance ....................................................................................36

E.    Appointment of a Special Master Is Unprecedented and
Unnecessary ........................................................................................37

1.    Insertion of a Fourth Oversight Body into the Clean Water
Remedial Process Established by the Decrees Is
Unnecessary ................................................................................37

2.    An Extra Measure of Oversight Will Be Provided by the
Board of County Commissioners' New Sewer Ombudsman .........40

3.    Appointment of a Special Master is Unprecedented in the
Municipal Clean Water Act Consent Decree Arena....................40

III.    CONCLUSION.................................................................................................42

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Canoe Ass'n v. EPA*, 54 F. Supp. 2d 621 (E.D. Va. 1999) ................................................... 3

*Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124 (2d Cir. 1991) ......................... 19

*Bishop v. The Water Works and Sanitary Sewer Bd. of the City of Montgomery*, Civ. A.
    No. 00-A0527-N, 2001 U.S. Dist. LEXIS 522 (N.D. Ala. 2001) ................................................ 9

*Bragg v. Robertson*, 83 F. Supp. 2d 713 (SD. W. Va. 2000) .................................................... 30, 38

*City of Bedford*, 1989 WL 158020 (N.D. Ohio) ............................................................ 16, 23

*Cmty of Cambridge Env. Health and Cmty. Dev. Group v. City of Cambridge*, 115
    F. Supp. 2d 550 (D. Md. 2000) ........................................................................... 14, 19, 22

*Connecticut Coastal Fisherman's Ass'n v. Remington Arms Co. Inc.*, 777 F. Supp. 173 (D.
    Conn. 1991) .................................................................................................................. 10

*Cronin v. Bowner*, 90 F. Supp. 2d 364 (S.D.N.Y. 2000) .......................................................... 41

*Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991) ....................................................... 9

*Frilling v. Village of Ana*, 924 F. Supp. 821 (S.D. Ohio 1996) ................................................... 19

*Jones v. City of Lakeland*, 224 F.3d 518 (6th Cir. 2000) ............................................................ 9

*Long Island Soundkeeper Fund, Inc. v. New York City Dep't of Envtl Prot.*, 27 F. Supp.
    2d 380 (E.D.N.Y. 1998) .................................................................................................. 19

*Milwaukee v. Illinois*, 451 U.S. 304 (1980) ............................................................................. 7

*N. and S. Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552 (1st Cir. 1991) ........................... 4, 19

*New York Coastal Fisherman's Ass'n v. New York City Dept. of Sanitation*, 772 F. Supp.
    162 (S.D.N.Y. 1991) ......................................................................................................... 9

*New York State Ass'n for Retarded Children, Inc. v. Carey*, 551 F. Supp. 1165 (E.D.N.Y
    1982) ............................................................................................................................. 41

*Ohio Valley Envtl. Coalition v. Horinko*, 279 F. Supp. 2d 732 (S.D.W.Va. 2003) ............... 35

*Orange Env't Inc. v. County of Orange*, 860 F. Supp. 1003 (S.D.N.Y. 1994) ................................ 19

*United States v. Akzo Coatings, Inc.*, 949 F.2d 1409 (6th Cir. 1991) .............................. passim

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990)............................................ 2, 23

*United States v. City of Bedford*, Civ. A. No. C 85-2587, 1989 WL 158020 (N.D. Ohio 1989) ................................................................................................................................. 8

*United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275 (1st Cir. 2000) ................................................................................................................................. 3, 26

*United States v. County of Muskegon*, 298 F.3d 569 (6th Cir. 2002) .............................. vi, 2, 3

*United States v. District of Columbia*, 933 F. Supp. 42 (D.D.C. 1996)......................................... 1, 3

*United States v. Microsoft Corp.,* 56 F.3d 1448 (D.C. Cir. 1995) ......................................... 29

*United States v. Telluride*, 849 F. Supp. 1400 (D. Colo. 1994) ...................................... 27

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ........................................ vii, 18, 20, 21

*Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300 (S.D. Iowa 1997) ...................... 4

*Wuori v. Concannon*, 551 F. Supp. 185 (D. Me. 1982)......................................................... 41

## Statutes

28 U.S.C. § 2675 ................................................................................................................ 30

33 U.S.C. § 1251 ................................................................................................................ 13

33 U.S.C. § 1342(q)(1) ...................................................................................................... 17

41 U.S.C. § 605 .................................................................................................................. 30

## Rules

40 C.F.R. § 122.41(m)(4)(B) ......................................................................................... 21, 22

40 C.F.R. § 131.10 .............................................................................................................. 35

Local Rule 7.2(A)(3).............................................................................................................. v

## State Statutes

OHIO REV. CODE § 2744.05 ................................................................................................ 32

## Other Authorities

*Combined Sewer Overflow Control Policy*, 59 Fed. Reg. 18,688 (Apr. 19, 1994) ......... passim

Merriam-Webster's Collegiate Dictionary (10th Ed. 1999)................................................... 11

USEPA Office of Water, *Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development*, EPA Doc. No. 832-B-97-004 (Feb. 1997)..................................................................................................... 12

USEPA Office of Water, *Combined Sewer Overflows Guidance for Long-Term Control Plan*, U.S. EPA Doc. No. 832-B-95-002 (September 1995) ...................................... 5

USEPA Office of Water, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, USEPA Doc. No. 833-R-01-002 (July 31, 2001)........ x, 33, 36

USEPA Office of Water, *Memorandum: Implementation of the CSO Control Policy*, (May 19, 1998) ............................................................................................. 34

USEPA, *Report to Congress:  Implementation of the Combined Sewer Overflow Control Policy*, EPA Doc. 833-R-01-003 (Dec. 2001)................................................. 1, 13

## Exhibits

| | |
|---|---|
| Exhibit 1 | Declaration of Peter P. Murphy |
| Tab A | Little Rock Settlement |
| Tab B | Excerpt of Bruce Bell Deposition |
| Tab C | Excerpt of Atlanta Consent Decree |
| Tab D | Excerpt of Toledo Consent Decree |
| Tab E | Excerpt of Youngstown Consent Decree |
| Tab F | Excerpt of Baton Rouge Consent Decree |
| Tab G | Excerpt of Patrick T. Karney Deposition |
| Tab H | Vellejo Settlement |
| Exhibit 2 | Declaration of Mark J. Klingenstein |
| Exhibit 3 | Declaration of Patrick T. Karney |
| Exhibit 4 | Declaration of Jeffry W. Rexhausen |
| Exhibit 5 | Declaration of Earnest F. McAdams, Jr. |

## Appendix A: Reference Materials

A.  USEPA, *Combined Sewer Overflow (CSO) Control Policy*, 59 Fed. Reg. 18,688 (April 19, 1994).

B.  USEPA, *Combined Sewer Overflows—Guidance for Financial Capability Assessment and Schedule Development*, EPA-832-B-97-004 (Feb. 1997) (excerpts).

C.  USEPA, *Report to Congress: Implementation and Enforcement of the Combined Sewer Overflow Control Policy*, EPA 833-R-01-003 (Dec. 2001) (excerpts).

D.  USEPA, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, USEPA Doc. No. 833-R-01-002 (July 2001) (excerpts).

E.  USEPA Office of Water, Memorandum: *Implementation of the CSO Control Policy*, (May 19, 1998).

F.  USEPA, *Combined Sewer Overflows: Guidance for Long-Term Control Plans*, EPA 832-B-95-002 (Sept. 1995) (excerpts).

**Appendix B: Unreported Cases**

## SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(A)(3)

In asking this Court to discard a carefully crafted wastewater remediation program developed by five expert regulatory agencies and the elected representatives of the citizens of Greater Cincinnati, Sierra Club and Marilyn Wall ("Intervenors") also ask this Court to:

- *__ignore__* binding Sixth Circuit authority, which calls for a deferential standard of review when reviewing settlements crafted by expert environmental enforcement agencies;

- *__void__* remedial measure scheduling mechanisms that have been *__endorsed__* in other cases by *__Plaintiffs and their experts__*, and *__approved by courts across the nation__*;

- *__impose__* a remedial measure scheduling scheme that would favor wealthier, newer neighborhoods over the poorer, older sections of Greater Cincinnati's urban core;

- *__prolong__* untreated wastewater discharges by enjoining construction of state-of-the-art remedial structures approved by five environmental regulatory agencies;

- *__ignore__* the fact that the Consent Decrees impose *__$1.2 million in civil penalties__* and *__$5.3 million in Supplemental Environmental Projects ("SEPs")__*;

- *__prohibit__* the Metropolitan Sewer District ("MSD") from following the United States Environmental Protection Agency's ("USEPA") own regulatory guidance regarding compliance with water quality standards; and

- *__shut down__* a basement backup remedial program that is the first of its kind in the nation.

**Section I. – Introduction (p. 1)**:  The subject Consent Decrees[1] represent a carefully crafted agreement between five environmental enforcement agencies[2] (the "Regulatory Agencies") and the two bodies elected to represent the citizens of Greater Cincinnati[3] (the "Defendants") to address complex and expensive municipal wastewater Clean Water Act compliance issues.  As will be shown, Intervenors offer no compelling reason why this agreement should be discarded.

**Section II. – The Decrees are fair, adequate, reasonable and consistent with the Clean Water Act (p. 2)**:  Binding Sixth Circuit authority, *United States v. County of Muskegon*, 298 F.3d 569, 581-82 (6th Cir. 2002), teaches that environmental consent decrees are to be approved so long as they are "fair, adequate, and reasonable, as well as consistent with the public interest." The Sixth Circuit also instructs that this standard is particularly deferential "where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  *United States v. Akzo Coatings, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991).  The inapposite citizen suit cases from other jurisdictions offered by Intervenors certainly do not trump this controlling authority.

---

[1]  The Court has two interrelated decrees ("Decrees") before it on the United States' Motion for Entry: the Interim Partial Consent Decree ("SSO Decree"), which was originally lodged with the Court on February 15, 2002 (Docket #2, attachment) and submitted to the Court with modifications on August 20, 2002 (Docket # 56, attachment #1); and the Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants and Implementation of Capacity Assurance Program Plan for Sanitary Sewer Overflows ("Global Decree"), which was formally lodged with the Court on December 3, 2003 (Docket # 101, attachment).

[2]  The subject environmental enforcement agencies are the USEPA, the United States Department of Justice ("USDOJ"), the Ohio Environmental Protection Agency ("OEPA"), the Ohio Attorney General's Office, and the Ohio River Valley Water Sanitation Commission ("ORSANCO") (collectively, the "Regulatory Agencies").

[3]  These elected representatives are the Board of County Commissioners for Hamilton County and the Cincinnati City Council.

**<u>Section II.A. – The enforceable deadlines established by the Decrees are reasonable and</u>**

**<u>consistent with the Clean Water Act (p. 4)</u>**:  Contrary to Intervenors' repeated allegations about

"loopholes," the Decrees require remedial measure implementation schedules that are "as

expeditious as practicable," and allow schedule extensions only in limited circumstances and

only with approval of the Regulatory Agencies.  As explained in **<u>Section II.A.1 (p. 6)</u>**, courts

across the country have approved sewer system decrees with extendable timelines, including a

number that have been endorsed by Intervenors and their purported experts.  More to the point,

as shown in **<u>Section II.A.2 (p. 10)</u>**, the "as expeditious as practicable" scheduling standard

established by the Decrees is reasonable and is consistent with the letter and objectives of the

Clean Water Act.  Intervenors fail to offer a single example of when their "earliest date possible"

formulation of the scheduling standard has been used in a Clean Water Act decree, and provide

no compelling reason why it should be substituted for the standard crafted here by the

Regulatory Agencies and the elected representatives of the citizens of Greater Cincinnati.

**<u>Section II.B. – The fact that Clean Water Act compliance will be attained over time as the</u>**

**<u>Decrees are implemented does not render the Decrees unreasonable (p. 18)</u>**:  Although

Intervenors assert that any approach to Sanitary Sewer Overflow ("SSO") remedial action that is

phased in over time - such that SSOs continue for some period - is "illegal" and "inconsistent

with law" (Opp. at 14), the United States Supreme Court has recognized the unavoidable fact that

some violations, by their nature, cannot be corrected overnight.  *Weinberger v. Romero-Barcelo*,

456 U.S. 305, 317-18 (1982).  Thus, the fact that the Decrees allow the Defendants to implement

interim remedies that will provide immediate reductions in SSO volume, but not immediate full

treatment, while final remedies are developed, does not render these remedies illegal or

unreasonable. This is particularly true when one considers that they provide greater reductions in untreated SSO frequency than those endorsed by Intervenors' purported expert in Little Rock.

