**TAB B**

1           UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4    ---------------------------------------
                                          :
5    UNITED STATES OF AMERICA, et al.,
                                          :
6           Plaintiffs,                   :
                                          :
7    SIERRA CLUB, et al.,                 :
                                          :
8           Intervenors,                  :
                                          :
9       vs.                               :    CASE NO.
                                          :    1-02-107
10   THE BOARD OF COUNTY COMMISSIONERS    : (Consol. with
     OF HAMILTON COUNTY, OHIO             : C-1-02-108 and
11   &                                    : C-1-02-135)
     THE CITY OF CINCINNATI,              :
12                                        :
            Defendants.                   :
13                                        :
     ---------------------------------------

14

15       Deposition of:    BRUCE A. BELL, Ph.D., P.E.

16       Taken:            By Board of County
                             Commissioners of Hamilton
17                           County, Ohio and the
                             City of Cincinnati
18                         Pursuant to Agreement

19       Date:             February 5, 2003

20       Time:             Commencing at 9:00 a.m.

21       Place:            Law Office of David Altman
                           15 East Eighth Street
22                         Cincinnati, Ohio   45202

23       Before:           S. Diane Farrell, CRR
                           Notary Public - State of Ohio

24                                   ORIGINAL

```
 1  APPEARANCES:

 2
        On behalf of Sierra Club and Marilyn Wall:
 3
            Albert J. Slap, Esq.
 4          20 Erie Avenue
            Glendale, Ohio  45246
 5
        On behalf of Hamilton County Board of Commissioners
 6          and the City of Cincinnati:

 7
            Christopher H. Buckley, Jr., Esq.
 8              and
            Peter P. Murphy, Esq.
 9              of
            Gibson, Dunn & Crutcher LLP
10          1050 Connecticut Avenue, N.W.
            Washington, D.C.  20036-5306
11
        On behalf of the Hamilton County Board of County
12          Commissioners:

13
             Nee Fong Chin, Esq.
14          Chief Assistant Prosecuting Attorney
            230 East Ninth Street
15          Suite 4000
            Cincinnati, Ohio  45202
16

17      On behalf of the State of Ohio:

18          Margaret Malone, Esq.
                and
19          Daniel J. Martin, Esq.
            Assistant Attorneys General
20          Environmental Enforcement Section
            30 East Broad Street
21          25th Floor
            Columbus, Ohio  43266-0410
22

23

24
```

1

2       On behalf of The United States of America:

3           Gary Prichard, Esq.
            Associate Regional Counsel
4           U.S. EPA Region 5
            77 West Jackson Boulevard
5           Chicago, Illinois  60604-3590

6

7       Also present:

8           Mark J. Klingenstein, P.E.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                      I N D E X

 2
     BRUCE A. BELL, Ph.D., P.E.                        PAGE
 3

 4        Cross-Examination by Mr. Buckley              5
          Cross Examination by Mr. Prichard           189
 5        Cross-Examination by Ms. Malone             192
          Examination by Mr. Slap                     201
 6        Recross-Examination by Mr. Buckley          219
          Recross-Examination by Ms. Malone           226
 7

 8
     EXHIBITS                      MARKED      REFERENCED
 9
          Plaintiffs' Exhibit  1      6            6
10        Plaintiffs' Exhibit  2     13           13
          Plaintiffs' Exhibit  3     27           27
11        Plaintiffs' Exhibit  4     41           41
          Plaintiffs' Exhibit  5     55           55
12        Plaintiffs' Exhibit  6     84           84
          Plaintiffs' Exhibit  7     85           85
13        Plaintiffs' Exhibit  8    109          109
          Plaintiffs' Exhibit  9    109          109
14        Plaintiffs' Exhibit 10    121          121
          Plaintiffs' Exhibit 11    125          125
15        Plaintiffs' Exhibit 12    146          146
          Plaintiffs' Exhibit 13    179          179
16        Plaintiffs' Exhibit 14    180          180
          Plaintiffs' Exhibit 15    181          181
17

18                        - - -

19

20

21

22

23

24
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620  Cincinnati, Ohio  45202**

1       BRUCE A. BELL, Ph.D., P.E.

2  of lawful age, a witness herein, being first duly sworn as

3  hereinafter certified, was examined and deposed as follows:

4       CROSS-EXAMINATION

5  BY MR. BUCKLEY:

6       Q.    Good morning, Dr. Bell.

7       A.    Good morning.

8       Q.    Would you state your name and home address for

9  the record, please?

