**TAB C**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA AND THE STATE OF GEORGIA, | ) ) |
| Plaintiffs, | ) CIVIL ACTION FILE ) NO.1:98-CV-1956-TWT |
| v. | ) ) |
| THE CITY OF ATLANTA, | ) ) |
| Defendant. | ) ) ) ) ) |

FIRST AMENDED CONSENT DECREE

(viii.)  a cost-effectiveness analysis comparing the costs for rehabilitation of structural deficiencies with the cost of transportation, storage, and treatment; and,

(ix.)  a proposed schedule for each remedial action identified.  This schedule shall include major milestones.

b.  Within sixty (60) days of the date of receiving EPA/EPD's comments on each Sewer Group Evaluation Survey Report, the Defendant shall modify the Report consistent with EPA/EPD's comments, and submit the modified Report to EPA/EPD for final approval.  Upon final approval, the Defendant shall implement the recommendations in the Report based upon the approved schedule.

8.  **Schedule Completion Dates**

a. Except as provided for in subparagraph VIII.C.8.b. below, in no case shall schedules for remedial actions under subparagraph VIII.C. extend beyond July 1, 2009, for Sewer Group one (1); July 1, 2011, for Sewer Groups two (2) and three (3); July 1, 2013, for Sewer Groups four (4) and five (5); and July 1, 2014, for Sewer Group six (6).

b.  In addition to any necessary time extensions approved in accordance with Paragraph XII. and subparagraph XIX.C., EPA/EPD may extend any of the dates in subparagraph VIII.C.8.a, above, based upon a demonstration by the Defendant that such extension is necessary based upon good cause. If EPA/EPD disapprove an extension of a schedule completion date, the Defendant may invoke Dispute Resolution under Paragraph XIII.

**TAB D**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF OHIO, | ) | |
| | ) | Civil Action No. 3:91:CV7646 |
| Plaintiffs, | ) | Judge James G. Carr |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF TOLEDO, OHIO, | ) | |
| A Municipal Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

CONSENT DECREE

quality monitoring data; and

(i) an expeditious schedule for the development and implementation of the Water Quality Model.

29. Upon approval by U.S. EPA and Ohio EPA of the work plan submitted in accordance with Paragraph 28, Toledo shall implement the Water Quality Model in accordance with the schedule included in the approved work plan.

30. <u>Long Term Control Plan</u>

Within thirty (30) days after entry of this Consent Decree, Toledo shall submit to U.S. EPA and Ohio EPA, for approval, a work plan for developing a long term control plan (the "Long Term Control Plan") for insuring that Toledo's CSOs comply with the requirements of Toledo's Current Permit, the Clean Water Act and the objectives of U.S. EPA's April 19, 1994 "Combined Sewer Overflow (CSO) Policy." The work plan shall include a schedule for completing development of the Long Term Control Plan within thirty months after approval by U.S. EPA and Ohio EPA of the work plan. At a minimum, the Long Term Control Plan shall include (and so the work plan shall describe how Toledo's development of the Long Term Control Plan will accomplish) the following:

(a) an assessment of the costs, effectiveness (in terms of pollutant loading reductions, regardless of water quality impacts) and water quality benefits of a wide range of alternatives for eliminating or reducing and treating CSOs. Toledo shall use the results of the Flow Characterization Study (performed in accordance with the requirements of Paragraphs 18-20), the results of the Water Quality Study (performed in accordance with the requirements of Paragraphs 22-24), the Hydraulic Model (developed pursuant to the requirements of Paragraphs 26-27) and the Water Quality Model

23

(developed pursuant to the requirements of Paragraphs 28-29) in performing this assessment. The alternatives that shall be considered include taking no-action (other than the improvements required by Section V.B); complete sewer separation; separation of specific portions of the combined system; various sizes of storage basins or tunnels at locations throughout the collection system; construction of additional facilities (such as high rate treatment or ballasted flocculation facilities) for providing primary treatment or advanced primary treatment to CSOs; construction of additional facilities for providing disinfection and dechlorination of CSOs; construction of facilities for removing floatables from CSOs; construction of relief sewers; relocation of CSOs; implementation of pretreatment measures to reduce flows and or pollutants discharged into the collection system from industrial users; and construction and/or implementation of combinations of these alternatives. The United States Environmental Protection Agency's "Combined Sewer Overflows Guidance for Long-Term Control Plan," ("Guidance for LTCP") provides Guidance on performing alternatives analyses. This assessment shall include:

(i) An evaluation of a range of "sizes" of each alternative that will reduce the number of untreated CSOs down to a range of numbers of overflows per CSO outfall (such as 0, 1-3, 4-7 and 8-12).

(ii) An evaluation of the "Project Costs," as that term is described on pages 3-49 through 3-51 of the United States Environmental Protection Agency's "Combined Sewer Overflows Guidance for Long-Term Control Plan," ("Guidance for LTCP") for each alternative, or mix of alternatives, that Toledo has evaluated. The determination of Project Costs shall include: (a) the total "project costs" for each alternative or mix of alternatives, and a break down of the "capital costs,"

24

"annual O & M costs," and "life cycle costs" which went into calculating the total "project costs" for each alternative or mix of alternatives; and (b) the "project costs" for each separate component of each alternative or mix of alternatives, and a break down of the "capital costs," "annual O & M costs," and "life cycle costs" which went into calculating the "project costs" for each separate component of each alternative or mix of alternatives. The terms "capital costs," "annual O & M costs," and "life cycle costs" are described on pages 3-49 through 3-51 of the Guidance for LTCP.

(iii) An evaluation of Toledo's financial capability to fund all improvements that have been considered. This evaluation shall include an evaluation of:

i.      Median household income/total project cost per household;

ii.     Per capita debt as a percent of full market property value;

iii.    Property tax revenues as a percent of full market property value;

iv.     Property tax collection rate;

v.      Unemployment;

vi.     Bond rating;

vii.    Grant and loan availability;

viii.   Current and projected residential, commercial and industrial user fees;

ix.     Other viable funding mechanisms and sources of financing; and

x.      Other factors which Toledo believes are important for this financial evaluation.

(iv)   An analysis of the water quality impacts of each alternative or mix of alternatives that are being considered.  This analysis, which shall utilize the results of the Water Quality Study (performed in accordance with the requirements of Paragraphs 22-24) and the Water Quality Model (developed in accordance with the requirements of Paragraphs 28-29), shall include an analysis of the reductions in $BOD_5$, suspended solids, fecal coliform, any pollutant parameters that the Water Quality Characterization determined are exceeding or approaching the State of Ohio's water quality criteria for those parameters in the Maumee River, Ottawa River or Swan Creek, and effluent toxicity that will result from implementation of each alternative; as well as an analysis of the impacts to the pollutant and dissolved oxygen levels in the receiving streams that will result from each alternative or mix of alternatives.

(v)  An analysis of the impact that each alternative or mix of alternatives will have on the peak instantaneous and sustained flows to the Bayview WWTP for a variety of storm events of varying durations and return frequencies, including, but not limited to, the most critical storm having a ten-year return frequency and duration of between one and twenty-four hours.

