# **APPENDIX A**

## **REFERENCE MATERIALS**

A. USEPA, *Combined Sewer Overflow (CSO) Control Policy*, 59 Fed. Reg. 18,688 (April 19, 1994).

B. USEPA, *Combined Sewer Overflows—Guidance for Financial Capability Assessment and Schedule Development*, EPA-832-B-97-004 (Feb. 1997) (excerpts).

C. USEPA, *Report to Congress: Implementation and Enforcement of the Combined Sewer Overflow Control Policy*, EPA 833-R-01-003 (Dec. 2001) (excerpts).

D. USEPA, *Coordinating CSO Long-Term Planning with Water Quality Standard Reviews*, USEPA Doc. No. 833-R-01-002 (July 2001) (excerpts).

E. USEPA Office of Water, Memorandum: *Implementation of the CSO Control Policy*, (May 19, 1998).

F. USEPA, *Combined Sewer Overflows: Guidance for Long-Term Control Plans*, EPA 832-B-95-002 (Sept. 1995) (excerpts).

**TAB A**



Tuesday
April 19, 1994

Part VII

# Environmental Protection Agency

Combined Sewer Overflow (CSO) Control Policy; Notice

18688    Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices

# ENVIRONMENTAL PROTECTION AGENCY

[FRL-4732-7]

## Combined Sewer Overflow (CSO) Control Policy

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final policy.

**SUMMARY:** EPA has issued a national policy statement entitled "Combined Sewer Overflow (CSO) Control Policy." This policy establishes a consistent national approach for controlling discharges from CSOs to the Nation's waters through the National Pollutant Discharge Elimination System (NPDES) permit program.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey Lape, Office of Wastewater Enforcement and Compliance, MC-4201, U.S. Environmental Protection Agency, 401 M Street SW., Washington, DC 20460, (202) 260-7361.

**SUPPLEMENTARY INFORMATION:** The main purposes of the CSO Control Policy are to elaborate on the Environmental Protection Agency's (EPA's) National CSO Control Strategy published on September 8, 1989, at 54 FR 37370, and to expedite compliance with the requirements of the Clean Water Act (CWA). While implementation of the 1989 Strategy has resulted in progress toward controlling CSOs, significant public health and water quality risks remain.

This Policy provides guidance to permittees with CSOs, NPDES authorities and State water quality standards authorities on coordinating the planning, selection, and implementation of CSO controls that meet the requirements of the CWA and allow for public involvement during the decision-making process.

Contained in the Policy are provisions for developing appropriate, site-specific NPDES permit requirements for all combined sewer systems (CSS) that overflow as a result of wet weather events. For example, the Policy lays out two alternative approaches—the "demonstration" and the "presumption" approaches—that provide communities with targets for CSO controls that achieve compliance with the Act, particularly protection of water quality and designated uses. The Policy also includes enforcement initiatives to require the immediate elimination of overflows that occur during dry weather and to ensure that the remaining CWA requirements are complied with as soon as practicable.

The permitting provisions of the Policy were developed as a result of extensive input received from key stakeholders during a negotiated policy dialogue. The CSO stakeholders included representatives from States, environmental groups, municipal organizations and others. The negotiated dialogue was conducted during the Summer of 1992 by the Office of Water and the Office of Water's Management Advisory Group. The enforcement initiatives, including one which is underway to address CSOs during dry weather, were developed by EPA's Office of Water and Office of Enforcement.

EPA issued a Notice of Availability on the draft CSO Control Policy on January 19, 1993, (58 FR 4994) and requested comments on the draft Policy by March 22, 1993. Approximately forty-one sets of written comments were submitted by a variety of interest groups including cities and municipal groups, environmental groups, States, professional organizations and others. All comments were considered as EPA prepared the Final Policy. The public comments were largely supportive of the draft Policy. EPA received broad endorsement of and support for the key principles and provisions from most commenters. Thus, this final Policy does not include significant changes to the major provisions of the draft Policy, but rather, it includes clarification and better explanation of the elements of the Policy to address several of the questions that were raised in the comments. Persons wishing to obtain copies of the public comments or EPA's summary analysis of the comments may write or call the EPA contact person.

The CSO Policy represents a comprehensive national strategy to ensure that municipalities, permitting authorities, water quality standards authorities and the public engage in a comprehensive and coordinated planning effort to achieve cost effective CSO controls that ultimately meet appropriate health and environmental objectives. The Policy recognizes the site-specific nature of CSOs and their impacts and provides the necessary flexibility to tailor controls to local situations. Major elements of the Policy ensure that CSO controls are cost effective and meet the objectives and requirements of the CWA.

The major provisions of the Policy are as follows.

CSO permittees should immediately undertake a process to accurately characterize their CSS and CSO discharges, demonstrate implementation of minimum technology-based controls identified in the Policy, and develop long-term CSO control plans which evaluate alternatives for attaining compliance with the CWA, including compliance with water quality standards and protection of designated uses. Once the long-term CSO control plans are completed, permittees will be responsible to implement the plans' recommendations as soon as practicable.

State water quality standards authorities will be involved in the long-term CSO control planning effort as well. The water quality standards authorities will help ensure that development of the CSO permittees' long-term CSO control plans are coordinated with the review and possible revision of water quality standards on CSO-impacted waters.

NPDES authorities will issue/reissue or modify permits, as appropriate, to require compliance with the technology-based and water quality-based requirements of the CWA. After completion of the long-term CSO control plan, NPDES permits will be reissued or modified to incorporate the additional requirements specified in the Policy, such as performance standards for the selected controls based on average design conditions, a post-construction water quality assessment program, monitoring for compliance with water quality standards, and a reopener clause authorizing the NPDES authority to reopen and modify the permit if it is determined that the CSO controls fail to meet water quality standards or protect designated uses. NPDES authorities should commence enforcement actions against permittees that have CWA violations due to CSO discharges during dry weather. In addition, NPDES authorities should ensure the implementation of the minimum technology-based controls and incorporate a schedule into an appropriate enforceable mechanism, with appropriate milestone dates, to implement the required long-term CSO control plan. Schedules for implementation of the long-term CSO control plan may be phased based on the relative importance of adverse impacts upon water quality standards and designated uses, and on a permittee's financial capability.

EPA is developing extensive guidance to support the Policy and will announce the availability of the guidances and other outreach efforts through various means, as they become available. For example, EPA is preparing guidance on the nine minimum controls, characterization and monitoring of CSOs, development of long-term CSO control plans, and financial capability.

Permittees will be expected to comply with any existing CSO-related requirements in NPDES permits,

onsent decrees or court orders unless evised to be consistent with this Policy.

