# APPENDIX B: Unreported Cases



1989 WL 158020                                                                                      Page 1
(Cite as: 1989 WL 158020 (N.D.Ohio))

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Ohio, Eastern Division.

UNITED STATES of America, Plaintiff,
v.
CITY OF BEDFORD, OHIO, and the State of Ohio,
Defendants.

**Civ. A. No. C 85-2897.**

July 20, 1989.

*CONSENT DECREE*

BATTISTI, Chief Judge.

*1 WHEREAS, Plaintiff, United States of America, on behalf of the United States Environmental Protection Agency (U.S. EPA), filed the Complaint herein against Defendants, City of Bedford (City) and the State of Ohio, on September 30, 1985, alleging that Defendant City had violated the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* (Act) and the terms and conditions of its National Pollutant Discharge Elimination System (NPDES) Permit No. D805*BD (Permit).

WHEREAS, the City owns and operates a wastewater treatment facility (Plant) at 705 West Glendale Avenue, Bedford, Ohio, which is alleged by Plaintiff to be in violation of Section 301 of the Act, 33 U.S.C. § 1311, and its Permit;

WHEREAS, the State of Ohio has been joined as a Defendant pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e), which provides that the state shall be liable for payment of any judgment or any expenses against the City to the extent that the laws of Ohio prevent the City from raising revenues needed to comply with such judgment;

NOW, THEREFORE, before the taking of any testimony upon the pleadings, and upon consent of the parties hereto, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

I. *JURISDICTION*

1. This Court has jurisdiction over the parties and the subject matter of this action under 28 U.S.C. §§ 1345 and 1355 and Section 309 of the Act, 33 U.S.C. § 1319. The Complaint states a claim upon which the Court can grant relief pursuant to Section 309 of the Act, 33 U.S.C. § 1319.

II. *APPLICABILITY*

2. The provisions of this Consent Decree shall apply to and be binding upon the parties to this action, as well as any agencies, officers, directors, agents and servants thereof, and the successors and assigns of each and any person having notice of this Consent Decree and all persons, firms and corporations in active concert or participation with them. The City shall give notice of this Consent Decree to all contractors performing any work required under this Consent Decree. The City shall also give notice of this Consent Decree to each successor in interest prior to transfer of ownership or operation of the Plant. The City shall simultaneously notify U.S. EPA, the United States Attorney for the Northern District of Ohio, and the Assistant Attorney General, Land and Natural Resources Division, Department of Justice, that either of the above notices have been given by the City.

3. Each signatory to this Consent Decree warrants that he or she has authority to sign this Consent Decree on behalf of the party he or she represents. The State of Ohio does not agree to the terms of Section IX of this Consent Decree, and does not consent to be bound thereby.

III. *COMPLIANCE PROGRAM AND REMEDIAL MEASURES*

4. The City of Bedford shall achieve the following objectives in accordance with the Compliance Program set forth below:

a. comply with the terms of its NPDES permit and the Clean Water Act and its regulations;

b. eliminate effluent discharges that violate the applicable NPDES permit, including effluent limitations based on Ohio Water Quality standards;

*2 c. operate and maintain the Plant to ensure the best interim effluent quality possible;

d. eliminate all sanitary sewer overflows and pump station bypasses, *i.e.* physically remove or plug the overflows or bypasses where applicable, and cease their use and operation through flow enhancement; and

e. minimize discharge of combined sewer overflows.

5. Attainment of Final Effluent Limits. By July 1, 1988, the City of Bedford shall achieve and demonstrate and thereafter maintain full compliance with Section 301 of the Act and all terms, conditions and limitations of its NPDES permit.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1989 WL 158020                                                                                      Page 2
(Cite as: 1989 WL 158020 (N.D.Ohio))

6. General Conditions of Permit. The City shall at all times comply with all monitoring and reporting requirements, and Part III--General Conditions of the Permit.

7. Plant Improvements. The City shall undertake improvements at the Plant in accordance with the following schedule:

```
                    Compliance Activity
Compliance
Date
 a.  Complete construction of, and put
into              Completed
      operation, all improvements to
the treatment
      processes that were described in
Contract C,
      the City of Bedford's
construction contract
      for improvements to the Plant's
primary and
      secondary treatment, and for
sludge
      processing, including repair or
replacement of
      the primary settling tank, the
existing
      trickling filter closing tank,
and flow meter,
      and for construction of two
additional
      settling tanks and sludge
thickener
      improvements. Attachment A.
 b.  Replace or modify in accordance
with plans        September
      approved by OEPA the primary
effluent pumps      1, 1988
      and well as necessary to improve
operations.
 c.  Complete improvements to its
potable water        September
      service to increase the supply of
water for          1, 1988
      process and fire protection at
the Plant.
 d.  Continue to enforce its phosphorus
ban              Continuous-
      ordinance.
ly
```

8. Elimination of Sanitary Sewer Overflows and Bypasses.

The City shall implement a plan for the elimination of overflows in the sanitary sewerage system and pump stations in accordance with the following schedule:

```
                    Compliance Activity
Compliance
Date
 a.  Complete a Sewer System Evaluation
Study (SSES).  Completed
 b.  Submit for approval to U.S. EPA and
OEPA a plan    March 1,
      and implementation schedule to
eliminate the       1989
      sanitary sewer overflows and pump
station
      bypasses. Such plans shall
include (i) dates
      by which detailed plans and
specifications for
      construction of the several
improvements shall
      be submitted to OEPA and (ii) a
detailed
      itemization of the sewer
projects. Upon
      approval by U.S. EPA and OEPA,
Plaintiff shall
      incorporate the plan and schedule
by reference
      into this Consent Decree.
 c.  Advertise for bids in order to
start              Sixty Days
      construction of sewer
improvements and            after
      elimination of sanitary sewer
overflows.          U.S. EPA
and OEPA
approval
 d.  Eliminate all separate sanitary
sewer overflows,  September
      pump station bypasses, and plant
overflows.          1, 1989
 e.  Complete rehabilitations of the
sanitary sewers    September
      as recommended by the SSES
including, but not    1, 1990
      limited to (i) installation of
retention/flow
      equalization basins, (ii)
upgrading the Wood
      Creek Interceptor, and (iii)
construction of
      relief sewers to the South
```

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1989 WL 158020
(Cite as: 1989 WL 158020 (N.D.Ohio))

Page 3

Broadway subsystem
        and other areas.
 f.   Completion of new laboratory
staffed with two      Completed
      class 3 operators.

*3 9. Combined Sewer Overflows. The parties recognize that the City of Bedford sewerage system is partly a combined system: a storm and sanitation system. During periods of wet weather, the sewerage system has not been able to convey the full flow to the Plant for treatment. As a result, bypasses of untreated and/or partially treated wastewater have resulted. In order to correct this situation, Bedford shall submit to and upon approval by Plaintiff and OEPA, shall implement a Wet Weather Treatment Plan comprised of two (2) major phases in accordance with the objectives, requirements and schedule below.

