IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE BOARD OF COUNTY COMMISSIONERS, HAMILTON COUNTY, OHIO, et al.,<br><br>Defendants. | Civil No. C-1-02-107<br><br>Judge S. Arthur Spiegel |
| STATE OF OHIO,<br><br>Plaintiff,<br><br>v.<br><br>THE BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO and THE CITY OF CINCINNATI,<br>Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR ENTRY OF CONSENT DECREES**

**SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(a)(3)**

II.A. Sierra Club is Improperly Applying the Standards and Priorities for Its SSO Citizen Suit to the Governments' Systemwide Enforcement Action and Settlement . . . . . . . . . . . . . . . . . . . p.2

This section stresses that the appropriate standard for reviewing these Decrees, as mandated by the Sixth Circuit, is whether they are fair, reasonable, and consistent with the Clean Water Act, giving deference to the regulators and due respect to the presumption of validity that should be afforded to settlements of this type. Akzo, infra, 949 F.2d at 1426, 435, 436.

Sierra Club attempts to confuse the issues by asserting that this Court must consider the "intertwining of the diligent prosecution issue" as it reviews the Decrees. On the contrary, this Court has appropriately set aside issues concerning Sierra Club's SSO citizen suit until it has ruled on the entry of these Decrees. Moreover, the facts of the "diligent prosecution" cases relied on by Sierra Club bear no resemblance to our situation or the Decrees here. Finally, presumably because the focus of its citizen suit is SSOs, Sierra Club asserts that the SSO violations must be fixed first. This bald assertion is unsupported by law or EPA policy, and would be contrary to the best interest of the public and the environment in this case. Defendants' system experiences not only SSOs, but also CSO and bypassing violations, and, of course, WIB problems. The CSOs surpass the SSOs by far in number and by an order of magnitude in volume and, collectively, have a significantly greater negative environmental impact. Therefore, giving priority to SSO abatement over other equally or more pressing compliance problems would shortchange the public. The Decrees require defendants to develop a system-wide, appropriately prioritized solution to all their violations, and Sierra Club's agenda should not be allowed to supplant the more appropriate comprehensive remedial approach negotiated by the regulators.

II.B. The Decrees Do Not Improperly Apply the CSO Policy to SSOs or WWTPs, and the Decrees Provide for Appropriate End Dates and Schedules. . . . . . . . . . . . . . . . . . . . . . . . . . . p.13

Sierra Club argues that the Decrees improperly apply the CSO Policy to SSOs and bypasses, and that allowing finances or flexibility to be taken into account is "illegal" for SSOs or bypasses. This is simply false. On the contrary, EPA's SSO guidance specifically supports taking a community's finances into account in developing a schedule to address SSOs, including consideration of the same financial indicators set forth in EPA's CSO guidance. Further, the Clean Water Act's "scheme as a whole contemplates the exercise of discretion and balancing of equities." Weinberger, infra, 456 U.S. at 316. Thus, the issue for this Court is whether the schedule approach is reasonable.

As demonstrated in the United States' Memorandum in Support, the "as expeditious as practicable" standard in the Decrees is fully appropriate, enforceable, and consistent with the standards in EPA's CSO and SSO policies – and has been used effectively by the regulators already to shorten deadlines in both of the plans proposed by defendants under the IPCD.

Further, contrary to Sierra Club's assertions, lack of a "fixed" compliance date in a decree is not a fatal flaw. The United States and Ohio have entered into and federal judges in this State have approved consent decrees that contain no compliance date, but rather require the date to be fixed as part of a forthcoming plan. Indeed, Sierra Club itself (with the expert assistance of Dr. Bell) entered into such consent decree in an SSO case against Little Rock, Arkansas. In any event, the deadlines in the Decrees are appropriately fixed. They are "backstopped" by a reasonable deadline (which is fully consistent with recent EPA guidance); must be set sooner if at all possible based on analysis of relevant engineering and financial information; and will be fully

fixed (as required by the CSO Policy and other EPA guidance) upon the regulators' approval of the Plans.

