B.    The Decrees Do Not Improperly Apply the CSO Policy to SSOs or WWTPs, and
the Decrees Provide for Appropriate End Dates and Schedules.

Sierra Club argues that the United States is somehow improperly applying the CSO Policy

to SSOs and bypasses. SC Op. p. 14. Further, Sierra Club asserts, without cite to any authority,

that while allowing finances or flexibility to be taken into account may be consistent with the

CSO Policy for CSOs, it is "illegal" for SSOs or bypasses.[17] As has been discussed,[18] the CSO

Policy, and its incorporation into the Clean Water Act by Congress, applies to CSOs, and the

approach to CSOs in the Final Decree conforms to that policy. However, the same sound policy

reasons underlying the approach in the CSO Policy also support a similar approach for SSOs.

Specifically, before scarce public resources are spent on SSO remediation, there should be a

thorough engineering analysis, including modeling, monitoring, and alternatives analysis to ensure

that the projects that are selected are appropriate, as cost-effective as possible and likely to work.

The United States' SSO consent decrees routinely use this phased approach. Klingenstein Dec. ¶¶

113, 117, 118.

Moreover, because sewer system remedial measures, whether they relate to CSOs, SSOs,

or WWTPs, are financed by the public, an analysis of a municipality's ability to raise money to

finance the measures is appropriate and should be taken into account in setting the remediation

schedule. EPA SSO guidance, issued in 1996, stresses that all SSO discharges "should be

addressed as soon as physically and financially possible," and that "schedules of compliance

---

[17] See SC Op. pp. 13, 15, 18 (Applying a potential extension of time and/or an "expeditious as
practicable" schedule to SSOs and bypasses is "inconsistent with the statute," "not authorized by
either the CWA or its regulations," and "violates the law and EPA's own policies.")

[18] See US Memo pp. 9-12, 16-17, 19, 55-56, 6162, 66-69, and 75-76.

which require significant capital investments should take into account the financial capabilities of the specific municipality." Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Separate Sanitary Sewers, U.S. EPA 1996 (attached hereto in Appendix A) (hereafter, "SSO Guidance"), pp. 3-4.[19] The SSO Guidance further notes that a compliance schedule should allow ample time for "all phases" of a sanitary sewer discharge control program, including a "diagnostic evaluation" phase. "Municipalities should be given a reasonable length of time to develop schedules so they can realistically assess their compliance needs, examine their financing alternatives, and work out reasonable schedules for achieving compliance." Id. p.7. The guidance further advises:

> When working with municipalities to develop comprehensive schedules, EPA Regions and States should be sensitive to their special problems and needs, including consideration of a municipality's financial picture. Factors that should be considered are the municipality's current bond rating, the amount of outstanding indebtedness, population and income information, grant eligibility and past grant experience, the presence or absence of user charges, and whether increased user charges would be an effective fund-raising mechanism, and a comparison of user charges with other municipalities of similar size and population. . . .  [Schedule development should also include] fiscally sound municipal financing techniques such as issuing revenue bonds, staging bond issuance, sequencing project starts, [and] sensitivity to rate increase percentages over time.

---

[19] EPA recently reaffirmed the approach set forth in the SSO Guidance. See Compliance and Enforcement Strategy Addressing CSOs and SSOs, Apr. 27, 2000, pp. 1, 3, 7-11. (Relevant pages are included in Appendix A.)

SSO Guidance p.8.[20] These are the same type of financial considerations that are required by

EPA's CSO Guidance for Financial Capability Assessment and Schedule, which the Final Decree

requires defendants to follow in developing their schedules for the LTCPU.[21] In short, EPA

policy and practice specifically support using the same types of considerations to develop

schedules for SSOs and CSOs alike, and nothing in the Clean Water Act suggests otherwise. See

Weinberger v. Romero-Barecelo, 456 U.S. 305, 316 (1982) (the Clean Water Act's "scheme as a

whole contemplates the exercise of discretion and balancing of equities.").[22]

> 1.    The "As Expeditious as Practicable" Standard is Appropriate, Enforceable, and Consistent with EPA Policy.

As discussed at length in the United States' Memorandum at pp. 52-58, the Decrees

contain a reasonable and appropriate approach to schedules and end dates. The schedules are

governed by reasonable "backstop" dates that are set forth in the Decrees. However, after

---

[20] The SSO Guidance also specifically supports the approach set forth in the IPCD to include interim measures for high impact problems, such as the interim remedy for SSO 700, where a long-term project is required to correct the SSOs. SSO Guidance p.8.

[21] See EPA's CSO Guidance for Financial Capability Assessment and Schedule Development, EPA 832-B-97-004, Mar. 1997 ("Financial Capability Guidance"), pp. 6-7. (Relevant pages of this guidance are included in Appendix A. The entire guidance is available at: http://cfpub1.epa.gov/npdes/cso/guidedocs.cfm. See also US Memo pp. 67-68.

