IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF OHIO,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO AND THE CITY OF CINCINNATI, OHIO,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. C-1-02-107<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

SECOND DECLARATION OF MARK J. KLINGENSTEIN, P.E.
IN SUPPORT OF MOTION BY THE UNITED STATES FOR
ENTRY OF THE INTERIM PARTIAL AND CSO CONSENT DECREES

I, Mark J. Klingenstein, P.E., declare:

1. This is my second declaration in support of the United States' motion for entry of the Interim Partial and CSO Consent Decrees. My first declaration, dated April 16, 2004, addressed comments raised by the Intervenor Sierra Club. This Second Declaration specifically addresses issues raised by Sierra Club's technical expert Dr. Bruce Bell in his April 29, 2004 Third Declaration. This declaration incorporates by reference Paragraphs 1 through 4 from April 16, 2004 declaration that describe my qualifications and experience, as well as my *curriculum vitae* attached to that declaration.

2. In his Paragraphs 5, 8, and 35, Dr. Bell raises concerns that the Consent Decrees are too complex, and that as a result of that complexity and resource limitations, the regulatory agencies will be unable to effectively administer the Decrees, or monitor Defendants' performance under the Decrees. I disagree. I have been involved in the development of the following entered collection system consent decrees: Miami, Florida (Metro Dade County); Toledo, Ohio; Youngstown, Ohio; New Albany, Indiana; Anderson, Indiana; Birmingham, Alabama (Jefferson County); and Baltimore, Maryland. In addition, I am currently personally involved in assisting USEPA in administering the Toledo, Ohio; New Albany, Indiana; Youngstown, Ohio; and Anderson, Indiana decrees. In each of these cases, I have worked directly with qualified USEPA technical staff in either

developing and negotiating decree language, or in reviewing required submissions and monitoring progress following decree entry. Each of these consent decrees is similar in complexity to the proposed Consent Decrees.

3. In my experience, USEPA assigns its own staff, and in many cases (including this case) hires technical experts, to support development and subsequent administration of each collection system consent decree. Dr. Bell offers no specific examples of Federal Consent Decrees that the regulatory agencies have failed to adequately administer and oversee as a result of either resource limitations or excess consent decree complexity.

4. In his Paragraph 5, Dr. Bell also raises concern that the proposed decrees do not include a "fixed date implementation schedule" for the LTCP. Dr. Bell's assertion is not accurate, as the proposed Consent Decrees include generally applicable "backstop" dates by which remedial measures must be implemented. Nonetheless, the United States has entered into consent decrees with municipalities in which remedial measures implementation dates are established solely by plans to be submitted for approval under those decrees, without the provision of "backstop" dates. Both the Youngstown, Ohio and Port Clinton, Ohio decrees rely on specifically this approach to remedial measure implementation. As noted above, I was directly involved in the development of the Youngstown decree, and I am familiar with the Port Clinton decree.

5. Another concern raised by Dr. Bell is that the proposed Decrees allow Defendants to petition the regulatory agencies for additional time to identify and implement corrective measures to address problems encountered in the course of implementing remedial measures under the proposed Decrees without being subject to stipulated penalties. Dr. Bell notes in his Paragraph 34 that "application of this provision to elimination of SSOs...is not consistent with EPA policy." I do not agree. I was personally involved in the development of the Jefferson County decree, and the Baltimore decree; both decrees contain similar provisions that apply to SSOs. It should be noted that courts have entered consent decrees that provide for no stipulated penalties for SSO violations, per se. The Winchendon and Greenwich decrees allow for waiver of stipulated penalties for SSOs so long as the Defendants are in compliance with their construction schedules, take appropriate steps to minimize the overflows, and report the overflow as required by the decrees. The Honolulu decree provides for stipulated penalties related to SSOs, only if "best efforts" are not made to minimize overflows. I am familiar with the three aforementioned decrees.

6. As is common in collection systems that have both CSOs and SSOs, Hamilton County's CSOs discharge a much larger volume per year than do its SSOs. These CSO points allow the release of peak wet weather flows that are larger than the collection and treatment system can process; total volume discharged from CSOs in a typical year is over 6 billion gallons. In comparison Hamilton County's current "enumerated SSO" volumes in a typical year are generally an order of magnitude smaller (i.e., hundreds of millions of gallons per typical year) compared to Defendants' CSOs. All else being

equal, more active, larger volume overflows pose greater risk to human health and the environment than smaller, less active overflows.

7. Dr. Bell suggests in his paragraphs 17 and 23 that defendants should be compelled to address SSOs before controlling CSOs. I am familiar with other consent decrees in which control of CSOs was required before elimination of SSOs. These have included the Atlanta and Baltimore consent decrees. In the Atlanta decrees, CSO elimination is required by July 1, 2007, while the last separate sewer system remedial measures are required to be completed by July 1, 2014. In the Baltimore decree, CSO elimination is required by June 2006, while the last separate sewer system remedial measures are required to be completed by January 1, 2016.

