EXHIBIT 2

DEPOSITION of Dr. Bruce Bell
(excerpts)

```
                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
                       WESTERN DIVISION
-----------------------------------------
                                          :
UNITED STATES OF AMERICA, et al.,         :
                                          :
         Plaintiffs,                      :
                                          :
SIERRA CLUB, et al.,                      :
                                          :
         Intervenors,                     :
                                          :
     vs.                                  :    CASE NO.
                                          :    1-02-107
THE BOARD OF COUNTY COMMISSIONERS         :    (Consol. with
OF HAMILTON COUNTY, OHIO                  :    C-1-02-108 and
 &                                        :    C-1-02-135)
THE CITY OF CINCINNATI,                   :
                                          :
         Defendants.                      :
                                          :
-----------------------------------------

         Deposition of:   BRUCE A. BELL, Ph.D., P.E.

         Taken:           By Board of County
                            Commissioners of Hamilton
                            County, Ohio and the
                            City of Cincinnati
                          Pursuant to Agreement

         Date:            February 5, 2003

         Time:            Commencing at 9:00 a.m.

         Place:           Law Office of David Altman
                          15 East Eighth Street
                          Cincinnati, Ohio  45202

         Before:          S. Diane Farrell, CRR
                          Notary Public - State of Ohio
```



COPY

    Q.    Is it your position that the projects on Exhibit 3 which are designed to address certain SSOs should not be able to be modified based upon the results of the systemwide modelling?

    A.    It's my position that there's no reason to believe that the projects that are listed on Exhibit 3 won't work. Is there maybe a better project out there some day? Sure. But if we keep waiting for the better one, I still wouldn't own a computer either.

    If it were clear that one could only modify, if they actually could demonstrate that the projects that are there wouldn't work, and it was clear -- which I don't believe it is in there -- that the -- any delay belongs to MSD, which I'm not at all sure is clear, because what if EPA sits on the request for five years, as they've been known to do, then I might not have a problem with it.

    The problem with it the way it's set up is that every time you think you have a better project, you can request another change and another change in schedule that goes with it.

    Q.    And EPA may say yes or it may say no, correct?

    A.    Or it may never answer.

    Q.    What if the systemwide model indicated that a particular project on that list as currently designed was

```
 1   of those projects as SEPs?
 2           (Off the record.)
 3       A.  No.
 4           (Defendant's Exhibit 15 was marked
 5           identification.)
 6       Q.  Okay. All right. Sir, I've had marked as
     Exhibit 15 the oral deposition of Bruce A. Bell taken in
     Little Rock, Arkansas on October 8th, 2001. Is this, sir,
     your deposition in the Little Rock case?
10       A.  I believe it probably is. Looks like it.
11       Q.  Okay. It was taken under oath, wasn't it?
12       A.  Sure.
13       Q.  Was the testimony you gave truthful?
14       A.  To the best of my ability, I'm sure it was.
15       Q.  After your testimony was taken, was the
     transcript furnished to you and reviewed by you?
17       A.  If memory serves, it was.
18       Q.  I'm sorry?
19       A.  If memory serves, it was.
20       Q.  Did you sign it?
21       A.  By memory, I think I did.
22       Q.  Well, take a look at it. Is that your
     signature?
24       A.  Okay. Then I did, yes.
```

```
 1        Q.    In fact, did you make certain corrections to
 2   it?
 3        A.    Yes, I did.
 4        Q.    To the best of your recollection as you sit
 5   here today, and I recognize that this deposition was taken
 6   some time ago, was any of your testimony incorrect?
 7        A.    To the best of my recollection, it was not.
 8        Q.    Now, I'd refer you to page -- I refer you, sir,
 9   to page 245 of your transcript.  Specifically starting at
10   line 8, and I'm quoting, QUESTION:  And we've questioned
11   (sic) the settlement agreement with the utility on several
12   occasions.  Do you think that the current settlement
13   agreement that has been sent to the Department of Justice
14   is a fair agreement?
15              ANSWER:  I think so.
16              That was your testimony, was it not, sir?
17        A.    Yes, it was.
18        Q.    And I refer you over to page 252 and 253
19   beginning at page -- I'm sorry, beginning at page 252, line
20   24.  QUESTION:  You characterized the settlement agreement
21   between the utility and the Sierra Club, the plaintiff, as
22   a fair agreement?
23              ANSWER:  I believe it is.
24              That was your testimony, wasn't it?
```

