# APPENDIX A:

# REFERENCE MATERIALS

- Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Separate Sanitary Sewers, U.S. EPA 1996

- Compliance and Enforcement Strategy Addressing CSOs and SSOs, Apr. 27, 2000 (excerpts)

- EPA's CSO Guidance for Financial Capability Assessment and Schedule Development, Mar. 1997 (excerpts)

- EPA Memorandum:  Negotiation of CSO Consent Decrees, Sept. 16, 200

- EPA Memorandum: Water Quality-Based and Technology-Based CSO Requirements, July 7, 1997

THE ENFORCEMENT MANAGEMENT SYSTEM

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

(CLEAN WATER ACT)

CHAPTER X:  Setting Priorities for Addressing Discharges
            from Separate Sanitary Sewers

U.S. ENVIRONMENTAL PROTECTION AGENCY

OFFICE OF REGULATORY ENFORCEMENT

1996

## Setting Priorities for Addressing Discharges from
## Separate Sanitary Sewers

Discharges of raw or diluted sewage from separate sanitary sewers before treatment can cause significant public health and environmental problems.  The exposure of the public to these discharges and the potential health and environmental impacts are the primary reasons EPA is developing this additional guidance on these discharges.  This document provides a method of setting priorities for regulatory response, and serves as a supplement to the Enforcement Management System guidance (EMS, revised February 27, 1986).  As such, this document addresses only those discharges which are in violation of the Clean Water Act.  As a general rule, the discharges covered by this guidance constitute a subset of all discharges from separate sanitary sewer systems.

### Legal Status

In the context of this document, a "discharge from a separate sanitary sewer system" (or "discharge") is defined as any wastewater (including that combined with rainfall induced infiltration/inflow) which is discharged from a separate sanitary sewer that reaches waters of the United States prior to treatment at a wastewater treatment plant.  Some permits have specific requirements for these discharges, others have specific prohibitions under most circumstances, and still other permits are silent on the status of these discharges.

The legal status of any of these discharges is specifically related to the permit language and the circumstances under which the discharge occurs.  Many permits authorize these discharges when there are no feasible alternatives, such as when there are circumstances beyond the control of the municipality (similar to the concepts in the bypass regulation at 40 CFR Part 122.41 (m)).  Other permits allow these discharges when specific requirements are met, such as effluent limitations and monitoring/reporting.

Most permits require that any non-compliance including overflows be reported at the end of each month with the discharge monitoring report (DMR) submittal.  As a minimum, permits generally require that overflow summaries include the date, time, duration, location, estimated volume, cause, as well as any observed environmental impacts, and what actions were taken or are being taken to address the overflow.  Most permits also require that any non-compliance including overflows which may endanger health or the environment be reported within 24 hours, and in writing within five days.  Examples of overflows which may endanger health or the environment include major line breaks, overflow events which result in fish kills or other significant harm, and overflow events which occur in environmentally sensitive areas.

3

For a person to be in violation of the Clean Water Act: 1) a person must own, operate, or have substantial control over the conveyance from which the discharge of pollutants occurs, 2) the discharge must be prohibited by a permit, be a violation of the permit language, or not be authorized by a permit, and 3) the discharge must reach waters of the United States. In addition, discharges that do not reach waters of the United States may nevertheless be in violation of Clean Water Act permit requirements, such as those requiring proper operation and maintenance (O&M), or may be in violation of state law.

## Statement of Principles

The following six principles should be considered as EPA Regions and States set priorities for addressing violating discharges from separate sanitary sewers:

1. All discharges (wet weather or dry weather) which cause or contribute significantly to water quality or public health problems (such as a discharge to a public drinking water supply) should be addressed as soon as physically and financially possible. Other discharges may, if appropriate, be addressed in the context of watershed/basin plans (in conjunction with state or federal NPDES authorities).

2. Discharges which occur in high public use or public access areas and thus expose the public to discharges of raw sewage (i.e., discharges which occur in residential or business areas, near or within parks or recreation areas, etc.) should be addressed as soon as physically and financially possible.

