United States     Office Of Water     EPA 832-B-97-004
Environmental Protection   (4204)     March 1997
Agency

Case 1:02-cv-00107-SAS   Document 1246   Filed 05/13/2004   Page 1 of 16

# ♻EPA

# Combined Sewer Overflows

## Guidance For Financial Capability Assessment And Schedule Development

LESLIE ALLEN

SENIOR ATTORNEY
DEPARTMENT OF JUSTICE
(202) 514-4114



EPA832-B-97-004
March 1997

# Combined Sewer Overflows

# Guidance For Financial Capability Assessment And Schedule Development

U.S. Environmental Protection Agency
Office of Wastewater Management
Municipal Support Division
Washington, D.C.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

MAR 27 1997

OFFICE OF
WATER

## MEMORANDUM

SUBJECT:   CSO Guidance for Financial Capability Assessment and
     Schedule Development

FROM:    Michael B. Cook, Director
     Office of Wastewater Management

TO:     Interested Parties

  I am pleased to provide you with the Environmental
Protection Agency (EPA)'s guidance *Combined Sewer Overflows —
Guidance for Financial Capability Assessment and Schedule
Development*.

  On April 11, 1994, EPA issued the final Combined Sewer
Overflow (CSO) Control Policy, which establishes a consistent
national approach for controlling discharges from combined sewer
systems through the NPDES permit program.  The Policy resulted
from negotiations with key CSO stakeholders including
representatives from States, environmental groups, municipal
organizations, and others.

  The CSO Policy encourages municipalities, permitting
authorities, water quality standards authorities, and the public
to engage in a comprehensive and coordinated planning effort to
develop cost-effective CSO controls that foster compliance with
the requirements of the Clean Water Act.  The Policy recognizes
the site-specific nature of CSOs and their impacts, and provides
the necessary flexibility to tailor controls to local situations.

  The CSO Control Policy lists six factors to consider when
developing a schedule for implementation of CSO controls:

  (1)  Eliminating discharges to sensitive areas

  (2)  Use impairment

  (3)  Financial capability

  (4)  Grant and loan availability

  (5)  Previous and current residential, commercial, and
     industrial sewer user fees and rate structures

  (6)  Other viable funding mechanisms and sources of
     financing

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (40% Postconsumer)

2

Financial capability, in particular, is identified as a factor that may warrant a phased approach to implementation of CSO controls. Financial capability includes the following elements:

(1)  Median household income

(2)  Wastewater and CSO control costs expressed as a percent of median household income

(3)  Overall net debt expressed as a percent of full market property value

(4)  Property tax revenues expressed as a percent of full market property value

(5)  Property tax collection rate

(6)  Unemployment

(7)  Bond rating

The attached document discusses how financial capability and the other factors listed may be used to negotiate reasonable compliance schedules for implementation of CSO controls. The guidance presents a two-phase process for assessing financial capability, based on EPA's experience in the Construction Grants, State Revolving Fund, enforcement, and water quality standards programs. It stresses the need for flexibility and evaluation of site-specific factors in the development of implementation schedules for CSO controls.

This guidance document incorporates changes resulting from stakeholder and Agency review. I am grateful to all who participated in its preparation and review, and I believe that it will further the implementation of the CSO Policy.

If you have any questions regarding the manual or its distribution, please call Haig Farmer in the Office of Wastewater Management at (202) 260-7279.

