UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., | CASE NO. C-1-02-107 |
| Plaintiffs, | |
| and | |
| SIERRA CLUB, ET AL., | Judge S. Arthur Spiegel |
| Intervenors, | |
| v. | |
| BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO, ET AL. | |
| Defendants. | |

SUR-REPLY OF INTERVENORS SIERRA CLUB AND MARILYN WALL
TO THE REPLY BRIEF OF DEFENDANTS BOARD OF COUNTY
COMMISSIONERS, CITY OF CINCINNATI AND THE METROPOLITAN SEWER
DISTRICT OF GREATER CINCINNATI

On Friday, May 13, 2004, the MSD submitted a new declaration from a new individual to try to counteract the written testimony of nationally known economist, Dr. Michael Kavanaugh. The Intervenors, Sierra Club and Marilyn Wall, submit this Sur-Reply to respond to the MSD's tactic and attach hereto Dr. Kavanaugh's 4th Declaration (Attached as Exhibit 2 to Sierra Club's Motion for leave to File Sur-Reply).

The MSD's new declaration came from a new expert witness, Mr. Jeffry Rexhausen. Mr. Rexhausen claims that Dr. Kavanaugh has made errors in his assessment

1

of the financial capability of the MSD ratepayers to afford the CWA remedial program. Dr. Kavanaugh's 4th Declaration specifically responds to these comments.

Dr. Kavanaugh is a resident of Batavia, OH. He earned his Ph.D. in Economics from University of Cincinnati and his B.A. in Economics from Xavier University. Dr. Kavanaugh was the economist consultant for the United States Department of Justice during an early stage of this case. Subsequently, Sierra Club requested Dr. Kavanaugh to assist it in its case. The Department of Justice waived any conflict of interest and Dr. Kavanaugh began assisting the Sierra Club.

Dr. Kavanaugh's First Declaration explained to the Court that the economic impact of a large remedial program cannot be determined solely by the "cost" of the program and explained the Court the EPA guidance on affordability. "The usual measure of burden is made by (1) expressing the annual charge for wastewater services paid by households as a share of median household income; and (2) comparing that result to the thresholds USEPA has established for indicating burden." Kavanaugh First Declaration, attached as part of Appendix "E" to Sierra Club's Memorandum in Opposition to Consent Decrees, para. 5.[1]

Dr. Kavanaugh's Second or Supplemental Declaration (also attached to his Third Declaration) provided a detailed report of his assessment of financial capability of Hamilton County MSD ratepayers. Dr. Kavanaugh utilized the EPA "Combined Sewer Overflows, Guidance for Financial Capability Assessment," March 1997. According to Dr. Kavanaugh, "USEPA considers a community on the threshold of financial distress if residential wastewater costs minus depreciation exceed 2% of median household

---

[1] For the Court's convenience, Dr. Kavanaugh attached to his Third Declaration both his First and Second (or Supplemental) Declarations. All three are found at Appendix "E" to the Sierra Club's Reply Brief.

2

income…I accept the USEPA 2% threshold and use it not only as a measure of the threshold burden in Hamilton County, but also as an indicator of the maximum amount that other communities are being asked to pay for wastewater controls." Kavanaugh, Third Declaration, note 9, p. 5.

Dr. Kavanaugh concluded in his Supplemental Declaration that neither the minimum MSD remedial program ($1.2 billion) nor the maximum MSD remedial program ($3.6 billion) exceeded the County ratepayers' ability to pay at the level of 2% of median household income.  Id. paras. 17, 18.  Dr. Kavanaugh determined that the minimum program would result in a MSD sewer rate of $692/year for an average family *in the year 2022*. This is less than $2/day for a family's waste disposal in 2022. Kavanaugh also found that an accelerated 10-year program had a peak rate in 2022 of $672/family/year, or $20 less per year than the 20-year program.  Id. Table I, and note 18.

Once it became clear (and finally disclosed to the Court from the Reply Briefs of the United States and the Defendants) that they had not done a financial capability assessment according to EPA Guidance and had merely "negotiated" the $1.5 billion, financial capability, re-opener clause in Section IX.B of the Consent Decree because "it seemed to the parties to represent a fairly large amount of money" (US Reply Brief, page 20, note 29), the MSD apparently needed to find a way to attack Dr. Kavanaugh's opinion that *even the $3.6 billion MSD remediation program was affordable*.

Mr. Rexhausen, who has a Masters Degree in Planning and not a doctorate in Economics, is the new vehicle employed to question Dr. Kavanaugh's analysis as to: (1) the number of households in Hamilton County MSD service area; (2) the residential share

3

of service revenues; (3) the level and growth of median household income; and, (4) the level and cost of debt.

