UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | : : : | NO. 1:02-CV-00107 |
| Plaintiffs, | : : | |
| v. | : : : | **ORDER** |
| BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO, et al., | : : : : | |
| Defendants. | : : | |

This matter is before the Court on the United States' Motion for Entry of the Consent Decrees (doc. 116), Intervenor Sierra Club's Response in Opposition (doc. 118), Defendants' Reply in Support of Plaintiffs' Motion (doc. 121), and Plaintiffs' Reply in Support of Motion for Entry of Consent Decrees (doc. 122). Also before the Court are Intervenor Sierra Club's Motion to Appoint Special Master (doc. 120), and Motion for Leave to File Sur-Reply (doc. 126). The Court held a hearing on Plaintiffs' Motion on May 25, 2004.

**I.  The Motion of the United States (doc. 116)**

The United States, with the consent of co-Plaintiffs Ohio River Valley Water Sanitation Commission ("ORSANCO"), and the State of Ohio, moves the Court to enter the lodged Interim Partial Consent Decree for Sanitary Sewer Overflows ("ICPD")(attachment 1, doc. 56), and the Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants, and Implementation of Capacity

Assurance Program Plan ("Final Decree")(doc. 116). The United States has solicited public comment on the decrees as required by regulation, and concludes the decrees are fair, reasonable, and consistent with law, and therefore satisfy the standards for entry consistent with <u>United States v. Akzo Coatings of America, Inc.</u>, 949 F.2d 1409, 1426 (6th Cir. 1991)(the general test applied by courts in the Sixth Circuit whether to approve a consent decree is one of "fairness, reasonableness and consistency with the statute").

According to the United States, the decrees represent a comprehensive plan on the part of the parties to address problems with Hamilton County's sanitary sewer overflows ("SSO's"), combined sewer overflows ("CSO's"), and wastewater treatment plants ("WWTP's"). In addition, the final decree includes a "basement component," that requires Defendants to take measures to prevent basement backups, clean up backups when they occur, and reimburse residents for damages. The two decrees, argue the United States, establish a framework for ensuring that Defendants develop and implement a long-term plan for massive infrastructure improvements needed to solve the current problems with the system.

## II. The May 25, 2004 Hearing

At the May 25, 2004 hearing, the Court permitted the parties to offer a detailed description of the components of the consent decrees, heard the objections of the Sierra Club, and took public comment from homeowners who have suffered damage to their property and the inability to sell their homes from the influx of

sewage water into their basements.

### A. The United States Argues that the Decrees Meet the Sixth Circuit Standard for Entry

The United States explained that the decrees are structured to implement remedies through the year 2022 at the latest, with interim measures taken along the way to more quickly target problem areas.  For CSO's, the final decree requires Defendants to monitor streams in order to generate information that can aid in the development of remedies that should bring the CSO's into compliance with the Clean Water Act.  Defendants' long-term plan to address CSO's is called the Long Term Control Plan Update ("LTCPU") and must be submitted to the regulatory agencies for their approval, no later than June 30, 2006.  The LTCPU must contain performance criteria and schedules for the completion of remedial measures that are "expeditious as practicable" but in no event later than February 28, 2022, unless one of a number of very narrow circumstances occurs.  A few of those circumstances--which the Sierra Club characterized as "openers" at the May 25, 2004 hearing--shall be treated with more detail below.  The LTCPU will also require post-construction monitoring to evaluate the effectiveness of its controls in relation to water quality.

For SSO's, the final decree similarly requires a study and proposal for elimination of all SSO's, entitled Capacity Assurance Program Plan ("CAPP"), to be submitted to the regulatory agencies by June 30, 2006.  CAPP, like the LTCPU, must contain performance criteria and schedules for completion of remedies as

"expeditious as practicable," but in no event later than February 28, 2022.

The United States further explained that the Consent Decrees also require interim measures to address specific problems with the system. The IPCD requires capital improvement projects ("CIP's") that should eliminate sixteen of the worst SSO's by July 31, 2006, while the Final Decree requires twenty-four CIPS to address some forty CSO's and a WWTP. The IPCD also requires that Defendants construct a $15.6 million interim storage and treatment system to address its worst SSO, SSO 700.

The government stated that the Final Decree requires the implementation of a three-pronged "Water in Basement Program," that Defendants have already started to implement, spending over $1 million in the first quarter of 2004. Other provisions in the decrees impose operation, maintenance, and response requirements, and impose a short-term adequate capacity plan ("STACP"), that forces Defendants to ensure that more flow is removed from the system than is added from proposed new flows from upstream development. Finally, the Final Consent Decree also requires Defendants to pay a civil penalty of $1.2 million, and to spend a minimum of $5.3 million to implement six supplemental environmental projects ("SEP's") to improve or protect the Mill Creek.

The United States argues that the decrees ensure accountability because 1) they incorporate stringent penalty provisions for any noncompliance, and 2) they require Defendants to submit quarterly reports to Plaintiffs regarding the status of

their compliance.  The United States commits to provide all documents that it receives to the Sierra Club so that the Intervenors can monitor efforts to enforce the decrees.  In addition, the United States indicates it has invited Ms. Marilyn Wall, a representative of the Sierra Club, to serve as a member of the LTCPU steering committee, which will provide oversight and guidance to Defendants as they develop the LTCPU.

