**SIERRA CLUB'S PETITION FOR ATTORNEYS' FEES AND COSTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................i

SUMMARY OF ARGUMENT .............................................................................iii

I.  THE BASIS FOR THE AWARD ......................................................................1

II. BACKGROUND.................................................................................................6

III. ARGUMENT ....................................................................................................8

A.  SIERRA CLUB'S PARTY STATUS UNDERSCORES ITS RIGHT TO COSTS
    AND REASONABLE FEES UNDER SECTION 1365(d)..............................9

B. SIERRA CLUB HAS SUBSTANTIALLY PREVAILED ...............................10

    1. Adding the Sewage-in-Basement ("SIB") Program ...............................12

    2. Ending Defendants' Use of Unconscionable Claims Releases.............15

    3. Requiring a Verification Component to the IPCD's Short-Term Adequate
       Capacity Program....................................................................................17

    4. Achieving Improvements to the SSO 700 Interim Treatment System .................18

    5. Other Issues on which the Sierra Club Prevailed....................................19

C. AWARDING COSTS AND FEES TO SIERRA CLUB IS APPROPRIATE .................21

D. SIERRA CLUB'S REQUEST FOR FEES AND COSTS IS REASONABLE...............22

    1. Sierra Club's Lodestar Request for Attorneys' Fees is Reasonable .....................22

    2. The Sierra Club's Request for Expert Witness Fees and Costs is Reasonable......27

**IV. CONCLUSION** ................................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Buckhannon Board and Care Home, Inc., et al. v. West Virginia Department of Health and Human Resources et al.*, 532 U.S. 598 (2001)......................................12

*Carroll v. Blinken*, 42 F.3d 122 (2nd Cir. 1994)...........................................10

*City of Burlington v. Dague*, 505 U.S. 557 (1992) .......................................22

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ........................................22

*Conservation Law Foundation v. Secretary of Interior*, 790 F.2d 965 (1st Cir. 1986) ...............................................................................21

*Farrar v. Hobby*, 506 U.S. 103 (1992) ........................................................11

*Gross v. Perrysburg Exempted Village School District*, 306 F.Supp. 2d 726 (N.D. Ohio 2004)...........................................................23

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .................................................10, 23, 26

*LeBlanc-Sternberg*, 143 F.3d 748 (2nd Cir. 1998) .....................................10

*Loggerhead Turtle v. The County Council of Volusia County, Florida*, 307 F.3d 1318 (11th Cir. 2002) ...................................................................12

*Natural Resources Defense Council v. Fox*, 129 F. Supp.2d 666 (S.D. N.Y. 2001).....................................................................................10, 11

*National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir. 1988)........22

*Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989).....................................................................................10, 21

*Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983) ........................................21, 22

*United States v. City of Green Forest*, 921 F.2d 1394 (8th Cir. 1990), *cert. denied,* 502 U.S. 956 (1991)..................................................................9

*United States v. Maine Department of Transportation*, 980 F. Supp. 546 (D. Maine 1997).......................................................................................10

*United States and Supporters to Oppose Pollution, Inc. v. Environmental Waste Control, Inc.,* 737 F. Supp. 1485 (N.D. Ind. 1990) .............................23

**Statutes**

*Clean Water Act*, 33 U.S.C. § 1365 (2004) ....................................................iv, 8, 9, 10

*Clean Water Act*, 33 U.S.C. § 1365(a) (2004) ............................................9

*Clean Water Act*, 33 U.S.C. § 1365(d) (2004) ............................................passim

*Clean Air Act*, 42 U.S.C. § 7604 ....................................................21

*Clean Air Act*, 42 U.S.C. § 7607 ....................................................21

Pub. L. No. 100-4, § 505, 101 Stat. 7, 76 (1987)........................................21

**Rules**

Fed. R. Civ. P. 26 ........................................................................24

**Other**

10-54 Moore's Federal Practice - Civil § 54.173 ........................................10

S. Rep. No. 50, 99th Cong., 1st Sess. 33 (1985)............................................22

## SUMMARY OF ARGUMENT PER LOCAL RULE 7.2(a) (3)

**I.    THE BASIS FOR THE AWARD……………………………………………p. 1**

Sierra Club is a substantially prevailing party in this consolidated action under the Citizen Suit provision of the Clean Water Act ("CWA"), 33 U.S.C. Sec. 1365(d) and is, therefore, entitled to reimbursement of costs, including reasonable attorneys' fees.  Sierra Club's efforts to protect sewage-in-basement ("SIB") victims by securing changes to the Consent Decrees resulted in enforceable commitments from MSD to provide a first-of-its-kind program to remedy, prevent, and provide compensation for SIB episodes.  Under applicable case law, this achievement alone would be enough to render the Sierra Club a prevailing party.  However, the Sierra Club is also a substantially prevailing party in this action because its advocacy obtained many additional achievements, including favorable changes to and improvements in the Consent Decrees.

**II.    BACKGROUND……………………………………………………..p. 5**

On February 15, 2002, after the Sierra Club had notified MSD of its intent to enforce MSD's CWA violations, the United States and the State of Ohio filed complaints against the MSD.  On that same date, the governments initially lodged the IPCD as a "stand alone" agreement.  On February 27, 2002, the Sierra Club filed its complaint, seeking an end to all MSD's illegal discharges on private and public property "as expeditiously as possible." The Sierra Club's citizen suit was later consolidated and its Motion to Intervene was granted.  On January 28, 2003, the Court ordered the motion for entry of the IPCD to be "held in abeyance" until a second decree was completed.  On October 7, 2003, a second decree was lodged with the Court and the United States and the State of Ohio moved to enter both consent decrees in April 2004.  The Sierra Club

was an active party in the consolidated cases on all issues relating to the consent decrees and in all of these formal, court-related activities.

**III.     ARGUMENT………………………………………………………..p. 7**

      Section III explains that a court may award costs, including reasonable attorneys' fees, to a citizen-plaintiff under Section 1365(d) of the CWA in an action brought pursuant to Section 1365 when the party seeking the award has prevailed or substantially prevailed and whenever the court determines such award is appropriate.  An award of costs and fees to the Sierra Club is justified because the requirements of Section 1365(d) are met in this case.

      First, consistent with the language of Section 1365(d), the Sierra Club and the State of Ohio both brought suits pursuant to Section 1365, making the fee-shifting provision applicable.  Further, as a party properly filing its own independent action that was consolidated with the governments' litigation, the Sierra Club's party status underscores its rights to costs, including reasonable fees, under Section 1365(d).  The Sierra Club extensively participated in discovery and the development of the final consent decree.  Its efforts on behalf of the affected citizens of Hamilton County resulted in substantial improvements to the decrees.

      Second, the Sierra Club has prevailed or substantially prevailed by obtaining substantial public benefits that it sought in bringing suit and by obtaining relief that materially altered the legal relationship between the parties and that modified the Defendants' behavior in a way that directly benefits Hamilton County residents, the Sierra Club, and its members.  Specifically, the Sierra Club's major successes include 1) successfully advocating for the first-of-its-kind SIB victims' response, compensation, and

prevention program; 2) bringing Defendants' use of unconscionable claims releases to the Court's attention and ending the use of such releases; 3) requiring a verification component to the IPCD's short-term adequate capacity program; and 4) achieving substantial improvements to the SSO 700 interim treatment system, making it more closely resemble a "secondary treatment" system.   Because Sierra Club achieved major settlement successes like the SIB program, an award of fees and costs is appropriate.

