UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA, <u>et</u>    :
<u>al</u>.,                              :    NO. 1:02-CV-00107
                                        :
          Plaintiffs,                   :
                                        :    **OPINION AND ORDER**
                                        :
     v.                                 :
                                        :
                                        :
BOARD OF COUNTY COMMISSIONERS          :
OF HAMILTON COUNTY, OHIO, <u>et</u>     :
<u>al</u>.,                             :

          Defendants.


          Before the Court is the Sierra Club and Marilyn
Wall's Motion for Attorneys' Fees and Costs (doc. 136).  The
Defendants, Board of County Commissioners, Hamilton County, and the
City of Cincinnati, filed their Opposition (doc. 140) to which
Sierra Club and Marilyn Wall Replied (doc. 143).

**FACTS AND PROCEDURAL HISTORY**

          The facts and circumstances prefacing Sierra Club
and Marilyn Wall's (hereinafter "Sierra Club") current motion
before the Court are lengthy and particularized.  At one point,
three separate complaints existed against the Defendants: Board of
County Commissioners of Hamilton County, Ohio (hereinafter
"Board"); the Metropolitan Sewer District of Cincinnati
(hereinafter "MSD"); and the City of Cincinnati (hereinafter
"City") (hereinafter, collectively "Defendants") (See <u>State of Ohio</u>
<u>v. Hamilton County Bd. Comm'r</u>, No. 1:02-CV-00108 (S.D. Ohio filed
Feb. 15, 2002); <u>Sierra Club et. al. v. Bd. of County Comm'r of</u>

Hamilton County et. al., No. 1:02-CV-00135 (S.D. Ohio filed Feb. 27, 2002); and United States et. al. v. Bd. of County Comm'r Hamilton County, Ohio et. al., No. 1:02-CV-00107 (S.D. Ohio filed Feb. 15, 2002)).  On the same date that the United States and the State of Ohio filed their Complaints, they initially lodged the Interim Partial Consent Decree (hereinafter "IPCD") as a "stand alone" agreement.  On March 3, 2002, Case No. 1:02-CV-00108 was consolidated with Case No. 1:02-CV-00108 (See Case No. 1:02-CV-00107 doc. 3).  On April 18, 2002 the remaining case, No. 1:02-CV-00135, was consolidated with case No. 1:02-CV-00107 (See Case No. 1:02-CV-00135 doc. 15).   This consolidation left one case remaining, that being Case No. 1:02-CV-00107.

On May 24, 2002, Sierra Club moved to intervene in the instant action (doc. 26).  Defendants opposed Sierra Club's motion to intervene (doc. 38).  The Court rejected each of the Defendants' arguments in opposition to Sierra Club's intervention and granted Sierra Club's motion to intervene without restrictions or limitations on the scope of said intervention (doc. 69).  In its Order granting intervention, the Court stated that the Clean Water Act (hereinafter "CWA") confers an unconditional right to intervene and that citizens have been given this right "presumably to prosecute . . . [their] interests when they feel that the government is doing less than an adequate job of protecting the interests of the intervenors themselves as well as the public-at-large" (Id.).

On January 28, 2003, the Court ordered several

interim, partial consent decrees and, ultimately, a final consent
decree was entered (See e.g., docs. 129, 130, and 131).  In the
Consent Decree entered on June 9, 2004 (doc. 129), it was agreed
that an ombudsman would be appointed to monitor the water-in-
basement (hereinafter "WIB") program.  The Court, on July 26, 2004,
issued an Order, subsequent to a hearing, defining more clearly the
role of this ombudsman (doc. 134).

**ANALYSIS**

Sierra Club moves the Court to award reasonable fees
and costs pursuant to their Clean Water Act (hereinafter "CWA")
Citizen Suit.  See 33 U.S.C. § 1365(d) (doc. 136).  Section 1365(d)
of the CWA states:

> The court, in issuing any final order in any action
> brought pursuant to this section, may award costs of
> litigation (including reasonable attorney and expert
> witness fees) to any prevailing or substantially
> prevailing party, whenever the court determines such
> award is appropriate. The court may, if a temporary
> restraining order or preliminary injunction is sought,
> require the filing of a bond or equivalent security in
> accordance with the Federal Rules of Civil Procedure.

33 U.S.C. § 1365(d).  Sierra Club maintains that it is a prevailing
or substantially prevailing party and, therefore, entitled to
reimbursement of costs, including reasonable attorneys' fees (doc.
136).  Sierra Club also argues that it is entitled to fees and
costs pursuant to the "catalyst" theory (Id.).

Of paramount in resolving this matter is whether the
"catalyst" theory remains viable under current Supreme Court and
Sixth Circuit precedent.  The Court will first address the

viability of the catalyst theory and whether the Sierra Club is entitled to an award of fees and costs pursuant thereto.  Next the Court will address whether the Sierra Club is a prevailing or substantially prevailing party and, thus, entitled to fees pursuant to 33 U.S.C. § 1365(d).

Defendants argue that the "catalyst theory" is not applicable to fees and costs requested pursuant to the CWA.  They cite Buckhannon Bd. & Care Home v. Dep't. of Health & Human Servs., 532 U.S. 598 (2001) for the proposition that the Supreme Court has found the catalyst theory no longer available under fee-shifting statutes that expressly use the "prevailing or substantially prevailing party" language (Id.).  However, the Court finds that the catalyst theory is still applicable.  Its analysis concerning this issue follows.

