**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | : | Case No. C:1-02-107 |
| Plaintiff, | : | |
| -vs- | : | JUDGE S. ARTHUR SPIEGEL |
| BOARD OF COUNTY COMMISSIONERS HAMILTON COUNTY, OHIO, et al., | : | **OMBUDSMAN'S REPORT** |
| Defendant. | : | |
| | : | |

**I.    Summary**

On June 9, 2004, the U.S. District Court, Southern District of Ohio, appointed the Legal Aid Society of Greater Cincinnati to serve as Ombudsman as part of its Order approving the Consent Decree in *USA v. Board Of County Commissioners,* Case No. C:1-02-107. As part of the Consent Decree, the Metropolitan Sewer District agreed to operate a Water-in-Basement Program (hereinafter "WIB"). The WIB Program provides services to property owners and residents who experience sewage backups as a result of capacity-related problems in the public sewer system operated by MSD. The Court appointed the Legal Aid Society to act as Ombudsman for the WIB Program.

MSD reports that its Water-in-Basement Program has received over 8,000 calls from County residents. Over the last two years MSD provided clean-up services at over 900 homes, paid damages to 334 of the 408 residents who filed claims, and installed prevention devices in about 320 homes. Legal Aid has received approximately 110 calls from residents about the WIB program.

The Ombudsman's overall impression is that MSD has invested significant time, effort and resources in the implementation of the Program. We have raised a number of issues, questions and concerns with MSD about the Program and many have been resolved. MSD has been prompt and

cooperative in responding to our concerns and individual problems about the Program. This Report details the activities of the Ombudsman since June 2004. The time and billing records for Legal Aid Ombudsman services are attached as Exhibit A.

**II.    Role of the Ombudsman**

Based upon the Court's Order appointing Legal Aid as Ombudsman, the Ombudsman has four roles:

1.    Ensure that the "Water in Basement Program" is understandable to the public;

2.    Provide the public with someone who acts on their behalf and who can assure that the "Water in Basement Program" is working;

3.    Investigate complaints; and

4.    Inform the Court regarding the status of the program.

**III.    Public Information and Notice**

Legal Aid has taken a number of actions and asked MSD to take additional steps to inform the public about the WIB Program.

1.    Requested that MSD provide further advertising concerning the existence of the program and the existence of the Ombudsman. *MSD ran the advertising in October 2004*.

2.    Encouraged MSD to provide a status update to those property owners awaiting work or evaluation under the Water In Basement Prevention Program. *MSD sent postcards to the property owners in Summer 2005.*

3.  Requested database from MSD so Ombudsman could send notices. *Ombudsman obtained the database and sent all WIB callers the attached letter and an informational flyer in August 2005, explaining the existence of the WIB Program and the Ombudsman's role*. (Attached as Exhibit B.)

4.  Provided information to officials and entities to facilitate referrals to the Ombudsman. *Sent notice to public officials throughout Hamilton County of the availability of Ombudsman's services for their residents; met with Sierra Club to coordinate referrals of homeowners.*

**IV.  Systemic Issues**

The Ombudsman sought information from MSD, the other parties, and from the Sierra Club to gain an understanding of the WIB Program, to assess whether or not the program was understandable to the public and to determine if there were problems related to program operation. We identified a number of systemic issues and presented those to MSD staff and counsel. The issues fall generally into three categories: administration of the prevention program (WIBPP), backups caused by problems with lateral sewer lines in the public right-of-way, and the process for asserting claims for damages. The nature and status of issues addressed by the Ombudsman, both those resolved and those that are still pending, are outlined below.

