UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| United States of America, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:02cv00107 |
| ) | (Consol. with C-1-02-108 and |
| ) | C-1-02-135) |
| The Board of County Commissioners, ) | |
| Hamilton County, Ohio, et al. ) | Judge S. Arthur Spiegel |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**MEMORANDUM OF DEFENDANTS IN RESPONSE TO OMBUDSMAN'S REPORT**

This responds on behalf of Defendants Hamilton County and the City of Cincinnati[1] to the Ombudsman's Report regarding the Metropolitan Sewer District's ("MSD") Water-in-Basement ("WIB") Program. Defendants respectfully request that the Court consider these comments in assessing the state of the WIB Program.

I.     **The WIB Program Is a Huge Undertaking that Has Been a Great Success**

Greater Cincinnati's WIB Program is the first of its kind in the nation. Two years ago, it did not exist. In an astonishingly short period of time, with an investment of over **$18 million** thus far, the County and the City, working through MSD, got the program up and running. It provides a 24-hour a day, 365-day a year service to MSD customers experiencing back-ups of

---

[1] As has been briefed extensively in this case, Hamilton County owns and the City of Cincinnati operates the Metropolitan Sewer District of Greater Cincinnati ("MSD"). For convenience, the County and City are collectively referred to herein as the "MSD Parties" or "MSD."

wastewater as a result of inadequate capacity in the sewer system. During large rain events, over a hundred MSD and contractor personnel are on the job, regardless of the hour, helping customers deal with back-ups. In the nearly two years of the program's life, MSD has received **_over 7000 calls_** for various kinds of WIB Program services. It is telling that, according to the Ombudsman's Report, he states that he has received **_only 110 calls_** about the program, many of which were not complaints. Ombudsman's Report ("Omb. Rep.") at 1. This is a vanishingly small rate of complaints for any undertaking, let alone a program that is the first of its kind.

The success of the program is also demonstrated by the statistics on its implementation. For example, the **WIB Prevention Program** has installed measures designed to prevent future WIB events at **over 320 homes** – with hundreds more homes in the pipeline – at a cost of over **$12 million**. The **WIB Customer Service Program** has cleaned up the immediate impacts of WIB events at over 900 homes and other properties at a cost of over **$5.3 million**. The **WIB Claims Program** has paid damages in 334 of 408 claims received to date – an **81% settlement rate**. Total value of the claims paid is **over $1 million**. These statistics point to the simple fact that the WIB Program is an incredible success.

II.     **The County, the City and MSD Have Been Responsive to Ombudsman Inquiries**

While the County and the City recognize that that there are areas where improvements could be made in program implementation, and that there are a few issues about which we disagree with the Ombudsman, these issues should not obscure the fact that the MSD Parties have welcomed the Ombudsman's oversight and worked hard to respond to his inquiries. Lost in the Ombudsman's recitation of the issues on which he has worked is the simple truth that MSD has embraced its WIB Program responsibilities under the Consent Decree. In our view, it would be profoundly unfortunate for the Court to take away from the Ombudsman's Report that the

WIB Program is beset by a host of problems. We believe that the Ombudsman's Report should have made clear that, while there are a few issues that we are still working through, the number of areas where the City, the County and MSD may disagree with the Ombudsman is truly small.

In the same vein, we believe that the Ombudsman's Report should convey the simple fact that the County, the City and MSD have worked exceptionally hard to be responsive to the Ombudsman's questions and concerns about various aspects of the program. MSD professionals have met and spoken with the Ombudsman innumerable times to answer his questions, educate him about the program, investigate problems and deliver results for customers. Given their considerable efforts to engage the Ombudsman, it was disheartening for them to read in his report that "MSD staff is generally committed to the program and its effective implementation." Omb. Rep. at 13. To be blunt, we think that their efforts reflect far more than a general commitment. While the report does mention in passing that MSD changed its claim form and the Prevention Program Covenant and Release in response to the Ombudsman's requests, it does not make as clear as it might that when the Ombudsman asks for something, MSD takes the inquiry very seriously and works hard to explain the situation and/or resolve it. At times, MSD's response may not be exactly what the Ombudsman was hoping for, and at times, it may take some time to resolve a situation, but there should be no question that MSD values and takes very seriously its relationship with the Ombudsman.

