**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| United States of America, et al.      ) | |
|                   ) | |
|     Plaintiffs,           ) | |
|                   ) | |

United States of America, et al.    )

       Plaintiffs,     )

v.                   )    **Case No. 1:02cv00107**
                   )    (Consol. with C-1-02-108 and
                   )    C-1-02-135)

The Board of County Commissioners,    )
Hamilton County, Ohio     )    Judge S. Arthur Spiegel
                   )    Magistrate Judge Timothy S. Hogan

    Defendants.     )

---

**DECLARATION OF PETER P. MURPHY IN SUPPORT OF DEFENDANTS**
**RESPONSE TO OMBUDSMAN'S REPORT**

I, Peter P. Murphy, state and declare as follows:

1.    I am over 18 years of age and am competent to testify regarding the following:

2.    I serve as outside counsel to Defendants in this matter.

3.    I have attached to this Declaration true and correct copies of the following

documents:

    A.    A copy of the revised WIB Prevention Program Covenant and Release form as approved by the Board of County Commissioners for Hamilton County on October 17, 2005.

    B.    Excerpts from the transcript of the May 25, 2004 fairness hearing on the Motion for Entry of Consent Decrees in this matter (Action 1:02-cv-107-SAS).

    C.    June 9, 2004 Order Approving Entry of Consent Decrees in this matter (Action 1:02-cv-107-SAS).

D.  December 5, 2005 electronic mail (and attachments) from Peter P. Murphy to Gary J. Pieples.

I swear under the penalty of perjury that the foregoing is true and correct.

Executed on December 19, 2005.

s/Peter P. Murphy
**Peter P. Murphy**

# TAB A

DECLARATION OF PETER P. MURPHY IN SUPPORT OF DEFENDANTS' RESPONSE TO OMBUDSMAN'S REPORT

**Covenant and Agreement**
**Water In Basement Prevention Program**
**Rules of Eligibility, Participation, and Competition**

## I. INTRODUCTION

To prevent the backup of wastewater from the sewer system operated by the Metropolitan Sewer District of Greater Cincinnati ("MSD"), MSD will purchase and install devices or systems to block wastewater from flowing back into a building or home at eligible properties. This initiative is known as the "Water In Basement Prevention Program" or "WIB Prevention Program." Eligibility for the WIB Prevention Program depends on a number of factors, such as the cause of backups experienced at a property, the number of backups that have occurred there in the past, the condition of nearby sewer lines, and the results of MSD investigations into conditions at a property.

Two examples of the prevention measures that might be installed at properties that are eligible for the WIB Prevention Program are described below.

- **Backflow Preventers** – mechanical devices installed in the private sewer "lateral" (the pipe that runs from the property to MSD's collection pipes in the street). Backflow preventers allow wastewater to flow away from the property, but block wastewater from flowing into the property and backing up into the basement.

- **Pump Systems** – systems installed to break the direct connection between a property's private sewer line and the public main line sewer. Instead, wastewater from the property is redirected to a holding tank and is then pumped into the mainline sewer using a motorized pump.

This document is a legally binding agreement between the Property Owner (as defined below), Hamilton County (which owns MSD) and the City of Cincinnati (which operates MSD) that sets out the rights and responsibilities of each of these parties in connection with the WIB Prevention Program. Here is a short bullet outline of some of the key terms of this agreement. The outline is provided for informational purposes. For an understanding of the complete terms of this agreement, one should read this document in its entirety.

- The Property Owner agrees to allow MSD and people or businesses working for MSD to come onto its property to investigate conditions that may contribute to basement backups and to install WIB prevention measures.

- The Property Owner agrees to accept the prevention measures that MSD or people/businesses working for MSD may install at the property.

- The Property Owner agrees to operate and maintain installed WIB prevention measures in accordance with instructions provided by MSD or people/businesses working for MSD.

- The Property Owner agrees to allow this agreement to be recorded with the property deed and to be binding on future owners of the subject property.

- In exchange for MSD's design and installation of WIB prevention measures, the Property Owner must sign a release that places certain limits on the liability of Hamilton County and the City of Cincinnati in connection with work performed under the WIB Prevention Program.

Although the above summary is provided as a brief overview of the terms of this agreement, this document, like any legal contract, should be read in its entirety before being signed by a Property Owner.

## II. DEFINITIONS:

"MSD or District" shall mean the Metropolitan Sewer District of Greater Cincinnati, its authorized agents, contractors and employees, as established by the City of Cincinnati and Hamilton County under management agreement entered into April 10, 1968 for the operation of wastewater transport and treatment in the designated service area of Hamilton County, Ohio.

"Property" shall mean a facility designed for public occupancy serviced by the District that is the subject of this Agreement.

