

**MSD CUSTOMER SERVICE**

March 4, 2004

Mrs. Anita Rosewood
1929 Fairmount
Cincinnati, OH 45214

RE: Basement Cleanup Services

Dear Mrs. Rosewood:

Following your report of water in your basement on January 3 – 4, 2004, MSD of Greater Cincinnati has attempted to make arrangements with both you and your husband to clean and sanitize your basement. MSD's records indicate the following course of events:

- You contacted MSD regarding water in your basement on January 5, 2004.
- MSD investigators arrived at your home at 9:30 a.m. January 5th to determine the cause of the water in your basement. They inspected the main sewer line and found no blockage or problem there. They informed you that there was no problem in the main line, but there might be a blockage in your lateral (the drain pipe that connects your home to the main sewer). They told you that they would need to use special equipment to rod your lateral to see if it was blocked, and that they would need to access the line through the toilet drain in your basement. They said they would call you to set up an appointment for the work.
- MSD called back later that day to schedule the appointment, but no one answered the phone; they left a message.
- MSD tried numerous times to reach you again by phone on January 8th, 9th, and 10th to schedule the rodding. Messages were left after each call.
- MSD eventually reached you and scheduled a time for the rodding. The rod crew determined that the basement had flooded because your lateral line was collapsed in the right of way under the street, and needed to be repaired. MSD subsequently authorized and dispatched a repair crew to dig up and replace the collapsed lateral under the street. This work was completed in late January.
- MSD customer service representatives began trying to contact you on February 10, 2004 to offer cleanup services, after getting confirmation from MSD Collections that the water in your basement was related to a maintenance problem in the right of way.

**EXHIBIT A**

**MSD CUSTOMER SERVICE**

- MSD representatives called you by phone and left messages at least eight times between February 10th and February 23rd attempting to make an appointment to meet with you, inspect the situation, and clean the affected area.
- You contacted the MSD customer service representative at 1:15pm on February 24th and agreed to meet with someone that same day. The appointment was scheduled within an hour of receiving your call.
- MSD's customer service representative and cleanup contractor both arrived at your home within the hour on the afternoon of February 24th. With your assistance and permission, they entered the house, inspected the basement, documented the incident, photographed the contents and conditions, and developed a plan for the cleanup.
- Although MSD's representatives were prepared to start the cleanup immediately, you requested a two-day delay to allow your husband time to sort through the extensive contents in the basement. Accordingly, cleanup was scheduled for 9:30am on February 26th.
- The customer service representative and the cleanup crew returned two days later at the appointed time, 9:30 am on February 26th, to start the cleanup but found that no one was home. The customer service representative immediately tried to reach you at work but realized there was no work number in the records. The customer service representative then attempted to reach you on your cellular phone, which Mr. Rosewood answered. Mr. Rosewood then informed the customer service representative that he wanted to cancel the appointment because he was not done going through his things. In addition, Mr. Rosewood stated that he did not want MSD representatives in his basement at all, but rather he would do the cleanup himself.
- There has been no further contact with or from you regarding this matter since that time.

We regret that we were unable to provide you with the professional cleanup services that are now available through MSD's Water-in-Basement Response Program. We respect your right to decline our services, and would like to notify you that, per your request, MSD will make no further attempts to contact you regarding this matter.

If you experience the problem again and desire MSD assistance, please don't hesitate to contact our Customer Service Center at 771-9424.

Sincerely,

Dennis M. Madden
WIB Response Manager

File: WIB 152

Metropolitan Sewer District
Wastewater Collection Division

# COMPLAINT FORM

Date: 01/05/04
Time: 7:00
Received: MPI

## CALLER INFORMATION

Name: ROSEWOOD ANITA A
Agency: Private
Address:

Business Phone:
Home Phone: 921-6978

## PROBLEM LOCATION

Address: 1929 FAIRMOUNT AV      45214      City/Township: CINC
                                                          SFAIRM
Nearest Intersection: SATURN ST
Detailed Location Information: USNG 1M:GJ1091533854
Condition Reported: Water - In - Basement
Comments: N/P

Current Condition: Water - In - Basement

## ON SITE INSPECTION

Date: 01/05/04                                           Unit Number: 444
Dispatch Time: 09:08      Arrival Time: 09:30      Completion Time: 10:00
Condition Found:
Action Taken:
Comments: CK'D 12' ML MH 2861404 NMST MH 28614013 NBUIMHS

