*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0426p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

THE SIERRA CLUB and MARILYN WALL,
                              *Plaintiffs-Appellees,*

     *v.*

HAMILTON COUNTY BOARD OF COUNTY
COMMISSIONERS and CITY OF CINCINNATI,
                              *Defendants-Appellants.*

No. 05-4437

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00107—S. Arthur Spiegel, District Judge.

Argued: September 15, 2006

Decided and Filed: October 18, 2007

Before: MARTIN and DAUGHTREY, Circuit Judges; REEVES, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Andrew S. Tulumello, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. D. David Altman, D. DAVID ALTMAN CO., LPA, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Andrew S. Tulumello, Michael K. Murphy, Peter P. Murphy, Amir C. Tayrani, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. D. David Altman, Amy M. Hartford, Amy J. Leonard, D. DAVID ALTMAN CO., LPA, Cincinnati, Ohio, Albert J. Slap, LAW OFFICE OF ALBERT J. SLAP, Aspen, Colorado, for Appellees.

     DAUGHTREY, J., delivered the opinion of the court, in which MARTIN, J., joined. REEVES, D. J. (pp. 11-21), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

     MARTHA CRAIG DAUGHTREY, Circuit Judge. The Hamilton County Board of County Commissioners and the City of Cincinnati (collectively, the County) appeal the district court's award of attorneys' fees to the Sierra Club and individual plaintiff Marilyn Wall (collectively, the Sierra

---

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Club) in this Clean Water Act case. The district court determined that the Sierra Club was entitled to recover litigation costs both on the basis of the "catalyst theory" and because the plaintiff was a "prevailing or substantially prevailing party" under section 1365 of the Act, 33 U.S.C. § 1365(d). The County argues that the catalyst theory of recovery was debunked by the Supreme Court in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), that the Sierra Club cannot be considered a prevailing party under existing case precedent, and that – even if the Sierra Club is entitled to attorneys' fees in this case – the amount awarded by the district court cannot be sustained on the record. We conclude that the district court did not err in determining that the Sierra Club was entitled to recover attorneys' fees as a "prevailing or substantially prevailing party" in this case, but we also find it necessary to remand the case for a particularized determination of the amount of that award.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Despite the legal nature of the dispute in this case, the run-up to its resolution turns out to be fairly fact-intensive and finds its genesis in the intricacies of Cincinnati's aging sewer system. Generally speaking, there are two principal types of sewer systems: a sanitary sewer system carrying only waste products and a combined sewer system, which carries both sanitary waste and storm water runoff. Cincinnati began efforts in the 1930's to separate its combined sewer system, which dated back to the 1860's, in order to avoid the commingling of sanitary waste and storm water. Although the separate sanitary sewer system was designed to handle only sanitary waste, many foundation drains and other drainage systems were constructed to flow into the sanitary sewer system, leading to an overtaxed sewer system and frequent basement flooding. In response to capacity-related overflows, which caused wastewater to back up onto streets and into homes, the County created sanitary sewer overflows (SSOs) along local tributaries as planned escape points when the sewer system was operating beyond capacity.

The result was the construction of approximately 100 overflows, designed to release excess waste into rivers and other waterways when the system was overtaxed. Eventually, the municipality-created SSOs were discharging hundreds of millions of gallons of sewage, at a rate of approximately 75 million gallons a year. Combined sewer systems also incorporated planned overflows, and because these combined sewer systems carried both sanitary waste and storm water, they were more prone to rain-induced overflows and resulted in some six billion gallons in overflows annually.

In 1972, Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251-1387, with the goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve this goal, the Act prohibits discharge of pollutants, including raw sewage overflows, into waters, *see* 33 U.S.C. § 1311(a), unless authorized by a National Pollutant Discharge Elimination System permit. *See* 33 U.S.C. § 1342. Sanitary system overflows are a violation of the Act and have been since 1972.

There are multiple parties responsible for enforcement of the Act, including the states, the federal government, and private citizens. Although the primary responsibility for enforcement rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations. *See* 33 U.S.C. § 1365(a). Because citizen suits were "meant to supplement rather than to supplant governmental action," *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987), citizen suits must fulfill several procedural prerequisites.

The Act provides that a citizen may not commence an action under § 1365 "prior to sixty days after the plaintiff has given notice of the alleged violation." 33 U.S.C. § 1365(b)(1)(A). Under

the relevant regulation, the notice must "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a). The 60-day notice provides federal and state governments with the time to initiate their own enforcement actions. If either the state or federal government is diligently prosecuting the Clean Water Act violation, a citizen suit for that same violation may not proceed. Nevertheless, a citizen may still play a role in a governmental enforcement action under § 1365(b)(1)(B), which provides that "in any such action in a court of the United States any citizen may intervene as a matter of right."

In response to at least two decades of sewage discharge into area rivers and tributaries, as well as concerns over what the Sierra Club described as ten years of non-enforcement, the Sierra Club provided a citizen suit notice to the required parties in a letter dated December 18, 2001. The notice states:

> On a monthly basis for at least the past 5 years to the present, the sanitary sewer conveyance systems owned and operated by the Metropolitan Sewer District, the City of Cincinnati and/or Hamilton county have and continue to overflow into the Mill Creek and the Little Miami River (both navigable waters of the United States) from specific openings in the sewer systems. These openings are known as Sanitary Sewer Overflows or SSOs. Such raw sewage overflows are a direct violation of [the] federal Clean Water Act, a threat to public health and safety and cause injury in fact to the recreational and aesthetic interests of the Sierra Club Miami Group, its members, and Marilyn Wall, individually.

> The MSD is required to keep records of the date, location and duration of each unpermitted sanitary sewer overflow. MSD is also required to provide that information to the Ohio Environment Protection Agency (OEPA). The specific information of each and every SSO on the Mill Creek and Little Miami River is in the possession of the MSD, so it is on actual notice of each activity that constitutes violation of the Clean Water Act, the location of the violations, and the dates and the duration of the violations. Each monthly report from MSD to OEPA on sanitary sewer overflows dating back five-years from the date of this notice letter is specifically incorporated by reference, herein. This notice letter, however, is not limited by the MSD's written reports to OEPA. It is also meant to include any additional SSOs to the Little Miami River and/or the Mill Creek of which MSD has actual notice, but were not reported to OEPA, as required. It is the intent of the Club and Marilyn Wall to enforce and seek elimination of all SSOs into the Mill Creek and the Little Miami River, regardless of whether said SSO was properly recorded and notice of it sent to the Ohio EPA/

The record indicates that the Sierra Club's action in this regard was spurred by the fact that the County and the Ohio Environmental Protection Agency had been engaged in negotiations concerning implementation of an order issued by the OEPA in 1992, compelling the County to remedy its illegal SSOs. In the intervening ten years, Hamilton County and the City of Cincinnati had spent more than $174 million to eliminate a total of 63 SSOs. Nevertheless, additional SSOs remained, and violations continued despite the order and the County's and City's efforts.

During the 60 days following the filing of its citizen suit notice on December 18, 2001, the Sierra Club communicated with government officials at the federal, state, and local levels. On February 11, 2002, the County provided the Sierra Club and the general public with a proposed

"interim partial consent decree on sanitary sewer overflows." Following the release of the proposed consent decree, the public had only two days to review the document before the Hamilton County Commissioners voted to approve the decree. According to an excerpt of a transcript of the February 13 meeting, the participants discussed whether approving the proposed consent decree would eliminate the possibility of the Sierra Club's lawsuit proceeding.[1] The proposed consent decree required the county and city to complete remedial projects on 16 of their 17 most active SSOs; to design and construct a chemical treatment facility to treat discharges from SSO number 700 – the SSO with the highest volume of discharges – as well as implement a permanent solution for SSO number 700 by the year 2022; and to develop a plan for remedying the remaining SSOs. The decree also included stipulated penalties for violation of its requirements.

