UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>Plaintiffs<br><br>vs<br><br>BOARD OF HAMILTON COUNTY<br>COMMISSIONERS, et al.,<br>Defendants | Case No. 1:02-cv-107<br>Spiegel, J.<br>Litkovitz, M.J.<br><br><br>**ORDER RE: REQUEST**<br>**FOR REVIEW BY**<br>**ROBERT L. WELLS, SR.** |

This matter is before the Court on the Request for Review of the denial of a Sewer Back Up ("SBU") claim by Robert L. Wells, Sr. (Docs. 521, 533). Mr. Wells seeks compensatory damages from the Metropolitan Sewer District of Greater Cincinnati ("MSD") for sewer backup into his basement on April 22, 2011.

Mr. Wells' request for review is filed under the Sewer Back Up[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Plan is intended to "compensate customers who experience WIB for real or personal property losses or expenses. Such losses may include, *inter alia*, building restoration costs, and loss of furniture and/or property stored in the flooded areas." (Doc. 131 at 47). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating

---

[1] The "Water-In-Basement" program has been renamed the "Sewer Back Up" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

> from MSD's Sewer Systems or caused by blockages in occupants' own lateral sewer lines.

(Doc. 131, Consent Decree, Exhibit 8 at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Exhibit 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id.*

Mr. Wells is the owner of the property located at 705 Elm Court, Cincinnati, Ohio. On April 22, 2011, raw sewage backed up into Mr. Wells' basement. There is no dispute that the backup of sewage into the basement of Mr. Wells' property was "the result of inadequate capacity of the MSD sewer system." (Doc. 530 at 1). The issues in this case involve: (1) the amount of compensation Mr. Wells may receive for personal property in the basement that was damaged by the backup; (2) whether Mr. Wells may be compensated for damage to the laminate flooring on the first floor of the house; and (3) whether Mr. Wells may be compensated for structural damage to the house.

In response to the SBU at 705 Elm Court, MSD investigated whether a capital improvement project scheduled to occur in the nearby vicinity would remedy the backup problems. Ultimately, MSD determined that the replacement of sewer lines in connection with the project would not correct the issues at Mr. Wells' property. Nevertheless, following further investigation by MSD and an additional reported sewage backup to the property in September

2

2011, it was determined that the property at 705 Elm Court qualified for a prevention device[2] under the Consent Decree's Prevention Program Plan.[3]

In June 2011, Mr. Wells made a claim to MSD for sewer backup damages to his property. He sought $13,898.00 in personal property damages, $375.00 for a field study he purchased at his own expense to determine the cause of structural damage to his house, and $11,500.00 to remediate the structural damage to the house (less $5,000.00 received in insurance proceeds). (Doc. 521, attachment). As an alternative, Mr. Wells proposed that MSD purchase his property for $54,246.50 in view of the amount of personal and real property damages sustained, the cost of a prevention device, and the opportunity for MSD to gain access to the Mill Creek interceptor for purposes of the capital improvement project via his property.

MSD declined to purchase Mr. Wells' property and instead offered to settle his claim for the $500.00 insurance deductible expended by Mr. Wells. Mr. Wells rejected MSD's offer and withdrew his initial offer to sell his property to MSD. On October 12, 2011, Mr. Wells filed a request for review with this Court.

Mr. Wells presents evidence of the following damages:

- Cost of site visit, investigation, and written report by Art J. Hunkele, Professional Engineer, New Millennium Building Engineers, LLC, on the structural damage to the house located on Mr. Wells' property: $375.00

- Cost to repair structural damage by Dwyer in accordance with the recommendations set forth in Mr. Hunkele's report: $11,500.00

---

[2]The cost of the prevention device is approximately $25,000.00 and the prevention device would be installed at no cost to the homeowner.

[3]As of the date of the hearing on Mr. Wells' claim by the undersigned Magistrate Judge, it appears that the prevention device option was still being explored and considered by Mr. Wells and MSD. Neither the capital improvement project nor the prevention device is at issue in the instant appeal.

