# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

UNITED STATES OF AMERICA, et al.,        Case No. 1:02-cv-107
     Plaintiffs                          Spiegel, J.
                                        Litkovitz, M.J.

   vs

BOARD OF HAMILTON COUNTY        **ORDER RE: REQUEST**
COMMISSIONERS, et al.,              **FOR REVIEW BY**
     Defendants                  **VERNON WIETHE**

This matter is before the Court on the Request for Review of the denial of a Sewer Back Up ("SBU") claim by Vernon Wiethe. (Doc. 545). Mr. Wiethe seeks compensatory damages from the Metropolitan Sewer District of Greater Cincinnati ("MSD") as a result of flooding to his basement on September 26, 2011.

Mr. Wiethe's request for review is filed under the Sewer Back Up[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Consent Decree in this case sets forth a framework for ensuring that the defendants address capacity and pollution problems with their sewer system. This framework includes a Sewer Back Up program under which MSD must "take measures to prevent back-ups of the sewer system into residences in Hamilton County, to clean up back-ups when they occur[], and to reimburse residents for damages." (Doc. 454 at 2, citing Doc. 131). The instant matter before the Court involves two SBU programs: the Prevention Program and the Claims Program.[2] Under the Prevention Program, MSD utilizes a variety of remedial measures to address SBU,

---

[1]The "Water-In-Basement" program has been renamed the "Sewer Back Up" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

[2]Under the Consent Decree, the Magistrate Judge has jurisdiction to hear any matter in dispute between homeowners and the MSD arising from the Sewer Back Up program. (Doc. 509 at 1).

including the installation of Grinder Pump systems. (Doc. 131 at 46-47). The Claims Program

provides for compensation for real and personal property losses sustained by SBU:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of waste water into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating from MSD's Sewer Systems or caused by blockages in occupants' own lateral sewer lines.

(Doc. 131, Consent Decree, Exhibit 8 at 1). In determining the cause of SBU, MSD must

exercise its good faith reasonable engineering judgment and consider the following non-

exclusive factors: amount of precipitation, property SBU history, condition of the sewer system

in the neighborhood, results of a visual inspection of the neighborhood to look for signs of

overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and

topography. (Doc. 131, Consent Decree, Exhibit 8 at 2). Damages arising from basement

backups for which MSD is responsible are limited to documented real and personal property. *Id.*

Mr. Wiethe is the owner of property at 1722 Laurelwood Circle, Cincinnati, Ohio. In

2005, Mr. Wiethe became eligible for participation in the SBU Prevention Program. As a result,

MSD installed a Grinder Pump system (prevention device) and Backflow Preventer (a one-way

"check valve" to prevent the flow of sewer water into the homeowner's sewer line) to remedy the

back up of sanitary waste water into Mr. Wiethe's basement. Prior to installing the prevention

device, MSD conducted an investigation to determine if there were storm water connections to

the sanitary building/lateral line. As a result of its investigation, MSD discovered and redirected

to a nearby storm sewer two downspouts on the side of Mr. Wiethe's home that were connected

to the sanitary building/lateral line. (Doc. 567, Exs. B, C). Under MSD rules and regulations,

2

removal of direct or indirect storm water connections to a sanitary sewer line is the responsibility

of the property owner.  In Mr. Wiethe's case, however, the removal of the two direct connections

was included in MSD's prevention project and performed by MSD contractors "in an attempt to

protect the sanitary pump from being overwhelmed by storm water" so as not to affect the

functioning of the prevention device.  (Doc. 567, Ex. B).  MSD states that it will undertake the

responsibility of removing storm water connections as a courtesy to and for the convenience of

the homeowner and MSD to prevent future problems with the Grinder Pump/prevention device.

Unbeknownst to Mr. Wiethe and MSD at the time MSD installed the prevention device, a third

underground pipe/connection also tied into the building sanitary sewer line and continued to feed

ground and storm water to the pump basin system.  (Doc. 567, Exs. B, E).  When the system was

installed in 2005, Mr. Wiethe asked about the water that continued to flow into the wet well of

the Grinder Pump system when there was no effluent coming from his basement sanitary line.

