# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

UNITED STATES OF AMERICA, et al.,
     Plaintiffs,

  vs.

BOARD OF HAMILTON COUNTY
COMMISSIONERS, et al.,
     Defendants.

Case No. 1:02-cv-107

Spiegel, J.

Litkovitz, M.J.

**ORDER RE: REQUEST**
**FOR REVIEW BY**
**LOUIS AND JANE KOHUS**

This matter is before the Court on the Request for Review of the denial of a Sewer

Backup ("SBU") claim by Louis and Jane Kohus. (Doc. 560). The Kohuses seek compensatory

damages from the Metropolitan Sewer District of Greater Cincinnati ("MSD") for sewer water

backup into their basement.

The Kohuses' request for review is filed under the Sewer Backup[1] program (formerly

known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree,

Exhibit 8). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result
> of the backup of wastewater into buildings due to inadequate capacity in MSD's
> Sewer System (both the combined and the sanitary portions) can recover those
> damages. This plan also provides a means for occupants to recover damages
> arising from backups that are the result of MSD's negligent maintenance,
> destruction, operation or upkeep of the Sewer System. The Claims Process is not
> intended to address water in buildings caused by overland flooding not emanating
> from MSD's Sewer Systems or caused by blockages in occupants' own lateral
> sewer lines.

(Doc. 131, Consent Decree, Exhibit 8 at 1). In determining the cause of SBU, MSD must

---

[1]The "Water-In-Basement" program has been renamed the "Sewer Backup" program to more accurately
reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc.
452 at 4; Doc. 454 at 16.

exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Exhibit 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id.*

## I. Background

The Kohuses are the owners of the property located at 6219 Woodlark Drive, Cincinnati, Ohio. In 2011, the Kohus property experienced two SBUs, one on June 21, 2011 (SBU Incident No. 4150) and one on July 23, 2011 (SBU Incident No. 4269). MSD was notified of both events, investigated, performed the clean-up, and documented the property removed from the basement on both occasions. It is undisputed that MSD was responsible for both backups to the Kohus residence in 2011 due to lack of capacity of the MSD public sewer system. The Kohuses then made two claims for property loss to MSD under the SBU program.

## II. The First SBU Claim

On October 19, 2011, the Kohuses filed their first claim for damages for the July 2011 SBU (SBU Incident No. 4269). (Doc. 569-4, Ex. B). The cover letter to MSD that accompanied the claim for Incident No. 4269 informed MSD that the Kohuses claimed $22,911.48 in property loss, less $10,000.00 in insurance proceeds, for a "remaining loss/claim balance of $12,911.48 for SBU Incident No. 4269." In terms of structural damage, the Kohuses reported that the damage appeared to be limited to areas previously damaged from the June 21, 2011 SBU in Incident No. 4150 and was "[t]o be determined." In accordance with MSD's instructions for

2

providing an inventory of damaged property (Doc. 569-4, p. 11), the Kohuses included an

"Inventory Report" of damaged property from the July 23, 2011 SBU, which specifically

referenced Incident No. 4269 on each page of the inventory. (Doc. 569-4, pp. 14-24). The final

page of the "Inventory Report" includes a "General Information" section stating, *inter alia*,

"MSDGC initially informed us that SBU Incident #4269 would be combined with WIB Incident

#4150 for damages claims purposes, which MSDGC later retracted." (Doc. 569-4, p. 24).

Mr. Kohus states that he filed a claim for the July 2011 SBU event before filing a claim

for the June 2011 SBU event because the property damage from the June 21st event was much

more extensive and the documentation of damages from that event was more time-consuming.

He also states he had not yet settled with his insurance company for the June 21st SBU claim.

(Doc. 572-2, Second Kohus Aff. at ¶ 18).

### III. MSD's Response to the First Claim

MSD presents the Affidavit of Anita Boulmetis, the valuation contractor employed by

MSD to review and value SBU claims. (Doc. 569-5, Ex. C). Ms. Boulmetis states that after she

reviewed the inventory of damaged personal property submitted by the Kohuses, she noticed that

certain items contained on the inventory were not listed on the SBU property disposal sheets

prepared by ETC, MSD's customer service contractor which responded to the backup at the

Kohuses' property. *Id.*, ¶ 4. She then contacted ETC for information on the SBU and learned

there had been two backups. ETC sent her photographs and disposal sheets from both the June

2011 and July 2011 backups. *Id.* Ms. Boulmetis states she reviewed the documents associated

with both SBU events, contacted Mr. Kohus by telephone, and advised him that she would not be

able to provide the value he requested on his claim form and inventory sheets, particularly as to

3

clothing items he valued at their purchase price. *Id.*, ¶ 5.  Ms. Boulmetis states she and Mr.

Kohus referenced both the June and the July backups throughout their conversation and it was

her understanding that she was preparing a release for both the June and July backups. *Id.*, ¶ 6.[2]

Following this conversation, Ms. Boulmetis states she assigned a value to each item on the June

and July 2011 disposal sheets and to the items included on the inventory provided by the

Kohuses.  She then prepared a release for both the June and July backups with a total damages

award of $12,911.48 and forwarded the release to Dorothy Carman in the Cincinnati Law

Department for her review.

