# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

UNITED STATES OF AMERICA, et al.,       Case No. 1:02-cv-107
       Plaintiffs,                          Spiegel, J.

     vs.                                        Litkovitz, M.J.

BOARD OF HAMILTON COUNTY        **ORDER**
COMMISSIONERS, et al.,
       Defendants.

This matter is before the Court on the Board of County Commissioners of Hamilton County, Ohio ("County")'s petition to enjoin violation of the Consent Decree (Doc. 708), the City of Cincinnati ("City")'s response in opposition (Doc. 720), the Sierra Club's response in opposition and notice of filing an exhibit to its response (Docs. 721, 723), and the County's reply memorandum (Doc. 722).

The Consent Decree in this case requires the County and City to implement infrastructure improvements to the county-wide Metropolitan Sewer District of Greater Cincinnati (MSD) to address longstanding capacity and pollution problems. The County and City disagree on the prevailing procurement laws that apply to Consent Decree sewer improvement projects and have agreed to resolution of the issue by the undersigned Magistrate Judge. For the reasons that follow, the Court finds that the City must apply County rules and regulations and state law in procuring contracts for MSD Consent Decree sewer projects and GRANTS the County's motion.

## I. CONSENT DECREE LAWSUIT

In 2002, the United States Environmental Protection Agency, the State of Ohio, and the Ohio River Valley Water Sanitation Commission brought suit against the County and City

alleging, *inter alia*, that overflows of MSD's sanitary sewer system violated the Clean Water Act and related Ohio laws and regulations. (Doc. 1, Complaint; *see also* Doc. 100, Amended Complaint). The plaintiffs challenged the capacity and pollution problems with MSD's sewer system, including sewage overflows from MSD's sanitary sewers, overflows from combined storm water and sanitary sewer lines, deficiencies at wastewater treatment plants, and backups of sewage into homeowners' basements.

In June 2004, the Court approved two consent decrees entered into by the parties which were aimed at eliminating all sanitary sewer overflows. (Doc. 129, granting Motion for Entry of Consent Decrees: Doc. 130, Interim Partial Consent Decree for Sanitary Sewer Overflows; Doc. 131, Consent Decree on Combined Sewer Overflows, Wastewater Treatment Plants, and Implementation of Capacity Assurance Program Plan for Sanitary Sewer Overflows) (collectively "the Consent Decree"). The Consent Decree establishes a comprehensive framework under which the County and City must develop and implement a long-term plan for major infrastructure improvements to address the capacity and pollution problems with MSD's sewer system. The Consent Decree also requires the County and City to implement programs to prevent basement backups, clean up backups when they occur, and reimburse residents for property damages for sewer backup events. (*Id.*). The express purpose of the Consent Decree is to "further the objectives" set forth in Section 101 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and to resolve the plaintiffs' claims for injunctive relief as set forth in the amended complaint. (Doc. 131, § IV). In light of these objectives, the County and City agree:

> to use sound engineering practices, consistent with industry standards, to perform investigations, evaluations and analyses and to design and construct any remedial measures required by this Decree; to use sound management, operational, and maintenance practices, consistent with industry standards, to implement all the

2

requirements of this Consent Decree; and to achieve expeditious implementation of the provisions of this Decree with the goals of eliminating all Sanitary Sewer Overflows and Unpermitted Overflows and coming into and remaining in full compliance with the requirements of the Clean Water Act, U.S. EPA's 1994 Combined Sewer Overflow (CSO) Policy, Chapter 6111 of the Ohio Revised Code and the rules promulgated thereunder, the Compact and the pollution control standards promulgated thereunder, and Defendants' Current Permits.

(*Id*.).

The Consent Decree sets forth the respective relationships and responsibilities of the

party defendants:

• Defendant, Board of Commissioners of Hamilton County ("the County"), is the duly authorized governing body of Hamilton County, Ohio, pursuant to the laws of the State of Ohio. The County is the holder of various NPDES[1] permits that govern discharges from the County's Wastewater Treatment Plants and Sewer System. As such, it is responsible for operating the County's Wastewater Treatment Plants and Sewer System. The County has established the MSD, a county sewer district established pursuant to Chapter 6117 of the Ohio Revised Code, and acts as the principal of MSD, including maintenance of funding authority for MSD. Prior court decisions in Ohio hold that MSD cannot be sued in its own name, and thus, MSD is not made a Party to this action.

• Defendant, City of Cincinnati ("the City"), is a chartered municipal corporation, organized and existing under the laws of the State of Ohio. Pursuant to an agreement with the County, and subject to the pertinent provisions of the Ohio Revised Code, the City also serves as the agent for the County in the management and operation of MSD. It is in this capacity that the City is named as Defendant.

(*Id*. at § II D, E).

The Consent Decree also provides certain milestones the County and City must achieve

in implementing infrastructure improvements through the year 2022 and the penalties for non-

compliance or untimely compliance.

There are two Consent Decree capital improvement projects at issue in the instant

dispute: MSD S.S. Project No. 6321, CIP 2008-19/21, Project ID 10171862, CSO 470 and 471

---

[1] National Pollutant Discharge Elimination System

3

Sewer Separation Phase 3 ("CSO 470 and 471 Phase 3") (Doc. 708, Ex. 12). In particular, the County and City disagree on the governing law and authority for the procurement of contracts for these projects. The County alleges that MSD must follow the County's rules, regulations, and resolutions, as well as Ohio state law, in bidding and building Consent Decree related projects. The City alleges that MSD is and should be managed and operated according to City laws, and that the City's ordinances govern the procurement of Consent Decree project contracts. As a result of this dispute, the construction of these two Consent Decree projects has been put on hold pending resolution of the procurement issue. Both the County and City acknowledge that resolution of the procurement issue will affect not only the two Consent Decree projects currently at issue, but future Consent Decree sewer projects as well. Because further delays in the implementation and construction of these two projects will likely result in noncompliance with the terms of the Consent Decree and attendant penalties and sanctions, the County and the City agreed to submit the procurement issue to the undersigned Magistrate Judge for resolution pursuant to the Consent Decree's dispute resolution provisions.

