# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br> Plaintiffs, <br><br> vs. <br><br> BOARD OF HAMILTON COUNTY <br> COMMISSIONERS, et al., <br> Defendants. | Case No. 1:02-cv-107 <br> Barrett, J. <br> Litkovitz, M.J. <br><br><br> ORDER RE: REQUEST <br> FOR REVIEW BY JAMES <br> AND SHARELL CLARK |

This matter is before the Court on the Request for Review of the denial of a Sewer Backup ("SBU") claim by James and Sharell Clark (Doc. 843) and the response of the Metropolitan Sewer District of Greater Cincinnati ("MSD") (Doc. 878). On May 15, 2017, the Court held a hearing on Mr. and Mrs. Clark's request for review of the denial of their SBU claim.

Mr. and Mrs. Clark's request for review is filed under the Sewer Backup[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating from MSD's Sewer Systems or caused by blockages in occupants' own lateral sewer lines.

(*Id.* at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation,

---

[1] The "Water-In-Basement" program has been renamed the "Sewer Backup" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Ex. 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id.* Homeowners who are dissatisfied with MSD's disposition of a claim under the SBU program may request review of the decision by the Magistrate Judge, whose decision is binding and not subject to any further judicial review. (Docs. 154, 190).

## I. Background

On August 28, 2016, a "100-year" rain event caused extensive overland flooding and backup to MSD's sewer system.[2] MSD states that more than 5.4 inches of rain fell in a concentrated area in 2.5 hours with a peak intensity rate of over 5 inches per hour. Flash flooding was evident and the level of the storm "vastly exceeded the abilities of the existing combined sewers, which were not designed to receive and convey waters from a storm more intense than a 10-year recurrence interval." (Doc. 878 at 1).

James and Sharell Clark are the owners of the property located at 1731 Avonlea Avenue, Cincinnati, Ohio. The Clarks experienced flooding at their property from the August 2016 rain event and sustained damage to their personal and real property. The Clarks made a claim to MSD under the SBU program for $87,249.00 in compensation for the losses they sustained. MSD's adjuster evaluated the Clarks' claim submittal and, in compliance with Ohio Rev. Code §

---

[2] Mike Pittinger, a registered professional engineer and wastewater collection superintendent for MSD, testified that classification of a rain event as a 100-year storm is based on historical precipitation records and statistical analysis. It does not mean that a storm of this magnitude would occur every 100 years. Rather, the classification means that if weather patterns remain the same, there is a one in 100 or a 1% chance that a storm of this magnitude would occur in any given year.

2744.05(B)(1), deducted the $5,250.00 they received from their insurance carrier from the calculated total damages. MSD's adjuster valuated the real and personal property loss of the building and its contents at $12,719.57. (Doc. 878-5 at 5-6). MSD offered the Clarks this amount in settlement of their claim. The Clarks rejected the offer and filed this appeal.

At the hearing, Mrs. Clark testified that when she discovered the basement flooding, she observed items floating in several feet of water in her basement. She also testified that she could observe signs of sewer discharge in the laundry tub. Mrs. Clark testified that their basement area is their living area and they sustained extensive damage to furniture, appliances, and other items in the basement and garage.

Mike Pittinger from MSD testified that there "is no question" that this particular rain event exceeded the capacity of MSD's combined storm and sanitary sewer in the affected area. He explained that when the volume of sewer contents exceeds the capacity of the sewer, there is a direct backup of sewage in manholes and connections to sewer lines which can result in SBU into people's homes. Mr. Pittinger testified that "in this particular case . . . I don't think there's any doubt that that occurred." He further testified that additional factors contributed to the SBU in the Clarks' residence, including the location of the Clarks' house in relation to the trunk sewer, overland flooding, and the natural drainage of the land where overland flow follows a natural water course.

**II. Whether the Consent Decree requires MSD to compensate for damages arising from severe wet weather events.**

In this case, MSD contends that it is not required to reimburse the Clarks for damages caused by this severe wet weather event under the Consent Decree. MSD attributes the losses

sustained by the Clarks to "the torrential rainfall their neighborhood experienced on August 28, 2016." (Doc. 878 at 2). MSD states:

> With a storm of this severity, it is undeniable that the sewer system was overwhelmed and did back up but it is impossible to definitively determine if and to what extent which sewers backed up or overflowed. It is also certain that flood waters from the storm entered the Clarks' home. The backyard of the Clarks' property sits at a low point in the neighborhood; it is paved for parking and a recessed driveway and garage are in the rear of the home. These conditions would cause overland flooding to flow toward the Clarks' backyard, down the recessed driveway and ultimately into their garage and basement.

(*Id.* at 3). MSD alleges that the Consent Decree places the burden of proof on claimants to establish their damages "arise from basement backups" caused by inadequate capacity in MSD's sewer system or MSD's negligent maintenance, destruction, operation or upkeep of its sewer system. MSD points out that the SBU program expressly excludes damages cause by waters "arising from overland flooding not emanating from MSD's Sewer System." (*Id.* at 4). MSD argues that the Clarks are not entitled to compensation in this case because they cannot establish that their property damage "arose" from a basement backup caused by MSD; rather, the damage arose from the rain event and overland flooding, not the sewer system. MSD reasons:

> During certain events, overland flooding occurs and results in the natural inundation of areas by the flood water. The source of flood water that enters, then exits buildings, culverts, some sewers, etc., remains the flood event. By contrast, the Consent Decree refers to a much narrower universe of circumstances where the source of a discharge during dry weather or a typical wet weather event within a sewer's design capacity would be the sewer system. Ultimately, the operation of the individual sewers and their designed capacity compared to the scale of the wet weather event determines the source of the flooding.

