UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

vs.

BOARD OF HAMILTON COUNTY
COMMISSIONERS, et al.,
Defendants.

Case No. 1:02-cv-107
Barrett, J.
Litkovitz, M.J.

**ORDER RE: REQUEST
FOR REVIEW BY
KIMBERLY TURNBOW**

This matter is before the Court on the Request for Review of the denial of a Sewer Backup ("SBU") claim by Kimberly Turnbow (Doc. 951), the response of the Metropolitan Sewer District of Greater Cincinnati ("MSD") (Doc. 1097), and the supplemental responses of the parties (Docs. 1120, 1151, 1152, 1153-1, 1175, 1180). On September 28, 2017, the Court held a hearing on Ms. Turnbow's request for review of her SBU claim. (Doc. 1102). The Court held supplemental hearings on October 17, 2017 (Doc. 1125), November 6, 2017 (Doc. 1153), and December 13, 2017 (Doc. 1198).

Ms. Turnbow's request for review is filed under the Sewer Backup[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating from MSD's Sewer System or caused by blockages in occupants' own lateral

---

[1] The "Water-In-Basement" program has been renamed the "Sewer Backup" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

sewer lines.

(*Id.* at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Ex. 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id.* Homeowners who are dissatisfied with MSD's disposition of a claim under the SBU program may request review of the decision by the Magistrate Judge, whose decision is binding and not subject to any further judicial review. (Docs. 154, 190).

As an initial matter, the Court notes that there is no dispute that one of the causes of damage to Ms. Turnbow's personal and real property was an MSD sewer backup. The only issue in this case is the amount of damages for Ms. Turnbow's property loss.

Ms. Turnbow is the owner of the property located at 20 Merzen Court, Cincinnati, Ohio. On August 28, 2016, Ms. Turnbow experienced an SBU incident in her basement which resulted in damage to her personal and real property. MSD crews responded to investigate Ms. Turnbow's report of a sewer backup and were able to identify evidence of a mainline sewer surcharge as well as overland flooding. MSD customer service contacted Ms. Turnbow on September 2, 2016 and she reported her hot water heater was not currently functioning. As such, she was referred to MSD contractor DNK Architects in order to expedite the repair and reimbursement for her home's critical mechanicals. Ms. Turnbow was given notice that she

could proceed with repairs to her hot water heater, furnace, and electrical panel on October 20, 2016. DNK verified the repairs were completed and MSD issued two-party checks to Ms. Turnbow and her contractors for a total of $12,743.00 on October 31, 2016.

Ms. Turnbow then made a claim for personal property damages to MSD for the August 2016 sewer backup into her basement. MSD made an offer of $4,910.84 to Ms. Turnbow as compensation for her claim. Ms. Turnbow rejected the offer and filed this appeal.

Following the initial hearing of Ms. Turnbow's appeal in this Court, MSD made a revised offer of $10,619.16 to Ms. Turnbow as compensation for her claim. Ms. Turnbow rejected that offer and seeks resolution of the dispute by this Court.

Ms. Turnbow requests compensation for a vehicle and its contents, a toddler car seat and a handgun, which were damaged by the flood while parked in the driveway. Under the Consent Decree that governs the SBU claims process, Ms. Turnbow may not be compensated for property loss outside of her dwelling, including her vehicle and its contents. "A consent decree is essentially a settlement agreement subject to continued judicial policing," the terms of which a court is obligated to enforce as circumstances dictate. *Shy v. Navistar Intern. Corp.*, 701 F.3d 523, 532 (6th Cir. 2012) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). In interpreting the terms of a consent decree, the Sixth Circuit has clarified:

> "[C]onsent decrees bear some of the earmarks of judgments entered after litigation" and . . . "[a]t the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986). It is this resemblance to contracts that requires that the scope of a consent decree "be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to" the consent decree. *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).

*Shy*, 701 F.3d at 530.

3

The clear language of the Consent Decree in this case limits recovery to structural or personal property damage of the building or dwelling of the occupant making an SBU claim. The Consent Decree defines "Water-in-Basement(s)" [now called Sewer Backup or SBU] as "any *release of wastewater from Defendants' Sewer System **to buildings*** that (i) is not the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by Defendants; and (ii) is not the result of overland, surface flooding not emanating from Defendants' Sewer System." (Doc. 131, Consent Decree at 18) (emphasis added). Similarly, Exhibit 8 to the Consent Decree[2] which governs the SBU claims process sets forth the "Scope of WIBs Covered" as follows:

> The Claims Process will *only reimburse damages arising from basement backups* caused by [1] inadequate capacity in MSD's Sewer System or [2] that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. . . .

(Doc. 131, Consent Decree, Exhibit 8 at 2) (emphasis added). Exhibit 8 to the Consent Decree further clarifies that under the Claims Process, "occupants who incur *damages as a result of the backup of wastewater **into buildings***" due to inadequate capacity in MSD's sewer system or resulting from MSD's negligent maintenance, destruction, operation or upkeep of the sewer system may recover those damages. (Doc. 131, Consent Decree, Exhibit 8 at 1) (emphasis added). There is nothing in the language of the Consent Decree to indicate that outside property damage resulting from a sewer surcharge or a combination of overland flooding and sewer surcharge is covered. In examining the four corners of the Consent Decree, the undersigned concludes that the plain language used by the parties to the decree evinces the intent to limit

---

[2]Section XIII of the Consent Decree incorporates Exhibit 8 by reference. (Doc. 131, Consent Decree at 47).

