# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br> Plaintiffs, <br><br> vs. <br><br> BOARD OF HAMILTON COUNTY <br> COMMISSIONERS, et al., <br> Defendants. | Case No. 1:02-cv-107 <br> Barrett, J. <br> Litkovitz, M.J. <br><br> **ORDER RE: REQUEST** <br> **FOR REVIEW BY** <br> **YVONNE COLLINS** |

This matter is before the Court on the Request for Review of the denial of a Sewer Backup ("SBU") claim by Yvonne Collins (Doc. 1200), Ms. Collins' supplements to the Request for Review (Docs. 1298, 1303, 1342), the response of the Metropolitan Sewer District of Greater Cincinnati ("MSD") (Doc. 1299), and MSD's supplemental response (Doc. 1343). On April 4, 2018, the Court held a hearing on Ms. Collins' request for review at which Ms. Collins and Tom Fronk, MSD Assistant Superintendent and SBU Response Program Manager, testified and documentary evidence was submitted. (Doc. 1305).

I. Background

Ms. Collins' request for review is filed under the Sewer Backup[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to

---

[1]The "Water-In-Basement" program has been renamed the "Sewer Backup" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

address water in buildings caused by overland flooding not emanating from MSD's Sewer System or caused by blockages in occupants' own lateral sewer lines.

(*Id.* at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Ex. 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id.* Homeowners who are dissatisfied with MSD's disposition of a claim under the SBU program may request review of the decision by the Magistrate Judge, whose decision is binding and not subject to any further judicial review. (Docs. 154, 190).

Ms. Collins is the owner of a two-family property located at 3811 South Madison Avenue, Norwood, Ohio. Ms. Collins' home consists of two living units, Unit A and Unit B, and a lower level basement. Prior to August 28, 2016, Ms. Collins lived in Unit B, the lower unit, and rented Unit A, the upper unit. Unit B consists of a full kitchen, three bedrooms, a dining room, a family room, a hallway, a full bath, and a half-bath. Two furnaces and two water heaters, one for each of the units, were located in the lower level basement.

On August 28, 2016, Ms. Collins experienced basement and first floor flooding after the area in which her property is situated experienced heavy rainfall. Drywall, flooring, critical mechanicals (water heaters and furnaces), trim, and insulation in Ms. Collins' home were damaged. Ms. Collins attempted to clean, disinfect, and remove damaged structural materials, such as trim and drywall. Furniture and appliances, including a stove and refrigerator, were also

2

damaged and had to be disposed of.

Ms. Collins subsequently submitted a claim to MSD under the SBU claims program seeking damages for property loss. MSD offered Ms. Collins $15,286.85 to settle her claim. Ms. Collins rejected MSD's offer and filed her request for review of MSD's decision in this Court.

## II. Evidence presented

MSD received a report on August 29, 2016 that Ms. Collins' property had experienced four feet of flooding. The service request, which was received by telephone call, states: "Backup is primarily entering the building from: Overland Flooding." (Doc. 1299, Ex. A). MSD states that due to the overwhelming number of calls for service related to this flood event, MSD crews were unable to respond to investigate. (Doc. 1299 at 1). MSD customer service contacted Ms. Collins on September 5, 2016 and September 15, 2016, and she reported her critical mechanicals were not functioning as a result of the flood. MSD referred her to its contractor DNK Architects in order to expedite the repair of and reimbursement for her home's mechanicals. DNK facilitated the repair of Ms. Collins' furnaces, and MSD issued a two-party check for $6,200.00 to Ms. Collins and her contractor for the repair on December 13, 2016. (Doc. 1299, Ex. B).

