UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>Plaintiffs,<br><br>vs.<br><br>BOARD OF HAMILTON COUNTY<br>COMMISSIONERS, et al.,<br>Defendants. | Case No. 1:02-cv-107<br>Barrett, J.<br>Litkovitz, M.J.<br><br>**ORDER RE: REQUEST<br>FOR REVIEW BY CHARLES<br>ADAMS/GLOBETROTTERS<br>VFW POST 6428** |

This matter is before the Court on the Request for Review of the denial of a Sewer Backup ("SBU") claim by Charles Adams/Globetrotters VFW Post 6428 ("the VFW") (Doc. 1434) and the response of the Metropolitan Sewer District of Greater Cincinnati ("MSD") (Doc. 1504). On November 29, 2018, the Court held a hearing on the VFW's request for review at which Charles Adams, Joe Wickman and Linda Wickman, representatives of the VFW, and MSD Assistant Superintendent and SBU Response Program Manager Tom Fronk testified and documentary evidence was submitted. (Doc. 1508).

## I. Background

The VFW's request for review is filed under the Sewer Backup[1] program (formerly known as the Water-in-Basement [WIB] Claims Process Plan) (Doc. 131, Consent Decree, Exhibit 8). The Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising

---

[1] The "Water-In-Basement" program has been renamed the "Sewer Backup" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system. *See* Doc. 452 at 4; Doc. 454 at 16.

from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating from MSD's Sewer System or caused by blockages in occupants' own lateral sewer lines.

(Doc. 131, Consent Decree, Exhibit 8 at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Exhibit 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id*. Homeowners who are dissatisfied with MSD's disposition of a claim under the SBU program may request review of the decision by the Magistrate Judge, whose decision is binding and not subject to any further judicial review. (Docs. 154, 190).

The Globetrotters VFW Post 6428 is located at 140 Main Street, Addyston, Ohio. On February 25, 2018, the VFW experienced flooding in the lower level of its building. The VFW subsequently submitted a claim to MSD under the SBU claims program seeking damages for property loss. MSD denied the VFW's claim because it determined that the damage to the VFW's property was not compensable under the Consent Decree that governs the SBU claims program. The VFW disagreed and filed a request for review of MSD's decision in this Court.

## II. Evidence presented

MSD presented evidence that from February 18, 2018, and continuing into the first week of March 2018, prolonged rains along the Ohio River led to a significant rise in the water level of the Ohio River and its tributaries, including the Muddy Creek. (Doc. 1504, Ex. B). The VFW

2

property is located approximately 250 feet from the west fork of the Muddy Creek and within the area impacted by riverine flooding. (Doc. 1504, Ex. F). The Ohio River crested at 60.53 feet on February 26, 2018, marking the Ohio River's 22nd highest level ever recorded. (Doc. 1504, Ex. A). The widespread flooding resulted in declarations of emergency from state and local governmental authorities. (Doc. 1504, Ex. B).

On March 2, 2018, MSD received a report that the VFW building experienced flooding on February 25, 2018. An MSD crew responded shortly after the report to investigate. The crew observed the building was not currently flooded, but they observed evidence of prior flooding. The downstream manhole for the combined sewer was currently surcharged but flowing. The MSD crew also noted evidence of overland flooding. Mr. Fronk testified that during the period of this historic flooding event, backwater from the Ohio River entered its tributaries, including Muddy Creek. MSD presented graphs showing the Ohio River peaked at 60.53 feet on or about February 26, 2018 and slowly receded to approximately 52 feet by March 2, 2018, the date the MSD crew visited the VFW property. (Doc. 1504, Ex. C). Mr. Fronk testified that the timing of the flooding of the VFW property corresponds with the peak level of the Ohio River. Mr. Fronk also testified that on March 2, 2018, the MSD crew observed that the Muddy Creek had receded within its own banks and the water level in the manholes had also receded. Mr. Fronk opined that these observations are consistent with the data showing the Ohio River receded from its peak of 60.53 feet on February 26 to 52 feet on March 2, 2018. (Doc. 1504, Ex. C).

