**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

United States of America, *et al.*,

       Plaintiffs,

v.

Board of County Commissioners,
Hamilton County, Ohio, *et al.*,

       Defendants.

Case No.  1:02cv107

Judge Michael R. Barrett

**OPINION & ORDER**

This matter is before the Court upon a myriad of pleadings submitted by the parties related to the Consent Decree entered into by the parties in June of 2004.[1] However, the Court will focus on four, fully-briefed pending motions:

- The Hamilton County, Ohio Board of County Commissioners' Dispute Resolution Petition.  (Doc. 1501).

- The City of Cincinnati's Motion to Clarify the Magistrate Judge's June 26, 2014 Order.  (Doc. 1502).

- The Hamilton County, Ohio Board of County Commissioners' Motion to Solve Dysfunction at MSD, to Have the County and City Move Forward Together to Ensure Consent Decree Compliance, and to Prevent Future Violations of the Consent Decree.  (Doc. 1649).

- The Hamilton County, Ohio Board of County Commissioners' Motion to

---

[1]Rather than repeat the entire history of the Consent Decree, which already appears in multiple places in the record, the Court will only briefly explain that the City and County entered into the Consent Decree after the United States Environmental Protection Agency ("EPA"), the State of Ohio, and the Ohio River Valley Water Sanitation Commission (collectively "the Regulators") sued the City and County for violations of the Clean Water Act and similar Ohio laws and regulations.  The Consent Decree establishes a comprehensive framework under which the County and City must develop and implement a long-term plan for major infrastructure improvements to address the capacity and pollution problems within the Metropolitan Sewer District's ("MSD") sewer system.  (Doc. 725, PAGEID# 12462).

Enjoin/Motion to Show Cause.  (Doc. 1815).

While the City and the Hamilton County Commissioners ("the County") have raised a number of issues in these motions, at the root of the current controversy is the submission of the Phase 2A Schedule of Work required by the Consent Decree.[2]  This work is part of the Wet Weather Improvement Program ("WWIP").  The City and County have submitted separate proposals for the Phase 2A Schedule of Work to the Regulators. In response to the competing proposals, the Regulators have imposed their own Phase 2A schedule, which Defendants are required to implement unless and until another Phase 2A schedule is approved by the Regulators or determined by the Court through dispute resolution.[3]

---

[2]Section IX of the Consent Decree provides:

B. Schedule for Implementation of WWIP

On January 6, 2010, the United States/State/ORSANCO approved the Final Wet Weather Improvement Program (Final WWIP). The deadline for completion of all remedial measures specified in the Final WWIP must be as expeditious as practicable, but the remedial measures may be implemented in phases consistent with the deadlines and approach set forth in the Final WWIP. Except as set forth in the Final WWIP, Phase 1, which includes the projects set forth in Attachments IA, 1B, and IC of the Final WWIP, must be completed by December 31, 2018. By June 30, 2017, Defendants shall submit a schedule that is as expeditious as practicable to the United States/State/ORSANCO for additional Final WWIP projects to be constructed (Phase 2). Defendants may propose a Phase 2 schedule for only a subset of the remaining Final WWIP projects (phase 2A), with construction of the remainder of the Final WWIP projects to be scheduled as part of an additional final phase (phase 2B), with the schedule for Phase 2B due at a later date specified in the Phase 2A schedule, provided that the Phase 2B schedule must also be as expeditious as practicable. Defendants may request additional phase(s) beyond Phase 2B only if they can demonstrate that the additional phase is necessary to avoid severe financial hardship and that the schedule for completion of remedial measures in that phase is as expeditious as practicable.

[3]Section XIV of the Consent Decree sets forth the procedure for dispute resolution:

C.     Except as provided in Paragraph B, above, any dispute that arises with respect to the meaning, application, implementation, interpretation, amendment or

2

The County seeks an order from this Court which would require the Regulators to accept the Board's Phase 2A Schedule of Work for review and reject the City's Phase 2A Schedule of Work.  It appears that the parties agree that the Court should rule on the County's pending dispute resolution, even if they seek different outcomes.  However, before reaching this central issue, the Court must address the related questions raised by the parties in their motions.

The first question is: who is in charge?  In 1968, the City and County entered into an Agreement ("1968 Agreement") to consolidate the sewer systems operated by the City and the County.  This led to the creation of the Metropolitan Sewer District of Greater Cincinnati ("MSD").  The 1968 Agreement set forth the rights and responsibilities of the City and County with respect to the operation of MSD.

