UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br> Plaintiffs, <br><br> vs. <br><br> BOARD OF HAMILTON COUNTY <br> COMMISSIONERS, et al., <br> Defendants. | Case No. 1:02-cv-107 <br> Barrett, J. <br> Litkovitz, M.J. <br><br><br> ORDER RE: REQUEST <br> FOR REVIEW BY <br> CLAUDETTE DAVIS |

This matter is before the Court on the Request for Review of the denial of a Sewer Backup ("SBU") claim by Claudette Davis (Doc. 2016) and the response of the Metropolitan Sewer District of Greater Cincinnati ("MSD") (Doc. 2024).  Ms. Davis's request for review is filed under the Sewer Back Up[1] Claims Process Plan (formerly known as the Water-in-Basement [WIB] Claims Process Plan).  (Doc. 131, Consent Decree, Exhibit 8).   On November 7, 2022, the Court held a hearing on Ms. Davis's request for review at which Ms. Davis and MSD Assistant Superintendent and SBU Response Program Manager Tom Fronk testified.

The Consent Decree in this case establishes a framework for ensuring that MSD addresses capacity and pollution problems with its sewer system.  This framework includes a sewer backup component under which MSD must "take measures to prevent back-ups of the sewer system into residences in Hamilton County, to clean up back-ups when they occur[], and to reimburse residents for damages."  (Doc. 454 at PAGEID 7495, citing Doc. 131).  The instant matter before the Court involves two SBU programs: the Prevention Program and the Claims

---

[1]The "Water-In-Basement" program has been renamed the "Sewer Back Up" program to more accurately reflect MSD's responsibility for sewage backups caused by inadequate capacity in MSD's sewer system.  *See* Doc. 452 at PAGEID 7475; Doc. 454 at PAGEID 7509.

Program.[2]

The SBU Prevention Program is designed to prevent the occurrence of building backups. Subject to the requirements of the Prevention Program, property owners who experience multiple wastewater backups into their buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) are eligible to have systems or devices installed on their property to prevent future wastewater backups. These preventive systems or devices are installed at no cost to eligible property owners who meet the Prevention Program requirements. The Prevention Program is not intended to address water in buildings caused by: 1) overland flooding not emanating from MSD's Sewer System; or 2) blockages in lateral or public sewer lines. (Doc. 131, Consent Decree, Exhibit 6 at 1). Under the Prevention Program, MSD utilizes a variety of remedial measures to address SBU, including the installation of backflow preventers and pumping systems on private property.

The SBU Claims Process Plan states in relevant part:

> Subject to the requirements of this Plan, occupants who incur damages as a result of the backup of wastewater into buildings due to inadequate capacity in MSD's Sewer System (both the combined and the sanitary portions) can recover those damages. This plan also provides a means for occupants to recover damages arising from backups that are the result of MSD's negligent maintenance, destruction, operation or upkeep of the Sewer System. The Claims Process is not intended to address water in buildings caused by overland flooding not emanating from MSD's Sewer System or caused by blockages in occupants' own lateral sewer lines.

(Doc. 131, Consent Decree, Exhibit 8 at 1). In determining the cause of SBU, MSD must exercise its good faith reasonable engineering judgment and consider the following non-exclusive factors: amount of precipitation, property SBU history, condition of the sewer system

---

[2]Under the Consent Decree, the Magistrate Judge has jurisdiction to hear any matter in dispute between homeowners and MSD arising from the Sewer Back Up program. (Doc. 509 at PAGEID 8161).

in the neighborhood, results of a visual inspection of the neighborhood to look for signs of overland flooding, neighborhood SBU history, capacity of nearby public sewer lines, and topography. (Doc. 131, Consent Decree, Exhibit 8 at 2). Damages arising from basement backups for which MSD is responsible are limited to documented real and personal property. *Id*. Homeowners who are dissatisfied with MSD's disposition of a claim under the SBU claims program may request review of the decision by the Magistrate Judge, whose decision is binding and not subject to any further judicial review. (Docs. 154, 190).