**Section II.C. – Intervenors' baseless attacks on the Water in Basement ("WIB") Program ignore the fact that it is the most ambitious program of its kind in the nation (p. 23)**: The Defendants' WIB Program was launched on January 1, 2004 – barely a month after execution of the Global Decree – requiring the Defendants to marshal considerable manpower, money, and institutional energy to implement a system-wide response network that is committed to respond promptly to customer complaints. No other wastewater utility in the nation has so comprehensive a program. In the program's first quarter alone, Defendants expended more than *$1 million* in WIB Program costs. Intervenors' complaint that this program must be pre-funded has no basis in any of the more than one hundred municipal wastewater settlements across the nation – including any of the ones endorsed by Intervenors or their purported experts. Additionally, Intervenors' effort to raise the Defendants' handling of a 2003 WIB property damage claim is irrelevant to assessing the adequacy of the new 2004 WIB Claims Program, and obscures the fact that 90% of the WIB claims decided to date have resulted in payments to claimants.

**Section II.D. – The water quality standards compliance program established by the Global Decree strictly adheres to USEPA's Combined Sewer Overflow ("CSO") Policy (p. 32)**: Notwithstanding Intervenors' assertions to the contrary, the water quality standards compliance process established by the Global Decree is entirely consistent and compliant with USEPA guidance on this subject. Indeed, USEPA's CSO Policy calls for "review and revision, as appropriate, of water quality standards and their implementation procedures when developing CSO control plans." *Combined Sewer Overflow Control Policy*, 59 Fed. Reg. 18,688-89, 18,694

(Apr. 19, 1997). USEPA even issued a 71-page guidance document, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, spelling out precisely how to conduct this process! USEPA Office of Water, USEPA Doc. No. 833-R-01-002 (July 31, 2001). The CSO remedial measure selection process required by the Global Decree follows this guidance to the letter. Intervenors offer no compelling reason why this process should be discarded here.

**Section II.E. – Appointment of a special master is unprecedented and unnecessary (p. 37)**:

The two Decrees represent a remarkable injection of USEPA, OEPA and ORSANCO into the operations of the Defendants' wastewater utility. Every deliverable under the two decrees is subject to review and approval of these agencies. Intervenors offer no justification for adding a fourth oversight body. Indeed, they cannot cite a single Clean Water Act consent decree where a special master has been required by the decree's own terms. Finally, the mere fact that that the Defendants have a sewer system in need of remedial action is not an indication that there has been some abdication of responsibilities by the Regulatory Agencies that necessitates appointment of a special master. The truth is that there are well over 700 communities across the nation that experience CSOs. Thus, the fact that Cincinnati also experiences wet weather overflows is not an indication that the environmental enforcement agencies are in need of additional oversight.

**Section III. – Conclusion (p. 42)**: In short, none of the criticisms leveled by Intervenors compels rejection of the Decrees. The Court's inquiry here is not to substitute its own judgment for that of the five expert environmental enforcement agencies, but rather to determine whether the Decrees are fair, reasonable and consistent with the Clean Water Act. They more than meet that standard.

# I.    INTRODUCTION

Intervenor-Plaintiffs Sierra Club and Marilyn Wall ("Intervenors") ask in their Opposition to the Entry of the Consent Decrees ("Opp." or "Opposition") that this Court discard two carefully crafted agreements between five expert environmental enforcement agencies – the United States Department of Justice ("USDOJ"), the United States Environmental Protection Agency ("USEPA"), the Ohio Environmental Protection Agency ("OEPA"), the Ohio Attorney General's Office and the Ohio River Valley Water Sanitation Commission ("ORSANCO") (collectively the "Regulatory Agencies" or "Government-Plaintiffs") – and the elected representatives of the citizens of Hamilton County and the City of Cincinnati – the Board of County Commissioners and the Cincinnati City Council (collectively the "Defendants") – to correct significant municipal wastewater problems that also plague over 700 other communities nationwide.[4]  Intervenors offer no compelling reason why this Court should do so.[5]

As will be shown, the Decrees[6] are "fair, adequate and reasonable," which is the standard for approval of Clean Water Act consent decrees articulated by the Sixth Circuit.  *United States v.*

---

[4]  USEPA, *Report to Congress:  Implementation of the Combined Sewer Overflow Control Policy*, EPA Doc. 833-R-01-003 (Dec. 2001) at ES-5 (excerpts attached hereto at Appendix A: Reference Materials).

[5]  Although this Court did not grant Intervenors' repeated demands to participate in negotiation of the Decrees (*see* Order, Docket # 78 at 2 (modified on other grounds at Order, Docket #90)), Intervenors continue to claim that the Decrees are not reasonable because they were not at the negotiating table. Opp. at 5-6.  There is no reason for the Court to re-entertain this "scurrilous argument."  As the Regulatory Agencies and Defendants have repeatedly pointed out, the law does not grant Intervenors the right to participate in negotiations.  *See United States v. District of Columbia*, 933 F. Supp. 42, 48 n.6 (D.D.C. 1996) (rejecting intervenors' claim that the decree was unfair because they were not part of the negotiations).

[6]  The Court has two interrelated decrees ("Decrees") before it on the United States' Motion for Entry: the Interim Partial Consent Decree ("SSO Decree"), which was originally lodged with the Court on February 15, 2002 (Docket #2, attachment) and submitted to the Court with modifications on August 20, 2002

[Footnote continued on next page]

*County of Muskegon*, 298 F.3d 569, 581-82 (6th Cir. 2002). It is difficult to understand how Intervenors could believe otherwise, given that the Decrees require Defendants to come into ***full compliance*** with the Clean Water Act at a cost that is likely to be well over ***$1 billion***, include a ***first-of-its-kind program to address basement backups***, impose penalties of ***$1.2 million***, require Supplemental Environmental Projects in excess of ***$5.3 million***, and include ***strict remedial schedules*** backed by heavy stipulated penalties. Accordingly, the Decrees should be entered as lodged.

## II.     THE DECREES ARE FAIR, ADEQUATE, REASONABLE AND CONSISTENT WITH THE CLEAN WATER ACT

Environmental consent decrees are to be approved so long as they are "fair, adequate, and reasonable, as well as consistent with the public interest."[7] *County of Muskegon*, 298 F.3d at 581-82 (affirming district court's approval of Clean Water Act settlement over the objection of intervenors); *see also United States v. Akzo Coatings, Inc.,* 949 F.2d 1406, 1426 (6th Cir. 1991) (approving CERCLA consent decree and articulating standard of review as one of "fairness,

---

[Footnote continued from previous page]
(Docket # 56, attachment #1); and the Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants and Implementation of Capacity Assurance Program Plan for Sanitary Sewer Overflows ("Global Decree"), which was formally lodged with the Court on December 3, 2003 (Docket # 101, attachment).

[7] At the outset, it is necessary to correct Intervenors' statement concerning the factors courts consider when addressing "reasonableness." Citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990), Intervenors claim that in assessing the approvability of a decree, courts examine "whether the . . . decree is an efficient vehicle for cleansing the environment." Opp. at 5. *Cannons Eng'g* actually states this standard as follows: "the decree's likely ***efficaciousness*** as a vehicle for cleansing the environment is of cardinal importance." *Cannons Eng'g Corp.*, 899 F.2d at 89 (emphasis added). As the *Cannons Eng'g* court further explained, this is "basically a question of technical adequacy." *Id.* Intervenors attempt to use this sleight-of-hand to imply that the reasonableness standard requires no possibility of deadline extensions. Opp. at 11. Their interpretation of the standard is simply incorrect.

reasonableness, and consistency with the statute").[8]  The Court's role in the present case is not "to substitute its judgment for that of the parties to the decree, but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy."  *District of Columbia*, 933 F. Supp. at 47.  Likewise, merely because Intervenors may object to a decree does not alter its approvability.  *See id.*

Intervenors' formulation of the standard of review entirely ignores the "strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts." *Comunidades Unidas Contra la Contaminacion*, 204 F.3d at 280 (approving Clean Water Act consent decree over intervenors' objections).  *See also Am. Canoe Ass'n v. EPA*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) (stating that public policy favoring settlements inherently recognizes that "the parties' expertise and comparative freedom in crafting a remedy promise a more sensible and practical resolution . . . than that likely to result from judicial intervention").  As the Sixth Circuit has made clear, this policy "is particularly strong" in cases like the present, "where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  *Akzo Coatings*, 949 F.2d at 1436.

Intervenors also argue – without citation – that the Court's standard of review is heightened because in order for the consent decree to be approvable, the government must be diligently prosecuting its enforcement action, thus barring Intervenors' pending citizen suit.  Even if this

---

[8]  Intervenors mistakenly assert, without citation, that the Court's standard of review is heightened in cases involving the Clean Water Act as opposed to CERCLA.  Opp. at 9-10.  The Sixth Circuit and other courts, however, apply this same deferential standard of review when assessing the appropriateness of Clean Water Act settlements.  *County of Muskegon*, 298 F.3d at 581-82; *see also United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000); *District of Columbia*, 933 F. Supp. at 47.

proposition had any support in the case law – which it does not – it would be inapposite here, because the United States filed complaints and lodged consent decrees against the Defendants before the Intervenors filed their SSO citizen suit, demonstrating diligent prosecution by the United States.[9]

Moreover, as is the case with the standard for the approvability of an environmental consent decree, the standard for assessing whether the government is diligently prosecuting an enforcement action is one of substantial deference to expert government regulatory agencies.  The burden on a citizen-plaintiff to show non-diligent prosecution "is heavy, because the enforcement agency's diligence is presumed."  *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1324 (S.D. Iowa 1997).  Just as the standard of review for a consent decree does not allow the court to substitute its judgment for that of the parties, there is not a lack of diligent prosecution "[m]erely because [a] State may not be taking the precise action [a citizen-plaintiff] wants it to or moving with the alacrity [the citizen-plaintiff] desires."  *N. and S. Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552, 558 (1st Cir. 1991); *Williams Pipe Line Co.*, 964 F. Supp. at 1324 (for an enforcement action to be diligent, the law does not require "the governmental agency . . . to succeed by the private party's definition of success") (internal quotations omitted).

A.      **The Enforceable Deadlines Established by the Decrees are Reasonable and Consistent with the Clean Water Act**

Intervenors describe the Decrees as "an illusory contract—a placeholder for continuous rounds of negotiation" due to "deadline extenders" and "loopholes."  Opp. at 33.  Their implication is that ***every single one of the seven public agencies*** that have tirelessly negotiated these Decrees has acted for a sinister motive: namely, to include flexibility in end dates for the sole purpose of

---

[9]   The United States and the State of Ohio filed a complaint and lodged the SSO Decree on February 15, 2002, but the Intervenors did not file their SSO citizen suit until February 27, 2002.

permitting Defendants to avoid forever compliance with the Clean Water Act. Nothing could be further from the truth, and this Court should reject Intervenors' baseless attempts to so argue.