10       A.    My name is Bruce A. Bell.  And the address is

11  14 Roanake Drive, Monroe, New York.

12       Q.    Are you on any drugs or medications, sir, that

13  would inhibit your ability to testify today?

14       A.    No.

15       Q.    Do you have any other conditions that would in

16  any way inhibit your ability to testify today?

17       A.    No.

18       Q.    Okay.  I'm just going to give you a few

19  standard suggestions.  First of all, if I ask you a

20  question and you don't understand it -- and given the

21  technical nature of this, I may well not articulate a

22  question very well -- be sure to let me know, and I'll try

23  to rephrase the question.

24            You need to answer audibly, as I'm sure you

1    not adequate to eliminate the SSO which was intended to be

2    eliminated.  Would you -- what is your view with respect to

3    whether a request to change the design of that project

4    would be appropriate?

5        A.    I would believe that if you could make a

6    demonstration that it would not work as opposed to that

7    there's a better, cheaper way to do it, I think any

8    rational person would make that request whether the consent

9    decree said so or not.

10        Q.    Let's go back to your first declaration.  And

11    I'd like to refer you specifically to paragraph 12.  You

12    say in paragraph 12 of your first declaration that there is

13    a technologically feasible and simple remedy to prevent the

14    capacity-related SSOs that's been available in your direct

15    experience for over 30 years.  Defendants could have simply

16    built sewers and treatment plants that were of adequate

17    size for the wet weather flow that actually occurs.

18        That's what you said, correct?

19        A.    Yes.

20        Q.    And I take it your position is that they didn't

21    build sewers and treatment plants that were of adequate

22    size for the wet weather flows that actually occur?

23        A.    My position is they either didn't build them of

24    adequate size in the first place, which I believe from some

1    of the things I've seen Mr. Karney's has written or said

2    that MSD believes that, or that they failed to upgrade them

3    along the way in terms of capacity, either due to letting

4    I&I build up or rainfall-induced I&I build up, or simple

5    growth.

6         Q.    Okay.  I noticed in paragraph 12 a shift in the

7    tense.  You said there is a technologically feasible

8    solution, and then you talked about what they could have

9    done or didn't do.

10        A.    Or could do tomorrow.

11        Q.    But we are today where we are today in terms of

12   the configuration of this system?

13        A.    Right, and that technologically feasible

14   solution exists today, go out and build -- go out and get

15   the right-sized sewers.

16        Q.    What is that technologically feasible solution

17   today, go out and rebuild the whole system?

18        A.    One could, if one wanted to.  I don't know why

19   one would, but one could do that.

20        Q.    Do you have any idea what that would cost?

21        A.    No.

22        Q.    Do you have any idea how long it would take?

23        A.    No.

24        Q.    Do you have any idea how many additional

1    treatment plants would have to be built?

2        A.    No.

3        Q.    Do you have -- have you analyzed any of these

4    things, the time line or the design or the cost of doing

5    that?

6        A.    No, I have not.

7        Q.    Given that we are where we are, do you think

8    that the use of the systemwide hydraulic model is a good

9    idea to seek to determine how best to solve the problem on

10   a systemwide basis?

11       A.    I believe that given where we are that we are

12   where we are, that you have a 2001 plan and identification

13   of projects based on previous modelling and other things.

14   That is a solution to this problem.  That -- in my view,

15   that waiting and delaying things to do more modelling is a

16   never-ending process, and that this process is going to

17   take a fair amount of time regardless because you can't

18   build things overnight.  And that, in my view, the best way

19   to handle things would simply be to start building what you

20   have, do whatever modelling you want while it's going on

21   and modify down the road.