(vi) "Knee of the curve" cost-performance analyses of the range of options that are being considered that will allow for the comparison of the costs per unit of measure (in mass) of pollutants removed from the discharge for each of the alternatives that are being considered.

(b) Identification and selection of additional remedial measures (the "Long Term Control Plan") that are necessary to insure that Toledo's CSOs comply with the requirements of Toledo's Current Permit, including, but not limited to, any specific or general water quality or technology based effluent limitations applicable to Toledo's CSOs, the Clean Water Act and the CSO

26

Policy.

31.  Upon approval by U.S. EPA and Ohio EPA of the work plan submitted in accordance with Paragraph 30, Toledo shall commence development of the Long Term Control Plan in accordance with the schedule and terms set forth in the approved work plan.  Development of the Long Term Control Plan shall be consistent with the terms of this Consent Decree, the CSO Policy and the Clean Water Act.

32.  Within thirty (30) days after completion of development of the Long Term Control Plan, Toledo shall submit a written report (the "Long Term Control Plan Report") to U.S. EPA and Ohio EPA, for approval, which incorporates the Long Term Control Plan and explains what steps Toledo took to comply with its Public and Regulatory Agency Participation Plan (required pursuant to Paragraphs 16-17), including how (if at all) Toledo took information provided by the public into account in developing its Long Term Control Plan; and which demonstrates that Toledo developed its Long Term Control Plan in accordance with the work plan and schedule set forth in the approved work plan and provides the results of the work Toledo performed in developing the Long Term Control Plan including, but not limited to:

(a) All of the information described in Paragraph 30 pertaining to Toledo's assessment of the costs, effectiveness, and water quality benefits of alternatives for eliminating or reducing and treating CSOs;

(b) Identification and selection of additional remedial measures that are necessary to insure that Toledo's CSOs comply with the requirements of Toledo's Current Permit, including, but not limited to, any specific or general water quality or technology based effluent limitations and conditions

27

applicable to Toledo's CSOs, the Clean Water Act and the CSO Policy; and

        (c) As expeditious a schedule as possible for design, construction and implementation of all measures described in Paragraph 32(b).  If it is not possible for Toledo to design and construct all measures simultaneously, Toledo shall develop a phased schedule based on the relative importance of each measure, with highest priority being given to eliminating discharges to sensitive areas and then to those projects which most reduce the discharge of pollutants.  The schedule shall specify critical construction milestones for each specific measure, including, at a minimum, deadlines for: (i) submission of applications for all permits required by law, such as State of Ohio permits to install; (ii) commencement of construction; (iii) completion of construction; (iv) commencement of operation; and (v) achievement of full operation.  The schedule also shall include a deadline for the completion of all construction and full implementation of all measures under the Long Term Control Plan, which must be as early as possible but in no event later than August 31, 2016.

        33.  Upon approval by U.S. EPA and Ohio EPA of the report submitted in accordance with Paragraph 32, the Long Term Control Plan shall be incorporated into this Consent Decree and Toledo shall implement the Long Term Control Plan in accordance with the schedule included in the approved Long Term Control Plan.

        34.  Upon completion of all construction and full implementation of all measures under the Long Term Control Plan,  Toledo's CSOs shall comply with the requirements of Toledo's Current Permit, including, but not limited to, any specific or general water quality or technology based effluent limitations applicable to Toledo's CSOs, the Clean Water Act and the CSO Policy.

        35.  Toledo currently anticipates that it will spend $236,000,000 to complete the CSO

28

improvements required by Sections V.B and V.C.

D.    Elimination of SSDs

36.  Toledo shall take the following measures, which are generally consistent with the Ohio

EPA's Director's Final Findings and Orders (the "SSD DFFO") issued to Toledo on June 23, 1999, to

eliminate all SSDs by November 1, 2006:

(a)  In accordance with the SSD DFFO, Toledo has completed intensive sewer

cleaning to eliminate root intrusions and grease accumulations, correct deficiencies of the 116th Street

interceptor sewer which runs from Summit Street west to 290th Street, constructed a relief pump station

at Manhattan Boulevard, eliminated thirty-two cross-connections between its storm and sanitary sewer

systems, and eliminated the cross-connection between the Lakeside Avenue sanitary sewer and the

Maumee Bay;

(b)  By April 1, 2002, Toledo shall submit to U.S. EPA and Ohio EPA, for approval, a

plan for construction of Phase 2 improvements in the Point Place area.  The plan shall include an

analysis of Toledo's pilot rehabilitation project as described in the SSD DFFO and the improvements

described above in Paragraph 36(a); a detailed description of the remediation alternatives that Toledo

considered in developing its Phase 2 plan as described in the SSD DFFO, including information

regarding the costs and effectiveness of each alternative that was considered; a detailed explanation of

why Toledo chose the alternatives that it chose; and a schedule for construction of the all Phase 2

improvements necessary to eliminate SSDs from the Point Place area.  The schedule shall include (i)

submission to Ohio EPA and U.S. EPA of a complete Permit to Install application package and

detailed plans for necessary Phase 2 improvements by June 1, 2003, (ii) awarding of contracts for construction of Phase 2 improvements by November 1, 2003, and (iii) completion of construction of all improvements necessary to eliminate all SSDs in the Point Place area by November 1, 2006.  Upon approval by U.S. EPA and Ohio EPA, Toledo shall implement the plan in accordance with the schedule in the approved plan.

(c) In accordance with the SSD DFFO, Toledo submitted to Ohio EPA a report of the results of its flow monitoring study of the sanitary sewer system contributing to surcharging in the River Road and Midland Avenue area.  The report includes a map indicating flow monitoring locations, a full description of the project, presentation of the results of the monitoring, structural and hydraulic problems observed during the flow monitoring activities, a table ranking each sub-basin according to its severity of rainfall induced inflow and infiltration, and a plan for performing a Sanitary Sewer Evaluation Study ("SSES") in those sub-basins in which an SSES is warranted based upon the results of Toledo's flow monitoring study.  The SSES includes smoke testing, dye testing, televising, and other investigative techniques as needed to determine causes and potential remedies for the sewer surcharging in the River Road and Midland Avenue area.  The plan for performing the SSES described in this Paragraph 36(c) includes a detailed description of the steps that Toledo will take to perform the SSES and a schedule for performing the SSES, which includes (i) awarding contracts for the SSES by January 1, 2001, (ii) completing the SSES by November 1, 2001, and (iii) submission of a final SSES Report to U.S. EPA and Ohio EPA, for approval, by January 1, 2002.  Toledo shall implement the plan in accordance with the schedule in the plan for performing the SSES described in this Paragraph 36(c).