The policy is organized as follows:

I. Introduction
  A. Purpose and Principles
  B. Application of Policy
  C. Effect on Current CSO Control Efforts
  D. Small System Considerations
  E. Implementation Responsibilities
  F. Policy Development
II. EPA Objectives for Permittees
  A. Overview
  B. Implementation of the Nine Minimum Controls
  C. Long-Term CSO Control Plan
    1. Characterization, Monitoring, and Modeling of the Combined Sewer Systems
    2. Public Participation
    3. Consideration of Sensitive Areas
    4. Evaluation of Alternatives
    5. Cost/Performance Consideration
    6. Operational Plan
    7. Maximizing Treatment at the Existing POTW Treatment Plant
    8. Implementation Schedule
    9. Post-Construction Compliance Monitoring Program
III. Coordination With State Water Quality Standards
  A. Overview
  B. Water Quality Standards Reviews
IV. Expectations for Permitting Authorities
  A. Overview
  B. NPDES Permit Requirements
    1. Phase I Permits—Requirements for Demonstration of the Nine Minimum Controls and Development of the Long-Term CSO Control Plan
    2. Phase II Permits—Requirements for Implementation of a Long-Term CSO Control Plan
    3. Phasing Considerations
V. Enforcement and Compliance
  A. Overview
  B. Enforcement of CSO Dry Weather Discharge Prohibition
  C. Enforcement of Wet Weather CSO Requirements
    1. Enforcement for Compliance With Phase I Permits
    2. Enforcement for Compliance With Phase II Permits
  D. Penalties

List of Subjects in 40 CFR Part 122

Water pollution control.

Authority: Clean Water Act, 33 U.S.C. 1251 et seq.

Dated: April 8, 1994.

Carol M. Browner,
Administrator.

Combined Sewer Overflow (CSO) Control Policy

I. Introduction

A. Purpose and Principles

The main purposes of this Policy are to elaborate on EPA's National Combined Sewer Overflow (CSO) Control Strategy published on September 8, 1989 at 54 FR 37370 (1989 Strategy) and to expedite compliance with the requirements of the Clean Water Act (CWA). While implementation of the 1989 Strategy has resulted in progress toward controlling CSOs, significant water quality risks remain.

A combined sewer system (CSS) is a wastewater collection system owned by a State or municipality (as defined by section 502(4) of the CWA) which conveys sanitary wastewaters (domestic, commercial and industrial wastewaters) and storm water through a single-pipe system to a Publicly Owned Treatment Works (POTW) Treatment Plant (as defined in 40 CFR 403.3(p)). A CSO is the discharge from a CSS at a point prior to the POTW Treatment Plant. CSOs are point sources subject to NPDES permit requirements including both technology-based and water quality-based requirements of the CWA. CSOs are not subject to secondary treatment requirements applicable to POTWs.

CSOs consist of mixtures of domestic sewage, industrial and commercial wastewaters, and storm water runoff. CSOs often contain high levels of suspended solids, pathogenic microorganisms, toxic pollutants, floatables, nutrients, oxygen-demanding organic compounds, oil and grease, and other pollutants. CSOs can cause exceedances of water quality standards (WQS). Such exceedances may pose risks to human health, threaten aquatic life and its habitat, and impair the use and enjoyment of the Nation's waterways.

This Policy is intended to provide guidance to permittees with CSOs, National Pollutant Discharge Elimination System (NPDES) permitting authorities, State water quality standards authorities and enforcement authorities. The purpose of the Policy is to coordinate the planning, selection, design and implementation of CSO management practices and controls to meet the requirements of the CWA and to involve the public fully during the decision making process.

This Policy reiterates the objectives of the 1989 Strategy:

1. To ensure that if CSOs occur, they are only as a result of wet weather;
2. To bring all wet weather CSO discharge points into compliance with the technology-based and water quality-based requirements of the CWA; and
3. To minimize water quality, aquatic biota, and human health impacts from CSOs.

This CSO Control Policy represents a comprehensive national strategy to ensure that municipalities, permitting authorities, water quality standards authorities and the public engage in a comprehensive and coordinated planning effort to achieve cost-effective CSO controls that ultimately meet appropriate health and environmental objectives and requirements. The Policy recognizes the site-specific nature of CSOs and their impacts and provides the necessary flexibility to tailor controls to local situations. Four key principles of the Policy ensure that CSO controls are cost-effective and meet the objectives of the CWA. The key principles are:

1. Providing clear levels of control that would be presumed to meet appropriate health and environmental objectives;
2. Providing sufficient flexibility to municipalities, especially financially disadvantaged communities, to consider the site-specific nature of CSOs and to determine the most cost-effective means of reducing pollutants and meeting CWA objectives and requirements;
3. Allowing a phased approach to implementation of CSO controls considering a community's financial capability; and
4. Review and revision, as appropriate, of water quality standards and their implementation procedures when developing CSO control plans to reflect the site-specific wet weather impacts of CSOs.

This Policy is being issued in support of EPA's regulations and policy initiatives. This Policy is Agency guidance only and does not establish or affect legal rights or obligations. It does not establish a binding norm and is not finally determinative of the issues addressed. Agency decisions in any particular case will be made by applying the law and regulations on the basis of specific facts when permits are issued. The Administration has recommended that the 1994 amendments to the CWA endorse this final Policy.

B. Application of Policy

The permitting provisions of this Policy apply to all CSSs that overflow as a result of storm water flow, including snow melt runoff (40 CFR 122.26(b)(13)). Discharges from CSSs during dry weather are prohibited by the CWA. Accordingly, the permitting provisions of this Policy do not apply to CSOs during dry weather. Dry weather flow is the flow in a combined sewer that results from domestic sewage, groundwater infiltration, commercial and industrial wastewaters, and any other non-precipitation related flows (e.g., tidal infiltration). In addition to

the permitting provisions, the enforcement and Compliance section of this Policy describes an enforcement initiative being developed for overflows that occur during dry weather.

Consistent with the 1989 Strategy, 30 States that submitted CSO permitting strategies have received EPA approval or, in the case of one State, conditional approval of its strategy. States and EPA Regional Offices should review these strategies and negotiate appropriate revisions to them to implement this Policy. Permitting authorities are encouraged to evaluate water pollution control needs on a watershed management basis and coordinate CSO control efforts with other point and nonpoint source control activities.

C. Effect on Current CSO Control Efforts

EPA recognizes that extensive work has been done by many Regions, States, and municipalities to abate CSOs. As such, portions of this Policy may already have been addressed by permittees' previous efforts to control CSOs. Therefore, portions of this Policy may not apply, as determined by the permitting authority on a case-by-case basis, under the following circumstances:

1. Any permittee that, on the date of publication of this final Policy, has completed or substantially completed construction of CSO control facilities that are designed to meet WQS and protect designated uses, and where it has been determined that WQS are being or will be attained, is not covered by the initial planning and construction provisions in this Policy; however, the operational plan and post-construction monitoring provisions continue to apply. If, after monitoring, it is determined that WQS are not being attained, the permittee should be required to submit a revised CSO control plan that, once implemented, will attain WQS.