10. Wet Weather Treatment Plan. The objectives of the Wet Weather Treatment Plan shall, at minimum, include:

a. Operating the entire treatment system so as to maximize treatment;

b. Preventing or reducing storm water entry into the sewer system;

c. Providing maximum use of the sewerage system storage capacity during wet weather;

d. Providing wet weather flow storage (off line or on line) and/or treatment capacity;

e. Providing full secondary treatment for all dry weather flows; and

f. Providing maximum treatment of all flows during wet weather, including, at a minimum, secondary treatment for the equivalent of dry weather flow quantity and maximum possible primary treatment.

11. Phases of the Wet Weather Treatment Plan. The City of Bedford shall implement this Wet Weather Treatment Plan in two phases and in accordance with the following schedule:

a. Phase 1--Storm Analysis Study of Existing System. By April 1, 1989, Bedford shall develop and submit to Plaintiff for review and approval a Stormwater Analysis Study Plan to meet, at a minimum, objectives 10.a, b, c and d. Bedford shall ensure that this Stormwater Analysis Study Plan is conducted pursuant to the requirements specified below:

i. The City shall conduct the Stormwater Analysis Study utilizing a Stormwater Management Model (SWMM) or other analytical techniques appropriate to provide reference to circumstances at the facility. The City shall use such models or techniques to define the quantity and quality of the combined sewer overflow discharges and to evaluate, screen and rank the Combined System Overflow (CSO) control alternatives. The City shall use a method that, at a minimum, will be able:

(a) to describe stormwater discharges, including combined sewer overflows, in terms of volume and pollutant concentrations and loading;

(b) to evaluate the effectiveness of various control alternatives; and

(c) to identify the cost effective solution.

ii. The Stormwater Analysis Study shall result in development of a Sewerage System Operational Plan that is consistent with the objectives at paragraph 10 and that gives full consideration to the elements in the Stormwater Analysis Study Plan.

iii. The City shall design the Operational Plan to minimize the volume and frequency of CSO discharges by an optimum operation of the sewage treatment plant and existing sewer system. This operation shall be an assurance of secondary treatment for all dry weather or equivalent flows before any CSO discharge occurs.

*4 iv. An approvable Operational Plan must, at a minimum:

(1) provide that no discharge from any CSO points is allowed unless the treatment plant treats all dry weather flow;

(2) report, if applicable, the number, location, types and kinds of regulators and their respective operating histories, maintenance program and performance efficiency;

(3) report the calculated or estimated storage capacities of the sewer system upstream from all control devices, such as pump stations and regulators;

(4) provide operational procedures for optimum utilization of the available capacity of interceptors and trunk lines and all storage capacities upstream of any control devices, such as pump stations or regulators, prior to any discharge from a combined sewer overflow or bypass;

(5) provide a method to assure that available upstream storage capacity is utilized prior to any discharge from the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1989 WL 158020                                                                                                Page 4
(Cite as: 1989 WL 158020 (N.D.Ohio))

combined sewer system;

(6) identify the storage/transport capabilities of the sewer system in such a manner as to minimize the volume and frequency of CSO discharges;

(7) identify the management practices to be implemented for minimizing or delaying the entry of stormwater into the sewer system to the maximum extent possible;

(8) provide the flexibility to adjust sewer system capacities to reflect connection and/or disconnection from the sewer system such that at all times overflows and bypasses are minimized;

(9) provide a method for prohibiting new connections to the transport/treatment system when the proposed new connections would exceed the system's capacity, until such time as the system's capacity can be expanded to accommodate the proposed new connections.

b. Phase 2--Stormwater Analysis Study of Expanded Facility. By December 31, 1989, Bedford shall develop and submit to Plaintiff for review and approval an *updated* Stormwater Analysis Study for the Improved Facility as described at Section III. Immediately after approval, the City of Bedford shall implement the Sewerage System Operation Plan. This updated Stormwater Analysis Study shall include:

i. the elements described at paragraph 11.a and the determination of the treatment plant flow capacity to meet, at a minimum, objectives 10.e and f above.

ii. documentation of the maximum flow beyond design capacities that the secondary treatment process of the Bedford Plant can process. The City of Bedford shall consider the peak flows and duration of those flows. This flow shall be defined as the dry weather flow.

iii. documentation of the maximum wet weather flows beyond rated capacities that both the primary portion and the secondary portion of the Bedford treatment plant can each process without resulting in the gross violation of effluent limits as determined by the attached and reviewed criteria. Attachment B. The City of Bedford shall consider the peak flows and duration of those flows.

iv. a plan for monitoring and reporting that will document when the full flow to the plant is not receiving complete secondary treatment.

*5 12. Operation and Maintenance of the Plant. The City shall maintain and operate the Plant and collection systems to minimize equipment breakdowns and interruptions of treatment. Pending attainment of final effluent limits specified in the Permit, the City shall provide the best effluent quality possible consistent with meeting the other schedules and obligations in this Consent Decree. The City shall develop an operation and maintenance manual for the Plant, incorporating all the newly constructed improvements by January 1, 1989, and shall immediately implement its procedures.

13. Priority of Compliance Dates. If at any time the City achieves and maintains compliance with all final effluent limits contained in its Permit for six consecutive months, it may, upon notification to U.S. EPA, seek U.S. EPA's agreement to change the priority of the remaining compliance dates contained in Part III of the Consent Decree. In no event shall the compliance dates regarding the Elimination of the Sanitary Sewer Overflows and Bypasses be extended. If the parties do not agree to a modification, the parties may submit the matter to the Court as provided in this Consent Decree. If the City demonstrates that the original compliance date is not necessary to assure the City's continuous compliance with the Permit, the City's request may be granted.

### IV. *FUNDING*

14. Performance of the terms of this Consent Decree by the City is not conditioned on the receipt of any Federal or State grant funds. In addition, performance is not excused by the lack of any Federal or State grant funds, nor by the processing, or failure to process, of any applications for the same.

### V. *REPORTING*

15. Beginning with the quarter ending December 31, 1988, and for every quarter thereafter, the City shall submit to U.S. EPA a written report detailing the status and progress of projects required under this Consent Decree. In this report, the City shall include the results of sampling and monitoring conducted during the quarter (which may include the Monthly Operating Reports required below), a statement indicating the City's compliance or noncompliance with the applicable requirements of this Consent Decree, including construction requirements and effluent limitations, and an explanation for any noncompliance. In addition, the City shall include in such reports a projection of the work the City of Bedford shall perform pursuant to this Consent Decree during the following twelve month period.

16. The City of Bedford shall submit the reports within

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



fifteen (15) days immediately following the last month of each quarter. All reports shall be available for inspection by any person at Bedford City Hall.

17. In addition, within ten (10) days of a compliance deadline contained in this Consent Decree, the City shall notify U.S. EPA in writing of compliance or noncompliance with said deadline.

18. Beginning in 1988, the City shall submit to U.S. EPA and OEPA, on or before the fifteenth (15th) day of each month, a Monthly Operation Report containing analytical test results obtained during the previous month's monitoring period. The City of Bedford shall submit the Monthly Operation Report in the form required by OEPA and the Permit.

*6 19. Notification to U.S. EPA of any anticipated delay shall not, by itself, excuse the delay.