Sierra Club maligns the $1.5 billion threshold for considering a potential schedule extension as a "per se" determination of financial hardship without the requisite analysis. However, this provision merely allows defendants to propose as part of the LTCPU a deadline that is later than 2022 if costs are expected to exceed $1.5 billion. If, as Sierra Club's expert has testified, an SSO or CSO consent decree is fair and approvable that contains no compliance deadline, surely these Decrees can provide defendants the opportunity to attempt to prove their need for a longer schedule if costs are anticipated to be very high. Defendants' proposed schedule is subject to the regulators' approval and will not be approved if an earlier compliance date is practicable – whatever the cost. Further, Sierra Club's assertion that a decree cannot provide such potential flexibility unless the regulators a priori perform the financial analysis required by EPA's Financial Capability Guidance puts the cart before the horse. This Guidance requires careful consideration of the costs of the proposed remedial measures and of a municipality's ability to afford them as part of developing the LTCP schedule, and this is just what the Final Decree requires. When defendants submit their LTCPU and CAPP in June 2006, they will be required to fully support their proposed schedule with financial and engineering analyses, and the regulators at that time will carefully review these plans, as well as anything Sierra Club wishes to submit then concerning defendants' finances or the proposed schedules.

Finally, Sierra Club's hypothetical assertion that all SSOs can be fixed in ten years (and therefore must be) is unsupported by any credible evidence, and again, ignores all other violations. This Court should not allow Sierra Club's narrower interests in its SSO-only citizen

suit to supplant the system-wide remedial approach negotiated by the regulators here. To do so would impermissibly turn Sierra Club's role from "interstitial," as intended by Congress, to "intrusive." Gwaltney, infra, 484 U.S. at 60-61.

II.C. Sierra Club's Various Arguments Concerning the Final Decree's Provisions Related to Water Quality Standards Are Not Compelling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.26

This section refutes Sierra Clubs unfounded argument that the Final Decree permits the illegal lowering of water quality standards. On the contrary, the Final Decree is absolutely consistent with the CSO Policy and subsequent CSO guidance. Any future changes to water quality standards will be governed by applicable law and subject to the normal separate public and legal process. Sierra Club is encouraged to participate in any such future proceedings.

II.D. The Decrees Contain No Illegal Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.29

This section debunks Sierra Club's assertion that the interim remedies provided for SSO 700 and bypassing at Sycamore are "illegal." Although these state-of-the-art wet weather treatment systems may not be acceptable as the final remedies for these violations. However, they are perfectly legal and appropriate as interim measures to protect public health and will go far toward eliminating any environmental harm while the final measures, which must comply with all applicable regulations, are being planned and constructed.

II.E. The WIB Programs are Appropriate and Can Be Overseen, in Part, by an Ombudsman If This Court Believes it Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.31

Sierra Club's brief adds little to its prior comments on the WIB Programs, and the United States' Memo in Support amply demonstrated appropriateness of these Programs. As previously shown, the WIB Programs afford due process; contain sufficient provisions for the regulators to mark defendants' progress and enforce the programs, including through the imposition of

stipulated penalties; and do not require a particular funding plan now because such a funding plan will be part of the LTCPU to be submitted in June 2006, and, in the meantime, defendants must nevertheless implement (and thus, fund) the programs appropriately.

Finally, Sierra Club states that the Decrees cannot be approved without a special master. Plaintiffs vehemently oppose the appointment a special master to oversee the Clean Water Act compliance programs in the Decrees, which would usurp the regulators' core functions. However, the regulators do not oppose the appointment of a local "ombudsman" to whom WIB victims could turn for assistance, and who could raise issues to the regulators that may warrant their attention and/or report to this Court as requested. The United States has suggested two candidates to serve in this role – Virginia Whitman and Michael Newman – either of whom would serve as a competent and willing ombudsman. Significantly, the parameters of such an ombudsman's duties can be negotiated and embodied in a separate order and should not delay entry of the Decrees.

**III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.34**

Sierra Club claims that "to be approvable," the Decrees need, "at a minimum:" "fixed" SSO deadlines, a WIB budget, various other WIB Program changes, and a special master. Plaintiffs have amply demonstrated that none of these improvements (or any others suggested by Sierra Club in its comments or Opposition) is necessary for this Court to approve the Decrees, and respectfully request this Court to enter them to ensure that defendants appropriately come into compliance with the Act as expeditiously as practicable under this Court's Order.