[22] Sierra Club notes that this Court "has the authority to apply injunctive relief in this case differently" to SSOs and WWTPs than it does to CSOs. SC Op. p.15. Of course it does. See, e.g., Weinberger, 456 U.S. at 312. However, that is not the issue in this consent decree approval proceeding. The issue is not what this Court might order after trial. See, e.g., United States v. Microsoft Corporation, 56 F.3d 1448, 1461 (D.C. Cir.1995); United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996). Rather, given that plaintiffs have shown there is no illegality in the schedule approach, the issue for this Court is whether the schedule approach set forth in the Decrees is reasonable, giving due deference to the agencies' expertise and to the parties' agreement. See, e.g., United States v. Cannons Engineering Corp., 899 F.2d 79, 84 (1st Cir. 1990).

development of the relevant information as part of the planning process, the schedules that are ultimately approved in the CAPP, LTCPU, and SSO 700 Remedial Plan must be "as expeditious as practicable," so if compliance can be achieved quicker than the relevant backstop date, it must be.

Sierra Club's arguments that the "as expeditious as practicable standard" is "inconsistent with EPA law and policy," "not in the public interest," and worse yet, "illegal" are preposterous. EPA's CSO Policy requires that LTCP schedules "require the earliest practicable compliance date considering physical and financial feasibility." 59 Fed. Reg. at 18,690, col. 3. The CSO Policy alternatively characterizes the required time frame as "as soon as practicable." See, e.g., 59 Fed. Reg. 18,690 (col.3), 18,691 (col. 3), 18,696 (col. 1, cols. 2-3). EPA's Financial Capability Guidance, at p.43, describes the deadline as "as expeditiously as possible."[23] EPA's SSO Guidance requires SSOs to be "addressed as soon as physically and financially possible." SSO Guidance, p.3, see also id. pp. 8-9. The "as expeditious as practicable" deadline used in the Decrees is synonymous with these variations on a theme, and is fully consistent with Sierra Club's notion that "time is of the essence."

   2. The Decrees' Deadlines are Appropriately "Fixed," But Lack of Any Fixed
     Construction Deadline in a Decree is Not Fatal to its Approvability.

Sierra Club attempts to argue that the Decrees are flawed because the schedules are not "fixed." However, as described in the United States' Memorandum at pp. 69-78, and further below, the complete construction deadline is "fixed" by a backstop date of 2022 that can only be

---

[23] Sierra Club's assertions that somehow the Decrees have "combined the least stringent parts of the two standards [in the CSO Policy and Financial Capability Guidance]" are tortured at best. SC Op. p. 20.

exceeded in tightly prescribed circumstances with the approval of the regulators. Moreover, as

described above, consent decrees that lack any end-date have been approved and entered in cases

such as Youngstown, Port Clinton, and Sierra Club's Little Rock case.[24]

Sierra Club makes numerous other statements about the Decrees' schedule provisions that

warrant correction here:

a. Upon Approval, the LTCPU Schedule Will Be Fixed, and Sierra Club's

Criticisms of the $1.5 Billion Potential Schedule Extension are Baseless: First, Sierra Club states

that the Final Decree fails to comport with EPA guidance, which requires that: "The long-term

control plan should include a fixed date implementation schedule." SC Op. n.17, quoting, with

added emphasis, the 1998 EPA "Perciasepe Memorandum" (attached to SC Op.). The Final

Decree is absolutely consistent with this policy. When the Final Decree's long-term control plan,

known as the "LTCPU," is submitted and approved, it will include a fixed date implementation

schedule.[25] The $1.5 billion potential schedule extension merely allows defendants to propose a

deadline in the LTCPU later than 2022 in the LTCPU when it is submitted for approval. After

---

[24] The consent decree in the City of Bedford case, discussed by Sierra Club, SC Op. p.16, is
easily distinguishable from this case because the remedial measures plan for eliminating SSOs
and bypasses in that case had already been submitted to the regulatory agencies at the time the
decree was entered. Moreover, the City of Bedford was not required to develop or implement a
long term control plan for addressing CSOs

[25] Similarly, Sierra Club stresses that the CSO Policy states that the municipality must be
"subject to enforceable schedules that require the earliest practicable compliance date
considering physical and financial feasibility." SC Op. p. 19, quoting, with emphasis, from 59
Fed. Reg. 18,690. When the LTCPU is approved, the deadlines and schedule will be enforceable
and will contain the earliest practicable compliance date.

approval, all dates in the LTCPU (and the CAPP) will be fixed.[26]

Further, there is no basis for Sierra Club's statements that the $1.5 billion potential schedule extension is certain to extend the end dates beyond 2022. SC Op.1. 13. In fact, the regulators initially disapproved both remedial plans that were submitted to date under the IPCD, because, even though the schedules met the "backstop deadline" in the IPCD, they were not "as expeditious as practicable." See US Memo pp. 57-58. Thus, there is every indication that the regulators will not approve a schedule unless it really is sufficiently expeditious.

Next, Sierra Club insinuates that because defendants have a cost estimate for system remediation that is $3.6 billion, the Decrees are guaranteeing a date later than 2022. SC Op. pp. 1, 13. However, as previously discussed, whatever defendants' prior cost estimates or consideration of projects have been is largely irrelevant. US Memo pp. 73-74. What matters is what is proposed in the CAPP and LTCPU, including their costs estimates.[27] If defendants inflate those costs as a basis to request a longer schedule, as Sierra Club suggests they will, SC Op. p. 18, then

---

[26] Plaintiffs again marvel at how Sierra Club can assert that the "deadline opener does not have to be pre-approved by EPA/OEPA and, it is not clearly covered by the Dispute Resolution process." SC Op. p. 18. As part of the LTCPU, the cost estimates and proposed schedule, including the deadline, must be approved by all three regulators and, like all the other plans under the Decrees, is subject to dispute resolution if necessary.