8. In his Paragraph 19, Dr. Bell notes that "remedies for SSOs upstream of combined portions of the system must be identified prior to being able to develop a Long Term Control Plan." In my opinion, remedies for "upstream SSOs" can be developed prior to LTCP development; however, LTCP development and SSO remedy development best take place simultaneously, as is provided for in the proposed decrees. This allows for the development of holistic solutions, and the consideration of both upstream and downstream impacts when identifying the best use of available resources.

9. Dr. Bell, in his Paragraph 21, repeats the complaint that the proposed Consent Decrees have "few if any milestone dates." This is completely inaccurate. Under the CSO decree, Hamilton County is required to submit a schedule for the implementation of remedial measures, that identifies three milestones per project. These are "submission [to OEPA] of applications for Permit to Install" ("PTIs"), "Commencement of Construction", and "Commencement of Operation/Substantial Completion of Construction." In its 1996 Draft LTCP, Hamilton County proposed a total of 68 "collection system and high rate treatment projects." I would expect Hamilton County's revised LTCP and schedule to contain a similar number of discrete projects. At three milestones per project, such a schedule would include over 160 milestone dates for the LTCP Update implementation alone; these should allow more than adequate monitoring of implementation progress.

10. In Dr. Bell's Paragraph 25, he states that my assertion that the proposed SSO 700 interim treatment facility "will negate much of the environmental harm currently caused by SSO 700" are without basis, because no formal "study" of the topic has been produced. Dr. Bell's assertion is entirely inaccurate. Assessment of every technical topic does not require completion of a formal "study." Hamilton County has utilized its recently upgraded hydraulic model to revise its estimates of the typical discharge characteristics of SSO 700. At the request of EPA, I (along with Jim Simpson of OEPA) participated in a technical group that provided input to Hamilton County in that model upgrade. As a result, I am very familiar with Hamilton County's modeling capabilities. Furthermore, as a registered engineer in three states, I am quite familiar with the performance and capabilities of the proposed interim treatment facility and the characteristics of SSO discharges. I am surprised that Dr. Bell would think it necessary to carry out a "formal"

3

study to ascertain that such a system would dramatically reduce untreated overflows, public health risks, and environmental impacts.

11. In his Paragraph 27, Dr. Bell references a document purported to be a "study" of secondary treatment by Hamilton County MSD. This untitled two page document does not provide any comparative analysis of alternatives, costs, relative benefits and impacts, or any support for the assertions contained therein. With no knowledge of its origin or underlying bases, I have no basis for viewing the referenced document as presenting the results of a "study."

12. In his Paragraph 28, Dr. Bell observes that "the cost for a secondary treatment plant at SSO 700 is also significantly below the costs for the Mill Creek Tunnel." That is accurate; however, Dr. Bell neglects to consider all of the benefits of the proposed Mill Creek Tunnel. These benefits, as described in my April 16, 2004 declaration's paragraphs 37 and 44, include the elimination of overflows from a large number of Mill Creek CSOs in a typical year.

13. In his Paragraph 36, Dr. Bell opines that the only way to review and judge the adequacy of a cost estimate is to independently generate a "parallel" estimate. Such an assertion is both inaccurate and misleading. Based on my experience, it is not necessary to "replicate" every step of a detailed technical or financial analyses to review that analysis and its results. Experience and alternative costing approaches allow qualified individuals to carry out review of detailed cost estimates in a fraction of the time and effort that went into creating the estimate being reviewed.

14. At the request of USEPA, I have reviewed the WIB program sections of Hamilton County's most recent quarterly consent decree report. Attachment B to the quarterly report summarizes activities under the WIB Prevention Program. This summary indicates that Hamilton County has underway evaluations and investigations of hundreds of WIB complaints, currently has 21 locations for which remedial measures are under design, and has approved, following initial engineering evaluation , an additional 58 customers for inclusion in the Prevention Program. Attachment C to the quarterly report describes activities under the Customer Service Program.  This attachment documents hundreds of responses by Hamilton County to requests for cleanup services; most of which involved physical inspection of the affected properties. During the past quarter, over 110 cleanups are reported to have been completed. Attachment D to the quarterly report indicates that 63 claims totaling over $120,000 have been paid under the WIB Claims Program.

15. In some cases, necessary remedial measures, including long term CSO control, has been adequately identified prior to the development of a consent decree. In these circumstances the required remedial measures may be specified in detail in the consent decrees or their  attachments.  It is generally only under such circumstances that it will be technically possible to develop and include detailed schedules for the identified measures in the decrees or their attachments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, May  13 , 2004

_____
Mark J. Klingenstein, P.E.