1      A.     Yes.

2      Q.     QUESTION: Do you have an opinion as to whether
3 or not that settlement agreement should be approved by the
4 Department of Justice?

5             ANSWER: I don't know that my opinion matters
6 at that. But my experience with Justice -- I think it
7 should be, and I -- the only issue that I can imagine them
8 commenting on it is actually the SEPs and that's because
9 they have their own crazy rules for supplemental
10 environmental projects, and they go down their checklists.

11            And you know, I didn't spend a lot of time
12 reading them. But what I read of them seemed like they'd
13 worked -- similar to things that have worked in the past.
14 So I can't imagine why they wouldn't approve it.

15            But I -- certainly if they were to ask me --
16 and they won't -- I would recommend it.

17            That was your testimony, wasn't it?

18     A.     Yeah.

19     Q.     Now, let's take a look at the settlement
20 agreement. I believe you testified that it was signed by
21 the Sierra Club, correct?

22     A.     I think you testified it was signed by the
23 Sierra Club. But I imagine if it was entered, it was
24 signed by the Sierra Club.

```
 1        Q.    Okay.  Now, there's a definition in this
 2   agreement of a design storm event, is there not, on pages 3
 3   and 4?
 4        A.    Yes.
 5        Q.    Is that essentially a two-year storm?
 6        A.    It's close to a two-year storm, yes.
 7        Q.    Okay.  And is it fair to state that there was
 8   no need to eliminate SSOs under this decree that resulted
 9   from larger than whatever that design storm was?
10        A.    Yes.
11        Q.    The consent decree envisioned a study of
12   capacity, did it not?
13        A.    Yes.
14        Q.    And it was -- the study was related to SSOs,
15   correct?
16        A.    Yes.
17        Q.    Okay.  But there wasn't any deadline set in
18   this decree itself, was there?
19        A.    As I recall -- I'd have to read the whole
20   decree, but as I recall, there was a deadline for the
21   study.  There was a requirement to build to what was in the
22   study.  The schedule was left to the study dispute
23   resolution mechanism if the two sides could not agree on
24   the timetable.
```

```
 1         Q.    Right.  But there was no implementation
 2   deadline in this decree, was there, directly?
 3         A.    Directly, no.
 4         Q.    And, in fact, the Sierra Club was to be paid
 5   $5,000 to cover a review of this study and suggested
 6   compliance deadline to be conducted by you, correct?
 7         A.    Yes.
 8         Q.    And regarding maintenance, the utility was to
 9   clean all SSOs pursuant to its established procedures,
10   correct?
11         A.    Yes.
12         Q.    Quote, as conditions allow, close quote,
13   correct?
14         A.    Yes.
15         Q.    There were no penalties for past violations
16   embodied in this decree, were there?
17         A.    I think they were done as SEPs.
18         Q.    So the only penalties -- the only -- there were
19   no dollar penalties assessed.  There were a certain number
20   of SEPs that were embodied in this decree?  Yes?
21         A.    Yes.
22         Q.    And there were no stipulated penalties in this
23   decree either, were there?
24         A.    No.
```

```
 1        Q.    And there was no moratorium imposed by this
 2   decree, was there?
 3        A.    No.
 4        Q.    And, in fact, the Sierra Club released the
 5   utility from any violations of its two NPDES permits
 6   resulting from capacity-related SSOs up to the compliance
 7   deadline, whenever that deadline would end up being,
 8   correct?
 9        A.    That's my understanding.
10        Q.    And, in fact, this is a full and final
11   settlement of the Sierra Club's claims in the lawsuit and a