3. Dry weather discharges should be addressed as soon as physically and financially possible.

4. Discharges due to inadequate operation and routine maintenance should be addressed as soon as possible. (Physical and financial considerations should be taken into account only in cases where overflow remedies are capital intensive.)

5. Discharges which could be addressed through a comprehensive preventive maintenance program or with minor capital investment should be addressed as soon as physically and financially possible.

6. With respect to principles 1 through 5 above, schedules of compliance which require significant capital investments should take into account the financial capabilities of the specific

4

municipality, as well as any procedures required by state and
local law for publicly owned facilities in planning, design, bid,
award, and construction.  (See later sections on Schedules).

## Causes of Sanitary Sewer Discharges

Discharges from separate sanitary sewers can be caused by a
variety of factors including, but not limited to:

1.    Inadequate O&M of the collection system.  For example,
failure to routinely clean out pipes, failure to properly seal or
maintain manholes, failure to have regular maintenance of
deteriorating sewer lines, failure to remedy poor construction,
failure to design and implement a long term replacement or
rehabilitation program for an aging system, failure to deal
expeditiously with line blockages, or failure to maintain pump
stations (including back-up power).

2.    Inadequate capacity of the sewer system so that systems
which experience increases in flow during storm events are unable
to convey the sewage to the wastewater treatment plant.  For
example, allowing new development without modeling to determine
the impact on downstream pipe capacity, insufficient allowance
for extraneous flows in initial pipe design (e.g. unapproved
connection of area drains, roof leaders, foundation drains), or
overly optimistic Infiltration/Inflow reduction calculations.

3.    Insufficient capacity at the wastewater treatment plant so
that discharges from the collection system must occur on a
regular basis to limit flows to the treatment plant.  For
example, basic plant designs which do not allow sufficient design
capacity for storm flows.

4.    Vandalism and/or facility or pipeline failures which occur
independent of adequate O&M practices.

## Applicable Guidance

For many years, EPA and the States have been working with
municipalities to prevent discharges from separate sanitary sewer
systems.  The preferred method has been to use the general policy
on responding to all violations of the Clean Water Act which is
contained in the EMS guidance.  Factors which are considered are
the frequency, magnitude, and duration of the violations, the
environmental/public health impacts, and the culpability of the
violator.  This guidance sets up a series of guiding principles
for responding to separate sanitary sewer discharge violations,

5

and it supplements the current EMS.

Every EPA Region and State uses some form of this general
enforcement response guidance as appropriate to the individual
state processes and authorities. Under the guidance, various EPA
Regions and States have taken a large number of formal
enforcement actions over the past several years to address
sanitary sewer discharge problems across the country. Responses
have included administrative orders and/or civil judicial actions
against larger municipalities to address sanitary sewer discharge
problems, resulting in substantial injunctive relief in some
cases.

As a result of EPA Region and State enforcement efforts, a
number of municipalities have invested substantial resources in
diagnostic evaluations and designing, staffing, and implementing
O&M plans. Other municipalities have undertaken major
rehabilitation efforts and/or new construction to prevent
sanitary sewer discharges.

**Priorities for Response**

There are approximately 18,500 municipal separate sanitary
sewage collection systems (serving a population of 135 million),
all of which can, under certain circumstances, experience
discharges. Given this fact, the Agency has developed a list of
priorities in dealing with the broad spectrum of separate
sanitary sewer discharges to ensure that the finite enforcement
resources of EPA and the States are used in ways that result in
maximum environmental and public health benefit. However, these
priorities should be altered in a specific situation by the
degree of health or environmental risks presented by the
condition(s).

In the absence of site-specific information, all separate
sanitary sewer discharges should be considered high risk because
such discharges of raw sewage may present a serious public health
and/or environmental threat. Accordingly, first priority should
be given within categories (such as dry weather discharges and
wet weather discharges) to those discharges which can be most
quickly addressed. The priority scheme listed below takes this
into account by first ensuring that municipalities are taking all
necessary steps to properly operate and maintain their sewerage
systems. Corrective action for basic O&M is typically
accomplished in a short time, and can yield significant public
health and environmental results.