Attachment

**Guidance to Support Implementation of the CSO Control Policy**

To help permittees and NPDES permitting and WQS authorities implement the provisions of the CSO Control Policy, EPA has developed the following documents:

- *Combined Sewer Overflows—Guidance for Long-Term Control Plan* (EPA 832-B-95-002)

- *Combined Sewer Overflows—Guidance for Nine Minimum Controls* (EPA 832-B-95-003)

- *Combined Sewer Overflows—Guidance for Screening and Ranking* (EPA 832-B-95-004)

- *Combined Sewer Overflows—Guidance for Monitoring and Modeling* (EPA 832-B-97-001)

- *Combined Sewer Overflows—Guidance for Financial Capability Assessment and Schedule Development* (EPA 832-B-97-004)

- *Combined Sewer Overflows—Guidance for Funding Options* (EPA 832-B-95-007)

- *Combined Sewer Overflows—Guidance for Permit Writers* (EPA 832-B-95-008)


**Goal of this Guidance**

The CSO Policy recognizes the need to address the relative importance of environmental and financial issues when developing an implementation schedule for CSO controls to be contained in the LTCP and the NPDES permit or other enforceable mechanism. According to the CSO Policy, an implementation schedule "may be phased based on the relative importance of adverse impacts upon WQS and designated uses, priority projects identified in the long-term plan, and on a permittee's financial capability."

This guidance has two goals. The first goal is to provide a planning tool for evaluating the financial resources a permittee has available to implement CSO controls. This assessment will involve the use of the following financial capability indicators listed in the CSO Policy:

- Total annual wastewater and CSO control cost per household as a percent of median household income

- Bond ratings

- Overall net debt as percent of full market property value

- Unemployment rate

- Median household income

- Property tax revenue collection rate

- Property tax revenues as a percent of full market property value

It must be emphasized that the financial indicators found in this guidance might not present the most complete picture of a permittee's financial capability to fund the CSO controls. However, the financial indicators do provide a common basis for financial burden discussions between the permittee and EPA and state NPDES authorities. Since flexibility is an important aspect of the CSO Policy, permittees are encouraged to submit any additional documentation that would create a more accurate and complete picture of their financial capability.

Although this guidance focuses on the role of financial capability for development of an implementation schedule for CSO controls, the financial capability analysis process can be useful for the identification and evaluation of long-term control alternatives in the LTCP.

The second goal is to assist the permittee, EPA and state NPDES authorities in cooperatively developing CSO control implementation schedules. This will involve an evaluation of the following environmental and financial considerations listed in the CSO Policy:

- Eliminating overflows to sensitive areas

- Use impairment

- Financial capability

- Grant and loan availability

- Previous and current sewer user fees and rate structures

- Other viable funding mechanisms and sources of financing

This guidance does not recommend specific schedules for implementation of the CSO controls based on financial capability or other considerations identified in the CSO Policy. It does, however, provide general boundaries to aid all parties in negotiating reasonable and effective schedules for implementation of the CSO controls.

It is important to recognize that scheduling flexibility is not the only form of relief available to permittees. The CWA and EPA regulations provide mechanisms for the review and revision of WQS. The CSO Policy also encourages the "review and revision, as appropriate, of water quality standards and their implementation procedures when developing CSO control plans to reflect the site-specific wet weather impacts of CSOs." During the process of developing the

# III. PHASE ONE: THE RESIDENTIAL INDICATOR

The Residential Indicator measures the financial impact of the current and proposed WWT and CSO controls on residential users. Development of this indicator starts with the determination of the current and proposed WWT and CSO control costs per household (CPH). Second, the service area's CPH estimate and the median household income (MHI) are used to calculate the Residential Indicator. Finally, the Residential Indicator is compared to established financial impact ranges to determine whether CSO controls will produce a possible high, mid-range or low financial impact on the permittee's residential users. Worksheets are provided to aid in developing the Residential Indicator.

## Developing CPH Estimate

The first step in developing the CPH is to determine the permittee's total WWT and CSO costs by adding together the current costs for existing wastewater treatment operations and the projected costs for any proposed WWT and CSO controls. The next step is to calculate the residential share of the total WWT and CSO costs. The final step is to calculate the CPH by dividing the residential share of total WWT and CSO costs by the number of households in the permittee's total wastewater service area.