In the attached 4th Declaration, Dr. Kavanaugh carefully and specifically counteracts the criticisms. He explains what he did, why he did it, and how he conducted his analysis.

For a number of households, Dr. Kavanaugh used Hamilton County census data and adjusted downward to subtract out households in Terrace Park, Glendale, and Harrison City, which are not served by MSD. Then, he subtracted out the unincorporated area of Western Hamilton County, also not served by MSD. Finally, "to be conservative", he reduced that estimate by 10%. See 4th Declaration at para. 5.

With regard to the forward-looking "residential" share of the MSD revenues, as opposed to the "industrial" and "commercial" shares, Kavanaugh clearly describes his rationale, increasing the current 64% residential share to 67%. In his 4th Declaration, now having updated information from the MSD's Official Statement, he recalculates and obtains a residential share of 66%. Id., para.7.

With regard to Mr. Rexhausen's criticism that Kavanaugh included in his determination of median household income: "more affluent areas within Hamilton County that are unsewered…," Dr. Kavanaugh responds – "My declaration states just the opposite. I subtract out the areas without sewers and the affluent villages that do not receive or pay for MSD service." Id., para. 9.

With regard to Rexhausen's criticism regarding Kavanaugh's assumptions about the growth of median household income over time, Kavanaugh demonstrates that the "pessimistic" assumptions used by Vredeveld are contrary to MSD assumptions used

4

most recently in a Hamilton County $215 bond issue, where the economy was described as "growing" and "vital". Kavanaugh assumes "no real economic growth" in determining future median household income -- a realistic projection.

Next, Rexhausen claims to have found a programming error in Kavanaugh's computer code, which he claims results in a "dramatic understatement of financial burden." Dr. Kavanaugh recalculates the rate burden using the corrected code and the burden of the minimal program increased from .8% of median household income to .9% and for the maximum program, the burden increased from 1.6% of median household income to 1.7%. Clearly, these code corrections show that there is no significant difference in Kavanaugh's opinion – all calculations of burden are below the EPA 2% threshold.

Finally, Rexhausen observes that Kavanaugh omitted the costs of debt service from his calculations. Responding to Rexhausen, Kavanaugh states: "I did omit this cost because it is a form of savings and it is the procedure recommended by EPA Guidance." Id. para. 15.

In conclusion, Dr. Kavanaugh states: "I have read and considered Mr. Rexhausen's declaration concerning my second declaration. There is no reason to modify the conclusions of my second declaration about the affordability of overflow controls to MSD ratepayers. My analysis shows that either the minimum or the maximum program can be paid for with rate burdens (rates expressed as a share of median household income) that are below the financial distress threshold set forth in the EPA's financial capability guidance." Id., at para. 17.

## **CONCLUSION**

The MSD's attack on Dr Kavanaugh was brought about by the fact that he demonstrated that the "negotiated" $1.5 billion deadline extender has no rational basis. A Consent Decree without rational basis in one of its most essential terms – the deadline for cessation of violations – should not pass a fairness review. MSD refused to undertake the proper financial affordability analysis. Instead, MSD negotiated affordability "cap" that is not supported by EPA Guidance threshold of affordability. It is, as the United States finally admits, merely a "negotiated" number. Dr. Kavanaugh's 4th Declaration makes it clear that the $1.5 Billion dollar re-opener should not be approved by the Court as part of either Decree.


Respectfully submitted,


/s/ David Altman_____
D. David Altman, Esq.
(#0021457)
D. David Altman Co., L.P.A.
15 East 8th St., Suite 200W
Cincinnati, OH 45202
(513)-721-2180

/s/ Albert J. Slap_____
Albert J. Slap, Esq.
(#0074579)
Law Office of Albert J. Slap
20 Erie Ave.
Glendale, OH 45246
(513)-771-7800

## CERTIFICATE OF SERVICE

      I hereby certify that on May 24, 2004, a copy of the forgoing Intervenor Sierra Club's Motion for Leave to file a Sur-Reply and supporting Memorandum of Law and Sierra Club's Sur-Reply Memorandum and the 4th Declaration of Dr. Michael Kavanaugh were filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                          /s/ D. David Altman
                          D. David Altman (0021457)
                          D. DAVID ALTMAN CO., L.P.A.
                          15 East 8th Street, Suite 200W
                          Cincinnati, OH  45202
                          E-mail:  daltman@one.net