The government quotes United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991), in which in opining on the validity of a settlement, the Sixth Circuit stated, "[i]n evaluating the decree, it is not our function to determine whether this is the best possible settlement that could have been obtained. . ." (doc. 122, quoting Akzo at 1436).  The Court's function, rather, argues the United States, is only to determine whether the decrees are fair, reasonable, and consistent with the Clean Water Act.  If necessary, the government states, the Court can always enforce the decrees with injunctive powers, thus forcing MSD and other signatories to comply.  The government argues that in no way does the Clean Water Act preclude a "phased compliance schedule," so that the schedule approach in the decrees is reasonable and appropriate. The government argues that its decrees do not contain "loopholes," but that limited opportunities for extensions of deadlines are reasonable and appropriate, the decrees do not need to contain a financial plan, as the LTCPU shall incorporate such a plan, and the decree appropriately accounts for the possibility of future revisions to water quality standards.

The State of Ohio and other Plaintiffs concurred with the position of the United States.

### B. Intervenor Sierra Club's Concerns

In its Memoranda, and at the hearing, the Sierra Club detailed a number of its objections to the Consent Decrees, which the Court has reviewed (doc. 118).  However, under <u>Akzo</u>, the Court is convinced that its role is not to dictate its view about the best sort of settlement possible, or to micro-manage the settlement, but rather to review the settlement to ensure that it is fair, reasonable, and consistent with the Clean Water Act.  949 F.2d 1409, 1436 (6th Cir. 1991).  Accordingly, Sierra Club raised three principal issues that the Court finds necessary to address: 1) its view that a Settlement Master should be appointed to oversee the implementation of the decrees, 2) its view that Section 7B of the Final Decree provides an "opener" in which communities can "buy time" by attempting to change water quality standards, and 3) its view that Section 9B of the Final Decree also provides an "opener" in which deadlines for completion of remedial projects can be extended beyond the year 2022 if the costs of such remedies in the LTCPU and CAPP are expected to exceed $1.5 billion in 2006 dollars.

### 1. The Proposed Settlement Master

In explaining its position on the necessity of a Settlement Master, Sierra Club protested that Defendant Metropolitan Sewer District ("MSD") has been using an unfair release with water-in-basement ("WIB") victims, asking them to release any past or future claims against MSD when obtaining MSD's

help with water in their basements.  The Court queried MSD counsel, who indicated that such releases have been freshly redrafted so as to only require waiver of further claims for property damage arising from the WIB incident that is being settled by payment. Sierra Club argued that without a Settlement Master to watch over Defendants, the public is at risk of similar abuses.  The Court appreciates the involvement of Sierra Club as intervenor and recognizes that the releases prepared by the Cincinnati Solicitor's Office were highly improper.  The Court finds that if any such releases were signed, they are unenforceable.  Only the releases described in Court by MSD counsel as freshly redrafted are enforceable.

The Court is not convinced, as it has expressed to Counsel for Sierra Club on previous occasions, that a Settlement Master should be appointed to supervise the implementation of the decrees.  Moreover, the United States opposes the appointment of a Settlement Master.  Judicial deference to a settlement is "particularly strong" when a settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like [the Environmental Protection Agency] which enjoys substantial expertise in the environmental field."  Akzo, 949 F.2d at 1436. The Court finds it appropriate to defer to the government's position that a Settlement Master is not necessary.  However, the Court finds well-taken the government's proposal that an ombudsman be appointed so as to ensure that WIB victims obtain effective and timely assistance.  The Court finds the appointment of an ombudsman

7

entirely appropriate, as such person can ensure that the WIB component of the consent decrees is in all respects comprehensible to the public.  Unlike the parties to this action, the public does not necessarily have easy access to legal counsel.  The appointment of an ombudsman should provide the public with an advocate who can ensure that the WIB program is working, investigate complaints, and keep the Court informed of the status of such program.

### 2.  Section 7B "Opener"

The language of Section 7B in the Final Decree (doc. 101) provides:

> Modification of the Long Term Control Plan Update if Anticipated Changes to Legal Requirements Do Not Occur
>
> The CSO Policy recognizes that information developed during the course of long term control planning may serve as a basis for seeking revisions to water quality standards or NPDES permit requirements, particularly where that information demonstrates that it will not be feasible to attain water quality standards.  If the Long Term Control Plan Update in the Long Term Control Plan Update Report is based upon Defendants' belief that the requirements of the Clean Water Act, U.S. EPA's CSO Policy, Chapter 6111 of the Ohio Revised Code and/or the rules promulgated thereunder, and/or the Compact, and/or the pollution control standards promulgated thereunder will be revised, and if information subsequently becomes available that indicates that those revisions are not going to occur in the manner set forth in Defendants' Long Term Control Plan Update Report, U.S. EPA, Ohio EPA, or ORSANCO may notify Defendants in writing that the expected revisions are not going to occur.
> Within 180 days of their receipt of the written notice described above, Defendants must submit to the U.S. EPA/Ohio EPA/ORSANCO for review and approval a Revised Long Term Control Plan Update that includes all of the elements of a Long Term Control Plan Update. . .(including a schedule that is as expeditious as practicable for completion of the remedial measures but that may be later than February 28, 2022, if it is not practicable to complete those measures by that date), but does not assume or rely on water quality standards that

have not been revised or approved.