Third, the Sierra Club's lodestar request for fees and costs is reasonable.  In calculating the lodestar, the total number of hours expended on this case is a reasonable number because the Sierra Club's work involved a common core of facts and law.  The issues relating to SIB overflows could not have been addressed in isolation from the problems of SSO overflows and system-wide problems with the MSD sewers. Further, the rates billed by the Sierra Club's attorneys and paralegals are reasonable.  For example, the rates billed by co-lead counsel, Mr. Slap and Mr. Altman, are reasonable, both nationally and in the context of the Cincinnati legal service market, given their level of experience and concentration.

Finally, the Sierra Club consulted experts in the fields of engineering (Dr. Bruce Bell and Mr. John Smith, P.E.) and economics (Dr. Michael Kavanaugh) to aid in its understanding of, *e.g.*, the structure, performance, and adequacy of the MSD's sewer system, and the reasonable cost of remedying the system's deficiencies.  These experts were necessary to the Sierra Club's effective prosecution of its citizen suit and to its advocacy as a party-intervenor.  The Sierra Club also incurred costs of litigation such as filing fees, photocopying, deposition transcripts, etc.

## I.   THE BASIS FOR THE AWARD

The Sierra Club and Marilyn Wall ("Sierra Club") respectfully request an award of attorneys' fees under the fee-shifting provision of the Clean Water Act ("CWA") citizen suit statute, 33 U.S.C. §1365(d).

The Sierra Club's efforts throughout this litigation have been based on a "common core of facts", which focused on eliminating widespread violations of the CWA, mending inadequacies in the Interim Partial Consent Decree ("IPCD"), defining key provisions of and obtaining changes in the final decrees, and ***enhancing current and future protection of the victims of the MSD's sewage-in-basement ("SIB") problems***. These achievements are interrelated.  For example, in order to succeed on the SIB issues, the Sierra Club had to understand the interrelationship between SIB, SSO, and CSO events, and to determine how the remedies proposed by the agencies in the IPCD and the first version of the second decree were inadequate to remedy the systemic problems leading to overflows of MSD sewers, and were, therefore, insufficient to abate the hazards of sewage in citizens' basements.

The extent of these efforts can be summarized as follows: Albert J. Slap, Esq. spent over 1,957 hours since August, 2001 on this case; the lawyers and staff of D. David Altman Co. LPA spent over 1,468 hours on the case since December, 2001; Sierra Club spent hundreds of volunteer hours since 2001 (for which no recovery is sought); and, Sierra Club paralegal, Katie Danko, spent over 1,168 hours since March 2003. The total sought for Mr. Slap's fees and expenses is $589,062.60. The total for D. David Altman Co. LPA is $377,540.73. The total fees and costs sought for the Sierra Club is $181,594.24.

It took all of the professional efforts detailed in this petition to obtain the many changes to the MSD's remedial commitments between the lodging of the IPCD on February 15, 2002 (Doc.2) and the July 2003 version of the second decree. It took all of these efforts to further prevail by defining and obtaining many additional important changes after the July 2003 proposed final consent decree was made available to the Sierra Club. All of these professional efforts were needed to protect SIB victims by securing procedural and substantive rights, which culminated with enforceable commitments from MSD to remedy, prevent, and provide compensation for SIB episodes and the citizens who suffer them.

Under the law, this achievement alone is enough to render the Sierra Club a prevailing party. The SIB victim issue is an overriding and significant one in the consolidated litigation and it was the Sierra Club's involvement in the lawsuits that brought to the Court's attention the complaints of thousands of isolated, unrepresented citizens.[1] Sierra Club sought to have those SIB discharges remedied, and it obtained:

- The first-ever SIB program in a federally enforceable consent decree – this provision was not added until after the Sierra Club's critique of the inadequacy of the July 2003 version of the second consent decree with regard to SIB victims;

- Revision of two unconscionable releases of liability, which were improperly exacted from SIB victims by MSD;

- An Order of this Court, declaring any of the previously executed, unconscionable releases unenforceable;

- In lieu of Sierra Club's Rule 53 request, the superior solution that this Court will *itself* remain actively involved in monitoring and enforcing the SIB provisions,

---

[1] Prior to the Sierra Club's successful advocacy as a party, MSD called Sierra Club's allegations of SIB problems "unsupported"; the State of Ohio derided Sierra Club's advocacy for SIB victims as a "parade of horribles"; and, the federal agency argued that the SIB problems would be addressed through implementation of the IPCD, alone, and proposed both the IPCD and the initial version of the second decree without any SIB program at all.

with the assistance of an independent ombudsman appointed pursuant to this Court's Order.

Moreover, as a party to this consolidated action, the Sierra Club can inform the Court of unenforced violations of the Consent Decree and request the Court to enforce the terms of the Decrees and this Court's Order (See, Transcript of May 25, 2004 Hearing, pp. 222-223). Thus, the Sierra Club has materially altered the legal relationship between the parties with respect to these SIB provisions, inter alia, and, its success on the SIB issues entitles the Sierra Club to prevailing party status.  Additionally, Plaintiffs have prevailed on other issues in the litigation, which have also materially altered the legal relationship between the parties to the Decrees. Plaintiffs:

- Obtained clarification, through Order of this Court, of ambiguous re-openers in the Decrees and the right to petition the Court to enforce the Decrees;

- Obtained changes in the July 2003 second decree that reduce the likelihood of continued violations of the CWA;

- Obtained a verification requirement for the provision requiring that additional flows caused by new development be offset by flow reductions ("STACP");

- Obtained substantial improvements in the "interim" remedy proposed for SSO 700 (though not the complete relief sought by Sierra Club);

- Avoided entry of the IPCD as a "stand-alone" measure, which would have clouded the Sierra Club's and the governments' ability to enforce the law.

Finally, the Sierra Club substantially prevailed with respect to provisions of the final Decrees.  In their Memorandum in Opposition to Entry of the Consent Decrees (Doc. No. 118), the Sierra Club asserted:

> To be approvable, the Consent Decrees ("Decrees") must, at least, be changed to impose firm SSO deadlines, to appoint a special master to oversee the Decrees, and to approve an SIB budget, along with other SIB program changes sufficient to abate, at the earliest possible date, the imminent hazard created by the SSOs for all SIB victims.

Intervenor Sierra Club's Memorandum in Opposition to Entry of the Consent Decrees at 3. The Sierra Club gained an enforceable Order that achieves the public benefit sought by these changes.