The catalyst theory first arose in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), where the Eighth Circuit awarded attorneys' fees to a plaintiff whose lawsuit was a "catalyst" for the defendant's policy revisions. Following this decision, every circuit, save the Fourth Circuit, adopted some form of the catalyst theory.[1]  The Sixth Circuit considered the issue in Payne v. Bd. of Educ., Cleveland City Schools, 88 F.3d 392, 397 (6th Cir. 1996), recognizing that a plaintiff who was the impetus for "voluntary change in a

---

[1] Lucia A. Silecchia, The Catalyst Calamity: Post Buckhannon Fee-Shifting in Environmental Litigation and a Proposal for Congressional Action, 29 Colum. J. Envtl. L. 1, 5 (2004).

defendant's conduct" could be considered a prevailing party in fee-shifting statutes.     In <u>Farrell v. International Brotherhood of Teamsters</u>, 1990 U.S. App. LEXIS 21850, *8 (6th Cir. 1990), a two-prong standard was articulated to determine:

> whether a lawsuit was a sufficient catalyst for the plaintiff to be considered a 'prevailing party': (1) the plaintiff must demonstrate that his 'lawsuit was causally related to securing the relief obtained', and (2) the 'plaintiff must establish some minimum basis in law for the relief secured . . . This legal inquiry does not entail full trial on the merits. Rather, the trial court need only consider whether the plaintiff's claim is frivolous, unreasonable, or groundless.''

<u>Id</u>. (<u>internal citations omitted</u>).

## A.   The <u>Buckhannon</u> Decision

Due to the split in the Circuits regarding the applicability of the catalyst theory to "prevailing parties" in fee-shifting statutes, the Supreme Court granted certiorari to consider the question in <u>Buckhannon</u>.     There, petitioners had requested attorneys' fees "as a prevailing party under the FHAA and ADA, basing their entitlement on the 'catalyst theory'." <u>Buckhannon</u> at 598.     The Court, looking to Blacks Law Dictionary 1145 (7th ed. 1999), determined that a prevailing party was "one who has been awarded some relief by the court." <u>Id</u>. at 603. Therefore, the Court found that a plaintiff who is successful in obtaining some objective of their lawsuit, without a court ordered consent decree or a judgement on the merits, "lacks the necessary judicial impimatur" needed to be considered a "prevailing party". <u>Id</u>. at 605.     The Court indicated that its holding was applicable to

other statutes that used the "prevailing party" language, such as
the Civil Rights Act of 1964, stating "[w]e have interpreted these
fee-shifting provisions consistently...and so approach the nearly
identical provisions here." Id. at 602 n.4 (internal citations
omitted).    However, the Court did not specifically consider
statutes that contain the "substantially prevailing" or
"whenever...appropriate" language of the CWA.

**B.   The Law after Buckhannon**

          In the intervening years, courts have applied
Buckhannon in one of two ways.   Several circuits have completely
denied the catalyst theory's applicability to all fee-shifting
statutes.   In Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 274 (4th
Cir. 2002), the court found that Buckhannon's treatment of the
catalyst theory should apply to all "prevailing party" fee-shifting
provisions "without distinctions based on the particular statutory
context in which it appears.   Conversely, other courts have applied
Buckhannon to "prevailing party" provisions on a case-by-case
basis, examining whether the catalyst theory applies to the
specific statute.   For example, in Union of Needletrades, Indus. &
Textile Employees v. United States Immigration & Naturalization
Serv., 336 F.3d 200, 207 (2nd Cir. 2003) (hereinafter "UNITE"), the
court, while finding that Buckhannon applied to the fee-shifting
provision of the Freedom of Information Act, noted that "[w]e do
not suggest that Buckhannon's rejection of the catalyst theory
necessarily extends to each and every fee-shifting provision."

Similarly, in <u>Perez- Arellano v. Smith</u>, 279 F.3d 791, 794 (9th Cir. 2002), the Ninth Circuit, when considering <u>Buckhannon's</u> applicability to the Equal Access to Justice Act ("EAJA") stated that "the same words in different statutes may have different meanings if a different intention of Congress is manifest in the purpose, history, and overall design or context of the statute." <u>Id</u>.

**C.  Catalyst Theory's application to CWA in the Sixth Circuit.**

Consistent with other circuits, the Sixth Circuit has found that the Court's holding in <u>Buckhannon</u> has some application beyond the two statutes that were specifically addressed in that case (the ADA and FHAA).  <u>See</u> <u>e.g.</u>. <u>Habich v. City of Dearborn</u>, 331 F.3d 524, 534 (6th Cir. 2003) (stating that the catalyst theory could not be used for a prevailing party under 42 U.S.C. § 1988); <u>see</u> <u>also</u> <u>Toms v. Taft</u>, 338 F.3d 519, 528-30 (6th Cir. 2003).  However, unlike some courts, the Sixth Circuit has not found that the catalyst theory can *never* be applicable to a fee-shifting statute.  <u>See</u> <u>Ailor</u>, 368 F.3d 587, fn. 6 (explicitly leaving the question open as to whether the catalyst theory applies to the CWA).  Therefore the Court must determine whether the catalyst theory can be used to obtain attorneys' fees under the CWA; looking first to the plain language of the statute, and then to legislative history, for guidance.  For the following reasons, the Court finds, as noted above, that the catalyst theory does apply to the CWA.

1.  **Plain Language and Canons of Construction**

The CWA allows the award of attorneys' fees to "any prevailing party *or* substantially prevailing party whenever the court determines that such an award is appropriate." 33 U.S.C. § 1365(d) (<u>emphasis</u> <u>added</u>).  Although <u>Buckhannon</u> might logically prevent the catalyst theory from being used for "prevailing parties" under this statute, its application to "substantially prevailing parties" is not as clear.  The D.C. Circuit considered a somewhat similar issue in <u>Oil, Chemical and Atomic Workers Int'l</u> <u>Union, AFL-CIO v. Dep't of Energy</u>, 288 F.3d 452, (D.C. Cir. 2002), and found that the catalyst theory was inapplicable to the Freedom of Information Act's ("FOIA") fee-shifting provision, which contained the "substantially prevailing" language.  The court there reasoned that the "'substantially prevail' language in FOIA [is] the functional equivalent of the 'prevailing party' language found in other statutes." <u>Id</u>. at 455 <u>citing</u> <u>Foster v. Boorstin</u>, 561 F.2d 340, 342 (D.C. Cir. 1977).  However, the fee-shifting provision in the FOIA only applies where a "complainant has substantially prevailed," 5 U.S.C. § 552(a)(4)(E), as opposed to the CWA provision which applies "to any prevailing *or* substantially prevailing party." 33 U.S.C.A. § 1365(d) (<u>emphasis</u> <u>added</u>).  A reading of the plain language of the CWA suggests that Congress intended these two terms to have different meanings.  It then logically follows that to "substantially prevail" a party would need to obtain a somewhat lesser degree of relief than if they were

-8-

to "prevail".