1.  **Administration of the Prevention Program**

Our initial concern about the Prevention Program was the pace at which work was being done to protect homes from backups. We are encouraged to see that MSD has been able to increase the pace and will complete prevention work on over 200 homes in 2005. The Ombudsman has observed the fine quality of the prevention work and MSD's efforts to accommodate the needs

and concerns of homeowners in completing the prevention work. The Ombudsman has focused on the following issues.

      a.      <u>Clarifying Responsibility for Maintenance of Prevention Measures</u>

We received numerous calls from homeowners concerned about the maintenance and repair of the prevention measures to be installed as part of the Water-in-Basement Prevention Program. Homeowners expressed both confusion and concern about their potential responsibility for future expenses, repair or replacement, once the warranty expires on the device.

MSD uses a Covenant and Agreement (Agreement) to authorize WIBPP work. The Agreement states that MSD will purchase and install a device in the home to prevent capacity-related backups. The Agreement lists a number of homeowner responsibilities concerning the maintenance and operation of the WIBPP devices. The Agreement, however, is silent regarding replacement and repair of the devices.

MSD has stated publicly and in conversations with the Ombudsman and individual property owners, that MSD is responsible for the repair or replacement of failed pumps *at least until the capacity-related backups are addressed on a systemic level.* Yet, the WIBPP Covenant and Agreement did not make clear the MSD responsibility, or limits on that responsibility.

In our opinion, the Consent Decree requires MSD to repair or replace any prevention devices installed to prevent backups until the capacity problems causing sewage backups are addressed through improved capacity. The Ombudsman raised the issues with counsel for MSD. Private citizens and the Sierra Club also raised the issue with the County Commissioners.

After several months the Covenant and Agreement was rewritten to clarify that MSD will be responsible for repairing the prevention device. We are now encouraging MSD to provide notice of the clarification to homeowners who have already received prevention measures.

      b.      <u>The Prevention Program Release</u>

An additional issue related to the Prevention Program Covenant and Agreement relates to the Release. The owner must release certain claims against the City and the County in order to receive WIBPP services. In our opinion and based upon the questions we received, it was not easy to understand the nature and extent of potential claims that homeowners were releasing when they signed the Agreement. More fundamentally, in our view, the Consent Decree does not require homeowners to release potential claims in order to participate in the Prevention Program. It is our position that the Covenant and Agreement should be similar to a remodeling contract – containing a proposal by MSD and an acceptance by the homeowner, with a recitation of the respective rights and obligations of MSD and the homeowner.

We approached MSD about the confusing language, the propriety of the release, and the proposed changes several months ago. MSD agreed to review the Release language. The Release language is now clearer, but our underlying concern about whether or not a homeowner should be required to sign a Release, has not been resolved.

      c.      <u>Homeowner Disagreement with the Scope of the Prevention Work</u>

A number of homeowners have declined participation in the WIBPP or have been denied participation because of a disagreement on the scope of the work needed to prevent the sewage backup.

A number of homeowners object to MSD's plan to close off their basement or garage where MSD's position is that the garage must be closed off in order to prevent stormwater runoff from entering the basement sewer line. MSD's position has been that its prevention plan must be able to prevent any stormwater from entering the sewer lines.

Several homeowners contacted the Ombudsman because they do not want to give up their garages. They want MSD to install back-flow and pump devices that they believe will substantially reduce their risk of future sewer backups. Several homeowners have expressed concern that MSD's offer of prevention work was "take-it-or-leave-it." Or, in other words, MSD has been unwilling to look at any less-drastic prevention options.

Recently, MSD presented its position to the Ombudsman, and discussed the possibility of accepting a less-comprehensive prevention approach in situations where the potential for overwhelming a pump or backflow device concerns stormwater only. In these situations (as opposed to potential sanitary sewer backups), MSD has expressed a willingness to review individual prevention plans with an open mind. The Ombudsman will assist affected homeowners to facilitate individual prevention solutions, by arranging for an independent engineering review and facilitating discussions with MSD. The Ombudsman estimates that it will cost approximately $1,000 to engage an engineer for this purpose.