### III. Response Specific Comments in the Ombudsman's Report

#### A. The Prevention Program Release

As noted above, MSD modified the Prevention Program Covenant and Release—including the terms of the release language—at the Ombudsman's request earlier this year. *See* Declaration of Peter P. Murphy in Support of Defendant's response to Ombudsman's Report

("Murphy Dec."), Exh. A (attaching revised Prevention Program Covenant and Release). Given that the Ombudsman requested specific changes in the wording of the release language—as opposed to its deletion—the MSD Parties were surprised to see in the Ombudsman's Report reference to an "underlying disagreement" about whether there should be any release at all. Omb. Rep. at 5. In fact, the Court considered the issue of releases during the fairness hearing on the Consent Decree (Murphy Dec., Exh. B) and in its order approving the Consent Decree. *Id.*, Exh. C at 7. While the Court expressed its disapproval of the original releases used in the various WIB Programs, it never instructed that Defendants should eliminate use of releases altogether. *Id.*

The release language in the updated Covenant and Release is exceptionally narrow. *Id.*, Exh. A. It covers only strict products liability claims against the City and County for defective equipment. The release does not affect customers' ability to bring negligence claims against the City and County. Moreover, it does nothing to prevent customers from bringing claims against the manufacturers and installers of this equipment. MSD has taken great care to make reasonable decisions in selecting the equipment used in the WIB Prevention Program. If, through no fault of MSD, a particular piece of equipment is manufactured defectively, customers should bring their claims to the manufacturer, not the City or County. Accordingly, we respectfully request that the Court not alter the revised release that the MSD parties now use at the Ombudsman's request.

### B. The MSD Parties Question the Need for Additional Engineering Review

The Ombudsman's Report suggests that Prevention Program remedial measures should be subjected to additional engineering review. MSD questions the need for this. The more than 320 Prevention Program solutions installed to date have worked without any significant problems or

complaints. This is because MSD subjects each project to three sets of review by highly credentialed and experienced engineers. The MSD Parties do not see the value that a fourth set of review will add.

In the event that an additional engineering review is undertaken, it is critical that the reviewing engineer be a licensed engineer with experience in designing systems to address storm water and waste water flows. Additionally, if the review by the additional engineer results in changes to MSD's proposed design for prevention measures at a home, we will expect the recommending engineer to assume responsibility for the impacts of any changes with which MSD does not agree.

C. **Responsibility for Lateral Lines in the Public Right-of-Way**

The Ombudsman's Report notes the Ombudsman's position that MSD should take responsibility for back-ups caused by collapses in customers' lateral lines underneath the public right-of-way. The Consent Decree repeatedly makes clear that MSD is not responsible for back-ups caused by blockages or collapses in private laterals. *See* Consent Decree on Combined Sewer Overflows, Exh. 7 at 1 & 2, and Exh. 8 at 1 & 2. Notwithstanding these provisions, the Ombudsman has sought to have the MSD Parties take responsibility for back-ups caused by conditions in laterals under the public right-of-way. Omb. Rep. at 7. The Ombudsman apparently believes that because MSD repairs breaks in lateral lines that are under the public right-of-way, MSD should be responsible for any issues that arise from such breaks. We disagree. MSD repairs breaks in laterals under the right-of-way at the insistence of local municipalities that do not want local roads being subject to unsafe and inconsistent repair by private citizens. The mere fact that MSD repairs the small portion of a lateral that is in the right-of-way does not mean that MSD owns or operates this part of the lateral. It also does not absolve

customers of their responsibility, as the owners of laterals, to inspect and maintain their laterals. In response to the Ombudsman's concern that this allocation of responsibility might be confusing for some customers, we sent revisions to customer claim response letters designed to address any such confusion to the Ombudsman on December 5, 2005. Murphy Dec., Exh. D. We would welcome the opportunity to work with the Ombudsman on any comments he may have regarding these revisions.

### D.      Administrative Hearings

As outlined above, the WIB Claims Program has paid damages in an astounding **81%** of the claims made and the total amount paid is **over $1 million**. In the few cases where a customer is not satisfied with the amount of the claim offered to be paid, the customer has the option of raising the issue to WIB Program Ombudsman. MSD has spent considerable time and resources investigating and responding to concerns that the Ombudsman has raised about customer claims. Other than claims relating to the collapse of customer's lateral lines—an issue about which responsibility under the Consent Decree is clear—we are unaware of any issues that the Ombudsman has raised in this regard that have not been satisfactorily addressed.

Given the open and substantial dialogue that has developed between the Ombudsman and MSD, we believe that the oversight that the Court envisioned when he appointed the Ombudsman has been achieved. There was considerable briefing and argument regarding the issue of WIB Program oversight when this Court considered the MSD Consent Decrees for entry. As a result of this process, the Court determined that the appointment of an ombudsman was the appropriate approach. In our view, this approach has worked well, and we are unaware of any developments over the last eighteen months that undermine that conclusion. As such, the

County, the City and MSD do not believe that the appointment of an administrative hearing process is necessary.