"Property Owner(s)" shall mean the verified owner(s) of the subject property. The District must be able establish and verify that the represented property owner(s) are the owner(s) of the subject property and that they are responsible to arrange for and pay for all electricity and other utility facilities and services necessary for proper operation of the sewer backflow prevention measures described in the water in basement prevention agreement.

"Program Improvements" shall include backflow preventers, pumping systems, waterproofing, property purchases (only used after careful consideration and as a last resort), as well as new technologies developed to eliminate basement backup of sewage from combined and/or separate sanitary sewers.

"WIB" or "Water In Basement" shall mean the incident of raw sewage or a combination of raw sewage and storm water that backflows from the sewer main (not the property lateral) into the lowest level of the property through designed plumbing fixtures.

"Covenant and Agreement" shall mean this document including the Release form, which will be recorded with the property deed.

"Clean Water" shall mean groundwater, storm water, or other sources of water that do not contain sewage and enter the public sewer system through cracks, holes, or direct connections such as from downspouts, driveway drains, sump pumps, and foundation drains, or surface drainage structures. These sources are improper in sewers designed for only sanitary flow but are proper in older sewer areas that are designed specifically to allow for sanitary and non-sanitary flows.

## II. ELIGIBLE PROPERTIES:

1) The property must have had one or more incidences of wet weather induced backflow of the sanitary or combined sewer system.

2) Property Owner(s) must grant permission to MSD employees and agents to enter on to the subject property, at no cost to the District, for purpose of investigation, design, inspection, construction, and final acceptance of the program improvements.

3) Property Owner(s) will expressly comply with the foregoing definition.

4) Property Owner must willingly and of their express consent acknowledge that they have voluntarily requested improvements offered by MSD through the WIB Prevention Program.

## III. PROGRAM IMPROVEMENTS:

1) The Property Owner(s) will accept an engineering design that eliminates or reduces the possibility of WIB incidences.

2) The Property Owner(s) will inspect and accept the program improvements.

3) The Property Owner(s) acknowledge that these are permanent changes to the Property. Due to some of the improvements, there may be limitations on the use or access of some of the Property. Examples of limitations of use or access: Removal of recessed driveway, elimination of doors (including garage doors) and some windows. Piping changes and pump location(s) may limit some access to the affected area.

4) To the extent possible, MSD is responsible for the maintenance of the Program Improvements installed. The Property Owner agrees to contact MSD in the event of a problem with the Program Improvements. The Property Owner agrees to maintain its plumbing systems and sewer lateral in such a manner as to not negatively affect the operation of the Program Improvements installed by MSD.

5) Clean Water Connections

    a. In sanitary-only sewer areas, the Property Owner(s) must allow for location and disconnection of all downspouts and all sump pumps draining storm water (or clean water) by the District prior to implementation of the sewer backflow prevention measures. The Property Owner(s) must not allow reestablishment of theses connections now or hereafter located on the Property in accordance with current District Rules & Regulations.

    b. For combined sewer areas, the Property Owner(s) must allow relocation of all downspouts and all sump pumps draining storm water or clean water so that this water enters the Property lateral downstream (or on the discharge side) of any sewer backflow prevention system.

6) The Property Owner(s) must execute a release, as further specified herein.

7) The Property Owner(s) will allow no part of the program improvements (including waterproofing) to be disconnected, removed, or breached in any way, unless such disconnected or removed portion is immediately replaced with a system or item of equal or better function and quality as the original installed or constructed pursuant to the water in basement prevention program agreement entered into between the Property Owner(s) and MSD. The alterations heretofore described constitute a material breach of the program improvements release.

8) MSD will provide for restoration of exterior non-permanent structures, decking, paving, or landscaping to the best of its ability and within cost guidelines. However, restoration may not replicate existing structures and MSD will not be responsible for any cost differential associated therein. Survival of specialty or regular landscaping is expressively not guaranteed.

The Property Owner(s) must exercise reasonable care such as watering in order to maintain all new landscaping, seeding, and/or sod during the period that it is needed to reestablish.

## IV. DAILY OPERATION AND USE:

1) The Property Owner(s) must enter into this covenant and agreement, to be recorded with the property deed, placing the responsibility for daily operation and use of the program improvements (including waterproofing) on the current and future Property Owner(s) and holding harmless Hamilton County, the City of Cincinnati and their respective officers, agents, and employees from any claims involving the daily operation and use of the program improvements (including waterproofing) to prevent future sewer backflow incidences. The covenant and agreement shall be binding upon the present homeowner(s), their heirs, successors and assigns.