I A/C THAT ML IS OK. I LEFT WIB SHEET. THERE IS SOME WATER IN BASEMENT. I A/C THAT WE WOULD SEND OUT A ROD CREW 1-5-04 TONY ROLLISN
REFER TO RERUN AND ROD 1-5-2004   KENNETH RUSSELL CALLED 3X 1-8-2004 TED CALLED @ 12:18 1-9-2004 NO ANSWER EFT MESSAGE 1   3;00 PM 1-9-04   J LOSEKAMP
CALLED 9:50 AM 1-10-2004 NO ANSWER DLH LEFT MESSAGE.   CK'D MH'S 28614013 28614014 OVER 12' M/L NMST NBUI  M/H'S RODDED HIT FROM BASEMENT PULLED TOILET RAN 96' AND WAS UNABLE TO PASS. BROUGHT BACK MUS ON 2' SPEAR WATER STILL BACKED UP IN F/D A/C MSD CREW WILL RESPOND TO RE ROD  & LOCATE SPOT AT 96' NOTIFIED STAT4    R 11:30    A 12:00    F 14:00
MARK LONGMORE 1-10-2004
I LOCATED BAD SPOT HIT HARD 90 BROUGH BACK MUD ON LOCATED JEFF STALLWORTH  1-10-2004
REFER TO G MILL JKENNY RUSSELL 1-11-2004   REFER TO B. SAYLOR FOR EMERGENCY REPAIR.   GHM 01/20/04

MSD

EXHIBIT B

Job Order:
Last Referral: ESS          Last Referral Date: 01/20/04
For:

Final Disposition

By:           Date: / /           Responsibility Of:

# Chris Sandman

| | |
|---|---|
| From: | Madden, Dennis [Dennis.Madden@cincinnati-oh.gov] |
| Sent: | Tuesday, September 07, 2004 1:24 PM |
| To: | Chris Sandman |
| Cc: | Boulmetis, Anita |
| Subject: | FW: Mr. and Mrs. Rosewood - 1929 Fairmount Avenue |

please give Anita a report on what we observed and photographed at this address.  Also let
her know the date of the certified mail we sent informing Mr. Rosewood that we were no
longer attempting to schedule an appointment for the cleanup and that he should call and
schedule an appointment by whatever date we set.  If you have any information that would
help Anita on this claim please call her and let her know what you have or saw.  thanks.
Dm2

```
>  -----Original Message-----
> From:     Boulmetis, Anita
> Sent:     Tuesday, September 07, 2004 11:57 AM
> To: Madden, Dennis
> Subject:  FW: Mr. and Mrs. Rosewood - 1929 Fairmount Avenue
>
> Got the wrong Madden the first time.
>
>  -----Original Message-----
> From:     Boulmetis, Anita
> Sent:     Tuesday, September 07, 2004 11:37 AM
> To: Wyler, Deborah; McAdams, Ernest; Madden, Christopher
> Subject:  Mr. and Mrs. Rosewood - 1929 Fairmount Avenue
>
>
> Mr. and Mrs. Rosewood had a break down of their house lateral in the right
> of way, which MSD replaced.   This occurred  on January 5, 2004.   We have
> never had any problem at this address before acording to MSD data base.
> The Rosewood did not allow ETC to come in until Feb 24, to review.   The
> Rosewood's have filed a claim for $31,000 dollars in damages to thier
> basement from water.   Mr. Rosewood states he had 6 ft of sewer water.
> Where could all this water come from is my question.
>
> The item he is request damage for is 2500 for his bathroom and the
> balance for computer items that are over ten years old.  He said he
> used them in his business.  He is requesting 20 for key boards that I found on ebay for
> .99.     After going onto ebay and finding items on his list, not ours, I
> came up with 3000+.   I requested receipts but he said they were damaged
> in flood in a file cabinet that the cleaning people took.   ETC group has
> no pictures or a cabinet on their list of removed items.  The only
> cabinet is the bathroom cabinet, and Mr. Rosewood kept the top.
>
> But, my question is "Where did 6 ft of water come from in his basement?"
>
```