On February 15, 2002, the United States filed suit against the Board of County Commissioners of Hamilton County, the City of Cincinnati, and the State of Ohio. On the same day, the State of Ohio filed an action against the Board of County Commissioners of Hamilton County and the City of Cincinnati. In addition, the United States, the State of Ohio, the Board of County Commissioners of Hamilton County, and the City of Cincinnati jointly filed the proposed consent decree with the court.

Despite the state and federal enforcement action, on February 27, 2002, the Sierra Club and Marilyn Wall, the Chair of the Ohio Chapter of the Sierra Club, filed a citizens' suit complaint under the Clean Water Act against the Board of County Commissioners of Hamilton County, the City of Cincinnati, and the Metropolitan Sewer District of Greater Cincinnati.[2] In its complaint, the Sierra Club alleged that "[t]he Defendants have failed to eliminate the SSOs and have failed to even furnish a fixed date compliance schedule for their elimination. These failures were exacerbated by the failure of the state and/or federal government to diligently prosecute these on-going violations during the ten-year period from 1992-2002."

On March 4, 2002, the court consolidated the actions initiated by the State of Ohio and the United States and, six weeks later, consolidated that action with the Sierra Club's citizen suit. On May 24, 2002, the Sierra Club filed a complaint-in-intervention seeking to intervene in the state and federal segments of the litigation. In this second complaint, the Sierra Club detailed what it considered to be the inadequacies of the proposed consent decree and requested the entry of an order to eliminate all the remaining SSOs, rather than just the 16 SSOs addressed in the proposed settlement, including water in basement/sewage in basement or "WIB/SIB-type" SSOs.[3] The court granted the motion to intervene, conferring upon the Sierra Club plaintiff status in the consolidated litigation.

On August 20, 2002, the federal government moved to enter the proposed consent decree. The Sierra Club opposed the motion, citing the lack of an adequate public comment period and evidence that the motive for the proposal was simply to block the Sierra Club's citizen suit, rather

---

[1] One Board member observed, "[W]hat is driving this expeditious action on the topic today and what has been negotiated between counsel is the threat of a suit being filed by the Sierra Club that may ripen early next week . . . . So, in my mind, the public comment period is a farce with respect to our responsibility as a government entity."

[2] The Metropolitan Sewer District of Greater Cincinnati (often referred to as "MSD") is the entity through which the City of Cincinnati and Hamilton County manage the sewer system.

[3] In the final consent decree, "Water-in-Basement" or WIB is defined as "any release of wastewater from Defendants' Sewer System to buildings that (i) is not the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by Defendants; and (ii) is not the result of overland, surface flooding not emanating from Defendants' Sewer System."

than permanently address the Clean Water Act violations. The Sierra Club then sought and was granted discovery to investigate the adequacy of the proposal. The court stayed a motion to dismiss submitted by the County, in which it argued that the proposed consent decree amounted to "diligent prosecution" under the Act and should therefore be deemed as a bar to the citizen suit.

On November 6, 2002, despite its earlier contentions that the proposed consent decree was the result of ten years of negotiations among the government parties and that it could adequately remedy existing violations, the federal government and the State of Ohio withdrew their motion for entry of the consent decree. The district court issued an order on December 3, 2002, noting the governments' withdrawal of the motion for entry. In that order, the court mandated that the parties "keep [the Sierra Club] apprised of their settlement negotiations so that the parties will have the benefit of [the Sierra Club's] views."

The Sierra Club participated in this second stage of negotiations, providing its views in writings and in meetings with the parties. On July 22, 2003, the Sierra Club submitted comments to the governmental plaintiffs on the first draft of a proposed "global decree." These comments included suggestions on how to deal with victims of sewage-in-basement violations. At a status conference, the Sierra Club informed the district court of the magnitude of the SIB/WIB-type SSOs and the inadequacy of the County's response to the problem.

Following the conference, the district court, obviously frustrated by the delays in the settlement efforts, issued an order requiring that a draft of the Consent Decree be filed with the district court by October 7, 2003. Failure to meet that deadline, the order indicated, would result in a bench trial in December 2003. Further, the district court ordered that a copy of the final proposal be provided to the Sierra Club for review and comment.

The government parties filed a revised consent decree on October 7, 2003, barely in time to meet the court's deadline. This draft required the County to remedy the combined sewer overflows and to address water-in-basement events by cleaning up such occurrences, to compensate customers for damages incurred as a result of the violations, and to install devices in residential basements to prevent further water-in-basement events. In response, the Sierra Club filed objections, contending that the revised decree lacked firm deadlines, that its soft deadlines were too far in the future, and that it failed to require a special master, which the Sierra Club argued was necessary to oversee implementation.

At an ensuing hearing on May 25, 2004, designed to determine whether the proposed final decree and the incorporated interim decree were fair and adequate, an attorney for the federal government represented to the district court that:

> Together, these decrees provide a comprehensive program to bring the defendants' sanitary sewer overflows, combined sewer overflows and waste water treatment plan violations into full compliance with the law at an expected cost to taxpayers of over a billion dollars.

> The decrees require defendants to develop comprehensive compliance plans that must be completed by no later than 2022 and must be completed as expeditiously as practicable.

The Sierra Club expressed its concern that the deadlines in the proposal could be extended without consequence through "openers" – provisions in the proposal that would allow the defendants to extend deadlines under certain circumstances by claiming that timely completion was not "practicable" – rendering the consent decree ineffective. The district court pressed the parties to

confirm on the record that any potential for the extension of the dates would not be used inappropriately and that the consent decree would be read to ensure that the County would comply with the deadlines and would be subject to the stipulated penalties if it failed to do so.

Two weeks later, on June 9, 2004, the district court issued its final order, finding "the consent decrees to be fair, adequate, and in compliance with the Clean Water Act." In doing so, the court addressed the Sierra Club's concerns, rejecting their request for appointment of settlement master but finding "the appointment of an ombudsman entirely appropriate," which mechanism, the court said, "should provide the public with an advocate who can ensure that the WIB program is working, investigate complaints, and keep the Court informed of the status of such program."

The court also addressed the Sierra Club's concerns about two "opener" provisions that enabled the County to avoid deadlines set up in the consent decree. The district court made it clear that the "openers" could go into effect only under narrow circumstances. Additionally, the court ensured the Sierra Club's continuing involvement in the implementation process by requiring that the County's quarterly reports to the federal government also be provided to the Sierra Club:

> The United States commits to provide all documents that it receives to the Sierra Club so that the Intervenors can monitor efforts to enforce the decrees. In addition, the United States indicates it has invited Ms. Marilyn Wall, a representative of the Sierra Club, to serve as a member of the LTCPU [Long Term Control Plan Update] steering committee, which will provide oversight and guidance to Defendants as they develop the LTCPU.

In urging the appointment of a Settlement Master, the Sierra Club had drawn the court's attention to releases that MSD had earlier demanded from WIB victims in exchange for assistance with the water in their basements. Though the MSD had since redrafted its releases, the Sierra Club argued that a Settlement Master was needed to ensure that such abuses did not recur. The court held that releases signed by SIB/WIB victims before the plan revisions were unenforceable and added that it "appreciate[d] the involvement of Sierra Club as intervenor and recognize[d] that the releases prepared by the Cincinnati Solicitor's Office were highly improper." However, the court did not consider the risk of future abuses significant enough to require appointment of a settlement master.

Following entry of the revised decree, the Sierra Club moved to recover over $1.1 million in attorneys' fees under the Act's citizen suit provision, which states that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). The district court subsequently granted the motion, finding that the Sierra Club was entitled to fees on the basis of alternative grounds.