3

- 374 square feet (13 cartons) of carpet tiles (new): $2,235.44

- Cost of removal of existing laminate flooring and shoe mold in the living room, bedroom, kitchen, hallway, and closet; and installation of new laminate flooring and shoe mold: $7,843.25

- Replacement of water heater by Feichtner Bros. Plumbing Co.: $841.00

- GE Dryer (7 cycle heavy duty): $599.00

- Kenmore Washer: $599.00

- Washer supply lines: $10.00

- Dryer electric cord: $23.00

- Florescent light fixture: $64.00

- Florescent bulbs (2): $4.00

- Sink cabinet: $922.00

MSD disputes the damages claimed by Mr. Wells and asserts that Mr. Wells is entitled to the depreciated value of the items, not the replacement value under the claims process. As a result, MSD values the damages as follows:

- Washer and dryer (vintage character): $500.00

- Basement carpet flooring: $1,500.00[4]

- Sink cabinet: $500.00

- Water heater: $500.00

- MSD denies it is responsible for any other damages claimed by Mr. Wells.

---

[4] The Court infers that MSD values the basement carpet flooring at $1,500.00 based on the following calculation: the $3,000.00 estimated personal property total, less the amounts calculated by MSD for the washer, dryer, sink cabinet, and water heater, which total $1,500.00. (Doc. 530 at 2, ¶ 6).

4

## RESOLUTION

Damages for SBU claims are determined based on the market value of personal property as of the date of loss and not on the original purchase price or cost of replacement. After careful review, the Court awards damages for the loss of personal property as follows.

### I. Basement items

- 374 square feet (13 cartons) of carpet tiles: $2,235.44[5]

- Water heater: $500.00

- GE Dryer (7 cycle heavy duty): $300.00

- Kenmore Washer: $300.00

- Washer supply lines: $10.00

- Dryer electric cord: $23.00

- Florescent light fixture: $64.00

- Florescent bulbs (2): $4.00

- Sink cabinet: $500.00

- Total: $3,936.44

### II. Laminate Flooring

MSD disputes Mr. Wells' claim for damages for the first floor laminate flooring, asserting that MSD "was not given the opportunity to inspect" the flooring allegedly removed after MSD cleaned the basement. (Doc. 530 at 2, ¶ 7). MSD claims that it is unable to determine if there were other causes for the damage to the first floor laminate, such as the natural

---

[5]The carpet was virtually new at the time it was damaged by the SBU (*see* Doc. 521, Insurance Home Inventory showing purchase date of 2/28/11).

5

occurrence of humidity in the Cincinnati area. *Id.*

Mr. Wells has presented a report from Mr. Robert McIntosh, President of McIntosh Hardwood Floors and General Construction, Inc., stating that the laminate flooring throughout the property at 705 Elm Court had noticeable cupping at the end joints and sides and raising of the floor which occurred in a "consecutive time period." Mr. McIntosh opined that the damage to the flooring resulted from excessive moisture content in a very short period of time. Mr. McIntosh also stated that the only way to correct the problem is to replace the existing laminate flooring.

At the hearing, Mr. Wells testified that the laminate flooring is still in the house and, contrary to MSD's representation, has not been removed. Mr. Wells stated that MSD has never requested to inspect the flooring and that MSD in fact has photos of the flooring which were taken in September 2011. In addition to the report from McIntosh Hardwood Floors, Mr. Wells submitted an inspection report from Kronotex, the manufacturer of the laminate flooring. A Kronotex representative performed an inspection in October 2011 and concluded that the swelling and warping problems with the laminate flooring were caused by the moisture from below due to the recent sewer backups. (Doc. 533, attachment).

MSD had notice as early as June 2011 that Mr. Wells was making a claim for damages to the laminate flooring and has had ample opportunity to inspect and investigate the cause of the damage to the laminate flooring. In the absence of any evidence to the contrary, the Court finds by a preponderance of the evidence that the damage to the laminate flooring was caused by moisture from the basement flooding and that Mr. Wells is entitled to compensation for the laminate flooring. As the laminate flooring was virtually new at the time it was damaged by the

6

SBU (*see* Doc. 521, Insurance Home Inventory), Mr. Wells is awarded the full value claimed of $7,843.25.

## III. Structural Repairs

MSD also disputes Mr. Wells' claim for structural repairs to his home. MSD denies it is responsible for the claimed structural damages and repairs, arguing that any leaking of sewage into the soil under the building slab necessarily came from a defective or ruptured private lateral pipe, which is the responsibility of the homeowner and not MSD. MSD argues that any sewage leakage into the soil came from a broken lateral line because flooded basement water naturally recedes through the lateral pipe. If the lateral line was broken, Mr. Wells is responsible for any resulting damage to the structural foundation of his house from the leakage of the lateral pipe.