He was advised by MSD that some ground/storm water would always be flowing into the wet

well.  Mr. Wiethe testified that when he pursued the ground water issue with MSD, he was

advised that MSD was not responsible for ground or storm water and that it was the

homeowner's responsibility.[3]  He testified that it was evident to him that MSD was not

concerned about the ground/storm water he observed flowing into the wet well and MSD did not

instruct him to do anything about it when the pump was installed.  Mr. Wiethe stated that he

trusted and relied on MSD's knowledge, experience, and expertise in this matter.  Mr. Wiethe did

not take any action to investigate whether there existed any additional connections to the sanitary

---

[3]Attached to MSD's response are an email and fax coversheet that reflect Mr. Wiethe's questions about
water in the wet well of the pump not emanating from the basement sewer line and the effect of power outages on the
potential for back ups.  (Doc. 567, Ex. D).  There is no evidence that Mr. Wiethe's questions were answered by MSD
or that MSD advised Mr. Wiethe that other downspouts or footer tile connections might still be tied into the sanitary
lateral line.

sewer line other than those found and disconnected by MSD.

In accepting the Backflow Preventer and the Grinder Pump system, Mr. Wiethe signed a covenant with MSD wherein Mr. Wiethe agreed that MSD was not responsible for ensuring power supply to the Grinder Pump. (Doc. 567, Ex. G at 2). Mr. Wiethe also agreed that as the homeowner, he was responsible for the utility costs to operate the pump system. (*Id.* at 5). Mr. Wiethe further agreed to "allow for location and disconnection of all downspouts . . . by the District" prior to the installation of the pump system and to "allow relocation of all downspouts. . . ." (*Id.* at 3).

In September 2011, a steady rainfall overwhelmed the Grinder Pump system installed on Mr. Wiethe's property and his basement flooded. There was also a power outage at the time of the rainfall. After an investigation, MSD inspectors found the Grinder Pump to be in proper working order when the power was restored and a heavy flow was coming into the pump basin due to pipe infiltration. (Doc. 567, Ex. A). There was no sewage from the public sanitary sewer that backed up into Mr. Wiethe's basement. MSD attributed the flooding to the power outage which prevented the pump from operating. (Doc. 545, MSD letter of Nov. 30, 2011). MSD informed Mr. Wiethe that the homeowner is responsible for securing power to the Grinder Pump system, there was no technical "failure" of the pump system, and MSD would not reimburse Mr. Wiethe for any personal or real property damage.

Mr. Wiethe testified that prior to the installation of the pumping system in 2005 by MSD, his property had experienced no back ups of ground water into his basement following a long, steady rain. However, after the installation of the pump, a back up of ground water occurred for the first time in September 2011. Mr. Wiethe states that prior to the installation of the prevention device and check valve in 2005, his property experienced SBU only when heavy rains occurred

4

over a short period of time, but not when a steady rain fell over an extended time period as in September 2011. (Doc. 545 at 4). He states that since the prevention device and check valve have been installed, the check valve has prevented "existing external sewer lines, which include raw sewage, from backing up through [his] basement floor drains" but that groundwater is nonetheless able to back up through the basement floor drains when there is a power outage or pump failure, which was not the case prior to 2005. (Doc. 545 at 4). Mr. Wiethe states the installation of the prevention device and check valve took care of one problem (sewage back up), but created another problem (ground water/storm water back up).

In May of 2012, Mr. Wiethe's basement again flooded after a steady rainfall that overloaded the pump system. However, this time there was no power outage, which suggested that MSD may not have correctly identified the cause of the September 2011 back up.

Mr. Wiethe sought the assistance of the Ombudsman following MSD's denial of the September 2011 claim. After the May 2012 back up into Mr. Wiethe's basement, the Ombudsman hired an independent engineer to investigate the cause of the back up of storm water on Mr. Wiethe's property despite the presence of an MSD prevention device. The engineer reported that the back up in September 2011 was not sewage water, but storm water entering through footer tile and/or downspout connections, which he determined were still connected to the sanitary lateral/building line. The engineer also reported that the May 2012 back up resulted from the prevention pump not being able to pump out the water entering the wet well fast enough. (Doc. 568, Ex. 2). The engineer concluded that despite the rerouting of the two downspouts by MSD in 2005 in conjunction with MSD's installation of the prevention device, MSD must have missed a storm water connection that was still tied into the sanitary lateral line. The engineer recommended that any storm water connections that were likely still tied to the

5

sanitary lateral line be removed.  *Id.*

MSD conducted its own investigation in May 2012 and discovered that a third pipe – one that was not found by MSD when it installed the prevention device in 2005 and re-routed the two existing downspouts – continued to tie into the sanitary building/lateral line and was likely the source of the water that overwhelmed the prevention device in September 2011 and May 2012. MSD then capped off the pipe to prevent additional water from emptying into the prevention device.