Mr. Kohus states he never spoke with Ms. Boulmetis and that the conversation related in

her affidavit is false.  (Doc. 572-1, Second Kohus Aff., ¶¶ 26-28).  He states he never discussed

his SBU claim with anyone at MSD or the City of Cincinnati Law Department until after he

received a letter dated November 23, 2011 from Ms. Carmen, which included a copy of a

document entitled "RELEASE."  (Doc. 572-1, Second Kohus Aff., ¶ 8, citing Doc. 569-6, p. 7).

The letter states in relevant part:

> Enclosed is a release for your requested amount that exceeded your insurance
> limited (sic).  MSD reimburses for the current (depreciated) value of damaged
> property and not for replacement cost.  Please sign this release and return it at
> your convenience to my attention at the address on this letter.  After you have
> signed and returned this release to me, I will forward to you the City of
> Cincinnati's check in settlement of your claim.  Do not alter the release, as it will
> delay settlement of your claim.  If you have any questions about this release,
> including the amount of the offer, please call me at 557-7134.

(Doc. 569-6, p. 6).  The "RELEASE" attached to the letter states in pertinent part:

---

[2]Ms. Boulmetis' affidavit states, "Based on my conversation, I understood that both Mr. Kohus and I understood I would be preparing a release for both the June and July backups." (Doc. 569, Ex. C, ¶ 6).  Ms. Boulmetis may testify regarding *her* understanding of their conversation, but she is not competent to testify as to what Mr. Kohus may have understood from their conversation as she does not have first hand knowledge of his mental processes.

> Louis M. and Jane M. Kohus, 6219 Woodlark Drive, Cincinnati, Ohio 45230, for the sole consideration of TWELVE THOUSAND, NINE HUNDRED ELEVEN and 48/100 DOLLARS, ($12,911.48), received by them to their satisfaction from the City of Cincinnati, on behalf of the City of Cincinnati, its employees, successors and assigns, does hereby release and forever discharge said City of Cincinnati its employees, success and assigns, from any and all claims, demands, actions and causes of action whatsoever or in any manner arising from **two "Sewer Back-up" incidents on or about June 25, 2011 and on or about July 23, 2011,** at 6219 Woodlark Drive, Cincinnati, Ohio 45230.

(Doc. 569-6, p.7) (emphasis added).

After he received the letter and release from Ms. Carmen, Mr. Kohus telephoned Ms. Carmen to discuss the letter and release. Mr. Kohus did not speak with Ms. Carmen, but instead he received a recorded message advising him to call Kathy Rahtz, Assistant Superintendent at MSD's Wastewater Collection Division, for sewer backup matters. (Doc. 572-1, Second Kohus Aff., ¶ 9). Mr. Kohus then contacted Ms. Rahtz to discuss the letter and release. He states he complained to Ms. Rahtz that the proposed release referenced both the June and July 2011 incidents, when he had made a claim for only the July 2011 incident. (*Id.* at ¶ 14). Mr. Kohus states he informed Ms. Rahtz that his claim for the June 2011 incident was not ready to be filed as he was still preparing and obtaining detailed information for the June 2011 claim, which involved many more items and was considerably larger than the July 2011 claim. *Id.* He states he was advised that the statute of limitations for each SBU claim was two years from the date of the SBU event and therefore he had two years to file the claim with MSD. (*Id.* at ¶ 15). Mr. Kohus also advised Ms. Rahtz that the June "25", 2011 date in the Release for the June 21st SBU event was inaccurate. *Id.* Mr. Kohus avers:

> I specifically asked Ms. Rahtz if I was allowed to change Ms. Carman's proposed release after I told her that we were not agreeable to releasing any claims related to the June 21st SBU incident. In particular, I asked Ms. Rahtz if it would be

5

> acceptable for me to modify the release by altogether deleting the reference to the
> June SBU given the fact that we had not yet filed a claim for it, and then my wife
> and I would sign and return the revised release to MSD. I also explained to Ms.
> Rahtz that Ms. Carman's letter said not to alter the release but only because it
> would delay settlement of our claim if I did change it. Ms. Rahtz told me that I
> could do that if I wanted but added a "proviso" and said if the law department did
> not agree with my changes that it might holdup our settlement check.

(*Id.* at ¶ 16).

Ms. Rahtz states that after reviewing Mr. Kohus' declaration in this matter, she recalled

speaking with him. Ms. Rahtz states that while she is responsible for the oversight and

management of the Sewer Backup (SBU) Response Program, she has no authority to adjust or

settle SBU claims. (Doc. 574-2, Rahtz Aff., ¶ 2). She avers that she normally refers non-routine

questions about SBU claims to the Assistant City Solicitor, Dorothy Carman, and occasionally,

when Ms. Carman is out of the office, Carman will request that Ms. Rahtz respond to calls for

SBU claim-related emergencies. (*Id.* at ¶3). She avers:

> I did not instruct Mr. Kohus to change the release to remove the June date. I
> informed him that decisions regarding the release would have to be made by Ms.
> Carman. In response to Mr. Kohus' question whether he could change the release,
> I stated that Mr. Kohus "could" change the release he had received, but that it was
> not likely to be accepted by Ms. Carman. My intent was not to grant him
> *permission* to modify the release, but to convey that he was *capable* and free to do
> whatever he liked with the documents- mark them up, tear them up, etc.
> Similarly, the City was also free to reject any changes that he made, and he should
> not expect his changes to be accepted by the City. Further, it was my
> understanding from the conversation that Mr. Kohus intended to *mark up* the
> document he had received from Ms. Carman, and not that he intended to create a
> new document.