## II. JURISDICTION OF THE COURT

The defendants invoke the Dispute Resolution and Continuing Jurisdiction provisions of the Consent Decree which provide for Court resolution of issues relating to, *inter alia*, the implementation of and compliance with the Consent Decree after informal negotiations among the parties have been unsuccessful.[2] (Doc. 131, § XXI, Consent Decree at 75-80, § XXXI, Consent Decree at 98). Under the terms of the Consent Decree, the Court "retains jurisdiction to enforce the terms and conditions and achieve the objectives of this Consent Decree and to

---

[2] The City and County agree that the Court has continuing jurisdiction under the Consent Decree to resolve this dispute. (Doc. 708 at 15; Doc. 720 at 17).

4

resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation or execution of this Decree." (*Id*. at 98).

By entering into the Consent Decree, the City and County agreed "to implement all the requirements of this Consent Decree; and to achieve expeditious implementation of the provisions of this Decree. . . ." (*Id*. at 11). The City and County also agreed "to use sound management, operational, and maintenance practices . . . to implement all the requirements of this Consent Decree. . . ." (*Id*.).

The Consent Decree sets forth certain benchmark dates by which sewer projects are to be completed. The dispute between the County and City over the procurement practices for Consent Decree capital improvement projects presents an imminent danger to the parties' compliance with these Consent Decree benchmarks and implementation of the Consent Decree. Specifically, the disagreement over the governing law on procurement contracts has resulted in the delayed implementation and completion of the CSO 470 and 471 Phase 3 Consent Decree projects for more than one year. Resolution of the respective rights and responsibilities of the County and City on the procurement issue will directly affect whether the City and County comply with the "expeditious implementation" and "sound management, operational, and maintenance practices" terms of the Consent Decree by implementing and completing the Consent Decree projects at issue by the deadlines established in the Consent Decree.

The Court has jurisdiction to address the state law procurement issues raised by the parties because the Consent Decree confers continuing jurisdiction to "*achieve the objectives* of th[e] Consent Decree and to *resolve disputes arising hereunder as may be necessary or appropriate for the . . . implementation or execution of this Decree*." (Doc. 130 at 68; Doc. 131

5

at 98) (emphasis added). *See Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1145 (6th Cir. 1997) (holding that a district court had subject matter jurisdiction to address state law issues affecting consent decree where decree explicitly retained jurisdiction). *See also DiMucci v. DiMucci,* 91 F.3d 845, 847-48 (7th Cir. 1996) (cited with approval in *Waste Mgmt. of Ohio*) (rejecting argument that pursuant to provision in consent decree requiring parties to execute any documents reasonably necessary to effectuate the purposes thereof, the reasonableness of the terms of such documents was a state law issue not within the court's jurisdiction). Resolution of the procurement issue is both "necessary and appropriate" to fulfill the Consent Decree's mandate that the County and City "use sound management, operational, and maintenance practices . . . to implement all the requirements of this Consent Decree" and "to achieve expeditious implementation of the provisions of this Decree with the goals of eliminating all Sanitary Sewer Overflows and Unpermitted Overflows. . . ." (Doc. 131 at 11). As the Consent Decree is "subject to continued judicial policing," the Court is responsible for enforcing its terms as circumstances dictate. *Shy v. Navistar Intern. Corp.*, 701 F.3d 523, 532 (6th Cir. 2012) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). The Court therefore has jurisdiction to determine the instant dispute between the County and City.

## III. THE METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI

### A. Pre-April 10, 1968 History

In 1924, the County, in accordance with Ohio law, established sewer districts which it owned, operated and maintained. These sewer districts were subsequently consolidated into a single county sewer district in 1955 which was known as the "Hamilton County Sewer District No. 1." In 1963, the boundaries of the Hamilton County Sewer District No. 1 were expanded to

6

include all other unincorporated areas of the county. (Doc. 708, Ex. 3, 1968 Agreement, Preamble).

**B. The April 10, 1968 Agreement between the County and City**

On April 10, 1968, the County and City entered into a 50-year Agreement "to provide for better and more efficient sewer service in Hamilton County through more effective management of the operation, maintenance, and development of all sewerage and sewage disposal facilities of the County." (Doc. 708, Ex. 3, 1968 Agreement, § XIV, ¶ 1). Under the 1968 Agreement, the County designated and appointed the City "as the sole and complete management agent for the county sewer system," which was renamed the Metropolitan Sewer District of Greater Cincinnati. (Doc. 708, Ex. 3, 1968 Agreement, § XV, ¶ 1). The City consented to be a part of the County's sewer district and granted to the County the sole and exclusive use of all sanitary sewers and sewage disposal facilities of the City. The County was authorized to proceed with construction, maintenance, repair, and operation of any sewer improvement for local services within the City. (Doc. 708, Ex. 3, 1968 Agreement at 1). Both the County and City agreed that it was in their mutual interest for the City "to provide a total and complete management service for the operation of the county sewer system." (*Id*. at 2). Section II of the Agreement specifies its purpose:

> The purpose of this Agreement is to set forth the terms and conditions under which the City will undertake the management and operation of the district for and on behalf of the Commissioners. In entering the Agreement, it is the intent of the Commissioners to constitute the City as the sole management agency for the operation and maintenance of the sewer system, subject to the exclusive control and direction of the Commissioners as provided herein.

(Doc. 708, Ex. 3, 1968 Agreement, § II, ¶ 1). The Agreement provides that "authority and control of the sewer system of the sewer district shall remain vested in the Commissioners

7

including, but not limited to, the major responsibilities of fixing sewerage service charges,

adopting Rules and Regulations and approving capital improvement programs, and undertaking

the necessary legislation therefor." (Doc. 708, Ex. 3, 1968 Agreement, § IV, ¶ 1). The

Agreement also sets forth the "Authority and Responsibility of the City":

> Subject to the authority vested in the Board of County Commissioners of Hamilton County, Ohio by the provisions of Section 6117.01 to 6117.04, inclusive, Ohio Revised Code, and Section 133.06, Ohio Revised Code, the City agrees to do all things necessary to manage and operate The Metropolitan Sewer District of Greater Cincinnati in an efficient and businesslike manner, including but not necessarily limited to, the following functions:
>
> • Plan, design, contract for, and supervise the construction of all sewers in the scope of this Agreement, sewage pumping stations, and sewage treatment facilities within Hamilton County, including special assessment improvements. . . .
>
> • Draft all necessary legislation . . . for the aforementioned sewerage facilities and submit same to the Commissioners for consideration and approval and/or passage;
>
> *
> *
> *
>
> • Advertise, purchase, let contracts, and make payments for all equipment, materials and services necessary for the management of the sewer system in the manner required by law. . . .