(Doc. 878 at 5). MSD alleges there is no evidence its sewers failed to operate at the level for which they were designed; instead, the volume and intensity of the rainfall caused extensive

overland flooding and any damage to the Clarks' property necessarily arose from the rain event, not the sewer system. (*Id.*).

MSD's argument cannot be reconciled with the terms of the Consent Decree. The rain event that caused the overland flooding likewise contributed to the overload of MSD's sewer system. Backups to MSD's sewer system almost always occur as a result of a rain event that overwhelms the existing capacity of MSD's sewer system. The fact that overland flooding may occur and ultimately contribute to the lack of sewer capacity – resulting in a sewer surcharge – does not exclude sewer backup as one cause of the damages sustained. The language of the Consent Decree does not require that SBU be the sole or greater cause of the damages sustained, or that damages should be apportioned where they are caused by both SBU and overland flooding not emanating from MSD's sewer system.

Moreover, the Consent Decree does not contain any exclusion based on the intensity of a rain event. According to MSD, the sewer projects under the Consent Decree are "designed for 2 to 10 year storms" and the extreme rain event that occurred on August 28, 2016 would have overwhelmed even the capacity of the sewers designed to comply with the Consent Decree. (Doc. 878 at 1). While this may be true, the Consent Decree does not exempt particular rain events from coverage under the SBU program. If the parties to the Consent Decree wished to exclude a particularly severe rain event, they could have done so. They did not. The Court is constrained to follow the express terms of the Consent Decree, which is silent regarding the exclusion of certain rain events. As the Court has previously advised the parties in connection with other provisions of the Consent Decree, nothing in this Order should be construed as barring the parties to the Consent Decree from seeking an amendment or modification thereof to clarify

their intentions regarding the scope or limitations of the Consent Decree. *See* Doc. 599 at 25; Doc. 680 at 13.

In cases such as this one, it is impossible to definitively determine after the fact the extent of damages to the homeowner's property caused by SBU, as opposed to overland flooding. In the past, Magistrate Judge Hogan, the undersigned's predecessor in these cases, determined that where there was evidence of damage from both SBU and overland flooding not emanating from MSD's Sewer System, MSD was responsible for all of the damage. *See* Docs. 474, 475, 476, 477. In addition, MSD has previously paid claims where both overland flooding and surcharging of the main sewer line during a rain event caused property damages. *See, e.g.,* Doc. 543. It would be inconsistent with prior decisions and past practice in this case to deny the Clarks' claim because both overland flooding and SBU contributed to their property loss. The evidence in this case establishes that the rain event of August 2016 exceeded the capacity of the combined storm and sanitary sewer and that the sewer surcharged causing damage to the Clarks' property. As SBU was one cause of the Clarks' property loss, MSD is responsible for the damages sustained by the Clarks.

### III. Property loss claim

The Court turns to an evaluation of the personal and real property damages claimed by the Clarks in this case. The Clarks seek $87,249.00 in damages for property restoration and the loss of personal property.

The Clarks' insurance company made a detailed, room by room assessment of the cost estimates for replacement or repair of their real property. The insurance carrier prepared a line item estimate for mitigation, repair, and debris removal in the amount of $8,603.46. Mr. Clark, a

contractor, submitted a bulk item estimate of $15,000.00, without a specific breakdown of the charges and expenses. The Clarks also submitted handwritten estimates of the cost of materials without documenting the amount of material needed. The Court finds the comprehensive estimate submitted by the Clarks' insurance carrier to be a more accurate reflection of the damages in this matter. Therefore, the Court accepts the value assessed by the insurance carrier as fair and reasonable.

The Clarks also seek damages for family photos, paperwork, two concrete saws, two Woodmax snow blowers, two nail guns, two leaf blowers, and ceiling tiles. Although the family photographs undoubtedly have sentimental value, they have virtually no market value. One leaf blower is documented, but the concrete saws, snow blowers, nail guns, second leaf blower, and ceiling tiles were not photographed or otherwise documented. Under the Consent Decree, "[d]amages will be paid for losses to real and personal property that can be documented" and "[c]laimants will be asked to submit copies of any documents that they may have that substantiate the existence and/or extent of their damages." (Doc. 131, Exh. 8 at 2-3). In the absence of documentation showing the existence of the concrete saws, snow blowers, nail guns, second leaf blower, and ceiling tiles, the Court denies compensation for these items. However, the Court awards $250.00 for the one leaf blower that appears in the photograph found at Doc. 878-3 at 67 (PAGEID#: 15655) of the record.

It appears that the Clarks are seeking the replacement value for the remaining items of personal property listed in their inventory of property. However, damages for SBU claims are determined based on the market value of personal property *as of the date of loss* (the depreciated value) and not on the original purchase price or cost of replacement. Under the Consent Decree

7

that governs the Court's review of SBU appeals, the Clarks are entitled to be reimbursed for the depreciated value of their personal belongings and not their replacement value or original cost. The Court finds the Clarks are entitled to the depreciated value of the remaining items of property in the amount of $12,810.57 as assessed by MSD's adjuster. (Doc. 878-5 at 5-6). The Court accepts the value assessed by MSD's adjuster as fair and reasonable.

To the extent the Clarks also seek damages for cleaning supplies and equipment, these items have already been covered in the estimate provided by their insurance carrier. *See* Doc. 878-3 at 16-21. Therefore, the Court declines to award further compensation for these items.

Finally, the Clarks are entitled to compensation for the $1,000.00 deductible paid to their insurance carrier.

In conclusion, the Court awards **$14,060.57** to Mr. and Mrs. Clark for the damages sustained in this case.

**IT IS SO ORDERED**.

Date: 5/23/17

Karen L. Litkovitz, Magistrate Judge
United States District Court