4

recovery to those damages associated with a claimant's building and not property outside the building. Therefore, Ms. Turnbow may not be compensated for the damage to her vehicle and its contents.[3]

Damages for SBU claims are determined based on the market value of personal property *as of the date of loss* (the depreciated value) and not on the original purchase price or cost of replacement. MSD's adjuster, Tenco Services, Inc., valuated the items lost by Ms. Turnbow by applying depreciation to the claimed items based on their age and/or market value. MSD's Claim Evaluation Worksheet sets forth an itemized list of 57 items of property for which Ms. Turnbow sought damages. With the exception of the items that follow, the Court finds MSD's valuations of Ms. Turnbow's personal property to be fair and reasonable.

The Court determines that MSD undervalued certain items of personal property before applying depreciation. The Court awards the following amounts for these items[4]:

Item 7.   Gap shirts: $45.00

Item 10.  Gap skirts: $127.92

Item 22.  2 Murray lawnmowers: $310.80

Item 27.  Fold up table: $42.50

Item 31.  Grayco Car Seat: $76.00

Item 33.  2 leather overnight bags: $175.00

Item 34.  Oversized bookbag, Adidas: $52.50

---

[3] This does not mean that homeowners are without a remedy if they believe the damage to their outside property was caused by MSD's negligence. Homeowners who disagree with MSD's decision on their claim may seek relief in the state courts, as MSD advises in their materials to consumers. *See* http://sbu.msdgc.org/sbu/page/filing-a-claim.aspx.

[4] Although Ms. Turnbow assigned different values to Items 35 (30-piece T-Fal pot and pan set) and Item 43 (Aldo over-the-knee boots) before depreciation, the Court's own research indicates that MSD's valuation of these items is fair and reasonable.

Item 44.     Cole Haan leather boots: $149.50

Item 45.     King comforters: $150.00

Item 48.     Wash cloths, towels, etc.: $113.27

Items omitted from MSD's worksheet:

Ugg boots: $130.00

Bear claw boots: $71.00

Michael Kor leather boots: $75.00

Ms. Turnbow also seeks compensation for the replacement of her basement electrical panel, which she states was damaged during the flood. Ms. Turnbow testified that HELP Plumbing, Heating, Cooling and Electrical, which performed work restoring her critical mechanicals shortly after the flood, advised her that the electrical panel needed to be replaced because of water damage. Ms. Turnbow initially presented an estimate of $17,500.00 from Pitts Construction for replacement of the service panel and all breakers; replacement of all knob and tube wiring to specification, all receptacles in the basement, three GFI outlets, and smoke and "carbon" detector; and removal of "[illegible] dry to remove [k]nob & tube." (Doc. 1151). The Court declines to award damages based on this estimate. The estimate is not signed; it is not dated; it does not include any breakdown in price or details about the work to be performed; and it does not indicate that the proposed work is related to the August 2016 flood.

At the request of the Court, Ms. Turnbow obtained an estimate from HELP for the replacement of the electrical panel. The $9,095.00 estimate from HELP dated November 14, 2017 includes the technician's observations that "water has damaged electrical service; washer circuit is not dedicated; no kitchen dedicated circuit; no kitchen circuit upstairs." (Doc. 1180).

6

The HELP estimate provides a lump sum for a "service upgrade" of the main electric service to "200 Amp" with a new panel and for new dedicated circuits for the washer, kitchen, and upstairs kitchen. (*Id.*).

Initially, MSD opposed Ms. Turnbow's request for this electrical work, arguing that the SBU Claims Process Plan provides for the reasonable cost of replacement of damaged real property and not for upgrades or improvements, such as those set forth in the HELP estimate.

On December 13, 2017, the Court held a supplemental hearing by telephone to clarify the HELP estimate. Brandon Jasper, the Service Advisor from HELP, stated that $4,827.00 of the $9,095.00 estimate was related to the water damage sustained by Ms. Turnbow. He stated that the estimate for the new outlets and dedicated circuits is not related to the water damage but was provided as a service to the customer in the event the customer wishes to bring the electrical system up to current standards. Mr. Jasper also stated that Ms. Turnbow paid the reduced "Club" rate of $59.00 for the service call. The $4,827.00 estimate is also a "Club" rate that HELP would honor even though Ms. Turnbow is not a "Club" member.

The Court determines that the $4,827.00 estimate for the replacement of the electrical panel is fair and reasonable and awards Ms. Turnbow this amount. The Court also awards Ms. Turnbow the $59.00 charge for the HELP service call.

In conclusion, the Court awards **$16,125.65** to Ms. Turnbow for the damages sustained in this case ($9,721.16 [MSD's valuation of items, excluding the itemized list on pages 5 and 6] + $1,518.49 [items on pages 5 and 6] + $4,827.00 [electrical panel work] + $59.00 [service

charge for electrical panel work].

**IT IS SO ORDERED.**

Date: 12/15/17

*Karen L. Litkovitz*
Karen L. Litkovitz, Magistrate Judge
United States District Court