After Ms. Collins submitted an SBU claim in June 2017, MSD investigated the cause of the flooding to her property. MSD determined that the property's building sewer is tapped into a sanitary-only sewer that connects to a larger combined sewer downstream on Duck Creek Road. (Doc. 1299, Ex. D). Ms. Collins' property is located just north of where Duck Creek was formerly located. (Doc. 1299, Ex. E; Doc. 1305, Def. Ex. 1). Mr. Fronk testified that Ms. Collins' property sits at the bottom of a large hill to the north and northwest. Mr. Fronk testified

that MSD did not receive a report of a sewer backup on August 28, 2016 from the two homes downstream of Ms. Collins' property on South Madison Avenue, which are served by the same sanitary-only sewer as Ms. Collins' property. SBUs were reported by four properties on Duck Creek Road, which runs perpendicular to South Madison Avenue. These properties are served by a large combined trunk sewer that connects to the sanitary sewer on South Madison Avenue. Mr. Fronk stated that the Duck Creek Road homes sit approximately four to five feet lower than Ms. Collins' home. Several homes on Burwood Avenue, which is located to the south of Ms. Collins' property, also reported sewer backups. However, the elevations of those Burwood Avenue properties were below that of Ms. Collins' property. Mr. Fronk testified that the sewer on Burwood Avenue is a combined sewer, whereas the sewer on South Madison Avenue is a sanitary-only sewer. (Doc. 1337 at 37). He testified that it was not known whether the backups at the Burwood Avenue properties were caused by a sewer backup from the Duck Creek Road trunk sewer or the increased flow in the combined sewer on Burwood Avenue. (*Id.*).

Mr. Fronk testified that he also investigated whether sewer water from an overflowing manhole commingled with overland flooding. He testified that no properties upstream and uphill from Ms. Collins' property on South Madison Avenue, Burwood Avenue, and Hudson Avenue reported sewer backups. Mr. Fronk stated that without reports of SBUs from these properties, he concluded it was unlikely that the manholes upstream from Ms. Collins' property overflowed and commingled with overland flooding.

Mr. Fronk testified he believed Ms. Collins' house was a two-level dwelling. (Doc. 1337 at 50). He testified there was significant evidence that the water entering Ms. Collins' home was from overland flooding. Numerous photographs presented by Ms. Collins in her SBU claim

4

contain handwritten notations that water came in through the screen door and through and over the windows into her home, which are indications of overland flooding. (Doc. 1299, Ex. C at 70-114). Based on the totality of this information, MSD determined that the cause of the flooding was overland flooding not emanating from MSD's sewer system. Nevertheless, because Ms. Collins had previously been offered assistance with cleaning services and critical mechanical repair, MSD offered her $15,286.85 as a good faith gesture for payment of the reasonable cost to clean her property and replace her hot water heaters. (Doc. 1299, Ex. F).

Ms. Collins presented evidence from a September 2, 2016 MSD press release about the August 28, 2016 rain event. MSD represented:

> The worst rain fell on Norwood, St. Bernard and eastern and central parts of Cincinnati, which are all on a combined sewer system that carried both rainwater and sewage in the same pipe.
>
> Many of the sewer backups resulting from this storm were caused by a lack of a capacity in the sewer system. Combined sewers, constructed up until the 1950s, were not designed to handle a 100-year-plus rain event. In some cases, these sewers filled with storm water and started overflowing into streams and rivers and backing up into buildings through floor drains.

(Doc. 1305, Pl. Ex. 1).

Ms. Collins also submitted an MSD Sewer Backup Investigation report dated September 2, 2016, related to Ms. Collins' home at 3811 South Madison Avenue in Norwood, Ohio. (Doc. 1305, Pl. Ex. 2). Mr. Fronk testified that the preliminary finding was "Mainline Overload—Wet Weather." Mr. Fronk testified that "the reason for a preliminary finding is to advance it through our workflow so that it would allow -- based on that finding, there is [sic] different work paths. And because it's a preliminary finding, we send it for cleaning." (Doc. 1337 at 21). Mr. Fronk

5

also testified that MSD employed a triage system for wet weather events like the one that occurred on August 28, 2016:

> MSD has had a long practice, since the start of this program in 2004, to make a quick preliminary finding and base a cleaning work order on that decision on that finding so that the property owner can get a cleaning in a more appropriate time due to health concerns and property damage issues and that. It's very often that a house will be referred for a cleaning based off of a preliminary finding, and yet a formal finding will determine that it actually was not something that MSD should have been offering a cleaning or would be settling claims for.