Mr. Fronk also presented a map showing the topography of the geographic area in which the VFW is situated. (Doc. 1508, Defendants Exhibit 1). The map shows the VFW is located to the west of the Muddy Creek and sits at the same relative elevation as the banks of the Muddy

Creek. Mr. Fronk testified that the contour lines clearly show that the backwater from the Muddy Creek would have been above the basement or lower level of the VFW building. In addition, the land bordering the east bank of the Muddy Creek slopes steeply upward and is at a higher elevation than the west bank of the creek. Mr. Fronk testified that the topography of the area facilitated the flow of backwater from the Muddy Creek overland toward the VFW building. A photograph taken on February 25, 2018 from a VFW security camera shows overland flooding directly adjacent to an outside wall of the VFW building. (Doc. 1504-5 at 58). Defendants' Exhibit 2 shows the location of the upstream manhole in the parking lot of the VFW property, as well as mud and debris in the parking lot, which further evidences overland flooding. (Doc. 1508, Defendants Exhibit 2). Mr. Fronk testified that the area surrounding the VFW building was covered with overflowing water from the tributaries of the Ohio River and that MSD's sewers, which are by nature a drainage system, necessarily took on river water from above the ground. Mr. Fronk testified that given the location of the manhole (#11013007) in the VFW parking lot, the proximity of the manhole and VFW building to the Muddy Creek, and the evidence of overland flooding, it is clear that the manhole was covered with and inundated by flood waters from the Muddy Creek. Mr. Fronk explained that public and building sewers were full of backwater from the Ohio River. He testified that Ohio River flooding is distinct from the rain events typically encountered in SBU cases because the flooding results not from a sudden rain event but from the slow rise of the water level of the Ohio River upstream of Cincinnati.

Mr. Adams from the VFW testified that the building had been flooded several times before but this was the first time members observed feces in the flood water, prompting them to call MSD on March 2, 2018. Mr. Adams states that an MSD crew inspected the premises and

4

advised the VFW that there was evidence of sewer backup through the toilets, causing the flood water to be contaminated with feces. (Doc. 1434 at 46; Doc. 1508, Plaintiff's Exhibit A). Mrs. Wickman testified that the water level was higher than the rim of the toilet and rose to about three feet. The MSD crew advised the VFW to remove everyone from the area until a specialized cleanup could be performed. The following day, an MSD cleaning crew arrived and also advised the VFW representatives that the premises were contaminated. The cleaning crew removed drywall, flooring, and two bars and threw out personal property that they said was contaminated. The VFW states that members were not permitted to clean items themselves and had no say in what items were kept or disposed of.

Mr. Wickman testified that the MSD pumping station located east of the VFW building was inundated with river water and stopped working. He opined that this resulted in the discharge of sewer water into the Ohio River, which then backed into the Muddy Creek. He alleges that had it not been for the operational failure of the pumping station, there would not have been sewage waste in the water that flooded the VFW building.

MSD states that any failure of the pumping station did not affect the contamination of the Ohio River because the river always contains some amount of sanitary waste discharged from MSD's combined sewer overflows, which have been regulated and permitted by the government. In addition, river water is by its very nature contaminated and flood waters pose a risk for infectious disease. (Doc. 1054, Ex. B, at 8).

**III. Resolution**

Under the Consent Decree, property owners may recover damages to personal or real property caused by (1) inadequate capacity in MSD's Sewer System, or (2) MSD's negligent

5

maintenance, destruction, operation or upkeep of the Sewer System. (Doc. 131, Consent Decree, Exhibit 8 at 1).

To the extent the VFW suggests that the operational failure of MSD's pumping station during the Ohio River flood caused the VFW's property damage and demonstrates MSD's negligence, the Court disagrees. A pumping station such as this is designed to pump wastewater or sewage from a lower elevation to a sewage treatment plant situated at a higher elevation when gravity cannot convey the wastewater/sewage. The pumping station was not designed to handle historic volumes of flood water from the Ohio River that might inundate the station. To the extent the pumping station was itself overwhelmed by Ohio River flooding such that sanitary water from the station was discharged into the Ohio River, the evidence shows the Ohio River is already contaminated from other sources, including MSD's combined sewer outflows. Therefore, when a property is flooded by the Ohio River, the water that enters the property will necessarily be contaminated and property that comes into contact with the contaminated flood water will be damaged or destroyed. Although a failure of the pumping station may result in additional contamination of the flood water that enters the property, the failure and resulting additional contamination does not increase the property damage or loss caused by intrusion of the flood waters. In addition, and as explained below, the evidence shows that the historic flooding of the Ohio River in February 2018 - not the failure of a single pumping station - caused the VFW's damage.

The preponderance of the evidence shows that backwater resulting from the historic flooding of the Ohio River flowed into the Muddy Creek, which in turn overflowed its banks, flowed overland to the west, and flooded the entire area surrounding the VFW building. This

6

riverine flooding also inundated the nearby manholes and sewer inlets, which were covered by the overland flooding. The photographic and topography evidence shows that overland flooding from the Muddy Creek was a source of the flood water in the lower level of VFW building.