In its Motion to Clarify the Magistrate Judge's June 26, 2014 Order (Doc. 1502), the City asks this Court to declare that the County's role as principal is limited to the terms of the 1968 Agreement and cannot impede or destroy the City's role as sole operator and manager of MSD.  This Court has already explained that according to the 1968

---

modification of this Consent Decree, or with respect to Defendants' compliance herewith (including the adequacy of the Defendants' performance of the remedial measures and adequacy of the submittals required  by this Decree) or any delay hereunder, the resolution of which is not expressly provided for in this Consent Decree, shall in the first instance be the subject of informal negotiations.  If any Party believes it has a dispute with any other Party, it shall notify all the other Parties in writing, including notice to the U.S. Department of Justice and the Ohio Attorney General, setting forth the matter(s) in dispute, and the Parties will proceed initially to resolve the matter in dispute by informal means.  Such period of informal negotiations shall not exceed thirty (30) days from the date the notice was sent, unless the Parties agree otherwise.

D.     If the informal negotiations are unsuccessful, the position of the United States and the State shall control unless, within twenty (20) days after the conclusion of the informal negotiation period, the Defendants invoke the formal dispute resolution procedures of this Section by serving on the United States and the State a written statement of position on the matter in dispute.

Agreement, "the City is the agent of the County for the operation and maintenance of the sewer system and is subject to the control and direction of the County in all matters related to those functions." (Doc. 725, PAGEID# 12478). In the *United States v. Bd. of Cty. Comm'rs of Hamilton Cty.*, 937 F.3d 679 (6th Cir. 2019), the Sixth Circuit likewise recognized that the 1968 Agreement established a principal-agent relationship between the County and the City. The Court finds it unnecessary to clarify the principal-agent issue any further and finds the City's Motion to Clarify the Court's 2014 Order (Doc. 1502) is moot.

While it is settled as a legal matter that the County is the principal and the City is the agent, that does not necessarily answer the question of who is in charge. As the City points out, the 1968 Agreement requires the City "in an efficient and businesslike manner" to plan, design, contract for, and supervise the construction of all sewage facilities; recommend the methods for financing sewerage facilities; advertise, purchase, let contracts, and make payments for all materials and services necessary for the management of the utility; prepare financial statements for the County and governmental agencies; and maintain all property utilized for sewer facilities. (Doc. 1550-1, 1968 Agreement, § VIII). In fulfilling these responsibilities, the City is not required to robotically follow every directive from the County. The MSD employees have the expertise and professional know-how for planning and implementing projects which meet the Consent Decree requirements. The County should place strong reliance on the advice it is given from these MSD professionals, but ultimately, it is the County which remains responsible for the operation of MSD. The 1968 Agreement provides that "authority and control of the sewer system of the sewer district shall remain vested in the [Board of County]

4

Commissioners including, but not limited to, the major responsibilities of fixing sewerage service charges, adopting Rules and Regulations and approving capital improvement programs, and undertaking the necessary legislation therefor." (Doc. 1550-1, 1968 Agreement, § IV).

Rather than carrying out these responsibilities in a cooperative manner, the relationship between the City and County has been marred by what the County refers to as "dysfunction" or "ongoing County-City governance disputes." Yet, this is a relationship where one party needs the other to function. To the extent that there is "dysfunction" in the relationship, one party is not to blame more than the other. The Court cannot order the dysfunction to stop, and is reluctant at this time to assert more control.[4] Like any relationship, there needs to be communication, honesty, cooperation, understanding, trust and a lack of judgment. Rehashing or revisiting what has happened in the past does not move the relationship forward. It is a waste of precious time and rate-payers' money. It does not serve the citizens who are depending on these two governmental bodies to do their best with the resources available. According to the Regulators, the MSD sewer system continues to discharge an estimated 8 billion gallons of illegal, untreated sewage into area waterways in a typical year and approximately 218 projects still need to be completed as part of the Consent Decree. The parties must begin the planning of the Phase 2A schedule to continue the tremendous progress already made on Consent Decree projects.

In doing so, the City is reminded that it is not an independent contractor. While the City serves as an agent to the County, it also indirectly serves the other municipalities

---

[4] At this time, the Court declines to grant the Sierra Club's request to appoint a special master or "administrator." (Doc. 1819, PAGEID # 42682).

which rely on MSD services. To be clear, the MSD is not a City of Cincinnati department which is funded by the County and it should not be treated that way. However, the County is reminded that it should not micromanage MSD, but needs to allow MSD to do its job. In this regard, the County Monitors' involvement has not been productive. At the same time, the City cannot use its objection to the County Monitor to cut off the flow of information the County needs to do its job of protecting rate-payers' interests.