**I. Background**

Ms. Davis is the owner of the property located at 3017 Westknolls Lane, Cincinnati, Ohio. On April 15, 2022, Ms. Davis filed an SBU claim with MSD seeking compensation for property damage allegedly resulting from a sewer backup on February 23, 2022. (Doc. 2024, Ex. F). MSD denied the claim for property loss, finding the damage was not caused by a sewer backup covered by the SBU program. (Doc. 2024, Ex. H). Ms. Davis disagreed with MSD's decision and filed a request for review in this Court.

**II. Evidence**

In 2007, MSD installed a Sanitary Pump System and a Storm Water Pump System at Ms. Davis's property under the SBU Prevention Program. The internal plumbing, including the basement floor drains, are connected to the Sanitary Pump System located in Ms. Davis's front yard. The driveway drain is connected to the Storm Water Pump System located in Ms. Davis's garage.

3

On November 28, 2007, Ms. Davis executed the "Covenant and Agreement" that contains the terms and conditions of her participation in the SBU Prevention Program. (Doc. 2024, Ex. I). As part of the SBU Prevention Program Agreement, Ms. Davis agreed:

- to allow MSD and individuals working on its behalf to "come onto [her] property to investigate conditions that may contribute to basement backups, and to install and maintain [SBU] prevention measures." (*Id.* at Section I, p. 2 of 11).

- to "operate installed [SBU] prevention measures in accordance with instructions provided by MSD or people/businesses working for MSD." (*Id.*).

- to "grant permission to MSD employees and agents to enter on to the subject property . . . for purpose of investigation, design, inspection, construction, final acceptance and maintenance of the Program Improvements."[3] (*Id.* at Section III).

- "to undertake responsibility for proper daily operation and use of the Program Improvements in accordance with the description of daily operation and use." (*Id.* at Section V.1). "Proper daily operation and use" is defined to include:
    - **Pumps**. Do not flush explosives, strong chemicals, oil or grease, glass, metal, diapers, rags, clothing, plastic objects, sanitary napkins or tampons, litter, rock, or other hard substances. …
    - **Piping**. Keep all associated piping free and clear of all debris that could result in a blockage. ***Do not dump grease or oils***. Obtain the services of a licensed plumber as needed to clear any debris from piping. (*Id.* at Section V.2 (emphasis added)).

- to "maintain its plumbing systems and sewer lateral in such a manner as to not negatively affect the operation of the Program Improvements installed by MSD." (*Id.* at Section IV.4; Section V. 4).

- "to contact MSD in the event of a problem with the Program Improvements." (*Id.*).

- that "(f)ailure by the Property Owner to operate the Program Improvements in accordance with the operating instructions or the proper daily operation and use obligations set out above, resulting in damage to the Program Improvements,

---

[3] The term "Program Improvements" is defined in the SBU Prevention Program Agreement to include, for example, backflow preventers and pumping systems. (*Id*. at Section II, p. 2 of 11).

> may be cause for MSD to seek reimbursement of costs for repairing or replacing any damaged equipment." (*Id*. at Section V.5).

On February 24, 2022, Ms. Davis contacted MSD to report that her property had experienced basement flooding on February 23, 2022 and that the pump alarm was going off. After Ms. Davis's report, MSD contacted its contractor, BlueChip Plumbing ("BlueChip"), to investigate and test the outdoor Sanitary Pump System. BlueChip responded to the property on February 24, 2022. BlueChip arrived at Ms. Davis's property and reported the following:

> Ms. Davis poked her head out door and proceeded to tell us to get off her property now and cussed us out the whole time. I got the lid off slapped the pump float and alarm float to separate from e[x]cessive amounts of grease caked on both floats inhibiting the pump from functioning.

(Doc. 2024, Ex. D). At the hearing, Ms. Davis acknowledges that she told one woman from BlueChip to get off her property because the woman was disrespectful. She denies that she told the other crew member to leave the property.