In short, the Decrees require that all remedial measures to address Defendants' sewer system be completed "as expeditious[ly] as practicable, but no later than February, 2022." Global Decree at § IX.B. Contrary to Intervenors' accusations, the Decrees are simply not full of open-ended, unenforceable extension clauses. Instead, the Decrees provide for extensions under *limited* circumstances and then only for *limited* periods of time. For example, if Defendants discover that a project constructed pursuant to Defendants' CSO Long Term Control Plan Update ("LTCP Update") does not work as designed, then the Global Decree allows Defendants ***to petition*** the Regulatory Agencies for an extension of the relevant deadline, but Defendants must do so "as soon as practicable" after they discover the problem that they believe warrants correction, and in no event later than 30 days after the close of the post-construction monitoring period for that project. *See* Global Decree at § VII.C.2. The petition must also include a new enforceable deadline that requires the project to be fixed "as expeditious[ly] as practicable." *Id.* at § VII.C.4-5.[10]

Therefore, Defendants clearly ***do not have the unilateral authority*** to extend a deadline because a remedial measure is deemed ineffective; the enforcement agencies may decline the petition, accept the petition, or accept the petition with modifications, which might include scheduling adjustments. *See id.* at § VII.C.4. As will be discussed, there is a similar provision that allows the Defendants to schedule completion of all remedial measures beyond the February 28, 2022 deadline, but only if the Regulatory Agencies approve, and only if the completion of remedial

---

[10] Fixing remedial measures that do not work as planned is expressly contemplated by the CSO Policy. *See* USEPA Office of Water, *Combined Sewer Overflows Guidance for Long-Term Control Plan*, U.S. EPA Doc. No. 832-B-95-002 (September 1995) at 4-17 ("expansion or retrofitting of a CSO control facility might ultimately be required.") (excerpts attached hereto at Appendix A: Reference Materials).

measures occurs "as expeditious[ly] as practicable." *See id*. at § IX.B.  Extension provisions that apply in limited circumstances, that are subject to the approval of the Regulatory Agencies and that still require revised schedules to be "as expeditious as practicable" are hardly "loopholes."

        **1.**      <u>**Numerous Sewer System Decrees that Contain Extendable**</u>
                  <u>**Timelines Have Been Found Fair, Adequate and Reasonable**</u>

Intervenors cite *no* cases in which a court has failed to enter a Clean Water Act consent decree because it contained flexible dates for compliance.  In fact, courts have approved consent decrees with flexible deadlines across the nation.

Indeed, decrees cited favorably by Intervenors and their purported experts contain deadline provisions far more open-ended than those proposed in the Decrees here.  Sierra Club, as a citizen-suit plaintiff, entered into a settlement agreement with the City of Little Rock to address SSOs that contained *no compliance date* in the agreement itself.  *See* Declaration of Peter P. Murphy in Support of Reply of Defendants to Intervenor Sierra Club's Memorandum in Opposition to Entry of the Consent Decrees ("Murphy Decl." or "Exh. 1"), attached hereto as Exh. 1, at Tab A ("Little Rock Settlement").  Under that agreement, the Little Rock Defendants were directed to undertake a study to examine alternatives for addressing their capacity-related SSOs and complete a report establishing a "compliance deadline."  Little Rock Settlement at ¶ 2.  The report was also to be reviewed by Sierra Club's expert in Little Rock—the same Dr. Bell who is Intervenors' expert in this case.  *See* Deposition of Bruce Bell at 176, 185 (Feb. 5, 2003) ("Bell Depo.") (excerpts attached Exh. 1 at Tab B).  The settlement allowed Defendants to select any compliance deadline they wished, though Sierra Club was permitted the right to challenge the compliance deadline in writing and propose an alternate date if it considered the deadline "unreasonable."  Little Rock Settlement at ¶ 2(B).  Dr. Bell testified that the Little Rock Settlement was fair and should be approved by the Department of Justice, even though it did not have a direct compliance deadline.

Q: Did you testify under oath that as far as you were concerned, [the Little Rock Settlement] should be approved by the United States Department of Justice and the United States Environmental Protection Agency?

A: To tell you truth [sic], I don't remember saying that, but certainly that was my opinion.

. . . .

Q: There was no implementation deadline in this [Little Rock] decree, was there, directly?

A: Directly, no.

Bell Depo. at 177-78, 185.[11]

If an open-ended compliance schedule in an SSO settlement that permits a deadline to be set in the future under a "not unreasonable" standard is adequate for Sierra Club and its expert in Little Rock, certainly a final deadline that can only be altered in very limited circumstances by the USEPA, OEPA, USDOJ and ORSANCO, and that must be "as expeditious as practicable," meets the criterion of "reasonableness" that is necessary for its entry in this case. Moreover, Intervenors and their experts also make favorable reference to the settlement in Atlanta (Opp. at 13, n.7), but in that case the deadline for addressing CSOs and SSOs can be extended by regulatory agencies "based upon a demonstration . . . that such extension is *necessary based upon good cause*." Exh. 1 at Tab C ("Atlanta First Amended Decree") at § VIII.C.8.b.[12]

_____

[11] In his deposition in the Little Rock case, Dr. Bell testified under oath that he thought the Little Rock Settlement was a "fair agreement" that should be approved by the Department of Justice. At his February 5, 2003 deposition in this matter, he testified that, to the best of his recollection, his earlier testimony was not incorrect. Bell Depo. at 182-83.

[12] Intervenors' expert also relies on the settlement agreement in Vallejo, California, for the proposition that Cincinnati could remedy its SSOs faster. *See* Opp. 13, n.7. Intervenors offer no explanation, however, of why a schedule that might have been appropriate for Vallejo has any relevance to what is reasonable in addressing the problems in Cincinnati. According to the US Census Bureau, the City of Vallejo had a total of 116,760 residents in 2000, with a median household income of $50,030. *See http://factfinder.census.gov* (last visited, May 11, 2004). By contrast, Defendants' system serves approximately 800,000 residents. As Defendants have stated repeatedly in this matter, the conditions that cause sewer overflows and the engineering solutions to remedy those conditions vary widely from

[Footnote continued on next page]

A host of other municipal wastewater Clean Water Act consent decrees contain similar, or even greater, levels of flexibility.  *See, e.g.,* Exh. 1 at Tab D ("Toledo Decree") at § VI (allowing Toledo to petition for a deadline extension "if it experiences significant adverse changes in its financial capabilities"); Exh. 1 at Tab E ("Youngstown Decree") at § D.10(b) (requiring development of LTCP that contains a schedule for implementation that is "***as expeditious as practicable***" to be reviewed by USEPA and Ohio, and not establishing a date certain by which the implementation deadline must be met) (emphasis added); Exh. 1 at Tab F ("Baton Rouge Decree") at ¶¶ 31, 34 (allowing implementation of comprehensive remedial action plan addressing SSOs to be developed with a completion date that is "[t]he earliest date on which the milestone can ***reasonably be achieved*** considering how quickly it is physically and financially possible to complete construction. . . .") (emphasis added).[13]

The existence of multiple decrees adopting similar—and even more flexible—approaches to the implementation of complex remedial measures addressing SSOs and CSOs shows that the Decrees before this Court are neither unusual nor unreasonable.  Instead, they are reflective of a

_____

[Footnote continued from previous page]
city to city, and there is only limited value in citing decrees from other jurisdictions for the proposition that the approach taken by the Regulatory Agencies and Defendants in Cincinnati is somehow unreasonable.  *See Milwaukee v. Illinois*, 451 U.S. 304, 324 (1980) ("The EPA has not promulgated regulations mandating specific control guidelines because of a recognition that the problem is 'site specific.'  The costs and benefits of control of various portions of pollution due to combined sewer overflows and by-passes vary greatly with the characteristics of the sewer and treatment system.").

[13]  Intervenors cite one decree that has a fixed end date for SSO elimination (with the exception of a force majeure clause) and addresses other elements of the system as well.  See Opp. at 16 (citing *United States v. City of Bedford*, Civ. A. No. C 85-2587, 1989 WL 158020 (N.D. Ohio 1989).  The case does not indicate the size of Bedford's sewer problems, the cost needed to correct the problems, the age of the sewer system, or any other factor that might be useful in determining whether Bedford's sewer problems are analogous to those facing the Defendants.  What is clear, however, is that according to the US Census Bureau, the City of Bedford had a total of 14,214 residents in 2000.  *See http://factfinder.census.gov* (last visited, May 6, 2004).  Again, Defendants' system serves approximately 800,000 residents.  Defendants fail to see how the existence of a single decree addressing a very small municipality's limited problems with a fixed compliance date for SSOs indicates that the Decrees' inclusion of a limited extension provision is unreasonable here.

standard approach taken by the United States and state regulatory agencies with expertise in the area that has been approved by courts in numerous jurisdictions. As such, it is an approach entitled to considerable deference. *See Akzo Coatings*, 949 F.2d at 1436 (holding that a court should defer to the terms of a decree where it has been negotiated by USDOJ on behalf of a federal administrative agency like USEPA that enjoys substantial expertise in the environmental field).

In the face of the considerable authority deferring to expert agency determinations regarding appropriate scheduling mechanisms, Intervenors cite multiple distinguishable cases involving *state enforcement actions* in which courts found a lack of diligent prosecution – not because the consent decrees or administrative orders in question allowed "for cause" extensions such as we have here, but because the state agency had *in fact* unreasonably extended deadlines and had made no progress in resolving the violations. *See Jones v. City of Lakeland*, 224 F.3d 518, 522-23 (6th Cir. 2000) (court finds lack of diligent prosecution where state issued three or four administrative orders that were "sweetheart consent orders," waived penalties for non-compliance and assessed token penalties, all while permitting an increase in the pollution discharge).[14]

In stark contrast to these cases, in this case the *federal* government initiated its enforcement action *in federal court* by filing a Complaint, lodging the SSO Decree in February 2002, lodging

---

[14] *See also New York Coastal Fisherman's Ass'n v. New York City Dept. of Sanitation*, 772 F. Supp. 162 (S.D.N.Y. 1991) (no diligent prosecution where 5 years after entering into an Order to implement a final remedy to stop leaking leachate from a single landfill within 4 years, Defendants had made no progress in remedying violation and the state had extended Defendants' compliance deadline until 10 years after initial Order was filed); *Dague v. City of Burlington*, 935 F.2d 1343, 1353 (2d Cir. 1991) (no diligent prosecution because state did not file a civil or criminal action to enforce federal law, as required for diligent prosecution under RCRA's citizen suit provision; stating in dicta that state's actions could not be diligent prosecution because it had allowed numerous extensions to the city to install remedial treatment); *Bishop v. The Water Works and Sanitary Sewer Bd. of the City of Montgomery*, Civ. A. No. 00-A0527-N, 2001 U.S. Dist. LEXIS 522, at *35-36 (N.D. Ala. 2001) (addressing an administrative consent order which "le[ft] open the possibility . . . that no" remedial changes would occur, where, by contrast, the Consent Decrees in this case *require* the implementation of remedial measures).

the Global Decree in December 2003 and seeking public comment on both Decrees. Since that time, the Government-Plaintiffs have not extended any compliance deadlines under the Decrees, with which Defendants have been complying since they were initially executed. Indeed, the Regulatory Agencies have shown that they take the "as expeditious as practicable" standard quite seriously. For example, as a result of their review of the SSO 700 Interim Remedial Measures Plan, the Regulatory Agencies required that the Defendants speed up substantial completion of this project by over a year. *See* Declaration of Mark J. Klingenstein, P.E. In Support of Motion by the United States for Entry of the Interim Partial and CSO Consent Decrees ("Klingenstein Decl.") at ¶ 31 (attached hereto as Exh. 2). Similarly, the Agencies required changes to a number of deadlines in the Capacity Assessment Plan submitted under the SSO Decree. These changes resulted in the deadline for submission of the Capacity Assurance Program Plan ("CAPP") being moved up by eight months. *Id.* ¶ 125. Thus, all of the Intervenors' cases addressing situations where settlements were not enforced are inapposite to the circumstances here.[15]

> **2.    The "As Expeditious As Practicable" Scheduling Standard Established by the Decrees Is Reasonable and Is Consistent with the Objectives of the Clean Water Act**

> > *a.    Integration of SSO, CSO and wastewater treatment plant remedial action is fair, adequate and reasonable*

Intervenors argue that application of an "as expeditious[] as practicable" standard to SSO and wastewater treatment plant remedial measures should be discarded for an "earliest possible

---

[15] Intervenors also attempt to use citations to diligent prosecution case law to establish that if a decree does not have a "date certain" for completion, then it is the result of non-diligent prosecution and is *per se* unreasonable. But case law flatly rejects any such rule. *See, e.g., Connecticut Coastal Fisherman's Ass'n v. Remington Arms Co. Inc.,* 777 F. Supp. 173, 185 (D. Conn. 1991) ("[D]iligent prosecution is not limited to order[ing] compliance . . . by a date certain . . . . [Rather] the [Clean Water Act] calls for a more deferential approach that does not circumscribe the administrator's discretion to implement a plan that, in his expert judgment, adequately addresses a violation.").

date" standard.  *See* Opp. at 16, 18.[16]  Tellingly, Intervenors do not cite a single SSO Clean Water

Act consent decree where this standard is used.  The Atlanta, Vallejo and Little Rock decrees that

Intervenors cite favorably do not apply this standard, and Intervenors offer no compelling reason

why it should be applied here.