22       Q.    When you start building what you have, are you

23   referring to the projects that are listed on Exhibit 3?

24       A.    No, I'm referring to the projects that are

1    it could be done within five years, correct?

2        A.    Yes.

3        Q.    But it couldn't be done by tomorrow, could it?

4        A.    No.

5        Q.    Couldn't be done in a year?

6        A.    I would sure doubt it.

7        Q.    Is it your view that that facility cannot be

8    allowed -- that that situation cannot be allowed at SSO 700

9    because until that facility is built there is not secondary

10   treatment there?

11       A.    I'm sorry, I'm missing that one.

12       Q.    Well, the fact is, isn't it, that even if

13   secondary treatment were built there and even if a facility

14   were built within five years, as you have indicated it can,

15   you would have a certain period of time when there would be

16   no secondary treatment there, right?

17       A.    Yes.

18       Q.    So is it your view that that cannot be allowed

19   either by EPA or a court?

20       A.    No.

21             MR. SLAP:  Again, same objection.

22       Q.    Because it is true, isn't it, if you have a

23   system that is out of compliance in some respect, and

24   pursuant to a consent decree or for whatever other reason,

1  a solution to that problem is found and implemented, it's

2  going to take a period of time to implement it, correct?

3      A.    Usually, yeah.

4      Q.    And therefore that system would remain out of

5  compliance until the solution is implemented, correct?

6      A.    Yes.

7      Q.    Let's talk about your testimony that a

8  secondary plant could be constructed at SSO 700 within five

9  years.  The first time you saw SSO 700 was yesterday,

10  correct?

11      A.    Yes.

12      Q.    Have you done any analysis of the -- of a

13  secondary plant -- possibility of having a secondary plant

14  at SSO 700 within the -- given the circumstances of that

15  site as part of your project?  Have you done any analysis

16  of the design of the secondary treatment facility?

17      A.    I have not designed a secondary treatment

18  facility, no.

19      Q.    Have you done any analysis of the permitting

20  that would be required or how long it would take?

21      A.    I certainly know what permitting would be

22  required.  How long it would take?  If MSD does a good

23  permit application and if Ohio EPA wanted to move the

24  permit along, it would probably take in the order of three

1        Q.    And how many instances in the last ten years

2  has the United States Environmental Protection Agency and

3  the United States Department of Justice imposed a

4  moratoria?

5        A.    I don't know.

6        Q.    Have you made any effort to determine that?

7        A.    No.

8        Q.    In how many instance in the last ten years has

9  either Ohio EPA or the United States Environmental

10  Protection Agency imposed a moratorium in the State of

11  Ohio?

12        A.    I don't know.

13        Q.    Have you made any effort to determine that?

14        A.    No.

15        Q.    How about United States EPA within Region 5 of

16  EPA?

17        A.    No.

18        Q.    You don't -- you haven't made any effort to

19  determine that?

20        A.    No.

21        Q.    Okay.  Let's talk about the Little Rock

22  lawsuit.  Tell me what you remember about the background of

23  that case.  Who were the defendants?

24        A.    The defendant in the -- sort of a complicated

1    mess, but the Little Rock sewer committee was one

2    defendant.  And, actually, I think it was under the same

3    action, I'm not positive, the City of Little Rock as

4    regards to SSOs.

5         Q.    And was the sewer committee, in fact, a

6    five-person lay board of the utility?

7         A.    I don't remember how many people were on the

8    board.

9         Q.    But was it a citizen board?

10        A.    I believe it was an appointed board by the -- I

11   think the city appoints the members.  I really don't know.

12        Q.    But they are -- regardless of how many or how

13   they are appointed, they're associated with the utility,

14   correct?

15        A.    Yes.

16        Q.    And was the other defendant the City of Little

17   Rock?

18        A.    Yes.

19        Q.    And was the sewer authority through the

20   five-person -- through the committee sued with respect to

21   SSOs?

22        A.    Yes.

23        Q.    And was the city sued with respect to storm

24   water problems?

1        A.    With respect to -- under the storm water

2    permit, one of the issues in the lawsuit with the city was

3    to effectively prohibit SSOs.