(d)  The SSES report required in Paragraph 36(c), above, shall include a detailed

30

description of the results of the SSES; a detailed description of all remediation alternatives that Toledo

considered in determining additional remedial measures needed to eliminate SSDs in the River Road

and Midland Avenue area, including information regarding the costs and effectiveness of each

alternative that was considered; a detailed explanation of why Toledo chose the alternatives that it

chose; and a schedule for construction of the Phase 3 and Phase 4 improvements as described in the

SSD DFFO necessary to eliminate SSDs from the River Road and Midland Avenue area. The

schedule shall include (i) submission to U.S. EPA and Ohio EPA of a complete Permit to Install

application package and detailed plans for necessary Phase 3 improvements by September 1, 2002; (ii)

awarding of contracts for construction of Phase 3 improvements by February 1, 2003; (iii) completion

of construction of all Phase 3 improvements by June 1, 2004; (iv) submission to U.S. EPA and Ohio

EPA of a complete Permit to Install application package and detailed plans for necessary Phase 4

improvements by June 1, 2005;

(v) awarding of contracts for construction of Phase 4 improvements by November 1, 2005; and

completion of construction of all improvements necessary to eliminate all SSDs in the River Road and

Midland Avenue area by November 1, 2006. Upon approval by U.S. EPA and Ohio EPA, Toledo

shall implement the plan in accordance with the schedule in the approved plan. Toledo currently

anticipates that it will spend between $40,000,000 and $80,000,000 to complete the SSD

improvements required by this Section V.D.

  37. Toledo shall eliminate all points where Toledo knows SSDs may occur by November 1,

2006. Following that date, Toledo shall have no SSDs. However, in the event that Toledo discovers a

new SSD, or determines that conditions in areas where SSDs are known to exist are more extensive

31

than originally anticipated, U.S. EPA and Ohio EPA may, upon request of the City, approve a plan and

schedule proposed by the City to remedy those conditions and may agree in writing to extend the

deadlines for elimination of SSDs set forth in this Paragraph or Paragraph 36.

38.  Any SSD that occurs prior to November 1, 2006, shall be considered to be a violation of

this Consent Decree if Toledo is out of compliance with its Sewer System Management, Operation and

Maintenance Plan.

E.    Separate Sewer System Monitoring And Reporting

39. Within 120 days after entry of this Consent Decree, Toledo shall submit a Separate Sewer

System Monitoring and Reporting Plan to U.S. EPA and Ohio EPA, for approval, which will assure

that Toledo provides timely and complete notice to Ohio EPA, and other appropriate Federal, State,

and local agencies as required below, of all relevant information regarding all SSDs:

(a)  Timely notice of SSDs includes at least the following:

(i) Telephonic or electronic reporting of all SSDs to Ohio EPA within twenty-four (24)

hours from the time Toledo becomes aware of such SSD;

(ii) Complete written notice (as described in Paragraph 39(b), below) to Ohio

EPA within five (5) days of the time Toledo becomes aware of the SSD;

(iii) If Toledo requires more than twenty-four (24) hours to stop a particular

SSD discharge event, submission of a separate written status report to Ohio EPA every five (5) days

until the SSD discharge has ceased; and

(b)  Complete written notice to Ohio EPA as required by Paragraph 39(a)(ii), above,

shall include at least the following:

CBOD$_5$. This sampling location shall be referred to for purposes of this Consent Decree as "sampling location 603."

(d) Toledo shall include the results of its monitoring under this paragraph in the Monthly Operating Reports that it submits to the Ohio EPA.

## VI. FUNDING

59. Compliance with the terms of this Consent Decree by Toledo is not conditioned on the receipt of federal or state grant funds or upon Toledo's financial capabilities. In addition, failure to comply is not excused by the lack of federal or state grant funds, or by the processing of any applications for the same, or by Toledo's financial capabilities. Toledo reserves the right to petition EPA and Ohio EPA for a change in compliance dates if it experiences significant adverse changes in its financial capabilities.

## VII. REPORTING

60. Beginning with the end of the next full calendar quarter after entry of this Consent Decree and for every calendar quarter thereafter until this Consent Decree terminates in accordance with Section XXVII, Termination, below, Toledo shall submit written status reports to U.S. EPA and Ohio EPA. In each report, Toledo shall provide the following:

(a) a statement setting forth the deadlines and other terms that Toledo is required by this Consent Decree to meet since the date of the last quarterly statement, whether and to what extent Toledo has met these requirements, and the reasons for any noncompliance;

(b) a general description of the work completed within the three-month period, and a projection of work to be performed pursuant to this Consent Decree during the three-month period.

43

**TAB E**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF OHIO, | ) | |
| | ) | Civil Action No. 4:98CV2438 |
| Plaintiffs, | ) | |
| | ) | Judge David D. Dowd, Jr. |
| vs. | ) | |
| | ) | |
| THE CITY OF YOUNGSTOWN, OHIO, | ) | |
| A Municipal Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

CONSENT DECREE

WHEREAS, Plaintiff, United States of America, on behalf of the United States Environmental

Protection Agency ("U.S. EPA"), filed a Complaint in this action on October 26, 1998, alleging that

Defendant, the City of Youngstown, Ohio ("Youngstown") violated the Clean Water Act ("Act"),

33 U.S.C. § 1251 *et seq.*, by discharging pollutants from Youngstown's wastewater treatment plant

- 1 -

(a)      Tod & Irving West - May 9, 2003

(b)      Tod & Irving East –   August 8, 2003

D.      <u>Development and Implementation of a CSO Long Term Control Plan</u>

10.      Youngstown shall develop a Long-term Control Plan ("LTCP"), in accordance with
the requirements and schedule of deliverables set forth in Part I, Item C., Section 7.g.(5) through (9) of
in NPDES Permit No. 3PE0006*KD,  and in accordance with U.S. EPA's 1994 Combined Sewer
Overflow Policy:

(a)      <u>CSO Controls Evaluation and Cost Performance Curves,</u> for the selected CSO
controls, to be submitted to Ohio EPA and U.S. EPA on or before June 1, 2002

(b)      <u>Implementation Schedule,</u> including any supporting analyses and a schedule for
implementation of the LTCP that is as expeditious as practicable, to be submitted to Ohio EPA and
U.S. EPA for review and approval on or before January 1, 2003;

(c)      <u>Operation Plan,</u> revised to reflect selected CSO controls, to be submitted to Ohio EPA
and U.S. EPA for review and approval on or before January 1, 2004;

(d)      <u>Post-Construction Compliance Monitoring Plan</u>, to be submitted to Ohio EPA and
U.S. EPA on or before June 1, 2006.

11.      As part of its proposed Implementation Schedule submitted pursuant to Paragraph
10(b) above,  Youngstown shall propose to Ohio EPA and U.S. EPA, for review and approval, at
least five milestones for which stipulated penalties shall apply, pursuant to Paragraph 38,  if the

milestones are not achieved in accordance with the approved Implementation Schedule for the LTCP. The milestones proposed by Youngstown shall relate to and be consistent with the proposed Implementation Schedule and shall be based on objective criteria such that Youngstown, U.S. EPA, and Ohio EPA shall each be capable of, on the associated milestone date, determining with certainty whether Youngstown has completed that milestone.  The final milestone shall be the submission of the Post Construction Monitoring Program Report.

12.    Upon approval by Ohio EPA and  U.S. EPA of the LTCP, the approved LTCP shall be incorporated into and made an enforceable part of this Consent Decree, and Youngstown shall implement the approved LTCP in accordance with the schedule included in the approved LTCP.