2. Any permittee that, on the date of publication of this final Policy, has substantially developed or is implementing a CSO control program pursuant to an existing permit or enforcement order, and such program is considered by the NPDES permitting authority to be adequate to meet WQS and protect designated uses and is reasonably equivalent to the treatment objectives of this Policy, should complete those facilities without further planning activities otherwise expected by this Policy. Such programs, however, should be reviewed and modified to be consistent with the sensitive area, financial capability, and post-construction monitoring provisions of this Policy.

3. Any permittee that has previously constructed CSO control facilities in an effort to comply with WQS but has failed to meet such applicable standards or to protect designated uses due to remaining CSOs may receive consideration for such efforts in future permits or enforceable orders for long-term CSO control planning, design and implementation.

In the case of any ongoing or substantially completed CSO control effort, the NPDES permit or other enforceable mechanism, as appropriate, should be revised to include all appropriate permit requirements consistent with Section IV.B. of this Policy.

D. Small System Considerations

The scope of the long-term CSO control plan, including the characterization, monitoring and modeling, and evaluation of alternatives portions of this Policy may be difficult for some small CSSs. At the discretion of the NPDES Authority, jurisdictions with populations under 75,000 may not need to complete each of the formal steps outlined in Section II.C. of this Policy, but should be required through their permits or other enforceable mechanisms to comply with the nine minimum controls (II.B), public participation (II.C.2), and sensitive areas (II.C.3) portions of this Policy. In addition, the permittee may propose to implement any of the criteria contained in this Policy for evaluation of alternatives described in II.C.4. Following approval of the proposed plan, such jurisdictions should construct the control projects and propose a monitoring program sufficient to determine whether WQS are attained and designated uses are protected.

In developing long-term CSO control plans based on the small system considerations discussed in the preceding paragraph, permittees are encouraged to discuss the scope of their long-term CSO control plan with the WQS authority and the NPDES authority. These discussions will ensure that the plan includes sufficient information to enable the permitting authority to identify the appropriate CSO controls.

E. Implementation Responsibilities

NPDES authorities (authorized States or EPA Regional Offices, as appropriate) are responsible for implementing this Policy. It is their responsibility to assure that CSO permittees develop long-term CSO control plans and that NPDES permits meet the requirements of the CWA. Further, they are responsible for coordinating the review of the long-term CSO control plan and the development of the permit with the WQS authority to determine if revisions to the WQS are appropriate. In addition, they should determine the appropriate vehicle (i.e., permit reissuance, information request under CWA section 308 or State equivalent or enforcement action) to ensure that compliance with the CWA is achieved as soon as practicable.

Permittees are responsible for documenting the implementation of the nine minimum controls and developing and implementing a long-term CSO control plan, as described in this Policy. EPA recognizes that financial considerations are a major factor affecting the implementation of CSO controls. For that reason, this Policy allows consideration of a permittee's financial capability in connection with the long-term CSO control planning effort, WQS review, and negotiation of enforceable schedules. However, each permittee is ultimately responsible for aggressively pursuing financial arrangements for the implementation of its long-term CSO control plan. As part of this effort, communities should apply to their State Revolving Fund program, or other assistance programs as appropriate, for financial assistance.

EPA and the States will undertake action to assure that all permittees with CSSs are subject to a consistent review in the permit development process, have permit requirements that achieve compliance with the CWA, and are subject to enforceable schedules that require the earliest practicable compliance date considering physical and financial feasibility.

F. Policy Development

This Policy devotes a separate section to each step involved in developing and implementing CSO controls. This is not to imply that each function occurs separately. Rather, the entire process surrounding CSO controls, community planning, WQS and permit development/revision, enforcement/compliance actions and public participation must be coordinated to control CSOs effectively. Permittees and permitting authorities are encouraged to consider innovative and alternative approaches and technologies that achieve the objectives of this Policy and the CWA.

In developing this Policy, EPA has included information on what responsible parties are expected to accomplish. Subsequent documents will provide additional guidance on how the objectives of this Policy should be met. These documents will provide further guidance on: CSO permit writing, the nine minimum controls, long-term CSO

Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices    18691

control plans, financial capability, sewer system characterization and receiving water monitoring and modeling, and application of WQS to CSO-impacted waters. For most CSO control efforts however, sufficient detail has been included in this Policy to begin immediate implementation of its provisions.

## II. EPA Objectives for Permittees

### A. Overview

Permittees with CSSs that have CSOs should immediately undertake a process to accurately characterize their sewer systems, to demonstrate implementation of the nine minimum controls, and to develop a long-term CSO control plan.

### B. Implementation of the Nine Minimum Controls

Permittees with CSOs should submit appropriate documentation demonstrating implementation of the nine minimum controls, including any proposed schedules for completing minor construction activities. The nine minimum controls are:

1. Proper operation and regular maintenance programs for the sewer system and the CSOs;
2. Maximum use of the collection system for storage;
3. Review and modification of pretreatment requirements to assure CSO impacts are minimized;
4. Maximization of flow to the POTW for treatment;
5. Prohibition of CSOs during dry weather;
6. Control of solid and floatable materials in CSOs;
7. Pollution prevention;
8. Public notification to ensure that the public receives adequate notification of CSO occurrences and CSO impacts; and
9. Monitoring to effectively characterize CSO impacts and the efficacy of CSO controls.

Selection and implementation of actual control measures should be based on site-specific considerations including the specific CSS's characteristics discussed under the sewer system characterization and monitoring portions of this Policy. Documentation of the nine minimum controls may include operation and maintenance plans, revised sewer use ordinances for industrial users, sewer system inspection reports, infiltration/inflow studies, pollution prevention programs, public notification plans, and facility plans for maximizing the capacities of the existing collection, storage and treatment systems, as well as contracts and schedules for minor construction programs for improving the existing system's operation. The permittee should also submit any information or data on the degree to which the nine minimum controls achieve compliance with water quality standards. These data and information should include results made available through monitoring and modeling activities done in conjunction with the development of the long-term CSO control plan described in this Policy.

This documentation should be submitted as soon as practicable, but no later than two years after the requirement to submit such documentation is included in an NPDES permit or other enforceable mechanism. Implementation of the nine minimum controls with appropriate documentation should be completed as soon as practicable but no later than January 1, 1997. These dates should be included in an appropriate enforceable mechanism.

Because the CWA requires immediate compliance with technology-based controls (section 301(b)), which on a Best Professional Judgment basis should include the nine minimum controls, a compliance schedule for implementing the nine minimum controls, if necessary, should be included in an appropriate enforceable mechanism.