## VI. STIPULATED PENALTIES

20. Except as excused by the Force Majeure provision at Section IX, if the City of Bedford fails to attain and maintain the Final Effluent Limits specified in its NPDES permit and to meet any of the other compliance schedule milestones set forth in Section III of the Consent Decree or the plans adopted pursuant thereto, the City shall pay a stipulated civil penalty in the amounts set forth below:

```
PERIOD OF NONCOMPLIANCE      PENALTY PER
DAY OF VIOLATION
  1st day to 30th day
$1000
  30th day to 60th day
$1500
  60th day to 120th day
$2000
  Each day beyond 120 days
$3000
```

21. The City of Bedford shall pay any penalty incurred under this Section by certified or cashier's check, payable to the Treasurer of the United States of America, and tendered to the United States Attorney on the fifteenth (15th) day of the month following the month of violation. The City shall send a copy of the check to U.S. EPA.

22. The stipulated penalties set forth above shall be in addition to, and shall not preclude use of, any other remedies or sanctions available to U.S. EPA by reason of the City's failure to comply with any requirements of this

Consent Decree or any applicable law.

## VII. CIVIL PENALTY

23. The City shall pay the United States, within thirty (30) days after the entry of this Consent Decree, a civil penalty of TWENTY-SEVEN THOUSAND AND FIVE HUNDRED DOLLARS ($27,500) with respect to the United States' civil claims for the City's violation of the Act and its NPDES Permit as set forth in the Complaint filed herein. The City shall pay this civil penalty by cashier's or certified check, payable to the Treasurer of the United States of America, and shall tender the payment to the United States Attorney for the Northern District of Ohio. The City shall send a copy of the check to U.S. EPA.

## VIII. NOTICE OF DELAY

24. If any event occurs that causes or may cause a delay in achieving any compliance deadline set forth in this Consent Decree, the City shall notify the Court, the United States Attorney, and the U.S. EPA in writing within five (5) days of the date on which the City first knew, or should have known by exercise of due diligence, of such event. The notice shall describe in detail the anticipated length of the delay, the precise cause or causes of the delay, the measures taken or to be taken by the City to prevent or minimize the delay and the timetable by which those measures will be implemented. The City shall adopt all reasonable measures to avoid or minimize any such delay.

## IX. FORCE MAJEURE

25. If the parties agree that any violations of this Consent Decree occur because of circumstances entirely beyond the control of the City, the City shall be excused as to that violation for the period of time the violation continues due to such circumstances. The City's time for performance for that event shall be extended for a period not exceeding the delay actually resulting from such circumstances.

*7 26. In the event the parties cannot agree that any violations of this Consent Decree occur because of circumstances entirely beyond the control of the City, any party may submit the matter to this Court for resolution. The burden of proving that any delay was caused by circumstances entirely beyond the control of the City and the length of such delay shall rest with the City. Failure by the City to comply with the notice requirements at Section VIII shall render this Section void and of no force and effect as to the particular incident involved, and constitutes a waiver of the City's right under this provision to obtain an extension of its obligation based on that incident.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



27. Unanticipated or increased costs associated with the implementation of this Decree or changed financial conditions do not constitute circumstances entirely beyond the control of the City.

28. Compliance with any requirement of this Consent Decree by itself, shall not constitute compliance with any other requirement. An extension of one compliance date based on a particular incident does not result in an extension of a subsequent compliance date or dates. The City must make an individual showing of proof regarding each delayed incremental step or other requirement of which an extension is sought.

29. Plaintiff reserves any and all legal and equitable remedies available to enforce the provisions of the Consent Decree and Law.

### X. *RIGHT OF ENTRY*

30. Consistent and in accordance with rights of entry under Federal, State and Local law, regulations, or permits, the U.S. EPA and its contractors and consultants, and attorneys for the United States have authority to enter any facility covered by this Consent Decree, upon proper presentation of credentials, for the purpose of:

a. Monitoring the progress of activities required by this Consent Decree;

b. Verifying any data or information submitted to U.S. EPA in accordance with the terms of this Consent Decree; and

c. Obtaining samples and, upon request, splits of any samples taken by the City or its consultants.

31. This provision in no way limits or otherwise affects any rights of entry held by the Plaintiff pursuant to applicable Federal or State laws, regulations or permits.

### XI. *PERMIT OBLIGATIONS*

32. This Consent Decree is not and shall not be interpreted to be a permit, or a modification or renewal of any existing permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. Nothing in this Consent Decree shall in any way relieve the City of its obligation to obtain and comply with the requirements of an NPDES permit for the Plant or with any other Federal or State law or regulation. The City shall comply with any new permits or modifications of existing permits in accordance with applicable Federal and State laws and regulations.

### XII. *NON-WAIVER PROVISIONS*

33. The United States does not waive any rights or remedies available to it, for the violation by the City of Bedford of any Federal or State laws, regulations, or permit conditions that follow completion of the requirements of this Consent Decree. The City does not waive any rights, defenses, or remedies.

*8 34. The parties agree that it is the responsibility of the City to achieve and maintain complete compliance with all applicable Federal and State laws, regulations and permits, and that compliance with this Consent Decree shall be no defense to any actions commenced to said laws, regulations or permits.

35. This Consent Decree does not limit or affect the rights of the City or of the United States as against any third parties, nor the rights of third parties, not parties to this Consent Decree, against each or all of the defendants.

### XII. *COSTS OF SUIT*
36. Each party shall bear its own costs and attorneys fees in this action.

### XIV. *PUBLIC COMMENT*

37. The parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the requirements of 28 C.F.R. § 50.7, which provides for notice and an opportunity for public comment.

### XV. *SEVERABILITY*

38. The provisions of this Consent Decree shall be severable, and should any provision be declared by a court of competent jurisdiction to be inconsistent with Federal law, and therefore unenforceable, the remaining provisions of this Consent Decree shall remain in full force and effect.

### XVI. *LIABILITY OF THE STATE OF OHIO*

39. The State of Ohio is a Party hereto solely pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e). The United States has not alleged any affirmative act by the State of Ohio that violates the Clean Water Act, or any law of Ohio that prevents the City of Bedford from raising revenues needed to comply with this consent judgment. The State of Ohio shall have no liability under this Consent Decree except as required by Section 309(e) of the Clean Water Act in the event that the laws of the State of Ohio prevent the City of Bedford from raising revenues needed to comply with this Consent Decree. The Attorney General of the State of Ohio hereby certifies that the present laws of the State of Ohio do not prevent the City of Bedford from raising revenues needed pursuant to this Consent Decree. The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1989 WL 158020                                                                                          Page 7
(Cite as: 1989 WL 158020 (N.D.Ohio))

United States is presently unaware of any information that would contradict this certification.

### XVII. *MODIFICATIONS*

40. No requirement or provision of this Consent Decree shall be modified for any reason except upon written order of this Court, entered after notice to the parties and an opportunity for the parties to be heard. No provisions of this Consent Decree shall be modified orally or altered in any way by the performance or conduct or the parties.