**TABLE OF CONTENTS**

I. **INTRODUCTION** . . . . . . . . . . 1

II. **ARGUMENT** . . . . . . . . . . 2

A. Sierra Club is Improperly Applying the Standards and Priorities for Its SSO Citizen Suit to the Governments' Systemwide Enforcement Action and Settlement . . . . . . . . . . 2

1. The Standard for Entry in the Sixth Circuit is Fair, Reasonable, and Consistent with the Statute, with Considerable Deference Afforded to the Regulators . . . . . . . . . . 2

2. Sierra Club is Mixing Apples and Oranges When It Attempts to Apply the Standard for Whether its Citizen Suit May Proceed to This Consent Decree Approval Proceeding. . . . . . . . . . . 4

3. Sierra Club's Priorities in its Narrower Citizen Suit Should Not Take Precedence over the System-Wide Solution Provided by the Decrees. . . . . . . . . . . 10

B. The Decrees Do Not Improperly Apply the CSO Policy to SSOs or WWTPs, and the Decrees Provide for Appropriate End Dates and Schedules. . . . . . . . . . . 13

1. The "As Expeditious as Practicable" Standard is Appropriate, Enforceable, and Consistent with EPA Policy. . . . . . . . . . . 15

2. The Decrees' Deadlines are Appropriately "Fixed," But Lack of Any Fixed Construction Deadline in a Decree is Not Fatal to its Approvability. . . . . . . . . . . 16

a. Upon Approval, the LTCPU Schedule Will Be Fixed, and Sierra Club's Criticisms of the $1.5 Billion Potential Schedule Extension are Baseless . . . . . . . . . . 17

b. The Evaluate and Correct Provisions Relate to Stipulated Penalties, Do Not Affect the Completion of Construction Deadline Fixed by the LTCPU or CAPP, and Do Not Improperly Apply the CSO Policy to SSOs . . . . . . . . . . . . . . . . . . . . 21

3. Sierra Club's Hypothetical Earlier Deadlines for SSOs Ignore CSOs and Other Violations, Are Unsupported by Any Credible Evidence, and Should Not Supplant the Appropriate Negotiated Backstop Dates in the Decrees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Sierra Club's Various Arguments Concerning the Final Decree's Provisions Related to Water Quality Standards Are Not Compelling. . . . . . . . . 26

D. The Decrees Contain No Illegal Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E. The WIB Programs are Appropriate and Can Be Overseen, in Part, by an Ombudsman If This Court Believes it Appropriate. . . . . . . . . . . . . . . . . . 31

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Exhibit 1: Second Declaration of Mark Klingenstein
Exhibit 2: Deposition of Dr. Bruce Bell (excerpts)
Appendix A: Reference Materials

- Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Separate Sanitary Sewers, U.S. EPA 1996
- Compliance and Enforcement Strategy Addressing CSOs and SSOs, Apr. 27, 2000 (excerpts)
- EPA's CSO Guidance for Financial Capability Assessment and Schedule Development, Mar. 1997 (excerpts)
- EPA Memorandum: Negotiation of CSO Consent Decrees, Sept. 16, 2003
- EPA Memorandum: Water Quality-Based and Technology-Based CSO Requirements, July 7, 1997

## I. INTRODUCTION

Intervenor Sierra Club's[1] Memorandum in Opposition to the Entry of the Consent Decrees ("SC Op." or "Sierra Club's Opposition") should do nothing to dissuade this Court from entering the Consent Decrees that are before it in this matter. Consistent with its other pleadings, Sierra Club has at best muddied the issues, and at worst, persists in making false statements about the Consent Decrees.[2] As demonstrated in the United States' Memorandum in Support of Motion for Entry of Consent Decrees ("US Memo" or "United States' Memorandum"), the Consent Decrees are fair, reasonable, and consistent with the Clean Water Act, and plaintiffs respectfully request this Court to enter them so that the work that has begun can continue under this Court's order.

---

[1] Intervenor Marilyn Wall has not submitted an opposition to the Consent Decrees.

[2] For example, Sierra Club continues to perpetuate the falsehood that there is a $1.5 billion "monetary cap" on the amount defendants will be required to spend on their compliance efforts, see Third Declaration of Bruce Bell ¶ 16; that defendants can "unilaterally" extend their compliance deadline, see id. ¶¶ 10, 39, SC Op. p. 18; and that the Decrees contain "few, if any" interim construction deadlines, see Bell Dec. ¶ 21. The United States has already shown these statements to be completely false and is, frankly, surprised that Sierra Club is raising them again. See United States' Memorandum in Support of Motion for Entry of Consent Decrees ("U.S. Memo") at pp. 71, fn. 82 (the $1.5 billion potential deadline extension is not a "cap"); 73-74 (defendants cannot "unilaterally extend" deadline); 55 (projects under all plans must include a minimum of three "critical construction milestones"). See also Second Declaration of Mark Klingenstein ("Klingenstein Dec. II," attached hereto as Exhibit 1) at ¶ (each set of projects under the plans must have at least 3 interim deadlines, which is expected to produce over 160 interim deadlines for the LTCPU alone).