[27] Sierra Club implies that it is wrong to use estimated costs for the purpose of determining the schedule. SC Op. p. 13, Bell Dec. ¶ 7. However, of course estimated or anticipated costs must be used for setting the schedule. After the costs are spent, "actual" cost figures are available but would be of no use. Further, the approach in the Final Decree is is precisely what is required by the CSO Policy and EPA's Financial Capability Guidance. See, e.g., 59 Fed. Reg. 18,692, col. 3 (analysis of alternatives should be sufficient to make a reasonable assessment of costs); see Financial Capability Guidance at, e.g., p.12.

those inflated costs and the resulting proposed schedule will be disapproved.[28]

Finally, Sierra Club asserts that the Decrees violate the CSO Policy "by failing to require an analysis of economic hardship." SC Op. p. 17. This is false. The Final Decree specifically requires an analysis of financial capability as part of schedule development, including the requirement that defendants use EPA's Financial Capability Guidance for this assessment. Final Decree, Exhibit 4, LTCPU Work Plan, ¶ II.F.

Sierra Club baldly argues that the EPA cannot provide any potential flexibility in a decree for a municipality's financial capability unless the Agency itself has, a priori, performed the analysis set forth in the Financial Capability Guidance. SC Op. p.17, n.13. Sierra Club completely misconstrues the Financial Capability Guidance. The Guidance starts from the premise that a suite of control measures has already been determined, or at least is being proposed. The very first step in the Guidance is to determine an estimate of the "costs per household" ("CPH") of the "current costs for existing wastewater treatment ["WWT"] operations and the projected costs for any proposed WWT and CSO controls." Financial Capability Guidance p. 12 (emphasis added). In some cases when EPA negotiates a CSO consent decree, a LTCP has already been developed and approved by EPA, is close to being finished and has EPA's general approval, or the future necessary control measures can be estimated with some certainty. In these cases, it may be possible to determine the feasibility of a particular schedule (from both an engineering and an affordability perspective) more precisely at the consent decree negotiation

---

[28] Dr. Bell's estimate of what it might cost the United States to perform such a review is inaccurate and irrelevant. The regulators do not need to develop their own independent cost estimates to allow them to disapprove defendants' cost estimates as inflated or otherwise incorrect. Klingenstein Dec. II ¶ 13.

stage. Klingenstein Dec. II ¶ 15. However, this is certainly not required by the guidance or the

CSO Policy, and was not the situation facing the negotiators here. In this case, initial estimates of

compliance costs varied widely. See US Memo p. 72-73. The very point of the CSO Policy's

approach is that adequate environmental, engineering, and financial studies must be performed

before the final suite of alternatives can be selected and before a schedule can be approved that is

as "expeditious as possible." Defendants will be required to fully support their proposed schedule

with financial and engineering analysis. At that time, Sierra Club and Dr. Kavanaugh will be free

to submit their opinions to the regulators or this Court on whether or not the schedule is

appropriately expeditious from a financial perspective.

Finally, if courts have approved decrees (including Sierra Club and Dr. Bell's Little Rock

decree) that contain no "complete construction" deadline, but rather require the deadline to be

developed in a plan to be submitted later, then, certainly, the regulators can provide the limited

flexibility set forth here – that is, an opportunity for defendants to try to prove that the proposed

remedial measures are so expensive as to be financially infeasible in the amount of time initially

negotiated and set by the "backstop" date in the Final Decree.[29]

---

[29] Sierra Club asserts that the $1.5 billion figure represents an "arbitrary threshold" that is "per se evidence" of financial hardship, warranting a "reopen[ing] of the deal." SC Op. p. 18. It is true that the $1.5 billion figure was a negotiated figure that seemed to the parties to represent a fairly large amount of money. It is not, however, "per se evidence" of anything and as discussed does not delay compliance, unless the sum of money is so significant compared to defendants' resources that they prove that it is not financially feasible or practicable for defendants to comply with the 2022 date. In that case, the regulators may approve a later date. However, on the other hand, a point that Sierra Club never seems to mention is that just because defendants' estimates exceed $1.5 billion, there is no assumption or guaranty that the deadline will be later than 2022 or even as late as 2022. In any case, the regulators will ensure that the deadline is "as expeditious as practicable," considering both engineering and economic feasibility.

b. The Evaluate and Correct Provisions Relate to Stipulated Penalties, Do Not Affect the Completion of Construction Deadline Fixed by the LTCPU or CAPP, and Do Not Improperly Apply the CSO Policy to SSOs: The United States apologizes for any confusion it may have engendered for including the "Evaluate and Correct" provisions under the heading of a "potential schedule extension" in its initial brief. US Memo at p. 74. In fact, these provisions do not potentially extend the deadline for completion of construction of the remedial measures that are approved in the LTCPU or CAPP. Regardless of these provisions, defendants must complete all construction projects in the LTCPU or CAPP by the date in the final approved LTCPU or CAPP. Nor do these provisions allow defendants to propose a completion of construction deadline in the 2006 CAPP and LTCPU that can exceed 2022. Rather, these provisions potentially relieve defendants of stipulated penalties for SSOs or non-compliant CSOs that still exist after completion of the approved CAPP or LTCPU.