12   resolution of all allegations through the termination date
13   of the settlement agreement, correct?
14        A.    That's my understanding.
15        Q.    And, in fact, this settlement agreement was a
16   complete and full remedy for all SSOs that occurred prior
17   to the settlement agreement's effective date, correct?
18        A.    Again, I am not reading that.  I assume it is.
19        Q.    And the settlement agreement was also a
20   complete and full remedy for all SSOs that would occur
21   after the effective date but prior to the termination date,
22   correct?
23        A.    If you -- if you want me to find it, I'll read
24   it, but I honestly don't remember.  This is law stuff, and
```

```
 1  I don't do the law stuff.
 2       Q.   All right.  Well, take a look at paragraph 27
 3  on pages 27 and -- I'm sorry, paragraph 27 on pages 28 and
 4  29.  Were you aware of the provisions of that paragraph --
 5       A.   No.
 6       Q.   -- paragraph 27?
 7       A.   No.
 8       Q.   Do you recall that you testified in your
 9  deposition in the Little Rock case that you need to know in
10  designing the system what the design storm is?
11       A.   Do I remember doing it?
12       Q.   Yes.
13       A.   No.
14       Q.   You agree with that statement?
15       A.   Yes.
16       Q.   Do you recall testifying in the case that you
17  cannot have 0 SSOs?
18       A.   I believe that -- I don't remember doing it,
19  but it wouldn't surprise me if I did.
20       Q.   Do you agree with that?
21       A.   I think unless you are a heck of a lucky
22  person, that's true.
23       Q.   Do you recall testifying in your deposition
24  that the utility needs to integrate fixes for SSOs, CSOs,
```

```
 1   storm water and wastewater treatment plant discharges,
 2   particularly with urban watersheds?
 3        A.   Do I remember?  No.
 4        Q.   Would you disagree with that?
 5        A.   No.
 6        Q.   Do you recall testifying in your deposition in
 7   the Little Rock case that once a basement backup is cleaned
 8   up, it's not much of an issue?
 9        A.   No.
10        Q.   Would you disagree with that?
11        A.   If it's properly cleaned up, that's true.
12        Q.   Do you recall in the Little Rock case that you
13   used benchmarking for a number of SSOs but not with respect
14   to O&M?
15        A.   No.
16        Q.   You don't remember that?
17        A.   No.
18        Q.   Do you remember using the Black & Veatch
19   studies, the benchmarking studies, for the number of SSOs?
20        A.   I remember having the Black & Veatch studies.
21   I can't remember how I used them.
22        Q.   You can't remember how you used them in Little
23   Rock?
24        A.   No.
```

1       Q.    Do you recall whether your deposition included
2  discussion of that by you?
3       A.    No.
4       Q.    Okay.  But in any event, to the extent there
5  were questions and answers about how you used the Black &
6  Veatch studies, or why you might have used or not used
7  portions of them, you don't have any reason to believe that
8  your testimony wasn't truthful and accurate?
9       A.    No.
10            MR. BUCKLEY:  Let's take a break.
11            (A recess was taken from 3:16 to 3:24.)
12            MR. BUCKLEY:  I don't have anything further, so
13       I'll turn it over either to the United States or
14       State of Ohio.
15                      CROSS-EXAMINATION
16  BY MR. PRICHARD:
17       Q.    I have just a few questions.  I'm Gary
18  Prichard.  I'm associate regional counsel with U.S. EPA,
19  here on behalf of the United States.
20            Dr. Bell, first, Mr. Buckley asked you some
21  questions about sewer moratoriums.  One question he didn't
22  ask, are you familiar with how many times in the past a
23  United States District Court judge has ordered a sewer
24  moratorium?