Risk again becomes a determinant factor when conditions

6

warrant long term corrective action.  The goal here should be to
ensure that capital intensive, lengthy compliance projects are
prioritized to derive maximum health and environmental gains.

     The priorities for correcting separate sanitary sewer
discharges are typically as follows:

1)  Dry weather, O&M related:  examples include lift stations or
pumps that are not coordinated, a treatment plant
that is not adjusted according to the influent flow, poor
communication between field crews and management,
infiltration/inflow, and/or pretreatment problems.

2)  Dry weather, preventive maintenance related: examples include
pumps that fail due to poor maintenance, improperly calibrated
flow meters and remote monitoring equipment, insufficient
maintenance staff, deteriorated pipes, and/or sewers that are not
cleaned regularly.

3)  Dry weather, capacity related:  examples include an
insufficient number or undersized pumps or lift stations,
undersized pipes, and/or insufficient plant capacity.

4)  Wet weather, O&M related:  examples include excessive inflow
and/or infiltration (such as from improperly sealed manhole
covers), inadequate pretreatment program (i.e. excessive
industrial connections without regard to line capacity),
uncoordinated pump operations, treatment plant operation that is
not adjusted according to the influent flow, poor coordination
between field crews and management, illegal connections, and/or
no coordination between weather forecast authorities and sewer
system management.

5)  Wet weather, preventive maintenance related:  examples
include poor pump maintenance leading to failure, improperly
calibrated flow meters and remote monitoring equipment,
insufficient maintenance staff, and/or sewers that are not
cleaned regularly.

6)  Wet weather, O&M minor capital improvement related:  examples
include the upgrading of monitoring equipment, pumps, or computer
programs, and/or repair or replacement of broken manholes or
collapsed pipes.

7)  Wet weather capacity, quick solution related:  examples
include a known collection system segment that is a "bottleneck",
pumps beyond repair in need of replacement, and/or need for
additional crews or technical staff.

7

8)  Wet weather, capacity, health impact related requiring long term corrective action:  examples include frequent discharges to public recreational areas, shellfish beds, and/or poor pretreatment where the total flow is large.

9)  Wet weather, capacity, sensitive area related requiring long term corrective action:  examples include discharges to ecologically and environmentally sensitive areas, as defined by State or Federal government.

## Selecting A Response

The appropriate regulatory response and permittee response for separate sanitary sewer discharges will depend on the specifics of each case.  The regulatory response can be informal, formal, or some combination thereof.  Typical regulatory responses include a phone call, Letter of Violation (LOV), Section 308 Information Request, Administrative Order (AO), Administrative Penalty Order (APO), and/or judicial action.  The permittee response can range from providing any required information to low cost, non-capital or low capital improvements to more capital intensive discharge control plans.

The attached chart lists some categories of separate sanitary sewer noncompliance along with the range of response for each instance.  The chart is intended as a guide.  The responses listed on the chart are not to be considered mandatory responses in any given situation.  EPA and the States should use the full range of regulatory response options (informal, formal, or some combination thereof) to ensure that the appropriate response or remedy is undertaken by the permittee or municipality.  All regulatory responses should be in accordance with the concept of the EMS regarding orderly escalation of enforcement action.

## Developing Compliance Schedules

A compliance schedule should allow adequate time for all phases of a sanitary sewer discharge control program, including development of an O&M plan, diagnostic evaluation of the collector system, construction, and enhanced O&M. Municipalities should be given a reasonable length of time to develop schedules so they can realistically assess their compliance needs, examine their financing alternatives, and work out reasonable schedules for achieving compliance.  Nevertheless, timelines for schedules should be as short as physically and financially possible.