Current WWT costs are defined as current annual wastewater operating and maintenance expenses (excluding depreciation) plus current annual debt service (principal and interest). This fairly represents cash expenses for current wastewater treatment operations. (Expenses for funded depreciation, capital replacement funds, or other types of capital reserve funds are not included in current WWT costs, because they represent a type of savings account rather than an actual operation and maintenance expense.)

Estimates of projected costs are made for any proposed WWT projects and the CSO controls. Any concerns about including specific proposed WWT projects or CSO controls in the projected costs, or the length of the planning period, should be discussed with the appropriate NPDES permitting and enforcement authorities. These costs are adjusted to current dollars (i.e., deflated). These include projected operation and maintenance expenses plus projected debt service costs for any proposed WWT and the CSO controls. The residential or household costs exclude the portion of expenses attributable to commercial, governmental and industrial wastewater discharges. The information and calculations used to develop the CPH and the Residential Indicator are presented in Worksheets 1 and 2 and their instructions.

 

U.S ENVIRONMENTAL PROTECTION AGENCY                    U.S. DEPARTMENT OF JUSTICE

September 16, 2003

**MEMORANDUM**

SUBJECT:    Negotiation of Combined Sewer Overflow (CSO) Consent Decrees

FROM:        Walker B. Smith, Director. *WBS*
                   Office of Regulatory Enforcement
                   Office of Enforcement and Compliance Assurance
                   Environmental Protection Agency

                   Bruce S. Gelber, Chief *BSG*
                   Environmental Enforcement Section
                   Environment and Natural Resources Division
                   Department of Justice

TO:             Water Protection/Management Division Directors, Regions I-X
                   Director, Office of Environmental Stewardship, Region I
                   Director, Division of Environmental Protection and Planning, Region II
                   Enforcement and Compliance Assistance Directors, Regions II, VI, and VIII
                   Water, Wetlands, and Pesticides Division Director, Region VII
                   Regional Counsels, Regions I-X
                   Assistant Section Chiefs, Environmental Enforcement Section, DOJ

        During the course of consent decree negotiations with representatives of Publicly Owned
Treatment Works ("POTWs") regarding long term remedial measures to address combined sewer
overflows ("CSOs"), several issues have arisen that we believe would benefit from clarification.
In particular, issues have arisen regarding the incorporation of long-term control plans into CSO
consent decrees, including whether to specify an end date for completion of all construction, and
defining the compliance that the POTW should achieve before the decree can be terminated.
Additional guidance on these issues will promote consistency throughout the country and will
help expedite resolution of CSO enforcement actions while ensuring that complete relief is
provided in each case. This memorandum addresses these as well as other aspects of CSO
consent decrees.

**I. Principal Objective of CSO Negotiations**

        The principal objective of all CSO negotiations is to reach agreement on a federal consent
decree[1] requiring a Defendant[2] to: 1) develop and implement a long-term control plan ("LTCP")

_____

[1] The CSO Policy also provides that EPA may use an administrative order on consent to
memorialize its settlement with a POTW when the LTCP will take less than five years to

2

necessary to bring the Defendant into compliance with the Clean Water Act, consistent with EPA's 1994 CSO Policy, 59 Fed. Reg. 18688 (April 19, 1994) ("CSO Policy" or "Policy"); and 2) implement the "Nine Minimum Controls" set forth in the Policy (and which may be incorporated into the Defendant's NPDES permit). At the time consent decree negotiations commence, the Defendant may just be beginning development of the LTCP, or may be further along in the development process. The negotiating team should coordinate with the NPDES permitting authority as set forth in the Policy, 59 Fed. Reg. 18695-18696. If an LTCP is in existence at the time consent decree negotiations commence, but is not consistent with the Policy, then the LTCP should be modified during the negotiations or under a schedule set forth in the consent decree, to make it consistent with the Policy. In any case, regardless of the status of the LTCP at the time negotiations commence, the case team should ensure that the remedial measures in the LTCP are consistent with those portions of the CSO Policy that address long term control planning.