Sierra Club expressed its concern that in its view, this provision provides Defendants a way to buy time by challenging existing water quality standards.  The United States stated that Sierra Club's understanding of this provision is the opposite of what is actually meant by it.  In order to remedy any possible ambiguity in the construction of this Section, the Court finds, as confirmed by counsel at the May 25, 2004 hearing, that the 2022 deadline is not suspended if Defendants exercise their right to attempt to change water quality standards.  Defendants may lobby for change collaterally to the implementation of the LTCPU and CAPP.  Defendants do not buy time or extend the 2022 deadline if they lobby for or win relaxed standards.  The Court finds reasonable the government's position that the consent decree legitimately provides, consistent with 40 C.F.R. § 131.10(g)(6), flexibility to extend the 2022 deadline only if the costs necessary to attain full compliance with existing water standards would result in "widespread social and economic impact."  Accordingly, the above section does not provide an "opener" based on Defendants' ability to lobby for change, but only provides flexibility in the event that standards do not change, and that compliance with the unchanged standards creates onerous hardship.  These conditions are not evidence of a loophole, but rather are reasonable, and conform to the requirements of the Clean Water Act.

   **3. Section 9B "Opener"**

Sierra Club similarly expressed concern about Section 9B of the Final Consent Decree, which states:

> Extension of Deadlines if Capital Costs Exceed $1.5 Billion
>
> The schedule for Substantial Completion of Construction for the remedial measures in the Long Term Control Plan Update and the Capacity Assurance Program Plan shall be as expeditious as practicable, but in no event later than February 28, 2022, unless Defendants demonstrate that the expected costs (in 2006 dollars) of the remedial measures in the Long Term Control Plan Update and the CAPP are expected to exceed $1.5 billion.  If such capital costs are expected to exceed $1.5 billion, then the deadline for completion of all remedial measures specified in the Plan(s) and must still be as expeditious as practicable, but may be later than February 28, 2022, if it is not practicable to complete the CAPP and Long Term Control Plan remedial measures by that date.

Sierra Club expressed its concern that the large infrastructure improvements contemplated in the decrees could potentially cost more than planned, and thus at some future date, the Defendants could buy more time thanks to cost overruns that cause expenses to exceed $1.5 billion.  The government clarified that the $1.5 billion figure only has meaning in the formulation of the LTCPU and CAPP in 2006, and that if Defendants do not meet the schedules within those plans, they shall be subjected to stipulated penalties.  The government stated that it must approve the projects specified in the plans, and that if the projects end up costing more as of the time of planning in 2006, then so be it.  In such an instance, the government would not approve a schedule extending beyond 2022 unless it was as expeditious as practicable, and Sierra Club could raise a Rule 60(b) challenge in the event that it finds

10

the schedule too attenuated.  The Court finds the government's explanation of this section satisfactory and reasonable.  The Court confirms that the $1.5 billion figure only applies to the formulation of the plans in 2006.

### III.  Conclusion

Having reviewed this matter, the Court finds the consent decrees to be fair, adequate, and in compliance with the Clean Water Act.  As indicated herein, the Court appoints an ombudsman, the Legal Aid Society of Greater Cincinnati, to such role.  Gary J. Pieples, Esq., shall serve as designated counsel of behalf of the Legal Aid Society.  Defendants shall cover the expenses for the retention and costs of the ombudsman, which shall be compensated at $150.00/hour, to be paid quarterly, for its services in such capacity.

The Court retains jurisdiction over this matter, and will not countenance unreasonable delay in correcting the problems that the decrees address.  Where homeowners suffer damage for which MSD is liable, the MSD will be responsible for clean-up costs, remedies, and for any diminution in the value of real estate.

Accordingly, the Court GRANTS the Motion of the United States for entry of the Consent Decrees (doc. 116), EXECUTES the lodged Interim Partial Consent Decree for Sanitary Sewer Overflows

("ICPD")(attachment 1, doc. 56), and the Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants, and Implementation of Capacity Assurance Program Plan ("Final Decree")(doc. 116), and DIRECTS the clerk to docket such decrees as approved.  Sections 7B and 9B of the Final Decree shall be interpreted in accordance with this Order.  The Court further DECLARES the releases purporting to extinguish WIB victims right to past or future recovery for damages unenforceable.  Finally, the Court DENIES Sierra Club's Motion for Court-Appointed Special Master (doc. 120), and DENIES as moot Sierra Club's Motion for Leave to File Sur-Reply (doc. 126).

       SO ORDERED.

Dated: June 9, 2004                    <u>s/S. Arthur Spiegel</u>
                                      S. Arthur Spiegel
                                      United States Senior District Judge