First, in its citizen suit complaint and throughout its intervention Sierra Club contended that the Decrees must impose firm SSO deadlines. The benefit sought by Sierra Club was the timely and expeditious enforcement of the legal requirement to cease SSO discharges. The IPCD did not impose firm deadlines and, the Second Decree contained reopeners with ambiguous language. During the fairness hearing, the Sierra Club achieved representations from the government that the Section 9B and 7B reopeners would not be used to unduly delay implementation of the Decrees' deadlines, despite the language of the reopeners. And, not only were those representations made by the U.S., they were incorporated into an enforceable order by this Court. The Order provides: "The Court retains jurisdiction over this matter, and **will not countenance unreasonable delay** in correcting the problems that the decree addresses." Order at 11 (emphasis added). Thus, the Sierra Club achieved the benefit of ensuring that these openers would not be abused to unduly delay remediation of the SSO discharges. Without these pre-approval statements, and the Orders memorializing them and clarifying the Decrees, the Decrees' language would have clouded enforcement of timeliness issues.

Second, the Sierra Club sought the appointment of a special master to report to the Court so the Court could be in a better position to monitor progress. The benefit sought by Sierra Club was the assurance of focused judicial oversight of the Decrees, given the length of time the violations have continued, the complexity of the process and the continuing injuries suffered by SIB victims. The Court's commitment to actively

retain jurisdiction over the process, to provide direct judicial scrutiny when needed, and the appointment of an independent ombudsman, who will "keep the Court informed of the status of such [SIB] program" ensure ongoing judicial oversight of the process. Order at 8. This is better than a special master and far more than the mere "customer service" employee that the MSD tried to substitute for the master/ombudsman. Further, the Court can still appoint a special master if the burden of direct oversight becomes too great. Thus, the benefit sought by Sierra Club's Rule 53 request was provided through the Court's ongoing oversight of the decree, together with an independent ombudsman who can do the work of monitoring the treatment of individual SIB victims by MSD. Moreover, the plight of the SIB victims was brought forth exclusively by the Sierra Club. The Club intends to follow-up as a party to assure that the victims are not forgotten.

Finally, the Sierra Club sought to ensure that, once it was created, the SIB program would be funded and changed to ensure that the imminent hazards faced by SIB victims would be abated at the earliest possible date. In the order approving the Decrees, the Court made clear that it will not countenance a failure of MSD to implement the SIB program expeditiously.[2] In addition to the ruling that the Court "will not countenance unreasonable delay," the Court ruled that "[W]here homeowners suffer damage for which MSD is liable, the MSD will be responsible for clean-up costs, remedies, and for any diminution in the value of real estate." Order at 11. Thus, the Sierra Club obtained the benefit of a judicially-enforceable obligation for MSD to fund and implement the SIB program, and to do so expeditiously.

---

[2] During the time between July 2003, when the second decree was proposed and circulated between the parties and the Sierra Club, and October 2003, when the second decree was lodged with the court, the second decree was, however, amended to include the SIB program. That program was not originally in the IPCD or the early version of the second decree. It was put in after the Sierra Club's July 2003 comments.

Thus, the Sierra Club is a substantially prevailing party in this action.  The Sierra Club and Marilyn Wall expended substantial resources in investigation, discovery, and expert analysis in order to bring the interest of otherwise isolated, unrepresented citizens before this Court and to ensure an effective remedy to sewage overflows.  The Sierra Club respectfully requests that the Court award fees and costs pursuant to section 1365(d) of the CWA.

## II. BACKGROUND

In 2001, the Sierra Club and Marilyn Wall intensified their long term investigation (going back to the 1990s) of ongoing violations of the Clean Water Act by MSD.  Even though the governments and the MSD had "talked" for years, these continuing violations were not being ***prosecuted*** by state and federal authorities. Throughout the years of talking, the residents of Hamilton County, including Sierra Club members, were impacted by raw sewage surging up in basements, backyards, and streams, in violation of law. A substantial number of these point sources had been illegally discharging for thirty years. And, while the state of Ohio had issued an enforcement order in 1992, the discharges continued.  There was no plan to remedy the situation and end sewage-in-basement impacts or sanitary sewer overflows as of the end of 2001.

By letter dated December 18, 2001, the Sierra Club notified MSD, pursuant to the CWA 60-day notice requirement, of its intent to enforce MSD's CWA violations.  On February 15, 2002, ***with just one day remaining*** in the Sierra Club's 60-day notice period, the United States and the State of Ohio filed complaints against the MSD.  ***On that same date***, the United States and the State of Ohio initially lodged the IPCD as a

"stand alone" agreement.  On February 27, 2002, the Sierra Club filed its complaint, seeking an end to all MSD's illegal discharges on private and public property "as expeditiously as possible." (See, Sierra Club v. Board of County Commissioners, et al., 1:02-CV-00135)  The Sierra Club's citizen suit was consolidated with the U.S. and State of Ohio cases on April 1, 2002 (See Doc. No. 5) and its Motion to Intervene was granted on May 24, 2002 (Doc. No. 26).

The Sierra Club participated as a party in the consolidated cases on all issues relating to the consent decrees.  It participated in Rule 26(f) conferences and in court-ordered discovery; identified deficiencies in the IPCD and Second Decree to this Court and submitted critiques and proposed changes to the federal government when provided with the draft documents; and responded to various Rule 12(b)(6) motions filed against it.

On January 28, 2003, the Court ordered the motion for entry of the IPCD to be "held in abeyance" until a second decree was completed.  (Doc. No. 90).   In July 2003, a draft second decree was circulated between the parties and the Sierra Club.  On October 7, 2003, the second decree was lodged with the Court (Doc. No. 96) and, the United States and the State of Ohio moved to enter both consent decrees on April 16, 2004 (Doc. 116).  The Sierra Club filed its Opposition to the entry of the consent decrees on May 3, 2004 (Doc. 118).   The Court entered the decrees on June 9, 2004. (Doc. No. 129) and: (1) specifically recognized commitments made by the United States to provide the Sierra Club with all documents the United States received so that the Sierra Club can monitor the decrees; (2) provided Sierra Club the right to petition the Court to enforce the terms of the Decrees and this Court's Order (See, Transcript of May 25, 2004 Hearing, pp. 222-

223); and, (3) clarified, in response to Sierra Club concerns, ambiguous terms in the decrees. The Sierra Club was an active party in all of these formal court-related activities.

## III. ARGUMENT

The Citizen Suit provision of the Clean Water Act provides that "the court, in issuing any final order in any *action brought pursuant to this section*, may award costs of litigation (including reasonable attorney and expert witness fees) to any *prevailing or substantially prevailing party, **whenever the court determines such award is appropriate**…*" 33 U.S.C. Sec. 1365(d) (emphasis added). The State of Ohio brought suit pursuant to section 1365.[3] Further, the Sierra Club brought its citizen suit[4] and moved to intervene pursuant to Section 1365. Finally, this Court assumed jurisdiction over the State of Ohio's suit and the Sierra Club's citizen suit under Section 1365 of the Clean Water Act, inter alia. Thus, the Court's final order is one arising in an "action brought pursuant to" Section 1365. The fee-shifting provision of the CWA is, therefore, applicable.

The Sierra Club should be awarded fees and costs pursuant to section 1365(d) because 1) it has substantially prevailed in the consolidated cases 1:02-CV 107, 108, and 135; and 2) the attorney and expert witness fees requested herein are reasonable and appropriate.