The Ninth Circuit, however, in <u>Kasza v. Whitman</u>, 325 F.3d 1178, (9th Cir. 2003), came to the opposite conclusion when examining the Resource Conservation and Recovery Act's ("RCRA"), fee-shifting provision which allowed fee awards to "the prevailing or substantially prevailing party." 42 U.S.C. § 6972(e). There, the court reasoned that the plaintiff was "not a 'prevailing party' (and thus cannot be a substantially 'prevailing party') because she did not gain by judgment or consent decree a material alteration of the legal relationship of the parties." <u>Kasza</u> at 1180. Likewise, in <u>Sierra Club v. City of Little Rock</u>, 351 F.3d 840, 845 (8th Cir. 2003), the Eighth Circuit rejected an award of attorneys' fees in a CWA case because the plaintiff "did not receive an 'enforceable judgment'", so they were not a prevailing party. The court did not consider whether the plaintiff was a "substantially prevailing" party when applying <u>Buckhannon</u>.

Respectfully both the plain language of the CWA and the canons of construction reject <u>Kasza</u> and <u>Sierra Club's</u> envelopment of the term "substantially prevailing" into "prevailing". First, canons of construction "ordinarily suggest that terms connected by a disjunctive be given separate meaning, unless the context dictates otherwise." <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330, 339 (1979). Here, there is no indication that "prevailing" and "substantially prevailing" were intended to be synonymous, and so the terms should be given distinct meanings.

Additionally, the canons instruct that we are "obliged to give effect, if possible, to every word Congress used." Reiter at 339 citing U.S. v. Menasche, 348 U.S. 528, 538-39 (1955)). It follows then that because it is possible to give effect to both terms, that the Court is obliged to do so. Finally, there is a "basic assumption that Congress does not use different language in different provisions to accomplish the same result." United States v. Fiorillo, 186 F.3d 1136, 1148 (9th Cir. 1999). As Plaintiffs suggest, this Court cannot assume that "*facially different* standards in *unrelated* statutes have the same meaning" (doc. 141). Therefore, because "substantially prevailing" and "prevailing" cannot be considered functional equivalents in this instance, while the Buckhannon reasoning may apply to the latter term, it does not apply to the former; leaving the catalyst theory intact for substantially prevailing parties.

### 2. Legislative History

An examination of the legislative history of the CWA further supports the plain language reading of the statute which would allow "substantially prevailing" parties to use the catalyst theory to recover attorneys' fees. When analyzing a statute to determine if Buckhannon applies, many courts have looked to legislative history. See Oil, Chemical and Atomic Workers International Union, AFL-CIO, 288 F.3d 456 (finding Committee reports inconclusive as to whether the FOIA allowed awarding attorneys' fees in absence of judgement); see also Brickwood

Contractors, Inc. v. United States, 288 F.3d 1371, 1379 (Fed. Cir. 2002) (determining that the legislative history pointed towards the "prevailing party" language in the EAJA to be read consistently with fee-shifting provisions discussed in Buckhannon); and Crabill v. Trans Union, L.L.C., 259 F.3d 662, 667 (7th Cir. 2001) (looking to the "text, structure, or legislative history" of a statute to determine if the fee-shifting provision "has a different meaning from the provision at issue in Buckhannon").

Here, the Supreme Court has found that the legislative history is clear. They examined the CWA in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc. 484 U.S. 49, 67 n.6 (1987)[2], and determined that:

> [t]he legislative history of this provision states explicitly that the award of costs 'should extend to plaintiffs in actions which *result in successful abatement but do not reach a verdict.* For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions.'

Quoting S.Rep. No. 92-414, p. 81 (1971), 2 Leg.Hist. 1499 (emphasis added). Unlike other statutes, where the legislative history was not definitive, here, the Supreme Court has recognized Congress' plain intention that citizen plaintiffs have the ability to be awarded attorneys' fees even where they did not obtain the "judicial impimatur" necessary to be considered a prevailing party

---

[2] The Gwaltney decision came ten months *after* the CWA was amended to add the "prevailing or substantially prevailing" language.

under <u>Buckhannon</u>.

A more in-depth look at the legislative history confirms the <u>Gwaltney</u> interpretation of the CWA. The original language of the CWA's fee-shifting statute allowed a court to award fees "whenever it determines that such an award is appropriate." In an effort to clarify which parties could recover attorneys' fees under the CWA, Congress amended the CWA's fee-shifting provision in 1987, by adding the words "prevailing or substantially prevailing party" to the "whenever...appropriate" standard, codifying the Supreme Court decision in <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 681 (1983). In <u>Ruckelshaus</u>, the Supreme Court examined the "whenever...appropriate" standard found in the Clean Air Act ("CAA"), which was identical to that of the CWA. <u>Id</u>. The lower court had allowed an award of attorneys' fees to plaintiffs where the defendant was successful on all the merits. <u>Id</u>. The Court rejected this view, and found that "some degree of success" was required before it was "appropriate" to award attorneys fees. <u>Id</u>. at 680. The Court noted that "success" included forced abandonment of a defendant's illegal conduct, even without a court order. <u>Id</u>. at 686 n.8.

The Senate Report pertaining to the CWA amendments references and affirms this decision, stating "the purpose of [the CWA amendment] is to clarify the circumstances under which costs of litigation may be awarded." S.Rep. No. 50, 99th Cong., 1st Sess. 33 (1985). Further, the Report makes clear that the "substantially

prevailing" language "is not intended to preclude the awarding of costs to a partially prevailing party with respect to the issues on which the party has prevailed, if such award is deemed appropriate by the court." Id.  This amendment only limited the classes of parties who can recover attorneys' fees from completely non-prevailing parties to prevailing or substantially prevailing parties, but did not limit *how* they could achieve their success. Therefore, the recovery of attorneys' fees in CWA under the catalyst theory, recognized as an important tool in citizen-suits when they passed the CWA, was not limited by the 1987 amendment.