**2.    Backups Caused by Problems with Lateral Sewer Lines in the Public Right-of-way**

A number of homeowners approached the Ombudsman for assistance in obtaining cleanup and/or damages for a backup caused by a collapse in the portion of the lateral sewer line located in the public right-of-way. Generally, the homeowner is responsible for upkeep of the lateral sewer line, and MSD is not responsible for cleanup or damages from a backup caused by blockage or collapse of the lateral line.

In this situation, a homeowner would experience a sewage backup and call MSD. MSD responds to the backup call, rods the lateral sewer line, and checks the sewer main for a surcharge. If MSD determines that the problem is a clogged or broken lateral sewer line, it informs

the homeowner that the clog or break is the homeowner's responsibility and advises the owner to call a plumber. If the problem is a broken lateral sewer line in the right-of-way, an MSD crew repairs the break. However, MSD does not approve a claim for the damage nor does it clean up the backup. At best, this result is confusing for the homeowner. MSD makes the repairs but refuses to accept responsibility for the damages or cleanup caused by the backup. Moreover, private homeowners are not permitted to undertake repairs of lateral line problems in the public right-of-way. The Ombudsman has had numerous discussions with MSD to clarify the issue and to try to convince MSD to provide cleanups and accept responsibility for damage claims in these instances. MSD appears to be taking a firm position that the WIB Program does not cover backups caused by blockages in, or collapse of, lateral lines, even if a break or collapse is located in the public right-of-way.

   **3.**  **Claims Procedure**

     a.  <u>The Claims Form</u>

      Residents who suffer damage because of a capacity-related backup are entitled to make a claim for reimbursement of those damages. The City of Cincinnati Solicitor's Office reviews the claims form submitted by the homeowner. The claims form initially used as part of the WIB Program was apparently the same form used for other claims submitted to the City.

      We asked the City to revise the claims form to make the form clearer and to conform it to the Court's order approving the Consent Decree. Specifically, we wanted the City to add a section to the claims form notifying homeowners about their right to make a claim for diminution in the value of the home. The City agreed and the form was revised early in 2005.

      b.      Lack of Administrative Hearings

Currently homeowners have no administrative avenue to challenge the decisions of MSD and the City concerning their determinations as to the cause of backups and their eligibility for cleanup services and claims for damages. At present, the City Law Department handles the claims like an insurance agent. If MSD has accepted responsibility for the backup, the claim is generally paid with little difficulty. On the other hand, if MSD has not accepted responsibility for the backup, the claim is denied. The homeowner is given no opportunity to challenge the decision and the only way to get a hearing on the issue is to file suit in the Court of Common Pleas. We have asked the City to establish an administrative review process. This request has been rejected.

**V.**    **Individual Assistance**

Since June 2004, Legal Aid has received approximately 110 calls from individuals requesting assistance with WIB issues. We have attempted to resolve each situation, and the issues have been resolved for the majority of those individuals. The balance includes both situations awaiting further investigation by MSD, and some requiring additional information from the homeowner. A number of the unresolved matters are related to the lateral line collapses in the right-of-way and disputes over the scope of prevention work discussed above.

We also received calls seeking general information about the WIB Program. We explained the parameters of the program to many of the callers. The largest percentage of callers were in the category of individuals who had a backup that MSD determined was not caused by a capacity problem in the public sewer. Many homeowners are unaware of their obligation to maintain the

lateral sewer line. Consequently, much time was spent explaining the circumstances that make a home eligible for WIB cleanup and prevention services.

1. **Questions Regarding Rights and Obligations**

Numerous callers have had questions about their rights under the WIB Program and concerns about the legal effect of releases and other forms. The Ombudsman has conducted legal research and provided information and advice about the homeowners' options. We have also provided advice and information concerning the claims process and appeals, statutes of limitation, how to safely clean up sewage, how to find a plumber, the importance of getting multiple estimates, and other information of a practical nature.