### E.    Courtesy

Customer-focused service is at the core of the WIB Program. MSD constantly surveys its customers to assess their satisfaction with the service that they are provided. In the overwhelming majority of cases, customers are satisfied with the services provided by the WIB Program. Needless to say, we were disappointed to hear that some customers felt that they had not been treated well by the Claims Program. The City Solicitor's Office had not previously received any such complaints. The County, the City and MSD take the Ombudsman's comments on this point seriously and will counsel the relevant personnel of the need to always treat customers with appropriate respect. We trust that the Ombudsman's experience in working with the MSD Parties gives him confidence that his concerns will be taken seriously, investigated and addressed. We hope that the experiences of the customers who felt that they had not been treated well by the Claims Program will not obscure the numerous achievements of the WIB Program.

IV.     **Conclusion**

In light of the MSD Parties' history of working with the Ombudsman, we do not believe that we need the Court's intervention at this time to resolve the issues identified in the Ombudsman's Report. Most importantly, we believe that the Ombudsman's Report should have better reflected the tremendous effort and resources that the County, the City and MSD have devoted to the WIB Program. We also strongly believe that the Ombudsman's report should have emphasized the considerable attention that MSD professionals have paid toward addressing issues that the Ombudsman has raised. The WIB Program represents a tremendous achievement by the County, the City and MSD. We look forward to its continued success.


Respectfully submitted


s/Nee Fong Chin
Nee Fong Chin, Trial Attorney
Ohio Bar # 003895
Assistant County Prosecutor
Hamilton County Prosecutor's Office
230 East 9th Street, Suite 4000
Cincinnati, OH  45202

Peter P. Murphy, Of Counsel
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306

Terrance Nestor
Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, Ohio 45202

## CERTIFICATE OF SERVICE

      The undersigned certifies that on December 19, 2005, he electronically filed the foregoing Response Of Defendants Board Of County Commissioners, Hamilton County, Ohio, And The City Of Cincinnati To Ombudsman's Report , with supporting exhibits and appendices. The undersigned understands that attorneys for each party in this matter have registered for the Court's Electronic Case Filing service, and thus has received copies of the Response Of Defendants Board Of County Commissioners, Hamilton County, Ohio, And The City Of Cincinnati To Ombudsman's Report , with supporting exhibits and appendices contemporaneously with the electronic filing.

                                  s/Michael K. Murphy
                                  Michael K. Murphy

### Parties

**Ohio River Valley Water Sanitation Commission**
represented by

**Joseph Steven Justice**
Taft, Stettinius & Hollister
110 N. Main St., Suite 900
Dayton, OH 45402
937-228-2838
937-228-2816 (fax)
justice@taftlaw.com

**State Of Ohio**
represented by

**Margaret Ann Malone**
Ohio Attorney General's Office
Environmental Enforcement Section
30 E Broad Street
25th Floor
Columbus, OH 43215-3428
614-466-2766
mmalone@ag.state.oh.us

| | | |
|---|---|---|
| **The Sierra Club** and **Marilyn Wall** represented by | **Dennis David Altman** D David Altman Co LPA 15 East Eighth Street Suite 200 W Cincinnati, OH 45202 513/721-2180 daltman@one.net | **Amy Jo Leonard** D David Altman Co LPA 15 East Eighth Street Suite 200 W Cincinnati, OH 45202 513/721-2180 |
| | **Lance D Himes** D David Altman Co LPA 15 East Eighth Street Suite 200 W Cincinnati, OH 45202 513/721-2180 lhimes@environlaw.com | **Albert J Slap** 20 Erie Avenue Glendale, OH 45246 513-771-7800 513-772-6506 (fax) albertslap@slaplaw.com |
| **United States of America** represented by | **Leslie Allen** Environmental Enforcement Section Environment and Natural Resources Div United States Department of Justice P.O. Box 7611 Washington, DC 20044-7611 202-514-4114 leslie.allen@usdoj.gov | |
| | **Gary Prichard** Associate Regional Counsel U S EPA Region 5 (C-14J) 77 West Jackson Blvd Chicago, IL 60604-3590 prichard.gary@epa.gov | **Donetta Donaldson Wiethe** U.S. Department of Justice Atrium II 221 E Fourth Street, Suite 400 Cincinnati, OH 45202 513-684-3711 donetta.wiethe@usdoj.gov |

70336608_1.DOC