2) The following constitutes normal responsibilities of daily operation and use expected of the Property Owner:

   a. For pumps, do not flush explosives, strong chemicals, oil or grease, glass, metal, diaper, clothing, plastic objects, sanitary napkins or tampons, litter, rock, or other hard substances. If the pumps have not been used for quite a while, run clear water and allow pump to activate prior to returning to normal service. Keep water usage to a minimum if power service is interrupted. Obey all alarms on the diagnostics panel as applicable. Replace batteries as needed. Contact the warranty/maintenance agreement contractor if the pump is not working and alarms indicate need for service.

   b. For piping, keep all associated piping free and clear of all debris that could result in a blockage. Do not dump grease or oils. Solicit the services of a licensed plumber as needed.

   c. For finished services, maintain all surfaces free of substances that may cause staining or deterioration. Seal all shrinkage cracks as necessary. Do not overload surfaces that could result in structural failure.

3) The Property Owner(s) must acknowledge that the utility costs, if any, to operate the program improvements are entirely the responsibility of the Property Owner(s) and not a responsibility of MSD.

4) To the extent possible, MSD is responsible for the maintenance of the Program Improvements installed. The Property Owner agrees to contact MSD in the event of a problem with the Program Improvements. The Property Owner agrees to maintain its plumbing systems and sewer lateral in such a manner as to not negatively affect the operation of the Program Improvements installed by MSD.

## V.  COMPETITIVE BIDDING PROCEDURES & REQUIREMENTS:

1)  The Director (or the Director's designate) shall determine for each participating Property the scope of work, which includes the design and detailed specifications, where warranted.  Related work shall include identification and removal of storm water or clean water connections from the sanitary lateral in sanitary-only areas, relocation of these flow sources in combined sewer areas, waterproofing of the house, and restoration.  The District will contract and pay for all the work identified in the scope of work.

2)  The contractor, electrician (if required), plumber, Property Owner, consultant (optional), and authorized MSD representative shall sign a statement stating the work is satisfactory and complete.

# AUTHORIZATION AND RELEASE OF CLAIMS AGREEMENT

WHEREAS, _____ (hereafter Property Owner) is the owner of a building located at _____, Ohio (the "Property"); and

WHEREAS, the Property is serviced by the Metropolitan Sewer District ("MSD"), which is operated by the City of Cincinnati (the "City") and owned by Hamilton County, Ohio (the "County"); and

WHEREAS, one or more water backups have occurred at the Property due to a condition involving overcharged public sanitary sewer lines, which condition can occur during periods of heavy rainfall; and

WHEREAS, the County and the City desire to prevent future water backups at the Property; and

WHEREAS, plumbing/electrical changes, installation of pumps/devices or other improvements, at the Property will help to prevent such water backups;

WHEREAS, in an effort to eliminate or reduce the probability of such water backups, plumbing/electrical changes, installation of pump devices or other improvements (collectively "Improvements") will be made at the Property by contractors paid by MSD;

NOW, THEREFORE, in consideration of the installation of Improvements made by MSD on behalf of the City and the County at the Property at no charge to the Property Owner, the City and the County and the Property Owner (hereinafter referred to as the "Parties"), all agree as follows:

1.  <u>Release</u>.  The Property Owner, as owner of the Property, releases and gives up all claims and rights which he/she has or may have in the future against the County and/or the City based on strict liability for defective products arising out of or

resulting from the installation of Improvements and the future use of such Improvements by the Property Owner; ***provided however***, that nothing in this Agreement shall bar any claims: a) arising from negligence or intentional misconduct of the City, the County or their employees (including claims for diminution in the value of the Property); or b) against contractors that design, install or otherwise provide services in connection with the Improvements.

2.    Anyone who succeeds to the rights and responsibilities of the Property Owner such as his heirs or the executor of his estate, are also bound. This Release is made for the benefit of Hamilton County and the City of Cincinnati and all who succeed to their rights and responsibilities, such as successors and assigns.

3.    Access to Property: Property Owner hereby agrees to allow MSD employees, contractors and agents to enter on to the subject property, at mutually-agreeable reasonable times, after reasonable advance notice, at no cost to the District, for purpose of investigation, design, inspection, construction, and final acceptance of the Program Improvements, and future maintenance service calls for the Program Improvements.

4.    Signatures. The City, the County and Property Owner have read, understand and agree to the terms of this Release.

**Property Owner(s)**

_____
                                                    Dated


STATE OF OHIO              )
                          )    SS
COUNTY OF HAMILTON  )

On this _____ day of _____, ____, before me personally

appeared _____ to me known to be the

person described in and who executed the foregoing instrument, and acknowledged that

he executed the same as his free act and deed.

　　　IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my

notarial seal on the day and year last aforesaid.

                          _____
                          Notary Public

**City of Cincinnati**

_____

                                                          Dated

STATE OF OHIO                )
                             )        SS
COUNTY OF HAMILTON  )


On this _____day of _____, _____, before me personally

appeared _____ to me known to be the

person described in and who executed the foregoing instrument, and acknowledged that

he executed the same as his free act and deed.

    IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my

notarial seal on the day and year last aforesaid.