## Chris Sandman

**From:** Chris Sandman
**Sent:** Tuesday, September 07, 2004 1:55 PM
**To:** 'Boulmetis, Anita'
**Subject:** Rosewood

Anita,

Dennis wanted me to respond to the email you sent him, copied below. I spoke with the CSR's about the cabinet; they said there was no such cabinet in the basement. According to Anita Rosewood and documented on our incident report, a copy of which I faxed to you this morning, the water was 8 to 12 inches deep. She went on to say, according to the report, the highest flood level ever recorded was this amount. **Also, the cleaners only cut out the bottom 3 feet of drywall, which is clearly indicated in Follow-up Picture 15. If the contamination was 6 feet, they would have removed above six feet.**

Also, Dennis wanted to make sure you knew that the certified letter we sent was signed for, by Mr. Rosewood, on 3/6.

If I can be of further assistance, please let me know.


Sincerely,


Chris

> -----Original Message-----
> From:    Boulmetis, Anita
> Sent:    Tuesday, September 07, 2004 11:37 AM
> To: Wyler, Deborah; McAdams, Ernest; Madden, Christopher
> Subject: Mr. and Mrs. Rosewood - 1929 Fairmount Avenue
>
>
> Mr. and Mrs. Rosewood had a break down of their house lateral in the right
> of way, which MSD replaced.  This occurred  on January 5, 2004.  We have
> never had any problem at this address before acording to MSD data base.
> The Rosewood did not allow ETC to come in until Feb 24, to review.  The
> Rosewood's have filed a claim for $31,000 dollars in damages to thier
> basement from water.  Mr. Rosewood states he had 6 ft of sewer water.
> Where could all this water come from is my question.
>
> The item he is request damage for is 2500 for his bathroom and the
> balance for computer items that are over ten years old.  He said he
> used them in his business.  He is requesting 20 for key boards that I found on ebay for
> .99.    After going onto ebay and finding items on his list, not ours, I
> came up with 3000+.  I requested receipts but he said they were damaged
> in flood in a file cabinet that the cleaning people took.  ETC group has
> no pictures or a cabinet on their list of removed items.  The only
> cabinet is the bathroom cabinet, and Mr. Rosewood kept the top.
>
> But, my question is "Where did 6 ft of water come from in his basement?"

9/7/2004

## Chris Sandman

**From:** Boulmetis, Anita [Anita.Boulmetis@cincinnati-oh.gov]
**Sent:** Wednesday, September 08, 2004 1:01 PM
**To:** Chris Sandman
**Subject:** RE: Rosewood

yep, that is exactly how he got water in his basement. I had an answer. thanks.

>   -----Original Message-----
>   **From:** Chris Sandman [mailto:Chris.Sandman@etc-online.com]
>   **Sent:** Wednesday, September 08, 2004 11:13 AM
>   **To:** Boulmetis, Anita
>   **Subject:** RE: Rosewood
>
>   It could be that his roof and outside drains are connected to his lateral. Considering the three days of constant rain we had in January, from which this flood was caused, I can believe an 8 to 12 inch backup, mostly consisting of rain water and some house sewage.

**From:** Boulmetis, Anita [mailto:Anita.Boulmetis@cincinnati-oh.gov]
**Sent:** Wednesday, September 08, 2004 8:01 AM
**To:** Chris Sandman
**Cc:** Madden, Dennis
**Subject:** RE: Rosewood

Was the dry wall in the bathroom? From the MSD Complaints, this is the only complaint for this property and the problem was in their lateral. A breakdown in the lateral in the right of way. The bathroom items is not a problem, it is his computer items. He, Mr. Rosewood states he had a business in his basement repairing computers. But, the items on his list are dated. He has a company sending me information. This man wants under 3,000 for property damage and 29,000. for his computers and ten suits, 200 each. I went on ebay and found he had about 3900 in computer items. I wait for his company to send in receipts and try to match what was on his list. If he had eight to twelve inches, where did the sewer backup come from if the blockage was in his lateral and not from surcharging of the main line? This is the question that haunts me! Where did the sewerage come from?