First, the court found that the Sierra Club should recover litigation costs because it served as a "catalyst" for developments in the litigation, detailing why *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), would not preclude application of the catalyst theory under the Clean Water Act. In the alternative, the court held that the Sierra Club was a prevailing party or substantially prevailing party for purposes of § 1365(d). The court did not award the full amount requested, however, saying:

> The Court has reviewed carefully the lodestar figures of those requesting fees and reimbursement of costs. It finds their requests generally reasonable. The Court does find, however, some duplicative and unreasonable charges. As such, the Court awards the following amounts. To Albert J. Slap, Esq. the Court awards $491,867.27 in fees and costs. To D. David Altman Co. LPA the Court awards $315,246.50 in

fees and costs. To the Sierra Club the Court awards $151,631.19. The total amount of fees and costs awarded to the various Plaintiffs is: $958,744.96.

The County now appeals the district court's order awarding attorneys' fees.

## *DISCUSSION*

Because the Clean Water Act leaves the award of attorneys' fees and costs to the discretion of the district court, *see* 33 U.S.C. § 1365(d), we review such an award for abuse of discretion. *Cf. Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 799 (6th Cir. 1996). The district court's ruling should be affirmed unless it "is based on an erroneous view of the law or on a clearly erroneous assessment of the record." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). In addition, "in the context of attorneys' fees provided by statute, we review a district court's determination of prevailing party status under the clear error standard." *Knulogy, Inc. v. Insight Comm'ns Co.*, 460 F.3d 722, 726 (6th Cir. 2006) (citation omitted). We find no abuse of discretion in this case, nor any demonstration of clear error on the part of the district court.

As the County correctly notes on appeal, under the common law, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Consequently, the courts have held that statutes awarding fees to the prevailing party in federal court are to be narrowly construed. *See, e.g., United States v. Texas*, 507 U.S. 529, 534 (1993). The County is also correct in noting that the primary responsibility for enforcing the Clean Water Act rests with the federal and state governments and that if the primary actors are diligently prosecuting violations of the Act, there is no need to provide incentives for private citizen action. Nevertheless, we conclude in this case that the award of fees under § 1365(d) was appropriate.

Section 1365(d) of the Clean Water Act provides that "in issuing any final order in any action brought pursuant to this section, [a court] may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). Relying on parallels between the Clean Air Act and the Clean Water Act, the County cites to cases from this circuit in which an intervenor was denied attorneys' fees because a citizen suit had not been "brought pursuant to subsection (a)" of the Clean Air Act's citizen suit provision. *United States v. Nat'l Steel Corp.*, 782 F.2d 62, 64 (6th Cir. 1986). Significantly, however, the Sierra Club's action here *was* filed under the citizen suit provision of section 1365. Moreover, even though that suit was subsequently consolidated with the federal and state enforcement actions, the order of consolidation did not destroy the legal basis on which the Sierra Club was originally authorized to bring suit. Indeed, the Sierra Club did not merely intervene in the government's actions; instead, its section 1365 citizen suit was *consolidated* with those other actions by order of the district court. Thus, to the extent that the Sierra Club was a "prevailing or substantially prevailing party," it was entitled to attorneys' fees under section 1365(d).[4]

Nor, contrary to the dissent's assertion, was the Sierra Club's now-consolidated complaint a mere duplicate of the governments' complaints. Rather, it was filed based on allegations that the government plaintiffs had "fail[ed] . . . to diligently prosecute the[] on-going violations during the ten-year period from 1992-2002" and now proposed to consent to a settlement that was inadequate

---

[4] By contrast, *United States v. Maine Department of Transportation*, 980 F. Supp. 546 (D.Me. 1997), on which the dissent relies to argue that attorneys' fees are not appropriate in this matter, involved a plaintiff who merely intervened in a governmental civil enforcement action but never filed a citizen suit, as require by section 1365.

to remedy the failures of the previous decade.  As the district court noted in response to the County's allegation that the court was without jurisdiction to award fees to the Sierra Club:

> [D]iligent prosecution is "normally determined as of the time of the filing of a complaint."  Accordingly, a diligent prosecution bar at the end of the litigation is of no consequence.  Additionally, as noted already, the Court views the Sierra Club, as an intervenor.  Thus, the Sierra Club is a party to this case able to litigate fully on the merits . . . .  The Court's jurisdiction is not barred as Sierra Club has a right to intervene pursuant to the applicable statute, it did intervene, and this Court granted that intervention viewing Sierra Club as equivalent to a party in this case.

Having determined that the Sierra Club was a party to the action, the district court was next faced with deciding whether it was a prevailing party or substantially prevailing party under the statute.  The court held that it was, invoking as alternative grounds application of the so-called catalyst theory and a straight-forward interpretation of the language of § 1365(c), as applied to the facts of this case.  Because we conclude that the district court's determination on the latter basis can be sustained, we pretermit discussion of the catalyst theory, which, as the County points out, has been called into question by the Supreme Court's opinion in *Buckhannon*.  *See* 532 U.S. 598; *see also Ailor v. City of Maynardville*, 368 F.3d 587, 601 n.6 (6th Cir. 2004) ("It is an open question whether the catalyst theory remains viable in the context of environmental statutes like the CWA that limit attorneys' fees to a prevailing party or substantially prevailing party.") (emphasis omitted) (citing Marisa L. Ugalde, *The Future of Environmental Citizen Suits after Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 8 Envtl. L. 589 (2002)).  *See generally* Lucia A Silecchia, *The Catalyst Calamity: Post Buckhannon Fee-Shifting in Environmental Litigation and a Proposal for Congressional Action*, 29 Colum. J. Envtl. L. 1, 34-59 (2004) (examining future of catalyst theory); Jason Douglas Klein, *Attorney's Fees and the Clean Water Act after Buckhannon*, 9 Hastings W.-Nw. J. Envtl. L. & Pol'y 109 (2003) (concluding that *Buckhannon* should have no impact on awards under the Clean Water Act).

The County argues, however, that a proper reading of *Buckhannon* not only undermines the application of the Sierra Club's catalyst argument but also precludes a finding that it was a prevailing party under any analysis.  Under *Buckhannon*, a plaintiff must obtain court-ordered or court-sanctioned relief in order to be considered a prevailing party.  *See* 532 U.S. at 600, 603. Despite the Sierra Club's forceful and persistent advocacy throughout the negotiation of the final consent decree, the County argues that it cannot be considered a prevailing party because it was not a party to that decree.  We conclude that this argument borders on the absurd.  The Sierra Club may not have been a signatory to the final consent decree in this case, but it is abundantly clear on the record that without the Sierra Club's active intervention in the litigation, the less-than-adequate interim consent decree would not have been withdrawn and a fully adequate consent decree would not have been entered in its place.  Likewise, the imprint of the Sierra Club's involvement is obvious from the district court's decision to appoint an ombudsman, to whom the citizens of Hamilton County may carry their complaints in the future.

In finding that the Sierra Club was entitled to an award of litigation costs, the district court observed:

> The Court witnessed first-hand these efforts of the Sierra Club.  After reviewing the above, it is hard to conclude that the Sierra Club is anything but a prevailing or substantially prevailing party.  The Sierra Club began this litigation as its own independent complainant.  Subsequently, the Court consolidated the Sierra Club's own action with the Government's litigation and granted the Sierra Club status as intervenor in this instant action.  The Sierra Club extensively participated in the

discovery and development of the final consent decree, despite its not being a signatory to said decree. Its participation resulted in changes and additions (which were improvements) beyond the terms contained in the [interim decree]. Without the efforts of the Sierra Club, the affected citizens of Hamilton County would not have benefitted as substantially from this litigation as they did.

As the district court also noted, although the Sierra Club was not a party to the consent decree, as an intervening party in the underlying litigation, "it can inform the Court of unenforced violations of the Consent Decree and request that the Court enforce the terms of the decrees and this Court's Order."