MSD also asserts there is no soil sampling to determine whether or not the soil in the area caused the shifting of the house. MSD argues that without soil samples, the moisture content of the soil is unknown and therefore MSD cannot confirm that a backup of sewage onto the property caused the structural issues. MSD contends that "[b]oth the level of groundwater at the site, and the soil's potential to cause shifting could be determined by a soil sample." (Doc. 530 at 3). Tom Fronk, an Engineering Technical Supervisor with MSD's Special Investigations Division, testified that the sinkhole under the property could have been caused by groundwater erosion and that a bore sample of the soil would be needed to determine the water and moisture content of the soil.

Mr. Wells testified that he had numerous backups in his basement prior to the April 22, 2011 incident, but was not aware of the MSD SBU program during the previous backups. Mr. Wells presents a letter from a City of Reading, Ohio Water Department plumber who states he

has "[p]articipated numerous times in pumping out [the] residence @ 705 Elm St. after and during a rain storm. Each time the water was observed coming up from the floor drain as we were pumping it out. The rains must fill the sanitary sewer main line to Full Capacity for the water to come in through your floor drain." (Doc. 521, Scarpinski Letter dated June 29, 2011).

Mr. Wells has also presented a report from Art J. Hunkele, P.E., New Millennium Building Engineers, LLC. Mr. Hunkele reported that the settling of the front porch and distortion to the adjoining foundation walls was caused by the sewer flooding:

> In the absence of any evidence of site disturbance or suggestion that the porch structure was built on substandard bearing material (i.e. fill) I can only conclude that the sewer flooding events and subsequent receding of water has eroded the southeast bearing. As the flood waters recede, they often find sub surface fissures which facilitate the water exodus and provide a path for sub grade soil erosion. In my opinion, this has led to the undermining of the slab and foundation causing the settlement and the 'hollow' under the slab.

(Doc. 521, attachment). This report was submitted to MSD by Mr. Wells with his June 2011 claims request.

The burden of proof is on the claimant seeking review of the denial of an SBU claim. Mr. Wells has presented evidence that the cause of the structural damage to his house was the backup of sewage resulting from the incapacity of the main sewer line. Mr. Wells' evidence consists of an expert report from a professional engineer who investigated the cause of the structural damage in May 2011. MSD has not presented evidence contradicting Mr. Hunkele's report showing that "sewer flooding events and subsequent receding of water has eroded the southeast bearing" and that the receding of the flood waters "undermin[ed] [] the slab and foundation causing the settlement and the 'hollow' under the slab." (Doc. 521, May 27, 2011 Hunkele Report). Although MSD argues there may be other causes for the structural damage

8

which a soil sample could reveal, MSD has not presented any such evidence. MSD was presented with the Hunkele Report in June 2011 and had ample opportunity to test the soil around the property and do whatever investigations it deemed appropriate to determine a cause other than that demonstrated by Mr. Wells' evidence. Mr. Wells, at his own expense, hired an engineer to investigate the issue and to advise him on the cause and remediation required. The Court has been presented with evidence that the inadequate capacity issue with the MSD sewer lines caused Mr. Wells' property to flood which, in turn, led to the structural problems with his house. The Court will not speculate whether there may be other causes as MSD argues. In the absence of any evidence to the contrary, Mr. Wells has met his burden of proof via the Hunkele Report. His claim for structural damage to his property is sustained, and Mr. Wells is awarded $11,500.00 for structural repairs and $375.00 for the cost of the Hunkele investigation and report (which the Court construes as an essential building restoration cost under the Consent Decree).

In sum, the Court awards Mr. Wells real and personal property damages in the amount of $23,654.69, less $5,000.00 in insurance proceeds received plus $500.00 for his insurance deductible, for a total award of $19,154.69.[6]

**IT IS SO ORDERED.**

Date: 1/5/2012

Karen L. Litkovitz, Magistrate Judge
United States District Court

---

[6] To the extent Mr. Wells may be asserting a claim for the involuntary taking of private property, his remedy lies in state court and not under the Consent Decree in the instant case. *See Gilbert v. Cincinnati*, 928 N.E.2d 706, 710 (Ohio 2010) (mandamus is the appropriate action to compel public authorities to institute appropriation proceedings when an involuntary taking of private property is alleged).

9