Tom Fronk, an Engineering Technical Supervisor with MSD's Special Investigations Division, testified that prior to the installation of the prevention device in 2005, it was likely that a combination of both storm water and sewage water were backing up into Mr. Wiethe's basement and that the storm water portion of the back up was imperceptible.  Mr. Fronk stated that when the third underground pipe was found and capped, it removed one point of entry of storm water into Mr. Wiethe's sanitary line.  However, Mr. Fronk also stated that dye testing showed storm water seepage through the joints in the pipe which would still permit storm water to enter the sanitary system.  (Doc. 567, Ex. B).

Mr. Wiethe seeks damages of $40,683.74 as a result of the September 2011 back up. This includes:  $3,529.14 for clean up; $11,148.86 for restoration of structural damage; $20,230.74 for personal property damage; and $5,775.00 for installation and maintenance of a back up generator.[4]

MSD disputes Mr. Wiethe's claim for damages in this case.  MSD asserts that the check valve installed in 2005 prevented any sanitary sewage from entering Mr. Wiethe's home during

---

[4]Mr. Wiethe testified he does not seek damages for the May 2012 back up as his basement was still unfinished at the time of the May back up and there was no additional damage to his basement.

6

the September 2011 and May 2012 rain events.  MSD contends that the issue here involves a private sewer line problem for which the homeowner, and not MSD, is responsible rather than a capacity-related issue with the public sanitary sewer.  MSD argues that the check valve installed on Mr. Wiethe's property performed exactly as designed and prevented the back up of sewage water into Mr. Wiethe's basement.  MSD contends that storm water, and not sewer water, infiltrated Mr. Withe's lateral pipe and overwhelmed the prevention system, resulting in the back up of storm water in Mr. Wiethe's basement in September 2011 and May 2012.  MSD argues the Grinder Pump installed on Mr. Wiethe's property was designed to deal with the over-capacity of sanitary waste, not storm water, into Mr. Wiethe's system, and it functioned as intended.  MSD asserts that both the Consent Decree[5] and MSD Rules and Regulations[6] establish that the removal of storm water connections from the sanitary building sewer line is the responsibility of the homeowner and therefore any damage resulting from the infiltration of storm water into the sanitary building sewer line is likewise the responsibility of the homeowner.  Although MSD acknowledges that when it installed the prevention device on Mr. Wiethe's property in 2005 it took responsibility for disconnecting and rerouting the existing downspouts/tie-ins of which it was aware at the time, MSD argues it should not be responsible for any newly discovered problems at this late date.  MSD argues it should not be a guarantor of private plumbing and storm water systems that are unique to each homeowner's property.

The Ombudsman acknowledges that this case does not involve a surge or capacity-related

---

[5]Consent Decree Exhibit 6 requires that "properties in sanitary-only service areas must remove downspouts and storm connections from the sanitary sewer lateral completely" and "properties in combined service areas must reroute downspouts to the discharge side of the device or system installed under this Program."  (Consent Decree Exhibit 6 at 3).

[6]Section 1201a of the MSD Rules and Regulations prohibits the connection of storm water sources to a building sanitary sewer and places the burden of disconnection on the property owner.  (Doc. 567, Ex. H).

7

problem with the public sanitary sewer.  Instead, the Ombudsman asserts the dispute in this case

concerns the adequacy of the prevention device installed on Mr. Wiethe's property under the

Consent Decree's Prevention Program and the lack of information given to Mr. Wiethe on the

parties' respective responsibilities when it came to the installation and operation of the

prevention device.  The Ombudsman also expressed frustration over the lack of communication

by MSD in connection with Mr. Wiethe's claim and request for review.  The Ombudsman stated

that the lack of complete, prompt information from MSD has made it difficult to fulfill its role as

ombudsman in resolving disputes between MSD and homeowners.