(Doc. 574-2, Rahtz Aff., ¶ 9).

Following his conversation with Ms. Rahtz, Mr. Kohus scanned the original release and

retyped portions of the release to reflect the July 2011 claim only. Visually, the release appears

6

to be identical to the original one with the exception of the following highlighted portions:

> Louis M. and Jane M. Kohus, 6219 Woodlark Drive, Cincinnati, Ohio 45230, for the sole consideration of TWELVE THOUSAND, NINE HUNDRED ELEVEN and 48/100 DOLLARS, ($12,911.48), received by them to their satisfaction from the City of Cincinnati, on behalf of the City of Cincinnati, its employees, successors and assigns, does hereby release and forever discharge said City of Cincinnati its employees, success and assigns, from any and all claims, demands, actions and causes of action whatsoever or in any manner arising from **one "Sewer Back-up" incident, MSD SBU Incident No. 4269, on or about July 23, 2011,** at 6219 Woodlark Drive, Cincinnati, Ohio 45230.

(Doc. 569-6, p. 9). Mr. Kohus avers that he changed what he believed to be an erroneous release and intended the revised release to be his counter-offer to MSD. (Doc. 572-1, Second Kohus Aff., ¶ 18). The Kohuses signed and dated the revised release and sent it to MSD on November 30, 2011. Mr. Kohus avers that before mailing the release to MSD, he "attached a bright pink-colored, arrowhead-style sticky note pointing toward the modified lines 6 and 7 of the revised, signed Release." (*Id.* at ¶ 19).

By letter dated December 12, 2011, a check in the amount of $12,911.48 from the City of Cincinnati was sent to the Kohuses "in settlement of your sewer back-up claim." (Doc. 569-6, p. 11-12). Mr. Kohus states that he believed MSD accepted his counter-offer and assented to the settlement by sending a check for the exact amount he claimed for the July 2011 SBU event. (Doc. 572-1, Second Kohus Aff., ¶ 22). The Kohuses cashed the check.

Assistant City Solicitor Dorothy Carman states that the Cincinnati Office of the Solicitor has sole responsibility for and authority over the SBU damages claims program, and she is the only person authorized to negotiate on behalf of MSD and the City. (Doc. 574-1, Carman Aff., ¶ 6). Ms. Carman states she received a signed release form from the Kohuses dated November 30, 2011, which appeared to be the exact form she sent to them for signature. (Doc. 574-1, Carman

7

Aff., ¶ 7).  She also states the release was not accompanied by a cover letter or any other communication, and there was no flag or any other device or notation to highlight the changes to the release.  (*Id.*).  Ms. Carman avers:

> Because I believed the signed release to be the exact form I had sent, I placed it in my file regarding the Kohuses' claims and proceeded with mailing a check.  If I had any reason to believe that the releases were not identical, and that one of the dates had been deleted, I would have either contacted the Kohuses or prepared a new offer for a reduced amount.

(*Id.* at ¶ 8).  Ms. Carman states that in the five years she has administered the SBU claims program, a few claimants have made minor, hand-written corrections to releases after speaking with her first, but no other claimant has ever submitted a retyped release to alter its terms.  (*Id.* at ¶ 9).

## IV. The Second SBU Claim

On March 7, 2012, the Kohuses filed a SBU claim form with MSD for property loss damages sustained on June 21, 2011, alleging property loss of $654,824.57.  Mr. Kohus states that he spent more than eight months researching, documenting, and evaluating what he believed were the June 2011 values of collectible items stored in his basement.  Mr. Kohus, a professional inventor, identifies some of the more expensive items of personal property damaged or destroyed by the June 2011 SBU incident as:

> (a) a large, vintage collection of collector trading cards, wax wrappers, and toy rings comprised of: (i) rare, unopened packs of non-sports and sports cards; (ii) rare singles of non-sports and sports cards; (iii) rare wax wrappers from opened packs of non-sports cards; and, (iv) complete sets of a variety of rare, theme-specific toy "Flicker" rings having lenticular lenses;
>
> (b) a large, vintage collection of embroidered public safety emblems comprised of department-issued police and fire patches; and,

8

(c) (i) several one-of-a-kind, full-scale, 100% professionally handcrafted U.S. Patent invention prototypes; (ii) a large, irreplaceable group of high-end, commercial studio photographs professionally made over a period of years to expertly document some of my new product inventions, designs, and prototypes and also used for my various marketing, advertising, and sales purposes; (iii) a large, irreplaceable group of original master detail drawings for the design, engineering, tooling, and production of some of my new product inventions, designs, and prototypes; and (iv) several very large, irreplaceable groups of my business and personal documents, files, records, and new product invention and design samples of all types and kinds from various pre-production, printing, and/or manufacturing stages.

(Doc. 560, First Kohus Aff., ¶ 11). Mr. Kohus explains that he stored these collectibles in the basement to protect them from regular exposure to light as wrappers, cards, and patches could lose substantial value if faded. *Id.* at ¶ 12. He avers that "[u]ntil several weeks before the SBU incident, the boxes had been stored on shelves, but with my daughter's graduation from college I was forced to make room for her belongings. The boxes containing my collections were therefore temporarily moved to the floor in the main section of the basement." *Id.* The cover letter accompanying claim No. 4150 informed MSD that the Kohuses claimed $654,824.57 in property loss, less $10,000.00 in insurance proceeds, for a "remaining loss/claim balance of $644,824.57 for SBU Incident No. 4150." (Doc. 560, binder 1).