(Doc. 708, Ex. 3, 1968 Agreement, § VIII, ¶¶ 1, 2, 11). The gross revenues of the sewer system

"shall be expended by the City subject to the same conditions as would govern the

Commissioners." (Doc. 708, Ex. 3, 1968 Agreement, § IX, ¶ 2).

In March of 2010, the County and City amended the Agreement to modify its scope:

> The scope of this Agreement includes all power and authority granted pursuant to Revised Code Chapter 6117 to acquire, develop, own or maintain, and to expend MSD funds for, any storm sewers or other "prevention or replacement facilities" as defined in Revised Code Section 6117.01 (collectively, "storm sewer facilities") where such storm sewer facilities are cost effective measure(s) to comply with requirements of the Global Consent Decree and the Interim Partial Consent Decree, entered on June 9, 2004 in *United States of America, et al. v.*

*Board of County Commissioners of Hamilton County, Ohio, et al.,* U.S. District Court, Southern District of Ohio, Case No. 1:02CV107. Determination of "cost effective" must include a business case evaluation by the Director of MSD, and the measure or measures must be recommended by the Director of MSD and approved by the Board of County Commissioners in an annual Capital Improvement Plan.

(Doc. 708, Ex. 4).

## IV. PROCUREMENT-RELATED LAWS

### A. The Ohio Revised Code Procurement-Related Provisions

Title 6117 of the Ohio Revised Code provides for the establishment, management, and maintenance of county sewer districts. Ohio Rev. Code § 6117.01(B)(1). Under Ohio law, a county may contract with a municipal corporation to perform services and functions on behalf of the county:

> [T]he board of county commissioners may enter into an agreement with the legislative authority of any municipal corporation . . . whereby the legislative authority of any municipal corporation undertakes, and is authorized by the board of county commissioners, to exercise any power, perform any function, or render any service, on behalf of the county or the board, that the county or the board may exercise, perform, or render. . . .

Ohio Rev. Code § 307.15(A)(1). Pursuant to such agreement, the municipal corporation exercises the powers the county possesses in performing the functions or services of the county:

> Upon the execution of an agreement described in division (A)(1) of this section, and within the limitations prescribed by the agreement, . . . the legislative authority of any municipal corporation may exercise the same powers as the county possesses with respect to the performance of any function or the rendering of any service, which, by such agreement, it undertakes to perform or render, and all powers necessary or incidental thereto, as amply as such powers are possessed and exercised by the county directly. . . .

Ohio Rev. Code § 307.15(A)(2).

Construction contracts for a county sewer district are subject to the competitive bidding

9

terms of Ohio Rev. Code §§ 307.86 to 307.92. *See* Ohio Rev. Code § 6117.27. The competitive

bidding sections of the Ohio Revised Code, §§ 307.86 to 307.92, state that the award of contracts

"shall be made to the lowest and best bidder. . . ." Ohio Rev. Code § 307.90(A). For all such

contracts, "contracting authority" means any department, authority, or agent "which has

authority to contract for or on behalf of the county. . . ." Ohio Rev. Code § 307.92.

The Ohio Revised Code provides that any apprenticeship program as part of a contract

issued by, or on behalf of, a county "shall be entirely on a voluntary basis. . . ." Ohio Rev. Code

§ 4139.06.

### B. MSD Rules and Regulations

The Rules and Regulations which govern MSD provide, in relevant part:

> The City of Cincinnati will follow the Hamilton County adopted Purchasing
> Policy without exception when purchasing goods and services and entering into
> any contracts. Any exception in following the county purchasing policy must be
> authorized by the Board of County Commissioners by resolution.

> In the performance of sewer repair work, the District shall follow the guidelines
> of Section 307.86 of the Ohio Revised Code, which delineates competitive
> bidding requirements. . . .

MSD Administrative Rules, Section 2402, Administrative Rule No. 2. (Doc. 708, Ex. 8).

### C. The City's Procurement-Related Ordinances: Chapters 318, 320, and 321

The City has applied three City ordinances to the bidding of contracts for MSD Consent

Decree sewer projects. Cincinnati Municipal Code ("CMC") 318, "Local Hiring Requirements"

("Local Hire"), was passed by City Council on April 25, 2012. (Doc. 720, Ex. 12). CMC 318

provides, in relevant part: "Where not otherwise prohibited by federal, state, or local law or the

terms of federal or state grants, every construction contract that goes out to bid after the effective

date of this law shall require that a minimum percentage of between 30% and 40% of all

10

construction worker hours within each trade is performed by local residents, with no less than

20% of all construction worker hours within each trade performed by disadvantaged workers."

*See* CMC 318-3. The "Local Hire" ordinance includes the following apprenticeship

requirements: "Contractors bidding for work under a construction contract must certify that they

will employ apprentices at a ratio of at least 25%, employing one (1) apprentice for every four

(4) journeypersons. In addition, each contractor shall certify that at least 50% of its

apprenticeship hours shall be performed by local residents." (Doc. 720, Ex. 12 at 4, Sec. 318-

5).[3]

CMC 320, "Compliance Guidelines for Construction Contracts Issued by Water Works

and the Department of Sewers" ("Responsible Bidder"), as amended on May 1, 2013, requires a

bidder on MSD construction contracts to make certain certifications and disclosures, including

whether it provides, or contributes to, a health care plan for those employees working on the

project and whether it contributes to an employee pension or retirement program. *See* CMC 320-

3(j), (k). (Doc. 720, Ex. 14 at 6).[4]

CMC 321, "Procurement and Disposal of Supplies, Services and Construction" ("Local

Preference"), passed by City Council on April 18, 2012, directs that a contract for supplies,

services or construction be awarded to the "lowest and best bidder." However, if the "lowest and

best bidder" is not a local business or local small business enterprise ("Local SBE") physically

located within the City, a local business or Local SBE that can match the lowest bid will then be

---

[3] The City of Cincinnati Clerk of Council website states that CMC 318 was "[t]emporarily suspended until August 1, 2013, pursuant to passage of Ordinance No. 211-2013." *See also* Doc. 720, Ex. 8, Rennekamp Decl., ¶ 4. In addition, CMC 318-5 has since been amended to specify that contractors must certify they will employ apprentices at a ratio of at least 20%. *See* CMC 318-5.