(*Id.* at 22). MSD made a preliminary finding of mainline overload for properties lying within designated "100-year-rain" event areas based on radar data. These properties qualified for expedited cleaning services and repair of critical mechanicals. (*Id.* at 60). The only factors MSD considered in making a preliminary finding of mainline overload were whether the property was located within a 100-year-rain event area or at the top of a hill. (*Id.*). Mr. Fronk testified that to his knowledge, every property located within the 100-year-rain event area whose owner reported a backup was referred for cleaning services in the preliminary finding. (*Id.*). He further testified:

> There was an emergency situation here. There were thousands of people that were without heat, air conditioning, hot water heater, some electric. So the Director implemented an emergency plan for mechanicals, and so those were handled separate. They weren't handled – because we understood it's difficult for people to file claims very quickly for all their personal belongings and that. It takes a while to itemize and everything.
>
> So there was a process put in place to get these property owners reimbursed for their mechanicals: hot water heat, furnace heat. Those were done quicker without the formal findings.

(*Id.* at 26).

Ms. Collins submitted an MSD excel spreadsheet showing a "Preliminary Finding" of "Mainline Overload-Wet Weather" for SBU Investigation Work Order number 183512 corresponding to Ms. Collins' address. (Doc. 1305, Pl. Ex. 3).

MSD presented Ms. Collins with a letter dated September 14, 2017, offering to settle her SBU claim for $15,286.85. (Doc. 1305, Pl. Ex. 4). Mr. Fronk admitted that the letter does not state that Ms. Collins' claim was denied on the basis of overland flooding and the words "overland flooding" do not appear in the letter. Instead, the letter suggests that the compensation offered was for a sewer backup:

> If you choose to accept compensation from the Sewer Backup Claims Program, MSD is permitted to request that you take reasonable precautions against the loss of personal and real property **in the event of *another* sewer backup**. These precautions should include refraining from storing personal property or installing new carpet or drywall below a previously document[ed] high water line or less than two feet above the basement floor for the next two years. The extent to which you comply with these requests may be a factor that is considered in determining the settlement offer for any claims pertaining to **a future sewer backup event**.

(Doc. 1298, Ex. 2) (emphasis added).

Mr. Fronk was presented with the declaration of Kirby Birk, who resides at 3823 South Madison Avenue, which states, "On August 28, 2016, after the significant storm event, I observed that three sewer manhole covers had been moved from their original spots at the bottom of South Madison and Duck Creek." (Doc. 1305, Pl. Ex. 6). Mr. Fronk testified that MSD did not receive any reports of dislodged manhole covers at this location. (Doc. 1337 at 66). Mr. Fronk declined to draw any conclusions from this evidence without knowing precisely which manhole lids Ms. Birk was referring to or doing a more in-depth investigation. (Doc. 1337 at 40-41). He admitted, however, that a surcharge of a sewer is the most likely cause of the movement of a manhole cover. (*Id.* at 42).

An MSD surveyor obtained the elevations of the recessed garage floors of 2440, 2442, and 2444 Duck Creek Road, three properties in close proximity to Ms. Collins' property that reported SBUs on August 28, 2016. The elevations of these homes are 617.28, 617.02, and 617.21 feet, respectively. (Doc. 1343, Ex. D). These three homes on Duck Creek Road along with the homeowner of 2446 Duck Creek Road all reported three to four feet of flooding shortly after the event. (Doc. 1343, Ex. F). MSD estimates that the elevation of Ms. Collins' lower level apartment is approximately 623 to 624 feet based on topographic maps.[2]