However, there is also evidence from the VFW that while the building experienced flooding in the past, this was the first time that fecal matter was observed in a building flood, strongly suggesting there was also a backup from the building sewer through the toilets. The evidence shows that the public and building sewers surrounding the VFW were full of backwater from the Ohio River and most likely backed up into the VFW's building sewer and through the toilets, which would explain why fecal matter was observed in the flooded VFW building. The question then becomes to the extent inflow of floodwaters contributed to a sewer backup, does the inability of MSD's sewer system to convey water from a historically significant flood constitute "inadequate capacity" under the Consent Decree?

The term "inadequate capacity" is not defined in the Consent Decree. However, the Consent Decree contains a provision entitled "Adequate Capacity" that is instructive. (Doc. 131-1 at 48). Under the "Adequate Capacity" provision of the Consent Decree, MSD is required to undertake remedial measures to ensure that MSD's sewer system has a capacity that is consistent with appropriate design standards or is equipped with other measures so as to prevent capacity-related SBUs. (*Id.*). The provision also indicates that a sanitary sewer system has "adequate capacity" when it conveys flow without any capacity-related sanitary sewer overflows "under current and projected future conditions." (*Id.*; *see also* Doc. 131-1 at 27-28). In addition, the Consent Decree requires, *inter alia*, the implementation of remedial measures in response to "wet weather issues." (Doc. 131-1 at 2-3, 48). Similarly, in determining the cause of a backup

7

under the Consent Decree, MSD must consider "wet weather" factors such as amount of precipitation, property SBU history, signs of overland flooding, and topography, among others. (Doc. 131, Consent Decree, Exhibit 8 at 2). Read together, these provisions indicate that the Consent Decree's SBU claims program was intended to address capacity-related issues resulting from wet weather conditions under current and projected future conditions and not from a historically significant river flood that inundates the portions of MSD's sewer system that lie in close proximity to the Ohio River or its tributaries, like the Muddy Creek. MSD's sewer system is not designed to convey historic flood waters from the Ohio River and it would be unreasonable to require MSD to design such a system. The Consent Decree was not intended to compensate homeowners for backups resulting from historic Ohio River flooding. To require MSD to compensate homeowners under these circumstances would be tantamount to making MSD a no-fault insurer for individuals residing on or around the Ohio River. It would be unreasonable to construe the Consent Decree as requiring MSD – and ultimately Hamilton County ratepayers – to effectively provide flood insurance to all residents impacted by Ohio River flooding. Therefore, the Court determines that the Consent Decree does not cover capacity-related issues resulting from the flooding of the Ohio River and its tributaries under the circumstances presented by this case.[2]

As a final matter, the Court notes that under the Consent Decree, "MSD's provision of cleanup services under this program does not constitute an admission of any liability by MSD with regard to any claims that the occupant may have against MSD for real or personal property

---

[2] There may be circumstances where it is unclear whether the capacity of MSD's sewer system was impacted by Ohio River flooding, wet weather precipitation, or both. That is not the case here because it is clear that the parking lot sewer serving the VFW property was covered by and inundated with backwater river flooding.

damage caused by the building backup." (Doc. 131, Ex. 7 at 4). MSD will provide cleaning services when doubt exists about the cause of the backup after an initial investigation based on the health risks posed by floods and water damage. (Doc. 640, Ex. B). Therefore, the fact that MSD provided this cleaning service for the VFW's property and paid for such service is not evidence that MSD is responsible for the damage to the VFW's real and personal property. In addition, to the extent the VFW disputes that MSD or its contractor had the authority to remove certain items during the cleaning process, the Court notes that the property offsite disposal report forms are all signed and dated by a VFW representative and thus signify the VFW's permission to remove the items listed. (Doc. 1434 at 30-38).

This is the first case faced by the Court involving SBU claims resulting from the historic February 2018 Ohio River flooding and the interpretation of the Consent Decree under these circumstances. The frustration expressed by the representatives of the VFW at the hearing is understandable, and the Court is not unsympathetic to the losses sustained by the VFW and its membership. However, the undersigned magistrate judge is responsible for ensuring that any costs for damages to private property such as the VFW that must be paid by MSD (and ultimately the rate payers of Hamilton County) under the Consent Decree are the result of the backup of wastewater into the property due to inadequate capacity in MSD's Sewer System or MSD's negligence. The VFW has not met its burden of showing that the flooding of the lower level of the building on February 25, 2018 was caused by inadequate capacity in MSD's sewer system or MSD's negligence. The Consent Decree's SBU claims process does not provide a remedy for the VFW under the circumstances of this case. Therefore, the VFW's appeal is

denied.

**IT IS SO ORDERED.**

Date: 1/3/19

Karen L. Litkovitz, Magistrate Judge
United States District Court