All of that is to say that the County and the City need to shift their focus from the past and create a structure and process for the future. The Court remains prepared to assist the parties in moving in this direction and resume mediated discussions. If the parties are not able to stop the finger-pointing and begin to work collaboratively, the Court will be forced to implement more draconian measures consistent with this Court's power to enforce the Consent Decree.

The next question is: has the "dysfunction" resulted in a violation of the Consent Decree? The County argues that the City has committed three breaches of the Consent Decree and this Court's orders: (1) purposefully hiding information from the Board during the MSD budget hearings; (2) failing to follow Board guidance on the 2020-2024 MSD capital improvement program; and (3) submitting information to the Regulators, including a new, second City alternative Phase 2A schedule. The City responds that these "breaches" are instead disagreements about what constitutes both "sound engineering practices, consistent with industry standards" and "sound management, operational, and maintenance practices, consistent with industry standards," which both the City and the County are required to use in achieving expeditious implementation of the Consent Decree. (See Doc. 1475, PAGEID# 32601-02) (quoting Consent Decree at § IV)).

6

Pursuant to the terms of the Consent Decree, this Court has jurisdiction to "enforce the terms and conditions and achieve the objectives of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation, or execution of this Decree." At this time, the Court is not prepared to turn disputes which are not directly related to the objectives of the Consent Decree into violations of the Consent Decree. Therefore, the Court will not address the County's claim that the City has been hiding information or failing to follow guidance from the County. As to the County's objection to the City's second alternative Phase 2A schedule, the City explains that this was not a Phase 2A schedule, but is a "Validation Report," which the City submitted at the request of the Regulators. The City explains that the Validation Report is the MSD professionals' best, most accurate information about the Regulators' proposed plan. The City recognizes that the Validation Report was contingent upon the County's ultimate budgetary authority. The Regulators do not view the submission of the Validation Report as a violation of the Consent Decree. The Regulators maintain that by forbidding the City to discuss these issues with the Regulators, and then also refusing to discuss them itself until some undetermined time in the future, the County is dragging out the Phase 2A scheduling process. The Court concludes that the Validation Report submitted by the City does not rise to the level of a Consent Decree violation but is instead part of the scheduling process for the next phase of the remedial measures under the Consent Decree.

The Court now turns to the final question: which plan? The County maintains that as the principal of MSD, its Phase 2A schedule should be the one accepted by the

Regulators. The Court agrees, but that does not end the discussion.[5] The Court is not deciding that the County's Phase 2A schedule must be implemented. As the Regulators point out, the Consent Decree sets forth a review process. The Regulators must approve the Phase 2A schedule. If the Regulators decline to approve and provide comments, the City and the County will have a choice between revising the proposed Phase 2A schedule within 60 days or commencing dispute resolution again. The County says that this process cannot be a three-party negotiation, but must be a negotiation only between the County and Regulators, with the County being fully supported by the MSD executives and their key consultants. Again, the Court agrees. However, the City remains a Defendant in this case and has certain responsibilities under the 1968 Agreement. For instance, the City explains that the County's Phase 2A plan states that costs were provided by MSD, but the plan does not acknowledge that most costs were rough estimates. The City claims that the County has not allowed MSD to provide updated estimates or, in some cases, to perform the planning and design required to improve the accuracy of estimated costs. If the City and County continue to function in this manner, neither will be able to fulfill their obligations under the Consent Decree. Previously, the City and County were able to reach an agreement which resulted in the MSD Transition and Cooperation Agreement Commitment Letter. (Doc. 1013-1). The Court remains hopeful that if the City and County resume mediated discussions, they can again reach an agreement which will provide a structure and process which will result in the Consent Decree obligations being completed.

---

[5] Sierra Club asks that, because of the resulting delays in implementing Phase 2 caused by the dispute resolution process, the Court should, as a remedy, impose the Regulators' Phase 2A plan. However, the Court declines to do so at this time.

Based on the foregoing, the Court hereby ORDERS that:

1. The Hamilton County, Ohio Board of County Commissioners' Dispute Resolution Petition (Doc. 1501) is **GRANTED**;

2. The City of Cincinnati's Motion to Clarify the Magistrate Judge's June 26, 2014 Order (Doc. 1502) is **DENIED AS MOOT**;

3. The Hamilton County, Ohio Board of County Commissioners' Motion to Solve Dysfunction at MSD, to Have the County and City Move Forward Together to Ensure Consent Decree Compliance, and to Prevent Future Violations of the Consent Decree (Doc. 1649) is **DENIED**;

4. The Hamilton County, Ohio Board of County Commissioners' Motion to Enjoin/Motion to Show Cause (Doc. 1815) is **DENIED**.

   **IT IS SO ORDERED.**

     /s/ Michael R. Barrett     
Michael R. Barrett
United States District Judge