Mr. Fronk testified that on the following day, he arrived at Ms. Davis's property and spoke with Ms. Davis about BlueChip's investigation process. Ms. Davis consented to the investigation. The crew removed the lid of the outdoor Sanitary Pump System and Mr. Fronk observed a lot of grease build up – multiple 5 gallon buckets' worth – in the pump basin, which he stated caused the pump to malfunction. BlueChip reported that the alarm float was covered in grease. BlueChip cleaned off the grease and tested the alarm several times. (Doc. 2024, Ex. E). Mr. Fronk testified that Ms. Davis opened her door, stepped onto her porch, cursed at the technicians, and ordered one of the technicians to leave the property, which she did. Mr. Fronk testified that Ms. Davis came to her porch a second time, cursed at Mr. Fronk and the remaining technician, and ordered them to leave her property. BlueChip attempted to check the Storm

5

Water Pump System in the garage but were unable due to Ms. Davis's demand that they leave the property.  Mr. Fronk explained that they would leave, but they needed to replace the lid on the Sanitary Pump System basin.  He testified that Ms. Davis told them not to replace the lid and immediately leave the property.  Mr. Fronk stated they replaced the lid anyway because the open 12 foot deep basin in the front yard presented a safety hazard.

Mr. Fronk testified that the grease he observed in Ms. Davis's Sanitary Pump System would have to come from the internal plumbing of the home, most likely the kitchen sink.  He stated that the grease would not have originated from the public sewer system because the check valve on the Sanitary Pump would prevent any debris and other substances from the public sewer from entering the pipe of the basin.

Mr. Fronk testified that MSD's next contact with Ms. Davis was on April 30, 2022.  Ms. Davis contacted MSD to report a Storm Water Pumping System alarm.  Mr. Fronk telephoned Ms. Davis prior to BlueChip's arrival to ensure they would be permitted on the property.  Ms. Davis authorized the work when they arrived.  The technicians determined that a new pump was needed for the system.  While the technicians waited for the new pump to arrive, Mr. Fronk instructed them to check the Sanitary Pump System.  The technicians observed two feet of grease in the basin and called a pump truck to suction out the grease from the basin. (Doc. 2024, Ex. G).

Ms. Davis testified that she did not recall telling Mr. Fronk or the technicians to leave her property on February 25, 2022.  She testified she would not have turned down the help.  Ms. Davis states she has been in her house for 24 years, and it has flooded 17 times.  She was living in a retirement home for a year and had only been back in her house one month prior to the

6

February 2022 incident.  Ms. Davis also testified she uses a can to dispose of kitchen grease, so she does not believe the internal plumbing was the source of the grease in the basin.

**III.  Resolution**

As an initial matter, both SBU programs involved in this case require homeowners to permit MSD or its contractors access to the homeowner's property to perform necessary investigations.  The SBU Claims Process Plan requires occupants to "allow MSD personnel and/or contractors reasonable access to the affected property to investigate the cause of the [SBU]." (Doc. 131, Ex. 8 at 1).  Likewise, as a participant in the SBU Prevention Program, Ms. Davis agreed to allow MSD contractors access to her property to maintain the pumping devices. (Doc. 2024, Ex. I).

The Court finds that Ms. Davis's actions in this case prevented MSD from investigating the cause of her February 23, 2022 basement flooding, such that the Court is unable to conclude there is a qualifying SBU in this case.   The preponderance of the evidence shows that Ms. Davis did not allow MSD workers to remain on her property on February 24 and 25, 2022 to fully investigate the cause of her basement flooding.  This prevented MSD's contractor from inspecting and removing grease from the Sanitary Pump System basin and completing its investigation into the cause of the reported sewer backup.  In addition, the evidence indicates that a significant amount of grease was observed in the Sanitary Pump System basin and coating the pump float, which prevented the device from operating as designed.  The credible evidence shows that the likely source of the grease was from Ms. Davis's internal plumbing and not the public sanitary sewer, given the presence of a check valve that would have prevented sanitary sewer debris from entering the pump system.  As part of the SBU Prevention Program, Ms.

7

Davis was responsible for maintaining her plumbing systems so as not to negatively affect the operation of the pumps, including not dumping grease or oil into the internal pipes and plumbing.  The preponderance of the evidence indicates Ms. Davis did not comply with her maintenance and daily operation obligations given the presence of excessive grease caking the Sanitary Pump System.  For these reasons, the Court is constrained to uphold MSD's decision in this case.  Ms. Davis's appeal is **DENIED.**

    **IT IS SO ORDERED**.

Date: 1/6/2023

Karen L. Litkovitz, Magistrate Judge
United States District Court