As a threshold matter, it is not entirely clear what the great difference is between "as

expeditious as practicable" and "earliest possible date."  Webster defines "practicable" as "capable

of being put into practice or of being done or accomplished: feasible," and defines "possible" as

"being within the limits of ability, capacity, or realization."  It also identifies "possible" and

"practicable" as synonyms.  *See* Merriam-Webster's Collegiate Dictionary (10th Ed. 1999).  If there

is a difference between these two, is it so great that the language crafted by the five Regulatory

Agencies and the two bodies elected to represent the affected citizens should be discarded?  The

Sixth Circuit teaches otherwise.  *See Akzo Coatings*, 949 F.2d at 1436 (holding that a court should

defer to the terms of a decree where it has been negotiated by the Department of Justice on behalf of

a federal administrative agency like EPA which enjoys substantial expertise in the environmental

field).

---

[16]  Despite Intervenors' assertion that they have provided the Court with "competent evidence that SSOs and sewage treatment plant violations can be ended by a date certain," Opp. at 14, Intervenors have *never* stated a date by which all of Defendants' overflows can be eliminated, or presented a plan for how to eliminate those overflows.  Dr. Bell admitted in his deposition that he has no idea of the timeline or costs of such a solution.  *See* Bell Depo. at 132-133.  That said, Dr. Bell and Intervenors recognize that compliance will take some time.  Dr. Bell's optimistic projection for the construction of a secondary treatment plant at SSO 700 alone is 5 years, presumably with other overflows unaddressed in the interim. *See* Declaration of Bruce A. Bell at ¶ 22 (Apr. 19, 2002), *see also* Bell Depo. at 154-55 (admitting that systems remain out of compliance until solutions are implemented).  For his part, Intervenors' expert Dr. Kavanaugh opines that "[s]erious observers . . . agree that compliance with the CWA will consume significant resources," and that "most see completion and compliance **in another 10 to 20 years.**" Supplemental Decl. of Michael Kavanaugh at ¶ 3 (emphasis added).

Intervenors also argue that application of the "as expeditious[] as practicable" standard to SSOs and wastewater treatment plant remedies is inconsistent with the law because it is drawn in part from the USEPA's CSO Policy, which directs that remedial measures be phased in "as soon as practicable," but does not on its face apply to SSOs. Opp. at 18-19. Intervenors' argument on this point is without merit, and if implemented, would compel an unreasonable and unfair result. Notwithstanding that it is not clear whether there is a significant difference between the two standards, Intervenors' demand that SSOs should be eliminated at the "earliest possible date," while CSO remedial action proceeds "as expeditious[ly] as practicable," is at its core a demand that CSO compliance be addressed last. This approach, however, ignores the necessary interrelationship between the CSO Policy and SSO compliance, and the objectives of the Clean Water Act.

Under USEPA's CSO Policy, LTCPs are to be implemented as "soon as practicable" – a standard that includes consideration of a permittee's "financial capability." Combined Sewer Overflow Control Policy, 59 Fed. Reg. 18,688, 18,691-94 (Apr. 19, 1994) (attached hereto at Appendix A: Reference Materials) ("CSO Policy"). Financial capability, in turn, is defined to account for "**total** annual wastewater **and** CSO control costs." *Id.* at 18,694 (emphasis added). *See also* USEPA Office of Water, *Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development*, EPA Doc. No. 832-B-97-004 (Feb. 1997) at 12 ("the first step in developing CPH [cost per household] is to determine the permittee's total WWT [wastewater treatment] ***and*** CSO costs by adding together the current costs for existing wastewater treatment operations and the current costs of any proposed WWT and CSO controls.") (excerpts attached hereto at Appendix A: Reference Materials). Thus, the more money a permittee devotes to wastewater costs – such as SSO elimination – the less money is available for CSO improvements, forcing the parties to consider solutions to SSOs and CSOs at the same time. Accordingly, the LTCP Update Workplan requires the schedule for the Update to:

> be developed ***in coordination with*** the schedule for implementing the [SSO] Capacity Assurance Program Plan . . . and will be based on consideration of the following: water quality, human health, capacity-related "water in basement" issues, pollutant loadings, volume of discharge, community priorities, sensitive areas, . . . [and USEPA's CSO affordability guidance].

Global Decree, Exh. 4, p. 6. Thus, any financial capability analysis – which must be performed pursuant to CSO Policy – and any remedial action scheduling will integrate CSO and SSO remedy considerations. This is hardly an unreasonable approach.

Intervenors' objection also gives short shrift to the broad purpose of the Clean Water Act, which is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Putting the comparative environmental impacts of CSOs and SSOs into some perspective, CSO discharges nationwide are estimated at 1.2 trillion gallons a year, *see* USEPA, Report to Congress: Implementation and Enforcement of the Combined Sewer Overflow Policy at ES-7 (excerpts attached hereto at Appendix A: Reference Materials), whereas USEPA estimates that SSOs contribute 1/1000th of that amount. *See* http://epa.gov/npdes/sso/control/ (last visited May 6, 2004). Defendants estimate that their total CSO overflow volume is approximately 75 times greater than their SSO overflow volume. *See* Declaration of Patrick T. Karney In Support of Reply Of Defendants To Intervenor Sierra Club's Memorandum In Opposition To Entry Of The Consent Decrees ("Karney Decl.") at ¶ 9 (attached hereto as Exh. 3). Moreover, CSOs, which represent an outdated approach to sewer system design that was abandoned decades ago, tend to be located in older, poorer sections of Greater Cincinnati's urban core. *Id*.

The Decrees take a reasonable enforcement approach to address ***all*** unpermitted overflows "as expeditious[ly] as practicable," a standard that means as quickly as can be technically and financially accomplished, and that carries no discernable difference from Intervenors' own "earliest possible date" standard. Thus, the Decrees are neither unreasonable nor contrary to Congressional intent. Indeed, it might be ***unreasonable*** for Defendants to adopt Intervenors' approach, which

13

would effectively require Defendants to focus all their limited resources solely on SSOs while the worst CSOs and WIBs continue unaddressed in the less wealthy, more diverse urban core.

    b.  *Allowing Defendants an extension if costs exceed $1.5 billion is a reasonable approach to a compliance schedule*

    Intervenors' objection to the Global Decree's provision that allows for a potential extension if compliance costs are expected to exceed $1.5 billion is no more reasonable than their criticism of the "as expeditious as practicable" standard.  Although Intervenors assert that the potential extension "violates EPA's own CSO Policy" (Opp. at 17-18), they blatantly mischaracterize the Global Decree and misinterpret the CSO Policy in making this argument.  At the outset, it must be noted that the precise costs of compliance are unknown and could vary widely depending upon future events, *see* Klingenstein Decl. at ¶ 75 (noting that Defendants' consultant, BBS, prepared a report in 2001 that contained an "order of magnitude" planning level cost estimate that estimated the costs of WIB, CSO and SSO programs at between $1.25 billion and $3.64 billion).  This makes it difficult for the settling parties at this time to determine precisely what Defendants can afford and over what schedule – hence the possibility of extending the compliance date if costs exceed a certain threshold.[17]  This iterative approach is inherently reasonable when addressing complicated environmental projects.  *See Cmty. of Cambridge Env. Health and Cmty. Dev. Group v. City of Cambridge*, 115 F. Supp. 2d 550, 557 (D. Md. 2000) ("[T]he time frame permitted by the [State] is

---

[17] In spite of the fact that Intervenors were provided a copy of this planning level costs analysis during the course of this litigation, they chose to mislead the Court as to the project's total anticipated costs by citing a newspaper article (and not providing it as an attachment to their opposition), which they knew improperly paraphrased MSD Director Karney as stating that elimination of Defendants' SSOs alone could cost $3.6 billion.  Intervenors even place quotes around this paraphrase, trying to manipulate the Court into thinking Director Karney stated as much.  Intervenors were on clear notice that this article's statement was incorrect because Director Karney testified under oath at his deposition that the USA Today's author did not accurately report what MSD believed to be the expected costs of compliance.  *See* Deposition of Patrick T. Karney ("Karney Depo.") at 225-228 (Jan. 30, 2003) (excerpts to Exh. 1 at Tab G).

not inconsistent with standard processes for complex environmental projects, which necessitate preparation of a series of documents, starting with investigative, analytic studies and proceeding thorough [sic] design and plan stages.")(internal quotations omitted).

Intervenors' assertion that the $1.5 billion estimate of capital costs does not have to be approved by the Government-Plaintiffs, and is a "*per se*" reopener, is simply inaccurate. The implementation schedules contained in the LTCP Update and CAPP must be developed "as expeditious[ly] as practicable." Global Decree at §§ VII.A.2, VIII.A. The Government, in turn, has the power to accept or reject Defendants' CSO Long Term Control Plan Update ("LTCP Update") and SSO Capacity Assurance Program Plan, both of which will include implementation schedules. *See id.* at § VII.B.3; SSO Decree at § VII.E.8. Nothing in the provision that leaves open the possibility of a post-February 28, 2022 completion date if expected costs exceed $1.5 billion changes the "as expeditious as practicable" standard. Global Decree at § IX.B. Thus, the enforcement agencies can reject proposed post-February 28, 2022, implementation deadlines, even when expected compliance costs are above $1.5 billion, if they determine that the proposed schedule is not "as expeditious as practicable." *Id.*

As a result, Dr. Kavanaugh's concern that the financial capability extension provision creates a "moral hazard," encouraging Defendants to inflate their costs, is alleviated by the Government-Plaintiffs' – and if necessary, this Court's – oversight of the process. Moreover, whether or not the Government-Plaintiffs performed a financial capability analysis is irrelevant to the reasonableness of the Decrees because one is not required under the CSO Policy until the LTCP Update is complete. *See* CSO Policy, 59 Fed. Reg. at 18,694 (permittee to include in LTCP all information necessary to assess a proposed implementation schedule, including information relevant to

permittee's financial capability).[18]  In sum, the Decrees' provisions for fixing timelines (and

preventing timelines from being extended past February 28, 2022 if expected compliance costs are

below $1.5 billion) are perfectly consistent with the CSO Policy that requires Clean Water Act

compliance "as soon as practicable," and provide no basis for the Court to doubt the reasonableness

of this approach.

> c.    *Applying the "as expeditious as practicable" standard to CSOs
>        is reasonable and is consistent with USEPA's CSO Policy*

Intervenors' argument that the Global Decree's use of the "expeditious as practicable"

formula for implementing the CSO LTCP Update is inconsistent with USEPA's CSO Policy is

without merit.

First*,* Intervenors apparently interpret the CSO Policy's requirement that CSO remedial

programs be "subject to enforceable schedules that require the earliest practicable compliance date,"

CSO Policy, 59 Fed. Reg. at 18,690, to mean that there must be a "definite date" that cannot be

extended under any circumstances.  *See* Opp. at 18-19.  Yet again, they cannot cite a single CSO

decree that has deadlines that cannot be extended.  Even the small 14,000 person town of Bedford,

Ohio that Intervenors cite for its non-extendable SSO remedial deadlines does not apply the

extension prohibition to its CSO program.  *See City of Bedford*, 1989 WL 158020 (N.D. Ohio) at

*5.  Likewise, the Atlanta and Little Rock decrees cited favorably by Intervenors have deadlines

that can be extended, *see, e.g.,* Atlanta First Amended Consent Decree at § VIII.C.8.b (allowing for

_____

[18]  Based on a study by their purported expert, Intervenors assert, without elaboration, that there would be
no economic "hardship" posed by "MSD's remediation plan."  Opp. at 17.  This argument ignores the fact
that there is no "remediation plan" yet, because development of SSO and CSO remedial plans is what the
Decrees require.  Moreover, as described in the attached Declaration of Jeffry Rexhausen, attached
hereto as Exh. 4, the affordability analysis of Intervenors' purported expert is rife with flaws and grossly
underestimates the burden on ratepayers of a remedial program that everyone agrees will cost well over
$1 billion.

extensions from end dates if an "extension is necessary based upon good cause"), as do decrees from other jurisdictions. *See, e.g.,* Toledo Decree at ¶59 (expressly reserving right to petition for change in compliance date if Toledo experiences adverse changes in its financial capabilities).