4        Q.    So SSOs were at issue with respect to the city

5    as well?

6        A.    Yes.

7        Q.    So it would be fair to say that SSOs were

8    involved in that case both with respect to the utility as a

9    defendant and the city as a defendant?

10       A.    It would be fair to say they were both

11   involved.  My understanding was that the city's involvement

12   or what came out of the city's involvement was

13   essentially -- and I don't know how to say this properly,

14   legally, but stay out of the utility's way in implementing

15   its -- its obligation under the consent decree, because my

16   understanding was that the city had significant control

17   over the utility's budget.

18       Q.    The case against the utility was settled,

19   wasn't it?

20       A.    Yes, it was.

21       Q.    Okay.  Is the case against the city still

22   pending?

23       A.    My understanding is, and this is basically just

24   what I've been told, that the judge made a ruling based on

1    paper that the city -- and, again, I don't know whether
2    it's an order or what it is, but the city was essentially
3    told, look, stay out of the way of the sewer committee,
4    don't mess up what they agreed to do.

5              The storm water part of that case, as I talked
6    earlier, went to a one-day trial, and my understanding
7    is -- or at least I've not heard a ruling on it.

8         Q.    When was your last involvement in the case?

9         A.    That one-day trial, oh, which was last summer,
10   I think.

11        Q.    Okay.  Now, with respect to -- I'm sorry.

12        A.    I'm trying to remember.  We reviewed somewhere
13   in that same time frame -- and I don't remember quite
14   frankly whether it was before that trial or after that
15   trial, so I don't know which was last -- we were asked to
16   review the capacity assurance plan that came under the
17   consent decree for our clients.  And I can't -- I honestly
18   can't tell you whether that was a few months before the
19   trial or a few months after.

20        Q.    Who reviewed it?

21        A.    I did, with some help from Steve Garabed.

22        Q.    And what was your conclusion?

23        A.    That fundamentally it was fine.

24        Q.    When was the case against the utility settled,

1    to the best of your recollection?

2        A.    Best of my recollection, which isn't all that

3    good, would be the late 2000, early 2001.

4        Q.    Did you have a hand in that settlement?  Were

5    you involved in the negotiation?

6        A.    Yes.

7        Q.    And how were you involved?

8        A.    I was involved in -- in working with Sierra

9    Club's lawyer as to they should -- you know, what, from a

10   technical standpoint, would make a good settlement.  I was

11   involved in going down once or twice, which I can't

12   remember, to meet with the folks from the utility.

13       Q.    So you were involved with settlement -- in

14   settlement meetings?

15       A.    In settlement meetings, yes.

16       Q.    Did you have any meetings with the United

17   States Department of Justice or the United States

18   Environmental Protection Agency with respect to that

19   settlement?

20       A.    I did not, no.

21       Q.    Now, the settlement was unopposed by the

22   Department of Justice, United States Department of Justice,

23   correct?

24       A.    I know it was entered.  I assume it was

1    unopposed, but I don't know.

2        Q.    It was entered as a consent judgment by a

3    federal judge, wasn't it?

4        A.    Yes.

5        Q.    And it was entered as a consent judgment by a

6    federal judge line by line?  In other words, the agreement

7    as reached between the Sierra Club and the utility was

8    entered as a consent judgment, correct?

9        A.    Yes.

10       Q.    Did you believe that the settlement was a good

11   one?

12       A.    I believed from a technical standpoint it was a

13   pretty good settlement.  The rest of it I just didn't have

14   an opinion on.

15       Q.    You didn't?  You never testified under oath

16   that it was a fair settlement?

17       A.    If I did, I did.  But I -- my memory is I was

18   asked about the technical parts of it and the technical

19   parts is what I thought were fine.  And, frankly, I

20   couldn't tell you what the money parts of it were.  And I

21   guess the money parts would have been fine with me whatever

22   they were.

23       Q.    Did you testify under oath that as far as you

24   were concerned, it should be approved by the United States

1   Department of Justice and the United States Environmental

2   Protection Agency?

3          A.     To tell the you the truth, I don't remember

4   saying that, but certainly that was my opinion.