13.    Implementation of its approved LTCP shall not relieve Youngstown of its obligation to comply with the requirements of its Permit, including, but not limited to, general water quality and technology-based effluent limitations.

E.    <u>Removal of Accumulated Sewer Sediments</u>

14.    By April 30, 2002,  Youngstown shall submit to Ohio EPA a plan to remove the accumulated material and sediment in the Mill Creek Collector downstream of Overflow Chamber # 20.

15.    By June 30, 2002, Youngstown shall complete the removal of  the accumulated material and sediment in the Mill Creek Collector downstream of Overflow Chamber # 20.

F.    <u>Short-Term Improvements to Collection System Maintenance Programs, Documentation and Data Management</u>

**TAB F**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF LOUISIANA, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. |
| CITY OF BATON ROUGE and PARISH OF EAST BATON ROUGE, | ) ) ) | |
| Defendants. | ) ) ) | |

## CONSENT DECREE

31.    No later than December 1, 2002, the City/Parish shall submit to EPA and LDEQ

for review and approval a Second Remedial Measures Action Plan ("the Second RMAP"). In the

Second RMAP, the City/Parish shall select a remedial measure to be implemented and provide a

detailed analysis of how the selected measure will accomplish the objectives of this Consent

Decree. The City/Parish may propose a remedial measure other than Alternatives 3, 4, and 7;

however, if the City/Parish proposes a remedial measure other than Alternatives 3, 4, and 7 which

will take more than 15 years to implement, EPA and/or LDEQ may disapprove the proposed

remedial measure and require the City/Parish to select among Alternatives 3, 4, and 7. EPA's

and/or LDEQ's decision to disapprove a proposed remedial measure other than Alternative 3, 4,

or 7 on the basis that it will take more than 15 years to implement shall not be subject to dispute

resolution pursuant to Section XXIV (Dispute Resolution). In the Second RMAP, the

City/Parish shall provide a detailed description of the selected remedial measure and shall specify

a schedule for beginning and completing construction of each element of the selected remedial

measure not addressed in the First RMAP. The Second RMAP shall also set forth a process for

evaluating and providing the personnel and training that will be required to successfully implement

the selected remedial measure. The Second RMAP shall also provide an estimate of the cost of

the selected remedial measure and a detailed description of how the City/Parish will fund the

remedial measure to be implemented.

32.    EPA and LDEQ shall evaluate the Second RMAP as provided in Section XVII

(Review of Submittals) for consistency with this Consent Decree, including Section V

(Objectives), and industry standards current at the time the Second RMAP is submitted.

33.    At any time after the Second RMAP is approved by EPA and/or LDEQ pursuant to Section XVII (Review of Submittals), the City/Parish may submit for review and approval pursuant to Section XVII (Review of Submittals) a proposal to modify the remedial measure selected in the Second RMAP. Any proposal to modify the Second RMAP shall be evaluated by EPA and LDEQ for consistency with this Consent Decree, including Section V (Objectives), and industry standards current at the time the proposal is submitted.

    A.    EPA and/or LDEQ may disapprove any proposal to modify the Second RMAP which would extend the completion date for the remedial measure past the deadline in the approved Second RMAP. EPA's and/or LDEQ's decision to disapprove a proposed modification on the basis that it will be completed after the completion date for the remedial measure in the approved Second RMAP shall not be subject to dispute resolution pursuant to Section XXIV (Dispute Resolution).

    B.    Any proposed modification of the Second RMAP which would extend the schedule for completion of the work or materially alter the selected remedial measure shall require the approval of the Court.

34.    In the Second RMAP, the City/Parish shall propose the following milestones:

    A.    Completion of design for remedial measures identified in the Second RMAP;

    B.    Thirty-three percent (33%) completion of construction of the complete remedial measure described in the First and Second RMAPs (the proposal shall specify the tasks which must be completed to demonstrate that this milestone has been achieved);

C.    Sixty-six percent (66%) completion of construction of the complete remedial measure described in the First and Second RMAPs (the proposal shall specify the tasks which must be completed to demonstrate that this milestone has been achieved); and

D.    Completion of all construction and fully operational status achieved. The date for this milestone shall be:

    i.    January 1, 2013 if the City/Parish selects as a remedial measure Options 3 or Option 4.

    ii.    January 1, 2015 if the City/Parish selects as a remedial measure Options 7.

    iii.    The earliest date on which the milestone can reasonably be achieved considering how quickly it is physically and financially possible to complete construction, if the City/Parish selects a remedial measure other than Options 3, 4, or 7.

35.    During the period from Entry of the Consent Decree until the City/Parish meets the milestone specified in Paragraph 34(D), the City/Parish shall spend at least $3 million per year for sewer repairs, sewer rehabilitation, and other capital needs related to reduction of Infiltration and Inflow ("I & I") into the North, Central, and South Plant Collection Systems. These expenditures will be documented in the Annual Report submitted pursuant to Paragraph 52.

**TAB G**

205

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

−   −   −

UNITED STATES OF AMERICA            :

AND THE STATE OF OHIO,              :

        PLAINTIFFS,                 :

    AND                             :

SIERRA CLUB, ET AL.,               :

        PLAINTIFF-INTERVENERS, :

    -VS-                            : CIVIL ACTION NO.

THE BOARD OF COUNTY                 : C-1-02-107

COMMISSIONERS OF HAMILTON           : (CONSOL. WITH

COUNTY OHIO AND THE CITY            : C-1-02-108 AND

OF CINCINNATI,                      :  C-1-02-135)

        DEFENDANTS.                 :

−   −   −

    Continued deposition of PATRICK T. KARNEY,

P.E., DEE, a witness herein, taken by the

plaintiff-interveners, as upon cross-examination

pursuant to the Federal Rules of Civil Procedure,

and pursuant to Notice to Take Deposition and

stipulations hereinafter set forth at the offices

of D. David Altman, Co., 15 East Eighth Street,

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

207

1  APPEARANCES:

2   On behalf of the Plaintiff, Ohio EPA:

3         Dan Martin, Esq.

4         Assistant Attorney General

5         Environmental Enforcement Section

6         State Office Tower

7         30 East Broad Street, 25th Floor

8         Columbus, Ohio  43215-3428

9   On behalf of the Plaintiff-Interveners:

10         Albert J. Slap, Esq.

11              of

12         The Law Offices of Albert J. Slap

13         20 Erie Avenue

14         Glendale, Ohio  45246

15  On behalf of the Defendant, City of Cincinnati:

16         Christopher Buckley, Esq.

17              and

18         Peter P. Murphy, Esq.

19              of

20         Gibson, Dunn & Crutcher, LLP

21         1050 Connecticut Avenue, N.W.

22         Washington, D.C.  20036-5306

23              -   -   -

24              S T I P U L A T I O N S

208

1          It is stipulated by and among counsel for

2    the respective parties that the deposition of

3    PATRICK T. KARNEY, P.E., DEE, a witness herein, may

4    be taken as upon cross-examination pursuant to the

5    Federal Rules of Civil Procedure, and pursuant to

6    Notice to Take Deposition; that the deposition may

7    be taken in stenotypy by the notary public-court

8    reporter and transcribed by her out of the presence

9    of the witness; that the jurisdiction of the notary

10   public-court reporter is waived; that the

11   transcribed deposition is to be submitted to the

12   witness for his examination and signature, and that

13   signature may be affixed out of the presence of the

14   notary public-court reporter.