### C. Long-Term CSO Control Plan

Permittees with CSOs are responsible for developing and implementing long-term CSO control plans that will ultimately result in compliance with the requirements of the CWA. The long-term plans should consider the site-specific nature of CSOs and evaluate the cost effectiveness of a range of control options/strategies. The development of the long-term CSO control plan and its subsequent implementation should also be coordinated with the NPDES authority and the State authority responsible for reviewing and revising the State's WQS. The selected controls should be designed to allow cost effective expansion or cost effective retrofitting if additional controls are subsequently determined to be necessary to meet WQS, including existing and designated uses.

This policy identifies EPA's major objectives for the long-term CSO control plan. Permittees should develop and submit this long-term CSO control plan as soon as practicable, but generally within two years after the date of the NPDES permit provision, Section 308 information request, or enforcement action requiring the permittee to develop the plan. NPDES authorities may establish a longer timetable for completion of the long-term CSO control plan on a case-by-case basis to account for site-specific factors which may influence the complexity of the planning process. Once agreed upon, these dates should be included in an appropriate enforceable mechanism.

EPA expects each long-term CSO control plan to utilize appropriate information to address the following minimum elements. The Plan should also include both fixed-date project implementation schedules (which may be phased) and a financing plan to design and construct the project as soon as practicable. The minimum elements of the long-term CSO control plan are described below.

1. Characterization, Monitoring, and Modeling of the Combined Sewer System

In order to design a CSO control plan adequate to meet the requirements of the CWA, a permittee should have a thorough understanding of its sewer system, the response of the system to various precipitation events, the characteristics of the overflows, and the water quality impacts that result from CSOs. The permittee should adequately characterize through monitoring, modeling, and other means as appropriate, for a range of storm events, the response of its sewer system to wet weather events including the number, location and frequency of CSOs, volume, concentration and mass of pollutants discharged and the impacts of the CSOs on the receiving waters and their designated uses. The permittee may need to consider information on the contribution and importance of other pollution sources in order to develop a final plan designed to meet water quality standards. The purpose of the system characterization, monitoring and modeling program initially is to assist the permittee in developing appropriate measures to implement the nine minimum controls and, if necessary, to support development of the long-term CSO control plan. The monitoring and modeling data also will be used to evaluate the expected effectiveness of both the nine minimum controls and, if necessary, the long-term CSO controls, to meet WQS.

The major elements of a sewer system characterization are described below.

a. Rainfall Records—The permittee should examine the complete rainfall record for the geographic area of its existing CSS using sound statistical procedures and best available data. The permittee should evaluate flow variations in the receiving water body to correlate between CSOs and receiving water conditions.

b. Combined Sewer System Characterization—The permittee should evaluate the nature and extent of its sewer system through evaluation of available sewer system records, field inspections and other activities necessary to understand the number, location and frequency of overflows and their location relative to sensitive areas and to pollution sources in the collection system, such as indirect significant industrial users.

c. CSO Monitoring—The permittee should develop a comprehensive, representative monitoring program that measures the frequency, duration, flow rate, volume and pollutant concentration of CSO discharges and assesses the impact of the CSOs on the receiving waters. The monitoring program should include necessary CSO effluent and ambient in-stream monitoring and, where appropriate, other monitoring protocols such as biological assessment, toxicity testing and sediment sampling. Monitoring parameters should include, for example, oxygen demanding pollutants, nutrients, toxic pollutants, sediment contaminants, pathogens, bacteriological indicators (e.g., Enterococcus, E. Coli), and toxicity. A representative sample of overflow points can be selected that is sufficient to allow characterization of CSO discharges and their water quality impacts and to facilitate evaluation of control plan alternatives.

d. Modeling—Modeling of a sewer system is recognized as a valuable tool for predicting sewer system response to various wet weather events and assessing water quality impacts when evaluating different control strategies and alternatives. EPA supports the proper and effective use of models, where appropriate, in the evaluation of the nine minimum controls and the development of the long-term CSO control plan. It is also recognized that there are many models which may be used to do this. These models range from simple to complex. Having decided to use a model, the permittee should base its choice of a model on the characteristics of its sewer system, the number and location of overflow points, and the sensitivity of the receiving water body to the CSO discharges. Use of models should include appropriate calibration and verification with field *measurements*. The sophistication of the model should relate to the complexity of the system to be modeled and to the information needs associated with evaluation of CSO control options and water quality impacts. EPA believes that continuous simulation models, using historical rainfall data, may be the best way to model sewer systems, CSOs, and their impacts. Because of the iterative nature of modeling sewer systems, CSOs, and their impacts, monitoring and modeling efforts are complementary and should be coordinated.

2. Public Participation

In developing its long-term CSO control plan, the permittee will employ a public participation process that actively involves the affected public in the decision-making to select the long-term CSO controls. The affected public includes rate payers, industrial users of the sewer system, persons who reside downstream from the CSOs, persons who use and enjoy these downstream waters, and any other interested persons.

3. Consideration of Sensitive Areas

EPA expects a permittee's long-term CSO control plan to give the highest priority to controlling overflows to sensitive areas. Sensitive areas, as determined by the NPDES authority in coordination with State and Federal agencies, as appropriate, include designated Outstanding National Resource Waters, National Marine Sanctuaries, waters with threatened or endangered species and their habitat, waters with primary contact recreation, public drinking water intakes or their designated protection areas, and shellfish beds. For such areas, the long-term CSO control plan should:

a. Prohibit new or significantly increased overflows;

b. i. Eliminate or relocate overflows that discharge to sensitive areas wherever physically possible and economically achievable, except where elimination or relocation would provide less environmental protection than additional treatment; or

ii. Where elimination or relocation is not physically possible and economically achievable, or would provide less environmental protection than additional treatment, provide the level of treatment for remaining overflows deemed necessary to meet WQS for full protection of existing and designated uses. In any event, the level of control should not be less than those described in Evaluation of Alternatives below; and

c. Where elimination or relocation has been proven not to be physically possible and economically achievable, permitting authorities should require, for each subsequent permit term, a reassessment based on new or improved techniques to eliminate or relocate, or on changed circumstances that influence economic achievability.

4. Evaluation of Alternatives

EPA expects the long-term CSO control plan to consider a reasonable range of alternatives. The plan should, for example, evaluate controls that would be necessary to achieve zero overflow events per year, an average of one to three, four to seven, and eight to twelve overflow events per year. Alternatively, the long-term plan could evaluate controls that achieve 100% capture, 90% capture, 85% capture, 80% capture, and 75% capture for treatment. The long-term control plan should also consider expansion of POTW secondary and primary capacity in the CSO abatement alternative analysis. The analysis of alternatives should be sufficient to make a reasonable assessment of cost and performance as described in Section II.C.5. Because the final long-term CSO control plan will become the basis for NPDES permit limits and requirements, the selected controls should be sufficient to meet CWA requirements.