### XVIII. *CONTINUING JURISDICTION OF THE COURT*

41. The Court shall retain jurisdiction to enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree.

### XIX. *ADDRESSES*

42. The following addresses shall be used for all notifications, reports, and payments required to be made pursuant to this Consent Decree:

*9 a. United States Attorney

Northern District of Ohio

1404 E. Ninth Street--Suite 500

Cleveland, Ohio 44114

b. United States Environmental Protection Agency

Region V

Branch Chief, Water Division

Water Quality Branch (5WQC-TUB-8)

230 South Dearborn Street

Chicago, Illinois 60604

*AND*

Office of Regional Counsel (5CA-TUB-3)

Branch Chief, Air, Water, Toxics and General Law Branch

230 South Dearborn Street

Chicago, Illinois 60604

### XX. *TERMINATION*

43. The obligations of this Consent Decree shall terminate, upon motion by either party, when the City of Bedford has completed all improvements required by this Consent Decree, has achieved and maintained compliance with final effluent limitations contained in the Permit for a one year period, and has paid all penalties hereunder.

For Plaintiff--UNITED STATES OF AMERICA:

by Donald A. Carr

Acting Assistant Attorney General

Land and Natural Resources Division

U.S. Department of Justice

by William J. Edwards

Acting United States Attorney

Northern District of Ohio

by Edward E. Reich, Acting .Assistant Administrator for Enforcement and Compliance Monitoring, U.S. Environmental Protection Agency

by VALDAS V. ADAMKUS, Regional Administrator, Region V, U.S. Environmental Protection Agency

by STEVEN J. WILLEY, Attorney, Environmental Enforcement Section, Land and Natural Resources Division, U.S. Department of Justice

by SANDRA M. LEE, Attorney, Region V, U.S. Environmental Protection Agency

For Defendant--CITY OF BEDFORD by Arthur V. Dickard, Manager, City of Bedford, Ohio

For Defendant--THE STATE OF OHIO

ANTHONEY J. CELEBREZZE, JR.

ATTORNEY GENERAL OF OHIO

by Margaret A. Malone, Assistant Attorney General

1989 WL 158020, 1989 WL 158020 (N.D.Ohio)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

LEXSEE 2001 US DIST LEXIS 522

**OTIS KURTIS BISHOP & RICKY LEE JARRETT, Plaintiffs, vs. THE WATER WORKS AND SANITARY SEWER BOARD OF THE CITY OF MONTGOMERY, Defendant.**

**CIVIL ACTION NO. 00-A-527-N**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

*2001 U.S. Dist. LEXIS 522; 51 ERC (BNA) 2201*

**January 16, 2001, Decided**
**January 16, 2001, Filed**

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment (Doc. # 12) on the ground that the Plaintiffs' claims are statutorily barred DENIED. Defendant's Request for Oral Argument (Doc. # 25) DENIED.

**LexisNexis (TM) HEADNOTES– Core Concepts:**

**COUNSEL:** For OTIS KURTIS BISHOP, RICKY LEE JARRETT, plaintiffs: G. Keith Clark, Clark & Nelms, Montgomery, AL.

For THE WATER WORKS AND SANITARY SEWER BOARD OF THE CITY OF MONTGOMERY, defendant: Robert E. Sasser, Tamara A. Stidham, Sirote & Permutt, P.C., Montgomery, AL.

ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, amicus: Olivia H. Jenkins, Harry A. Lyles, Alabama Department of Environmental Management, Montgomery, AL.

UNITED STATES OF AMERICA, amicus: Lois J. Schiffer, Asst. Attorney Gen., Environmental & Natural Resources Div., Washington, DC.

THE ASSOCIATION OF METROPOLITAN SEWERAGE AGENCIES, amicus: William G. Kelly, Kelly & Weaver, Washington, DC.

ALABAMA WATER AND WASTEWATER INSTITUTE, amicus: Donald R. Jones, Jr., Montgomery, AL.

**JUDGES:** W. HAROLD ALBRITTON, CHIEF UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** W. HAROLD ALBRITTON

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by the Defendant, the Water [*2] Works and Sanitary Sewer Board of the City of Montgomery, ("the Board") on August 8, 2000 (Doc. # 12).

The Plaintiffs originally filed their Complaint in this case on April 26, 2000. The Plaintiffs filed an Amended Complaint on August 21, 2000, with leave of court. The Plaintiffs bring two counts against the Board, alleging that the Board has discharged pollutants into a creek in violation of its discharge permit.

The Board and the Plaintiffs have separately moved for summary judgment on the Plaintiffs' claim in Count II. This Memorandum Opinion only addresses the summary judgment motion filed by the Board asserting that the Plaintiffs' claims in this court are statutorily barred. The remaining summary judgment motions will be discussed in a separate Memorandum Opinion and Order to be entered at a later date.

The parties have filed a total of five briefs discussing the issues raised in the Board's Motion for Summary Judgment. These briefs have thoroughly addressed the issues of law and discussed the facts of this case. The court concludes, therefore, that oral argument on this motion is unnecessary and that the Defendant's request for oral argument on this motion is due to be DENIED. [*3]

For reasons to be discussed, upon consideration of all of the briefs filed relative to this Motion for Summary Judgment, the Motion for Summary Judgment is due to be DENIED.

**II. SUMMARY JUDGMENT STANDARD**

Under *Rule 56(c) of the Federal Rules of Civil*

2001 U.S. Dist. LEXIS 522, *3; 51 ERC (BNA) 2201

*Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id. at 323.* The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, **[*4]** the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. See *id. at 322–324.*

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id. at 324.* To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party **[*5]** is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

## III. FACTS

The submissions of the parties establish the following facts, viewed in a light most favorable to the non–movant:

The Plaintiffs, Otis Curtis Bishop and Ricky Lee Jarrett (collectively "the Plaintiffs") are residents of Pike Road, Alabama, who live on or near Miller Creek. The Plaintiffs have provided affidavits wherein they state that they fish and otherwise recreate in or around Miller Creek and its tributaries.

In July of 1999, the Board took over ownership of the Pike Road Waste Water Treatment Plant ("Plant")

through eminent domain. The previous owner of the Plant held a National Pollutant Discharge Elimination System ("NPDES") permit to discharge into Miller Creek.

In July of 1999, the Alabama Department of Environmental Management ("ADEM") issued a Consent Order in which it stated that the Board recently assumed title and operation of the wastewater treatment and collection system at Pike Road and did not have sufficient knowledge of its condition. The Consent Order says that the Board and ADEM agreed to the terms of the Consent Order. The Consent Order requires that immediately after **[*6]** the date of execution of the Consent Order, the Board shall comply with all of the monitoring and reporting provision of the NPDES permit then in effect, to the extent that those requirements were not inconsistent with the Consent Order. The Consent Order also sets forth deadlines by which the Board is required to submit an engineering report which investigates the need for changes in maintenance and procedure. The Consent Order further requires a report to be made by a certain deadline and provides that the Board shall substantially complete modification of the existing treatment facility and sanitary sewer collection system as outlined in the study and report to ensure compliance with discharge limitations in the NPDES permit no later than 3 years following completion and submittal of the reports. Under the Consent Order, the Board shall comply with the discharge limitations in the NPDES permit no later than 3 years following the completing of the reports. According to the Consent Order, it is a full resolution of the past violations and other matters which are cited in the Order.