One final egregious example is Sierra Club's assertion that plaintiffs did not take steps to force defendants to submit an approvable Long Term Control Plan until this case, "which was triggered by the Sierra Club's 60-day Notice Letter on December 18, 2001." SC Op. p. 41. As has been repeatedly explained, plaintiffs and defendants had fully negotiated the SSO IPCD before we received Sierra Club's notice letter, which gave notice of their intent to file an SSO complaint. See Responsiveness Summary ¶ 39. The IPCD itself speaks of the parties' ongoing negotiations concerning CSOs. So, it is inconceivable how Sierra Club can baldly assert that its notice letter sparked the CSO settlement – especially since Sierra Club never has filed a complaint (in intervention or separately) concerning CSOs.

## II. ARGUMENT

### A. Sierra Club is Improperly Applying the Standards and Priorities for Its SSO Citizen Suit to the Governments' Systemwide Enforcement Action and Settlement

#### 1. The Standard for Entry in the Sixth Circuit is Fair, Reasonable, and Consistent with the Statute, with Considerable Deference Afforded to the Regulators.

At the outset, it is critical to reiterate that the test to be applied by this Court in determining whether to approve the Decrees is one of "fairness, reasonableness and consistency with the statute." United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991).[3] Moreover, while this Court is to "eschew any rubber stamp approval in favor of an independent evaluation," id. at 1435, the law in the Sixth Circuit is clear that there is a presumption of validity in settlements of this type:

> [W]e are faced with a presumption in favor of voluntary settlement. That presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field. . . . In evaluating the decree, it is not our function to determine whether this is the best possible settlement that could have been obtained, but only whether it is fair, adequate and reasonable.

[3] See also US Memo n.29. Contrary to Sierra Club's wholly unsupported assertion, there is no different standard applied to Clean Water Act decrees than CERCLA decrees. While Akzo was a CERCLA case, the Sixth Circuit specifically noted that the standard it enunciated is "our court's general test for consent decrees" and cited United States v. Jones & Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir.1986), which was a settlement under the Clean Water Act and Clean Air Act, and Williams v. Vukovich, 720 F.2d 909, 920-23 (6th Cir.1983), which concerned an employment discrimination settlement. Sierra Club itself cites seven cases for its discussion of the consent decree entry standard – all but one of which concern CERCLA settlements.

Id. at 1436; see also id. at 1435 (court "may not substitute [its] . . . own judgment for that of the parties to the decree.").[4]

In reviewing consent decrees, courts also bear in mind that the parties are settling the matter, have not (and do not need to) "prove up" the violations, and that the remedies in the decree should not be reviewed as if the matter had been tried. As the District of Columbia Court of Appeals has explained,

> As Justice Rehnquist noted in Maryland v. United States, when a consent decree is brought to a district judge, because it is a settlement, there are no *findings* that the defendant has actually engaged in illegal practices. It is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial. Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted.

[4] Noticeably absent from Sierra Club's recitation of the relevant legal standard is any notion of deference that the Sixth Circuit counsels is due to the regulators in this case. Instead, Sierra Club dwells on an unreported case from the Western District of Pennsylvania to give the impression that the proponents of the Decrees here bear some special burden of proof. SC Op. p.4. In fact, the Pesses court does not appear to be assigning any special burden to the governments, as the court appropriately cites Akzo and other cases for the notions that assessments of "reasonableness, fairness, and fidelity to the statute" are to be made "in conjunction with the recognition that public policy strongly favors settlements of disputes and that parties to a lawsuit are generally free to compromise their positions in order to reach an amicable resolution," and that a reviewing court's role is not to determine "whether the best possible settlement that could have been reached has been, but is limited to determining whether the agreement is fair, reasonable, and consistent with the goals of [the statute]." United States v. Pesses, 1994 WL 741277 at *15 (W.D. Pa. 1994)(citations omitted; attached to SC Op.). Leaving aside whether Sierra Club believes that Pesses imposes some additional burden on the parties to these Decrees, the United States has already produced ample evidence and legal support for the appropriateness of the Decrees in this case – whether reviewed under a deferential or a more searching standard.