Thus, the notion is that if defendants construct everything required by the plans – everything that the regulators approved and that the parties believed would result in compliance – and for some reason, there were still non-compliant discharges, defendants would not be subject to significant stipulated penalties if they petition the regulators and receive approval for a revised plant to correct the problem. E.g., Final Decree ¶¶ VIII.B, XVII.E.2 -.3. Given that Sierra Club (with Dr. Bell's expert assistance) entered into a consent decree with Little Rock, Arkansas, containing no stipulated penalties for any non-compliance, it is incredible that it argues that these Decrees should not be approved because of the flexible approach provided for stipulated penalties

if, despite all best efforts, the remedial measures do not wholly fix the problem.[39]

Sierra Club also asserts that it is improper to apply post-construction monitoring and reevaluation of projects, which is explicitly set forth in the CSO Policy, to SSOs or WWTPs. Bell Dec. ¶ 34. What would Sierra Club have the regulators do? <u>Not</u> give the defendants an opportunity to evaluate and correct the problem in order to come into compliance with the law?[31]

   3. Sierra Club's Hypothetical Earlier Deadlines for SSOs Ignore CSOs and
      Other Violations, Are Unsupported by Any Credible Evidence, and Should
      <u>Not Supplant the Appropriate Negotiated Backstop Dates in the Decrees.</u>

Sierra Club asserts that it has provided "competent and unrebutted evidence" that the SSOs can be fixed in "as few as 10 years" and that SSO 700 can be ended in five years by a secondary WWTP. SC Op. pp. 2, 14. The biggest problem with this assertion is that Sierra Club says nothing about a schedule for fixing <u>all</u> of defendants' violations – again choosing to focus only on the SSOs that are the subject of its citizen suit. As stressed above, it is not in the public interest to "frontload" all the work on the SSOs, leaving CSO and bypass remedies for later. Further, Sierra Club's opinions concerning these engineering possibilities make no mention of financial considerations. In short, while it <u>might</u> be physically possible from an engineering

---

[39] It should be remembered that stipulated penalties still apply to all interim and final construction deadlines and to the other requirements of the approved CAPP and LTCPU. Similarly, if defendants submit a revised LTCPU or CAPP in an effort to fix a problem under the "evaluate and correct" provisions, the plan must include the same several deadlines and will also be subject to stipulated penalties for any failures to comply with the plan or deadlines.

[31] Sierra Club provides no citation for the assertion that the "evaluate and correct" provisions are "not consistent with EPA policy" as applied to SSOs. In fact, this approach has been used under other SSO consent decrees, which have been approved and entered. Klingenstein Dec. II ¶ 5. Further, the United States has negotiated, and courts have approved, various different approaches to stipulated penalties for post-construction SSOs, including, for example, no stipulated penalties for such discharges and no stipulated penalties if defendant is otherwise in compliance with the construction schedule (and minimizes and reports the discharge). Klingenstein Dec. II ¶ 5.

standpoint to construct a secondary treatment plant at SSO 700 in five years,[32] or to remediate

defendants' SSOs in that amount of time, this is neither the relevant inquiry nor the most

appropriate course of action. The relevant inquiry is required by the Decrees, and includes a

detailed analysis of alternatives, financing considerations, and other considerations to devise an

affordable remedy and a prioritized schedule that is as expeditious as practicable for all

violations.[33]

---

[32] Even if it is theoretically possible from an engineering perspective to construct a secondary WWTP in five years, Sierra Club offers no evidence to suggest that such a plant could be constructed at SSO 700 in that time frame, whether it would work appropriately there, and whether it could ultimately be permitted there. See Responsiveness Summary ¶ 36, Klingenstein Dec ¶¶ 47-50, 52, 54, 55; Elmaraghy Aff. ¶¶ 7-8. US Memo pp.*. Moreover, the Bell declaration in no way demonstrates that requiring a secondary plant here is preferable to the IPCD's approach of requiring an interim high-rate treatment and disinfection facility here while the final remedy is being designed and constructed. As Mr. Klingenstein has stated in his declaration (points which are unaddressed by Dr. Bell), the interim facility will provide a comparable level of public health protection as a secondary treatment facility at a fraction of the cost. It will reduce SSO 700's untreated discharges from over 40/year to one every several years or so and will almost completely eliminate the environmental impact from this SSO. Klingenstein Dec. ¶¶ 27-28, 32, 50-51; see also Klingenstein Dec. II ¶ 10. Further, it would accommodate the dual-purpose use of the Mill Creek Tunnel, if it is built by the Corps for flood control. The Tunnel would result in the complete elimination of SSO 700 as well as eliminating many of their CSOs – at a significant cost savings to the residents of Hamilton County compared to a secondary WWTP at SSO 700 plus the additional measures necessary to address the CSOs in this watershed. Klingenstein Dec. ¶ 37, 44, 48, 53; see also Klingenstein Dec. II ¶ 12. If the tunnel is not built, of course, defendants still must spend whatever it takes to eliminate or otherwise bring SSO 700 and the area's CSOs into compliance. Defendants must provide notice by December 2005 whether they plan to pursue the tunnel as part of their permanent solution for SSO 700. IPCD ¶ VI.C.1. In short, requiring construction of an expensive permanent secondary WWTP now at SSO 700 is unwarranted and is not preferable to the approach in the IPCD. given that the interim remedy will reduce untreated discharges from SSO 700 while the decision is made whether certainly not preferable to the approach set forth in the IPCD.