## Short Term Schedules

8

In general, short term schedules would be appropriate for sanitary sewer discharges involving O&M problems, or where only minor capital expenses are needed to correct the problem. The schedule should have interim dates and a final compliance date incorporated in the administrative order or enforcement mechanism.

## Comprehensive Discharge Control Schedules

Comprehensive discharge control schedules should be used where specific measures must be taken to correct the discharges, and the measures are complicated, costly, or require a significant period of time to implement. If appropriate, these schedules should include the use of temporary measures to address high impact problems, especially where a long term project is required to correct the sanitary sewer discharge violation.

When working with municipalities to develop comprehensive schedules, EPA Regions and States should be sensitive to their special problems and needs, including consideration of a municipality's financial picture. Factors that should be considered are the municipality's current bond rating, the amount of outstanding indebtedness, population and income information, grant eligibility and past grant experience, the presence or absence of user charges, and whether increased user charges would be an effective fund-raising mechanism, and a comparison of user charges with other municipalities of similar size and population.

Physical capability should be considered when schedules are developed. Schedules should include interim milestones and intermediate relief based on sound construction techniques and scheduling such as critical path method. Compliance schedules should be based on current sewer system physical inspection data adequate to design sanitary sewer discharge control facilities. Schedules should not normally require extraordinary measures such as overtime, short bidding times, or other accelerated building techniques. Where possible, schedule development should be completed according to normal municipal government contracting requirements.

Financial capability should also be considered in schedule development, including fiscally sound municipal financing techniques such as issuing revenue bonds, staging bond issuance, sequencing project starts, sensitivity to rate increase percentages over time.

-------

9

Note: The intent of this guidance is to aid the Regions and
States in setting priorities for enforcement actions based on
limited resources and the need to provide a consistent level of
response to violations.  This does not represent final Agency
action, but is intended solely as guidance.  This guidance is not
intended for use in pleading, or at hearing or trial.  It does
not create any rights, duties, obligations, or defenses, implied
or otherwise, in any third parties.  This guidance supplements
the Agency's Enforcement Management System Guide (revised
February 27, 1986).



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

APR 2 7 2000

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

**MEMORANDUM**

SUBJECT:  Compliance and Enforcement Strategy Addressing
          Combined Sewer Overflows and Sanitary Sewer Overflows

FROM:     Steven A. Herman
          Assistant Administrator

TO:       Water Management Division Directors, Regions I - X
          Enforcement Division Directors, Regions I, II, VI,
          and VIII
          Regional Counsels, Regions I - X

    Combined sewer overflows (CSOs) and sanitary sewer overflows
(SSOs) present important concerns for public health and the
environment.   To address these concerns, we need to increase
Federal and State enforcement and compliance assistance in these
areas.   Attached is the Office of Enforcement and Compliance
Assurance's (OECA) Compliance and Enforcement Strategy for CSOs
and SSOs to address and remedy the threat to public health and
the environment caused by overflows from municipal sewer
collection systems.   This strategy was developed through the
cooperative efforts of EPA Headquarters and Regional staff. In
June 1999, OECA established a Workgroup of Regional personnel to
aid in final development and proper implementation of this
strategy.   All Regions and the Office of Wastewater Management
were represented on the Workgroup,  and the strategy reflects a
great deal of hard work by you and your staffs.

    As many of you know,  EPA convened a Federal Advisory
Committee (FAC) to provide recommendations on how the Agency
should address SSOs.  EPA is developing a proposed rule to
address SSOs consistent with the work of the SSO Federal Advisory
subcommittee.   This strategy does not change any existing Agency
policy.  However,  the Regions should be prepared to adjust their
SSO response plans so that they are consistent with future SSO
guidance that is expected to be issued later this year.