## II. Consent Decree Provisions

All CSO consent decrees should address the following elements: an LTCP, Nine Minimum Controls, the compliance standard necessary for termination of the decree, and non-waiver provisions.[3] Each of these is discussed below.

### A.    Long Term Control Plans

As discussed above, all CSO consent decrees should make the LTCP, or those elements of the LTCP that the litigation team determines are "essential elements,"[4] enforceable under the consent decree. When LTCPs are in existence prior to the conclusion of consent decree negotiations and are consistent with the Policy, the LTCP or the essential elements should be attached to the consent decree and/or incorporated into the text of the decree. For LTCPs that

----

complete, and for minor NPDES permittees that have complied with the final date of the enforceable order for compliance with their Phase I permit. See 59 Fed. Reg. 18697 (April 19, 1994) (middle column, Section V-C-2 of Policy).

[2] The terms Defendant and POTW are used interchangeably in this memorandum. However, while most Defendants with whom EPA will be negotiating CSO consent decrees will be POTWs, i.e. will own and operate wastewater treatment plants, there may be some Defendants who own and operate collection systems with CSOs but whose waste waters are conveyed to and treated at a neighboring municipality's treatment plant.

[3] This memorandum is not intended to set forth an exhaustive list of all provisions that should appear in CSO consent decrees.

[4] While the litigation team has discretion to determine which elements will be deemed essential, those elements should include, at a minimum, construction schedules and design and performance criteria.

3

will be prepared or modified under the consent decree, this means that the decree should recite that once EPA approves the LTCP or certain elements of the LTCP, the approved LTCP or approved portions of the LTCP are automatically incorporated by reference into the consent decree and are enforceable thereunder.

1. Provisions for LTCPs. All LTCPs, whether developed pre-lodging or under the consent decree, should conform to those portions of EPA's 1994 CSO Policy that address long term control planning and should contain the following elements:

a. An implementation plan, a construction schedule, and a schedule for post construction monitoring, all set forth in straightforward, enforceable formats. For each major project, consideration should be given to including specific deadlines for, among others: issuance of notices to proceed, interim construction milestones, completion of tasks, and placing the constructed facilities in operation.

b. A work schedule that ensures that all work is completed at the earliest practicable date consistent with the CSO Policy, see 59 Fed. Reg. 18696 (first column, under "Phase II Permits"), and a specific end date for completion of construction. While many LTCP schedules are not particularly lengthy, where costs of remedial measures are expected to be especially large, a construction schedule of up to fifteen years, or where compelling circumstances exist, up to 20 years, may be appropriate.

c. Design criteria and quantified performance criteria for the engineering solutions contained in the LTCP. Examples of appropriate performance criteria could include provisions ensuring that pump stations pump at their design capacity, that treatment facilities treat the volume of wastes they were designed to treat, that storage facilities store the volume of waste water they were designed to store, or that a specific percentage removal of specified pollutants is actually achieved.

2. Provisions for Consent Decrees Requiring the Development or Revision of LTCPs. Where the consent decree requires the development or modification of an LTCP, the consent decree should include the following:

a. A deadline for the Defendant to submit the LTCP. Generally, that deadline should be no more than two years from the date of lodging of the consent decree. See 59 Fed. Reg. 18691 (April 19, 1994) (middle column, Section II-C of Policy). Where the POTW has already developed a substantial part of the LTCP (or where a fully developed LTCP needs minor revisions) at the time the POTW enters into negotiations with EPA, a time period significantly shorter than two years may be appropriate.

b. In general, a specific end date for completion of all construction under the LTCP, which end date is consistent with Subsection II.A.1.b above.

4

c.  Provisions requiring that the LTCP submitted under the decree conform with those portions of EPA's CSO Policy that address long term control planning and contain all of the elements set forth above in Subsection II.A.1 above.