---

[3] Complaint, State of Ohio, Attorney General Betty D. Montgomery, Plaintiff v. The Board of County Commissioners, Hamilton County, OH and the City of Cincinnati, C-1-02-108: "Para. 1. This is a civil action pursuant to Sections 309(b) and 505 of the Clean Water act ("CWA" or "Act"), 33 U.S.C. Sections 1319(b) and 1365, for injunctive relief…"

[4] Complaint, Sierra Club and Marilyn Wall, Plaintiffs v. Board of County Commissioners, et al., C-1-102-135: "Para. 1. This is a citizens' suit brought under Section 505 of the Federal Water Pollution Prevention and Control Act…33 U.S.C. Sec. 1365…"

A.    **SIERRA CLUB'S PARTY STATUS UNDERSCORES ITS RIGHT TO COSTS AND REASONABLE FEES UNDER SECTION 1365(d).**

The Sierra Club is not merely an intervenor in this suit.  Rather, the Sierra Club properly filed its own independent complaint against Defendants, which the Court consolidated with the governments' litigation.  Although not a signatory to the final consent decree entered by the Court, the Sierra Club extensively participated in discovery and the development of the final consent decree by seeking changes and additions beyond the terms contained in the IPCD.  In fact, the Sierra Club is the only party that conducted court-authorized discovery.  As discussed below, the Sierra Club's efforts on behalf of the affected citizens of Hamilton County, especially on behalf of the thousands of otherwise isolated and unrepresented citizens affected by sewage-in-basement problems resulted in substantial improvements to the Decrees and related orders.

A party, such as the Sierra Club, which has properly filed a complaint (and, as an additional precaution, sought and obtained intervenor status), is eligible for costs and reasonable fees under Section 1365(d).  *See United States v. City of Green Forest*, 921 F.2d 1394 (8th Cir. 1990), *cert. denied,* 502 U.S. 956 (1991).  In *Green Forest*, the citizens commenced an action pursuant to the citizen suit provision of the CWA, 33 U.S.C. § 1365(a).  The district court denied the citizens' motion to intervene in the United States' action brought subsequent to the citizen suit. On appeal, the Eighth Circuit found that, because the citizens had participated by filing objections to the consent decree, the denial of the motion, while in error, was largely harmless.   However, the court found the error did cause harm ***to the extent that it precluded the citizens from seeking attorneys' fees under section 1365(d)***.  *Id.* at 1402.  Thus, the court reversed the

denial of the motion to intervene and remanded on that issue for the purpose of permitting the citizens group to seek attorneys' fees. *Id.*

Indeed, the plain language of the statute permits an award of costs and reasonable fees to a prevailing or substantially prevailing party so long as the action was brought pursuant to section 1365. 33 U.S.C. §1365(d); *See United States v. Maine Department of Transportation*, 980 F.Supp. 546 (D. Maine 1997) (denying motion for fees under section 1365(d) because the intervenor brought no action under section 1365, the action intervened in was not brought pursuant to section 1365, and because the intervenor did not prevail because it sought no relief in addition to that sought by the United States). Unlike *U.S. v. Maine*, both the State and the Sierra Club brought suit pursuant to section 1365. Further, as discussed below, the Sierra Club has substantially prevailed on important issues in this case and is, therefore, eligible for costs, including reasonable fees.[5]

## B. SIERRA CLUB HAS SUBSTANTIALLY PREVAILED

The Sierra Club is entitled to costs and reasonable attorney and expert witness fees because it has substantially prevailed by achieving substantial public benefits that it sought in bringing suit. The standard for determining when a party has prevailed for purposes of a fee-shifting statute is a "generous formulation." *Natural Resources Defense Council v. Fox*, 129 F. Supp. 2d 666 (S.D. N.Y. 2001). In *Fox*, the Court found that:

> 'For a plaintiff to be considered a 'prevailing party,' and thus eligible for an award of fees, he need not have succeeded on 'the central issue' in the case . . . and need not have 'obtained the primary relief sought.'' *LeBlanc-Sternberg*, 143 F.3d at 757 (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782,

---

[5] *See also* 10-54 Moore's Federal Practice - Civil § 54.173 ("An intervenor is generally eligible for an award of fees just as if the intervenor were an original party to the litigation…").

790-91, 103 L. Ed. 2d 866, 109 S. Ct. 1486 (1989) and *Carroll v. Blinken*, 42 F.3d 122, 130 (2d Cir. 1994)). Rather, 'plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on *any* significant issue in litigation which achieves some of the benefit the parties sought in bringing suit…' *Hensley v. Eckerhart*, 461 U.S. 424, 433, 76 L.Ed. 2d 40, 103 S.Ct. 1933 (1983).

Id. at 669 (emphasis added).  Applying this standard, the *Fox* court awarded fees to the

plaintiff under section 1365(d), even though the plaintiff succeeded on just one of its

thirteen (13) CWA and Administrative Procedure Act claims.  The court found that the

single prevailing claim was a sufficient basis for a fee award because it "was a significant

issue in the litigation and achieved some of the benefit plaintiffs sought in bringing the

suit."  *Id.*

Under *Fox*, the Sierra Club's success in requiring an SIB program, alone,

particularly given the Court's Order requiring prompt implementation and requiring MSD

to remedy, prevent, and provide compensation for sewage in basement victims, is

sufficient to render Plaintiff a substantially prevailing party.  However, in addition, the

Sierra Club succeeded on other significant issues raised in its citizen suit complaint. In

total, the Sierra Club effected important changes and additions to the consent decree[6] and

vindicated important societal interests.

The *Fox* court also noted that " [A] plaintiff 'prevails' when actual relief on the

merits of his claim materially alters the legal relationship between the parties by

modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v.

Hobby*, 506 U.S. 103, 111-12, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992). The changes,

additions, and commitments secured by the Sierra Club (e.g., establishing a sewage-in-

basement program and ending the MSD's use of unconscionable claims releases, *infra*)

---

[6] "[S]ettlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees."  *Buckhannon Board and Care Home, Inc., et al. v. West Virginia Department of Health and Human Resources et al.*, 532 U.S. 598, 604, n.5 (2001).

have altered the legal relationship between the parties by modifying the MSD's behavior

in a way that benefits the Sierra Club and the public.  Moreover, these changes, additions,

and commitments are now sanctioned in a judicially enforceable consent decree and in an

enforceable Order granting entry of the decrees. [7]

### 1.    Adding the Sewage-in-Basement ("SIB") Program.

The Sierra Club's advocacy in this case directly resulted in the establishment of a

first of its kind sewage-in-basement victims' response, compensation, and prevention

program.  Until the Sierra Club's involvement, SIB victims were thousands of isolated

complainants, not collectively heard by the U.S., the State, or MSD.