**D.  Conclusion Regarding Catalyst Theory**

Although the Supreme Court clearly stated a new standard for the award of attorney's fees for "prevailing parties" under <u>Buckhannon</u>, this Court cannot blindly apply that decision to all fee-shifting provisions.  An examination of the plain language of the CWA, using well-established canons of construction, suggests that this provision cannot be read consistently with the provisions considered in <u>Buckhannon</u>.  The legislative history confirms this reading, making it clear that Congress intended for "substantially prevailing" parties under the CWA to be able to obtain attorneys' fees through the catalyst theory.  Therefore, this Court finds that the catalyst theory still applies to the CWA, and an award of attorneys' fees to Plaintiffs under this theory is viable.

As the catalyst theory remains a viable theory for substantially prevailing parties seeking fees and costs pursuant to

§ 1365(d) of the Clean Water Act, the Court finds that the Sierra Club's motion should be granted. The Court in the remainder of its Order fully details the Sierra Club's accomplishments in this case. This listing clearly demonstrates the applicability of the catalyst theory to the instant matter. Yet, the Court also finds that despite this reasoning (in other words, if Buckhannon were to preclude application of the catalyst theory), Sierra Club is a prevailing or substantially prevailing party as required by Section 1365(d) and, accordingly, an award of fees is appropriate. Before addressing the Sierra Club as a prevailing or substantially prevailing party pursuant to Section 1365(d), the Court addresses several threshold issues argued by the Defendants.

**E.    Threshold Matters Argued by Defendants**

Buckhannon maintains that in order to obtain an award of fees and costs a defendant's change in conduct accomplishing what the plaintiff sought must have the requisite "judicial imprimatur." (Id. at 605). The requisite "judicial imprimatur" is evidenced by either a judgment on the merits or a court-ordered consent decree. Buckhannon at 603-04. However, the plaintiff need not prevail on the merits of all his claims, just some of them. Id. at 603 citing Hewitt v. Helms, 482 U.S. 755, 760 (1987). Ignoring the Court's above analysis finding the catalyst theory applicable to the CWA, it now focuses exclusively on the Parties' arguments concerning whether Sierra Club is in fact a "prevailing or substantially prevailing" party.

-14-

Defendants argue several threshold issues that the Court will address first before turning to whether Sierra Club is or is not a prevailing party pursuant to the language in the CWA. First, Defendants assert that Sierra Club is not entitled to fees and costs as a result of their limited and flawed citizen suit (doc. 140).  Defendants argue that pursuant to Section 1365(b), citizens may only bring a citizen suit if they have given adequate notice to those they are intending to sue (Id.).  Defendants maintain that Sierra Club filed a notice letter that limited its intention to sue only to specific, reported Storm Sewer Overflows ("SSO") and, therefore; it is jurisdictionally barred from bringing citizen-suit claims regarding Combined Sewer Overflows ("CSO"), Water-in-Basement claims ("WIB"), or any SSOs not identified in their notice letter (Id.).  As a result, aver the Defendants, Sierra Club cannot now be entitled to attorneys' fees and costs related to improvements in these areas based upon their invalid citizen suit (Id. citing Ailor v. City of Maynardville, 368 F.3d 587 (6th Cir. 2004).

Defendants maintain that Sierra Club's citizen suit is flawed because it did not adhere to the strict notice requirements for citizens wishing to bring suit under Section 1365 of the CWA (doc. 140).  Section 1365(b)(1)(A) states that no action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violations."  33 U.S.C. § 1365(b)(1)(A).  The Sixth Circuit has noted that "[the statutory notice requirement

under § 1365 is] a jurisdictional requirement to maintaining a cause of action under the [CWA]." Bd. of Trs. Of Painesville Township v. City of Painesville, Ohio, 200 F.3d 396, 400 (6th Cir. 1999). Furthermore, note Defendants, under Section 1365, a plaintiff's mandatory notice must include:

> [S]ufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). Defendants maintain that the sufficiency of information contained in the notice must include "notice of the specific limitations, standards or orders alleged to be violated." Frilling v. Village of Anna, 924 F.Supp. 821, 823 (S.D. Ohio 1996) (Rice, J.).

Defendants aver that Sierra Club is well-aware that its citizen suit is jurisdictionally flawed to the extent that the Board and City did not have specific notice of certain violations alleged by Sierra Club (doc. 140). Defendants maintain that Sierra Club's notice letter provides notice of its intention to sue only for explicitly reported SSOs, claiming a CWA violation for SSOs in "each monthly report from MSD to OEPA on sanitary sewer overflows dating back five-years from the date of this notice letter . . ." (Id.). Defendants do admit that as regards these reported SSOs, Sierra Club did properly notify the Board and the City of its

-16-

intent to sue (Id.).  Defendants assert that Sierra Club's notice letter does not mention any WIB violations and, as such, are jurisdictionally barred from bringing claims related to WIB-related injuries and cannot now claim attorneys' fees for claims that it could not have brought initially (Id.).  The notice letter of Sierra Club also fails, argue Defendants, to sufficiently identify any injuries relating to CSOs and, consequently, attorneys' fees as relate to CSOs are not obtainable by Sierra Club (Id.).

Sierra Club naturally argues that an award of attorneys' fees is not restricted by the specificity of its notice letter (doc. 143).  Sierra Club comments that "[i]ntervenors . . . assume the status of full participants in a lawsuit and are normally treated as if they were original parties once intervention is granted . . . intervenor[s] cannot change the issues framed between the original parties, but [are] entitled to litigate fully on the merits."  Alvarado v. J.C. Penny Co., 768 F.Supp. 769, 774 (D. Kan. 1991).  Thus, argues Sierra Club, it was both an independent litigator and an intervenor in the instant action and worked to prosecute not only the claims raised in its citizen suit, but also those already raised by the governments in their consolidated actions (doc. 143).