A big question from many homeowners related to the requirement that they file an insurance claim before they could collect damages from the City. After research and consultation with the parties, the Ombudsman concluded that the Consent Decree did not modify the general rule in Ohio, which provides partial immunity to local governments for tort claims, and requires injured parties to collect from their insurance carrier prior to collecting from the government entity. The municipality is liable only to the extent that an individual's insurance does not cover the whole loss. In essence, WIB victims with insurance coverage could recover only the difference between their insurance coverage and their loss, with the result in some instances that the City paid only the deductible.

A number of homeowners balked at this requirement. Once a homeowner makes such a claim, their rates often increase significantly. In addition, there is the possibility that their homeowner's insurance coverage will be canceled. While homeowners were unhappy to hear it, the

Ombudsman's role was to explain that, while the Consent Decree created a damage remedy for some claims, it did not relieve the homeowner from the necessity of making an insurance claim.

### 2. Calls Regarding Cause of the WIB

The majority of callers were property owners and other residents who had a backup that MSD determined was not caused by a capacity-related problem. In most cases, MSD had visited the home, inspected the public sewer line nearby, and rodded the lateral sewer line. However, many of the callers were not quite sure what MSD had done or found during the visit. They often received only a verbal explanation. Once told that their backup was not capacity-related, many homeowners struggled with how to determine the cause of the backup, and take appropriate steps for prevention. In these situations, the Ombudsman investigated the history and circumstances of the backup and gathered information from MSD to pass along to the homeowner.

These calls can be broken down into two main categories: homes that had a one-time or recent back-up problem, and homes with ongoing backup problems. The homes with a recent single occurrence were generally easy to resolve, usually with an explanation of how the program operates and the responsibilities of the homeowner to maintain the sewer line.

More difficult issues arose with homeowners who continued to experience backups which MSD states are unrelated to capacity problems in the public sewer system. It seems obvious that there is a problem. No one should be experiencing sewage backups in their basement unless there is a problem. On some occasions, the MSD crew which rods the lateral line is able to determine a cause of the backup. Unfortunately, that is not always the case, and many homeowners do not have the resources to get the problem identified let alone resolved.

We have tried to help homeowners investigate the causes for their backups. We follow up with plumbers regarding work that was done in the homes. We also check the MSD

database to see if neighboring homes also suffered WIBs. We advise owners to call MSD if another backup occurs, and advise homeowners that once MSD determines it is not responsible, the homeowner will have to hire a plumber to address the cause of the backup.

We have encouraged MSD to establish a uniform procedure for providing at least brief written information regarding MSD's determination of the cause of the backup. MSD has indicated that it is going to implement a system to provide written information to WIB callers.

   3.   **Insurance Coverage and Claims**

Several callers had trouble with their insurance companies refusing to pay or pay enough. One insurer refused a claim because MSD had cleaned up the mess and disposed of the property before the claims agent assessed the damages. We worked with the City and the insurance agent to get the information needed to approve the claim. We also assisted a number of callers get reimbursed for damages from the WIB Program that exceeded their insurance coverage.

   4.   **WIBPP Covenant and Agreement**

The second-largest category of callers had questions about the WIBPP Covenant and Agreement and Release. We had two types of calls about the Release. First, callers wanted to know what claims they were releasing. We researched the issue and spoke with counsel for the parties. We came to a conclusion about the meaning and explained that conclusion to the callers. This issue is also discussed above at Section IV.1.b.

   5.   **Miscellaneous Individual Issues**

The Ombudsman's overall impression from speaking to callers is that MSD staff are generally considered courteous, even when MSD was denying responsibility for the backup. On the other hand, many homeowners seemed to have little understanding as to the cause of their problems

or a grasp of what MSD did or found when they visited the home. We continue to encourage MSD to provide more detailed information to the homeowners.

We also heard from a number of individuals with complaints about their treatment by the City Solicitor's Office. Several felt they were treated in a rude and patronizing manner. The City should take steps to improve customer service in the claims processing portion of the program.