                              _____
                              Notary Public

**Hamilton County**

_____

                                                            Dated:


STATE OF OHIO                )
                             )    SS
COUNTY OF HAMILTON   )


On this _____day of _____, _____, before me personally

appeared _____ to me known to be the

person described in and who executed the foregoing instrument, and acknowledged that

he executed the same as his free act and deed on behalf of _____.

        IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my

notarial seal on the day and year last aforesaid.


                                    _____
                                    Notary Public

## Homeowner Notification Maintenance Checklist

☐ Outside Drains such as stairwell     xxxxxx     ☐ Backflow Valve Operation
drains and sump pump pits must                      -If Backflow Valve is installed, then
have leaves or other debris                         basement floor facilities such as the
cleaned from them on a regular                      toilet, washer, dryer, etc. should not be
basis.                                              used when alarm is activated.

☐ Debris has been found in your          ☐ Backflow Maintenance.  See Backflow
lateral.  It is your responsibility         valve operation manual for instructions.
to maintain and clean your
lateral.

☐ Sludge, Grease and Other               ☐ Power Outages.  Limit use of home
Sanitary Debris is present in               utilities during power failures.
internal pipes. Pipes need to be
cleaned and maintained.

☐ Downspouts Clogged or Outlet           ☐ Existing Plumbing Conditions.  See
is Undetermined.  See drawings.             Drawings.

☐ Basement Cleanup.  Removal of          ☐ Pump Operation.  Operate pump in
household goods in basement is              accordance with Owners Manual.
required before inside
construction can proceed.

                                         ☐ Other Homeowner Maintenance
                                            Notifications:_____

                                            _____

                                            _____

                                            _____

                                            _____

                                            _____.

# TAB B

DECLARATION OF PETER P. MURPHY IN SUPPORT OF DEFENDANTS' RESPONSE TO
OMBUDSMAN'S REPORT

1    committed on their property or they have been seriously

2    damaged personal injury-wise because of --

3            MR. ALTMAN:   Your Honor, the cost.

4            THE COURT:   -- some disease that develops by

5    reason of contamination that they're exposed to.

6            MR. ALTMAN:   Your Honor, I'm the guy -- we

7    handle -- we had everybody come to us.  We handle a small

8    fraction.  I'm telling you there are not people -- the cost

9    of bringing that action, it just won't happen.  That's why

10   we're spending so much time on this, trying to tell the

11   Court the pieces of bad news about this consent decree.

12           As a practical matter, this is the only chance,

13   practical matter, these people are going to have.  And if

14   somebody could have filed a class action on their behalf,

15   Mr. Chesley would have by now.  But it isn't going to

16   happen.  And individual people don't have the money to do

17   it.

18           So -- oh, and further, Your Honor, if we could

19   find out whether the mistake in releases that have already

20   been signed by all these people on this WIB Prevention

21   Program, can we -- if they're not going to be valid; are

22   they still valid?

23           MR. MURPHY:   Those releases, the revised

24   releases, will be given to everyone, including, for

25   example, the people on Kenker Place in Cheviot who had

1    signed the old release and had the material installed

2    there, that will be modified along the lines of the

3    original -- I'm sorry -- along the lines of the new

4    release.

5            THE COURT:  Mr. Murphy, where do you live?

6            MR. MURPHY:  I live in Vienna, Virginia, sir.

7            THE COURT:  Okay.  Big community or small

8    community?

9            MR. MURPHY:  It's a small town, but it's part of

10   the larger Fairfax County, Virginia.

11           THE COURT:  Okay.  That's a pretty wealthy

12   community in Fairfax County, isn't it?

13           MR. MURPHY:  Fairfax itself is.  Vienna is one,

14   yes.

15           THE COURT:  Is that just across -- is that near

16   Quantico?

17           MR. MURPHY:  Quantico is, I believe, in Stafford

18   County, which is one south, immediately south.

19           THE COURT:  Are you right up on the edge of the

20   District of Columbia?

21           MR. MURPHY:  I'm a ways out.  I'm 17 miles out

22   from the District, Your Honor.

23           THE COURT:  Suppose one of your neighbors

24   received this covenant and agreement piece of paper.  Have

25   you read it?

# TAB C

DECLARATION OF PETER P. MURPHY IN SUPPORT OF DEFENDANTS' RESPONSE TO
OMBUDSMAN'S REPORT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,          :    NO.  1:02-CV-00107
                    et al.,        :
                                   :
          Plaintiffs,              :
                                   :    **ORDER**
     v.                            :
                                   :
BOARD OF COUNTY COMMISSIONERS :
OF HAMILTON COUNTY, OHIO,          :
                    et al.,        :
                                   :
          Defendants.              :


     This matter is before the Court on the United States'
Motion for Entry of the Consent Decrees (doc. 116), Intervenor
Sierra Club's Response in Opposition (doc. 118), Defendants' Reply
in Support of Plaintiffs' Motion (doc. 121), and Plaintiffs' Reply
in Support of Motion for Entry of Consent Decrees (doc. 122).  Also
before the Court are Intervenor Sierra Club's Motion to Appoint
Special Master (doc. 120), and Motion for Leave to File Sur-Reply
(doc. 126).  The Court held a hearing on Plaintiffs' Motion on May
25, 2004.