>   -----Original Message-----
>   **From:** Chris Sandman [mailto:Chris.Sandman@etc-online.com]
>   **Sent:** Tuesday, September 07, 2004 2:55 PM
>   **To:** Boulmetis, Anita
>   **Subject:** Rosewood
>
>   Anita,
>
>   Dennis wanted me to respond to the email you sent him, copied below.  I
>   spoke with the CSR's about the cabinet; they said there was no such
>   cabinet in the basement.  According to Anita Rosewood and documented on
>   our incident report, a copy of which I faxed to you this morning, the
>   water was 8 to 12 inches deep.  She went on to say, according to the
>   report, the highest flood level ever recorded was this amount.  **Also, the
>   cleaners only cut out the bottom 3 feet of drywall, which is clearly
>   indicated in Follow-up Picture 15.  If the contamination was 6 feet, they
>   would have removed above six feet.**
>
>   Also, Dennis wanted to make sure you knew that the certified letter we
>   sent was signed for, by Mr. Rosewood, on 3/6.

9/9/2004

Page 2 of 2

If I can be of further assistance, please let me know.

Sincerely,

Chris

```
>    -----Original Message-----
> From:    Boulmetis, Anita
> Sent:    Tuesday, September 07, 2004 11:37 AM
> To: Wyler, Deborah; McAdams, Ernest; Madden, Christopher
> Subject:   Mr. and Mrs. Rosewood - 1929 Fairmount Avenue
>
>
> Mr. and Mrs. Rosewood had a break down of their house lateral in the
right
> of way, which MSD replaced.   This occurred  on January 5, 2004.   We
have
> never had any problem at this address before acording to MSD data base.
> The Rosewood did not allow ETC to come in until Feb 24, to review.
The
> Rosewood's have filed a claim for $31,000 dollars in damages to thier
> basement from water.  Mr. Rosewood states he had 6 ft of sewer water.
> Where could all this water come from is my question.
>
> The item he is request damage for is 2500 for his bathroom and the
> balance for computer items that are over ten years old.  He said he
> used them in his business.  He is requesting 20 for key boards that I
found on ebay for
> .99.     After going onto ebay and finding items on his list, not ours,
I
> came up with 3000+.   I requested receipts but he said they were
damaged
> in flood in a file cabinet that the cleaning people took.   ETC group
has
> no pictures or a cabinet on their list of removed items.  The only
> cabinet is the bathroom cabinet, and Mr. Rosewood kept the top.
>
> But, my question is "Where did 6 ft of water come from in his
basement?"
```

9/9/2004

[Cite as *Bibbs v. Cinergy Corp.*, 2002-Ohio-1851.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO



OHIO FIRST DISTRICT COURT OF APPEALS

| | | |
|---|---|---|
| THOMAS BIBBS, | : | APPEAL NO. C-010390 |
| and | | TRIAL NO. A-003170 |
| GWENDOLYN BIBBS, | : | *D E C I S I O N.* |
| Plaintiffs-Appellants, | : | |
| THOMAS BIBBS, JR., by and through | : | |
| his next friend, GWENDOLYN BIBBS, | : | |
| and | | |
| DONALD ANTEN, | : | |
| Plaintiffs, | : | |
| vs. | | |
| CINERGY CORPORATION[1] | : | |
| and | | |
| CITY OF CINCINNATI, | : | |
| METROPOLITAN SEWER DISTRICT, | : | |
| Defendants-Appellees, | | |
| and | : | |
| CINCINNATI BELL TELEPHONE, | | |
| Defendant. | : | |
| | : | |

---

[1] The party's name appears here as it does on the pleadings, although its correct name is Cinergy Corp., not Cinergy Corporation. The entity, incorporated in Delaware, is the holding company of The Cincinnati Gas & Electric Company.

## OHIO FIRST DISTRICT COURT OF APPEALS

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: April 12, 2002

*Forg & Forg* and *John H. Forg III,* for Appellants,

*Jill T. O'Shea*, for Appellee Cinergy Corp.,

*Fay D. Dupuis,* Cincinnati City Solicitor, and *Frank H. Prouty, Jr.,* Assistant City Solicitor, for Appellee City of Cincinnati, Metropolitan Sewer District.

Please Note:  We have *sua sponte* removed this case from the accelerated calendar.

OHIO FIRST DISTRICT COURT OF APPEALS

**PAINTER, Presiding Judge.**

{¶1} The home of appellants Thomas and Gwendolyn Bibbs was damaged when raw sewage backed up through the plumbing on the first and second floors and flooded the first floor and basement. The home became contaminated with mold, mildew, and bacteria, resulting in Gwendolyn and her son being diagnosed with severe asthma and allergies. The Bibbses vacated the house.