The County also argues that because the Sierra Club's notice letter identified specific SSOs, to the exclusion of others and to the exclusion of any WIB violations, it cannot claim attorney fees for any claims not included in the notice. The district court comprehensively addressed this argument, concluding that the Sierra Club's notice was sufficient:

> First, Sierra Club, as an intervenor, assumed the same position as the primary litigants in this matter and are dealt with by this Court as if they are the primary litigants and are not restricted to the specificity of their notice. Furthermore, the Code of Federal Regulations states "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated" is adequate. 40 C.F.R. § 135.3(a) (emphasis added). The Court holds that the Sierra Club's notice did contain sufficient information to allow Defendants to identify all pertinent aspects of its SSO, WIB, and CSO violations without extensive investigation. Lastly, as required by *Comfort Lake [Association v. Dresel Contracting, Inc.*, 138 F.3d 351 (8th Cir. 1998)], the Court views the WIB, SSO, and CSO violations as "closely related" and, thus, the notice was sufficient.

The County's remaining challenge to the Sierra Club's notice, concerning the adequacy of the contact information for the Sierra Club's counsel, was not raised below and is therefore not properly before us for review. *See, e.g.*, *Barner v. Pilkington N. Am.*, 399 F.2d 745, 749 (6th Cir. 2005).

As for the argument that the Sierra Club cannot be considered a prevailing party because none of its objections to the final decree were successful, the district court found that those objections were only a small part of the Sierra Club's efforts throughout the course of the litigation and observed:

> The [proposed interim decree] and the Complaint in this matter were filed at the same time. The Court found the [proposed interim decree] illusory in that there were no fixed dates or enforceable rights establishing who would provide relief to those affected. Plaintiffs and Defendants (i.e., those involved in the case not including the Sierra Club) claimed they had been negotiating for approximately ten years about SSOs, CSOs, and other problems. However, despite ten years of negotiations nothing concrete was accomplished to help those being injured. It was not until the Sierra Club filed its own complaint and ultimately intervened in this matter that positive solutions began to emerge.

The record before us fully supports the district court's conclusion that, without the Sierra Club's efforts, the more comprehensive consent decree would not have come to fruition. For example, the Sierra Club argued that the language of the final consent decree could be manipulated improperly to justify extensions of the deadlines set forth within the document. The court observed that as a result of the objections, the "Sierra Club achieved representations from the government"

that this language "would not be used to unduly delay the implementation of the decree deadlines." And, as the court added, "Not only were these representations made by the government but they were incorporated into an enforceable order of the Court." The district court also emphasized the Sierra Club's success in ensuring that the SIB/WIB plan was included in the final consent decree. Despite the County's contention on appeal that those provisions are beyond the reach of the Act and, therefore, cannot provide a basis for a fee award, the federal government had conceded that the sewer overflows, the deficiencies at wastewater treatment plants, and backups in people's basements were interrelated problems. Those people affected obviously have the Sierra Club to thank for any relevant improvements in their sewer service. Moreover, the court need not trace the relief achieved back to a discrete claim in the litigation, so long as the claim "involve[d] a common core of facts or . . . related legal theories." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

Finally, as to the amount of the award, the County contends that if the recovery is affirmed, it should be radically reduced because the Sierra Club enjoyed only a *de minimis* level of success. We conclude to the contrary, but we do find that the case must be remanded in light of the district court's order summarily reducing the requested fees without specifying what "duplicative and unreasonable charges" were excluded from the award. As noted in *U.S. Structures, Inc. v. J.P. Structures, Inc.*, "'[the] district court should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why.' Failure to provide such an explanation requires us to remand the case for further consideration." 130 F.3d 1185, 1193 (6th Cir. 1997) (quoting *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1176 (6th Cir.1990)).

### CONCLUSION

For the reasons set out above, we AFFIRM the district court's decision to award litigation costs to the Sierra Club but REMAND the case for clarification as to the amount of the award.

---

**DISSENT**

---

REEVES, District Judge.  The majority upholds the district court's award of attorney's fees to Sierra Club under 33 U.S.C. § 1365(d).  However, because I believe that § 1365(d) does not authorize such an award, and because Sierra Club is neither a prevailing nor a substantially prevailing party, I must respectfully dissent.  Further, while the majority found it unnecessary to address whether the catalyst theory remains a viable theory of recovery under the Clean Water Act, I believe this issue must be addressed because it was an alternative basis for the district court's decision.  And as discussed below, analysis of relevant authorities leads me to conclude that this is no longer a viable theory for recovery of attorney's fees.  Accordingly, I would reverse the decision of the district court.

## I.    THE CLEAN WATER ACT

The Clean Water Act (the "CWA" or "Act") provides a comprehensive scheme for regulation of water pollution from point sources.  The statute allows government agencies to bring administrative enforcement or judicial actions seeking injunctive relief and/or monetary penalties.  33 U.S.C. § 1319 (a)(3), (b), (g).  The Act also allows citizen suits in limited circumstances.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (holding that jurisdiction is established "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation").

There are other limitations applicable to citizen suits which are relevant here.  In any citizen suit, notice of the precise alleged violation must be given at least sixty days before any action is filed.  33 U.S.C. § 1365(b)(1)(A); *see also Ailor v. City of Maynardville*, 368 F.3d 587, 591 (6th Cir. 2004).  In fact, failure to provide notice requires dismissal for lack of jurisdiction.  *Hallstrom v. Tillamook County*, 493 U.S. 20 (1989).[1]  In *Hallstrom*, the Supreme Court pointed out that requiring citizens to provide specific notice of the alleged violations serves two purposes:

> First, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits . . .  Second, notice gives the alleged violator an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.

*Id*. at 29 (internal citations omitted).

As a general rule, citizens may not sue if either the EPA or the relevant state agency has commenced and is diligently prosecuting a civil or criminal action in court to compel compliance with a relevant standard.  Under § 1319(g)(6), administrative enforcement also will preclude a citizen suit for penalties with respect to violations for which governmental agencies have either commenced and are diligently prosecuting or have issued a final order not subject to further judicial review and the alleged violator has paid a penalty.  33 U.S.C. § 1319(g)(6).  Section 1319(g) gives citizens broad rights of participation in administrative enforcement actions, notwithstanding the fact that they may not be deemed "parties" in the proceedings.  At least two circuits have expressed reluctance to second-guess environmental agencies in such circumstances with respect to "diligent

---

[1]Dismissal for failure to give sixty days notice is without prejudice to the action being reinstituted if notice is properly given.  *Hallstrom*, 493 U.S. at 32-33.

prosecution." *North & South Rivers Watershed Ass'n, Inc. v. Scituate*, 949 F.2d 552, 557 (1st Cir. 1991); *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320 (7th Cir. 1992).

Finally, in addition to injunctive relief and monetary penalties, private party plaintiffs may seek an award of attorney fees and costs if they "substantially prevail" in the litigation.

## II.    RELEVANT FACTS[2]

As noted by the majority, the City of Cincinnati's waste removal system constitutes the backdrop for this appeal.  In 1992, the Director of the Ohio Environmental Protection Agency ("OEPA") formulated a SSO elimination plan.  This plan required Hamilton County, the City of Cincinnati, and the Metropolitan Sewer District (an entity operated by the County and City)[3] to control the sewer system, to prepare a plan for elimination of "all unpermitted discharge of sewage, industrial waste and other wastes to the waters of the state from identified overflow point in MSD's separate sanitary sewage system" within nine months.  On June 21, 1993, the Defendants submitted their "General Compliance Plan to Eliminate Sanitary Sewer Overflows."  However, in subsequent years, they continued to report illegal overflow locations.