In this case, it appears that the water damage to Mr. Wiethe's property in September 2011

was caused by a combination of factors, some of which were not discovered until 2012:  the

power outage causing inoperability of the pump; the connection of a third undiscovered pipe to

the sanitary sewer line that continued to feed storm water into the sanitary sewer line and Grinder

Pump system; and the presence of old pipes that allowed infiltration of ground water through

pipe joints into the sanitary line.  In 2005, MSD endeavored to prevent SBU into Mr. Wiethe's

basement by installing a Grinder Pump prevention device.  At that time, MSD recognized that

storm water connections to the sanitary sewer line posed a problem with the capacity capabilities

of the Grinder Pump.  In recognition of the need to not overwhelm the capabilities of the

prevention device, MSD took responsibility for disconnecting and redirecting two storm water

connections from the building sewer line.  In hindsight, given the information now available to

all of the concerned parties, it appears the prevention device may not have been sized adequately

in light of the amount of storm water that continued to flow into the system from a third pipe that

remained connected to the sanitary sewer line.  Coupled with this problem is the lack of

information MSD provided to Mr. Wiethe on the adverse effects of any downspouts or footer

tiles that remained connected to the sanitary sewer line. Mr. Wiethe credibly testified that when he asked about the storm water he continued to observe in the pump well after the Grinder Pump was installed, MSD contractors informed him that it was normal, to be expected, and not a concern. In reliance on this information, Mr. Wiethe reasonably took no further steps to investigate whether there existed any other tie-ins or connections to his building sewer line. There is no evidence that MSD specifically advised Mr. Wiethe that even though MSD would disconnect and reroute the two downspouts they found, it was Mr. Wiethe's responsibility to investigate and remedy any other connections that remained tied into his sanitary sewer line. While MSD's rules and regulations place the responsibility for removal of such connections on the homeowner, MSD affirmatively undertook this responsibility and in Mr. Wiethe's case the covenant Mr. Wiethe signed required him to "allow" MSD to locate, disconnect, and relocate downspouts and other sources of "clean" water. (Doc. 567, Ex. G at 3). The evidence shows that it was not until 2012 that Mr. Wiethe was told that storm water and existing connections were a problem. (Doc. 567, Ex. B). Mr. Wiethe relied on the expertise of MSD in the installation of the prevention device, which included the rerouting of the two downspouts. Where MSD undertakes what would otherwise be the responsibility of the homeowner, *i.e.*, the disconnection and redirection of downspouts, and does not clearly advise the homeowner that any remaining downspouts or connections are the homeowner's responsibility, and where the homeowner relies on that work and lack of information to his or her detriment, MSD must bear responsibility for the ensuing damages.

On the other hand, it is clear that Mr. Wiethe was on notice that ensuring an adequate supply of power to the prevention device was his responsibility. Mr. Wiethe is bound by the covenant which he signed in 2005 in which he acknowledged that as the homeowner, he is

responsible for ensuring a power supply to the Grinder Pump system and for the system's utility costs. (Doc. 567, Ex. G at 2 and 5). Mr. Wiethe therefore should bear the burden of any damages related to the inoperability of the pump from a lack of power and for providing a back up generator to the prevention device system.

In this case, the responsibility for the September 2011 back up and resulting damages to Mr. Wiethe's property is one that should be shared by both the homeowner and MSD. The Court is not finding that MSD is a guarantor of all connections to a homeowner's sanitary sewer line. However, under the particular circumstances of this case, MSD must bear partial responsibility for undertaking the removal of some of the tie-ins to the sanitary sewer line without clearly advising Mr. Wiethe at the time the prevention device was installed of his responsibility for the removal of any remaining connections. Mr. Wiethe is now on notice that any existing yet undiscovered downspouts/pipes/connections to the sanitary lateral sewer line are his responsibility.