## V. MSD's Response to the Second Claim

By letter dated March 23, 2012, Assistant City Solicitor Carman denied the Kohuses' claim for SBU Incident No. 4150. The letter states in relevant part:

On November 23, 2012, MSD mailed you an offer for settlement of your back-ups on both June 25, 2011[3] and July 23, 2011. That settlement offer included the following admonition: "Do not alter the release, as it will delay settlement of your claim." Despite this, you created a new release and removed the June 25 back-up

_____

[3] The "June 25, 2011" date is a mistaken reference to the June 21, 2011 SBU event. There is no evidence of a SBU event on June 25, 2011.

> without notifying MSD or obtaining MSD's agreement to the alteration. MSD's payment of $12,911.48 was made as settlement for both June 25, 2011 and July 23, 2011. Had MSD been aware that you did not intend to settle the June 25, 2011 backup via the November 23, 2012 release, MSD would have made you a new, lesser offer for the July 23, 2011 back-up alone. Accordingly, because MSD has already paid you $12,911.48 as settlement for both your June 25, 2011 and July 23, 2011 claims, MSD must deny your new claim for June 25, 2011.

(Doc. 569-6, p.14). Ms. Carman states that she did not discover the Kohuses had signed and submitted a substitute release excluding the June 2011 back up until they submitted their second claim form requesting compensation for the June 2011 SBU. (Doc. 569, Ex. D, Carman Aff., ¶ 9). Ms. Carman states she denied the Kohuses' second claim because she understood the $12,911.48 to be compensation for both the June 2011 and July 2011 back ups. (*Id.* at ¶¶ 6, 10).

Following the March 23 denial of his claim, Mr. Kohus left a voice mail message for Ms. Carman requesting that she reconsider the denial. (*Id.* at ¶ 11). Ms. Carman states she then spoke with Ms. Boulmetis and learned of Ms. Boulmetis' conversation with Mr. Kohus regarding the items included on the original claim form. Ms. Carmen states that once Ms. Boulmetis confirmed she did not instruct the Kohuses to alter the release, Ms. Carman sent a second letter, dated March 27, 2012, to Mr. Kohus in which she reaffirmed MSD's denial of the renewed claim for the June 21, 2011 backup. (*Id.* at ¶ 13; Doc. 569-6, p. 16).

## VI. Court Appeal

The Kohuses then appealed MSD's denial of their second SBU claim to this Court. (Doc. 560). Although the Kohuses claimed losses of $654,824.57 in their June 2011 SBU claim to MSD, on appeal to this Court they now request an award for "the full amount of the property loss– $826,544 – plus all costs, expert witness fees, and expenses related to this claim." (Doc. 560 at 6). The Kohuses assert they undervalued the property lost in the June 2011 SBU. They

10

retained the services of a professional, licensed insurance adjuster, who opines that the total property loss is actually $826,544.00, and not $654,824.57 as originally claimed.

In response to the Kohuses' appeal, the City moves to dismiss the request for review, arguing the Kohuses are not entitled to review of the March 2012 denials of their second claim as they have already received compensation for both the June and July 2011 SBU incidents and released all claims related to the two incidents. In the alternative, the City moves to dismiss the Kohuses' request for review because it falls outside the limits of the SBU program and review by this Court is improper.

## VII. Initial Procedural Issue

The City's motion to dismiss "pursuant to Fed. R. Civ. P. 12(b)(6)" presents a threshold procedural issue – the status of a motion to dismiss under the SBU judicial review process and whether and to what extent the Federal Rules of Civil Procedure should apply. If the Kohuses' claim is viewed as a type of "complaint" under the Federal Rules, the City's motion to dismiss must be converted into a motion for summary judgment under Fed. R. Civ. P. 12(d) given the consideration of matters outside the "pleadings." The Consent Decree does not address whether claims for judicial review are subject to the strictures of the Federal Rules of Civil Procedure or the Federal Rules of Evidence, but the practice as developed by the Court and parties over the five years of Court review of SBU claims suggests that formal motion practice was neither contemplated, nor warranted in SBU claims for review.

Under the original Consent Decree, there was no forum for review of MSD's decisions on the cause of backups (*i.e.,* whether MSD or the homeowner was responsible for the backup) and the valuation of property damages in SBU claims. (Doc. 154 at 2). In February 2006, District

11

Judge Spiegel, after consideration of the Ombudsman's report on the status of the WIB/SBU claims program, implemented a mechanism for limited judicial review of MSD's decisions. The Court ordered that a homeowner dissatisfied with the City's disposition of a claim under the WIB/SBU program may request judicial review of the decision by the Magistrate Judge. *Id.* The Court further ordered that "[t]he Magistrate Judge will review such requests and may hold an evidentiary hearing in order to determine whether the [City's] decision is supported by the law and evidence." *Id.* The District Judge later clarified that the Magistrate Judge's decision as to any such claims is binding on the parties and not subject to further judicial review (Doc. 190) and that "the Magistrate Judge has jurisdiction to hear any matter in dispute between homeowners and the Metropolitan Sewer District arising from the Sewer Back Up program." (Doc. 509 at 4).