[4] A previous version of CMC 320-3 required a bidder to "certify that it provides, or contributes to, a health care plan" and "that it contributes to an employee pension or retirement program" for employees. (Doc. 720, Ex. 13 at 5).

awarded the contract. (Doc. 720, Ex. 11). *See* CMC 321-1-L; CMC 321-1-L1; CMC 321-1-P2; CMC 321-37; CMC 321-38; and CMC 321-39. The Local Preference ordinance is intended to "support businesses located within the City[]" and "promote the success of local businesses and enhance employment in the City. . . ." (Doc. 720, Ex. 11 at 1).

## V. FACTUAL BACKGROUND OF INSTANT DISPUTE

On March 7, 2013, the Cincinnati City Solicitor authored a memorandum to the City Mayor and members of City Council entitled "Management and Operation of MSD under the 1968 Agreement and the Consent Decree" ("March Memo"). The March Memo highlights the dispute between the City and County "over responsible bidder and local hire ordinances" which "has raised fundamental questions from Council members regarding the ownership, management, and operation of the [MSD]." The March Memo also recaps the City's position that the City manages and operates MSD according to City laws; the City has done so since the 1968 Agreement was implemented; and "[n]either the 1968 Agreement nor state law gives the County authority to tell the City how to run a city department, MSD." (Doc. 708, Ex. 5 at 1). The March Memo states that MSD has been directed to follow the City's procurement laws; the County has begun to hold legislation necessary to fund MSD projects; and the County's withholding of such funds has interfered with MSD's daily operations, which may affect the ability to comply with Consent Decree milestones.

In the County's March 20, 2013 response to the City Solicitor's March Memo, the County outlined the reasons it believed the City was required to follow County rules, regulations, and resolutions, as well as Ohio state law, in bidding and building Consent Decree related projects. (Doc. 708, Ex. 7). The County also noted that the local hiring ordinance approved by

12

the City Council "has the potential to increase the cost of capital projects across a $3 billion capital program." (*Id.* at 3).

Thereafter, the County passed several resolutions regarding the City's procurement practices under the disputed ordinances. These resolutions require Consent Decree projects to be bid and awarded pursuant to MSD regulations and state law:

> • May 22, 2013 resolution: suspending appropriations for MSD projects until the procurement policy issues between the County and the City were resolved and directing MSD to "immediately cease implementation of the policies known as the 'Local Business Preference' [Chapter 321] and 'Responsible Bidder' [Chapters 318 and 320]." (Doc. 708, Ex. 10).

> • September 16, 2013 resolution: terminating the County's May 22, 2013 suspension of approval of capital project bidding and capital budget appropriations for MSD; authorizing MSD to proceed with competitive bidding projections pursuant to the Ohio Revised Code, the Rules and Regulations of MSD, and the applicable policies and procedures of the County; prohibiting MSD from conducting procurement of any project using policies or procedures which deviate from the County's authority under the Ohio Revised Code, specifically, CMC 318, CMC 320, and CMC 321; and resolving that any project awarded by MSD in contravention of the authorization provided would be de-legislated immediately and MSD would be directed to immediately cease all expenditure of funds associated with the project. (Doc. 708, Ex. 11).

> • October 2, 2013 resolution: authorizing the City Manager, in accordance with the pertinent competitive bidding procedures and requirements as set forth in the Ohio Revised Code, and the County's resolution of September 16, 2013, to advertise bidding for MSD S.S. Project No. 6321, CIP 2008-19/21, Project ID 10171862, CSO 470 and 471 Sewer Separation Phase 3 ("CSO 470 and 471 Phase 3"). (Doc. 708, Ex. 12).

> • November 20, 2013 resolution: de-legislating CSO 470 and 471 Phase 3 after learning that MSD bid these projects using CMC 318, CMC 320, and CMC 321 contrary to the County's resolution and directing MSD to immediately cease all expenditures of funds associated with CSO 470 and 471 Phase 3. (Doc. 708, Ex. 13).

On January 7, 2014, the Cincinnati Interim City Manager circulated to the City Mayor and City Council a document entitled "City-County Impasse Regarding MSD Bidding Laws and Effect on the Consent Decree for MSD Construction" (the "January Memo"). The January

Memo outlines the City-County impasse over the "Local Hire," "Responsible Bidder," and "Local Preference" ordinances affecting bidding on MSD construction projects. (Doc. 708, Ex. 6). The January Memo notes that in 2013 the County held legislation authorizing funds for projects bid under those ordinances; adopted resolutions that required MSD to use Ohio laws and to not use these City ordinances; and adopted a resolution defunding any MSD project that incorporates these ordinances, including CSO 470-471, which is a Phase I Consent Decree project with a 2015 stipulated completion deadline. (*Id.*). The memo also notes that delays in Consent Decree compliance could subject both the City and County to substantial penalties and contempt of court sanctions. (*Id.*).

On January 29, 2014, the County passed a resolution authorizing MSD to again bid the CSO 470 and 471 Phase 3 Consent Decree projects in accordance with the pertinent competitive bidding procedures and requirements set forth in the Ohio Revised Code and the September 16, 2013 resolution. (Doc. 708, Ex. 14).

In a memo to the MSD Director of Water and Sewers dated March 13, 2014, the Assistant Superintendent for Governance and Procurement for the City recommended that a contract be awarded on the CSO 470 and 471 Phase 3 Consent Decree projects. (Doc. 708, Ex. 15). The memo notes that the bid included requirements provided for under the Local Hire and Responsible Bidder ordinances that were in effect as of the release of the bid on November 6, 2013, which was contrary to the County's January 29, 2014 resolution requiring procurement to proceed in accordance with Ohio law and the September 16, 2013 resolution. (*Id.*).

The County and City remain at an impasse over the bidding requirements for MSD's Consent Decree projects.

14

## VI. THE COUNTY'S POSITION

The County contends that as the lead defendant in the Consent Decree case, it is the only defendant authorized to set procurement policies for MSD. The County argues that the City operates MSD subject to the County's exclusive control and direction as the County's agent and may take only those actions which the County – its principal – may take. According to the County, the City is therefore bound by the 1968 Agreement and MSD regulations to bid Consent Decree projects pursuant to County rules and regulations and Ohio law. In addition, the County contends the City's procurement ordinances violate Ohio and federal laws; using the City's procurement-related ordinances for Consent Decree projects would invite litigation and threaten timely implementation of the Consent Decree; the City's actions favor City residents at the expense of all County ratepayers; and the County is acting to preserve Consent Decree resources and timely meet the objective of the Decree.