Ms. Collins submitted a letter from Shonda Daugherty, the neighbor who resides at 3813 South Madison Avenue. The letter states that she also had water backup in her unfinished basement on August 28, 2016. (Doc. 1305, Ex. 8). Mr. Fronk testified he did not speak with Ms. Daugherty as part of his formal investigation, nor did MSD receive a report of a backup on August 28, 2016 at her property. (Doc. 1337 at 53, 69).[3]

Mr. Fronk was also questioned about a sworn declaration from Monte Robinson, who states that he visited Ms. Collins' home on August 29, 2016, to assist her in the cleanup of her property. Mr. Robinson states he saw and smelled sewage, and he observed that "throughout the entire lower level and basement it was wet, tissue, smell, dark brown, water. It was full of sludge." (Doc. 1305, Pl. Ex. 9). Mr. Fronk testified that after his "years of dealing with these issues, I can attest that overland flooding picks up the mud and it also picks up a smell. So my question would be if this was actually sewage or not." (Doc. 1337 at 54). Mr. Fronk

---

[2] Ms. Collins denied MSD permission to enter her property for survey work. (Doc. 1343, Ex. E).

[3] The Court has not considered Plaintiff's Exhibit 5, which is a map labeled "August 28, 2016 –SBU Information." (Doc. 1305, Pl. Ex. 5). Neither Mr. Fronk nor any other witness was able to identify, authenticate, or explain the significance of the symbols contained within the document.

acknowledged that Ms. Collins' SBU claim indicated she had sewage coming in her drains and testified he did not investigate any of the drains at Ms. Collins' house. However, based on a photograph of her bathroom taken on August 28, 2016 and submitted by Ms. Collins which showed standing water on the floor, but no sewage residue on the walls of the bathtub or toilet seat, Mr. Fronk concluded that it was unlikely that Ms. Collins' bathroom fixtures were overflowing. (*Id.* at 62-63; Doc. 1305, Def. Ex. 2).[4] Mr. Fronk also testified that if someone observed water backing up through a tub or a toilet, this could be a sign of either sewer backup or an indication of overland flooding entering floor drains and overwhelming the building sewer. (*Id.* at 55, 61).

Subsequent to the hearing, MSD submitted an August 23, 2017 email from Mr. Fronk to MSD's counsel explaining his investigation and conclusions about Ms. Collins' backup:

> This is a tough one. There were four other properties that reported SBUs around the corner on Duck Creek but they are tapped into a 6 ft x 8 ft sewer. This property is tapped into an 8 inch sanitary sewer that is connected to that sewer. It is possible that the large sewer, if backed up, would have either backed up into the 8 inch sewer or at least prevented the 8 inch sewer from discharging into the larger sewer. The claimant describes overland flooding multiple times in her submission. However, on the photo of the bathroom, she did say it came up through the toilet and bathtub. I am a little confused by the photo on page 125 of the scanned claim. It shows dirty, murky water on the bathroom floor, but the toilet and tub look clean. Why would there be a roll of paper on the tub, if it wasn't there before the flood. If it was there and the tub overflowed, wouldn't it be soaked/dirty. The location of the garbage can seems to indicate that the toilet was not used after the flood. (Note bathroom floor was damaged/missing prior to the flood.[)]
>
> Also, there is very little signs of water actually reaching four feet. The rooms that do not have the drywall cut out have no discernible high water marks. Items on the coffee table do not appear to be wet.

---

[4] At the hearing, both parties move to strike certain evidence, including testimony of witnesses, that was presented at the hearing but allegedly not produced to respective counsel prior to the hearing. The Court overruled both motions. Based on the additional information and arguments submitted by counsel for the parties subsequent to the hearing (Docs. 1342, 1343), the Court sees no basis to reconsider its ruling.