Second*, even if the CSO Policy required non-narrative, fixed dates for implementation, it clearly directs those schedules to be developed after or in conjunction with development of the LTCP. *See* CSO Policy, 59 Fed. Reg. at 18,694. Because Defendants' LTCP Update will contain a schedule for completion that must be "as expeditious as practicable," which will be subject to the approval of the Regulatory Agencies, *see* Global Decree VII.A.2, 3, the Global Decree follows the CSO Policy even under Intervenors' own flawed interpretation.[19]

The Regulatory Agencies have already demonstrated that the "as expeditious as practicable" standard is not an euphemism for endless delay by using it to push forward the date for substantial completion of construction of the interim remedy at SSO 700 to July 2006, even though the deadline in the SSO Decree requires substantial completion to be no later than December 31, 2007, or "as expeditious[] as practicable." Klingenstein Decl. ¶31.

---

[19] Intervenors' assertion that the CSO Policy has been amended to require compliance "as expeditiously **as possible**" instead of "as expeditiously **as practicable**" is wrong, and a distinction without a difference. Opp. at 19-20 (emphasis added). To be sure, the 1994 CSO policy requires the implementation of a LTCP "as soon as practicable," CSO Policy, 59 Fed. Reg. at 18,688, and USEPA's Financial Capability Guidance Document, published in 1997, states that CSO controls identified in the LTCP should "[i]n general, . . . be implemented as expeditiously as possible." *See* Opp. at Exh. 5. But as discussed above, Webster give these terms effectively the same meaning. If there were a difference in the meaning of the two terms, the articulation expressed in the CSO Policy would prevail, as it was adopted by Congress as law. 33 U.S.C. § 1342(q)(1) ("Each permit, order, or decree issued . . . for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Policy. . . .").

**B.     The Fact that Clean Water Act Compliance Will Be Attained over Time as the Decrees Are Implemented Does Not Render the Decrees Unreasonable**

Intervenors assert that any approach to SSO remedial action that is phased in over time, allowing SSOs to continue for some period, is "illegal" and "inconsistent with the law."  Opp. at 14. Intervenors' argument fails on multiple levels, and thus does not call into question the reasonableness of the Global Decree.  First, there is no question that some SSOs will necessarily continue while solutions are implemented, ***no matter what solution is chosen* –** even Intervenors' proposed solution to SSO 700 would apparently take five years (if one accepts their optimistic predictions) and will fail to address overflows in the interim.  *See* Opp. at 23.  The Defendants cannot turn off the spigot and eliminate discharges.  Even the Supreme Court has recognized the unavoidable fact that some Clean Water Act violations, by their nature, cannot be corrected overnight.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 317-18 (1982) ("Congress did ***not*** anticipate that all discharges would be immediately enjoined. . . . Rather, [Clean Water Act] enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act.") (internal quotation marks and citation omitted; emphasis added).

Given that immediate compliance is not an alternative and that the only option is to phase in compliance, the only remaining question is ***how*** to phase in compliance.  Intervenors argue that this compliance should be achieved "at the earliest possible date," Opp. at 16 & n.10, whereas the Global Decree's signatories have agreed to a standard that would phase in compliance "as expeditious[ly] as practicable," but no later than February 28, 2022 (absent unexpected expenditures making it impracticable to achieve compliance by that time).  As discussed above, a simple reference to Webster calls into question whether there is a significant difference between these two standards.  Moreover, given that either standard might be reasonable, this Court should not reject

18

the formulation adopted by the Decrees because the schedule by which SSO compliance measures are to be implemented is one best left to the discretion of "federal and state governments as the enforcing regulatory agencies with expertise in the field." *Akzo Coatings,* 949 F.2d at 1436.

The diligent prosecution case law also reflects this common sense approach, and holds that the government's prosecution is diligent even when violations may continue while the decree is being implemented. *See, e.g., Scituate*, 949 F.2d at 557 (finding diligent prosecution even where "violations may continue"); *City of Cambridge*, 115 F. Supp. 2d at 556 (government found to be diligently prosecuting enforcement action where $6.4 million fix would be implemented over 15 years). None of the diligent prosecution cases cited by Intervenors suggests that the judicial enforcement action filed by the Regulatory Agencies in this case amounts to non-diligent prosecution because the Decrees do not ask the Defendants to defy physics by simply "turning off the spigot."[20]

## 1.   The Interim Remedy at SSO 700 Promotes the Public Interest by Dramatically Reducing Discharges in the Short-Term

The interim (*i.e.*, temporary) remedy that has been proposed for SSO 700 (the "Interim Remedial Measure" or "IRM") is eminently reasonable because it will "allow for very effective disinfection (similar to that achieved in secondary treatment plants)" and will significantly reduce

---

[20] *Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127-128 (2d Cir. 1991) (determining whether a state enforcement action filed ***subsequent*** to a citizen suit commenced in the absence of an enforcement action could foreclose the citizen suit as ***moot***); *Long Island Soundkeeper Fund, Inc. v. New York City Dep't of Envtl Prot.*, 27 F. Supp. 2d 380, 384 (E.D.N.Y. 1998) (no bar to citizen suit on diligent prosecution grounds where citizen plaintiff filed action before commencement of state action and state action had not progressed beyond the filing of the Complaint); *Orange Env't Inc. v. County of Orange*, 860 F. Supp. 1003, 1014-18 (S.D.N.Y. 1994) (finding diligent prosecution, but determining that the portion of citizen-plaintiffs' suit seeking injunctive relief was not ***moot*** due to ongoing violations, and allowing citizen-plaintiffs to proceed under a ***different statutory citizen-suit bar than is applicable here***); *Frilling v. Village of Ana*, 924 F. Supp. 821 (S.D. Ohio 1996) (finding no diligent prosecution where the state failed to allow for any public comment, in stark contrast to the numerous public participation opportunities offered in this case).

discharges until a permanent remedial measure is implemented.  *See* Klingenstein Decl. ¶28.

Indeed, the IRM facility will be designed to prevent ***all*** untreated discharges in the typical year and

will thereby "almost completely eliminat[e] this SSO's environmental effects."  *Id.* ¶32.  The

potential reduction in untreated discharges from forty per year to one every several years is

indisputably in the public interest.  *Id.*  This phased remedial program is entirely consistent with the

Clean Water Act, as interpreted by the Supreme Court.  *See Romero-Barcelo*, 456 U.S. at 317-18

(recognizing that Congress did not intend that all Clean Water Act violations be immediately

enjoined).

    In fact, Defendants' interim remedy at SSO 700 – which will be designed to provide capture

and treatment up to a 10 year storm[21] – will likely protect against the occurrence of untreated SSO

discharges in large, high volume rainstorms to a greater degree than the "full compliance" Sierra

Club and Dr. Bell endorsed as reasonable in Little Rock, which provided protection only to up to a

2-year storm level.  Little Rock Settlement at ¶¶ 1(A), 2(A).  Thus, for rain events bigger than a 2-

year storm and smaller than a 10-year storm, the SSO 700 Interim Remedy will provide capture and

treatment of SSO flows whereas the system deemed reasonable by Dr. Bell and Sierra Club in Little

Rock will not.  It is difficult to understand how an ***interim*** remedy that performs ***better*** in large,

high volume rainstorms than the permanent system in Little Rock cannot also be reasonable.

    Although Defendants may eventually decide to build a secondary treatment plant to address

SSO 700 under the SSO Decree, it is wholly premature to make that decision now before

completing the system-wide study and remedial plan required by the Decrees.  The Court must

remember that the IRM facility ***is not being installed as a permanent solution***, but only an interim

---

[21]  A storm over a 24-hour period that is so big that it is expected to occur only once every ten years.

measure until the Defendants can address the system-wide issues affecting SSO 700.[22]  Although

such an interim remedy is not required per *Romero-Barcelo*,  the Defendants are electing to furnish

one at SSO 700 to provide significant treatment to the large flows at this location while a permanent

remedy is developed.  *Romero-Barcelo*,  456 U.S. at 317-18.  There is nothing unreasonable about

doing so.

2.    **The Sycamore Project Is Also Consistent with the Law, which**
**Authorizes Bypasses where Treatment Is Not Feasible**

Intervenors also object to the Global Decree's plan to upgrade the Sycamore Wastewater

Treatment Plant on the ground that it does not provide for the secondary treatment of bypassed

sewage.  *See* Opp. at 24.  Intervenors' assertion that bypassed flow must always receive secondary

treatment, however, is a misstatement of law, as USEPA's regulations authorize bypassing where

"no feasible alternatives" are available.  40 C.F.R. § 122.41(m)(4)(B).

In this case, the Regulatory Agencies, in their expert discretion, have determined that they

"expect" that the $22 million upgrades to the Sycamore facility "will be the feasible alternatives to

bypassing" at this plant.  Global Decree § VI.  Upon completion of this project, the vast majority of

the wastewater treated at the Sycamore Plant will receive full secondary treatment.  During rain

events, when the plant cannot provide secondary treatment, excess flows will be treated by the same

highly effective treatment method that will be used at the SSO 700 IRM facility.  Klingenstein Decl.

at ¶28, ¶155.  In light of the acknowledged technical challenges of increasing the capacity of the

_____

[22]  Intervenors suggest that a purported "study" authored by MSD exists that concludes that a secondary
treatment facility is feasible at the SSO 700 site.  Opp. at 23.  There is, however, no evidence
establishing that this two-page document was authored by MSD, as it bears absolutely no marks of
attribution and carries no indicia that it is in fact a "study."  For all the parties know, the "study" was
authored by an outside contractor or some other unaffiliated entity attempting to sell the idea to MSD.
Revealingly, when Director Karney was shown the "study" during his deposition, he was unable to
identify it, to identify its author, or to determine if it came from MSD.  Karney Depo. at 325-28.

secondary treatment facility at the Sycamore Plant—and the significant economic burden that any such attempt would entail—it serves the public interest to subject the substantial majority of wastewater to secondary treatment, while treating the remainder with an alternative disinfection method of similar effectiveness.  *Id.* ¶154, 156.  If, as the result of the extensive analyses required in connection with development of the SSO CAPP, the Defendants and/or the Regulatory Agencies determine that the Sycamore project is not an appropriate "feasible alternative" to bypassing under 40 C.F.R. § 122.41(m)(4)(B), a different remedy to this issue will need to be constructed in a manner that is "as expeditious as practicable."  *See* Global Decree § VIII.A.1 and VIII.A.2.

### 3.   The "Study, Design, Fix" Approach to Remedial Action Established by the Decrees is Reasonable and Consistent with the Clean Water Act

In their public comments on the Decrees, Intervenors have criticized the Decrees for having inadequate "benchmarks," such as "number of SSOs eliminated each year . . .[or] number of treatment plant bypasses eliminated each year."  Opp., Ex. 7, p.1.  This criticism ignores the holistic "study, design, fix" approach to developing and implementing comprehensive system-wide remedies for major environmental projects.  This approach is consistent with USEPA's CSO Policy, which requires that municipalities "undertake a process to accurately characterize their [sewer system] and CSO discharges . . . and develop long term CSO control plans which evaluate alternatives for attaining compliance with the CWA."  CSO Policy, 59 Fed. Reg. at 18,688.[23]  Until the sewer system has been characterized and the plan has been developed as required by the Policy, there is no basis for establishing remedial measure benchmarks.  Once the CSO LTCP Update and

---

[23] Courts have recognized the reasonableness of the "study, design fix" approach.  *See City of Cambridge*, 115 F. Supp. 2d at 557 ("The time frame permitted by the [State] is not inconsistent with standard processes for complex environmental projects, which necessitate preparation of a series of documents, starting with investigative, analytic studies and proceeding through design and plan stages.").

the SSO CAPP are completed, however, they will each contain "a schedule that is as expeditious as practicable for the design, construction, implementation and utilization of" remedial measures. Global Decree, Exh. 4, p.5; *see also*, SSO Decree § VII.E and Global Decree § VIII.A (requiring development and implementation "as expeditious[ly] as practicable" of SSO remedial measures).