5          Q.     Did you testify under oath that you would

6   recommend approval of it to the Department of Justice and

7   the Environmental Protection Agency if they asked you about

8   it?

9          A.     Again, I don't remember testifying to it, but I

10  would have.

11         Q.     Did you have any involvement in the

12  administration of the settlement decree?

13         A.     Can you define "administration" for me?

14         Q.     Did you have any involvement in implementation

15  of the settlement decree?

16         A.     Well, I just told you that we did review the

17  capacity assurance plan.  Whether that's -- fits your

18  definition of implementation, I don't know.  That's the

19  only thing we've dealt with.

20         Q.     In fact, didn't the settlement agreement

21  require that you review the study and the results of the

22  study?

23         A.     I can't remember whether we were in there by

24  name or the Sierra Club was, but we did.

1      Q.    In fact, wasn't the Sierra Club paid $5,000 for
2  you to do that?
3      A.    May have been.
4      Q.    You don't know?
5      A.    I don't remember.  I know we were asked to do
6  it.  I know we did it.  I know we got paid to do it.
7              (Plaintiffs' Exhibit 13 was marked for
8              identification.)
9      Q.    Okay.  All right.  Let me show you what's been
10 marked as Exhibit 13.  Exhibit 13 is a judgment entered by
11 a federal court, United States District Court, Eastern
12 District of Arkansas, signed by a federal judge whose name
13 I can't make out.  Do you recall who the judge was in the
14 case?
15     A.    No, I don't.  In fact, the copy I have doesn't
16 have the judge's signature on it.
17     Q.    Okay.  Which enters a consent judgment of
18 settlement agreement between the Sierra Club and the Little
19 Rock Sanitary Sewer Committee.  This is the settlement
20 agreement we're talking about, isn't it?
21     A.    Yes.
22     Q.    Okay.  You've seen this before, correct?
23     A.    I have.
24     Q.    And this was signed by the Sierra Club and by

1    the utility, correct?

2         A.    Yes.

3         Q.    Have you seen the judgment before, which is the

4    first two pages?

5         A.    I don't think so.

6         Q.    Okay.

7               (Plaintiffs' Exhibit 14 was marked for

8               identification.)

9         Q.    The next exhibit -- is it 14 -- has been marked

10   as Exhibit 14.  It is a letter from the United States

11   Department of Justice dated November 2nd, 2001.  Have you

12   ever seen this letter before?

13        A.    No, I haven't.

14        Q.    Were you aware of the fact that the -- the

15   Department of Justice was troubled by two of the SEPs,

16   supplemental environmental projects, that were embodied in

17   the consent decree --

18        A.    No.

19        Q.    -- specifically relating to creation of bike

20   paths and construction of a golf course?  Were you aware

21   that there was any controversy with respect to those two

22   projects as SEPs?

23        A.    No.

24        Q.    Were you involved in any way in the selection

1   of those projects as SEPs?

2              (Off the record.)

3       A.    No.

4            (Defendant's Exhibit 15 was marked

5            identification.)

6       Q.    Okay.  All right.  Sir, I've had marked as

7   Exhibit 15 the oral deposition of Bruce A. Bell taken in

8   Little Rock, Arkansas on October 8th, 2001.  Is this, sir,

9   your deposition in the Little Rock case?

10      A.    I believe it probably is.  Looks like it.

11      Q.    Okay.  It was taken under oath, wasn't it?

12      A.    Sure.

13      Q.    Was the testimony you gave truthful?

14      A.    To the best of my ability, I'm sure it was.

15      Q.    After your testimony was taken, was the

16  transcript furnished to you and reviewed by you?

17      A.    If memory serves, it was.

18      Q.    I'm sorry?

19      A.    If memory serves, it was.

20      Q.    Did you sign it?

21      A.    By memory, I think I did.

22      Q.    Well, take a look at it.  Is that your

23  signature?