15                    -   -   -

16                  I N D E X

17   WITNESS                  CROSS-EXAM        EXAM

18   Patrick T. Karney, P.E., DEE   210, 365     363

19                    -   .-   -

20                E X H I B I T S

21   SC KARNEY EXHIBITS                   MARKED

22   No. 27, a document containing          211

23        BBS documents.

24   No. 28, a USA Today article.           225

209

1   No. 29, a Declaration of Clyde Wilber.     229

2   No. 30, a document entitled "BBS Wet     235

3       Weather Program Cost Documentation of

4       May 2001."

5   No. 31, a Declaration of George Vredeveld.     251

6   Nos. 32 through 35, a multi-page package     295

7       from Kevin St. John of Gibson, Dunn &

8       Crutcher.

9   No. 36, an MSD document.     300

10   No. 37, an MSD document containing numbers     301

11       V-W-308-25 and 26.

12   No. 38, a document entitled "Constructing a     325

13       Conventional Treatment Plant at or near

14       SSO 700."

15   No. 39, a letter from Mr. Tin to     330

16       Mr. Minges.

17   No. 40, a statement by ORSANCO.     337

18   No. 41, a document written by     339

19       Ms. Carothers.

20   No. 42, a response to a consult referral.     343

21   No. 43, a document entitled     349

22       "Supplemental Monitoring Report Submitted

23       by MSD to the Ohio EPA."

24                -   -   -

210

1                    (Witness sworn.)

2          PATRICK T. KARNEY, P.E., DEE

3   of lawful age, a witness herein, being first duly

4   sworn as hereinafter certified, was examined and

5   deposed as follows:

6              CONTINUED CROSS-EXAMINATION

7   BY MR. SLAP:

8          Q.   Good morning, Mr. Karney.   Welcome

9   back.   I'm sure you're excited to get back in the

10  deposition.   I want to start by turning to Karney

11  Exhibit 5, which was the Power Point from the May

12  15th, 2002 public meeting that you held with some

13  other MSD people.   And, particularly, I'd like to

14  point to page 3 of that.

15             Now, Mr. Karney, what I'd like you to

16  review on that is your -- in the slides, the slide

17  that talks about the wet weather costs and the

18  rates; do you see those two slides?

19         A.   Yes.

20         Q.   Okay.   And were these slides that you

21  prepared or you had somebody prepare for you?

22         A.   I prepared them.

23         Q.   Okay.   And did you get those --

24  First, the numbers of the costs of the wet weather

1  100-year number of $5,100 is high.  That number

2  would be lower.

3  MR. SLAP:  Okay.  Now, I'd like to

4  mark as Karney Exhibit 28 a copy of a USA Today

5  article.

6  (Karney Exhibit No. 28 was marked for

7  identification.)

8  BY MR. SLAP:

9  Q.   If you take a moment, take a look at

10  this.  It has some quotes from you in it on the

11  first page.  Are you familiar with this article,

12  Mr. Karney?

13  A.   I am.

14  Q.   Okay.  And did you speak to this USA

15  Today reporter?

16  A.   I believe I did.  At the time that

17  this came out, I didn't recall having given this

18  interview, but as I went back through some of my

19  files I found I had.  I'm not sure if it was the

20  same gentleman or if it was someone that was doing

21  research for him.

22  Q.   Okay.

23  A.   This article came out probably, I

24  don't know, three or four months after I had spoken

1  with someone at USA Today.

2        Q.    Okay.  The quote that they have here

3  on the first page, they have you saying "it would

4  bankrupt us.  It would be the last one.  Turn out

5  the lights.  Cincinnati would just be another wide

6  spot on I75;" is that an accurate statement of what

7  you said?

8        A.    It is.

9        Q.    And looking on page 4 of 5, the page

10 numbers are in the upper right-hand, and if you

11 look about, you know, four fifths of the way down,

12 do you see the paragraph that says "plugging,

13 plugging all of Cincinnati's estimated 100 SSOs

14 would cost 3.6 billion," Karney says; do you see

15 that?

16       A.    I do.

17       Q.    Is that an accurate quote?

18       A.    Are you asking about the entire

19 paragraph of that one sentence?

20       Q.    Let's take that first sentence.

21       A.    That's not actually in quotations.

22 That's paraphrasing.  If you note, there are no

23 quotation marks on that statement.

24       Q.    Would that be an accurate paraphrase

1    of what you had said?

2          A.    It is somewhat.  It doesn't qualify

3    that 3.6 billion figure as to which of the two

4    levels of the program were indicated.

5          Q.    Right.  But when we were going

6    through the BBS report just a few minutes ago, the

7    3.6 included CSOs, SSOs and water in basement.  So

8    to the extent that anyone would believe that just

9    solving the SSOs would cost 3.6 billion, that would

10   give them a misimpression?

11         A.    You're correct.  The 3.6 billion went

12   to them, and we talked about SSOs.  But as I've

13   noted, this is the writer or editor's paraphrasing,

14   it's not in quotation marks.  It deals with all

15   three of the issues and not just with the SSOs.

16         Q.    So this particular sentence would not

17   be accurate?

18         A.    That's -- You're right.  That is not

19   an accurate sentence, as it's stated.

20         Q.    And then the next sentence, "even if

21   you had 15 years to do it, rate payers would still

22   see annual bills jump from 320 -- $320 to $5,100

23   based on an average bill for winter water usage;"

24   is that an accurate paraphrasing of what you said

228

1   at the time?

2           A.    It may be.   I'm not sure about the

3   15-year piece or if that's another jumbling, but to

4   get to the 3.6 at the time I would have used the

5   $5,100 figure.

6           Q.    But now you don't believe that's

7   accurate?

8           A.    I know the $5,100 figure is not

9   accurate.

10          Q.    Okay.   You didn't know that at the

11  time, though?

12          A.    No.

13          Q.    Now, in terms of 15 years, when you

14  calculated the $1,500 annual rate, were you using

15  a 15-year completion of all of the projects; is

16  that the length of time that you were using?

17          A.    I don't recall at this point if it

18  was 15 or if it was 20.

19          Q.    Okay.   Would you agree that when

20  you're trying to calculate rates that would be

21  required for an additional capital improvement

22  program, the number of years that you do it in is

23  important; isn't it?

24          A.    It is, yes.

1           MR. SLAP:  Let's go to 38, then, and

2    I'll come back to that one.

3    (SC Karney Exhibit No. 38 was marked for

4    identification.)

5    BY MR. SLAP:

6           Q.   Mr. Karney, could you take a moment

7    to review this document, please?

8           A.   Okay.

9           Q.   Have you seen this document before?

10          A.   Yes.

11          Q.   Okay.  And can you tell us what this

12   document is and who prepared it?

13          A.   I don't know who prepared it.

14          Q.   Okay.  In what context did you see

15   this document?