In addition to considering sensitive areas, the long-term CSO control plan should adopt one of the following approaches:

a. "Presumption" Approach

A program that meets any of the criteria listed below would be presumed to provide an adequate level of control to meet the water quality-based requirements of the CWA, provided the permitting authority determines that such presumption is reasonable in light of the data and analysis conducted in the characterization, monitoring, and modeling of the system and the consideration of sensitive areas described above. These criteria are provided because data and modeling of wet weather events often do not give a clear picture of the level of CSO controls necessary to protect WQS.

i. No more than an average of four overflow events per year, provided that the permitting authority may allow up to two additional overflow events per year. For the purpose of this criterion, an overflow event is one or more overflows from a CSS as the result of a precipitation event that does not receive the minimum treatment specified below; or

ii. The elimination or the capture for treatment of no less than 85% by volume of the combined sewage collected in the CSS during precipitation events on a system-wide annual average basis; or

iii. The elimination or removal of no less than the mass of the pollutants, identified as causing water quality impairment through the sewer system

Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices    18693

haracterization, monitoring, and modeling effort, for the volumes that would be eliminated or captured for treatment under paragraph ii. above. Combined sewer flows remaining after implementation of the nine minimum controls and within the criteria specified at II.C.4.a.i or ii, should receive a minimum of:
- Primary clarification (Removal of floatables and settleable solids may be achieved by any combination of treatment technologies or methods that are shown to be equivalent to primary clarification.);
- Solids and floatables disposal; and
- Disinfection of effluent, if necessary, to meet WQS, protect designated uses and protect human health, including removal of harmful disinfection chemical residuals, where necessary.

b. "Demonstration" Approach

A permittee may demonstrate that a selected control program, though not meeting the criteria specified in II.C.4.a. above is adequate to meet the water quality-based requirements of the CWA. To be a successful demonstration, the permittee should demonstrate each of the following:

i. The planned control program is adequate to meet WQS and protect designated uses, unless WQS or uses cannot be met as a result of natural background conditions or pollution sources other than CSOs;

ii. The CSO discharges remaining after implementation of the planned control program will not preclude the attainment of WQS or the receiving waters' designated uses or contribute to their impairment. Where WQS and designated uses are not met in part because of natural background conditions or pollution sources other than CSOs, a total maximum daily load, including a wasteload allocation and a load allocation, or other means should be used to apportion pollutant loads;

iii. The planned control program will provide the maximum pollution reduction benefits reasonably attainable; and

iv. The planned control program is designed to allow cost effective expansion or cost effective retrofitting if additional controls are subsequently determined to be necessary to meet WQS or designated uses.

5. Cost/Performance Considerations

The permittee should develop appropriate cost/performance curves to demonstrate the relationships among a comprehensive set of reasonable control alternatives that correspond to the different ranges specified in Section II.C.4. This should include an analysis to determine where the increment of pollution reduction achieved in the receiving water diminishes compared to the increased costs. This analysis, often known as knee of the curve, should be among the considerations used to help guide selection of controls.

6. Operational Plan

After agreement between the permittee and NPDES authority on the necessary CSO controls to be implemented under the long-term CSO control plan, the permittee should revise the operation and maintenance program developed as part of the nine minimum controls to include the agreed-upon long-term CSO controls. The revised operation and maintenance program should maximize the removal of pollutants during and after each precipitation event using all available facilities within the collection and treatment system. For any flows in excess of the criteria specified at II.C.4.a.i., ii. or iii and not receiving the treatment specified in II.C.4.a, the operational plan should ensure that such flows receive treatment to the greatest extent practicable.

7. Maximizing Treatment at the Existing POTW Treatment Plant

In some communities, POTW treatment plants may have primary treatment capacity in excess of their secondary treatment capacity. One effective strategy to abate pollution resulting from CSOs is to maximize the delivery of flows during wet weather to the POTW treatment plant for treatment. Delivering these flows can have two significant water quality benefits: First, increased flows during wet weather to the POTW treatment plant may enable the permittee to eliminate or minimize overflows to sensitive areas; second, this would maximize the use of available POTW facilities for wet weather flows and would ensure that combined sewer flows receive at least primary treatment prior to discharge.

Under EPA regulations, the intentional diversion of waste streams from any portion of a treatment facility, including secondary treatment, is a bypass. EPA bypass regulations at 40 CFR 122.41(m) allow for a facility to bypass some or all the flow from its treatment process under specified limited circumstances. Under the regulation, the permittee must show that the bypass was unavoidable to prevent loss of life, personal injury or severe property damage, that there was no feasible alternative to the bypass and that the permittee submitted the required notices. In addition, the regulation provides that a bypass may be approved only after consideration of adverse effects.

Normally, it is the responsibility of the permittee to document, on a case-by-case basis, compliance with 40 CFR 122.41(m) in order to bypass flows legally. For some CSO-related permits, the study of feasible alternatives in the control plan may provide sufficient support for the permit record and for approval of a CSO-related bypass in the permit itself, and to define the specific parameters under which a bypass can legally occur. For approval of a CSO-related bypass, the long-term CSO control plan, at a minimum, should provide justification for the cut-off point at which the flow will be diverted from the secondary treatment portion of the treatment plant, and provide a benefit-cost analysis demonstrating that conveyance of wet weather flow to the POTW for primary treatment is more beneficial than other CSO abatement alternatives such as storage and pump back for secondary treatment, sewer separation, or satellite treatment. Such a permit must define under what specific wet weather conditions a CSO-related bypass is allowed and also specify what treatment or what monitoring, and effluent limitations and requirements apply to the bypass flow. The permit should also provide that approval for the CSO-related bypass will be reviewed and may be modified or terminated if there is a substantial increase in the volume or character of pollutants being introduced to the POTW. The CSO-related bypass provision in the permit should also make it clear that all wet weather flows passing the headworks of the POTW treatment plant will receive at least primary clarification and solids and floatables removal and disposal, and disinfection, where necessary, and any other treatment that can reasonably be provided.

Under this approach, EPA would allow a permit to authorize a CSO-related bypass of the secondary treatment portion of the POTW treatment plant for combined sewer flows in certain identified circumstances. This provision would apply only to those situations where the POTW would ordinarily meet the requirements of 40 CFR 122.41(m) as evaluated on a case-by-case basis. Therefore, there must be sufficient data in the administrative record (reflected in the permit fact sheet or statement of basis) supporting all the requirements in 40 CFR 122.41(m)(4) for approval of an anticipated bypass.

For the purposes of applying this regulation to CSO permittees, "severe property damage" could include

situations where flows above a certain level wash out the POTW's secondary treatment system. EPA further believes that the feasible alternatives requirement of the regulation can be met if the record shows that the secondary treatment system is properly operated and maintained, that the system has been designed to meet secondary limits for flows greater than the peak dry weather flow, plus an appropriate quantity of wet weather flow, and that it is either technically or financially infeasible to provide secondary treatment at the existing facilities for greater amounts of wet weather flow. The feasible alternative analysis should include, for example, consideration of enhanced primary treatment (e.g., chemical addition) and non-biological secondary treatment. Other bases supporting a finding of no feasible alternative may also be available on a case-by-case basis. As part of its consideration of possible adverse effects resulting from the bypass, the permitting authority should also ensure that the bypass will not cause exceedances of WQS.