ADEM subsequently issued a new NPDES permit to the Board for its operation of the Plant. The NPDES **[*7]** permit places minimum, maximum, and/or average limitations on the discharge of certain pollutants including pH, total residual chlorine ("TRC"), dissolved oxygen ("DO"), fecal coliform ("FC"), carbonaceous biological oxygen demand ("CBOD"), total suspended solids ("TSS"), and ammonia as nitrogen ("NH3-N"). The permit also requires the Board to monitor each of these pollutants by taking samples and analyzing these samples three times per week. The old and new NPDES permit numbers are the same because the point of discharge did not change.

The Plaintiffs maintain that there have been illegal discharges of pollutants by the Board which have adversely impacted Miller Creek and the Plaintiffs. The Plaintiffs further maintain that ADEM has and is not diligently prosecuting those violations.

The Defendant, on the other hand, claims that the Plaintiffs' claims are statutorily barred in this court because ADEM is diligently prosecuting the same alleged violations identified by the Plaintiffs through the Consent

2001 U.S. Dist. LEXIS 522, *7; 51 ERC (BNA) 2201

Order.

## IV. DISCUSSION

The Plaintiffs have brought a citizen suit under § 505(a) of the Federal Water Pollution Control Act ("FWPCA"), *33 U.S.C. § 1365* [*8] (a). Under the Clean Water Act ("CWA") and its amendments in the FWPCA, it is unlawful to discharge any pollutant into navigable waters except as authorized. See *33 U.S.C. § 1311*(a). Discharge can be authorized by a National Pollutant Discharge Elimination System ("NPDES") permit. See *33 U.S.C. § 1342.* The Plaintiffs contend that the Board has discharged pollutants into Miller Creek in violation of its NPDES permits.

The Board argues that the Plaintiffs' citizen suit is barred under *33 U.S.C. § 1319*(g)(6) because ADEM is diligently prosecuting an action under comparable state law by virtue of the Consent Order entered by ADEM and agreed to by the Board. The Plaintiffs argue in response that the statutory provision barring citizen suits does not apply in this case because the Consent Order does not apply to past or future violations, that the Consent Order does not bar their suit because it does not assess penalties, that the Consent Order was not issued pursuant to comparable state law, and that ADEM has not prosecuted violations of the NPDES permits in a diligent manner. The issue presented by this Motion [*9] for Summary Judgment, therefore, is whether the Consent Order entered in this case is sufficient to bar the Plaintiffs' suit under the terms of *33 U.S.C. § 1319*(g)(6).

It is axiomatic that the starting point for interpreting a statute is the language of the statute itself. See *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 98 L. Ed. 2d 306, 108 S. Ct. 376 (1987).* Under the FWPCA:

> any violation
> * * *
>
> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or
> (iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be, shall not be the subject of a civil penalty action under subsection (d) of this section or subsection 1321 (b) of this title or section 1365 of this title.

*33 U.S.C. § 1319*(g)(6)(A)(ii),(iii).

Under this statute, diligent prosecutions and final orders assessing penalties are events which bar subsequently [*10] filed citizen suits. Courts have differed, however, on defining a "diligent prosecution." Some courts have said that a final order issued by the agency, which does not assess penalties, can bar citizen suits. See *North and South Rivers Watershed Assoc., Inc. v. Town of Scituate, 949 F.2d 552 (1st Cir. 1992).* This is a broad view of the citizen suit bar provision which is based largely on policy. The logic behind this approach is that states should have the discretion in selecting the specific mechanism of their enforcement program. See *id. 558.* Under the more narrow view of the statutory bar, courts determine that the state's action must be taken under the specific provision of state law that allows for administrative penalties. See *Citizens for a Better Environment–California v. Union Oil Co. of Cal., 83 F.3d 1111 (9th Cir. 1996).* The reasoning of these courts is that the most persuasive evidence of congressional intent is the words used in the statute, not a court's sense of the general role of citizen suits in the enforcement of the act. See *Friends of Santa Fe County v. LAC Minerals, Inc., 892 F. Supp. 1333 (D. N.M. 1995).* [*11]

The Plaintiffs in this case argue that the broad view of the statute which bars citizen suits is not only contrary to the plain language of the statute and the legislative history, it also does violence to the language of the statute because it renders the division between the two types of actions meaningless. The Plaintiffs argue that the Consent Order in this case does not fall within part (iii), because part (iii) bars citizen suits when there are final orders which assess penalties and the penalty has been paid, and that the Consent Order cannot fall within part (ii) because it is a final order, not an ongoing prosecution. The Plaintiffs state that if the Consent Order is covered under part (ii), any final order of the agency would bar a citizen suit, so (iii) is rendered superfluous.  .

The court can conceive of at least one reason why part (ii) and (iii) are separated even though part (ii) can include administrative orders. Part (iii) is a per se rule that bars citizen suits if a penalty has been assessed and paid. Part (ii) involves a further inquiry into the nature of the state law under which the action is proceeding and into the diligence of the prosecution. It is reasonable, [*12] therefore, to read part (ii) as applying to orders which do not assess penalties because part (ii) only applies if the additional considerations are met.

There are courts which have considered compliance orders issued by agencies to be diligent prosecutions. See e.g., *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 682 F. Supp. 1186 (N.D. Ala. 1988).* In such cases,

2001 U.S. Dist. LEXIS 522, *12; 51 ERC (BNA) 2201

there is an ongoing monitoring of the violator's compliance with the terms of the order. See *id. at 1188.* It is apparently the ongoing nature of such actions which brings them within the definition of an action which the state is "prosecuting." The question of whether a consent order can constitute a diligent prosecution can only be answered, however, by also examining the question of whether an order which does not assess penalties can be considered to be an action under state law comparable to the administrative penalties provision under the FWPCA.

The statutory provision, as set out above, provides that citizen suits are barred when the state is prosecuting an action under state law comparable to the administrative penalties section in the FWPCA. See *33 U.S.C. § 1319* [*13] (g)(6)(A)(ii). While this language indicates that a civil penalty must have been available as an enforcement tool, an issue arises when one considers that a state could commence an action for penalties, but ultimately enter into a settlement with the violator. Under the narrow view of the citizen suit bar, even though a burden is imposed on the violator as a result of such a settlement, a plaintiff could still bring a suit as long as the burden was not a technical imposition of a penalty.