United States v. Microsoft Corporation, 56 F.3d 1448, 1461 (D.C. Cir.1995)(emphasis in original; citation omitted); see also United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996).[5] Thus, the issue is not what remedy this Court might have ordered after trial, but rather, giving due deference to the regulators' selected approach, whether the Decrees are fair, reasonable, and consistent with the Clean Water Act.

2. Sierra Club is Mixing Apples and Oranges When It Attempts to Apply the Standard for Whether its Citizen Suit May Proceed to This Consent Decree Approval Proceeding.

Sierra Club, again without citing to any legal support, suggests that this Court must consider "the intertwining of the diligent prosecution issue" in evaluating the Decrees. SC Op. p.6. This is simply incorrect. As has been discussed, the role of citizens as enforcers of the Clean Water Act is secondary and supplementary to the governments. Responsiveness Summary ¶ 13. This Court should first determine whether the Decrees are approvable under the appropriate standard, and then determine whether there are any violations alleged in Sierra Club's citizen suit that are not being "diligently prosecuted" by the Decrees.

Further, Sierra Club cites no case law in support of the proposition that this Court should proceed to evaluate the Decrees using a different standard than that outlined in Akzo and discussed above, simply because a citizen suit is pending. Rather than engaging in an analysis of whether a proffered decree should be entered, the decisions cited by Sierra Club are engaged in an

[5] Thus, there is no merit to Sierra Club's assertion that the governments are required to provide a full assessment of defendants' past violations or current compliance status for this Court (or Sierra Club) to evaluate the remedies in the decree. E.g., SC Op. Exhibit 7, p.2. Nevertheless, the United States' initial filing provided a substantial picture of defendants' compliance record for the past two years. See Declaration of Mark Klingenstein, United States' Memo, Exhibit 2 ("Klingenstein Dec."), ¶¶ 140-144.

analysis of a very different question, i.e., whether previous enforcement actions (judicial or otherwise) undertaken by entities other than the United States under state law can bar a citizen suit. This court has previously and correctly recognized that the issue of whether the citizen suit will proceed is an entirely different issue which will be addressed at a later time. See Order, Sept. 8, 2003, Doc. 95 (declining to release stay previously ordered for citizen suit). Sierra Club has offered nothing new in its Opposition that should cause this Court to revisit that determination, and this Court should continue its stay until it has determined whether the Decrees should be entered under the relevant Sixth Circuit standard.

Sierra Club cites Jones v City of Lakeland, 224 F.3d 518 (6th Cir. 2000) at length. But that case does not even discuss the criteria applicable to entry of a consent decree in an enforcement action brought under the Clean Water Act by the United States in federal court. Rather, that case specifically interprets the provisions of the Clean Water Act that relate to when citizen suits may be maintained. In Lakeland, the district court had dismissed a citizen suit because there had been a history of administrative enforcement actions pursued by the Tennessee Department of Environmental Conservation. The Sixth Circuit reversed the district court because 33 U.S.C. § 1365 precludes a citizen suit only if EPA or the State is diligently prosecuting an enforcement action in a court of the United States or a State. The prior administrative enforcement actions in Lakeland were specifically found not to preclude a citizen suit because under Tennessee's statutory scheme the administrative forums did not rise to the level of a federal or state court. Lakeland, 224 F.3d at 521-22. The Sixth Circuit's decision was based on the conclusion that the state administrative process in the Tennessee law that was used in the prior enforcement action did not meet the comparability requirements of the Clean Water Act. Lakeland, 224 F.3d at 524.

But the instant case is brought by the United States in court, the State is joined by both the United States and ORSANCO, and the Consent Decrees have the full authority of this Court to back them up.

The lengthy citation from Lakeland at pages 7-8 in Sierra Club's Opposition is dicta even in terms of the citizen suit provisions. The Sixth Circuit did discuss specific inadequacies of the prior State administrative enforcement that it thought raised issues about diligent prosecution. However, the concerns that the court enunciated in Lakeland are based on a fact pattern that is not repeated in the instant case. In Lakeland there was a series of ineffective state administrative orders that again and again waived deadlines while imposing nominal penalties. At issue in Lakeland was whether yet another of these ineffectual State administrative orders should bar the citizen suit.[6] This Court is presented with a comprehensive set of Decrees negotiated by the United States and the other plaintiffs to address all the claims raised by the Plaintiffs' Amended Complaint. The comprehensive Decrees impose substantial civil penalties and establish a specific schedule for the implementation of interim measures and other capital improvements designed to reduce the adverse impact from defendants' sewer system even while defendants complete plans to bring the sewer system into full compliance with the requirements of the Clean Water Act.