[33] Sierra Club states that the SSOs are "not required to end until 2022." SC Op. 14. This is very misleading. Numerous SSOs are expected to be eliminated much sooner by the CIPs in the IPCD. See, e.g., Bell Depo. p. 130 ("[T]here's no reason to believe that the [SSO CIP] projects . . . won't work."). Further, as explained in the United States' Memorandum at pp.58, n.66, defendants will need to provide a phased construction schedule that has SSOs (and the other

-23-

Moreover, the "backstop" date of 2022, which provides for a construction schedule of 15 years from the anticipated date of approval of the LTCPU and CAPP, is reasonable. Recent CSO consent decree guidance issued by EPA counsels that CSO LTCP consent decrees should require that all work be completed "at the earliest practicable date consistent with the CSO Policy," and that "where costs of remedial measures are expected to be especially large, a construction schedule of up to fifteen years, or where compelling circumstances exist, up to 20 years, may be appropriate." Negotiation of Combined Sewer Overflow (CSO) Consent Decrees, U.S. EPA/U.S. DOJ, Sept. 16, 2003 (included in Appendix A).[34]

Finally, for Sierra Club to suggest that it has "competent evidence" that would warrant this Court's disapproval of the Consent Decrees and imposition of a ten year SSO-only schedule or a mandate that defendants build a secondary plant at SSO 700 in five years borders on the disingenuous. The Bell declarations contain nothing more than conclusory assertions that construction of this sort is technically feasible, with no engineering studies or other detailed analysis.[35] Similarly meritless is Sierra Club's assertion that MSD has performed a "study" that

---

violations) being addressed in a logical way over time. The "end construction" deadline of 2022 means that the final violations must be addressed by then (or sooner if possible), but many of the violations are likely to be corrected much sooner than 2022.

[34] Dr. Kavanaugh's financial analysis, which was performed prior to the lodging of the Final Decree, assumes that the pollution controls will be finished in 2023. Supplemental Declaration of Michael Kavanaugh (attached to SC Op.) ¶ 14(d).

[35] Bell Dec. Appendix B, ¶¶ 14, 22; see also note 32 supra. Sierra Club's estimate that the SSOs can be fixed in 10 years is presumably based on Bell's assertions concerning various construction projects that Atlanta is implementing under CSO consent decree lodged in 1997. While it is true that Atlanta must fix its CSOs by 2007, Bell's declaration omits the fact that Atlanta has a second decree for SSOs, which was lodged in 1999 and has a complete construction deadline of 2014. Klingenstein Dec. II ¶ 7.

shows that a full secondary plant is feasible at SSO 700.[36]  At the same time, Sierra Club attempts to attack <u>Mr. Klingenstein's</u> credibility for offering opinions without having performed an "engineering study." SC Op. n.26.[37]

Ultimately, the exact level of either of these experts' knowledge is somewhat beside the point here.[38]  Under the Decrees, the <u>defendants</u> are required to perform sufficient study and analysis to propose appropriate solutions, schedules, and priorities for their sewer system problems, and to support those proposals with sufficient information for the regulators to make an informed decision on whether or not to approve them. (Sierra Club is of course also free to review the plans and offer its opinion about whether they should be approved or not.)  This matter is not being litigated in this decree approval process.  Thus, it is frankly irrelevant if Sierra Club <u>could</u> prove that the SSOs can be fixed in ten years.  The Decrees include reasonable schedules, that are consistent with EPA's guidance.  Might this Court require a tighter deadline after trial?

---

[36]  The two-page abbreviated "notes," apparently authored by an MSD employee and attached as Appendix D to the Third Bell Declaration can hardly be considered a "study." Klingenstein Dec. II ¶ 11.

[37]  Sierra Club attempts to impugn Mr. Klingenstein's credibility by attributing a statement to Mr. Klingenstein that he never made, complaining that Mr. Klingenstein did not conduct a study to support the statement that he never made, and then arguing that Mr. Klingenstein's credibility in this case has been seriously undercut because he did not conduct a study to support the statement that he never made. SC Op. p. 26.  Specifically, Sierra Club claims that Mr. Klingenstein indicated that "he doubted that the site at SSO 700 is sufficient for a full secondary treatment plant." <u>Id.,</u> citing Klingenstein Dec. ¶ 48.  In fact, Mr. Klingenstein simply stated that "I have seen no information indicating that a site sufficient for a full secondary treatment plant is available." Klingenstein Dec. ¶ 48.

[38]  It is worth noting, however, that Mr. Klingenstein is far more familiar with defendants' system than is Dr. Bell.  Mr. Klingenstein and others at SAIC have spent over 7000 hours reviewing and learning about defendants' system, models, and plans, speaking to State regulators and the Army Corps, and otherwise becoming very familiar with defendants' system, violations, and potential solutions. Klingenstein Dec. ¶ 8.