**Recycled/Recyclable** • Printed with Vegetable Oil Based inks on 100% Recycled Paper (40% Postconsumer)

2

The cornerstone of the strategy is the development of Regional response plans for both CSOs and SSOs. The Regional plans should include enforcement and compliance assistance targets based on the factors outlined in the strategy. However, development of these response plans should not delay any ongoing or prospective Regional action against any known violators, as the Agency's highest priority is still to address significant violators expeditiously. The Regional plans for CSOs and SSOs should be submitted to my office **within sixty days from the date of this transmittal memorandum.**

The attached CSO/SSO strategy sets out expectations for compliance and enforcement activities to be implemented by EPA Regions and States. This strategy does not change existing Agency policy on CSOs or SSOs. The strategy is designed to promote the enforcement and compliance assistance components of the EPA CSO Control Policy (April 19, 1994), the joint OECA/OW memorandum "Enforcement Efforts Addressing Sanitary Sewer Overflows" (March 7, 1995), and Chapter X of the Enforcement Management System (EMS) entitled "Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Sanitary Sewers" (March 7, 1996). Furthermore, the strategy supports the Memorandum of Agreement (MOA) for Regional performance expectations, the Clean Water Action Plan, and the Agency's Strategic Plan. I encourage Regions and States to coordinate their NPDES permitting and enforcement efforts closely when developing their CSO and SSO enforcement strategies.

CSO and SSO response plans should recognize wet weather planning on a watershed basis. To the extent watersheds are targeted under this strategy, all permitted wastewater utilities and any associated satellite utilities located in the selected watersheds should be appropriately addressed. In individual cases where a municipality is negotiating in good faith, injunctive relief sought in an enforcement action should be comprehensive in addressing any CSO, SSO and storm

3

water problems within the municipality's watershed.

I commend those Regions that have already made
significant progress to date in implementing both the CSO
Policy and Chapter X of the EMS.  Region IV in particular has
been a leader in program development to address CSOs and SSOs.
Specifically, the Region IV Capacity, Management, Operation
and Maintenance (CMOM) and municipal self-audit program have
met with great success to date, and I encourage you to explore
the Region IV program as you implement this strategy.  We need
to build on these successes and foster continued vigilance
within EPA Regions and States in a national effort to protect
public health and the environment from the threat posed by
sewage overflows.

Should you have any questions, please contact Brian Maas,
Director of the Water Enforcement Division, at (202) 564-2240,
or have your staff contact the appropriate staff member
identified in the strategy.  We look forward to working with
you on this important CSO and SSO enforcement and compliance
assistance strategy.

Attachment

cc:  Mike Cook, OWM
     Charles Sutfin, OWM

April 27, 2000

# COMPLIANCE AND ENFORCEMENT STRATEGY
# FOR CSOs AND SSOs

## I.    INTRODUCTION

The objective of this strategy is to ensure that CSO and SSO violations are properly addressed through the continuing implementation of the CSO Control Policy (April 19, 1994, 59 FR 18688), the joint OECA/OW memorandum "Enforcement Efforts Addressing Sanitary Sewer Overflows" (March 7, 1995), and the Chapter X "Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Sanitary Sewers" (EMS Guidance - Chapter X, March 7, 1996).

EPA convened a Federal Advisory Committee (FAC) to provide recommendations on how the Agency should address SSOs. EPA is developing a proposed rule to address SSOs consistent with the work of the SSO Federal Advisory subcommittee.  This strategy does not change any existing Agency policy.  However, the Regions should be prepared to adjust their SSO response plans so that they are consistent with future SSO guidance that is expected to be issued later this year.

This strategy is consistent with the FY 2000/2001 Memorandum of Agreement (MOA) priorities for wet weather as well as the Clean Water Action Plan (CWAP), including targeting of high priority watersheds.