3.  LTCP Provisions for All Consent Decrees. In addition, all CSO consent decrees should include the following provisions regarding the LTCP:

a.  A requirement that the Defendant implement the approved LTCP (or the approved "essential elements" of the LTCP) attached to or incorporated into the consent decree in accordance with the construction schedules and design criteria set forth in the LTCP.

b.  A requirement that the facilities, as constructed, meet the performance criteria set for them in the LTCP.

c.  A requirement that the Defendant properly operate and maintain the facilities constructed under the consent decree.

d.  A requirement that, upon completion of the LTCP, the Defendant comply with its then current NPDES permit.

e.  A requirement that the Defendant perform monitoring to determine:  the extent to which the remedial measures, as built, meet the design and performance criteria set forth in the LTCP; whether the remedial measures are sufficient to ensure compliance with Defendant's then-current NPDES permit; and the extent to which CSO discharges remaining after implementation of the LTCP will, or have the reasonable potential to, cause or contribute to excursions above water quality standards.

f.  Stipulated penalties for failing to comply with specified consent decree requirements described above, including, but not limited to, all interim and final milestones, (and, where applicable, for failing to meet the deadline for submission of an LTCP or a modified LTCP).

g.  Where appropriate, the litigation team may wish to include a provision allowing EPA to require the Defendant to modify the LTCP to account for certain circumstances including, for example, where the LTCP was based on an anticipated change in water quality standards that did not occur, or where subsequent monitoring or other information indicates that the LTCP will not meet water quality standards.

## B.  Nine Minimum Control-Related Requirements

In general, CSO consent decrees should also require the Defendant to comply with

5

requirements for implementation of the Nine Minimum Controls set forth in the CSO Policy[5] and EPA's May 1995 "Combined Sewer Overflows: Guide for Nine Minimum Controls." Where the consent decree addresses violations of such requirements, the consent decree should specify the remedial measures that the Defendant should take in order to achieve compliance. These measures should be set forth in an enforceable format in the consent decree. If the Defendant's obligation to perform one or more of the Nine Minimum Controls may cease once construction is completed on an aspect of the LTCP, the Decree may so provide. Failure to comply with the Nine Minimum Controls remedial measures should result in the imposition of stipulated penalties.

### C. Compliance Standard for Termination of the Decree

All consent decrees should provide that, before the Decree may terminate, the Defendant must demonstrate that:

1. All construction and all post-construction monitoring required by the LTCP and/or the consent decree have been satisfactorily completed in accordance with the consent decree.

2. The remedial measures in the LTCP, as built, in fact meet the design criteria for those measures set forth in the LTCP and/or the consent decree.

3. The remedial measures, as operated (including any specified time period for demonstrating that the performance criteria are consistently being met) meet the performance criteria for those measures set forth in the LTCP.

4. The Defendant has achieved and maintained continuous compliance with its then-effective NPDES permit[6] for a specified period of time. The consent decree may also provide that, where the NPDES authority has notified the Defendant in accordance with Section IV.2.g of the CSO Policy that the NPDES authority intends to modify or reissue the permit, EPA may require that the Defendant demonstrate that it has achieved and maintained continuous compliance with the modified or reissued permit for a specified period of time. The foregoing may be made subject to Subsection II.A.3.g.

The consent decree should further provide that, if the Defendant certifies, with sufficient supporting data, to EPA and the State that it has complied with the requirements described above

---

[5] See 59 Fed. Reg. 18691 (Section II.B. of Policy).

[6] In some situations there may be NPDES permit compliance issues totally unrelated to a Defendant's CSO control strategy that a litigation team recognizes may exist at the time the LTCP is completed. In these situations, the litigation team may want to consider excluding these unrelated compliance issues in determining whether the Defendant will be in compliance with its NPDES permit during the compliance period.

6

in this Subsection, and neither EPA nor the State contests the certification within a specified time period, then the decree should terminate upon motion to the Court.