The Sierra Club's Complaint alleged that the Defendants' sewers were illegally

overflowing into the yards and basements of Hamilton County residents (Complaint,

Para. 20) and sought injunctive relief to "completely eliminate" this practice "as

expeditiously as possible." (Complaint, Para. 74 C).   In the context of the federal/state

case, Sierra Club extensively critiqued the consent decrees and provided expert witness

---

[7] The Supreme Court recently held that, to be a "prevailing party" under the fee shifting provisions of the
Fair Housing Amendments Act of 1988 (FHAA) and the Americans with Disabilities Act of 1990 (ADA),
a party must secure some form of "judicially sanctioned change in the parties' legal relationship" rather
than, e.g., a defendant's voluntary change in conduct.  *Buckhannon* 532 U.S. at 599 (rejecting the "catalyst
theory" in relation to ***those statutes***).  *Buckhannon* is immaterial in this case because the Sierra Club's
advocacy secured changes to the IPCD and the proposed second decree, as well as enforceable ruling in
the final Order granting entry of the decrees. This relief is judicially sanctioned in the final consent decree
and Order.  However, the "catalyst theory" remains a valid basis for cost recovery under CWA section
1365(d).  Unlike section 1365(d), the fee shifting provisions at issue in *Buckhannon* do not contain the
"substantially prevailing" or "whenever ...appropriate" language.  Because *Buckhannon* construed a
different fee entitlement standard, its holding is not controlling over the CWA's citizen suit fee shifting
provision.  *See Loggerhead Turtle v. The County Council of Volusia County, Florida*, 307 F.3d 1318 (11th
Cir. 2002) (interpreting the "whenever…appropriate" language of the fee-shifting provision of the
Endangered Species Act, finding that *Buckhannon* does not invalidate use of the catalyst test under that
statute). While the Court need not reach the issue of the application of the catalyst theory, Plaintiff-
Intervenor Sierra Club would prevail under that theory as well.

declarations advocating specific measures to remedy the problem of sewage backups into residents' homes.[8]

From the outset, the U.S. and the State of Ohio argued that the *IPCD – **which included no SIB program*** – was sufficient protection for the community, including the SIB victims.  In fact, the State opposed the Sierra Club's efforts to obtain injunctive relief for SIB victims, labeling the Sierra Club's claims of thousands of sewage backups in basements in Hamilton County each year as an unsupported "parade of horribles."  State of Ohio's Reply Memorandum in Support of Motion for Entry of Consent Decree, Sept. 19, 2002 (Doc. 63), at 12-13.

Yet, once the Court granted Sierra Club discovery rights (Doc. 71), the discovery obtained solely by the Sierra Club revealed that:

- Defendants receive more than one thousand complaints each year from residents of Hamilton County regarding raw sewage surfacing outside of the sewer system. Request for Admission #3.

- From 1997 to the present, the MSD has received more than 15,000 complaints from residents of Hamilton County regarding sewage surfacing outside of the sewer system. Request for Admission #4.

- Over 80% of the above complaints are from residents complaining that sewage was backing up into their basements. Request for Admission #5.

The Sierra Club also obtained written declarations from SIB victims and prepared a videotape of interviews with SIB victims. Thus, the Sierra Club proved that, contrary to the State's claims of exaggeration, raw sewage did back up into the homes of Hamilton County residents thousands of times each year.

---

[8] According to Dr. Bell's Second Declaration: "The IPCD fails to bring Defendants into compliance…including failure to address in any meaningful way the over 2500 backups of raw sewage into basements every year." *See* Exhibit 3 to Sierra Club and Marilyn Wall's Memorandum in Opposition to United States' Motion for Entry of Consent Decree (Doc. No.60).

On July 22, 2003, the Sierra Club submitted to the United States and the Court its detailed written critique of and proposals for the draft Second Decree. *See* Exhibit B to Motion for Status Conference and Memorandum in Support (Doc. No. 99). Even at this late date, ***the Second Decree contained no program to help SIB victims.*** Sierra Club proposed in detail a comprehensive victims' response and compensation program, including:

- Funding an administrative claims mechanism to help SIB victims (Para.4);

- MSD payment for immediate cleanup and disinfection of sewage overflows in residences (Para. 7.e);

- Yearly, third-party audits of MSD performance in WIB program (Para. 7.g);

- Payment of property damage claims within 90-days (Para. 7.j).

It was not until ***after*** the Sierra Club's critiques and after Court's September 2003 status conference that it became clear that the Second Decree would, in fact, contain relief for the SIB victims.

The public value of the SIB victims' program is substantial. During the discovery period, Sierra Club found MSD estimates that even a partial fix of the SIB problem would cost in the range of ***$250 to $300 million dollars***.[9] After September 3, 2003, when it became evident that Defendants would actually need to provide immediate relief to the SIB victims in the Second Decree (in order to obtain approvable Decrees), it publicly

---

[9] The 2001 BBS Corporation Report estimates a range of $1.25 to $3.63 billion for the entire MSD Clean Water Act remediation program, the Sewage-in-Basement fix ($250 to $300 million) represents approximately 20% of the low estimated costs and 8% of the high estimated costs. The Executive Summary of the BBS Report is attached as Exhibit 1 and incorporated herein. The complete Report was previously submitted to the Court at the Fairness Hearing.

reduced its $250 to $300 million SIB remediation estimate to $35 to $40 million.[10]

Whether the total public benefit of this program is $35 million or $300 million, however,

it is substantial and, ***its existence is directly and causally-related to Sierra Club***

***advocacy in this case***.

      As the United States wrote in its Memorandum in Opposition to Intervenor's

Motion for Status Conference, dated December 5, 2003 (Doc. 103):

> On some matters, however, the parties are in basic agreement with Sierra Club
> and have included provisions in the decree *similar to those requested by Sierra*
> *Club.*  For example, the parties were well aware that this consent decree must
> adequately address the all-too-frequent occurrence of sewage backups in
> basements.  *Sierra Club and this Court have repeatedly raised concerns about*
> *this unacceptable situation*…Although the provisions are not identical to those
> requested by Sierra Club…the Water-in-Basement (WIB) program, addresses the
> Court's and Sierra Club's concerns… (Emphasis supplied).

Also, the United States acknowledged that the program is ***"the first of its kind in a***

***federal consent decree…"***  Memorandum in Support of Entry of Consent Decrees (Doc.

116), at ii-iii (emphasis added).  The fact that, out of numerous sewer cases pursued by

the United States, the Hamilton County SIB program is the first of its kind in a federal

consent decree is a further indication that the Sierra Club's efforts were instrumental in

effecting this outcome. Thus, the Sierra Club advocated (and the Court ultimately

accepted) that the IPCD did not go far enough to protect Hamilton County SIB victims.

    **2.**    **Ending Defendants' Use of Unconscionable Claims Releases.**

      Sierra Club also prevailed by putting an end to Defendants' use of unconscionable

claims releases when dealing with SIB victims.  Through outreach to SIB victims, the

---

[10] October 2, 2003, Enquirer: "Hamilton County Commissioners agreed Wednesday to use sewer fees to fix
persistent flooding in basements – a move that could spell relief for hundreds of homeowners…The sewer
district estimated that 1000 homes may need to be repaired or torn down to solve the problem, at a cost of
$251 million.  The Sierra Club puts the number of homes at 10,000. MSD has proposed a new solution that
would cost an estimated $37 million for 1000 homes." *Id.* (attached as Exhibit 2).

Sierra Club became aware that Defendants were using releases in cases where sewage backups were clearly the fault of the MSD sewers that required the victims to give up substantial rights, including personal injury claims and future rights of recovery, in order to get financial compensation for damage to personal property.  There were at least two type*s* of unconscionable releases that Defendants were using: one for the claims program and one for the prevention program.