Sierra Club notes that Defendants admit that its notice letter is adequate with respect to the SSOs reported to the Ohio Environmental Protection Agency ("OEPA") (doc. 143).  However,

Sierra Club takes issue with Defendants assertion that sufficient notice was not provided as to the claims for SSOs which the MSD had knowledge but were not reported to the Ohio EPA, CSOs, and claims relating to WIB problems (Id.). Sierra Club cites the Code of Federal Regulations which states that, with respect to alleged violations, a notice letter need only include "sufficient information *to permit the recipient to identify* the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a) (<u>emphasis added</u>).

Even courts which take a "strict interpretive approach" such as those cited by Defendants, according to Sierra Club, recognize the flexibility of the notice regulation (doc. 143). The language of 40 C.F.R. § 135.3(a) "clearly requires something less than a thoroughly detailed account of every possible litigation." <u>Atwell v. KW Plastics Recycling Div.</u>, 173 F.Supp. 2d 1213, 1221 (M.D. Ala. 2001). Yet, the notice provided by a plaintiff must "provide enough information to enable both the alleged violator and the appropriate agencies to identify the pertinent aspects of the alleged violations without undertaking an extensive investigation of their own." <u>Id</u>. at 1222. Sierra Club maintains that its notice did contain sufficient information to allow Defendants to identify all pertinent aspects of its SSO, WIB, and CSO violations without extensive investigation (doc. 143). Sierra Club points to the discovery record in this matter as clearly establishing this fact (<u>Id</u>.).

-18-

First, avers Sierra Club, with respect to the
unreported SSOs, its notice letter and Complaint clearly
incorporate those of which Defendants had "actual notice" or
"knowledge," occurring during the specific time frame set forth
(Id.).  Discovery by Sierra Club revealed that Defendants had
detailed information of these unreported SSOs that was only
revealed through Sierra Club's discovery efforts (Id.).  It should
be noted that knowledge of unreported SSOs on the part of the
Defendants is contained in the record before the Court.

Defendants cite <u>Atlantic States Legal Found. v.
United Musical Instruments U.S.A., Inc.</u>, 61 F.3d 473 (6th Cir.
1995), in which a not-for-profit organization sued a manufacturer
for violations of the Emergency Planning and Community Right-to-
Know Act (hereinafter "EPCRA").  <u>Id</u>. at 474.  In <u>Atlantic States</u>,
the not-for-profit organization failed to provide adequate pre-suit
notice of the violations in question pursuant to the EPCRA.  <u>Id</u>. at
478.  The court in <u>Atlantic States</u> stated:

> One of the important purposes of the notice requirement
> under environmental statutes is to facilitate "dispute
> resolution by EPA negotiation [and thereby] reduce the
> volume of costly litigation."  Here, ASLF's failure to
> include the 1991 violation in its notice may have
> contributed to the EPA's decision not to act.  Moreover,
> the vague warning of possible other claims failed to
> inform UMI of the year of the additional alleged
> violation or even the specific EPCRA reporting
> requirement involved.  For these reasons, the notice of
> the alleged 1991 violation was inadequate.

<u>Id</u>.  Much like the notice in <u>Atlantic States</u>, Defendants maintain

that Sierra Club's notice was too vague as to those violations not
reported to the OEPA

Yet, Sierra Club points out that <u>Atlantic States</u>
found the plaintiff's notice inadequate because it referenced
violations "not yet known" even by the plaintiff. <u>Atlantic States</u>
at 478. Here, avers Sierra Club, it simply noticed additional
violations, already known by the Defendants, of the same
requirements that apply to the reported SSOs (doc. 143). Thus,
contends Sierra Club, Defendants cannot maintain that they
simultaneously both had knowledge and did not have knowledge of the
SSO violations (<u>Id</u>.).

Furthermore, Sierra Club argues that Defendants
cannot rationally contend that its notice of SSOs did not
incorporate notice of WIBs (<u>Id</u>.). A SSO, maintains Sierra Club, is
a sewer overflow caused by lack of capacity in the MSD sewer system
(<u>Id</u>.). Similarly, Sierra Club argues, that a WIB is a sewer
overflow that backs up into a basement (<u>Id</u>.). Thus, concludes
Sierra Club, a WIB is a SSO (<u>Id</u>.). The Court notes that the Global
Decree entered by the Court defines SSOs to include WIBs.

Also, Sierra Clubs notes that the violations alleged
in a citizen suit need only be "closely related to" and "of the
same type" as the violations specified in a notice letter (<u>Id</u>.
<u>citing</u> <u>Comfort Lake Ass'n, v. Dresel Contracting, Inc.</u>, 138 F.3d
351, 355 (8th Cir. 1998)). <u>Comfort Lake</u> stated: "[a] citizen suit

[under the CWA] is limited to violations that are closely related to and of the same type as the violations specified in the notice of intent to sue." Id. at 355. Sierra Club notes that Comfort Lake is a case cited and relied upon by Defendants in their Opposition Memorandum (doc. 143).

Sierra Club argues that the WIB violations, even if different than the SSO violations, are still "closely related to" and "of the same type" as one another (Id.). Notwithstanding, Sierra Club maintains that it gave notice to Defendants of all SSO violations known to the MSD, including those that made their way into the basements of citizens (Id.). Lastly, Sierra Club notes that in arguing for the global decrees, Defendants contended that it was not possible to fix SSOs without addressing CSOs; now, contends Sierra Club, Defendants want to separate the two (i.e., SSOs and CSOs) for the purposes of the fee petition (Id.). Sierra Club admits, as did Defendants, that CSOs cannot be fixed without also addressing inflow from SSO portions of the sewer district (Id.). As CSOs are so closely related to and of the same type as SSO violations, Sierra Club maintains that its notice was sufficient.