As part of our work as Ombudsman, we assisted individuals with issues unrelated to the WIB Program. Several callers were having problems with claims against the City of Cincinnati on other potential damage claims. For example, two homeowners suffered damage allegedly caused by water main breaks. We provided some advice on how to pursue those claims. We helped other callers with referrals for assistance on repairs, public benefits, foreclosure assistance, and water run-off disputes with neighbors. Finally, we were able to provide legal advice to several tenants who suffered sewage backups and were having difficulty getting the landlord to make the necessary repairs.

The most heartbreaking of the individual calls are from those homeowners who have suffered from years of backups. One homeowner in North College Hill has lived in her home since it was built in the 1950s. The home flooded with sewage regularly for the first fifty years she lived there. She replaced her furnace twice, replaced the washer and dryer numerous times. She fought for many years to get to the bottom of the problem. Yet, no one – not the City, MSD, County, or any other entity – offered any help nor accepted any responsibility for her problem. The backups stopped a few years ago after MSD widened the sewer main a few blocks from her home. This occurred approximately two years before the WIB Program started. The homeowner's damage claims have been denied. In the Ombudsman's opinion, the City and County should consider establishing a

modest program to help citizens who long suffered from the effects from backups caused by the inadequacy of the public sewer system.

## VI.     Conclusion

The Water-in-Basement Program is a valuable service for the community which has brought much needed relief to MSD customers. It is our opinion that MSD staff is generally committed to the program and its effective implementation.  There must be a continuing commitment to the program as long as the capacity problem exists in the County sewer system.

The WIB Program is an opportunity for the City and County to remedy many years of neglect and mistrust over the operation of the sewer system in Hamilton County. It is our belief that many affected homeowners have not contacted MSD.  It is our impression that property owners are fearful about reporting backup problems because of concerns about having to disclose the existence of backups on any real estate disclosures.  In many areas of the County there is a level of distrust of MSD based upon years of denials by MSD that sewage backups were MSD's responsibility.  We encourage MSD to continue to publicize the program so that more of those affected by backups will participate in the program.

As the report indicates, several homeowners disagree with MSD regarding the scope of work needed to remedy a home's WIB issues.  We seek the Court's guidance on the extent to which the Ombudsman is authorized to employ experts (such as an engineer at $140/hr) to consult on selected cases to review MSD's WIB Prevention Plan proposals.

Finally, we seek the Court's assistance in addressing the issues identified in this Report as being unresolved or at an impasse. The Consent Decree does not provide absolute guidance on these issues. First, whether it is appropriate for MSD to require Prevention Program participants to release

certain claims in order to get prevention devices installed. Second, whether the City should implement an administrative review process for denied claims. Third, whether MSD should accept responsibility for clean up and damages for backups caused by a collapse of the lateral sewer line in the right-of-way.

Respectfully submitted,

Gary J. Pieples
Ombudsman for the MSD WIB Program
LEGAL AID SOCIETY OF GREATER CINCINNATI
215 E. Ninth Street, Suite 200
Cincinnati, OH 45202
Phone: (513) 241-9400; Fax: (513) 241-7871
E-mail: gpieples@lascinti.org

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing document was served on the following parties, by electronic mail, on this 15th day of December, 2005.

| | |
|---|---|
| Leslie Allen: | leslie.allen@usdoj.gov |
| Dennis David Altman: | daltman@one.net |
| Christopher J. Buckley: | cbuckley@gibsondunn.com |
| Nee Fong Chin: | nchin@prosecutor.hamilton-co.org |
| Lance D. Himes: | lhimes@environlaw.com |
| Joseph Steven Justice: | justice@taftlaw.com |
| Margaret Ann Malone: | mmalone@ag.state.oh.us |
| Peter P. Murphy: | pmurphy@gibsondunn.com |
| Terrance A. Nestor: | terry.nestor@cincinnati-oh.gov |
| Gary Prichard: | prichard.gary@epa.gov |
| Albert J. Slap: | albertslap@slaplaw.com |
| Donetta Donaldson Wiethe: | donetta.wiethe@usdoj.gov |

Gary J. Pieples
Attorney at Law