I.  **The Motion of the United States (doc. 116)**

     The United States, with the consent of co-Plaintiffs Ohio
River Valley Water Sanitation Commission ("ORSANCO"), and the State
of Ohio, moves the Court to enter the lodged Interim Partial
Consent Decree for Sanitary Sewer Overflows ("ICPD")(attachment 1,
doc. 56), and the Consent Decree on Combined Sewer Overflows,
Wastewater Treatment Plants, and Implementation of Capacity

Assurance Program Plan ("Final Decree")(doc. 116).   The United
States has solicited public comment on the decrees as required by
regulation, and concludes the decrees are fair, reasonable, and
consistent with law, and therefore satisfy the standards for entry
consistent with <u>United States v. Akzo Coatings of America, Inc.</u>,
949 F.2d 1409, 1426 (6th Cir. 1991)(the general test applied by
courts in the Sixth Circuit whether to approve a consent decree is
one  of  "fairness,  reasonableness  and  consistency  with  the
statute").

According to the United States, the decrees represent a
comprehensive plan on the part of the parties to address problems
with Hamilton County's sanitary sewer overflows ("SSO's"), combined
sewer  overflows  ("CSO's"),  and  wastewater  treatment  plants
("WWTP's").   In addition, the final decree includes a "basement
component," that requires Defendants to take measures to prevent
basement backups, clean up backups when they occur, and reimburse
residents for damages.   The two decrees, argue the United States,
establish a framework for ensuring that Defendants develop and
implement a long-term plan for massive infrastructure improvements
needed to solve the current problems with the system.

## II.  The May 25, 2004 Hearing

At the May 25, 2004 hearing, the Court permitted the
parties to offer a detailed description of the components of the
consent decrees, heard the objections of the Sierra Club, and took
public comment from homeowners who have suffered damage to their
property and the inability to sell their homes from the influx of

2

sewage water into their basements.

### A. The United States Argues that the Decrees Meet the Sixth Circuit Standard for Entry

The United States explained that the decrees are structured to implement remedies through the year 2022 at the latest, with interim measures taken along the way to more quickly target problem areas. For CSO's, the final decree requires Defendants to monitor streams in order to generate information that can aid in the development of remedies that should bring the CSO's into compliance with the Clean Water Act. Defendants' long-term plan to address CSO's is called the Long Term Control Plan Update ("LTCPU") and must be submitted to the regulatory agencies for their approval, no later than June 30, 2006. The LTCPU must contain performance criteria and schedules for the completion of remedial measures that are "expeditious as practicable" but in no event later than February 28, 2022, unless one of a number of very narrow circumstances occurs. A few of those circumstances--which the Sierra Club characterized as "openers" at the May 25, 2004 hearing--shall be treated with more detail below. The LTCPU will also require post-construction monitoring to evaluate the effectiveness of its controls in relation to water quality.

For SSO's, the final decree similarly requires a study and proposal for elimination of all SSO's, entitled Capacity Assurance Program Plan ("CAPP"), to be submitted to the regulatory agencies by June 30, 2006. CAPP, like the LTCPU, must contain performance criteria and schedules for completion of remedies as

3

"expeditious as practicable," but in no event later than February 28, 2022.

The United States further explained that the Consent Decrees also require interim measures to address specific problems with the system. The IPCD requires capital improvement projects ("CIP's") that should eliminate sixteen of the worst SSO's by July 31, 2006, while the Final Decree requires twenty-four CIPS to address some forty CSO's and a WWTP. The IPCD also requires that Defendants construct a $15.6 million interim storage and treatment system to address its worst SSO, SSO 700.

The government stated that the Final Decree requires the implementation of a three-pronged "Water in Basement Program," that Defendants have already started to implement, spending over $1 million in the first quarter of 2004. Other provisions in the decrees impose operation, maintenance, and response requirements, and impose a short-term adequate capacity plan ("STACP"), that forces Defendants to ensure that more flow is removed from the system than is added from proposed new flows from upstream development. Finally, the Final Consent Decree also requires Defendants to pay a civil penalty of $1.2 million, and to spend a minimum of $5.3 million to implement six supplemental environmental projects ("SEP's") to improve or protect the Mill Creek.