{¶2} The Bibbses sued appellees Cinergy Corp. ("Cinergy"), Cincinnati Bell Telephone Company ("Cincinnati Bell"), and Cincinnati Metropolitan Sewer District ("MSD"). They alleged that Cinergy and/or Cincinnati Bell had installed a line of telephone poles in the front of their residence so that a pole had blocked a portion of the sewer line. After a thunderstorm in June of 1988, earth loosened and oozed through the break in the sewer created by the misplaced telephone pole, causing the sewer line to block and raw sewage to back up into their home. The Bibbses alleged that Cinergy had a duty to place the pole in a position that would not impede the flow of sewage, and that it had breached that duty. They alleged that MSD had a duty to inspect, operate, and maintain the sewer, and that it had breached that duty, and that it had also appropriated their home for public use without adequate compensation. The Bibbses settled with Cincinnati Bell.

{¶3} Cinergy and MSD moved for summary judgment. Cinergy argued that Cincinnati Bell installed the pole, had the responsibility regarding its location, and was responsible for any consequent damages caused by the placement. According to Cinergy, The Cincinnati Gas & Electric Company ("CG&E") had installed electric utility lines on the

4

**OHIO FIRST DISTRICT COURT OF APPEALS**

telephone poles located on the Bibbses' street in 1925 and had updated the lines in 1972. CG&E had not moved the poles during these projects.

{¶4} The Bibbses moved to strike the affidavits of Mary Crowe, CG&E's records custodian, and George Scherer, CG&E's engineering supervisor, filed by Cinergy in support of its motion, contending that the affidavits offered improper opinion evidence and were not based on personal knowledge. The Bibbses also moved for summary judgment on the issue of the liability of Cinergy, Cincinnati Bell, and MSD. The trial court granted Cinergy's and MSD's summary-judgment motions and denied the Bibbses' motion to strike the affidavits and their summary-judgment motion.

{¶5} The Bibbses appeal the entry of summary judgment against them, contending that the trial court erred in (1) denying their motion to strike the affidavits of Crowe and Scherer because their testimony was not based on personal knowledge, (2) granting summary judgment for Cinergy, (3) granting summary judgment for MSD, and (4) denying their summary-judgment motion.

{¶6} In their motion to strike, the Bibbses argued that the affidavits of Crowe and Scherer constituted opinion evidence that did not comply with Civ.R. 56(E) and Evid.R. 701 and 702, because neither affiant had firsthand knowledge of the subject matter and because neither affidavit would assist the trier of fact. The Bibbses stated that the business records of CG&E would probably determine the issue of whether Cinergy had a duty to them, but that the affidavits failed to supply the business records. (Crowe's initial affidavit and Scherer's affidavit referred to attached documents, but no documents were attached. Crowe's supplemental affidavit remedied the problem by attaching the documents to which she had referred. Scherer never filed a supplementary affidavit rectifying his omission.)

OHIO FIRST DISTRICT COURT OF APPEALS

{¶7} We have reviewed Crowe's affidavits, including the attached documents, and Scherer's affidavit. It is obvious that Crowe's affidavits contain factual statements based on her personal knowledge and that the attached documents on which she relied were admissible as business records under Evid.R. 803(6).

{¶8} The mere fact that Crowe and Scherer relied on business records to garner their facts does not mean that the facts were not based on personal knowledge. Further, it was not an abuse of discretion for the trial court to consider the attached documents.[2] A document is properly admitted under Evid.R. 803(6) if the records custodian shows that it was (1) made at or near the time, by, or from information by, a person with knowledge, (2) kept in the course of a regularly conducted business activity, and (3) reflected the regular practice of the business entity to make the document. Crowe's affidavit provided a sufficient foundation to admit the documents.

{¶9} Because Scherer did not provide the documents on which he relied for the facts to which he attested, we question the reliability of his affidavit. We believe that the trial court erred by not striking his affidavit. But because the facts in his affidavit were cumulative of the facts provided by Crowe's affidavit on the issue of Cinergy's lack of responsibility for the pole, we conclude that the error was not prejudicial. We overrule the Bibbses' first assignment.