In 1999, the OEPA joined with the United States EPA ("EPA") to negotiate a comprehensive solution associated with the Defendants' SSOs, CSOs, and various water treatment plants.  Over the next two years, the parties met frequently to discuss the proper solution to the issues raised by the OEPA and EPA.  The parties agreed to divide the negotiations into two phases to address: (1) SSOs and (2) CSOs and issues related to MSD's wastewater treatment plants.

On December 18, 2001, Sierra Club sent a sixty-day notice letter to the Defendants.  The letter pertained exclusively to SSOs, specifically alleging that the Defendants were violating the CWA because their "sanitary sewer conveyance systems . . . have and continue to overflow into the Mill Creek and Little Miami River (both navigable waters of the United States) from specific openings in the sewer system."  Sierra Club indicated it was providing notice of SSOs included in "[e]ach monthly report from MSD to OEPA . . . dating back five-years from the date of th[e] notice letter."  In addition, Sierra Club stated that it was providing notice of "any additional SSOs to the Little Miami River and/or the Mill Creek of which MSD has actual notice."

On February 15, 2002, before the sixty-day notice period elapsed, the federal and state governments filed an enforcement action against the Defendants.  The federal and state action alleged that the Defendants' wastewater discharge constituted a violation of the CWA and Ohio environmental laws.  On that same day, the parties filed a Interim Partial Consent Decree ("IPCD") in the United States' enforcement action relating to implementation of remedial measures to address the SSOs.  The parties also made the decree available for a thirty-day public comment period.[4]

Two weeks later, on February 27, 2002, Sierra Club filed a citizen suit against the Defendants, alleging that the OEPA and EPA were not diligently prosecuting the Defendants'

---

[2]I agree with the majority that, "despite the legal nature of the dispute in this case, the run-up to its resolution turns out to be fairly fact-intensive."  However, because I disagree with the majority's resolution of this case, recitation of additional facts is necessary to explain my view of the case.

[3]Collectively, "the Defendants."

[4]The fact that the parties finalized their negotiations during the sixty-day notice period does not support Sierra Club's argument that the action did not constitute "diligent prosecution."  And absent such a finding, the subsequent citizens' suit was premature without further violations and a related notice.

violations because the IPCD "fail[ed] to seek comprehensive or substantial relief." The district court opined that citizen suit filed by Sierra Club was more definite and comprehensive than the federal and state enforcement actions, inasmuch as the enforcement actions did not cover violations after the lawsuit was filed. Notably, however, both Sierra Club's complaint and the government complaint involved the Defendants' alleged SSO violations. The Defendants moved to dismiss Sierra Club's citizen suit for lack of subject matter jurisdiction, arguing that the federal and state entities were already diligently prosecuting the same CWA violations raised in the citizen suit. The district court never ruled on the motion. Instead, Sierra Club's citizen suit was consolidated with the federal and state actions and Sierra Club was permitted to intervene in the federal enforcement action.

While the litigation was pending, the Defendants continued to pursue the second phase of their negotiations with the federal and state environmental officials in an attempt to craft a second consent decree addressing the remaining issues, including CSOs and wastewater treatment plants. The consent decree on CSOs, Wastewater Treatment Plants, and Implementation of a Capacity Assurance Program Plan for Sanitary Sewer Overflows (the "CSO Decree") was filed with the district court on December 3, 2003. The United States, the State of Ohio, the County, the City, and the Ohio River Valley Water Sanitation Commission (an interstate agency responsible for preventing pollution of the Ohio River ) were signatories to the CSO Decree. Sierra Club, however, was not a party to either the CSO Decree or the IPCD Decree. Thus, *it did not obtain any enforceable rights as a result of the decree*.

The CSO Decree required that the Defendants remedy their CSOs as expeditiously as practicable and improve the performance of their wastewater treatment plants. It also required that the Defendants install devices in residential basements to prevent back-ups in customer basements (Water-in-Basement or "WIB events"), clean-up WIB events when they occur, and compensate customers for damages that they incur as a result of WIB events. In addition, through the CSO Decree, the Defendants agreed to pay $1.2 million in civil penalties for past CWA violations and implement at least $5.3 million in supplemental environmental projects in lieu of additional penalties.

By Order dated June 9, 2004, the district court granted the government plaintiffs' motion to enter the IPCD and CSO Decrees. The district court noted that the two decrees presented a comprehensive plan for remedying the Defendants' sewer-capacity issues and achieving full compliance with the CWA. Sierra Club opposed entry of the Decrees, alleging, in part, that the Decrees lacked firm deadlines and contained deadlines that were too distant. Sierra Club also moved the district court to appoint a special master to oversee the implementation of the Decrees. The district court rejected Sierra Club's objections noting, in particular, that it was unnecessary to appoint a special master to supervise implementation of the decrees. However, in accordance with the federal government's suggestion, the district court appointed an ombudsman to oversee implementation of the WIB program.

Following entry of the Decrees, Sierra Club moved to recover over $1.1 million in attorney's fees under the CWA's citizen suit provision. The district court granted the motion, resulting in the present appeal.

## III.    ANALYSIS

### A.  33 U.S.C. § 1365(d) Does Not Authorize An Award Of Fees To Sierra Club.

The district court awarded fees in this case pursuant to the citizen suit provision of the CWA, 33 U.S.C. § 1365(d). As an initial matter, the majority opinion fails to adequately address whether

§ 1365(d) authorizes an award of fees in this case.  Instead, the majority notes that the Sierra Club intervened in the government's action *and* filed a separate action pursuant to § 1365(d) which was later consolidated with the government's action.

It is unclear whether the majority upholds the award of fees to Sierra Club because it was a prevailing or substantially prevailing party in the citizen-suit or because it was a prevailing or substantially prevailing intervening party in the government enforcement action.  In either case, I do not believe that Sierra Club was entitled to fees under § 1365(d).  Sierra Club was not a prevailing or substantially prevailing party in its citizen suit or the consent decree and § 1365(d) does not authorize an award of fees to an intervening party in an enforcement action.

The majority concludes that "to the extent that the Sierra Club was a 'prevailing or substantially prevailing party,' it was entitled to attorneys' fees under section 1365(d)."  I disagree with this conclusion.  Section 1365(d) provides that:

> [t]he court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.

33 U.S.C. § 1365(d).  Based on a reading of the plain language of § 1365(d), a court is only authorized to award fees and costs in an action brought pursuant to the citizen suit provision of the CWA.

Additionally, while the majority notes that "the Sierra Club's action here was filed under the citizen suit provision of § 1365," the mere filing of citizen-initiated suit does not warrant an award of fees under § 1365(d).  Rather, a court may only award fees to prevailing or substantially prevailing parties in such actions.  And Sierra Club certainly was not a prevailing or substantially prevailing party *in its citizen suit*.  After filing the citizen suit, Sierra Club elected to consolidate it with the federal enforcement action and to cease prosecution of its claims.[5]  Sierra Club then

---

[5]Prior to filing its citizen suit, Sierra Club sent a sixty-day notice of intent to sue letter to the Defendants, alleging various violations of the CWA in connection with the sanitary sewer overflows.  *See* 33 U.S.C. § 1365(b)(1)(A) (requiring that prior to brining an action, private parties must notify the EPA, the State in which the alleged violation occurred, and the alleged violator).  Before the expiration of the sixty-day period, the United States and the State of Ohio filed enforcement actions against the Defendants.  Two weeks later, Sierra Club elected to initiate a citizen suit against the Defendants, claiming that the federal and state enforcement actions did not constitute diligent prosecution.