The Court addresses one final issue on the role of the Ombudsman in this case. It appears from previous Ombudsman reports that the Ombudsman and MSD have enjoyed a productive, positive relationship. Nevertheless, communication difficulties are inevitable in any relationship and the Court concurs with the Ombudsman's assertion that the role of the Ombudsman should not be adversarial to MSD. The parties should be working collaboratively and cooperatively to fulfill the goals of the Consent Decree through prompt and positive dialogue. In the future, where communication issues arise in any case in which the Ombudsman seeks to investigate a homeowner's claim, the parties are invited to contact the undersigned for an informal conference and/or mediation assistance in resolving any disputes. The Court offers its assistance and is at the parties' disposal to assist in any way it can.

10

The Court now turns to an assessment of the damages in this case.  Damages for SBU claims are determined based on the market value of personal property as of the date of loss and not on the original purchase price or cost of replacement.  After careful review, the Court awards damages for the loss of personal property as follows:

## I.  Basement items

- Washing machine:  $275.00

- Dryer:  $150

- Couch:  $510.00

- Loveseat:  $492.00

- Wooden desk:  $350.00

- Sewing machine:  $165.00

- Vacuum cleaner with bags:  $205.00

- Printer/scanner/fax: $20.00

- Blender: $10.00

- Illuminated magnifier: $30.00

- Electric heating pad: $0

- 4 decorative pillows: $10.00

- Portable heater: $43.00

- Wooden chest: $108.00

- Wood cabinet with doors & shelves: $50.00

- Twin box spring: $90.00

- Bed frame: $10.00

- Baby jumper for door frame: $5.00

- 3 ½ inch floppy discs: $0

- Case of paper: $49.00

- Box of envelopes: $9.00

- Box of manila folders: $15.00

- Power strip: $14.00

- Pack of poster board: $5.00

- Portable massage heating cushion: $30.00

- Children's books (128): $192.00

- Board games (20): $60.00

- Cardboard puzzles (21): $63.00

- Folding cutting board for sewing: $5.00

- Wool oriental rug: $266.00

- Throw rugs (4): $20.00

- Craft kits (33): $100.00

- Leather cowgirl boots: $35.00

- Art supplies: $150.00

- Federfisa bass accordion: $450.00

- Total: $3,986.00

## II. Clean up and repair

The Court awards $122.42 for appliance evaluation and $85.00 for water heater service.
Mr. Wiethe seeks $950.00 in damages for a replacement electronic air cleaner. However, as Mr.
Wiethe has not indicated the age of the item to permit an estimated value with depreciation or the
amount attributable to installation of the item, the Court awards one-half of the amount

12

documented for an award of $475.00. The Court makes no award for the cleaning performed by Servpro as it appears from MSD's evidence that Mr. Wiethe's insurance paid this claim. (Doc. 567, Ex. I, attachment 1).

### III. Structural restoration

Mr. Wiethe seeks damages of $11,148.86 for restoration of structural damage, floor covering, painting, cabinetry, plumbing, and finishing. He has submitted a statement from his insurance company indicating the depreciated value for this restoration is $9,323.03. Therefore, the Court values the structural restoration damages at $9,323.03.

### IV. Generator

Mr. Wiethe seeks damages for the installation and maintenance of a Standby Generator in the amounts of $5,540.00 and $235.00 respectively. As the Court has indicated above, the homeowner is responsible for providing utility service to the prevention device and Mr. Wiethe agreed to this expense when he signed the covenant with MSD. Accordingly, the Court declines to award damages for this item.

### V. Damages awarded

As discussed above, both parties share responsibility for the September 2011 back up and resulting damages. Therefore, the Court awards Mr. Wiethe damages of $6,995.73 (one-half of the total amount of $13,991.45) subject to the following proviso:

All claims brought under the SBU program are subject to the limitations of Ohio Rev. Code § 2744.05, which requires that insurance policy payments for alleged injuries must be disclosed to the Court and subtracted from any award against a political subdivision. (Consent Decree, Ex. 8 at 3). Mr. Wiethe has not submitted documentation or otherwise indicated whether his insurance company covered any of the personal or real property damage from the September

13

26, 2011 incident, aside from the cleaning by Servpro. Any insurance benefits received by Mr. Wiethe must first be subtracted from the amount of damages awarded by the Court. Mr. Wiethe must submit documentation of any insurance company coverage to the Court and provide a copy to MSD within 30 days of the date of this Order.

**IT IS SO ORDERED.**

Date: _12/4/12_

Karen L. Litkovitz, Magistrate Judge
United States District Court