To implement this new review procedure, the Ombudsman, in collaboration with the parties and the Magistrate Judge, developed a formal "user-friendly" review process for homeowners affected under the WIB/SBU program. (Doc. 162 at 6). A Request for Review form was developed to help homeowners exercise their right to judicial review by the Magistrate Judge. This form elicits specific information from the homeowner to assist the Magistrate Judge in assessing the merits of the claim for review. The form includes requests for information about the nature and description of the dispute and the relief sought, a copy of the City's decision, and any evidence to support the claim (*e.g.*, receipts, photos, videos, etc.), and boxes to check for requesting an in-person hearing with the Magistrate Judge or for requesting a decision based on a review of the form and attached documents without an in-person hearing. (Doc. 162, Ex. B). For the five years the judicial review process has been in effect, the City, in response to a homeowner's request for review, has filed a written response to the Request for Review,

12

supported by documentary evidence in support of its decision on the claim. The in-person hearings before the Magistrate Judge have been informal and most homeowners have appeared pro se. Neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence have been strictly applied and the Court has made every effort to obtain the necessary information from both parties to fairly evaluate each claim.

The City's motion to dismiss "pursuant to Rule 12(b)(6)" does not fit within the process developed over the years by the Court, the parties, and Ombudsman for review of homeowner's claims. Allowing some SBU claims for review to be subject to formal "motions to dismiss" and the like would thwart the user-friendly, efficient process utilized by the parties and the Court in the review process. The Court understands that the amount of the Kohuses' claim far exceeds that of any other claim in the history of the SBU review process. Nevertheless, the existing review process, without resort to formal motions practice and the federal rules, is sufficient to address the issues raised by the Kohuses' claim. Therefore, the Court construes the City's motion to dismiss as a response to the Kohuses' claim for review which seeks to uphold the City's decision for the particular reasons set forth therein.

## VIII. The City is not entitled to reformation of the November 30, 2011 release to reflect the terms originally proposed by the City.

The City argues the Kohuses should be bound by the terms of the original release covering both the June 2011 and July 2011 SBU incidents. The City seeks reformation of the release submitted and signed by the Kohuses, arguing they failed to act in good faith by substituting an altered release without first speaking with the only person with authority to authorize any changes to the original release, *i.e.*, Assistant City Solicitor Dorothy Carman. The

13

City asserts that by retyping the release form to appear identical to the original release, with the exception of the removal of the June 2011 SBU date, the Kohuses induced Ms. Carman's mistake in issuing the $12,911.48 check. The City contends the Kohuses were aware of the City's intention to make an offer for both the June and July 2011 events "based on Mr. Kohus' conversation with Anita Boulmetis," yet intentionally substituted an altered release without notifying Ms. Carman by "brightly colored sticky note" or otherwise. The City contends that reformation of the release based on Ms. Carman's unilateral mistake is proper because the Kohuses knew of the terms Ms. Carman had offered and she reasonably believed they had accepted those terms when she issued the check.

The Kohuses, in contrast, contend that the release and payment for the July 2011 SBU, by its very terms, contained no release of or compensation for the losses suffered in the June 2011 SBU. They argue that MSD and the City were negligent in not reading the revised release sent by the Kohuses and that the City bears responsibility for reviewing the terms of a contract prior to agreeing to its terms. The Kohuses assert that the City is not entitled to reformation of the contract as they entered into an unambiguous agreement by issuing a check in response to the Kohuses' revised release/counter-offer. In addition, the Kohuses allege that anyone who actually read their claim documents seeking damages for the July SBU would have no reason to think it included damages for the June SBU as there was no overlap in the property damages shown in the records and the July SBU claim explicitly referred to the exclusion of structural damages from the June 2011 SBU.

The evidence shows that Ms. Carman made a unilateral mistake when she issued the check in response to the Kohuses' revised release. A mistake is "[a]n erroneous belief as to the

14

contents of a writing that expresses the parties' agreement. . . ." *Faivre v. DEX Corp. Northeast*, 913 N.E.2d 1029, 1035 (Ohio Ct. App. 2009) (citation omitted). "A unilateral mistake occurs when only one party has an erroneous belief as to the facts." *Id.* (internal quotation and citation omitted). Here, the Kohuses' submission of a revised release form, without having first spoken directly to Ms. Carman, led to Ms. Carman's erroneous belief about the contents of the revised release. Ms. Carman's affidavit establishes that when she received the release from the Kohuses, she reasonably believed it was the same one she had mailed to them previously. Instead of striking out the language on the original release to reflect their intent to release only the July 2011 claim, the Kohuses scanned the original release and retyped only portions of the release that reflected what they believed to be their counter-offer to the City's original offer. Visually, the revised release submitted by the Kohuses was strikingly similar to the original sent by Carman: it was in the same font and style as the original release; it reflected the same spacing as the original release; it contained identical language, with the exception that the phrase "one 'Sewer Back-up' incident, MSD SBU Incident No. 4269, on or about July 23, 2011" was substituted for "two 'Sewer Back-up' incidents on or about June 25, 2011 and on or about July 23, 2011"; and it contained the same payment amount of $12,911.48 that the City had offered in the original release. Ms. Carman was the only party to hold the erroneous belief that the release was for both the June and July SBU events. Aside from issuing a check for $12,911.48 to the Kohuses, all of the other evidence before the Court establishes that the City did not intend to release only the July 2011 claim in exchange for the $12,911.48 payment, and the issuance of the check in response to the Kohuses' revised release was a mistake on the part of the City. Because there was a unilateral mistake in the acceptance of the Kohuses' revised release, the Court must

15

determine whether reformation of the release, as requested by the City, is warranted.