## VII. THE CITY'S POSITION

The City argues that the 1968 Agreement defines the scope of powers granted to the City and County, including the City's role as sole management agency for MSD. The City contends that both the City and County intended that City laws apply to MSD construction projects under the 1968 Agreement and both reaffirmed this intention publicly in response to a State Auditor's inquiry on the matter in 1990. The City asserts that neither the Consent Decree nor MSD's own Rules and Regulations supersede the terms of the 1968 Agreement defining the respective powers of the City and County. The City contends that its procurement laws do not violate state or federal law; the Court should order MSD to follow City procurement laws; and the Court should enjoin the County's refusal to fund MSD project contracts procured under the City's

laws. Finally, the City contends that at a minimum, the Court should find that the City's laws apply to MSD projects undertaken within the City boundaries.[5]

## VIII. OPINION

Both the County and the City agree that their respective rights and obligations with regard to the operation of MSD are governed by the 1968 Agreement. However, they dispute how the Agreement should be interpreted. As the 1968 Agreement is a contract, the Court applies Ohio contract principles in its interpretation of the Agreement.

Under Ohio law, the Court must determine as a matter of law the interpretation of a contract's terms, including whether its terms are ambiguous. *Savedoff v. Access Group, Inc.,* 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted). "The role of courts in examining contracts is to ascertain the intent of the parties." *Id.* (quoting *City of St. Marys v. Auglaize Cty. Bd. of Comm'rs,* 875 N.E.2d 561, 566 (Ohio 2007)). The Court must presume that the parties' intent resides in the language of their agreement. *Graham v. Drydock Coal Co.,* 667 N.E.2d 949, 952 (Ohio 1996). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys,* 875 N.E.2d at 566; *accord Alexander v. Buckeye Pipe Line Co.,* 374 N.E.2d 146, 150 (Ohio 1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the

---

[5] The City also argues that its procurement laws do not increase the costs to ratepayers, contrary to the County's complaints, and that the three bids on CSO 470 and 471 were below the construction estimate. (Doc. 720 at 15-17). Whether or not the City's procurement laws have achieved their desired effect as a public policy matter is not at issue before this Court and has no bearing on the interpretation of the 1968 Agreement governing the City and County.

agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 500 (Ohio 1992) (syllabus).

The City argues that it is "the sole and complete management agent for the county sewer system" under the 1968 Agreement and that the County does not "operate" or "maintain" any part of the sewer system. (Doc. 720 at 20-21). The City essentially argues that as the entity that manages and operates MSD, it has the right to control the procurement policies and practices for MSD Consent Decree projects. The plain and unambiguous terms of the 1968 Agreement belie the City's position.

The City's authority to operate and manage MSD is not unqualified but is restricted by the 1968 Agreement and state law which require the City – as the agent for the County – to apply County rules and regulations and state law in procuring contracts for Consent Decree projects. The 1968 Agreement explicitly states, "[I]t is the intent of the Commissioners to constitute the City as the sole management agency of the operation of the sewer system, *subject to the exclusive control and direction of the Commissioners as provided herein.*" (Doc. 78, Ex. 3, 1968 Agreement, § II, ¶ 1) (emphasis added). The Agreement further states that the City is bound to perform its functions as the County's agent "for the county sewer system . . . in accordance with the terms, conditions and provisions" of the Agreement. (Doc. 708, Ex. 3, 1968 Agreement § XV, ¶ 1). These terms created a contractual agency relationship pursuant to which the parties agreed that the City would function as the County's agent in the operation and maintenance of MSD. *See Bradley v. Farmers New World Life Ins. Co.*, 679 N.E.2d 1178, 1187 (Ohio App. 1st Dist. 1996) ("Agency is a contractual relation created by agreement of the parties. As between

17

principal and agent, the creation of the agency relationship arises from the agreement of the

parties to the existence of the relationship."). Thus, in accordance with the plain terms of the

1968 Agreement, the City is the agent of the County for the operation and maintenance of the

sewer system and is subject to the control and direction of the County in all matters related to

those functions.

As the County's agent, the authority of the City is defined and limited by the agreement

giving rise to the parties' principal-agent relationship. "Applying the ordinary rules applicable to

principal and agent, . . . the agent is limited to such powers as shall carry out the enterprise

involved for the interest of the principal. In the absence of direct and explicit provision, no

power vests in him to proceed to his principal's undoing." *Urner v. Pickelheimer*, 187 N.E.123,

124 (Ohio App. 1st Dist. 1933).[6] The 1968 Agreement clearly defines and repeatedly

circumscribes the City's authority to manage and operate MSD as follows:

> •"As provided by Sections 6117.01 and 133.06, ORC, *authority and control of the sewer system of the sewer district* **shall remain vested in the Commissioners** *including,* **but not limited to**, the major responsibilities of filing sewerage service charges, adopting Rules and Regulations and approving capital improvement programs, and undertaking the necessary legislation therefor." (Doc. 708, Ex. 3, 1968 Agreement at § IV, ¶ 1) (emphasis added).

> •The City's proposals for sewerage service charges, rules and regulations for the operation of MSD, and capital improvement projects are all subject to approval by the County. (*Id*. at § V, ¶¶ 1-3).

> •The City has the authority to "[d]raft all necessary legislation" for MSD, but must "submit same to the Commissioners for consideration and approval and/or passage." (*Id*. at § VIII, ¶ 2).

> •The City has the authority to let contracts and make payments for services necessary for the management of MSD "in the manner required by law," which is specified in the opening paragraph of Section VIII as "the provisions of Section

---

[6] The Consent Decree recognizes the principal-agent relationship of the County and City, but does not modify the parties' respective rights or obligations under the 1968 Agreement. (Doc. 131, § II D, E).

18

6117.01 to 6117.04, inclusive, Ohio Revised Code, and Section 133.06, Ohio Revised Code," under which the authority of the Board of County Commissioners of Hamilton County is vested. (*Id.* at § VIII, ¶ 11).