(Doc. 1343, Ex. A).[5]

Ms. Collins testified that at five or six o'clock on August 28, 2016, she was talking on the telephone when she felt water underneath her feet. She walked around Unit B and observed water "coming up from the floor." (Doc. 1337 at 78). She observed a large amount of water gushing through a wall panel in the center of Unit B behind which a metal floor drain was located. (Doc. 1305, Pl. Ex. 11 at 1). Ms. Collins testified that she understood this drain was connected to the sewer system. She also observed bubbling water in the toilet, toilet tissue, and water coming up in the tub in the bathroom of Unit B. Ms. Collins testified that the water was brown, thick, and gooey and smelled like sewage. She then opened the basement door and observed approximately four feet of water in her basement. She testified that her basement has no windows and she did not observe water seeping through the walls. She also testified that she observed water entering her home from the door and windows.

The following day, she observed her next door neighbors at 3809 and 3813 South Madison Avenue cleaning out their basements. Ms. Collins testified that she was unable to hire a restoration company to perform the cleanup, so with the help of friends and neighbors she performed the cleanup herself. She testified there was extensive damage to her home. The drywall, door trim, and insulation had to be removed from all six rooms of Unit B. Ms. Collins testified that she sustained personal property damage, including to her furnaces, water heaters, washer and dryer, and personal items. Ms. Collins obtained a quote to replace the two water heaters for $2,898.00. (Doc. 1305, Pl. Ex. 12). Ms. Collins also obtained a quote to restore Unit B to its pre-August 28, 2016 condition from H. Glasgow Construction Company in the amount

---

[5] MSD waived attorney-client privilege associated with this email communication. (Doc. 1343 at 1).

of $55,027.88. Her claim submission includes an additional estimate from ServiceMaster Restoration for cleanup in the amount of $11,799.17 and repairs in the amount of $24,294.08. (Doc. 1298, Ex. 1 at 31-55). She also submitted a claim for $2,949.94 in personal property loss for items that were documented by photographs. (Doc. 1305, Pl. Exs. 14-15). Finally, Ms. Collins seeks $13,300.00 for lost rental income for Unit A. She testified that because Unit B has been uninhabitable, she has been living in Unit A since the August 28, 2016 flood.

Ms. Collins testified that prior to receiving MSD's September 14, 2017 letter offering to settle her claim for $15,286.85, she was never advised by MSD, orally or in writing, that the flooding in her home was caused by overland flooding. She testified that the first time she heard the term overland flooding was when she refused MSD's offer to settle her SBU claim.

On October 29, 2017, former MSD Director Gerald Checco sent an email to Ms. Collins. (Doc. 1343, Ex. C). The email states that after MSD received Ms. Collins' SBU claim, MSD did an assessment and concluded that "this was not a SBU but an overland flooding, caused by an exceptional storm." (*Id.*). The email states that MSD's offer of settlement was "more of a 'good faith' gesture" given MSD's previous offer to clean Ms. Collins' property and repair or replace her critical mechanicals. (*Id.*).[6]

## III. Resolution

The preponderance of the evidence establishes that Ms. Collins' property was damaged by both a surcharge from the public sewer and overland flooding. It appears that Mr. Fronk's conclusion about the cause of the flooding to Ms. Collins' house is based on flawed or inaccurate

---

[6] The email from Mr. Checco refutes the argument by Ms. Collins' attorney that MSD did not reveal its overland flooding "theory" until one week before the SBU hearing in this case. *See* Doc. 1342 at 9.