Tellingly, this is precisely the approach to SSO and CSO remedial measure planning undertaken in the Vallejo settlement, which contains no benchmarks of the type advocated by Intervenors. *See* Exh. 1 at Tab H at ¶¶ 1.a-c. Likewise, there are none in the Bedford, Ohio settlement that Intervenors have touted – just phased "study, design, fix" SSO and CSO remedial programs such as one finds in the Decrees. *See City of Bedford*, 1989 WL 158020 (N.D. Ohio) at *2-5. The same is true in Toledo. *See* Exh. 1 at Tab D at ¶¶ 30-38. Intervenors have not articulated any reason why what has been found to be reasonable in those communities is not reasonable here.

**C.    Intervenors' Baseless Attacks on the WIB Program Ignore the Fact that It Is the Most Ambitious Program of its Kind in the Nation**

Intervenors continue their derisive rhetoric by attacking the Global Decree's new WIB Program. *See* Opp. at 25. They would have this Court find the Global Decree unfair because it simply does not comport with the "Sierra Club" model – again misstating the standard of review that must be applied by this Court. *See Cannons Eng'g.*, 899 F. Supp. at 84 (holding that the court determines "not whether the settlement is one which the court itself [not to mention non-settling intervenors] might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute"). Indeed, the fact that the Global Decree contains an enforceable and robust WIB program augers in favor of the Decrees' fairness and reasonableness, not against it.

1.    **Far from Being Unfair, the WIB Program Represents a Perfectly Suited Response to Capacity-Related WIBs**

As Intervenors admit in their Opposition, the Decrees "contain a first of its kind, basement sewage program" designed to address conditions caused by MSD's system.  *See* Opp. at 26 n.30. The WIB Program consists of three separate prongs that work together to address all deleterious effects of the WIB problem.

- **Water-in-Basement Prevention Program:**  Individuals that have experienced capacity-related WIBs in the past can apply to receive a variety of remedial measures installed and paid for by Defendants, including the installation of grinder pumps and backflow preventers, as well as the purchase of the property in question in extreme situations.  *See* Global Decree ¶ XIII.A, Exh. 6.

- **Water-in-Basement Customer Service Program**:  Defendants are required to promptly respond and clean up sewage backups if caused by backups of wastewater from Defendants' sewer system.  *See id*. at ¶ XIII.B, Exh. 7.

- **Water-in-Basement Claims Program**:  Defendants are required to establish an expeditious, streamlined process for compensating building owners who have suffered real or personal property losses or expenses.  *See id*. at ¶ XIII.C, Exh. 8.

The Global Decree's WIB Program was launched on January 1, 2004 – barely a month after execution of the Global Decree – requiring the Defendants to marshal considerable manpower, money and institutional energy to implement a system-wide response network that is committed to respond promptly to customer complaints.  In the program's first quarter alone, Defendants expended more than *$1 million* in WIB Program costs and placed more that *800 homes* into the WIB Prevention Program.  *See* Karney Decl. at ¶ 5.  During rain events, MSD employs up to 86 men and women in the field at once to respond to WIB calls, with a minimum of 24 employees during non-peak conditions.  *See id*. at 6.  In short, Intervenors' criticisms of this ambitious program cannot dilute the fundamental fact that the WIB Program represents a vigorous and immediate response to the WIB issue.  It is an effort that attempts to address immediate impacts while Defendants implement other, longer-term solutions embodied in the Decrees that are designed to eliminate all capacity-related WIBs.

A review of selected WIB programs in other metropolitan areas confirms that the WIB Program as a whole represents a more than reasonable approach to basement backups. Toledo and Boston, for example, offer no reimbursement for homeowners, who are responsible for the cleanup themselves.[24] Other jurisdictions offer programs to clean up the effects of a backup caused by the sewer system, but do not offer property damage compensation or prevention programs.[25] The closest any jurisdiction comes to matching the Global Decree's WIB Program is St Louis, which offers to install grinder pumps as part of a limited prevention program, but caps available compensation for cleaning or personal property damage at $1,900. *See* <http://www.msd.st-louis.mo.us/CustSrv/CustAssist/BuAssist.htm> (capping damage payments at $1,900) (last visited May 11, 2004); <http://www.msd.st-louis.mo.us/CustSrv/CustAssist/BuPrevent.htm> (describing prevention program) (last visited May 11, 2004).

The WIB Program, therefore, represents a thorough and integrated approach to every aspect of citizens' basement back-up problems, and is specifically designed to prevent WIBs at houses where they have occurred, to provide immediate cleaning services and to pay claims for damaged property. USDOJ, EPA, OEPA and ORSANCO all agree that the three prongs of the WIB Program

---

[24] *See* <http://www.ci.toledo.oh.us/index.cfm?dept=dept13nav&page=Page274> (last visited May 11, 2004) (City of Toledo website describing what citizens should do in the event of basement flooding; not indicating City cleanup or claims program); <http://www.bwsc.org> (last visited May 11, 2004) (Boston Water and Sewer Commission's website, advising customers with backups to install backflow preventers at customer expense to prevent basement backups, but not indicating Commission cleanup or claims program).

[25] *See, e.g.,* <https://baltimore.customerservicerequest.org/web_intake_balt/Controller?op=query> (last visited May 11, 2004) (Baltimore City Services website indicating that City "would correct the condition" of backups for which the city is responsible, but not indicating a claims program); Prince William County Service Authority, Customer Handbook at 17-18, *available at* <http://www.pwcsa.org/pdf/Handbk.pdf> (last visited May 11, 2004) (describing basement backups, indicating that if main line "has blocked or surcharged," Service Authority will pay for cleaning and disinfecting but "will not accept any liability for damage due to sewage backup").

operate together to protect the public interest and represent a reasonable approach to mitigating Defendants' capacity issues. *See Akzo Coatings, Inc.*, 949 F.2d at 1436 (finding that a court must give great deference to a settlement that "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field").  This Court should not allow Sierra Club's strident – and, as discussed below, baseless – objections to supplant these agencies' reasoned opinions on the Decrees' protection of the public interest. *See Comunidades Unidas Contra La Contaminacion*,  204 F.3d at 280 (stating that the policy in favor of approving settlements in complex areas has "added bite where the settlement has been advanced for entry as a decree by a government actor committed to the protection of the public interest and specially trained and oriented in the field") (internal citations omitted).

### 2.    Intervenors' Objections to the WIB Program Do Not State Any Legitimate Reason for this Court Not to Enter the Decrees

Intervenors raise numerous objections alleging that the WIB Program is unfair or unreasonable, all of which fail to obscure the simple fact that the WIB Program represents a comprehensive response to the overcapacity issues affecting MSD customers that is without equal anywhere in the nation.

#### a.    *Defendants must meet the Decrees' enforceable commitments no matter how they are funded*

Intervenors' first main objection to the WIB Program is that it is not "pre-funded," and therefore its relief is "illusory," "ephemeral," and may "evaporate quickly in the future" if funds are not allocated to the program. *See* Opp. at 26-29.  But Clean Water Act decrees rarely, if ever, incorporate pre-funding requirements.  Mark Klingenstein has testified that, in his experience, the

United States does not include provisions in consent decrees specifying how a defendant will fund its compliance with the decree's obligations. *See* Klingenstein Decl. at ¶102.[26]

Indeed, Intervenors fail to cite a single consent decree in which funding levels are set up front. Certainly, the decrees that Intervenors cite favorably – Bedford, Vallejo and Atlanta – do not have pre-funding requirements. A review of other SSO decrees in other metropolitan areas, including, for example Miami (Civ. No. 93-1109 (SD Fl. 1995)) and Baton Rouge (M.D. La. (2002)), also demonstrates that these decrees do not mention how the municipalities will fund the remedial measures required by them. Most importantly, the SSO consent decree in Little Rock, which Dr. Bell endorsed as fair and reasonable, *see* Bell Depo. at 177-178, 185, also lacks any mention of how Little Rock would fund the environmental projects included in that decree. *See* Little Rock Settlement. Thus, how can it be that the Global Decree is "unreasonable" because it fails to include an ***unprecedented*** "pre-funding" requirement? Moreover, Intervenors assert that the Global Decree is inadequate because it requires MSD initially to fund the WIB Cleanup Program using the monies that were accumulated in the Environmental Security Account established pursuant to the 1985 Consent Decree, completely ignoring the Global Decree's plain terms. The

---

[26] Intervenors criticize Mr. Klingenstein for relying on "assumptions" and "data and information" provided by Defendants in forming his opinions on the WIB Program, citing their favorite case, *United States v. Telluride*, 849 F. Supp. 1400 (D. Colo. 1994), for the proposition that the Decrees are unreasonable because Klingenstein, the Government-Plaintiffs' expert, failed to undertake his own independent investigation. Intervenors' use of *Telluride* for this proposition entirely misapplies that case's limited holding. In *Telluride*, the court discounted the government's expert opinion because it ***relied on expert opinions provided by defendants*** and undertook no analysis at all. *See id.* at 1404 ("The record shows that the EPA relied heavily, if not exclusively, on Dr. Olgeirson, Telco's environmental expert, to produce the work plan for Telco's remediation and mitigation projects."). The facts here make *Telluride* completely inapposite. As the Government's Motion for Entry states, USDOJ and USEPA's expert, Mr. Klingenstein, has taken an active role in the negotiations, spending about 7000 hours analyzing the Decrees and Defendants' situation. He has based his opinions on an independent analysis of the available data and on his past experiences – not assumptions as alleged by Intervenors. This situation is a far cry from the extreme situation addressed by the court in *Telluride*, and belies Intervenors' repeated attempts to use that case – the only case they cite where a court refused to enter a federal consent decree – and to discount the expert opinions of Mr. Klingenstein that have been properly offered.

Global Decree clearly states that "when those funds are depleted, Defendants shall continue to implement the program in accordance with the requirements and schedules in Exhibit 7."  *See* Global Decree at § XIII.B.2.  Defendants, then, are explicitly required to procure sufficient funds to comply with the program – indeed, Defendants' implementation of the WIB Program cost over ***$1 million dollars in the first quarter alone***, disproving Intervenors' claim that the $1 million environmental fund somehow represents a ceiling on Defendants' financial commitments.

Also in direct conflict with Intervenors' over-the-top allegations is the fact that Defendants do ***face the imposition of stipulated penalties*** for failing to implement the WIB Program in accordance with the Global Decree – i.e., there is no "out" permitting non-compliance if the Defendants do not fund the programs as suggested by Intervenors.  *See* Global Decree at §§ XIII (instructing that "Defendants shall implement" the three WIB programs); XVII.F (stipulating $2,000 per day penalties if Defendants fail to meet the requirements set forth in the WIB Prevention Plan, the WIB Customer Service Program Plan, and the WIB Claim Process Plan).  These plans impose enforceable requirements on Defendants, specifying mandatory duties, enforceable schedules, and expected results upon which USEPA, ORSANCO, OEPA or the USDOJ can rely in imposing stipulated penalties.  *See, e.g., id.* at Exh. 6 (requiring MSD to exercise its good faith reasonable engineering judgment in determining if homes are eligible, and to purchase and install, at its own cost, a variety of technologies designed to prevent future basement backups at eligible properties "as expeditious[ly] as practicable").  As part of these agencies' oversight of the Decrees, Defendants are required to submit quarterly reports on the WIB Program.  *See id.* at ¶ XV.C.  These quarterly statistics provide the agencies with the information necessary to evaluate the WIB Program, to set internal benchmarks if they wish once they review the data, and to determine whether Defendants are in compliance with the Global Decree.

> b.    The WIB Program is in the public interest, and Intervenors'
> "numerous other flaws" do not alter that conclusion

Intervenors list a few additional "flaws" with the WIB Program, and the WIB Claims Program Plan in particular, which they believe preclude this Court from finding that the Global Decree and the SSO Decree are in the public interest.  *See* Opp. at 29.  Even if valid – and as discussed below, they are not – these points cannot outweigh the incredible benefit that will accrue to the public through implementation of the WIB Program, placing the Global Decree squarely in the public's interest.  *See United States v. Microsoft Corp.,* 56 F.3d 1448, 1460 (D.C. Cir. 1995) (stating that the public interest inquiry is flexible, and that the court's function is not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the ***reaches of the public interest***) (internal citations omitted).