24      A.    Okay.  Then I did, yes.

1    Q.    In fact, did you make certain corrections to
2    it?
3    A.    Yes, I did.
4    Q.    To the best of your recollection as you sit
5    here today, and I recognize that this deposition was taken
6    some time ago, was any of your testimony incorrect?
7    A.    To the best of my recollection, it was not.
8    Q.    Now, I'd refer you to page -- I refer you, sir,
9    to page 245 of your transcript.  Specifically starting at
10   line 8, and I'm quoting, QUESTION:  And we've questioned
11   (sic) the settlement agreement with the utility on several
12   occasions.  Do you think that the current settlement
13   agreement that has been sent to the Department of Justice
14   is a fair agreement?
15            ANSWER:  I think so.
16            That was your testimony, was it not, sir?
17   A.    Yes, it was.
18   Q.    And I refer you over to page 252 and 253
19   beginning at page -- I'm sorry, beginning at page 252, line
20   24.  QUESTION:  You characterized the settlement agreement
21   between the utility and the Sierra Club, the plaintiff, as
22   a fair agreement?
23            ANSWER:  I believe it is.
24            That was your testimony, wasn't it?

1    A.    Yes.

2    Q.    QUESTION:  Do you have an opinion as to whether

3  or not that settlement agreement should be approved by the

4  Department of Justice?

5    ANSWER:  I don't know that my opinion matters

6  at that.  But my experience with Justice -- I think it

7  should be, and I -- the only issue that I can imagine them

8  commenting on it is actually the SEPs and that's because

9  they have their own crazy rules for supplemental

10  environmental projects, and they go down their checklists.

11    And you know, I didn't spend a lot of time

12  reading them.  But what I read of them seemed like they'd

13  worked -- similar to things that have worked in the past.

14  So I can't imagine why they wouldn't approve it.

15    But I -- certainly if they were to ask me --

16  and they won't -- I would recommend it.

17    That was your testimony, wasn't it?

18    A.    Yeah.

19    Q.    Now, let's take a look at the settlement

20  agreement.  I believe you testified that it was signed by

21  the Sierra Club, correct?

22    A.    I think you testified it was signed by the

23  Sierra Club.  But I imagine if it was entered, it was

24  signed by the Sierra Club.

1        Q.    Okay.  Now, there's a definition in this

2   agreement of a design storm event, is there not, on pages 3

3   and 4?

4        A.    Yes.

5        Q.    Is that essentially a two-year storm?

6        A.    It's close to a two-year storm, yes.

7        Q.    Okay.  And is it fair to state that there was

8   no need to eliminate SSOs under this decree that resulted

9   from larger than whatever that design storm was?

10       A.    Yes.

11       Q.    The consent decree envisioned a study of

12  capacity, did it not?

13       A.    Yes.

14       Q.    And it was -- the study was related to SSOs,

15  correct?

16       A.    Yes.

17       Q.    Okay.  But there wasn't any deadline set in

18  this decree itself, was there?

19       A.    As I recall -- I'd have to read the whole

20  decree, but as I recall, there was a deadline for the

21  study.  There was a requirement to build to what was in the

22  study.  The schedule was left to the study dispute

23  resolution mechanism if the two sides could not agree on

24  the timetable.

1       Q.      Right.   But there was no implementation

2   deadline in this decree, was there, directly?

3       A.      Directly, no.

4       Q.      And, in fact, the Sierra Club was to be paid

5   $5,000 to cover a review of this study and suggested

6   compliance deadline to be conducted by you, correct?

7       A.      Yes.

8       Q.      And regarding maintenance, the utility was to

9   clean all SSOs pursuant to its established procedures,

10  correct?

11      A.      Yes.

12      Q.      Quote, as conditions allow, close quote,

13  correct?

14      A.      Yes.

15      Q.      There were no penalties for past violations

16  embodied in this decree, were there?

17      A.      I think they were done as SEPs.

18      Q.      So the only penalties -- the only -- there were

19  no dollar penalties assessed.   There were a certain number

20  of SEPs that were embodied in this decree?   Yes?

21      A.      Yes.

22      Q.      And there were no stipulated penalties in this

23  decree either, were there?