16          A.   My attorney showed this to me just

17   this week.

18          Q.   And prior to that, had you seen this

19   document before?

20          A.   I don't recall having seen it.

21          Q.   Do you recognize this as an MSD

22   document?

23          A.   No, I don't.

24          Q.   Do you see the bates number in the

1  bottom right-hand corner?

2         A.   I do.

3         Q.   And do you have any reason to dispute

4  that that is a document that was produced by your

5  attorneys from the MSD files?

6         A.   Not if my attorneys don't find any

7  reason to object.  It could have come from our

8  files.

9         Q.   And do you recall in the deposition,

10  on the first day of your deposition, last time I

11  had asked you if you had ruled out a secondary

12  treatment plant at SSO 700, and you said that you

13  hadn't?

14         A.   Correct.

15         Q.   Okay.  And is that still your

16  position today?

17.        A.   Yes, it is.

18         Q.   And do you understand what Exhibit 38

19  purports to be?

20         A.   No.

21         Q.   Will you take a moment to review it,

22  because I want to ask you a question?

23         A.   Okay.  I did look at it a minute ago.

24         Q.   Well, the title is "Constructing a

1  Conventional Treatment Plant at or Near SSO 700;"

2  do you see that?

3          A.   I do see that.

4          Q.   And there's another caption

5  "Advantages of a Conventional Treatment Plant;" do

6  you see that?

7          A.   I do.

8          Q.   Have you had discussions with your

9  staff about constructing a conventional treatment

10  plant at or near SSO 700?

11          A.   I have.

12          Q.   And have you had discussions about

13  the advantages of conventional treatment?

14          A.   We have.

15          Q.   And point number one, has there been

16  discussion -- point number one in Exhibit 38 says

17  "a conventional treatment plant would be

18  considered a permanent solution to discharges from

19  SSO 700;" have you discussed that?

20          A.   We -- To put that fine of a point

21  upon it, I'm not sure that we have.

22          Q.   Okay.  Point number two in Exhibit 38

23  "diverting waste flow from the sewer shed upstream

24  of SSO 700 would reduce the load entering the Mill

1    Creek waste water treatment plant;" have you had

2    discussions about that?

3              A.    We have.

4              Q.    And number three "water quality of

5    Mill Creek downstream of the discharge point would

6    be improved due to effluent limitations imposed

7    under an MPDES permit for a treatment plant versus

8    untreated flows currently being discharged from SSO

9    700 under wet weather conditions, which are

10   unregulated;" have you discussed that?

11             A.    I don't know that we've discussed

12   that type of conclusion overall.  This would seem

13   to say that on an annual basis you'd have less --

14   What does it say?  That on an annual basis of

15   discharging a secondary effluent in the Mill Creek,

16   it would improve water quality over what's there

17   currently.  I don't know that we've had that

18   discussion.

19             Q.    Okay.  Point number four it states in

20   Exhibit 38 "by properly sizing the plant, capacity

21   would be available to provide service to Northern

22   Hamilton County and Southern Butler County as it

23   develops;" have you had discussions about that?

24             A.    Possibly.

1    Q.    No specific recollection, as we sit

2  here?

3    A.    No.   The discussions that I had

4  regarding a treatment plant -- There is nothing an

5  engineer likes better than to build a treatment

6  plant.   That's good stuff, because you can see

7  that.   I put pipes under the ground you can't see

8  that, plus maybe I get it named after me; it's a

9  good thing.

10    It was back, I believe, in 1999

11  shortly after I arrived here I tried to bring in

12  all the brains for us, so it's been almost four

13  years.   To try to say exactly what we discussed at

14  that time it's very difficult.

15    Q.    Okay.   Since '99, though, have you

16  had other discussions about a conventional

17  treatment plant at or near SSO 700?

18    A.    I'd have to say, yeah, it's come up.

19  To what degree of detail, not like it was at that

20  meeting in '99.

21    Q.    Okay.

22    A.    Because I've not reconvened that side

23  of the group again to go over the issue.

24    Q.    The point five, "conventional

1    treatment can be designed to produce an effluent

2    containing relatively low concentration of

3    contaminates."  Do you recollect discussing that, a

4    discussion about that?

5            A.    I don't know that I recollect

6    discussing it, but I don't know that I'll argue

7    with the statement either.  The question there is:

8    Is the term relatively low?  One person's relative

9    is another person's exorbitance.

10           Q.    Okay.

11           A.    Is there anything more to this than

12   just this one sheet of paper that gives us a clue?

13           Q.    That's all that I have.  I actually

14   have a question into your counsel about who -- you

15   know, who did that, if you know, so I assume that

16   they're working on that.

17   (SC Karney Exhibit No. 39 was marked for

18   identification.)

19   BY MR. SLAP:

20           Q.    I'd like to show you a document

21   marked Karney 39.  Mr. Karney, have you seen this

22   document before?

23           A.    I don't think so.

24           Q.    Do you recognize this as an MSD

**TAB H**

JUN-09-1999  06:42        WASHBURN, BRISCOE&MCCARTHY          415 394 0179   P.02/13

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made this 18th day of May, 1999, by and between San Francisco BayKeeper ("BayKeeper") and the Vallejo Sanitation and Flood Control District (the "Vallejo District"). BayKeeper and the Vallejo District are sometimes collectively referred to herein as the "Parties."

WHEREAS, BayKeeper is a non-profit public benefit corporation with a stated mission of protecting, preserving and enhancing the resources and health of ecosystems on the San Francisco Bay and its tributaries;

WHEREAS, the Vallejo District is a local agency providing a sanitary sewage disposal for the City of Vallejo and its environs;

WHEREAS, the Vallejo District's point source discharges into the San Francisco Bay and its tributaries are presently regulated pursuant to a National Pollutant Discharge Elimination System Permit ("NPDES Permit") No. CA 0037699, issued by the California Regional Water Quality Control Board–San Francisco Bay Region ("RWQCB") to the Vallejo District on October 19, 1988;

WHEREAS, on August 29, 1996, BayKeeper filed a complaint against the Vallejo District in the United States District Court for the Eastern District of California, entitled San Francisco BayKeeper v. Vallejo Sanitation and Flood Control District, No. CIV-S-96 1554 DFL (the "Lawsuit"), alleging violations of the Vallejo District's NPDES Permit under 33 U.S.C. 1311(a) (the "Clean Water Act"), from 1991 through 1997;

WHEREAS, a trial has been set in the Lawsuit for October 25, 1999;

**PROTECTED SETTLEMENT COMMUNICATION**
**CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408**

50036 v07

1

JUN-09-1999  08:42    WASHBURN, BRISCOE&MCCARTHY    415 394 0179  P.03/13

WHEREAS, by entering into this Settlement Agreement, the Vallejo District is in no way admitting liability or conceding any wrongdoing whatsoever, nor is it admitting that, by paying any sum of money or agreeing to perform any act, it is in any way responsible or liable for any of the claims alleged in the Lawsuit.