This Policy does not address the appropriateness of approving anticipated bypasses through NPDES permits in advance outside the CSO context.

### 8. Implementation Schedule

The permittee should include all pertinent information in the long term control plan necessary to develop the construction and financing schedule for implementation of CSO controls. Schedules for implementation of the CSO controls may be phased based on the relative importance of adverse impacts upon WQS and designated uses, priority projects identified in the long-term plan, and on a permittee's financial capability.

Construction phasing should consider:

a. Eliminating overflows that discharge to sensitive areas as the highest priority;
b. Use impairment;
c. The permittee's financial capability including consideration of such factors as:
  i. Median household income;
  ii. Total annual wastewater and CSO control costs per household as a percent of median household income;
  iii. Overall net debt as a percent of full market property value;
  iv. Property tax revenues as a percent of full market property value;
  v. Property tax collection rate;
  vi. Unemployment; and
  vii. Bond rating;
d. Grant and loan availability;

e. Previous and current residential, commercial and industrial sewer user fees and rate structures; and
f. Other viable funding mechanisms and sources of financing.

### 9. Post-Construction Compliance Monitoring Program

The selected CSO controls should include a post-construction water quality monitoring program adequate to verify compliance with water quality standards and protection of designated uses as well as to ascertain the effectiveness of CSO controls. This water quality compliance monitoring program should include a plan to be approved by the NPDES authority that details the monitoring protocols to be followed, including the necessary effluent and ambient monitoring and, where appropriate, other monitoring protocols such as biological assessments, whole effluent toxicity testing, and sediment sampling.

### III. Coordination With State Water Quality Standards

#### A. Overview

WQS are State adopted, or Federally promulgated rules which serve as the goals for the water body and the legal basis for the water quality-based NPDES permit requirements under the CWA. WQS consist of uses which States designate for their water bodies, criteria to protect the uses, an anti-degradation policy to protect the water quality improvements gained and other policies affecting the implementation of the standards. A primary objective of the long-term CSO control plan is to meet WQS, including the designated uses through reducing risks to human health and the environment by eliminating, relocating or controlling CSOs to the affected waters.

State WQS authorities, NPDES authorities, EPA regional offices, permittees, and the public should meet early and frequently throughout the long-term CSO control planning process. Development of the long-term plan should be coordinated with the review and appropriate revision of WQS and implementation procedures on CSO-impacted waters to ensure that the long-term controls will be sufficient to meet water quality standards. As part of these meetings, participants should agree on the data, information and analyses needed to support the development of the long-term CSO control plan and the review of applicable WQS, and implementation procedures, if appropriate. Agreements should be reached on the monitoring protocols and models that will be used

to evaluate the water quality impacts of the overflows, to analyze the attainability of the WQS and to determine the water quality-based requirements for the permit. Many opportunities exist for permittees and States to share information as control programs are developed and as WQS are reviewed. Such information should assist States in determining the need for revisions to WQS and implementation procedures to better reflect the site-specific wet weather impacts of CSOs. Coordinating the development of the long-term CSO control plan and the review of the WQS and implementation procedures provides greater assurance that the long-term control plan selected and the limits and requirements included in the NPDES permit will be sufficient to meet WQS and to comply with sections 301(b)(1)(C) and 402(a)(2) of the CWA.

EPA encourages States and permittees jointly to sponsor workshops for the affected public in the development of the long-term CSO control plan and during the development of appropriate revisions to WQS for CSO-impacted waters. Workshops provide a forum for including the public in discussions of the implications of the proposed long-term CSO control plan on the water quality and uses for the receiving water.

#### B. Water Quality Standards Reviews

The CWA requires States to periodically, but at least once every three years, hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards. States must provide the public an opportunity to comment on any proposed revision to water quality standards and all revisions must be submitted to EPA for review and approval.

EPA regulations and guidance provide States with the flexibility to adapt their WQS, and implementation procedures to reflect site-specific conditions including those related to CSOs. For example, a State may adopt site-specific criteria for a particular pollutant if the State determines that the site-specific criteria fully protects the designated use (40 CFR 131.11). In addition, the regulations at 40 CFR 131.10(g), (h), and (j) specify when and how a designated use may be modified. A State may remove a designated use from its water quality standards only if the designated use is not an existing use. An existing use is a use actually attained in the water body on or after November 28, 1975. Furthermore, a State may not remove a designated use that will be attained by implementing the

technology-based effluent limits required under sections 301(b) and 306 of the CWA and by implementing cost-effective and reasonable best management practices for nonpoint source controls. Thus, if a State has a reasonable basis to determine that the current designated use could be attained after implementation of the technology-based controls of the CWA, then the use could not be removed.

In determining whether a use is attainable and prior to removing a designated use, States must conduct and submit to EPA a use attainability analysis. A use attainability analysis is a structured scientific assessment of the factors affecting the use, including the physical, chemical, biological, and economic factors described in 40 CFR 131.10(g). As part of the analysis, States should evaluate whether the designated use could be attained if CSO controls were implemented. For example, States should examine if sediment loadings from CSOs could be reduced so as not to bury spawning beds, or if biochemical oxygen demanding material in the effluent or the toxicity of the effluent could be corrected so as to reduce the acute or chronic physiological stress on or bioaccumulation potential of aquatic organisms.

In reviewing the attainability of their WQS and the applicability of their implementation procedures to CSO-impacted waters, States are encouraged to define more explicitly their recreational and aquatic life uses and then, if appropriate, modify the criteria accordingly to protect the designated uses.

Another option is for States to adopt partial uses by defining when primary contact recreation such as swimming does not exist, such as during certain seasons of the year in northern climates or during a particular type of storm event. In making such adjustments to their uses, States must ensure that downstream uses are protected, and that during other seasons or after the storm event has passed, the use is fully protected.

In addition to defining recreational uses with greater specificity, States are also encouraged to define the aquatic uses more precisely. Rather than "aquatic life use protection," States should consider defining the type of fishery to be protected such as a cold water fishery (e.g., trout or salmon) or a warm weather fishery (e.g., bluegill or large mouth bass). Explicitly defining the type of fishery to be protected may assist the permittee in enlisting the support of citizens for a CSO control plan.

A water quality standard variance may be appropriate, in limited circumstances on CSO-impacted waters, where the State is uncertain as to whether a standard can be attained and time is needed for the State to conduct additional analyses on the attainability of the standard. Variances are short-term modifications in water quality standards. Subject to EPA approval, States, with their own statutory authority, may grant a variance to a specific discharger for a specific pollutant. The justification for a variance is similar to that required for a permanent change in the standard, although the showings needed are less rigorous. Variances are also subject to public participation requirements of the water quality standards and permits programs and are reviewable generally every three years. A variance allows the CSO permit to be written to meet the "modified" water quality standard as analyses are conducted and as progress is made to improve water quality.