Courts, including the United States District Court for the Northern District of Alabama, in a decision provided to the court by the Plaintiffs, have concluded that it is unreasonable to find that a state agency's prosecution is not diligent merely because a compromise was reached and the agency could be considered to have prevailed in some fashion. See *Franklin v. Birmingham Hide & Tallow Co., Inc., 1999 U.S. Dist. LEXIS 22489,* CV 98–BU–0259–S (N.D. Ala. April 22, 1999); see also *Arkansas Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376, 380 (8th Cir. 1994).* Such a situation would also run afoul of an example given by the United States Supreme Court in deciding another issue under the CWA and FWPCA. See [*14] *Gwaltney, 484 U.S. at 66.*

In Gwaltney, the Supreme Court held that a citizen may not bring a citizen suit based wholly on past violations of the Water Act. See id. In reaching this conclusion, the Court offered the following example:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to

seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of the state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

See *id. at 66.* [*15]

The First Circuit has relied on this reasoning by the Court in determining that the statutory requirements for the citizen's suit bar are still met even if no penalties are assessed. See *Scituate, 949 F.2d at 556.* The court explained that an interpretation of the statute which would allow a citizen suit when government action to correct a violation does not require a financial penalty would change the role from "interstitial to potentially intrusive." Id. The court also held that if the state law would have allowed for assessment of penalties, but the state chose not to assess penalties, then an order issued under other authority of the state is still issued under comparable state law because the state could have issued penalties. See id. The court reasoned that the penalties provision and the provision allowing for compliance orders are part of the same enforcement mechanism. See id.

Title Board argues that this court should adopt a similar interpretation, relying in part on *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 682 F. Supp. 1186 (N.D. Ala. 1988).* In Atlantic States, the court found that *Alabama Code § 22–22A–5(18)* [*16] is law comparable to the federal administrative penalties section. See *id. at 1187.* The court also determined that an administrative order which required the defendant to begin construction of facilities constituted an action under that code provision. See id.

The court finds that the Supreme Court's analysis of congressional intent indicates that the Supreme Court would find that a reading of the statute to require an imposition of civil penalties would be inconsistent with congressional intent. The Supreme Court explained that the bar on citizen suits when governmental action is under way suggests that the citizen suit is meant to supplement rather than to supplant government action. *Gwaltney, 484 U.S. at 60.* In light of Gwaltney, this court must conclude that the narrow view of the citizen suit bar, which requires an imposition of penalties before an agency action can be considered to be a prosecution under comparable state law, is an unreasonable interpretation of the statute. The

2001 U.S. Dist. LEXIS 522, *16; 51 ERC (BNA) 2201

reasonable interpretation is that a consent order which does not assess penalties may constitute a prosecution under state law comparable to the FWPCA administrative **[*17]** penalty provision. See *Scituate, 949 F.2d at 556.*

In addition, interpreting the citizen suit bar provision to apply even in the absence of the imposition of penalties has been identified as being more consistent with the way in which an agency functions than the narrow view of the citizen bar. See Ross Macfarlane and Lori Terry, *Citizen Suits: Impacts on Permitting and Agency Enforcement, 11 Nat. Resources & Env't 20 (Spring 1997)*(stating that the EPA often settles its cases instead of using penalties in resolving administrative enforcement actions so that a state agency should be able to do the same and still fall within the comparable state law and penalty requirements of the diligent prosecution defense). This court, therefore, following Gwaltney, Scituate, and their progeny, concludes that the citizen bar of the FWPCA can apply when there is a consent order, even if the state has not assessed a penalty.

Simply because the court adopts the broader view of the citizen bar provision does not, however, necessarily mean that the Plaintiffs' claims are barred in this case. Gwaltney does not foreclose the possibility that the remedy the Administrator, **[*18]** or state, chose to impose rather than a civil penalty could be inadequate to bar a citizen suit. The example given by the Court in Gwaltney referred to the Administrator taking an "extreme corrective action, such as to install particularly effective but expensive machinery, that [the violator] otherwise would not be obliged to take." *Gwaltney, 484 U.S. at 59.* This identification of the type of action required to be taken goes to the question of whether the state's prosecution of a violation is "diligent" under the statute.

In conducting an inquiry into the "diligence" of agency action, the court must bear in mind that there is a presumption of agency diligence which the Plaintiffs must overcome. See e.g., *Glazer v. American Ecology Envtl. Servs. Corp., 894 F. Supp. 1029, 1036 (E.D. Tex. 1995).*

Another district court has thoroughly examined the cases addressing the issue of diligent prosecution. See *Citizens Legal Envtl. Action Network, Inc. v. Premium Standard Farms, Inc., 2000 U.S. Dist. LEXIS 1990, 2000 WL 220464*, No. 97-6073-CV-SJ-6 (W.D. Mo. Feb. 23, 2000). The Citizens Legal Environmental Action Network court determined that the presumption of **[*19]** diligence arises from policy considerations including deference to state enforcement authority, protection of litigant's interest in finality, preservation of the incentive to settle with state or federal authorities, and recognition of the limited

role of citizen suits. See id. at *12 (collecting cases). A citizen's mere unhappiness with an enforcement action or the terms of a settlement does not authorize a separate lawsuit, "but neither are prosecutions ipso facto 'diligent.'" Id. In fact, courts are willing to review the agency's actions for diligence, even when the actions are a result of an agreement. See Franklin, Slip. Op. at page 11 (stating that just because a penalty amount was reached through a settlement does not mean that ADEM's actions are immune from an examination of whether they are diligent).

There are several indicia of diligence to which courts have looked in determining whether prosecution is diligent. These indicia, or factors, include whether the government required or sought compliance with the specific standard, limit, or order invoked by the citizen suit; whether the government was monitoring the polluter's activities or otherwise enforcing the **[*20]** permits at issue after settlement with the polluter and up to the time of the citizen suit; the possibility that the citizen-alleged violations will continue notwithstanding the polluter's settlement with the government; and the severity of any penalties compared to the economic benefits in not complying with the law or with the penalties imposed for similar violations in the state. See *Citizens Legal Envtl. Action Network, 2000 U.S. Dist. LEXIS 1990, 2000 WL 220464 at *13.* The court finds this multi-factor approach to be a useful way of analyzing a state's action to evaluate diligence of the prosecution.

In this case, one of the Plaintiffs' primary contentions is that the Consent Order did not require or seek compliance with the violations which are identified in the citizen suit. The Plaintiffs argue that the Consent Order does not apply to past or future violations. The Board argues in response that the Consent Order applies to future violations because it sets forth a number of steps which must be met to ensure that the Plant is in compliance with its NPDES permit within 3 years, and because the Consent Order provides for stipulated penalties if the Board fails to meet any of the requirements, **[*21]** and provides for future action as may be appropriate. It appears from the language of the Consent Order, however, that it only provides for set penalties for violations of the deadlines in the Consent Order itself, although it does provide for monitoring of NPDES permit discharges. See Consent Order, paragraph K.

As to past violations, the Consent Order purports to apply to "the past violations and other matters which are cited in this Order." n1 The Plaintiffs point out that no violations are identified in the Consent Order. The Board maintains that "other matters" refers to the strict schedule intended to bring about compliance within three years following the submittal of required reports to ADEM,

2001 U.S. Dist. LEXIS 522, *21; 51 ERC (BNA) 2201

and that "cited in this Order" is not intended to modify "past violations," but only to modify "other matters." The Plaintiffs argue that such a reading of the provision renders "past violations" meaningless, because the phrase is "the past violations" which makes no sense without a further qualification.

n1 The Consent Order at issue provides, in part, as follows:

> M. Subject to the terms of these presents and subject to provisions otherwise provided by statute, this Consent Order is intended to operate as a full resolution of the past violations and other matters which are cited in this Order.
> * * *
> Q. This Order does not preclude the Department from taking other enforcement actions based on these facts regarding violations of other regulatory programs. Should additional facts and circumstances be discovered in the future concerning the MWWSSB, which would constitute possible violations not addressed in this Order, or if the violations noted herein continue, then such future violations shall be addressed in Orders as may be issued by the Department, litigation initiated by the Department, or other such enforcement action as may be appropriate . . .