---

[6] This Court might be faced with a closer issue if it were deciding whether simply another State administrative order ("DFFO") for SSOs, with, for example, no penalties, stipulated penalties, or comprehensive approach, particularly after defendants' failure to fully comply with the 1992 DFFO, would bar Sierra Club's SSO suit. However, this is not the case here. In fact, the State considered issuing another SSO DFFO but decided, instead, that the more comprehensive and enforceable approach provided by a joint Federal/State decree was the appropriate enforcement mechanism to use in this case. See Responsiveness Summary ¶ 45; Affidavit of George Elmaraghy ("Elmaraghy Aff."), attached to US Memo as Exhibit 7, ¶¶ 4-5.

These Decrees are not the blank check to further violations that were presented in Lakeland.[7]

Assuming, for the sake of argument, that the issue of diligent prosecution was in fact relevant–and it bears repeating that it is not–there is no case law analysis that supports Sierra Club's assertion that the Consent Decrees here are not diligent prosecution. Indeed, counsel for the United States has been unable to find any decision by any federal court to the effect that a consent decree negotiated by the United States in an enforcement action brought by the United States is not diligent prosecution.[8]

Sierra Club asserts that the Decrees here do not qualify as "diligent prosecution" because

---

[7] Sierra Club's citations to Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company, 933 F.2d 124 (2d Cir. 1991) and New York Coastal Fishermen's Association v. New York City Department of Sanitation, 772 F. Supp. 162, 169 (S.D.N.Y. 1991) are similarly inapposite. Neither of these cases address the issue presented by the United States' Motion for Entry. These were citizen suits where the question the courts addressed was whether prior enforcement by the state was diligent prosecution or whether citizen suits could proceed. It is instructive to note that even in this context the courts in each case recognized that an overly technical interpretation of the provisions of the Clean Water Act related to comparability should not be favored given the direction provided by the Supreme Court that citizen suits are to supplement not supplant state enforcement of the Clean Water Act. See Atlantic States, 933 F.2d at 127; New York Coastal, 772 F. Supp. at 165-66. Further, the Court in Atlantic States held that the citizens group could not challenge the settlement reached by the state. Indeed, the court specifically stated: "However we do not believe that the Clean Water Act can or should be read to discourage a governmental enforcement action once a citizen suit has been commenced nor to prevent state or local authorities from achieving a settlement as to conduct that is the subject of the citizen complaint." Atlantic States, 933 F.2d at 127. That court merely allowed further inquiry into the facts that might support a citizen suit. The string of cases cited by Sierra Club at pages 12-13 of its Memorandum are similarly flawed. They address only issues pertinent to whether citizen suits may be maintained.

[8] While there may be such a case, counsel for the United States did not find it after significant efforts. The vast majority of cases that discuss whether prior enforcement efforts amount to "diligent prosecution" concern State-only actions.

they lack "fixed" end dates.[9] As discussed infra, the deadlines are indeed appropriately fixed. More importantly, though, the lack of a fixed end-date in a consent decree does not mean a decree is not appropriate. Numerous District Court Judges in Ohio have entered Clean Water Act decrees that required an end-date to be fixed by a subsequent plan.[10] Moreover, Sierra Club's own expert, Dr. Bell, provided expert assistance to Sierra Club to negotiate just such a Clean Water Act SSO decree between Sierra Club and Little Rock, Arkansas. Specifically, that decree did not contain a fixed deadline for SSO construction or compliance, but rather required the defendant to perform a study to select the remedial measures, and left the schedule, including the deadline, to be established in the study and to be resolved through dispute resolution if there was disagreement. Deposition of Dr. Bruce Bell ("Bell Depo."), pp. 181-85. (Excerpts of this deposition are attached hereto as Exhibit 2.) Significantly, Dr. Bell testified at his deposition in

---

[9] Sierra Club also strangely argues that because the Decrees here do not put an immediate end to the ongoing Clean Water Act violations, they do not bar Sierra Club's citizen suit. SC Op. p.9. Of course the Decrees cannot immediately end the violations, because the remedies to end the violations will take time to develop and construct. The Supreme Court has clearly recognized this fact. Weinberger v. Romero-Barcelo, 456 U.S. 305, 317-18 (1982). The relevant issue, which again is not relevant at this stage of the proceedings, is whether the Decrees represent diligent prosecution of the violations – that is, whether the Decrees provide an appropriately diligent approach for remediating the violations. Atlantic States Legal Foundation v. Eastman Kodak Co., 933 F.2d 124 (2d Cir. 1991), which Sierra Club cites in support of its argument, is inapposite because the state settlement at issue did not include injunctive relief to address the violations. The settlement merely required defendant to pay a fine and provide $150,000 in support for local emergency planning committees, in exchange for a release from the state for further criminal liability and certain additional penalties.