Perhaps, but this is certainly not assured, and a tremendous level of resources would be required

for the regulators to prove, and this Court to determine, the appropriate schedule and injunctive

relief were this case to proceed to trial.[39]

C.    Sierra Club's Various Arguments Concerning the Final Decree's Provisions
      Related to Water Quality Standards Are Not Compelling.

Sierra Club attempts in several different ways to argue that the Final Decree contains

illegal or otherwise inappropriate provisions concerning compliance with water quality standards.

None of these provides grounds for disapproval of the Decrees.

First, Sierra Club makes the entirely unsubstantiated and false assertion that the Final

Decree will allow for a LTCPU that does not protect "existing uses." SC Op. pp. 31-32. The

Final Decree does nothing of the sort. Specifically, the Final Decree requires that defendants

develop and submit to the regulators a LTCPU that includes remedial measures "necessary to

achieve the goals of insuring that . . . Defendants' CSOs comply with the requirements of the

Clean Water Act, U.S. EPA's CSO Policy, Chapter 6111 of the Ohio Revised Code and the rules

promulgated thereunder, the Compact and the pollution control standards promulgated thereunder,

and Defendants' Current Permits." Final Decree Exhibit 4 ¶ II.E, see also Final Decree ¶ VII.A.1

& A.2. Because U.S. EPA's regulations at 40 C.F.R. § 131.10(h)(1) prohibit revising water

quality standards below a level necessary to protect "existing uses,"[40] any LTCPU premised upon

---

[39] As an example, Bell asserts that it would cost $100,000 for the United States merely to
develop independent estimates of the cost of the defendants' proposed remedial measures for this
case. Bell Dec. ¶ 36. Without necessarily agreeing with this estimate, plaintiffs note that if the
case were to proceed to trial, they would need to develop not only cost estimates but would also
need to prove the appropriateness of the particular injunctive relief sought.

[40] "Existing uses" are defined by 40 C.F.R. § 131.3(e) as "those uses actually attained in the
water body on or after November 28, 1975." See also 40 C.F.R. § 131(g)(emphasis in

the belief that water quality standards will be revised in a manner that does not protect "existing uses" would not be approvable under the Final Decree because it would not result in compliance with the Act. See also 59 Fed. Reg. 18,694, col. 3 (Apr. 19, 1994).

Sierra Club suggests that the Final Decree is somehow defective in providing defendants an opportunity, as they evaluate the measures necessary to bring their CSOs into compliance, to also evaluate the possibility of seeking revisions to water quality standards,[41] and, if it appears that such revisions are likely to occur, to propose a LTCPU that reflects that likelihood.  SC Op. pp. 33-34.  However, as described in the United States' Memorandum, pp. 61-62, the Final Decree's approach is precisely the approach called for by U.S. EPA's 1994 CSO Policy, endorsed by Congress at 33 U.S.C. § 1342(q), and further described and discussed in various subsequent EPA guidance, including guidance on CSO consent decree drafting issued in September 2003.[42] These guidance memoranda emphasize specifically:  that a LTCP can be based on anticipated changes to water quality standards; that compliance should be measured based on the water quality standards and "Current Permits" that are in effect after the LTCP has been implemented, to account for the possibility that ultimate compliance goals may differ from those in place at the entry of a decree; and that CSO consent decrees should include provisions allowing EPA to

---

original)("States may remove a designated use which is not an existing use . . if the State can demonstrate that attaining the designated use is not feasible . . . ."

[41]  Under EPA regulations, standards can be revised if, inter alia, the costs of controls necessary to attain the "designated use" "would result in substantial and widespread social and economic impact," 40 C.F.R. § 131.10(g)(6)

[42]  In a related vein, this Court should disregard Sierra Club's insinuation that Ohio EPA and ORSANCO are somehow acting inappropriately in evaluating the appropriateness of Ohio River's water quality standards during wet weather, SC Op. p. 33, n.42, as such evaluations are entirely in keeping with the CSO Policy and Congress' directives in 33 U.S.C. § 1342(q).

require a defendant to modify a LTCP where the LTCP was based on anticipated change in water

quality standards that did not occur.[43]

Sierra Club also makes a number of arguments premised upon the belief that the Final

Decree somehow provides defendants unfettered discretion in choosing the LTCPU that will have

to be implemented under the Final Decree. These include the arguments that, under the Final

Decree: "Defendants may refuse to develop a LTCP that meets the Water Quality Criteria," SC

Op. p. 31 (emphasis added); defendants can unilaterally avoid the obligation to develop an

appropriate LTCPU simply because defendants have requested that water quality standards be

revised, id. pp. 31 n.39, 34 & n.44; and defendants are not bound to implement a LTCPU

necessary to meet current legal requirements if it does not appear that those requirements are

likely to change due to revisions to water quality standards, id. at 32, 33. These arguments are

without merit because they are based upon a mischaracterization of the Final Decree's provisions.

As already noted, the Final Decree requires defendants to develop and submit to the

regulators a LTCPU that includes measures "necessary to achieve the goals of insuring that . . .