## II.  Regional Compliance and Enforcement Plans

Under this strategy, each Region should develop a compliance  and enforcement response plan to implement the components of this strategy outlined below.  The NPDES permitting, compliance assistance, and enforcement programs, taken together, are the Agency's key regulatory tools to ensure that the requirements of the Clean Water Act (CWA) are met.  Regions and States should coordinate their NPDES permitting and enforcement efforts closely

when developing their CSO and SSO response plans.  **The Regional plans for CSOs and SSOs should be submitted to the**

2

**Assistant Administrator for the Office of Enforcement and Compliance Assurance (OECA) within sixty days from the date of the strategy's transmittal memorandum.**

The Regions have flexibility in developing their plans, but the goals of this document should be met.  It is important that each plan include: (1) a systematic approach to address wet weather violations through compliance assistance and enforcement, (2) the identification of compliance and enforcement targets, and (3) details on NPDES State participation, including tracking of State CSO/SSO compliance and enforcement activities.  Development of these response plans should not delay any ongoing or prospective Regional action against known violators, as the Agency's highest priority is still to address significant violators expeditiously.

The Agency is committed to planning and implementation of CSO, SSO and storm water programs on a watershed basis. Regions are encouraged to develop CSO and SSO response plans that recognize wet weather planning on a watershed basis. Enforcement remedies requiring major capital improvements should give priority to protecting the most sensitive areas of the watershed (e.g. beaches and shellfish beds).

It is envisioned that Headquarters, Regions, and NPDES States will work together to achieve the goals of the strategy.   Federal enforcement, including the initiation of civil judicial actions, should be a key element of the Regional plans.  In individual judicial actions where a municipality is negotiating in good faith, injunctive relief sought should be comprehensive in addressing any CSO, SSO and storm water problems within the municipality's watershed. These global settlements of wet weather violations may only be possible if a municipality has a final watershed plan. However, enforcement remedies should not be delayed by watershed plan development.

### A.    CSO Response Plan

Each CSO response plan should, at a minimum, describe an approach and timetable within FY 2000 by which the Region and/or NPDES States will examine all CSO communities to ensure that they are under an enforceable mechanism (e.g. NPDES

3

Permit, administrative order) requiring implementation of the Nine Minimum Controls (NMC) and development of a Long Term Control Plan (LTCP).  The response plan should also indicate where coordination with the permitting authority is necessary to ensure that NPDES permit requirements for CSOs contain the appropriate
requirements.  If an existing CSO permit does not require these steps and it is not necessary to make an inspection, the Region or State should bring a formal enforcement action in FY 2000, where appropriate.  The Regional plan should also include a process and timetable for the Region or States to inspect all CSO communities within the Region by the end of FY 2001, and to take appropriate action when they are not in compliance with CSO requirements in permits or existing enforcement orders.  Any enforcement action should, at a minimum, require implementation of the NMC and development of an LTCP.  Additional appropriate relief that may be sought in a judicial action may include sediment remediation, construction of greenways, and other measures that remediate past harm to the environment or public health caused by CSOs.

**B.        SSO Response Plan**

The Regional SSO response plan should at a minimum describe the approach the Region and NPDES States will use to develop an SSO inventory of systems with SSO violations, and how this inventory will be addressed under the EMS Guidance - Chapter X.  The Regional plan should also cover compliance assistance for small communities to address SSO related municipal deficiencies.

The initial SSO inventory as described below in the Sanitary Sewer Overflows section is due from each Region by July 28, 2000.  As a goal, the FY 2000/2001 MOA guidance directs the Regions to address (under the EMS guidance) 20% of the priority systems each fiscal year, including FY 2000. Specific percentages are negotiated individually with each Region through the MOA approval process.

**III. Combined Sewer Overflows**

7

quality programs, for example, as set forth in the July 7, 1999, memorandum from EPA Headquarters that was discussed in an earlier section of this strategy.

### 3.        Priorities for Compliance Assistance

Even though CSO enforcement is a high priority and the deadlines in the CSO Policy have long passed, there may be circumstances in small communities where compliance assistance could be appropriate.  The Regions have several tools available to provide compliance assistance.  These tools include (1) guidance documents developed by the Office of Wastewater Management, and (2) the Local Government Environmental Assistance Network (LGEAN).  LGEAN is designed to help local government officials stay on top of the latest environmental requirements and technologies.  LGEAN is an environmental assistance network coordinated by the International City/County Management Association (ICMA) in partnership with the Water Environment Federation (WEF), the Air and Waste Management Association (A&WMA), the American Water Works Association (AWWA), the Solid Waste Association of North America (SWANA), the Environmental Council of States (ECOS), and the National Association of Counties (NACO).