### D. Non-waiver Provisions

All CSO consent decrees should make clear that performance of all work required under the Decree is no defense to a subsequent action to require that the Defendant undertake additional measures to meet requirements of the CWA. Also, as is standard in CWA consent decrees, any CSO decree should have a nonwaiver provision that reserves the United States' right to obtain additional relief in the event of the Defendant's noncompliance with the law.

### E. Disclaimer

This document provides guidance on how EPA and the Department of Justice intend to exercise their discretion in implementing provisions of the CSO Policy concerning judicial consent decrees to resolve CSO enforcement actions. Any statutory provisions and EPA regulations described in this document contain legally binding requirements. This document does not substitute for those provisions or regulations, nor is it a regulation itself. Thus, it does not impose legally binding requirements on EPA, States, or the regulated community, and may not apply to a particular situation based upon the circumstances. EPA and State decision makers retain the discretion to adopt approaches on a case-by-case basis that differ from this guidance where appropriate. Any decisions regarding a particular facility will be made based on the statute and regulations, not in reliance on this guidance. Upon application of the recommendations and interpretations in this guidance, EPA will, and States should, consider whether or not the recommendations or interpretations are appropriate in that situation. This guidance is a living document and may be revised periodically without public notice. EPA welcomes public comments on this document at any time and will consider those comments in any future revision of this guidance document.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

JUL - 7 1999

<u>**MEMORANDUM**</u>

SUBJECT:    Water Quality-Based and Technology-Based CSO Requirements

FROM:    Michael B. Cook, Director
Office of Wastewater Management

Eric Schaeffer, Director
Office of Regulatory Enforcement

TO:    Water Division Directors
Regions I-X

Since EPA released the Combined Sewer Overflow (CSO) Control Policy in 1994
(59 FR 18688), questions have arisen concerning the application of the water quality-based and
technology-based requirements of the Clean Water Act to CSOs, particularly where enforcement
cases are pending or imminent. This memorandum clarifies that:

1. Because CSOs are subject to the technology-based requirements of the Clean Water
Act (CWA), permitting authorities must specifically determine best available technology
economically achievable (BAT)/best conventional pollutant control technology (BCT) on
a case-by-case basis using best professional judgment (BPJ) during the permitting process.
Given the protectiveness of properly-applied water quality standards (WQS), we expect
the combination of the nine minimum controls (NMC) and water quality-based controls
described in the CSO Policy to be generally at least as stringent as any applicable
BAT/BCT requirements. Therefore, evaluation of CSO controls beyond the NMC may
appropriately focus primarily on water quality issues.

2. Permitting and water quality programs should coordinate closely to reach agreement on
the requirements of a long-term CSO control plan (LTCP). Where there is a planned or
pending enforcement matter, the enforcement, permitting and water quality programs
should all coordinate closely to ensure that the long-term control requirements imposed by
a Phase II permit and by a compliance plan are consistent.

Our expectation is that NPDES permitting, enforcement, and WQS staff would work on a
cooperative basis with the permittee, following the course described below. This process assumes
the collaborative participation of the CSO discharger in the approach to CSO planning described
in EPA's policy and guidance.

2

## Water quality-based requirements

The CSO Policy encourages a watershed-based approach to CSO planning. The LTCP should include extensive analysis of current water quality conditions, including the impacts of CSOs and other pollution sources on WQS attainment. It should evaluate the cost, performance, and likely water quality improvements associated with a wide range of CSO control alternatives and evaluate control measures based on cost/performance criteria (as described in EPA guidance) as well as CWA requirements.

Data developed during LTCP development can inform decisions about the attainability of designated uses and the appropriateness of any WQS revisions. State and Federal WQS authorities need to be involved throughout the planning process to ensure that, if the LTCP is based in part on anticipated changes to WQS, those changes are appropriate and satisfy Federal regulatory requirements.

State and Federal NPDES authorities must coordinate throughout the planning process to ensure that, after implementation of the controls in the proposed LTCP, CSOs will not cause or contribute to nonattainment of WQS. Stakeholders, especially groups representing environmental interests, should be encouraged to participate actively during the development of the LTCP, including the consideration of potential WQS revisions.