On February 3, 2004, Sierra Club requested <u>inter alia</u> a copy of the legal release that the Defendants were using in the SIB claims program.[11]  Based on representations made by Defendants' counsel, the Sierra Club understands that, after the February 3 communication, Defendants modified the release to limit its coverage to only the specific event and specific items being compensated.

However, as this Court saw at the Fairness Hearing on May 25, 2004, Defendants were still using the unconscionable release in the SIB *prevention* program up until six-days before the hearing.  As a result, the Court found, in its June 9, 2004 Order, that these releases "prepared by the Cincinnati Solicitor's Office were highly improper" and that, "if any such releases were signed, they are unenforceable." Order at 7.

The public detriment that these releases would have caused had they not been brought to the Court's attention by Sierra Club is substantial.  In exchange for participation in the SIB prevention program (one of the public benefits of the Second Decree), victims were required to sign away "all past, present and future" claims against Defendants.  If an inexpensive prevention[12] fix by MSD did not work and basement

---

[11] See February 3, 2004 email from Albert J. Slap, Esq., Peter P. Murphy, Esq. A true and correct copy of that email is attached as Exhibit 3 and incorporated herein.

[12] Installation of a simple "backflow preventer" may only cost a few hundred dollars, yet the SIB victims would have released MSD for all claims, past, present and future.

backups continued, victims signing away their rights would have been barred from

seeking or receiving compensation *after* MSD had attempted to fix the basement backup,

but failed.[13]

### 3.    Requiring a Verification Component to the IPCD's Short-Term Adequate Capacity Program.

The original IPCD, which was filed with the Court on February 15, 2002 (Doc. 2),

included a "Short-Term Adequate Capacity Program" ("STACP"). IPCD, Section VIII.

The objective of the STACP was to "prevent any wastewater flows from new

development from aggravating or in any way adding to the quantity discharged from any

downstream SSO.  Specifically, the objective of the STACP Plan is to ensure that more

flow is removed from the system than is added from a proposed new sewer, sewer

extension, or increased flow associated with new development upstream of the SSO…"

Section VIII.C, p. 37.

Sierra Club objected to the STACP because it lacked a verification program to

ensure that the removal credits being claimed by MSD were actually being earned by

flow reductions in the sewer system.  *See* Sierra Club's Comments on the IPCD (attached

as Exhibit C to Sierra Club's Opposition to Defendant's Motion to Dismiss for Lack of

Subject Matter Jurisdiction (Doc. No. 9)) and Bruce Bell Declaration (attached as Exhibit

2 to Doc. No.60), at ¶23.

Ultimately, the U.S. agreed to change the IPCD as a result of Sierra Club's

critique and proposals.  As of February 15, 2002, the IPCD contained no verification

---

[13] Prior to the Court's Order of June 9, 2004, Sierra Club followed up on this issue under the Ohio Public Records Law and requested from Defendants information regarding all persons who were given the unconscionable releases and evidence that those releases had been voided and replaced with the ones provided at the Fairness Hearing on May 25, 2004. See Letter from Katie Danko, dated June 3, 2004 (attached as Exhibit 4 and incorporated herein).  Sierra Club will provide a copy of this request to the Ombudsman, Gary J. Pieples, Esq. and will continue to monitor the situation to make sure the invalid releases have all been replaced.

program.  However, in the United States' Memorandum in Support of Motion for Entry

of (Interim Partial) Consent Decree (Doc. 56), filed on August 20, 2002, pp. 26-27,

provides: "4. Changes to Short-Term Adequate Capacity Program Plan… [P]laintiffs

agree with Sierra Club's comment…In addition to the changes set forth above, the parties

have also agreed to the inclusion of an additional area-specific testing credit verification

that combines both manhole rehabilitation and sewer rehabilitation…"[14]

### 4.    Achieving Improvements to the SSO 700 Interim Treatment System.

The Sierra Club substantially prevailed by causing at least two specific changes to

the IPCD regarding the SSO 700 interim treatment system.  As originally submitted in

February 2002, the IPCD proposed the use of an interim treatment system called the

CEHRS at SSO 700 until either 2016 (when the Mill Creek Tunnel is expected to be

completed) or 2022 (when a permanent remedy must be in place).  The CEHRS did not

include disinfection of wastewater from SSO 700 prior to discharge and did not contain

an adequately-sized sewage retention tank.

The Sierra Club objected to the inadequacy of the proposed IPCD remedy for

SSO 700.  *See* Bell Declaration, Exhibit 2 to Doc. No.60, at ¶¶18-21.  Specifically, it

advocated the use of a full-scale secondary treatment plant at the location of SSO 700.

The Sierra Club also objected to the size of the treatment system proposed for SSO 700.

*See* Bruce Bell's Second Declaration (Exhibit 3 to Doc. No.60) at ¶25.

After Sierra Club submitted its critique of and proposed changes to the IPCD

along with the expert declarations of Dr. Bruce Bell, the parties added a disinfection

requirement to the CEHRS to make it more similar to the secondary treatment

---

[14] Id. at 63: "Sierra Club further comments that the credits (in the Short-Term Adequate Capacity Program) are not based on demonstrated reductions of upstream hydraulic loading.  SC, Attachment 2-A, p. 2."

requirements at the MSD's wastewater treatment plants.  Further, after the submission of the revised IPCD for approval to the Court and after the parties' receipt of the Second Bell Declaration, the size of the raw sewage storage tank at SSO 700 was significantly increased from 1 million gallons to 3.6 million gallons.[15]

Although Sierra Club did not obtain *all* of the relief that it was seeking regarding SSO 700, it was successful in achieving *substantial improvements* to the CEHRS design, making it more closely resemble secondary treatment.

### 5.  Other issues on which the Sierra Club Prevailed.

The Sierra Club prevailed on other issues as well.  First, the Sierra Club prevented the adoption of the IPCD as a stand-alone agreement, without contemporaneous adoption of a final consent decree that included: a) provisions for the implementation of the SSO remedial plan; b) a final deadline for elimination of SSOs; c) civil penalties; and d) injunctive relief to prevent discharges of raw sewage onto private property.  This provided a public benefit by avoiding  adoption of an interim and partial decree that would have clouded the Sierra Club's and the governments' ability to enforce the law.

Second, the Sierra Club substantially prevailed when the Court ordered that an "ombudsman" be appointed "so as to ensure that WIB victims obtain effective and timely assistance."  June 9, 2004 Order, at 7. Neither the IPCD nor the Second Decree as presented to the Court contained any reference to an ombudsman.  In fact, the concept of an ombudsman only arose in the United States' Memorandum in Support of Entry of Consent Decrees (Doc. 116), in its ***response*** to Sierra Club's call for a special master.

---

[15] See Declaration of Mark J. Klingenstein, P.E., in Support of Motion of the United States for Entry of the Interim Partial and CSO Consent Decrees, Para. 32.

Without Sierra Club's vigorous advocacy in support of a special master, there would have been no offer of an ombudsman by the United States in this case.