The Court finds that indeed the Sierra Club's notice was sufficient. First, Sierra Club, as an intervenor, assumed the same position as the primary litigants in this matter and are dealt with by this Court as if they are the primary litigants and are not

restricted to the specificity of their notice. See Alvarado at 774. Furthermore, the Code of Federal Regulations states "sufficient information *to permit the recipient to identify* the specific standard, limitation, or order alleged to have been violated" is adequate. 40 C.F.R. § 135.3(a) (emphasis added). The Court holds that the Sierra Club's notice did contain sufficient information to allow Defendants to identify all pertinent aspects of its SSO, WIB, and CSO violations without extensive investigation. Lastly, as required by Comfort Lake, the Court views the WIB, SSO, and CSO violations as "closely related" and, thus, the notice was sufficient.

The Defendants also argue that the Court has no jurisdiction over Sierra Club's citizen suit because the United States and Ohio were diligently prosecuting a civil action against the City and County within the sixty-day notice period following Sierra Club's notice letter (doc. 140 citing 33 U.S.C. § 1365(b)(1)(B)). Thus, without jurisdiction over this matter, Defendants maintain that this Court cannot award attorneys' fees based on Sierra Club's citizen suit (doc. 140). Defendants concede that the Court has jurisdiction over the matter only if Sierra Club can show that the actions filed by both the United States Environmental Protection Agency (hereinafter "USEPA) and the OEPA did not constitute diligent prosecution with respect to the reported SSOs (Id.).

Sierra Club counters this argument of Defendants by noting that the IPCD failed to amount to diligent prosecution and also that the diligent prosecution bar does not apply to prevailing parties, of which Sierra Club maintains it is (doc. 143). Additionally, Sierra Club maintains that diligent prosecution is irrelevant when a citizen-plaintiff is also an intervenor (Id.). Section 1365 permits a citizen-plaintiff to intervene in the government's suit "as a matter of right." 33 U.S.C § 1365(b)(1)(B). Sierra Club avers that once it was granted intervention in the government's action, it became a party to the case, entitled to fully litigate on the merits (doc. 143). As a party to the case, entitled with the ability to fully litigate on the merits, Sierra Club maintains it is eligible for attorneys' fees (Id.). Furthermore, avers Sierra Club, diligent prosecution is "normally determined as of the time of the filing of a complaint." Chesapeake Bay Found. v. American Recover Co., 769 F.2d 207 (4th Cir. 1985). Thus, a diligent prosecution bar at the end of the litigation would be of no consequence, and according to Sierra Club, is illusory (doc. 143).

Furthermore, a diligent prosecution bar only applies to those issues sought to be addressed in a citizen action that overlap with those issues sought to be addressed by the government's suit. Frilling v. Village of Anna, 924 F.Supp. 821 (S.D. Ohio 1996) (Rice, J.). The court in Frilling noted:

> [A] citizen suit to enforce a particular standard, limitation, or order will be barred only if the State commences a civil action to require compliance with the *same standard, limitation, or order* referenced in the plaintiff's 60-day notice letter, which provides the basis of the plaintiff's suit. Otherwise stated, citizen suits are barred only if they are based on the *very same* standards, limitations, or orders for which the State has brought a civil enforcement action, and only if the State seeks to require compliance with the same.

Frilling at 836-37.  Sierra Club maintains that the issues sought to be addressed by it significantly exceeded those sought to be addressed in the IPCD (doc. 143).  At best, argues Sierra Club, a diligent prosecution argument would only serve as a "partial bar." (Id.).  The IPCD addressed 16 of 101 numbered illegal SSOs, yet Sierra Club's Complaint sought elimination of all illegal SSOs. The Court notes that proper notice was given by Sierra Club for at least 101 SSOs.

The Court does not find Defendants' argument on this issue persuasive.  First, the Court agrees with the Sierra Club that diligent prosecution is "normally determined as of the time of the filing of a complaint." Chesapeake Bay Foundation v. American Recover Co., 769 F.2d 207 (4th Cir. 1985).  Accordingly, a diligent prosecution bar at the end of the litigation is of no consequence. Additionally, as noted already, the Court views the Sierra Club, as an intervenor.  Thus, the Sierra Club is a party to this case able to litigate fully on the merits.  See Alvardo and 7C Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1920 (2d ed. 1987).  The Court's jurisdiction is not barred as Sierra Club has

a right to intervene pursuant to the applicable statute, it did intervene, and this Court granted that intervention viewing Sierra Club as equivalent to a party in this case.

**F.  Sierra Club: A Substantially Prevailing or Prevailing Party?**

Lastly, the Defendants argue that the Sierra Club did not prevail or substantially prevail (doc. 140).  The Sierra Club seeks approximately $1.1 million in total fees and reimbursement of costs (doc. 136).  The Sierra Club asserts they substantially prevailed "by achieving public benefits that [they] sought in bringing suit" (doc. 136).

Sierra Club maintains that it has sought and obtained benefits which have received the requisite "judicial imprimatur" - specifically, the final Court-approved Consent Decrees (hereinafter "Decrees") and the June 2004 Order (hereinafter "June Order") which granted additional relief (doc. 143).  Sierra Club cites <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983) for the standard necessary to determine whether a party is eligible for attorneys' fees as a "prevailing party" (<u>Id</u>.).  <u>Hensley</u> states: "plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on any significant issue in litigation which *achieves some of the benefit the parties sought in bringing suit*."  <u>Hensley</u>, at 432 (<u>emphasis</u> <u>added</u>) (<u>internal citations omitted</u>).  Sierra Club asserts that, pursuant to <u>Hensley</u>, it is a prevailing party (doc. 143).

First, Sierra Club avers that it prevailed by obtaining relief granted in an enforceable June Order of this Court (Id.). The June Order, maintains Sierra Club, provides benefits to it as well as its members and the general public - benefits which it sought in its Complaint (Id.). Thus, this June Order, asserts Sierra Club, alters in a material way the legal relationship between the parties (Id.). The June Order provided:

> (1) for the appointment of an ombudsman who is to "ensure that WIB victims obtain effective and timely assistance, . . . and ensure that the WIB program is working, investigate complaints, and keep the Court informed of the status of such program" (June Order);

> (2) the Court with retained jurisdiction over the matter, noting that the Court would "not countenance unreasonable delay in correcting the problems that the decree addresses;

> (3) that the MSD be held responsible for clean-up costs, remedies, and any diminution in the value of real estate for the thousands of citizens (including Sierra Club members) affected by WIB releases;

> (4) that "Sections 7B and 9B of the Final Decree shall be interpreted in accordance with" the Court's Order; and

> (5) that the releases previously prepared by the Cincinnati Solicitor's Office were "highly improper" holding that those releases "purporting to extinguish WIB victims right to past or future recovery for damages unenforceable."