The United States argues that the decrees ensure accountability because 1) they incorporate stringent penalty provisions for any noncompliance, and 2) they require Defendants to submit quarterly reports to Plaintiffs regarding the status of

4

their compliance.   The United States commits to provide all documents that it receives to the Sierra Club so that the Intervenors can monitor efforts to enforce the decrees.   In addition, the United States indicates it has invited Ms. Marilyn Wall, a representative of the Sierra Club, to serve as a member of the LTCPU steering committee, which will provide oversight and guidance to Defendants as they develop the LTCPU.

The government quotes United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991), in which in opining on the validity of a settlement, the Sixth Circuit stated, "[i]n evaluating the decree, it is not our function to determine whether this is the best possible settlement that could have been obtained. . ." (doc. 122, quoting Akzo at 1436).   The Court's function, rather, argues the United States, is only to determine whether the decrees are fair, reasonable, and consistent with the Clean Water Act.   If necessary, the government states, the Court can always enforce the decrees with injunctive powers, thus forcing MSD and other signatories to comply.   The government argues that in no way does the Clean Water Act preclude a "phased compliance schedule," so that the schedule approach in the decrees is reasonable and appropriate. The government argues that its decrees do not contain "loopholes," but that limited opportunities for extensions of deadlines are reasonable and appropriate, the decrees do not need to contain a financial plan, as the LTCPU shall incorporate such a plan, and the decree appropriately accounts for the possibility of future revisions to water quality standards.

5

The State of Ohio and other Plaintiffs concurred with the position of the United States.

## B.    Intervenor Sierra Club's Concerns

In its Memoranda, and at the hearing, the Sierra Club detailed a number of its objections to the Consent Decrees, which the Court has reviewed (doc. 118). However, under <u>Akzo</u>, the Court is convinced that its role is not to dictate its view about the best sort of settlement possible, or to micro-manage the settlement, but rather to review the settlement to ensure that it is fair, reasonable, and consistent with the Clean Water Act.  949 F.2d 1409, 1436 (6th Cir. 1991).  Accordingly, Sierra Club raised three principal issues that the Court finds necessary to address: 1) its view that a Settlement Master should be appointed to oversee the implementation of the decrees, 2) its view that Section 7B of the Final Decree provides an "opener" in which communities can "buy time" by attempting to change water quality standards, and 3) its view that Section 9B of the Final Decree also provides an "opener" in which deadlines for completion of remedial projects can be extended beyond the year 2022 if the costs of such remedies in the LTCPU and CAPP are expected to exceed $1.5 billion in 2006 dollars.

### 1.    The Proposed Settlement Master

In explaining its position on the necessity of a Settlement Master, Sierra Club protested that Defendant Metropolitan Sewer District ("MSD") has been using an unfair release with water-in-basement ("WIB") victims, asking them to release any past or future claims against MSD when obtaining MSD's

6

help with water in their basements. The Court queried MSD counsel, who indicated that such releases have been freshly redrafted so as to only require waiver of further claims for property damage arising from the WIB incident that is being settled by payment. Sierra Club argued that without a Settlement Master to watch over Defendants, the public is at risk of similar abuses. The Court appreciates the involvement of Sierra Club as intervenor and recognizes that the releases prepared by the Cincinnati Solicitor's Office were highly improper. The Court finds that if any such releases were signed, they are unenforceable. Only the releases described in Court by MSD counsel as freshly redrafted are enforceable.

The Court is not convinced, as it has expressed to Counsel for Sierra Club on previous occasions, that a Settlement Master should be appointed to supervise the implementation of the decrees. Moreover, the United States opposes the appointment of a Settlement Master. Judicial deference to a settlement is "particularly strong" when a settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like [the Environmental Protection Agency] which enjoys substantial expertise in the environmental field." Akzo, 949 F.2d at 1436. The Court finds it appropriate to defer to the government's position that a Settlement Master is not necessary. However, the Court finds well-taken the government's proposal that an ombudsman be appointed so as to ensure that WIB victims obtain effective and timely assistance. The Court finds the appointment of an ombudsman

7

entirely appropriate, as such person can ensure that the WIB
component of the consent decrees is in all respects comprehensible
to the public.  Unlike the parties to this action, the public does
not necessarily have easy access to legal counsel.  The appointment
of an ombudsman should provide the public with an advocate who can
ensure that the WIB program is working, investigate complaints, and
keep the Court informed of the status of such program.