{¶10} The Bibbses' remaining assignments challenge the trial court's grant of summary judgment in favor of Cinergy and MSD. This court reviews a grant of summary judgment *de novo*.[3] Summary judgment was proper for Cinergy and MSD if (1)

---

[2] Accord *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 587 N.E.2d 290.
[3] See *Doe v. Schaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, 1245.

## OHIO FIRST DISTRICT COURT OF APPEALS

there was no genuine issue of material fact; (2) Cinergy and MSD were entitled to judgment as a matter of law; and (3) after construing the evidence most favorably for the Bibbses, reasonable minds could have only reached a conclusion adverse to them.[4] If Cinergy and MSD, as the moving parties, met their burden of demonstrating that there was no genuine issue of material fact concerning an essential element of the Bibbses' case,[5] the Bibbses had to come forward with specific facts demonstrating a genuine issue of material fact.[6]

{¶11} The Bibbses alleged negligence against Cinergy and MSD. To prove negligence, the Bibbses had to demonstrate that Cinergy and MSD owed them a duty, that Cinergy and MSD breached that duty, and that the Bibbses suffered damages proximately resulting from that breach.[7]

{¶12} In their second assignment, the Bibbses contend that the trial court erred by granting summary judgment for Cinergy based on the trial court's admission of the affidavits. We have concluded that the admission of Crowe's affidavit was proper and that the improper admission of Scherer's affidavit was not prejudicial. The Bibbses' claim against Cinergy was premised on the misplacement of the pole that crushed the lateral sewer line. Cinergy provided evidence that the pole that had cracked the lateral sewer was not installed, owned, or moved by Cinergy. The Bibbses offered no evidence to dispute these facts. Thus, because we conclude that the trial court properly granted Cinergy summary judgment on the Bibbses' claim, we overrule their second assignment.

---

[4] See Civ.R. 56; *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201, 204.
[5] See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264, 273.
[6] See *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099.
[7] See *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707, 710; *Kaczor v. Bellaire* (July 13, 1998), Belmont App. No. 96 BA 60, unreported.

{¶13} The Bibbses contend in their third assignment that the trial court erred in granting summary judgment for MSD. The Bibbses argued below that MSD was liable for negligently maintaining the lateral sewer line. The trial court, in part, determined that MSD was immune from liability. That portion of its analysis was incorrect.

{¶14} First, we conclude that MSD is a political subdivision as defined under R.C. 2744.01(F). It admitted in its answer that it was a division of the city of Cincinnati, and it pleaded governmental immunity and limited damages under R.C. Chapter 2744. Further, this issue was implicitly determined in *H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist.*[8]

{¶15} R.C. 2744.02(A)(1) provides immunity to a political subdivision in a civil action for injury and property damage allegedly caused by an act or omission by that political subdivision or its employees in connection with a governmental or proprietary function. Exceptions to that immunity are found in R.C. 2744.02(B). That section provides, in part, that political subdivisions are liable for injury or loss to persons or property caused by the negligent performance of acts by their employees in connection with governmental or proprietary functions. Under R.C. 2744.01(G)(2)(d), the maintenance of a sewer system constitutes a proprietary function. These provisions clearly remove the shield of immunity from MSD. Immunity is re-established, however, if one of the defenses or immunities listed in R.C. 2744.03 is applicable. (MSD does not assert the applicability of R.C. 2744.03, nor do we think any of the enumerated defenses apply.)

---

[8] See *H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist.* (1997), 118 Ohio App.3d 792, 694 N.E.2d 111. Accord *Nice v. Marysville* (1992), 82 Ohio App.3d 109, 611 N.E.2d 468; *Best v. Findlay* (Dec. 5, 1997), Hancock App. No. 5-97-22, unreported; *Kendle v. Summit Cty.* (Apr. 15, 1992), Summit App. No. 15268, unreported.