Notably, however, diligence provisions are interpreted liberally to accord government agencies great latitude and discretion in the methods of compelling compliance.  *See e.g., Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 478 (6th Cir. 2004) (citing *Citizens Legal Envtl. Action Network v. Premium Standard Farms*, No. 97-6073, 2000 WL 220464, at *12 (W.D. Mo. Feb. 23, 2000) (noting that prosecutions under the Clean Air Act are heavily presumed diligent).  The rationale for presuming diligence is grounded in the principle that the state and federal governments, not individuals citizens, are viewed as the primary enforcers of the CWA.  *See Gwaltney*, 484 U.S. at 60; *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004).

In the instant case, if Sierra Club actually believed that the government's actions were inadequate, it either would have continued to pursue its citizen suit or filed a complaint asserting its own claims against the Defendants once it intervened.  Instead, Sierra Club elected to consolidate its citizen suit with the federal enforcement action and to cease prosecution of its claims.

Under the circumstances presented here, permitting Sierra Club to recover attorney's fees under § 1365(d) solely for *aiding* in the government's enforcement efforts would eviscerate the bar on citizen suits when the government is diligently prosecuting an action.  *See Gwaltney*, 484 U.S. at 60 (noting that Congress intended citizen suits under 33 U.S.C. § 1365 to "supplement rather than to supplant governmental action" and that "citizen suits are proper only if the

intervened in the government enforcement action and did not seek or achieve *any* relief beyond that sought and achieved by the governmental entities. In fact, Sierra Club ceased prosecution of its *own* citizens' suit claims and proceeded exclusively as an intervenor in the enforcement action. Therefore, the district court lacked authority to award fees to Sierra Club inasmuch as it was not a prevailing or substantially prevailing party in its citizen suit.

I must also part company with the majority's conclusion that the district court had authority to award fees to Sierra Club because it was an prevailing or substantially prevailing intervening party in the government enforcement action. While the majority does not address whether the § 1365(d) authorizes an award of fees to an intervening party in an enforcement action, the district court relied primarily on the Eighth Circuit's decision in *EPA v. City of Green Forest*, 921 F.2d 1394 (8th Cir. 1990), in finding that a citizen group with intervenor status was entitled to an award of fees under § 1365(d). In *Green Forest*, the court held that the district court erred when it refused to allow a group of citizens to intervene in the EPA's enforcement action. The citizens argued that "the denial of the intervention motion robbed them of their right to seek attorney's fees" and that "their efforts were instrumental in spurring the EPA into finally taking action against the City." *Id.* at 1402. The court noted that these arguments had "some force" and agreed that the "citizens should be permitted to seek their fees." *Id.* As such, the court remanded the attorney's fees issue back to the district court "to determine the proper amount of such fees." *Id.*

*Green Forest* cannot bear the weight that the district court placed upon it. It does not stand for general proposition that § 1365(d) authorizes fees to citizen intervenors in federal enforcement actions. The court found that the citizen group was entitled to fees not simply because they were intervenors but because their "efforts were instrumental in spurring the EPA into . . . taking action." *Id.* In other words, based on the language of the opinion, the court believed that the citizens were a catalyst for the EPA's enforcement action. However, as discussed below, I believe the catalyst theory is no longer a viable theory of recovery for attorney's fees. Therefore, the holding in *Green Forest* is not, as the district court suggests, persuasive authority upon which this court should rely in concluding that § 1365(d) authorizes an award of fees to citizen-intervenors in enforcement actions.

In *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275 (1st Cir. 2000), the First Circuit acknowledged "[t]here exists a question currently undecided at the court of appeals level whether, in a case brought under the Clean Water Act, an intervenor, as distinguished from a plaintiff which has initiated its own suit, is entitled to counsel fees." *Id.* at 282. The court declined to address the issue, noting that the district court failed to provide an explanation for the denial of the fee award. The court stated that it would not decide the issue of whether an intervenor was entitled to fees under § 1365(d) unless it was the only obstacle to an award of fees. Ultimately, the case was remanded to the district court for the purpose of revisiting the attorney's fees issue.

The two district courts that have considered whether an intervenor in an enforcement action is entitled to fees under the CWA have reached different conclusions. In *United States v. Maine Department of Transportation*, 980 F. Supp. 546 (D. Me. 1997), the court held that Sierra Club was not entitled to attorney's fees under § 1365(d) where it intervened in a CWA enforcement action brought by the United States pursuant to 33 U.S.C. § 1319 instead of bringing a citizen suit action. In reaching this conclusion, the court noted that § 1365(d) unambiguously authorizes an award of fees only in an "action" under § 1365 and determined the filing of a sixty-day notice did not constitute the commencement of an "action." The court also rejected the argument that, because § 1365(b)(1)(B) authorizes citizen intervention into a § 1319 enforcement action, the intervention

---

Federal, State, and local agencies fail to exercise their enforcement responsibility.").

constitutes an "action" under § 1365. The court pointed out that such a claim was contrary to the plain language of § 1365, which prohibits citizen suits where the United States has commenced and is diligently prosecuting a civil or criminal action, thereby recognizing that a citizen suit is distinct from a § 1319 enforcement action.

In contrast, in *United States v. City of San Diego*, 18 F. Supp. 2d 1090 (S.D. Cal. 1998), the district court stated, with little discussion, that it could award attorney's fees to a prevailing intervenor. As justification, the court simply noted that at an earlier stage in the proceedings, it had found that the CWA authorized an award of fees to an intervenor when that inventor was a prevailing party.

While there exists an unresolved question regarding whether a intervening party in a CWA enforcement action is eligible for fees under § 1365(d), under the clear language of the statute the analysis in *Maine Department of Transportation, supra,* is better-reasoned than the *Green Forest* decision relied upon by the district court. Therefore, I disagree with the conclusion that § 1365(d) authorizes an award of fees to intervening parties in enforcement actions.

Because Sierra Club was not a prevailing or substantially prevailing party in its citizen suit and because § 1365(d) does not authorize an award of attorney's fees to intervening parties in enforcement actions, Sierra Club was not entitled to a fee award under § 1365(d). Inasmuch as the majority concludes that Sierra Club was entitled to a fee award – whether based on its status as a prevailing party in the citizen suit or its status as a prevailing intervening party in the enforcement action – I dissent from the opinion.

**B.      Sierra Club Is Neither A Prevailing Nor A Substantially Prevailing Party.**

Even if the district court had authority to award attorney's fees under § 1365(d), I would reverse the award because Sierra Club was not a prevailing or substantially prevailing party. A party prevails either by "obtain[ing] an enforceable judgment . . . or comparable relief through a consent decree or settlement . . . [that] directly benefit[s the plaintiff] at the time of the judgment or settlement." *Farrar v. Hobby,* 506 U.S. 103, 111 (1992) (internal citations omitted). In *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), the Supreme Court made clear that a party must "receive at least some relief on the merits of his claim before he can be said to prevail," such that the relief "material[ly] alter[s] [] the legal relationship of the parties." *Id.* at 604. Further, the change in the relationship must be "judicially sanctioned." *Id.* at 605. According to the Supreme Court's recent decision in *Sole v. Wyner*, 127 S. Ct. 2188 (2007), interpreting *Buckhannon*, "the term 'prevailing party'. . . does not 'include a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct.'" *Sole v. Wyner*, 127 S. Ct. 2188, 2195 n.3 (2007) (reversing an award of attorney's fees to a party who prevailed in a preliminary injunction, but ultimately lost on the merits of her claim).