The City argues the release should be reformed to reflect the terms of the original release because the Kohuses were aware of the City's intention to make an offer for both the June and July 2011 SBU events based on Mr. Kohus' conversation with Anita Boulmetis, and the Kohuses induced the City's mistake in issuing the $12,911.48 check by substituting a revised release without notifying Ms. Carman. Although reformation of a contract is generally not permitted based on the unilateral mistake of a party:

> where the mistake occurred due to a drafting error by one party and the other party knew of the error and took advantage of it, the trial court may reform the contract. . . . Reformation is appropriate if one party believes that a contract correctly integrates the agreement and the other party is aware that it does not, even though the mistake was not mutual.

*Faivre*, 913 N.E.2d at 1036 (quoting *L.B. Trucking Co., Inc. v. C.J. Mahan Const. Co.*, No. 01AP-1240, 2002 WL 1969645, at *6 (Ohio Ct. App. 2002)). *See also 425 Beecher, L.L.C. v. Unizan Bank, Natl. Assn.*, 927 N.E.2d 46, 58 (Ohio Ct. App. 2010) (holding reformation is appropriate remedy where one party believed contract correctly integrated terms of the agreement and other party was aware it did not). The City seeks reformation on the basis that the Kohuses took advantage of Ms. Carmen's mistaken belief that she was issuing the check in response to their acceptance of the original release.

To reform the release as the City requests would amount to creating a new contract that contained terms to which the parties never agreed. Reformation is not an appropriate remedy in this case because there was never an underlying agreement between the City and the Kohuses.[4]

---

[4]The City appears to imply that a contract arose from the conversation between Ms. Boulmetis and Mr. Kohus where both the June and July SBU events were allegedly discussed. The problem with this argument is that Mr. Kohus denies that any such conversation ever occurred. In addition, his actions in submitting the July 2011

16

The goal of reformation of a written contract is to reflect and give effect to the actual agreement made by the parties which is not reflected in the written instrument:

> The purpose of reformation is to cause an instrument to express the intent of the parties as to the contents thereof, *i.e.*, to establish the actual agreement of the parties. 47 Ohio Jurisprudence 2d 120, Reformation of Instruments, Section 2.

> 'Reform' does not connote 'create.' A reformation presupposes the existence of a valid instrument which fails to express the actual intent of the parties. An action for reformation is not to create an obligation but to establish the content of the instrument as intended by the parties.

*Delfino v. Paul Davies Chevrolet, Inc.*, 209 N.E.2d 194, 197 (Ohio 1965). In other words, there must be an underlying agreement between the parties before a written contract may be reformed to match the terms of that underlying agreement. *Faivre*, 913 N.E.2d at 1036.

The problems with reformation of the release in this case are twofold. First, while reformation is appropriate where one party knows of an error in the written instrument and takes advantage of the other's party's mistaken belief as to the contents of the instrument, here there was no "error" contained in the revised release submitted by the Kohuses. Instead, the revised release reflects the counter-offer by the Kohuses to the City's original offer to release both the June and July 2011 SBU claims. This is unlike cases where the written instrument reflects a typographical error as to the terms of a contract orally agreed to or discussed by the parties. *See, e.g., Faivre*, 913 N.E.2d 1029 (employer had erroneous belief as to contents of written agreement where employer orally offered severance pay of 3 months, but submitted written severance agreement to employee that contained typographical error reflecting 15 months of severance).

The evidence demonstrates the Kohuses never agreed to release both the July and June

---

claim and his response to receiving the City's proposed release clearly indicate there was no intent by the Kohuses to release the June 2011 SBU claim.

2011 claims in settlement for $12,911.48 as offered by the City. First, the steps taken by the Kohuses in submitting the July 2011 claim show they only intended to make a claim for one SBU incident – the July 2011 incident. Second, their actions in response to receiving the original release from the City establish that the Kohuses never intended to release both the June and July 2011 claims.

There was a single SBU claim made by the Kohuses on October 18, 2011, prior to the drafting of the City's original release, and that was for the July 2011 SBU only. All of the claim documents, including the cover letter, insurance check, MSD claim forms, and inventory report, prominently reflect the SBU Incident Number for the July incident – SBU Incident No. 4269. None of the claim documents or inventories reflect items or requests for damages for the June 2011 SBU event. The October 2011 claim documents also include notations that structural damage from SBU Incident No. 4150 in June 21, 2011 was yet "[t]o be determined," and the final page of the "Inventory Report" includes the statement that "MSDGC initially informed us that SBU Incident #4269 would be combined with WIB Incident #4150 for damages claims purposes, which MSDGC later retracted." (Doc. 569-4, p. 24). There is nothing in these submissions to indicate the Kohuses submitted a claim for the June 2011 SBU event in conjunction with their July 2011 SBU claim to MSD.