•"Funds in the Sewer System Revenue Fund shall be expended by the City *subject to the same conditions as would govern the Commissioners*." (*Id.* at § IX, ¶ 2) (emphasis added).

The 1968 Agreement is thus clear and unambiguous in this regard: The 1968 Agreement creates a principal-agency relationship pursuant to which the City's authority as agent is specifically limited and is subject to the direction and control of the County as principal.

In addition, the 1968 Agreement explicitly incorporates provisions of Ohio law which indicate the City is endowed only with such powers and duties as the County possesses in carrying out the management duties for MSD. Contrary to the City's assertion that MSD "is not a standard county-run sewer system formed under Ohio Revised Code Chapter 6117" (Doc. 720 at 5), the 1968 Agreement explicitly provides: "*Subject to the authority vested in the Board of County Commissioners of Hamilton County, Ohio by the provisions of Section 6117.01 to 6117.04, inclusive, Ohio Revised Code, and Section 133.06,*[7] *Ohio Revised Code*, the City agrees to do all things necessary to manage and operate [MSD] in an efficient and businesslike manner. . . ." (Doc. 708, Ex. 3, 1968 Agreement, § VIII) (emphasis added). Moreover, by entering into the Agreement with the County, the City consented to be part of the county's sewer district "pursuant to Section 6117.03 of the Ohio Revised Code." (*Id.* at 1, Preamble). Further, Ohio Rev. Code § 307.15(A)(1) authorizes a county to contract with a municipal corporation to exercise the power, perform the functions, and render any service on behalf of the county that the "county . . . may exercise, perform, or render." The City entered into such a contract with the

---

[7] Former § 133.06, governing county revenue securities, was amended and recodified as § 133.08 by 1989 H 230, eff. 10-30-89; 1988 H 592; 1984 H 224; 1971 S 343; 1969 S 245; 132 v S 475; 129 v 442; 127 v 720; 125 v 43; 1953 H 1; GC 2293-16a.

19

County in 1968.  The 1968 Agreement explicitly recognizes that "Section 307.15 et seq.
authorizes the Board of County Commissioners to contract with the City and the City to contract
with the Board of County Commissioners to provide such services." (Doc. 708, Ex. 3, 1968
Agreement at 2, Preamble).  Therefore, under the 1968 Agreement and Ohio law as incorporated
therein, the City is authorized to "exercise the same powers as the county possesses" and to
exercise "such powers [as] are possessed and exercised by the County directly. . . ."  Ohio Rev.
Code § 307.15(A)(2).

Because the County is subject to the competitive bidding requirements of Ohio Revised
Code §§ 307.86 to 307.92, the City – as the "contracting authority" for the County under Ohio
Rev. Code § 307.92 – is likewise subject to these same requirements under Ohio law.  These
provisions of Ohio law require that the award of contracts "shall be made to the lowest and best
bidder. . . ."  Ohio Rev. Code § 307.90(A).  Similarly, the County is required to follow state law
which provides that a bidder's participation in an apprenticeship program "shall be entirely on a
voluntary basis. . . ."  Ohio Rev. Code § 4139.06.  Bids pursuant to CMC 318 and CMC 320 do
not satisfy this provision because they require that bidders have an apprenticeship program and
contribute to an apprenticeship fund, and that a percentage of apprenticeship hours be performed
by local residents.  Because the City's rules for apprenticeship programs are not voluntary and
conflict with state law,[8] the County would be prohibited from implementing them directly.  Thus,
the City, which "exercise[s] the same powers as the county possesses," is likewise constrained to

---

[8] The City's arguments for why its procurement laws do not run afoul of Ohio Rev. Code § 4139.06 (Doc. 720 at
32) miss the mark.  The question before the Court is not whether § 4139.06 precludes all laws that require
participation in an apprenticeship program or whether the City's ordinances curtail a bidder's freedom to bid or an
entity's freedom to contract.  The issue here is whether Ohio Rev. Code § 4139.06 applies to MSD projects and
takes precedence over conflicting provisions of municipal law pursuant to the terms of the 1968 Agreement, by
which the City and County agreed to be bound.

apply Ohio law relating to apprenticeship programs in letting bids for Consent Decree and MSD projects.

Finally, MSD Rules and Regulations provide that the City must "follow the Hamilton County adopted Purchasing Policy without exception when purchasing goods and services and entering into any contracts" and that "[i]n the performance of sewer repair work, the District shall follow the guidelines of Section 307.86 of the Ohio Revised Code, which delineates competitive bidding requirements. . . ." MSD Administrative Rules, Section 2402, Administrative Rule No. 2. (Doc. 708, Ex. 8). When it entered into the 1968 Agreement, the City agreed that the County was authorized to adopt "Rules and Regulations" for the county sewer system. (Doc. 708, Ex. 3, 1968 Agreement, § IV, ¶ 1). The City is therefore bound by the County's rules as set forth in the MSD Rules and Regulations in bidding out Consent Decree project contracts.

Under the plain terms of the 1968 Agreement providing that the County maintains authority and control over MSD, as well as the provisions of Ohio law and MSD regulations incorporated therein, the City must adhere to the County's rules and regulations, as well as the County's resolutions, for procuring Consent Decree projects.[9] The City exercises the powers and

---

[9] In support of its argument that under the 1968 Agreement the parties intended that the City would follow City laws and requirements in contracts and purchases for MSD, the City has presented historical news articles and a 1990 memorandum from the City and County in response to a preliminary audit by the Ohio State Auditor. (Doc. 720, Exs. 1-7). The extrinsic evidence presented by the City may not be considered by the Court as the terms of the 1968 Agreement are clear and unambiguous and, therefore, the Court must discern the parties' intent from the language they used in the Agreement. *Shifrin*, 597 N.E.2d at 500. Likewise, the City's evidence on the financial impact of its procurement laws (Doc. 720 at 15-17) is not relevant to the Court's interpretation of the 1968 Agreement. The Court's role is not to determine the "best" or "wisest" policies for running MSD, but to discern the parties' intent as set forth in the 1968 Agreement. To the extent the City's brief suggests that principles of estoppel may apply to prohibit the County from withholding funding for MSD projects bid under the City ordinances based on the parties' past procurement practices and understandings, the City has failed to develop and has therefore waived any such argument.