assumptions. Mr. Fronk's August 23, 2017 email suggests that Ms. Collins reported sewer water "overflowed" from the toilet and bathtub in Unit B. He observed that the photograph of the bathroom taken on the day of the rain event showed a clean roll of toilet paper on the edge of the tub and questioned why the paper was not "soaked/dirty" if the tub overflowed. Mr. Fronk also testified that the photograph did not show sewage residue on the walls of the bathtub or toilet seat. However, Ms. Collins did not report that the toilet and tub "overflowed." Rather, she reported that sewage "came up the toilet, tub and floor." (Doc. 1299, Ex. C at 125). Ms. Collins testified that she observed the toilet bubbling water and water coming up in the tub of Unit B. She did not testify that both fixtures overflowed. The bottom of the tub is not visible in the photograph, but the water in the toilet appears to be discolored, which would be consistent with the backup of sewer water. Therefore, Mr. Fronk's observation of a clean toilet paper roll on the side of the tub and lack of sewer residue on the sides of the tub or toilet seat in Unit B does not appear to negate Ms. Collins' observations of sewer water in the toilet and bathtub drain. In addition, Mr. Fronk's email states the photographs submitted by Ms. Collins show little signs of four feet of water (as reported by Ms. Collins) on the walls of Unit B and he observed the items on the coffee table in Unit B did not appear to be wet. But the four feet of water reported by Ms. Collins was the level of water she observed in her basement, which Mr. Fronk apparently did not consider as he testified Ms. Collins' home was a two-floor dwelling, when in actuality it is a three-floor dwelling which includes a basement. Finally, Mr. Fronk admitted that Ms. Collins' claim was "a tough one" and that it is possible the sewer on Duck Creek Road either overflowed into South Madison Avenue or prevented the smaller sewer pipe on South Madison Avenue from discharging into the larger sewer on Duck Creek Road.

The Court finds Ms. Collins' testimony about what she observed on August 28, 2016 to be credible. She related in detail what she was doing at the time she first observed water on her floor in Unit B and the steps she took to investigate the source of the water. Concerning the sewer drain behind the panel in the middle of Unit B, she testified that she was not aware this drain even existed because it was hidden behind a wall panel which she never had occasion to open. It was not until a plumber removed the panel subsequent to the August 2016 rain event that Ms. Collins discovered a floor drain behind the panel. (Doc. 1337 at 105-106). She testified that in addition to water entering Unit B from her windows and doors, she observed water exiting the wall panel. This observation supports a finding that one source of the water in Unit B was from the drain behind the panel, which tends to support a sewer backup and not overland flooding.

In addition, the Court has no reason to discount the observations of Mr. Robinson, who observed and smelled sewage in Ms. Collins' apartment the day after the rain event, and the sworn declaration of Ms. Birk, who observed displaced manhole covers at the bottom of South Madison Avenue and Duck Creek Road. There are two sanitary sewer manholes at the bottom of South Madison Avenue and a combined sewer manhole at the intersection of South Madison Avenue and Duck Creek Road. (Doc. 1343, Ex. H). Mr. Fronk testified that the most likely reason for the displacement of a manhole cover is the discharge of a sewer. The two most southern manholes on South Madison Avenue have lid elevations of 623.25 and 625.59 feet, respectively. (Doc. 1343, Ex. D). The sanitary sewer manhole closest to Ms. Collins' property sits at an elevation of 625.59 feet, which is higher than the floor elevation of Unit B of Ms. Collins' property. Therefore, any surcharge at that level would likely have reached Unit B.

Finally, MSD's September 14, 2017 letter to settle Ms. Collins' claim does not mention overland flooding even though it has been MSD's practice to inform homeowners that their claims are denied because overland flooding was the cause of their flooded property. The letter also advises Ms. Collins of her responsibilities and the precautions she should take "in the event of *another* sewer backup." This lends further support to the conclusion that Ms. Collins' property was damaged by both a sewer backup and overland flooding.

Nevertheless, MSD contends it is unlikely that the two most southern manhole lids on South Madison Avenue would have been displaced and overflowing. MSD argues that based on the reported level of flooding at the Duck Creek Road homes, had these manholes overflowed, the Duck Creek homes would have received significantly more flooding than the three to four feet reported. The Court recognizes that the elevation evidence presented by MSD may be incompatible with Ms. Kirby's declaration of displaced manholes.[7] However, in light of the preliminary findings made by MSD, the location of Ms. Collins' property in an area that received one-hundred-year rainfall, the pattern of sewer backups in the immediate vicinity of Ms. Collins' house on August 28, 2016, MSD's offer letter to Ms. Collins which fails to mention overland flooding, the contemporaneous photographic evidence, Mr. Robinson's observations, and Ms. Collins' testimony, the Court determines that the preponderance of the evidence supports a finding that the sanitary sewer surcharged and persuades the Court that the flooding to Ms. Collins' house was caused by both a sanitary sewer surcharge and overland flooding.