Intervenors' objections do not raise any weakness in the WIB Program sufficient to place it outside of the reaches of the public interest.  First, nothing in the WIB Claims Program limits property owners' due process rights under the law – in fact the Global Decree contains provisions that require Defendants to inform anyone denied under the program of their legal rights.  The Global Decree requires that "[a]ny decision denying a claim in full or resulting in an offer of payment of an amount less than the full amount of the claim will include pertinent information regarding the process for pursuing the claim in Ohio State court."  *See* Global Decree, Exh. 8, p. 4. Defendants have complied with this directive, and each denial letter informs WIB claimants of their right to challenge Defendants' responsibility determination in the Municipal Court or the Court of Common Pleas.  *See* Declaration of Ernest F. McAdams, Jr., Esq., In Support Of Reply Of Defendants To Intervenor Sierra Club's Memorandum In Opposition To Entry Of The Consent Decrees ("McAdams Decl.") at ¶ 4 (attached hereto as Exh. 5).

Defendants are therefore *not* the final arbiter of responsibility, and individuals not satisfied with the decision by the City Solicitor's Office may appeal that decision to the Ohio courts at any time – guaranteeing due process to the citizens of Cincinnati. In the first quarter, Defendants received 90 WIB claims. Of these claims, 63 were paid, 20 are still pending, and 7 were denied. *See id.* at ¶ 4. As these statistics show, 90% of the personal property claims that have been decided have awarded damages to the claimant, refuting Intervenors' allegations that the City Solicitor's office cannot be trusted. *See* Opp. at 29, fn. 35.[27]

Intervenors also cite the affidavit of Mr. Ryan Lehan as evidence that Defendants have failed to abide by the terms of the WIB Claims Process Plan during the first quarter – specifically the 60-day claim response time requirement and the presumption for addresses that have had capacity-related WIBs in the past. *See id.* at 29-30. First, it must again be pointed out that Intervenors' objections relate solely to the implementation of the Global Decree, and specifically to whether the agencies will enforce its terms, not to whether its terms are fair, reasonable and consistent with the Clean Water Act. *See Akzo Coatings*, 949 F.2d at 1426.

Defendants have investigated the Lehan claim that arose from an incident on January 4, 2004, only four days after the WIB Program came on-line. On that date, the Cincinnati metropolitan area suffered a heavy rainstorm in which 3.7 inches of rain fell in a twenty-four hour

---

[27] It is not unusual to have a claims process administered by an allegedly liable government agency. Under the Federal Tort Claims Act, claimants are required to submit claims to the offending agency, and may only appeal that decision in court. *See* 28 U.S.C. § 2675. The Social Security Administration employs its own appeals board, to which all social security disputes are directed. Only after the claim is denied is an appeal then directed to the court system. Similarly, individuals who contract with the federal government must appeal their rights first to a contracting officer, then to an agency's own contract appeals board. *See* 41 U.S.C. § 605. There is simply nothing unusual about directing claims to the City Solicitor's Office to determine eligibility under the program, because a "basic presumption of our system of government [is] that public servants abide by the law and their sworn duty to uphold it." *Bragg v. Robertson*, 83 F. Supp. 2d 713, 719 (SD. W. Va. 2000).

time period.  *See* Karney Decl. at ¶ 4.  Defendants received over 253 calls under the new WIB

Program, overwhelming the nascent program and leading inevitably to some unintentional

inaccuracies in the new system that have since been resolved.  *See id.*  Mr. Lehan's claim was filed

with the City Solicitor's Office on February 13, 2004.  Because Mr. Lehan had previously retained

an attorney in connection with a 2003 backup claim that he made, his February 2004 claim was

mistakenly sent to the City attorney who was handling the 2003 backup matter – resulting in the

unfortunate situation where the Lehan claim was taken out of the normal processing procedures

established by the City Solicitor to resolve claims filed since January 1, 2004 within the required 60

days.  *See* McAdams Decl. at ¶ 6.  Mr. Lehan's claim has been placed back into the WIB Claims

Process, and based on a review of the file, Defendants have approved his claim based upon his past

history of backup difficulties, in accordance with the terms of the Global Decree.  *See id*. at ¶ 7.

Intervenors' counsel also attempt to shoehorn Mr. Lehan's 2003 backup dispute with

Defendants, in which they are also representing Mr. Lehan, into the present action and plan to

present Mr. Lehan's video, Mr. Lehan's expert, and Mr. Lehan himself at the fairness hearing later

this month.  Opp. at 30, n.37.  It is important for this Court to bear in mind that the Defendants'

WIB Claims Program began on January 1, 2004.  In this case, there is no dispute or issue of fact

with respect to whether Defendants' system suffers from capacity related problems, including WIBs

– this is exactly the situation that the Decrees are meant to remedy.  The fact that Mr. Lehan has

suffered backups in the past – before the WIB Program was instituted – has therefore only limited

relevance to the issue of whether the Decrees constitute a fair and reasonable remedial approach to

address that very problem in the future.  Moreover, Defendants' dispute with Mr. Lehan over the

2003 backup events in question concerns issues wholly unrelated to whether the backups were

caused by Defendants' system.[28]  Lastly, Intervenors' complaints related to the scope of the release that Mr. Lehan signed with Defendants in 1997, and was again offered to him with a partial settlement in 2003, are misplaced because they focus on events prior to the signing of the Global Decree.  The terms of the Global Decree in fact require Defendants to permit WIB claimants to appeal partial settlement offers.  *See* Global Decree, Exh. 8, p. 4.  Moreover, Defendants' pre-Global Decree release language has been revised to reflect the spirit of the new WIB Program, and requires settling claimants to release only their right to seek additional damages related to the actual property damage reimbursed by Defendants, not personal injury claims.  *See* McAdams Decl. at ¶ 8.

In sum, Intervenors have failed to raise a single legitimate reason why this Court should ignore the basic fact that the WIB Program represents a boon to the citizens of Cincinnati and Hamilton County because it is the most robust and complete WIB remediation program in the nation – clearly supporting the conclusion that the Decrees are fair, reasonable and in the public interest.

**D.     The Water Quality Standards Compliance Program Established by the Global Decree Strictly Adheres to USEPA's CSO Policy**

With characteristic hyperbole, Intervenors label the water quality standards compliance program established by the Global Decree "an illusory contract," Opp. at 33, despite the fact that it commits the Defendants to a Long Term Control Plan Update ("LTCP Update") development process that mirrors the process established by USEPA's CSO Policy.

---

[28]  Rather, Defendants' current understanding is that this dispute focuses on the issue of whether Mr. Lehan has been properly compensated for the damages by his insurance company and the proper application of OHIO REV. CODE § 2744.05, which prohibits any Ohio agency from paying compensation to an individual if he or she is entitled to receive insurance benefits for that loss, and also prohibits any claim for subrogation from the individual's insurer.

1.    **USEPA's CSO Policy Explicitly Allows Consideration of Water Quality Standards Revisions in LTCP Development**

The "LTCP Update Workplan," which is attached as Exhibit 4 to the Global Decree, establishes the process by which defendants, working with USEPA, OEPA and ORSANCO, will develop their CSO remedial action plan. The Workplan allows the Defendants to propose, for review and approval by the Government Parties, a LTCP Update "premised on Defendants' belief that legal requirements [including Water Quality Standards] will change." Global Decree, Exh. 4, p. 6.

Such consideration of changes to water quality standards is expressly permitted under USEPA's CSO Policy, which calls for "[r]eview and revision, as appropriate, of water quality standards and their implementation procedures when developing CSO control plans." CSO Policy, 59 Fed. Reg. at 18,689. Indeed, USEPA has issued a 71-page guidance document, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, **spelling out precisely how to conduct this process!** *See* USEPA Office of Water, USEPA Doc. No. 833-R-01-002 (July 31, 2001) (excerpts attached hereto at Appendix A: Reference Materials). This guidance establishes a rigorous process that requires a community to develop a "thorough understanding of its sewer system, the overflows and water quality impacts that result from CSOs. Monitoring and modeling should be used to adequately characterize the system for a range of storm events. . . . The monitoring and modeling data will be used to evaluate the effectiveness of the . . . LTCP in meeting water quality standards." *Id*. at 43. The Global Decree requires that the Defendants conduct just such modeling and monitoring pursuant to the "Monitoring and Modeling Workplan in Support of the LTCP Update," which is attached as Exhibit 3 to the Global Decree.

In addition, a 1998 USEPA Memorandum on "Implementation of the CSO Control Policy," which is cited by Intervenors' own expert,[29] states that

> "[i]n locations where uses have been designated without consideration of wet weather conditions of urban streams [as is the case in Greater Cincinnati], it is appropriate to evaluate the attainability of WQS. . . . In many cases, the permittee's development of a long-term control plan, and the State's review and revision of WQS, will occur concurrently and interdependently."

USEPA Office of Water, Memorandum: Implementation of the CSO Control Policy, (May 19, 1998) (attached hereto at Appendix A: Reference Materials).  Concurrent and interdependent development of the LTCP Update and consideration of potential changes to water quality standards are precisely what has been contemplated by USEPA *in its own guidance documents*.  As required in the LTCP Update Workplan, Defendants must meet with the Regulatory Agencies no fewer than five times during the course of the LTCP Update development process to discuss, among many other things, "[p]roposed modifications, if any, to existing water quality standards on a stream-by-stream basis."  Global Decree, Ex. 4, p. 9.  Although Intervenors prefer to dismiss such collaboration as "continuous rounds of negotiations," Opp. at 33, interdependent decision-making is at the heart of the remedial process established by USEPA's CSO Policy.  Intervenors' exaggerated characterizations aside, it is hardly unreasonable or against the public interest for a Clean Water Act consent decree to require conformity with guidance issued by USEPA in implementing that statute. *See Akzo Coatings*, 949 F.2d at 1436 (deferring to USDOJ and USEPA expertise where a consent decree has been negotiated in the environmental field).

---

[29]  *See* Third Declaration of Bruce A. Bell at ¶ 5.

**2.    Consideration of Water Quality Standards Revisions with Regard to the Waters of Hamilton County Is Not Precluded**

Notwithstanding the great weight of USEPA guidance cited above, which explicitly permits parties to conduct water quality standard reviews in conjunction with the development of a CSO Long Term Control Plan, Intervenors assert that this guidance must be disregarded in the present case. They disingenuously claim that any change to current water quality standards would violate 40 C.F.R. § 131.10, which prohibits changes to water quality standards that do not protect the "existing use" of the subject stream. Opp. at 31-32. Although Intervenors suggest that any water quality standard revisions would not protect the existing use of "the rivers, streams and creeks in Hamilton County," they offer no valid support for this assertion. Intervenors do not cite any official finding by any governmental agency as to the "existing use" of Hamilton County waterways. This is because there has been no such finding. Instead, they cite *Ohio Valley Envtl. Coalition v. Horinko*, 279 F. Supp. 2d 732 (S.D.W.Va. 2003), for the proposition that any activity (such as swimming or fishing) that "is actually taking place in the stream" is an existing use that must be protected. Opp. at 32. Not surprisingly, *Horinko* simply does not say this. Instead, *Horinko* merely notes in passing what the existing uses were for the West Virginia stream that was the subject of that case, without explaining the basis for this observation. It never asserts that the existing use is whatever is "actually taking place in the stream."

As described above, the Global Decree allows the Defendants to work with the Regulatory Agencies to review existing water quality standards in conjunction with the development of the LTCP Update – precisely as contemplated by the extensive USEPA guidance cited above. The Defendants have no intention of pursuing water quality standards that would require a prohibited change in existing uses for any stream – and even if they did, the Regulatory Agencies would not permit that result. The existing uses of the relevant receiving streams will be identified and protected as part of the water quality standards review process. It is simply premature for

35

Intervenors to assert that those uses have already been identified for every stream in the County and that the results of any water quality standards review will necessarily infringe on those uses.