24      A.      No.

1      Q.    And there was no moratorium imposed by this

2  decree, was there?

3      A.    No.

4      Q.    And, in fact, the Sierra Club released the

5  utility from any violations of its two NPDES permits

6  resulting from capacity-related SSOs up to the compliance

7  deadline, whenever that deadline would end up being,

8  correct?

9      A.    That's my understanding.

10     Q.    And, in fact, this is a full and final

11  settlement of the Sierra Club's claims in the lawsuit and a

12  resolution of all allegations through the termination date

13  of the settlement agreement, correct?

14     A.    That's my understanding.

15     Q.    And, in fact, this settlement agreement was a

16  complete and full remedy for all SSOs that occurred prior

17  to the settlement agreement's effective date, correct?

18     A.    Again, I am not reading that.  I assume it is.

19     Q.    And the settlement agreement was also a

20  complete and full remedy for all SSOs that would occur

21  after the effective date but prior to the termination date,

22  correct?

23     A.    If you -- if you want me to find it, I'll read

24  it, but I honestly don't remember.  This is law stuff, and

1    I don't do the law stuff.

2        Q.    All right.  Well, take a look at paragraph 27

3    on pages 27 and -- I'm sorry, paragraph 27 on pages 28 and

4    29.  Were you aware of the provisions of that paragraph --

5        A.    No.

6        Q.    -- paragraph 27?

7        A.    No.

8        Q.    Do you recall that you testified in your

9    deposition in the Little Rock case that you need to know in

10   designing the system what the design storm is?

11       A.    Do I remember doing it?

12       Q.    Yes.

13       A.    No.

14       Q.    You agree with that statement?

15       A.    Yes.

16       Q.    Do you recall testifying in the case that you

17   cannot have 0 SSOs?

18       A.    I believe that -- I don't remember doing it,

19   but it wouldn't surprise me if I did.

20       Q.    Do you agree with that?

21       A.    I think unless you are a heck of a lucky

22   person, that's true.

23       Q.    Do you recall testifying in your deposition

24   that the utility needs to integrate fixes for SSOs, CSOs,

1    storm water and wastewater treatment plant discharges,

2    particularly with urban watersheds?

3       A.    Do I remember?   No.

4       Q.    Would you disagree with that?

5       A.    No.

6       Q.    Do you recall testifying in your deposition in

7    the Little Rock case that once a basement backup is cleaned

8    up, it's not much of an issue?

9       A.    No.

10       Q.    Would you disagree with that?

11       A.    If it's properly cleaned up, that's true.

12       Q.    Do you recall in the Little Rock case that you

13    used benchmarking for a number of SSOs but not with respect

14    to O&M?

15       A.    No.

16       Q.    You don't remember that?

17       A.    No.

18       Q.    Do you remember using the Black & Veatch

19    studies, the benchmarking studies, for the number of SSOs?

20       A.    I remember having the Black & Veatch studies.

21    I can't remember how I used them.

22       Q.    You can't remember how you used them in Little

23    Rock?

24       A.    No.

1     Q.    Do you recall whether your deposition included

2  discussion of that by you?

3     A.   No.

4     Q.   Okay.  But in any event, to the extent there

5  were questions and answers about how you used the Black &

6  Veatch studies, or why you might have used or not used

7  portions of them, you don't have any reason to believe that

8  your testimony wasn't truthful and accurate?

9     A.   No.

10     MR. BUCKLEY:  Let's take a break.

11     (A recess was taken from 3:16 to 3:24.)

12     MR. BUCKLEY:  I don't have anything further, so

13    I'll turn it over either to the United States or

14    State of Ohio.

15              CROSS-EXAMINATION

16  BY MR. PRICHARD:

17     Q.   I have just a few questions.  I'm Gary

18  Prichard.  I'm associate regional counsel with U.S. EPA,

19  here on behalf of the United States.

20     Dr. Bell, first, Mr. Buckley asked you some

21  questions about sewer moratoriums.  One question he didn't

22  ask, are you familiar with how many times in the past a

23  United States District Court judge has ordered a sewer

24  moratorium?