WHEREAS, BayKeeper and the Vallejo District each desire to avoid the costs and uncertainties of litigation, and therefore, through their authorized representatives and without trial or final adjudication of the remaining issues of fact or law with respect to BayKeeper's claims in the Lawsuit, have agreed to settle this matter;

NOW THEREFORE, in consideration of the terms, conditions and covenants herein set forth, the Parties hereto agree as follows:

1.    The Vallejo District shall engage a consultant to undertake a study of alternatives (the "Study") that would enable the Vallejo District to eliminate unauthorized rain-related overflows of raw sewage ("unauthorized sewage overflows") from its collection and treatment system by no later than August 18, 2006 pursuant to the Vallejo District's NPDES Permit in effect as of that date, as such Permit may be amended or modified from time to time by the RWQCB or by such other regulatory authority as may replace the RWQCB for purposes of enforcing the Vallejo District's NPDES Permit. For purposes of designing the alternatives for the Study, unauthorized sewage overflows are those that are prohibited under the Vallejo District's NPDES Permit in effect as of the date of the completion of the Study.

a.    The Study may consider a range of alternatives including, but not limited to, infiltration and inflow (I/I) reduction, expansion of convey and treat systems,

**PROTECTED SETTLEMENT COMMUNICATION**
**CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408**

2

and retention basins. The Study will identify alternatives to assure compliance with the NPDES Permit provision then in effect regarding unauthorized sewage overflows, and will recommend an alternative for implementation by the Vallejo District.

    b.    Upon completion of the Study, and at least two (2) weeks before the Vallejo District Board's public hearing on the Study, the Vallejo District shall provide to BayKeeper, at the Vallejo District's sole expense, one copy of the Study. The Vallejo District will also comply with reasonable written requests by BayKeeper or its expert for any documents specifically referred to in the Study and will provide such documents at the Vallejo District's sole expense. Any disputes between the Parties as to whether such requests are reasonable will be determined by Magistrate Judge John F. Moulds by telephone conference, with twenty-four (24) hours' noticed request by either party. BayKeeper's expert is to be designated by BayKeeper and identified to the Vallejo District within thirty (30) days after the Vallejo District Board's selection of its consultant for the Study, and BayKeeper may designate up to two additional experts in writing. Notice of any change in the designation of BayKeeper's experts shall be made to the District in writing. BayKeeper (in writing) or its expert (orally or in writing) shall have the opportunity to submit comments to the Vallejo District regarding the Study and the alternative recommended by the consultant preparing the Study, but said comments must be submitted no later than two weeks following submittal of the Study to BayKeeper.

    c.    By no later than November 30, 2000, the Vallejo District's Board of Directors shall adopt a resolution authorizing the District to implement the alternative in the Study selected by the Vallejo District Board ("Selected Alternative"). Failure of the

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50036.v07

Vallejo District Board to adopt a resolution authorizing the Vallejo District to implement the Selected Alternative by November 30, 2000, shall be a breach of this Agreement. The Court shall order the Vallejo District to pay to the Mitigation Fund described in Paragraph 5 below, the fixed sum of one thousand dollars ($1000) per day until said resolution is adopted.

2.    By August 18, 2006 (the "Compliance Deadline"), the Vallejo District must be in compliance with its then-applicable NPDES Permit prohibition regarding unauthorized sewage overflows. If the Vallejo District continues to have unauthorized sewage overflows in violation of said Permit prohibition after August 18, 2006, such unauthorized sewage overflows shall be deemed by the Court to constitute a breach of this Settlement Agreement, except such determination shall be subject to the Vallejo District's right to assert all defenses available to it under its then-existing NPDES Permit, and under applicable federal and state laws. Further, BayKeeper reserves all rights to assert, in any action to enforce this Settlement Agreement, that the unauthorized overflows occurring after August 18, 2006, also constitute violations of the Clean Water Act, and the Vallejo District reserves its right to assert all defenses to such Clean Water Act claims that are available to it under its then existing NPDES Permit, and under applicable federal and state laws.

3.    The Vallejo District agrees to copy and submit to BayKeeper at the Vallejo District's sole expense, the following documents in the following manner, from the date this Settlement Agreement is fully executed through August 18, 2009, or the date the Court's jurisdiction in this Lawsuit terminates pursuant to paragraph 7 below, whichever is later.

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50036-07

For the period that the Court retains jurisdiction over this matter as set forth in paragraph 7, below, but not thereafter, the Vallejo District shall mail to BayKeeper the monthly and annual written self-monitoring reports required by the RWQCB, and any other interim reports submitted to the RWQCB addressing the Vallejo District's progress in implementing the Selected Alternative, on the same dates that it mails such reports to the RWQCB up to and including the report for August 18, 2009. Said reports shall include a statement of the Vallejo District's progress in implementing the Selected Alternative after said alternative has been selected. At the request of BayKeeper, the Vallejo District shall, at the District's expense, mail to BayKeeper any other documents that are relevant to understanding and evaluating the progress and the results of the Selected Alternative, so long as said requests are not unreasonable. Any disputes between the Parties as to whether such requests are reasonable will be determined by Magistrate Judge John F. Moulds by telephone conference, with twenty-four (24) hours' noticed request by either party.

4.     The Vallejo District agrees to use its best efforts to meet the deadlines set forth herein and expressly acknowledges that monetary cost shall not be an excuse for failing to meet the deadlines set, unless the Vallejo District is prevented from implementing the necessary rate increase, if any, for the Selected Alternative by operation of law. The Vallejo District's obligation to meet any requirement set out in this Settlement Agreement may be excused only to the extent that such failure or delay arises out of causes or circumstances beyond the reasonable control of, and without the fault of, the Vallejo District. Examples of such causes include but are not limited to acts of God, fires, floods beyond the reasonable control of the Vallejo District that prevent contractors from performing their services, any

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50056-07

5

unsuccessful challenges made by BayKeeper or any third party under the California
Environmental Quality Act, any court-issued injunction not attributable to the fault of the
Vallejo District, and the inability of the Vallejo District to obtain required approvals or
permits from any regulatory agency with jurisdiction for reasons outside the Vallejo
District's reasonable control.  Any requests for extensions of deadlines contained in this
Settlement Agreement shall be made by the Vallejo District by noticed motion.

  5.  The Vallejo District agrees to pay the sum of six hundred fifty thousand
dollars ($650,000) into a fund to be established with the Solano County Farmlands and
Open Space Foundation (the "Mitigation Fund"). The Mitigation Fund is to be restricted
for the purpose of implementing the following projects that are designed to protect, preserve
and/or restore, or that reduce or mitigate the effects of pollutants in the watershed of the
Vallejo District and written instructions to this effect will be provided to the Solano County
Farmlands and Open Space Foundation (the "Foundation"):

  a.  The first $275,000 is to be applied to the Lynch Canyon Project as
follows: $100,000 for restoration projects as described in the Lynch Canyon Management
Plan and $175,000 for the payoff of a note for the purchase of the property; and

  b.  The balance of $375,000 is to be applied to the option to purchase
and/or the purchase of the Vallejo Swett Ranch. In the event the option to purchase is not
exercised, these funds shall be applied by the Foundation to other projects within the Vallejo
District's sphere of influence that meet the criteria of this paragraph 5.