Justifications for variances are the same as those identified in 40 CFR 131.10(g) for modifications in uses. States must provide an opportunity for public review and comment on all variances. If States use the permit as the vehicle to grant the variance, notice of the permit must clearly state that the variance modifies the State's water quality standards. If the variance is approved, the State appends the variance to the State's standards and reviews the variance every three years.

IV. Expectations for Permitting Authorities

A. Overview

CSOs are point sources subject to NPDES permit requirements including both technology-based and water quality-based requirements of the CWA. CSOs are not subject to secondary treatment regulations applicable to publicly owned treatment works (*Montgomery Environmental Coalition vs. Costle*, 646 F.2d 568 (D.C. Cir. 1980)).

All permits for CSOs should require the nine minimum controls as a minimum best available technology economically achievable and best conventional technology (BAT/BCT) established on a best professional judgment (BPJ) basis by the permitting authority (40 CFR 125.3). Water quality-based requirements are to be established based on applicable water quality standards.

This policy establishes a uniform, nationally consistent approach to developing and issuing NPDES permits to permittees with CSOs. Permits for CSOs should be developed and issued expeditiously. A single, system-wide permit generally should be issued for all discharges, including CSOs, from a CSS operated by a single authority. When different parts of a single CSS are operated by more than one authority, permits issued to each authority should generally require joint preparation and implementation of the elements of this Policy and should specifically define the responsibilities and duties of each authority. Permittees should be required to coordinate system-wide implementation of the nine minimum controls and the development and implementation of the long-term CSO control plan.

The individual authorities are responsible for their own discharges and should cooperate with the permittee for the POTW receiving the flows from the CSS. When a CSO is permitted separately from the POTW, both permits should be cross-referenced for informational purposes.

EPA Regions and States should review the CSO permitting priorities established in the State CSO Permitting Strategies developed in response to the 1989 Strategy. Regions and States may elect to revise these previous priorities. In setting permitting priorities, Regions and States should not just focus on those permittees that have initiated monitoring programs. When setting priorities, Regions and States should consider, for example, the known or potential impact of CSOs on sensitive areas, and the extent of upstream industrial user discharges to the CSS.

During the permittee's development of the long-term CSO control plan, the permit writer should promote coordination between the permittee and State WQS authority in connection with possible WQS revisions. Once the permittee has completed development of the long-term CSO control plan and has coordinated with the permitting authority the selection of the controls necessary to meet the requirements of the CWA, the permitting authority should include in an appropriate enforceable mechanism, requirements for implementation of the long-term CSO control plan, including conditions for water quality monitoring and operation and maintenance.

B. NPDES Permit Requirements

Following are the major elements of NPDES permits to implement this Policy and ensure protection of water quality.

18696    Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices

1. Phase I Permits—Requirements for Demonstration of Implementation of the Nine Minimum Controls and Development of the Long-Term CSO Control Plan

In the Phase I permit issued/modified to reflect this Policy, the NPDES authority should at least require permittees to:

a. Immediately implement BAT/BCT, which at a minimum includes the nine minimum controls, as determined on a BPJ basis by the permitting authority;

b. Develop and submit a report documenting the implementation of the nine minimum controls within two years of permit issuance/modification;

c. Comply with applicable WQS, no later than the date allowed under the State's WQS, expressed in the form of a narrative limitation; and

d. develop and submit, consistent with this Policy and based on a schedule in an appropriate enforceable mechanism, a long-term CSO control plan as soon as practicable, but generally within two years after the effective date of the permit issuance/modification. However, permitting authorities may establish a longer timetable for completion of the long-term CSO control plan on a case-by-case basis to account for site-specific factors that may influence the complexity of the planning process.

The NPDES authority should include compliance dates on the fastest practicable schedule for each of the nine minimum controls in an appropriate enforceable mechanism issued in conjunction with the Phase I permit. The use of enforceable orders is necessary unless Congress amends the CWA. All orders should require compliance with the nine minimum controls no later than January 1, 1997.

2. Phase II Permits—Requirements for Implementation of a Long-Term CSO Control Plan

Once the permittee has completed development of the long-term CSO control plan and the selection of the controls necessary to meet CWA requirements has been coordinated with the permitting and WQS authorities, the permitting authority should include, in an appropriate enforceable mechanism, requirements for implementation of the long-term CSO control plan as soon as practicable. Where the permittee has selected controls based on the "presumption" approach described in Section II.C.4, the permitting authority must have determined that the presumption that such level of treatment will achieve water quality standards is reasonable in light of the data and analysis conducted under this Policy. The Phase II permit should contain:

a. Requirements to implement the technology-based controls including the nine minimum controls determined on a BPJ basis;

b. Narrative requirements which insure that the selected CSO controls are implemented, operated and maintained as described in the long-term CSO control plan;

c. Water quality-based effluent limits under 40 CFR 122.44(d)(1) and 122.44(k), requiring, at a minimum, compliance with, no later than the date allowed under the State's WQS, the numeric performance standards for the selected CSO controls, based on average design conditions specifying at least one of the following:

i. A maximum number of overflow events per year for specified design conditions consistent with II.C.4.a.i; or

ii. A minimum percentage capture of combined sewage by volume for treatment under specified design conditions consistent with II.C.4.a.ii; or

iii. A minimum removal of the mass of pollutants discharged for specified design conditions consistent with II.C.4.a.iii; or

iv. performance standards and requirements that are consistent with II.C.4.b. of the Policy.

d. A requirement to implement, with an established schedule, the approved post-construction water quality assessment program including requirements to monitor and collect sufficient information to demonstrate compliance with WQS and protection of designated uses as well as to determine the effectiveness of CSO controls.

e. A requirement to reassess overflows to sensitive areas in those cases where elimination or relocation of the overflows is not physically possible and economically achievable. The reassessment should be based on consideration of new or improved techniques to eliminate or relocate overflows or changed circumstances that influence economic achievability;

f. Conditions establishing requirements for maximizing the treatment of wet weather flows at the POTW treatment plant, as appropriate, consistent with Section II.C.7. of this Policy;

g. A reopener clause authorizing the NPDES authority to reopen and modify the permit upon determination that the CSO controls fail to meet WQS or protect designated uses. Upon such determination, the NPDES authority should promptly notify the permittee and proceed to modify or reissue the permit. The permittee should be required to develop, submit and implement, as soon as practicable, a revised CSO control plan which contains additional controls to meet WQS and designated uses. If the initial CSO control plan was approved under the demonstration provision of Section II.C.4.b., the revised plan, at a minimum, should provide for controls that satisfy one of the criteria in Section II.C.4.a. unless the permittee demonstrates that the revised plan is clearly adequate to meet WQS at a lower cost and it is shown that the additional controls resulting from the criteria in Section II.C.4.a. will not result in a greater overall improvement in water quality.