[*22]

The court agrees with the Plaintiffs that the Board's reading of "the past violations and other matters cited in this Order" is somewhat tortuous. If the court were to adopt the Board's interpretation, the Consent Order would be referring to unspecified past violations and to "other matters" cited in the Order. Therefore, the Consent Order would purport to apply to past violations, whatever they may be. The question before this court, then, is whether the language used in the Consent Order is sufficient as a matter of law to encompass the violations which form the basis of the Plaintiffs' citizen suit.

The cases to which the Plaintiffs have cited this court which have concluded that consent orders were insufficient to establish that the state was prosecuting an action as to the same violations identified by the plaintiff included very broad language. In *Citizens Legal Envtl. Action Network, Inc. v. Premium Standard Farms, Inc.,*

*2000 U.S. Dist. LEXIS 1990, 2000 WL 220464,* No. 97-6073-CV-SJ-6 (W.D. Mo. Feb. 23, 2000), the court determined that the language in the consent judgment's general release of all claims that "could arise out of facts known to the State" at the time of execution of the [*23] consent judgment did not establish that there was diligent prosecution because it was just a broad release, not an indication of any prosecution. The court reasoned that the order only released the violator from legal obligations that the state's action never sought to enforce. See See id. at *13. In *Glazer v. American Ecology Environmental Services Corporation, 894 F. Supp. 1029 (E.D. Tex. 1995),* language that a final judgment "resolves all matters arising out of facts alleged or which could have been alleged . . . as well as all other known matters that could have been alleged or asserted" was not sufficient to show that the state had commenced particular actions. In the case relied upon by the Board, although the order, which is cited in a footnote, contained language which included the release of any future prosecution "on account of the violations which led to the entry of this Order," the court did not address the scope of the consent orders. See *New York Coastal Fishermen's Assoc. v. New York City Dep't of Sanitation, 772 F. Supp. 162, 165 n.8 (S.D. N.Y. 1991).* Therefore, the case cited by the Board does not provide any persuasive analysis [*24] on this question.

In this case, although the language used is not as broad as the language in the cases relied on by the Plaintiffs, and, in fact purports to be specific, referring to violations cited in the order, because no violations are identified in the Consent Order, the effect of the Order is to purport to cover, and release, any violations which could have occurred. Under the cases discussed above, such broad language fails to adequately identify and therefore fails to cover and release the violations which form the basis of the Plaintiffs' suit. Accordingly, the factor of the Consent Order addressing the violations identified by the Plaintiffs in their Amended Complaint militates against a finding of diligent prosecution.

As to the factor of the severity of the burden which was imposed, the court does not have any evidence before it to compare any economic benefit or penalties assessed in other cases. One difference between this case and the example given in Gwaltney, or the facts of Scituate and cases following it relevant to the severity of the penalty, however, is that no extraordinary expenditure of money will necessarily be required of the Board in this case. [*25] The Consent Order provides in paragraph D that the Board is required to submit an engineering report which "investigates the need for changes in maintenance and operating procedures." Although the Consent Order goes on to provide for time limits by which changes must be completed, the Consent Order leaves open the possibility that upon

investigation, no changes will be required. This is especially true given that in paragraph A, the Consent Order imposes the obligation upon the Board to comply with the NPDES permit. The court agrees with the Plaintiffs that paragraph A appears to indicate that ADEM thought that the NPDES limits could be met. On the other hand, if the NPDES limits could not be met at the time of the Consent Order, then the Consent Order allows the Board to violate the terms of paragraph A, and the NPDES permit, until modifications are made, which would not constitute a diligent prosecution.

In addition, even though the Consent Order indicates that whatever modifications to the facility are recommended will have to be implemented, there is no evidence before the court to indicate that any required modifications would rise to the level of a burden placed upon the Board [*26] which courts have been willing to recognize as taking the place of an administrative penalty. The only evidence of the cost to the Board of the requirements of the Consent Order is an affidavit stating that the Board has spent $250,000 to comply with the Consent Order. See Thompson Affidavit. The court cannot conclude from this evidence that this expenditure is an "extreme corrective action" as identified in the Gwaltney example, or as significant a burden as the expenditure of close to one million dollars in Scituate. See *Scituate, 949 F.2d at 557;* see also *Arkansas Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376 (8th Cir. 1994)*(diligent prosecution where several $500 penalties were assessed and half a million dollars was spent making technological changes). Accordingly, this factor also weighs against a finding of diligent prosecution.

The Board argues that the administrative Consent Order sets forth a time frame for construction of facilities sufficient to bring the plant into compliance with the terms of the permit and leaves open the prospect of civil penalties and other appropriate relief, and so is diligent prosecution. The Board [*27] also points out that there is a schedule of set penalties for failure to comply with "milestones" or any requirement date. See Consent Order, paragraph K. The Board argues that ADEM decided, in its discretion, that a Consent Order requiring the Board to investigate, evaluate, and if necessary upgrade the Plant was more prudent than penalties.

The Plaintiffs point out that the set penalties provided for in the Consent Order are for failure to meet any of the milestone dates set forth or established in the Consent Order. See id. The Consent Order also provides, however, that if there are violations not addressed in the order or if violations "noted herein" continue, then such future violations shall be addressed in future enforcement actions. See id. at paragraph Q. While this provision does not es-

tablish that the Consent Order itself is a prosecution of such violations, it does indicate that future violations will be monitored. The Board has also pointed out that notices of violations have been issued to the Board, and states that these notices are evidence of enforcement of the Consent Order, although the Plaintiffs argue that notices of violation are not prosecutions [*28] of violations.

The indicia of diligence of prosecution which has been identified by courts is whether the government was monitoring the polluter's activities or otherwise enforcing the permits at issue after settlement with the polluter and up to the time of the citizen suit. See *Citizens Legal Environmental Action Network, 2000 U.S. Dist. LEXIS 1990, 2000 WL 220464* at *13. While there is no evidence of enforcement of violations by ADEM as against the Board, there is evidence through notices of violations that violations are being monitored. Accordingly, this indicator, or factor, weighs in favor of a finding of diligent prosecution.

The Plaintiffs have advanced an argument as to why ADEM's prosecution is not diligent that goes to the propriety of ADEM's decision not to assess a penalty. The Plaintiffs argue that ADEM's decision not to assess penalties can only be considered to be diligent if the relevant penalty factors were properly considered. The Plaintiffs argue that because the Consent Order never identified any violations, ADEM did not consider the penalty factors. The Plaintiffs also state that there is evidence that ADEM did not consider the penalty factors in deciding not to assess [*29] any penalties since ADEM entered into the Consent Order before it received any monitoring reports from the Board's operation of the plant.