[10] For example, Judge Katz in United States and Ohio v. Port Clinton, 99CV7434 (Sept. 8, 1999), and Judge Dowd in United States and Ohio v. Youngstown, 98CV2438 (May 9, 2002), approved decrees that required the deadlines for implementation of remedial measures to be set by subsequent the plans. Klingenstein Dec. II ¶ 4.

this case that this approach was fair and approvable. Bell Depo. p. 182.[11] Further, such consent decrees have been held to represent diligent prosecution under the Clean Water Act and other environmental statutes.[12]

Contrary to the assertion made by Sierra Club, when addressing the issue of diligent prosecution, the Clean Water Act "calls for a more deferential approach that does not circumscribe the administrator's discretion to implement the plan that, in his expert judgment, adequately address a violation." North and South Rivers Watershed Ass'n v. Town of Scituate, 755 F. Supp. 484, 486-87 (D. Mass. 1991), aff'd, 949 F.2d 552 (1st Cir. 1991).[13] Indeed, the Supreme Court addressed this in its decision in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987), stating that the main purpose behind the limitation of citizen

---

[11] Dr. Bell also admitted at his deposition that Sierra Club's Little Rock consent decree controlled SSOs only to a "two-year storm," had no stipulated penalties for any violations or missed construction deadlines, did not contain a sewer moratorium, resolved claims for all SSOs occurring up through the unspecified construction deadline, and obtained no civil penalty. Bell Depo. pp. 185-88. Sierra Club and Dr. Bell appear to apply different standards to their own consent decrees than they do to those negotiated by the government.

[12] See, e.g., North and South Rivers Watershed Ass'n v. Town of Scituate, 755 F. Supp. 484, 486-87 (D. Mass. 1991), aff'd, 949 F.2d 552, 557 (1st Cir. 1991) (order to develop a plan and schedule for addressing WWTP Clean Water Act violations held to be diligent prosecution); City of Heath, Ohio v. Ashland Oil, Inc., 834 F. Supp. 971, 981-82 (S.D. Ohio 1993) (consent order that required defendants to perform substantial, costly subsurface investigations and determine the need for remedial work with the approval of OEPA is diligent prosecution under RCRA's citizen suit provision); Orange Environment, Inc. v. County of Orange, 860 F. Supp. 1003, 1009-18 (S.D.N.Y, 1994) (state consent decree that provided for an interim leachate management proposal until a permanent leachate management program was in effect but which did not establish a fixed date for the permanent program's implementation, was diligent prosecution for the discharge of leachate from a landfill).

[13] See also, e.g., Connecticut Coastal Fisherman's Association v. Remington Arms Company Inc., 777 F. Supp. 173, 185 (D. Conn. 1991), Orange Environment Inc v Hudson Riverkeeper Fund Inc., 860 F. Supp. 1003, 1017 (S.D.N.Y. 1994).

suits is to permit the federal and state governments to exercise their powers to remedy violations of the Clean Water Act. The citizen suit is not meant to supplant governmental action. When discussing the issue of wholly past violations the Court in Gwaltney discussed this interplay with an example that is instructive here.

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of the state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

Gwaltney, 484 U.S. at 60-61.

As shown in the United States' Memo and discussed further herein, the Decrees before this Court, including their deadlines and general approach to schedules, are fair, reasonable, and in the public interest. As has been discussed, Sierra Club will have every opportunity to oversee implementation of the Decrees and to offer comments on the plans and schedules as they are developed. However, to allow Sierra Club, by the filing of its much narrower SSO-only citizen suit, to attempt to force a different schedule or approach than has been negotiated by the parties here, would clearly change its role from "interstitial" to "intrusive." This Court should not permit such a result.

3. Sierra Club's Priorities in its Narrower Citizen Suit Should Not Take Precedence over the System-Wide Solution Provided by the Decrees.