Defendants' CSOs [comply with applicable legal requirements]." Final Decree Exhibit 4 ¶ II.E,

see also Final Decree ¶ VII.A.1 & A.2. To the extent defendants' proposed LTCPU is premised

upon defendants' belief that water quality standards will be revised, but the regulators disagree,

defendants would be required under the Final Decree to (1) resubmit a LTCPU, within 120 days

of receiving the regulators' comments, that contains measures necessary to comply with current

requirements, and to then implement those measures upon approval or (2) invoke dispute

---

[43] See EPA Memorandum: Negotiation of CSO Consent Decrees, Sept. 16, 2003, pp. 4-5; EPA Memorandum: Water Quality-Based and Technology-Based CSO Requirements, July 7, 1997, pp. 2-3 (both of which are included in Appendix A).

resolution and attempt to persuade this Court to allow them to implement a LTCPU that will not

result in compliance with current requirements. Id. ¶ VII.A.3-4  Defendants may not unilaterally

refuse to comply.[44]

Further, even if defendants propose a LTCPU based on the assumption that water quality

standards will change, the Final Decree requires defendants to develop a suite of alternatives that

will result in compliance with the standards that are in effect now.  Final Decree, Exhibit 4,

LTCPU Work Plan ¶II.G.  The statement in the LTCPU Work Plan that defendants are not

necessarily proposing to implement these measures is not an act of defiance, as implied by Sierra

Club, SC Op. p. 32, but rather reflects defendants' belief that any LTCPU they propose based on

an anticipated change to WQS is appropriate.  Ultimately, as noted, the regulators, or this Court

through dispute resolution, will dictate what defendants must implement, which could be the suite

of alternatives necessary to meet water quality standards that are in place now.

D.    The Decrees Contain No Illegal Remedies

The Consent Decrees require defendants to develop and implement long term remedial

measures to bring their CSOs, SSOs, bypassing and basement backup problems into compliance

with the law.  The Decrees also require defendants to construct and implement a number of

interim remedial measures, to ameliorate conditions pending completion of the final compliance

measures.  Sierra Club objects to two of those measures:  construction of state-of-the-art interim

---

[44] Similarly contrary to Sierra Club's statements, see SC Op. pp. 31 n.39, 34 n.44, defendants
may not unilaterally extend the February 28, 2022 date for completion of the LTCPU measures
under Section VII.B of the Final Decree.  Instead, that date may only be extended under that
section of the Decree if either the regulatory agencies or this Court through dispute resolution
had first agreed that defendants had demonstrated in their LTCPU Report that water quality
standards were likely to be revised, and then those revisions in fact did not occur.

wet weather treatment facilities at SSO 700 and at the Sycamore WWTP. These interim measures

will virtually eliminate the public health risks posed by the hundreds of millions of gallons of

sewage that would otherwise be discharged untreated or partially treated while the long term

remedial measures plans are being developed and implemented.[45] SC Op. pp. 20-25.

Sierra Club first argues that the Decrees are "inconsistent with law" in requiring these

interim remedial facilities. SC Op. p. 20. However, other than arguing that these interim

measures may not by themselves be enough to achieve ultimate compliance with the law, Sierra

Club offers no support for its assertion that the Consent Decrees are illegal for including them.

This Court, of course, has equitable discretion to approve consent decrees containing interim

remedial measures to protect public health pending completion of the long term remedial

measures that are necessary to achieve ultimate compliance. See US Memo pp.52-54,

Responsiveness Summary ¶ 36.

Sierra Club next argues that the SSO 700 interim remedial measures are not in the public

interest because Sierra Club believes that a conventional secondary treatment facility should be

constructed instead. SC Op. p. 23. This argument has already been addressed above in

responding to Sierra Club's arguments that Defendants' SSOs should be remedied first. See supra

¶ II.B.3 and n.30.

Sierra Club next resorts to misrepresentations to support its view that the construction and

---

[45] As previously explained, and Sierra Club does not dispute, the high rate treatment and
disinfection facilities being constructed under the Decrees at SSO 700 and the Sycamore WWTP
will provide a high level of disinfection of the bacteria and other disease-causing organisms
found in sewage, comparable to that achieved by the type of secondary treatment facility
proposed by Sierra Club, and they will also remove a substantial amount of suspended solids and
biochemical oxygen demanding materials. Klingenstein Dec. ¶¶ 27-28, 32.

implementation of the interim measures to treat bypasses at the Sycamore WWTP are not in the public interest. Specifically, Sierra Club notes that U.S. EPA is taking comment on a proposed "blending" policy, see 68 Fed. Reg. 63,042 (Nov. 7, 2003), and then suggests that the Decrees are somehow attempting to implement that policy before U.S. EPA has finalized it. SC Op. p. 25. Under that policy, NPDES permits could allow diversions of flow around portions of treatment facilities under limited circumstances without such diversions being considered "bypasses," and therefore such diversions could be allowed on a permanent basis without a showing that there are no feasible alternatives to the diversion. 68 Fed. Reg. at 63,049-50. This approach would be in contrast to the more stringent approach of treating such diversions as bypasses, and prohibiting them unless there are no feasible alternatives to the bypass, the approach advocated by the Commonwealth of Pennsylvania in the comments Sierra Club attached to its Opposition. As described previously, see Responsiveness Summary ¶ 19, nothing in the Final Decree treats the diversions around the Sycamore WWTP as anything other than bypasses, and the Final Decree requires that defendants implement all feasible alternatives to bypass at the WWTPs, including at the Sycamore plant. Thus, contrary to Sierra Club's conclusory and unsupported assertions, the Final Decree is consistent with the more stringent approach advocated by the Commonwealth of Pennsylvania, not the approach set forth in the proposed "blending" policy.