The Regions should refer communities to LGEAN for the detailed technical information on federal regulations and pollution prevention practices at www.lgean.org, or call toll free at 1-877-TO LGEAN.  The LGEAN website, for example, contains several links to other sites that have an explanation of CSO requirements as well as the full text of the CSO Control Policy.  The Regions can utilize the above tools either through onsite visits or other outreach mechanisms such as telephone calls.

## IV. Sanitary Sewer Overflows

### A.        Background

Similar to CSOs, SSOs of raw or diluted sewage from the collection system can cause significant public health and environmental problems.  The term "SSO(s)" as used in this strategy includes overflows that reach Waters of the United States as well as those overflows that are indicative of improper operation and maintenance.  SSOs not reaching Waters of the United States, such as raw sewage spills to public

8

parks and backyards, may be violations of standard permit conditions for proper operation and maintenance, and may cause significant threat to public health and the environment.

SSOs typically have high concentrations of bacteria from fecal contamination, pathogens and nutrients, all of which are significant contributors to the impairment of lakes, rivers, and streams. Aside from the pollutant impact on surface waters, sanitary sewer overflows frequently occur in areas that may be frequented by pedestrian traffic and pets, providing a likelihood of direct contact with pathogenic bacteria and viruses in the wastewater, and posing a significant public health risk.

There are approximately 3,700 POTWs classified as major facilities under the Agency's definition. Recent informal studies of municipalities have shown that as many as one third of sanitary sewer systems have problems associated with SSOs from the collection system. The Agency believes that strong compliance monitoring, compliance assistance, and enforcement applied nationwide are necessary to protect public health and the environment from these raw sewage overflows.

As part of the Agency's continuing policy to ensure national consistency in addressing SSOs, and to reemphasize the threat SSOs pose to public health and the environment, the Agency issued a joint OECA/OW memorandum on "Enforcement Efforts Addressing Sanitary Sewer Overflows" (March 7, 1995) calling for continued SSO enforcement. As a follow-up to this memorandum, OECA issued the Chapter X "Enforcement Management System Guidance on Setting Priorities for Addressing Discharges from Sanitary Sewers" (EMS Guidance - Chapter X, March 7, 1996) dealing with discharges from sanitary sewers. This chapter provides a method for setting priorities to address discharges of untreated sewage from separate sanitary sewer collection systems prior to the headworks of a sewage treatment plant. Chapter X includes an Enforcement Response Guide specifically tailored to these types of discharge violations.

B.        Elements of Regional SSO Response Plan

9

## 1.    Development of SSO Inventory

The MOA guidance for FY 2000/2001 includes language on SSOs, directing the Regions to develop an inventory of SSO violations and address, as a goal, 20% of the priority systems with SSO violations each year according to the guidance included in Chapter X of the EMS.  (Specific percentages are negotiated individually with each Region through the MOA approval process.)

The SSO response plan should describe the process and criteria that the Region and NPDES States will use to identify SSO violations.  An initial SSO inventory should be completed by July 28, 2000.  This initial SSO inventory should be based on the best available information that the Region has at the time of development.  The inventory should be updated as new information on SSO violations becomes available.  For MOA purposes, the Regions should use the inventory as it exists on October 1 of each fiscal year, or as of the July 28, 2000 submission for the first year.

For inventory development, the Regions should use every tool available to identify SSO violations.  The inventory should include the permittee's name, permit number, extent of SSOs, and any available information on threats to public health and the environment.  The Regions could develop and update the SSO inventory on information obtained during inspections or reported through permit requirements.  The Regions could also issue Section 308 Information Requests to major municipal facilities that are on the Exceptions List or on the significant noncompliance (SNC) list, or to other POTWs that are either suspect, or known to be experiencing SSOs.  In addition, the Regions could use Section 308 Information Requests to follow up on citizen complaints for SSOs.  The Regions should also evaluate any ongoing municipal enforcement actions to ensure that any SSO problems are addressed as part of the resolution of the actions.

Municipal inspections can be an effective tool for documenting SSO violations.  The Office of Compliance and Region IV are developing an inspection guidance document which includes a checklist and an inspection report writing template that will assist inspectors in evaluating sanitary sewer collection systems for adequate hydraulic capacity, and on

ensuring there is proper
management, operation, and maintenance of the system.  The
inspection guidance document will be available in the third
quarter of FY 2000, with the checklist and report writing
template to follow shortly thereafter.

### 2.        Priorities for SSO Enforcement Response

    The Office of Regulatory Enforcement, Water Enforcement
Division (ORE/WED) will continue to work with the Regions and
NPDES States in their application of the EMS Chapter X SSO
Enforcement Response Guide to address SSO problems at major
POTWs.  Success in this effort will depend in part on ensuring
that POTWs have adequate hydraulic capacity, as well as an
effective program for management, operation and maintenance of
the sanitary sewer systems they own or over which they have
operational control.  The Regions should be mindful that under
the 2000/2001 MOA guidance, Regions should identify the
universe of SSO discharge violations and ensure that 20% (or
the percentage negotiated individually with each Region
through the MOA approval process) of the priority systems will
be addressed each year, consistent with the Chapter X EMS
guidance.  Special emphasis should be placed on SSOs in
priority watersheds or in areas where the receiving waters are
impaired (e.g. shellfish bed closures, beach closures, fish
advisories, or drinking water sources), and/or in
environmental justice areas, as well as other sensitive areas
as provided for in the CWAP and the MOA wet weather
priorities.


    The Regions and NPDES States should use the full range of
regulatory response options (informal, formal, or some
combination thereof) to ensure that the appropriate remedy is
undertaken by the permittee or municipality to correct all SSO
problems, as outlined in the Chapter X SSO Enforcement
Response Guide.  Municipal self-audits similar to the ones now
being
conducted in Region IV may also prove to be a valuable tool in
addressing SSOs.  Civil judicial actions should be used, when
appropriate, resulting in a Consent Decree with an enforceable
schedule and milestones to ensure expeditious progress toward
compliance.

11

### 3.    Small Community Outreach and Technical Assistance

For small communities, the Regions should use a combination of public outreach and onsite technical assistance to identify and address SSO related municipal deficiencies. This compliance assistance approach to small communities should be altered to include enforcement if warranted by the public health or environmental risk presented by the condition(s).

As with CSOs, the Regions can provide outreach to small communities by providing information through LGEAN at www.lgean.org. The Regions should encourage small communities to use LGEAN to receive technical and compliance assistance. The Regions should work with The Office of Compliance on issues relating to compliance and technical assistance.

### V.    FY 2000/2001 MOA, CWAP Reporting, and Case Conclusion Data Sheets for CSOs and SSOs

As stated above, CSOs and SSOs are priorities for both the FY 2000/2001 MOA and CWAP. Both the MOA and the CWAP require reporting of compliance monitoring and assistance, and enforcement activities. The MOA mid-year and end-of-year reports will be used as the primary mechanisms for reporting these activities. The Regions should be aware that the attached measures are required for the FY 2000/2001 MOA wet weather priorities. These measures will also satisfy reporting for the CWAP.

The Regions may make use of the *Regional Compliance Assistance Tracking System* (RCATS), which is a computer database for tracking and reporting information on compliance assistance activities. Every Region has a RCATS contact who may be identified by contacting the Office of Compliance. The Office of Compliance will track and monitor all compliance assistance and monitoring activities relating to CSOs and SSOs.

The Agency is committed to achieving the goals of the Government Performance and Results Act by fostering demonstration of the environmental results of our environmental programs. This CSO and SSO Enforcement Strategy can support this objective by ensuring that our enforcement