## Technology-based requirements

The CSO Policy calls for all CSO communities to implement the NMC. For each CSO community, the NPDES authority must determine on a best professional judgment (BPJ) basis whether the NMC satisfy the technology-based requirements of the CWA, considering the factors identified at 40 CFR 125.3.[1] The LTCP must include sufficient information concerning these factors to support a BPJ determination by the permitting authority. A BPJ analysis of any potential technology-based controls beyond the NMC would typically be conducted on a system-wide basis, rather than outfall-by-outfall.

We expect that, given the protectiveness of properly-applied WQS, the NMC, combined with water quality-based controls, will generally provide a level of CSO control that meets CWA requirements and is at least as stringent as technology-based controls identified on a BPJ basis. Although the permitting authority must still perform an analysis of technology-based requirements, the evaluation of potential CSO controls beyond the NMC may appropriately focus primarily on water quality issues, as described in EPA guidance.[2]

---

1. EPA, 1995. *Combined Sewer Overflows — Guidance for Permit Writers* (EPA 832-B-95-008), p. 3-8.

2. EPA, 1995. *Combined Sewer Overflows — Guidance for Long-Term Control Plan* (EPA 832-B-95-002).

3

<u>Coordination of enforcement, permitting, and water quality programs in enforcement cases</u>

EPA's CSO policy provides that once an LTCP is completed, the permitting authority should issue a Phase II NPDES permit including "[n]arrative requirements which insure that the selected CSO controls are implemented, operated and maintained as described in the long-term CSO control plan." The CSO policy also provides that NPDES authorities should "incorporate the long-term CSO control plan through a civil judicial action, an administrative order, or other enforceable mechanism...." An enforcement action may be brought before an LTCP is approved, and appropriate interim relief may be sought after consultation with the permitting authority.

The result of this approach is that the Phase II permit and the compliance plan resulting from an enforcement action should impose consistent requirements for long-term CSO control. The coordination necessary to achieve this result is described below.[3]

When an enforcement action is pending or planned, enforcement, permitting, and WQS staff (both State and Federal) should coordinate closely throughout the CSO planning process, with the goal of reaching consensus on a LTCP that will ultimately meet all water quality-based and technology-based requirements and is consistent with the CSO Policy. Areas of potential disagreement between enforcement, permitting, and WQS staff regarding appropriate water quality and technology-based requirements should be elevated early in the planning process to ensure agreement on the LTCP when it is completed. If a proposed LTCP contemplates WQS revisions and EPA concludes that it will disapprove the anticipated WQS revisions and promulgate federal WQS, then the LTCP should provide for attainment of the expected federal WQS. Similarly, if EPA concludes that it will object to the requirements of a future Phase II CSO permit and issue a federal permit if necessary, then the LTCP should be consistent with the requirements of the federal permit.

Once there is agreement on the LTCP, a schedule would then be negotiated for implementation of the LTCP. Where the schedule is negotiated in the context of an enforcement action, the enforcement program will be responsible for the negotiations, and will consult with the permitting program. If a LTCP assumes future revisions to WQS, the implementation schedule may account for such revisions if there is reasonable confidence that these revisions will become effective in the near future (i.e., that the WQS authority will in fact proceed with such revisions expeditiously, and that EPA will approve them). In such a case the schedule should include a reopener provision in the event that the anticipated revisions do not in fact occur. Such a reopener should require the implementation of specific controls, rather than a return to the planning phase.

If you have questions concerning this memorandum, please contact one of us, or have your staff call John Lyon of the Office of Regulatory Enforcement at (202) 564-4051 or Tim Dwyer of the Office of Wastewater Management at (202) 260-6064.

---

3. While the LTCP will generally be the basis for the injunctive relief in the enforceable schedule, there may be circumstances where relief beyond the LTCP is appropriate.