As explained above, the Sierra Club sought assurance of judicial oversight of the decree. The Court's continuing jurisdiction, its Order holding MSD accountable to SIB victims, and the appointment of the ombudsman together assure that such oversight will continue, that SIB victims will be treated fairly, and that measures to compensate them, and prevent and remedy SIB overflows will be funded and implemented expeditiously.

Third, the Sierra Club succeeded by adding the definition of "10-year storm" to the final consent decree. The government agreed to add the definition (10-year, 24-hour storm) after the Sierra Club comments pointed out the unenforceability of other provisions, if MSD could claim some other, much smaller, 10-year storm was intended, *e.g.* the 10-year, 30-minute storm.

Finally, the Sierra Club prevailed on the interpretation of the Section 9B and 10B potential "openers" in the final consent decree. The Sierra Club was concerned that the final compliance deadline language of Section 9B of the 2nd Decree was subject to ambiguous interpretations adverse to the prompt correction of the MSD's problems. At the Fairness Hearing on May 25, 2004, Counsel for the Department of Justice clarified that the parties' intent was to temporally limit use of the $1.5 billion "opener" to the 2006 LTCPU submission. As a result, the Court "confirm[ed] that the $1.5 billion figure only applies to the formulation of the plans in 2006." Order, at 11. This clarification satisfied one of Sierra Club's significant concerns by removing ambiguity from a key implementation provision, which could have delayed final compliance with the Clean Water Act. Similarly, the Sierra Club obtained a clarification from the Court, ensuring

that the re-opener relating to water quality standard revisions would not unduly delay implementation of the decrees.  Order, at 9.

As the above demonstrates, the Sierra Club has achieved important public benefits that it sought in its Complaint and intervention.  Further, its advocacy has modified Defendants' behavior in a way that directly benefits the Sierra Club's public interest purposes.  Thus, the Sierra Club meets the definition of a "substantially prevailing party" in this case.

### C.    AWARDING COSTS AND FEES TO SIERRA CLUB IS APPROPRIATE.

Because the Sierra Club is a substantially prevailing party, an award of costs, including reasonable fees to the Sierra Club, is "appropriate" under section 1365(d).  In *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983), the Supreme Court analyzed the meaning and history of the "whenever…appropriate" standard under the fee-shifting statute of section 307 of the Clean Air Act ("CAA"), which authorizes judicial review of U.S. EPA actions.  While the court held that an award of costs and fees is not appropriate where a plaintiff achieves *no* degree of success on the merits, it concluded that *it is appropriate to award costs and fees to* "*partially prevailing parties – parties achieving some success, even if no major success*." *Id.* at 687 (emphasis added).[16]  *See also Conservation Law Foundation v. Secretary of Interior*, 790 F.2d 965, 967 (1st Cir. 1986) (interpreting the "whenever appropriate" language of the fee-shifting provision of the Endangered Species Act to mean "notable progress, short of full achievement, on any issue of substance.").

---

[16] In making its decision, the Court compared the fee-shifting provision of section 307 of the CAA, 42 U.S.C. §7607, to that of the CAA's citizen suit provision (42 U.S.C. §7604), noting that "similar attorney's fee provisions should be interpreted *pari passu. Ruckelshaus*, 463 U.S. at 691.

The holding of *Ruckelshaus* applies to fee requests made pursuant to section 1365(d) of the CWA.  In fact, Congress amended section 1365(d) of the CWA in 1987 to affirm the sections' conformity to the interpretation of the "whenever…appropriate" language under *Ruckelshaus*. While retaining the "whenever…appropriate" standard, Congress added the words "prevailing or substantially prevailing" before the word "party."  Pub. L. No. 100-4, § 505, 101 Stat. 7, 76 (1987).  *See also* S. Rep. No. 50, 99th Cong., 1st Sess. 33 (1985)(agreeing with *Ruckelshaus*, limiting cost awards under the CWA to prevailing or substantially prevailing parties, and finding that a party may prevail by achieving a successful settlement).  Thus, because the Sierra Club achieved success, including major settlement successes like the SIB program, an award of costs is appropriate.

 **D.**    **SIERRA CLUB'S REQUEST FOR FEES AND COSTS IS REASONABLE.**

   **1.**    **Sierra Club's Lodestar Request for Attorneys' Fees is Reasonable**

Once a petitioner has met the threshold test for fee-shifting under the CWA, it must then demonstrate that the request for fees and costs is reasonable.  The familiar "lodestar" method is used to calculate the amount of attorneys' fees.  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

In *City of Riverside v. Rivera*, 477 U.S. 561 (1986), the Supreme Court affirmed a substantial award of attorneys fees in a police abuse case, notwithstanding that the fee award greatly exceeded the amount of damages awarded by the jury.  The Court found that the petitioners were entitled to attorneys' fees based on the total number of hours expended on the case.  Recognizing that civil rights plaintiffs obtain relief not only for themselves, but also as "private attorneys general," the Court found that "[b]ecause

damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases to depend on obtaining substantial monetary relief." Id. at 575.  Similarly, the Sierra Club is acting as a "private attorney general" in this case.  *See also National Wildlife Federation v. Hanson*, 859 F. 2d 313 (4th Cir. 1988) ("Unlike plaintiffs in traditional civil actions, plaintiffs in environmental suits do not seek vindication of personal rights and they obtain no financial benefits if they win.").

In finding that the petitioners were entitled to attorneys fees based on the total number of hours expended on the case, the *Riverside* court cited to *Hensley v. Eckerhart*, 461 U.S. 424 (1983), stating, "…*Hensley* emphasized that "[where] a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id*. at 569.

*Hensley* also teaches that:

In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. Id. at 465.[17]

*Id.  See also Gross v. Perrysburg Exempted Village School District*, 306 F.Supp. 2d 726 (N.D. Ohio 2004) (awarding fees for the plaintiffs claims as a whole when the work performed was based on a 'common core of facts' focused on proving the overall inadequacy of [the plaintiff's son's educational] situation...").

---

[17] See also, *United States and Supporters to Oppose Pollution, Inc. v. Environmental Waste Control, Inc.,* 737 F. Supp. 1485 (N.D. Ind. 1990).

As explained throughout this petition, the Sierra Club's work in this case similarly involved a common core of facts and law. As in *Gross*, the Sierra Club's efforts were focused on Defendant's Clean Water Act violations and analyzing the overall adequacy of the Consent Decrees. The Sierra Club sought enforcement of CWA provisions against MSD, on behalf of its members, who were exposed to sewage as it surged up in basements, backyards and streams. It was the Sierra Club's advocacy on behalf of affected citizens that kept a spotlight on issues that were not a priority for the agencies. The Sierra Club vigorously pursued these issues, focused the parties' attention on the admitted gaps in the IPCD, and the absence of any real protections for SIB victims and brought analyses and declarations from nationally-recognized experts in the field to bear on the issues.

The Court is familiar with the high degree of complexity and the number of factual and legal issues that were involved in this case. The issues relating to SIB overflows could not be addressed in isolation from the problems of SSO overflows and system-wide problems with the MSD sewers. Thus, an examination of the attorney hours spent on this case must be made in the context of the litigation as a whole. There were over 130 docket entries in this case. The Sierra Club's legal work started well before the filing of the IPCD (Doc. 2). Specifically, Sierra Club:

- prepared a 60-day Notice letter pursuant to 33 U.S.C. Sec. 1365;

- prepared and filed a citizen suit complaint (C-1-02-135);

- reviewed the EPA and Ohio complaints (C-1-02-107 and 108);

- reviewed and analyzed the IPCD;

- obtained nationally-recognized experts to review the decree;

- filed a motion and memorandum to consolidate (Doc. 5);

- litigated Defendants' Motion to Dismiss for Failure to State a Claim in C-1-02-135 (the Sierra Club Citizen Suit in the consolidated cases) (see Doc. 8);

- litigated Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction in C-1-02-135 in the consolidated cases (Doc. 9);

- prepared and filed a Motion to Intervene (Doc. 26);

- prepared for and participated in Rule 26(f) conference (Doc. 53);

- participated in preparation of case management order;

- litigated another Motion to Dismiss for Failure to State a Claim by Defendants (Doc. 39) and Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 40);

- commented on the IPCD to the EPA and the Dept. of Justice;

- reviewed revised IPCD (Doc. 56);

- prepared and filed Memorandum in Opposition to Entry of IPCD (Doc. 60);

- prepared for and participated in hearing on Oct. 9, 2002 (Doc. 70);

- prepared and responded to discovery after Court authorized a 90-day discovery period (Doc. 74)[18];

- filed opposition to governments and Defendants attempt to stay discovery (Doc. 77);

- Attended depositions and deposed witnesses, including the deposition of a US Army Corps of Engineers witness in Louisville, KY;

- interviewed and obtained declarations from Hamilton County SIB victims;

- researched factual and legal issues regarding the Defendants' claims releases;

- prepared for and attended the Sept. 8, 2003 Status Conference (Doc. 95);

---

[18] The MSD produced 85 bankers' boxes of documents during the discovery period and 10 compact discs of data (index attached hereto and incorporated herein as Exhibit 5). The Sierra Club paralegal prepared a detailed index of the MSD document production and summarized various parts of the document production that were determined to be important by counsel. See Sierra Club index of MSD document production, attached hereto and incorporated herein as Exhibit 6.

- prepared and submitted critiques and proposed changes to the draft Second Consent Decree;

- attended meetings with the EPA;

- prepared and filed Motion in Opposition to Entry of the Second Decree (Doc. 118);

- prepared motion for Special Master (Doc. 110; Doc. 120); and

- prepared for and attended the May 25, 2004 Fairness Hearing (Doc. 127).

These formal events are the tip of the iceberg of the thousands of professional hours expended.

As the Supreme Court in *Hensely*, supra, noted, much of the legal work in any case involves just "staying in the case." *Id*. 461 U.S. 465. This means responding to dispositive motions, following the requirements of the Rules of Civil Procedure (e.g., Rule 26 disclosures), conducting discovery, etc. In hotly contested cases, the amount of work involved in being there at the finish line is enormous.

The first attorney hours billed in this case for Sierra Club date back to August 10, 2001, three-years ago, when attorney Albert J. Slap was asked to review a file of materials on the MSD's sewer overflows by Plaintiff Marilyn Wall, who was then Chair of the Miami Group of the Sierra Club. The total sought for Mr. Slap's fees and expenses is $589,062.60. See Albert Slap Declaration, attached as Exhibit 7. The total for D. David Altman Co. LPA is $376,890. See D. David Altman Declaration, attached as Exhibit 8. The total fees and costs sought for the Sierra Club is $181,594.24. See Katie Danko's time records (attached as Exhibit 9) and Marilyn Wall's Declaration (attached as Exhibit 10).

Given the complexity of this case, its high level of activity over a period of three years, and the common core litigation tasks that required counsels' focused attention, the number of hours spent by Plaintiffs' counsel is reasonable.

Next, to determine the lodestar attorneys' fee, the Court must look at the rates charged by Counsel to determine if they are also reasonable. Given the level of experience and concentration of co-lead counsel, Mr. Slap and Mr. Altman, the rates charged are reasonable both nationally and in the context of the Cincinnati legal service market.[19] Both Mr. Slap and Mr. Altman have been for 30 years and both have focused their practice on environmental law. Further, both Mr. Slap and Mr. Altman have published in the area of environmental law and have taught environmental law. A complete listing of Mr. Slap and Mr. Altman's qualifications can be found in their declarations, attached as Exhibits 7 and 8, respectively.

Additionally, a number of highly experienced associate attorneys that are employed by Mr. Altman have worked on this case, billing at rates that are both nationally and locally reasonable. *See* Declaration of James B. Helmer, Esq. (attached as Exhibit 11) and Declaration of Jonathan Conte, Esq. (attached as Exhibit 12). Finally, Ms. Danko is a paralegal employed directly by Sierra Club and worked under the supervision of Mr. Slap. Time and billing information for each attorney is attached to Mr. Slap and Mr. Altman's declarations. Ms. Danko's time records are attached as Exhibit 9.

### 2. The Sierra Club's Request for Expert Witness Fees and Costs is Reasonable.

To effectively prosecute its citizen suit and to properly advocate its positions as a party-intervenor, Sierra Club sought and received the assistance of nationally-recognized,

---

[19] See Declaration of James B. Helmer, Esq., attached as Exhibit 11.

expert witnesses, including 1) Dr. Bruce Bell, an engineering expert, who submitted three declarations to the parties and the Court; 2) Dr. Michael Kavanaugh, an economic expert, who submitted four declarations to the parties and the Court; and 3) John Smith, P.E., a civil engineer in Cincinnati, who provided an expert report on the MSD's SIB prevention program to the parties and the Court. The curriculum vitaes of Dr. Bell, Dr. Kavanaugh, and Mr. Smith are attached hereto as Exhibits 13, 14, and 15, respectively. The invoices of Dr. Bell, Dr. Kavanaugh, and Mr. Smith are attached to Marilyn Wall's declaration (Exhibit 10) and are incorporated herein.

The Sierra Club also directly incurred costs of litigation such as filing fees, photocopying, deposition transcripts, etc. A declaration of Plaintiff Marilyn Wall detailing the expert witness fees and costs incurred by Sierra Club is attached as Exhibit 10 and incorporated herein.

### III. CONCLUSION

For the reasons set forth above, the Sierra Club and Marilyn Wall respectfully request that their Motion for Attorneys' Fees and Costs be granted.

Respectfully submitted,


/s/ D. David Altman                          /s/ Albert J. Slap

D. David Altman, Esq.                        Albert J. Slap, Esq. (#0074579)
(#0021457)                                   Law Office of Albert J. Slap
D. David Altman Co., L.P.A.                  20 Erie Ave.
15 East 8th St., Suite 200W                  Glendale, OH 45246
Cincinnati, OH 45202                         (513-771-7800)
(513-721-2180)

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2004, a copy of the forgoing Sierra Club and

Marilyn Wall's Motion for Attorneys' Fees and Costs was filed electronically.  Notice of

this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


/s/ D. David Altman
D. David Altman (0021457)
D. DAVID ALTMAN CO., L.P.A.
15 East 8th Street, Suite 200W
Cincinnati, OH  45202
E-mail:  daltman@one.net

30