(Id.). Sierra Club argues that Defendants' stance that these items do not grant substantial public benefits is erroneous (Id.). Sierra Club cites NRDC v. Fox, 129 F.Supp.2d 666 (S.D.N.Y. 2001),

in which environmental groups were deemed prevailing parties and eligible for attorneys' fees under the CWA despite their prevailing on only one of thirteen claims. NRDC at 669-670. Consequently, avers Sierra Club, having advocated throughout this litigation for the above listed benefits, it is a prevailing party (doc. 143)

Sierra Club also argues that it has prevailed or substantially prevailed by obtaining substantial public benefits that it sought in bringing its initial suit and by obtaining relief that materially altered the legal relationship between the parties and that modified Defendants' behavior in a way that directly benefitted Hamilton County residents, Sierra Club, and members of Sierra Club (doc. 136). Sierra Club maintains that its efforts throughout this litigation have been based on a "common core of facts," which focused on eliminating widespread violations of the CWA, mending inadequacies in the IPCD, defining key provisions of and obtaining changes in the final decrees, and enhancing current and future protection for victims of the MSD's SIB problems (Id.).

These achievements, aver Sierra Club, are interrelated (Id.). For example, in order to succeed on the SIB issue, Sierra Club argues it had to understand the relationship between SIB, SSO, and CSO events (Id.). It determined how the remedies proposed by the various agencies in the IPCD as well as the first and second consent decrees were inadequate to remedy the systematic problems leading to overflows of MSD sewers and, thus,

insufficient to abate hazards of sewage in citizen's basements (Id.).

Over one million dollars was expended to obtain these successes claims Sierra Club (Id.). These efforts resulted in enforceable commitments from the MSD to remedy, prevent, and provide compensation for SIB episodes and citizens who suffer from them (Id.). The creation of the first-of-its-kind SIB program, maintains Sierra Club, under the CWA is enough to render them a prevailing party (Id.) The SIB program was not added until after Sierra Club's critique of the inadequacy of the July 2003 version of the second consent decree (Id.). Also, important in establishing Sierra Club as a prevailing party was its part in revising two unconscionable releases of liability, which were improperly exacted from SIB victims by the MSD (Id.). Additionally, notes Sierra Club, their efforts resulted in this Court ordering that any of the previously executed, unconscionable releases were unenforceable (Id.).

Furthermore, Sierra Club notes that as a party to this consolidated action, it can inform the Court of unenforced violations of the Consent Decree and request that the Court enforce the terms of the decrees and this Court's Order (Id.). Furthermore, Sierra Club lists the following as other issues upon which it has prevailed and materially altered the legal relationship between the parties to the decrees:

(1) obtained clarification, through the Court, of ambiguous re-openers in the decrees and the right to petition the Court to enforce the decrees;

(2) obtained changes in the July 2003 second decree that reduced the likelihood of continued violations of the CWA;

(3) obtained a verification requirement for the provision requiring that additional flows caused by new development be offset by flow reductions ("STACP");

(4) Obtained substantial improvements in the "interim" remedy proposed for SSO 700 (though not the complete relief sought by Sierra Club);

(5) Avoided entry of the IPCD as a "stand-alone" measure, which would have clouded Sierra Club's and the government's ability to enforce the law.

(Id.)

Finally, Sierra Club maintains that it substantially prevailed with respect to provisions of the final decrees (Id.). In Sierra Club's Memorandum in Opposition to the Entry of Consent Decree (doc. 118), it asserted:

To be approvable, the Consent Decrees ("Decrees") must, at least, be changed to impose firm SSO deadlines, to appoint a special master to oversee the Decrees, and to approve an SIB budget, along with other SIB program changes sufficient to abate, at the earliest possible date, the imminent hazard created by the SSOs for all SIB victims.

(Id.). Sierra Club avers that in its citizen suit complaint and throughout its intervention it fought to ensure that the consent decrees imposed firm SSO deadlines (Id.). Initially, avows Sierra

-29-

Club, the IPCD did not impose firm deadlines and the second consent decree contained reopeners with ambiguous language (<u>Id</u>.).  During the fairness hearing, Sierra Club achieved representations from the government that Section 9B and 7B reopeners would not be used to unduly delay the implementation of the decree deadlines, despite the language of these reopeners (<u>Id</u>.).  Not only were these representations made by the government but they were incorporated into an enforceable order of the Court (<u>Id</u>.).

        Sierra Club also maintains that it sought the appointment of a special master to report to the Court so the Court could be in a better position to monitor the progress - the benefit sought by Sierra Club was that of focused judicial oversight (<u>Id</u>.).  This continuing judicial oversight, avers Sierra Club, is far better than the "customer service" employee that the MSD attempted to substitute for the final special master/ombudsman (<u>Id</u>.).  Finally the Sierra Club sought to ensure that, once it was created, the SIB program would be funded and charged so that imminent hazards faced by SIB victims could be abated at the earliest possible date (<u>Id</u>.).  This Court made it clear that it would not tolerate failure on the part of the MSD to implement the WIB program expeditiously (<u>Id</u>.).  This Court also ruled that the MSD is liable for clean-up-costs, remedies, and for any diminution in value of their property for damages suffered as a result of the MSD (<u>Id</u>.).  This is a benefit - specifically, a judicially enforceable obligation on the part of the MSD to fund and implement the SIB

-30-

program - obtained by the efforts of the Sierra Club (Id.).

The Court witnessed first-hand these efforts of the Sierra Club. After reviewing the above, it is hard to conclude that the Sierra Club is anything but a prevailing or substantially prevailing party. The Sierra Club began this litigation as its own independent complainant. Subsequently, the Court consolidated the Sierra Club's own action with the Government's litigation and granted the Sierra Club status as intervenor in this instant action. The Sierra Club extensively participated in the discovery and development of the final consent decree, despite its not being a signatory to said decree. Its participation resulted in changes and additions (which were improvements) beyond the terms contained in the IPCD. Without the efforts of the Sierra Club, the affected citizens of Hamilton County would not have benefitted as substantially from this litigation as they did.

In United States v. City of Green Forest, 921 F.2d 1394 (8th Cir. 1999), cert. denied, 502 U.S. 956 (1991), the court found that a citizen group, with intervenor status, was entitled to costs and reasonable fees under Section 1365(d) of the CWA. Id. at 1402. In this case Ohio and the Sierra Club both brought an action pursuant to Section 1365 and the Sierra Club retained the rights granted under Section 1365 even after its original case was consolidated and they gained intervenor status. In United States v. Maine Dep't of Transp., 980 F.Supp. 546 (D. Maine 1997), the

district court denied a motion for fees under Section 1365(d) because the intervenor did not bring an action under Section 1365, the action in which it intervened was not brought pursuant to Section 1365, and because the intervenor did not prevail.  <u>Id</u>. Unlike the situation in <u>Maine</u>, the Sierra Club as noted did file suit pursuant to Section 1365, it did intervene in an action brought pursuant to Section 1365, and ultimately it did prevail or substantially prevail receiving the requisite judicial imprimatur as highlighted above.  Accordingly, an award of reasonable costs and fees is appropriate.  Pursuant to either the catalyst theory or the requirements of Section 1365, as circumscribed by <u>Buckhannon</u>, the Sierra Club is a prevailing or substantially prevailing party.

The IPCD and the Complaint in this matter were filed at the same time.  The Court found the IPCD illusory in that there were no fixed dates or enforceable rights establishing who would provide relief to those affected.  Plaintiffs and Defendants (i.e., those involved in the case not including the Sierra Club) claimed they had been negotiating for approximately ten years about SSOs, CSOs, and other problems.  However, despite ten years of negotiations nothing concrete was accomplished to help those being injured.  It was not until the Sierra Club filed its own complaint and ultimately intervened in this matter that positive solutions began to emerge.

The "lodestar figure" has been coined the "guiding

light" of United States Supreme Court fee-shifting jurisprudence. See <u>City of Burlington v. Dague</u>, 505 U.S. 557, 562 (1992). The Sierra Club highlights <u>City of Riverside v. Rivera</u>, 477 U.S. 561 (1986) which stated: ". . . <u>Hensley</u> emphasized that '[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee,' and that 'the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." <u>Id</u>. at 569 <u>quoting</u> <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983). <u>Hensley</u> stated in relation to an award of fees:

> In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

<u>Hensley</u> at 465. The Court initially notes that it finds the rates charged by Counsel seeking fees in this case to be reasonable based upon the complexity of the case and the level of expertise of attorneys Slap and Altman. Mr. Slap and Mr. Altman have both focused their practice on environmental law for thirty years (doc. 136). Both have published articles in the area of environmental law and taught courses on said subject (<u>Id</u>.). The associate attorneys who assisted Mr. Altman also billed at what the Court deems to be reasonable rates, nationally and locally.

The Sierra Club maintains that its work in this case "similarly involved a common core of facts and law" (<u>Id</u>.). The Sierra Club notes that its efforts focused on Defendants' CWA violations as well as analyzing the adequacy of the Consent Decrees (<u>Id</u>.). The Court has fully discussed the Sierra Club's efforts in this litigation above. The first attorney hours billed by the Sierra Club date to August 10, 2001 when attorney Albert J. Slap was asked to review a file of materials on the MSD's sewer overflows by Plaintiff Marilyn Wall, who was then chair of the Miami Group of the Sierra Club (<u>Id</u>.). Mr. Slap seeks fees and reimbursement of costs in the amount of $589,062.60 (<u>Id</u>.). David D. Altman Co. LPA seeks $377,540.73 in total fees and costs. The total fees and costs sought by the Sierra Club amount to $181,594.24 (<u>Id</u>.).

The Defendants object to such amounts claiming that the Sierra Club is entitled to nothing (doc. 140). The Defendants assert that the Sierra Club obtained only limited success at best since the Court rejected all of the Sierra Club's objections to the Consent Decrees in its Entry Order (<u>Id</u>.). The Defendants argue the the Sierra Club has billed in a way that does not reflect "billing judgment" (<u>Id</u>.). Rather, Defendants aver that the Sierra Club has billed "everything from lunch and parking to countless hours of block time for reviewing and communicating with each other and clients regarding unsuccessful motions" (<u>Id</u>.). Defendants cite, <u>American Lung Ass'n v. Reilly</u>, 144 F.R.D. 622, 627 (E.D.N.Y 1992),

for the proposition that the Court can reduce the hours unreasonably spent - i.e., hours that are redundant or excessive (doc. 140). The Court does find interesting that the Defendants decline to analyze line-by-line the fees requested by the Sierra Club (Id.). Instead, Defendants rest their objections to the amount of fee that is reasonable on the argument that no fee is reasonable as the Sierra Club is not entitled to an award. However, as discussed above the Sierra Club is entitled to fees and costs.

The Sierra Club's Motion is GRANTED (doc. 136). The Court has reviewed carefully the lodestar figures of those requesting fees and reimbursement of costs. It finds their requests generally reasonable. The Court does find, however, some duplicative and unreasonable charges. As such, the Court AWARDS the following amounts. To Albert J. Slap, Esq. the Court AWARDS $491,867.27 in fees and costs. To D. David Altman Co. LPA the Court AWARDS $315,246.50 in fees and costs. To the Sierra Club the Court AWARDS $151,631.19. The total amount of fees and costs awarded to the various Plaintiffs is: $958,744.96.

SO ORDERED.

Dated: August 23, 2005            /s/ S. Arthur Spiegel

S. Arthur Spiegel
United States Senior District Judge