### 2.  Section 7B "Opener"

The language of Section 7B in the Final Decree (doc. 101)
provides:

> Modification of the Long Term Control Plan Update if
> Anticipated Changes to Legal Requirements Do Not Occur
>
> The CSO Policy recognizes that information developed
> during the course of long term control planning may serve
> as a basis for seeking revisions to water quality
> standards or NPDES permit requirements, particularly
> where that information demonstrates that it will not be
> feasible to attain water quality standards.  If the Long
> Term Control Plan Update in the Long Term Control Plan
> Update Report is based upon Defendants' belief that the
> requirements of the Clean Water Act, U.S. EPA's CSO
> Policy, Chapter 6111 of the Ohio Revised Code and/or the
> rules promulgated thereunder, and/or the Compact, and/or
> the pollution control standards promulgated thereunder
> will be revised, and if information subsequently becomes
> available that indicates that those revisions are not
> going to occur in the manner set forth in Defendants'
> Long Term Control Plan Update Report, U.S. EPA, Ohio EPA,
> or ORSANCO may notify Defendants in writing that the
> expected revisions are not going to occur.
> Within 180 days of their receipt of the written
> notice described above, Defendants must submit to the
> U.S. EPA/Ohio EPA/ORSANCO for review and approval a
> Revised Long Term Control Plan Update that includes all
> of the elements of a Long Term Control Plan Update. .
> .(including a schedule that is as expeditious as
> practicable for completion of the remedial measures but
> that may be later than February 28, 2022, if it is not
> practicable to complete those measures by that date), but
> does not assume or rely on water quality standards that

8

have not been revised or approved.

Sierra Club expressed its concern that in its view, this provision provides Defendants a way to buy time by challenging existing water quality standards.  The United States stated that Sierra Club's understanding of this provision is the opposite of what is actually meant by it.  In order to remedy any possible ambiguity in the construction of this Section, the Court finds, as confirmed by counsel at the May 25, 2004 hearing, that the 2022 deadline is not suspended if Defendants exercise their right to attempt to change water quality standards.  Defendants may lobby for change collaterally to the implementation of the LTCPU and CAPP.  Defendants do not buy time or extend the 2022 deadline if they lobby for or win relaxed standards.  The Court finds reasonable the government's position that the consent decree legitimately provides, consistent with 40 C.F.R. § 131.10(g)(6), flexibility to extend the 2022 deadline only if the costs necessary to attain full compliance with existing water standards would result in "widespread social and economic impact."  Accordingly, the above section does not provide an "opener" based on Defendants' ability to lobby for change, but only provides flexibility in the event that standards do not change, and that compliance with the unchanged standards creates onerous hardship.  These conditions are not evidence of a loophole, but rather are reasonable, and conform to the requirements of the Clean Water Act.

### 3.  Section 9B "Opener"

9

Sierra Club similarly expressed concern about Section 9B of the Final Consent Decree, which states:

> Extension of Deadlines if Capital Costs Exceed $1.5 Billion
>
> The schedule for Substantial Completion of Construction for the remedial measures in the Long Term Control Plan Update and the Capacity Assurance Program Plan shall be as expeditious as practicable, but in no event later than February 28, 2022, unless Defendants demonstrate that the expected costs (in 2006 dollars) of the remedial measures in the Long Term Control Plan Update and the CAPP are expected to exceed $1.5 billion. If such capital costs are expected to exceed $1.5 billion, then the deadline for completion of all remedial measures specified in the Plan(s) and must still be as expeditious as practicable, but may be later than February 28, 2022, if it is not practicable to complete the CAPP and Long Term Control Plan remedial measures by that date.

Sierra Club expressed its concern that the large infrastructure improvements contemplated in the decrees could potentially cost more than planned, and thus at some future date, the Defendants could buy more time thanks to cost overruns that cause expenses to exceed $1.5 billion. The government clarified that the $1.5 billion figure only has meaning in the formulation of the LTCPU and CAPP in 2006, and that if Defendants do not meet the schedules within those plans, they shall be subjected to stipulated penalties. The government stated that it must approve the projects specified in the plans, and that if the projects end up costing more as of the time of planning in 2006, then so be it. In such an instance, the government would not approve a schedule extending beyond 2022 unless it was as expeditious as practicable, and Sierra Club could raise a Rule 60(b) challenge in the event that it finds

10

the schedule too attenuated.  The Court finds the government's explanation of this section satisfactory and reasonable.  The Court confirms that the $1.5 billion figure only applies to the formulation of the plans in 2006.

### III.  Conclusion

Having reviewed this matter, the Court finds the consent decrees to be fair, adequate, and in compliance with the Clean Water Act.  As indicated herein, the Court appoints an ombudsman, the Legal Aid Society of Greater Cincinnati, to such role.  Gary J. Pieples, Esq., shall serve as designated counsel of behalf of the Legal Aid Society.  Defendants shall cover the expenses for the retention and costs of the ombudsman, which shall be compensated at $150.00/hour, to be paid quarterly, for its services in such capacity.

The Court retains jurisdiction over this matter, and will not countenance unreasonable delay in correcting the problems that the decrees address.  Where homeowners suffer damage for which MSD is liable, the MSD will be responsible for clean-up costs, remedies, and for any dimunition in the value of real estate.

Accordingly, the Court GRANTS the Motion of the United States for entry of the Consent Decrees (doc. 116), EXECUTES the lodged Interim Partial Consent Decree for Sanitary Sewer Overflows

11

("ICPD")(attachment 1, doc. 56), and the Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants, and Implementation of Capacity Assurance Program Plan ("Final Decree")(doc. 116), and DIRECTS the clerk to docket such decrees as approved. Sections 7B and 9B of the Final Decree shall be interpreted in accordance with this Order. The Court further DECLARES the releases purporting to extinguish WIB victims right to past or future recovery for damages unenforceable. Finally, the Court DENIES Sierra Club's Motion for Court-Appointed Special Master (doc. 120), and DENIES as moot Sierra Club's Motion for Leave to File Sur-Reply (doc. 126).

SO ORDERED.

Dated: June 9, 2004          s/S. Arthur Spiegel
                             S. Arthur Spiegel
                             United States Senior District Judge

# TAB D

DECLARATION OF PETER P. MURPHY IN SUPPORT OF DEFENDANTS' RESPONSE TO
OMBUDSMAN'S REPORT

**Murphy, Peter P.**

| | |
|---|---|
| **From:** | Murphy, Peter P. |
| **Sent:** | Monday, December 05, 2005 4:13 PM |
| **To:** | gpieples@lascinti.org |
| **Subject:** | Insert for Right-of-Way collapse Letters |

| | |
|---|---|
| **Importance:** | High |
| **Sensitivity:** | Confidential |



ROW_Inse.pdf (79
KB)

Gary:

In response to your recent letters on responses to customers who have had lateral
collapses in the right-of-way, here is some new language that we plan to put in response
letters to customers.

Please let me know if you have any questions or comments on this approach.

Thanks very much.

--Peter

Peter P. Murphy
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
(202) 887-3695 (voice)
(202) 530-9570 (fax)
pmurphy@gibsondunn.com

*Confidential Communication*

**Insert for use in letters denying damage claims at home with collapsed lateral**

We are sensitive to your situation, but building laterals belong to the property owner. As such, under the Metropolitan Sewer District's ("MSD") Regulations, property owners are responsible for inspecting and maintaining their building laterals. To ensure that replacement of collapsed laterals is conducted in a manner that does not cause undue disruption to traffic and results in a repaired street that is safe for continued use as a public right-of-way, local governments require MSD to conduct the actual replacement of property owners' collapsed laterals. Although MSD conducts replacements, it is still the responsibility of the property owner to inspect and maintain laterals, and damages resulting from any blockage in a lateral that was not caused by MSD are the responsibility of the property owner.

As a result, based on the fact that your claimed damages arose from a collapse in your lateral, MSD is not responsible for your damages and the City of Cincinnati must deny your claim. You may appeal this decision though the standard legal process in the courts of Hamilton County. The Municipal Court and the Court of Common Pleas are both located at 1000 Main Street, Cincinnati, Ohio 45202. If you cannot afford legal counsel, the Legal Aid Society of Greater Cincinnati is located at 215 E. 9th Street, Suite 200, Cincinnati, Ohio and can be reached at 241-9400.

70335667_1.DOC

MAY-12 05 15:17  FROM:LAW DEPT.          513-352-1515          TO:513 241 6061          PAGE:02

# City of Cincinnati



·Office of City Solicitor
Courts Division
Claims/Collections
and Revenue Recovery
July 19, 2004

Room 126 __ Ha __
801 Plum __ tree __
Cincinnati __ Ohio __ 5202-5705
Phone __ (513) 352-3334 __
FAX

J. Rita M __
City Solici __

Ernest F. M __ Jr.
City Prosec __

Marge Poehner
6745 Palmetto Street
Cincinnati, Ohio 45227

Dear Ms. Poehner:

We have completed our review of your claim for damage to your property from a sewer
backup you incurred on April 10, 2004, at 6745 Palmetto Street, in Cincinnati, Ohio.

The Metropolitan Sewer District (MSD) responded to a call for service on April 12, 2004,
at 6745 Palmetto Street, concerning water in basement. An MSD crew found the
problem in your building lateral. Under the Metropolitan Sewer Districts Regulation, the
property owner is responsible for the maintenance of their building lateral from the
building to the public sewer line. Metropolitan Sewer District is only responsible for the
replacement of the building lateral that is located in the right of way. Please see attached.

[Insert]

Therefore, based upon the facts, the City of Cincinnati must deny your claim. Though
there is no formal appeals process through the City of Cincinnati, you may appeal th __
decision through standard legal process in the courts of Hamilton County. The Municip __
Court and the Court Common Pleas are both located at 1000 Main Street, Cincinna __
Ohio 45202. If you cannot afford legal counsel, the Legal Aid Society of Greate __
Cincinnati is located at 215 E. 9th Street, Suite 200, Cincinnati, Ohio 45202, and ca __
reached at 241-9400.

Sincerely,

Anita A. Boulmetis
Claims Administrator

cc: MSD

Enclosure

Equal Opportunity Employer