OHIO FIRST DISTRICT COURT OF APPEALS

{¶16} It is uncontested that the broken sewer line was a lateral or building line running under the Bibbses' property to provide services to them. Thus, we must determine whether summary judgment was proper on the Bibbses' negligence claim against MSD for failure to maintain the lateral sewer. We also note that if we determine that MSD was responsible for the sewage backup, the Bibbses' claim that the sewage backup constituted an unlawful taking is not properly before us. "It is well-settled in Ohio that a property owner's remedy for an alleged 'taking' of private property by a public authority is to bring a mandamus action to compel the authority to institute appropriation proceedings."[9]

{¶17} The Bibbses presented evidence that a previous owner or resident of their home had experienced a problem with a sewer line in 1991 and that MSD had had four feet of the main line replaced due to a cracked pipe. In his deposition, John Turck, a plumber, testified on behalf of the Bibbses that there was a break in the "lateral coming from the house" in the right-of-way, ten feet from the main sewer. MSD checked the main line and found no blockage, but found that a pole had been placed through the six-inch building or lateral sewer line, diminishing its flow capacity. An MSD crew replaced nineteen feet of the building or lateral sewer line and three feet of the main line sewer.

{¶18} We conclude that the Bibbses failed to demonstrate that MSD owed them a duty to maintain a lateral sewer line. First, it is undisputed that the defect occurred in the lateral line, on the right-of-way, and not in the main sewer line. Section 1207 of the rules and regulations of MSD states, in part,

{¶19} The owner of the premises served by a sewer shall be responsible for the maintenance and cleaning of the building sewer line from

---

[9] See *State ex rel. Livingston Apts. v. Columbus* (1998), 130 Ohio App.3d 730, 739-740, 721 N.E.2d 135, 142, quoting *Consol. Rail Corp. v. Gahanna* (May 16, 1996), Franklin App. No. 95APE12-1578, unreported (see cases cited therein).

**OHIO FIRST DISTRICT COURT OF APPEALS**

the building to the point of connection with the public local sewer and for the maintenance, operation, cleaning, repair, and reconstruction of the building sewer from the building to the property line or point of connection in a public easement. Repair and reconstruction of the building sewer in a public right-of-way shall be the responsibility of the Department.

{¶20} This only makes sense because it is the main sewer line that is owned and used for the public and in the public domain. The pole was placed on the lateral line. The break occurred in the lateral line, ten feet from the main line. The main line was unobstructed. It was the lateral line that was obstructed and causing the backup. MSD repaired the lateral line. The Bibbses have failed to demonstrate that MSD was responsible for maintaining the lateral line or that the damage was not in the lateral line.

{¶21} The Bibbses argue that, because Section 1207 of MSD's rules and regulations makes MSD responsible for repair and reconstruction of a lateral sewer in a public right-of-way, MSD is also responsible for maintenance of the lateral line. We disagree. A "repair" requires someone to fix something that is broken. If the rule had been intended to impose liability on MSD for maintenance, it would have specifically stated so, as it did for the property owner. We also take judicial notice of Cincinnati Municipal Code 719-29, which makes a property owner responsible for the maintenance and good condition of any lateral sewer branch except under limited circumstances not demonstrated here.

{¶22} Further, Ohio common law holds that, where a sewer structure is on private property, a political subdivision is not obligated to maintain it unless the property has been used for public purposes.[10] "If the line is not used for public purposes but is for purely

---

[10] See *Fatobene v. Warren* (May 3, 1996), Trumbull App. No. 95-T-5269, unreported.

10

private use, * * * a city is not obligated to maintain it. Since the homeowner benefits from the tie-in with the main sewer line, even though the city may participate in the original tap-in, the homeowner is responsible for subsequent maintenance of that private service line called a lateral. This is true even where the actual repair to the lateral takes place on city property."[11]

{¶23} Because the Bibbses have failed to demonstrate that the lateral line was used for public purposes or that the line causing the problem was not the lateral line, we conclude as a matter of law that MSD owed no duty to the Bibbses. Because the trial court properly granted summary judgment for MSD, we overrule the Bibbses' third assignment.

{¶24} Because the trial court properly granted Cinergy and MSD summary judgment, it properly denied the Bibbses' motion for summary judgment on the issue of liability. The Bibbses' fourth assignment is overruled.

{¶25} Accordingly, we affirm the trial court's entry of summary judgment in favor of Cinergy and MSD.

*Judgment affirmed.*

HILDEBRANDT and SUNDERMANN, JJ., concur.

*Please Note:*

The court has recorded its own entry on the date of the release of this Decision.

---

[11] See *Kaczor v. Bellaire, supra*; *Fatobene v. Warren, supra*.