Here, Sierra Club did not obtain *any* relief on the merits. The Defendants entered into Consent Decrees with the government Plaintiffs, agreeing to remedy the SSOs and CSOs and agreeing to address WIB events. However, Sierra Club was not a party to the Consent Decrees and did not obtain any judicially-enforceable relief or rights as a result of the decree. While the district court allowed Sierra Club to express its concerns and file objections to the proposed Consent

Decrees[6] prior to entry, it *declined to grant any of the relief* that Sierra Club sought, specifically denying its objections.[7]

The majority places great emphasis on the fact that the government Plaintiffs and the Defendants spent a great deal of time addressing issues raised by Sierra Club. However, such an argument can be made in *almost every* environmental case which require public notice and comment before a consent decree may be confirmed and entered.[8]  As noted above, the Supreme Court has expressly held that such a voluntary change in the relationship between the parties as a result of a lawsuit is insufficient to trigger a shift in the general rule that parties pay their own fees. *Buckhannon*, 532 U.S. at 605; *see also Sole*, 127 S. Ct. at 2195 n.3 . Although the majority opinion notes that Sierra Club, as an intervening party, was entitled to "inform the court of unenforced

---

[6]The majority states that "the imprint of the Sierra Club's involvement is obvious from the district court's decision to appoint an ombudsman." However, the district court rejected all of Sierra Club's objections to the proposed decrees. In fact, the district court even disagreed with Sierra Club that it was necessary to appoint a special master to supervise implementation of the decrees. It was actually the *federal government's suggestion* to appoint an ombudsman to oversee implementation of the WIB program.

[7]Sierra Club could have provided comments to the proposed Consent Decrees without being added as a party to the litigation, either as an intervenor or a citizens' suit plaintiff. Notice to the public and opportunity for public comment is required before a consent decree may be entered under the CWA. 33 U.S.C. § 1319(g).

[8]For example, the Northern District of Iowa recently addressed a case similar to the one currently before the Court and held that the intervening/consolidated citizen party was a prevailing party because, under *Buckhannon*, "a consent decree 'may serve as the basis for an award of attorney's fees.'" *Ne. Iowa Citizens for Clean Water v. Agriprocessors, Inc.,* 489 F. Supp. 2d 881, 892 (N.D. Iowa 2007) (citing *Buckhannon*, 532 U.S. at 604). However, like the majority in the present case, the court in *Agriprocessors* misconstrued the context of the Supreme Court's statement in *Buckhannon*. According to the Court in *Buckhannon*,

> [i]n addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. *See Maher v. Gagne*, 448 U.S. 122, 65 L. Ed. 2d 653, 100 S. Ct. 2570 (1980). Although a consent decree does not always include an admission of liability by the defendant, *see, e.g., id.* at 126, n. 8, it nonetheless is a court-ordered "change [in] the legal relationship between [the plaintiff] and the defendant." *Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 792, 103 L. Ed. 2d 866, 109 S. Ct. 1486 (1989) (citing *Hewitt, supra*, at 760-761, and *Rhodes v. Stewart*, 488 U.S. 1, 3-4, 102 L. Ed. 2d 1, 109 S. Ct. 202 (1988)(per curiam)). These decisions, taken together, establish that enforceable judgments on the merits and court-ordered consent decrees create the "material alteration of the legal relationship of the parties" necessary to permit an award of attorney's fees. 489 U.S. at 792-793; *see also Hanrahan, supra*, at 757 ("It seems clearly to have been the intent of Congress to permit . . . an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal" (emphasis added)).

*Buckhannon*, 532 U.S. at 604 (citations omitted) (alterations in original).

Clearly, the Supreme Court intended that a consent decree may serve as the basis for an award of attorney's fees only when it creates "the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* The Court explicitly cautioned that private settlements could not confer prevailing party status because "[a] defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* at 605.

In the present case, the Sierra Club was not a signatory to the consent decree and cannot show that there has been a court-ordered change in the legal relationship between it and the other parties to the lawsuit. Although the court in *Agriprocessors* found that a change in the legal relationship had occurred because the citizen party was foreclosed from bringing suit for the same violations under the doctrine of *res judicata*, this argument would apply to every citizen, regardless of whether they had been involved in the suit. Accordingly, it cannot be said that the citizen party achieved a result that "*materially* altere[ed] the legal relationship between the parties." *Sierra Club*, 351 F.3d at 845 (citing *Farrar*, 506 U.S. at 111-12) (emphasis added).

violations of the Consent Decree[s] and request that the court enforce the terms of the decrees and this Court's order," this entitlement had no effect on the Defendants' behavior toward Sierra Club. Moreover, Sierra Club did not receive an "enforceable judgment" and was not a party to the consent decrees. Without obtaining *any* relief to enforce, Sierra Club cannot be said to be a "prevailing or substantially prevailing party."

### C.    The Catalyst Theory Is Not A Viable Theory Of Recovery.

Finally, although not addressed by the majority, the Sierra Club was not entitled to a fee award under the catalyst theory. Prior to the Supreme Court's decision in *Buckhannon*, "prevailing parties" included parties who secured a judgment on the merits, parties who obtained a court-ordered settlement decree, and, in most circuits, parties who "achieve[d] the desired result because the lawsuit brought about a voluntary change in the defendant's conduct," pursuant to the "catalyst theory." *Buckhannon*, 532 U.S. at 601-02. In *Buckhannon*, the Supreme Court clearly rejected the "catalyst theory" that had been the case law in this and other circuits. *See Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824 (6th Cir. 2005) (citing *Chambers v. Ohio Dep't of Human Servs.*, 273 F.3d 690 (6th Cir. 2001)). In *Buckhannon*, the Plaintiff brought a preemption challenge to a state law but the action became moot after the state legislature repealed the allegedly preempted law. Even though the court did not rule on the merits of the action, the Plaintiff sought an award of attorney's fees, arguing that its suit was the catalyst for the repeal.

The Supreme Court began its analysis by observing that the term "prevailing party" is a legal term of art. *Buckhannon*, 532 U.S. at 603. Quoting from Black's Law Dictionary, the Court explained that "prevailing party" means "[a] party in whose favor a judgment is rendered." *Id.* (alternation in original). After surveying its own precedents involving "prevailing party" fee-shifting statutes, the Court observed that it had never approved an award of attorney fees without finding that a party had obtained some degree of *formal* success. As such, the Court concluded that a "prevailing party" is one who has been awarded some relief by the court. *Id.* at 604. In reaching this conclusion, the Court rejected the "catalyst theory" because it permits an award where there is no judicially-sanctioned change in the legal relationship of the parties. *Id.* at 605. Specifically, the Court noted that:

> A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties.

*Id.* at 605 (emphasis in original). The Court further explained that only "enforceable judgments on the merits and court-ordered consent decrees create the material alteration of the legal relationship of the parties necessary to permit an award of attorney's fees." *Id.* at 604 (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989) (internal quotation marks omitted).

In *Chambers v. Ohio Department of Human Services*, this court concluded that *Buckhannon* "invalidat[ed] the catalyst theory as a permissible basis for awarding attorneys fees." *Chambers*, 273 F.3d at 692. Discussing *Buckhannon*, the *Chambers* court noted that:

> [t]he Court concluded that to prevail, and thus become eligible for attorneys fees, a party must have obtained a *judicially sanctioned* change in the legal relationship of the parties. More specifically, the Court noted that an award of attorneys fees is appropriate where a plaintiff has obtained an enforceable judgment [] on the merits

or a court-ordered consent decree [], but not under the catalyst theory, which allows
an award where there is no judicially sanctioned change in the legal relationship of
the parties. Thus, the Court concluded that [a] defendant's voluntary change in
conduct, although perhaps accomplishing what the plaintiff sought to achieve by the
lawsuit, lacks the necessary judicial *imprimatur* on the change. Proceeding from this
analysis, the Court categorically rejected the catalyst theory as a permissible basis
for awarding attorney's fees.

*Id.* at 692-93 (internal quotation marks and citations omitted) (alteration in original).

The *Chambers* court acknowledged that, although *Buckhannon* involved an award of
attorney's fees under different statutes, *i.e.*, the Fair Housing Amendments Act ("FHAA") and
Americans with Disabilities Act ("ADA"), the Supreme Court's rejection of the catalyst theory was
not limited to those statutes. Specifically, this court pointed out that the Supreme Court has
expressly stated that "all statutes . . . that authorize attorney's fees to the prevailing party are to be
treated consistently." *Id.* at 693 n.1 (internal citations omitted).

In finding that the catalyst theory under the CWA survived the *Buckhannon* decision, the
district court stated that "[a]lthough *Buckhannon* might logically prevent the catalyst theory from
being used for 'prevailing parties' . . . its application to 'substantially prevailing parties' is not as
clear.'" However, a party that "substantially prevails" (or a "substantially prevailing party") under
the CWA is not necessarily different from a "prevailing party" as that term is construed in
*Buckhannon*.

Several circuit courts have expressly held that *Buckhannon's* holding applies with equal
force to statutes such as the CWA that include "prevailing or substantially prevailing" party
language.[9] For example, in *Sierra Club v. City of Little Rock*, 351 F.3d 840 (8th Cir. 2003), the
Eighth Circuit held that Sierra Club was not entitled to attorney's fees under the CWA where the
district court found the City of Little Rock to be in violation of the CWA but did not order any relief.
Relying upon *Buckhannon*, the court explained that Sierra Club was not a "prevailing or
substantially prevailing party" because "the judgment did not change the relationship between Sierra
Club and the City." *Id.* at 846. Also, in *Kasza v. Whitman*, 325 F.3d 1178 (9th Cir. 2003), the Ninth
Circuit addressed language in the Resource Conservation and Recovery Act of 1976 that allows for
an award of fees to a "prevailing or substantially prevailing party," 42 U.S.C. § 6972(e). The court
held that the plaintiff was not a "'prevailing party' (and thus could not be a *substantially* 'prevailing
party') because she did not gain by judgment or consent decree a material alteration of the legal
relationship of the parties." *Id.* at 1180.

Likewise, in *Oil, Chemical & Atomic Workers International Union, AFL-CIO v. Department
of Energy*, 288 F.3d 452 (D.C. Cir. 2002), the D.C. Circuit concluded that *Buckhannon's* rejection
of the catalyst theory is broad enough to preclude an award of attorney's fees under FOIA, which
makes fees available to a "substantially prevailing party." The court noted that it had "seen nothing
to suggest that Congress sought to draw any fine distinction" between the phrases "prevailing party"
and "substantially prevail." *Id.* at 455. The Second Circuit agreed in *Preservation Coalition of Erie
County v. Federal Transit Administration*, 356 F.3d 444 (2nd Cir. 2004), and determined that the

---

[9] In *Ailor v. City of Maynardville*, this court noted that the availability of the catalyst theory under the CWA
remains an "open question." *Ailor*, 368 F.3d at 601 n.6. This statement conflicts with two earlier decisions in which
it appears that this court recognized that *Buckhannon* foreclosed all reliance upon the catalyst theory. *See Chambers*,
273 F.3d at 693 (*Buckhannon* "categorically rejected the catalyst theory as a permissible basis for awarding attorney's
fees."); *Dubuc v. Green Oak Township*, 312 F.3d 736, 754 (6th Cir. 2002) (stating that "the catalyst theory has been
clearly rejected as a basis for awarding attorney's fees").

fee-shifting provision of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321-4370(d), which allows fee awards to a party who "substantially prevails" is fundamentally the same as those statutes containing the term "prevailing party" for purposes of determining whether a plaintiff can recover under a fee-shifting statute. Therefore, the Second Circuit concluded that *Buckhannon* applied. *Pres. Coal.*, 356 F.3d at 450 n.3.

In finding that the catalyst theory is a viable theory for recovery of attorney's fees under the CWA, the district court relied, in part, on the CWA's legislative history, referring in particular to a passage from a Senate Report which provides that the award of fees under the CWA:

> should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions.

S. Rep. No. 92-414, at 81 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3747(discussing § 505 of Public Law 92-500 regarding attorney's fee awards in citizen suits).

This passage, however, refers to the 1972 version of the statute, which did not include the "prevailing or substantially prevailing party" language at issue in *Buckhannon*. When it was originally enacted, the CWA authorized an award of fees "to any party, whenever the court determines such award is appropriate." Pub. L. No. 92-500, § 505(d), 86 Stat. 816, 888-89 (1972). In 1987, the statute was amended to add the phrase "prevailing or substantially prevailing," thereby codifying the requirement that parties must obtain some measure of success in order to recover attorney's fees. Pub. L. No. 100-4, § 505(c), 101 Stat. 7, 76 (1987).

In *Buckhannon*, the Supreme Court considered the legislative history of the ADA and the FHAA, but concluded "that [the] legislative history [of those two statutes] could [not] overcome what . . . is the rather clear meaning of prevailing party." *Buckhannon*, 532 U.S. at 607. In fact, even though the legislative history of § 1988 explicitly stated that the term "prevailing party" was not intended to be limited to those acquiring a judgment on the merits, the Court concluded that some form of judicially-sanctioned relief was required to support an award of fees. The Court held that the legislative history of the ADA and FHAA was "at best ambiguous as to the availability of the 'catalyst theory.'" *Id.* at 608.

The legislative history of the CWA is no more persuasive than that recounted in *Buckhannon*. In fact, as noted above, the legislative history cited by Sierra Club refers to a version of the statute which did not contain the prevailing party language. Moreover, there is also a lack of clear congressional intent to endorse the catalyst theory, inasmuch as the legislative history does *not* clearly and explicitly state that the catalyst theory is applicable in CWA actions.

For these reasons, *Buckhannon* precludes application of the catalyst theory under the CWA. The principles underlying *Buckhannon's* holding are broadly stated and are not statute-specific. Likewise, this court's previous holdings contain similar language which is not statute-specific. The *Buckhannon* Court used "prevailing party "as a legal term of art (meaning "a party in whose favor a judgment is rendered") to be interpreted consistently across fee-shifting statutes. *Buckhannon*, 532 U.S. at 603 (citing Black's Law Dictionary 1145 (7th ed.1999)). The Supreme Court also relied on the general baseline "American Rule" that each party pays its own fees.[10] *Id.* at 602. In light of the

---

[10]Under the "American Rule," a prevailing party is generally not entitled to recover attorney's fees in the absence of a statute which allows such an award. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975); *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308 (6th Cir. 1997).

plain language of the CWA, the "inconclusive" nature of the legislative history, and the relevant case law, Sierra Club was not entitled to attorney's fees because the catalyst theory is no longer a viable theory for recovering such fees.

Even if an intervenor (as distinguished from a plaintiff which has initiated its own suit) is entitled to fees under § 1365(d), Sierra Club is not entitled to an award of fees under the facts presented here. The government agencies were diligently exercising their enforcement responsibilities through separate actions and there was no need for citizen enforcement. Moreover, as intervenors, Sierra Club did not pursue its own members' claims but, at most, "assisted" the governments' efforts.

In addition, Sierra Club is not a "prevailing or substantially prevailing party" under the standard set forth in *Buckhannon*. Regarding this issue, it is undisputed that Sierra Club did not obtain a court-ordered change in its legal relationship with the Defendants, inasmuch as Sierra Club was not a party to the consent decrees and failed to secure an enforceable judgment on the merits of either its citizen suit or the government's enforcement action in which it intervened.

Simply put, this court should follow its earlier decisions and conclude that the Supreme Court has rejected the catalyst theory as a method of seeking recovery of attorney's fees. Analysis of the meaning of the term "prevailing or substantially prevailing party," the legislative history of the CWA, and the Supreme Court's decision in *Buckhannon* demonstrate that district court clearly erred in finding that the catalyst theory was a permissible basis for an award of attorney's fees to Sierra Club.

In summary, for the reasons discussed above, I would reverse district court's award of attorney's fees to Sierra Club in all respects.