The evidence also shows that Mr. Kohus' actions in response to receiving the City's proposal to release claims for both the June and July 2011 SBU events reflect his non-acceptance of the City's proposal. Upon receiving the City's original release, Mr. Kohus telephoned Ms. Carman. Instead of speaking with Ms. Carman, he spoke with Ms. Rahtz and informed her he did not agree with releasing both claims. Both Ms. Rahtz's affidavit and Mr. Kohus's affidavit

18

consistently reflect there was a discussion about the terms of the release proposed by the City and the Kohuses' disagreement with those terms. Mr. Kohus then revised the release to reflect only the July 2011 SBU claim. Unfortunately, the method chosen by the Kohuses to reflect their disagreement with the City's proposal, as discussed above, led to the mistaken issuance of the $12,911.48 check in this case.

The Court may reform a written agreement to reflect the agreement actually made by the parties. Here, there was never a meeting of the minds that both the June and July 2011 SBU claims were to be released by the payment of $12,911.48. Because the Kohuses never accepted the City's original proposal, there is simply no agreement on which to base reformation of the revised release as the City requests. Any reformation of the revised release in this case would amount to making a new contract – one reflecting only the City's intent and terms to which the Kohuses never agreed. Therefore, the Court declines to reform the revised release in the instant case to reflect the contents of the original release proposed by the City.[5]

### IX. The Kohuses' claim falls within the scope of judicial review of SBU claims under the existing Consent Decree and Orders implementing the judicial review process, and any modification of the Consent Decree and/or Orders implementing the SBU claims program must be made by the District Judge and not the Magistrate Judge.

The City also argues that the Kohuses should not be permitted to pursue an appeal of the denial of their June 2011 claim because the amount of damages requested by the Kohuses far exceeds that envisioned by the Global Consent Decree entered in this case in June 2004. The City contends that the SBU program was intended to reimburse homeowners for routine sewer

---

[5]The Court expresses no view on whether rescission of the July 2011 release based on the City's unilateral mistake is an appropriate remedy as the City never requested rescission of that release.

19

backups resulting from insufficient capacity in the MSD sewer system, and not as an unlimited

insurance pool for homeowners who choose to store allegedly valuable items in their basement,

regardless of their worth or previous insurance coverage. MSD argues that permitting the

Kohuses' claim to go forward in this case is tantamount to making the SBU program a substitute

for insurance for reckless homeowners. While the Kohuses did have an insurance policy that

provided sewer backup coverage, the policy had a $10,000 limit. The City contends it will have

no opportunity to limit its liability if the SBU program is interpreted to allow homeowners to

bring extraordinarily large claims, like the Kohuses' $800,000 claim, nor will it have access to

traditional defenses such as assumption of risk, comparative negligence, and failure to mitigate

damages. The City contends the Consent Decree was never meant to address a single claim in

excess of $800,000. MSD asserts it has spent an average of $668,613 annually on *all* real and

personal property claims between 2004 and 2011, with an average of $3,530 spent on each claim

during that period (Doc. 569 at 12-13), and that the Kohuses' claim alone exceeds that spent

annually on all SBU claims to date. The City contends the judicial review process enacted for

SBU claims is not the proper forum to litigate claims of the magnitude asserted by the Kohuses

and that the SBU claims program was not intended to waive MSD's "right to safeguard public

ratepayer dollars by litigating claims that are extreme." (Doc. 569 at 13).

     The City does not identify the parameters of "extreme" except to say that the Kohuses'

request for more than $800,000 in damages falls within them. As the Court understands the

City's argument, the Consent Decree was never intended to cover claims of the magnitude made

by the Kohuses.

     "A consent decree is essentially a settlement agreement subject to continued judicial

policing," the terms of which a court is obligated to enforce as circumstances dictate. *Shy v. Navistar Intern. Corp.*, 701 F.3d 523, 532 (6th Cir. 2012) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). In interpreting the terms of a consent decree, the Sixth Circuit has recently clarified:

> "[C]onsent decrees bear some of the earmarks of judgments entered after litigation" and that "[a]t the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986). It is this resemblance to contracts that requires that the scope of a consent decree "be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to" the consent decree. *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). Therefore, while [the defendant's] argument that the parties' original intent was to permanently reduce [the defendant's] retiree healthcare costs *might be relevant in a motion to modify the consent decree, the interpretation of the consent decree as written should focus only within the four corners of the consent decree.*

*Shy*, 701 F.3d at 530 (emphasis added).

Examining the four corners of the Consent Decree in this case, there is nothing in the language of the Consent Decree that limits participation in the SBU claims program or the authority of the Magistrate Judge to review SBU claims based on the magnitude of the claim.

The Consent Decree provides in relevant part:

> Defendants shall implement the Water-in-Basement Program components set forth in Paragraphs XIII.A, XIII.B, and XIII.C, below, and Exhibits 6, 7, and 8, until the Consent Decree terminates in accordance with Section XXXIII.

(Doc. 131 at 46). The "Claims Program" is one component of the overall WIB/SBU program and requires the following:

> Defendants shall implement, in accordance with the requirements and schedules therein, the Water-in-Basement Claims Process Plan, attached to this Consent Decree as Exhibit 8, to compensate customers who experience WIB for real or personal property losses or expenses. Such losses may include, inter alia, building restoration

21

costs, and loss of furniture and/or property stored in the flooded areas.

(Doc. 131 at 47). Exhibit 8 to the Consent Decree identifies the specific parameters of the

Claims Program:

> The Water in Basement ("WIB") Claims Process is the damages reimbursement
> component of the Metropolitan Sewer District of Greater Cincinnati's ("MSD") WIB
> Program. Subject to the requirements of this Plan, occupants who incur damages as
> a result of the backup of wastewater into buildings due to inadequate capacity in
> MSD's Sewer System (both the combined and the sanitary portions) can recover
> those damages. This plan also provides a means for occupants to recover damages
> arising from backups that are the result of MSD's negligent maintenance, destruction,
> operation or upkeep of the Sewer System. The Claims Process is not intended to
> address water in buildings caused by overland flooding not emanating from MSD's
> Sewer System or caused by blockages in occupants' own lateral sewer lines.

(Doc. 131, Ex. 8 at 1). The following guidelines govern the reimbursement of damage claims

submitted under the WIB/SBU claims program:

> A. Scope of WIBs Covered.
>
> 1. The Claims Process will only reimburse damages arising from basement backups
> caused by inadequate capacity in MSD's Sewer System or that are the result of
> MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System.
> MSD will not pay claims for damages caused by WIBs arising from blockages in
> occupants' lateral lines or arising from overland flooding not emanating from MSD's
> Sewer System.
>
> *
> *
> *
>
> B. Damages will be paid for losses to real and personal property that can be
> documented. For that reason, claimants must, as a condition to the payment of any
> claim, cooperate with MSD's efforts to investigate and document the losses that have
> occurred as a result of a WIB incident. Claimants will be asked to submit copies of
> any documents that they may have that substantiate the existence and/or extent of
> their damages. Among other measures taken to document losses, MSD may: prepare
> an inventory of damaged items, take photographs of the building or property present
> there during or after the WIB incident or the cleaning process, request information
> about the value, type, age or other characteristics of items for which damages are
> claimed, and require the owner or occupant to submit documentation about damaged
> items. The property owner or occupant must provide MSD reasonable access to the

22

property for the purpose of documenting losses to personal property.

C. Claimants must notify MSD regarding the WIB within twenty-four hours of the time that the claimant discovers the WIB.

D. Claimants must allow MSD personnel and/or contractors reasonable access to the affected property to investigate the cause of the WIB.

E. Claims will be subject to the limitations on Ohio political subdivision liability imposed by ORC 2744.05.

(Doc. 131, Ex. 8 at 2-3).

The Consent Decree conditions payment of claims under the SBU Claims Program on the homeowner's cooperation with MSD's investigation and documentation of the claimed loss; timely notification of SBU; the allowance of reasonable property access; and the deduction of any insurance proceeds from any claim award under Ohio Rev. Code § 2744.05, which requires that insurance policy payments for alleged injuries must be disclosed to the Court and deducted from any award against a political subdivision. (Consent Decree, Ex. 8 at 3). However, there is nothing in the language of the Consent Decree that limits participation in or reimbursement under the SBU claims program based on the magnitude of the property loss. In examining the four corners of the Consent Decree, the undersigned is unable to conclude from its silence on the issue that claims exceeding a specified amount do not qualify for damages under the program or fall outside the parameters of judicial review.

In addition, the Orders of the District Judge in this case, which govern judicial review of SBU claims, do not limit the jurisdiction of the Magistrate Judge's review based on the magnitude of the claim. As explained above, the Judge Spiegel has ordered that MSD's decisions under the SBU claims program are subject to judicial review by the Magistrate Judge,

who "will review such requests and may hold an evidentiary hearing in order to determine whether the decision is supported by the law and evidence" (Doc. 154 at 4) and who "has jurisdiction to hear *any matter* in dispute between homeowners and the Metropolitan Sewer District arising from the Sewer Back Up program." (Doc. 509 at 4) (emphasis added). The authority of the Magistrate Judge to review SBU claims is broad, clear, and not limited based on the size of the claim.

Essentially, the City is asking the undersigned Magistrate Judge to unilaterally modify the Consent Decree and/or Orders of the District Judge to bar judicial review of claims in excess of certain, unspecified amounts which fall outside the average damages claims paid in the SBU program to date. The Court is not unsympathetic to the many concerns raised by the City that claims like that made by the Kohuses which approach the one million dollar mark may jeopardize the fiscal integrity of the SBU claims program and other remedies set forth in the Consent Decree. However, the Magistrate Judge's authority does not extend to modifying the terms of the Consent Decree to which the parties agreed or Judge Spiegel's Orders implementing the process for judicial review. If MSD believes that exceptions should be made for certain types of claims that exceed a particular amount, it should petition the District Judge in this lawsuit to request such relief, and all other parties to the Consent Decree must be given an opportunity to weigh in on this question. The undersigned is without the authority to deny review of the Kohuses' claim based solely on the magnitude of their claim under the present Consent Decree and Orders of the District Judge.

**X. The City is entitled to respond to the valuation of damages alleged.**

For the foregoing reasons, the Kohuses are entitled to judicial review of the denial of their

24

June 2011 SBU claim. MSD and the City shall have the right to address the valuation of the property damages alleged by the Kohuses. The Court grants MSD and the City an extension of time of 90 days from the date of this Order to submit their response. Upon submission of a response by the City on the valuation of the Kohuses' property damages, the Court shall set an evidentiary hearing on the damages claim.

Nothing in this Order should be construed as barring the City from seeking a modification of the Consent Decree or supplemental orders implementing the judicial review process as it relates to the scope of claims under the SBU claims program.

**IT IS SO ORDERED.**

Date: 3/12/13

Karen L. Litkovitz, Magistrate Judge
United States District Court

25