21

duties of the County under the 1968 Agreement. Thus, in bidding contracts for Consent Decree

sewer projects the City, like the County, must adhere to the competitive bidding requirements

and voluntary apprenticeship provisions of the Ohio Revised Code. Accordingly, the City is

prohibited from bidding Consent Decree contracts under CMC 318, CMC 320, and CMC 321.

The Court's view is supported by an Ohio Attorney General opinion on this very dispute.

In a 1991 opinion to the Ohio State Auditor, the Ohio Attorney General opined that the state's

competitive bidding requirements apply to county sewer district projects where a municipal

legislative authority enters into a contract with the county to manage and operate the county

sewer district:

> Pursuant to R.C. 307.15, a municipal legislative authority that enters into a contract with a board of county commissioners to manage and operate a county sewer district established under R.C. Chapter 6117 must exercise the specific powers and duties that pertain thereto in accordance with the terms of such statutory provisions as apply to the exercise of those powers and duties by the board of county commissioners. In such circumstance the award of contracts by the municipal legislative authority for capital improvement, assessment, and maintenance and repair projects of the county sewer district must comply with the pertinent competitive bidding procedures and requirements set forth in R.C. Chapter 153, R.C. 307.86-.92, and R.C. 6117.27 as would apply to the award of such contracts by the board of county commissioners.

(Doc. 708, Ex. 9).

The opinions of the Ohio Attorney General have no precedential effect and are not

binding on the court; at best, they are considered persuasive authority. *State ex rel. Van Dyke v.*

*Pub. Emp. Retirement Bd.*, 793 N.E.2d 438, 445 (Ohio 2003). Although the undersigned's

determination that the City must follow County and state rules in procuring MSD Consent

Decree projects is based on the construction of the 1968 Agreement set forth above, the Ohio

Attorney General's opinion lends further support to this decision.

Nevertheless, the City contends that Ohio Rev. Code § 307.15, as interpreted in the 1991 Ohio Attorney General Opinion, violates the Ohio Constitution as it limits the City's power of self-government and home-rule authority. The City also contends that even if the Ohio Attorney General's Opinion is correct, the City nevertheless retains home-rule authority under Section 3, Article XVIII of the Ohio Constitution to enforce its procurement laws, regardless of state law, because "[t]he City 'as a charter municipality, in the exercise of its powers of local self-government under Section 3, Article XVIII, Ohio Constitution, may, pursuant to its charter, enact a bidding process for improvements to public property which *differs from the bidding process contained in the Ohio Revised Code*.'" (Doc. 720 at 26, quoting *Greater Cincinnati Plumbing Contractors' Ass'n v. City of Blue Ash*, 666 N.E.2d 654, 657 (Ohio Ct. App. 1995) (emphasis added by the City)). Finally, the City contends that even if the Court were to find that the City must follow County and state procedures under Section 307.15, the Court should permit the City to use its own procurement policies within the jurisdiction of the City. To find otherwise, the City argues, would violate the Ohio Constitution's municipal home-rule rights and contravene the parties' intent expressed in the 1968 Agreement.

The City's reliance on its home-rule powers is misplaced. The home-rule amendments to the Ohio Constitution give the citizens of a municipality the "power to construct the machinery of their own local government and to operate it themselves." *Dies Elec. Co. v. City of Akron*, 405 N.E.2d 1026, 1028 (Ohio 1980) (quoting *Froelich v. Cleveland*, 124 N.E. 212, 216 (Ohio 1919)). Article XVIII, Section 3 of the Ohio Constitution provides that "municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with

general laws." While the powers of local self-government are broad, *see State Personnel Bd. of Review v. City of Bay Village Civil Service Com'n*, 503 N.E.2d 518, 522 (Ohio 1986), they are nevertheless limited to "matters of a purely local nature." *Britt v. City of Columbus*, 309 N.E.2d 412, 415 (Ohio 1974) (quoting *State, ex rel. Arey v. Sherrill*, 53 N.E.2d 501 (Ohio 1944)). These powers of local self-government, "(i)n view of their nature and their field of operation, are local and municipal in character." *Dies Elec. Co.*, 405 N.E.2d at 1029. As explained by the Ohio Supreme Court:

> The power of local self-government granted to municipalities by Article XVIII relates solely to the government and administration of the internal affairs of the municipality, and, in the absence of statute conferring a broader power, municipal legislation must be confined to that area. *See Prudential Co-Operative Realty Co. v. City of Youngstown,* 118 Ohio St. 204, 160 N.E. 695. Where a proceeding is such that it affects not only the municipality itself but the surrounding territory beyond its boundaries, such proceeding is no longer one which falls within the sphere of local self-government but is one which must be governed by the general law of the state.

*Britt*, 309 N.E.2d at 416 (quoting *Beachwood v. Bd. of Elections*, 148 N.E.2d 921 (Ohio 1958)).

When the City entered into the 1968 Agreement, it became the agent for the "*county sewer system*." (Doc. 708, Ex. 3, 1968 Agreement, § XV, ¶ 1) (emphasis added). At that time, the City consented to be a part of the County's sewer district, which encompassed all of Hamilton County. As the contractual agent for the County in managing and operating the county-wide sewer system, the City operates both within and outside of the territorial limits of the City. The City's implementation of the procurement ordinances in question have a county-wide reach. As such, these City functions are not of a "purely local nature" or limited to the sphere of local self-governance for purposes of home-rule authority. Because the City is acting outside its territorial boundaries in managing and operating MSD, a county sewer district, neither

24

its home-rule authority nor its power of local self-government is implicated in the bidding of

contracts for MSD Consent Decree projects.  Consistent with the terms of the 1968 Agreement

by which the City agreed be bound, the City is required to follow County and state procedures

under Ohio Rev. Code § 307.15 for Consent Decree projects both within and outside of the

City's boundaries.  Holding the City to its part of the bargain by requiring the City to follow

County and state rules and regulations, as opposed to City ordinances, in operating and managing

MSD does not violate the Ohio Constitution or illegally usurp the City's home-rule authority.

　　　The City argues that independent of its home-rule and self-government powers, the 1968

Agreement expresses the parties' understanding that the City would apply its own laws in

operating the county-wide sewer system.  Although the City argues that this was clearly the

parties' understanding at the time they entered into the 1968 Agreement, the City does not point

to any terms of the Agreement itself to demonstrate the parties' alleged understanding but instead

cites extrinsic evidence consisting of the City-County Response to State Auditor.  (Doc. 720, Ex.

1).  The City also relies on Ohio case law for the proposition that a municipality has

constitutional authority to sell public utility services, including sewer services, outside its

borders.  (Doc. 720 at 24, citing *Xenia v. State*, 746 N.E.2d 666, 668 (Ohio App. 10th Dist.

2000)).  The City argues that this authority shows that "[b]efore entering into the 1968

Agreement, the City already had the constitutional power to operate a sewer system in the

County under its own laws."  (Doc. 720 at 24).  The City argues it did not need the statutory

authority of Ohio Rev. Code Ch. 6117 or Ohio Rev. Code § 307.15 to operate a county-wide

25

sewer system as the Ohio Constitution already provided all of the necessary authority.[10] The

City contends that because it already possessed this power, it would have been illogical for the

City to unnecessarily limit its authority by invoking § 307.15 to enter into the 1968 Agreement.

Whatever the merits of the City's argument concerning the logic of limiting its authority

by entering into the 1968 Agreement, it is not the Court's role to look beyond the plain language

of the Agreement to discern the parties' intent or the wisdom of their decisions. Rather, the

Court must presume that the parties' intent resides in the language of their agreement. *Graham*,

667 N.E.2d at 952. The language of the 1968 Agreement is not ambiguous in this respect. The

language clearly shows that the City contracted with the County under the statutory authority of

Ohio Rev. Code § 307.15. (Doc. 708, Ex. 3, 1968 Agreement at 2, Preamble). The City further

expressly "consented to be part of the Hamilton County Sewer District No. 1 *pursuant to Section

6117.03 of the Ohio Revised Code*, and granted to the county the sole and exclusive use of all

sanitary sewers and sewage disposal facilities of the City as part of the county sewer system. . . ."

(Doc. 708, Ex. 3, 1968 Agreement at 1, Preamble) (emphasis added). By expressly contracting

under these state statutory provisions, the City agreed to be bound by the same provisions of

Ohio law by which the County was bound and forfeited any right it had to adhere to its own

competitive bidding regulations and requirements. Given the City's clear choice and its

agreement to become part of the County sewer district in 1968, the City's constitutional authority

---

[10] Section 4, Article XVIII, Ohio Constitution, authorizes a municipality to "acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants. . . ." Section 6, Article XVIII, Ohio Constitution, authorizes such a municipality to "also sell and deliver to others any transportation service of such utility and the surplus product of any other utility. . . ." Taken together, these provisions of the Ohio Constitution "authorize municipalities that own and operate public utilities to contract with entities outside their municipal borders for the sale of the public utility services." *Xenia*, 746 N.E.2d at 670 (citing *Miller v. Orrville*, 192 N.E. 474, 475-76 (Ohio App. 9th Dist. 1934)).

to provide sewer services outside its borders simply has no bearing on whose rules and regulations govern MSD procurement matters at issue here.

Further, the case law cited by the City does not support the proposition that the Ohio Constitution provided the City with all the authority necessary to operate the County's sewer system under the City's own laws prior to execution of the 1968 Agreement. (Doc. 720 at 24). While an Ohio municipality has the constitutional authority to sell public utility services to non-residents of the municipality, *Xenia*, 746 N.E.2d at 669-70, a contract is necessary to govern the terms of any such sale. *Xenia*, 746 N.E.2d at 671 (citing *Fairway Manor Inc., v. Summit Cty. Bd. of Commrs. Cty.,* 521 N.E.2d 818, 822-823 (Ohio 1988)). The City could not operate the County sewer system prior to execution of the 1968 Agreement because the County owned the sewer system that extended past the City's borders and there was no contract that allowed the City to sell sewer services to County residents. In order for the City to operate the County's sewer system, the City had to enter into a contract with the County which gave the City that authority. The City concedes that the terms of the contract it executed with the County in 1968 delineate its authority and govern its rights and obligations with regard to MSD.

In summary, the terms of the 1968 Agreement are clear and unambiguous and require the City to apply County rules, regulations, and resolutions, as well as state law, in procuring contracts for MSD Consent Decree projects both within and outside of the City limits.

In view of the above findings, the Court need not decide whether the City's procurement laws are unconstitutional because, in any event, the City cannot use such laws in the procurement of MSD Consent Decree projects. Likewise, the Court declines to consider the County's policy arguments (Doc. 708 at 24-28) as they are not relevant to the legal determination in this case.

27

Finally, the Sierra Club's brief does not address the issues regarding the interpretation of the 1968 Agreement and the impact of Ohio Rev. Code § 307.15 on the procurement issues in this case. Rather, the Sierra Club's brief is focused on why it believes the Responsible Bidder Ordinance constitutes good public policy. However, it is not the Court's role to determine the public policy merits of the challenged ordinances; that is a role for the legislative bodies of the City and County. The Court's role is to determine the respective rights and obligations of the parties under the 1968 Agreement and Consent Decree.

## IX. RELIEF

A federal court has broad equitable powers when enforcing a consent decree and when choosing a remedy for its violation. *Shy*, 701 F.3d at 533 (internal citations omitted). The City and County's dispute over the governing rules and regulations for the procurement of contracts for Consent Decree sewer projects has resulted in serious delays in implementing the provisions of the Consent Decree. The City's application of CMC 318, CMC 320, and CMC 321 in its management and operation of MSD, instead of the competitive bidding requirements set forth in Ohio Rev. Code §§ 307.86 to 307.92 and § 6117.27 and the apprenticeship provision of Ohio Rev. Code § 4139.06, violates the Consent Decree's mandate to the City to "use sound management, operational, and maintenance practices . . . to implement all the requirements of this Consent Decree" and "to achieve expeditious implementation of the provisions of this Decree with the goals of eliminating all Sanitary Sewer Overflows and Unpermitted Overflows. . . ." (Doc. 131 at 11). As such, the City is enjoined from using CMC 318, CMC 320, and CMC 321 in the procurement of contracts for Consent Decree sewer projects and is ordered to follow the County's rules, regulations, and resolutions and Ohio state law in procuring Consent Decree

sewer projects both within and outside of the City boundaries.

   **IT IS SO ORDERED**.

Date: _6/26/14_                                    _Karen L. Litkovitz_
                                                   Karen L. Litkovitz, Magistrate Judge
                                                   United States District Court

29