---

[7] The Court understands MSD's argument to be based on the hydraulic principle that water seeks its own level. This would appear to hold true if the trunk sewer on Duck Creek Road surcharged into the sanitary sewer on South Madison Avenue. However, it is not clear whether this same principle would apply if the overloaded sewer on Duck Creek Road prevented the sanitary sewer on South Madison Avenue from discharging into the larger sewer, which is one of the scenarios posited by Mr. Fronk in his August 23, 2017 email.

It is impossible to know how much of the damage to Ms. Collins' home was caused by overland flooding and how much was caused by the surcharge of the public sewer. In the past, Magistrate Judge Hogan, the undersigned's predecessor in these cases, determined that where there was evidence of damage from both SBU and overland flooding not emanating from MSD's Sewer System, MSD was responsible for the entirety of the damage. *See* Docs. 474, 475, 476, 477. In addition, MSD has previously paid claims where both overland flooding and surcharging of the main sewer line during a rain event caused property damage. *See* Doc. 543. In accordance with this precedent, MSD is responsible for the damages sustained by Ms. Collins. Ms. Collins' appeal is therefore sustained.

Ms. Collins seeks the following relief: $55,027.88 for restoration costs; $2,200 for replacement of two water heaters; $2,949.94 for documented lost personal property; and $13,300 for lost rental income ($700 per month rental value multiplied by 19 months of loss of use of her real property). (Doc. 1298, Exs. 1, 3, 4, 5).

The Court has carefully reviewed the estimates submitted by Ms. Collins. The Court adopts the ServiceMaster Restoration by BTM as fair and reasonable and awards

$36,093.25 for sanitizing/cleaning and restoration.[8] The Court further awards $2,200 for replacement of two water heaters and $2,949.94 for documented lost personal property[9] for a total award of $41,243.19.

The Court denies Ms. Collins' request for compensation for the "loss of use" of her property in addition to restoration costs. Ms. Collins argues that Ohio law allows recovery of both types of damages. Under the Consent Decree, however, damages are limited to documented real and personal property loss. As this Court has previously determined, it would be inconsistent and duplicative to award claimants compensation for the alleged loss of use of their property when they are compensated for the rebuild cost of the interior of their homes. *See* Doc. 1281 at 8. In addition, the "loss of use" claimed by Ms. Collins is in reality lost income in the form of rent which is not compensable under the Consent Decree. *See* Doc. 693 at 9. The Court declines Ms. Collins' request to reconsider these rulings and denies Ms. Collins' request for lost rental income.[10]

---

[8] At the hearing, MSD appeared to question whether the removal of drywall was duplicative of the work Ms. Collins and others had already accomplished prior to the filing of her claim. (Doc. 1337 at 115). The Court finds that the work is not duplicative. The photographs included with Ms. Collins' SBU claim predate the ServiceMaster Restoration estimate and depict various heights of removed drywall. The drywall removal proposed by the company was "to an *even* 4ft." (Doc. 1299, Ex. C) (emphasis added). Given the uneven nature of the drywall removed by Ms. Collins, the estimate for the removal of drywall is appropriate and compensable.

[9] The depreciated value assigned by Ms. Collins for her personal property appears fair and reasonable.

[11] This does not mean that homeowners are without a remedy where they believe certain damages not covered under the Consent Decree were caused by a sewer backup or MSD's negligence. Homeowners who disagree with MSD's decision on their claim may seek resort in the state courts, as MSD advises in their materials to consumers. *See* http://sbu.msdgc.org/sbu/page/filing-a-claim.aspx.

In sum, Ms. Collins is awarded $41,243.19 on her SBU claim.

**IT IS SO ORDERED**.

Date: 6/4/18

Karen L. Litkovitz, Magistrate Judge
United States District Court