### 3.    Allowing the Defendants the Opportunity and Time to Analyze Multiple Alternatives Is Consistent with USEPA Guidance

In the event that the proposed LTCP Update must be modified because water quality standards are not changed, the Global Decree gives the Defendants additional time to develop and implement an alternative version of their LTCP Update.  Notwithstanding Intervenors' protestations to the contrary, such modifications are precisely what the CSO Policy contemplates.  "If water quality standards decisions differ from those that the CSO community anticipated . . . the community would have to revise the draft LTCP."  USEPA Office of Water, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, USEPA Doc. No. 833-R-01-002 (July 31, 2001) at 46.  Such modifications must obviously take some time.  Moreover, the Global Decree also states that the Defendants must implement remedial measures in a manner that is "as expeditious as practicable."  Global Decree ¶ VII.B.2.

Equally reasonable are the provisions of the LTCP Update Workplan that allow Defendants to "identify, describe and evaluate" a number of remedial alternatives, including "at least one alternative set of remedial measures that would . . . comply with all legal requirements if those requirements are not changed."  Global Decree, Ex. 4, p. 6.  Although Intervenors disingenuously characterize this provision as evidence of Defendants' intent to "submit two Long Term Control Plan Updates," Opp. at 32, analysis of a variety of remedial alternatives is in fact central to the remedial scheme established by the CSO Policy.  *See* CSO Policy, 59 Fed. Reg. at 18692 ("EPA expects the long-term CSO control plan to consider a reasonable range of alternatives.  The plan should, for example, evaluate controls that would be necessary to achieve zero overflow events per year, an average of one to three, four to seven, and eight to twelve overflow events per year.").  Given that the LTCP Update is subject to review and final approval by USEPA, OEPA and

ORSANCO, there is nothing untoward about the statement in the LTCP Update Workplan that merely confirms the truism that the preparation of alternatives that comply with unrevised water quality standards in no way implies that Defendants have now "agree[d] to implement such measures." Global Decree Ex. 4, p. 6. Rather, the alternative to be implemented will be the one that emerges from the collaborative process established by the Global Decree in strict conformity with USEPA's CSO Policy. Such an approach is eminently reasonable.

E.    **Appointment of a Special Master Is Unprecedented and Unnecessary**

Intervenors devote a substantial portion of the Opposition and the declarations of their purported experts to their demand that this Court add a special master to the already crowded cast of overseers – USEPA, OEPA, ORSANCO and this Court – to monitor implementation of the two Decrees by the Defendants. *See* Opp. at 35-41. In addition to adding an unnecessary layer of supervision to an already complex remedial process, this proposal is unprecedented in the area of municipal Clean Water Act compliance consent decrees. It should be rejected.

1.    **Insertion of a Fourth Oversight Body into the Clean Water Remedial Process Established by the Decrees Is Unnecessary**

The terms of the Decrees interject the three Regulatory Agencies into the daily operations of MSD. *See* Global Decree § XV (requiring quarterly reports on overflows, as well as detailed data from the WIB Program). Every deliverable under the Decrees is subject to review and approval of USEPA, OEPA and ORSANCO. *See e.g.* SSO Decree § VI.B.2 (Regulatory Agencies' approval of SSO 700 Interim Remedial Measures); § VI.C.2 (Agencies' approval of final SSO 700 Remedial Plan); § VII.C.5 (Agencies' approval of Capacity Assessment Plan) § VII.D.2 (Agencies' approval of Capacity Assessment Report); and § VII.E.8 (Agencies' approval of Capacity Assurance Program Plan); Global Decree § VII.A.3 (Agencies' approval of Long Term Control Plan Report); § VII.B.3 (Agencies' approval of Modifications to Long Term Control Plan Update); and § XI.C.3 (Agencies' approval of Maximization of Storage and Transport Report). It is difficult to see how insertion of a

37

fourth oversight body into this lengthy, technical process is going to identify a significant problem with these deliverables that at least one of the three expert regulatory agencies will not. Moreover, it almost certainly will not make oversight more efficient.

This is particularly true given the statutory mandate and technical expertise of the Regulatory Agencies. As amply demonstrated in the United States' Motion for Entry, USEPA has been charged by Congress to attack the CSO issue head-on. *See* US Mot. for Entry at 38-39. This continues a long history of USEPA and USDOJ vigilance regarding the compliance of wastewater utilities with the Clean Water Act that has resulted in over 150 Clean Water Act settlements with municipalities. *Id*. The United States' technical expert, Mark Klingenstein, has been involved in 17 municipal wastewater collection system Clean Water Act enforcement cases. *See* Klingenstein Decl. at ¶¶ 5-6. Similarly, OEPA has James Simpson, who brings more than 22 years of Clean Water Act enforcement experience to the table. *See* Affidavit of James Simpson at ¶ 1. As outlined in the Motion for Entry, the United States and its representatives have invested thousands upon thousands of hours in this case and "are in no way going to shirk their duty to ensure that defendants comply with the decrees and ultimately the Clean Water Act." US Mot. for Entry at 43. When the USDOJ attorneys make such commitments as officers of the United States and of this Court, their diligent oversight should be presumed.[30] In these circumstances, there is no need to insert a special master into an oversight process to which so many regulatory resources have already been devoted.

Moreover, the Regulatory Agencies' review and approval of Defendants' submittals under the Decrees to date demonstrate that they take their responsibilities quite seriously and intend to hold Defendants' implementation of the Decrees to rigorous standards. For example, as a result of

---

[30] *See Bragg*, 83 F. Supp. 2d at 719 ("It is a basic presumption of our system of government that public servants abide by the law and their sworn duty to uphold it.").

their review of the SSO 700 Interim Remedial Measures Plan, the Agencies required that the Defendants speed up substantial completion of this project by over a year. *See* Klingenstein Decl. at ¶ 31. Similarly, the Agencies required changes to a number of deadlines in the Capacity Assessment Plan submitted under the SSO Decree. These changes resulted in the deadline for submission of the Capacity Assurance Program Plan being moved up by eight months. *Id*. at ¶ 125.

Finally and most importantly, notwithstanding Intervenors' shrill accusations to the contrary, the fact that the Defendants have a sewer system in need of remedial action is not an indication that there has been some abdication of responsibilities by the Regulatory Agencies that necessitates appointment of a special master. By Intervenors' own admission, Atlanta (*id*.), Vallejo, California (*id*.), Bedford, Ohio (Opp. at 16), and Little Rock all have municipal waste water system correction consent decrees. Add to that list Toledo (3:91-CV-07646, (N.D. Ohio 2002)); Miami (Civ. No. 93-1109 (S.D. Fl. 1995)), Boston (85-0489 (D. Mass. 1985)), New Orleans (Civ. No. 93-3212 (E.D. La 1998)), Birmingham (Civ. No. 93-G-2492-S (S.D. Al. 1996)), Baton Rouge (M.D. La. (2002)), Baltimore (Civ. No. 02-CV-1524 (D. Md. 2002)), Honolulu (Civ. No. 94-CV-765 (D. Hi. 1994)), Washington, DC (Civ. No. 02-2511 (D.D.C. 2003)), and a host of others. Wet weather overflows are a national crisis. According to USEPA's Report to Congress: Implementation of the Combined Sewer Overflow Control Policy, at ES-5. there are 772 communities that experience CSOs. These communities are primarily concentrated in the Northeast and Great Lakes regions. *Id*. To be clear, the Defendants do not assert that this problem should be allowed to persist in Cincinnati simply because many other communities also experience overflows. Rather, the Defendants recognize that this serious problem must be fixed. In executing the Decrees, they have demonstrated their commitment to making that happen. Still, the fact that the Defendants – like hundreds of other communities across the nation – have insufficient capacity in their sewer system does not mean that

the Regulatory Agencies have failed in their enforcement mission such that a special master must be appointed.

### 2.    An Extra Measure of Oversight Will Be Provided by the Board of County Commissioners' New Sewer Ombudsman

The Board of County Commissioners for Hamilton County ("BOCC") is creating an ombudsman function that should go a long way toward meeting the objective of providing Hamilton County residents with a mechanism for voicing any complaints that they may have with service provided by MSD, including implementation of the WIB program.

The ombudsman will be hired and paid by the BOCC, and report directly to the County Administrator, who in turn reports to the BOCC. The ombudsman will not be an MSD employee or contractor, and will operate with complete independence from MSD. The ombudsman will serve as a point of contact and investigator of complaints regarding the WIB program and other MSD customer service issues. The ombudsman will address these comments with MSD management in an effort to resolve any customer concerns. The ombudsman will also report on complaints received to the County Administrator who will share these reports with the BOCC. Reports will include a description of the disposition of each case and any recommendations for Commission action. The ombudsman will also independently look for opportunities to improve MSD's customer service and business operations. The BOCC ombudsman will provide an appropriate mechanism for ensuring that MSD customers receive the level of service and WIB response that they deserve.

### 3.    Appointment of a Special Master is Unprecedented in the Municipal Clean Water Act Consent Decree Arena

Intervenors do not cite a single instance in which a special master has been appointed in connection with a municipal wastewater Clean Water Act consent decree. At various times in their papers, Intervenors and their experts discuss decrees in Atlanta (*id*.), Vallejo, California (*id*.) and Bedford, Ohio (Opp. at 16), yet none of these decrees involves a special master. As discussed, the

40

United States has entered into over 150 municipal Clean Water Act settlements.  US Mot. for Entry at 39.  None has required appointment of a special master under the terms of the settlement itself. *Id.* at 45.

Indeed, of the five cases cited by Intervenors in support of the unremarkable proposition that the Court has authority to appoint a special master under Federal Rule of Civil Procedure 53, only one involves a decree whereby the special master was required under the terms of the settlement itself.[31]  That one case, however, *Wuori v. Concannon*, 551 F. Supp. 185 (D. Me. 1982), did not involve a special master providing additional oversight of multiple expert regulatory agencies in their enforcement of the law.  Instead, it involved a special master who sought to ensure that a social service agency that had violated a number of statutory and constitutional requirements followed through with its commitments in the decree to correct those violations.  *Id*. at 189.  In *Wuori*, there was no regulatory agency available to ensure that the violating entity complied with the decree.  Here there are three.  There is no need to add a fourth.

---

[31]  All of the other cases cited by Intervenors involve situations where a special master was appointed after the regulated party failed to abide by its obligations under a previously approved consent decree.  *See e.g. New York State Ass'n for Retarded Children, Inc. v. Carey*, 551 F. Supp. 1165 (E.D.N.Y 1982) (master appointed after multiple violations of consent order by mental health care facility); *Cronin v. Bowner*, 90 F. Supp. 2d 364, 377 (S.D.N.Y. 2000) (special master appointed where insufficient progress was being made toward development of regulation required by consent decree).

### III. CONCLUSION

For the reasons stated above, Defendants respectfully urge this Court to approve the United

States' Motion for Entry of the Consent Decrees and find that the Global Decree and the SSO

Decree are fair, adequate, reasonable and consistent with the Clean Water Act.


Dated this 13th day of May, 2004.

    s/Nee Fong Chin
Nee Fong Chin, Trial Attorney           Terrance A. Nestor, Of Counsel
Ohio Bar # 0038095                 Assistant City Solicitor
Assistant County Prosecutor         City Solicitor's Office
Hamilton County Prosecutor's Office   City of Cincinnati
230 East 9th Street, Suite 4000       801 Plum Street
Cincinnati, OH 45202              Room 214 City Hall
                                   Cincinnati, OH 45202

Christopher H. Buckley, Jr., Of Counsel
Peter P. Murphy, Of Counsel
Michael K. Murphy, Of Counsel
Kevin St. John, Of Counsel
Gibson, Dunn and Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306


For the Board of County Commissioners Of
Hamilton County, Ohio and the City of
Cincinnati

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 13, 2004, he electronically filed the foregoing Reply Of Defendants Board Of County Commissioners, Hamilton County, Ohio, And The City Of Cincinnati To Intervenor Sierra Club's Memorandum In Opposition To Entry Of The Consent Decrees, with supporting exhibits and appendices.  The undersigned understands that attorneys for each party in this matter have registered for the Court's Electronic Case Filing service, and thus has received copies of the Reply Of Defendants Board Of County Commissioners, Hamilton County, Ohio, And The City Of Cincinnati To Intervenor Sierra Club's Memorandum In Opposition To Entry Of The Consent Decrees, with supporting exhibits and appendices contemporaneously with the electronic filing.


s/Kevin M. St. John _____

Kevin M. St. John