  6.  The Parties agree that BayKeeper's claim for attorney's fees and costs shall be
determined by the Court upon motion made by BayKeeper in accordance with 33 U.S.C.

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

§ 1365(d) and the applicable federal and local rules. The Parties acknowledge that the existing Scheduling Order in the Lawsuit shall have no force and effect in connection with such motion.

7.     The Parties hereby agree that, subject to the Court's approval, a Judgment shall be entered in favor of BayKeeper on liability for past violations of the Vallejo District's Permit, as set forth in the Court's Summary Judgment Order, in the form submitted herewith. The Parties further agree that the terms of this Settlement Agreement shall be incorporated into the Judgment of the Court, and that the Court shall retain jurisdiction over this Lawsuit for purposes of interpreting, modifying or enforcing the terms of this Settlement Agreement through August 18, 2009. This date shall be extended only if the Vallejo District obtains relief from any deadline pursuant to paragraph 4, above, in which case the jurisdiction of the Court shall be extended for like period; or, if there is a motion to enforce this Settlement Agreement pending as of August 18, 2009, the Court shall retain jurisdiction to adjudicate said motion and to enforce any resulting order.

8.     The Parties further agree that the Court shall retain jurisdiction over this Lawsuit , notwithstanding Paragraph 7, to adjudicate any motion for attorneys' fees and costs filed by BayKeeper.

9.     This Settlement Agreement shall terminate and be of no further force or effect upon termination of the Court's jurisdiction in accordance with paragraph 7, above.

10.     In the event of a breach of this Settlement Agreement, the Court shall have the power to enforce this Agreement with all available legal and equitable remedies, including contempt. The provisions of this Settlement Agreement shall not be construed to

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

limit the Parties' respective defenses to any claims of breach alleged by the other party.

11.    By executing this Agreement BayKeeper, its agents, successors, affiliates, assigns, attorneys, representatives and employees, release the Vallejo District from all claims for relief which arise from violations of the Vallejo District's NPDES Permit up to the date of execution of this Settlement Agreement. BayKeeper, its agents, successors, affiliates, assigns, attorneys, representatives and employees, further release the Vallejo District from any violations of the prohibitions in its NPDES Permit (as it may be amended, modified, or reissued) resulting from unauthorized sewage overflows up to the Compliance Deadline; provided, however, that the Court, in enforcing this Settlement Agreement, may take into consideration the Vallejo District's efforts and the results of such efforts toward achieving compliance with its NPDES Permit then in effect.

12.    BayKeeper further agrees that neither it nor any of its successors, employees, agents, or attorneys, or any organization BayKeeper controls, will encourage or solicit any third party or any member of BayKeeper, to allege any violation by the Vallejo District of its NPDES Permit released under paragraph 11, above.

13.    Documents to be submitted to BayKeeper shall be sent by first-class mail, postage prepaid to: Legal Director, San Francisco BayKeeper, Presidio, Bldg. 1004, P.O. Box 29921, San Francisco, CA 94129-0921.

14.    Both parties agree that they each shall act in good faith in implementing the terms of this Settlement Agreement.

15.    The Parties shall submit this Settlement Agreement to the U.S. Department of Justice, Environmental and Natural Resources Division, Legislation and Special Litigation

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

Section for review and comment in writing by the United States (including Region IX of the U.S. Environmental Protection Agency) prior to the submittal of the Settlement Agreement to the Court, and shall submit the comments of the United States to the Court together with the Settlement Agreement and the proposed Judgment.  In the event the Court does not adopt this Settlement Agreement and the proposed Judgment as written, this Settlement Agreement shall automatically be deemed to be null and void and of no legal force or effect.

16.    The language in all parts of this Settlement Agreement shall be construed according to its plain and ordinary meaning.

17.    In the event that any provision, section or sentence of this Settlement Agreement is held by a court of competent jurisdiction to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

18.    This Settlement Agreement may be executed in one or more counterparts, and each executed copy shall be deemed an original, which shall be binding upon the signatories hereto.

19.    This Settlement Agreement constitutes the entire agreement between the Parties, and it is expressly understood and agreed that this Settlement Agreement may not be altered, amended, modified, or otherwise changed, in any respect or particular whatsoever, except by a writing duly executed by the Parties or their authorized representatives.  The Parties acknowledge and agree that no one of them will make any claim at any time or place that this Settlement Agreement has been orally altered or orally modified in any respect.

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50056 r07

20.     No party to this Settlement Agreement may assign their respective rights or obligations, including the right to enforce this Settlement Agreement, to any third party who is not a successor in interest. This Settlement Agreement shall be binding on any successors in interest of these Parties.

21.     This Settlement Agreement constitutes a full and final settlement of this Lawsuit, and resolves all allegations of the Lawsuit through the date of termination of this Settlement Agreement, with the exception of BayKeeper's motion for attorneys' fees and costs and all obligations, rights and defenses expressly set forth in this Agreement.

22.     This Settlement Agreement is the product of arms-length negotiations between the Parties and their respective attorneys. Each of the Parties expressly acknowledges and agrees that this Settlement Agreement shall be deemed to have been mutually prepared so that the rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement.

23.     The undersigned representatives for BayKeeper and the Vallejo District each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this Settlement Agreement and that this Settlement Agreement binds that party.

24.     This Agreement shall be interpreted in accordance with the laws of the State of California and such federal laws as may be applicable.

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50036 v07

IN WITNESS WHEREOF, the undersigned have executed this Settlement

Agreement as of the date first set forth above.

DATED: _May 12, 1999_          SAN FRANCISCO BAYKEEPER


By: _Michael R Hogan_
As Its: _Executive Director_

DATED: _May 18, 1999_          VALLEJO SANITATION AND FLOOD
                               CONTROL DISTRICT


By: _Charles Mosley_
As Its: _Engineer – Manager_

Approved as to form:

DATED: _May 14, 1999_          KEKER & VAN NEST, L.L.P.


By: _____
        JEFFREY R. CHANIN
        Attorneys for Plaintiff

Approved as to form:

DATED: _5/14/99_               EARTHJUSTICE LEGAL DEFENSE FUND


By: _Deborah S. Reames_
        DEBORAH S. REAMES
        Attorneys for Plaintiff

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50036-07

Approved as to form:

DATED: 17 May 1999                    LAWYERS FOR CLEAN WATER

By: _____
        DANIEL G. COOPER
        Attorneys for Plaintiff

Approved as to form:

DATED: 5/18/99                        WASHBURN, BRISCOE & McCARTHY
                                      A Professional Corporation

By: _____
        SANDI L. NICHOLS
        Attorneys for Defendant

Approved as to form:

DATED: 4/18/99                        FAVARRO, LAVEZZO, GILL, CARETTI &
                                      HEPPELL
                                      A Professional Corporation

By: _____
        ALBERT M. LAVEZZO
        Attorneys for Defendant

PROTECTED SETTLEMENT COMMUNICATION
CAL. EVID. CODE §§ 1152, 1154, FED. RULE EVID. 408

50036 v07

TOTAL P.13