Unless the permittee can comply with all of the requirements of the Phase II permit, the NPDES authority should include, in an enforceable mechanism, compliance dates on the fastest practicable schedule for those activities directly related to meeting the requirements of the CWA. For major permittees, the compliance schedule should be placed in a judicial order. Proper compliance with the schedule for implementing the controls recommended in the long-term CSO control plan constitutes compliance with the elements of this Policy concerning planning and implementation of a long term CSO remedy.

3. Phasing Considerations

Implementation of CSO controls may be phased based on the relative importance of and adverse impacts upon WQS and designated uses, as well as the permittee's financial capability and its previous *efforts to control* CSOs. The NPDES authority should evaluate the proposed implementation schedule and construction phasing discussed in Section II.C.8. of this Policy. The permit should require compliance with the controls proposed in the long-term CSO control plan no later than the applicable deadline(s) under the CWA or State law. If compliance with the Phase II permit is not possible, an enforceable schedule, consistent with the Enforcement and Compliance Section of this Policy, should be issued in conjunction with the Phase II permit which specifies the schedule and milestones for implementation of the long-term CSO control plan.

*V. Enforcement and Compliance*

A. Overview

It is important that permittees act immediately to take the necessary steps to comply with the CWA. The CSO enforcement effort will commence with

Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices    18697

an initiative to address CSOs that discharge during dry weather, followed by an enforcement effort in conjunction with permitting CSOs discussed earlier in this Policy. Success of the enforcement effort will depend in large part upon expeditious action by NPDES authorities in issuing enforceable permits that include requirements both for the nine minimum controls and for compliance with all other requirements of the CWA. Priority for enforcement actions should be set based on environmental impacts or sensitive areas affected by CSOs.

As a further inducement for permittees to cooperate with this process, EPA is prepared to exercise its enforcement discretion in determining whether or not to seek civil penalties for past CSO violations if permittees meet the objectives and schedules of this Policy and do not have CSOs during dry weather.

B. Enforcement of CSO Dry Weather Discharge Prohibition

EPA intends to commence immediately an enforcement initiative against CSO permittees which have CWA violations due to CSOs during dry weather. Discharges during dry weather have always been prohibited by the NPDES program. Such discharges can create serious public health and water quality problems. EPA will use its CWA Section 308 monitoring, reporting, and inspection authorities, together with NPDES State authorities, to locate these violations, and to determine their causes. Appropriate remedies and penalties will be sought for CSOs during dry weather. EPA will provide NPDES authorities more specific guidance on this enforcement initiative separately.

C. Enforcement of Wet Weather CSO Requirements

Under the CWA, EPA can use several enforcement options to address permittees with CSOs. Those options directly applicable to this Policy are section 308 Information Requests, section 309(a) Administrative Orders, section 309(g) Administrative Penalty Orders, section 309 (b) and (d) Civil Judicial Actions, and section 504 Emergency Powers. NPDES States should use comparable means.

NPDES authorities should set priorities for enforcement based on environmental impacts or sensitive areas affected by CSOs. Permittees that have voluntarily initiated monitoring and are progressing expeditiously toward appropriate CSO controls should be given due consideration for their efforts.

1. Enforcement for Compliance With Phase I Permits

Enforcement for compliance with Phase I permits will focus on requirements to implement at least the nine minimum controls, and develop the long-term CSO control plan leading to compliance with the requirements of the CWA. Where immediate compliance with the Phase I permit is infeasible, the NPDES authority should issue an enforceable schedule, in concert with the Phase I permit, requiring compliance with the CWA and imposing compliance schedules with dates for each of the nine minimum controls as soon as practicable. All enforcement authorities should require compliance with the nine minimum controls no later than January 1, 1997. Where the NPDES authority is issuing an order with a compliance schedule for the nine minimum controls, this order should also include a schedule for development of the long-term CSO control plan.

If a CSO permittee fails to meet the final compliance date of the schedule, the NPDES authority should initiate appropriate judicial action.

2. Enforcement for Compliance With Phase II Permits

The main focus for enforcing compliance with Phase II permits will be to incorporate the long-term CSO control plan through a civil judicial action, an administrative order, or other enforceable mechanism requiring compliance with the CWA and imposing a compliance schedule with appropriate milestone dates necessary to implement the plan.

In general, a judicial order is the appropriate mechanism for incorporating the above provisions for Phase II. Administrative orders, however, may be appropriate for permittees whose long-term control plans will take less than five years to complete, and for minors that have complied with the final date of the enforceable order for compliance with their Phase I permit. If necessary, any of the nine minimum controls that have not been implemented by this time should be included in the terms of the judicial order.

D. Penalties

EPA is prepared not to seek civil penalties for past CSO violations, if permittees have no discharges during dry weather and meet the objectives and schedules of this Policy. Notwithstanding this, where a permittee has other significant CWA violations for which EPA or the State is taking judicial action, penalties may be considered as part of that action for the following:

1. CSOs during dry weather;
2. Violations of CSO-related requirements in NPDES permits; consent decrees or court orders which predate this policy; or
3. Other CWA violations.

EPA will not seek penalties for past CSO violations from permittees that fully comply with the Phase I permit or enforceable order requiring compliance with the Phase I permit. For permittees that fail to comply, EPA will exercise its enforcement discretion in determining whether to seek penalties for the time period for which the compliance schedule was violated. If the milestone dates of the enforceable schedule are not achieved and penalties are sought, penalties should be calculated from the last milestone date that was met.

At the time of the judicial settlement imposing a compliance schedule implementing the Phase II permit requirements, EPA will not seek penalties for past CSO violations from permittees that fully comply with the enforceable order requiring compliance with the Phase I permit and if the terms of the judicial order are expeditiously agreed to on consent. However, stipulated penalties for violation of the judicial order generally should be included in the order, consistent with existing Agency policies. Additional guidance on stipulated penalties concerning long-term CSO controls and attainment of WQS will be issued.

Paperwork Reduction Act

The information collection requirements in this policy have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq* and have been assigned OMB control number 2040–0170.

This collection of information has an estimated reporting burden averaging 578 hours per response and an estimated annual recordkeeping burden averaging 25 hours per recordkeeper. These estimates include time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Information Policy Branch; EPA; 401 M Street SW. (Mail Code 2136); Washington, DC 20460; and to the Office of Information and Regulatory Affairs, Office of Management and

**18698** Federal Register / Vol. 59, No. 75 / Tuesday, April 19, 1994 / Notices

Budget, Washington, DC 20503, marked "Attention: Desk Officer for EPA."

[FR Doc. 94-9295 Filed 4-18-94; 8:45 am]
BILLING CODE 6560-50-P