The Board disputes the Plaintiffs' arguments on a factual basis. The Board states that there is evidence that ADEM considered the penalty factors because ADEM had available to it the monitoring reports of the previous owner. According to the Board, ADEM considered the penalty factors in entering a Consent Order with regard to the Board by considering the violations committed by the previous owner.

While it may be that the performance of the previous owner would be a relevant consideration to ADEM, the Consent Order was purporting to resolve the violations of the Board. Because this Consent Order was entered before receiving reports of the extent to which violations occurred under the Board's ownership, there could have been no consideration of the Board's own violations. Accordingly, the court finds that even if ADEM considered the penalty factors based on violations by the previous owner, deciding not to impose a penalty on the Board based on any violations which occurred while it owned the plant based on the acts of the prior owner does not

2001 U.S. Dist. LEXIS 522, *30; 51 ERC (BNA) 2201

[*30] weigh in favor of a finding of diligent prosecution.

The Plaintiffs also argue that the Consent Order is not diligent because it extends the effective date of the subsequently issued permit without acknowledging that extension in the NPDES permit. The Board states that the Consent Order does not extend the effective date of the permit.

The court has carefully considered the terms of the Consent Order. In paragraph M, the Consent Order states that immediately after the date of execution of the Order, the Board shall comply with all the monitoring and reporting provisions of the NPDES permit, and all other limitations, terms, and conditions of the NPDES permit which are not consistent with the Consent Order. As stated above, in paragraph D, the Board is required to, within 180 days of the Consent Order, submit an engineering report which investigates the need for changes in maintenance and operating procedures. In paragraph H, the Board is required to complete the modification of the existing facility and sanitary sewer collection system to ensure compliance with the discharge limitations contained in the NPDES permit no later than three years following the completion and submittal [*31] of the reports required by the Consent Order. Finally, in paragraph 1, the Consent Order states that no later than three years following completing and submittal of the engineering reports, the Board shall comply with all discharge limitations contained in the NPDES permit.

Under the plain language of this Consent Order, the Board is required to meet the NPDES standards in effect at the time of the Consent Order, except to the extent that those requirements are inconsistent with the Consent Order. See Consent Order, paragraph A. The Consent Order, however, gives a three year time period for the Board to comply with the permit. The court agrees with the Plaintiffs that under this reading of the Consent Decree, even though the Consent Order required the NPDES permit to be met immediately, and the subsequently issued NPDES permit also had an immediate effective date, under the Consent Decree, ADEM had essentially agreed not to enforce the NPDES permit as to the Board for three years. While the Board has pointed out that notices of violations have been issued, there has been no enforcement action taken as to those violations. The court must conclude, therefore, that the Consent Order, [*32] after stating that the NPDES limits must be met as of the date of the Order, whether by technical amendment of the NPDES permit itself, or as a matter of contract in the Consent Order, gives the Board three years from the date of its required reports to meet the same NPDES limits.

Another district court in this circuit has examined the effect that extensions of a compliance date has on the applicability of the citizen suit bar provision. See Culbertson v. Coats American, Inc., 913 F. Supp. 1572 (N.D. Ga. 1995). In Culbertson, a permit was issued, but the state agency issued an administrative order extending the compliance date and which required the violator to have an independent consultant conduct a study and give proposals for any necessary upgrades of the facilities. The state agency issued additional orders which revised interim scheduling dates and extended the final compliance date. The violator then sought to preclude a citizen suit under the FWPCA citizen suit bar. In analyzing the citizen suit bar, the Culbertson court first acknowledged the Supreme Court's statement that citizen suits are intended to supplement, rather that to supplant governmental [*33] action. See id. at 1578. The court, relying on cases such as Scituate, explained that courts defer to administrative action where the preclusive administrative action involves the imposition of penalties or other burdens on the violator. See id. at 1579. The court then determined that although the state agency in that case had taken action relating to the defendant's violations of effluent limitations in two permits, those actions fundamentally consisted of a series of extensions of compliance deadlines. See id. The court concluded, therefore, that the state agency had not diligently prosecuted an action and the plaintiff's suit was not barred. See id. n2

> n2 This court recognizes that similar analysis was rejected by the district court in Atlantic States. See Atlantic States, 682 F. Supp. at 1188. There, the court rejected the idea that the state agency's actions amounted only to extensions of the compliance deadlines. See id. The difference in that case, however, was that the administrative order also required the violator to construct a wastewater treatment facility and the violator had expended $1.8 million in making the required modifications in its facilities. See id.

[*34]

In this case, although the Consent Order does acknowledge that there will be future monitoring, and there is some evidence of such monitoring, the court cannot conclude that the Consent Order constitutes diligent prosecution in the absence of the imposition of a penalty or some other extreme corrective action, especially since the effect of the Consent Order, if no modifications are even required, will only be to give the Board additional time in which to come into compliance with its NPDES permit, even though the Consent Order itself imposes the obligation of compliance at the time of the Consent Order. n3

2001 U.S. Dist. LEXIS 522, *34; 51 ERC (BNA) 2201

n3 The Plaintiffs also argue that the Consent Order cannot constitute diligent prosecution because it extended the compliance date of the NPDES permit without notice and public comment. The court need not resolve the issues implicated by such an argument, however, finding that the ADEM's actions, whether technically a modification of the permit or whether an exercise of prosecutorial discretion by which ADEM contractually agreed not to prosecute the Board for a period of years, see *Citizens for a Better Environment-California v. Union Oil Company of California, 83 F.3d 1111 (9th Cir. 1996),* did not constitute due diligence.

[*35]

The facts which have been presented to the court in this case indicate that ADEM entered a Consent Order purporting to resolve violations of an NPDES permit before it knew the exact nature of any NPDES violations which had been committed by the Board. The Consent Order requires the Board to be in immediate compliance with its NPDES permit, but then goes on to give the Board a period of years in which to come into compliance with a future NPDES permit, which, when it was issued, provided the same limits as the first NPDES permit. In providing for this additional time, the Consent Order requires the Board to have certain studies and reports done to evaluate the necessity of modifications to the facility and to implement such changes. The Consent Order leaves open the possibility, however, that no changes would be made. Under the case law which has developed with regard to when it is appropriate to bar a citizen suit in the face of state agency action, this court concludes that the mere fact that ADEM did not issue a penalty is not dispositive, but that the evidence as to ADEM's actions with regard to the Board's alleged violations of its NPDES permits is sufficient to overcome the presumption [*36] of diligent prosecution by the state agency. Accordingly, the court concludes that the Plaintiffs' claims as asserted in the Amended Complaint filed in this case are not statutorily barred.

## V. CONCLUSION

For the reasons discussed, the court concludes that the Defendant's Motion for Summary Judgment (Doc. # 12) on the ground that the Plaintiffs' claims are statutorily barred is due to be and is hereby ORDERED DENIED. It is further ORDERED that the Defendant's Request for Oral Argument (Doc. # 25) is DENIED.

Done this 16th day of January, 2001.

W. HAROLD ALBRITTON

CHIEF UNITED STATES DISTRICT JUDGE