The defendants' and their public have massive sewer system problems, including:

- Approximately 3000 CSO discharges each year, resulting in six billion gallons per year of raw sewage illegally discharged from approximately 233 CSO outfalls, Klingenstein Dec. ¶ 15;
- Over 100 events of partially treated sewage illegally bypassed around Defendants' WWTP each year; Klingenstein Dec. ¶ 143;
- Approximately 1000 events of raw sewage illegally discharged each year from approximately 100 SSO points, resulting in hundreds of millions of untreated sewage illegally discharged into area waterways, Klingenstein Dec. ¶¶ 16, 141; Klingenstein Dec. II ¶ 6 ; and
- An average of 2470 complaints to MSD each year concerning sewage backups in basements, SC Op. pp. 28-29.

The regulators believe that it is in the public interest to address all of these problems in a holistic manner to ensure they are appropriately remedied once and for all. The two Decrees accomplish that goal, requiring development of plans by June 2006 to remedy these problems in a manner that is as expeditious as practicable and that is appropriately staged and prioritized.[14]

Sierra Club, in its citizen suit, filed claims exclusively for SSO violations and does not address either the six billion gallons of illegal CSO discharges or the many annual illegal bypasses.[15] While that is certainly Sierra Club's right, the regulators believe that such a

---

[14] Paragraph II.F of the LTCPU Work Plan, Exhibit 4 to the Final Decree, requires the CAPP and LTCPU schedule to be coordinated and to be prioritized based on considerations of, inter alia: water quality, human health, capacity-related "water in basement" issues, pollutant loadings, volume of discharge, community priorities, and environmentally-sensitive areas.

[15] While this Consent Decree entry proceeding is not the appropriate time to focus on Sierra Club's citizen suit, the governments note that Sierra Club has only asserted a cause of action for the SSOs under Sections 301 and 402 of the Clean Water Act, 33 U.S.C. § 1311 and 1342 (and related State law). See Civ. No. C-1-02-135, Doc. 1, p.17. Violations of these sections of the Act are predicated on a discharge of a pollutant to "navigable waters," or a "waters of the United States." 33 U.S.C. §§ 1311, 1362(12), (7). While Sierra Club's prayer for relief asks this Court to enjoin defendants from discharging "on to public and private property," id. p.18, Sierra Club has not asserted a cause of action apart from its claim for SSO discharges to "waters," and it is uncertain whether Sierra Club is in fact entitled to such relief under the Clean Water Act. Unlike

piecemeal approach is not in the public interest, and that the regulators' decision to address the entire universe of violations is much more appropriate.

Perhaps because Sierra Club has only asserted a cause of action for the SSOs, it seems to be arguing that the SSOs are "worse" or "more illegal" than the other violations and so should take priority over the other violations and be fixed first. See, e.g., SC Op. p.16, 16-17; Bell Dec. ¶ 17. This is untrue. Defendants' SSOs are unpermitted discharges, while their illegal CSO and bypasses are violations of their permits. Both unpermitted discharges and permit violations constitute violations of Section 301 of the Clean Water Act, equally subject to penalties and injunctive relief under Section 309 of the Act. 33 U.S.C. §§ 1311, 1319. If anything, defendants' six billion gallons of illegal raw sewage CSO discharges each year pose a far more serious environmental threat than the hundreds of millions of gallons of illegal raw sewage SSO discharges. See Klingenstein Dec. ¶ 15, Klingenstein Dec. II ¶ 6.[16] This is precisely why it is in the public interest to look at defendants' system and violations as a whole and to come up with a solution that will address all of the violations in an appropriately prioritized fashion, rather than arbitrarily moving SSO remediation to the fore as advocated by Sierra Club.

---

the United States, Sierra Club cannot seek injunctive relief under Section 504 of the Act, 33 U.S.C. § 1364, the Act's "emergency powers" provisions. It is this provision on which the United States has based its claim for relief for the basement backups. See Doc. 1, ¶¶ 84-87. Cf. Community of Cambridge Env. Health and Community Dev. Group v. City of Cambridge, 115 F. Supp. 2d 550, 555-556 (D. Md. 2000) (dismissing citizens' requests for compensation and remediation of property from CSO violations as beyond the scope of the remedies provided by Clean Water Act citizen suit provisions).

[16] Any suggestion that the regulators place a higher priority on SSOs than CSOs is belied by the fact that, in at least two other settlements that have addressed both SSOs and CSOs, the CSOs were remedied before the SSOs. Klingenstein Dec. II ¶ 7.