    E.    <u>The WIB Programs are Appropriate and Can Be Overseen, in Part, by an Ombudsman If This Court Believes it Appropriate.</u>

Sierra Club's brief adds very little to its previous comments on the WIB Programs. As was fully explained in the United States' initial filing, there is no need to set a particular funding commitment up front in the Final Decree for the WIB Programs. Such a funding plan will be

forthcoming as part of the LTCPU in June 2006, is subject to the regulators' approval, and will be enforceable. In the meantime, defendants are nevertheless required to fund the program appropriately, since if the Final Decree is entered, they will be subject to this Court's order to implement the program. The United States' filings also set forth in detail why the WIB Programs are fair, reasonable, and in the public interest, including how they do not violate due process, contain sufficient benchmarks and reporting requirements for the regulators (and Sierra Club) to oversee, and are sufficiently detailed to be enforced, including through the imposition of stipulated penalties. See US Memo pp. 66-69; Responsiveness Summary ¶¶ 3, 26-29.[46]

Sierra Club provided an affidavit of Ryan Lehan and videotape of a May 2003 sewage backup in support of several additional points. First, Sierra Club asserts that defendants are requiring participants in its current program to release all personal injury claims against them as a condition for settlement of property damage claims. Counsel for the United States has informed defendants that such a release is inappropriate, and has been informed that the release now only requires waiver of further claims for property damage arising from the WIB incident that is being

---

[46] The regulators have received, and are in the process of reviewing, the first quarterly report under the Final Decree documenting the substantial efforts defendants have made through the end of March to implement the WIB Programs. As of the end of March, concerning the WIB Prevention Program, defendants are evaluating and investigating hundreds of properties, have 21 locations for which remedial measures are under design, and have approved, following initial engineering evaluation, an additional 58 customers for inclusion in the Prevention Program. Under the WIB Customer Service Program, defendants have responded to hundreds of requests for cleanup services, most of which involved physical inspection of the affected properties. During the past quarter, over 110 cleanups are reported to have been completed. Finally, as the end of March, 63 claims totaling over $120,000 have been paid under the WIB Claims Program Klingenstein Dec. II ¶ 14.

necessary.[49]

## III.    <u>CONCLUSION</u>

For the reasons set forth above and in the United States Memorandum and supporting

documents, plaintiffs, United States, State of Ohio, and ORSANCO, respectfully ask this Court to

find that the IPCD and Final Decree, taken together, are fair, reasonable and consistent with the

Clean Water Act and to enter them as orders of this Court.

Respectfully submitted,
THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.  20530


LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 514-4114

GREGORY G. LOCKHART
United States Attorney
for the Southern District of Ohio

---

[49] As will be set forth in the Plaintiffs' forthcoming response to Plaintiff Intervenor Sierra
Club's Motion for Court-Appointed Special Master, the regulators continue to oppose the
imposition of a Special Master to oversee the Clean Water Act compliance provisions of the
Consent Decrees.  Defendants' compliance with these provisions of the Act have been committed
to EPA, Ohio EPA, the regulators fully intend to do their jobs, and appointment of a special
master to oversee these functions threatens to impermissibly usurp the regulators' core functions.
Sierra Club's request is, at a minimum without foundation and premature.

By: _____Donetta Wiethe___ (p.t.a. CA)

DONETTA D. WIETHE (0028212)
Assistant United States Attorney
221 East Fourth Street
Atrium II, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

OF COUNSEL:

Gary Prichard
Associate Regional Counsel
U.S. EPA, Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, IL 60604-3590

Andrew Stewart
Attorney-Advisor
U.S. EPA, Office of Enforcement and
  Compliance Assurance
Ariel Rios Building (2243A)
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

FOR STATE OF OHIO:

JIM PETRO
Attorney General

By:    _____ Margaret Malone (pta LA)
MARGARET A. MALONE (0021770)
Assistant Attorney General
Environmental Enforcement Section
30 East Broad Street
25th Floor
Columbus, Ohio 43215-3400
(614) 466-2766

FOR OHIO RIVER VALLEY WATER
SANITATION COMMISSION:

_____ Steven Justice (pt-LA)
J. STEVEN JUSTICE (0063719)
Taft, Stettinius & Hollister LLP
110 N. Main St., Ste. 900
Dayton, OH 45402
(937) 228-2838

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, Plaintiffs' Reply Memorandum in Support of

United States' Motion for Entry of Consent Decrees, and its associated attachments, was served

on the 13th day of May, 2004, electronically on:

Donneta D. Wiethe; Gary Prichard; Margaret A. Malone; J. Steven Justice; Christopher J.

Buckley; Peter P. Murphy; Michael K. Murphy; Kevin M. St. John; Nee Fong Chin;

Terrance A. Nestor (for himself and the Cincinnati City Solicitor); Albert J. Slap; D.

David Altman (for himself and Amy Jo Leonard); and Lance D. Himes.

LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice